UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

PETER ALLEN, BRIAN BERNARD, MARK DANIELS, SHANNON DICKINSON, AARON DOCKERY, EDDIE FIELDS, JOHN GRADIA, ANGEL HERNANDEZ, SPENCER JACKSON, HUGH KNIGHT, TERRY MATHIS, HAROLD ORTIZ, SEAN PRITCHETT, RASHID RAHMAN, FELIPE RIVERA-CRUZ, WAYNE STEWART, MICHAEL VATTIATO, DERRICK WILLIAMS, on behalf of themselves and others similarly situated

                    Plaintiffs,

                    v.

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION; CARL KOENIGSMANN, MD; JOHN MORLEY, MD; SUSAN MUELLER, MD; DAVID S. DINELLO, MD; PAULA BOZER, MD; JOHN HAMMER, MD; ANN ANDOLA, MD; MIKHAIL GUSMAN, MD; CHUN LEE, MD; JON MILLER, MD; KATHLEEN MANTARO, MD; PETER BRASELMAN, MD; DAVID KARANDY, MD; ALBERT ACRISH, NP; KRISTIN SALOTTI, NP; MARY ASHONG, NP; JOHN DOE #1, MD; JOHN DOE #2, MD; JANE or JOHN DOE, MD #3-#50; and JANE or JOHN DOE, NP or PA #1-#50

                    Defendants.

_____

**ECF CASE**

**CLASS ACTION COMPLAINT**

**19-cv-8173**

## PRELIMINARY STATEMENT

This a class action by patients in the custody of the New York State Department of Corrections and Community Services ("DOCCS") who require effective pain management and/or neuromodulating medication to treat chronic health conditions. After years of development, in 2017, DOCCS promulgated its Medications With Abuse Potential ("MWAP") Policy, authored by Defendant David S. Dinello and approved and implemented by his colleagues, Defendant Doctors Morley, Koenigsmann, Mueller, Bozer and Hammer. A benign reading of the MWAP Policy shows a stated goal of reducing the prescription of MWAPs in the correctional setting. MWAPs

include medications such as opioids, neuromodulating medications such as Neurontin and Lyrica and medications such as Baclofen and Flexeril administered to treat severe muscles spasms. For a medical provider within DOCCS to prescribe any of these MWAPs, the Policy demands the approval of a Regional Medical Director ("RMD") or the Chief Medical Officer ("CMO") before the prescription will be filled.  DOCCS administrators suggest this approval process is intended to "get physicians to think about alternative treatments" before prescribing the medications.  In truth and practice, the MWAP Policy strips medical treatment decisions from the medical providers and specialists who treat patients and puts it in the hands of remote medical administrators, who invariably deny the MWAP medications, no matter the patient's individual medical needs.   The wholesale denial of these medications especially effects an already vulnerable population: one that includes patients with severe spinal and neurological issues, phantom pain from amputations, multiple sclerosis and serious, chronic pain.  Many of the representative plaintiffs and purported class members were effectively treated with MWAP medications for years before their medications were abruptly stopped after implementation of the MWAP Policy.  This case does not involve "disagreements over proper medical treatment," nor a "patient's preferred treatment."  As the allegations make clear, the patients' treating physicians and specialists requested and/or recommended the medications based on their medical judgment and individualized assessments of the patients.  RMDs categorically refuse to approve the medications, based on the medication, not the needs of the patient or the recommendations of his/her treating physicians and specialists.  Once approval is denied, many class members are not even offered effective alternatives.  If anything, patients are offered one of a suite of psychiatric medications that are wholly inadequate to treat their chronic pain and/or neurological issues.

As the following allegations make clear, DOCCS has implemented a policy that demands the medical recommendations of outside specialists and treating physicians are completely dismissed and medications are discontinued or never prescribed due to a blanket policy. Plaintiffs argue that the MWAP Policy is unconstitutional as applied to patients for whom certain MWAP medications are the most (if not only) effective medications to treat their chronic pain and neurological issues. The implications of stripping effective pain control from an already vulnerable population are well-known to DOCCS and its medical personnel. On January 13, 2015, Alredo Lopez was found dead in solitary confinement in Great Meadow Correctional Facility. His suicide note stated that since medical staff had discontinued his nerve medication on December 26, 2014 he had not slept. His note stated that he could not take the chronic pain anymore. Despite this senseless death, as alleged below, DOCCS has promulgated the MWAP Policy exposing hundreds of patients to the wanton infliction of pain and suffering in violation of the *Eighth Amendment*.

## JURISDICTION AND VENUE

1.      This action arises under 42 U.S.C. § 1983, *et seq*.

2.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 (a)(3)-(4).

3.      The acts complained of occurred in the Southern District of New York and other jurisdictions throughout New York State, including the Western, Eastern and Northern Districts of New York. Venue is proper under 28 U.S.C. § 1391(b).

## JURY DEMAND

4.      Plaintiffs demand trial by jury in this action.

## THE PARTIES

**Defendants and State Actors**

5.      **DOCCS** is responsible for the confinement and rehabilitation of approximately 49,500 individuals in its custody at approximately 54+ state facilities.

6.      DOCCS is responsible for the medical care of all inmates in its custody.

7.      DOCCS receives state and federal financial assistance.

8.      Neither the New York Health Department of Health nor any other entity provides oversight to DOCCS' medical treatment, other than relating to infectious diseases like tuberculosis or hepatitis C.

9.      DOCCS medical administration effectively creates its own rules.

10.     **Carl Koenigsmann, MD ("Defendant Koenigsmann")** served as the Chief Medical Officer ("CMO") for DOCCS until late 2018. Defendant Koenigsmann is sued in his individual capacity.

11.     **John Morley, MD ("Defendant Morley")** currently serves as the current CMO for DOCCS.  Defendant Morley is sued in his official capacity.

12.     **Susan Mueller, MD ("Defendant Mueller")** is a Regional Medical Director ("RMD") and a treating physician at DOCCS. Defendant Mueller is sued in her individual capacity.

13.     **David S. Dinello, MD ("Defendant Dinello")** is an RMD and treating physician at DOCCS. He is sued in his individual capacity.  Defendant Dinello is Chairman of the Pharmacy and Therapeutic Committee for DOCCS.

14.     **Paula Bozer, MD ("Defendant Bozer")** is an RMD and treating physician at DOCCS. Defendant Bozer is sued in her individual capacity.  Defendant Bozer is on the Policy

Review Committee for DOCCS which oversees development and necessary changes in medical policy.  Defendant Bozer is the RMD for the Wende "hub."

15.     **John Hammer, MD ("Defendant Hammer")** is an RMD and treating physician at DOCCS.   Defendant Hammer is sued in his individual capacity.

16.     **Ann Andola, MD** ("Dr. Andola") is a physician who works for DOCCS.

17.     **Mikhail Gusman, MD** ("Dr. Gusman") is a physician who works for DOCCS.

18.     **Chun Lee, MD** ("Dr. Lee") is a physician who works for DOCCS.

19.     **Jon Miller, MD** ("Dr. Miller") is a physician who works for DOCCS.

20.     **Kathleen Mantaro, MD** ("Dr. Mantaro") is a physician who works for DOCCS.

21.     **Peter Braselman, MD** ("Dr. Braselman") is a physician who works for DOCCS.

22.     **David Karandy, MD** ("Dr. Karandy") is a physician who works for DOCCS.

23.     **Kristin Salotti, NP** ("Ms. Salotti") is a nurse practitioner who works for DOCCS.

24.     **Mary Ashong, NP** ("Ms. Ashong") is a nurse practitioner who works for DOCCS.

25.     **Albert Acrish, NP** ("Mr. Acrish") is a nurse practition who worked for DOCCS.

26.     **John Doe #1, MD** ("Dr. John Doe #1") is a physician who works for DOCCS.

27.     **John Doe #2, MD** ("Dr. John Doe #2") is a physician who works for DOCCS.

28.     **Jane or John Doe, MD #3 - #50** are physicians who work for DOCCS.

29.     **Jane or John Doe, Nurse Practitioners ("NP") or Physician Assistants ("PA") #1 - # 50** are Mid-Level Clinicians who work for DOCCS.

30.     **Facility Treating Physicians and Mid-Level Clinicians ("MDs and Mid-Level Clinicians")** are responsible for the medical treatment of prisoners within the facility where they work.  Facility doctors, physician assistants and nurse practitioners answer to the FHSDs, RMDs and CMO.

31.     **Consultants and Specialty Medical Providers** ("Consultants" or "Specialists") are medical professionals who practice either in DOCCS' Regional Medical Unit specialty clinics or outside of DOCCS at area hospitals, emergency rooms and specialty offices. Patients are sent to them for specialty assessment and treatment because DOCCS doctors and specialists do not possess the requisite expertise to treat the referred patient.

## FACTUAL HISTORY – HOW HEALTH CARE IS ADMINISTERED

### The Role of the Chief Medical Officer ("CMO")

32.     Defendant CMO Morley is the current ultimate arbiter of medical policy for DOCCS.

33.     Defendant CMO Koenigsmann was the ultimate arbiter of medical policy for DOCCS through late 2018.

34.     Though the CMO normally does not treat individual patients, the CMO is directly involved with DOCCS' Office of Counsel and the AG's office when a patient sues DOCCS, often coordinating with RMDs, treating physicians, mid-level clinicians and medical personnel on the facility level to review the patient's records and craft medical and legal responses. The CMO makes decisions that directly impact the health care of individual patients.

35.     Defendants Morley and Koenigsmann were responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment and medical health care policies.

36.     Defendants Morley and Koenigsmann are charged with developing and regularly updating clinical practice guidelines in an effort to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

37.     As alleged below, the CMO also reviews medical providers MWAP Request forms, approving or denying the provision of MWAP medications to patients.

**The Role of Regional Medical Directors ("RMDs")**

38.     Defendants Dinello, Bozer, Hammer and Mueller are also responsible for crafting policies and procedures for medical treatment of patients in DOCCS' custody, including overseeing primary care guidelines for treatment.

39.     Defendants Dinello, Bozer, Hammer and Mueller are charged with developing and regularly updating clinical practice guidelines to maintain consistency of care throughout the correctional setting and to stay current with scientific advances and community standards of treatment.

40.     Each RMD is responsible for a "hub."  A DOCCS' medical hub is a group of correctional facilities within a region.  There are five hubs within DOCCS.  As of early 2018, Defendant Dinello was in charge of two hubs, due to a staffing shortage of RMDs.

41.     The CMO and RMDs do not usually have access to the patient's full hard copy Ambulatory Health Record ("AHR"), which is handwritten and solely maintained at the facility where the patient is housed.

42.     However, RMDs, the CMO and other administrative personnel do have access to the "FHS1" electronic medical records system.  A patient's FHS1 records are electronically stored on a network accessible through monitors in each DOCCS facility or administrative office.

43.     The Facility Health Services Database ("FHS1") records include the patient's: 1) Medical Problem List; 2) history of prescriptions via the CIPS pharmacy system (as far back as 2016); 3) referral history to specialists; 4) history of non-formulary requests; and 5) history of ER

trips.  These FHS1 records allow DOCCS' RMDs to look up some relevant features of a patient's record, but not their daily treatment records held with their primary provider.

44.    Through the FHS1, RMDs have limited access to plaintiff class members' history of specialty appointments, hospital stays, prescription histories and medical problem lists.

**The Role of MDs and Mid-Level Clinicians**

45.    MDs and Mid-Level Clinicians are the Facility Health Services Directors, treating physicians and mid-level clinicians within DOCCS' 53+ facilities.

46.    The MDs and Mid-Level Clinicians are directly responsible for the healthcare of plaintiff class members.

47.    The MDs and Mid-Level Clinicians are directly responsible for examining plaintiff class members during sick call and scheduled examinations.  Along with nurses, MDs and Mid-Level Clinicians respond to the medical complaints of individual plaintiff class members regarding chronic pain and neurological issues.

48.    The MDs and Mid-Level Clinicians are directly responsible for sending plaintiff class members for specialist diagnostic testing including MRIs and electromamyograph ("EMG") testing which assesses the health of muscles and motor neurons.

49.    The MDs and Mid-Level Clinicians are directly responsible for prescribing medications available in the DOCCS' "Formulary Book" when a plaintiff class member requires prescriptive care.

50.    The DOCCS' "Formulary Book," lists all the medications available for doctors to prescribe without approval from an RMD.

51.     Formularies dictate what specific drugs in each therapeutic class are available to physicians to prescribe without further approval.  They are established to offer a limited but viable choice of drugs for most conditions.

52.     For prisons, formularies are also established to ensure that the drugs prescribed are convenient to administer in a correctional environment and have a low potential for abuse.

53.     As of September 2018, the most recent iteration of the DOCCS' "Formulary Book," included Neurontin as a formulary medication.  To prescribe, a provider "requires a diagnosis on the prescription;" it must be "nurse administered;" and it is "non-formulary for an O[ffice] of M[ental] H[ealth] diagnosis and use."

54.     MDs and Mid-Level Clinicians cannot prescribe medications that are "Non-Formulary" without the approval of an RMD.

55.     Historically, Non-Formulary medications included narcotics, medications "Scheduled" in accordance with the Controlled Substances Act, and medications not generally carried in DOCCS' pharmacies.

56.     If an MD or Mid-Level Clinician prescribe a Non-Formulary medication he/she must submit a Non-Formulary Request to an RMD for approval through the FHS1 system.

57.     To submit the Non-Formulary Request for approval, MDs and Mid-Level Clinicians supply information to the RMD, including 1) Name of person requesting med, if not MD 2) whether the medication is a Consultant[or Specialist] Recommendation 3) Generic or trade name of non-formulary drug 4) dose, frequency, dosage form, quantity requested, prior approval number; 5) Condition treated 6) Other associated conditions 7) Formulary alternatives tried (must list medication, dose, frequency and duration; 8) Comments.

58.     An RMD reviews the Non-Formulary Request and adds comments along with his/her initials to show approval, along with an Approval number for tracking with the pharmacies.

**The Role of Consultants and Specialty Medical Providers**

59.     MDs and Mid-Level Clinicians are directly responsible for issuing referrals for patients to outside consultants and specialists when MDs and Mid-Level Clinicians not skilled or experienced enough to diagnose or treat specific conditions.

60.     DOCCS spends hundreds of millions of dollars in state funds for consultant and specialist services to treat DOCCS' patients in the form of contracts with institutions like Albany Medical Center, Erie County Medical Center, Westchester County Healthcare and Montefiore Mount Vernon Hospital.

61.     According to Defendant Dinello, "If the patient has a medical issue that we need help managing, we would send them to a referral, a consultant, to help us manage the case."

62.     DOCCS Health Services Policy states, "Referrals for outpatient care will be requested only when necessary medical assessment and treatment services are not available from facility primary care providers."

63.     To facilitate a Referral, an MD or Mid-Level Clinician submits a "Request and Report of Consultation" ("Referral") that includes a synopsis of the patient's particular medical issue drafted by the referring medical provider on the facility level and the reasons he/she believes a visit with a specialist is necessary.

64.     At the appointment, the specialist then fills out his/her findings on the bottom half of the "Referral," generally in hand.  Sometimes the specialist attaches his/her computer-generated

report, like an EMG reading.  The specialist report is then given to the MDs and Mid-Level Clinicians for review.

65.    The MDs and Mid-Level Clinicians personally review the reports and recommendations of specialists who treat the plaintiff class members.

66.    To record the fact that an MD or Mid-Level Clinician has reviewed the specialist report and recommendation, he/she initials the report with the date of review.

67.    The MD or Mid-Level Clinician then makes a notation in the patient's AHR regarding the findings and recommendations of the specialist.

68.    The MDs and Mid-Level Clinicians are directly responsible for prescribing specialist-recommended medications.

69.    Treating consultants or specialists have no ability to directly ensure prescriptions to DOCCS' patients, they can only make recommendations to the treating MDs and Mid-Level Clinicians through their reports.

70.    According to Division of Health Services Policy 3.02 "Medication Orders Within DOCCS Facilities," procedure, "Consultants [and/or Specialists] may recommend medication treatment for inmates, but it is the responsibility of the Department's primary care provider to review the consultant's recommendations and determine the course of therapy.  The facility prescriber may modify or decline the recommendations but ***___must document their reasons for doing so___*** in the Ambulatory Health Record."

71.    In the voluminous medical records of the representative patients, **__NOT ONCE__** did MDs or Mid-Level Clinicians document the reasons for ignoring or dismissing the prescriptions and recommendations of outside consultants and specialists after the MWAP Policy was promulgated.

**The Intake Process for Patients**

72.    When a male patient is first 'drafted in' to DOCCS he generally resides at Downstate Correctional Facility ("Downstate") or another 'intake' facility until staff conducts a medical assessment and a department called "Movement and Classification" determines the best housing for the patient.

73.    The medical staff at Downstate maintains a patient on all the medications and prescriptions he was taking before being "drafted in" to ensure continuity of care.

74.    Upon transfer to a facility for housing, a nurse conducts an "assessment,' of the patient.  If an inmate needs medications prescribed, a medical provider is given the medication list to review.

75.    To quote sworn testimony of a DOCCS physician, "[we] continue the meds we feel that [are] appropriate or discontinue meds we feel are not appropriate."  This arrangement can abruptly interrupt or end a patient's treatment.

76.    However, Defendant MDs and Mid-Level Clinicians often do not see or examine the patient, nor do they review the medical charts before stopping or re-prescribing medications on intake.  Sometimes, the patient's AHR has not even arrived with them.

77.    Long before promulgation of the MWAP Policy, the abrupt discontinuation of medications was based on nothing more than a facility "policy," as each FHSD and/or physician initiated his/her own preferences with little regard to continuity of care or the needs of the patient.

78.    A patient can be bounced around facilities and have his medications changed each and every time at the whim of medical personnel once he is in the system.

79.    However, before promulgation of an MWAP Policy, if a patient was lucky and ended up at a facility with good health care practitioners, the patient could receive compassionate,

appropriate and constitutionally adequate medical care, including MWAP medications to treat his chronic pain or neurological issues.

**Medications With Abuse Potential**

80.     On its MWAP list, DOCCS has included a group of rather ubiquitous medications.

81.     Ultram (generic name "Tramadol") is a pain management medication used to treat moderate to moderately severe pain in patients.  The dose should be individualized to a patient's needs and a patient should not take more than necessary to control his/her pain.  Ultram is considered a lower risk alternative for Percocet or other narcotics or opiates.[1]

82.     Lyrica (generic name "Pregabalin") is used to treat fibromyalgia, diabetic nerve pain, spinal cord injury nerve pain and other nerve related pain symptoms.  Lyrica is often prescribed in lieu of Neurontin or when Neurontin fails for any number of reasons.[2]  Lyrica is a scheduled medication.

83.     Neurontin (generic name "Gabapentin") is an anticonvulsant generally taken to control seizures.  It is also often prescribed to relieve nerve pain and considered an alternative to Lyrica.[3]  Historically, in DOCCS, a patient is prescribed Neurontin if an EMG test shows neuropathy.

---

[1] To diminish confusion Plaintiff's counsel will refer to and quote all references to Ultram/Tramadol as "Ultram."
[2] To diminish confusion Plaintiff's counsel will refer to and quote all references to Lyrica/Pregabalin as "Lyrica."
[3] To diminish confusion Plaintiff's counsel will refer to and quote all references to Neurontin/Gabapentin as "Neurontin."

84.     Baclofen is a muscle relaxer and antispasmodic agent used to treat Multiple Sclerosis, spinal cord injuries and other spinal cord disorders.  There are no other medications that work in the same way Baclofen works.

85.     Flexeril (generic name "Cyclobenzaprine") is also a muscle relaxer that works by blocking nerve impulses to the brain.  Flexeril is used in short term doses to control muscle spasms.

86.     These medications are not risk free.  Like any medication they can be abused, but Neurontin and Lyrica are considered to have low addiction potential.

87.     The use of Ultram, Percocet, Oxycodone, Neurontin, Lyrica and Baclofen like any medications, certainly engender some risk.

88.     DOCCS, its physicians and mid-level clinicians have been aware of the risks of these medications for decades.

89.     DOCCS' physicians and nurses have submitted at least 41 sworn declarations in federal district courts in the Second Circuit since 2006 discussing the dangers of Neurontin and Ultram within the prison population due to risk of abuse.

90.     Nonetheless, like all physicians, DOCCS physicians and mid-level clinicians continued to prescribe the medications when appropriate as effective treatment for patients' ailments.

91.     To adapt to the risks of diversion and abuse, DOCCS has developed a number of policies over the last twenty years including 1) the administration of the medications one-on-one, meaning a nurse watches as the medication is taken by a patient; 2) the crushing and dilution in water so a patient must drink the medication; and, most recently, 3) the administration of certain medications, including Neurontin, in liquid form.

92.     DOCCS can also (and sometimes does) administer a simple blood test that measures the amount of Neurontin in a patient's blood stream, as well as the presence of any other illicit medications or drugs.  This allows doctors to tell whether a patient is diverting medication or is at risk of negative interactions with other medications or drugs.

93.     Having a patient's blood tested for Neurontin and illicit drug levels costs DOCCS no additional money.  DOCCS has a $40,000,000.00 contract with BioReference Laboratories that covers the cost of all testing.

94.     If an RMD, MD or Mid-Level Clinician is concerned about an individual patient's diversion or misuse of MWAP medications, he/she can easily request a blood test to confirm or deny the concerns.

**Standard of Care in the Correctional Environment**

95.     As implemented, the MWAP Policy is an almost wholesale restriction on the prescription of MWAPs.  A complete ban on such medications does not comport with the standards adopted by other prison systems or the Standard of Medical Care in the community.

96.     For instance, NYS DOCCS is an accredited member of the National Commission on Correctional Health Care ("NCCHC").

97.     In 2018, the NCCHC published a position statement on "Management of Noncancer Chronic Pain."

98.     The position states, "Because complaints of chronic pain are common in corrections, corrections clinicians must address the challenges presented.  The use of adjunctive medications such as opiates or GABA analogues [these include Neurontin and Lyrica] is particularly troublesome in the correctional environment because of very high percentage of inmates have a history of substance abuse, chemical dependency, and misuse of prescription

medications . . . On the other hand, the confinement environment provides opportunities to obtain information (e.g., a patient's physical activities in the housing unit, at recreation, and at work) that can be important when assessing function and when reviewing the efficacy of treatment . . . Therefore, when patient function remains poor and pain is not well controlled, and other options have been exhausted, a therapeutic trial of medication, including opioids, should be considered. . . Clinicians should not approach the treatment of chronic pain as a decision regarding the use or nonuse of opioids (as in acute pain). Rather clinicians should consider all aspects of the problem and all available proven modalities."[4]

99.     In its further statement, NCCHC recommended: "Chronic pain should be addressed like other chronic medical conditions, in a systematic, objective, structured manner beginning with diagnosis and treatment planning and proceeding with structured and regular monitoring of progress.  Clinicians should establish measurable treatment goals for chronic pain and measure progress against them. . . They must be functional in nature, measured against the patient's established baseline . . . Most chronic pain can be managed through primary care clinicians. However, an interdisciplinary team approach is often beneficial, and specialty care, including pain management, should be available for patients whose function and chronic pain are not improved with treatment… Policies banning opioids should be eschewed.  Opiates should be considered with caution after weighing other treatment options."

100.    In June of 2018 the Federal Bureau of Prisons ("BOP") published its "Pain Management of Inmates," Clinical Guideline.[5]  Even the BOP clinical guideline does not prohibit the use of opioids or neuromodulating medications like Lyrica and Neurontin.

---

[4] https://www.ncchc.org/position-statements (last visited August 18, 2019.)
[5] https://www.bop.gov/resources/pdfs/pain_mgmt_inmates_cpg.pdf (last visited August 8, 2019).

101.     The BOP Clinical Guideline lists Neurontin and Lyrica as second line treatments for neuropathic pain after TCA and SNRIs.[6]

102.     The reality is that incarcerated patients have a higher-than-average prevalence of disease, as well as substance use disorders and psychiatric illness, often in combination.[7]

103.     Prison populations also have a higher than normal incidence of patients with major spinal cord injuries, due to traumatic events and gun violence.

104.     Treatment protocols are also necessarily different in prisons.  Diet modification, exercise and non-medicinal treatments are not as available.  Patients in prisons often wait months to see specialists, receive diagnostic testing, surgeries and follow-up care.

105.     Therefore, pharmaceuticals, which already play an important role in the U.S. health care system, may take on an even greater therapeutic importance in prisons.

106.     A December 2017 Pew Charitable Trust study found that use of prescription drugs in the prison population may decrease total medical costs because appropriate use of prescription drugs can avert even more expensive unplanned hospital admissions.[8]

---

[6] Both TCAs and SNRIs are antidepressant medications.  TCAs are Tricyclic antidepressant medications.   DOCCS doctors favor Pamelor and Amitriptyline.  SNRIs are serotoninin-Novepinephorine Reuptake Inhibitors and DOCCS favors Cymbalta.  Plaintiff does not contest that these TCAs and SNRIs may work in some patients to help alleviate neuropathic pain, but more often than not, DOCCS patients report awful side-effects like drowsiness, lethargy and diminished cognitive function without neuropathic pain relief.

[7] See The Pew Charitable Trusts, Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs (Dec. 2017) at https://www.pewtrusts.org/en/research-and-analysis/reports/2017/12/pharmaceuticals-in-state-prisons (last visited August 18, 2019).

[8] See The Pew Charitable Trusts, *Pharmaceuticals in State Prisons: How departments of corrections purchase, use and monitor prescription drugs* (Dec. 2017) at 5. See https://www.pewtrusts.org/en/research-and-analysis/reports/2017/12/pharmaceuticals-in-state-prisons (last visited August 18, 2019).

107.    In fiscal year 2015, DOCCS reported that prescription medications accounted for 32% of all health care spending.

108.    Unlike many of the medications on DOCCS' MWAP list, many psychiatric drugs are 'low cost' due to their availability of reasonable lower-costs psychotropic alternatives and the drop in the high price of some older ones due to these drugs coming off patent during the last several years.[9]

**Policies Before The MWAP Policy Implementation**

109.    Before the MWAP Policy, DOCCS' physicians, including the RMDs, already had troubling "policies" regarding MWAPs.

110.    The more punitive MDs and Mid-Level Clinicians might stop a patient's medications for reasons totally unrelated to patient care.  If the patient does not show up at the medication window or if the patient is accused of diverting or abusing medications, the prescriptions could be discontinued with no notice. Medical providers discontinue medications without any investigation into the alleged incident or exploration of why a patient might be missing medication window visits.

