UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER ALLEN, *et al.*,

                                        *Plaintiffs*,

              -against-                                        ECF Case

NEW YORK STATE DEPARTMENT OF                                   19-cv-8173
CORRECTIONS AND COMMUNITY SUPERVISION,
*et al.*,                                                      LAP

                                        *Defendants*.

---

### NON-STATE REPRESENTED DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Ryan E. Manley
HARRIS, CONWAY & DONOVAN, PLLC
*Attorneys for Non-State Represented Defendants*
50 State Street, 2nd Floor
Albany, New York 12207
(518) 436-1661
RManley@HCDLegal.com

Date: April 8, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...............................................................................................2

STANDARD OF REVIEW .............................................................................................17

ARGUMENT ..................................................................................................................18

POINT I

THE SECOND CLAIM FOR RELIEF AGAINST THE NON-STATE REPRESENTED
DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL
INVOLVEMENT..........................................................................................................18

POINT II

PLAINTIFF'S THIRD CLAIM FOR RELIEF AGAINST THE NON-STATE
REPRESENTED DEFENDANTS FAILS TO STATE A CLAIM FOR DELIBERATE
INDIFFERENCE...........................................................................................................21

POINT III

THE NON-STATE REPRESENTED DEFENDANTS ARE ENTITLED TO QUALIFIED
IMMUNITY AS A MATTER OF LAW. .........................................................................37

CONCLUSION...............................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

Acosta v. Thomas,
No. 9:16-CV-0890 (LEK/TWD), 2019 WL 5197313 (N.D.N.Y. June 21, 2019)................23

Alvarado v. Westchester Cty.,
22 F. Supp. 3d 208 (S.D.N.Y. 2014)......................................................................................19

Ashcroft v. Iqbal,
556 U.S. 662 (2009)...............................................................................................................18

Bell Atl. Corp. v. Twombly,
550 U.S. 554 (2007)...............................................................................................................18

Benjamin v. Pillai,
2019 WL 5783304 (2d Cir. 2019)..........................................................................................21

Chance v Armstrong,
143 F.3d 698 (2d Cir. 1998)..............................................................................................21, 22

Cole v. Goord,
2009 WL 1181295 (S.D.N.Y. Apr. 30, 2009)........................................................................27

Crouch v. Spaulding,
No. 16-CV-01435, 2019 WL 1004539 (N.D.N.Y. Jan 24, 2019)..........................................34

Daniels v. Williams,
474 U.S. 327 (1986)...............................................................................................................24

Estelle v Gamble,
429 U.S. 97 (1976)...........................................................................................................21, 24

Farmer v. Brennan,
511 U.S. 825 (1994).........................................................................................................21, 22

Farrell v. Burke,
449 F.3d 470 (2d Cir. 2006)...................................................................................................19

Garcia v. Does,
779 F.3d 84 (2d Cir. 2015)...............................................................................................38, 39

Goldman v. Belden,
754 F.2d 1059 (2d Cir. 1985).................................................................................................17

Gonzalez v. City of Schenectady,
728 F.3d 149 (2d Cir. 2013)..........................................................................38

Grandon v. Merrill Lynch & Co.,
147 F.3d 184 (2d Cir. 1998)..........................................................................17

Gray v. Kang Lee,
No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573 (N.D.N.Y. Apr. 15, 2015).....................25

Griffin v. Amatucci,
611 F. App'x 732 (2d Cir. 2015) ...................................................................39

Harlow v. Fitzgerald,
457 U.S. 800 (1982)....................................................................................38

Hathaway v. Coughlin,
37 F.3d 63 (2d Cir. 1994)..............................................................................22

Hathaway v. Coughlin,
99 F.3d 550 (2d Cir. 1996)............................................................................22

Hernandez v. Keane,
341 F.3d 137 (2d Cir. 2003)..........................................................................22

Hunter v. Bryant,
502 U.S. 224 (1991)....................................................................................38

Hyman v. Abrams,
630 F. App'x 40 (2d Cir. 2015) .....................................................................39

Jamiel v. Washburn,
No. 17-CV-7172 (NSR), 2019 WL 2491596 (S.D.N.Y. June 14, 2019)..............................19

Liffiton v. Keuker,
850 F.2d 73 (2d Cir. 1988)............................................................................19

Luck v. Westchester Med. Ctr.,
No. 17-CV-9110 (NSR), 2020 WL 564635 (S.D.N.Y. Feb. 4, 2020) ...................................38

Martinez v. California,
444 U.S. 277 (1980)....................................................................................19

Matteo v. Perez,
No. 16-CV-1837 (NSR), 2017 WL 4217142 (S.D.N.Y. Sept. 19, 2017) ..............................18

McKenna v. Wright,
386 F.3d 432 (2d Cir.2004)................................................................................39

Milan v. Wertheimer,
808 F.3d 961 (2d Cir. 2015)........................................................................20, 33

Mitchell v. Forsyth,
472 U.S. 511 (1985)...........................................................................................39

Nowinski v. Rao,
No. 6:14-CV-06559 (MAT), 2018 WL 2303780 (W.D.N.Y. May 21, 2018) ......................25

Ortiz v. Makram,
No. 96-CV- 3285, 2000 WL 1876667 (S.D.N.Y. Dec.21, 2000) ..........................................23

Ross v. Koenigsmann,
No. 9:14-CV-1321 (GTS/DJS), 2016 WL 11480164 (N.D.N.Y. Sept. 8, 2016).................23

Ross v. Westchester Cty. Jail,
No. 10-CV-3937 (DLC), 2012 WL 86467 (S.D.N.Y. Jan. 11, 2012)...................................19

Rothstein v. UBS AG,
708 F.3d 82 (2d Cir. 2013)................................................................................18

Rush v. Fischer,
2011 WL 6747392 (S.D.N.Y. July 6, 2011) .........................................................30

Rush v. Fischer,
No. 9-CV-9918, 2011 WL 6747392 (S.D.N.Y. Dec. 23, 2011) ...........................................23

Salahuddin v. Goord,
467 F.3d 263 (2d Cir. 2006)........................................................................21, 22

Sledge v. Bernstein,
No. 11 CV. 7450(PKC)(HBP), 2012 WL 4761582 (S.D.N.Y. Aug. 2, 2012)......................38

Smith v Carpenter,
316 F.3d 178 (2d Cir. 2003)........................................................................21, 22

Taravella v. Wolcott,
599 F.3d 129 (2d Cir. 2010).............................................................................38

Veloz v. New York,
339 F.Supp.2d 505 (S.D.N.Y. 2004).................................................................23

<u>Weyant v. Okst,</u>
101 F.3d 845 (2d Cir. 1996)............................................................................................22

<u>Wilson v. Seiter,</u>
501 U.S. 294 (1991)........................................................................................................22

<u>Wood v. Moss,</u>
572 U.S. 744 (2014)........................................................................................................38

<u>Wright v. Genovese,</u>
694 F.Supp.2d 137 (N.D.N.Y. 2010)..............................................................................23

<u>Zherka v. Amicone,</u>
634 F.3d 642 (2d Cir. 2011)............................................................................................18

**Statutes**

42 U.S.C. § 1983.......................................................................................................18, 19

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................*passim.*

Defendants Drs Ann Andola, Mikhail Gusman, Chun Lee, Kathleen Mantaro, David Karandy; and Nurse Practitioners Albert Acrish and Mary Ashong (collectively "Non-State Represented Defendants" or "NSRDs")[1], respectfully submit this memorandum of law in support of their motion, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the First Amended Class Action Complaint filed by Plaintiffs, Dkt. No. 76 ("FAC").

## PRELIMINARY STATEMENT

This action involves the application of the Medications with Abuse Potential ("MWAP") policy to inmates housed in New York State correctional facilities.  It is alleged that the goal of the policy is to reduce the prescription of MWAPs in the correctional setting.  MWAPs include medications such as opioids, neuromodulating medications such as Neurontin and Lyrica and other medications such as Baclofen and Flexeril.  Plaintiffs assert, on behalf of themselves and a purported class of inmates to whom certain MWAP medications have been denied at one point or another, that all of the Defendants violated their constitutional right to adequate medical care for their pain management under the Eighth Amendment.  Plaintiffs concede that the MWAP policy is not unconstitutional on its face but argue that the way the MWAP policy is being applied is unconstitutional. The challenged application is the Regional Medical Directors' roles in either approving or denying prescription requests by the NSRDs and other mid-level MDs and Clinicians.  Although the FAC is labeled as a Class Action Complaint, it is clear from a reading of the Second and Third Claims for relief as against the NSRD MDs and Mid-Level Clinicians that what we have here are eighteen factually distinct and separate deliberate indifferent claims.

---

1 These Defendants are categorized in the FAC as Facility Treating Physicians and Mid-Level Clinicians ("MDs and Mid-Level Clinicians").

Plaintiffs' Second Claim for Relief warrants dismissal because the FAC fails to allege any facts to support allegations that the NSRDs were personally involved in withholding any medications from any inmates in a punitive manner.

Plaintiffs' Third Claim for Relief alleging deliberate indifference must be dismissed because objectively, the Plaintiffs received adequate care and subjectively, the FAC fails to allege that any of the NSRDs acted with the requisite intent to support a deliberate indifference claim.

Finally, Plaintiffs' claims fail because the NSRDs are entitled to qualified immunity.

