UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER ALLEN, et al.,

                Plaintiffs,

-against-

CARL KOENIGSMANN, et al.,

                Defendants.

No. 19-CV-8173 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

    Before the Court are two motions to dismiss the First Amended Class Action Complaint (the "FAC").[1]  First, Defendants Drs. Ann Andola ("Andola"), Mikhail Gusman ("Gusman"), Chun Lee ("Lee"), Kathleen Mantaro ("Mantaro"), David Karandy ("Karandy"), and Nurse Practitioners Albert Acrish ("Acrish") and Mary Ashong ("Ashong") (collectively, the "Non-State Represented Defendants," "NSRDs," or "Defendant Providers") move to dismiss the FAC as against them pursuant to Federal Rule of Civil Procedure 12(b)(6).[2]  (See dkt. nos. 92, 93, 132.)  Second, Defendants the New York State Department of Correction and Community Services ("DOCCS"), Drs. Carl Koenigsmann ("Koenigsmann"), John Morley ("Morley"), Susan Mueller ("Mueller"), David S. Dinello ("Dinello"), Paula Bozer

---

[1] (See FAC, dated December 11, 2019 [dkt. no. 76].)
[2] On June 18, 2020, the Court ordered Dr. Peter Braselmann's request to join the NSRDs' motion to dismiss.  (See dkt. no. 146.)

("Bozer"), John Hammer ("Hammer"), Jon Miller ("Miller"), and Nurse Practitioner Kristin Salotti ("Salotti") (collectively, the "State Represented Defendants" or "Defendant Administrators") move to dismiss the FAC as against them pursuant to Federal Rules of Civil Procedure 12(b)(1),[3] 12(b)(3), and 12(b)(6).  (See dkt. nos. 101, 102, 133.)  Plaintiffs oppose the motions.  (See dkt. no. 109.)  For the reasons set forth below, Defendant Providers' and Defendant Administrators' motions are DENIED.

I.  **Background**

    This is a putative class action by inmates in the custody of DOCCS who require pain management and/or neuromodulating medication to treat chronic health conditions.  On June 2, 2017, Koenigsmann, DOCCS' Chief Medical Officer ("CMO") until late 2018, promulgated the Medications With Abuse Potential ("MWAP") Policy.[4]  Under the MWAP Policy, a medical provider no longer submitted a "Non-Formulary drug request" for an MWAP medication; rather, he or she submitted "an MWAP Request Form" to the Regional Medical Director ("RMD") in charge of his or her "hub." (See SAC ¶ 168.)  Approval by an RMD or the CMO—based on the

---

[3] The Court does not decide the pending 12(b)(1) motions, (see dkt. no. 102 at 1; dkt no. 273 at 1, 13), as to date Plaintiffs have not filed their opposition to the 12(b)(1) motions along with Plaintiffs' motion for injunctive relief.  (See dkt. nos. 285, 291 at 1 n.1.)

[4] (See Second Amended and Supplemental Class Action Complaint ("SAC"), dated June 25, 2021 [dkt. no. 256] ¶¶ 156-57.)

MWAP Request Form's contents—was required prior to a pharmacy's filling the requested MWAP medication.  (See id. ¶¶ 35, 173, 177.)  Once an RMD or the CMO declined an MWAP Request Form, medical personnel could not give the inmate the requested MWAP medication.  (See id. ¶¶ 168, 178.)

Plaintiffs allege that "the MWAP Policy is unconstitutional as applied to patients for whom certain MWAP medications are the most (if not only) effective medications to treat their chronic pain and neurological issues" because "the MWAP Policy strips medical treatment decisions from the medical providers and specialists who treat patients and puts it in the hands of remote medical administrators, who invariably deny the MWAP medications, no matter the patient's individual medical needs." (Id. at 1-2.)

Plaintiffs commenced the instant action on September 2, 2019, stating claims pursuant to 42 U.S.C. § 1983 ("§ 1983") for violations of the Eighth Amendment.  (See dkt. no. 1.)  On January 18, 2020, Plaintiffs filed the FAC.  (See dkt. no. 76.) Three months later, in April 2020, Defendants filed motions to dismiss.  (See dkt. nos. 92, 101.)

On May 5, 2020, the Court ordered the voluntary dismissal of Count II of the FAC, as well as claims against DOCCS, Miller, and Bozer.  (See dkt. no. 111.)  Thus, the Court need not decide the following:

1. NSRDs' arguments regarding Count II of the FAC (see dkt. no. 93 at 18-21);

2. The State Represented Defendants' Eleventh Amendment argument regarding DOCCS (see dkt. no. 102 at 44-45);

3. The State Represented Defendants' argument that Plaintiffs failed to plead Bozer's personal involvement in any alleged constitutional violation (see id. at 30-33); and

4. The State Represented Defendants' argument that Plaintiffs failed to plead Miller's personal involvement in any alleged constitutional violation (see id. at 36-37).

On December 14, 2020, Plaintiffs moved for leave to file the SAC, noting that the SAC intentionally did not disturb allegations related to Defendants' pending motions to dismiss. (See dkt. nos. 189, 190.)  Defendants did not file an opposition.  The Court granted Plaintiffs' motion on June 7, 2021.  (See dkt. no. 250.)  Plaintiffs filed the SAC on June 25, 2021.  (See dkt. no. 256.)  The SAC substituted Defendant Qutubuddin Dar, MD ("Dar") for the former "John Doe, MD #1," added a claim against Morley in his individual capacity, removed the voluntarily dismissed claims and defendants, and, among other things, added new allegations regarding Koenigsmann and Morley (who replaced Koenigsmann as CMO in late 2018).  (See

4

dkt. no. 190 at 1.)  On July 23, 2021, the Court ordered the
NSRDs' request to apply their pending motion to dismiss (dkt.
nos. 92, 93) to the SAC.  (See dkt. nos. 269, 272.)  Thus, in
deciding the NSRDs' motion to dismiss, the Court considers
Plaintiffs' allegations in the SAC.

The State Represented Defendants filed supplemental
briefings addressing changes in Plaintiffs' allegations since
the State Represented Defendants filed their pending motion to
dismiss.  (See dkt. nos. 273, 299.)  The State Represented
Defendants' supplemental briefing also addresses DOCCS'
recission of the MWAP Policy on February 8, 2021, replaced by
Health Services Policy Number 1.24A—Prescribing for Chronic
Pain.  (See dkt. no. 273 at 2.)  Plaintiffs opposed the motion
to dismiss.  (See dkt. no. 291.)  Thus, in deciding the State
Represented Defendants' motions to dismiss, the Court considers
Plaintiffs' allegations in the SAC, referring to the State
Represented Defendants' supplemental briefing regarding new
allegations raised in the SAC.

