UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PETER ALLEN, BRIAN BERNARD, MARK DANIELS, SHANNON DICKINSON, AARON DOCKERY, EDDIE FIELDS, JOHN GRADIA, ANGEL HERNANDEZ, HUGH KNIGHT, TERRY MATHIS, HAROLD ORTIZ, SEAN PRITCHETT, RASHID RAHMAN, FELIPE RIVERA-CRUZ, WAYNE STEWART, and DERRICK WILLIAMS, on behalf of themselves and others similarly situated | : : : : : : : : | |
| Plaintiffs | : | |
| v. | : : | |
| CARL KOENGISMANN, MD; JOHN MORLEY, MD; SUSAN MUELLER, MD; DEFENDANT S. DINELLO, MD; JOHN HAMMER, MD; ANN ANDOLA, MD; MIKHAIL GUSMAN, MD; CHUN LEE, MD; KATHLEEN MANTARO, MD; ALBERT ACRISH, NP; KRISTIN SALOTTI, NP; MARY ASHONG, NP; JOHN DOE #2, MD; JANE OR JOHN DOE, MD #3 - # 50; AND JANE OR JOHN DOE, NP OR PA, #1 - #50 | : : : : : : : : : : : | **ECF CASE**<br><br>**PLAINTIFF AND PLAINTIFF-INTERVENORS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| Defendants. | : : | **19-cv-8173** |
| | : | |
| DR. CHRISTINE MICHAEL, guardian *ad litem* for ADITEP WHITE, JOSEPH PEREZ, RICHARD RIVERA, RODERICK REYES, CLAUDIO JOHNSON, ROBERT OLEMAN and GARY ORTIZ, on behalf of themselves and others similarly situated | : : : : : : : | |
| Plaintiff-Intervenors | : | |
| v. | : : | |
| CARL KOENGISMANN, MD; JOHN MORLEY, MD; CAROL MOORES, MD; IMTIAZ SAMAD, MD; KRISTIN SALOTTI, NP; CHRISTOPHER WRIGHT, MD; SUSAN MUELLER, MD; DAVID S. DINELLO, MD; PAULA BOZER, MD; CHUN LEE, MD; JOHN HAMMER, MD; VERONICA RUIZ, MD; ROBERT BENTIVEGNA, MD; LESTER SILVER, MD; KATHRYN INFANTINO, NP; and ALBERT ACRISH, NP. | : : : : : : : : : : : : : | |
| Defendants-in-Intervention | : | |

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** 1

**LEGAL ARGUMENT** 8

**I.    The Proposed Classes Satisfy the Requirements of Rule 23(a)** 8

A.  Rule 23(a) Requirements 9

1.  Numerosity 9

2.  Commonality 11

3.  Typicality 13

4.  Adequacy of Representation 15

5.  Ascertainability 16

**II.    The Liability Class Satisfies the Requirements of Rules 23(b)(1)-(3)** 17

A.  Rule 23(b)(1) and (2) Allow Certification of the Liability Class 18

B.  Rule 23(b)(3) and/or (c)(4) Allow Certification of the Liability Class 19

**III.    The Injunctive Class Satisfies the Requirements of Rule 23(b)(2)** 22

**CONCLUSION** 25

# TABLE OF AUTHORITIES

Abdul-Malik v. Coombe,                                                                    18
  96-cv-1021, 1996 U.S. Dist. LEXIS 18203 (S.D.N.Y. Dec. 6, 1996)

Amchem Prods., Inc. v. Windsor,                                                           19
  521 U.S. 591, 624, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)

Amgen Inc. v. Conn. Ret. Plans & Tr. Funds,                                              9
568 U.S. 455, 459, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013)

Augustin v. Jablonsky (In re Nassau County Strip Search Cases),                          21
  461 F. 3d 219 (2d Cir. 2006)

Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,                                        15
  222 F.3d 52 (2d Cir. 2000)

Barfield v. Cook,                                                                         12-13
  18-cv-1198, 2019 U.S. Dist. LEXIS 131295 (Conn. Dist. Ct. Aug. 6, 2019)

Boucher v. Syracuse Univ.,                                                                22
  95-cv-0620, 1996 U.S. Dist. LEXIS 8395 (N.D.N.Y. June 12, 1996)

Brecher v. Republic of Argentina,                                                         8
  806 F.3d 22 (2d Cir. 2015)

Brown v. Kelly,                                                                           20, 21
  609 F.3d 467 (2d Cir. 2010)

Brown v. Giuliani,                                                                        22
158 F.R.D. 251 (E.D.N.Y. 1994)

Butler v. Suffolk County,                                                                 12
289 F.R.D. 80 (E.D.N.Y. 2013)

Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed                13
Care, L.L.C.,
  504 F.3d 229 (2d Cir. 2007)

Clarkson v. Coughlin,                                                                     9
  145 F.R.D. 339 (S.D.N.Y. 1993)

Comcast Corp. v. Behrend,                                                                 8-9
  569 U.S. 27, 33, 133 S. Ct. 1426, 185 L. Ed. 2d 515 (2013)

Comer v. Cisneros,                                                                  18
   37 F.3d 775, 796 (2d Cir. 1994)

Consol. Rail Corp. v. Hyde Park,                                                     9
   47 F.3d 473 (2d Cir. 1995)

Dodge v. County of Orange,                                                          20
   226 F.R.D. 177 (S.D.N.Y. 2005)

Ebin v. Kangadis Food Inc.,                                                         14
   297 F.R.D. 561 (S.D.N.Y. 2014)

Galvan v. Levine,                                                                   22
   490 F.2d 1255 (2nd Cir. 1973)

Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,                                 8
   317 F.R.D. 374 (S.D.N.Y. 2016)

Gunnells v. Healthplan Servs.,                                                      22
   348 F.3d 417 (4th Cir. 2003)

Hill v. Cty. of Montgomery,                                                         20
   14-cv-0933, 2018 U.S. Dist. LEXIS 140305 (N.D.N.Y. Aug. 20, 2018)

In re Drexel Burnham Lambert Grp., Inc.,                                            13
   960 F.2d 285 (2d Cir. 1992)

In re Flag Telecom Holdings, Ltd. Securities Litig.,                                15
   574 F.3d 29 (2d Cir. 2009)

In re Frontier Ins. Grp., Inc. Sec. Litig.,                                         15
   172 F.R.D. 31 (E.D.N.Y. 1997)

In re Methyl Tertiary Butyl Ether Products Liability Litigation,                    16
   209 F.R.D. 323 (S.D.N.Y. 2002)

In re Petrobras Securities,                                                      passum
   862 F.3d 250 (2d Cir. 2017)

In re Visa Check/MasterMoney Antitrust Litig.,                                      20
   280 F. 3d 124 (2d Cir. 2001)

Inmates of Attica Correctional Facility v. Rockefeller,                             12
   453 F. 2d 12 (2d Cir. 1971)

Jane B. by Martin v. N.Y.C. Dept. of Social Services,
   117 F.R.D. 64 (S.D.N.Y. 1987) .................................................... 16

Johnson v. Nextel Communs. Inc.,
   780 F.3d 128 (2d Cir. 2015) .................................................... 8, 11

Langan v. Johnson & Johnson Consumer Cos., Inc.,
   897 F.3d 88 (2d Cir. 2018) .................................................... 19

MacNamara v. City of New York,
   275 F.R.D. 125 (S.D.N.Y. 2011) .................................................... 20

Marisol A. v. Giuliani,
   126 F.3d 372 (2d Cir. 1997) .................................................... 22

Marriott v. County of Montgomery,
   227 F.R.D. 159 (N.D.N.Y. 2005) .................................................... 14

Mazzei v. Money Store,
   829 F.3d 260 (2d Cir. 2016) .................................................... 19

McGee v. Pallito,
   04-cv-335, 2015 U.S. Dist. LEXIS 118690 (D. Vt. Sept. 4, 2015) .................................................... 12

Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.),
   471 F. 3d 24 (2d Cir. 2006) .................................................... 20

Non-Traditional Employment for Women v. Tishman Realty and Const. Corp.,
   88-cv-4620, 1989 U.S. Dist. LEXIS 10224 (S.D.N.Y. Sept. 19, 1989) .................................................... 22

Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.,
   772 F.3d 111 (2d Cir. 2014) .................................................... 9

Pecere v. Empire Blue Cross & Blue Shield,
   194 F.R.D. 66 (E.D.N.Y. 2000) .................................................... 9

Pyke v. Cuomo,
   209 F.R.D. 33 (N.D.N.Y. 2002) .................................................... 13

Robidoux v. Celani,
   987 F.2d 931 (2d Cir. 1993) .................................................... 13

Robinson v. Metro-N. Commuter R.R. Co.,
   267 F.3d 147 (2d Cir. 2001) .................................................... 13

Rodriguez v. It's Just Lunch, Int'l,                                                          15
    300 F.R.D. 125 (S.D.N.Y. 2014)

Royal Park Invs. SA v. Wells Fargo Bank, N.A.,                                                17
    No. 17 Civ. 553, 2018 U.S. Dist. LEXIS 9087 (S.D.N.Y. Jan. 10, 2018)

Shahriar v. Smith & Wollensky Rest. Grp., Inc.,                                               15
    659 F.3d 234 (2d Cir. 2011)

Stinson v. City of New York,                                                                  14
    282 F.R.D. 360 (S.D.N.Y. 2012)

Suchanek v. Sturm Foods, Inc.,                                                                11
    764 F.3d 750 (7th Cir. 2014)

Tyson Foods, Inc. v. Bouaphakeo,                                                          19, 20
    136 S. Ct. 1036, 194 L. Ed. 2d 124 (2016)

Univs. Superannuation Scheme Ltd. v. Petróleo Brasileiro S.A. (In re Petrobras               8
Sec.),
    862 F.3d 250 (2d Cir. 2017)

V.W. ex rel. Williams v. Conway,                                                         12, 14
    236 F. Supp. 3d 554 (N.D.N.Y. 2017)

Wal-Mart Stores, Inc. v. Dukes,                                                               11
    564 U.S. 338, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)

**RULES**

Fed. R. Civ. P. 23(a)                                                                       8, 17

Fed. R. Civ. P. 23(b)                                                                         17

Fed. Rule Civ. P. 23(b)(1)                                                                    18

Fed. R. Civ. P. 23(b)(2)                                                                   *passum*

Fed. R. Civ. P. 23(b)(3)                                                                  19, 20

Fed. R. Civ. P.  23(c)(4)                                                                     19

## **OTHER AUTHORITIES**

6 Alba Conte & Herbert B. Newberg, <u>Newberg on Class Actions</u> § 18:7 (4th ed. 2002)                                                                                               21

1 Herbert B. Newberg, Newberg on Class Actions: <u>A Manual for Group Litigation at Federal and State Levels</u> § 3.05 (2d ed. 1985)                                              9

7AA Wright & Miller, <u>Federal Practice & Procedure</u> § 1790 (3d ed. 2005)      21

## PRELIMINARY STATEMENT

This case seeks to rectify the constitutional violations perpetrated by medical personnel at the New York State Department of Corrections and Community Supervision ("DOCCS") through implementation of policies and practices that stripped patients in their custody of effective medical treatment. Putative class members seek both monetary restitution for their injuries as well as injunctive and declaratory relief to remedy on-going violations of their rights as secured by the Eighth Amendment to the United States Constitution.

Beginning in 2014, at least one Regional Medical Director ("RMD") Defendant, David Dinello, began limiting the prescription of medications he deemed to have "abuse potential" in the prison setting under the auspice that alternatives were "safer for the patient." (Declaration of Amy Jane Agnew ("Agnew Decl.") [dkt. no. 367], Ex. 10, Deposition of David Dinello "Dinello Dep." [dkt. no. 367-17] at 31:16-20; 39:6-40:25; 42:19-43:18.) Around the same time, security personnel at Green Haven Correctional Facility sought to limit the prescription of narcotics and an anti-convulsant medication, Neurontin, due to perceived hoarding, diverting and illicit drug use in the incarcerated population. (Agnew Decl. Ex. 8-9 [dkt. nos. 367-8 thru 367-9].) To try and reduce the prescription of these medications, DOCCS created a Narcotics Review Committee at Green Haven which was supposed to individually assess patients. (Agnew Decl. ¶ 30 [dkt. no. 367].) Serving on the Committee was Dr. Steven Weinstein, a physiatrist and pain management specialist, who contracted with DOCCS to provide specialty services. (Id. Ex.7, Deposition of Dr. Steven Weinstein ("Weinstein Dep.") [dkt. no. 367-14] at 62:20-75:18.) While the Committee did individually assess patients, there came a time when Defendant Mueller and then acting RMD, Dr. Gail Bailey-Wallace, "made the final decisions anyway . . . and [the medications] would get denied." (Weinstein Dep. at 76:24-77:17.) As Dr. Weinstein described it, "[i]f there was a patient

that we thought maybe was appropriate to stay on the medications, they would come and overrule it. . ." (Id. at 81:23-82:3.)  The policy "was basically we're not going to be prescribing narcotics anymore." (Id. at 82:10-17.)  Green Haven also started discontinuing Neurontin prescriptions, using the results of electromyography tests to discontinue the medication if the patient did not have what were considered positive test results – a standard not used by pain management doctors. (Id. at 84:13-90:20.)

The Defendant RMDs soon had other facilities follow suit and began directing providers to discontinue or wean patients from opioids and Neurontin.  The effort was numbers-driven with Senior Utility Review Nurses (SURN) Reports and Quality Improvement (QI) meeting minutes memorializing the effort to curb all prescriptions of opioids and Neurontin. (Agnew Decl. Exs. 12-29 [dkt. nos. 367-19 thru 367-36].)  In mid-2016, Dr. Michelle Belgard, the Facility Health Services Director ("FHSD") at Five Points testified about the "rules" for Neurontin: "They're not my rules, they are our regional director's rules, and they are currently trying to change the policy on the use of Neurontin to limit its use." (Agnew Decl. Ex. 11, June 15, 2016 Hearing Testimony of Michelle Belgard ("Belgard Test." [dkt. no. 367-18] at 47:17-21.)  Dr. Belgard also identified medications being discontinued: "[p]rescription drugs, Neurontin is our number one.  We no longer prescribe most of them, such as morphine, Percocet, Tramadol.  Baclofen is also abused . . . Flexeril which we don't prescribe, only short term, that's another drug of abuse.  Clonidine . . . which is an anti-hypertensive." (Id. [dkt. no. 367-18] at 58:17-25.)  She finished, "We are trying to remove those medications .  .  . from use anyway." (Id. at 70:15-24.)  Dr. Zaki, the FHSD at Marcy Correctional Facility testified that before 2017 it was true that Defendant Dinello was "getting rid of Neurontin." (Agnew Decl. Ex. 34, Deposition of Dr. Shehab Zaki ("Zaki Dep.") [dkt. no. 367-41] at 45:24-48:22.)  He also testified that even though he did not need RMD approval to prescribe

Neurontin before MWAP, Defendant Dinello had his own policy mandating that providers justify the prescription to him.  (Id. [dkt. no. 367-41] at 48:10-52:10.)  Dinello was "adamant in his directives about these medications." (Agnew Decl. Ex. 38, Deposition of Dr. Gerald Cahill ("Cahill Depo.") [dkt. no 367-40] at 26:21-22.)  Many of the studied putative class members suffered MWAP discontinuations even before the written policy came out.[1]

