```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PETER ALLEN, et al.,

 4                 Plaintiffs

 5         v.                           19 Civ. 08173 (LAP)
                                        Remote Teleconference
 6
     NEW YORK STATE DEPARTMENT OF
 7   CORRECTIONS AND COMMUNITY
     SUPERVISION, et al.,
 8
                  Defendants
 9
     ------------------------------x
10                                      New York, N.Y.
                                        December 23 2022
11                                      10:00 a.m.

12   Before:

13                    HON. LORETTA A. PRESKA
                                        District Judge
14
                          APPEARANCES
15
     LAW OFFICE OF AMY JANE AGNEW PC
16        Attorneys for Plaintiffs
     AMY JANE AGNEW
17   JOSHUA L. MORRISON

18   WHITEMAN OSTERMAN & HANNA LLP
          Attorneys for Defendant Moores
19   ORIANA L. KILEY
     WILLIAM S. NOLAN
20
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
21        Attorneys for Defendant New York State
     MICHAEL KEANE
22   IAN RAMAGE

23

24   CONWAY DONOVAN & MANLEY PLLC
          Attorneys for Non-State Defendants
25   RYAN MANLEY
     ROBERT TIETJEN
```

2

1              (The Court and all counsel appearing via remote

2    teleconference)

3              THE COURT:  Good morning, counsel.

4              Thank you for being on this morning.

5              Who is on for plaintiffs, please?

6              MS. AGNEW:  Good morning, your Honor.  AJ Agnew here,

7    along with Josh Morrison.

8              THE COURT:  Good morning, counsel.

9              Who is on for the state representative defendants,

10   please?

11             MR. KEANE:  Michael Keane, your Honor, and Ian Ramage.

12   Good morning.

13             THE COURT:  Good morning, counsel.

14             Who is on for Dr. Moores?  I'm sorry, Ms. Kiley, was

15   that you?

16             MS. KILEY:  Yes, your Honor.  Oriana Kiley and Will

17   Nolan for Dr. Moores.

18             THE COURT:  Thank you, counsel.

19             Anybody else who wishes to be identified on the

20   record?

21             MR. MANLEY:  Good morning, your Honor.  Ryan Manley

22   and Robert Tietjen on behalf of the non-state representative

23   defendants.  Good morning.

24             THE COURT:  Thank you.

25             Is the court reporter on, please?

```
1              (Replies)
2              THE COURT:  Counsel, first off, shall we discuss
3    Mr. Dockery and Mr. Lopez, please.
4              As you know, in Ms. Agnew's letter dated December 20,
5    Docket No. 487, Mr. Dockery alleged that one of the nurses
6    attempted to put a previously used flashlight in his mouth, it
7    having been used in other inmates mouths, and was disciplined
8    and had his medication cut off because of that.
9              Mr. Lopez had been on gabapentin, which, as I
10   understand it, is an anticoagulant used to control seizures and
11   relieve nerve pain, and my understanding is based on Docket
12   Entry 256 at page 17.  Gabapentin was restored to Mr. Lopez in
13   September of '22.  But upon his transfer to Fishkill, the
14   medication was terminated, apparently based on a study of
15   inmates in Florida diverting gabapentin.  That's what I
16   understand the allegation to be.
17             May I look to our state folks to tell us what their
18   position is?
19             MR. KEANE:  Your Honor, Michael Keane for the state
20   representative defendants.
21             The issues with respect to both Mr. Dockery and
22   Mr. Lopez are specific to those facilities and individual
23   medical providers at those facilities.  We do not represent
24   those facilities.  We do not represent those individuals who
25   are identified.  And when we hear about complaints from
```

1   incarcerated individuals with respect to this lawsuit, we

2   forward those complaints to the appropriate DOCCS personnel;

3   and we would point out that that has been done.  And beyond

4   what efforts we made to notify them of the issues that have

5   arisen, we can't speak any more to those issues.

6           THE COURT:  Counsel, the reason you were notified that

7   these individuals' cases were going to be discussed is so that

8   you could do what you did, and then report back to us what

9   DOCCS' position is as to the facts on the ground.  So what have

10  you heard -- that's why you got noticed.  That's why you were

11  told we were going to discuss this today.  What have your

12  people reported back to you?

13          MR. KEANE:  What we know is that they have been

14  looking into the issues.  We don't have any further report to

15  make.  We do not represent --

16          THE COURT:  Okay.  Then I need a report by this

17  afternoon at 3:00.  Whatever you have to do, you have to do.

18  The allegations in this case relate to medical treatment with

19  these kinds of drugs at DOCCS' facilities.  If you can't tell

20  me what's going on, then who can?  We need a report by 3:00.

21  We will get back on the phone this afternoon at 3:00.  Any

22  questions?