111.    Sometimes a brave patient will sue for deliberate indifference to his/her medical needs when necessary, effective medications are abruptly discontinued.

112.    DOCCS' defendants repeatedly roll out two justifications for stopping a patient's MWAP medication.  They sign declarations that assert: 1) the patient is a drug addict or abuser, or 2) the DOCCS defendant lists each and every time an Ambulatory Health Record entry exists for

---

[9] *Id.* at 17.

the patient, implying because he/she was seen by a health care practitioner there can be no deliberate indifference.[10]

113.    Dr. Jacqueline Wolf, a DOCCS doctor, summarized DOCCS' position best in an email to RMDs, "[So long as the patient] is seen within a reasonable amount of time, complaint addressed, exam documented, and rational for medical decision made [we're safe].  Hopefully, the A[ttorney] G[eneral]'s office will defend us this way."

114.    A sampling of 133 public *pro se* prisoner cases alleging deliberate indifference for the revocation of Neurontin or Ultram by DOCCS physicians in the Second Circuit demonstrate that the Attorney General's office systematically submits a standard declaration signed by a DOCCS medical provider accusing the *pro se* plaintiff of diversion, drug abuse or hoarding.

115.    In every single sampled case the pleadings were dismissed due to the *pro se* prisoner's inability to rebut the accusations.

116.    In another large sampling of *pro se* Eighth Amendment cases a DOCCS medical provider will outline in a declaration the number of times a patient was seen by some sort of medical provider, creating the guise that the patient had been treated merely because there was interaction with health care staff.

117.    DOCCS has now decided to solidify these already constitutionally questionable actions into the MWAP Policy.

---

[10] Often no such interactions exist.  Once one becomes familiar with DOCCS' patients' medical records, a pattern emerges wherein nurses record the complaints a patient submits on a sick call slip into the patient's record, but the patient is often not seen.  Maybe motrin is dispensed at the next medication run or an appointment with the MD is scheduled for a week or two later, if at all.  The recordation of the contents of the sick call slip give the impression to an outsider that the patient was seen for the complaints, but most of the time there is no interaction with medical staff.

**Development of the MWAP Policy**

118.    In 2006, Defendant Dinello was working as an emergency room physician in area hospitals and began working for DOCCS part-time as well.

119.    He soon ran into trouble.  In 2007 and 2008 he failed to treat patients in the Auburn Emergency Room before discharging them.

120.    Arguably in response to Defendant Dinello's malpractice issues, he started a company that offers drug-testing and evaluations of employees – services that do not require a medical license.

121.    He also started to pursue his "passion" for addiction issues, an area of medical practice for which he received no additional or specialized training.

122.    In 2010, the New York State Department of Health State Board of Professional Medical Conduct charged Defendant Dinello with three counts of failing to adequately evaluate patients prior to discharge from an emergency room.

123.    In Defendant Dinello's words he was, "accused of not ordering additional testing or prescribing medications for patients."

124.    Defendant Dinello plead guilty and was prohibited from practicing emergency medicine again and sentenced to three years' probation for the practice of non-emergency medicine, during which time he was to be monitored by another doctor.

125.    The Commonwealth of Pennsylvania followed suit and placed Defendant Dinello on probation with an adjudication and order dated May 5, 2011.

126.    Despite these very serious charges and adjudications, DOCCS named Defendant Dinello Chairman of its Pharmacy and Therapeutic Committee in which role he crafted policies

and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients.

127.     Unbelievably, Defendant Koenigsmann allowed Defendant Dinello to draft a new policy on Medications With Abuse Potential ("MWAP"), despite the fact that Defendant Dinello had no specialized addiction training, no pain management training and was stripped of his emergency medical license for not properly evaluating or treating patients.

128.     Defendant Dinello wrote the policy in rough form in 2015 and Defendant Koenigsmann promulgated it on June 2, 2017.

129.     On September 10, 2018 Defendant Koenigsmann signed a revised version of the MWAP Policy.

130.     But there were earlier versions and elements of the MWAP Policy that resulted in the discontinuation of a patient's effective pain or neuropathic pain management medication before June 2, 2017.

131.     Doctor Michelle Belgard, the Facility Health Services Director at Five Points, who worked directly under Defendant Dinello, testified under oath in 2016 that Defendant Dinello had already targeted Neurontin, Baclofen, Lyrica and any scheduled medications.  She testified, "we no longer prescribe Morphine, Percocet, or [Ultram] . . . we are trying to remove those medications."

132.     Of Neurontin in particular she testified, "[Dinello] is currently trying to change the policy on the use of Neurontin to limit its use."

133.     Defendant Dinello has also testified under oath that "in the prisons I took care of, this was something I was already doing as a health care provider."

134.    Certain RMDs and facilities started rolling out the MWAP restrictions and policy implementation well before the Policy was actually promulgated by Defendant Koengismann.

135.    Defendant Dinello started refusing approvals of the MWAPs on "Non-Formulary" Request forms from treating MDs and Mid-Level Clinicians as early as 2016.

136.    Once the MWAP Policy went into effect, a provider would no longer submit a "Non-Formulary drug request" for a MWAP medication.  She or he would submit an MWAP Request Form.

137.    Under the MWAP Policy, an MD or Mid-Level Clinician submits the MWAP Request Form to the RMD in charge of his/her "hub."

138.    The MWAP Request Form asks for relevant health information regarding the patient, the justification for use of the medication and a list of any alternatives tried to treat the medical issue.

139.    The MWAP Request Form also asks if there is any recent evidence of drug diversion or abuse by the patient.

140.    To conduct a review of the MWAP Request Form, the RMDs have access to the limited portions of the patient's medical history available on the DOCCS' FHS1 database.

141.    RMDs do not have access to the patient's personal paper AHR which is kept at the facility where the patient is in custody.

142.    Based on the MWAP Request Form contents the RMD -- and not the patient's medical provider -- determines whether a patient will receive an MWAP.

143.    In 2018, under oath, Defendant Dinello was asked whether the MWAP Policy would force a facility doctor to discontinue MWAP medications that were effectively treating patients.

144.   Defendant Dinello responded, "That was up to them.   That's the individual provider's prerogative, I assume."

145.   This response was categorically untrue.  The MWAP is a "policy" and not a practice guideline.

146.   MDs and Mid-Level Clinicians within DOCCS must discontinue an MWAP prescription if it is not approved by the RMD.  The pharmacies will not fill a prescription for an MWAP without RMD approval.

147.   An MD or Mid-Level Clinician has no ability to provide the medication once an RMD refuses to approve the prescription.

148.   Defendant Koenigsmann testified under oath, "A policy requires adherence.  A practice guideline is a guideline; it's a recommendation for care. . . The regional medical directors felt strongly that this should be policy, that it required adherence by the providers, not as guidance."

149.    Defendants knew the new MWAP Policy would violate constitutional rights.

150.   In an internal DOCCS email to Defendant Dinello, Defendant Koenigsmann wrote, "[I]n discussions, grievance responses, et cetera, we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy.  Changing meds based on policy is doomed to failure . . ."

151.   When asked if he meant, "doomed to failure legally," Defendant Koenigsmann responded, "I did mean that.  And I also meant that for the providers --- and this was my reservation originally for thinking of a practice guideline versus a policy, was it's difficult with licensed clinicians to dictate how they provide care.  And this being a policy, we do require that they have

to prove certain things before they're able to prescribe these medications, and that's different from out in the free world.  There are not similar limitations on providers."

152.    Defendant Koenigsmann added the MWAP Policy was "never designed to eliminate any specific med, medication, or class of medication from its use.  It was only to ensure that we have proper oversight over the clinicians ordering the medications."

153.    But the policy does not operate to create "oversight," it had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs, including patients who suffered from epileptic seizures, Multiple Sclerosis, phantom pain, major spinal injuries, and other sources of chronic pain.

154.    Defendant Koenigsmann testified that it was possible that the MWAP policy could have the effect of discontinuing effective medical treatment to patients.

155.    In fact, since the MWAP Policy has gone into effect, many conscientious DOCCS MDs and Mid-Level Clinicians have challenged the policy, especially the suggestion that patients with chronic pain issues should be treated with psychiatric medications to numb them and "drug them up."

156.    A review of the medical records of DOCCS' patients shows consistent patterns of medical providers fighting the RMDs when their patients are stripped of effective MWAP medications.  The MDs and Mid-Level Clinicians also attempt to exploit loopholes to get their patients necessary care.

157.    Under the MWAP Policy an MD or Mid-Level Provider can prescribe five (5) days of an MWAP medication without RMD approval.

158.    Medical providers within DOCCS sometimes use this five-day loophole to get patients in severe chronic pain at least five days of relief in facility infirmaries.

159. Medical providers check patients with chronic neurological or other chronic pain issues into facility infirmaries for "pain control," meaning the providers are administering the five days of pain management they can get without an MWAP approval from an RMD.

160. Defendant Mueller has even suspended at least one facility physician for using the five-day treatment loophole to provide patients with relief from chronic, disabling pain.

161. Medical providers and inmate grievance responses repeatedly tell patients that "Albany" has refused the prescriptions in accordance with 'policy.'

162. The truth is that after June 2, 2017 Defendant RMDs repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need of medications to effectively treat chronic pain and nerve issues, no matter the recommendations of treating providers and specialists, nor the patient's individualized medical needs.

## PLAINTIFFS AND PROPOSED CLASS REPRESENTATIVES[11]

163. **PETER ALLEN** ("Mr. Allen") is a 66-year-old inmate currently housed at Eastern Correctional Facility ("Eastern").

164. Mr. Allen suffers from cervical spine syndromes, spinal stenosis, peripheral neuropathy, herniated nucleus pulposus (slipped disk), chronic degenerative disk disease, disk herniation, severe right neural foraminal stenosis and partial neural foraminal encroachment.

165. As a result of these conditions, Mr. Allen suffers from chronic back pain, leg pain, cramps and neuropathy. His pain interrupts his sleep and negatively impacts his quality of life.

166. At least since 2010, DOCCS' doctors prescribed Mr. Allen Neurontin and Ultram to help manage his chronic pain.

---

[11] The representative patients' medical histories and history of treatment have been greatly reduced for brevity and to omit references to ailments and conditions not germane to this litigation.

167.    Mr. Allen's physical and medical problems are well documented and understood by his treating providers, Dr. Andola and Dr. Gusman, at Eastern.

168.    A number of diagnostic MRIs and spinal examinations have demonstrated objective proof of Mr. Allen's spinal and nerve issues.

169.    In response, Drs. Andola and Gusman repeatedly renewed Mr. Allen's prescriptions for Ultram and Neurontin.  Sometimes the doses were adjusted to treat corresponding improvement or degeneration in his pain.

170.    Following a motor and sensory nerve conduction study and a needle EMG on August 7, 2015, Dr. George Forrest concluded that Mr. Allen's sural sensory SNAP were absent. Dr. Forrest also noted that the latency to his superficial peroneal SNAP was prolonged and the amplitudes of Mr. Allen's peroneal motor CMAP were low in each leg with reduced conduction velocity. Forrest concluded that Mr. Allen's symptoms were consistent with peripheral neuropathy mixed with axonal demyelinating.

171.    A January 21, 2016 specialist report found that Mr. Allen had partial neural foraminal encroachment bilaterally at C4-C5 and C5-C6.

172.    Through 2016, Drs. Gusman and Andola continued to treat Mr. Allen with Ultram and Neurontin.

173.    On January 12, 2017 Mr. Allen tested positive for Buprenorphine. This was his first positive drug test since his incarceration in 2006.  The comments on the test read, "is this even possible?" Following the test Mr. Allen wrote a letter to Dr. Andola which stated in part, "I was called for a urine sample. It came back positive for Buprenorphine. I do not even know what this is. Twenty-five years in corrections and I never had a dirty urine. I need to know if any of my meds can give a false positive. I know Elavil can. What about Ultram, Remeron, the 3 inhalers I have?

What about a synergy of two or more? I have enclosed a copy of the test. RN Singh said to have the hearing officer call the clinic. Please, I need your help."

174.    The hearing officer did not allow Mr. Allen to call either the doctors or the pharmacists as witnesses at his disciplinary hearing.

175.    Mr. Allen was retested, was positive again, and again, the hearing officer refused to allow him to call medical witnesses.

176.    Because of Mr. Allen's positive urine drug screen, his Ultram was discontinued.

177.    On January 19, 2017 the nurse on call reported that Mr. Allen's Ultram was discontinued unexpectedly. Mr. Allen reported experiencing pain in his back, neck and hot flashes. The nurse gave him Ibuprofen.

178.    On January 20, 2017 Mr. Allen reported a sick call to check on his Ultram order. The nurse advised that he would not be getting Ultram due to his dirty urine.

179.    On February 3, 2017 Mr. Allen reported experiencing a lot of pain due to his Ultram being discontinued. He reported that he could not sleep and had a lot of sciatic pain. He requested to increase his Neurontin and was informed that he could see Dr. Andola on February 6, 2017.

180.    On February 23, 2017 Mr. Allen reported that he was very stressed and tired. He reported feeling sciatic and knee pain. He also was experiencing leg cramps and had trouble sleeping. He also expressed that he was very upset about his recent dirty urine test. The medical staff assisting Mr. Allen increased his Neurontin.

181.    On June 2, 2017 the MWAP Policy was promulgated.

182.    On or about June 9, 2017 Dr. Andola submitted an MWAP request for Mr. Allen's Neurontin prescription.

183.     Defendant Mueller responded to the MWAP request by stating, "Need EMG findings with date.  This is far more important than radiologic findings.  Most recent PT.  Thank you."

184.     Dr. Andola responded, "EMG on 8/7/15 revealed sural sensory snap are absent. Latency to supervicial peroneal snap is prolonged.  Amplitudes of peroneal motor cmap are low in each leg and conduction . . . this is written in computer.  Actual report no longer in his active chart which has been thinned.  I have no one currently available to go find it in his old record (it's not that old, but his chart apparently needed to be thinned…) it is abnormal apparently.  Pth for back pain 9/21/11 thru 10/21/11."

185.     Doctor Andola cc'd Defendants Dinello and Hammer, as well as Dr. Gusman on the email with additional information for Defendant Mueller.

186.     Defendant Dinello replied, "Thanks for the additional information.  I[t] would appear the patient does have well documented Chronic Pain Issues.  No question. . . . The [Neurontin] could be fine for now (if approved) and can be weaned off as alternative treatment modalities are attempted.  Let me know if you have any questions.  Thanks."

187.     Dr. Andola responded, "So, is this the approval I am looking for?  I need a prior authorization #, don't I?  Where does all this back and forth leave the issue?  Mr. Allen is here today.  He reports pins and needles, numbness and pains in legs are better on the [Neurontin].  Is it approved?"

188.     Defendant Dinello responded, "The [Neurontin] has not been approved.  Suggest alternative treatment at this time.  I hope that helps."

189.     Dr. Andola, now obviously frustrated responded, "FYI, OMH has pt on Elavil 25 mg po qam and 100mg po qhs.  I am not sure what else he can take?  I am not comfortable with

Tegretol, Dilantin, valproic acid, or Trileptal.  I do not order these meds, they are used by Neurology and Psychiatry.  I am not a specialist in either area.  Can you make a suggestion?"

190.    Dr. Andola did not let up.  She added, "Per Pharmacy, valproic acid is an anti-manic, anti-convulsant medication.  Not approved for pain mgmt…."

191.    Defendant Dinello responded, "Really.  I have used it on a number of patients with good success.  There a variety of safer alternative treatment modalities so work with whatever you are comfortable with.  No problem."

192.    Dr. Andola then went understandably off: "That info on valproic acid is from our DOCCS pharmacy staff as of today when I called them.  I am super comfortable keep the patient on the medication regimen he is on – even the information you sent to me from the mayo clinic states that [Neurontin] or lyrica is research-supported for the treatment of pain caused by damaged nerves.  He is doing well on [Neurontin], has an abnormal emg, already has a tens unit, already sees psychiatry and on meds thru them…I do not understand why [Neurontin] is not being approved.  We do not have access to U/S therapy.  Lidocaine patches are super expensive and only treat the area they cover.  Already takes Tylenol and Ibuprofen – I don't see how voltaren gel is going to help nerve pain – it is more for localized musculoskeletal pain.  Risk of serotonin syndrome with TCAs with patient is already on.  I do not feel good about any of these alternatives . .. I am being asked to use a medication off label????  That is unreasonable. . . My FHSD will need to get involved with this as I have answered every question on the form given and more and this is unresolved."

193.    On June 30, 2017 Mr. Allen reported that [Neurontin] helped his pain due to all of his spinal injuries. He refused pain injections because "they don't work." Mr. Allen requested an increase in his Neurontin and in his Elavil. The medical staff assisting Mr. Allen made a note that

his Neurontin did not get MWAP approval. The nurse attending to Mr. Allen advised him that his Neurontin was not approved for continued use "per RMD" after the MWAP form did not receive approval. The nurse informed Mr. Allen that he would need to be weaned off the drug.

194.    On July 20, 2017 the medical staff attending to Mr. Allen reported that they were weaning him off Neurontin.

195.    On July 26, 2017 Mr. Allen wrote a letter to Defendant Mueller regarding her denial of his Neurontin prescription. Mr. Allen wrote, "…I have broken my neck four times, I have had multiple major surgeries, facial reconstruction, too many broken bones to remember, sustained T.B.I., countless concussions…" Mr. Allen questioned why Defendant Mueller wanted to prescribe Lamictal instead of Neurontin. He expressed, "I have had too many brain injuries to experiment with Lamictal." Mr. Allen informed Defendant Mueller that Dr. Andola refused to prescribe Lamictal, because in her belief, Lamictal may be too dangerous to experiment with. Mr. Allen stated that Defendant Mueller's reasoning for disallowing Neurontin was that, "Neurontin has the propensity to cause euphoria." Mr. Allen reminded Defendant Mueller that may be correct if an inmate saves several tablets and ingests them all at once, however, at Eastern Neurontin is administered in liquid form. A nurse and officer watch the patient ingest the medicine. The patient must also open his mouth before leaving in order to show the nurse that he swallowed his medication, making it impossible to save anything.

196.    Dr. Andola attempted to help how she could by issuing Mr. Allen a lumbar supportive brace.

197.    On October 12, 2017 Mr. Allen filed a grievance alleging "Deliberate Indifference by RMD." Mr. Allen included the results of an MRI conducted by Dr. Marc Jouandat of Cayuga Medical Center with his grievance. The results showed the extensive problems with Mr. Allen's

back, including chronic degenerative disk disease and bilateral facet arthropathy at every level of the lumbar spine from the L1-2 through L5/S1 levels.  It also showed disc herniation compressing the left L4 nerve root.

198.    Mr. Allen professed that he was in constant pain and that Defendant Mueller was subjecting him to deliberate indifference by refusing him effective pain medication.

199.    On November 2, 2017 Mr. Allen's allegations were 'investigated' by Deputy Security of Administration Moore.  Ordinarily, a grievance regarding a patient's medical treatment would be investigated with the patient's treating physician.  Although DSA Moore claimed that Mr. Allen was receiving medical care deemed appropriate by his health care provider, Mr. Allen's actual health care provider never expressed that Mr. Allen was receiving appropriate medical care.  DSA Moore concluded that there was not sufficient evidence to substantiate Mr. Allen's allegations and encouraged him to address further medical concerns via sick call.

200.    On November 8, 2017 Mr. Allen appealed DSA Moore's decision to CORC. In his appeal Mr. Allen recognized that DSA Moore's response to his grievance was a "blatant lie." Mr. Allen wrote, "had the DSA's Office contacted my primary care provider, Dr. Andola, she would have reported that she had spent over an hour cumulatively, oftentimes with this grievant in her office, attempting to have RMD Mueller approve a requested non-narcotic liquid medication that she had prescribed for approx. three years. Also, as noted in the enclosed exhibits, the same medication that 'medical specialists' prescribed."

201.    Mr. Allen's appeal inquired about the lack of "sufficient evidence" that the DSA's Office reported and requested to know what other evidence they could possibly want. Mr. Allen submitted MRI results, electromyograms and specialists' findings. Mr. Allen added that he had been on Neurontin for at least 10 years.

202.    Of course, CORC did not respond for 15 months and ultimately found that there was insufficient evidence to substantiate improper medical care or malfeasance by staff. CORC published its pat response to a medical grievance: "CORC notes that the grievant's complaint has been reviewed by the Division of Health Services' staff who advise that a complete investigation was conducted and that the grievant is receiving appropriate treatment.   CORC notes that the grievant's Neurontin was discontinued by the Regional Medical Director.   CORC asserts all inmates will have access to medically appropriate medications, and that the RMD is required to review and approve the use of potentially unsafe medications that have abuse potential as outlined in HSPM Item #1.24 [the MWAP Policy].   CORC continues to uphold the discretion of the provider to determine the type and necessity of medication administered and finds no compelling reason to revise HSPM Item #1.24 at this time.   CORC also notes that the grievant's medical conditions are being addressed with provider appointments, specialist consultations, diagnostic tests and lab work.  Further, he is currently prescribed Tylenol, Ibuprofen and [Elavil]."

203.    However, the CORC decision failed to acknowledge that Mr. Allen's medical provider was not allowed to determine the type and necessity of medication administered.  The decision was in the hands of Dr. Mueller, an RMD who had never examined or treated Mr. Allen.

204.    On October 4, 2018 Dr. Andola submitted an MWAP request for Lyrica, a common alternative to Neurontin, for Mr. Allen's chronic pain and multiple etiologies. The MWAP pointed out that Mr. Allen had already tried Elavil and Tylenol in order to manage his pain.  Again, Defendant Mueller denied Dr. Andola's request.

205.    On February 22, 2019 Mr. Allen put in a request to see Dr. Andola due to severe leg cramps.

206.    On May 6, 2019 Mr. Allen reported experiencing lower back pain. He expressed that his lower back was "on fire." The medical staff attending to Mr. Allen noted that he took Ibuprofen daily, but it was not helping. Mr. Allen requested to see Dr. Andola.

207.    On May 20, 2019 Mr. Allen reported experiencing "severe insomnia." Mr. Allen expressed that his current medication was causing cramps and weight gain. He wanted to stop taking Elavil and get back to taking Zoloft. Mr. Allen also requested to restart Neurontin. The nurse assisting Mr. Allen advised him that Cymbalta may be helpful for neuropathic pain. Mr. Allen again requested to restart Neurontin. The nurse advised Mr. Allen "re: MWAP med classification and abuse potential, not readily available."

208.    Mr. Allen continues to complain of unnecessary pain and suffering due to the lack of effective pain medication.

209.    **BRIAN BERNARD** ("Mr. Bernard") is a 57-year-old patient who is currently housed at Marcy Correctional Facility ("Marcy").

210.    Mr. Bernard suffers from severe degenerative lumbar disc disease.  He has had a spinal fusion of the L3-S1, a laminectomy of the L5, he suffers from lower lumbar disc disease in the L4-L5 and spondylosis.  He suffers from severe lower back pain and spinal stenosis L4/L5 and L5/S1.  Mr. Bernard's severe chronic pain issues were known to DOCCS from at least 2008.

211.    DOCCS has housed Mr. Bernard in a number of different facilities prior to his current assignment to Marcy.

212.    To accommodate Mr. Bernard's physical ailments DOCCS allows him to use a cane, a back brace, medical boots and he is assigned to a lower bunk because he cannot get in and out of a top bunk.

213.   Dr. Lee, the treating physician at Shawangunk Correctional Facility ("Shawangunk"), described Mr. Bernard's ailments in a July 3, 2017 referral to a specialist, "Lower back pain not relieved with back brace, NSAIDS, sleeping disturbance, difficulty walking, muscles spasms, can't bend/lifting."

214.   Mr. Bernard was successfully treated for his pain with Percocet, Neurontin and Celecoxib from May 2017 to June 2017.  He had been on Neurontin and Celecoxib since at least 2014.

215.   On June 20, 2017, nineteen days after the MWAP Policy was promulgated, Dr. Lee submitted a MWAP request for Mr. Bernard's Percocet and Neurontin prescriptions.  Defendant Mueller refused to approve Mr. Bernard's Percocet prescription.  She wrote, "He is on maximal dosage of Neurontin, yet has never been to PT, Pain, Neurosurg, etc."

216.   Defendant Mueller made no provision for effective pain management until such consultations could take place despite being well aware it can take a patient months to get scheduled for the pain clinic or physical therapy.

217.   Defendant Mueller did approve his MWAP request for the Neurontin prescription but stated, "Recommend referral to Pain, Neurosurg, PT.  Despite your comments to the contrary, he has never been . . ."[12]

218.   On July 3, 2017 Mr. Bernard requested an "alternative to Percocet" because his pain was so extreme and by July 14, 2017 he was having trouble walking and requested an appointment with Dr. Lee to request "alternative pain meds."  The nurse gave him 12 motrin.

---

[12] Defendant Mueller's comments are cut off in the version received by Plaintiffs' counsel through pre-litigation sources.  In the multitude of MWAPs reviewed, Defendant Mueller's tone is never any better.  Her disdain for patients permeates every word.

219.    In July, Dr. Lee submitted another MWAP to fill Mr. Bernard's prescription for Neurontin.  Defendant Mueller refused the request stating, "1 mo. Supply was approved 6/26/17 w/several recommendations made.  There should be no reason to. . ."

220.    By July 25, 2017 Mr. Bernard was still having difficulty walking and told staff, "my quality of life has decreased since my pain med was stopped."  The nurse noted he was limping, had a guarded gait and there was an "alteration in comfort."  The nurse issued another 12 pack of Ibuprofen.

221.    On July 31, 2017 Mr. Bernard once again requested a meeting with the doctor to "discuss alternative pain meds and getting a wheelchair."  His pain was so bad, Dr. Lee admitted him to the infirmary "for pain control."

222.    But the five days was all Dr. Lee could provide to Mr. Bernard.  Defendant Mueller refused the MWAP requests moving forward stating, "Has never been sent to PT or Pain Management which was suggested when request was made 6/26/17 for . . ."

223.    Once again, Mr. Bernard was without effective pain medication and on August 14, 2017 he submitted a sick call slip about how the pain was making him suicidal and that he was very disturbed with his medication changes.  He reported that the Celebrex was not enough.