## STATEMENT OF FACTS[2]

### A. MWAP Policy

In 2017, the New York State Department of Corrections and Community Supervision ("DOCCS") promulgated the MWAP Policy.  See FAC at p. 1.  According to Dr. Carl Koenigsmann who served as the Chief Medical Officer ("CMO") for DOCCS until late 2018, the purpose of the policy was to ensure proper oversight over the clinicians ordering the medications. FAC ¶¶10, 152. Medications that are listed include Ultram, Lyrica, Neurontin, Baclofen, Flexeril, Percocet and Oxycodone. FAC ¶¶80-87. After examining a patient, under the MWAP Policy, an MD or Mid-Level Clinician submits the MWAP Request form for one of these medications to the Regional Medical Director in charge of his/her "hub." FAC ¶137. The MWAP Request Form asks for relevant health information regarding the patient, the justification for use of the medication, a list of any alternatives tried to treat the medical issue, and if there is

---

2 The NSRDs accept the allegations as outlined in the FAC as true solely for the purposes of this motion and otherwise reserve the right to contest these allegations if this case is not dismissed.

any recent evidence of drug diversion or abuse by the patient. FAC ¶¶138-139. The RMD's then review the patient's medical history available on the DOCCS database, evaluate the contents of the MWAP Request form, and determine whether a patient will receive an MWAP. FAC ¶¶140 & 142.

If an MWAP prescription is not approved by the RMD, MDs and Mid-Level Clinicians must discontinue the prescription. FAC ¶146. The pharmacies will not fill a prescription for an MWAP without RMD approval. Id. An MD or Mid-Level Clinician has no ability to provide the medication once an RMD refused to approve the prescription. FAC ¶147.

It is alleged that each of the individuals within the plaintiff class require treatment for chronic pain and neurological conditions with medications on DOCCS' MWAP list. FAC ¶974. It is alleged that each of the individuals within the plaintiff class has been examined and/or tested by outside specialists who have recommended treatment with MWAPs. FAC ¶975. The DOCCS' MDs and Mid-Level Clinicians agree that the patient requires treatment with an MWAP and have submitted or would submit an MWAP Request Form but for the MWAP policy. FAC ¶975. It is alleged that if the medical treatment of the proposed plaintiff class members was left with the outside specialists, MDs and Mid-Level Clinicians, each plaintiff class member would receive treatment with an MWAP. FAC ¶976. According to the FAC, but for the MWAP Policy and the requirement that an RMD "approve" the prescription of an MWAP, the purported plaintiff class members would receive treatment with MWAPs.  FAC ¶977.

**B.     Dr. Ann Andola**

Dr. Andola is a physician that works at Eastern Correctional Facility. FAC ¶¶16,17, 167. It is alleged that Dr. Andola was deliberately indifferent to the medical needs of Plaintiffs Allen

and Gradia.

### 1. Peter Allen

According to the FAC, Mr. Allen suffers from a number of spinal and back issues. FAC ¶164. As a result, Drs Andola and Gusman repeatedly renewed his prescriptions for Ultram and Neurontin and adjusted the doses to treat corresponding improvement or degeneration in pain. FAC ¶169. On or about January 12, 2017, Mr. Allen's Ultram was discontinued in response to a positive drug test. FAC ¶ 173,176. It is not alleged that either Drs Andola or Gusman were responsible for discontinuing his Ultram. FAC ¶¶176-177. On January 19, 2017, a nurse gave Mr. Allen Ibuprofen in response to his Ultram being discontinued. FAC ¶177. On or about June 9, 2017, Dr. Andola submitted an MWAP request for Mr. Allen's Neurontin. After submitting the MWAP, Dr. Andola advocated in great detail through a series of e-mails in support of her patient's MWAP request for Neurontin being granted. FAC ¶¶184-192. In response, the request was denied by Drs. Dinello and Mueller who suggested Neurontin could be weaned off and that alternative treatments should be utilized. FAC ¶¶186,188. Allen's Neurontin was not immediately discontinued. Per an AHR notation, on July 20, 2017, Allen was being weaned off of Neurontin. FAC ¶194. Dr. Andola attempted to help how she could by issuing Mr. Allen a lumbar supportive brace. FAC ¶196. Notably, Allen filed a grievance against Dr. Mueller and not Dr. Andola. FAC ¶197. On October 4, 2018, Dr. Andola submitted an MWAP request for Lyrica as an alternative to Neurontin. FAC ¶ 204. Mueller denied this request. Id. At or around this time, Mr. Allen was being prescribed Tylenol, Ibuprofen and Elavil. FAC ¶¶202, 207.

### 2. John Gradia

In April and May of 2017, Mr. Gradia saw two outside specialists whom recommended

4

Neurontin and Percocet to treat pain. FAC ¶¶477, 478. On May 19, 2017, Dr. Andola prescribed the max doses of Neurontin and two weeks of Percocet. FAC ¶479. On June 7, 2017 after the MWAP policy was promulgated, Andola secured a 5-day emergency supply of pain medication for Gradia in response to a specialist's recommendation. FAC ¶481. Andola submitted a detailed MWAP request for Percocet to Dr. Mueller, which were followed up by e-mails in further support of the request. FAC ¶¶482-483. Dr. Mueller denied the MWAP request. FAC ¶484. Andola followed up again by e-mail again in support of Gradia being granted the e-mail request and cc'd Drs Hammer and Dinello. FAC ¶485. On June 23, 2017, an MWAP request for Neurontin filed by Dr. Andola was approved. FAC ¶492. In July of 2017, a pain management specialist recommended Ultram to be prescribed and Drs. Andola and Gusman agreed.  FAC ¶493. In August of 2017, Andola explained to Gradia that Dr. Mueller had stopped all of his pain medications due to the MWAP policy. FAC ¶494. Despite this, Andola filed an MWAP requesting Ultram which was denied. FAC ¶¶494, 496. Quoted directly from the FAC: "[o]n October 11, 2017, Dr. Andola issued Mr. Gradia a double mattress in an attempt to help how she could with his pain." FAC ¶ 505. In response to being told his knee was in pain on November 3, 2017, Dr. Andola scheduled an MRI and an orthopedic visit. FAC ¶508. At that time, Gradia was apparently on Neurontin 1200mg three times per day. Id.

In December of 2017, Andola placed another MWAP request for Neurontin which was denied by Mueller. FAC ¶¶512-513. Dr. Andola then "went around" Mueller to Dr. Koenigsmann who approved Neurontin for 90 days. FAC ¶517. Dr. Andola also submitted an MWAP request to another RMD who allowed a five-day dose of Ultram in December of 2017. FAC ¶518. Throughout 2018, Andola gave Gradia a five-day supply of Ultram, FAC ¶521; she

5

submitted MWAP requests for Neurontin and Ultram, FAC ¶523; She also submitted MWAP

requests for Neurontin and Ultram in March of 2018.  In a "boss move" Dr. Andola submitted an

MWAP for Neurontin to Koeningsman which was approved FAC ¶524; referred Gradia to pain

management, FAC ¶530; and started Gradia on a trial dose of Elavil and then switched to

Benedryl at his request, FAC ¶¶538-539, 548.

### C.  Dr. Mikhail Gusman

Dr. Gusman is a physician who works at Eastern Correctional Facility. FAC ¶¶17, 167. It

is alleged that he was deliberately indifferent to the medical needs of Plaintiffs Bernard, Gradia

and Hernandez.

#### 1.  Brian Bernard

It appears that while at Shawangunk Correctional Facility and under the care of Dr. Chun

Lee, Dr. Gusman met with Mr. Bernard on February 1, 2018. See generally FAC ¶¶213-237. It is

alleged that Mr. Bernard had a specialty appointment with an orthopedist on January 26, 2018

during which it was recommended Mr. Bernard be prescribed Neurontin.  FAC ¶237. It is alleged

that Gusman reviewed the recommendation and noted "Will see Dr. Lee to discuss if he wants

surgery."  It is further alleged that Gusman did not prescribe Neurontin, nor did he note "why he

was dismissing the specialist's recommendation of Neurontin." Id. It appears that this was Dr.

Gusman's one and only interaction with Mr. Bernard. It is not alleged that Gusman abruptly

discontinued an MWAP medication punitively or otherwise.

#### 2.  John Gradia

As previously discussed, during his time at Eastern Correctional, Mr. Gradia was also

under the care of Dr. Andola. On or about July 31, 2018, Mr. Gradia saw a pain therapist who

recommended he try Lamictal or Trileptal for neuropathic pain and "recommended [Ultram] for severe pain." FAC ¶535. Dr. Gusman prescribed a two-week supply of Lamictal but did not prescribe Ultram. FAC ¶536.  It is alleged that Dr. Gusman did not try to get an MWAP for Ultram.  FAC ¶537. It is not alleged that Gusman abruptly discontinued an MWAP medication punitively or otherwise.

### 3.  Angel Hernandez

While at Coxsackie Correctional Facility and being treated by Dr. Mantaro, an MWAP request for Ultram was denied by Dr. Mueller sometime between June 26, 2017 and August 2, 2017. FAC ¶568-571. On August 2, 2017 in response to the MWAP request denial, Dr. Mantaro discontinued Mr. Hernandez's Ultram and Neurontin with a taper order. FAC ¶571-572.

On August 29, 2017, Mr. Hernandez was transferred to Eastern Correctional under the care of Dr. Gusman. On September 1, 2017, Dr. Gusman wrote "transferred from another facility with suggested tapering dose of Neurontin 300 mg to be started 9/1 no need for further tapering. Neurontin can be safely discontinued." FAC ¶574.

### D.  Dr. Kathleen Mantaro

Dr. Mantaro is a physician who worked at Coxsackie Correctional Facility for the times relevant to the FAC. FAC ¶¶20, 389-391. It is alleged that she was deliberately indifferent to the medical needs of Plaintiffs Aaron Dockery and Angel Hernandez.

### 1.  Aaron Dockery

On or about July 31, 2017, either Dr. Miller or Dr. Mantaro gave Mr. Dockery a five-day emergency supply of Neurontin in response to complications from MS. FAC ¶¶391, 390. Dr. Mantaro then submitted an MWAP request which was approved but without refills. FAC ¶392.