On November 8, 2021, the Court ordered the voluntary
dismissal of all claims by Plaintiffs Spencer Jackson and
Michael Vattiato ("Vattiato"), which consequently dismissed all
claims against Dar.  (See dkt. no. 319.)  Thus, the Court need
not decide Plaintiffs' claims against Dar under Count II of the
SAC, (see SAC ¶¶ 1055-67), or Defendant Administrators' motion

for improper venue for Vattiato, (see dkt. no. 102 at 44).

Finally, on April 7, 2022, the Court ordered the substitution of

Dr. Carol Moores ("Moores") for Morley for Plaintiffs' official

capacity claims against Morley.  (See dkt. no. 342.)

## II.  <u>Legal Standards</u>

### a. Rule 12(b)(3)

Federal Rule of Civil Procedure 12(b)(3) provides that a

defendant may move to dismiss for improper venue.  Fed. R. Civ.

P. 12(b)(3).  In adjudicating a motion to dismiss pursuant to

Rule 12(b)(3), the Court accepts as true all factual allegations

in the non-moving party's pleadings and draws all reasonable

inferences in that party's favor.  See <u>Blakely v. Lew</u>, No. 13

Civ. 2140 (JMF), 2013 WL 6847102, at *1 (S.D.N.Y. Dec. 30,

2013).  Under Rule 12(b)(3), the Court may consider materials

outside the pleadings.  See <u>Concesionaria DHM, S.A. v. Int'l

Fin. Corp.</u>, 307 F. Supp. 2d 553, 555 (S.D.N.Y. 2004).  "Once

venue is challenged, the plaintiff has the burden to establish

that venue is proper."  <u>Water Quality Ins. Syndicate v. Nat'l

Pollution Funds Ctr.</u>, No. 19 Civ. 6344 (PAE), 2020 WL 417653, at

*4 (S.D.N.Y. Jan. 27, 2020); see also <u>K.A. Holdings Ltd. of N.Y.

v. Chagaris</u>, No. 07-CV-9675, 2009 WL 10685159, at *5 (S.D.N.Y.

Nov. 13, 2009) ("On a motion to dismiss for improper venue, the

plaintiff has the burden of establishing that it has chosen a

proper venue.").  "Unless the court holds an evidentiary

hearing, however, 'the plaintiff need only make a prima facie showing of venue.'" NextEngine Inc. v. NextEngine, Inc., No. 17-CV-9785 (JPO), 2019 WL 79019, at *1 (S.D.N.Y. Jan. 2, 2019) (citations omitted).  Under 28 U.S.C. § 1406(a), if a case is filed in an improper venue, the Court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. § 1406(a).

      **b. Rule 12(b)(6)**

      To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  That "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Palin v. N.Y. Times Co., 940 F.3d 804, 810 (2d Cir. 2019) (quoting Iqbal, 556 U.S. at 678).  Evaluating "whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Iqbal, 556 U.S. at 679.

When considering a motion to dismiss, the court "accept[s] as true all factual allegations and draw[s] from them all reasonable inferences." Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 188 (2d Cir. 2020).  It is not required, however, "to credit conclusory allegations or legal conclusions couched as factual allegations." Id. (ellipsis omitted) (quoting Nielsen v. Rabin, 746 F.3d 58, 62 (2d Cir. 2014)). "Accordingly, threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Nielsen, 746 F.3d at 62 (cleaned up).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Iqbal, 556 U.S. at 679.

"In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014) (quoting In re Thelen LLP, 736 F.3d 213, 219 (2d Cir. 2013)).  The Court may take judicial notice of documents that are "integral to the complaint," such that the complaint "relies heavily upon [the documents'] terms and effect." Palin, 940 F.3d at 811 (citation omitted).

A complaint alleging a civil rights violation pursuant to § 1983 must contain specific factual allegations demonstrating a

deprivation of a constitutional right, or it will be dismissed.
Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 887 (2d Cir. 1987).
However, claims brought pursuant to § 1983 are not subjected to
Rule 9(b)'s heightened pleading standard.  O'Hara v. City of New
York, 17-CV-4766 (ILG) (RML), 2021 WL 4932287, at *5 (E.D.N.Y.
Oct. 22, 2021).

### III. Discussion

#### a. Section 1983 Claim for Deliberate Indifference

Plaintiffs press, under § 1983, Eighth Amendment deliberate
indifference claims against Defendant Providers and Defendant
Administrators, regarding "constitutional violations that
occurred after effective medical treatment was discontinued
pursuant to the MWAP Policy."  (Dkt. no. 109 at 31.)  The Court
addresses Defendant Providers' and Defendant Administrators'
arguments in turn.

##### i. Claims Against Defendant Providers

###### 1. Failure to State a Claim

A plaintiff suing under § 1983 must show that the
defendants "deprived him of a right secured by the Constitution
or laws of the United States."  Palmieri v. Lynch, 392 F.3d 73,
78 (2d Cir. 2004).  In Estelle v. Gamble, 429 U.S. 97, 104-05
(1976), the Supreme Court held that "to state a cause of action
under § 1983 for violations of the Eighth Amendment's Cruel and
Unusual Punishment Clause, a prisoner must show that the state

was deliberately indifferent to his or her medical needs."
Charles v. Orange County, 925 F.3d 73, 85 (2d Cir. 2019) (citing
Estelle, 429 U.S. at 105); Harrison v. Barkley, 219 F.3d 132,
136 (2d Cir. 2000).  Deliberate indifference may be manifested
"by prison doctors in their response to the prisoner's needs or
by prison guards in intentionally denying or delaying access to
medical care or intentionally interfering with the treatment
once prescribed."  Estelle, 429 U.S. at 104-05.

To prevail on a claim of failure to protect or deliberate
indifference to health or safety due to unconstitutional
conditions of confinement, Plaintiffs must prove objective and
subjective elements.  See Chance v. Armstrong, 143 F.3d 698, 702
(2d Cir. 1998); see also Farmer v. Brennan, 511 U.S. 825, 834
(1994) ("[A] prison official violates the Eighth Amendment only
when two requirements are met.").