On March 23, 2017 then Chief Medical Officer, Carl Koenigsmann,, solidified these efforts by announcing that the Medications with Abuse Potential policy would be implemented on June 1, 2017.  He circulated a memo, "in advance to allow providers to reevaluate patients on these medications and begin to make appropriate changes." (Agnew Decl. Ex. 30 [dkt. no. 367-37].)  Koengismann later admitted that the RMDs felt strongly "it should be a policy that . . . required adherence by the providers." (Agnew Decl. Ex. 42, September 18, 2018 Hearing Testimony of Dr. Carl Koenigsmann ("Koenigsmann Test." [dkt. no. 367-44] at 186:2-187:12.)  Internally, at DOCCS, Koenigsman warned that "we need to be extremely careful about indicating that anyone is having their medication discontinued because of a new policy.  Changing meds based on policy is doomed to failure. . ." (Koenigsmann Test. at 187:24-188:3.)  Koenigsmann clarified that he

---

[1] See Expert Report of Dr. Adam Carinci ("Carinci Report") Khalaire Allah, Ex. 2 at 77 [dkt. no. 348-4]; Peter Allen, Ex. 4 at 126 [dkt. no. 348-18], T&M 151-153 [dkt. no. 348-25 to 27]; John Alston, Ex. 5 at 79 [dkt. no. 348-29]; Frank Andolina, Ex. 6 at 2 [dkt. no. 348-4], 153 [dkt. 348-7]; Jose Hernandez, Ex. 26 at 7-9, 12-13 [dkt. no. 353-1]; Stephen Jacks, Ex. 27 at 148 [dkt. no. 353-31]; Alonzo Jacobs, Ex. 29 at 109 [dkt. no. 354-7], T&M 78-80 [dkt. no. 354-13]; Hugh Knight, Ex. 32 at 183, 196, 206 [dkt. no. 355-4], T&M 172 [dkt. 355-22], 230 [dkt. no. 355-24]; Kiaza Locenitt, Ex. 34 at 52 [dkt. no. 355-29], T&M 43-46, 57 [dkt. no. 355-35]; Benjamin Marcial, Ex. 37 at 135-137, [dkt. no. 356-19], 145A [dkt. no. 356-20], T&M 59 [dkt. no. 356-24], 62-65 [dkt. no. 356-25]; Sean Pritchett, Ex. 47 at 169-170 [dkt. no. 358-10]; Rashid Rahman, Ex. 48 at 122-124 [dkt. no. 358-23], T&M 21 [dkt. no. 358-28]; Larry Rau, Ex. 49 at 20 [dkt. no. 358-31], T&M 15-16 [dkt. no. 358-37]; Everett Reed, Ex. 50 at 24-25 [dkt. no. 359-1]; Felipe Rivera-Cruz, Ex. 54 at 95-96 [dkt. no. 360-2]; John Rosado, Ex. 56 at 22-25 [dkt. no. 360-23], T&M 183 [dkt. no. 360-32]; Kevin Schwartz, Ex. 57 at 44-46 [dkt. no. 360-37]; Wayne Stewart, Ex. 60 at 67-113 [dkt. nos. 361-19, 361-20]; and Frank Thomas, Ex. 61 at 55-56 [dkt. no. 361-25], T&M 46 [dkt. no. 361-26].)

meant doomed to fail legally. (Id. at 190:1-4.) Even though DOCCS' providers and administrators suggested stopping medications based on a policy was not happening, medications were being discontinued without individualized assessments across all facilities. While reception facility doctors kept patients on medications they were prescribed before entry to ensure continuity of care, as soon as many of the studied putative class members were transferred to holding facilities their prescriptions were discontinued without even seeing a provider.[2] (Agnew Decl. Ex. 38, Cahill Depo. at 47:12-49:20.)

By June 1, 2017 when the actual MWAP Policy went into effect, things became more dire for patients. Providers had to submit an MWAP Request Form to an RMD to have MWAP medications "approved." (Agnew Decl. Ex. 31, Policy 1.24 "Medications with Abuse Potential" [dkt. no. 367-38].) DOCCS Defendants started discontinuing medications that had been long-taken by patients to manage diagnoses from diabetic neuropathy to sickle cell disease.[3] Many

---

[2] See Carinci Report: *Frank Andolina*, Ex. 6 at 1-2 [dkt. no. 349-1], 153 [dkt. no. 349-3]; *Milton Beauchamp*, Ex. 7 at 53 [dkt. no. 349-8]; *Todd Briglin*, Ex. 9 at 73-76, 82 [dkt. no. 349-19]; *Jose Burgos*, Ex. 10 at 93-97 [dkt. no. 349-23], 143 [dkt. no. 349-24], T&M 6-8 [dkt. no. 349-25]; *Robert Grof*, Ex. 23 at 16, 19-21, 24 [dkt. no. 352-23], T&M 3-4 [dkt. no. 352-26]; *Bryan Hale*, Ex. 24 at 48-49, 52 [dkt. no. 366-1], 60-65 [dkt. no. 366-2] T&M 1-8 [dkt. no. 366-3]; *Jose Hernandez*, Ex. 26 at 7-9, 12-13 [dkt. no. 353-1], T&M 15-16 [dkt. no. 353-6]; *Hannah Jones*, Ex. 31 at 5 [dkt. no. 354-35], T&M 1-6 [dkt. no. 354-36]; *Brent Latham*, Ex. 33 at 13 [dkt. no. 355-26], T&M 2 [dkt. no. 355-27]; *Benjamin Marcial*, Ex. 37 at 135-137, 139, 141-143 [dkt. no 356-19], 145A [dkt. no. 356-20], T&M 62-65 [dkt. nos. 356-24 thru 356-25]; *McKinley Miller*, Ex. 39 at 23, 25, 34-35 [dkt. no. 356-34], T&M 3 [dkt. no. 356-37]; *Ernest Montgomery*, Ex. 40 at 10, 14-17 [dkt. no. 357-1], T&M 7 [dkt. no. 357-3]; *George Pivetz*, Ex. 46 at 78-79, 82-82A [dkt. no. 358-2]; *Marcos Rivera*, Ex. 52 at 35-38 [dkt. no. 359-28], 51-53 [dkt. no. 359-29], T&M 2 [dkt. no. 359-33]; *Edwin Shockley*, Ex. 58 at 78-88 [dkt. no. 366-5], T&M 2, 4-5 [dkt. no. 366-7]; *Wayne Stewart*, Ex. 60 at 46, 48-49 [dkt. no 361-18], 67-68 [dkt. no. 361-19], T&M 7 [dkt. no. 361-22]; *Kevin Townsend*, Ex. 62 at 34-35 [dkt. no. 361-28]; *Curtis Washington*, Ex. 65 at 48-53 [dkt. no. 361-35], 58-67 [dkt. no. 361-36]; *Aditep White*, Ex. 66 at 90-110 [dkt. no. 362-2]; *Mali Wilkerson*, Ex. 67 at 79-81, 87 [dkt. no. 362-7], T&M 53 [dkt. no. 362-13]; *See also* Agnew Decl. Ex. 32, Deposition of Dr. John Bendheim ("Bendheim Depo."), [dkt. no. 367-39] at 26:15-27:3.

[3] See Carinci Report: *Khalaire Allah*, Ex. 2 at 114C [dkt. no. 348-6]; *James Allen*, Ex. 3 at 7 [dkt. 348-14]; *Peter Allen*, Ex. 4 at 149-151 [dkt. no. 348-19]; *Brian Bernard*, Ex. 8 at 12-36 [dkt. no.