23          MR. KEANE:  No, your Honor.  We will --

24          THE COURT:  All right.

25          Second, I just looked at Ms. Agnew's letter of

1    December 23 Docket Entry 493.  In it, she alleges that the

2    position of the chief medical officer and the various regional

3    medical directors at DOCCS is that no one of them had custody

4    and control over the responsive medical records.

5            Is that in fact your position, counsel?  And, if so,

6    who's got custody?  Who wants to speak to that one?

7            MR. NOLAN:  Your Honor, this is Will Nolan for

8    defendant Moores.  With respect to Dr. Moores, we are not

9    taking the position that nobody has custody.  We certainly have

10   custody of some of these records.  They will be produced, as

11   we've indicated in our responses.  There are a few records

12   which we think we just need to confer with Ms. Agnew on before

13   we make sure we understand exactly what she's looking for to

14   produce, and the ones we do not have in our possession, we've

15   identified.

16           THE COURT:  Why do you -- which ones -- counsel, which

17   ones do you not have in your possession?

18           MR. NOLAN:  Those that are simply identified in our

19   responses.  If we want to go through --

20           THE COURT:  Counsel, give me a preview, why do you not

21   have them in your possession if they're medical records

22   relating to DOCCS' inmates?

23           MR. NOLAN:  I don't think we're taking the position

24   that medical records are not in our possession.  Certainly

25   medical records are in our possession.  There are documents

1   Ms. Agnew has claimed we have not produced, or we don't have

2   custody of them, we have specifically identified in our

3   responses but those are not medical records.  Medical records

4   have and will continue to be produced so that should not be an

5   issue at all.

6           THE COURT:  Ms. Agnew.

7           MS. AGNEW:  So, your Honor, forgive me, they've

8   listed -- in response to a number of my requests, they have

9   said that Defendant Moores does not have them in her custody

10  and control.  They are not medical records in the sense that

11  they are part of a patient's AHR.  These are documents created

12  by the medical department, such as non-formulary audit

13  documents, inner utility review nurse documents.  These are all

14  documents that defendant Moores has relied on in signing his

15  sworn declaration to this Court.  As we discussed at our last

16  conference, we are certainly entitled to those if they were the

17  bases of audits that she's relied upon.  I understand that they

18  want to have a meet and confer, but their responses to me were

19  that they were not in the custody and control of defendant

20  Moores.

21          MR. NOLAN:  That's not true.

22          THE COURT:  Counsel.  Counsel.  Counsel.  Counsel,

23  forgive me.  That was my fault.  I was banging on my phone

24  trying to get attention and apparently they thought it was a

25  request for assistance, so forgive me.

1          My question to you, Mr. Keane, is, I thought we did

2     this a conference ago where we talked about the various

3     documents that Dr. Moores discussed in her declaration, and

4     those were ordered to be produced.  How can they not be in her

5     possession and control now?  What does that mean?

6          MR. NOLAN:  We are not taking that position.  In fact,

7     with respect to the non-formulary requests mentioned by

8     Ms. Agnew, we specifically agreed to produce those.  The only

9     reason they have not been produced is because to the extent we

10    do not have certain medical releases on file.  We have to go

11    through redacted names of those individuals.  We are doing

12    that, and we are in the process of doing that.  We are going to

13    produce them and we have identified a specific date by which

14    they will be produced.  So I'm not sure why the -- you know,

15    this is the reason we think a meet and confer would be very

16    productive because I don't think there really is a dispute

17    here, Judge.

18          THE COURT:  The question that -- go ahead, Ms. Agnew.

19          MS. AGNEW:  Your Honor, I put this on ECF last night.

20    It's document 492 and 492-1, your Honor.  Those are their

21    responses in response to --

22          THE COURT:  I saw that.

23          MS. AGNEW:  They say it over and over, she does not

24    have custody and control.  I'm not really sure what to do with

25    it.  They're telling me she doesn't have custody and control.

1    I'm telling you certainly she does.  She's the chief medical

2    officer, and they need to be produced.

3           MR. NOLAN:  Like I said, we can go through these one

4    by one --

5           THE COURT:  Mr. Keane.  Mr. Keane.

6           MR. NOLAN:  This is Mr. Nolan.  This is not Mr. Keane.

7           THE COURT:  I'm so sorry.  Forgive me.

8           Mr. Nolan, what is the meaning of that portion of the

9    response that says certain documents are not within Dr. Moores'

10   custody and control?  What documents does that refer to?

11          MR. NOLAN:  With respect to which request, your Honor?

12          THE COURT:  Each of them.  There are several, as I

13   read the response that I believe is Exhibit two or B, whatever,

14   to Ms. Agnew's December 23 letter.  It seemed that there were

15   multiple responses that said that the documents were not in

16   Dr. Moores' custody and control.

17          MR. NOLAN:  To the extent that we have said that, that

18   would mean that Dr. Moores and her staff, the people she

19   controls, has the ability to obtain, that we do not have those

20   documents or they've already been produced.