224.    Though there is no MWAP in Mr. Bernard's records, it appears that Defendant Mueller probably went on vacation and an MWAP was approved for Neurontin by some kind soul on August 22, 2017.[13]  Mr. Bernard received Neurontin, but no replacement for the Percocet, until September 24, 2017 when Mr. Bernard's prescription for Neurontin once again had to be renewed.

---

[13] It is highly likely the approval was gained by Defendant Koenigsmann.  Many doctors attempt to go around the RMDs to Koenigsmann, who rarely refused approval of an MWAP Request.

225.    On September 8, 2017 a nurse reported that Mr. Bernard was "grimacing" in pain. Dr. Lee put Mr. Bernard on Cymbalta, but Mr. Bernard refused it as he cannot take psychotropic medication due to priapism effects.

226.    On September 28, 2017 Mr. Bernard could not take the pain any more and Dr. Lee admitted him to the infirmary again for pain management.

227.    Dr. Lee put in a MWAP request for a five-day supply of Percocet to alleviate Mr. Bernard's pain, at least short term.  He was able to administer two doses of Percocet until it was stopped.  Dr. Lee got more aggressive with the MWAP request, and pointed out that the MWAP had been approved on 7-7-17 and including the MWAP approval number: 346915, but it was to no avail.  Defendant Mueller stated, "you sent the same request on 9/20 & 9/21/17.  You have included no new information on this req[quest]…"

228.    Dr. Mueller denied the requests stating, "There is no pertinent information on this form to support usage of this strong narcotic.  No PE, clinical . . ."

229.    Dr. Lee also submitted an MWAP for Neurontin for Mr. Bernard's use in the infirmary stay.   Defendant Mueller also rejected this request stating, "No PE, or updated information to support this request.  Have recommended safer alternative treatments."

230.    In lieu of his effective pain medication, Mr. Bernard was prescribed Mobic and Depakote, two ineffective medications.

231.    On October 17, 2017 the medical records show that Dr. Lee's referral of Mr. Bernard to a pain specialist was denied, however, an MRI was conducted.

232.    On November 6, 2017 Mr. Bernard's MRIs were read by Dr. Joseph Racanelli of Multi-Diagnostic Services, Inc.   Dr. Racanelli found "diffuse degenerative changes and malalignment" as well as "severe spinal stenosis which is recurrent at L4-L5 and L5-S1."

233.    In late November, Mr. Bernard had given up on the DOCCS staff and started asking for "medical marijuana" or anything else that might ease his pain.

234.    In mid-December, after even more experimenting with Mobic and lidocaine patches, Mr. Bernard once again asked to be put back on Neurontin and Celebrex.  Dr. Lee did nothing, but saw him on January 2, 2018 about his request for Celebrex and Neurontin.  Dr. Lee's note stated, "will submit for approval (MWAP).

235.    If Dr. Lee submitted a MWAP it is not in Mr. Bernard's medical file and was not approved.

236.    Mr. Bernard's medical records in the preceding four years had never once mentioned that he was drug-seeking or malingering.  His disciplinary history is also practically non-existent with four tickets for smoking, one ticket in September of 2016 for "alcohol intoxication," and one other one for 'creating a disturbance."

237.    At a January 26, 2018 specialty appointment, Dr. John Galeno, an orthopedist, recommended that Mr. Bernard be prescribed Neurontin.   Dr. Gusman reviewed the recommendation on February 1, 2018 and noted, "Will see Dr. Lee to discuss if he wants surgery." He did not prescribe Neurontin, nor did he note why he was dismissing the specialist's recommendation of Neurontin.

238.    Mr. Bernard's was continued on a useless combination of Lamictal and a lidocaine patch.

239.     On February 23, 2018 Mr. Bernard was transferred to Marcy and pointedly told the medical staff member on intake, "I want my pain, nerve meds back.  I want my eggcrate mattress.  I want a wooden cane."  The nurse added to the exam notes, "TOLD [him] to never ask again for [Neurontin], celebrex wooden cane or egg create mattress NOT available at this facility.

Obvious <u>con artist</u> and <u>drug seeker</u> overly solisitice [spelled wrong in original] polite but demanding…"

240.    Since his transfer to Marcy, Mr. Bernard has repeatedly complained of his chronic pain.  The medical staff there has stopped even his lidocaine patches as "NF [non-formulary]."  He currently receives Lamictal, though it does not alleviate his chronic pain.

241.    **MARK DANIELS** ("Mr. Daniels") is a 55-year-old inmate currently being housed in Shawangunk.

242.    As of December 12, 2018, Mr. Daniels has no entries related to drug use, diversion or contraband on his Medical Problem List and no disciplinary records for such issues.

243.    Mr. Daniels suffers from cervical myelopathy, C-spine stenosis, severe nerve damage and chronic back pain. Mr. Daniels also often suffers from "foot drop" which is when the foot loses the ability to respond to the body's signals and hangs.  It is caused by damage to the common fibular nerve.  The foot drop and his other neurological issues challenge his mobility.

244.    Mr. Daniels took Neurontin intermittently from at least April 2015 until July 31, 2017 which, though never a perfect remedy, helped his neuropathy and allowed him to function.

245.    On February 26, 2015, Mr. Daniels' many back problems led doctors at Upstate University Hospital to perform a spinal fusion.

246.    Post-surgically Mr. Daniels was treated with Motrin, Neurontin and Flexeril.

247.    Joseph Racanelli, MD, interpreted an MRI of Mr. Daniels' lumbar spine done on May 13, 2015. Dr. Racanelli concluded that Mr. Daniels' spine had diffuse degenerative changes, postoperative changes at L4-L5 and L5-S1, and Slight anterolisthesis at L4-L5.

248.    On June 6, 2015, at Auburn, Defendant Dinello ordered nursing staff to discontinue Mr. Daniels' Neurontin because Mr. Daniels did not show up to take his medicine. The order to discontinue makes no note of the fact that Mr. Daniels had been complaining that he was having major problems with mobility, could not walk and had asked for in cell permits which were denied.

249.    The surrounding medical notes make very clear that Mr. Daniels was having great difficulty ambulating through the facility.

250.    On August 4, 2015 Mr. Daniels was transferred to Shawangunk.

251.    Thankfully, Dr. Lee re-prescribed Mr. Daniels' Neurontin and gave him feed in cell permit due to his mobility limitations.

252.    On November 26, 2016 the nurse on call at Shawangunk refused to provide Mr. Daniels with his Neurontin because he did not have his ID with him.

253.    In order to get his medication, Mr. Daniels would have had to ambulate with his cane all the way back to his cell, get the ID and then make another trip.

254.    While it makes sense that a prisoner would need his ID to gain his medication, it seems shockingly punitive to deny medication when a man who needs a cane and sometimes a wheelchair to ambulate is denied his medication all together because he forgot his ID.  Mr. Daniels was at that medication window three times a day every day.

255.    On January 5, 2016 Dr. Lee reviewed Mr. Daniels' MRI and noted it showed "severe canal stenosis with degenerative changes."

256.    Each day between January 7, 2016 and January 10, 2016 Mr. Daniels refused to take Neurontin. He reported that he was "being accused of spitting it out" and for that reason he did not want to take it because he was "being setup."

257.    Despite the results of Mr. Daniels' MRI, without examining or speaking to Mr. Daniels, on January 11, 2016, Dr. Lee discontinued his Neurontin prescription because he did not take it for three days.

258.    Mr. Daniels was left in pain due to his concerns that nurses were trying to set him up to take away his medications.

259.    On March 3, 2016 Mr. Daniels went to see Dr. Matthew Adamo, a neurosurgeon. Dr. Adamo noted that Mr. Daniels' MRI showed multilevel spondylosis, C3-C4 disc bulge with severe stenosis, hyperintensity in cord at C3-C4 level, and severe cervical stenosis.  Mr. Daniels was exhibiting severe neurological issues including an inability to button his shirt and perform daily living activities.  Dr. Adamo told Mr. Daniels that he would recommend a change in medication to help him.  In his notes, Dr. Adamo wrote, "Will coordinate case."

260.    On March 9, 2016 Dr. Lee reviewed Dr. Adamo's report.

261.    On March 16, 2016 Dr. Lee saw Mr. Daniels and reported that Mr. Daniels had severe central canal stenosis and that he was experiencing numbness, neck and back pain. Dr. Lee suggested a Neurology appointment to consider more surgery.  Dr. Lee did not re-prescribe Neurontin nor any other medication to treat the obvious pain in the interim.

262.    On April 15, 2016 Nurse Denman noted that Mr. Daniels was in severe pain and needed to feed in cell until his surgery.

263.    On April 18, 2016 Mr. Daniels' neck pain and hand issues were so severe he begged Dr. Lee to start taking Neurontin again.

264.    Dr. Lee finally acknowledged Mr. Daniels' medical needs and on April 19, 2016 Mr. Daniels began taking Neurontin again regularly.

265.    On May 26, 2016 Mr. Daniels expressed that he was experiencing pain that morning and Nurse Scofield gave him Percocet. Later that evening Mr. Daniels reported that Percocet provided some relief.

266.    On August 22, 2016 Mr. Daniels refused to take Neurontin because it upset his stomach and because he said it was not effective. He reported that after his follow up with the neurosurgeon, the surgeon explained that he would be changing Mr. Daniels' medication, however, after four weeks his medication still had not been changed.

267.    On October 25, 2016 Mr. Daniels requested that his medication be changed to once a day because the Neurontin was not helping. He noted that it upset his stomach and that he could not take Ibuprofen.

268.    Following an MRI of Mr. Daniels' C-Spine on December 8, 2016, Joseph Racanelli, MD concluded that there was a significant improvement of Mr. Daniel's central canal stenosis, but that there were post-operative changes at C4-C5 and persistent abnormal change at T2 signal with in his upper cervical cord.

269.    On January 5, 2017 Mr. Daniels expressed feeling numbness and pain in his neck and hands. He also requested a different "non-narcotic" pain medication so he could function.

270.    On January 6, 2017 Mr. Daniels stated that he still had pain on the right side of his lower back. He explained that he could not stand for too long because of it.

271.    On January 12, 2017 Mr. Daniels saw Dr. Kenning, a neurosurgeon, who recommended Neurontin.

272.    On February 20, 2017 Mr. Daniels received Tylenol due to neck spasms. The nurse on call at Shawangunk wrote that a note was given to a doctor regarding Mr. Daniels' discomfort.

273.     In March and April of 2017 Mr. Daniels had some problems with his Neurontin dosing, but the medication did allow him some functionality.

274.     On May 25, 2017 Dr. Lee reported, "pain → no relief with Neurontin. Doesn't want to increase [can't] tolerate.  Please refer back to n[eurosurgery] clinic."

275.     On June 2, 2017 the MWAP Policy was promulgated.

276.     On June 8, 2017 Dr. Lee submitted an MWAP Request for Neurontin to Defendant Mueller.

277.     Defendant Mueller approved, but said, "No EMG.  Will approve until EMG obtained for presumptive [diagnosis]."

278.     On June 15, 2017 Mr. Daniels complained of chronic neck pain and numbness from his arms to his hands. He informed the nurse that he was out of pain medication. The nurse on call informed that his Neurontin had been approved.

279.     On July 27, 2017 Mr. Daniels expressed that he was losing coordination along his left side while walking. Nurse Scofield informed Mr. Daniels that a neurosurgery follow-up was ordered and that a copy of his EMG and MRI would be sent to the neurosurgeon.

280.     Mr. Daniels did not get an EMG until February of 2018, seven months later.

281.     Though Mr. Daniels' medical records are woefully incomplete and deficient, it is obvious Defendant Mueller discontinued his Neurontin prescription sometime between late July 2017 and early September 2017 due to the MWAP Policy.  Despite her note stating, "Will approve until EMG obtained for presumptive [diagnosis]," she discontinued Neurontin when Mr. Daniels' EMG would still not happen for six months.

282.    Defendant Mueller had never met Mr. Daniels, never examined him and had no idea regarding his personal medical history, other than that he had not had a recent EMG to "justify" treatment with Neurontin.

283.    Defendant Mueller did not seem to care that an EMG would take months and months to schedule and that while waiting Mr. Daniels would be without adequate pain management.

284.    On September 7, 2017 Mr. Daniels reported to the nurse on call at Shawangunk that he still was in severe pain. He also stated, "haven't seen the doc!" The nurse ordered for a refill of his Ibuprofen and informed Mr. Daniels that his neurosurgery appointment had been approved.

285.    On September 12, 2017 Dr. Lee discontinued the Ibuprofen and prescribed Cymbalta.

286.    On October 11, 2017 Dr. Lee referred Mr. Daniels to the neurology department at Coxsackie for a neurology evaluation.

287.    On November 9, 2017 Mr. Daniels reported to Dr. Lee that he was experiencing numbness and requested an egg crate mattress for his pain.

288.    On February 13, 2018 Nicole Lostritto, MD, finally performed an EMG on Mr. Daniels. She reported that Mr. Daniels was now taking Cymbalta instead of Neurontin to treat his pain. She also reported left sided ulnar neuropathy, mild median mononeuropathy and cervical neuropathy. Lostritto noted that Mr. Daniels' symptoms were most likely related to cervical stenosis and that she could not test that with electrodiagnostic studies. She recommended that Mr. Daniels take Baclofen in addition to Cymbalta to "address spasticity and modulate pain receptors." She also noted that Baclofen can "often help alleviate neuropathic pain symptoms by further stabilizing the neural membrane."

289.    On February 15, 2018 Dr. Lee noted in Mr. Daniels AHR, "EMG: ulnar neuropathy left.  Strongly suggest cervical myelopathy."  Dr. Lee did not note why he was dismissing Dr. Lostritto's recommendation of Baclofen.

290.    There is no record of Mr. Daniels being administered Baclofen, nor of Dr. Lee requesting it, nor any reason Dr. Lee dismissed the specialist recommendation.

291.    On February 22, 2018 Mr. Daniels saw Dr. Adamo again for his neuropathy.  Dr. Amado again noted that the MRI showed severe cervical spinal canal stenosis, etc, but suggested surgery might not help at this point.  Dr. Adamo recommended DOCCS prescribe Mr. Daniels Lyrica, a stronger version of Neurontin, for his pain and discomfort.

292.    Dr. Lee reviewed the recommendation on February 26, 2018.  Dr. Lee noted, "NES clinic: no surgery, Medical t[reatment] such as Lyrica."  Dr. Lee did not prescribe Lyrica, which is an MWAP, but rather Cymbalta.  Dr. Lee did not note why he was dismissing Dr. Adamo's recommendation.

293.    On March 2, 2018 Mr. Daniels asked about the Lyrica as Dr. Adamo had told him would help with his neurological issues and pain.

294.    On March 12, 2018 Dr. Lee finally submitted an MWAP request for Lyrica pursuant to Dr. Adamo's recommendation.  He wrote, "rt hand pain/numbness/tingling sensation, tried NSAIDS/pth/Cymbalta/Depakote not effective, NES clinic on 2-22-18 recom; please try w/Lyrica, for neuropathic pain.  Offender is rt handed, limited his daily activity due to numbness/tingling sensation.  Lyrica 100mg po bid then increase to tid."

295.    He sent the MWAP Request to Defendant Mueller.  There is no response in Mr. Daniel's medical files, but Mr. Daniels was never prescribed Lyrica.  Mr. Daniels' AHR makes no mention of the MWAP or its denial.  Defendant Mueller obviously denied the request.

296.     On April 9, 2018 Dr. Lee prescribed Mr. Daniels Ibuprofen.

297.     On April 17, 2018 Dr. Lee allegedly saw Mr. Daniels for pain management, but all he mentioned was a diagnosis for lower back pain, which is not his complaint.  He noted, "LBP well tolerate with Cymbalta."  Dr. Lee made zero comment on Mr. Daniels' on going neurological issues.

298.     Mr. Daniels had been on Cymbalta for months because that was all DOCCS would give him, but it never effectively treated his neurological issues, nor did Mr. Daniels ever suggest that it was working.

299.     On May 25, 2018 Mr. Daniels requested a renewal of his feed in cell permit which Dr. Lee granted.

300.     On August 13, 2018 Mr. Daniels asked for another renewal because he "can't walk stairs to go to dinner."  Dr. Lee granted the permit again.

301.     Mr. Daniels' pain and mobility were so severe he could not get to the mess hall, yet Dr. Lee could offer him nothing stronger than Ibuprofen and the ineffective Cymbalta.

302.     On September 9, 2018 Mr. Daniels reported experiencing severe numbness in his right hand, and that it was worse since surgery.

303.     On September 12, 2018 Dr. Lee referred Mr. Daniels to Dr. Darryl Dirisio, a neurosurgeon.  His referral read, "Offender with neck and arms pain, MRI: severe central canal stenosis C3/C4, diffuse deg. Changes & malalignment.   N[eurosurgery] clinic referral & Recommendation; C3-4; Poss additional level, ant. Cervical discectomy and fusion," etc.

304.     Dr. Lee's AHR notes for this visit state, "Call out: mobility issues; EMG cervical myopathy.  Immobility issues feed in cell."

305.    Dr. Dirisio found "Severe numbness and hand worse since surgery.  Known cervical myelopoathy on MRI – hyperintense. Cervical cord."  Dr. Dirisio said no surgery was indicated at that time, but recommended, "Neurontin/Lyrica for pain … would try PREGABA [Lyrica] 50mg BID."

306.    Dr. Lee reviewed Dr. Dirisio's recommendations on October 8, 2018.  He noted in Mr. Daniel's AHR, "N[eurosurgery] cervical discectomy and fusion, still has pain, numbness, Rec[ommends]: Lyrica/Neurontin. F[ollow-up]: 1 year."  Dr. Lee did not note why he dismissed Dr. Dirisio's recommendation for Neurontin or Lyrica.

307.    On both October 8, 2018 and October 16, 2018 Mr. Daniels reported experiencing pain and numbness to Dr. Lee. Dr. Lee noted, "f/up pain management" and that Mr. Daniels was suffering from numbness in his hands, that they were cold, that he had pain in his neck." He did not prescribe Lyrica but wrote a referral to pain clinic once again.

308.    On October 4, 2018 Dr. Chowdhury at Albany Medical Center studied radiographs of Mr. Daniel's cervical spine.  It showed moderate degenerative changes since the last set of images.

309.    On November 6, 2018 Dr. Lee again prescribed Ibuprofen, a wholly inadequate treatment option.

310.    On November 11, 2018 Mr. Daniels reported pain, tightness and weakness in his left forearm and hand.

311.    On November 12, 2018 Mr. Daniels reported that he was still experiencing upper extremity pain.  Dr. Lee asked for a referral to the pain clinic.

312.    On December 17, 2018 Dr. Lee once again saw him for cervical myopathy, but he did not prescribe a medication to help Mr. Daniels neurological issues.

313.    Mr. Daniels repeatedly attended physical therapy.

314.    On February 26, 2019 Mr. Daniels reported that he felt "bad on my hands, cold, numbness and I can't do my workout." The physical therapist at Shawangunk expressed that he would benefit from a neuro consultation.

315.    Throughout March 2019 Mr. Daniels reported that his upper extremities were cold and numb.  Dr. Lee responded, not by prescribing him Lyrica, but by sending him back out to the neuro[surgery] clinic.

316.    Over three years, six specialty visits objectively demonstrated Mr. Daniels' sources of neurological pain and specialists recommended three MWAP medications: Neurontin, Baclofen or Lyrica.  All recommendations were dismissed due to the medications' status on the MWAP List.

317.    Mr. Daniels' pain and mobility issues are so bad he feeds in his cell, yet Defendant RMDs continue to refuse to prescribe effective medication that would manage some of Mr. Daniels' neuropathic and chronic pain.

318.    **SHANNON DICKINSON** ("Mr. Dickinson") is a 46-year-old inmate who is currently housed at Mohawk Correctional Facility ("Mohawk").

319.    Mr. Dickinson is paraplegic from a gun shot wound in 1989.  He has degenerative lower cervical disc disease C6-C7, moderate degenerative lower cervical spondylosis C5-C7 with partial neural foraminal constriction right side level C6-C7 and worsening osteoarthritis in his hips. He also suffers from left ulnar neuropathy and a serious right shoulder rotator cuff tear and impingement, probably suffered moving himself in and out of his wheelchair.

320.    Upon his transfer into DOCCS on November 15, 2016, Mr. Dickinson was prescribed 50mg of Ultram twice a day, 10mg of Baclofen three times a day and Lyrica 200 mg

three times per day.  The Baclofen and Lyrica controlled the very painful spasming in his lower body as well as his neuropathy.

321.    This combination of medications was not perfect but it did control his daily pain, severe spasming and neuropathy.

322.     Though Mr. Dickinson's medical records are woefully incomplete, it seems he transferred to Shawangunk in late 2016 and the care of Dr. Lee.  Dr. Lee discontinued Ultram, but continued to treat Mr. Dickinson with Baclofen and Lyrica.

323.    Mr. Dickinson attended physical therapy through April and May 2017, but on June 7, 2017 the physical therapist stated, "Pt has reached max potential.  Refer back to PCP → he would benefit from pain management."

324.    On June 19, 2017 Dr. Stanley Penc read Mr. Dickinson's EMG which "demonstrated abnormal motor and sensory responses that can be seen with sensori-motor neuropathy."  Dr. Lee reviewed the report on June 22, 2017 and acknowledged the findings as positive for neuropathy.

325.    On June 26, 2017, a nurse noted in Mr. Dickinson's AHR that he was experiencing "chronic [right] shoulder and back pain unrelieved by [physical therapy], neuro[logy] consult[ation] and pain med[ication] were [discontinued].  Requests Ultram scrip or other alternative medication."

326.    From July 1, 2017 until July 7 Mr. Dickinson received 600mg of Neurontin twice a day, however on July 7 the prescription ran out and the nurses kept noting, "OOS [out of stock]."[14]

---

[14] In the thousands of pages of medical records reviewed, this is the only time nursing staff suggested that medications were "Out Of Stock." It's possible the MWAP was not

327.    The medical records suggest that by August 5, 2017 a nurse noted, "waiting for MWAP," for Baclofen, but it was never approved.

328.    On August 9, 2017, Dr. Murnane, the consulting neurologist found, "He has involuntary spasms of legs.  In past he had Lyrica 100 mg BID … which helped him, but was d'c'd.  Please commence low dose [Neurontin] 300mg tid… EMG/NCS suggests . . . peripheral neuropathy….trial  Elavil 25mg….may increase Elavil every 2-3 weeks to 75 mg if needed,  If no benefit would re-challenge with [Neurontin] but no dose higher than 600mg tid."

329.    On August 14, 2017 Dr. Lee noted in Mr. Dickinson's AHR, "neuro clinic rec [increase] [Neurontin], Baclofen, Elavil. Request MWAP Neurontin Baclofen."

330.    On August 19, 2017 Dr. Lee again wrote that Mr. Dickinson should have Elavil, Baclofen and Neurontin per the Neuro clinic.

331.    From August 9, 2017 until September 8, 2017 Mr. Dickinson received 600mg of Neurontin twice a day, but the Elavil made him extremely sleepy and he started refusing it on August 28, 2017.[15]

332.    Mr. Dickinson's medical notes show that the Elavil was making him sleep 18 hours a day and Mr. Dickinson was unable to function.

333.    On September 6, 2017, Dr. Lee ordered for Mr. Dickinson to receive 600mg of Neurontin twice a day.  However, Defendant Mueller did not approve the MWAP.  The medication

---

approved, as while there are sometimes delays of a few days getting medications this is the only instance of medications being "OOS."

[15] Based on the limited records in Mr. Dickinson's medical record, it seems likely the thirty days of Neurontin was somehow a make up for the Out of Stock supply the month before… There is no MWAP, nor notation regarding an effort to get MWAP approval, until August 2017 when Mr. Dickinson's prescription must have run out.

administration chart shows Mr. Dickinson did not receive it and then in late September it says, "awaiting approval."  On September 28, 2017 the chart says, "Not Approved."

334.    On September 7, 2017 Dr. Lee noted that the 25 mg of Elavil was too strong for Mr. Dickinson, so he decreased the prescription to 10mg.

335.    By mid-September both of Mr. Dickinson's prescriptions for medication that controlled his spasms and neurological pain, Baclofen and Neurontin, had been totally discontinued by Defendant Mueller pursuant to the MWAP Policy.

336.    On September 28, 2017 medical personnel noted that Mr. Dickinson's "muscle spasms in legs are getting worse…wants to [discontinue Elavil] and only making Mr. Dickinson sleep."  Additionally, the writer ordered for Mr. Dickinson's Elavil prescription to be discontinued with a plan to find alternative "med for muscle spasms."

337.    On October 24, 2017, Dr. Welch conducted an MRI and found "a tear of the supraspinatus tendon with a gap in the tendon by approximately 9 mm," in Mr. Dickinson's right shoulder.

338.    Mr. Dickinson continued to complain of pain and muscle spasms in his lower back and extremities.

339.    On December 21, 2017, a nurse noted that Mr. Dickinson "has medication questions."

340.    On December 27, 2017, Dr. Lee again sent Mr. Dickinson to a neurologist, this time Timothy Lynch, MD.   Dr. Lynch wrote, "last recommendation by neuro was trial of Elavil , but med list states patient got 10mg…. also written for [Neurontin] 600mg [three times a day] if Elavil unsuccessful.  Patient states also not given that.  Either patient received this but does not recall or patient never received this.  Need to clarify.  If recommendations do not work would send to pain

specialist as recommended." Dr. Lee reviewed this recommendation on December 28, 2017. Dr. Lee was well aware Mr. Dickinson had not received the Neurontin prescription.

341.    On December 28, 2017, instead of getting Mr. Dickinson a prescription for Neurontin, Dr. Lee referred him to the pain clinic.

342.    In his referral, Dr. Lee wrote, "tried with Neurontin/Elavil not effective…" even though Mr. Dickinson's Neurontin had been discontinued. He had not received it, nor any alternative for his muscle spasms and neuropathic pain since August of 2017.

343.    On February 6, 2018, Dr. Schwartz, an orthopedist saw Mr. Dickinson. In his report he wrote, "Dr. Lee please state this patient on this medicine [Meloxicam] asap self-carry." Dr. Lee was easily able to prescribe Meloxicam as it is not an MWAP.

344.    The pain management doctor from Harris Anesthesia saw Mr. Dickinson on February 16, 2018 and suggested steroid injections as well as "Neurontin, Baclofen." Dr. Lee reviewed this recommendation on February 19, 2018.

345.    Still, no Neurontin nor Baclofen were prescribed. On April 2, 2018, a nurse wrote Mr. Dickinson "wants his old medicine, legs have muscle spasms…[and] nerve pain in [his] feet."