On September 17, 2017, a second MWAP request for Neurontin was submitted. Dr. Dinello rejected the request, suggested weaning Mr. Dockery off Neurontin and recommended an unnamed safer non-habit-forming nerve modulating agent. FAC ¶395.

On September 21, 2017 Mr. Dockery was sent to Albany Medical Center Hospital "AMCH"). FAC ¶396. Staff at AMCH noted that Mr. Dockery was being tapered off of his Neurontin. FAC ¶397. A doctor at AMCH wrote that they believed that Mr. Dockery required Neurontin and that it be restarted at 600mg twice a day.  FAC ¶398-399.  In response and upon return from the hospital, Dr. Mantaro secured for Mr. Dockery a five-day emergency prescription for Neurontin.  FAC ¶400.  Dr. Mantaro (or Miller) then "cleverly" submitted an MWAP request for Neurontin directly to Dr. Koeningsmann which was granted.  FAC ¶402.  Through December of 2017, Mr. Dockery received 900mg of Neurontin every morning and 1800mg of Neurontin every night.  FAC ¶408.  It is not alleged that Dr. Mantaro abruptly discontinued an MWAP medication punitively or otherwise.

### 2. Angel Hernandez

On May 15, 2017, Mr. Hernandez had an appointment with a pain specialist who recommended increasing his Neurontin to three times a day and an epidural steroid injection. FAC ¶566.  Dr. Mantaro agreed and increased Mr. Hernandez's Neurontin prescription, referred him for epidural shot treatments, lidocaine patched and 650mg of acetaminophen four times per day.  FAC ¶567.  On June 26, 2017, Dr. Mantaro submitted an MWAP request to renew Mr. Hernandez's prescription for Ultram which Dr. Mantaro did not approve.  FAC ¶¶568-570.  As a result, Dr. Mantaro ordered his Ultram discontinued with a taper order.  FAC ¶571.  Dr. Mantaro also discontinued Mr. Hernandez's prescription of Neurontin with a taper order, but there does

not appear to be an MWAP request in the file.  FAC ¶572.

**E.  Dr. David Karandy**

Dr. Karandy is a physician who worked at Great Meadow Correctional Facility for the times relevant to the FAC.  FAC ¶22, 943.  It is alleged that he was deliberately indifferent to the medical needs of Plaintiff Derrick Williams.

Dr. Karandy's first and only interaction with Mr. Williams was on July 17, 2017 and it was noted that he had a deformed foot and would need a "flats permit."  FAC ¶944.  Although the FAC alleges that Mr. Williams' Neurontin was summarily discontinued on June 9, 2017, it is not alleged that Dr. Karandy was the one who discontinued it and this occurred before the one and only alleged interaction. Id.

**F.  Albert Acrish, NP**

Albert Acrish is a Nurse Practitioner who worked at Green Haven Correctional Facility for the times relevant to the FAC.  FAC ¶¶25, 355-356.  It is alleged that he was deliberately indifferent to the medical needs of Plaintiff Shannon Dickenson.

On May 22, 2018, Mr. Dickenson transferred to Green Haven.  FAC ¶355.  On May 30, 2018 Mr. Acrish noted "pain neuropathy, worsening osteoarthritis, right shoulder surgery [needed] and neuropathy back L5."  FAC ¶356.  In response, Mr. Acrish prescribed Elavil to Mr. Dickenson that it is alleged he could not handle at his previous facility. FAC ¶357.  Although no other visits with Mr. Acrish are described in the FAC, it is alleged that Mr. Acrish never attempted to get MWAPs to treat his chronic issues and that in February and March of 2019, Mr. Dickenson complained of pain and spasms to Mr. Acrish and other medical personnel.  FAC ¶¶366, 367.

9

### G. Mary Ashong, NP

Mary Ashong is a Nurse Practitioner who worked at Green Haven Correctional Facility for the times relevant to the FAC.  FAC ¶¶24, 446.  It is alleged that she was deliberately indifferent to the medical needs of Plaintiff Eddie Fields.

Upon drafting into Green Haven on August 22, 2017, Ms. Ashong prescribed Baclofen and ordered physical therapy.  FAC ¶446.  On September 7, 2018, Mr. Fields was prescribed a ten-day supply of 10 mg of Baclofen twice a day.  FAC ¶447.  On September 14, 2018, Mr. Fields was allowed to continue Baclofen until September 20, 2018 at which time it would be discontinued.  FAC ¶448.  It is inferred that Dr. Hammer "refused the MWAP Request for Baclofen" although the FAC fails to mention one being requested.  FAC ¶448.  Although unclear when, it appears that Nurse Ashong put another MWAP request in for Baclofen which was denied on October 4, 2018 by Dr. Hammer. FAC ¶453.  That same day, Ms. Ashong crossed out "Baclofen" from the recommendation of an outside neurologist.  FAC ¶451.  On October 19, 2018, Mr. Fields was prescribed and started taking Tizanidine milder muscle relaxant than Baclofen.  FAC ¶454.  On October 31, 2018, Ashong submitted an MWAP request for Tizanidine which was approved by Dr. Hammer for 180 days.  FAC ¶455.  Dr. Hammer then approved an increase in dosage of the Tizanidine in January of 2019 in response to a specialist recommendation.  FAC ¶¶458-459.

### H. Dr. Chun Lee

Dr. Lee is a physician who worked at Great Meadow Correctional Facility for the times relevant to the FAC.  It is alleged that he was deliberately indifferent to the medical needs of Plaintiffs Bernard, Daniels, Dickenson, Dockery, Hernandez, Jackson, Knight, Mathis, Pritchett,

Rahman, Rivera-Cruz and Stewart.

### 1. Brian Bernard

On June 20, 2017, Dr. Lee submitted an MWAP request for Percocet and Neurontin. FAC ¶215.  Dr. Mueller refused to approve Percocet but granted Neurontin. Id. On July 2, 2017, Mr. Bernard requested an alternative to Percocet and was provided with 12 motrin from a nurse. FAC ¶218.  In July, Dr. Lee submitted another MWAP request for Neurontin which was denied by Dr. Mueller.  FAC ¶219. On July 31, 2017, Dr. Lee admitted Mr. Bernard to the infirmary for pain control. FAC ¶221. Dr. Lee obtained a five-day emergency supply of pain medication and Dr. Mueller continued to deny MWAP requests. FAC ¶222. An MWAP was approved on August 22, 2017 for Neurontin, presumably by Dr. Koenigsmann.  FAC ¶224.  On or about September 28, 2017, Dr. Lee admitted Mr. Bernard to the infirmary for pain management and put in an MWAP request for a five-day supply of Percocet.  FAC ¶227. Two doses were administered before it was stopped by Dr. Mueller. Id. Dr. Lee "got more aggressive with his MWAP request" pointed out that it had previously been approved but was denied again. Id. Dr. Lee also submitted an MWAP request for Neurontin that was also denied. FAC ¶229. In the alternative, Mr. Bernard was prescribed Mobic and Depakote. FAC ¶230. In December of 2017, Mr. Bernard asked to be put on Neurontin and Celebrex. FAC ¶234. Dr. Lee saw Mr. Bernard again on January 2, 2018 about this request and noted that he would submit an MWAP request for approval. FAC ¶234.

### 2. Mark Daniels

In August of 2015, Dr. Lee prescribed Mr. Daniels Neurontin. FAC ¶250-251. On November 26, 2016, an unknown nurse did not provide Mr. Daniels with his Neurontin because he did not have ID with him. FAC ¶252. Each day between January 7, 2016 and January 10,

2016, Mr. Daniels refused to take Neurontin because he was "being accused of spitting it out" and "being set up." FAC ¶256. On January 11, 2016, Dr. Lee discontinued the Neurontin because Mr. Daniels had not taken it for three days. FAC ¶257. Neurontin was prescribed Neurontin again in April of 2016. FAC ¶264.

On June 8, 2017, Dr. Lee submitted an MWAP request for Neurontin to Dr. Mueller which was approved. FAC ¶276-277. On March 12, 2018, Dr. Lee submitted an MWAP for Lyrica based upon the recommendation of an outside specialist. FAC ¶294. There is no mention of it being granted in the AHR. FAC ¶295. On April 9, 2018, Dr. Lee prescribed Mr. Daniels Ibuprofen and on April 17, 2018 noted "LBP well tolerate with Cymbalta." FAC ¶297. On May 25th and August 13th of 2018, Dr. Lee granted renewals of Mr. Daniels' feed in cell permits. FAC ¶299-300. Dr. Lee was only able to offer Mr. Daniels Ibuprofen and Cymbalta for his pain. FAC ¶301. Between September 12, 2018 and March of 2019, Dr. Lee referred Mr. Daniels to two neurosurgeons and a pain clinic, prescribed him Ibuprofen and referred him to physical therapy. FAC ¶303-315.

### 3. Shannon Dickenson

On August 14, 2017 Dr. Lee noted in Mr. Dickinson's AHR, "neuro clinic rec [increase] [Neurontin], Baclofen, Elavil. Request MWAP Neurontin Baclofen." FAC ¶329. On August 19, 2017, Dr. Lee again wrote that Mr. Dickenson should have Elavil, Baclofen and Neurontin per the Neuro clinic. FAC ¶330. From August 9th through September 8th of 2017, Mr. Dickenson received 600mg of Neurontin twice a day and he started to refuse Elavil. FAC ¶331. On September 6, 2017, Dr. Lee made an MWAP request for Mr. Dickenson to receive 600mg of Neurontin twice a day but Dr. Mueller did not approve the MWAP. FAC ¶333. By mid-

September, Baclofen and Neurontin had been discontinued by Dr. Mueller pursuant to the MWAP Policy. FAC ¶335. In December of 2017, Dr. Lee sent Mr. Dickenson to a Neurologist and a pain clinic. FAC ¶340-341. In February of 2018, an orthopedist asked Dr. Lee to prescribe Mr. Dickenson Meloxicam which he did. FAC ¶343.