First, to meet the objective prong, "the alleged
deprivation of adequate medical care must be 'sufficiently
serious.'"  Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir.
2006) (citations omitted).  To determine whether a deprivation
is sufficiently serious, the court conducts a two-part inquiry.
Id.  First, Plaintiffs must demonstrate that they were "actually
deprived of adequate medical care."  Id.  In Salahuddin, the
Court of Appeals held that an inmate receives adequate medical
care when "prison officials [] act reasonably [in response to an

10

inmate-health risk]." Id. at 279 (citation omitted).
Conversely, however, "failing 'to take reasonable measures' in
response to a medical condition can lead to liability." Id. at
280 (citation omitted).

Second, the court inquires "whether the inadequacy in
medical care is sufficiently serious." Id.; see also Sonds v.
St. Barnabas Hosp. Corr. Health Servs., 151 F. Supp. 2d 303, 310
(S.D.N.Y. 2001) (noting that courts deem a medical condition
"'serious' if it is 'one that has been diagnosed by a physician
as requiring treatment'" (citation omitted)). Because
Plaintiffs acknowledge that they received some medical care
related to their underlying conditions but allege that the care
they received was inadequate, "the seriousness inquiry
'focus[es] on the challenged delay or interruption in treatment
rather than the prisoner's underlying medical condition alone.'"
Salahuddin, 467 F.3d at 280 (quoting Smith v. Carpenter, 316
F.3d 178, 185 (2d Cir. 2003)); see also Sonds, 151 F. Supp. 2d
at 310 ("The seriousness of an inmate's medical need may also be

determined by reference to the effect of denying the particular treatment.").[5]

The second prong of the deliberate indifference test is subjective and requires Plaintiffs to demonstrate that Defendants had "a sufficiently culpable state of mind." Salahuddin, 467 F.3d at 280 (citing Wilson v. Seiter, 501 U.S. 294, 300 (1991)).  A defendant had a sufficiently culpable state of mind if he or she "acted or failed to act 'while actually aware of a substantial risk that serious inmate harm will result.'"  Horace v. Gibbs, 802 F. App'x 11, 14 (2d Cir. 2020) (quoting Salahuddin, 467 F.3d at 280); see also Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (noting that "evidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of [the risk]").  The level of

---

[5] Plaintiffs acknowledge that they "were not denied care;" rather, Plaintiffs allege that the medical care they received after the MWAP Policy was promulgated was inadequate to treat their preexisting medical needs.  (Dkt. no. 109 at 12 n.4.) This acknowledgment is significant as case law demonstrates a difference in the second inquiry of the objective prong if a plaintiff is denied care.  See Salahuddin, 467 F.3d at 280 (noting that "if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious . . . includ[ing] whether 'a reasonable doctor or patient would find [it] important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" (citations omitted, emphasis added)).

subjective culpability required is "the equivalent of criminal recklessness." Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) (quotation marks and citation omitted).  It is "something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "Proof of awareness of a substantial risk of the harm suffices." Salahuddin, 467 F.3d at 280 (citing Farmer, 511 U.S. at 835).

Defendant Providers argue that Plaintiffs' allegations fail to give rise to the plausible inference that they satisfy either prong of the deliberate indifference test.  (See dkt. no. 93 at 21-37.)  Specifically, Defendant Providers argue that Plaintiffs do not allege a policy-based deliberate indifference claim but rather "eighteen factually distinct and separate deliberate indifferen[ce] claims," each failing as to Defendant Providers because "Plaintiffs were frequently seen and treated, prescribed pain medication and other modalities, sent to pain clinics, and referred to outside specialists." (Id. at 1, 24.)  The Court disagrees.

As to the first subpart of the objective prong, Plaintiffs have adequately pleaded that they were actually deprived of adequate medical care.  First, Plaintiffs allege that Defendant Providers failed to take reasonable measures treating Plaintiffs

13

under the MWAP Policy because Defendant Providers' treatment
deviated from medical norms, considering the following:

1. The Federal Bureau of Prisons' "Pain Management of
   Inmates," Clinical Guideline "does not prohibit the use
   of opioids or neuromodulating medications like Lyrica and
   Neurontin."  (SAC ¶ 122.)

2. The National Commission on Correctional Health Care—of
   which DOCCS is an accredited member—published a position
   statement on "Management of Noncancer Chronic Pain"
   recommending that "when patient function remains poor and
   pain is not well controlled, and other options have been
   exhausted, a therapeutic trial of medication, including
   opioids, should be considered. . . . <u>Policies banning
   opioids should be eschewed</u>.  Opiates should be considered
   with caution after weighing other treatment options."
   (<u>Id.</u> ¶¶ 118-21 (emphasis added).)

Next, Plaintiffs ask the Court to draw a series of
inferences that Defendant Providers deviated from reasonable
medical practices.  (<u>See</u> dkt. no. 109 at 34-36.)  Specifically,
Plaintiffs ask the Court to infer that Defendant Providers'
dismissal of specialty doctors' recommendations of MWAP
medications without explanation diverged from reasonable medical
practices based on the MWAP Policy and not medical judgment.
(<u>See</u> <u>id.</u>)  Defendant Providers agree that "a deliberate

indifference claim can lie where prison officials deliberately ignore the medical recommendations of a prisoner's treating physicians."  <u>Johnson v. Wright</u>, 412 F.3d 398, 404 (2d Cir. 2005); (<u>see</u> dkt. no. 132 at 4.).

Plaintiff Aaron Dockery's request on June 20, 2017, for either increased Neurontin or a more effective medication to address his multiple sclerosis illustrates how the Court can draw these inferences.  (<u>See</u> SAC ¶ 484.)  On the same day (18 days after DOCCS promulgated the MWAP Policy), rather than increasing Dockery's intake of Neurontin, Salotti developed "a tapering schedule to take Mr. Dockery off his Neurontin completely . . . [and] prescribed Depakote, a psychiatric medication."  (<u>Id.</u> ¶ 485.)  "Salotti made no reference in Mr. Dockery's [ambulatory health record ("AHR")] to the discontinuation of his Neurontin, nor is there any justification in his medical records."  (<u>Id.</u> ¶ 486.)  The following month, Dockery saw neurologist Dr. Jubelt who not only "noted that the facility ha[d] stopped his Neurontin and prescribed Depakote" but also wrote, "since cannot get Neurontin, could try Lyrica . . . ."  (<u>Id.</u> ¶ 488.)  Despite reviewing Dr. Jubelt's recommendation for Lyrica, Salotti "never attempted to order Lyrica."  (<u>Id.</u> ¶ 489.)  Taking these allegations as true, it is reasonable for the Court to infer that Salotti tapered Dockery off Neurontin, could not acquire Neurontin going forward, and

15

declined filing an MWAP Request Form for Lyrica—despite Dr. Jubelt's recommendation—in response to the MWAP Policy.