MWAP Requests were "Not Approved" or "Approved" but only for the purposes of weaning or switching patients to other medications. (Agnew Decl. Exs. 1-6 [dkt. nos. 367-1 thru 367-13].) Dr. Gerald Cahill, the FHSD at Franklin admitted, "eventually . . . when I found that we . . . were not going to have it approved . . . I would still have to submit the MWAP form, but then I would put in my own tapering [schedule]." (Agnew Decl. Ex. 38 [dkt. no. 367-40] at 23:21-25:12; 42:12-43:17; 71:4-25.) "[T]he individual practitioner had no input into this. It was just put in our plate and that's the way it had to be." (Agnew Decl. Ex. 38 [dkt. no. 367-40] at 29:7-17.) Dr. Bendheim, who practiced at Downstate, a reception facility, stated, "there have been cases where it's really obvious people need [MWAP medication] and . . . couldn't get it because of MWAP." (Agnew Decl. Ex. 32, Deposition of Dr. John Bendheim ("Bendheim Depo.") [dkt. no. 367-39] at 30:21-24.) Dr. Bendheim offered that only 2 or so out of 20 MWAP requests were approved and he "didn't think any of them were unreasonable." (Id. at 31:8-15.) He had no belief that an MWAP request would be approved "no matter what the clinical indication is, what the clinician says, it could be rejected." (Id. at 34:11-20; 35:18-36:12.) Dr. Gusman, FHSD at Eastern echoed, "When you are a doctor in the community, there is a . . . doctor-patient relation, and in the correctional,

---

349-10]; _Kevin Crichlow,_ Ex. 11 at 15 [dkt. no. 349-26]; _Mark Daniels,_ Ex. 12 at 129-136 [dkt. no. 349-36]; _Shannon Dickinson_, Ex. 14 at 104-106 [dkt. no. 350-10]; _Aaron Dockery,_ Ex. 16 at 33-35 [dkt. no. 351-2]; _Wilbert Dunbar_, Ex. 17 at 30-35 [dkt. no. 351-13]; _Robert Feder_, Ex. 18 at 75-77 [dkt. no. 351-24]; _Elvio Feola_, Ex. 19 at 27-28 [dkt. no. 351-33]; _John Frateschi,_ Ex. 21 at 63A-63C [dkt. no. 352-2]; _John Gradia,_ Ex. 22 at 213-214 [dkt. no. 352-11], 254 [dkt. no. 352-12]; _Angel Hernandez_, Ex. 25 at 80-82 [dkt. no. 352-32]; _Spencer Jackson_, Ex. 28 at 77-79 [dkt. no. 354-2]; _Claudio Johnson_, Ex. 30 at 441-455 [dkt. no. 354-20]; _Michael Lorandos_, Ex. 35 at 111-128 [dkt. no. 356-3]; _Terry Mathis_, Ex. 38 at 110-113 [dkt. no. 356-28]; _Brian Munger_, Ex. 41 at 71-75 [dkt. no. 357-5]; _Robert Oleman_, Ex. 43 at 92, 100 [dkt. no. 357-15]; _Gary Ortiz_, Ex. 44 at 165-66 [dkt. no. 357-27]; _Joseph Perez_, Ex. 45 at 130-135 [dkt. no. 357-37]; _Rashid Rahman_, Ex. 48 at 190-193 [dkt. no. 358-24]; _Everett Reed,_ Ex. 50 at 29 [dkt. no. 359-1]; _Roderick Reyes_, Ex. 51 at 267-272 [dkt. no. 359-15]; _Richard Rivera_, Ex. 53 at 96-97 [dkt. no. 359-36]; _Felipe Rivera-Cruz_, Ex. 54 at 116-118 [dkt. no. 360-3]; _Angel Rodriguez_, Ex. 55 at 196-200 [dkt. no. 360-12]; _Frank_ Thomas, Ex. 61 at 55-56 [dkt. no. 361-25]; and _Christopher VanGuilder_, Ex. 63 at 70-72 [dkt. no. 361-31].

you are a state worker, you are following state directives and your state guidelines." (Agnew Decl. Ex. 36, Deposition of Dr. Mikhail Gusman ("Gusman Depo.") [dkt. no. 367-38] at 72:12-19.)  Dr. Gusman continued, "I am a state worker.  It's the same as military organization.  I prefer not to argue." (Id. at 88:2-5; 111:10-22.)

Other doctors directly advocated for their patients and challenged MWAP through emails or conversations with Administrators.  Dr. Cahill spoke with Defendant Dinello and attempted to push back. (Agnew Decl. Ex. 38 [dkt. no. 367-40] 26:17-23; 31:9-32:18.)  Dr. Michael Salvana served as the FHSD for Walsh Regional Medical Unit ("RMU"), a DOCCS-run hospital for critical or palliative care patients.  (Salvana Declaration ("Salvana Decl.") [dkt. no. 369] at ¶¶ 13-18.)  Dr. Salvana doggedly sought an exception to MWAP for his hospital as his patients were suffering due to the discontinuations and refusals of MWAP medications. (Salvana Decl. at ¶¶ 22-25.)  Dr. Salvana even wrote a memorandum highlighting seven specific patients for whom he could not getting necessary MWAP medications in an attempt to highlight the risks of MWAP to Koenigsmann and Dinello. (Id. ¶¶ 26-29, Ex. I [dkt. no. 369-8].)  Even after a meeting with Salvana and his team at Walsh, Koenigsmann and Dinello did nothing to revise MWAP so patients who needed medications could get them. (Id. at ¶ 32.)

There can be no question that implementation of the MWAP policy effected hundreds if not thousands of patients, some severely.  DOCCS maintained an *ad hoc* "directory" of MWAP Request forms which Plaintiffs' counsel converted into an excel spreadsheet entitled, "Project Bob," of the relevant data from the saved MWAP Request forms. (Declaration of Sterling Avellino ("Avellino Decl.") [dkt. no. 368] ¶¶ 2, 4-13.) Project Bob shows that there were 993 patients whose MWAP Requests for Neurontin were not approved or approved only for purposes of weaning. (Agnew Decl. at ¶ 19, Ex. 1 [dkt. nos. 367-1 thru 367-5].)  The database shows 120 patients whose

6

Ultram was not approved or approved only for weaning. (Id. at ¶ 20, Ex. 2 [dkt. nos. 367-6 thru 367-7].)  There were 61 patients whose Lyrica was not approved or approved only for weaning (Id. at ¶ 21, Ex. 3 [dkt. no. 367-8]) and 112 patients for whom Percocet was denied (Id. at ¶ 22, Ex. 4 [dkt. no. 367-9]).  Even Baclofen, a fairly benign anti-spasmatic, was denied or not approved for 91 patients. (Id. at ¶ 23, Ex. 5 [dkt. no. 367-10].)  These numbers do not even include some important classes of medications like morphine and Project Bob includes only data from Request Forms that DOCCS saved. There can be no question that hundreds of patients were discontinued from effective medication before MWAP was even promulgated. (Agnew Decl. Exs. 8-9, 29 [dkt. nos. 367-15, 367-16, 367-36].)

Plaintiffs now seek the certification of two classes to address the unconstitutional violations caused by implementation of the MWAP Policy:

**A liability class pursuant to 23(b)(1)-(3) or (c)(4):**
All incarcerated individuals in the care and custody of the New York State Department of Corrections and Community Supervision who suffered or will suffer from chronic pain and/or neuropathies for whom medications defined as Medication with Abuse Potential ("MWAP") were denied or discontinued without an individualized assessment of medical need or efficacy.

**An injunctive class pursuant to 23(b)(2)**
All incarcerated individuals who are or will be in the care and custody of the New York State Department of Corrections and Community Supervision who suffer or will suffer from chronic pain and/or neuropathies who require individualized assessments of medical need for treatment with MWAP medications.

Plaintiffs propose the Class Period start June 1, 2015 and extends to the date on which the New York State Department of Corrections and Community Supervision, through its Chief Medical Officer, is enjoined from, or otherwise ceases, allowing the policy, practice and custom of denying or discontinuing MWAP treatment to incarcerated individuals without medical justification and undertakes real and substantial efforts to remediate the constitutionally inadequate treatment of chronic pain in its patients.  Based on the following authority, Plaintiffs and Plaintiff-Intervenors now seek certification.