21          THE COURT:  If it's already been produced, then you

22   have to say that.  That's not the same as not within our

23   control, number one.  Number two --

24          MR. NOLAN:  That's why I asked for specific --

25          (Reporter inquires; then accidentally disconnects)

1          THE COURT:  Mr. Nolan, why don't you start that one

2    again.  The response with respect to request number 77.  And

3    when you read it, read it like someone is trying to take it

4    down, okay?

5          MR. NOLAN:  Of course.

6          So request 77 asks for us to produce documents,

7    communications, emails, memorandums that relate to and/or

8    memorialize the establishment of an auditing system conducted

9    by Drs. Moores and Khan pursuant to the description in the

10   Moores' declaration at paragraph 36.

11         Okay.  There are documents establishing such a system,

12   and that speaks for itself.  If they existed, we produced them.

13   They don't.  That's one category --

14         THE COURT:  Okay.  Mr. Nolan.  Then the response to

15   that is:  There are no responsive documents.  The response is

16   not:  The documents are not within Dr. Moores' custody on

17   control, right?

18         MR. NOLAN:  Okay.  I am happy to adjust the response,

19   but surely we're only required to produce documents that we can

20   control.

21         THE COURT:  Counsel, you are not listening to me.  If

22   there are no such documents, that is the response.  If there

23   are such documents, and they are not within Dr. Moores' custody

24   or control, that's the response.  Those are two different

25   responses addressing two different factual situations.  Do we

1      understand each other?

2              MR. NOLAN:  I understand you, Judge.  We are happy to

3      make that change.

4              THE COURT:  Okay.  Next, I think I heard you say that

5      you are going to produce all of the medical records, et cetera,

6      et cetera.  And I think I heard you say you had specified a

7      date by which they would be produced.  Ms. Agnew says you

8      didn't provide a date by which responsive documents would be

9      produced.

10             MS. AGNEW:  That's my mistake, your Honor.  It was

11     state defendants who did not provide a date specific.

12     Defendant Moores did provide a date of January 31 for those

13     documents she is going to produce, and I appreciate that.

14             THE COURT:  Okay.  Mr. Keane, what's the question

15     here?  Why have we not said when we are producing our

16     documents?

17             MR. KEANE:  And, your Honor, the reason for the lack

18     of specificity about the date is we don't know how soon we can

19     do it.  We are well under way, we think, and it could be two

20     weeks, and it could be longer than that.  We just don't want to

21     set up a hard deadline and set ourselves up to fail.

22             THE COURT:  Counsel?  Counsel?

23             MR. MANLEY:  Yes, your Honor?

24             THE COURT:  Do you think you are different from any

25     other party in that regard?  Have you read Federal Rule of

1    Civil Procedure 34(b)(2)(B)?

2             MR. MANLEY:  No, your Honor, and we can provide a

3    date.  I attempted to call Ms. Agnew yesterday -- she didn't

4    pick up -- to discuss what our timetable was because we think

5    January 31 is probably a reasonable timeframe within which it

6    can be done.  We just don't want to disappoint.  And we are not

7    different from any other party.

8             THE COURT:  All right.  January 31 it is.

9             How about a privilege log, counsel?

10            MR. KEANE:  For state representative defendants, your

11   Honor, to the extent that our review generates privileged

12   materials, we will certainly identify anything withheld on that

13   privilege log.

14            THE COURT:  Okay.  The privilege log is to accompany

15   your response, right?  How does counsel know what the situation

16   is with respect to privilege if there's not a log?  Okay.  Two

17   weeks after the first of the year, whatever that date is,

18   privilege logs.  Do we understand each other?

19            MR. KEANE:  Yes, your Honor.

20            THE COURT:  Thank you.

21            And Mr. Nolan -- yes?

22            MR. NOLAN:  I was just going to ask, we had raised

23   privilege on, I believe, two of the requests, and we're happy

24   to provide a log on that, if necessary.  There is only a

25   handful of privileged documents so far that we've located.  And

1    we'll provide one for any other documents, if there are others.

2    The question I have for you, your Honor, and for Ms. Agnew as

3    well, is, do we want to have a situation here where we are

4    going to be agreeing to those privilege logs for all post

5    litigation communications, which is a burdensome and difficult

6    thing for all the parties to do.  We are happy to do that.  We

7    just request that all parties be required to produce them.

8                THE COURT:  Ms. Agnew.

9                MS. AGNEW:  Your Honor, I always produce a privilege

10   log for everything, and I would expect the same of my

11   adversary.

12               THE COURT:  All right.  You heard it, friends.  It

13   does make sense.  How are your opponents supposed to know what

14   the situation is if there is no privilege log, right?

15               MR. NOLAN:  Fair enough.

16               THE COURT:  These are not surprises.  This is in the

17   rules, right?