346.    Somehow on April 3, 2018, Mr. Dickinson was sent back to Dr. Schwartz, the orthopedist who wrote, "probably should have surgery [and] was referred to Dr. Holder. Why [was] he sent back to my clinic?"

347.    On April 9, 2018, Mr. Dickinson again complained of "leg spasms [and] nerve pain."

348.    On April 25, 2018 Mr. Dickinson was given multiple joint injections on the right side of his neck by a doctor at Harris Anesthesia to attempt to help with his shoulder pain.

349.    On April 29, 2018 Mr. Dickinson was admitted to the infirmary at Shawangunk.

350.    On April 30, 2018, medical personnel stated that Mr. Dickinson complained of "nerve pain [and] wants to see Neurologist, [Mr. Dickinson] states spasms are out of control, [complains of] contraction to left leg [and] can barely straighten it."

351.    On May 10, 2018, Mr. Dickinson finally saw Dr. Holder who found that Mr. Dickinson had "[right] shoulder atrophy…[and a] full thickness [right] rot[ator] cuff tear."

352.    On May 11, 2018, in Mr. Dickinson's AHR, a nurse wrote that Mr. Dickinson's hip has progressively worsened.

353.    On May 14, 2018, Dr. Lee ordered an x-ray of Mr. Dickinson's left hip.  The technician reported, "worsening of osteoarthritis with further reduction in joint space."

354.    On May 18, 2018, Mr. Dickinson had a follow-up with Harris Anesthesia who noted that despite the injections, Mr. Dickinson "still [complains of right] upper neck pain."

355.    On May 22, 2018 Mr. Dickinson was transferred to Green Haven and the care of Dr. Bentivegna and Nurse Practitioner Albert Acrish.

356.    On May 30, 2018 Defendant Acrish noted, "pain, neuropathy, worsening osteoarthritis, right should surgery [needed] and neuropathy back L5."

357.    Without discussing it with Mr. Dickinson, Defendant Acrish immediately prescribed 50mg of Elavil three times per day, the very drug that Mr. Dickinson could not handle in 10mg doses at Shawangunk and referred Mr. Dickinson back to the pain clinic.  Defendant Acrish either could not access the information in Mr. Dickinson's medical chart (which is incomplete and a mess) or did not bother to look into past treatment attempts.

358.    Understandably, Mr. Dickinson refused to take the Elavil until July 18, 2018 when it was finally discontinued.  The nurses, rather than following up with Mr. Dickinson, just repeatedly noted that he was "non-compliant" with his medications.

359.     Finally, in late July, a nurse spoke with Mr. Dickinson who explained that the Elavil totally knocked him out and that he was supposed to follow up with shots from pain management for which he had not been scheduled since his transfer.

360.     When he could get the attention of a nurse, Mr. Dickinson repeatedly reported the constant pain and nurses noted his "alterations in comfort."

361.     From August through early October of 2018 Mr. Dickinson continued to complain of severe pain in his groin, legs, hips and feet.

362.     On October 11, 2018, medical personnel stated that Mr. Dickinson required a "return trip [to the] pain clinic."

363.     He was seen by Dr. Clifford Gevirtz on October 15, 2018, who gave Mr. Dickinson three trigger point injections, a nerve block and [drumroll] recommended a trial of Neurontin.

364.     On November 7, 2018, in Health Services Progress Notes, the writer states that Mr. Dickinson has "upper back/neck and shoulder pain (6/10); had 4 injections this year and one more to go.  [Mr. Dickinson] stated 'I had 2 rounds of [physical therapy] at the other facility [and] no significant [changes] and opted not to have another formal [physical therapy] program at this time."

365.     Through late 2018 and early 2019 Mr. Dickinson continued to complain of his severe muscle spasms.  Though he was sent out for epidurals to his right shoulder a few more times, his neurological pain and spasming in his legs was never addressed.

366.     Mr. Dickinson's medical records do not show that Mr. Acrish ever attempted to get MWAPs to treat his chronic issues.

367.     Through February and March of 2019, Mr. Dickinson continued to complain of pain and spasms to Mr. Acrish and other medical personnel at Green Haven.

368.    On or around March 21, 2019 Mr. Dickinson was transferred to Five Points and to the care of Nurse Practitioner Kristin Salotti.

369.    On May 1, 2019, Nurse Salotti stated that Mr. Dickinson had "notable spasms…more burning in [right foot] than [left] . . ."

370.    Nurse Salotti immediately submitted a MWAP Request for Baclofen to Defendant Dinello, the RMD for Five Points which he approved.

371.    To recap, at least four specialists have recommended that Mr. Dickinson take Baclofen and Neurontin or Lyrica and his primary care provider, Dr. Lee, agreed.  He did not receive the medications because of the MWAP Policy.  He still does not receive Neurontin or Lyrica to treat his neuropathic pain due to the MWAP Policy.

372.    Mr. Dickinson has no history of drug use, addiction or diversion tickets since his incarceration in 2016.

373.    **AARON DOCKERY** ("Mr. Dockery") is a 34-year-old patient currently housed at Shawangunk.

374.    Mr. Dockery was diagnosed with multiple sclerosis ("MS") in October of 2016.

375.    MS is a disease of the brain, spinal cord and central nervous system.  Patients who suffer from MS have an immune system that attacks the protective sheath that covers nerve fibers and causes communication problems between the brain and rest of your body.  There is no cure for MS, but victims of the disease suffer "flare ups" and will sometimes go into remission.

376.    Due to his MS, Mr. Dockery suffers numbness, weakness in his body, electric-shock sensations, tremors, fatigue, dizziness, slurred speech, pain and tingling in parts of his body and problems with his bladder and bowel functions.  Mr. Dockery's symptoms are particularly bad

in the heat of the summer, when he often needs a walker or wheelchair to ambulate due to his MS symptom flare-ups.

377.    From December 2016 until June 29, 2017 Mr. Dockery received 600mg of Neurontin twice a day which helped manage his neurological symptoms including pain, tingling and numbness.

378.    In 2017, Mr. Dockery was at Five Points and under the care of Nurse Practitioner Salotti.  Five Points is in Defendant Dinello's hub.

379.    On February 10, 2017 he was seen by neurologist, Dr. Jubelt, who recommended he continue taking Neurontin among other medications.

380.    On May 24, 2017 Mr. Dockery's chart was given to Ms. Salotti for the renewal of his Neurontin prescription which was 600mg twice per day.  Ms. Salotti approved the renewal and the prescription was sent to the pharmacy.

381.    On June 2, 2017, the MWAP Policy was promulgated.

382.    In mid-June Mr. Dockery started suffering increased symptoms.  He believed the Neurontin was not working.

383.    On June 20, 2017 Mr. Dockery requested an increase in his Neurontin or a change to an even more effective medication due to the increasingly hot weather.  His MS was flaring up.

384.    The same day, Ms. Salotti, responded by writing down a tapering schedule to take Mr. Dockery off his Neurontin completely.  Her notes claim he was sent "notification," but Mr. Dockery never received such notification.   Ms. Salotti prescribed Depakote, a psychiatric medication.

385.    Ms. Salotti made no reference in Mr. Dockery's AHR to the discontinuation of his Neurontin, nor is there any justification in his medical records.  It can be presumed that Mr. Dockery's Neurontin prescription was discontinued due to the MWAP Policy.

386.    Believing his Neurontin was not working, on June 27, 2017 he questioned the nurse who brought his medication.  She told him that he was actually being tapered off of it.

387.    On July 6, 2017 Mr. Dickinson saw, Dr. Jubelt again, due to his worsening symptoms.  Dr. Jubelt noted that the facility has stopped his Neurontin and prescribed Depakote.  Dr. Jubelt wrote, "since cannot get Neurontin, could try Lyrica…."

388.    Ms. Salotti reviewed Dr. Jubelt's recommendation on July 7, 2017, but she never attempted to order Lyrica.

389.    On or around July 28, 2017 Mr. Dockery was transferred to Coxsackie Correctional Facility ("Coxsackie").

390.    On July 31, 2017 Mr. Dockery was in the facility infirmary due to complications from MS.   A nurse noted in his chart, "[restart] copax[one], Neurontin helped spasticity/neuropathy."

391.    In response, either Dr. Miller or Mantaro gave Mr. Dockery a five-day emergency supply of Neurontin.

392.     Mr. Dockery's symptoms improved.  Drs. Miller and Mantaro submitted a MWAP Request which was approved but without refills.  There is no record of this MWAP form in Mr. Dockery's medical records, other than a reference.

393.    With only one refill on September 17, 2017 Drs. Miller and Mantaro had to resubmit the MWAP Request for Mr. Dockery's Neurontin prescription.

394.     Dr. Mantaro wrote on the MWAP Request, "Inmate on copaxone, Elavil, Tegretol which is causing significant diarrhea and dizziness and not helping with painful neuropathy of feet, ibuprofen tried, detropan for bladder, left facial numbness…decreasing sensation left side of body, weak gait, diagnosed with MS 11/16.

395.     Defendant Dinello refused to approve the Neurontin prescription writing, "insufficient medical justification" and suggested weaning Mr. Dockery off Neurontin.  Defendant Dinello added, "a safer non-habit forming nerve modulating agent is recommended that has also been found to be effective in MS."  Defendant Dinello did not give the name of the alleged "safer non-habit forming nerve modulating agent."

396.     On September 21, 2017, Mr. Dockery was transferred to Albany Medical Center due to his increasing symptoms and chest pains.

397.     Albany Medical Center staff noted: "32 yo with a history of [MS] diagnosed in July 2016 . . . presents for bilateral foot numbness and tingling "pins and needles" as well as chest pain. According to correction facility records, the patient is being tapered off his [Nuerontin] but the patient was unaware since he only receives his medications crushed.  3 weeks ago the patient began to have more foot pain that feels, "like steam burns on feet.""

398.     The doctor at Albany Medical Center wrote, "I do believe the [chest pain] is likely secondary to anxiety related to the patient's severe pain. . . He recently saw Dr. White, a neurologist through the coxsackie facilities who told him that he should be on an increased dose of [Neurontin] for some of his symptoms.  He was previously on 600 mg twice a day but as supposed to be on 1200 mg at night with 600 in the morning.  The patient believes he was getting this, however, documentation from the facility suggests that he has actually been tapered off this medication.  The patient was unaware. . . I did contact the facility who did describe the same story

to me as the patient.  Seems as though the patient's symptoms began to increase as the patient's [Neurontin] was taken off.  I do believe these symptoms are directly related to the fact that the patient is no longer [] [Neurontin], and I do believe it is medically necessary for the patient to receive this medication as prescribed by his neurologist.  I did speak with the deputy superintendent of the jail who told me that [Neurontin] has been taken off of all inmates in this region and this patient was deemed to not require it by the regional medical director.  I do believe that this patient does [in] fact require [Neurontin].  I recommend[] that [Neurontin] is restarted at 600 mg twice a day and that the patient see the facility neurologist in the next week for discussion regarding dosage."

399.    In a discharge packet from Albany Medical Center the doctor wrote, "you should be restarted on [Neurontin] 600 mg two times per day. You should also follow up with the facility neurologist in the next week to discuss dosing of the [Neurontin] which I do believe to be necessary to prevent these symptoms."

400.    Upon his return from the hospital, Dr. Mantaro gave Mr. Dockery an emergency 5 day prescription of Neurontin

401.    On September 25, 2017 Mr. Dockery made clear at sick call that he "feels like he's not getting proper medical care for his MS and symptoms associated with it."

402.    Dr. Mantaro and/or Dr. Miller then cleverly submitted the MWAP request form for Neurontin directly to Defendant Koenigsmann.  Dr. Koenigsmann approved the MWAP request but changed the prescription to three times per day.

403.    In an October 2, 2017 entry in Mr. Dockery's AHR, Dr. Miller noted, "CMO will approve liquid Neurontin based on recommendations from three neurologists."

404.    Despite this prescription, Mr. Dockery received Neurontin very sporadically – sometimes every other day getting one dose.  The medical records demonstrate no medical justification nor reason for this sporadic dosage and it does not mimic the prescription approved by Defendant Koenigsmann.

405.    DOCCS put Mr. Dockery on a medication called, "Copaxone," but it did not work.

406.    On November 24, 2017 Mr. Dockery made clear that he had "not been evaluated concerning the medications…I have been prescribed.  I am seriously sick and [it] has not been addressed.  I ask that I speak with someone.  The only medication that I absolutely need is Neurontin."

407.    On October 28, 2017 Mr. Dockery was checked into the infirmary at Coxsackie.

408.    Though there is no note in Mr. Dockery's records, someone ensured that he finally started to receive 900mg of Neurontin every morning and 1800mg of Neurontin every night at bedtime through December of 2017.

409.    On January 5, 2018 refusal from, Mr. Dockery refused the Copaxone, once again, because it was not working and no one had evaluated his medication needs to control his MS.

410.    That same day a renewal of Neurontin 900mg twice a day was approved by Defendant Koenigsmann.  Dr. Koenigsmann also wrote, "Recommended by multiple neurologists, alternative [treatments] failed."

411.    Unfortunately, on January 11, 2018 Mr. Dockery suffered an extreme flair up and could not walk.  He was transported to Albany Medical Center ("AMC").

412.    AMC discharged Mr. Dockery on January 17, 2018 and Dr. James R. Wyant wrote on his discharge, "[T]his patient should be on a maintenance multiple sclerosis medication.  We will start him on Tecfidera.  The intention is that this medication should be started after his

discharge.  Given this patient's medical history, he will likely have waxing and waning symptoms and often have difficulty ambulating without an assistive device.  It is recommended that he be . . given either a cane or a walker as available to help him during these periods when his symptoms flare."  Dr. Wyant also prescribed Neurontin 900 mg every morning and 1800mg at bedtime.

413.    Mr. Dockery was never put on Tecfidera because it was "non-formulary" at Coxsackie Correctional Facility and was, instead, put back on the ineffective Copaxone.

414.    On January 20, 2018 Coxsackie ordered Neurontin from Kinney drugs to administer to Mr. Dockery.

415.    On February 1, 2018 Mr. Dockery was transferred to Shawangunk and admitted to the infirmary.

416.    In what seems like very little knowledge of Mr. Dockery's medical condition and needs, Dr. Gusman put in a MWAP request to Defendant Hammer for a ten day prescription of Neurontin.  Among other notes, Dr. Gusman wrote, "Please approve for the first 10 days at Shawangunk suggested treatment.  Then we will investigate and possibly change the dosage."

417.    In his approval, Dr. Hammer wrote, "The dosage mentioned above apparently represents an increase from the prior dosage of 900 mg po bid.  I will approve Neurontin at 900 mg po bid for 10 days to allow for transition to the new facility and continuity of care.  Approval beyond this time and any change in dosage will be reviewed by Dr. Mueller on her return."

418.    Dr. Hammer changed Mr. Dockery's prescription without personally examining him or investigating his medical records in any meaningful way.   Dr. Wyant had just cared for Mr. Dockery at AMC and recommended the 900mg/1800mg dosage.

419.    On February 4, 2018 Mr. Dockery was still not receiving Neurontin and a nurse accused him of "hoarding" medication in the infirmary, though no such accusations or any drug-related charges existed in Mr. Dockery's records before that date.

420.    The next week, the regular physician at Shawangunk, Dr. Lee, sent the MWAP for continued treatment with Neurontin not to Defendant Mueller, but to Defendant Koenigsmann. Dr. Koenigsmann approved the MWAP for Neurontin, but once again changed the prescription to 600mg three times a day.   It seems not one DOCCS physician cared enough to check the prescription doses recommended by Mr. Dockery's treating neurologists.

421.    This medication regimen continued until about June 14, 2018 when Dr. Lee noted in Mr. Dockery's AHR that he would need an MWAP for [Neurontin] for neuropathic pain.

422.    There is no MWAP Request Form in Mr. Dockery's records, but on July 3, 2018 Dr. Lee entered an order to taper off the Neurontin prescription.   The MWAP had not been approved.

423.    Mr. Dockery started to complain about his increasing neuropathic pain and there is an increasing number of bizarre remarks from the nursing staff that he "doesn't seem to be in lots of pain," or that he's "not using his walker."

424.    On August 13, 2018 a nurse noted, "MWAP Policy explained [to patient]."

425.    Mr. Dockery's condition had not changed, nor was there any reason to believe he no longer required Neurontin, in fact, it was mid-summer when Mr. Dockery's symptoms are at their worst.

426.    Mr. Dockery immediately filed a grievance in which he wrote, "I have been told by Dr. Lee that I am once again being taken off my medication (Neurontin).  This medication has already been approved by the CMO Dr. Koenigsmann.  Also, I have already suffered a traumatic

event as a direct result of being taken off of this medication.  No reason has been given why this is happening again.  I ask that my medication be continued."

427.    On July 9, 2018 Mr. Dockery reported to a consulting physician "I feel numbness down my legs.  I don't have my meds anymore."

428.    On July 20, 2018 for the first time during Mr. Dockery's incarceration he was charged with, "drug use."  His medical records reveal no tests for drug use.  – neither an urinalysis nor blood work.   A note to the Nurse Administrator, Jennifer Gallagher, said that Mr. Dockery was charged with "drug use," and in Dr. Lee's hand a note says, "marijuana."

429.    On August 8, 2018 Dr. Lee submitted another MWAP request form for Mr. Dockery's Neurontin prescription, stating that Mr. Dockery "cannot sleep, x several days, d/t pain & hands/foot neuropathy, used walker for ambulatory, used to walk without walker, tried w/Elavil, tegretol symblata [sic?] not effective."

430.    Defendant Mueller denied the MWAP request for Neurontin stating, "Does not have EMG diagnostic of peripheral neuropathy.  Has recent Tier 3 convictions for drug use most recently 7/20/18.  According to medical staff does not appear to be in pain, but rather malingering and drug seeking, strongly muscled.  Started bringing walker to medical unit after Neurontin stopped last month.  For how long and what dates were above-noted medications used?  Need supportive diagnostics.  Suggest alternative safer modalities for this patient who is presently abusing illicit drugs."

431.    On August 13, 2018 medical refused to answer Mr. Dockery's questions about his medication instead writing, "MWAP Policy/Procedure explained."

432.    On August 20, 2018 a provider requested a pain management update due to facial and hand numbness.  Mr. Dockery's condition was worsening.

433.    On November 19, 2018 medical records show that Mr. Dockery was suffering from dizziness, "numbness [and] tingling to legs [and] feet,…hip pain, back pain, legs [and] feet."

434.    Mr. Dockery continues to request Neurontin.

435.    Mr. Dockery continues to suffer from MS flare ups, pain, tingling and other symptoms that were at least mitigated with consistent treatment with Neurontin.

436.    On January 17, 2019 a member of the medical staff at Shawangunk entered a code on Mr. Dockery's chart for, "3048 Substance abuse/habit/addiction," referring to the July 20, 2018 for Mr. Dockery allegedly smoking marijuana.

437.    DOCCS continues to refuse to prescribe Neurontin which worked to effectively manage some of Mr. Dockery's neurological symptoms.

438.    **EDDIE FIELDS** ("Mr. Fields") is a 48-year-old inmate who is currently housed at Green Haven Correctional Facility ("Green Haven").

439.    Mr. Fields is paralyzed from the waist down due to a stabbing assault in prison.  He was stabbed in his spine at C4-C5 vertebrae and is wheelchair-bound.  He suffers from spasticity and extreme weakness in his right side.

440.    Spasticity is a condition in which certain muscles are continuously contracting. This contraction causes stiffness or tightness of the muscles and can interfere with normal movement, speech and gait.

441.    Mr. Fields was drafted in from Erie County Holding on August 4, 2017, two months after the MWAP Policy was promulgated.  His records show he was on Flexeril and Lamictal prior to his transfer to DOCCS custody.

442.    Mr. Fields history on intake showed tobacco use and marijuana use, but no alcohol, narcotics or other drug use.

443.    DOCCS originally transferred Mr. Fields to Elmira Correctional Facility ("Elmira").

444.    Within two days, Dr. Braselman reduced his Flexeril without an examination, an EMG or any other assessment.

445.    On August 10, 2017, Mr. Fields explained to the nurse that the reduction will cause problems and asked how his pain would be addressed.  The nurse's response (like so many DOCCS medical practitioners) was to immediately suggest in her notes that Mr. Fields was manipulating/drug-seeking for asking how his pain would be treated after the Flexeril reduction. Mr. Fields had been in custody six days.

446.    On or about August 22, 2017 Mr. Fields was transferred to Green Haven.  There, Nurse Ashong prescribed Baclofen to treat his spasticity and ordered some physical therapy. Baclofen is a muscle relaxer and an antispasmodic agent.

447.    On September 7, 2018 Mr. Fields was prescribed a ten-day supply of 10 mg of Baclofen twice a day.

448.    On September 14, 2018 Mr. Fields was allowed to continue to be on Baclofen until September 20, 2018, after which he would be cut off of Baclofen.  Nurse Ashong gave no reason for the discontinuation of Baclofen, but it can be inferred that Defendant Hammer refused the MWAP Request for Baclofen.

449.    On September 20, 2018 Mr. Fields requested to go back on Baclofen and stated that the medication really helped him. Mr. Fields complained of tingling in his fingers and toes and again requested that he be prescribed Baclofen. The notes on the ambulatory health records progress note said that Mr. Fields had a pending appointment with a neurologist, seemingly to discuss his medication.

450.    On September 26, 2018 Mr. Fields saw a neurologist, Dr. Kishore Ranade.

451.    Dr. Ranade specifically prescribed, "Baclofen 10mg [three times a day]; Tizanidine 8mg [twice a day] . . . "  When Nurse Practitioner Mary Ashong reviewed the recommendations on October 4, 2018 she crossed a line through "Baclofen" and placed "done" next to the other orders.

452.    On October 1, 2018, after his appointment with Dr. Ranade, Mr. Fields again requested Baclofen and stated that the neurologist recommended that he go back on the medication.

453.    October 4, 2018, the same day that the neurology report was reviewed, Defendant Hammer denied Nurse Ashong's MWAP Request for Baclofen and said that no increases in dosage in medicines should occur.

454.    On October 19, 2018 Mr. Fields started taking Tizanidine 8mg BID to treat his spasticity. Tizanidine is a much milder muscle relaxant than Baclofen.

455.    On October 31, 2018 Defendant Ashong submitted a MWAP form only for the drug Tizanidine, not Baclofen. Defendant Hammer reviewed the MWAP request for Tizanidine and commented, "Please note that this patient has an extensive history of poly substance abuse. Use caution in monitoring for compliance and the possibility of diversion as this patient is in GP.  I will approve for 180 days."  On the same MWAP form in response to the question "is there evidence of recent overdose, drug abuse or diversion?" the answer was "no."

456.    Mr. Fields' drug history makes no reference to substance abuse of opioid, benzo, stimulant, hallucinogen or inhalants. Additionally, he has never had to go through substance abuse treatment, nor does he have disciplinary tickets for drug use.

457.    Mr. Fields was in pain due to the discontinuation of his effective medications and continued to complain of pain. On November 5, 2018, Mr. Fields complained that his toes were curling under his foot.

458.    He then saw Dr. Ranade, the neurologist, again on December 26, 2018 and explained Nurse Ashong would not give him his medications.  Dr. Ranade tried to help by increasing the dosage of the Tizanidine from 8mg twice a day to 8mg three times a day, indicating that the medication is not sufficiently treating the pain.

459.    Defendant Hammer approved the increase in dosage on January 3, 2019, though Mr. Fields continues to suffer unnecessarily.  He has given up asking for effective medication, as he has been repeatedly told that he will not be approved for Baclofen.

460.    **JOHN GRADIA** ("Mr. Gradia") is a 49-year-old inmate who is currently housed at Eastern Correctional Facility ("Eastern").

461.    Mr. Gradia has no history of drug or contraband disciplinary charges.  He has one charge for "unauthorized medication," from 2012 in which three expired nicotine patches were found in his cell left over from when he quit smoking.

462.    Mr. Gradia has a number of very serious physical problems, mostly involving degenerative issues in his spine with radiating pain, burning and numbness down his left side through his foot.

463.    Mr. Gradia has long been treated with very strong medications to meet his pain management needs.  From 2015 forward, Doctors Andola and Gusman at Eastern treated him with Percocet (often 2-3 times per day), Neurontin, Toradol shots (intermittently), Flexeril, Wellbutrin, Motrin, Tylenol #3, short courses of Prednisone and Motrin and Ibuprofen when tolerated.

464.   A July 13, 2015 MRI showed that Mr. Gradia had multilevel signal loss of the intervertebral discs consistent with desiccation.  He had disc space narrowing the endplate spurring at C5/C6 and C6/C7, he had C4/C5 disc protrusion with narrowing, C5/C6 broad-based posterior disc herniation/osteophytic ridge complex protruding 3-4 mm abutting the ventral surface of the spinal cord, and bilateral foraminal stenosis associated with uncinate spurs."

465.   On February 26, 2016 Mr. Gradia received an anterior lumbar ineterbody fusion of L5-S1 at Albany Medical Center.  The procedure was performed by Dr. DiRisio, who discharged him with a number of medications including Neurontin.

466.   The surgery failed. Mr. Gradia began to suffer complications, experiencing intense pain in his lower back and down the left side of his body to his left foot.  He was urinating blood. During the spinal cord surgery he also suffered an injury which caused retrograde ejaculation.

467.   During a post-surgical follow-up Dr. DiRisio told him the complication was irreversible and the surgery had failed.  Mr. Gradia would have to undergo another back surgery.

468.   On April 25, 2016 an MRI was conducted due to Mr. Gradia's reports of "numbness, pain and radiculopathy in the left lower extremity."

469.   The MRI Report read by Dr. Maresca found "a new left lateral disc herniation identified at L4-5 which with disc material filling the inferior aspec of the subarticular fat pad … this may be effecting the descending left L5 nerve root versus the exiting left L4 nerve root."

470.   Dr. Forrest reported after a May 13, 2016 EMG, "There are high frequency waves and or polyphasic potentials seen in the paraspinal muscles (polyphasic) gastrocnemius muscle (high frequency) ext halluces longus (high frequency) and tib anterior (polyphasic).  This suggests Chronic multi level nerve root irritation."

471.    On January 3, 2017, eight months after the EMG was performed, a medical worker entered "Post-Clinic Comments" into the FHS1 system for Mr. Gradia's EMG.  These comments only read, "No evidence of peripheral neuropathy."  Dr. Forrest's complete conclusions and recommendations are not on the FHS1 system available to RMDs for review.  Of particular importance, the finding of "chronic, multi-level nerve root irritation," is not int eh FHS1 entry.