### 4. Aaron Dockery

In February of 2018, Dr. Lee sent an MWAP request for Neurontin to Dr. Koenigsman which was approved at 600mg three times per day. FAC ¶420. On June 14, 2018, Dr. Lee noted in the AHR that he would need an MWAP for Neurontin. FAC ¶421. On July 3, 2018, Dr. Lee entered an order to taper off Mr. Dockery's Neurontin prescription as the MWAP had not been approved. FAC ¶422. On July 20, 2018, Mr. Dockery was charged with drug use. FAC ¶428.  On August 8, 2018, Dr. Lee submitted another MWAP request form for Mr. Dockery's Neurontin prescription which was denied by Dr. Mueller. FAC ¶429-430.

### 5. Angel Hernandez

It is alleged that on May 17, 2019, Mr. Hernandez saw a specialist who recommended baclofen and there is no note why Dr. Lee refused recommendation for Baclofen. FAC ¶606.

### 6. Spencer Jackson

Mr. Jackson's intake notes upon arriving at Shawangunk on September 28, 2017 stated he was to receive Ibuprofen, 600 mg, Neurontin 800mg and Zyrtec. FAC ¶619. On October 2, 2017 he was observed playing basketball by a Correction Officer. FAC ¶620. On October 5, 2017, Mr. Jackson reached the end of his script for Neurontin. FAC ¶621. In response to the basketball claim, Dr. Lee ordered Mr. Jackson to give up his cane. FAC ¶622. On October 16, 2017 Dr. Lee sent Mr. Jackson to PT. FAC ¶624. On January 2, 2018, Dr. Lee noted nerve

13

sciatica pain and left knee patella pain but did not represcribe Neurontin. FAC ¶630.

### 7. Hugh Knight

Until 2014, Mr. Knight was treating with Lyrica. FAC ¶645. In November of 2014, Mr.

Knight was transferred to Shawangunk where his Lyrica was changed to Neurontin – which

apparently did nothing to address Mr. Knight's symptoms. FAC ¶646. Mr. Knight repeatedly

refused to take Neurontin and requested Lyrica. FAC ¶647. At Albany Medical Center, a

neurologist recommended prescribing Neurontin to Mr. Knight. FAC ¶651. In response, Dr. Lee

increased his dosage of Elavil and a low dose of Flexeril in late February 2016 which did not

help.  In September 2016 after another Neurologist recommended Neurontin, Dr. Lee noted

"already on [Neurontin]." FAC ¶653. In 2018, Dr. Lee attempted to get Mr. Knight moved to a

closer cell to the clinic because "his leg pain seizes up" but the administration refused the move.

FAC ¶655. Mr. Knight has been repeatedly told by Dr. Lee that "Albany" will not allow him to

have Lyrica, no matter his pain complaints.

### 8. Terry Mathis

From December 1, 2016 until September 28, 2017, Mr. Mathis was prescribed 1200m of

Neurontin twice a day, and on some occasions, he was treated with Percocet. FAC ¶681. When

Neurontin was not available in the prison, Dr. Lee administered Ultram to treat Mr. Mathis' pain.

FAC ¶682. On February 8, 2017, Dr. Lee renewed Mr. Mathis' prescription for 1200mg of

Neurontin twice a day with five refills. FAC ¶688. During this time period, Dr. Lee continued to

send Mr. Mathis out for sonograms, x-rays and MRIs. FAC ¶692.

On June 27, 2017, Dr. Mueller approved an MWAP request for 1200mg of Neurontin

twice a day for Mr. Mathis. FAC ¶696. On July 27, 2017 in response to reports of worsening

14

pain, Dr. Lee admitted Mr. Mathis to the infirmary for pain control. FAC ¶698. Dr. Lee ordered a prescription for Ultram from the pharmacy who wrote back: "you need MWAP. Please send MWAP, thank you 8/4/17" FAC ¶699. The MWAP request was subsequently denied by Dr. Mueller. FAC ¶700. Nonetheless, Dr. Lee treated Mr. Mathis with Ultram for five days in the infirmary which substantially helped. FAC ¶700. On September 6, 2017, Dr. Lee submitted an MWAP request for 1200 mg of Neurontin twice a day with 11 refills which Dr. Mueller denied. FAC ¶705-706. Mr. Mathis was admitted to the infirmary for "brief stints" in November of 2017 where he was administered Percocet. FAC ¶707-712.

### 9. Sean Pritchett

Mr. Pritchett "successfully treated with Lyrica [from 2008] to January 26, 2017." FAC ¶753-754. During this time frame, Drs Bozer and Mueller repeatedly approved Lyrica to treat Mr. Pritchett's pain. FAC ¶755. In February of 2015, Dr. Lee attempted to reduce Mr. Pritchett's Lyrica dosage but reported the reduced dose was "unsuccessful." FAC ¶756. On October 15, 2015, Dr. Lee reported to Dr. Mueller that alternatives were not effective and Dr. Mueller approved Lyrica again. FAC ¶757. In January of 2017, a non-formulary approval for Lyrica submitted by Dr. Lee was denied by Dr. Dinello and suggested a change to Neurontin. FAC ¶¶759-760. Dr. Lee had no choice and prescribed Neurontin. FAC ¶762. On February 27, 2018, Mr. Pritchett saw Dr. Lee who noted that Mr. Pritchett's stump pain had increased since he switched from Lyrica to Neurontin. FAC ¶767.  Dr. Lee recommended cryotherapy and a surgical consult. Id.

On June 20, 2017, Dr. Lee submitted an MWAP request for Neurontin that was approved by Dr. Mueller. FAC ¶771. On September 22, 2017, Dr. Lee administered a five-day emergency

supply of 600mg of Neurontin to Mr. Pritchett, "but the five days was all Dr. Lee could provide to Mr. Pritchett." FAC ¶¶774-775. Dr. Lee submitted an MWAP request for Neurontin to Dr. Mueller which was denied. FAC ¶¶775-776. On October 27, 2017, Dr. Lee prescribed Cymbalta for Mr. Pritchett. FAC ¶790. On November 22, 2017, Dr. Lee noted that Aleve was not working. FAC ¶793. On December 26, 2017, Mr. Pritchett was given a prescription for 200mg of Tegretol, an anticonvulsant medication that can treat nerve pain; Aleve, as well as 25mg of Diphenhydramine. FAC ¶795. On January 9, 2018, Dr. Lee noted that Mr. Pritchett was suffering from chronic pain and increased the Tegretol dosage from 200mg to 400mg. FAC ¶796. After a surgery for exploration and excision of stump neuroma in July of 2018, an MWAP was approved by Dr. Mueller for Percocet. Mr. Pritchett was also prescribed Ibuprofen and Aspirin. FAC ¶¶800-801. From December 2018 to April of 2019, Mr. Pritchett requested appointments with, and was sent to pain and orthopedic specialists. FAC ¶¶807-814.

### 10. Rashid Rahman

On September 28, 2016, a doctor at Walsh Regional Medical Unit ("Walsh") discontinued his Ultram prescription. FAC ¶829. On January 4, 2017, Dr. Lee re-prescribed Ultram to Mr. Rahman. FAC ¶837. On June 20, 2017, an MWAP request was submitted and on June 26, 2017, Mr. Rahman's prescription for Ultram expired when it was discontinued due to lack of "MWAP approval" FAC ¶840. On June 29, 2017, Mr. Rahman attended Physical Therapy. FAC ¶841. Although unclear from the FAC when he was prescribed Elavil, it was a new medicine as of August 9, 2017, and it was reported on August 16, 2017 that it was helping with his pain. FAC ¶845-846. Mr. Rahman's Elavil was discontinued on March 1, 2018 at which time Dr. Lee prescribed Cymbalta. FAC ¶848.

### 11. Felipe Rivera-Cruz

On June 15, 2017, Dr. Lee submitted an MWAP request for Baclofen for Mr. Rivera-Cruz's chronic pain and spasming which Dr. Mueller denied. FAC ¶874. Dr. Lee noted in Mr. Rivera-Cruz's chart: "Baclofen for paraplegia chronic pain not approved." FAC ¶878. Dr. Lee told Mr. Rivera-Cruz that Albany would not allow him to have Baclofen or Neurontin any longer. FAC ¶881.

### 12. Wayne Stewart

On May 2, 2017 after transferring to Shawangunk Correctional Facility, Dr. Lee ordered Mr. Stewart's MS Cotin prescription be discontinued and that he be treated with Percocet twice per day at 5mg. FAC ¶895. On May 7, 2017, one of Mr. Stewart's lawyers, who is also a registered nurse, wrote to Dr. Lee about the discontinuation of MS Contin and replacement with 5mg Percocet. She explained that 5mg was insufficient and 10mg might help. FAC ¶896-897. On May 8, 2017, Dr. Lee ordered a tapering of Percocet. FAC ¶898. On June 21, 2017, Mr. Stewart's prescription for Percocet was up for renewal and Dr. Lee submitted an MWAP request to Dr. Mueller which was denied. FAC ¶901-903. Dr. Lee tapered the Percocet and prescribed Mr. Stewart Ibuprofen. FAC ¶906.

### STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) hinges on a claim's "legal sufficiency." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). For purposes of the motion the facts alleged in the complaint shall be deemed true and all reasonable inferences drawn in plaintiffs' favor. See Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).