While the Court acknowledges that Salotti is a State Represented Defendant, Plaintiffs similarly alleged that Defendant Providers ignored specialists' recommendations without reasoning due to the MWAP Policy.  For example, although Lee noted in Plaintiff Mark Daniels' AHR that neurologist Dr. Dirisio recommended "Lyrica/Neurontin," he "did not note why he dismissed Dr. Dirisio's recommendation . . . ."  (Id. ¶ 407.) In fact, during six specialty visits over three years, specialists recommended prescribing Daniels Neurontin, Baclofen, or Lyrica, but each recommendation was dismissed.  (Id. ¶ 417.) Taking these allegations as true, it is reasonable for the Court to infer that Defendant Providers' failure to prescribe Neurontin, Baclofen, or Lyrica for Daniels was in response to the MWAP Policy.  Based on these examples, Plaintiffs have adequately pleaded facts to permit the Court to infer that Defendant Providers' dismissal of specialty doctors' recommendations of MWAP medications without explanation diverged from reasonable medical practices because of the MWAP Policy and not Defendant Providers' medical judgment.  (See dkt. no. 109 at 34-36.)

Finally, Plaintiffs allege that "Defendant Providers prescribed patients psychiatric medication alternatives that

were ineffective and left patients with unbearable side effects." (Id. at 31.)  In response, Defendant Providers seek to dismiss Count II of the SAC as to Defendants Andola, Mantaro, Ashong, and Acrish because Plaintiffs do not allege that these Defendant Providers prescribed "psychiatric medications (i.e.[,] Cymbalta; Depakote; Lamictal; and sometimes Elavil)." (Dkt. no. 132 at 3.)  However, Plaintiffs plausibly alleged these Defendants' involvement in ignoring specialty doctors' recommendations of MWAP medications.[6] (See SAC ¶¶ 464, 467, 550, 602, 657-58.)

While Defendant Providers agree that the Court of Appeals has held that "a physician may be deliberately indifferent if he

---

[6] Defendant Providers also sought to dismiss Defendant Karandy because he did not prescribe psychiatric medications. (See dkt. no. 132 at 3.)  However, unlike Defendants Andola, Mantaro, Ashong, and Acrish, Plaintiffs have not adequately alleged that Karandy ignored specialty doctors' recommendations of MWAP medications.  Despite this difference, the Court does not dismiss Karandy.  Count II of the SAC also alleges that "MDs and Mid-Level Clinicians [] abruptly discontinue a patient's MWAP medications regardless of the patient's medical needs or the successful treatment to date." (SAC ¶ 1063.) Taking Plaintiffs' allegations as true, on June 9, 2017, when DOCCS transferred Derrick Williams from Green Haven to Great Meadow, Williams's preexisting prescription for Neurontin was discontinued. (SAC ¶ 1008.)  Although Karandy "did not see or evaluate Mr. Williams until July 17, 2017," the Court may draw the reasonable inference that Karandy either discontinued Williams's Neurontin on June 9, 2017, or did not note his neuropathic problems (which may have resulted in the reinstatement of Neurontin) when he evaluated Williams on July 17, 2017 because "[i]t does not seem that Dr. Karandy had access to Mr. Williams' medical chart or history." (Id. ¶ 1009.)

or she consciously chooses 'an easier and less efficacious' treatment plan," Rodriguez v. Manenti, 606 F. App'x 25, 27 (2d Cir. 2015) (citation omitted); (dkt. no. 132 at 3-4), Defendant Providers misconstrue Plaintiffs' allegations regarding their involvement.  Defendant Providers argue that once denied by an RMD, they had no choice but to discontinue inmates' MWAP medications. (Dkt. no. 132 at 3-5.)  However, Plaintiffs' allegations are more nuanced.  Plaintiffs allege that Defendant Providers were deliberately indifferent by not submitting MWAP Request Forms in response to specialist doctors' recommendations (effectively choosing a less efficacious treatment plan) because of the MWAP Policy, not based on medical judgment.  (Dkt. no. 109 at 35-36.)  Accordingly, the Court finds that Plaintiffs have adequately pleaded the first subpart of the objective prong.

As to the second subpart of the objective prong, Plaintiffs argue that this prong is met as "[n]either set of Defendants contends that Plaintiffs did not truly suffer after the discontinuation of MWAPs." (Id. at 34.)  The Court agrees that Defendant Providers do not debate the severity of Plaintiffs' suffering after the discontinuation of their MWAP medications. Thus, the Court finds that Plaintiffs have adequately pleaded the second subpart of the objective prong.

As to the second subjective prong, Defendant Providers argue that because they provided alternative treatments to Plaintiffs following the promulgation of the MWAP Policy, Plaintiffs have not adequately pleaded the required mental culpability.  (See dkt. no. 93 at 25-37.)  As stated above, the second prong requires a plaintiff to allege that a defendant "acted or failed to act while actually aware of a substantial risk that serious inmate harm will result."  Horace, 802 F. App'x at 14 (cleaned up).  As shown in the examples discussed above, Plaintiffs have alleged that Defendant Providers (1) were aware of Plaintiffs' chronic pain and neurological issues after their MWAP medications were discontinued, (2) knew that their prescribed course of treatment for Plaintiffs' pain management did not include the MWAP medications recommended by specialist doctors, and (3) declined to file MWAP Request Forms based on those recommendations.  See Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994).  Accordingly, the Court finds that Plaintiffs have adequately pleaded the second prong of the deliberate indifference test.  Thus, Defendant Providers' motion to dismiss for failure to state a claim is denied.

### ii. Claims Against Defendant Administrators

#### 1. Failure to State a Claim

Defendant Administrators first dispute that a "general policy denying medications regardless of need [existed], rather

19

than discrete decisions based on individual factors." (Dkt. no.
133 at 3.) That argument fails. Plaintiffs clearly allege that
on June 2, 2017, Koenigsmann promulgated the MWAP Policy, an
allegation that must be accepted as true at this stage. (See
SAC ¶¶ 156-57.)

The Court pauses to note that Plaintiffs do not allege that
the MWAP Policy was a blanket policy. Rather, Plaintiffs
contend that Defendant Administrators' implementation of the
MWAP Policy established a pattern of deliberate indifference
"that denied patients individualized assessments of need" and
gave "less efficacious treatment for reasons not deriving from
medical judgment." (Dkt. no. 109 at 16 n.6, 19.) At most,
Plaintiffs allege that the "MWAP Policy acts as an almost
wholesale ban on certain medications within DOCCS and does not
comport with the standard of care articulated in the community."
(Dkt. no. 291 at 3.)