**LEGAL ARGUMENT**

I.    **The Proposed Classes Satisfy the Requirements of Rule 23(a)**

Plaintiffs seeking to certify a class must satisfy the requirements of Fed. R. Civ. P. 23(a): (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). In addition, the Second Circuit has "'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Univs. Superannuation Scheme Ltd. v. Petróleo Brasileiro S.A. (In re Petrobras Sec.), 862 F.3d 250, 260 (2d Cir. 2017) (quoting Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015)).

Assuming the requirements of Rule 23(a) are met, a class action may only be maintained if the plaintiffs also qualify the proposed classes under one of the categories in Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiffs seek to certify the classes under all three modes, but need only establish one for each class.  Plaintiffs suggest for purposes of compensatory relief under Rule 23(b)(3), the class can be limited to the issue of liability under Rule 23(c)(4), as damages will require an individualized inquiry.

The party seeking class certification bears the burden of satisfying Rule 23's requirements by a preponderance of the evidence. Goldemberg v. Johnson & Johnson Consumer Cos., Inc., 317 F.R.D. 374, 384 (S.D.N.Y. 2016); Johnson v. Nextel Communs. Inc., 780 F.3d 128, 138 (2d Cir. 2015) (quoting Comcast Corp. v. Behrend, 569 U.S. 27, 33, 133 S. Ct. 1426, 185 L. Ed. 2d 515

(2013))(through evidentiary proof). However, it is a lesser burden than showing that the common questions 'will be answered, on the merits, in favor of the class.'" Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 459, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013).

## A. Rule 23(a) Requirements

### 1. Numerosity

Rule 23(a)(1) first requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In general, "numerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). But the number need not be precisely at any given threshold as a court may make 'common sense assumptions' without the need for 'precise quantification of the class.'" Pecere v. Empire Blue Cross & Blue Shield, 194 F.R.D. 66, 69 (E.D.N.Y. 2000)); see also 1 Herbert B. Newberg, Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels § 3.05, at 139 (2d ed. 1985). Further, the numerosity inquiry is not "strictly mathematical." Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co., 772 F.3d 111, 120 (2d Cir. 2014). Rather, it must take into account whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members. Ibid. As this court noted in Clarkson v. Coughlin, the "class action device is particularly well-suited in actions brought by [incarcerated individuals] due to the fluid composition of the prisoner population." 145 F.R.D. 339, 346-47 (S.D.N.Y. 1993).

The proposed classes in this case include hundreds, if not thousands, of incarcerated individuals who lost effective medical treatment and those who require constitutionally required individualized assessments and effective treatment moving forward.  The Project Bob spreadsheet

shows hundreds of patients who lost effective treatment. (See Agnew Decl. Ex. 1 [dkt no. 367-1 thru 5], "Neurontin Not Approved or Only to Wean"; Ex. 2 [dkt. no. 367-6 thru 7], "Ultram Not Approved or Only to Wean"; Ex. 3 [dkt. no. 367-8], "Lyrica Not Approved or Only to Wean," Ex. 4 [dkt. no. 367-9], "Percocet Not Approved or Only to Wean"; Ex. 5 [dkt. no. 367-10 thru 12], "Baclofen Not Approved or Only to Wean"; Carinci Rpt. Ex. 71 [dkt. no. 262-31], "Neurontin Denied As Not FDA Approved For Use".)  Plaintiffs' expert has already studied sixty-nine (69) patients in depth who lost their medications without an individualized assessment and/or medical justification. (Declaration of Dr. Adam Carinci ("Carinci Decl."), Ex. 2. ("Carinci Report"), Exs. 2-69 [dkt. nos. 348-4 thru 362-27, 366-1 thru 7].)  Twenty-two of those patients are still not being treated despite an alleged "reassessment" process of MWAP victims in late 2020.[4] Fifteen other patients studied by Plaintiffs' expert only received treatment by outside doctors after release.[5] Furthermore, Plaintiffs' counsel has gathered medical records of at least 180 putative class

---

[4] *See* Carinci Report: Ex. 4 *Peter Allen* [dkt. no. 348-16 thru 27]; Ex. 10, *Jose Burgos* [dkt. no. 349-22 thru 25]; Ex. 11 *Kevin Crichlow* [dkt. no. 349-26 thru 31]; Ex. 12 *Mark Daniels* [dkt. no. 349-32 thru 42]; Ex. 15, *Ronald Diggs* [dkt. no. 350-33 thru 40]; Ex. 17, *Wilbert Dunbar* [dkt. no. 351-3 thru 42]; Ex. 26, *Jose Hernandez* [dkt. no. 353-1 thru 27]; Ex. 29, *Alonzo Jacobs* [dkt. no. 354-5 thru 14]; Ex. 31 *Hannah Jones* [dkt. no. 354-35 thru 37]; Ex. 32, *Hugh Knight* [dkt. no. 355-1 thru 25]; Ex. 36, *Donald Madison* [dkt. no. 356-14 thru 16]; Ex. 37, *Benjamin Marcial* [dkt. no. 356-17 thru 25]; Ex. 38, Terry Mathis [dkt. no. 356-26 thru 33]; Ex. 40, *Ernest Montgomery* [dkt. no. 357-1 thru 2]; Ex. 43, *Robert Oleman* [dkt. no. 357-14 thru 22]; Ex. 48, *Rashid Rahman* [dkt. no. 358-20 thru 30]; Ex. 49, *Larry Rau* [dkt. no. 358-31 thru 39]; Ex. 50, *Everett Reed* [dkt. no. 359-1 thru 9]; Ex. 54, *Felipe Rivera-Cruz* [dkt. no. 360-1 thru 8]; Ex. 55, *Angel Rodriguez* [dkt. no. 360-9 thru 22]; Ex. 60, *Wayne Stewart* [dkt. no. 361-18 thru 23]; and Ex. 64, *Richard Vasquez* [dkt. no. 361-33 thru 34];.

[5] *See* Carinci Report: Ex. 6, *Frank Andolina* [dkt. no. 349-1 thru 5]; Ex. 7, *Milton Beauchamp* [dkt. no. 349-6 thru 9]; Ex. 9, *Todd Briglin* [dkt. no. 349-18 thru 21]; Ex. 20, *Jeffrey First*; [dkt. no. 351-35 thru 42]; Ex. 21, *John Frateschi*[dkt. no. 352-1 thru 6]; Ex. 23, *Robert Grof* [dkt. no. 252-23 thru 27]; Ex. 24, *Bryan Hale* [dkt. no. 366-1 thr 3]; Ex. 33, *Brent Latham* [dkt. no. 355-26 thru 27]; Ex. 44, *Brian Munger* [dkt. no. 357-4 thru 9]; Ex. 61, *Frank Thomas* [dkt. no. 361-24 thru 27]; Ex. 62, *Kevin Townsend* [dkt. no.361-28 thru 29]; Ex. 63, *Christopher VanGuilder* [dkt. no. 361-30 thru 32]; Ex. 65, *Curtis Washington* [dkt. no. 361-35 thru 38]; Ex. 68, *Derrick Williams* [dkt. no. 362-16 thru 22]; and Ex. 69, *Dimitri Williams* [dkt. no. 362-23 thru 27].

members who lost their effective medications under MWAP. (Agnew Decl. ¶¶ 25-26.) Defendants' own "directory" demonstrates at least 1,377 instances of patients being denied or discontinued from Neurontin, Ultram, Lyrica, Percocet, and Baclofen when the patients' providers felt they were medically indicated. (Agnew Decl. ¶¶ 19-23, Exs. 1-5.) It is irrefutable that many of the patients who lost their effective medications still require individualized assessments as many of the very patients brought to the attention of Defendants never received them, including named Plaintiffs. As Dr. Gusman testified, he was never told by anyone to reassess his patients after the policy was revoked in February 2021 and replaced with the Management of Chronic Pain policy. (Gusman Depo. at 133:16-135:24.)