18               Again, January 14 or thereabouts.

19               Have we finished with discovery, friends?

20               MS. AGNEW:  I believe we have, your Honor.  Just to

21   clarify, I'm going to have a meet and confer with Mr. Nolan and

22   Ms. Kiley this afternoon at their convenience.

23               THE COURT:  Yes, please.  And I want to go back and

24   talk to you at 3:00 to find out what the situation is with

25   Mr. Dockery and Mr. Lopez.

1          MS. AGNEW:  Just so it's very clear, I did communicate

2     with Mr. Dockery and his mother last night.  His medications

3     have not been restored.  As of a day ago, we talked to the

4     nursing staff at Fishkill, and Mr. Lopez is also not receiving

5     any medication.

6          THE COURT:  All right.  I guess if there is an update,

7     we'll hear it at 3:00.  All right, counsel.

8          MR. KEANE:  Your Honor?  I'm sorry.  Michael Keane for

9     state representative defendants.  Just to be clear, we at the

10    Attorney General's Office represent the regional medical

11    directors.  We do not represent DOCCS.  And to the extent that

12    your Honor wishes an update this afternoon on the status of

13    Mr. Dockery and Mr. Lopez, it would seem that since we don't

14    represent DOCCS, it is perhaps not appropriate for us to be

15    inquiring into that.

16          Does your Honor intend to direct Dr. Moores, for

17    example, to look into the situation or if --

18          THE COURT:  It seems to me that the chief medical

19    officer or the regional medical directors would be in a

20    position to inquire about the status of two of the inmates

21    under their supervision.  So whether it's Dr. Moores or the

22    regional medical directors, I don't care, but be on the phone

23    at 3:00 to give a report.  It will be the same dial-in number.

24    There is no reason why -- yes?

25          MS. KILEY:  If I could just make a note on behalf of

1   Dr. Moores?  This is Ms. Kiley.

2          THE COURT:  Yes, ma'am.

3          MS. KILEY:  I was able to touch base with Dr. Moores

4   yesterday -- excuse me -- the day before to inquire about

5   Mr. Dockery and Mr. Lopez.  She is unavailable for personal

6   reasons today -- yesterday and today and till next week.  So to

7   the extent that there is an expectation that Dr. Moores can

8   offer an update, she cannot.  She is out for personal reasons

9   at the moment.  But I did ask --

10          THE COURT:  Counsel.  Go ahead.

11          MS. KILEY:  I did also just want to put out, I

12   understand that the Court stated earlier on this call the

13   allegations in the case have to do with this type of medical

14   treatment.  However, the way we see it, your Honor, the second

15   amended complaint has to do with medications that were

16   discontinued because of a policy.  Respectfully, nothing in

17   Ms. Agnew's letter indicates that Mr. Dockery's or Mr. Lopez's

18   medications were discontinued because of a policy.  There were

19   the reasons for it.  It just appears that it seems we disagree

20   with that reason.  I'm happy to speak in detail about how the

21   Court sees fit.  I just wanted to keep things in perspective,

22   your Honor.  This case is about the MWAP policy that was in

23   place from 2017 to 2019.  The MWAP policy doesn't exist, and no

24   medications are being denied because of the policy.  There has

25   been no proof submitted to support that.

1          THE COURT:  I am well aware of what the case is about,

2     counsel.

3          Two things:  Number one, everybody is out for personal

4     reasons during this time period.  I assume Dr. Moores has a

5     deputy who is in charge of her absence.  I expect inquiry to be

6     made as to the current status of the medications of these two

7     inmates and to get a report this afternoon at 3:00.  The fact

8     that all of us take time off does not mean that folks who can't

9     take time off from incarceration don't get their medication.

10         Secondly, I am well aware, and actually am going to

11    address in a moment the allegations of the second amended

12    complaint.  But I will just observe, counsel, that the

13    allegations made by Mr. Dockery and Mr. Lopez mirror the

14    allegations that have been set forth in the first amended

15    complaint and the second amended complaint throughout the

16    pendency of this litigation.  Essentially among the allegations

17    are that the previously designated MWAP medications have been

18    discontinued for arbitrary and capricious reasons having

19    nothing to do with the individual inmate's medical situation.

20    These where we are.  I will expect a report at 3:00.

21         Second, I've reviewed the submissions of the parties

22    regarding the defendants 12(b)(1) motion to dismiss for lack of

23    subject matter jurisdiction, and the plaintiffs' motion for

24    preliminary injunctions.  I will now make certain findings

25    based on the papers and then discuss the need for an

1    evidentiary hearing on outstanding questions of fact.

2           Counsel, with your permission, in certain places as we

3    go through this, I would like to just say "citation," and I

4    will send to the court reporter my written notes so that she is

5    able to insert the appropriate citation at the appropriate

6    point without my prolonging the proceedings by reading that.