472.    On May 19, 2016 Dr. Darryl DiRisio, a neuro-surgeon, noted that Mr. Gradia was already on Neurontin and Ultram, but he recommended that Mr. Gradia also be prescribed oxycodone or hydrocodone for pain until three weeks before his surgery.

473.    On January 29, 2017 Mr. Gradia's pain was so severe, Dr. Andola ordered a Toradol shot via telephone.

474.    On February 5, 2017 Mr. Gradia reported a pain level of 8-9 out of ten.  Dr. Gusman noted, "severe pains left groin tendon . . . inflammation, history of back surgeries."

475.    On February 16, 2018 Mr. Gradia saw a pain specialist at Harris Anesthesia, who recommended a pain block, pain medications and a muscle relaxant.

476.    Mr. Gradia continued to consistently complain of his extreme pain.  On March 30, 2017 he told Dr. Andola that Flexeril helped a bit, but Percocet was the only thing that really worked.  He told her he may have to sue, but that he did not want her to take it personally.

477.    On April 28, 2017 Mr. Gradia saw a doctor at Harris Anesthesia again who recommended nerve blocks and that Neurontin be increased to 1200 mg three times per day.

478.    On May 9, 2017, a urologist, Dr. Thomas Stellato, examined Mr. Gradia due to his on-going pain and the retrograde ejaculation diagnosis.  Dr. Stellato recommended Neurontin and Percocet to treat the resulting pain, as well as a referral to neurosurgery.

479.     On May 19, 2017 Dr. Andola examined Mr. Gradia.  She noted that his pain wakes him up at night, radiates to his gluteal crease, anus, perineal are, scrotum, inner thigh and that he was suffering from chronic burning and numbness.  During the night he had to stand for three hours as the pain was worse laying down.  Dr. Andola prescribed the max dose of Neurontin, Percocet for 2 weeks and the scheduling of the pain management injections.  As the MWAP Policy was not in effect, she was able to get him two weeks of Percocet.

480.     On June 2, 2017 DOCCS promulgated the MWAP Policy.

481.     On June 7, 2017 a pain management specialist at Harris Anesthesia wrote, "Patient needs to have pain meds for post-operative pain 2-3 times per day for up to 2 weeks." Dr. Andola could only get him the five-day emergency supply allowable under the MWAP Policy without approval.

482.     Dr. Andola submitted an MWAP Request for Percocet.  She listed his diagnoses as "chronic low back pain s/p anterior lumbar interbody fusion L5/S1 now s/p additional pain management procedure."  She listed the alternative treatment options tried as, "[Nuerontin] 1200 mg [three times per day], felxeril 10mg  [three times per day], ibuprofen 600mg [three times per day], Mobic 15mg [once a day], Tylenol #3, prednisone taper, ultram 50mg [twice per day]."  In response to the question "is there any evidence of abuse or diversion, Dr. Andola answered, "No."

483.     Dr. Andola followed up her request with a June 9, 2017 email to Defendant Mueller stating, "Inmate Gradia . . . is not receiving ultram currently.  He had received it in the past.  He is no longer on that medication.  He just had a pain mgmt. procedure and the pain mgmt. provider recommended pain medication for 2 weeks per the consult.  The pain injection is not expected to take full effect per the Pain Mmgt provider for that time."  At 5:35pm, Dr. Andola added, "he is

no longer on [Mobic], Tylenol 3 or prednisone.  The box was asking for treatment options attempted/step therapy.  The meds were attempted in the past not now."

484.    Defendant Mueller denied the request stating, "Not approved.  Receiving Ultram among many other meds.  Just received injection from Pain Management which should . . ." Defendant Mueller did not check Mr. Gradia's current medications nor even bother to read the concern that the pain injections would not take effect for two weeks.

485.    On June 12, 2017 the five-day supply Dr. Andola could give without MWAP approval ran out.  She emailed Defendants Dinello, Mueller and Hammer in all caps: INMATE GRADIA . . . IS NOT CURRENTLY RECEIVE ULTRAM NOR IS HE RECEIVING T#3 OR PREDNISONE – HE IS CURRENTLY GETTING PAIN MANAGEMENT AND [NEURONTIN] AND IBUPROFEN AND WAS GETTING FLEXERIL.  NO OTHER OPIATES CURRENTLY.  PAIN MGMT PROVIDER RECOMMENDED PAIN MEDICATION FOR 2 WEEKS PER THE CONSULT AFTER PAIN INJECTION AS IT WOULD NOT BE EXPECTED TO TAKE FULL EFFECT FOR 2 WEEKS PER PAIN MGMT."

486.    As Defendant Mueller was out, on June 14, 2017 both Defendants Hammer and Dinello responded.  Defendant Dinello wrote, with seemingly no understanding of Mr. Gradia's issues, "Even according to recent DOH Guidelines, a maximum of 7 days' worth of a Controlled/Scheduled Substance has been recommended for acute pain.  The use of 5 days of [Ultram] post-injection would be appropriate with housing in the Infirmary if the pain is that severe.  You are definitely on the right track by utilizing more definitive treatment modalities (Steroid blocks) to treat the patients underlying pathology.  Hopefully you can wean him from the [Neurontin] as well."

487.    Defendant Dinello did not recognize that Mr. Gradia's pain was chronic, nor did he approve an MWAP for the Ultram.

488.    Defendant Mueller did not approve the medication and responded, "See text of attached email from Dr. Dinello."

489.    On June 16, 2017 Mr. Gradia told a nurse, "I don't know why I'm suffering with all this pain when it was recommended by "pain management" that I receive my pain medication for two weeks after this injection."

490.    On June 14, 2017 New York Assemblyman David I. Weprin, Chair of the Standing Committee on Correction, wrote a letter to Defendant Koenigsmann requesting proper medical treatment for Mr. Gradia's pain and suffering.  The letter was ignored.

491.    Oddly, on June 21, 2017 Defendant Dinello wrote Dr. Andola again.  He wrote, "The brief course of Percocet seems appropriate. . . Typically, housing in a secure location like an infirmary is preferred for patients receiving a short course of opiate analgesia.. . In this case, housing in the GP has been approved.  Just keep this in mind down the road."  He returned the MWAP approving Percocet for five days, completely not caring that the five days had already been administered and the patient was without pain medication.  In fact, the first MWAP read, "Brief course of Prednisone approved," which was the wrong drug altogether.

492.    On June 23, 2017 Dr. Andola filed an MWAP Request for Mr. Gradia's Neurontin. She again listed his diagnoses, the treatment options used and the fact that he had not recent overdose, drug abuse or diversion.  Defendant Mueller approved the Neurontin with no comment.

493.    On July 21, 2017 Mr. Gradia was seen by a pain management specialist at Harris Anesthesia, who recommended an injection every 14 days and treatment for Mr. Gradia's pain

with Ultram at 100mg three times per day.   Both Dr. Gusman and Andola reviewed the recommendations and agreed.

494.   On August 25, 2017 Mr. Gradia met with Dr. Andola.   Mr. Gradia expressed his extreme pain and Dr. Andola explained that Defendant Mueller had stopped all of his pain medications due to the MWAP Policy.   Dr. Andola examined the rash on Mr. Gradia's legs and told him it was a reaction to the Ibuprofen he was taking to ease the pain.   Dr. Andola then emailed Defendant Mueller an MWAP requesting Ultram and asked for an appointment with a neurosurgeon.

495.   Dr. Andola's MWAP Request for Ultram explained that Mr. Gradia was having a rash from chronic NSAID use, as well as all the medications he had taken.

496.   Defendant Mueller refused the MWAP request for Ultram.   She said, "Most recent MRI 4/25/16, thus not new finding, plus "HNP" is effecing fat planes which is not clinically significant.   EMG is WNL.   On Neurontin inappropriately & at maximal dose for at least 1yr. Obviously ineffective as it should be.   Has never had PT for LBP.   Chronic use of high dose controlled substance not indicated for this patient.   Recommend explore safer alternatives as well as continue Pain Management."

497.   Every "medical finding" Defendant Mueller "relied on" in her denial was false. Not only had she never examined the patient, but the May 13, 2016 EMG showed "chronic multi-level nerve root irritation," which never made it into the FHS1 database.

498.   Mr. Gradia had also seen SIX specialists, including FOUR in "Pain Management," who had recommended Percocet and Neurontin to control Mr. Gradia's obvious, severe pain.

499.   On August 28, 2017 Dr. Dinello piped in via email writing, "There is insufficient medical justification to continue a MWAP (in this case [Ultram]) for continued use in Chronic-

Non Palliative Pain.   The patient has Chronic Lumbar Back Pain which is being managed conservatively by [neurosurgery] and successfully treated by [pain management] with shots.   I would recommend [physical therapy] as well since the patient was last seen by them in 2007.   The use of Neuropathic pain medication does not appear to be medically justified since his LE EMG/NCS in 05/13/16 was Normal.   Let me know if you have any questions."

500.    Again, the Defendant RMD's comments were completely wrong.   They did not even note Mr. Gradia's post-surgical ailments, his radiculopathy, that the surgery had failed or that it was both Neurosurgery and Pain Management who recommended Ultram and Neurontin.

501.    On August 30, 2017 Mr. Gradia went to sick call for his extreme pain and found out that Defendant Mueller had denied his Ultram prescription.

502.    On September 11, 2017 Mr. Gradia returned to sick call.   He was against denied medication.   He requested a double mattress to help alleviate his chronic pain.   A nurse's note states, "Denied MWAP – Patient knows."

503.    In a bizarre response to one of Mr. Gradia's grievances regarding the discontinuation of his pain medication, Defendant Gusman wrote: "[I]n 2016 & 2017 inmate Gradia was receiving Percocet, [Neurontin], Flexeril, Ultram & Tylenol 3.   Patient received narcotics before 2016, but the new pharmacy system cannot provide this information.   At this time is receiving [Neutrontin] due to his medical needs.   All these medications are medications with potential abuse.   These mean that he is prescribed medications despite possibility of potential abuse due to his medical needs."

504.    Mr. Gradia had not received any of those medications except Neurontin since the MWAP Policy was promulgated.

505.     On October 11, 2017 Dr. Andola issued Mr. Gradia a double mattress in an attempt to help how she could with his pain.

506.     On October 12, 2017 he was taken by facility van to Coxsackie where he was evaluated by Dr. DiRisio.   Dr. DiRisio ordered an MRI and a CT scan.  Mr. Gradia and Dr. DiRisio discussed his pain management needs.  Dr. DiRisio recommended "repeat injections (he did well), Lidoderm patches may help and said, "may try Ultram."    Dr. Andola reviewed the recommendation but made no note of why she was dismissing Dr. DiRisio's recommendation that Mr. Gradia try Ultram.

507.     Mr. Gradia reported his severe pain repeatedly through October and November of 2017.

508.     On November 3, 2017 Mr. Gradia met with Dr. Andola again and he reported his chronic pain, including the pain in his right knee.   She scheduled him for an MRI and an orthopeodic specialist.   On her referral she wrote, "Patient followed by Neurosurgery last appointment 10/12/17.  May need decompression of L4-L5 needs updated open MRI of lumbar spine without contrast.   Patient with long history of lower back pain [treated with] pain management injections and pervious anterior lumbar interbody fusion at L5-S1 by neurosurgery in past.  On Neurontin 1200mg three times per day and having persistent pain in left lower extremity and testicular pain. . ."

509.     On November 17, 2017 Mr. Gradia was back with a doctor from Harris Anesthesia who scheduled him for injections and said, "continue with [] med," referring to the medication he had prescribed in July – Ultram.

510.     A November 21, 2017 MRI report dictated by Dr. Gibbs found, "postsurgical changes noted at L5-S1; Lateral recess narrowings at L5-S1 due to degenerative spondylosis;

diffuse disc bulging L3-L4 and L4-L5.  A superimposed left lateral disc herniation at foraminal narrowing at L4-L5 due to underlyinig diffuse disc bulging and simper-imposed left lateral disc herniation, and focal central disc herniation at T11-T12 resulting in mild central canal stenosis."

511.    On November 24, 2017 Mr. Gradia asked for Ultram again, pursuant to what the doctor at Harris Anesthesia had just told him.

512.    On December 12, 2017 Dr. Andola requested that he be prescribed Neurontin through an MWAP Request.  Dr. Andola noted that he was "awaiting pending pain management procedure, awaiting CT scan of Lumbar spine, waiting orth eval of his right knee."

513.    In response, Defendant Mueller denied the Nuerontin request stating, "EMG [within normal limitations], and on maximal dose of Neurontin (of no proven benefit at such high dosing).  This all mentioned on previous MWAP request.  Need Neurontin level for renewal which is not provided.  Can obtain and resubmit.  Meanwhile would begin taper and recommend safer alternative medications.  Please refer to televideo and accompanying handout of 8/17/17.

514.    The nurse's note states, "RMD asking for a drug level now!"

515.    Defendant Mueller was attempting to 'prove' that Mr. Gradia was diverting his Neurontin.  Of course, he was not.

516.    As of December 21, 2017 the test results were still pending.

517.    The BioReference test came back and it seems Dr. Andola went around Defendant Mueller to Defendant Koengismann who approved the Neurontin for 90 days on December 22, 2017.

518.    It seems that while Defendant Mueller was away Dr. Andola also submitted a MWAP Request to Defendant Hammer who allowed a five day dose of Ultram on December 26, 2017 to give Mr. Gradia some pain relief.

519.    On December 27, 2017 Mr. Gradia received an injection to help with his severe pain.

520.    On January 26, 2018 Mr. Gradia reported extreme pain again and felt that the pain injections were making his pain worse.  He asked if there was an alternative to Neurontin.

521.    On February 23, 2018 Dr. Andola noted Mr. Gradia's severe pain.  She noted, "Requests pain med due to above issues.  Will try Ultram 50mg PO twice per day – 5 day emergency supply."  She gave him the five days supply that she did not have to get an MWAP approval from an RMD to administer.

522.    On March 23, 2018 Dr. Andola examined some extreme rashes Mr. Gradia as suffering on his legs.  She concluded they were allergic reactions to NSAIDs.  Mr. Gradia returned his self-carry medications: Asprin, Motrin and Tylenol.

523.    Mr. Gradia's pain in his back and rectum was severe.  He was also experiencing shooting pain down his left leg which was interrupting his sleep.  Dr. Adola submitted MWAP Requests for Neurontin and Ultram.

524.    In a boss move to get her patient his necessary medication, Dr. Andola submitted the MWAP to Defendant Koenigsmann, who once again approved the Neurontin for another 90 days.

525.    On April 3, 2018 Dr. Holder performed a right knee arthroscopy for medial femoral condylar and trochlear groove pick arthroplasty repair and augmentation of femur fracture.

526.    In the beginning of April of 2018 Mr. Gradia also filed suit in the New York State Court of Claims against Defendant Mueller.

527.    On April 25, 2018 Mr. Gradia saw Harris Anesthesia for his pain.  Dr. Andola wrote on the referral, "Seen by Pain management per neurosurgeon for low back pain and reported pain

into lower left extremity.  Recommends Left L5-S1 nerve root block (L5-S1 transforaminal ESI)."
The doctor performed injections into Mr. Gradia's spine and said, "patient needs post op pain meds
oxydodone X 6 hours for 5-7 days."   The catheters that facilitate the injections are incredibly
painful.

528.    On May 7, 2018 Mr. Gradia reported that he had had injections two weeks ago but
that he was still suffering from pain.

529.    Between May 7, 2018 and December 2018 Mr. Gradia lost over 16 pounds due to
his excruciating pain and inability to eat.

530.    On May 31, 2018 Dr. Andola noted that Mr. Gradia needed to see Pain
management.  About a week later he complained about the pain in his lower back, rectum, testicles
and Left leg to foot, explaining that his pain was currently a 4 out of 10.

531.    On June 22, 2018 Dr. Andola wrote, "Eform/MWAP done for [Neurontin].
Awaiting decision by RMD."

532.    Defendant Mueller was the recipient of this MWAP Request and summarily
discontinued Mr. Gradia's Neurontin prescription.  She wrote, "No updated information included
on this request.  As mentioned before in my comments, EMG is [within normal limits] and patient
has never had [physical therapy] for his back."

533.    On June 29, 2018 Mr. Gradia saw Dr. Andola and reported that he still has chronic
pain, "I still have a lot of back pain and pain in the rectum."  He asked Dr. Andola about Toradol
shots, but she wrote, "No Toradol pt cannot take NSAIDs."

534.    On July 17, 2018 Mr. Gradia noted that his back was hurting bad and his left leg
down to his left foot.  The pain in his groin and testicles was flowing down his left leg and he

reported the pain was become more frequent with the discontinuation of Neurontin.  The nurse noted, "Need Neurontin."

535.   On July 27, 2018 Mr. Gradia saw a pain therapist, who recommended he try Lamictal or Trileptal "for the neuropathic pain in his knees" and wrote "recommend [Ultram] for severe pain."

536.   On July 31, 2018 Defendant Gusman prescribed a two weeks supply of Lamictal, but he did not prescribe Ultram, nor note why he was dismissing the specialist's recommendation.

537.   On August 10, 2018 Mr. Gradia filed a Grievance regarding the discontinuation of his Neurontin prescription.  The Grievance was passed through the Superintendent who responded, "per Facility Health Services Director Gusman . . . the grievant's medical records were reviewed noting that he was seen by pain management on July 27, 2018 and they suggested a trial of Lamictal.  On July 31, 2018 Lamictal was ordered for the grievant.  It is noted that DOCCS requires Eastern's Regional Medical Director [Defendant Mueller] to review and approve or deny all unsafe medications with abuse potential per Health Services Policy 1.24."  The response did not note that the pain therapist had recommended Ultram and that Dr. Gusman had not even tried to get an MWAP.

538.   On August 16, 2018 Dr. Andola started Mr. Gradia on a trial dose of Elavil remarking that if he tolerated it should would increase to 50mg.  Dr. Andola remarked on his chronic joint pain, lower back pain, poor sleep due to back pain, pain into lower extremities, etc.

539.   On  September 7, 2018 he requested an appointment with Dr. Andola to discuss his labs.  He also requested to discontinue the Elavil because it was not helping with the pain and was making him sleepy throughout the day – a very common complaint of the patients DOCCS puts on Elavil.  He requested Benadryl to help him sleep at night.  He also requested pain med

management with injections.  Dr. Andola noted his chronic pain including the sharp pains in his rectum and the burning sensations in his left leg and foot.  Dr. Andola prescribed Benadryl at 25 mg at night.

540.    On September 11, 2018 Mr. Gradia reported his chronic pain was not improving and that the spasm in his right lower extremity was "waking him every two hours."  The nurse noted, "Pt req. pain meds."  She noted his pain was at an 8.

541.    On October 5, 2018 a pain therapy appointment was approved, but not scheduled.

542.    On October 12, 2018, Dr. Holder, an orthopedist, prescribed a right hinged knee brace to help with Mr. Gradia's ambulation and pain.

543.    On October 31, 2018 he returned from getting yet another epidural on his left side at the L4/L5, L5/S1.  The nurse noted, "Patient will need pain med for pain for 5-7 days."  He was not administered any.

544.    On November 1, 2018 Mr. Gradia asked for pain meds due to his recent pain therapy treatment, stating, "I can't sleep, all my joints hurt."

545.    On November 8, 2018 Dr. Andola saw Mr. Gradia and he told her about his decreased appetite due to pain and his trouble sleeping.  She prescribed Celebrex and changed the time of his lidocaine patches to later at night

546.    On November 30, 2018 Mr. Gradia's pain was so bad that he requested Toradol shots, even though he had a documented allergy to NSAIDs.

547.    On December 7, 2018 Mr. Gradia saw a pain management doctor at Harris Anesthesia.  The doctor noted, "Pt with lower back pain, failed back surgery syndrome and r[ight] lumbar radiculopathy, . . . nerve root block with no relief and report back and leg pain is worse

with severe cramps in legs worse at night.  The doctor recommended, "Requip for leg cramps, 2) . . would like to consider trial of spinal cord stimulator; 3) consider a trial of Lyrica or Trileptal."

548.    Dr. Andola reviewed the report, but made no notes in his chart about the Pain Management specialist's recommendations.

549.    On December 11, 2018 Mr. Gradia had a Standing xray of his hips which showed mild bilateral osteoarthritis, right tendinitis and disc disease at L5-S1.

550.    On January 24, 2019 Dr. Andola noted that his sleep is interrupted due to the cramping in his legs 3-5 times per night.  She was also concerned about his weight loss and requested that a nurse assess his BMI.  She prescribed the "Requip," but not any of the pain management doctor's other suggestions, including Lyrica or Trileptal.  She also did not note why she was dismissing the specialist's recommendations.

551.    On February 11, 2019 Mr. Gradia reported to the nurse that his left foot goes numb with no feeling and suffers from sharp pain.

552.    At a February 25, 2019 examination nurse Baluvelt noted his impaired comfort due to back and joint pain.  Mr. Gradia had to stop taking the Requip because it wasn't helping and it was too sedating; he was getting in trouble by sleeping through the count.

553.    On March 14, 2019 Dr. Andola saw him and noted his weight loss as well as his continuing pain and discomfort, as well as the fact that he doesn't sleep well.

554.    In April and May of 2019 Dr. Andola had to request adjustments to Mr. Gradia's back and knee braces due to his weight loss.

555.    Mr. Gradia is still not getting effective pain management.  He lives with severe, chronic pain which was controlled before promulgation of the MWAP Policy.

556.   **ANGEL HERNANDEZ** ("Mr. A. Hernandez") is a 57-year-old inmate currently housed in Shawangunk.

557.   Mr. A. Hernandez suffers from a number of physical maladies including asthma, back pain with radiating symptoms, numbness to left hand, shoulder and upper back, degenerative disc disease at his L5-S1, osteoarthritis, and left carpal tunnel syndrome.

558.   A June 5, 2014 MRI showed "extensive steophytic spurring spondylosis and chronic disc degeneration at L5/S1."

559.   A December 19, 2016 MRI read by Dr. Racinelli showed severe degenerative disc changes at the L5-S1, as well as foraminal stenosis bilaterally.

560.   To control the spasming, pain, numbness and burning which radiates from his lower back area down his left leg, Mr. A. Hernandez has taken a combination of Ultram and Neurontin for many years.

561.   He has been in NY State custody since 2014 and was administered both medications regularly until the MWAP Policy.

562.   In 2016 and 2017 Dr. Mantaro at Coxsackie Correctional Facility was Mr. A. Hernandez's treating physician.

563.   On December 6, 2016 the pain therapy doctor recommended physical therapy in addition to the Neurontin, Ultram and other medications Mr. A. Hernandez was taking.

564.   Dr. Mantaro did not send him to physical therapy, nor did she note why she was dismissing the specialist's recommendation.

565.   On April 3, 2017 Mr. A. Hernandez had an appointment with a general surgeon who did not believe surgery would benefit him.  The surgeon recommended continuing Neurontin for his neuropathic pain.

566.     On May 15, 2017 Mr. A. Hernandez saw Dr. Nyla Azam, a pain specialist.  She reported, "I recommend increasing Neurontin to [three times a day] through a slow tritation, a back brace, also consider an epidural steroid injection."

567.     Dr. Mantaro agreed with Dr. Azam's recommendation and on June 29, 2017 increased the Neurontin prescription and referred Mr. A. Hernandez for epidural shot treatments, lidocaine patches and 650 mg of acetaminophen four times per day.

568.     On or about June 26, 2017 Dr. Mantaro submitted an MWAP request to renew Mr. A. Hernandez's prescription for Ultram.

569.     On the MWAP she wrote, "Has had physical therapy, back brace, formulary nsaids, brief use of muscle relaxer, back brace.  Declined invasive procedure after informed consent (esi). Pain management now recommending addition of lidocaine patch to regime."  Dr. Mantaro noted that Mr. A. Hernandez had not evidence of recent overdose, drug abuse or diversion.

570.     Defendant Mueller summarily refused approval for Ultram writing, "Has not had PT for [lower back pain] since 2014.  Past success with steroid injections. Recommend PT for back, counselling to accept recommended interventional pain procedures."

571.     On August 2, 2017 Dr. Mantaro ordered Mr. A. Hernandez's Ultram discontinued with a taper order.  She did not note why Ultram was being discontinued, nor did she prescribe an alternative medication.

572.     Though Mr. A. Hernandez's medical records do not include an MWAP Request for Neurontin, on August 2, 2017 Dr. Mantaro also discontinued Mr. A. Hernandez's prescription of Neurontin with a taper order.  There are no notes nor reasons articulated why Mr. A. Hernandez's effective medications were being discontinued after years of treatment.

573.     On August 29, 2017 Mr. A. Hernandez was transferred to Eastern and the care of Dr. Gusman.  A note on his intake record at Eastern says, "MWAP not approved.  Note left with [Nurse Administrator] re taper [of Neurontin]."

574.     On September 1, 2017, without examining the patient, Dr. Gusman wrote, "transferred from another facility with suggested tapering dose of Neurontin 300 mg to be started 9/1 No need for further tapering.  Neurontin can be safely discontinued."

575.     On September 14, 2017 Mr. A. Hernandez reported pain and asked about his Neurontin prescription.

576.     On September 19, 2017 Mr. A. Hernandez started refusing the lidocaine patches for his back because they did not work at all.  He felt they should be used on patients for whom they offered relief.

577.     Dr. Gusman started Mr. A Hernandez on Lamictal, but Mr. A. Hernandez started experiencing common, but serious side effects of dizziness and extreme fatigue.  He asked the nurse why he could not get his regular medications.

578.     On September 26, 2017 a nurse noted that Mr. A. Hernandez was complaining of pain in his legs and back and asked for an MRI and the re-prescription of his Neurontin.  The nurse noted, "per AHR no need for Neurontin."

579.     Nowhere in Mr. A. Hernandez's AHR records does it say that he doesn't need Neurontin.

580.     Despite the fact that Mr. A. Hernandez had experienced intolerable side effects and documented them in his refusals, on October 17, 2017 Dr. Gusman again prescribed Lamictal.