To survive a 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). Factual allegations must "nudge [a plaintiff's] claim from conceivable to plausible." Twombly, 550 U.S. at 570. A claim is plausible when the plaintiff pleads facts which allow the court to draw a reasonable inference the defendant is liable. Iqbal, 556 U.S. at 678. To assess the sufficiency of a complaint, the court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." Rothstein v. UBS AG, 708 F.3d 82, 94 (2d Cir. 2013). While legal conclusions may provide the "framework of a complaint," "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678–79.

## ARGUMENT

## POINT I

## THE SECOND CLAIM FOR RELIEF AGAINST THE NON-STATE REPRESENTED DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL INVOLVEMENT.

To state a claim under 42 U.S.C. § 1983, a plaintiff "must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." Matteo v. Perez, No. 16-CV-1837 (NSR), 2017 WL 4217142, at *3 (S.D.N.Y. Sept. 19, 2017) (citing Zherka v. Amicone, 634 F.3d 642, 644 (2d Cir. 2011)). A defendant's conduct must therefore be a proximate cause of the claimed violation for a court to find that the individual defendant deprived the plaintiff of his constitutional rights. Ross v. Westchester Cty. Jail, No.

10-CV-3937 (DLC), 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (citing Martinez v. California, 444 U.S. 277, 285 (1980)).

Additionally, as a prerequisite to recover monetary damages under § 1983, a plaintiff must show personal involvement in the alleged constitutional deprivation. Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006). In other words, there must be "specific factual allegations as to how *each defendant* is personally involved in the alleged illegal activities." Jamiel v. Washburn, No. 17-CV-7172 (NSR), 2019 WL 2491596, at *3 (S.D.N.Y. June 14, 2019) (emphasis added); see also Liffiton v. Keuker, 850 F.2d 73, 76 (2d Cir. 1988) (dismissing claim against defendant where complaint lacked specific factual allegations concerning defendant's personal involvement in the alleged constitutional harm); Alvarado v. Westchester Cty., 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) ("Personal involvement is a question of fact and must be satisfied as to each individual defendant.").

Under Plaintiffs' Second Claim for Relief for deliberate indifference, Plaintiffs allege that the MDs and Mid-Level Clinicians *sometimes* discontinue a plaintiff's medications: for failure to come to the medication window; because there is a claim of drug abuse or diversion; or in retaliation for complaints about his/her healthcare. See FAC ¶ 995.  Plaintiffs allege that discontinuation of medications for these reasons are punitive measures and constitute deliberate indifference to the serious needs of the plaintiffs.  For the reasons set forth below, these are conclusory allegations and this claim must fail because the FAC is void of facts to support it.

A.      **Defendants Mantaro, Karandy, Acrish, and Ashong**

Nowhere in the FAC are there any facts to even remotely suggest that Drs Mantaro, Karandy; or Nurse Practitioners Albert Acrish and Mary Ashong have punitively denied

19

prescribing pain medications to any plaintiff for failure to appear at the medication window; because there is a claim of drug abuse or diversion; or in retaliation for complaints about his healthcare.  See FAC generally.  *Sometimes* is not sufficient when the plaintiffs fail to allege *anytime* that any one of these defendants have acted in such a manner.  Because plaintiffs have failed to set forth *any* facts as to each of these defendant's personal involvement in alleged misconduct under the Second Claim for Relief, this claim must fail.

**B.      Defendants Andola and Gusman**

With regard to Drs Andola and Gusman, the FAC alleges that Peter Allen's Ultram was discontinued in response to a positive drug test. FAC ¶¶173, 176. It is not alleged however that either Drs. Andola or Gusman were personally responsible for this discontinuation.

**C.      Dr. Lee**

With regard to Dr. Lee, the FAC alleges that in January of 2016, Dr. Lee discontinued Plaintiff Daniels' Neurontin because he had not taken it for three days. FAC ¶257. To the extent this incident falls within the second cause of action, this specific instance warrants dismissal as being beyond the statute of limitations.  See Milan v. Wertheimer, 808 F.3d 961, 963 (2d Cir. 2015) (claims brought under Section 1983 and filed in New York are subject to a three-year statute of limitations); See Dkt. No. 1 (original complaint filed on September 2, 2019).

The FAC alleges that Dr. Lee submitted an MWAP request form to obtain approval for a Neurontin prescription for Plaintiff Dockery. FAC ¶429-430. That request was denied by Dr. Mueller for among other reasons, Plaintiff Dockery's close in time Tier 3 conviction for drug use.  Plaintiff Dockery's prescription for Neurontin was denied by Dr. Mueller and not by Dr.

Lee. As an MD, Dr. Lee had no ability to provide the medication once an Dr. Mueller refused to approve the prescription. FAC at ¶147.

**POINT II**

**PLAINTIFF'S THIRD CLAIM FOR RELIEF AGAINST THE NON-STATE REPRESENTED DEFENDANTS FAILS TO STATE A CLAIM FOR DELIBERATE INDIFFERENCE[3]**

To establish inadequate medical care under the Eighth Amendment, Plaintiff must prove "deliberate indifference to [his] serious medical needs." Chance v Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v Gamble, 429 U.S. 97, 104 (1976); see also Smith v Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (stating that "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law"). There is both an objective and a subjective element to a deliberate indifference claim.

In order to meet the objective requirement, the alleged deprivation of adequate medical care must be "sufficiently serious." Benjamin v. Pillai, 2019 WL 5783304, at *2 (2d Cir. 2019) (citing Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006)). Determining whether a deprivation is sufficiently serious also involves two inquiries. Salahuddin, 467 F.3d at 279. First, a prisoner must demonstrate that he was actually deprived of adequate medical care. Id. Prison officials who act "reasonably" in response to the inmate's health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." Id. (citing Farmer v. Brennan, 511 U.S. 825, 844–47 (1994)).  The second inquiry is "whether the

---

[3] For ease of reference, the NSRD's are moving to dismiss all of the Plaintiffs' individual claims under the Third Claim for Relief except for the following: *Hernandez v. Mantaro; Dockery v. Lee; Jackson v. Lee; and Rivera Cruz v. Lee.*  The NSRDs reserve their right to make a dispositive motion at a later date should the Court not dismiss the Third Claim for Relief on the basis of Qualified Immunity.

inadequacy in medical care is sufficiently serious." Id. at 280. In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." Salahuddin, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Id. (quoting Smith v. Carpenter, 316 F.3d at 185).

The second element of a deliberate indifference claim is subjective and asks whether the official acted with "a sufficiently culpable state of mind." Id. (citing Wilson v. Seiter, 501 U.S. 294, 300 (1991)). In order to meet the second element, plaintiff must demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. Wilson v. Seiter, 501 U.S. at 301-03; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. Farmer, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Id. at 835; see also Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996) (citing Farmer, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.'" Chance, 143 F.3d at 702 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)); see also Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

It is well settled that "differences in opinions between a doctor and an inmate patient as to

the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs." Ross v. Koenigsmann, No. 9:14-CV-1321 (GTS/DJS), 2016 WL 11480164, at *11 (N.D.N.Y. Sept. 8, 2016), Report and Recommendation Adopted, 2016 WL 5408163 (N.D.N.Y. Sept. 28, 2016); see also e.g., Acosta v. Thomas, No. 9:16-CV-0890 (LEK/TWD), 2019 WL 5197313, at *14 (N.D.N.Y. June 21, 2019) ("[C]ourts have repeatedly declined to find that a medical provider was deliberately indifferent to an inmate's medical needs when a plaintiff challenges the type and quantity of pain medication.") (internal quotations and citations omitted); Wright v. Genovese, 694 F.Supp.2d 137, 160 (N.D.N.Y. 2010) ("Differences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's 'serious' medical needs."); Veloz v. New York, 339 F.Supp.2d 505, 525 (S.D.N.Y. 2004) ("Differences in opinion by a doctor and a prisoner over the appropriate medication to be prescribed is a disagreement over a treatment plan and does not implicate the Eighth Amendment"); Rush v. Fischer, No. 9 Civ. 9918, 2011 WL 6747392, at *3 (S.D.N.Y. Dec. 23, 2011) (no deliberate indifference where defendant discontinued plaintiff's course of treatment with Percocet and provided him with another medication regimen consisting of Baclofen and Ibuprofen, against plaintiff's wishes); Ortiz v. Makram, No. 96-CV-3285, 2000 WL 1876667, at *9–10 (S.D.N.Y. Dec.21, 2000) (doctor's decision to prescribe Motrin in lieu of Percocet for prisoner's medical condition did not amount to deliberate indifference, even when that decision contravened recommendation of specialist).

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth

Amendment. <u>Sonds v. St. Barnabas Hosp. Corr. Health Servs.</u>, 151 F. Supp. 2d 303, 307 (S.D.N.Y. 2001) (citing <u>Estelle v. Gamble</u>, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. <u>Id.</u>; see also <u>Daniels v. Williams</u>, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

Plaintiffs' Third Claim for Relief amounts to various disagreements with treatment and choices of medications between the Plaintiffs and the Defendants. The Third Claim for Relief alleges that the application and enforcement of the MWAP policy resulted in the Plaintiffs' MWAP medications being abruptly discontinued by the MDs and Mid-Level Physicians. FAC ¶¶ 1004-1008. It is further alleged that the Plaintiffs suffer severely and unnecessarily due to the discontinuation of their MWAP medications by Defendant MDs and Mid-Level Clinicians. FAC ¶¶1008-1012. However, on its face, the FAC demonstrates that these MDs and Mid-Level Clinicians were not the decisionmakers whom discontinued these medications; that they acted in an objectively reasonable manner; sought treatment for their patients; and were not deliberately indifferent to the medical needs of the Plaintiffs.