Defendant Administrators further assert that no unifying
"policy" or "pattern" existed with regards to Defendant
Administrators' implementation and enforcement of the MWAP
Policy because of the alleged forty-six MWAP Requests, over
forty percent (nineteen MWAP Requests) were approved. (See dkt.
no. 102 at 15, 17.) In response, Plaintiffs urge the Court to
shift its focus from the number of approved MWAP Requests to the
fact that Defendant Administrators "discontinued each and every

Plaintiff's MWAP prescriptions by November 2017 – except for
Aaron Dockery and John Gradia" who lost their MWAPs by June
2018.  (Dkt. no. 109 at 17.)  Moreover, Plaintiffs allege that
"Defendant RMDs repeatedly and systematically refused the
prescription or re-prescription of MWAPs to patients . . . no
matter the recommendations of treating providers and
specialists, nor the patient's individualized medical needs."
(SAC ¶ 193.)

     The Court finds that, at this stage, the number of
approvals and denials is not dispositive but that Plaintiffs
adequately allege that RMDs denied MWAP Requests because of the
MWAP Policy.  (See id. ¶ 499 (noting that a doctor at Albany
Medical Center stated that the deputy superintendent of the jail
told him "that [Neurontin] has been taken off of all inmates in
this region"); id. ¶ 746 (noting that Lee told Plaintiff Hugh
Knight "that 'Albany' will not allow him to have Lyrica").)

     Defendant Administrators next contend that even if the
Court finds that Plaintiffs have sufficiently pleaded a
"policy," the SAC contains diffuse allegations on behalf of
individuals with a variety of dissimilar medical conditions
receiving varied treatments, including the application of the
MWAP Policy to them.  (See dkt. no. 102 at 17-19.)  This
argument is premature and goes to typicality for class

certification.  (See dkt. no. 109 at 17 n.10.)  Thus, the Court
need not address this argument at this stage.

Next, the Court assesses whether Plaintiffs have adequately
pleaded facts to support an Eighth Amendment claim for
deliberate indifference based on Defendant Administrators'
implementation and enforcement of the MWAP Policy.  The Court
addresses the deliberate indifference test's objective and
subjective prongs in turn.

The root of Defendant Administrators' argument regarding
the objective prong—whether Plaintiffs were actually deprived of
adequate medical care—is that Plaintiffs' allegations merely
show RMDs' and the CMO's exercising their medical judgment under
a variety of circumstances as opposed to acting pursuant to a
common policy.  (See dkt. no. 133 at 14-15.)  Plaintiffs counter
that they have established a prima facie deliberate indifference
claim based on "allegations that MWAP refusals were policy
driven" in a way that contravened professional norms and medical
standards.  (Dkt. no. 109 at 21.)  The Court agrees.  The Court
cannot dismiss Defendant Administrators, at this stage, based on
their assertions that they were exercising medical judgment
because whether an approval or denial of an MWAP Request was the
product of sound medical judgment, negligence, or deliberate
indifference is a factual issue.  For the reasons stated above,
Plaintiffs have adequately pleaded that the RMDs' enforcement of

the MWAP Policy was "policy driven" in a way that diverged from medical norms of other prison systems.  (See SAC ¶¶ 119-128.) Accordingly, the Court finds that Plaintiffs have adequately pleaded the first subpart of the objective prong.

The second subpart of the objective prong is met because Defendant Administrators do not contend that Plaintiffs did not in fact suffer after the discontinuation of their MWAP medications.  (See dkt. no. 109 at 34.)  Accordingly, the Court finds that Plaintiffs have adequately pleaded the second subpart of the objective prong.

With respect to the subjective prong, Defendant Administrators argue that Plaintiffs' allegations fail to support that Defendant Administrators acted with a "sufficiently culpable state of mind" because the MWAP Policy "permitted the exercise of medical judgment."  (See dkt. no. 102 at 23.) Defendant Administrators rely on the court's holdings in Sonds v. St. Barnabas Hospital Correctional Health Services, 151 F. Supp. 2d 303 (S.D.N.Y. 2001) that a "difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference" and that "disagreements over medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim."  Id. at 311-12.

However, the allegations in the SAC are not disagreements
between prisoners and prison officials over their medications.
Rather, Plaintiffs allege that by implementing and enforcing the
MWAP Policy, RMDs ceased Plaintiffs' MWAP medications and denied
Facility Treating Physicians' and Mid-Level Clinicians' MWAP
Requests pursuant to the MWAP Policy, not their medical
judgment.  Given these allegations, and as stated above, courts
have held that a "physician may be deliberately indifferent if
he or she consciously chooses 'an easier and less efficacious'
treatment plan."  Chance, 143 F.3d at 703; see also id. at 703-
04 (finding that the plaintiff adequately alleged deliberate
indifference where the defendant chose the plaintiff's treatment
based on monetary incentives); Walker v. County of Nassau, 15-
CV-4794, 2016 WL 11481725, at *9 (E.D.N.Y. 2016) ("'[J]udgments
that have no sound medical basis, contravene professional norms,
and appear designed simply to justify an easier course of
treatment . . . may provide the basis of a claim' under the
Eighth Amendment." (quoting Stevens v. Goord, 535 F. Supp. 2d
373, 388 (S.D.N.Y. 2008))).  Taking Plaintiffs allegations as
true, the Court finds that Plaintiffs have adequately pleaded
that Defendant Administrators based their decisions regarding
MWAP Requests on criteria other than sound medical judgment.
(See SAC ¶ 181 (Koenigsmann writing to Dinello that in
"discussions, grievance responses, et cetera, we need to be

extremely careful about indicating that anyone is having their medication discontinued because of a new policy.  Changing meds based on policy is doomed to failure . . . ."); dkt. no. 109 at 23-24 (noting that Non-Formulary Requests required Facility Treating Physicians and Mid-Level Clinicians to include the same information as MWAP Request Forms and that RMDs approved Non-Formulary Requests based on the same medical criteria in which they denied MWAP Requests after the promulgation of the MWAP Policy).)  Accordingly, the Court finds that Plaintiffs have adequately pleaded the subjective prong.  Thus, Defendant Administrators' motion to dismiss for failure to state a claim is denied.

      **2. Personal Involvement of Defendant Administrators Salotti, Hammer, Dinello, and Mueller**

Defendant Administrators argue that Plaintiffs failed to plead the personal involvement of Salotti, Dinello, Mueller, and Hammer in any alleged constitutional violations.  (See dkt. no. 102 at 33-40.)  Specifically, Defendant Administrators argue Salotti, Dinello, Mueller, and Hammer merely exercised their medical judgment when they discontinued MWAP medications.  (See dkt. no. 133 at 12-14.)  The Court addresses each Defendant's involvement in turn.