**2. Commonality**

Next, a plaintiff seeking class certification must show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A question of law or fact is common to the class if the question is capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Johnson, 780 F.3d at 137 (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350, 131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011)) (citations and internal marks omitted). The common question(s) must generate "common answers apt to drive the resolution of the litigation." Wal-Mart Stores, Inc., 564 U.S. at 350 (internal quotation marks and emphasis omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." Johnson, 780 F.3d at 137 (quoting Suchanek v. Sturm Foods, Inc., 764 F.3d 750, 756 (7th Cir. 2014)). Second Circuit courts have long held that the requirement of common questions of law and fact in prisoner rights class actions when the incarcerated individuals "have a common

interest in preventing the recurrence of the objectionable conduct.  Inmates of Attica Correctional Facility v. Rockefeller, 453 F. 2d 12, 24 (2d Cir. 1971).

Plaintiffs propose that the answers to the following questions go to the heart of this case—(1) whether Defendants, through a policy or practice of discontinuing or denying MWAP medications without individualized assessments based on medical need were deliberately indifferent to the medical needs of Plaintiffs, Plaintiff-Intervenors and other patients in DOCCS' custody; and (2) whether Defendants, through a policy or practice of failing to effectively treat Plaintiffs after discontinuation or denials of MWAPs , were deliberately indifferent to the medical needs of Plaintiffs, Plaintiff-Intervenors and other patients in DOCCS' custody. *See* Butler v. Suffolk County, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the County was aware of and deliberately indifferent to the conditions at the [jail] is a common question subject to class-wide resolution."); McGee v. Pallito, No. 04-cv-335, 2015 U.S. Dist. LEXIS 118690, at *15 (D. Vt. Sept. 4, 2015) (finding "common issue" of whether prison officials' policy amounted to deliberate indifference and observing that "common questions" pertinent to the individual class members "frame the ultimate question of whether the Defendants' policy violates the Constitution"); V.W. ex rel. Williams v. Conway, 236 F. Supp. 3d 554, 575 (N.D.N.Y. 2017) (concluding that common questions included whether the defendants "applied a common course of unlawful conduct to the members of the class and subclass . . . acted with deliberate indifference to the substantial risk of serious harm posed by certain aspects of that common course of conduct," and whether the defendants "have collectively deprived plaintiffs of the education, special services, and related procedural protections to which they are entitled" and that the "common answers to these questions will drive the resolution of the litigation"); Barfield v. Cook, 18-cv-1198, 2019 U.S. Dist. LEXIS

131295, *30 (Conn. Dist. Ct. Aug. 6, 2019)(finding same unconstitutional injury when defendant prison withheld medical treatment).

### 3. Typicality

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Robinson v. Metro-N. Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001) (internal quotation marks and citation omitted). Typicality "requires that the claims of the class representatives be typical of those of the class." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 245 (2d Cir. 2007) (quoting Robinson, 267 F.3d at 155). This requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "[T]he test for typicality is not demanding." Pyke v. Cuomo, 209 F.R.D. 33, 42 (N.D.N.Y. 2002) (internal quotations marks and emphasis omitted). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936-37 (2d Cir. 1993). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936-37. "When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality

is usually met." <u>Stinson v. City of New York,</u> 282 F.R.D. 360, 371 (S.D.N.Y. 2012); *See* <u>14.</u>, 236 F. Supp. 3d at 576 (finding that the plaintiffs carried their burden on typicality, explaining that "the members of the class and subclass share the same legal arguments because their claims are based on the common application of certain challenged policies"). Although "the extent of class members' exposure to the [alleged] conditions and the exact nature of their injuries will necessarily differ from those of the proposed class members, '[t]he representative claims need not be identical to the claims of every class member in order to meet the typicality requirement.'" <u>Butler,</u> 289 F.R.D. at 99 (*quoting* <u>Mazzeitt v. County of Montgomery,</u> 227 F.R.D. 159, 172 (N.D.N.Y. 2005)) (certifying class of pretrial detainees and convicted prisoners in conditions-of-confinement action under Fourteenth and Eighth Amendments); *see* <u>Ebin v. Kangadis Food Inc.,</u> 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (finding typicality where "the lead plaintiffs' and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories").

Plaintiffs and Plaintiff-Intervenors suggest their claims are typical of the classes. Each and every named Plaintiff and Plaintiff-Intervenor lost his effective treatment with MWAP or was denied effective treatment due to the MWAP policy as implemented.[6] Some of the named Plaintiffs

---

[6] *See* Carinci Report: Ex. 4 *Peter Allen* [dkt. no. 348-16 thru 27]; Ex. 8, *Brian Bernard* [dkt. no. 349-10 thru 17]; Ex. 12, *Mark Daniels* [dkt. no. 349-32 thru 42]; Ex. 14, *Shannon Dickinson* [dkt. no. 350-8 thru 32]; Ex. 16, *Aaron Dockery* [dkt. no. 351-1 thru 12]; Ex. 22, *John Gradia* [dkt. no. 352-7 thru 22]; Ex. 25, *Angel Hernandez* [dkt. no. 352-30 thru 38]; Ex. 30, *Claudio Johnson* [dkt. no. 354-15 thru 34]; Ex. 32, *Hugh Knight* [dkt. no. 355-1 thru 25]; Ex. 38, *Terry Mathis* [dkt. no. 356-26 thru 33]; Ex. 43 *Robert Oleman* [dkt. no. 357-14 thru 22]; Ex. 44 *Gary Ortiz* Ex. [dkt. no. 357-23 thru 33]; *Harold Ortiz*[6]; Ex. 45, *Joseph Perez* [dkt. no. 357-34 thru 50]; Ex. 47, *Sean Pritchett* [dkt. no. 358-6 thru 19]; Ex. 48, *Rashid Rahman* [dkt. no. 358-20 thru 30]; Ex. 51 *Roderick Reyes* [dkt. no. 359-10 thru 27]; Ex. 53, *Richard Rivera* [dkt. no. 359-34 thru 41; Ex. 54, *Felipe Rivera-Cruz* [dkt. no. 360-1 thru 8]; Ex. 60, *Wayne Stewart* [dkt. no. 361-18 thru 23]; Ex. 66, *Aditep White* [dkt. no. 362-1 thru 5] and Ex. 68, *Derrick Williams* [dkt. no. 362-16 thru 22]; Second Amended and Supplemental Complaint ("SAC") [dkt. no. 256]; Proposed Complaint-In-Intervention [dkt. no. 344-1].)

and Plaintiff-Intervenors – Peter Allen, Mark Daniels, Robert Oleman, Rashid Rahman, Felipe Rivera-Cruz, and Wayne Stewart -- also still require appropriate reassessments and treatment and have claims typical of the injunctive class.

### 4. Adequacy of Representation

Plaintiffs must also demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiffs['] interests are antagonistic to the interest of other members of the class and 2) plaintiffs['] attorneys are qualified, experienced and able to conduct the litigation." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000). In other words, the plaintiff must be "prepared to prosecute fully the action and have no known conflicts with any class member." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 253 (2d Cir. 2011); Rodriguez v. It's Just Lunch, Int'l, 300 F.R.D. 125, 146 (S.D.N.Y. 2014) ("Because the ultimate merits of Berkowitz's claim are not relevant to determining whether Berkowitz is an adequate class representative, the Court does not—and indeed is prohibited from—evaluating the merits now."); *See* In re Frontier Ins. Grp., Inc. Sec. Litig., 172 F.R.D. 31, 47 (E.D.N.Y. 1997) ("Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." (internal quotation marks and citations omitted)). In order to defeat a motion for certification, however, the conflict must be fundamental." In re Flag Telecom Holdings, Ltd. Securities Litig., 574 F.3d 29, 35 (2d Cir. 2009) (internal quotation marks and citations omitted).

Plaintiffs and Plaintiff-Intervenors argue they are more than able to adequately and fairly represent the class.  Each representative plaintiff has been involved in the case now for several year and there are no known conflicts with the class as a whole or other class members. (Agnew Decl. ¶¶ 11-12.)  Credibility issues are not germane to this matter as each member of the class is a convicted felon with credibility issues.  *See* Jane B. by Martin v. N.Y.C. Dept. of Social Services, 117 F.R.D. 64, 70-71 (S.D.N.Y. 1987)(courts are reluctant to deny class certification based on characteristics or conduct not "arising out of or touching up on the very prosecution of the lawsuit.").