7           Is there any objection to that from counsel?

8           MS. AGNEW:  No, your Honor.

9           MR. NOLAN:  No, your Honor.

10          MS. KILEY:  No, your Honor.

11          THE COURT:  Thank you.

12          The defendants' challenges to the plaintiffs' second

13   amended complaint concern the procedural history of the case.

14          You will recall that in the first amended complaint,

15   plaintiffs challenged a DOCCS policy regarding medications with

16   abuse potential ("MWAP policy") under 42 U.S.C. Section 1983.

17   Plaintiffs allege that as applied, the MWAP policy resulted in

18   deliberate indifference to serious medical needs of prisoners

19   violating the Eighth Amendment's prohibition against wanton

20   infliction of pain.

21          On December 14, 2020, plaintiffs moved to amend their

22   first amended complaint.

23          In February of 2021, DOCCS rescinded the MWAP policy

24   and promulgated Health Services Policy Number 1.24A –

25   prescribing for chronic pain, which I refer to as Policy 1.24A.

1    In June 2021, the Court granted the plaintiffs leave
2 to file a second amended complaint, and plaintiffs filed their
3 second amended complaint later that month.  (docket No. 256)

4    On May 20, 2022, plaintiffs filed a motion for
5 preliminary injunction.  (Docket No. 373)

6    Based on these facts, the defendants argue:

7    1.  The Court lacks jurisdiction over plaintiffs'
8 motion for preliminary injunction because it is based on
9 allegations that were not made in the second amended complaint.

10    See Memorandum of Law in Opposition to Motion for
11 Injunctive Relief, Dkt. No. 449 at 7, filed Nov. 15, 2022
12 ("Opp. to Injunction").

13    2.  The Eleventh Amendment bars plaintiffs from suing
14 DOCCS because plaintiffs have alleged a past violation of
15 federal law rather than an ongoing violation.

16    See SRDs' Supp. Memo. at 17-18; Opp to Injunction at
17 7; Reply Memorandum of Law in Further Support of Defendants
18 Rule 12(b)(1) Motion to Dismiss Plaintiffs' Second Amended
19 Complaint, Dkt. No. 448 at 19, filed Nov. 15, 2022.

20    3.  Plaintiffs fail to establish causation under
21 Section 1983 because they fail to present evidence that Policy
22 1.24A or its attendant procedures are "the moving force" behind
23 any ongoing constitutional violation.

24    See Opp. to Injunction at 7.

25    4.  Plaintiffs do not demonstrate an Eighth Amendment

1    violation against Dr. Moores.

2              See Opp. to Injunction at 7.

3              5.  DOCCS' promulgation of Policy 1.24A moots

4    plaintiffs' claims for injunctive relief under the voluntary

5    cessation doctrine.

6              See SRDs' Supp. Memo at 14-17; 12(b)(1) Reply Memo at

7    11 and 15.

8              6.  Plaintiffs cannot meet the preliminary injunction

9    requirement of imminent, irreparable harm because the

10   allegations concern past instances of inadequate pain

11   treatment.

12             See Opposition to Injunction at 7.

13             Contrary to defendants' first argument, the Court has

14   jurisdiction over plaintiffs' motion for preliminary

15   injunction.

16             Defendants argue that because DOCCS replaced MWAP with

17   Policy 1.24A, plaintiffs' allegations in the second amended

18   complaint concerning the MWAP no longer sufficiently support

19   their claim.  See Opp. to Injunction at 15.

20             At the same time, defendants fault plaintiffs for

21   improperly alleging a new claim for the first time in their

22   motion papers -- that Section 1.24A is unconstitutional and

23   gives rise to deliberate indifference because it failed to spur

24   sweeping changes.  Id. at 16.

25             However, plaintiffs have sufficiently alleged that

1    DOCCS's deliberate indifferent is ongoing, regardless of the

2    change in policy from MWAP to Policy 1.24A.  The updated facts

3    and arguments that plaintiffs include in their motion papers

4    are evidence of the ongoing nature of the allegations contained

5    in the second amended complaint.  The Court also observes that

6    the allegations with respect to Inmates Dockery and Lopez

7    (already discussed this morning) are also evidence of ongoing

8    violations.  Accordingly, because plaintiffs' motion is based

9    on ongoing conduct in line with that alleged in the second

10   amended complaint, the Court has jurisdiction over plaintiffs'

11   motion.

12              Separately, Dr. Moores' letter dated December 20,

13   (Dkt. No. 486) asserted that plaintiffs' reply submissions

14   improperly raise new factual matters and new theories against

15   non-parties.

16              However, Dr. Moores raised the issue of certain

17   inmates' current health status in her declaration (¶¶ 87-89,

18   92, 95 and 96).  Therefore, the Court finds that plaintiffs'

19   reply submissions are appropriate.

20              Defendants' second and third argument regarding the

21   Eleventh Amendment and Section 1983 causation falter on similar

22   grounds.