581.    On November 10, 2017 a nurse noted, "Patient not taking Lamictal. No NSAIDs, No ASA."[16]

582.    Mr. A. Hernandez continued to complain of his untreated pain repeatedly.

583.    Dr. Gusman started referring to his pain as "moderate lower back pain," in his notes.

584.    On a March 1, 2018 entry Dr. Gusman stated, "reluctant to take Cymbalta because 1:1."

585.    That statement was unequivocally untrue.   Mr. A. Hernandez's effective medication Neurontin was also a 1:1 medication which he would have happily taken.  Plus, Mr. Hernandez had been taking the Cymbalta and complaining of the headaches caused by the medication.

586.    Finally, after months of repeated complaints of untreated pain, Dr. Gusman ordered an EMG to assess Mr. A. Hernandez's neurological pain.

587.    DOCCS' doctors suggest to patients that if they have an abnormal EMG they will get back their Neurontin prescriptions, however, in all the patients studied by Plaintiff's counsel not one abnormal EMG reading has resulted in the re-prescription of a patient's Neurontin prescription.

588.    The practice seems to be a ruse, wherein the physician can say we tested you, but it does not indicate a need for the medication.

589.    Through July and August of 2018 Mr. A. Hernandez continued to complain of his untreated pain and requested to see Dr. Gusman many times.

590.    On August 6, 2018 he specifically stated, "I want to see Dr. Gusman for my lower back pain.  He took me off Neurontin, it kept my pain at bay.  My legs go out on me sometimes .

---

[16] ASA refers to aspirin.

. . my legs go out on me . . . the pain shoots down my legs.  I get a lot of muscle spasms in my legs."

591.    In a note in response, Dr. Gusman wrote, "request for Neurontin can be submitted after EMG of lower extremities."  Dr. Gusman prescribed yet another psych drug, Trileptal.

592.    On August 6, 2018 Dr. Gusman put in a referral for Mr. A. Hernandez's EMG.  He stated, "complaints of [lower back pain], cramps both legs, spasms legs of calves on and off.  Patient's MRI of both legs revealed diffuse degenerative changes.  Needs EMG of lower extremities. . . knee jerks decreased both sides.  Signs of lumbago left side."

593.    On August 23, 2018 in an obvious response to Mr. A. Hernandez's obvious pain and issues, Dr. Gusman allowed him a back brace.

594.    On September 17, 2018 an EMG was conducted by Dr. Stanley Penc and found, "evidence of mild chronic bilateral L5 and left S1 lubmar sacral radiculopathies.  This is an abnormal study."

595.    On September 24, 2017 Mr. A. Hernandez asked to see Dr. Gusman to discuss his radiculopathy.  He wanted to know "if his Neurontin [was] approved again.  The nurse noted, "no order found."

596.    On October 2, 2018 Dr. Gusman reviewed the study and wrote, "No action."

597.    Dr. Gusman avoided Mr. A. Hernandez who kept asking to see him for his pain.

598.    On October 23, 2017 Mr. A. Hernandez reported his difficulty sleeping due to the pain.

599.    On November 11, 2018 he complained about his leg numbness and getting an appointment.  The nurse noted he was suffering "impaired comfort," and told him he was scheduled to see Dr. Gusman December 18, 2018

600.    Finally, on December 20, 2017, three months after the abnormal EMG, Dr. Gusman saw Mr. A Hernandez.  Mr. A. Hernandez reported his pain and Dr. Gusman noted, "will request pain management evaluation."

601.    Mr. A. Hernandez's medical records are full of his complaints of severe and unmitigated pain and suffering.  Nothing was done.

602.    He undertook physical therapy which he readily admitted helped in the very short term, but "after a few hours the pain comes back."

603.    On January 4, 2019 Mr. A. Hernandez was transferred to Shawangunk and Dr. Lee's care.

604.    On intake, Nurse Scofield noted Mr. A. Hernandez's extensive issues including "nerve pain lower back, legs, left hand and arm" and stated, "has pain clinic next month."

605.    From January through July of 2019 Mr. A. Hernandez repeatedly complained of his pain and lack of proper treatment, including his muscle spasms, leg pain, etc.

606.    On May 17, 2019 Mr. A. Hernandez saw Dr. Hussein, a pain specialist, who recommended, "Baclofen, Motrin and injections."  Mr. A. Hernandez cannot take NSAIDs like Motrin and there is no note as to why Dr. Lee refused the recommendation of Baclofen.

607.    On June 29, 2019 Mr. A. Hernandez was seen by Dr. Hussein again for a pain therapy follow up.  Despite repeated recommendations that Mr. A. Hernandez be treated medicinally for his pain, the MWAP Policy demands he receive no such treatment.

608.    **SPENCER JACKSON** ("Mr. Jackson") is a 32-year-old patient who is currently housed at Green Haven Correctional Facility ("Green Haven").

609.    Mr. Jackson had suffered from a stab wound in 2007 and a gunshot wound leading to severe nerve damage in his left leg and a completely dislocated patella.  Due to these injuries

Mr. Jackson suffers from painful muscle spasms, weakness and atrophy of his left foot due to sciatic nerve injury

610.    From June 1, 2016 until December 8, 2016 Mr. Jackson received 800mg of Neurontin twice a day at Auburn Correctional Facility ("Auburn"). He described the pain he suffered to be 3/10 at best and 8/10 at worst.[17]

611.    On December 2, 2016, in an Ambulatory Health Record Progress Note, the writer increased Mr. Jackson's Neurontin dose to aid with the nerve pain in his left knee and leg.

612.    From December 9, 2016 until February 9, 2017 Mr. Jackson was receiving 2000 mg of Neurontin a day.

613.    On December 28, 2016, Mr. Jackson received an MRI of his left knee to determine the cause of his chronic knee pain and weakness.  Dr. Hojnowski reported the findings: "Patellar subluxation/dislocation …with a possible small cartilage defect involving the medial facet of the patella may be responsible for what appears to be an intra-articular loose body is seen within the intercondylar notch."

614.    In early February 2017, Mr. Jackson complained of dizziness and foot pain and stated that he believed the "dizziness [relates to increase of] Neurontin."  Mr. Spencer requested to have his Neurontin prescription decreased.  The prescription was decreased to 800mg twice per day.

615.    From February 10, 2017 until early June 2017 Mr. Jackson received 800mg of Neurontin twice a day.

_____

[17] Like many of the patient/plaintiffs, Mr. Jackson's medical records as received by Plaintiffs' counsel in response to a FOIL/Public Health Law request are incomplete.  The records contain no Medical Problem List, and scant medication administration charts compared to the length of his incarceration.

616.    On June 12, 2017, ten days after the MWAP Policy was promulgated medical staff at Auburn ordered Mr. Jackson to receive "Neurontin 800mg po bid x 1 mo pending MWAP response."

617.    Defendant Dinello approved the MWAP request for Neurontin without any comment and Mr. Jackson continued to receive Neurontin.

618.    On September 22, 2017, Mr. Jackson was scheduled to be transferred to another facility.  Medical staff issued an "outgoing draft" with a prescription of 800mg of Neurontin twice a day.

619.    On September 28, 2017, Mr. Jackson arrived at Shawangunk, where he was placed under the care of Dr. Lee.  Mr. Jackson's intake notes say he is to receive Ibuprofen 600mg, [Neurontin] 800mg and Zyrtec.  Mr. Jackson requested an "MD app[ointmen]t for torn ligament [in his left] knee [and] Rx for nerve damage [to his left] leg."

620.    On October 2, 2017 a Correction Officer reported to medical that he had seen Mr. Jackson playing basketball and "running up and down court," an absolutely impossible claim.

621.    Shawangunk medical staff administered Neurontin to Mr. Jackson until October 5, 2017 which was the "end of the script."  Dr. Lee's notes on October 5, 2017 say, "Must review new indraft.  ? Neurontin."

622.    Without examining Mr. Spencer (or even verifying the story) Dr. Lee ordered that Mr. Spencer give up his cane.  Mr. Jackson wrote a sick call slip about both his cane and medication being taken from him.

623.    He was finally seen on October 16, 2017 by M. Dappet who clearly did not believe he was "running up and down" a basketball court.  The nurse noted that Mr. Jackson's "left patella

was visibly dislocated laterally . . . he has to be very careful walking or [his knee] will give out and then swell up."

624.    On October 16, 2017, Dr. Lee finally examined Mr. Spencer.  He sent him to physical therapy.

625.    On October 25, 2017, in a Physical Therapy/Occupational Therapy Utilization review, Mr. Jackson ranked the pain from his knee at worst an 8/10 and on average 5/10.

626.    On October 30, 2017, in an Ambulatory Health Record Progress Note, Mr. Jackson is quoted stating "I have nerve pain [in my left] thigh from 2014-knee pain since 2013."

627.    On November 17, 2017, Mr. Jackson complained of "nerve pain, [left] calf and leg to [left] foot [and] numbness."  The nurse noted that he "was receiving Neurontin 800mg BID [at] prior facility.  Last fill: 9/25/17."  The nurse also states that she will send the "chart to MD regarding med request."

628.    On December 7, 2017, Mr. Jackson again reported to the medical staff at Shawangunk, "I have chronic nerve pain.  I need my nerve pain medicine I took for 3 years." Again, the staff member wrote, "chart to MD to eval[uate]…possible Rx for Neurontin or Ibuprofen."

629.    On December 14, 2017, a medical staff member wrote, Mr. Jackson "need[s] pain meds for nerve damage…knee damage."

630.    On January 2, 2018, Dr. Lee examined Mr. Jackson once again and pointedly noted his "nerve/sciatica pain" and "left knee patella [and] left knee pain."  Yet, he did not represcribe Neurontin.

631.    On January 11, 2018, Mr. Jackson was transferred to Green Haven.  On intake it was noted that Mr. Jackson suffers from left leg pain and has left foot nerve damage.

632.    On January 25, 2018, a medical staff member at Green Haven noted that Mr. Jackson needed to see a "provider for several issues – chronic knee pain."

633.    On February 21, 2018 Mr. Jackson finally saw a provider, but the doctor merely wrote, "no c/o needs," which cannot be true. The medical records reflect Mr. Jackson complaining of his nerve pain repeatedly and often.

634.    On June 26, 2018, in an Ambulatory Health Record Progress Note, the writer states that Mr. Jackson has complaints of "nerve pain [in his left] leg."

635.    On October 26, 2018, a nurse states that Mr. Jackson said, "I want to get EMG have H/O [left] leg nerve damage and it's hurting a lot."

636.    On October 30, 2018, a doctor wrote, "pt had posit. EMG for neuro[] after stab wound l tibial nerve new c/o pain will give [Elavil]. 50mg."

637.    Amitriptyline is an antidepressant. While taking the medication, Mr. Jackson suffered severe side effects, including vomiting and nodding off. After about three weeks, he started refusing the medication due to the side effects.

638.    On November 23, 2018, a doctored noted, "amitriptyline makes him vomit. [Mr. Jackson] requesting Neurontin specifically…on exam [Mr. Jackson] doesn't act as in pain."

639.    On December 19, 2018 an EMG was conducted which showed some improvement in Mr. Jackson's neuropathic pain but was nonetheless abnormal and demonstrated the need for neuromodulating medication.

640.    Mr. Jackson is still not being treated for his severe nerve damage, despite successful treatment for years with Neurontin. DOCCS continues to administer Elavil at night, which causes him to sleep most of the day, and Ibuprofen.

641.    **HUGH KNIGHT** ("Mr. Knight") is a 63-year-old inmate who is currently housed at Shawangunk.

642.    In 1990, Mr. Knight suffered several gunshot wounds in his lower spinal cord.  The wounds caused paralysis for a number of years, but Mr. Knight slowly recovered somewhat despite being told that he would not walk again.

643.    Mr. Knight can now sometimes ambulate but with great difficulty.  He still suffers from neuropathic pain and uses a cane, wheeled walker or wheelchair depending on the severity of his pain.

644.    Mr. Knight suffers from osteoarthritis, peripheral neuropathy, injury to his lumbar spine, immune mediated neuropathy and possibly radiculopathy.

645.    While in Sullivan Correctional Facility until 2014 Mr. Knight was successfully treated with Lyrica.

646.    In November of 2014, Mr. Knight was transferred to Shawangunk where his Lyrica prescription was changed to Neurontin, a medication that did nothing to address Mr. Knight's symptoms.

647.    Because Neurontin did not help him, Mr. Knight repeatedly refused to take the Neurontin and requested the re-prescription of Lyrica.  Dr. Lee.

648.    In December of 2015 Dr. Lee noted that Mr. Knight was suffering from, "pain, numbness, tingling sensation bilateral lower legs/foot."

649.    In January of 2016 he was referred out for an EMG to explore his bilateral leg pain and neurological issues.

650.    The results were abnormal and showed non-specific peripheral neuropathy.

651.    He was sent to Albany Medical Center ("AMC") for further examination where the neurologist was concerned that he suffered from immune mediated neuropathy and could not exclude radiculopathy.  The neurologist recommended adding [Neurontin] to control Mr. Knight's pain.

652.    In response, Dr. Lee increased his dosage of Elavil, a psychiatric medication and told him that he was put in for neuro when he complained that the chronic pain was getting worse. Medical added a low dose of Flexeril in late February 2016 which did not help.

653.    After a neurologist recommended Neurontin in September 2016, Dr. Lee strangely noted, "already on [Neurontin]," an absolutely untrue statement.   Mr. Knight was on no neuromodulating medications.

654.    Throughout 2018 Mr. Knight's pain was so bad that he took all his meals in his cell and could not walk to the clinic daily for his blood pressure checks due to the distance and his pain.

655.    Dr. Lee attempted to get Mr. Knight moved from C block to B block to be closer to the Clinic "because his leg pain seizes up" but the administration refused the move.

656.    In October of 2018 Mr. Knight reported excessive neuropathic pain in his foot.  He requested Lyrica or something like it.

657.    Mr. Knight has been repeatedly told by Dr. Lee that "Albany" will not allow him to have Lyrica, no matter his pain complaints.

658.    **TERRY MATHIS** ("Mr. Mathis") is a 60-year-old inmate at currently housed at Shawangunk.

659.    Mr. Mathis is unable to walk without the use of a back brace.  Mr. Mathis had a lumbar laminectomy L2-L5 in 2014.  He had another laminectomy of his L1-S1 in 2016.  He

suffers from degenerative osteoarthritis in his AC and glenoid humeral joints and has a rotator cuff tear in his left shoulder.  Mr. Mathis has previously experienced spinal fluid leaks and through surgery has had rods and screws have been surgically implanted in his back.  He consistently complains of debilitating back and knee pain and often describes his chronic lower back pain as a "red hot poker to [his] lower back."  He also suffers from a gastric ulcer and bleeding, thought to be from years of taking over-the-counter pain medications, and degenerative joint disease in both knees.

660.    Mr. Mathis had previously undergone epidural procedures which proved to be ineffective and continues to receive physical therapy which aids slightly in his pain management.  Historically, the most effective treatment for Mr. Mathis has been a combination of a low dose of Percocet and Neurontin.

661.    On January 19, 2016 a nurse states that Mr. Mathis "[complained of] back pain, currently [prescribed] Flexeril but states that [it] is not working.  Went to pain clinic on Friday."

662.    Similar notes appeared through February of 2016, each describing that Flexeril was not diminishing Mr. Mathis' pain.

663.    On March 1, 2016, in a Health Provider Order Sheet, the writer states that Mr. Mathis was admitted to the infirmary for spinal cord stimulation which was subsequently canceled.

664.    Through March of 2016, Mr. Mathis continuously complained of knee and back pain, including grinding and swelling.

665.    In response to March 26, 2016 complaints, the nurse issued sixteen packets of Tylenol to Mr. Mathis.  The Tylenol was ineffective.

666.    On March 29, 2016, Defendant Mueller sent Dr. Lee an email stating "I have just been asked to weigh in on the planned procedures for [Mr. Mathis].  I know nothing about the

inmate or the proposed procedures (spinal cord stimulator, trial, etc.).  Please provide me with a summary of his care to this point . . . "

667.     Through April and May, Mr. Mathis "[complained of] back pain, state[d] standing [to] sitting now [increased] pain 'more than before'…chart to MD for request to increase Ultram."

668.     On May 3, 2016, Dr. Lee noted that Mr. Mathis was in "severe pain," suffered from radiculopathy, "can't function," and suffered from "sleep disturbances."  He increased Mr. Mathis' Ultram prescription to 50mg two times per day.

669.     Unfortunately, some combination of Mr. Mathis' medication induced vomiting.  He told the nurse, "I was throwing up from 10P.M. to 12P.M. and I'm not sure it's Ultram."

670.     On May 17-18, 2016, Mr. Mathis refused medication because the medication made him "very nauseous and throwing up, not feeling good."

671.     Mr. Mathis continued to complain of both severe pain and nausea for weeks.

672.     Despite the frequent complaints of vomiting, on June 25, 2016, Dr. Lee ordered a medication renewal for 50mg of Ultram twice a day.

673.     Finally, on July 5, 2016, Dr. Lee discontinued Ultram and prescribed 900mg of Neurontin twice a day.

674.     Despite the change in medication, Mr. Mathis continued to complain about extreme pain.

675.     On August 9, 2016, Dr. Lee increased Mr. Mathis' Neurontin prescription to 1200mg twice a day.

676.     Mr. Mathis continued to have problems with his back and knees, but the Neurontin did help.

677.    On October 21, 2016, a nurse who seemingly had no familiarity with Mr. Mathis or his physical issues wrote that Mr. Mathis "(a frequent visitor to sick calls) [complained of] back pain since 10/15/16.  Requesting additional pain meds…[Mr. Mathis] denies use of [over the counter] pain meds for relief, states he is unable to sleep at night.  Tylenol given for breakthrough pain."   The nurse seemingly had no idea that Mr. Mathis was in so much pain he was scheduled to have a laminectomy within two weeks, nor of his stomach ulcers caused by over-the-counter medications.

678.    On November 11, 2016 surgeons at Westchester Medical Center performed a laminectomy at L1-S1 in Mr. Mathis' back.

679.    The discharge orders included a prescription for 600mg of Neurontin twice a day.

680.    Mr. Mathis was admitted to the infirmary at Shawangunk where his pain was over 10/10 on a 1-10 pain scale.  Mr. Mathis also received Percocet for his pain.  Mr. Mathis went back to the ER and returned to the infirmary at Shawangunk.  He was struggling with post-surgical pain management.

681.    From December 1, 2016 until September 28, 2017 Mr. Mathis was prescribed 1200mg of Neurontin twice a day.  On some occasions Mr. Mathis was treated with Percocet for particularly awful break-out pain.

682.    Although there were several periods when Neurontin was unavailable in the prison and Dr. Lee administered Ultram to treat Mr. Mathis' pain, his pain was somewhat managed by the daily dosage of Neurontin.

683.    However, after the laminectomy Mr. Mathis started to experience burning sensations in his left arm down to his wrist.  His shoulder was also popping out.

684.    He continued to complain about burning and needle-like symptoms.

685.   On January 5, 2017, Mr. Mathis received an x-ray of his left wrist due to the complained of pain.  It showed moderate degenerative osteoarthritis.

686.   Mr. Mathis' complaints of severe pain, burning and painful needle-like symptoms continued.

687.   On January 31, 2017 yet another X-ray was done showing degenerative first carpometacarpal joint disease.

688.   On February 8, 2017, Dr. Lee renewed Mr. Mathis' prescription for 1200mg of Neurontin twice a day with five refills.

689.   On February 22, 2017, in an Ambulatory Health Record Progress Note, the writer states Mr. Mathis "[complained of] continued burning, debilitating pain to [his left] wrist."

690.   On March 20, 2017, an EMG of his left wrist was performed, but as one might predict it showed no neurological features because the problems stemmed from osteoarthritis.

691.   In March Mr. Mathis started to have back problems again and complained of snapping and pain.

692.   Dr. Lee continued to send Mr. Mathis out for sonograms, X-rays and MRIs.

693.   On June 2, 2017 the MWAP Policy was promulgated.

694.   On June 19, 2017, Mr. Mathis had "[complained of] back pain 'it feels like a pin is out, sometimes stabbing pain, burns all the time.  My knee swells [and] it feels like it's about to buckle on me.'"  No medications were ordered by the writer and they questioned if an x-ray was performed on Mr. Mathis.  Many X-rays had been performed.

695.   On June 20, 2017, Mr. Mathis had yet another X-ray, this time of his whole back with contrast.  It showed significant disc narrowing at L1-L2, L2-L3, L3-L4, L4-L5, L5-S1 with

laminectomy defect, sclerotic endplate changes the screw at his L5 was exiting the bone into his L4-L5 disc space and fluid collection in the posterior soft tissues in the lower lumbar region.

696.    On June 27, 2017, Defendant Mueller approved the MWAP request for 1200mg of Neurontin twice a day for Mr. Mathis.  Dr. Mueller's approval notes indicate little familiarity with Mr. Mathis' medical history.   She wrote, "Recommend f/u w/pain management, PT, Neurosurg/Ortho as indicated.  Safer agents indicated…"[18]

697.    On July 14, 2017, medical personnel stated that Mr. Mathis "[complained of] 'burning in lower back and legs…severe pain [right] side lower back.'  Issued eggcrate mattress [with] permit x 6 [months]."

698.    On July 27, 2017, Dr. Lee noted that Mr. Mathis' pain was "getting worse," and it was "hard to move."  He admitted Mr. Mathis to the infirmary for pain control.

699.    Dr. Lee ordered a prescription for Ultram to treat Mr. Mathis and the pharmacy wrote back, "you need MWAP.  Please send MWAP, thank you 8/4/17" was handwritten.

700.    The MWAP request to Defendant Mueller made clear that Mr. Mathis was in the infirmary and that his pain was acute.  Defendant Mueller denied the request and wrote caustically, "you failed to mention that [Mr. Mathis] is also on Neurontin 2400 mg.  In that approval, recommended referral to [physical therapy]."  Nonetheless, Dr. Lee treated Mr. Mathis with Ultram for five days in the infirmary which substantially helped.

701.    Mr. Mathis was discharged from the infirmary on July 31, 2017 feeling much better.

702.    However, within a few weeks, on August 16, 2017, a physical therapist stated that Mr. Mathis ranked his pain at least 5/10, at most 8/10 and 7/10 on average with "difficulty walking…[and] standing."

---

[18] The MWAP approval notes are cut off.

703.    Again, on August 22, 2017, Mr. Mathis was admitted to the infirmary.  TM 498.

704.    On August 23, 2017, Mr. Mathis received a CT scan of his spine, Dr. Racanelli wrote that Mr. Mathis has "significant disc space narrowing…a laminectomy defect…[and] bilateral pedicle screws at [L1, L2, L3, L4, L5 and S1]," the same results from the June 20, 2017 X-rays.

705.    On September 6, 2017, Dr. Lee submitted an MWAP Request for Mr. Mathis' prescription of 1200mg of Neurontin twice a day with 11 refills.

706.    Defendant Mueller denied the renewal of Mr. Mathis' Neurontin prescription. She wrote, "no EMG, PE noted. MWAP of 6/27 recommended use of safer agents with many alternatives listed."  Mr. Mathis' Neurontin prescription was stopped.

707.    Other than brief stints in the infirmary for "pain control," when Dr. Lee administered a few days of Percocet, Mr. Mathis has not received any new pain management prescriptions.

708.    On November 3, 2017, medical personnel stated that Mr. Mathis had pain in his lower back, "[right] leg pain" and when laying down "[experiences] chest/back/leg pain."  He was admitted to the infirmary.

709.    From November 3, 2017 until November 6, 2017, Mr. Mathis received Percocet twice a day in the infirmary to cut his pain.

710.    On November 5, 2017, the infirmary nurse noted, "[Mr. Mathis] states in pain all the time, [no] pain meds requested [at] this time.  [Mr. Mathis] stated will take prior to bed.  [Mr. Mathis] stated that he wants to be alert and have tests to see what is wrong."

711.   On November 6, 2017, the infirmary nurse wrote Mr. Mathis "is in a lot of pain…in visible pain.  [Complains of] numbness around left [side] toward abdomen.  [Mr. Mathis] asking for pain meds."

712.   He was discharged back to his cell later that day, feeling better having been administered pain medication.

713.   From late November 2017 until the present Mr. Mathis has continued to complain of pain – both in his back and shoulder.  He wears at least one and sometimes two back braces. He takes meals in his cell and cannot participate in any programming.  He has a "flats permit" to keep him from having to climb stairs.

714.   Mr. Mathis is now constantly suffering from severe back pain.  He describes his pain when he moves as being "like a sledgehammer to my back."

715.   In April of 2019 he complained to Nurse Childress about the severe pain in an especially brutal bout of pain and where he was defecating blood.  The nurse told him to show his stool to a CO next time and ignored him.

716.   He was recently sent to Albany Medical Center which showed he had a small stroke in April.  The cardiologist articulated that the stroke could have been a byproduct of the consistent pain he suffers.  Mr. Mathis was supposed to return to the cardiologist for follow-ups and has not been sent.

717.   **HAROLD ORTIZ** ("Mr. Ortiz") is a 47-year-old inmate who is currently housed at Marcy Correctional Facility ("Marcy").

718.   Mr. Ortiz has been transferred to multiple facilities since his incarceration including Five Points, Great Meadow, Downstate and Elmira.

719.    Mr. Ortiz suffers from severe degenerative lower spondylosis, lumbar disc disease, degenerative posterior facet joint disease and he is pre-diabetic.  Mr. Ortiz also has hardware in his left arm due to a broken humerus and suffers from left radial neuropathy in that arm.  Mr. Ortiz is also severely mentally ill which makes his medical care a challenge.

720.    As many other DOCCS' patients, Mr. Ortiz's treatment for chronic pain has been spotty at best.  In March of 2013, he told medical personnel, "I was on Vasotec, Voltaren, Ultram and two Lidoderm patches for chronic pain.  The doctor had to [discontinue] the Ultram, I asked him to place me on Neurontin.  He told me 'no because I have to deal with my chronic pain' and [discontinued] all the pain medication besides one Lidoderm patch and the Vasotec.  I am in bad physical health with chronic pain so I might as well stop drinking the Vasotec as well.  My chronic pain is as a heart attack and I'll deal with it just like the doctor told me to do."

721.    Mr. Ortiz's pain was successfully treated for years with Neurontin and other medications.

722.    However, in December of 2014 he was transferred to Elmira. Within days of his transfer, a nurse accused him of drug diversion because she saw white residue on his tongue.  She referred to a November 24, 2014 record (no such record exists in Mr. Ortiz's medical records) and she discontinued his medication.

723.    Mr. Oritz's pain then went untreated for months.  In January of 2015, Dr. Zaki reviewed his chart and sent him out for an EMG.