Objectively, the FAC seemingly provides a detailed rendition of each of the named Plaintiffs' medical records. On its face, the first inquiry of the objective prong is not met with regard to any of these Plaintiffs to demonstrate that they were "actually deprived of adequate medical care" by the individual Defendants. In fact, Plaintiffs were frequently seen and treated, prescribed pain medication and other modalities, sent to pain clinics, and referred to outside specialists. See, <u>Gray v. Kang Lee</u>, No. 9:13-cv-258 (GLS/DEP), 2015 WL 1724573, at *3

(N.D.N.Y. Apr. 15, 2015) (finding prisoner could not satisfy objective requirement where he was frequently treated, prescribed pain medication, tested with an x-ray and MRI, and referred to an orthopedic specialist); Nowinski v. Rao, No. 6:14-CV-06559 (MAT), 2018 WL 2303780, at *5-6 (W.D.N.Y. May 21, 2018) (plaintiff was not deprived of adequate care where, inter alia, the inmate was provided with extensive care for his knee problems, including multiple surgeries, physical therapy, medications, and accommodations).  For those reasons, Plaintiffs claims should be dismissed.

However, even assuming the Plaintiffs could satisfy the objective element, the FAC fails to establish that the specific Defendant MDs and Mid-Level Clinicians below acted with the required mental culpability to satisfy the subjective element.

### A.  Dr. Andola

#### 1.  Peter Allen

Subjectively, it cannot be said that Dr. Andola provided inadequate medical care to Mr. Allen. According to the FAC, upon her June 9, 2017 MWAP request for Neurontin being denied, she advocated in great detail through numerous e-mails for Mr. Allen to either be prescribed Neurontin or for viable alternatives. FAC ¶¶182-192. At this time, Mr. Allen was being treated with Elavil, Tylenol and Ibuprofen. FAC ¶¶189, 192. Although the request for Neurontin was denied by Dr. Mueller, it was not immediately discontinued. As of July 20, 2017, Mr. Allen was still on Neurontin and being weaned off. FAC ¶194. Additionally, Dr. Andola issued Mr. Allen a lumbar supportive brace to assist with his pain. FAC ¶196. In October of 2018, Dr. Andola submitted an MWAP request for Lyrica which was also denied. FAC ¶204. At or around this time Mr. Allen was also being treated with Tylenol, Ibuprofen and Elavil.  FAC ¶¶202, 207.

On these facts, there is no evidence that Dr. Andola acted with subjective recklessness. The advocacy that Dr. Andola showed for her patient and the treatment of Mr. Allen's pain with alternative prescriptions and assistive devices belies any notion the she knew of or disregarded any risk to Mr. Allen's health or safety.

### 2. John Gradia

Subjectively, it also cannot be said that Dr. Andola was deliberately indifferent to Mr. Gradia. In May of 2017 and in response to outside specialist recommendations, Dr. Andola prescribed Mr. Gradia Neurontin and two weeks' worth of Percocet. FAC ¶479. On June 7, 2017, Dr. Andola prescribed Mr. Gradia a five-day emergency supply of pain medication. FAC ¶481. An MWAP request for Percocet was denied by Dr. Mueller despite detailed follow ups from Dr. Andola advocating for Mr. Gradia. On June 23, 2017, an MWAP request for Neurontin by Dr. Andola was approved. FAC ¶492. After a later MWAP from Dr. Andola requesting Ultram was denied, Dr. Andola issued Mr. Gradia a double mattress. FAC ¶¶494, 496, 505. In November of 2017, Dr. Andola scheduled appointments for Mr. Gradia with specialists and at the time he was being treated with Neurontin 1200mg three times per day. FAC ¶508. From December of 2017 to March of 2018, Dr. Andola submitted and was granted MWAP requests for Neurontin and Ultram; she started him on a trial of Elavil; later switched to Benadryl at his request; and referred Mr. Gradia to pain management. FAC ¶512-530.

On these facts, there is no evidence that Dr. Andola acted with subjective recklessness. The advocacy that Dr. Andola showed for her patient and the treatment of Mr. Gradia's pain with MWAP requests and alternative prescriptions belies any notion the she knew of or disregarded any risk to Mr. Gradia's health or safety.

### B. Dr. Mikail Gusman

### 1. Brian Bernard

The extent of Mr. Bernard's allegations against Dr. Gusman are that it was recommended by an orthopedist that Mr. Bernard be prescribed Neurontin and Dr. Gusman did not prescribe it to him. FAC ¶237. It is not alleged that Dr. Gusman discontinued any MWAP medications in the one and only interaction he had with Mr. Bernard. Further, a difference of opinion between physicians as to their determination of the appropriate treatment for a particular patient does not satisfy the requirements for a constitutional claim of deliberate indifference. Cole v. Goord, 2009 WL 1181295, at *8 n.9 (S.D.N.Y. Apr. 30, 2009), aff'd, 379 Fed.Appx. 28 (2d Cir. 2010) (citing Estelle, 429 U.S. at 97 (1976)). For these reasons, the claim against Dr. Gusman by Mr. Bernard should be dismissed.

### 2. John Gradia

Similarly, the extent of Mr. Gradia's allegations against Dr. Gusman are that he saw a pain therapist who recommended he try Lamictal, Trileptal or Ultram for pain and that Dr. Gusman only prescribed Lamictal. FAC ¶¶535-536. It is not alleged that Dr. Gusman discontinued any medications and as previously stated, a difference of opinion between physicians does not establish a constitutional claim for deliberate indifference. Any purported claims by Mr. Gradia against Dr. Gusman should be dismissed.

### 3. Angel Hernandez

The extent of Mr. Hernandez's claim against Dr. Gusman is that upon being transferred to Eastern from another correctional facility, Dr. Gusman safely discontinued a suggested tapering dose of Neurontin by another physician. FAC ¶574. As alleged, this constitutes a

difference of opinion between physicians and does not state a claim for deliberate indifference.

## C. Dr. Kathleen Mantaro

### 1. Aaron Dockery

The FAC states that in July of 2017, Dr. Mantaro secured a five-day emergency supply of Neurontin for Mr. Dockery and then submitted an MWAP request that was granted. FAC ¶¶390-392. In September of 2017, a second MWAP request for Neurontin was denied by Dr. Dinello and Mr. Dockery was being tapered off of Neurontin. FAC ¶395, 397. While being tapered (not abruptly discontinued) and in response to a specialist recommendation, Dr. Mantaro obtained another five-day emergency supply of Neurontin and submitted another MWAP request for Neurontin to Dr. Koeningsmann which was granted. FAC ¶400, 402. Mr. Dockery continued to receive Neurontin twice a day through December 2017. FAC ¶402. As alleged, these facts fail to establish that Dr. Mantaro deprived Mr. Dockery from adequate medical care or that she knew of or disregarded a substantial risk.  For these reasons, the claim against Dr. Mantaro by Mr. Dockery should be dismissed.

## D. Dr. David Karandy

Dr. Karandy's first and only interaction with Derrick Williams was in July of 2017 in which it was noted in his records that Mr. Williams had a deformed foot and would need a "flats permit." FAC ¶944. Although it is alleged that Mr. Williams' Neurontin was summarily discontinued in June of 2017, it is not alleged that Dr. Karandy was the one who discontinued it and this alleged discontinuance occurred prior to the sole interaction between them. Id. There are no facts at all to support any allegation that Dr. Karandy was in any way deliberately indifferent to any serious medical need of Mr. Williams, or personally involved in any discontinuance of

treatment.

### E. Albert Acrish, NP

The FAC alleges that on May 30, 2018 Nurse Acrish prescribed Shannon Dickenson Elavil to treat his back and joint pain. FAC ¶356. It is alleged that Mr. Dickenson could not handle Elavil and that Nurse Acrish should have been aware of this fact. FAC ¶357. Although no other visits with Nurse Acrish are described in the FAC, it is alleged in conclusory fashion that Nurse Acrish never attempted to get MWAPs to treat Mr. Dickenson's chronic issues although he complained of pain. FAC ¶366, 367. There are no facts in the FAC to support the allegation that Nurse Acrish discontinued any MWAP medications as alleged in the Third Claim for Relief. Further, prescribing the wrong medication if true, does not rise to the level of deliberate indifference." A mistake in administering medication is more appropriately recoverable in negligence rather than a § 1983 action, and allegations of medical malpractice are not sufficient to establish a Constitutional violation." Long v. Lafko, 254 F.Supp.2d 444, 447 (S.D.N.Y.2003).

### F. Mary Ashong, NP

On September 7, 2018, Mr. Fields was prescribed a ten-day supply of 10 mg of Baclofen twice a day.  FAC ¶447. On September 14, 2018, Mr. Fields was allowed to continue Baclofen until September 20, 2018 at which time it would be discontinued. FAC ¶448. It is inferred that Dr. Hammer "refused the MWAP Request for Baclofen" although the FAC fails to mention one being requested. FAC ¶448. Although unclear when, it appears that Nurse Ashong put another MWAP request in for Baclofen which was denied on October 4, 2018 by Dr. Hammer. FAC ¶453. That same day, Ms. Ashong crossed out "Baclofen" from the recommendation of an outside neurologist. FAC ¶451. On October 19, 2018, Mr. Fields was prescribed and started

taking Tizanidine milder muscle relaxant than Baclofen. FAC ¶454. On October 31, 2018,

Ashong submitted an MWAP request for Tizanidine which was approved by Dr. Hammer for

180 days. FAC ¶455. Dr. Hammer then approved an increase in dosage of the Tizanidine in

January of 2019 in response to a specialist recommendation. FAC ¶¶458-459.

Nurse Ashong was not deliberately indifferent to the medical needs of Mr. Fields because

it was not her decision to discontinue Baclofen. Further, she prescribed and obtained approval for

Tizanidine, an alternative pain medication. Although it is alleged to be a weaker substitute, "The

failure to provide stronger medication in place of another does not constitute deliberate

indifference to a prisoner's serious medical needs." Rush v. Fischer, 2011 WL 6747392, at *3

(S.D.N.Y. July 6, 2011). For these reasons, the claim against Mary Ashong should be dismissed.