With respect to Salotti, the parties focus on Salotti's care of Dockery in June and July 2017.  (See SAC ¶¶ 481-89.)  As discussed above, after "Dockery requested an increase in his Neurontin or a change to an even more effective medication," Salotti tapered Dockery off Neurontin and prescribed Depakote. (Id. ¶¶ 484-85.)  Defendant Administrators contend that Salotti's decision to discontinue Dockery's Neurontin and change to Depakote "is clearly the type of discretionary medical decision-making that is inadequate to support a constitutional claim."  (Dkt. no. 102 at 35.)  However, at this stage, it remains a question of fact whether Depakote is an effective alternative to Neurontin.  Moreover, the focus of Plaintiffs' allegations against Defendant Administrators is that prior to the promulgation of the MWAP Policy, Dockery was prescribed Neurontin, which Salotti renewed on May 24, 2017.  (SAC ¶ 481.) One month later, after the MWAP Policy was promulgated, Salotti not only tapered Dockery off Neurontin but also did not submit an MWAP Request Form for an alternative MWAP medication, Lyrica, that Dockery's neurologist recommended.  (Id. ¶¶ 488-89.) Accordingly, the Court finds that Plaintiffs adequately allege Salotti's involvement in an alleged constitutional violations.

With respect to Hammer, Dinello, and Mueller, Plaintiffs adequately allege these Defendants' involvement in an alleged constitutional violation because each Defendant denied an MWAP

Request.  (See id. ¶¶ 552-54 (Hammer's denying Ashong's MWAP
request for Baclofen for Plaintiff Eddie Fields); id. ¶¶ 494-96
(Dinello's denying Mantaro's MWAP request for Neurontin for
Dockery); id. ¶ 309 (Mueller's denying Andola's MWAP request for
Lyrica for Plaintiff Peter Allen).)  While Defendant
Administrators argue that Plaintiffs only allege that Mueller
approved MWAP medications through Non-Formulary Requests prior
to the promulgation of the MWAP Policy, (see dkt. no. 133 at 13-
14), the Court notes that, at this stage, Plaintiffs'
allegations that Hammer, Dinello, and Mueller denied MWAP
Requests is sufficient.  Accordingly, Defendant Administrators'
motion to dismiss Salotti, Hammer, Dinello, and Mueller for lack
of personal involvement is denied.

### 3. Personal Involvement of Koenigsmann and Morley

Defendant Administrators also argue that Plaintiffs failed
to plead the personal involvement of CMOs Koenigsmann and Morley
in any constitutional violation.[7]  (See dkt. no. 273 at 14.)

"It is well settled that, in order to establish a
defendant's individual liability in a suit brought under § 1983,

---

[7] Following the parties' supplemental briefing Moores replaced
Morley as the current CMO of DOCCS.  (See dkt. no. 342.)  This
personnel change does not affect the Court's analysis of
Morley's personal involvement because Plaintiffs sued
Koenigsmann and Morley in their individual capacities.  (See SAC
¶¶ 1045-54.)

a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013); Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010).  To establish personal involvement, a plaintiff must plead that "each Government-official defendant, through the official's own individual actions, has violated the Constitution." Tangreti v. Bachmann, 983 F.3d 609, 618 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  As the Court of Appeals stated in Tangreti, "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue because the elements of different constitutional violations vary.  The violation must be established against the supervisory official directly." Id.  "[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregard it." Id. at 616.  Thus, Plaintiffs must show that Koenigsmann and Morley themselves "personally knew of and disregarded an excessive risk to [Plaintiffs'] health or safety." Id. at 619 (cleaned up).

Plaintiffs allege that Koenigsmann and Morley received over 100 advocacy letters written "by patients, lawyers from Legal Aid Society, Prisoners Legal Services and small law firms,

28

politicians, clergy members and family members on behalf of
putative class members injured by MWAP." (SAC ¶ 229.) However,
"it is well-established that an allegation that an official
ignored a prisoner's letter of protest and request for an
investigation of allegations made therein is insufficient to
hold that official liable for the alleged violations." Allah v.
Annucci, No. 16-CV-1841 (KMK), 2018 WL 4571679, at *6 (S.D.N.Y.
Sept. 24, 2018) (collecting cases); see also Mateo v. Fischer,
682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) ("Courts in this
circuit have said that the receipt of letters or grievances, by
itself, does not amount to personal involvement."); Reid v. City
of New York, No. 20-CV-644 (GBD) (JLC), 2021 WL 3477243, at *19
(S.D.N.Y. Aug. 6, 2021), report and recommendation adopted, No.
20-CV-644 (GBD) (JLC), 2021 WL 4177756 (S.D.N.Y. Sept. 14,
2021).

    With respect to Morley, Plaintiffs allege that after
reading patient complaints, Morley forwarded them "to the person
who oversees the [Regional Health Services Administrators
("RHSA")]" who then contacted the patient's facility and
responded accordingly. (SAC ¶¶ 232-33, 235.) The fact that
Morley forwarded putative class members' complaints to the RHSA
for a response does not establish that he was personally
involved in a constitutional deprivation. See Mateo, 682 F.
Supp. 2d at 430. However, Plaintiffs also allege that "Morley

personally investigates and answers the letters from politicians regarding the medical care of DOCCS' patients and then forwards his drafts to Commissioner Annucci's office."  (SAC ¶ 248.)

Because Plaintiffs allege that Morley investigated letters "from New York State Assemblyman David Weprin, members of the Committee on Correction and other politicians," the Court may draw the reasonable inference that such investigation included reviewing inmates' medical records and/or speaking with the relevant Facility Treating Physician.  (<u>Id.</u>)  Such an investigation would make Morley aware of the risk to inmates' health due to the discontinuation of their MWAP medications. Even assuming that Morley conducted no investigation before responding to politicians' letters, the fact that politicians sent Koenigsmann and Morley letters advocating for inmates seeking MWAP medications to treat their chronic health conditions is evidence that the risk of serious inmate harm was obvious to Morley.  <u>See</u> <u>Brock</u>, 315 F.3d at 164.  Given that Morley testified that patient letters to New York politicians "are [] unfounded" and that Morley provides letter responses to Commissioner Annucci's office to send, the Court may infer that Morley disregards inmates' complaints.  (SAC ¶ 247.)  Thus, Plaintiffs have adequately alleged Morley's personal involvement in violating Plaintiffs' constitutional rights.