Plaintiffs' and Plaintiff-Intervenors' counsel is also capable of representing the classes and their interests. The principal attorney and firm have experience serving as class counsel and counsel for organizational plaintiffs. (Agnew Decl. ¶¶ 4-5.)  Counsel also have experience with Eighth Amendment prisoner rights cases, including the cultivation of this case for the past four (4) years. (Id. ¶¶ 1, 6-7.)  Counsel has both the financial and staffing resources to fully prosecute the litigation and serve the Plaintiffs and Plaintiff-Intervenors. (Id. ¶¶ 7-10.)

## 5. Ascertainability

The Second Circuit recently clarified that "[t]he ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." In re Petrobras Securities, 862 F.3d 250, 264 (2d Cir. 2017); In re Methyl Tertiary Butyl Ether Products Liability Litigation, 209 F.R.D. 323, 337 (S.D.N.Y. 2002).  Importantly ascertainability is not "an administrative feasibility requirement. . . [It] does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition." (emphasis in original). Petrobras, 862 F.3d at 269. "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some

fundamental way." Ibid. The Circuit expressly "decline[d] to adopt a heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage." Id. at 265. Neither does "[a]scertainability . . . directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23." Id. at 269. The question is not how difficult or practical ascertaining class members will be, but rather if it is "objectively possible." Id. at 270; Royal Park Invs. SA v. Wells Fargo Bank, N.A., No. 17 Civ. 553, 2018 U.S. Dist. LEXIS 9087, (S.D.N.Y. Jan. 10, 2018) (discussing that ascertainability is a "modest threshold requirement;" class was ascertainable although it might be administratively "difficult.")

Here, the class is ascertainable through at least three mechanisms offered by Plaintiffs at this juncture: 1) notice and response; 2) pharmacy records for patients at reception facilities who came into DOCCS on MWAP medications; and 3) the Project Bob database created from DOCCS' MWAP Request form "directory." (Agnew Decl. ¶ 28; Avellino Declaration [dkt. no. 368].)  If a putative class member responds to notice, some effort will have to be expended to confirm membership in the class but not so much that it is objectively impossible.  The pharmacy records and Project Bob database are fairly simplistic means for ascertaining class membership.  The pharmacy records should even be able to show if a patient has had his/her MWAP medications restored and is no longer a potential member of the injunctive class.

## II.    The Liability Class Satisfies the Requirements of Rules 23(b)(1)-(3)

In moving for class certification, once the requirements of Fed. R. Civ. P. 23(a) are satisfied, the plaintiffs must show that the putative classes fall within one of the three categories set forth in Fed. R. Civ. P. 23(b). Here, the liability class satisfies all three categories, and the injunctive class satisfies (b)(2).

### A. Rule 23(b)(1) and (2) Allow Certification of the Liability Class

Fed Rule Civ. P. 23(b) allows for class character if (1) prosecuting separate actions by or against individual class members would create risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests." Fed. Rule Civ. P. 23(b)(1).  Consistency in the adjudication of this case is just as equally important to Defendants as to Plaintiffs.  The allegations of Plaintiffs and Plaintiff-Intervenors in this case clearly implicate the rights of other class members.  If this Court finds that the discontinuation or denial of effective medical treatment without individualized assessments is constitutional, the well-being of absent class members would be in the mix; similarly, any holding which deems almost blanket bans on certain medications because of the risk for abuse or other non-patient specific factors implicates almost every patient in DOCCS' care.  And if the Court does not order injunctive relief to cure the constitutional violations perpetrated and still on-going, many patients may never get relief.  Defendants may also suffer under various orders for injunctive relief all honed toward individual situations and not a comprehensive, DOCCS-wide solution that will create consistency and remedy.

Rule 23(b)(2) is also satisfied as State Defendants' have acted in a consistent manner towards all members of the class such that their actions are clearly part of a pattern and practice common to all class members. *See, e.g.* <u>Abdul-Malik v. Coombe</u>, 96-cv-1021, 1996 U.S. Dist. LEXIS 18203 (S.D.N.Y. Dec. 6, 1996)*(citing* <u>Comer v. Cisneros</u>, 37 F.3d 775, 796 (2d Cir. 1994)).

**B.  Rule 23(b)(3) and/or (c)(4) Allow Certification of the Liability Class**

To gain certification pursuant to Rule 23(b)(3), it is not enough that there is commonality, the commonalities must predominate over any questions affecting only individual members.  In re Petrobras Sec. Litig., 862 F.3d 250, 270 (2d Cir. 2017).  "This predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" Langan v. Johnson & Johnson Consumer Cos., Inc., No. 17-1605, 2018 WL 3542624, at *6, 897 F.3d 88, 2018 U.S. App. LEXIS 20592, at *16 (2d Cir. July 24, 2018) (quoting Mazzei v. Money Store, 829 F.3d 260, 272 (2d Cir. 2016)). The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions can be achieved through generalized proof, and (2) these common issues are more substantial than the issues subject only to individualized proof." Petrobas, 862 F.3d at 270 (internal quotations, citations, and formatting omitted). The distinction between individual and common questions is "central to the predominance analysis." Ibid. The Supreme Court has explained that an "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." Tyson Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045, 194 L. Ed. 2d 124 (2016) (alteration in original) (internal quotation marks omitted).

The predominance requirement is "far more demanding" than the commonality requirement under Rule 23(a), and it is not satisfied "simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 624, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997). "The predominance inquiry mitigates this risk by 'ask[ing] whether the common, aggregation-enabling, issues in the case are *more prevalent or*

*important* than the non-common, aggregation-defeating, individual issues." Petrobras, 862 F.3d at 270 (quoting Tyson Foods, 136 S. Ct. at 1045). For this reason, courts must give "careful scrutiny to the relation between common and individual questions in a case." Id. at 1045.  "This analysis is more . . . qualitative than quantitative and must account for the nature and significance of the material common and individual issues in the case." Petrobras, 862 F.3d at 271 (internal quotation marks and citation omitted).  In making this determination, the district court should assess all of the relevant evidence admitted at the class certification stage and resolve material factual disputes. Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.), 471 F. 3d 24, 42 (2d Cir. 2006).

The Second Circuit has noted that where plaintiffs are "allegedly aggrieved by a single policy of the defendants'" and there is a strong commonality of the violations and the harms, this is "precisely the type of situation for which the class action device is suited." Brown v. Kelly, 609 F.3d 467, 484 (2d Cir. 2010)  (quoting In re Visa Check/MasterMoney Antitrust Litig., 280 F. 3d 124, 146 (2d Cir. 2001)(affirming district court's finding that common issues predominated in a class action challenging the defendants' continued enforcement of an unconstitutional loitering law); Hill v. Cty. of Montgomery, 14-cv-0933 (BKS/DJS), 2018 U.S. Dist. LEXIS 140305, *43-44 (N.D.N.Y. Aug. 20, 2018)(finding common questions regarding conditions of confinement predominated over prisoner-specific issues regarding amount of injury or alternative causes); MacNamara v. City of New York, 275 F.R.D. 125, 146 (S.D.N.Y. 2011)(finding common liability issues predominated over individual issues when class status was based on defendants' policy or practice of conducting mass arrests); Dodge v. County of Orange, 226 F.R.D. 177 (S.D.N.Y. 2005)(certifying class of prisoners pursuant to Rule 23(b)(3) because the issue common to the class was the existence of a blanket strip search policy).