23              First, because plaintiffs have sufficiently alleged

24   ongoing constitutional violations, the Eleventh Amendment does

25   not bar plaintiffs' suit against DOCCS.

1          Because plaintiffs have sufficiently alleged that the

2    constitutional violations resulting from the MWAP policy

3    continue despite the promulgation of Policy 1.24A, plaintiffs

4    meet the causation element of Section 1983.

5          Contrary to defendants' fourth argument, plaintiffs do

6    not have to so that Dr. Moores had personal involvement in the

7    Eighth Amendment violation.  To be granted injunctive relief,

8    plaintiffs must only show that Dr. Moores has responsibility

9    for the alleged violations.  And the Court finds that

10   plaintiffs have indeed shown that.

11         Finally, defendants argue that the promulgation of the

12   Policy 1.24A moots plaintiffs' claims and that plaintiffs

13   cannot show the irreparable harm necessary to support a

14   preliminary injunction because the constitutional violations

15   have ceased.  Meanwhile, plaintiffs assert, first, that any

16   deprivation of a constitutional right is irreparable injury;

17   and, second, that the constitutional violations that resulted

18   from the MWAP policy persist despite Policy 1.24A.

19         Accordingly, to resolve this disputed issue of fact,

20   the parties shall appear for an evidentiary hearing beginning

21   on February 6 of 2023.  At that hearing, the parties shall

22   offer evidence as to:

23         1.  Whether the conduct complained of has, in fact,

24   ceased;

25         2.  Whether there is a reasonable expectation that

1    violations will reoccur; and

2                3.   Whether policy 1.24A has completely and

3    irrevocably eradicated the effect of the MWAP policy.

4                Counsel, I will ask you to confer with each other and

5    we will give you a date approximately a week before February 6

6    for a conference to discuss exactly how long this will take,

7    which witnesses will be called, whether they will be in person

8    or remote, and the like.

9                Is there anything else today, counsel, before we get

10   to our 3:00 call?

11               MS. AGNEW:  Not from plaintiffs, your Honor.

12               MR. KEANE:  Not from state defendants, your Honor.

13               MS. KILEY:  Not for Dr. Moores.

14               THE COURT:  Thank you.

15               The non-state representative defendants?

16               MR. MANLEY:  Nothing from us, your Honor.  Thank you.

17               THE COURT:  Thank you.  Ms. Reporter, we will send you

18   the notes from which the citations come.

19               Thank you, ladies and gentlemen.  I'll see most of you

20   at 3:00 on the same call-in number.  Thank you.

21               (Adjourned until 3:00 p.m.)

22               THE COURT:  Good afternoon, counsel.  Who do we have

23   on for plaintiffs, please?

24               MS. AGNEW:  Good afternoon, your Honor.  AJ Agnew, and

25   Mr. Morrison is with me as well, for plaintiffs.

1              THE COURT:  Good afternoon.

2              Who do we have on for Dr. Moores?

3              MS. KILEY:  Good afternoon.  Oriana Kiley.

4              THE COURT:  Ms. Kiley, good afternoon.

5              MR. NOLAN:  And will Nolan.

6              THE COURT:  Yes, sir.  Good afternoon, Mr. Nolan.

7              Do I have state representative defendants?

8              MR. KEANE:  Michael Keane from the Attorney General

9    Office.  Good afternoon.

10             THE COURT:  Good afternoon, sir.

11             MR. RAMAGE:  And Ian Ramage from the Attorney General

12   too.

13             THE COURT:  Mr. Ramage, good afternoon.

14             Non-state defendants?

15             MR. MANLEY:  Good afternoon, Judge.  Ryan Manley.

16             THE COURT:  Mr. Manley, good afternoon.

17             Is the court reporter on?

18             (Replies)

19             THE COURT:  Ladies and gentlemen, what do we know

20   about our two patients?

21             MS. KILEY:  Your Honor, this is Oriana Kiley for

22   Dr. Moores.  For Mr. Dockery, we have learned that he's not

23   presently receiving medication because he has on several

24   occasions refused to comply with a mouth check procedure which

25   is where a nurse would check to be sure that the pills have

1   actually been swallowed.  This is a standard procedure for any

2   medication where there is a risk of abuse or diversion.  As a

3   result of his noncompliance, his medication was discontinued.

4   Medical indicated that if he would agree to mouth check and

5   actually allow them, they would restart his medication.

6            He currently has access to the TENS unit to assist

7   with pain management.

8            THE COURT:  Let me ask you this:  If the person

9   seeking to check his mouth has cleaned his or her flashlight in

10  front of him, then that would solve all the problems, wouldn't

11  it?

12           MS. KILEY:  I can't speak on behalf of the patient,

13  your Honor.