724.    Mr. Ortiz waited two months to have an EMG with no nerve pain medication.

725.    The March 2015 EMG study showed "chronic left radial neuropathy," and Dr. Zaki reinstated the Neurontin prescription.

726.    Mr. Ortiz was briefly released from custody and returned in August of 2016.

727.    On August 22, 2016, medical personnel at Downstate Correctional Facility prescribed Mr. Ortiz 600mg of Neurontin twice a day and 50mg of Elavil every night at bedtime.

728.    On August 26, 2016, Mr. Ortiz was also prescribed 10mg of Baclofen twice a day for his nerve pain.

729.    On August 29, 2016, Mr. Ortiz's Neurontin prescription was increased to 1200mg of Neurontin twice a day and 10mg of Baclofen twice a day.

730.    On September 19, 2016, Mr. Ortiz complained of spasms.  Medical personnel increased Mr. Ortiz's Baclofen prescription to 20mg twice a day.

731.    In early November of 2016 Mr. Ortiz was transferred from Downstate to the Regional Medical Health Unit at Marcy Correctional facility.  His prescriptions included 25mg of Elavil twice a day, 1200mg of Neurontin twice a day and 10mg of Flexeril twice a day.

732.    On November 4, 2016, Mr. Ortiz's Neurontin prescription was decreased to 600mg of Neurontin twice a day.

733.    On November 7, 2016, Mr. Ortiz "[complained of] pain, wants to speak [with] MD regarding Neurontin decrease."

734.    On November 14, 2016, medical personnel noted that Mr. Ortiz "[wanted] meds to be the way they were before."

735.    On November 22, 2016, Mr. Ortiz requested his Neurontin prescription be increased back to 1200mg twice a day.

736.    On December 27, 2016, Mr. Ortiz requested "to be placed back on pain meds."

737.    On January 4, 2017, in Ambulatory Health Record Progress Notes, the writer states that Mr. Ortiz complained of chronic lower back pain.

738.    On January 17, 2017, in Ambulatory Health Record Progress Notes, the writer states that Mr. Ortiz "[complained of lower back pain], wants something stronger for pain…already on Neurontin 600mg PO BID."   Medical had never increased his Neurontin prescription back to effective levels.

739.    On or around April 3, 2017 Mr. Ortiz was transferred to Great Meadow Correctional Facility ("Great Meadow").

740.    Dr. John Doe #2 noted on intake that Mr. Ortiz's use of Neurontin was justified based on an October 14, 2016 x-ray.

741.    Nonetheless, for reasons unknown, on May 1, 2017, Mr. Ortiz's Neurontin prescription was discontinued by Dr. John Doe #2.

742.    After Mr. Ortiz had his Neurontin prescription discontinued he was solely on Elavil and Meloxicam.

743.    Sometime shortly thereafter, Dr. John Doe #2 also discontinued Mr. Ortiz's Baclofen prescription.

744.    Prior to May 2017 Mr. Ortiz's pain was effectively treated with Neurontin and Baclofen for years.

745.    Despite Mr. Ortiz's protests to the contrary, Dr. John Doe #2 wrote a September 14, 2017 note indicating, "Meloxicam is working…continue Meloxicam for chronic pain."

746.    In truth, since May 2017 Mr. Ortiz has repeatedly stated that he needs his prescriptions for Neurontin and Baclofen reinstated.  He has been repeatedly told that "DOCCS' Policy" prevents his effective pain management treatment.

747.    **SEAN PRITCHETT** ("Mr. Pritchett") is a 50-year-old inmate who is currently housed at Shawangunk.

748.     Mr. Pritchett suffered from a gun shot wound spinal cord injury and "phantom pain" due to an above knee amputation ("AKA") of his right leg.

749.     Phantom pain is a pain that feels like it is coming from a body part that is no longer there. Doctors once believed this post-amputation phenomenon was a psychological problem, but experts now recognize that these real sensations originate in the spinal cord and brain, often from a nerve that was severed during amputation.

750.     Due to his phantom pain, Mr. Pritchett has suffered severe chronic pain and the pain has progressively gotten worse. He describes his pain as burning, sharp, shooting and throbbing with extreme sensitivity surrounding his stump.

751.     At its worst Mr. Pritchett has been admitted to the infirmary, has described his pain as a ten out of ten and has been unable to sleep. He has been described by medical staff as visibly in pain and discomfort.

752.     Mr. Pritchett was treated for his pain by DOCCS doctors with Neurontin between 2005 and 2007.  However, his pain was not controlled and in October of 2008 DOCCS referred him to a neurologist.

753.     The Neurologist, Dr. Aboelsaad, prescribed Lyrica.

754.     Mr. Pritchett was successfully treated with Lyrica until January 26, 2017.

755.     Lyrica was approved by Defendants Bozer and Mueller repeatedly to treat Mr. Pritchett's pain.  Dr. Lee's past non-formulary requests listed the alternative treatments Mr. Pritchett had tried including NSAIDs, Ultram, Neurontin and Cymbalta.

756.     In February of 2015, Dr. Lee attempted to reduce Mr. Pritchett's Lyrica dosage but reported the reduced dose was "unsuccessful."

757.    On October 15, 2015 Dr. Lee reported to Defendant Mueller, "has been tried with Cymbalta for week; can't tolerate his neuropathic pain/needling/burning admitted to infirmary, tried with Percocet not effective."  Defendant Mueller approved the Lyrica again.

758.    Both Dr. Lee and Defendant Mueller had ample proof that Lyrica had successfully treated Mr. Pritchett's severe pain.

759.     In January of 2017, Defendant Mueller was covered by Defendant Dinello.  When Dr. Lee submitted a non-formulary approval for Lyrica, he, as always, listed the alternatives tried: Neurontin, Cymbalta, NSAIDs and Ultram.

760.    Defendant Dinello denied the Lyrica approval and wrote, "will not approve a controlled/scheduled substance for a chronic pain issue that is not life or limb threatening.  The risk/benefit ratio is too high.  Suggest change back to Neurontin if needed."

761.    Defendant Dinello had no knowledge of Mr. Pritchett's medical needs nor his successful or unsuccessful treatments.  He discontinued Lyrica and suggested a medication that had already failed to help Mr. Pritchett.

762.     Dr. Lee had no choice and prescribed Neurontin.  Defendant Dinello would not issue an approval for Lyrica, despite the fact that Mr. Pritchett had been successfully treated with it for almost ten years.

763.    On February 1, 2017, after Mr. Pritchett was taken off of Lyrica, he had nausea, diarrhea, and a headache "due to withdrawal of Lyrica."

764.    On February 13, 2017, Mr. Pritchett was still suffering from being taken off of Lyrica. The Ambulatory Record stated that he had been feeling sick for two weeks.

765.    On February 21, 2017, Mr. Pritchett told a nurse that he could not deal with the pain that he was experiencing off of Lyrica. At the time he was taking Neurontin and Cymbalta for the pain, but it was completely ineffective.

766.    Mr. Pritchett requested a follow up appointment with pain management, a neurosurgeon and an appointment with Dr. Lee. The nurse noted that Mr. Pritchett was supposed to have that appointment with Dr. Lee on that day, but it was never scheduled. The appointment was scheduled for the next week.

767.    On February 27, 2018, Mr. Pritchett had an MD callout with Dr. Lee. Dr. Lee noted that Mr. Pritchett's stump pain had increased since he was switched from Lyrica to Neurontin. He recommended cryotherapy and a surgical consult.

768.    On April 18, 2017, Mr. Pritchett saw Dr. Holder in orthopedics. Dr. Holder noted that Mr. Pritchett was in severe stump pain and that he had no relief.  He suggested stump revision surgery.

769.    After Mr. Pritchett was denied both Lyrica and Neurontin he was left with only Aleve to treat his pain.

770.    On June 15, 2017, Mr. Pritchett again saw Dr. Holder, as DOCCS had lost track of the fact that he had just seen him in April.  Dr. Holder noted that Mr. Pritchett has severe stump and that he had no pain management relief. Dr. Holder also noted that Mr. Pritchett's stump was hypersensitive. He suggested that Mr. Pritchett be referred to a plastic surgeon or general surgery that performs stump revision surgery.

771.    On June 20, 2017 Dr. Lee submitted an MWAP Request for Neurontin.  Defendant Mueller approved it but suggested a "surgical referral for possible stump revision," seemingly without checking Mr. Pritchett's referrals at all.

772.     In response, on June 27, 2017, Dr. Lee scheduled an appointment for Mr. Pritchett with a plastic surgeon, however, that appointment was rescheduled twice, and Mr. Pritchett did not see a plastic surgeon until October 16, 2017.

773.     Throughout July and August Mr. Pritchett complained that his stump pain was increasing and asked when he would be scheduled for surgery.  He also complained of "terrible" itching and a rash from the ineffective medications.

774.     On September 22, 2017 the pain was unbearable.  Dr. Lee administered a five-day emergency supply of 600 mg of Neurontin to Mr. Pritchett.

775.     But the five days was all Dr. Lee could provide to Mr. Pritchett.  On September 28, 2017, about three months after the MWAP Policy was promulgated, Dr. Lee submitted a MWAP request to Defendant Mueller for Neurontin.

776.     Defendant Mueller refused to approve Mr. Pritchett's Neurontin prescription.

777.     In the comments on the MWAP Request Form, Dr. Mueller expressed that it was unclear when and why Mr. Pritchett was changed from Lyrica to Neurontin. She did not bother to investigate that it was Defendant Dinello's decision.  She refused to prescribe Neurontin and recommended "a change to a safer agent until surgery."

778.     Defendant Mueller knew full well it would take months and months for Mr. Pritchett to get to surgery.  In fact, the surgery was not performed until June 17, 2018.

779.     On September 28, 2017, one day after Mr. Pritchett's five-day supply of Neurontin had ran out, he was in extreme pain. He told a nurse that he "really [couldn't] take the pain" and he was sent to the infirmary again.

780.     On October 2, 2017, Mr. Pritchett had an MD callout. He was prescribed 500mg of Aleve, for his pain and Diphenhydramine to relieve his chronic itching.   Aleve did not help.

781.    On October 3, 2017 Mr. Pritchett filed a grievance about his need for effective pain medication.

782.    On April 17, 2019 the Central Office Review Committee responded with their pat answer to grievances related to health care: "CORC notes that the grievant's complaint has been reviewed by the Division of Health Service's staff who advise that a complete investigation was conducted and that the grievant is receiving appropriate treatment through provider appointments, specialty care consultants and diagnostic tests.   CORC further notes that he is prescribed [Cymbalta] and Ibuprofen for pain."

783.    Mr. Pritchett had not been on Cymbalta for years and it had failed.  Dr. Lee had even listed it as a tried and failed medication many times on the Non-Formulary requests. Ibuprofen had also failed.

784.    On October 10, 2017, Mr. Pritchett requested an increase in his Naproxen medication. He asked to go from twice to three times per day due to his pain.  Nurse Scofield advised him that three times a day would be too much. Mr. Pritchett said he would like something else for his pain. Nurse Scofield gave him sixteen packs of Tylenol.

785.    Nurse Scofield handwrote a note to Dr. Lee and asked if there was another medication to add.  Dr. Lee noted back, "no."

786.    On October 16, 2017, Mr. Pritchett finally saw a plastic surgeon, which Dr. Holder had recommended four months before. He saw reconstructive surgeon, Dr. Malcolm Roth. Dr. Roth noted that Mr. Pritchett has tried multiple medications and nerve blocks without relief. He noted that Mr. Pritchett has severe and constant pain.

787.    Dr. Roth suggested surgery to ablate the neuroma and discussed risks and benefits of the procedure with Mr. Pritchett. He also suggested that Mr. Pritchett see an orthopedist.

788.     On October 17, 2017 Nurse Denman noted that Mr. Pritchett was experiencing throbbing pain in his stump and gave him twelve packs of Tylenol. She noted that the Aleve was not working.

789.     On October 26, 2017, Mr. Pritchett requested to see an orthopedist, which has also been recommended by Dr. Roth.

790.     On October 27, 2017, Mr. Pritchett, still in pain, requested a change from Naproxen to Tegretol, an anticonvulsant medication that can treat nerve pain. Nurse Denman noted that he was in pain and suffering from burning in his stump.

791.     Dr. Lee ignored the request and prescribed Cymbalta which Dr. Lee had repeatedly noted did not work to treat Mr. Pritchett's neurological pain multiple times over the previous four years in non-formulary and MWAP requests.

792.     On November 14, 2017, Nurse Denman again recorded Mr. Pritchett's request to at least try Tegretol for the burning sensation in his stump.  She noted that Mr. Pritchett was in pain and the Aleve was not working to alleviate his burning.

793.     On November 22, 2017, Dr. Lee finally noted that Aleve was not working.

794.     On December 7, 2017, Mr. Pritchett requested a change in his medicine and again asked when he was going to see an orthopedist.

795.     On December 26, 2017, Mr. Pritchett got his Aleve medication renewed and was finally prescribed 200mg Tegretol as well as 25mg Diphenhydramine to treat the itch that persisted.

796.     On January 9, 2018, Dr. Lee noted that Mr. Pritchett was still suffering from chronic pain.  Dr. Lee increased the Tegretol dosage from 200mg to 400mg.

797.    On February 13, 2018, Mr. Pritchett saw Dr. Holder again.  Dr. Holder reviewd Mr. Pritchett's CT scans and concluded that the pain was neurologically based. He said that he did not do amputation surgery or revision and that they should consider a surgeon with oncologic or traumatology experience.

798.    On February 20, 2018, Mr. Pritchett requested an increase in his Tegretol dosage due to his pain.

799.    On May 18, 2018, Mr. Pritchett finally saw an orthopedist at Upstate Orthopedics, Dr. Timothy Damron. Dr. Damron noted that Mr. Pritchett's stump pain has been worsening for the past five years. He also noted that it was likely neuroma and recommended exploration and excision.

800.    On July 17, 2018. Mr. Pritchett had his surgery for exploration and excision of stump neuroma at State University Upstate.

801.    After his operation, Mr. Pritchett was prescribed Ibuprofen, Aspirin.  Dr. Mueller allowed a MWAP Request for post-surgical Percocet but added the completely unnecessary caveat, "recommend rapid taper down to less potent agent."  Defendant Mueller was not concerned about Mr. Pritchett's post-surgical pain, only the medication he would be administered.

802.    On August 3, 2018, Mr. Pritchett had a post-op appointment with Dr. Damron. Dr. Damron noted that Mr. Pritchett was doing well.

803.    Dr. Lee acknowledged the fact that the surgery revealed there were three neuromas in Mr. Pritchett's stump, not just one.

804.    On October 16, 2018, Mr. Pritchett experienced extreme stump pain and was unable to sleep. Mr. Pritchett tried 30mg of Tegretol. He was also admitted to the infirmary. In the progress notes of that day, the writer noted that Mr. Pritchett said that Tegretol did help a little bit.

Mr. Pritchett was also educated on techniques to decrease limb pain. Mr. Pritchett accepted all of his medications.

805.    On October 17, 2018, Mr. Pritchett said he felt better and he wanted to go back into his cell.

806.    On October 31, 2018, Mr. Pritchett had his MD callout to discuss his pain. Dr. Lee noted that Mr. Pritchett was still in pain. He also noted that only one neuroma was removed, but Mr. Pritchett has three neuromas and 2/3 have not been touched and still required surgery.

807.    On December 3, 2018, Mr. Pritchett requested to see a specialist for his nerve pain. He was told that his orthopedic appointment with Dr. Holder was scheduled.

808.    On December 20, 2018, Mr. Pritchett said that he wanted surgery to relieve his stump pain and that the surgery for neuroma was "not effective."

809.    On January 2, 2019, Mr. Pritchett saw Dr. Stephen Schwartz, an orthopedic specialist. Dr. Schwartz described Mr. Pritchett as suffering from "severe untreated pain."

810.    Dr. Schwartz noted that the one neuroma which was removed in surgery seems to have been satisfactory, but he believed that Mr. Pritchett needed a consultation at a medical center for evaluation and treatment by a specialized surgeon. He also noted that Mr. Pritchett might need spinal ablation which is a minimally invasive procedure that destroys the nerve fibers carrying pain signals to the brain. It can provide lasting relief for people with chronic pain, especially in the lower back, neck and arthritic joints. He referred Mr. Pritchett to Albany Medical Center for evaluation and treatment. (pg. 139)

811.    On March 18, 2019, Mr. Pritchett wanted to know the status of his orthopedic appointments. The writer noted that both appointments for his hand and stump were approved but not scheduled.

812.     On March 30, 2019, Mr. Pritchett had nerve spasm pain. Mr. Pritchett's discomfort was "visually noted" by the nurse.  He was given six packets of Tylenol and six packets of Motrin. In an effort to proactively move his medical care along, Mr. Pritchett also stated that he wanted rhizotomy, a neurosurgical procedure that selectively destroys problematic nerve roots in the spinal cord.

813.     On April 2, 2019, Dr. Lee referred Mr. Pritchett to the pain specialist at Albany Medical Center to evaluate him, possibly for rhizotomy.

814.     On April 11, 2019, the Nurse Administrator, Jennifer Gallagher, saw Mr. Pritchett and acknowledged his pain which they both described as "jabbing" and "throbbing." Nurse Gallagher noted that he was grimacing and groaning. Dr. Lee ordered Mr. Pritchett to the infirmary.

815.     Since being denied Lyrica by Defendant Dinello, which was effective in treating his pain, Mr. Pritchett waited for over a year for the surgery that Dr. Mueller had in mind when she later also discontinued his Neurontin prescription.

816.     He was not put on effective pain medication to help him cope with the pain while he awaits more surgeries.

817.     Mr. Pritchett has consistently asked to see specialists and has tried every treatment method that doctors have recommended to him including neuroma excision, spinal cord stimulation and myriad medications.

818.     As of August 11, 2019, Mr. Pritchett is still experiencing chronic pain and DOCCS is not administering effective pain management despite knowing that Lyrica was effective.

819.     **RASHID RAHMAN** ("Mr. Rahman") is 50-year-old inmate who is currently being housed at Shawangunk Correctional Facility ("Shawangunk").

820.   Mr. Rahman suffers from bilateral degenerative AC joint disease, multilevel degenerative changes in the cervical spine with foraminal stenosis and spondylosis predominating and bilateral pulmonary emboli and bilateral popliteal DVTs following the T2T3 laminectomy he underwent due to the T2T3 narrowing with cord compression and disc bulging occurring in his spine. Since the surgery, Mr. Rahman experiences chest pain, extreme pain and numbness in his lower extremities and back pain. Mr. Rahman is wheelchair bound.

821.   To accommodate Mr. Rahman's physical ailments DOCCS allows him to use a walker and a wheelchair.

822.   Mr. Rahman began experiencing weakness in his lower extremities in April 2016 while housed at Clinton Correctional Facility ("Clinton"). Attending physicians at Champlain Valley Physicians Hospital evaluated Mr. Rahman 4 times and dismissed him each time until he finally requested a CT scan which revealed "scattered masses" on his spine and he was transferred to Albany Medical Center Hospital ("AMCH") for further care.

823.   Following a laminectomy on May 27, 2016, Mr. Rahman was discharged to Coxsackie Regional Medical Unit ("Coxsackie") on June 16, 2016 for inpatient rehabilitation through DOCCS.  His discharge medication list from AMC included Ultram.

824.   At the time of his transfer he was unable to move his lower extremities. Mr. Rahman arrived at Coxsackie and was given Ultram, Mylanta, Albuterol and Xanax to relieve chest pain, back pain and anxiety. A couple of hours after receiving this treatment he reported that he felt "much better."

825.   On June 22, 2016 Mr. Rahman reported that Ultram relieves his pain and that he was unable to sleep without his pain medicine.

826.     On June 30, 2016 Mr. Rahman complained of chest pain and the Nurse Practitioner on call ordered for him to take Ultram, Mylanta and Xanax. An hour and a half later Mr. Rahman reported that he felt better.

827.     On July 1, 2016 Mr. Rahman was transferred from Coxsackie to Walsh Regional Medical Unit ("Walsh"). Although he did not have a prescription, Mr. Rahman was regularly administered Ultram to treat his pain between July 5, 2016 and September 27, 2016.

828.     Mr. Rahman was successfully treated for his pain with Ultram and Xanax through October 2016 while at Walsh.

829.     On September 28, 2016 a doctor at Walsh summarily discontinued his Ultram prescription.  No reason is given in the medical records and no alternative was prescribed.  In fact, the records show that the doctor noted he cannot take NSAIDs.

830.     On October 3, 2016 Mr. Rahman wrote a letter of complaint in regard to being in extreme pain since his pain medications were discontinued. He requested medication stronger than Tylenol and said that "when I was taking Ultram and Xanax, I did not feel this pain."

831.     On November 9, 2016 Mr. Rahman was admitted to the infirmary at Shawangunk.

832.     On November 27, 2016 Mr. Rahman reported that his pain was at a level 10. The nurse on call did not administer any medication.

833.     On December 8, 2016, Mr. Rahman reported that he needed to see Dr. Lee due to his "severe back pain." Subsequently, on December 9, 2016 Mr. Rahman sought Ultram to relieve his back pain yet was given Tylenol.

834.     On December 15, 2016 Mr. Rahman reported that he was experiencing chest pain into his back, down the side and chest tightness. He also noted experiencing "10/10 pain and pressure." He was sent to St. Luke's Cornwall Emergency Room. At the time Mr. Rahman was

taking Xarelto and informed the Emergency Room physicians that the symptoms started after no longer receiving the Xanax and Ultram he was prescribed after his spinal surgery.

835. Mr. Rahman returned to the infirmary at Shawangunk and was then discharged back to Shawangunk's general population.

836. On January 3, 2017 Mr. Rahman could not attend his occupational therapy appointment due to extreme pain throughout neck and his entire back. He also reported abdominal pain.

837. In response to Mr. Rahman's continuous pain, Dr. Lee finally re-prescribed Ultram on January 4, 2017. Mr. Rahman was successfully treated for his pain with Ultram between January 4, 2017 and June 26, 2017.

838. On June 2, 2017 DOCCS promulgated the MWAP Policy.

839. The MWAP request was submitted on June 20, 2017.

840. Mr. Rahman's prescription for Ultram expired on June 26, 2017, when it was discontinued due to lack of "MWAP approval."

841. On June 29, 2017 Mr. Rahman reported his physical therapist at Shawangunk that he was in extreme pain and that he could not do much that day. The physical therapist noted that Mr. Rahman tolerated physical therapy with difficulty.

842. On July 5, 2017 Mr. Rahman reported experiencing weak and shaking legs. He also reported pain in his back.

843. On July 14, 2017 Mr. Rahman reported that the combination of the weather and no pain medication made him feel terrible that day.

844. Mr. Rahman continued to report "extreme pain from the neck down due to no pain meds."

845.    On August 9, 2017 Mr. Rahman reported that his new medicine made him feel sleepy and that he was still experiencing pain on his back. He also reported that his legs were shaking.

846.    On August 16, 2017 the nurse on call reported that the Elavil Mr. Rahman took was helping his pain.

847.    On September 14, 2017 Mr. Rahman reported that he was in "excruciating pain" and that his whole body hurt due to not receiving his pain meds.

848.    Despite Elavil's apparent effectiveness, Mr. Rahman's prescription was discontinued on March 1, 2018. At that time, Dr. Lee prescribed Cymbalta.

849.    On May 5, 2018 Mr. Rahman was admitted to the infirmary for heavy chest pain.

850.    Mr. Rahman refused to take Cymbalta between March 7, 2018 and March 12, 2018 because it made him feel very uncomfortable and as though he couldn't breathe. His prescription for Cymbalta was thus discontinued on March 12, 2018.

851.    On June 4, 2018 Mr. Rahman received a new prescription for Depakote, a psychiatric medication.

852.    On July 26, 2018 Mr. Rahman refused to take Depakote. He was concerned about the medication due to the side effects and requested an alternative. Mr. Rahman voiced his concern that the "NYS government is cutting all prisoners off from pain medication." The nurse explained the "current direction medicine and government are reducing the use of narcotics in the treatment of chronic pain." Mr. Rahman replied that it is only prisoners that are being denied pain medication. The nurse responded by saying that "civilians and inmates are being treated the same," and that the "DEA, AMA, and the legislative bodies are reducing the use of narcotics, and that

alternative therapies such as medications that target the CNS be used for chronic pain." Mr. Rahman insisted that the "alternatives" do not work.

853.    Of course, there is some truth that all practitioners are attempting to reduce the number of prescriptions of opioids, but any competent pain specialist will agree that there are patients who require strong medicinal treatment for their chronic pain.

854.    On January 10, 2019 Mr. Rahman reported weakness and numbness in his legs. He had difficulty standing and using his walker and experienced spasms and tremors to both legs throughout the night.

855.    On February 25, 2019 Dr. Stanley Penc conducted an EMG and reported that Mr. Rahman displayed evidence of a sensory neuropathy involving the lower extremities which could potentially result in paresthesias.

856.    On March 1, 2019 Mr. Rahman reported that he almost fell in the shower due to vibrating legs. The following week at physical therapy, March 6, 2019, he said that on a scale of 1-10 that his back pain was at a 7.

857.    DOCCS continues to refuse to prescribe an effective pain medication that would manage Mr. Rahman's chronic pain despite his well-documented success on Ultram at a low dosage.

858.    **FELIPE RIVERA-CRUZ** ("Mr. Rivera-Cruz") is a 61-year-old inmate currently being housed in Shawangunk.

859.    Due to a gunshot wound in 2003, Mr. Rivera-Cruz has a spinal cord injury making him a level T-6 paraplegic with incomplete bilateral paralysis.  Mr. Rivera-Cruz has full leg exterior braces (akin to an exo-skeleton) and suffers from documented neuropathy.  Mr. Rivera-

Cruz undergoes physical therapy whenever it is offered to him, however, despite physical therapy he suffers from chronic pain and swelling in his back and in his legs.

860.    To treat his chronic neuropathic pain, DOCCS consistently prescribed Mr. Rivera-Cruz Neurontin and Baclofen starting in 2013.

861.    Neurontin and Baclofen managed Mr. Cruz-Rivera's neuropathic and chronic pain pretty steadily, however, in August of 2016 Mr. Cruz-Rivera started to suffer from swelling in his legs which made it impossible for him to wear his leg braces.