### G. Dr. Chun Lee

#### 1. Brian Bernard

On June 20, 2017, Dr. Lee submitted an MWAP request for Percocet and Neurontin.

FAC ¶215.  Dr. Mueller refused to approve Percocet but granted Neurontin. Id. On July 2, 2017,

Mr. Bernard requested an alternative to Percocet and was provided with 12 motrin from a nurse.

FAC ¶218. In July, Dr. Lee submitted another MWAP request for Neurontin which was denied

by Dr. Mueller. FAC ¶219. On July 31, 2017, Dr. Lee admitted Mr. Bernard to the infirmary for

pain control. FAC ¶221. Dr. Lee obtained a five-day emergency supply of pain medication and

Dr. Mueller continued to deny MWAP requests. FAC ¶222. An MWAP was approved on August

22, 2017 for Neurontin. FAC ¶224. On or about September 28, 2017, Dr. Lee admitted Mr.

Bernard to the infirmary for pain management and put in an MWAP request for a five-day

supply of Percocet. FAC ¶227. Two doses were administered before it was stopped by Dr.

Mueller. Id. Dr. Lee "got more aggressive with his MWAP request" pointed out that it had previously been approved but was denied again. Id. Dr. Lee also submitted an MWAP request for Neurontin that was also denied. FAC ¶229. In the alternative, Mr. Bernard was prescribed Mobic and Depakote. FAC ¶230. In December of 2017, Mr. Bernard asked to be put on Neurontin and Celebrex. FAC ¶234. Dr. Lee saw Mr. Bernard again on January 2, 2018 about this request and noted that he would submit an MWAP request for approval. FAC ¶234.

On these facts, there is no showing that Dr. Lee deviated from any reasonable medical practice or that he acted with any culpable state of mind in making any treatment decisions for Mr. Bernard. Dr. Lee submitted requests for MWAP prescriptions some of which were granted. For those that were denied, Dr. Lee prescribed alternative medications. For these reasons, this claim for deliberate indifference against Dr. Lee should be dismissed.

### 2. Mark Daniels

On June 8, 2017, Dr. Lee submitted an MWAP request for Neurontin to Dr. Mueller which was approved. FAC ¶276-277. On March 12, 2018, Dr. Lee submitted an MWAP for Lyrica based upon the recommendation of an outside specialist. FAC ¶294. There is no mention of it being granted in the AHR. FAC ¶295. On April 9, 2018, Dr. Lee prescribed Mr. Daniels Ibuprofen and on April 17, 2018 noted "LBP well tolerate with Cymbalta." FAC ¶297. On May 25th and August 13th of 2018, Dr. Lee granted renewals of Mr. Daniels' feed in cell permits. FAC ¶299-300. Dr. Lee was only able to offer Mr. Daniels Ibuprofen and Cymbalta for his pain. FAC ¶301. Between September 12, 2018 and March of 2019, Dr. Lee referred Mr. Daniels to two neurosurgeons and a pain clinic, prescribed him Ibuprofen and referred him to physical therapy. FAC ¶303-315.

On these facts, there is no showing that Dr. Lee deviated from any reasonable medical practice or that he acted with any culpable state of mind in making any treatment decisions for Mr. Daniels. There is no indication that any MWAP submitted by Dr. Lee was denied. Further, the FAC demonstrates that Mr. Daniels was treated with other pain medications. For these reasons, this claim for deliberate indifference against Dr. Lee should be dismissed.

### 3.  Shannon Dickenson

On August 14, 2017 Dr. Lee noted in Mr. Dickinson's AHR, "neuro clinic rec [increase] [Neurontin], Baclofen, Elavil. Request MWAP Neurontin Baclofen." FAC ¶329. On August 19, 2017, Dr. Lee again wrote that Mr. Dickenson should have Elavil, Baclofen and Neurontin per the Neuro clinic. FAC ¶330. From August 9th through September 8th of 2017, Mr. Dickenson received 600mg of Neurontin twice a day and he started to refuse Elavil. FAC ¶331. On September 6, 2017, Dr. Lee made an MWAP request for Mr. Dickenson to receive 600mg of Neurontin twice a day but Dr. Mueller did not approve the MWAP. FAC ¶333. On September 7, 2017, Dr. Lee noted that 25 mg of Elavil was too strong for Mr. Dickenson and decreased it to 10mg. FAC ¶334. By mid-September, Baclofen and Neurontin had been discontinued by Dr. Mueller pursuant to the MWAP Policy. FAC ¶335. In December of 2017, Dr. Lee sent Mr. Dickenson to a Neurologist and a pain clinic. FAC ¶340-341. In February of 2018, an orthopedist asked Dr. Lee to prescribe Mr. Dickenson Meloxicam which he did. FAC ¶343.

On these facts, there is no showing that Dr. Lee deviated from any reasonable medical practice, acted with deliberate indifference, or that he acted with any culpable state of mind in making any treatment decisions for Mr. Dickenson. The MWAP medications in question were discontinued by Dr. Mueller and not by Dr. Lee. Mr. Dickenson was also prescribed Meloxicam.

For these reasons, this claim for deliberate indifference against Dr. Lee should be dismissed.

### 4. Angel Hernandez

It is alleged that an outside specialist recommended Baclofen and that there was no note as to why Dr. Lee refused this recommendation for Baclofen. FAC ¶606. As alleged, this constitutes a difference of opinion between physicians and does not state a claim for deliberate indifference.

### 5. Hugh Knight

Until 2014, Mr. Knight was treating with Lyrica. FAC ¶645. In November of 2014, Mr. Knight was transferred to Shawangunk where his Lyrica was changed to Neurontin – which apparently did nothing to address Mr. Knight's symptoms. FAC ¶646. Mr. Knight repeatedly refused to take Neurontin and requested Lyrica. FAC ¶647. At Albany Medical Center, a neurologist recommended prescribing Neurontin to Mr. Knight. FAC ¶651. In response, Dr. Lee increased his dosage of Elavil and a low dose of Flexeril in late February 2016 which did not help. In September 2016 after another Neurologist recommended Neurontin, Dr. Lee noted "already on [Neurontin]." FAC ¶653. In 2018, Dr. Lee attempted to get Mr. Knight moved to a closer cell to the clinic because "his leg pain seizes up" but the administration refused the move. FAC ¶655. Mr. Knight has been repeatedly told by Dr. Lee that "Albany" will not allow him to have Lyrica, no matter his pain complaints.

First, any claim for alleged deliberate indifference that took place before September 2, 2016 is barred as being beyond the statute of limitations. See Milan supra; Dkt. No. 1. Secondly, there are no facts to support Dr. Lee discontinuing any MWAP medications within the SOL period as alleged under the Third Claim for Relief.  Finally, to the extent that Mr. Knight seeks a specific medication that Dr. Lee will not or cannot prescribe does not give rise to a constitutional

violation.  See <u>Crouch v. Spaulding</u>, No. 16-CV-01435, 2019 WL 1004539, at *4 (N.D.N.Y. Jan

24, 2019) ("Plaintiff's claim . . . is not that he was entirely denied care . . ., but that he did not

received the specific treatment he requested.  Such a claim is not cognizable under the

Fourteenth Amendment deliberate indifference standard . . .").

### 6.  Terry Mathis

It is alleged that from December 1, 2016 until September 28, 2017, Mr. Mathis was

prescribed 1200m of Neurontin twice a day, and on some occasions, he was treated with

Percocet. FAC ¶681. When Neurontin was not available in the prison, Dr. Lee administered

Ultram to treat Mr. Mathis' pain. FAC ¶682. On February 8, 2017, Dr. Lee renewed Mr. Mathis'

prescription for 1200mg of Neurontin twice a day with five refills. FAC ¶688. During this time

period, Dr. Lee continued to send Mr. Mathis out for sonograms, x-rays and MRIs. FAC ¶692.

On June 27, 2017, Dr. Mueller approved an MWAP request for 1200mg of Neurontin

twice a day for Mr. Mathis. FAC ¶696. On July 27, 2017 in response to reports of worsening

pain, Dr. Lee admitted Mr. Mathis to the infirmary for pain control. FAC ¶698. Dr. Lee ordered a

prescription for Ultram from the pharmacy who wrote back: "you need MWAP. Please send

MWAP, thank you 8/4/17" FAC ¶699.  The MWAP request was subsequently denied by Dr.

Mueller. FAC ¶700. Nonetheless, Dr. Lee treated Mr. Mathis with Ultram for five days in the

infirmary which substantially helped.  FAC ¶700. On September 6, 2017, Dr. Lee submitted an

MWAP request for 1200 mg of Neurontin twice a day with 11 refills which Dr. Mueller denied.

FAC ¶705-706. Mr. Mathis was admitted to the infirmary for "brief stints" in November of 2017

where he was administered Percocet. FAC ¶707-712.

There are no facts alleged to demonstrate that Dr. Lee was subjectively reckless in any

perceived denial of medical care to Mr. Mathis. Dr. Lee treated Mr. Mathis repeatedly with various pain medications. According to the FAC, Dr. Mueller was responsible for discontinuing Mr. Mathis' Neurontin and not Dr. Lee.