Plaintiffs' allegations regarding Morley's process of reading and forwarding complaints to RHSA also applies to Koenigsmann.  (Id. ¶ 234.)  For the reasons stated above, the fact that Koenisgmann ignored New York Assemblyman David Weprin's letter "requesting proper medical treatment for [Plaintiff John] Gradia's pain and suffering"[8] does not amount to personal involvement.  (Id. ¶ 588.)  However, Plaintiffs also allege that Koenigsmann knew of and disregarded an excessive risk to Gradia's health when Rabbi Frank Maxwell emailed Koenigsmann regarding Mueller's rejecting Gradia's pain management specialist's recommendation of 100mg of Ultram.  (Id. ¶ 234.)  Defendant Administrators argue that Rabbi Maxwell's letter to Koenigsmann does not amount to personal involvement because it failed "to sufficiently put [Koenigsmann] on notice of an alleged constitutional violation."  (Dkt. no. 299 at 6.)  However, this is not an instance where Koenigsmann received and ignored a complaint.  In response to Rabbi Maxwell's email, Koenigsmann stated,

> [t]his patient is under the care of pain
> specialists and has a future appointment
> scheduled.  Ultram is an addicting agent which

---

[8] Defendant Administrators argue that "[i]t appears from the SAC that the letter to Dr. Koenigsmann prompted the approval of the requested MWAP medication, which presumably was the goal of the letter."  (Dkt. no. 299 at 7.)  The Court disagrees with this characterization.  Plaintiffs allege that Koenigsmann ignored Assemblyman Weprin's letter and that "[o]ddly" one week later, Dinello "approv[ed] Percocet for five days."  (SAC ¶ 588.)

> is not appropriate for long term management of
> pain syndromes as is the trend in the
> community. The focus of pain management is
> not complete pain relief but to regain and
> maintain function. If the patient is able to
> carry out his activities of daily living that
> is successful treatment.

(SAC ¶¶ 238-39.)

The level of detail in Koenigsmann's response suggests that Koenigsmann reviewed Gradia's condition and his treatment history. These allegations are distinguishable from the facts in Mateo where the court found no personal involvement where the defendant "received [plaintiff's] letters, forwarded at least two of them to subordinates for investigation, and sent [plaintiff] a response to the effect that [plaintiff] had provided insufficient information to support his allegations." Mateo, 682 F. Supp. 2d at 431; see also Gardner v. Koenigsmann, No. 21-cv-10185 (PMH), 2022 WL 1058498, at *3 (S.D.N.Y. Mar. 30, 2022) (holding that plaintiff's allegation that defendant responded to plaintiff's complaint "by directing Plaintiff to comply with DOCCS' procedures . . . is substantively no different from ignoring the complaints and is, accordingly, insufficient to implicate [defendant] in any constitutional violation").

Koenigsmann's response to Rabbi Maxwell addresses the core of Plaintiffs' allegations: (1) whether prescribing MWAP medications violates medical norms; (2) whether non-MWAP

medications effectively treat Plaintiffs' conditions; and (3) whether DOCCS medical personnel knew that patients experienced pain resulting from the discontinuation of their former MWAP medications.  The Court finds that Koenigsmann's response to Rabbi Maxwell is sufficiently detailed to demonstrate personal involvement.  See Mateo, 682 F. Supp. 2d at 430-31 (finding that a "supervisor's detailed, specific response to a plaintiff's complaint" constituted personal involvement because it "suggests that the supervisor has considered the plaintiff's allegations and evaluated possible responses"); see also Rashid v. Hussain, No. 95-CV-00676, 1997 WL 642549, at *3 (N.D.N.Y. Oct. 15, 1997) (denying summary judgment as to the defendant's personal involvement because while "the mere fact that [the defendant] responded to a letter complaining about [the plaintiff's] medical treatment would not, by itself, subject [the defendant] to liability," plaintiff's response to the defendant detailed his "condition, his treatment history, and his complaints regarding his care at Eastern").  Thus, Plaintiffs adequately alleged Koenigsmann's personal involvement.  Accordingly, Defendant Administrators' motion to dismiss Morley and Koenigsmann is denied.

### b. Qualified Immunity

Both Defendant Providers and Administrators moved pursuant to Rule 12(b)(6) to dismiss for qualified immunity.  The Court

addresses Defendant Providers' and Administrators' arguments in
turn.

### i. Defendant Providers

"Qualified immunity shields government officials performing
discretionary functions 'from liability for civil damages
insofar as their conduct does not violate clearly established
statutory or constitutional rights of which a reasonable person
would have known.'" Zellner v. Summerlin, 494 F.3d 344, 367 (2d
Cir. 2007) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818
(1982)). "In the Second Circuit, 'a right is clearly
established if (1) the law is defined with reasonable clarity,
(2) the Supreme Court or the Second Circuit has recognized the
right, and (3) a reasonable defendant would have understood from
the existing law that his conduct was unlawful.'" Schubert v.
City of Rye, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting
Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004)).

Qualified immunity is an affirmative defense, and the
parties agree that when raised on a Rule 12(b)(6) motion instead
of a motion for summary judgment, defendants face a more
"stringent standard." McKenna v. Wright, 386 F.3d 432, 436 (2d
Cir. 2004). "Not only must the facts supporting the defense
appear on the face of the complaint, but . . . the motion may be
granted only where 'it appears beyond doubt that the plaintiff
can prove no set of facts in support of his claim that would

entitle him to relief.'"  Id. (citation omitted).  Thus, Plaintiffs are entitled to all reasonable inferences from the facts alleged, including those defeating Defendant Providers' immunity defense.  See id.

Defendant Providers first re-raise their position that Plaintiffs have inadequately pleaded facts supporting a deliberate indifference claim in violation of the Eighth Amendment.  (Dkt. no. 93 at 39.)  The Court disagrees for the reasons stated above.