Further, the fact that Defendants may have individual defenses does not preclude a finding of predominance. "[A]lthough 'a defense may arise and may affect different class members differently, [this] does not compel a finding that individual issues predominate over common ones.'" Brown v. Kelly, 609 F.3d at 485 (quoting Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461 F. 3d 219, 225 (2d Cir. 2006)) (affirming finding of predominance in class action challenging blanket strip search policy "[i]n light of the pervasive character of the common liability issues and the admittedly *de minimis* nature of individualized liability issues," concerning whether the search of some of the plaintiffs was justified by reasonable suspicion)). If the Court finds there was an unconstitutional scheme to eradicate certain medications from New York State prisons regardless of patient need and this act caused injury, there is predominance. It does not then matter which patient lost which drug on which date and how it affected him/her.

The Second Circuit has also held that "a court may employ Rule 23(c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement. In re Nassau County Strip Search Cases, 461 F. 3d at 223. A court may use subsection (c)(4) to single out issues for class treatment when the action as a whole does not satisfy Rule 23(b)(3). *See* 7AA Wright & Miller, Federal Practice & Procedure § 1790 (3d ed. 2005) (stating that subsection (c)(4) "best may be used to designate appropriate classes or class issues at the certification stage" so that "the court can determine whether, as so designated, the other Rule 23 requirements are satisfied"); 6 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 18:7 (4th ed. 2002) ("Even cases which might not satisfy the predominance test when the case is viewed as a whole may sometimes be certified as a class limited to selected issues that are common, under the authority of Rule 23(c)(4).").  Rule 23(c)(4) provides as follows:

> When appropriate (A) an action may be brought or maintained as a class action *with respect to particular issues*, or (B) a class may be divided into subclasses and each subclass treated as a class, *and* the provisions of this rule shall *then* be construed and applied accordingly.

Fed. R. Civ. P. 23(c)(4) (emphases added).  As the rule's plain language and structure establish, a court must first identify the issues potentially appropriate for certification "and . . . then" apply the other provisions of the rule, *i.e.*, subsection (b)(3) and its predominance analysis. *See* Gunnells v. Healthplan Servs., 348 F.3d 417, 439 (4th Cir. 2003)(reasoning that the rule's language provides this "express command" that "courts have no discretion to ignore").

## III.    The Injunctive Class Satisfies the Requirements of Rule 23(b)(2)

As an initial matter, Rule 23(b)(2) was intended to assist litigants seeking wide-spread institutional reform through injunctive and/or declaratory relief. See Marisol A., 929 F. Supp. at 692. In fact, several courts have found that Rule 23(b)(2) will generally be satisfied in cases where injunctive relief is sought and would benefit the entire class. *See e.g.,* Boucher v. Syracuse Univ., 95-cv-0620, 1996 U.S. Dist. LEXIS 8395, at *3 (N.D.N.Y. June 12, 1996); Brown v. Giuliani, 158 F.R.D. 251, 269 (E.D.N.Y. 1994); Non-Traditional Employment for Women v. Tishman Realty and Const. Corp., 88-cv-4620, 1989 U.S. Dist. LEXIS 10224, *4 (S.D.N.Y. Sept. 19, 1989)("Since defendants have allegedly acted 'on grounds generally applicable to the class' and the court finds injunctive relief appropriate should plaintiffs prevail on their claims, plaintiffs have satisfied Rule 23(b)(2).")

And to nip in the bud any suggestion that the Galvan Rule might thwart certification of an injunction class, Plaintiffs offer that Defendants have had ample opportunity to reassess patients after rescission of the MWAP Policy and its replacement with Health Services Policy 1.24A, "Prescribing for Chronic Pain."   Galvan v. Levine, 490 F.2d 1255, 1261-62 (2nd Cir. 1973). (Agnew Decl. Ex. 43 [dkt. no. 367-45].)  As will be briefed in Plaintiffs' motion for injunctions,

the "relief" offered by the new policy has only helped a small subset of putative class members. Because the new policy's adoption was not coupled with other reform measures, including but not limited to communicating with pain management specialists who still operate under the impression certain medications are not available, the new policy has just amounted to a new piece of paper providers have not read. (*See* Agnew Decl. Ex. 41, Deposition of Dr. Aathirayen Thiyagarajah ("Thiyagarajah Depo.") 30:9-17; 47:10-17; 49:21-50-16.)  Even taking COVID delays into account, it has been almost a year and a half since the "reassessments" started in October and November of 2020.  Far too many of the already identified putative class members have still not received MWAP medications recommended by specialists and/or never received a reassessment. For instance, named Plaintiff Wayne Stewart never received a reassessment at all. (See Carinci Ex. 60 [dkt. no. 361-18 thru 23].)  In late 2020, Dr. Win reassessed Mark Daniels and said he could receive MWAP treatment "if neurosurgery recommend." (Carinci Report Ex. 12 [dkt. no. 349-38].) Dr. Dalfino did recommend Neurontin at the next appointment. (Id. at 189, 196.) Dr. Holder, an orthopedic surgeon, also recommended Neurontin thereafter.  (Id. at 198.)  Yet, Mark Daniels still does not have the medication and is still in pain.  (Id. at 201, 203.) Curtis Washington suffered the same fate.  Dr. Burke reassessed him and noted that he would benefit from an MWAP, but he never received it.  (Carinci Report Ex. 65 at 130, 131-147 [dkt. no. 361-37].)[7]  Alonzo Jacobs was sent to pain management expert, Dr. Charles Argoff, who recommended a low dose opioid. (Carinci Report Ex. 29 at 265 [dkt. no. 354-11].)  Mr. Jacob's provider, Nurse Practitioner Mary Ashong, instead, prescribed him nothing because there was "no medical indication for opioids or Neurontin." (Id. at 269.)  Yet, when deposed it was clear that Ms. Ashong does not even know

---

[7] Mr. Washington was released recently and immediately had his MWAP treatment reinstated by an outside doctor.  The records will be produced to Defendants' counsel as soon as they arrive.

what Neurontin does for patients, nor did she know why the specialists had repeatedly recommended treatment. (Agnew Decl. Ex. 35, Deposition of Mary Ashong ("Ashong Dep.") [dkt. no. 367-42].)

Patients are also still having effective MWAP medication stopped for non-medical reasons without even counseling or a discussion. Dr. Ruiz at Woodbourne summarily discontinued Mr. Johnson's Neurontin upon his transfer in August of 2021. (*See* Carinci Report, Ex. 30 at 585 [dkt. no. 354-22], 590-592 [dkt. no. 354-23]; *see also* dkt. nos. 304, 306 – 308.)  Dr. Bentivegna, at Green Haven, discontinued Mr. Oleman's Lyrica four days after prescribed in April of 2021 because Oleman discarded a pill and "whether diversion or carelessness the behavior is a threat to safety and good order in the facility.") (Carinci Report Ex. 43 at 123-124, 125 [dkt. no. 357-16].) There have been several other instances even since the new policy came out that supposedly demands medications should not be discontinued unless a patient sits down with his/her provider to discuss the issues. (Agnew Decl. Ex. 43, Policy 1.24A "Treatment of Chronic Pain" at 2 [dkt. no. 367-50].)

The necessary injunctive relief in this case cannot amount to a one-page piece of paper to address the on-going constitutional violations.  A wholesale effort must take place marrying education, true reassessments based on review of patient charts, true education on pharmaceutical medicine, implicit bias training and some serious supervision to ensure that follow through occurs for each and every patient requiring treatment.  Even with a list of victims and a veritable road map for addressing the constitutional violations, Defendants have failed to cure the violations.

**CONCLUSION**

For the foregoing reasons, Plaintiffs and Plaintiff-Intervenors respectfully respect that the Court certify the classes.


Dated:  May 19, 2022
        Saltaire, New York


                              **LAW OFFICE OF AMY JANE AGNEW, P.C.**


                                        By:  /s/ AJ Agnew
                                        Amy Jane Agnew, Esq.
                                        Josh Morrison, Esq.
                              *Counsel for Plaintiffs and Plaintiff-Intervenors*
                                        24 Fifth Avenue, Suite 1701
                                        New York, New York 10011