14           MS. AGNEW:  I can, your Honor.  It would solve the

15  problem, but I would just note for the record gabapentin is a

16  liquid medication, so the notion that a mouth check is

17  necessary to make sure he swallowed it is a little silly.

18  While he certainly needs to adhere to protocol, his concern is

19  that he has muscular sclerosis and autoimmune issues, and they

20  were shoving a dirty flashlight into his mouth.

21           THE COURT:  Ms. Kiley, what's the story with the mouth

22  check for the liquid medication?

23           MS. KILEY:  I would have to go back and discuss

24  further with medical staff.

25           THE COURT:  Ms. Agnew?

1          MS. AGNEW:  Your Honor, I can get a message to

2     Mr. Dockery right now, but, look, I think it's perfectly

3     appropriate for someone with his medical history not to want a

4     dirty flashlight in his mouth.

5          THE COURT:  Yes.  Who is speaking, please?

6          MS. KILEY:  Sorry.  This is Oriana Kiley.  I think we

7     are still getting away from the reason behind the

8     discontinuance.  If there's a procedure in place for a mouth

9     check, he's not complying.  This is the rationale.  It's not

10    because of a policy.

11         MS. AGNEW:  Your Honor, it is not a medical

12    justification.  They are telling me they've cut an MWAP patient

13    off of his medications over a mouth check and put this man in

14    the hospital because he didn't want a dirty flashlight in his

15    mouth?  I can't accept that.

16         THE COURT:  Ms. Kiley, it does seem that if the

17    patient is correct that the flashlight was in the mouth of

18    another person and not cleaned before it was going to be put in

19    his mouth, that there was justification for objecting.  If

20    there's a clean flashlight, I think Ms. Agnew is telling me

21    that the patient does not object.  Is that right?

22         MS. AGNEW:  Of course, your Honor.  He very much wants

23    his medication.

24         THE COURT:  So it's not the procedure.  The procedure,

25    however, has to be medically sound.  And I think even those of

1   us on this call who don't have much medical background would

2   understand that putting a flashlight that's been in someone

3   else's mouth in this patient's mouth can't be appropriate.  Go

4   ahead.

5          MS. KILEY:  I will confirm this, but I don't believe

6   they are inserting flashlights into the mouths of patients.  I

7   think they ask for a patient to open their mouth and they put a

8   flashlight close to the mouth to see the inside of a patient's

9   mouth.  Absent testimony from the folks at -- who are actually

10  conducting these procedures, I think this is going to be an

11  inconclusive conversation at this moment, but I can certainly

12  ask.

13         MS. AGNEW:  Your Honor, I have several other patients

14  in the same medical line.  What they do is they put the guys up

15  against the wall -- it's the same nurse who does it every

16  time -- and she shoves the head of the flashlight into people's

17  mouths.  Many people complained about it.  Mr. Dockery is just

18  very concerned for his own medical well-being and said, "I

19  can't do that."  He asked her very respectfully to clean it

20  before it was inserted in his mouth.  She refused and then she

21  marked him down for refusal.  He wasn't refusing his

22  medication.  He was refusing to have a dirty flashlight placed

23  in his mouth.  Again, it's just not medical justification.

24         THE COURT:  Ms. Kiley, would you be kind enough to

25  confer again with the folks.  If there is no cleaning of the

1    flashlight before it's in his mouth, then they have to change.

2    The nurse has to clean the flashlight before it is inserted in

3    the patient's mouth.  By inserted, I don't mean he is licking

4    it, but I mean it is in his mouth.

5            Anything more on Mr. Dockery?

6            MS. KILEY:  That's all I have at this time, your

7    Honor.

8            THE COURT:  How about Mr. Lopez?

9            MS. KILEY:  For Mr. Lopez, his primary provider

10   Fishkill removed him from gabapentin because in reviewing his

11   chart, he has no medical documentation substantiating his

12   neuropathy.  The patient only claims neuropathy stemming from a

13   motor vehicle accident, but has never actually formally been

14   tested or diagnosed with neuropathy.  He is currently on

15   suboxone for his opioid use disorder.  He would need an EMG to

16   corroborate his self-reported neuropathy, which his provider is

17   exploring order and EMG for Mr. Lopez for that reason.

18           THE COURT:  Ms. Agnew.

19           MS. AGNEW:  When did he actually get administration of

20   suboxone?  Because as of yesterday he had not.

21           MS. KILEY:  I don't have an exact date.

22           MS. AGNEW:  The problem is we have been getting his

23   medication administration charts faxed over to us, and they

24   show that he is not getting suboxone.  There is a state-wide

25   pause on prescribing suboxone to anyone because they're out of

1    supply.  Not only that, there is an EMG in Mr. Lopez's chart.

2    I've been through his chart very carefully, so I have great

3    concerns on that point as well.  They are certainly welcome to

4    set him up for another EMG, but in the interim he needs

5    something to treat his pain.  You don't cut off someone's pain

6    medication because you think maybe it's not appropriate.  You

7    check and see if it's appropriate and then you make an

8    adjustment based on the objective medical diagnoses.