862.    On August 23, 2016 Dr. Forrest conducted an EMG and reported that Mr. Rivera-Cruz's "nerve conduction study is consistent with neuropathy." He also stated that Mr. Rivera-Cruz's need for pain medication likely relates to Mr. Rivera-Cruz's spinal injury. Mr. Forrest also reported that "Neurontin is associated with edema."

863.    In response to Dr. Forrest's suggestion regarding Neurontin's potential to cause swelling, Dr. Lee discontinued the Neurontin on September 14, 2016.

864.    Dr. Lee prescribed Elavil, an anti-depressant and common alternative,

865.    Like many patients, the Elavil caused Mr. Rivera-Cruz to feel incredibly dizzy and negatively affected his daily living.

866.    Accordingly, Mr. Rivera-Cruz refused to take the Elavil September 16-18, 2016 reporting that it made him feel dizzy.

867.    On September 19, 2016 Mr. Rivera-Cruz refused the Elavil again. His refusal form reads, "I don't want to take this medication because it gets me dizzy. I'm in severe pain. I need a better medication that actually works and don't make me dizzy."

868.    On September 19, 2016 Dr. Lee discontinued the Elavil.  He did not prescribe Mr. Rivera-Cruz an alternative medication.

869.    At this point, Mr. Rivera-Cruz was still on Baclofen, a medication used to treat muscle spasms in patients with spinal cord injuries, among other injuries.

870.    After his Neurontin was discontinued and no alternative was offered, Mr. Rivera-Cruz complained repeatedly to the physical therapist he saw regarding his pain and suffering.

871.    Mr. Rivera-Cruz was experiencing spasming at night which was causing him to have chest pains as well.

872.    On May 4, 2017, Dr. Anthony Nappi, a cardiologist examined Mr. Rivera-Cruz and noted that his chronic pain and spasming in his lower extremities at night seemed to trigger palpitations and chest discomfort."   The cardiologist reported, "need to control chronic lower extremity pain and spasming."

873.    On June 2, 2017 DOCCS promulgated the MWAP Policy.

874.    On June 15, 2017 Dr. Lee submitted an MWAP request for Baclofen for Mr. Rivera-Cruz's chronic pain and spasming.

875.    Dr. Lee noted on the MWAP Request form that Mr. Rivera-Cruz had attempted NSAIDs, braces and physical therapy, none of which were effective.

876.    Defendant Mueller received the MWAP Request and denied the request commenting that the "information provided does not meet criteria for approval."

877.    And that was it.   Dr. Lee did not prescribe an alternative, nor did he supply Defendant Mueller with follow-up information like the positive EMG results, nor did he resubmit the request at a later date with the information she believed to require.

878.    Dr. Lee only noted in Mr. Rivera-Cruz's chart: "Baclofen for paraplegia chronic pain Not approved."

879.    Defendant Lee just gave up and allowed his patient's only remaining effective treatment to be discontinued due to the MWAP Policy.

880.    Defendant Mueller also did not follow-up to ensure that the patient's chronic neuropathy and pain were being addressed in other ways, nor did she look into Mr. Rivera-Cruz's medical history to ascertain his need for pain management.

881.    On July 27, 2017 and August 2, 2017 Dr. Lee noted that Mr. Rivera-Cruz was suffering from bilateral pain in his legs and that physical therapy was not effective, but he did nothing.  In fact, Dr. Lee repeatedly told Mr. Rivera-Cruz that Albany would not allow him to have Baclofen or Neurontin any longer.

882.    Since that point forward, Mr. Rivera-Cruz has repeatedly complained of his pain and discomfort, as well as filed grievances regarding his medical care.

883.    As of today, Mr. Rivera-Cruz is not being prescribed any medication for his neuropathy, severe leg spasms and chronic pain.

884.    **WAYNE STEWART** ("Mr. Stewart") is a 40-year-old inmate who is currently housed at Shawangunk.

885.    Mr. Stewart suffered serious gun shot wounds in 2003 which left him paralyzed from the waist down.   He has five bullets still lodged in various parts of his body, including his head and at the base of his spine.

886.    In 2013, Mr. Stewart also suffered from pelvic osteomyelitis which necessitated the complete amputation of his right left and hip.  This amputation means that Mr. Stewart's full body weight sits on the left side of his body and base of his spine causing additional chronic pain.

887. Mr. Stewart managed his own health with the help of his family and a home health care aid. Before his incarceration, Mr. Stewart's substantial chronic pain was managed with a daily prescription of Percocet.

888. He was seen every thirty days by Dr. Dunstan Pulle, his internist at Essen Medical Associates in the Bronx, who monitored his Percocet prescription and conducted drug-testing if he felt necessary. Dr. Pulle was aware Mr. Stewart smoked marijuana but did not believe it contraindicated his treatment with Percocet for his chronic pain, however, in accordance with law Mr. Stewart saw Dr. Pulle every month to monitor his use and need for Percocet.

889. After his arrest, Mr. Stewart was housed for over two years on Rikers Island in the North Infirmary Command where doctors prescribed him MS Contin twice per day to manage his chronic pain.

890. On or around April 5, 2017 Mr. Stewart was transferred from Rikers to Downstate for his DOCCS Intake assessment.

891. At the time, Mr. Stewart was suffering from a broken femur in his left leg suffered when he fell from his wheelchair on Rikers Island. The leg was casted.

892. On intake, Dr. Bendheim at Downstate maintained all Mr. Stewart's medications, including MS Contin 30mg twice per day to manage his chronic pain.

893. On or about May 2, 2017 Mr. Stewart was transferred to Shawangunk and the care of Dr. Lee.

894. Mr. Stewart was housed in the infirmary for assessment and to wait for a proper cell to accommodate his wheelchair and disabilities.

895. On May 2, 2017 Dr. Lee ordered that Mr. Stewart's MS Cotin prescription be discontinued and that he be treated with Percocet twice per day instead, but at only 5mg.

896.     On May 5, 2017 Mr. Stewart requested to see Dr. Lee about his pain management needs because the 5 mg of Percocet was not helpful in managing his pain.

897.     On May 7, 2017 one of Mr. Stewart's lawyers, who is also a registered nurse, wrote a letter to Defendant Lee and the Superintendent about the discontinuation of the MS Contin and replacement with 5mg of Percocet.  She explained that the 5mg of Percocet was insufficient and that 10mg might help.

898.     In response to these complaints, on May 8, 2017, Dr. Lee ordered the tapering of the Percocet as well.

899.     Unfortunately, a common retaliatory act on the part of DOCCS' medical providers is to discontinue medication when a patient complains about medical treatment.

900.     However, Mr. Stewart's records show that his pain was a 6-7/10 pretty consistently and at some point Dr. Lee determined that treatment with Percocet was appropriate.

901.     On June 21, 2017 Mr. Stewart's prescription for Percocet was up for renewal.

902.     Dr. Lee submitted an MWAP Request for to Defendant Mueller.  Dr. Lee wrote, "GSW head, arm, rt thigh spine, total hip amputation, 5 bullets remain, head spin.. can't stand, sit w[heelchair] bound has been treated with morphine, nsaids not effective."

903.     On June 27, 2017 Dr. Mueller refused to approve the prescription stating, "Nothing on this form to support . . usage of Percocet.  Remote [gun shot wound] do not equate severe pain."

904.     On that same day (while still getting Percocet), Mr. Stewart did see a physiatrist, who examined him for wheelchair need.  She noted, "presents with pain syndromes unable to perform pressure relief."

905.    Defendant Mueller had never met Mr. Stewart; she had no medical records to review as he was a new intake and he had not been to see any specialists.  She just stopped his effective pain management.

906.    Dr. Lee tapered the Percocet and put Mr. Stewart on Ibuprofen.

907.    On June 27, 2017 at Shawangunk a nurse noted, "when evaluated for pain/well-being [inmate] reported pain in LCG will monitor and endorse to 7am-3pm RN for alternate pain med/[management] post [discontinue] with Percocet."

908.    On June 30, 2017 Mr. Stewart's lawyer faxed a letter to both Superintendent Lamanna and Dr. Lee explaining Mr. Stewart's long treatment with Percocet and his medical need for treatment of his chronic pain.  His lawyer wrote, "I am hopeful that a pain management regime can be found which will effectively mitigate his pain and conform to DOCCS' policy.  According to Mr. Stewart, the ibuprofen currently prescribed still leaves him in tremendous pain."

909.    Dr. Lee took no action.

910.    On July 9, 2017 Mr. Stewart's nurse practitioner/lawyer wrote again asking Acting Superintendent Pinotti and Defendant Lee for a meeting to understand their decision to discontinue Mr. Stewart's pain medication.  She also requested a copy of the 'policy' that necessitated the denial of his effective pain medication.  They never answered, nor did they see to it that Mr. Stewart received effective pain management.

911.    Mr. Stewart has repeatedly recorded his pain levels and requested appropriate pain management.

912.    His medical records indicate that he has never been sent to a pain management specialist to assess his needs.

913.    A protective order was needed for a March 2018 deposition to limit the time Mr. Stewart had to attend because Mr. Stewart's pain was so great he could not sit for longer than three hours at a time.

914.    To this day, Mr. Stewart continues to live with chronic, untreated pain.  He does his best to exercise his body, take care of himself and attend to his medical needs, but his quality of life is negatively impacted by his chronic, untreated pain.

915.    **MICHAEL VATTIATO** ("Mr. Vattiato") is a 52-year-old inmate who is currently housed at Groveland Correctional Facility ("Groveland").

916.    Mr. Vattiato entered the DOCCS system in October of 2017 after the MWAP Policy went into effect.

917.    Mr. Vattiato suffers from severe advanced rheumatoid arthritis with severe valgus deformities in both his hands and feet.  He also suffers from diabetic neuropathy.  He struggles to use a cane because of his hand deformities and requires a back brace, a left knee brace and a right wrist brace.  He often uses a wheelchair due to the pain.

918.    Mr. Vattiato entered DOCCS with a prescription for 800mg of Neurontin three times per day which greatly helped manage his neuropathic pain and symptoms.

919.    Mr. Vattiato came through Downstate Correctional Facility where Dr. Bendheim kept his Neurontin prescription in place during his three-week stay.

920.    On November 3, 2017 Mr. Vattiato drafted out to Groveland Correctional Facility ("Groveland") and his Neurontin prescription transferred with him.

921.    On November 7, 2017 Mr. Vattiato was found on the floor due to pain and weakness.  He was issued a wheelchair.

922.    On November 9, 2017 Dr. John Doe #1 summarily discontinued Mr. Vattiato's prescription and did not note a reason.[19]

923.    On November 16, 2017 Mr. Vattiato complained, "I don't have meds."

924.    On November 17, 2017 Mr. Vattiato's pain and symptoms were so severe a doctor ordered an "emergency RX of Neurontin" for five days.  A nurse noted, "not sure what is to be done continue new rx or taper [Neurontin]."[20]

925.    The [Neurontin] was not continued.  Instead, Dr. John Doe #1 prescribed Cymbalta.

926.    Cymbalta has not effectively treated Mr. Vattiato's chronic pain.

927.    Mr. Vattiato's pain has continued unabated.

928.    On November 23, 2017 he complained that the pain was so bad he could not raise his arms and he requested a muscle relaxer and better pain control.

929.    In February 21, 2018 he was issued a ticket for not coming to the medication window and his prescription for Cymbalta was discontinued as punishment.

930.    Mr. Vattiato did not come to the medication window because he was in so much pain he was having trouble ambulating.

931.    In the face of the ineffective treatment, Mr. Vattiato's symptoms got worse.  The rheumatologist noted that he "will need some joint replacement at some point in the future."

932.    All through 2018 Mr. Vattiato refused to come to the clinic for blood draws to track his diabetes because his pain was so severe he could not leave his cell on many days.

---

[19] This doctor may be Qutubuddin Dar, MD but Plaintiffs will endeavor to confirm the identity of the responsible doctor through discovery.

[20] Mr. Vattiato's medical records are woefully incomplete and lack all medication administration records except those from Downstate, so there is no way to tell whether the five days of [Neurontin] were administered.

933.    In September of 2018 he requested another doctor, hoping a new doctor would properly treat his pain and symptoms.

934.    In December of 2018 Mr. Vattiato started suffering from bilateral foot pain, probably a symptom of his diabetic neuropathy.  Despite many notes in his medical charts that he is in a "lot of pain," and he suffers from "alteration in comfort," Dr. John Doe #1 has not reinstated Mr. Vattiato's prescription for Neurontin, nor has he been offered an effective alternative.

935.    **DERRICK WILLIAMS** ("Mr. Williams") is a 26-year-old male currently housed at Green Haven.  Mr. Williams' case is one of the most horrible of the current representative plaintiffs.  He suffers from severe intellectual and psychiatric issues and his medical records indicate he very obviously cannot advocate for himself with medical professionals.  He is often not followed up with for long bouts of time, despite not showing up for his medication for months. Mr. Williams' medical records are also woefully inadequate.  There are giant swaths of records missing, potentially because he was in specialized programs, but there are no MWAP request forms and little indication that he has been administered consistent medical care, except when he had burns on his left leg.

936.    In 2012, Mr. Williams attempted to commit suicide by leaping off a ten story building.  He fractured his skull as well as his left leg.  He was in a coma for 28 days and his left foot is severely deformed. Mr. Williams also suffered from a gunshot wound to his left leg and related lower left extremity paresis.  He wears external braces on both legs, he has substantial hardware installed in his back and he must walk with a cane or a walker.

937.    He also suffers from seizures, neuropathy, osteomyelitis and chronic lower back pain.

938. In June of 2015, Mr. Williams entered the system with current prescriptions for 100mg of Ultram twice per day and 1800 mg of Neurontin per day. Unfortunately, Mr. Williams also must take psychiatric medications. It appears that Mr. Williams was in the custody of another agency until October 2016.

939. Sometime in early November of 2016, Mr. Williams' prescription of Neurontin was increased to 1800 mg per day while at Green Haven.

940. On January 9, 2017, the prescription was renewed at 1800 mg per day.

941. On May 9, 2017, Dr. Bentivegna added Flexeril to Mr. Williams' pain management regime.

942. On June 2, 2017 DOCCS promulgated the MWAP Policy.

943. On June 9, 2017 DOCCS transferred Mr. Williams from Green Haven to Great Meadow prison where Dr. Karandy took over his medical care.

944. Summarily, on June 9, 2017 Mr. Williams' prescription for Neurontin was discontinued. Dr. Karandy did not see or evaluate Mr. Williams until July 17, 2017 and then did not note his neuropathic problems, only that he had a deformed foot and would need a "flats permit." It does not seem Dr. Karandy had access to Mr. Williams' medical chart or history.

945. On July 25, 2017, Mr. Williams' pain began to catch up with him and he requested pain medications. The medical practitioner noted "chart not available."

946. Mr. Williams was in the infirmary from late July to September 2017 for treatment of self-inflicted wounds. There are no records in his AHR to represent this time period.

947. On October 23, 2017, Mr. Williams complained of increased discomfort in his legs and was taking only Ibuprofen in response.

948. On October 26, 2017 Mr. Williams was transferred back to Green Haven.

949.    On November 21, 2017, a nurse noted that Mr. Williams complained of left knee pain.

950.    On February 16, 2018, a medical staff member ordered that Mr. Williams receive 25mg of Indomethacin twice a day.  This medication is an NSAID used to treat mild joint pain and swelling.

951.    From February through late June 2018 medical personnel repeatedly reported that Mr. Williams was "non-compliant" with his medications but did not follow up with him.

952.    On May 28, 2018, Mr. Williams slipped and fell in the shower and "[complained of] back pain [and was] unable to move [his] left leg." In the infirmary, Mr. Williams was prescribed Cymbalta and Motrin.  He was transferred to Putnam Hospital Center for an evaluation.

953.    Putnam Medical Center recommended he take Neurontin at discharge, though the discharge papers do not reflect a dosage.

954.    Another specialist (the details are not filled out on the document) suggested Mr. Williams be prescribed Flexeril twice per day for pain.  It does not appear medical at DOCCS prescribed Mr. Williams either medication.

955.    On June 1, 2018, "[Mr. Williams complained of] back pain" again.

956.    Finally, on June 21, 2018, "[Mr. Williams was] seen because being non-complaint with meds…states that he doesn't get relief from med enough to walk to take…wants it stopped. The medical employee merely discontinued Mr. Williams' Cymbalta prescription and failed to follow up in any other way, offer him alternatives or schedule a pain management appointment. The records show that Mr. Williams had been failing to show up for his medications since at least February and no one noticed until June.

957.    An October 29, 2018 entry in Mr. Williams' medical chart notes that Mr. Williams slipped and fell in the yard and was suffering from chronic back pain and knee pain.

958.    On November 1, 2018, Mr. Williams affirmatively requested a pain medication appointment with the help of a friend.

959.    On November 6, 2018, "[Mr. Williams complained of] pain, request[ed] to be put on Neurontin [and] EMG requested.  Will put on [Elavil] before EMG results."

960.    From November 5, 2018 until December 31, 2018 Mr. Williams was offered 50mg of Elavil every night at bedtime, but 90% of the time he refused it.

961.    No one followed up with him to understand why he was refusing the medication. In fact, like many other patients, Elavil had extremely negative side effects, including extended sleep and drowsiness.

962.    On November 21, 2018, Dr. Weinstein performed an EMG which revealed left tibial and deep peroneal neuropathies.  Additionally, the EMG revealed evidence of acute and chronic denervation in the Tibial and Peroneal innervated muscles of his left leg.  The EMG has no provider initials showing it was reviewed and no one adjusted Mr. Williams' pain medications to address his obvious neuropathy and pain issues.

963.    Instead, throughout December, medical personnel noted that Mr. Williams was non-compliant with taking the Elavil. December 2, 2018, in an Ambulatory Health Record Progress Note, the writer states that Mr. Williams was non-compliant with his meds.

964.    On January 3, 2019, Mr. Williams reported suffering from nerve pain.

965.    On January 8, 2019, in an Ambulatory Health Record Progress Note, someone from medical noted that Elavil was not effective for Mr. Williams and ordered it discontinued.

966.    To this day, Mr. Williams does not receive any effective pain management treatment.  He suffers greatly from the chronic pain and has trouble ambulating. Despite a positive EMG Mr. Williams has never even been given a trial or Neurontin, nor is his chronic pain addressed.  In fact, Mr. Williams is largely ignored it seems in large part due to his mental health issues and inability to advocate for himself.

**The Purported Plaintiff Class Members**

967.    Plaintiffs bring this lawsuit on behalf of themselves and all present and future patients in the care of DOCCS who require treatment with MWAPs.

968.    The allegations and claims of the representative plaintiffs are typical of the claims of the proposed plaintiff class.

969.    The plaintiff class is so numerous that joinder of all members is impractical.

970.    Each of the individuals within the plaintiff class require treatment for chronic pain or neurological conditions with medications on DOCCS' MWAP list, although the specific medical conditions, injuries and neuropathic ailments may differ patient to patient.

971.    Each of the individuals within the plaintiff class has been examined and/or tested by outside specialists who have recommended treatment with MWAPs.  The DOCCS' MDs and Mid-Level Clinicians agree that the patient requires treatment with an MWAP and have submitted or would submit an MWAP Request Form.

972.    If the medical treatment of the plaintiff class members was left with the outside specialists, MDs and Mid-Level Clinicians, each plaintiff class member would receive treatment with an MWAP.

973.    But for the MWAP Policy and the requirement that an RMD "approve" the prescription of a MWAP, plaintiff class members would receive treatment with MWAPs.

**FIRST CLAIM FOR RELIEF**

**42 U.S.C. § 1983**
***Deliberate Indifference to Health or Safety – Policy Implementation and Enforcement***
***(Against Defendants Koenigsmann, Dinello, Bozer, Hammer and Mueller in their***
***individual capacities, Defendants DOCCS and Defendant Morley in his official capacity for***
***injunctive purposes)***

974.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

975.     On June 2, 2017 Defendants promulgated the Medications With Abuse Potential Policy ("MWAP Policy").

976.     On September 10, 2018 Defendants promulgated a revised version of the MWAP Policy.

977.     Though the policy is not facially unconstitutional, its application and enforcement demands that Plaintiffs' MWAP medications are abruptly discontinued by RMDs who refuse to approve prescriptions.

978.     The denials of MWAP medications take place regardless of the patient's medical needs or the successful treatment to date.

979.     The denials of MWAP medications take place even when necessary diagnostic testing has not been arranged or conducted.

980.     The denials of MWAP medications take place even when effective alternative treatments have not been prescribed or identified.

981.     Enforcement of the MWAP Policy strips a patient's medical care providers of the ability to treat their patients in accordance with their medical judgment.

982.   Enforcement of the MWAP Policy strips the patient's medical care provider of the ability to accept the recommendations of specialty care providers and consultants for prescriptions and treatments.

983.   Instead, the MWAP Policy places decision-making about a patient's treatment solely in the hands of a Regional Medical Director, who is often not familiar with the patient's needs or treatments to date.

984.   Plaintiffs suffer severely and unnecessarily due to Defendants' MWAP Policy.

## SECOND CLAIM FOR RELIEF

### 42 U.S.C. § 1983
### *Deliberate Indifference*
**(Against Defendants Dinello, Mueller, Hammer, Andola, Gusman, Lee, Miller, Mantaro, Braselman, Karandy, Acrish, Ashong, Salotti, John Doe #1, John Doe #2, Jane or John Doe #3 - #50 and Jane or John Doe NP or PA #1 - #50)**

985.   Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

986.   Defendant MDs and Mid-Level Clinicians sometimes discontinue a plaintiff's medications due to factors having nothing to do with effective medical treatment: the plaintiff fails to come to the medication window, there is a claim of drug abuse or diversion, or in retaliation for complaints about his/her health care.

987.   Defendant MDs and Mid-Level Clinicians sometimes discontinue or refuse necessary, effective medication due to remote occurrences or suspicion of a patient's drug-related history without testing the patient for current abuse.

988.   Defendant MDs and Mid-Level Clinicians have the ability to test plaintiffs for the presence of medications within their bodies prior to discontinuing or rejecting effective medications that have been prescribed to them.

989.     Defendant MDs and Mid-Level Clinicians also have the ability to stop the medications in the short term to avoid harmful potential drug interactions, but to subsequently test the patient and reinstate the medications when safe.

990.     The complete and abrupt discontinuation of necessary medications as a punitive measure is deliberately indifferent to the serious medical needs of plaintiff class members and violative of the Eighth Amendment prohibition against cruel and inhumane punishment.

## THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983**
*Deliberate Indifference*
*(Against Defendants Dinello, Mueller, Hammer, Andola, Gusman, Lee, Miller, Mantaro, Braselman, Karandy, Acrish, Ashong, Salotti, John Doe #1, John Doe #2, Jane or John Doe #3 - #50 and Jane or John Doe NP or PA #1 - #50 in their individual capacities)*

991.     Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth herein.

992.     Defendant MDs and Mid-Level Clinicians send their patients out to consultants and specialty physicians when Defendant MDs and Mid-Level Clinicians not skilled enough to treat a patient's particular condition.

993.     Consultants and specialty physicians examine the patients, run necessary testing and craft recommendations for the patient's care which is reviewed by the Defendant MDs and Mid-Level Clinicians.

994.     Defendant MDs and Mid-Level Clinicians then agree or disagree with the specialist recommendations and submit Non-Formulary Requests or MWAP Request Forms requesting recommended medications for their patients.

995.     Defendant RMDs sought to prohibit and restrict the prescription of MWAP medications and started denying Non-Formulary Requests while crafting the MWAP Policy.

996.   On June 2, 2017 Defendants promulgated the MWAP Policy.

997.   On September 10, 2018 Defendants promulgated a revised version of the MWAP Policy.

998.   Though the policy is not facially unconstitutional, its application and enforcement meant that Plaintiffs' MWAP medications were abruptly discontinued.

999.   Defendant MDs and Mid-Level Clinicians then abruptly discontinue a patient's MWAP medications regardless of the patient's medical needs or the successful treatment to date.

1000.   Defendant MDs and Mid-Level Clinicians discontinue a patient's MWAP medications even when necessary diagnostic testing has not been arranged or conducted -- leaving patients to suffer while they await testing or specialty appointments.

1001.   Defendant MDs and Mid-Level Clinicians discontinue a patient's MWAP medications even when effective alternative treatments have not been prescribed or identified.

1002.   Defendant MDs and Mid-Level Clinicians continue patients on psychiatric medication alternatives that are often ineffective treatment and leave patients with unbearable side effects.

1003.   Plaintiffs suffer severely and unnecessarily due to the discontinuation of their MWAP medications by Defendant MDs and Mid-Level Clinicians.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff requests that the Court grant the following relief against Defendant DOCCS' physicians and administrators in their individual capacities:

1004.   Certifying this action as a class action under Fed. R. Civ. P.  23(b)(1)(A), (b)(2) and (b)(3), with the class as defined above.

1005.   Adjudging and declaring that the policy, practice, omission and conditions described above are in violation of the rights of the Plaintiffs and members of the Class as secured by the Eighth Amendment.

1006.   Permanently enjoining Defendants, their agents, employees, and all persons acting in concert with them from subjecting Plaintiffs and the members of the Class to the illegal policies, practices, omissions and conditions described above.

1007.   Directing Defendants to allow individualized assessments of Plaintiff Patients' MWAP needs by their primary care physicians, consultants and specialists;

1008.   Awarding compensatory damages for the pain and suffering of Plaintiffs and members of the Class, including compensation for garden variety emotional damages;

1009.   Awarding Plaintiffs reasonable attorneys' fees, costs, disbursements and other litigation expenses, pursuant to 42 U.S.C. § 1988;

1010.   Retaining jurisdiction over this case until Defendants have fully complied with the orders of this Court and there is reasonable assurance that Defendants will continue to comply in the future.

1011.   Ordering such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      September 2, 2019

**LAW OFFICE OF AMY JANE AGNEW, P.C.**

By: */s/ AJ Agnew*
Amy Jane Agnew, Esq.
*Counsel for Plaintiff*
24 Fifth Avenue, Suite 1701
New York, New York 10011
(973) 600-1724
aj@ajagnew.com

*Plaintiff's Counsel is incredibly grateful for the time, dedication, compassion and energy of the following law students who worked tirelessly to develop this Complaint over the last two years by working with over one hundred and twenty class members (and their voluminous medical records): Shayan Mirzahaidar, Rutgers School of Law; Kara Somerstein, Cardozo School of Law, Robert Price and Margaret Foster, Brooklyn School of Law, Michelle Kraidman and Peter Rosenberg, Fordham School of Law.*