### 7. Sean Pritchett

Mr. Pritchett "successfully treated with Lyrica [from 2008] to January 26, 2017." FAC ¶753-754. During this time frame, Drs Bozer and Mueller repeatedly approved Lyrica to treat Mr. Pritchett's pain. FAC ¶755. In February of 2015, Dr. Lee attempted to reduce Mr. Pritchett's Lyrica dosage but reported the reduced dose was "unsuccessful." FAC ¶756. On October 15, 2015, Dr. Lee reported to Dr. Mueller that alternatives were not effective and Dr. Mueller approved Lyrica again. FAC ¶757. In January of 2017, a non-formulary approval for Lyrica submitted by Dr. Lee was denied by Dr. Dinello and suggested a change to Neurontin. FAC ¶759-760. Dr. Lee had no choice and prescribed Neurontin. FAC ¶762. On February 27, 2018, Mr. Pritchett saw Dr. Lee who noted that Mr. Pritchett's stump pain had increased since he switched from Lyrica to Neurontin. FAC ¶767. Dr. Lee recommended cryotherapy and a surgical consult. Id.

On June 20, 2017, Dr. Lee submitted an MWAP request for Neurontin that was approved by Dr. Mueller. FAC ¶771. On September 22, 2017, Dr. Lee administered a five-day emergency supply of 600mg of Neurontin to Mr. Pritchett, "but the five days was all Dr. Lee could provide to Mr. Pritchett. FAC ¶774-775. Dr. Lee submitted an MWAP request for Neurontin to Dr. Mueller which was denied. FAC ¶775-776. On October 27, 2017, Dr. Lee prescribed Cymbalta for Mr. Pritchett. FAC ¶790. On November 22, 2017, Dr. Lee noted that Aleve was not working. FAC ¶793. On December 26, 2017, Mr. Pritchett was given a prescription for 200mg of

Tegretol, an anticonvulsant medication that can treat nerve pain; Aleve, as well as 25mg of Diphenhydramine. FAC ¶795. On January 9, 2018, Dr. Lee noted that Mr. Pritchett was suffering from chronic pain and increased the Tegretol dosage from 200mg to 400mg. FAC ¶796. After a surgery for exploration and excision of stump neuroma in July of 2018, an MWAP was approved by Dr. Mueller for Percocet. Mr. Pritchett was also prescribed Ibuprofen and Aspirin. FAC ¶800-801. From December 2018 to April of 2019, Mr. Pritchett requested appointments with, and was sent to pain and orthopedic specialists. FAC ¶807-814.

There are no facts alleged to demonstrate that Dr. Lee was subjectively reckless in any perceived denial of medical care to Mr. Pritchett.  In response to complaints of pain, Dr. Lee prescribed a number of different pain medications to Mr. Pritchett. Dr. Lee also referred him for surgery and to different pain and orthopedic specialists.

### 8.  Rashid Rahman

On September 28, 2016, a doctor at Walsh Regional Medical Unit ("Walsh") discontinued his Ultram prescription. FAC ¶829. On January 4, 2017, Dr. Lee re-prescribed Ultram to Mr. Rahman. FAC ¶837. On June 20, 2017, an MWAP request was submitted and on June 26, 2017, Mr. Rahman's prescription for Ultram expired when it was discontinued due to lack of "MWAP approval" FAC ¶840. On June 29, 2017, Mr. Rahman attended Physical Therapy. FAC ¶841. Although unclear from the FAC when he was prescribed Elavil, it was a new medicine as of August 9, 2017, and it was reported on August 16, 2017 that it was helping with his pain. FAC ¶845-846. Mr. Rahman's Elavil was discontinued on March 1, 2018 at which time Dr. Lee prescribed Cymbalta. FAC ¶848.

On these facts, there is no showing that Dr. Lee deviated from any reasonable medical

36

practice or that he acted with any culpable state of mind in making any treatment decisions for Mr. Rahman. With regard to the MWAP requests that were denied, Dr. Lee prescribed alternative medications and physical therapy. For these reasons, this claim for deliberate indifference against Dr. Lee should be dismissed.

### 9. Wayne Stewart

On May 2, 2017 after transferring to Shawangunk, Dr. Lee ordered Mr. Stewart's Ms Cotin prescription be discontinued and that he be treated with Percocet twice per day at 5mg. FAC ¶895. On May 7, 2017, one of Mr. Stewart's lawyers, who is also a registered nurse, wrote to Dr. Lee about the discontinuation of MS Contin and replacement with 5mg Percocet. She explained that 5mg was insufficient and 10mg might help. FAC ¶896-897. On May 8, 2017, Dr. Lee ordered a tapering of Percocet. FAC ¶898. On June 21, 2017, Mr. Stewart's prescription for Percocet was up for renewal and Dr. Lee submitted an MWAP request to Dr. Mueller which was denied. FAC ¶901-903. Dr. Lee tapered the Percocet and prescribed Mr. Stewart Ibuprofen. FAC ¶906.

This claim against Dr. Lee amounts to a difference of opinion regarding the strength of a pain medication between Mr. Stewart's attorney and treating physician. When Dr. Mueller discontinued Mr. Stewart's percocet, Dr. Lee tapered the Percocet and prescribed Mr. Stewart Ibuprofen as an alternative.  For these reasons, no constitutional violation exists and this claim should be dismissed.

### POINT III

### THE NON-STATE REPRESENTED DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY AS A MATTER OF LAW.

Qualified immunity shields government officials from liability for civil damages when

"their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It protects government officials who act in ways they could reasonably and objectively believe to be lawful, barring damages unless the law is clearly established to the contrary. Hunter v. Bryant, 502 U.S. 224, 227-29 (1991); Taravella v. Wolcott, 599 F.3d 129, 133 (2d Cir. 2010). The issues regarding qualified immunity are: (1) whether plaintiff has shown facts making out a violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the official to believe the conduct at issue was lawful. Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013). Taravella, 599 F.3d at 133.

A defendant should raise a qualified immunity defense during pretrial proceedings so that the issue of qualified immunity can be resolved in the earliest possible stage of litigation. Luck v. Westchester Med. Ctr., No. 17-CV-9110 (NSR), 2020 WL 564635, at *12 (S.D.N.Y. Feb. 4, 2020). A defendant may raise qualified immunity in a pre-answer motion to dismiss, but the defense is held to a higher standard than if it were asserted in a motion for summary judgment. Sledge v. Bernstein, No. 11 CV. 7450(PKC)(HBP), 2012 WL 4761582, at *4 (S.D.N.Y. Aug. 2, 2012). This higher standard is not insurmountable however as "[t]he Supreme Court has made clear that qualified immunity *can* be established by the facts alleged in a complaint[.]" Garcia v. Does, 779 F.3d 84, 97 (2d Cir. 2015) (see Wood v. Moss, 572 U.S. 744 [2014]).  Because qualified immunity protects officials not merely from liability but from litigation, the issue should be resolved when possible on a motion to dismiss, "before the commencement of discovery," to avoid subjecting public officials to time consuming and expensive discovery

procedures.  Garcia, citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  A district court may

grant a Rule 12(b)(6) motion on the ground of qualified immunity if "the facts supporting the

defense appear on the face of the complaint." Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir.

2015) citing McKenna v. Wright, 386 F.3d 432, 435–36 (2d Cir.2004).

      First, as described in Points I and II above, the FAC fails to allege facts to support that

the NSRDs were deliberately indifferent to Plaintiffs medical needs in violation of the Eighth

Amendment.  These Defendants have acted in an objectively reasonable manner, and the FAC

reflects that either the Plaintiffs have been treated for their alleged pain, and that the NSRDs lack

the requisite culpable intent to demonstrate a constitutional violation.

      Second, reasonable officials in the NSRD's positions could have believed that their

actions did not violate any of the Plaintiff's constitutional rights. In Griffin v. Amatucci, 611 F.

App'x 732, 734 (2d Cir. 2015), Griffin, an inmate at Upstate Correctional Facility, alleged that an

RMD and a Nurse Practitioner violated his Eighth Amendment rights by refusing to provide him

with a treating-physician-recommended humidifier for his Continuous Positive Airway Pressure

("CPAP") machine pursuant to the RMD's policy of not providing humidifiers. With regard to

the Nurse Administrator who ordered the machine without the humidifier pursuant to the RMD

policy, the Second Circuit found that where she confirmed the policy with the RMD, and had no

ability to deviate from the policy, that she was entitled to qualified immunity.  Simply put,

subordinate medical professionals cannot be held liable for following departmental policy.

      Similarly, in this case, as alleged, pursuant to the MWAP policy, the MD and Mid-Level

Clinician defendants "must discontinue the prescription" of any MWAP request that is not

approved by an RMD. FAC ¶147. Even if the MDs and Mid-Level Clinician defendants wanted

to go against the RMD, the pharmacies will not fill a prescription for an MWAP without RMD approval. Id. An MD or Mid-Level Clinician has no ability to provide the medication once an RMD has refused to approve the prescription. FAC ¶147. Because the MWAP requests made by the NSRDs were denied by the RMDs, allegedly pursuant to policy and they had no ability to deviate from that policy, the NSRDs are entitled to qualified immunity.

## CONCLUSION

For the reasons set forth above, the Non-State Represented Defendants' motion to dismiss the complaint should be granted in its entirety.

Dated: April 8, 2020

HARRIS, CONWAY & DONOVAN, PLLC

s/Ryan E. Manley
Ryan E. Manley, Esq.
*Attorneys for Non-State*
*Represented Defendants*
50 State Street, 2nd Floor
Albany, New York 12207
Phone: (518) 436-1661
Fax: (518) 432-1996
RManley@HCDLegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on April 8, 2020, I served the accompanying Memorandum of Law in Support of the Non-State Represented Defendants' Motion to Dismiss the First Amended Complaint upon counsel for all parties via ECF.


Dated:  April 8, 2020

> HARRIS, CONWAY & DONOVAN, PLLC
>
> s/Ryan E. Manley
> Ryan E. Manley, Esq.
> *Attorneys for Non-State*
> *Represented Defendants*
> 50 State Street, 2nd Floor
> Albany, New York 12207
> Phone: (518) 436-1661
> Fax: (518) 432-1996
> RManley@HCDLegal.com