Next, Defendant Providers argue that they are entitled to qualified immunity because "reasonable officials in the NSRD's positions could have believed that their actions did not violate any of the Plaintiff's constitutional rights" because once an RMD denied a Defendant Provider's MWAP Request, the Defendant Provider had to discontinue the MWAP prescription.  (Id. at 39-40.)  Plaintiffs oppose arguing that granting Defendant Providers qualified immunity at this stage would be premature because whether Defendant Providers lacked means to treat Plaintiffs effectively after RMDs denied requests for MWAP medications are "questions of fact to be determined through discovery."  (Dkt. no. 109 at 44.)  The Court agrees.  Because Plaintiffs alleged methods that Defendant Providers employed to obtain MWAP medications after an RMD denied an MWAP request, the Court may reasonably infer that Defendant Providers had some

means to treat patients after the denial of an MWAP Request.
(See SAC ¶ 786 (Lee's treating Plaintiff Terry Mathis with
Ultram for five days after Mueller denied Lee's MWAP Request).)
The Court notes Plaintiffs' acknowledgment that "Defendant
Providers may eventually prove that after MWAP approvals were
denied they had no means of effectively treating patients,"
entitling them to qualified immunity.  (Dkt. no. 109 at 44.)
However, the Court agrees that, at this stage, it is premature
for the Court to grant Defendant Providers' affirmative defense
on the pleadings.  Moreover, the Court finds that Defendant
Providers' position does not account for Plaintiffs' allegations
concerning Defendant Providers' not filing MWAP Requests in
response to specialists' recommendations due to the MWAP Policy.
Accordingly, Defendant Providers' motion to dismiss the SAC on
the ground of qualified immunity is denied.

ii.  Defendant Administrators

    Defendant Administrators' 12(b)(6) motion for qualified
immunity raises many of the same arguments as Defendant
Providers' motion.

    First, Defendant Administrators re-assert their position
that Plaintiffs have inadequately pleaded facts supporting a
deliberate indifference claim in violation of the Eighth
Amendment.  (See dkt. no. 102 at 41-42.)  The Court disagrees
for the reasons stated above.  The Court pauses to note that

36

Defendant Administrators' arguments misconstrue Plaintiffs'
allegations against them.  Plaintiffs do not allege that
Defendant Administrators treated Plaintiffs.  Rather,
Plaintiffs' claims against Defendant Administrators relate to
the implementation and enforcement of the MWAP Policy (including
denying MWAP Requests) and the MWAP Policy's responsibility for
the discontinuation of Plaintiffs' MWAP medications.  The Court
finds that Defendant Administrators' briefing addresses
Plaintiffs' allegations as against Defendant Providers rather
than those as against Defendant Administrators.  (See id. at 41-
43 (disputing whether the Supreme Court or Court of Appeals have
recognized a right that medical staff must defer their medical
judgment in favor of specialists' recommendations).)

Next, Defendant Administrators, like Defendant Providers,
contend that they are entitled to qualified immunity because "it
was objectively reasonable for them to believe that their
actions did not violate any clearly established right."  (Id. at
40.)  Because the Court has found that Plaintiffs have
adequately pleaded a deliberate indifference claim against
Defendant Administrators, it would be premature for the Court to
grant Defendant Administrators' motion for qualified immunity at
this stage.

Finally, Defendant Administrators argue that state
officials are "entitled to a separate analysis of qualified

immunity where it would be objectively reasonable for them to believe that they were not sufficiently involved in a matter to implicate their constitutional liability in light of clearly established law." (Id. at 43; see also dkt. no. 299 at 9-10.) Because Plaintiffs do not bring a claim of supervisory liability, (see dkt. no. 291 at 2), only claims against Defendant Administrators in their individual capacities, (see SAC ¶¶ 1045-54), no further analysis is needed. Accordingly, Defendant Administrators' motion to dismiss the SAC on the ground of qualified immunity is denied.

### c. Improper Venue for Plaintiffs Ortiz and Knight

Defendant Administrators move to dismiss Plaintiffs Vattiato, Rahman, Ortiz, and Knight for improper venue. (See dkt. no. 102 at 44.) The Court need not consider Vattiato as the Court ordered the voluntary dismissal of all claims by Vattiato on November 8, 2021. (See dkt. no. 319.) In addition, Defendant Administrators withdrew their improper venue argument against Rahman. (See dkt. no. 133 at 14.) The Court addresses the remaining two Plaintiffs in turn.

First, Plaintiffs acknowledge that "there may be grounds for dismissal of the claims of Plaintiff[] Ortiz" and "anticipate taking some action [with respect to Ortiz] before an opinion is drafted on these motions." (Dkt. no. 109 at 41 n.29.) However, to date, Plaintiffs have not voluntarily

dismissed Ortiz's claims.  The Court finds that Plaintiffs have met their burden of making a <u>prima facie</u> showing of venue for Ortiz.  Plaintiffs allege that in August 2016, medical personnel at Downstate Correctional Facility in Dutchess County prescribed Ortiz Neurontin and Baclofen.  (<u>See</u> SAC ¶¶ 809-13.)  After Ortiz was transferred to Great Meadow Correctional Facility, his Neurontin was discontinued "for reasons unknown on May 1, 2017 . . . by Dr. John Doe #2."  (<u>Id.</u> ¶¶ 820-22.)  Plaintiffs' allegations are sufficient because they show that "[p]rior to May 2017, Mr. Ortiz's pain was effectively treated with Neurontin and Baclofen."  (<u>Id.</u> ¶ 825.)  Thus, Defendant Administrators' motion to dismiss Ortiz for improper venue is denied.

Next, Defendant Administrators note that Plaintiffs' citations in support of Knight's argument for venue pertain to a different Plaintiff, Sean Pritchett.  (<u>See</u> dkt. no. 133 at 14.)  However, the Court finds that Plaintiffs have met their burden of making a <u>prima facie</u> showing of venue for Knight.  Plaintiffs allege that "[w]hile in Sullivan Correctional Facility [in Sullivan County] until 2014 Mr. Knight was successfully treated with Lyrica."  (SAC ¶ 735.)  Although Knight was transferred to Shawangunk in November 2014, "where his Lyrica prescription was changed to Neurontin," he requested the re-prescription of Lyrica through October 2018.  (<u>Id.</u> ¶¶ 736-46.)  Plaintiffs

39

further allege that Lee repeatedly told Knight that "'Albany' will not allow him to have Lyrica." (Id. ¶ 746.) Plaintiffs' allegations are sufficient because they show that Knight's pain was effectively treated with Lyrica for years and that alternative medications were not successful. Thus, Defendant Administrators' motion to dismiss Knight for improper venue is denied.

## IV.  <u>Conclusion</u>

For the foregoing reasons, Defendant Providers' motion to dismiss [dkt. no. 92] and Defendant Administrators' motion to dismiss [dkt. nos. 101] is DENIED. The Clerk of the Court shall close the open motions [dkt. nos. 92, 101].

**SO ORDERED.**

Dated:     May 19, 2022
           New York, New York

_Loretta A. Preska_
LORETTA A. PRESKA
Senior United States District Judge