9              THE COURT:  So what is your suggestion?

10             MS. AGNEW:  I think he needs to go back on the

11   gabapentin, your Honor, until they can actually administer

12   suboxone.  I'm not sure I have a problem with suboxone taking

13   the place of gabapentin, but he can't have nothing, because the

14   man was on gabapentin for years.  It's in his medical records.

15   He drafted in, and like every other MWAP victim, he got cut off

16   of it.  We sent his HotDocs to the provider and we asked that

17   he be reassessed.  They reassessed him, and they put him back

18   on gabapentin.  Then this nurse practitioner when he was

19   transferred took him off.  That means that any patient is

20   susceptible to the whim of where they are placed, not whether

21   or not they're getting adequate medical treatment.  It is a big

22   issue in this case, your Honor, but this man shouldn't be made

23   to suffer.

24             THE COURT:  Ms. Kiley, what is your position on no

25   pain medication.  If the patient was on gabapentin for a very

1    long time, it does seem he needs something.

2          MS. KILEY:  Your Honor, respectfully, I'm not

3    comfortable offering a medical opinion at this time.  I don't

4    know.  I would have to consult with Dr. Moores and his medical

5    care provider.  The only thing I can say which was explained to

6    me is that suboxone is a pain medication in addition to being a

7    treatment for opiod abuse disorder, so I think is significant

8    here.

9          THE COURT:  Okay.  If he were getting it, that would

10   be one thing, but as Ms. Agnew said, as of yesterday, he's

11   getting nothing.

12         MS. KILEY:  I understand that's what Ms. Agnew said,

13   but I don't see any medical record indicating that he isn't

14   getting suboxone.

15         THE COURT:  Excuse me.  Excuse me.  Ms. Kiley, does

16   the medical record indicate that he is receiving it?

17   Ms. Kiley?

18         MS. KILEY:  Yes.  I don't have his medical record in

19   front of me at the moment.

20         THE COURT:  So you don't know one way or the other if

21   he's receiving it or not.

22         MS. KILEY:  I was told by staff a few weeks ago that

23   he was.

24         THE COURT:  Okay.  First of all, that was a few weeks

25   ago.  Second of all, Ms. Agnew represents that as of yesterday,

1    he was getting nothing.  Tell me what your update was today if

2    you're telling me that you learned a few weeks ago that he was

3    getting the alternative medication.  What was today's news?  Go

4    ahead.

5              MS. KILEY:  I'm sorry.  The news today is that he is

6    currently on suboxone for his opioid abuse disorder.  This also

7    provides treatment for pain.

8              THE COURT:  Ms. Agnew.

9              MS. AGNEW:  Your Honor, all I've asked for is a

10   medication administration chart.  When a man gets suboxone,

11   they write it down on the chart, including the time he came.

12   There's little initials.  I've never gotten that.  The nursing

13   staff at Fishkill have confirmed with us repeatedly he is not

14   being administered suboxone.

15             THE COURT:  Ms. Kiley, I'm going to ask you to get

16   back in touch with staff and to confirm to Ms. Agnew today that

17   he actually is receiving it.  You might recall that in the last

18   few months, we had an issue where staff at a facility

19   represented to counsel that a patient had a prescription for a

20   particular medication.  Well, that turned out to be true, but

21   it did not mean that the patient was receiving the medication.

22             So, Ms. Kiley, I'll ask you to get back in touch can

23   them and to confirm with Ms. Agnew today that the patient is

24   actually receiving the alternative medication.  Is there

25   anything else today, friends?

1              MS. AGNEW:  Your Honor, if I could, I'm trying to work

2    through a solution for Mr. Dockery.  If they could confirm that

3    he's going to show up at the window today and his medication

4    will be there, and a prescription has been written, I will make

5    sure certainly that he does the mouth check as long as it's

6    clean.  I'm really concerned about Mr. Dockery not having his

7    medication.

8              THE COURT:  Okay.  Ms. Kiley, we understand each other

9    that you are going to inform the caretaker for Mr. Dockery that

10   the flashlight needs to be cleaned before it's in his mouth,

11   and his medication has to be there for him to take, correct?

12             MS. KILEY:  I can rely that message, yes.

13             THE COURT:  Yes, ma'am.  Is there anything else?

14             MS. AGNEW:  That's all from plaintiffs, your Honor.

15   Thank you.

16             THE COURT:  Let me thank the other counsel for being

17   on the phone.  We appreciate your being here.

18             Ms. Reporter, do you need anything from any of us?

19             (Replies)

20             Merry Christmas all.  Thank you for being on this

21   afternoon.

22             Ms. Kiley, you and Ms. Agnew talk later in the

23   afternoon.

24             (Adjourned)

25