N27CallH

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PETER ALLEN, et al.,

 4                  Plaintiffs,

 5           v.                               19 Civ. 8173 (LAP)

 6   NEW YORK STATE DEPARTMENT OF
     CORRECTIONS AND COMMUNITY
 7   SUPERVISION, et al.,

 8                  Defendants.

 9   ------------------------------x
                                         New York, N.Y.
10                                       February 7, 2023
                                         10:00 a.m.
11
     Before:
12
                          HON. LORETTA A. PRESKA,
13
                                          District Judge
14
                             APPEARANCES
15
     LAW OFFICE OF AMY JANE AGNEW PC
16        Attorneys for Plaintiffs
     BY:  AMY J. AGNEW
17        JOSHUA L. MORRISON

18   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
          Attorneys for Defendants
19   BY:  MICHAEL J. KEANE
          IAN RAMAGE
20
     WHITEMAN OSTERMAN & HANNA LLP
21        Attorneys for Defendant Dr. Carol Moores
     BY:  ORIANA L. KILEY
22        WILLIAM S. NOLAN
          GABRIELLA LEVINE
23        JENNIFER M. THOMAS

24

25
```

N27CallH

1          THE COURT:  Good morning, friends.  Are we ready?  Do

2     we have a witness, do we have Mr. Khan here?

3          MS. KILEY:  We do, your Honor.

4          MS. AGNEW:  I think we have two issues, if the Court

5     would entertain?

6          THE COURT:  Yes, ma'am.  Go ahead.

7          MS. AGNEW:  The first is, yesterday, we had a

8     stipulation on the record.  I did submit a letter to the Court

9     late last evening because I misspoke.  It's about my pending

10    motion about the belatedly produced records.  When I asked for

11    the stipulation, I said if they would stipulate to only use

12    them for rebuttal purposes, I of course meant to say

13    impeachment purposes.  I did misspeak.  I apologize to everyone

14    here.  If we could just amend the stipulation, I'd be

15    appreciative.

16         THE COURT:  I think everybody was tired; right?  Is

17    that okay with you, Ms. Kiley?

18         MS. KILEY:  Your Honor, we would argue this is a

19    binding stipulation.  If I may be heard on this issue for a

20    moment.

21         Plaintiffs' motion is premature.  We haven't even

22    offered any of the documents at issue into evidence, so I would

23    argue that this motion is premature to have these documents

24    precluded.  A closer look at these records show that they are

25    mostly in the form of the most updated pharmacy records for

1     every single witness that is being ordered to testify in this

2     hearing.  The current medications that these individuals are on

3     goes to the heart of this PI, and frankly we're concerned that

4     plaintiffs are looking to preclude this information.

5          If it seems to be a timing issue that is the problem,

6     Ms. Agnew seems upset that she got these records three days ago

7     before the hearing, but I would like to just highlight that, by

8     way of example, Mr. Myriel, who came on the scene about two

9     weeks ago, we didn't receive these documents until 8:15 p.m.

10    the day before Dr. Moores was going to be deposed.  She brought

11    these issues to Dr. Moores' deposition, didn't even give my

12    client an opportunity to review them and ask questions.  So we

13    asked for a date by which to exchange documents.  Ms. Agnew

14    adamantly said we are not going to exchange documents before

15    the hearing.  We gave them to her three days in advance, as is

16    our obligation to do so under Rule 26.

17         For these reasons, your Honor, we would like to uphold

18    our stipulation from yesterday.

19         THE COURT:  Ms. Agnew.

20         MS. AGNEW:  Your Honor, I don't think the question is

21    about when Mr. Myriel's documents were tendered, we tendered

22    them within 12 hours of receiving them from the facility.  The

23    documents that were produced to me from last Friday are dated

24    far in advance of last Friday.  I don't understand the onus of

25    Bates stamping documents and sending them over to counsel, I do

1    it all the time.  We had a deadline of January 31st, 2023,

2    which we graciously extended multiple times to get them to

3    respond to our requests.  These are responsive documents.  I

4    don't understand the excuse.  If they want to ask my clients

5    what prescription drugs they're on, they're welcome to do that.

6    Whether or not my clients know is a different issue, but that's

7    not the problem.  They can't just put the documents into the

8    record now that they're given to me three days before an

9    evidentiary hearing.

10              THE COURT:  Ms. Kiley.

11              MS. KILEY:  These are not documents responsive to

12   plaintiffs' tenth demand for documents.  These are documents we

13   received in preparation for the hearing that we are obligated

14   to turn over and that's what we did.

15              THE COURT:  But we had back and forth about by when

16   documents for the hearing would be exchanged.

17              MS. KILEY:  Correct.  I graciously asked the Court to

18   impose a deadline and Ms. Agnew was very adamant there was

19   going to be no exchange of exhibits before the hearing and that

20   my office would receive her exhibits on the morning of.

21              THE COURT:  I thought we had agreed to January 31st,

22   and then that got extended; am I wrong?

23              MS. KILEY:  The January 31st deadline was responsive

24   to the document demands.

25              THE COURT:  I see.  Let me know when one of these

N27CallH

1     documents comes up and we'll see what we do about it.

2              MS. KILEY:  Thank you.

3              MS. AGNEW:  Your Honor, an issue we're having, as

4     chambers knows, my office has worked very hard to coordinate

5     these video conferences with different facilities and different

6     providers.  When we found out the defendants would be finishing

7     their case in chief midday today, we arranged to move the

8     testimony coming from the Marcy facility from Friday to this

9     afternoon.  We did work very hard to do that.  However, the

10    provider from Marcy is now saying she's not available because

11    she has patients scheduled for Tuesday.  We'll be as brief as

12    possible, we'd really like the state's cooperation on this,

13    Mr. Keane has been working very hard to try to accommodate us,

14    but he's telling us the superintendent of the facility is

15    saying she will not be produced.  We need to move this case

16    along and get it done.

17             THE COURT:  We need to have that person produced today

18    or tomorrow.

19             MS. AGNEW:  Well, I wanted to do it today because

20    we're going to fill up the time, your Honor.

21             THE COURT:  That's all fine with me, but they can pick

22    the time.  How long is the testimony going to be?

23             MS. AGNEW:  I agree.  I don't see the direct being any

24    more than an hour, an hour and a half.

25             THE COURT:  How long do we anticipate the cross of

N27CallH

1  this witness?

2          MR. NOLAN:  Your Honor, we are unsure because we're

3  unsure of what the direct is at this point, but I don't

4  imagine --

5          THE COURT:  We're not going to be talking more than

6  two hours.

7          MR. NOLAN:  Maybe half an hour.

8          THE COURT:  Let them pick the time, whatever time they

9  want, we will do, even if it's lunch, I don't care.

10          Where's Mr. Keane?

11          MS. AGNEW:  He just stepped out, your Honor.  And he

12  is working hard, your Honor.

13          THE COURT:  I know.  He did last week, too.

14          MS. AGNEW:  I'm not trying to disparage his efforts.

15          THE COURT:  My hero.  Mr. Keane, would you let them

16  know that the witness has to testify today.  We anticipate it

17  will not extend beyond two hours and let them pick what time

18  they want.  It can be the lunch hour, whatever time they want.

19  Obviously, we want to finish by 5:00ish, but whatever time they

20  want, we will accommodate.

21          MR. KEANE:  That will be with respect to Amy Ferguson.

22          THE COURT:  I know you've been working hard on the

23  other people.  Obviously, we would not like to upset that apple

24  card either, but whatever works, it has to get done today.  If

25  there's something you need me to sign, you let me know.

1          MR. KEANE:  Understood, your Honor.  There is a domino

2     effect and a lot of moving parts.

3          THE COURT:  I'm sure that Mr. Khan won't mind if we

4     interrupt him, he won't mind much anyway.  We can do it this

5     morning, whatever they want.  If we go through lunch, that's

6     fine, too.  Thank you, Mr. Keane.

7          Are we ready for Dr. Khan?

8          MS. AGNEW:  Yes.

9          THE COURT:  Dr. Khan, would you stand, give your

10    attention to Ms. Phillips, please.

11     AFSAR KHAN,

12         called as a witness by the Defendants,

13         having been duly sworn, testified as follows:

14         THE DEPUTY CLERK:  State and spell your name for the

15    court reporter, please.

16         THE WITNESS:  First name is Afsar, A-f-s-a-r.  Last

17    name is Khan, K-h-a-n.

18    DIRECT EXAMINATION

19    BY MS. KILEY:

20    Q.  Good morning, Dr. Khan.

21    A.  Good morning.

22    Q.  Dr. Khan, would you please share with the Court your

23    educational background.

24    A.  I'm a physician, family-practice trained, have done family

25    medicine, as well as emergency medicine since 2001.  So

N27CallH                          Khan - Direct

1    approximately 22 years of medicine.

2    Q.   Where did you go to medical school?

3    A.   In Pakistan.

4    Q.   And when did you complete medical school?

5    A.   1996.

6    Q.   And where did you do your residencies?

7    A.   Saint Elizabeth Medical Center in Utica, New York.

8    Q.   Can you tell us a little bit about your employment history.

9    A.   Sure.  I have done a couple years of primary care and I

10   have done the majority of the time in emergency medicine.  I

11   have worked in Saint Elizabeth Medical Center and Saint Luke's

12   emergency department, both the ERs.  For the last six years,

13   I'm the medical director for both the emergency departments, as

14   well, too.

15   Q.   What does your role as the medical director in those

16   organizations mean?

17   A.   I oversee the emergency department providers, patient care.

18   Q.   And when did you become employed with the Department of

19   Corrections?

20   A.   November 2020.

21   Q.   And what position did you begin with in 2020?

22   A.   As a clinical physician 2.

23   Q.   Which facility were you assigned?

24   A.   Mohawk and Walsh.

25   Q.   Can you please explain for the Court how you were assigned

N27CallH                        Khan - Direct

1    to two facilities?

2    A.  Mohawk we call the GP, and then the Walsh is a higher

3    security and have sicker patients in Walsh medical unit.

4    Q.  For the record, what do you mean by GP?

5    A.  General population.

6    Q.  Is Walsh a regional medical unit?

7    A.  Yes.

8    Q.  What does that mean?

9    A.  The patients who are really sick who cannot stay in the

10   general population are into the setting where they need a lot

11   more care and treatment.

12   Q.  And these two facilities, where are they located

13   geographically?

14   A.  Walsh RMU is actually located inside Mohawk.

15   Q.  Are they connected or are they in different parts of the

16   facility?

17   A.  They are connected.

18   Q.  Have you worked in any other facilities?

19   A.  No.

20   Q.  Have you taken on any other roles since November of 2020?

21   A.  Yes.  In 2021 of November, I became the facility health

22   director for Mohawk and Walsh, which means I was overseeing the

23   physician staff at Walsh, as well as doing the clinical

24   medicine, as well, too.

25   Q.  Can you explain a little bit more what you mean by oversee

1  staff as facility health services director?

2  A.  So it's the clinical role, which means that, you know, if

3  they have any clinical questions, the providers in that

4  facility come up to me and answer all their questions, guide

5  them with the clinical medicine, as well as if there are any

6  administrative support they need like schedules and time off.

7  So we handle those situations, as well.

8  Q.  For how long were you the facility health services

9  director?

10 A.  For one year.

11 Q.  What is your current role?

12 A.  I am doing, as deputy CMO for Dr. Moores in central office,

13 as well as I'm doing clinical medicine in Walsh, as well.

14 Q.  So how much of your time is split, meaning is it 50 percent

15 clinical work and 50 percent central office work or something

16 else?

17 A.  No, that's correct.

18 Q.  So how many days a week are you at the facility doing

19 clinical work?

20 A.  Two days.

21 Q.  Are you there for the whole day?

22 A.  Yes.

23 Q.  How many hours?

24 A.  About 20 hours.

25 Q.  A week?

1   A.  Clinical medicine, 20 hours, and then administrative in

2   Dr. Moores' central office is 20 hours, as well.

3   Q.  Can you describe briefly for the Court your duties as

4   deputy chief medical officer.

5   A.  Since I joined the central office, looking into the

6   policies, updating the policies, as well as looking through the

7   procedures and trying to make the procedures better.

8   Q.  In your role as deputy chief medical officer, have you

9   visited other facilities, besides the ones that you are

10  assigned to?

11  A.  Yes, I have.

12  Q.  Approximately how many facilities have you visited since

13  becoming the deputy chief medical officer?

14  A.  About seven to ten.

15  Q.  And what do you do on your facility visits in this role as

16  deputy?

17  A.  We engage the providers working in those facilities,

18  provide them the support, also guidance and find out what their

19  needs and struggles are and try to help them out with whatever

20  their needs are in that facility.  Also speak to the

21  administrative side of the facilities, as well, too, which

22  includes the superintendents and see what their needs are and

23  try to help them out, as well, through the central office.

24          THE COURT:  This is not a race, doctor.  My friends

25  here are taking down the words, you're talking a little fast.

1          THE WITNESS:  Okay.

2          THE COURT:  Thank you.

3          THE WITNESS:  Sure.

4   Q.  Can you recall which seven facilities you have visited thus

5   far?

6   A.  There is a Mid-State, Marcy, Lakeview, Shawangunk, and

7   there's a couple more.

8   Q.  What are some examples of some of the questions that some

9   of the providers have asked you during these facility visits?

10  A.  I think those are very basic questions they have.

11  Nowadays, we have a MAT program going on through the central

12  office, which is the medication assisted treatments.  So a

13  majority of the questions are regarding the MAT program.

14          THE COURT:  Doctor, I'm going to ask you to move a

15  little closer to the microphone and to just slow it down a

16  little bit.

17          THE WITNESS:  Sure.

18  Q.  What is the nature of the questions specific to the MAT

19  program?

20  A.  I think it's just need some guidance about the MAT program.

21  They need how to treat the patients, the dosage, the scheduling

22  of the medications, different formulations, side effects,

23  benefits.  So those kind of questions.

24  Q.  I want to now switch to talking about your duties as a

25  clinical physician 2 at Walsh.  How many patients do you see in

1    a day?

2    A.  We will probably see between 15 to 20 patients.

3    Q.  When you say we, who are you referring to?

4    A.  Actually, we have midlevels, other providers work with us.

5    So we work as a team.  So we round together.  Especially

6    myself, round with two midlevels.  So if they have any

7    questions, I give them a guidance and oversee those midlevels,

8    as well.

9    Q.  For the record, what do you mean when you say midlevels?

10   A.  Nurse practitioners and physician assistant.

11   Q.  How many physicians, besides you, are assigned to Walsh?

12   A.  We have total of seven providers which are working in

13   Walsh.

14   Q.  And do those providers also provide care for Mohawk?

15   A.  Once a while, if there's a need for somebody in the

16   location in Mohawk, we usually go out and help out in Mohawk,

17   as well.

18   Q.  How many physicians are assigned to Mohawk?

19   A.  I believe it's four or five, combination of full-times and

20   part-times.

21   Q.  How many midlevels are at Mohawk?

22   A.  I believe there's at least two to three.

23   Q.  So do you communicate with all of the staff that you've

24   just mentioned on a daily basis?

25   A.  Yes.

N27CallH                        Khan - Direct

1   Q.  And you testified a moment ago that you make rounds.  What

2   do you mean by rounds?

3   A.  Myself and one or two midlevels, we have our list of

4   patients and we go from unit to unit together.  Then we make

5   rounds with the nursing staff and find out what the issues are

6   with the patients and we treat them accordingly.

7   Q.  Do the rounds include observations of other providers

8   treating patients?

9   A.  Yes.

10  Q.  Do you provide feedback to the providers after you watch

11  them provide care to a patient?

12  A.  Yes.

13  Q.  Generally, what is the purpose of making rounds?

14  A.  I think it serves two different purpose.  One is the

15  clinical supervision or clinical medicine doing myself, as well

16  as overseeing my colleagues at the same time.  It also provides

17  support for the midlevels, as well, too.

18  Q.  How often do you make rounds?

19  A.  When I'm there every day.  So now it's twice a week.

20  Q.  So just to clarify, you don't make rounds because there was

21  an issue that you need to look into?

22  A.  Those are regular rounds every day I will make for clinical

23  medicine, yes.

24         THE COURT:  Can I ask a question.  In the facility,

25  when you say rounds, and it conjures up being in the hospital

1    going from room to room, do the patients come to you in one

2    space or do you visit them?

3             THE WITNESS:  In Walsh, we visit them.

4             THE COURT:  Thank you.

5    Q.  I believe you testified earlier that the patients at Walsh,

6    and forgive me, I don't know if you said very sick or they're

7    very complex patients, can you help us understand what you mean

8    by that?

9    A.  I think of it multiple medical problems.  Some of them are

10   acute, majority of them are chronic medical problems.  They

11   have some physical disabilities.  So their overall picture of

12   their health is very complex.

13   Q.  Given your role and what you've just described as far as

14   making rounds and all of your communication with other

15   providers, in your current role, do you review the records of

16   patients that are not in your care?

17   A.  Yes.

18   Q.  And why is that?

19   A.  I think for couple different purposes.  As a facility

20   health directors, we are supposed to review ten charts every

21   few months to make sure the quality is maintained and there is

22   proper documentation so we can give feedback to the providers.

23   Q.  Are there any other circumstances that you review the

24   medical records of patients that are not in your care?

25   A.  If midlevel brings a concern to my attention or nursing

N27CallH                        Khan - Direct

1   staff brings, you know, an issue or concern to my attention,

2   those are the other reasons to review those records, as well.

3   Q.  And you testified earlier that you were the facility health

4   services director I believe for one year.  Are you still

5   reviewing medical records on a monthly basis?

6   A.  Yes.

7   Q.  And why is that?

8   A.  For same reasons, for providing feedbacks, as well as

9   guidance and overseeing the care of those patients.

10  Q.  I want to talk about the medications with abuse potential

11  policy.  Dr. Khan, do you recall the MWAP policy being in

12  place?

13  A.  I believe very briefly when I came on board for very short

14  period of time.

15  Q.  And what was your understanding at the time of the MWAP

16  policy?

17  A.  I think the only thing I remember is we just have to fill

18  up an extra form for some medications.  That was it.

19  Q.  Do you recall making MWAP requests yourself?

20  A.  Probably once or twice.

21  Q.  Do you have any recollection of whether or not those

22  medications were approved or denied?

23  A.  They were approved.

24  Q.  Did you have any issues with the MWAP policy?

25  A.  No.

1    Q.  Do you recall when the MWAP policy was rescinded?

2    A.  Yes.

3    Q.  Do you recall how that was communicated to you?

4    A.  Yes, it was the communication from the central office.

5    Q.  Did you discuss the change with anyone?

6    A.  With the providers and the midlevels at the facility, yes.

7    Q.  Do you have recollections of those discussions?

8    A.  We have monthly meetings, provider meetings, as well as the

9    dep of health has their own monthly meetings, as well, too.  So

10   the policy was discussed in provider meetings as well as the

11   health meeting, as well.

12   Q.  What do you recall, if anything, about the substance of

13   those conversations?

14   A.  It was discussed, the MWAP policy has been discontinued and

15   we don't have to fill up extra forms for the medications.

16   Q.  Do you recall learning about policy 1.24A?

17   A.  Yes.

18   Q.  How was that communicated to you?

19   A.  It was through the central office, as well as through the

20   superintendent's office, as well.

21   Q.  Do you recall having any discussions about 1.24A?

22   A.  Yes.  Provider meetings and the DEP of health meeting.

23   Q.  What do you recall about that transition away from MWAP and

24   to the 1.24A policy?

25   A.  I don't think there was any big difference, we just didn't

1    have to fill up an extra form.  That was the only change we

2    noticed.

3    Q.  I want to talk about some parts of the 1.24A policy.  You

4    testified earlier that you see about 10 to 20 patients in a

5    day.  How often would you say you see patients specifically for

6    pain?

7    A.  I think when it comes to the pain patient, it's just the

8    part of the regular patient's evaluation.  Once we are making

9    rounds, if the patient's list of diagnoses say it's a chronic

10   pain, that's just an additional diagnosis they have in their

11   list of diagnoses.

12   Q.  Before you see a patient, what documents, if any, do you

13   review before you go and see a patient that's scheduled?

14   A.  I think the chart -- the front portion of the chart has all

15   the diagnoses written for the same patient on the first page,

16   and we look at those first pages about all these diagnoses and

17   then we know exactly what's going on with the patient.  Once

18   you are seeing those patients frequently, you already know

19   what's, majority of the time, wrong, the diagnoses of those

20   patients.

21   Q.  And if you see code 338 on a medical problems list, what

22   does that mean to you?

23   A.  I believe it means -- we call it pain patient, but there

24   are so many codes that we pay so close attention to these

25   codes, I think we pay close attention to the written diagnosis

1    of the patient.  That's what we -- usually, providers go by

2    those diagnoses.

3    Q.  So if you see 338 on a medical problems list before you go

4    and see a patient, does that change anything about the way

5    you're going to provide care for that patient?

6    A.  It's just an additional diagnosis they have.  This should

7    not affect the care of the patient by any means.

8    Q.  And if you review a medical problems list before you go and

9    see a patient and they don't have 338 on their medical problems

10   list, but then they complain of pain, are you still going to

11   provide care for pain?

12   A.  Of course.

13   Q.  To your knowledge, have any other providers you've spoken

14   to not provided treatment because a patient didn't have 338 on

15   their medical problems list?

16   A.  No, that's not the case.

17   Q.  Can you share with the Court very briefly on some of the

18   commonly used pain medications that you've prescribed for pain?

19   A.  Sure.  I think it depends on the diagnosis of the patient.

20   Pain can be acute, which is short-term, and the chronic, which

21   is a long-term.  Acute patients will last probably for few days

22   to few weeks depending on the nature of the injury.  The

23   chronic pain will last a lot longer, which is on the basis of

24   months and years.  The treatment is the same way.  For acute

25   pain, the pain management is short-term.  For the chronic pain,

1    the pain management is long-term.  And the medication for both

2    these purposes is used differently, as well.  We can start from

3    localized medications, which includes lidocaine patches or

4    there's a lot of ointments used for the pain control to some

5    simple pain medications, which includes nonsteroidal

6    antiinflammatory patches or some medicines, which is commonly

7    used as ibuprofen or Tylenol.  Then we can go to some stronger

8    pain medications, which includes some narcotics and muscle

9    relaxants.  So it depends on the clinical presentation of the

10   patient and the clinical judgment of the provider.

11   Q.  And is there any one, let's say textbook way of treating

12   any one specific patient for pain?

13   A.  I think everybody's diagnosis is different and the

14   treatment is exactly according to the diagnosis.

15   Q.  And in your experience, could two providers have different

16   views on an appropriate course of treatment for the same

17   patient?

18   A.  Yes.

19   Q.  And as a provider at DOCCS, is there anything preventing

20   you from prescribing the medication that you believe to be

21   appropriate for a patient?

22   A.  No.

23   Q.  To your knowledge, are the more commonly prescribed pain

24   medications on formulary or non-formulary?

25   A.  They are formulary, most of them are formulary.

N27CallH                        Khan - Direct

1   Q.  What does that mean?

2   A.  For non-formulary, you have to fill another form, but for

3   majority of the pain medications, you don't have to fill out

4   any form by any means at all.  You just have to write it down

5   on the order sheet, the medications.  That's pretty much it.

6   Q.  Does formulary mean those medications are available to the

7   providers?

8   A.  Yes.

9   Q.  If the pain medications that you described are all on

10  formulary, what, if anything, stands between the patient and

11  the provider's ability to prescribe that medication?

12  A.  I don't believe so there is anything in between them except

13  the clinical judgment of the provider and the diagnosis of the

14  patient.

15  Q.  I want to now talk about specialist recommendations.

16  Dr. Khan, generally, what happens when you send a patient to

17  see a pain specialist?

18  A.  We make recommendations that patient needs to see a

19  specialist for the pain management.  We make that request

20  through the system, it gets to the specialist, and we schedule

21  the appointment for the patient.

22  Q.  And what happens at the conclusion of a specialist visit?

23  A.  Patient comes back with the recommendations and we look at

24  the recommendations.  Majority of the time, what we see is the

25  specialist is just focused on one area of the patient's

1    management, but as a primary care physician, you look at the

2    whole big picture of the patient and then decide from there.

3    Q.  And so, are there times when a specialist recommendation

4    might not be followed by the primary care provider?

5    A.  I think the way it works is we come up with the best

6    solution for that patient or best medicine or what's going to

7    work better for that patient given the overall picture of his

8    other medical problems, as well, too, because some of the

9    medications might interact with other medications and we see

10   the patients almost every day or multiple times a week, but the

11   specialist only sees them once or twice a year.  So he might

12   not have as good of an overall picture of the patient as we

13   have.

14   Q.  And to your knowledge, are there providers that may not

15   have followed a specialist recommendation every single time?

16   A.  I don't believe so that's the case.  I think we try to do

17   what's best for the patient.

18   Q.  In any scenarios that you're aware of that a provider is

19   not following the recommendation of a specialist, to your

20   knowledge, is that reason because of an RMD --

21            THE COURT:  We're not going to lead excessively, are

22   we?

23            MS. KILEY:  I can rephrase.

24            THE COURT:  Oh, good.

25   Q.  Are the regional medical directors involved in approving

N27CallH                         Khan - Direct

1    the recommendation of a specialist?

2    A.   They are, yes.

3    Q.   How?

4    A.   I think they are involved in approving the consults only,

5    but not the management of the patient at all.

6    Q.   So I'm talking about the recommendation made by the

7    specialist at the conclusion of a visit.  Are the regional

8    medical directors involved in following the recommendation of

9    the specialist?

10   A.   No, they're not involved.

11   Q.   Dr. Khan, have you ever encountered a patient who does not

12   agree with your treatment plan?

13   A.   It's not uncommon to have those disagreements sometimes,

14   but I think it comes down to good communication, good effective

15   communication with the patient and the reasonings.  So as long

16   as we sit down, have the good discussion and explanation, I

17   think, majority of the time, the patients do understand.

18   Q.   Would it be appropriate for inappropriate for a provider to

19   prescribe whatever a patient is asking for?

20          MS. AGNEW:  Objection, your Honor.  I think he can

21   talk about his personal beliefs, but I think that this is

22   getting a little wonky, experty.

23          THE COURT:  I'm sorry.  Is this an expert objection?

24          MS. AGNEW:  Yes, your Honor.

25          THE COURT:  Sustained.

N27CallH                              Khan - Direct

1   Q.  Have you ever prescribed a medication to a patient solely
2   because they asked for it?
3   A.  It's very difficult to prescribe what the patient asking --
4   as I said earlier, I think it depends what they need on their
5   clinical, you know, exam, on the basis of clinical exam, yeah.
6   Q.  You testified a moment ago about having a discussion with a
7   patient regarding their care.  Do you document every single
8   word exchanged between you and a patient after a visit?
9   A.  I think it's extremely difficult to write down a half an
10  hour, 45 minutes of a conversation, but we try to write down
11  the major points of it.
12  Q.  And to your knowledge, based on the many medical records
13  you've reviewed in your time as facility health services
14  director, for example, are there times when there are providers
15  that maybe haven't documented every single thing about their
16  encounter with a patient?
17  A.  Yes.
18  Q.  And do you believe that those patients --
19          MS. KILEY:  Withdrawn.
20  Q.  In the times where you've seen that, did you have any
21  reason to believe that those patients were not receiving
22  adequate care?
23  A.  No.
24  Q.  Dr. Khan, what is your understanding of an annual
25  evaluation for pain patients?

1    A.   I think we evaluate these patients a lot quicker, a lot

2    sooner on a regular basis, pretty much almost every month,

3    every couple months.  In Walsh RMU, we are supposed to do

4    monthly rounds, every 30 days.  During our monthly rounds, we

5    ask the patients, we go over their list of medications, their

6    diagnosis, and also if we need to address some medications, we

7    do it.  So it's usually happening a loot sooner than a year for

8    sure.

9    Q.   And if there were to be a formalized comprehensive annual

10   assessment form, let's just say, would that change anything

11   about the way that care is already provided to patients?

12   A.   I don't believe it's going to change anything.

13   Q.   Why is that?

14   A.   As I mentioned earlier, we are making those rounds and

15   recommendations a lot sooner on a regular basis.

16   Q.   I'd like to talk about transfers when one patient comes to

17   your facility for the first time.  Have you ever done a medical

18   intake for a transfer?

19   A.   Sure.

20   Q.   Can you describe that process?

21   A.   A patient comes to the facility with a medication list and

22   we go over the medication list.  Whatever medicine they're

23   already on, we continue those medications.  Very rarely, if the

24   medication is not available for some reason, that's not a

25   provider thing, that might be a pharmacy thing because pharmacy

N27CallH                    Khan - Direct

```
 1    might not have every single medicine available all the time.
 2    So sometimes it takes them a few days to get the medication.
 3    Or if it's a weekend, Friday evening, so it might not get in
 4    until Monday morning.  So sometime we can have tiny bit of a
 5    gap.
 6    Q.  Is there a requirement that a provider at a new facility
 7    has to reorder all of the medications prescribed from a
 8    previous provider?
 9    A.  Yes, we continue all the medication the previous provider
10    has written, yes, at least in the start.  Subsequently, when we
11    examine the patient, that's the time if we need to make
12    adjustment after talking to the patient, that's something
13    different.
14    Q.  Is there a difference in whether the medications from the
15    prior facility are keep on person versus being administered
16    one-to-one?
17    A.  Sorry?
18    Q.  Sorry.  That was confusing.
19             Is it significant to consider whether or not the
20    medication from the previous facilities keep on person versus
21    one-to-one?
22    A.  I think one-to-one rules are different, though.  There are
23    certain medications which are one-to-one, but certain
24    medications are not one-to-one.  So some medications, I'm not
25    sure --
```

N27CallH                        Khan - Direct

1          THE COURT:  Can I just ask the witness, sir, you said

2     that the one-to-one rules are different, certain medications

3     are not one-to-one, and then I didn't hear what you said after

4     that.

5          THE WITNESS:  There are certain medications, like

6     psychiatric medications, they are given to patients while we

7     watch them taking those medications, but there are medications

8     like antibiotics for dental pain, they just carry them with

9     them to the dorm and they can take them when they need it.

10         THE COURT:  Thank you.

11    BY MS. KILEY:

12    Q.  If a medication is not ordered immediately upon transfer

13    from a new provider, you testified a moment ago that sometimes

14    they might not be available at the pharmacy, so my question to

15    you is are there any other circumstances where a prescription

16    might not be written at a new facility?

17    A.  I can't foresee any reasons.  Majority of the medicines are

18    exactly written the same way once the patient arrives.

19    Q.  Could a provider make a change after a physical examination

20    of the incoming patient?

21    A.  They can.  I think everybody's clinical judgment and

22    treatment can vary, it's medicine.  So they can, talking to the

23    patients and coming up with a solution to the plan, yes.

24    Q.  I want to discuss now your role in supporting Dr. Moores.

25    Are you involved in auditing?

1   A.  Yes.

2   Q.  Can you please explain your involvement.

3   A.  We do the audits for the patients' charts, as we do already

4   at the facility level.  Then we do audits about the referrals,

5   which are coming through the central office, we audit those

6   referrals, as well, too.  Those are pretty much --

7   Q.  What are you auditing the referrals for?

8   A.  Make sure they are appropriately documented or enough

9   information is provided on those referrals.

10  Q.  And what happens if you feel that a referral is not

11  appropriate?

12  A.  I think we pick up the phone and call the provider and have

13  a conversation, get more history from the provider, as well,

14  too.  Then we come up with the best solution for the situation.

15  Q.  How often have you had to do that since becoming deputy

16  chief?

17  A.  Quite often, a few times a day.

18  Q.  Are providers receptive to that conversation?

19  A.  Yes, they are.

20          THE COURT:  In those conversations, doctor, are you

21  saying essentially to the provider, I see here that you have

22  referred this patient for a specialist review, I don't think

23  that's appropriate, and have a conversation?  Is it from that

24  angle?  It's not I think there should be a referral here and

25  you haven't done it yet?

N27CallH                    Khan - Direct

1          THE WITNESS:  I think the referral is -- when I have

2     the conversation, it's getting more information about the

3     patient, what is the clinical situation of the patient and what

4     is the best -- either the test or the medicine or the referral

5     that patient can benefit from.

6          THE COURT:  Do you end up approving the majority of

7     those referrals or not approving the majority of those

8     referrals?

9          THE WITNESS:  I think since I have been taken this

10    role, I have not refused any one of the referral at all.  It's

11    the conversation is based on what's the best thing is for the

12    patient.

13         THE COURT:  Thank you.

14    BY MS. KILEY:

15    Q.  Do you review non-formulary requests?

16    A.  Yes.

17    Q.  How do you do that?

18    A.  Central pharmacy sends us post-reviews, we look at the

19    medication and we approve them once they are needed by the

20    patient.

21    Q.  Do you engage in the same dialogue that you just described

22    for denials for non-formulary medications?

23    A.  Yes.  None of them get denied.  There is no denial at all.

24    We're just trying to find out what the best medication for the

25    patient is.

N27CallH                          Khan - Direct

1   Q.  Dr. Khan, given the amount of communication that you have

2   with the providers at the facilities all around the state,

3   based on those conversations, have any providers communicated

4   to you that they believe that they can't prescribe a medication

5   because of a policy?

6   A.  No.

7   Q.  And based on those conversations, have any providers

8   indicated to you that they feel they can't prescribe a

9   medication because someone told them not to?

10  A.  No.

11  Q.  To your knowledge, are any providers still operating as

12  though the MWAP policy still exists?

13  A.  No.

14              MS. KILEY:  I have nothing further.

15              THE COURT:  Thank you.  Do you want to take a break or

16  what?

17              MS. AGNEW:  I do, your Honor.

18              THE COURT:  Why don't we take five minutes.

19              How long are you going to be about?

20              MS. AGNEW:  40 minutes.

21              THE COURT:  Thank you.  Mr. Keane, let us know when

22  you know something.

23              MR. KEANE:  I know 12:00 noon to 2:00 p.m. is the

24  window.

25              THE COURT:  Wonderful.  We are on board.

1              (Recess)

2              THE COURT:  Thank you, folks.  Won't you be seated.

3    Cross examination, please.

4    CROSS-EXAMINATION

5    BY MS. AGNEW:

6    Q.  Good afternoon, Dr. Khan.  We haven't met.  I'm Amy J.

7    Agnew. I represent the plaintiffs in this case.  The fact that

8    we don't know each other probably says a lot about how you

9    practice medicine.  It's a pleasure to meet you.

10   A.  Thank you.

11   Q.  I just want to ask you, have you read the complaint in this

12   action?

13   A.  The complaint, I was mentioned by the attorney.

14   Q.  So my question was, have you read it?

15   A.  I did not read it, no.

16   Q.  Do you understand what the plaintiffs in this case are

17   alleging, what they're complaining of?

18   A.  I think the MWAP policy, the medication for abuse potential

19   policy, having issues with that policy in the past.

20   Q.  Do you have an understanding of what their issues were with

21   the policy?

22   A.  I believe the medications were getting denied in the past

23   for pain control.

24   Q.  Is it your understanding that patients suffered or are

25   claiming that they suffered when these medications were denied?

N27CallH                      Khan - Cross

1    A.  I can't speak for what happened before I joined the DOCCS,

2    very hard to tell.

3    Q.  Let's talk about that moment.  Actually, I'm going to talk

4    about before you joined DOCCS.  I think you testified that your

5    training is in family medicine; correct?

6    A.  Yes.

7    Q.  Are you board certified in anything?

8    A.  Yes, family medicine.

9    Q.  Are you board certified in pediatrics?

10   A.  No.

11   Q.  And I think you said that you did your residency at Saint

12   Elizabeth Medical Center?

13   A.  Yes.

14   Q.  And then I think you testified that you've worked in

15   emergency rooms; correct?

16   A.  Yes.

17   Q.  Including at Saint Luke's; is that correct?

18   A.  Yes.

19   Q.  Is it true that Saint Luke's takes in prisoners from some

20   DOCCS facilities when they need to be seen on an emergent

21   basis?

22   A.  I believe all the facilities takes prisoners from DOCCS

23   when they come in for any emergency situations, they can go to

24   any local hospitals.

25   Q.  And I think you testified that you were the medical

N27CallH                        Khan - Cross

1    director of Saint Luke's emergency room; correct?

2    A.   Yes.

3    Q.   Can you just tell us, what did you do as a medical director

4    of the emergency room?

5    A.   Do clinical medicine, as well as look at the management of

6    the department and oversee the providers, as well.

7    Q.   And were you serving in a clinical role when you were

8    working in the emergency room?

9    A.   Yes.

10   Q.   And so, in your clinical role, were you seeing patients?

11   A.   Yes.

12   Q.   And in your clinical role when you saw a patient, would you

13   call a specialist if you felt it was needed to examine the

14   patient and give a recommendation on treatment?

15   A.   Yes.

16   Q.   How often would you say that happened, just ballpark?

17   A.   30, 40 percent of the time.

18   Q.   Can you just, to give us an idea of how that worked, what

19   kind of specialist would you refer with?

20   A.   Depends on the diagnosis of the patient, if they're having

21   MI, which is heart attack, we call the cardiologist.  If

22   they're suffering from trauma, we can call the trauma surgeon,

23   as well.  If they're having a stroke, we call the stroke

24   specialist.

25   Q.   When you were giving clinical care within the emergency

N27CallH                        Khan - Cross

1   room, were you the primary care provider, so to speak, for that

2   patient?

3   A.   Yes.

4   Q.   And in your practice in that emergency room, would you

5   often refuse to follow the recommendations of the specialist

6   that you brought in?

7   A.   We can give them our input, as well, too, what's going on

8   with the patient.  I think it's a teamwork between us and the

9   specialist.

10  Q.   When you say teamwork, you would consult with the

11  specialist; correct?

12  A.   Right.

13  Q.   You'd give your input on the kind of medical background of

14  the patient and the specialist would give you his input on his

15  specialty; correct?

16  A.   Right.

17  Q.   And is it often that you would disregard the

18  recommendations of the specialist?

19  A.   If we disregard them, we have to have a conversation and

20  the reasons behind it.

21  Q.   How often would that happen that you would come to the

22  conclusion that the specialist was not acting in the best

23  interests of the patient?

24  A.   Very rarely, but disagreements do happen, but that's why we

25  communicate with each other to come up with the best solution

N27CallH                        Khan - Cross

1    for the patient.

2    Q.   And so, the success of that relationship was about

3    communication?

4    A.   That's correct.

5    Q.   So can you tell me, if you remember, your start date with

6    DOCCS?

7    A.   November 2020.

8    Q.   Can we agree, sitting here today, that the MWAP policy was

9    rescinded in February of 2021?

10   A.   Yes.

11   Q.   So you were with DOCCS for a very short period of time when

12   MWAP was actually in effect?

13   A.   Yes.

14   Q.   Isn't it true, sir, that you actually only submitted one

15   MWAP request during that time period?

16   A.   I can't recall, but probably more than once.  I can't

17   recall exactly.

18   Q.   Would it refresh your recollection if I told you that one

19   MWAP request form was for baclofen?

20   A.   I can't really recall at this point, yes.

21   Q.   Can you tell me, is baclofen a controlled substance?

22   A.   Baclofen is not a controlled substance.

23   Q.   Can you describe for the Court what baclofen does?

24   A.   It's a muscle relaxant.

25   Q.   So when you first came in in late 2020, were you

1   immediately assigned to the Walsh regional medical unit?

2   A.  Yes.

3   Q.  So I don't think we really got into this, but we really

4   need to detail for the Court what the Walsh regional medical

5   unit is.  Isn't it true, sir, that that regional medical unit

6   operates like a hospital?

7   A.  It's not really the hospital, it's just the patients are

8   more complex in that place.

9   Q.  How does a patient get admitted to Walsh?

10  A.  They can be admitted from multiple different sources.  They

11  can be from another facility or they can be from the hospital,

12  as well, too.

13  Q.  Does someone make a recommendation for a patient to be

14  admitted to Walsh?

15  A.  Recommendations can be made either from the central office

16  or from the sending facility, as well.

17  Q.  And what are some of the circumstances that prompt a

18  patient's admission to Walsh?

19  A.  It could be medical condition, it could be a physical

20  limitation, it could be either one of them.

21  Q.  And isn't it true that the patients in Walsh, generally

22  speaking, demand a higher level of care than patients in the

23  general population?

24  A.  Yes.

25  Q.  And isn't it true that the patients -- well, let me go

N27CallH                          Khan - Cross

1   back.  Strike that.  I apologize.

2            There's approximately 130 beds at Walsh; correct?

3   A.  Yes.

4   Q.  So 130 beds, does that mean, at most, there's 130 patients

5   housed at Walsh?

6   A.  Yes.

7   Q.  Based on the facilities that you've visited, is Walsh

8   smaller or larger than most facilities?

9   A.  I think it's a decent size.  I think, I'm not sure exactly,

10  but it's the largest one we have, probably.

11  Q.  And I think you're comparing it to other RMUs; correct?

12  A.  Yes.

13  Q.  How many RMUs are there in the DOCCS system?

14  A.  I might not know the exact number.

15           THE COURT:  Ballpark.

16  Q.  Let's do this, sir.  Do we have Wende RMU?

17  A.  Yes.

18  Q.  Do we have Fishkill RMU?

19  A.  Fishkill, yes.

20  Q.  Do we have Coxsackie RMU?

21  A.  Yes.

22  Q.  And we have Walsh RMU?

23  A.  Yes.

24  Q.  Do you know of another one?

25  A.  I think it's four or five.  That's pretty much it.

N27CallH                    Khan - Cross

1   Q.  I don't know of another one, but maybe one appeared.  So
2   we've got four RMUs; correct?
3   A.  Yes.
4   Q.  What I want to do is ask you, is an RMU, in general,
5   smaller, does it house more patients or less than a normal
6   facility, one without an RMU?
7   A.  It houses, of course, smaller number of patients, yes.
8   Q.  So you also worked at Mohawk; correct?
9   A.  Yes.
10  Q.  Do you know what security level Mohawk is?
11  A.  I think it's medium, if I believe.
12  Q.  Do you know how many prisoners are housed in Mohawk?
13  A.  I'm not 100 percent sure, but it varies quite a bit.  So
14  last time I counted, it was calculated between 600 or so,
15  between 500, 600.
16  Q.  So Mohawk roughly has three to four times the amount of
17  patients that the Walsh RMU does; correct?
18  A.  Yes.
19  Q.  And we can agree that those patients in the Walsh RMU
20  demand a higher level of care; correct?
21  A.  Yes.
22  Q.  And in the Walsh RMU, sir, isn't it true that the medical
23  staff, they make up treatment teams; correct?
24  A.  You can make treatment teams, yes.
25  Q.  Does Walsh no longer use treatment teams?

N27CallH                    Khan - Cross

1    A.   Some providers wants to make their rounds independently,

2    some wants to do it in the team fashion, like myself.

3    Q.   Can you describe for the Court what a treatment team is?

4    A.   It's going to be myself, midlevel, which includes a nurse

5    practitioner, PA, together, so we make rounds together.   Some

6    providers, they just want to make their own rounds by themself.

7    Q.   So at Walsh RMU, could we agree that a patient could be

8    receiving care from actually a treatment team, just not a

9    single physician?

10   A.   I don't recall any treatment team, per se.

11   Q.   Does Walsh no longer have treatment team meetings to

12   discuss patients' care?

13   A.   We have care plans conferences, which includes an RN and

14   the provider.

15   Q.   So can you describe one of those care conferences for the

16   Court.

17   A.   We select a few patients for the conference.   The provider

18   will head as that patient as well as the nurse who takes care

19   of that patient are in that meeting to discuss taking that

20   patient.

21   Q.   What are the objectives of those meetings?

22   A.   Go through the medical diagnosis of those patients and the

23   treatment plan of those patients.

24   Q.   And are those meetings scheduled?

25   A.   Yes.

N27CallH                      Khan - Cross

1  Q.  Do those meetings take place at Mohawk?

2  A.  They take place at Walsh.

3  Q.  I'm going to ask you now again just about Mohawk.

4  A.  Sure.

5  Q.  When you work at Mohawk, do you have those care conferences

6  about patients?

7  A.  No, we don't.

8  Q.  And I think you testified that once a month — and this is

9  true I think of most RMUs, correct me if I'm wrong — somebody

10  does a monthly report on the patient; correct?

11  A.  Yes.

12  Q.  And can you tell the Court what are the contents of that

13  monthly report?

14  A.  I think it's prepared by the nurse manager of the unit,

15  which includes the census and the diagnosis of the patients,

16  and the provider senses how many patients are provided there.

17  Q.  Isn't it true that that report often details the diagnoses

18  of the patient?

19  A.  Yes.

20  Q.  And isn't it true that report details any progress the

21  patient has made in certain medical areas?

22  A.  Yes.

23  Q.  And isn't it true that that report also contains a

24  treatment plan moving forward?

25  A.  That's part of the care plan, yes.

1  Q.  So isn't it true that the patients that are housed in RMUs

2  are getting much more comprehensive medical care than the

3  patients who are housed in regular facilities at DOCCS?

4  A.  I think they have a different level of care.  The RMUs use

5  a different level of care, I would say, because of the

6  complexity of the patients.

7  Q.  How is the care at a different level, in what way?

8  A.  I think the patients in GPR, low acuity patients.  Some of

9  them might not have any medical problem and some might have

10  just pure psychiatric problems and some might have medical

11  problems.  When it comes to RMU, these patients might have five

12  or six different diagnoses or treatment plans.

13  Q.  And in the RMU, are the patients in the eight-by-eight

14  cells with the bars on the front?

15  A.  They have separate rooms with the doors.

16  Q.  And isn't it true those rooms then have something akin to a

17  hospital bed in it; correct?

18  A.  Yes.

19  Q.  And they have a call-bell; correct?

20  A.  Yes.

21  Q.  And then there's usually a bathroom appended to the room;

22  right?

23  A.  Yes.

24  Q.  So it much more, in an RMU, mimics a hospital room than the

25  cells that the patients in regular facilities are housed in;

N27CallH                          Khan - Cross

1    correct?

2    A.  Yes.

3    Q.  And I think you testified you do rounds for your patients

4    on a pretty regular basis; correct?

5    A.  Yes.

6    Q.  When you're at Mohawk, are you doing those rounds?

7    A.  No.

8    Q.  At Mohawk, how did you see your patients when you were

9    working there?

10   A.  A patient comes, a patient will have a scheduled

11   appointment.  They can schedule the appointment through the

12   call-out list and then they schedule their providers to come

13   into the office and see us.  We examine them and make treatment

14   plans from there and then follow up on those patients, as well.

15   Q.  How often did you see a patient when you were working at

16   Walsh, generally?

17            THE COURT:  Are you asking Walsh now or are you asking

18   Mohawk?

19            MS. AGNEW:  I'm asking Walsh.  Oh, thank you, your

20   Honor, I am asking about Walsh.

21            THE COURT:  I'm really following.

22            MS. AGNEW:  Thank you.  You're on it, I'm not.

23   Q.  Dr. Khan, I apologize.  I am asking about Mohawk.

24   A.  I only go there if there is a shortage for the physician or

25   somebody's on vacation, I cover those vacations for a week or

N27CallH                    Khan - Cross

1    maybe a few days in a month.

2    Q.  So you weren't, quote-unquote, assigned to Mohawk; correct?

3    A.  Yes.

4    Q.  And I think you talked about the number of physicians at

5    Mohawk; correct?

6    A.  Yes.

7    Q.  And what was that number again?

8    A.  There are, I think, three providers and two midlevels.

9    Q.  And you said there were approximately 600 patients at

10   Mohawk; right?

11   A.  Yes.

12   Q.  And we've got three MDs, medical doctors?

13   A.  Yes.

14   Q.  And then two midlevels?

15   A.  Yes.

16   Q.  And I think you testified that you've been to Marcy;

17   correct?

18   A.  Yes.

19   Q.  So do you know off the top of your head how many patients

20   are housed at Marcy?  I'll say prisoners.

21   A.  No, at this point, I don't remember the total number.

22   Approximately, I think same number, 500 to 600.

23   Q.  Would you have reason to believe, if I was wrong, if I said

24   it's approximately 900?

25   A.  You could be right because I don't know the exact numbers.

N27CallH                          Khan - Cross

1  Q.  That's fair.  So can you tell me how many physicians, right

2  now, are assigned to Marcy?

3  A.  We have two full-time providers there.

4  Q.  I didn't ask you that.

5         How many physicians, medical doctors are assigned to

6  Marcy?

7  A.  There's no physician at this time, but we hired one just

8  recently.

9  Q.  You hired one.  When is that one going to start?

10 A.  The application is complete and I think 8 of March is his

11 date of start.

12 Q.  And then you mentioned two other providers who are at Marcy

13 right now.  Who are they?

14 A.  Two midlevels.

15 Q.  And what's a midlevel?

16 A.  Nurse practitioner or a physician assistant.

17 Q.  Would I be wrong if I said there's two nurse practitioners,

18 Brandi Lynn Corigliano and Amy Ferguson?

19 A.  Yes.

20 Q.  And you visited there in the last six months; correct?

21 A.  Yes.

22 Q.  How many times?

23 A.  At least two or three times.

24 Q.  During those two or three visits, did you discuss with that

25 staff policy 1.24A?

N27CallH                    Khan - Cross

1    A.  They already are aware of this policy, 1.24A, yes.

2    Q.  How do you know they're already aware?

3    A.  I think we spoke about it, not in an official meeting

4    manner, but just in conversations with the providers there.

5    Q.  What was the substance of those conversations?

6    A.  About the -- I think majority of the conversation was about

7    the MAT program, which we just recently started in the DOCCS,

8    and when we were talking about the MAT program, the MWAP policy

9    also came through, and we talked about that one, as well.

10   Q.  Tell me this, is the MAT program intended to be for pain

11   management?

12   A.  No, it's for addiction medicine, for addiction.

13   Q.  Can you tell me why would a conversation about MAT come up

14   in the context of discussing 1.24A or vise-versa?

15   A.  I think it was just another part of the whole conversation

16   that, you know, we can prescribe any medicine the patient wants

17   and the policy has been rescinded in the past and there's a new

18   policy in effect.  So we were having just general conversations

19   about these things, about the changes.

20   Q.  Isn't it true those conversations took place in October of

21   2022?

22   A.  There was -- when I was a facility health director in

23   Walsh, yeah.

24   Q.  Do you know, approximately, the date?

25   A.  I can't remember the exact date.  Usually it's part of the

N27CallH                         Khan - Cross

1    monthly provider meeting.

2              THE COURT:  Was it in 2022?

3              THE WITNESS:  2020.

4              MS. AGNEW:  He believes it was in 2020.

5    Q.  Sir, I'm going to direct your attention to --

6              MS. AGNEW:  It bears stamp P1, your Honor.  This has

7    already been admitted into the record as D2.

8    Q.  Sir, that's right in front of you.  All of our memories are

9    a little faulty, including my own.  If you want to look at this

10   policy, sir.  Just, first of all, tell me, do you recognize it?

11   A.  Yes.

12   Q.  Can you tell me when 1.24A was promulgated according to

13   this policy?

14   A.  2/8/21.

15   Q.  So is it possible your conversation with your providers

16   happened after February 8th of 2021?

17   A.  Yes.

18   Q.  Is it possible that conversation actually took place in

19   October of 2022?

20   A.  I can't recall.  I can't recall.

21   Q.  When you had that conversation, did you ensure that each of

22   those midlevel providers understood every aspect of this

23   policy?

24   A.  It was just a general conversation.  I can't recall if

25   there was any specifics about the details of the policy.

N27CallH                      Khan - Cross

1    Q.  Did you ever hear about any problems with compliance with

2    1.24A at Mid-State or Marcy?

3    A.  I did not hear any issues, no.

4    Q.  Were you ever charged with making sure that the medical

5    providers at Mid-State and Marcy understood policy 1.24A and

6    how it should be implemented?

7    A.  I was -- my belief, they already knew about the policy when

8    it came out.  So if they had any further questions, they

9    were -- I was always available for them to reach out to me if

10   they have any questions.

11   Q.  Did you ever ask them explicitly if they had any questions

12   about policy 1.24A?

13   A.  I did not ask them, no.

14   Q.  I'm going to take you back to the moment when this was

15   promulgated.  Actually, let's go back.

16          I think we discussed the fact -- and this is just that

17   you submitted one or two MWAP request forms; correct?

18   A.  Yes.

19   Q.  But from late 2020, you were at Walsh RMU; correct?

20   A.  Yes.

21   Q.  Isn't it true that there are patients housed at Walsh RMU

22   for palliative care?

23   A.  Not all of them.  There is a very small number that would

24   be on palliative care.

25   Q.  Can you tell the Court what palliative care means?

N27CallH                    Khan - Cross

1    A.  Palliative care is the management of the end stage of a

2    patient's life.  Most likely, they have a terminal diagnosis.

3    Q.  I think that might -- I want to know why you didn't submit

4    more MWAP request forms when you were working at Walsh RMU from

5    late 2020 until early 2021 when it was rescinded.

6    A.  I believe -- it depends on how the palliative patients are

7    coming to us.  Sometimes we might have one or two patients in a

8    month and sometimes we might not have any patient on palliative

9    care at all.  It's very variable.

10   Q.  Isn't it true under the MWAP policy that prescriptions had

11   to be renewed every 30 days with another request form?

12   A.  Yes.

13   Q.  So during that period, if you only submitted one form,

14   approximately how many patients were you assigned?

15   A.  I had about 20 patients.

16   Q.  And none of those patients required MWAP medication during

17   that time period except for the one who you got baclofen for?

18   A.  It might have been those patients did not require any

19   medication.  It was pretty common, it's not uncommon at all

20   that not every single person is going to be on the long-term

21   pain medications.

22   Q.  We can agree on that.

23        When you started working at Walsh RMU, did you receive

24   any training?

25   A.  Well, I was orientation, yes.

N27CallH                        Khan - Cross

Q.  And orientation is like two weeks for DOCCS orientation;

correct?

A.  Correct.

Q.  Was there any other physician or doctor who trained you?

A.  It was just the orientation about the place and some about

the rules and regulations about the place kind of thing.

Q.  What are you speaking of when you say rules and

regulations?

A.  Like what the process is, how you make the rounds,

documentations, orders, how to write monthly orders, how to

place the consults, those kind of things, which is quite

different from when you come from the community.

Q.  Who introduced you to the health services policy manual?

A.  It was the -- Dr. Samad was the facility medical director

at that time, as well as the nurse manager at that time.

Q.  And did you review the health services policy manual when

you on-boarded to DOCCS?

A.  Yes.

Q.  Did you sign anything that verified that you had read the

manual?

A.  Yes.

Q.  What did you sign, do you recall?

A.  I think I signed some papers that I have received and

reviewed the copies.

Q.  So when you did that review, do you recall reviewing the

N27CallH                         Khan - Cross

1   MWAP policy itself?

2   A.  I reviewed it, yes.

3   Q.  And did anything about the MWAP policy strike you as

4   different than your prior practice?

5   A.  No, it was just an extra form I have to fill out for these

6   medications.  There was nothing more than that, other than --

7   except another extra form if I need to submit other

8   medications.

9   Q.  Did you have any discussions with Dr. Samad or Dr. David

10  Dinello about the prescription of MWAP medications in Walsh?

11          THE COURT:  Slowly, please.

12          MS. AGNEW:  Sorry.

13  A.  Yes, just the extra form has to be filled out first for

14  certain medications.

15  Q.  That was the sum total of your conversations?

16  A.  Yes.

17  Q.  Did David Dinello ever tell you that you should think twice

18  before you prescribe an MWAP medication?

19  A.  No.

20  Q.  Do you recall when 1.24A was promulgated, was David Dinello

21  your RMD?

22  A.  Yes.

23  Q.  Did he ever show up at Walsh RMU?

24  A.  I seen him a couple times since then, yes.

25  Q.  Did you have discussions with him about patients?

N27CallH                    Khan - Cross

1    A.  Yes.

2    Q.  I want you to take a look at the second document there that

3    has a P58 on it.

4            MS. AGNEW:  Your Honor, that's behind your exhibit tab

5    at 58, I hope.

6            THE COURT:  Thank you.

7            MS. AGNEW:  For the record, this document bears Bates

8    number OAGMWAP 101436.

9    Q.  Dr. Khan, I'm going to give you a moment with this email.

10   Okay, I'm not going to test you.  We can refer back to it.

11   Okay?

12   A.  Sure.

13   Q.  Dr. Khan, were you a recipient of this email?

14   A.  Yes.

15   Q.  And isn't it true, Dr. Khan, that a lot of your colleagues

16   at DOCCS were also recipients of this email?

17   A.  Yes.

18   Q.  Before we get into the meat of it, what's the gist -- well,

19   first, who's it from?

20   A.  I believe it's from the RMD, Dr. Dinello.

21   Q.  And can we agree that the date is February 3rd of 2021?

22   A.  Yes.

23   Q.  And can we agree that the subject is health services policy

24   1.24, medications with abuse potential?

25   A.  Yes.

N27CallH                      Khan - Cross

1    Q.   What's the gist of Dr. Dinello's email?

2    A.   I think he's mentioning about rescinding the policy for the

3    MWAP and the form does not need to be filled up again.  Those

4    are the things he's mentioning, acute pain needs to be treated

5    for seven days of medications and chronic palliative pain needs

6    to be treated with what works better for the patient, and

7    clinical judgment as well as the guidance by the specialist, as

8    well, too, in there.

9    Q.   In the first paragraph, can we agree Dr. Dinello writes:

10   "The MWAP policy was been targeted in a class action lawsuit

11   which has been litigated for months and months.  Sadly, after

12   this Monday to 8/21, it will no longer be in effect.  On the

13   plus side, no more MWAP request forms.  On the negative side,

14   this could open the floodgates for highly addictive medications

15   to once again cripple DOCCS and, more importantly, enslave our

16   patient population."

17             That language, do you think that was an encouragement

18   for you and your colleagues to start prescribing the

19   medications you felt best suited your patients?

20   A.   No, it did not actually change anything because the

21   language, people can use whatever they want.  I think at this

22   stage where we are with clinical medicine, everybody's adult,

23   and these kind of language should not hurt my critical

24   disagreement for what I'm going to decide for the patient.

25   Q.   I didn't ask you if it affected you.

N27CallH                          Khan - Cross

1    A.  Okay.

2    Q.  I'm asking you, did the messaging indicate.

3    A.  Messaging, of course it is a negative message.

4    Q.  And then in the last paragraph, can we agree Dr. Dinello

5    writes, the specialists are there to, quote, guide treatment

6    and not dictate care, so choose wisely.

7            Again, is that language encouraging you and your

8    colleagues to follow the recommendations of specialists?

9    A.  I think it's, again, the guidance is there by the

10   specialist and it comes down to the provider's clinical

11   judgment when they see the bigger picture.

12   Q.  After Dr. Dinello left DOCCS' employment, did you, either

13   in your role with Dr. Moores or in your own role as a facility

14   health services director, discuss Dr. Dinello's messaging and

15   what negative impact it might have on provider care?

16   A.  I personally did not discuss.  But whoever I talked to, the

17   providers at the facility, I did not see or they did not see

18   the concern they cannot prescribe any medication just depending

19   on this email, language of this email, either before or after.

20   Q.  Was there a concern that David Dinello had kind of

21   cultivated providers not to prescribe these kind of

22   medications?

23   A.  I think you can try by these kind of messaging, but as I

24   said earlier, a mature, good clinical physician will not

25   compromise the health of his patients, regardless what the

N27CallH                          Khan - Cross

1    other persons are trying to convey.

2    Q.  I want to now talk about you discussed reviewing charts;

3    correct?

4    A.  Yes.

5    Q.  Let's first talk about when you reviewed charts as a

6    facility health services director.  And let me make the record

7    clear, you're no longer a facility health services director;

8    correct?

9    A.  I'm still doing the role until we find another person.

10   Q.  So if I understood, half your time is at Walsh?

11   A.  Yes.

12   Q.  And then half your time is with Dr. Moores; correct?

13   A.  Yes.

14   Q.  So when you're at Walsh, I think you testified you pulled

15   10 charts every few months?

16   A.  Right.

17   Q.  And you review those; correct?

18   A.  Yes.

19   Q.  And then you were saying that you might then, if you notice

20   problems, speak with providers?

21   A.  Yes.

22   Q.  Do you know if that is done DOCCS-wide?

23   A.  I think it's -- the policy I think is we have to do it once

24   a year for the DOCCS providers and midlevels.

25   Q.  Okay.  Who's "we"?

N27CallH                         Khan - Cross

1   A.   The facility health directors needs to review those

2   records.

3   Q.   So once a year, a facility health services director is

4   going to pull 10 charts?

5   A.   Yes.

6   Q.   Some of these facilities, can we agree, have as many as

7   2,000 patients, don't they?

8   A.   Yes.  I'm not sure they go that far in numbers.  I think

9   majority of them are probably close to a thousand, maybe a

10  little above or below a thousand.

11  Q.   In your experience -- I can't talk about Walsh because we

12  agree Walsh only has 130 patients; right?

13  A.   Right.

14  Q.   So 10 charts might give you a pretty good perspective of

15  what's going on at Walsh; right?

16  A.   Right.

17  Q.   But would 10 charts give you a good perspective of what's

18  going on at Green Haven that has 2200 patients?

19  A.   I think a majority of those patients, as you mentioned

20  earlier, they could classify them, a large number might not

21  have any medical problems at all.  So we pick up the patients

22  who have the medical problems for those patients to review the

23  charts.

24  Q.   You're the deputy chief medical officer of DOCCS; correct?

25  A.   Yes.

N27CallH                    Khan - Cross

1   Q.  Isn't it true that Green Haven has a unit for the

2   physically disabled?

3   A.  Yes.

4   Q.  Isn't it true that Green Haven actually has a heightened

5   acuity level when compared with other facilities?

6   A.  Yes, they do.

7              THE COURT:  You two could slow it down a little bit.

8              MS. AGNEW:  Sorry.

9   Q.  I want to go back to your role with Dr. Moores.  Is it your

10  understanding that you and Dr. Moores are supposed to be fixing

11  the effects of MWAP?

12  A.  I think the role we are trying to do is to keep up with the

13  changing environments in the medicine.  Medicine is something

14  which is always changing and things change in medicine and in

15  the DOCCS, as well, too.  So by changing the policies, we are

16  trying to keep up with the changes which are going on in the

17  medicine, and this is an example of what that one is.

18  Q.  Well, I'm talking to you specifically about this.

19  A.  Sure.

20  Q.  And I appreciate that both of you are doing a lot of work,

21  I truly do.  I want is to know if you understand that you have

22  an affirmative role fixing the effects of the MWAP policy?

23             MS. KILEY:  Objection, your Honor.  There was no such

24  testimony given by Dr. Khan, that that was his role as deputy

25  chief medical officer.

N27CallH                        Khan - Cross

1            THE COURT:  That's the question, isn't it?

2            Do you need the question again, sir, or can you answer

3   it?

4            THE WITNESS:  Sure, let me have it.

5   Q.  Do you understand that you have a role with Dr. Moores to

6   affirmatively address the effects of the MWAP policy?

7   A.  Yes.

8   Q.  What is that role?

9   A.  I think the role is to change ourself, as you mentioned

10  earlier, the changing medicine.  Medicine is something that's

11  constantly changing, and I cannot speak for what's in the past,

12  but the things in medicine have changed to the point where we

13  need to update these policies, that's all we're doing.  We're

14  not only changing the policies, we're changing our procedures

15  when it comes to these kind of diagnoses and managements.

16  Q.  Have you taken any effort to identify the patients impacted

17  by MWAP?

18  A.  You know, I have not seen there was any difference, you

19  know, before or after the policy changes.  The patients who are

20  getting treatment, depending on the clinical judgment of the

21  patients -- of the providers and the diagnosis of the patients.

22  So, if there is any issues, me and Dr. Moores are definitely

23  going to look into that one.

24  Q.  I'm going to ask my question again.  I need you to answer

25  the question, not tell me the thing you want me to hear.  Okay?

1    A.  Sure.

2    Q.  Have you made any efforts to identify the patients impacted

3    by MWAP?

4    A.  Yes.

5    Q.  What were those efforts?

6    A.  Again, the policy change is the first thing, which has been

7    done.  MWAP is completely gone, it's not there anymore.  So

8    there is nothing between the patient and the provider at this

9    point to prescribe if the patient needs any of the medications,

10   regardless if it was MWAP or outside the MWAP.

11   Q.  How does promulgating the new policy help you identify the

12   patients impacted by MWAP?

13   A.  I think it's the -- I think it's going to go back to the --

14   clinically, I don't think it's going to impact anything,

15   though.  Yes, we're going to encourage or we're going to make

16   sure all the patients are getting what they need, but I can't

17   specify the procedures.

18   Q.  You can't specify the procedures because there haven't been

19   any procedures to identify the patients impacted by MWAP;

20   correct?

21   A.  I think we -- let me just --

22   Q.  Yes or no, is there a procedure to identify the patients

23   impacted by MWAP?  No one is judging you on it.  Is there or

24   isn't there?

25   A.  We have the procedures in place.  We're trying to audit the

N27CallH                      Khan - Cross

1  charts of the patients who are on the, you know, chronic pain

2  medications or requiring more evaluations.  So there are things

3  in place.

4  Q.  Okay.  Where is the list of the patients impacted by MWAP?

5          MS. KILEY:  Objection, your Honor.  We haven't

6  established that there have been patients impacted by MWAP

7  still today.

8          THE COURT:  I think that the doctor is answering the

9  questions as -- are you able to answer this question, sir?

10          THE WITNESS:  Sure.

11          THE COURT:  Please.  Do you need it again?

12          THE WITNESS:  Sure.

13  Q.  Where is the list of patients impacted by MWAP?

14  A.  I don't believe I have the list.

15  Q.  Does somebody else have the list?

16  A.  That's not -- I can't speak for anybody yet.

17  Q.  To your knowledge, is there a list?

18  A.  I am not sure.

19  Q.  So you testified earlier, and I truly appreciated your

20  testimony, that when a patient gets transferred in, you don't

21  automatically discontinue medications; correct?

22  A.  Yes.

23  Q.  Not until you sit down, and I think you used the term "good

24  effective communication," correct?

25  A.  Yes.

N27CallH                          Khan - Cross

1    Q.  In what way, just for the Court, would that good effective

2    communication be, how does that take place in that interaction?

3    A.  I think it's you schedule a time with the patient, you sit

4    down with the patient, examine them, look at their diagnosis,

5    look at their treatment, and if you think that you want to try

6    something different which might benefit them better compared to

7    what they have in the past.  So this is what you offer to the

8    patients and document accordingly, as well.

9    Q.  And I think you mentioned half an hour to a 45-minute

10   conversation.  Is that how long you speak with your DOCCS

11   patients?

12   A.  I think it's variable.  It can go until, easy, half an hour

13   to 45 minutes, sometimes they're more.

14   Q.  Is that kind of the timeframe of your medical encounters

15   with patients in the RMU?

16   A.  It's not the routine every day, but there are certain

17   patients who require a lot more interaction compared to some

18   other patients.  It's very variable from patient to patient.

19   Q.  Do the providers in normal facilities have the luxury of

20   half an hour to 45 minutes with each patient?

21   A.  I think they have at least half hour.

22            MS. AGNEW:  One moment, your Honor.

23            THE COURT:  Yes, ma'am.

24            MS. AGNEW:  Your Honor, I have no further questions on

25   cross.

1              Thank you very much, Dr. Khan.

2              THE COURT:  Off the record.

3              (Discussion off the record)

4  REDIRECT EXAMINATION

5  BY MR. NOLAN:

6  Q.  Dr. Khan, Ms. Agnew just mentioned patients impacted by

7  MWAP.  Do you recall those questions?

8  A.  Yes.

9  Q.  She didn't say what she meant by impact, did she?

10 A.  No.

11 Q.  You don't know what was in her head when she said "patients

12 impacted by MWAP," correct?

13 A.  Yes.

14 Q.  And when she asked you about a list of patients impacted by

15 MWAP, you wouldn't know what to look for, would you?

16 A.  Right.

17             MR. NOLAN:  Thank you.  No further questions.

18             THE COURT:  Recross.

19             MS. AGNEW:  Nothing further, your Honor.

20             THE COURT:  Off the record.

21             (Witness excused)

22             (Discussion off the record)

23             MR. MORRISON:  Your Honor, I believe the defendants

24 are done with their case, we do want to make an oral motion for

25 a judgment.

1              THE COURT:  Ms. Kiley, do you folks rest?

2              MS. KILEY:  Yes, your Honor.

3              THE COURT:  Mr. Morrison.

4              MR. MORRISON:  At this time, we would like to make an

5       oral motion for --

6              THE COURT:  It is deemed made now.  You can argue it

7       later.

8              Let's take a break before we get this witness going,

9       please.  Thank you.

10             (Recess)

11       AMY FERGUSON,

12            called as a witness by the Plaintiffs,

13            having been duly sworn, testified as follows:

14             THE DEPUTY CLERK:  Please state your name and spell it

15       for the record.

16             THE WITNESS:  Amy Ferguson, A-m-y F-e-r-g-u-s-o-n.

17             THE COURT:  Ms. Agnew.

18       DIRECT EXAMINATION

19       BY MS. AGNEW:

20       Q.  Good afternoon, Ms. Ferguson.  I want to just start off

21       with your educational background.  If you can tell the Court,

22       generally speaking about that, I'd appreciate it.

23       A.  I received a bachelor's degree in biology and psychology

24       from Union College in 1998, and a master's degree in RN family

25       nurse practitioner from Massachusetts General Institute in

1  health professions in 2002 in Boston.

2  Q.  Can you tell me, for the nurse practitioner master's, how

3  many years did you attend school?

4  A.  Three years post-bachelor program.

5  Q.  Are you currently licensed in the State of New York?

6  A.  Yes.

7  Q.  Can you tell the Court how long have you worked for DOCCS?

8  A.  17 years.

9  Q.  And just by way of background, we spoke the other day,

10  correct, a couple weeks ago?

11  A.  Yes, for the deposition, yes.

12  Q.  Can you tell us, since you on-boarded to DOCCS, where have

13  you worked, in which facilities?

14  A.  I worked at Mid State Correctional Facility from 2005 until

15  this past August, and since August, I've been at Marcy

16  Correctional Facility.

17  Q.  Just so the record is incredibly clear, that's from August

18  2022; correct?

19  A.  Yes, that is correct.

20  Q.  So you were at Mid-State for approximately 17 years;

21  correct?

22  A.  Correct.

23  Q.  And were you always working as a nurse practitioner at

24  Mid-State?

25  A.  Yes.

N27CallH                     Ferguson - Direct

1    Q.  Are you considered by DOCCS to be a midlevel provider?

2    A.  I believe so.  There's several -- I don't know what

3    officials are called, physician extenders, midlevels, I don't

4    know.  That's what the terminology is right now.

5    Q.  For the record, you do not have a medical degree; correct?

6    A.  No.

7    Q.  Can you just tell the Court, in your clinical practice at

8    Mid-State, what does a typical patient encounter look like?

9    A.  So, if a patient comes to see me for diabetes, say, I would

10   review their recent lab work, I would discuss their medication

11   and their compliance, I would do an exam, I would discuss their

12   (technical interruption) with them, talk about diet and

13   exercise.  That would be a chronic care visit.  An episodic

14   visit could be whatever they're presenting with, a cold, an

15   infected toe, back pain.  It depends on the visit.

16   Q.  I'm going to ask you, this is not your fault, it's the

17   connection.  If you could speak a little more slowly and more

18   clear.  And I apologize.

19   A.  Okay.

20   Q.  It's just how this is working.  Okay?

21   A.  Okay.

22   Q.  So, in addition to your medical encounters with patients,

23   what other duties do you have as a nurse practitioner with

24   DOCCS?

25   A.  I'm sorry.  Can you repeat.  There's a really loud fan and

N27CallH                    Ferguson - Direct

1   I was just asking if they can turn that down.  Would you mind

2   repeating that question.  I'm sorry.

3   Q.  Sure.  I appreciate that.

4           In addition to your medical encounters, your clinical

5   duties, do you have other duties as a nurse practitioner with

6   DOCCS?

7   A.  Meaning administrative duties?

8   Q.  Yes, ma'am.

9   A.  If so, then no.  No.

10  Q.  So, when you came into DOCCS, did you receive any specific

11  training?

12  A.  Yes.

13  Q.  Can you describe that for the record.

14  A.  In the clinical setting, I was trained by the physician

15  that was here at the time as to how they operated in the

16  clinic.  In the correctional setting, I was given a weeklong

17  introduction to corrections training.

18  Q.  How about medical training, Ms. Ferguson?

19  A.  I shadowed the doctor for several days as to how things

20  worked in the correctional setting at Mid-State.

21  Q.  Could you tell us for the record which doctor that was?

22  A.  That was Dr. Ramineni.

23          THE COURT:  Ms. Ferguson, are you able to spell that

24  for us, please?

25          THE WITNESS:  I believe it's R-a-m-i-n-e-n-i.

1            THE COURT:  Thank you.

2            THE WITNESS:  You're welcome.

3   Q.  Can you tell us for the record, is Mid-State a medium

4   security facility?

5   A.  It is a medium security facility.

6   Q.  Can you tell us approximately how many prisoners are housed

7   at Mid-State, and I appreciate that that fluctuates.

8   A.  Maybe 1100 right now.

9   Q.  Generally speaking, when you were offering clinical

10  services at Mid-State, how many patients were assigned to you?

11  A.  We didn't have a set assignment of patients at Mid-State.

12  Q.  And now that you're at Marcy, is that different?

13  A.  It is different.

14  Q.  And how is it different?

15  A.  You split the alphabet.  I have the alphabet from K to Z.

16  Q.  You have the alphabet from K, K as in Khan?

17  A.  Kool-Aid.

18  Q.  Kool-Aid.  Very good.  Thank you.

19            Isn't it true nurse Corigliano has the alphabet A

20  through J?

21  A.  Nurse practitioner, yes.

22  Q.  Yes.  Thank you.  I apologize.

23            Is there any doctor currently assigned to Marcy?

24  A.  Dr. Khan is their go-to with any questions, but there is no

25  physician employed at Marcy.

N27CallH                    Ferguson - Direct

1   Q.  What do you mean by Dr. Khan is your go-to with any
2   questions?
3   A.  He is our backup if we were to have any concerns or
4   questions.
5   Q.  Do you mean questions about patient care?
6   A.  In general.
7   Q.  Is it your understanding that within DOCCS, a nurse
8   practitioner should be assigned to a doctor?
9   A.  I'm not aware.
10  Q.  So as of today, it's you and nurse practitioner Brandi Lynn
11  Corigliano at Marcy; correct?
12  A.  Correct.
13  Q.  And the two of you see, between the two of you, 1100
14  patients; correct?
15  A.  That is correct.  No, Marcy has about eight or nine hundred
16  patients.
17  Q.  I apologize.  You meant 1100 about Mid-State; right?
18  A.  Right.  You're asking about the patients at Mid-State.
19  Q.  I'm sorry.  You have approximately 400 to 450 patients
20  yourself; correct?
21  A.  I believe so.  I never counted.
22  Q.  That's okay.  If you are having medical encounters in a
23  day, approximately how many patients do you see?
24  A.  Up to 12, but could be more with emergencies.
25  Q.  Approximately how much time do you have to spend with each

1   patient?

2   A.  As much time as I need.

3   Q.  Just generally speaking, approximately how much time do you

4   spend on a clinical encounter?

5   A.  Could be anywhere from 5 minutes to 20, 25 minutes or

6   longer depending on the needs of the appointment.

7   Q.  When you have those clinical encounters, do you consult

8   with the patient's chart?

9   A.  Yes.

10  Q.  And can you describe for the record what the chart is

11  composed of that you have at your fingers?

12  A.  It's the patient's medical chart.  So it has their problem

13  list, their medications, any previous notes from the past year,

14  labs, consults, history and physical.

15  Q.  And the chart that you keep with you during medical

16  encounters, could we call that the active chart?

17  A.  That is correct.

18  Q.  And can you describe for the record what the inactive chart

19  is?

20  A.  Anything from a previous prison bid and/or anything older

21  than a year old during their present bid.

22  Q.  I want to speak for a moment, you have in front of you, I

23  hope, your documents.  I want you to look at P1.

24  A.  Okay.  I have to open it.

25  Q.  Take your time.  You are such a good player.

1    MS. AGNEW:  We put a note not to open it until they

2    testified, your Honor.

3    Q.  Ms. Ferguson, a-plus, gold star.

4         THE COURT:  Now you're going to scare her.

5         MS. AGNEW:  I'm not going to scare her.  She's tough.

6    She's tough.

7    Q.  Right, Ms. Ferguson?

8    A.  Okay.

9    Q.  Do you see the page that has P1 on it?

10   A.  Yes.

11        MS. AGNEW:  For the record, your Honor, that's already

12   been entered into the record as D2.

13   Q.  Can you tell us, Ms. Ferguson, do you recognize that

14   document?

15   A.  I do.

16   Q.  What do you recognize it to be?

17   A.  The DOCCS policy for chronic pain.

18   Q.  Do you recall speaking with me about this DOCCS policy a

19   few weeks ago when I deposed you?

20   A.  I do.

21   Q.  Since I deposed you, have you spoken with anyone from DOCCS

22   or the Office of the Attorney General or otherwise about this

23   policy or your testimony today?

24   A.  No.

25   Q.  So can you tell me, do you recall when this policy was

1   promulgated?

2   A.   Just from the date, that it was February 2021.

3   Q.   And when it was promulgated, did you understand this policy

4   to be replacing another policy?

5   A.   I don't remember.

6   Q.   Are you familiar with the former MWAP policy?

7   A.   I am.

8   Q.   Could you describe what the MWAP policy dictated as you

9   remember it sitting here today?

10  A.   That dictated that there was a list of medications with the

11  potential to cause abuse.  If we wanted to prescribe those

12  medicines, we had to complete a form and submit it for review

13  and approval before the pharmacy would fill those medications.

14  I remember that mostly going away, but that's what I remember.

15  Q.   When you completed those forms, who did you submit them to?

16  A.   They were submitted electronically, but I believe they were

17  reviewed by Dr. Dinello.

18  Q.   And at that time, was Dr. Dinello your regional medical

19  director?

20  A.   Yes.

21  Q.   Do you recall, and it doesn't have to be an exhaustive

22  list, but what kind of medications were deemed to be MWAPs

23  under the policy?

24  A.   Any narcotics, testosterone, Neurontin, baclofen, and I

25  don't remember what else was on that list.

N27CallH                    Ferguson - Direct

1   Q.  Do you recall if cough syrups were on that list?

2   A.  I don't remember.

3   Q.  How about Imodium?

4   A.  That was probably on that list, but I don't specifically

5   remember.

6   Q.  Can you tell us, sitting here today, what does Imodium do?

7   A.  It stops diarrhea.

8   Q.  And can you tell us, in your experience as a DOCCS

9   provider, how is Imodium administered to patients?

10  A.  Pill.  Is that what you mean, what form does it come in?

11  Q.  Yes.

12  A.  It's a pill.

13  Q.  And is Imodium, when it is given, given one-on-one?

14  A.  I don't remember if it was necessarily given one-on-one.

15  Maybe when it was on the list it was, but not always.

16  Q.  Let me ask you, for the record, what does one-on-one

17  administration mean?

18  A.  They have to come to the medical building and take the

19  medication in front of the nurse.

20  Q.  Do you have any understanding of why some medications are

21  one-on-one?

22  A.  Because they can be abused and sometimes, like blood

23  thinners need to be one-on-one for the same reasons so patients

24  can hoard them and take them or harm themselves with those

25  medications.  Also, insulin and any medications that need to be

N27CallH                        Ferguson - Direct

1   injected are also one-to-one.

2   Q.  Can you tell us, for the record, what do you mean when you

3   say can be abused?

4   A.  Imodium, taken in large amounts, can be used to get high,

5   something like that.

6   Q.  Do you have any awareness -- I'm sorry.

7   A.  I had --

8   Q.  How much Imodium would a patient have to take to get high?

9   A.  I'm not sure.

10  Q.  Is there a way within the DOCCS medical system to test

11  whether or not an inmate has taken an illicit drug?

12  A.  There are tox screens.

13  Q.  How is a tox screen done?

14  A.  By urine.

15  Q.  How about, are there screening tests for the amount of

16  gabapentin in a patient's bloodstream?

17  A.  We don't generally use that.  They're not indicative of

18  their level taking that I've been told.  No, I never check for

19  gabapentin levels in blood.

20  Q.  But is the testing available if you wanted to do it?

21  A.  It is available, it's not reliable.

22  Q.  Who told you it wasn't reliable?

23  A.  Physician.  I don't remember.  I couldn't specifically tell

24  you.

25  Q.  Do you recall when P1 was promulgated, did you receive any

1  training on P1?

2  A.  I don't remember.

3  Q.  Do you often receive training on new DOCCS policies?

4  A.  Sometimes.  This was at Mid-State, so not all the time.

5  Q.  When you do receive training on policies, what form did

6  that take?

7  A.  At Mid-State?

8  Q.  Yes, ma'am.

9  A.  If they were printed out and laying in the nurses' station

10  for us to read or if they were hanging in the nurses' station.

11  Q.  How did the printing out of the policy offer you training

12  on how the policy should be implemented?

13  A.  I don't know.  That was what was available.

14  Q.  Would you sign a verification when you reviewed a policy?

15  A.  When I read and reviewed a policy, I would, yes.

16  Q.  Is that also the program at Marcy?

17  A.  Marcy, they are left in central area for reviewing in the

18  nurses station.

19  Q.  When you were in Mid-State, were new policies always left

20  there for you to review and then sign a verification?

21  A.  No.

22  Q.  Was there any set period of time when you had to review the

23  health services policy manual and verify in some form that you

24  had reviewed it?

25  A.  Sometimes.  I don't know if (technical interruption).

1  Q.  Do you recall ever being prompted to review the health

2  services policy manual and to verify that you had reviewed it?

3  A.  I know we had to sign that we reviewed the clinical

4  practice guidelines for primary care providers yearly, but I

5  don't remember about the health services policy manual.

6  Q.  Just for the record, those are two separate sources of

7  documents; correct?

8  A.  Correct.

9  Q.  And is it true that both of those sources of documents are

10 maintained on your computer system?

11 A.  Yes, that is correct.

12 Q.  When 1.24A was promulgated, do you recall changing any of

13 your clinical encounter practices?

14 A.  I don't recall.

15 Q.  Do you recall a time when you started adding problem list

16 code 338 to the medical problem lists of your patients?

17 A.  No, I don't.

18 Q.  Have you ever added code 338 to the medical problem list of

19 your patients?

20 A.  I may have, but I don't remember.

21 Q.  Do you ever recall getting any direction, other than in

22 this policy, that you should be adding problem list code 338 to

23 the medical problem lists of patients who suffer from chronic

24 pain?

25 A.  No, I don't remember.

1  Q.  You don't remember or you've never gotten any direction to

2  do that?

3  A.  I don't remember if I have gotten direction to do that.

4  Q.  If you had gotten direction to do that, would you have done

5  it?

6  A.  Yes.

7  Q.  So do you recall at any point in time systematically going

8  through your patients and adding 338 to the medical problem

9  list codes for your patients who suffer from chronic pain?

10 A.  No, I do not.

11 Q.  Ms. Ferguson, do you treat patients who suffer from chronic

12 pain?

13 A.  Yes.

14 Q.  Looking at policy 1.24A, at the third paragraph, it also

15 mandates that a provider, in the event that the PCP does not

16 accept the recommendation of the specialist, that the PCP will

17 document in the AHR regarding the reasons why the PCP does not

18 accept the recommendations.

19        Have you ever received training, Ms. Ferguson, to make

20 those recordings within the AHRs?

21 A.  I don't remember.  I may have.

22 Q.  If you had received that training, do you believe you would

23 have signed a verification that you received it?

24 A.  If I received training, I would have, yes.

25 Q.  Can you tell me, as practice, when you are not going to

1    follow the recommendation of a specialist, do you record the

2    reasons why in the patient's AHR?

3              MR. NOLAN:  Objection.  She hasn't established that

4    she doesn't follow the recommendations of a specialist.

5              THE COURT:  I think she used the word "if."

6              MR. NOLAN:  No, she said "when."

7    Q.  Ms. Ferguson, do you always follow the recommendations of

8    specialists?

9    A.  I don't know if I would say always.  It's up to our

10   discretion per the policy and outside consults.

11   Q.  Who's outside counsel?

12   A.  Consults.

13   Q.  I apologize.

14             And you referenced a policy.  What policy is that?

15   A.  The policy related to outside medical appointments.

16   Q.  And what does that policy say about following the

17   recommendation --

18   A.  That's --

19   Q.  Sorry.  Let me finish.

20             -- about following the recommendations of outside

21   specialists?

22   A.  That outside consultants make recommendations and it's up

23   to the medical providers in DOCCS to determine what is ordered.

24   Q.  So, do you record if the specialist has made a

25   recommendation you are choosing not to follow?

N27CallH                          Ferguson - Direct

1   A.  I've reviewed the consult, I write a note in the AHR

2   related to the consult and what I'm ordering.  Sometimes I will

3   note the reasoning of why I'm ordering something or not

4   ordering something, or sometimes I'll follow the

5   recommendations, everything that they've recommended, and

6   sometimes I omit something.  If I don't think it's necessary or

7   the outside providers may not be aware of what we have

8   available in DOCCS.

9   Q.  Do you always follow the part of policy 1.24A that says you

10  should record the reasons why you're not going to follow a

11  specialist's recommendations?

12  A.  I don't know if I've not followed an in-clinic

13  recommendation.  So, I couldn't say that I (technical

14  interruption) consult --

15  Q.  Do you recall, when I took your --

16  A.  -- consult.  This policy is only talking about pain clinic

17  consults, not every other consult.

18          THE COURT:  Ms. Ferguson, I'm going to read the

19  portion of the answer we were able to hear and then I'm going

20  to ask you if you had completed it.

21          The question was:

22  "Q.  Do you always follow the part of policy 1.24A that says

23  you should record the reasons why you're not going to follow a

24  specialist's recommendations?

25  "A.  I don't know if I've not followed an in-clinic

1    recommendation.  I couldn't say."

2                THE COURT:  And then there's a portion missing.  And

3    then you said something about this is only talking about pain

4    clinic consults, not every consult.

5                Would you tell us what else you said in that answer,

6    please, ma'am.

7    A.  Yes.  I said it was a pain clinic consult.  So this policy,

8    1.24A is specifically referring to when patients go out for a

9    pain clinic appointment only.  So I said when patients are

10   brought out to a pain clinic specialist, I believe I followed

11   their recommendations and write the orders that are

12   recommended.  I don't remember if I've disagreed with a pain

13   clinic specialist and written the note in the AHR.  So I don't

14   know if I can answer always because your question said do I

15   always, and I don't know.

16   Q.  Do you recall when I took your deposition on January 12th

17   of 2023?

18   A.  Yes.

19   Q.  And do you recall that Mr. William Nolan was present?

20   A.  Yes.

21   Q.  Do you recall that Mr. Ryan Manley was present?

22   A.  Yes.

23   Q.  And do you recall that we had a court reporter who was over

24   the computer?

25   A.  Yes.

1    Q.  And do you recall being sworn in at that time to tell the

2    truth in your testimony?

3    A.  Yes.

4    Q.  And do you recall me asking you:

5    "Q.  Do you record if the specialist has made a recommendation

6    you are choosing not to follow?

7    "A.  Not always.

8    A.  Okay.

9    Q.  Okay.  That was your testimony on January 12th of 2023;

10   correct?

11   A.  Yes.

12   Q.  Can you tell me where in policy 1.24A it says that it

13   applies only to pain management consults?

14   A.  It just says specialty consults will be ordered as

15   indicated for the evaluation and care of chronic pain patients.

16   So that was my interpretation.

17   Q.  Is it only pain management doctors who treat chronic pain

18   patients?

19   A.  Chronic pain is a fairly general term, so I don't know.

20   Q.  Do you recall a patient named Aaron Dockery?

21   A.  Yes.

22        MS. AGNEW:  Mr. Dockery, can you look up at the camera

23   and just wave, maybe drop your mask.

24   Q.  Do you see Mr. Dockery in this courtroom?

25   A.  I can.

1    Q.  And do you know Mr. Dockery, Ms. Ferguson?

2    A.  I know him, yes.

3    Q.  How do you know Mr. Dockery?

4    A.  I only know him because I was covering Ms. Corigliano's

5    patients when she was away.

6    Q.  So normally speaking, is Mr. Dockery your patient?

7    A.  No.

8    Q.  Can you look in that pile I gave you, and I apologize,

9    there is a bound group of documents, and on the cover it says

10   Aaron Dockery, DIN 15A3271, and I premarked it as P3.

11   A.  Yes.

12           MS. AGNEW:  For the record, this is a subset of

13   Mr. Dockery's AHR at DOCCS.

14   Q.  It is not complete, Ms. Ferguson, so I don't want you to

15   believe this is an entire copy of that.  Okay?

16   A.  Okay.

17   Q.  Can you tell us, sitting here today, are you familiar with

18   Mr. Dockery's medical history?

19   A.  I know he has multiple sclerosis.

20   Q.  How did you come to know that Mr. Dockery had multiple

21   sclerosis?

22   A.  From his chart.

23   Q.  When did you review his chart?

24   A.  2022.

25   Q.  I'm sorry?

N27CallH                    Ferguson - Direct

1    A.   Probably in December of 2022.

2    Q.   And can you tell me why you reviewed Mr. Dockery's active

3    chart?

4    A.   Because the nurse approached me that he was refusing mouth

5    checks for his Neurontin and his baclofen.

6    Q.   What do you mean when you say the nurse approached you?

7    A.   (Technical interruption)

8    Q.   I'm so sorry.  We missed that part, Ms. Ferguson.

9    A.   The nurse approached me to let me know he was refusing to

10   let the nurse check his mouth to ensure he took the Neurontin

11   and the baclofen.

12   Q.   Who was the nurse who approached you?

13   A.   Theresa Reilly.

14   Q.   Did she have anything with her when she approached you?

15   A.   I don't remember.

16   Q.   When she first approached you, were you familiar with

17   Mr. Dockery's medical history?

18   A.   I don't think so.

19   Q.   So when nurse Reilly approached you, what actions did you

20   take?

21   A.   Well, she told me over the course of several days.  She

22   told me the first time just to let me know and then I believe

23   let me know after the third time, the third refusal results in

24   a discontinuation of medication.

25   Q.   Can you please explain to the Court what that means, the

1    third time a patient refuses, it results in a discontinuation

2    of medication, where is that, is that a policy?

3    A.  It is.

4    Q.  Where is that policy written?

5    A.  I don't know.  Probably the medication administration

6    policy.

7    Q.  Who is supposed to discontinue the medications if a patient

8    misses three doses?

9    A.  The provider.

10   Q.  And have you discontinued the medications of patients under

11   those circumstances in the past?

12   A.  Yes.

13   Q.  Approximately how many times?

14   A.  Many times.

15   Q.  When you do that discontinuation, do you review the

16   patient's refusal forms?

17   A.  I may.

18   Q.  Can you tell the Court what a refusal form is?

19   A.  A refusal form is a piece of paper that an inmate signs or

20   doesn't sign that refuses medication, treatment, trip.

21   Q.  Isn't it true if a patient refuses either medication or a

22   trip, a refusal form is supposed to be completed?

23   A.  That is correct.

24   Q.  So when you discontinue medications because a patient has

25   missed three doses, do you always review those refusal forms?

1   A.  I try to.  I don't know if you're asking always.

2   Q.  I'm not asking always, but generally, you look at the

3   refusal forms; correct?

4   A.  Yes.

5   Q.  What if you don't have three refusal forms?

6   A.  If the nurses documented that he's refused it three times,

7   despite being called down, refusing to comply with the

8   procedure, it will be discontinued.

9   Q.  Do you look into why a patient might have not shown up at

10  the med window?

11  A.  If the patient mentioned why they were refusing the

12  medicine, then it would be discussed, I would absolutely meet

13  with them.  If the patient is just refusing for the nurse to

14  check their mouth to show they've taken their medicine, then

15  that's their choice, but we have a job to do to make sure a

16  medicine is taken and not diverted.

17  Q.  Did nurse Reilly tell you why she believed Aaron Dockery

18  was diverting his medication?

19  A.  She didn't say that.  She just said he was refusing to do a

20  mouth check for the medication.  She didn't tell me anything.

21  Q.  And did you read Aaron Dockery's refusal form?

22  A.  I don't remember.

23  Q.  So what action did you then take?

24  A.  I discontinued the medication because he was refusing the

25  mouth check.

N27CallH                    Ferguson - Direct

1   Q.  Did you sit down with Mr. Dockery and discuss the fact that

2   you were going to discontinue his medications?

3   A.  No, he had already missed three to four days of doses at

4   that point because he was refusing them when I discontinued

5   them.

6   Q.  When you discontinued the medications, did you review

7   Mr. Dockery's chart to see why he was taking the medications?

8   A.  No.

9   Q.  So when you discontinued Mr. Dockery's baclofen and

10  gabapentin, you had no idea why he was taking them?

11  A.  He was refusing them.  That's why they were discontinued.

12  Q.  Did you know that Mr. Dockery was taking those medications

13  to control his symptoms for his multiple sclerosis?

14  A.  I believe he was taking Neurontin, which he chose to not

15  take for four days before it was discontinued.

16  Q.  Did there come a time when you sat down with Mr. Dockery

17  and discussed his refusals with him?

18  A.  No, he never said his concerns to sick call or the nurse.

19  Had he, this would have been avoided.

20  Q.  Say that again.  He never reported any concerns to sick

21  call or the nurse?

22  A.  Right.  If he had reported this issue about the mouth check

23  and the flashlight, then we would have dealt with it at that

24  time, but instead, here we are.  I didn't know the issue was

25  over a mouth check until we heard from legal.

1  Q.  You didn't know the issue was over a mouth check until you

2  heard from legal?

3  A.  That it was over the flashlight.  His complaint was because

4  of the flashlight, apparently.  The first time we were aware of

5  that was when he came to legal, that through the sick call

6  contact.

7  Q.  Can you open up those documents I gave you, Mr. Dockery's,

8  and they're imperfect, so bear with me, but if you could go to

9  page 313, which is very much toward the back.

10  A.  Yes.

11  Q.  Do you see page 312, it says Aaron Dockery 312 on the

12  bottom?

13  A.  Yes.

14  Q.  Do you see your handwriting on that page?

15  A.  I do.

16  Q.  And what is your handwriting memorializing?

17  A.  Discontinue Neurontin and baclofen, secondary to refusal.

18  Q.  When you signed that, did you meet with Mr. Dockery and ask

19  him why he was refusing the medications?

20  A.  No.

21  Q.  Can we just flip one page over, it should be Aaron Dockery

22  314, but it was stamped upside down because I'm sometimes not

23  good at my job and I apologize.

24          Can we agree that that is a note from Mr. Dockery to

25  the nurse administrator?

1   A.  Yes.  I'm not the nurse administrator.

2   Q.  I understand.  And isn't this note dated December 8 of

3   2022?

4   A.  Yes.

5   Q.  So are you Mr. Dockery's normal provider?

6   A.  No.  Neither is the nurse administrator.

7   Q.  I understand.  When you discontinued Mr. Dockery's

8   medication, would he have any way of knowing who discontinued

9   it?

10  A.  He wrote the letter on the 8th, I discontinued it on the

11  2nd.

12  Q.  And what does that mean to you?

13  A.  That means, to me, that he told us his reasoning six days

14  after it was discontinued and nine days after he started to

15  refuse it.

16  Q.  Do patients at Marcy need a pass in order to go to the med

17  line?

18  A.  I believe they do.

19  Q.  If you're looking at that, can a patient go to the med line

20  if he doesn't have his pass without getting a ticket?

21  A.  I don't know.

22  Q.  Has anyone counseled you, and that's besides me speaking

23  with you in our deposition, on not discontinuing patients'

24  medications until you sit down and speak with them?

25  A.  No, they have not.

N27CallH                          Ferguson - Direct

1    Q.  Now, looking back at policy 1.24A, isn't it true that the

2    second paragraph from the bottom says, "Pain management

3    medication should only be discontinued after a provider has met

4    with the patient, discussed the issues regarding the use of the

5    medication, analyzed the patient's situation, and subsequently

6    determined that it is in the best interests of the patient for

7    the medication to be discontinued"?

8    A.  The patient refused the medication.

9    Q.  I didn't ask you that, ma'am.  I asked you if that's what

10   the policy says?

11   A.  Okay.  That's what the policy says.

12   Q.  Did you follow the policy when you discontinued Aaron

13   Dockery's medication?

14   A.  (Technical interruption) policy --

15   Q.  Could you say that again.  I apologize.  You froze.

16   A.  I followed the medication administration policy about

17   medication refusals.

18   Q.  Did you prescribe an effective alternative for Mr. Dockery

19   to manage his symptoms from MS?

20   A.  I did not prescribe anything.

21           MS. AGNEW:  I have no further questions, your Honor.

22           THE COURT:  Thank you.  Cross examination, please.

23           MR. NOLAN:  Real quick before cross, I don't know if

24   you entered that into evidence.

25           MS. AGNEW:  Thank you so much.  I didn't enter it into

N27CallH                          Ferguson - Cross

 1  evidence, your Honor.

 2          THE COURT:  Yes, go ahead.

 3          MS. AGNEW:  I apologize.  Your Honor, I'd like to move

 4  into evidence the pages from the group of documents premarked

 5  P3 at Aaron Dockery 312, 313, and 314.

 6          THE COURT:  Any objection?

 7          MR. NOLAN:  None.

 8          THE COURT:  Received.

 9          (Plaintiffs' Exhibit P3, PAGES 312, 313, 314 received

10  in evidence)

11          MR. NOLAN:  Are you just moving in parts of it?

12          MS. AGNEW:  Just those three pages.

13          MR. NOLAN:  Why don't we move in the whole thing since

14  we stipulated to the admissibility of the whole thing.

15          MS. AGNEW:  No, just those three pages.

16          MR. NOLAN:  We stipulated to the admissibility --

17          MS. AGNEW:  You can use my exhibit, sir.

18          MR. NOLAN:  Okay.

19          THE COURT:  Cross, please.

20  CROSS-EXAMINATION

21  BY MR. NOLAN:

22  Q.  Good afternoon, nurse practitioner Ferguson.  Can you hear

23  me?

24  A.  Yes, I can.  Good afternoon.

25  Q.  Do you have P3 in front of you?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

N27CallH                    Ferguson - Cross

1    A.  Yes, I do.

2    Q.  Can you turn to page 309 at the bottom in the middle.

3    A.  Yes, I see it.

4    Q.  So you have 309 in front of you?

5    A.  Yes.

6    Q.  Can you just take a minute to familiarize yourself with

7    that.

8    A.  Okay.

9    Q.  The top portion on page 309, can you describe what that

10   says?

11   A.  That the patient was brought to medical and possibly under

12   the influence of an unknown substance.  Slow to respond.  It

13   was a nurse visit on 11/9/22.

14   Q.  And what does that indicate to you as a medical provider?

15   A.  That means that he may have been high on something and

16   brought to medical to be evaluated.

17   Q.  Now, you talked earlier about the date that you actually

18   discontinued Mr. Dockery's medications; correct?

19   A.  Correct.

20   Q.  When was that?

21   A.  That was on 12/2/2022.

22   Q.  So that was after the medical records indicate that he may

23   have showed up high?

24   A.  That is correct.

25   Q.  And you talked a little bit earlier about what you said was

N27CallH                        Ferguson - Cross

1   diversion.  Can you describe what you meant?

2   A.  That could be not taking your medication as prescribed,

3   taking it back with you to your cell to sell or to use in large

4   amounts for other purposes.

5   Q.  And you indicated, I believe, that there were two or three

6   occasions that Mr. Dockery, to your understanding, had refused

7   his medication, his gabapentin and his baclofen; is that

8   correct?

9   A.  That's correct.

10  Q.  And when, to your understanding, was it that he refused his

11  baclofen and his gabapentin at the mouth check?

12  A.  He had refused it, from what I can see, at least on 12/1

13  and 12/2 with the mouth check.

14  Q.  So that was after he showed up to medical high?

15  A.  Correct.

16          MS. AGNEW:  Objection.  It's after the notes say --

17          THE COURT:  Fair enough, right?

18          MR. NOLAN:  Fair enough, your Honor.

19  Q.  Now, when a patient is refusing medication on multiple

20  occasions in a short period of time, does that present any

21  concerns to you as a medical provider?

22  A.  I mean, if they're refusing their medication, it is a

23  concern as to -- he was refusing the procedure of the

24  medication administration.

25  Q.  What does it tell you --

```
 1   A.  So --
 2   Q.  What does it tell you about their need for that medication
 3   when they're refusing it?
 4              MS. AGNEW:  Objection.
 5              THE COURT:  Basis.
 6              MS. AGNEW:  Didn't refuse the medication, he refused
 7   the mouth check, your Honor.  She said that.
 8              THE COURT:  Sustained.
 9   Q.  What does it tell you when a patient refuses a mouth check
10   for medication as to their need for that medication?
11   A.  Well, if they don't want to comply with the DOCCS
12   procedures of giving medication, which, to my knowledge, have
13   always been that way, then they're refusing to follow the
14   procedures that have been there.  Then maybe they don't need it
15   or maybe they have something else going on.
16   Q.  Well, what else might be going on?
17   A.  Diversion.
18   Q.  In Mr. Dockery's case, with a patient who showed up high a
19   month earlier --
20              MS. AGNEW:  Objection.
21              THE COURT:  Same objection, counsel.
22   Q.  Having reviewed Mr. Dockery's medical records, is there
23   anything that you could see now to suggest to you that there
24   was a substantial risk of diversion?
25              MS. AGNEW:  Objection.
```

1          THE COURT:  Ms. Ferguson, when counsel objects, would

2    you hold your answer, please, and let me rule on it.

3          THE WITNESS:  I apologize.

4          MS. AGNEW:  I'm going to withdraw my objection, your

5    Honor.

6          THE COURT:  All right.  Here we go.  Ms. Ferguson, do

7    you need the question again?

8          THE WITNESS:  Yes.

9          THE COURT:  Having reviewed Mr. Dockery's medical

10   records, is there anything that you could see now to suggest to

11   you that there was a substantial risk of diversion?

12   A.  Yes, possibly.

13   Q.  And when presented with a substantial risk of diversion, do

14   you, as a medical provider, have medical concerns about

15   continuing that person's medication?

16         THE COURT:  Is this an excessively leading question or

17   a moderately leading question?

18         MR. NOLAN:  This is a witness who's not represented by

19   counsel today.

20         THE COURT:  All right.  I'm listening pretty hard.

21   Okay.

22         What you said was, when presented with a substantial

23   risk of diversion, do you, as a medical provider, have medical

24   concerns about continuing that person's medication.

25         Do you want to stick with that or do you want to do

1    something else?

2                MR. NOLAN:  I'll stick with that.

3                THE COURT:  Ms. Ferguson.

4                THE WITNESS:  Yes.

5    Q.   What are those concerns?

6    A.   The concerns are for the safety of the patient, that the

7    patient does not take that medication back to take all at once

8    to possibly overdose, that is the concern, or to sell some to

9    somebody else that could possibly overdose.  Those are our

10   medical concerns.

11   Q.   Do you have overdoses in your facility?

12   A.   Yes, we do.

13   Q.   How often?

14   A.   We had a death recently.

15   Q.   I just want to hit on a few other points, if you just give

16   me a second.

17                With respect to the mouth checks that we talked about

18   earlier, are you familiar with the procedure that is used

19   generally in your facility for that?

20   A.   Yes, from what I can see, the nurse holds a flashlight to

21   the patient's mouth to ensure that the pill or strip or

22   whatever has been swallowed or cleared out of their mouth.

23   Q.   To your knowledge, how far away is the flashlight usually

24   held?

25                MS. AGNEW:  Objection.

N27CallH                      Ferguson - Cross

1                 THE COURT:  Basis.

2                 MS. AGNEW:  He needs to establish that she's actually

3     seen it happen.

4                 THE COURT:  Counsel.

5                 MR. NOLAN:  That's fair.

6     Q.  Have you seen this happen?

7     A.  Yes.

8     Q.  And same question again, how far away from the patient's

9     mouth is the flashlight typically held?

10    A.  I would guess 6 to 12 inches.

11    Q.  Is it typically put in the patient's mouth?

12    A.  No.

13    Q.  Would you be surprised if counsel for Mr. Dockery

14    represented to this Court that the flashlight in question in

15    this case was shoved in the patient's mouth?

16                MS. AGNEW:  Objection.

17                THE COURT:  Sustained.

18                MR. NOLAN:  You don't have to answer that.

19    Q.  Are you familiar or have you seen the flashlights that are

20    used for mouth checks?

21    A.  Yes.

22    Q.  Are you familiar with the size and shape of the flashlight?

23    A.  Yes, I am.

24    Q.  Can you describe that for us?

25    A.  It's probably at least 3 to 5 inches wide -- the length.

N27CallH                    Ferguson - Cross

1   Q.   Is it wider than, say, an inmate's mouth?

2   A.   Yes.

3   Q.   When you discontinued Mr. Dockery's medication, did you

4   intend for that to be a permanent discontinuation?

5   A.   No, I did not.

6   Q.   We talked a little bit earlier about 338 codes.  Do you

7   recall that when Ms. Agnew was questioning you?

8   A.   What codes?

9   Q.   338, problem list codes.

10  A.   Yes.

11  Q.   Does the appearance of a 338 code on a patient's chart

12  impact how you go about treating a patient?

13  A.   No.

14  Q.   What does impact how you go about treating a patient?

15  A.   Their medical needs, how they're presenting and what needs

16  to be done.  I don't treat patients with 338 codes differently

17  than other patients.

18  Q.   We talked a little bit about specialist recommendations.

19  Do you recall that testimony?

20  A.   Yes, I do.

21  Q.   When, if at all, was the last time you can recall rejecting

22  a pain specialist's recommendation?

23  A.   I don't recall doing that.

24  Q.   Do you have any reason to believe that you've ever done

25  that?

1   A.  No, unless it was something that was just unable to be done

2   in the facility, but not any specific injections, medications,

3   pain patches, we would follow that.

4   Q.  You were asked earlier about your testimony at your

5   deposition on January 12th, 2023.  Do you recall that?

6   A.  I do.

7   Q.  And you were asked or reminded about your testimony with

8   respect to whether or not you always follow the recommendations

9   of a pain specialist; right?

10  A.  Yes.

11  Q.  And in your deposition, when you gave the testimony you

12  did, were you referring to pain specialists or were you

13  referring to any recommendation of a specialist?

14  A.  Any recommendation of a specialist.

15          MR. NOLAN:  I have no further questions.  Thank you.

16          Before I end, I'd like to move page 309 of P3 into the

17  record.

18          THE COURT:  Any objection?

19          MS. AGNEW:  No.

20          THE COURT:  Received.

21          (Plaintiffs' Exhibit P3, page 309 received in

22  evidence)

23          THE COURT:  Redirect, please.

24  REDIRECT EXAMINATION

25  BY MS. AGNEW:

1   Q.  Ms. Ferguson, you just testified that you didn't intend to

2   discontinue Mr. Dockery's medications forever; correct?

3   A.  That is correct.

4   Q.  How long did you intend for the discontinuation to last?

5   A.  When I learned he was refusing them because of a mouth

6   check, I stated he could have them back (technical

7   interruption) as soon as I learned that, which was not -- which

8   was a day after I discontinued it, and I learned that from

9   legal.

10  Q.  Forgive me, Ms. Ferguson.  I think it froze for everyone,

11  not just me.  So it's not your fault, it's just the technology.

12         I asked you how long you intended it to be

13  discontinued, we didn't pick up the answer.  So please

14  reanswer.

15  A.  Okay.  I said as soon as he agreed to follow the mouth

16  check procedure for the medication, he could have them back.

17  Once I learned that he was refusing them because of the

18  flashlight, or why he was refusing them -- somebody can refuse

19  a medication, any medication and ask for it to be restarted and

20  it will be restarted, any medication, not just in the case of

21  Mr. Dockery.

22  Q.  When did you restart Mr. Dockery's medication?

23  A.  I did not.  It was restarted when I was on vacation.

24  Q.  Forgive me.  You said you didn't intend for the

25  discontinuation to be forever; correct?

1  A.  Correct.

2  Q.  How did you let Mr. Dockery know if he did the mouth check

3  the way everyone wanted, he'd get them back?

4  A.  Well, number one, I think he knew that, but if he reported

5  that to medical -- I learned about it the day before Christmas

6  break, whenever that was.  That afternoon is when it ended up

7  being ordered after I left work, after I told counsel they

8  could be restarted if he would agree to the mouth checks, if he

9  were to tell us that, and they were restarted that evening.

10  Q.  And that evening was December 23rd; correct?

11  A.  I believe so.

12  Q.  Was the court involved in getting Mr. Dockery's medications

13  restarted, to your knowledge?

14  A.  To my knowledge, they were.

15  Q.  Okay.  So my question to you is, if you didn't intend the

16  discontinuation to be forever, why hadn't you restarted his

17  medications by December 23rd?

18  A.  Because he never reported to us the things that the court

19  reported to us until the 23rd.

20  Q.  Ma'am, we just read a letter that Mr. Dockery wrote to the

21  nurse administrator on December 8th of 2022.

22  A.  I did not see that letter, so I can't speak to that.

23  Q.  When did you call Aaron Dockery to come and speak with you

24  about the discontinuations of his medication?

25  A.  He refused the medication.

1    Q.  That wasn't my question.

2            When did you call him down to speak with him --

3    A.  I did not.  I did not.

4    Q.  Let's just look again at those documents.  I want you to

5    look at Aaron Dockery 310.  Can you tell me what that document

6    is?

7    A.  It's a refusal of medication and/or treatment.

8    Q.  And what's the date on that document?

9    A.  12/1/2022.

10   Q.  And whose handwriting is on that document?

11   A.  Nurse Reilly's.

12   Q.  Where is Mr. Dockery's signature on that document?

13   A.  It's not.

14   Q.  Where is it noted that Mr. Dockery refused to sign the

15   refusal form?

16   A.  It's actually in the AHR note 309, the nurse documented

17   when he refused to sign it.

18   Q.  But isn't she supposed to write "Refused" on the form

19   itself?

20   A.  I don't know.

21   Q.  Tell me something, looking at 309, after the top box, which

22   we've established was written on November 9th of 2022; correct?

23   A.  Yes.

24   Q.  The second box, is that dated November 9th of 2022?

25   A.  Yes.

1  Q.  And that contains nurse Reilly's handwriting, as well,

2  doesn't it?

3  A.  Yes.

4  Q.  And can we agree that that note says:  "Telephone order,

5  Brandi Corigliano.  Hold Neurontin and baclofen.  830 and 2000

6  meds.  Inmate currently under the influence."  Correct?

7  A.  Correct.

8  Q.  Does that say to you that Brandi was called and told that

9  the nursing staff believed that Mr. Dockery was under the

10 influence?

11 A.  Yes.

12 Q.  Looking at the note, did Brandi Lynn Corigliano discontinue

13 Mr. Dockery's medications because the nursing staff believed he

14 was under the influence?

15 A.  She just held them that day, she did not discontinue.

16 Q.  And then the next note, can we agree, is December 1st of

17 2022; correct?

18 A.  That's correct.

19         MS. AGNEW:  I have no further questions.

20         MR. NOLAN:  I have just a couple of questions on

21 recross.

22         MS. AGNEW:  I didn't move it in.  I am so sorry, your

23 Honor.

24         I'd like to move into the record Aaron Dockery 310.

25         THE COURT:  Any objection, counsel?

1           MR. NOLAN:  No.

2           THE COURT:  Thank you.

3           (Plaintiffs' Exhibit Aaron Dockery 310 received in

4    evidence)

5    RECROSS EXAMINATION

6    BY MR. NOLAN:

7    Q.  Nurse practitioner Ferguson, when you discontinued

8    Mr. Dockery's medications after the refusal on the mouth

9    checks, did you do so because of the MWAP policy?

10   A.  No.

11   Q.  Do you currently follow the MWAP policy?

12   A.  No.

13   Q.  Does anybody in your facility, to your knowledge, follow

14   the MWAP policy?

15   A.  No.

16   Q.  Does anybody in DOCCS, to your knowledge, follow the MWAP

17   policy?

18   A.  No.

19   Q.  Do you need to get RMD approval in order to prescribe an

20   MWAP?

21   A.  No.

22   Q.  When is the last time you actually needed to get RMD

23   approval to prescribe an MWAP?

24   A.  Years.

25           MR. NOLAN:  No further questions.  Thank you.

1                  THE COURT:  Redirect?

2                  MS. AGNEW:  One question.

3       REDIRECT EXAMINATION

4       BY MS. AGNEW:

5       Q.  Isn't it true, Ms. Ferguson, that you have needed RMD

6       review and approval for non-formulary drugs?

7       A.  For non-formularies, yes.  He asked me about MWAP.

8       Q.  Isn't it true that there are MWAP medications that were

9       deemed non-formulary?

10      A.  Not any that I'm using.  Maybe.  I mean -- DOCCS has a

11      formulary of every type of medication and then there's some

12      that are non-formulary that we don't use as much.

13      Q.  Do you want to change your answer to the question as to

14      whether or not there has been an RMD review of any MWAP

15      medications?

16      A.  Then I'd have to say I don't know because I don't know.

17                  MS. AGNEW:  No further questions.

18                  THE COURT:  Anything else?

19                  MR. NOLAN:  Nothing further.

20                  THE COURT:  Ms. Ferguson, after you discontinued

21      Mr. Dockery's medications, how was it communicated to him that

22      they would be restarted if he complied with the mouth check

23      policy?

24                  THE WITNESS:  I don't know.

25                  THE COURT:  Anything else, counsel?

1           MS. AGNEW:  No, your Honor.

2           THE COURT:  Thank you.  Thank you, Ms. Ferguson.

3           THE WITNESS:  Thank you. can I ask one question?

4           THE COURT:  Yes, ma'am.

5           THE WITNESS:  Are these documents only for me?  I'm

6     not to leave them for --

7           MS. AGNEW:  No, you can discard them.

8           THE WITNESS:  Okay.

9           MS. AGNEW:  Thank you very much.

10          THE WITNESS:  Thank you.

11          THE COURT:  Off the record.

12          (Witness excused)

13          (Discussion off the record)

14          (Luncheon recess)

15

16

17

18

19

20

21

22

23

24

25

N27CallH                         Wilkerson - Direct

 1                         AFTERNOON SESSION

 2                            1:51 p.m.

 3           THE COURT:  Mr. Wilkerson, would you give your

 4   attention to Ms. Phillips, please.

 5    MALI WILKERSON,

 6         called as a witness by the Plaintiffs,

 7         having been duly sworn, testified as follows:

 8           THE DEPUTY CLERK:  Please state your name and spell it

 9   for the record.

10           THE WITNESS:  It's Mali Wilkerson, spelled M-a-l-i,

11   Wilkerson is W-i-l-k-e-r-s-o-n.

12           THE COURT:  Mr. Morrison.

13   DIRECT EXAMINATION

14   BY MR. MORRISON:

15   Q.  Good afternoon, Mr. Wilkerson.  How are you feeling?

16   A.  So so, could be better.

17   Q.  How are you currently?

18   A.  I'm about to -- tomorrow is my birthday, so I'll be 49

19   tomorrow.

20   Q.  Well, happy birthday.

21   A.  Thank you.

22   Q.  What current facility are you housed?

23   A.  Marcy Correctional Facility.

24   Q.  How long have you been in Marcy Correctional Facility?

25   A.  Last year, April some time.  April, I believe.

Q.   Prior to Marcy, what correctional facility were you housed

at?

A.   Green Haven Correctional Facility.

Q.   How long were you at Green Haven?

A.   Since July 2019.

Q.   And before Green Haven, what correctional facility were you

in?

A.   None, I was free at the time.  That was the first

correctional facility I was taken to after the reception center

at Downstate Correctional Facility.  I stayed at Downstate for

about 10 days for reception and then they send you to Green

Haven.

Q.   So you got into Downstate in June or July of 2019; is that

correct?

A.   June it had to be, yeah.

Q.   Can you tell the Court a little bit about any medical

conditions that you have?

A.   I was born with sickle cell anemia, which sprouted a whole

lot of other underlying conditions.  Because of the sickle

cell, it prevents and blocks the blood flow to everywhere.  So

it causes severe deterioration throughout all of my organs, my

bones.  So I have avascular necrosis in both hips.  I have a

lot of abnormalities, I have a lot of kidney problems, liver

problems, et cetera, eye problems because of the sickle cell, a

lot of it is secondary to the sickle cell.

1   Q.  Go ahead, anything else?

2   A.  That's about it.  A lot of other side effects that was

3   caused by the sickle cell.

4   Q.  And you mentioned, and if I heard you right, you were

5   diagnosed with sickle cell anemia when you were young?

6   A.  Yes, I was born with it, yes.  When I was about -- when I

7   was able to speak, my mom said it's when I was able to point

8   out I was in a lot of pain, I think a year and a half, two

9   years old.

10  Q.  You said that you're in a lot of pain.  Can you describe

11  what that means, what type of pain have you felt throughout

12  your life due to the sickle cell anemia?

13  A.  Well, sporadically, it come at its own control or devices.

14  Sometimes, regardless how well I'm taking care of myself, I go

15  into what's known called sickle cell crisis.  That's when it's

16  low blood flow and the hemoglobin, they're not acting right and

17  my blood cells turn into C's.  That causes extreme pain

18  throughout my limbs.  Sometimes it comes in my legs, sometimes

19  it comes in my back, arms.  Wherever it is blood flows,

20  basically I could have a sickle cell crisis and that cases

21  pain.  Sometimes I have minor and I just fight them with myself

22  with just pain meds, rest, oxygen, water, whatever, but when

23  it's in a severe crisis, I have to be rushed to the hospital or

24  I risk that.

25  Q.  How old were you when you first remember having a sickle

N27CallH                        Wilkerson - Direct

1   cell crisis?

2   A.   That I remember, probably around 5, 4 or 5, something

3   around there that I remember going back that far.

4   Q.   What type of treatment have you been prescribed for your

5   sickle cell disease?

6   A.   Over the years, things have changed, medical advances.

7   They first started me on just a daily dose of pain management

8   with Tylenol #3 and Penicillin was the recommended thing when I

9   was young, I'd say maybe between the ages of 2 when I was

10   diagnosed to about 10, along with folic acid.  But they stopped

11   the penicillin, they said that wasn't too safe or dangerous or

12   whatever and it weakened my immune system.  If I had to get

13   some type of antibiotic, then it would be ineffective, so they

14   stopped that treatment.  Then they started giving me

15   hydroxyurea during the process.  That didn't go -- I still

16   had -- I think, actually, it caused me to go on a crisis even

17   more --

18   Q.   Let me stop you for a second.  What was that medication

19   that you mentioned?

20   A.   Hydroxyurea.

21   Q.   How old were you when you were prescribed that medication?

22   A.   I want to say mid spring, around there.

23   Q.   Is it fair to say from when you were very young, when you

24   were diagnosed until, let's say your 20s, were you being

25   prescribed by a physician Tylenol #3 or some sort of narcotic

1   medication to treat your sickle cell anemia?

2   A.  Yes.  It changed over the years from Tylenol #3 to Norco,

3   to morphine, to OxyContin, what I'm getting now, depending on

4   who was the prescriber and where I was at.  Different things

5   changed, different pain management changed.

6   Q.  And were the prescriptions, let's say before you went into

7   custody, these narcotic prescription medications, how were they

8   administered, how often did you take them as prescribed?

9   A.  For the most part, most of the time, they had one

10  long-lasting extended relief, an ER pill.  And then they had

11  the Norco, which is also called Lortab.  So I would take the

12  Lortab every four hours and the other one was twice a day every

13  12 hours for continued extended release.

14  Q.  Were these medications taken every day whether or not you

15  were in crisis or only during times that you're in crisis?

16  A.  No, every day.

17  Q.  So just to be clear, whether or not you're -- let's take

18  away the times that you're in crisis, are you still affected by

19  chronic and consistent pain?

20  A.  Yes.  And that's due to the deterioration in my bones.  I

21  have a spine and back problem.  Mostly, once my hips -- my hips

22  started deteriorating and my shoulders started deteriorating,

23  that's when the daily doses really started.  Before, when I was

24  a kid, starting around a few years old, I would only take this

25  medication once the sickle cell crisis started acting up and it

1   was at a low level to try to prevent hospitalization.  So

2   once -- if it didn't work, that's when I had to be rushed to

3   the ER and you Demerol was the thing they used in the hospital

4   then, then they went to morphine later on in my life.  Now one

5   of the things is Dilaudid that they use once I'm being

6   hospitalized, they use Dilaudid.

7   Q.  Are those IV medications when you're hospitalized?

8   A.  You said -- excuse me?

9   Q.  When you're hospitalized for a crisis, is it IV

10  medications, pain medications that you're provided?

11  A.  Sometime there are injections, but now the Dilaudid most of

12  the time is IV, yes.

13  Q.  How old were you, just to be clear, did you start being

14  prescribed pain medication to be taken every day, whether or

15  not you're in crisis or not?

16  A.  Somewhere in my 20s.  Once the hip problem started, I

17  believe -- it had to be sometime after 2002, sometime after

18  2002, that's when my hips started acting up, somewhere around

19  there, a few years after that maybe.

20  Q.  I noticed you came in on a wheelchair.  When did you start

21  using a wheelchair?

22  A.  At the beginning of this incarceration.  I was going

23  through problems first inside the county jail where I was at

24  where they didn't -- it was a same, similar situation.  They

25  wasn't trying to give anybody any pain medications or whatever.

1    I went, I was hospitalized.  On top of that, they wouldn't give

2    me any kind of bedding, soft cushion bedding.  So my hips

3    basically got chipped up even more and messed up even more.

4    And I got -- went to the hospital, Albany Med.  And at that

5    point, the specialists and doctors were telling me basically

6    there is nothing they can really do at this point and the best

7    thing to do was to try to sit inside the chair to reduce the

8    pain and curb the damage and deterioration.  But I've been

9    wheelchair bound ever since.

10   Q.  When did you become wheelchair bound?

11   A.  I got -- around February 2019, somewhere.

12   Q.  Prior to February of 2019, were you using any other

13   equipment to help you ambulate?

14   A.  Yes, I was using a cane.

15   Q.  And how long were you using a cane?

16   A.  I'd say mid -- around 2005, 6, on and off, getting little

17   flareups or stuff like that.  If it's cold or something like

18   that, then it really flares up and messes with me a lot.  Some

19   days I have to lay down and just can't get up at all.  I was

20   using it on and off for a while and it became more consistent,

21   a daily use, I would say around '11, '12, somewhere around

22   there.

23   Q.  Was it recommended to you by a medical professional that

24   you should use a cane in around 2011 or 2012 or is it something

25   that you did on your own?

1    A.  No, the doctor gave it to me.  I believe I was incarcerated

2    at the time and that's when I asked for some type of aid or

3    whatever the case may be, surgeries and try to fix the problem

4    altogether.

5    Q.  So in 2011, 2012, you were incarcerated in a New York State

6    Department of Corrections or somewhere else?

7    A.  Correct, I was -- I got arrested in 2012.  By 2013, I was

8    in the Department of Corrections New York State.

9    Q.  For lack of a better term, during that bid from 2013, when

10   did you get out of custody?

11   A.  I believe around 2016, November.

12   Q.  And just to be clear, you then went back into DOCCS custody

13   in June of 2019; is that correct?

14   A.  Correct, yes.

15   Q.  Let's talk about, just briefly about your incarceration in

16   2013.  Do you recall during that time if you were being

17   prescribed any medication for your sickle cell anemia and pain,

18   specifically by a DOCCS medical provider?

19   A.  I believe it was the folic acid, the hydroxyurea around

20   that time and pain management.  I'm not sure exactly.  I don't

21   recall.  I believe I was still on morphine ER around that time.

22   Q.  So there was a point in time that you were being prescribed

23   morphine by a medical provider at DOCCS; is that accurate?

24   A.  Yes, it was a time, yes.

25   Q.  Do you remember during that bid, which you were released in

1    2016, when you were released, were you being provided morphine?

2    A.  Excuse me.  Say that again.

3    Q.  That was a terrible question.  I'm sorry.

4    A.  Rephrase.

5    Q.  It's going to happen, Mr. Wilkerson.  It's going to happen.

6            So the incarceration that you were in from 2013 to

7    2016, when you were released in 2016, was a DOCCS medical

8    professional prescribing you morphine or a pain management

9    medication?

10   A.  After I was released?

11   Q.  No, while you were in, before you were released.

12   A.  Yes, but it wasn't consistently.  I had a lot of issues

13   with the doctors and had to have everyone go to Albany with me,

14   file grievances.  They finally gave it back to me and when they

15   gave it back to me, they announced that they cutting everybody

16   off.  I went back to the doctor again and they had reduced it

17   at first.  Then I was letting them know that I'm still in a lot

18   of pain, I can't do it, I can't manage, I can't even think

19   straight.  I believe they cut it off still anyway and then gave

20   it back to me after a certain amount of time.

21   Q.  During your 2013 to 2016 incarceration, did you ever have

22   any crises, a sickle cell crisis while you were in custody?

23   A.  All right.  Major crisis or random crisis?  Because I have

24   random crisis a lot, and those are the ones I don't have to be

25   hospitalized for.  So a minor crisis I can get along with the

pain management, rest, plenty of oxygen and water, and the
major crisis is when you're near death and you have to be
hospitalized.  I believe there were -- I can't recall.  I'm in
and out of the hospital so much.  I can't recall exactly when
or how many times I was hospitalized or if not, but it's
consistent.  I'm always, you know, in and out of crisis
depending on the situation.
Q.   How often do you go into a major crisis, is there some sort
of average amount per year, per month?
A.   Well, yeah, it used to be an average.  I say that because
I've learned to take care of myself and as long as I'm being
taken care of, I avoid crisis.  For instance, I believe May of
2021 was my last major crisis that I had to be hospitalized
for, but because I had consistent pain management, I've changed
my diet, it's a plant-based diet.  I try to do as much as I can
proactively.  Most of those times when I don't get any help to
fight these crises or to calm the minor crisis or whatever, it
goes from zero to 100 really, really fast.  So on average, when
I was younger, it was five times a year for a major crisis and
I would say one a month maybe, somewhere around there, all the
way into my 20s.
Q.   While you're not incarcerated, the times you've not been
incarcerated, has there ever been a point in time where your
medical provider did not prescribe you pain medication?
A.   No, I always been consistently getting pain management in

1   the free world when I was free.

2   Q.  Did that change at all in regards to when you went into

3   DOCCS custody?

4   A.  Yes.  Yes.

5   Q.  Tell me a little bit about that change.

6   A.  Okay.  So over the 2013 incarceration, came into the system

7   with pain management, the pain meds.  I had my doctor, because

8   they automatically started denying me the pain meds.  She

9   advocated for me and wrote letters to the administration to let

10   them know that it could lead to real fatality if I'm not

11   treated properly with my pain management and other sickle cell

12   treatments that I should require.  It's Dr. Michelina, who's

13   followed me maybe from 2002, and she unfortunately retired

14   recently.  She's been a huge advocate from that point on.  So

15   once I got into DOCCS custody, I believe it started when I

16   first came into their custody and that's when they started

17   denying me the meds again.  At that point --

18   Q.  Mr. Wilkerson, just to be clear, when you're saying "they,"

19   who do you mean?

20   A.  The doctors.

21   Q.  What doctors?

22   A.  I'm not sure all of the names.  I know that -- because they

23   keep switching.  Like now, I don't even have a doctor, I have a

24   nurse practitioner that fills in for the doctor that quit or

25   resigned or whatever he did.  They're just floaters and just do

1    the paperwork.  There's no one that really, you know, is not

2    like my doctor where I'd see him every month, once a month,

3    evaluate me, we'd discuss issues, do my referrals, he was

4    really on top of it.  Here, it's a different situation and it's

5    not as thorough as in the streets.

6    Q.  Just to be clear, Mr. Wilkerson, because I think I

7    understand what you're saying, when you're saying "my doctor,"

8    are you meaning doctors that you have on the outside?

9    A.  Yes, my primary care physician, which has mostly been

10   Dr. Michelina.

11   Q.  And your primary care physician advocated for you while you

12   were in custody, is that what you were saying?

13   A.  Yes.

14   Q.  Is your understanding she advocated for you to be

15   prescribed pain medication?

16   A.  Yes.

17   Q.  Can you describe to the Court what is the consequences, as

18   you understand it, when you're not being prescribed pain

19   medication or narcotic pain medication, to be specific, for

20   your disease?

21   A.  Physically, I'm in a lot of pain.  I can't really move

22   around, care for myself, cook, clean for myself.  I can't

23   really function.  Mentally, it's a drag, depressing, suicidal

24   ideations at some point in my life.  It's really bad, you know,

25   it's not good at all.  And I always resent major

1    hospitalization.  That means I'm one step closer to death.

2    Q.  Can you describe to the Court how, if at all, pain

3    medications, narcotic pain medication helps you deal with your

4    disease?

5    A.  Well, it helps me prevent from going into major crisis and

6    it helps me to function a little bit better, a little bit more

7    independently on a daily basis because now I have the daily

8    issues with my limbs and mobility issues and et cetera.  On top

9    of that, like, I don't even want to -- I'm really, really

10   cranky.  If you see me in pain, some people don't even want to

11   visit me in the hospital, like my mom, my wife.  They always --

12   I'm just in a lot of pain and I'm cranky when I'm in that much

13   pain.  I don't mean to do it, but it's just that situation that

14   I'm really tired of.  I didn't ask to be born with sickle cell.

15   So I really do be taking it out on the wrong people sometimes.

16   So the pain medicine does help to act the way I should be

17   acting, like to be nice, to be able to function, to be able to

18   think, to be able to go to college.  It helped me a lot.  So I

19   have my own business and still function.  It helped me a lot.

20   Otherwise, I cannot focus, it just throws me all the way off.

21   I'm miserable.

22   Q.  Mr. Wilkerson, do you take narcotic pain medications to get

23   high?

24   A.  No.

25   Q.  Did you ever abuse the prescription pain medications that

1    you had on the outside to get high?

2    A.  No, never.

3    Q.  How about while you're in custody and you were being

4    prescribed pain medications, did you ever abuse those

5    medications to get high?

6    A.  Nope.

7    Q.  Did you ever sell those medications for money to others?

8    A.  No.

9    Q.  I want to talk about during this recent bid that you had

10   that you came in in 2019.  You said in June 2019, you arrived

11   at Downstate Correctional receptions facility; is that

12   accurate?

13   A.  That's correct.

14   Q.  When you arrived at Downstate, do you recall whether or not

15   you were prescribed any pain medication for your sickle cell

16   disease?

17   A.  Yes, I was.

18   Q.  What medication, if you recall?

19   A.  I believe they switched it because they don't give certain

20   pain medicines, they didn't keep the same protocol there.  So I

21   believe they switched it to the Xanax (technical interruption)

22   release and the breakthrough one.  They changed it to something

23   else, I forget the names of them, but one was an extended

24   release and one was an instant release that was every -- three

25   times a day.  Another one was two, two times day.

1  Q.  Were you taking those medications — I think you said you

2  were there for about 10 days at Downstate — every day?

3  A.  Yes.

4  Q.  Is it your understanding that whatever they were — you

5  don't recall the name, that's fine — narcotic medications?

6  A.  Yes.  I believe the OxyContin for the extended release and

7  maybe Percocet for the instant.

8  Q.  And then after the 10 days or so that you were in reception

9  at Downstate, you said you were transferred to Green Haven

10  Correctional Facility; correct?

11  A.  That's correct.

12  Q.  And that was around July of 2019, I believe you said?

13  A.  July 1st, I believe it was, or 2nd, 1st or 2nd.

14  Q.  Can you tell me what happened when you transferred to Green

15  Haven on July 1st or 2nd, 2019, concerning your narcotic pain

16  medication.

17  A.  I was housed inside the prison's hospital.  They told me I

18  was there to get fitted for a wheelchair and I would be moving

19  on to another facility because I'm classified as a medium

20  status inmate, and it's a max A, the highest classification.

21  So after a while, I want to say a week or so, that's when I

22  believe it was PA Infantino came to me and said, look, we'll

23  put in your medical approvals and if it gets approved -- and

24  they decided -- I don't know who they were.  Her higher-ups

25  decided that they was going to taper me off of everything and

1    that it was not recommended at this time or whatever.  And then

2    that's when they started a -- they said it was going to be over

3    60 days, but it was more like three weeks until everything was

4    just totally discontinued.

5            At that point, I went through severe withdrawals, a

6    lot of pain, couldn't function, couldn't get out the bed.  And

7    they have a crazy rule there that even though you're in the

8    hospital in a hospital bed, in order to get food, you have to

9    come to the dayroom area.  At one point, I just couldn't make

10   it, I just didn't -- they just wouldn't bring my food, they

11   wouldn't feed me.  That's when I got my people, my family

12   involved, to have my wife start making calls.

13   Q.  When nurse practitioner Infantino informed you that they

14   were going to taper you off or get you off of the narcotic

15   medication, did you explain to her anything about your concern

16   about that?

17   A.  Sure did.  She agreed with me that it's crazy.  What she

18   was telling me is it's crazy in your condition, like, you know,

19   you got a lot of, you know, pain issues, chronic pain issues.

20   I don't see what's going on or whatever the case may be and I

21   agreed with her.  I was like, I'm not going to be able do this,

22   I'm not going to survive.  I'm going to be back in the

23   hospital, which I dread because, like I said, each

24   hospitalization is like a chip off of my life clock.  I just --

25   I dread going into the hospitals.  I hate it.  I've been doing

1    this since I was 2 years old.  And that's -- and that was it.

2    It was left at that.  And they just tapered me off and just

3    discontinued it.

4    Q.  After you were tapered off in July of 2019, did you make

5    any complaints or notify anyone within Green Haven Correctional

6    Facility about what was happening with you pain-wise?

7    A.  Yes, I talked to the doctor personally and made complaints,

8    made grievances, wrote sick calls.  Like I said, I had my wife

9    contacting the facility and at DOCCS, and she kept getting the

10   runaround whenever she tried to call the central office in

11   Albany, writing her own letters -- yes.

12   Q.  What were the results of the grievances you filed, if you

13   recall?

14   A.  They were denied.  They were saying, basically, it's up to

15   the doctors, it's their recommendation and they don't see it's

16   fit or it's not needed, that the pain medicine isn't needed.

17   Q.  After you filed any grievances, were you ever called down

18   to medical to be reevaluated or evaluated about the pain that

19   you were experiencing?

20   A.  No.

21        However, at one of my appointments with Dr. Silver,

22   who was my PCP, I questioned -- because he said he's putting in

23   another request because he felt it was the same thing, it was

24   ridiculous they would take me off the pain meds.  I asked him

25   the reasoning for it or whatever, and this is when he explained

1    to me that someone had alleged that I was trying to keep

2    medicine when I was in Downstate Correctional Facility.  We

3    went back and forth about that, that's not what happened, I

4    explained to him what happened.  Once he explained that, that's

5    when I grieved that issue and told him I want that

6    misinformation expunged from my record, that it's prejudicing

7    me and it's causing a lot of problems.  Went through that

8    grievance process or whatever, but, of course, they just

9    continued to side all the way up from each level and just

10   didn't make any real, you know, didn't give me the relief that

11   I asked, that it be expunged from my record, because that's not

12   what the nurse wrote, reported.  What the nurse wrote, reported

13   was she saw stains on top of my tongue, not that I was cheeking

14   any medication, but that she saw stains on the top of my tongue

15   when she woke me up to give me my medication.  And when she

16   came, it's early in the morning, the officer is standing right

17   in front of me, I had a roommate, she came in, a big cup of

18   medications -- I take a lot of medications.  I put the meds in

19   my mouth, I went to reach for the cup, the cup was empty.  She

20   went and got the water for me, the officer's standing right

21   there, she went and got the water for me, poured it inside a

22   little cup and she came back with the water, poured it inside a

23   little cup, and then I swallowed the pills.  When I did the

24   mouth check, whatever the case may be, she said you have stains

25   on your tongue.  I said oh, I didn't realize there was still

1     stains on my tongue or whatever.  Okay.  So I drunk some more

2     water.  She asked to look again, she's like, they're still

3     there.  I was like, well, it sat on my tongue for a while,

4     they're like candy coated, you know, I don't know what to tell

5     you or whatever the case may be.  She reports it to the doctor.

6     The doctor takes it as that I was cheeking it or whatever, the

7     medication on a higher note, whatever the case may be, which is

8     like 8 to 12 pills at a time and that's how the situation

9     unrolled and unraveled.  But they never corrected what the

10    nurse wrote or originally said, which was, you know, stains on

11    his tongue, not that she saw a pill, she saw stains, which is

12    obvious because I was sitting there with a mouthful of pills in

13    my mouth waiting to get water.  So I went through these things,

14    so -- and used that as an excuse to discontinue my medication

15    for the longest.

16    Q.  Mr. Wilkerson, you said, and correct me if I'm wrong, that

17    this incident where you were alleged to have been cheeking

18    happened at Downstate?

19    A.  Yes.

20    Q.  And that was in June, around June of 2019?

21    A.  Correct.

22        No misbehavior report followed or anything like that

23    because, you know, if you are caught in that type of situation,

24    it's required that you get a misbehavior report.

25    Q.  Fair enough.

1    A.  I wasn't in that type of situation.

2    Q.  After this incident, was your medication automatically

3    stopped at Downstate?

4    A.  No, it just -- so that incident happened at the date of

5    my -- when my transfer went in, the day before my transfer went

6    in, and before I even got a chance to really talk to the doctor

7    about it, I was already on the trap and going to Green Haven.

8    So once I got to Green Haven, that's what they saw and then

9    they continued on from there, but that doctor couldn't take me

10   off.  It was the medical staff from New Haven that decided to

11   use that as a reason to -- or whoever it was, the higher-ups,

12   yes.

13   Q.  You said there is no misbehavior report or anything written

14   against you for that incident; correct?

15   A.  That's correct.

16   Q.  So there is no formal way or process for you to challenge

17   what was written by the nurse in your AHR; is that fair to say?

18   A.  No, it's not fair to say.  I grieved.  I put in a grievance

19   and I asked them to correct the information, rely on whatever

20   she wrote in her reports, question her, call her as a witness,

21   and she'll verify that it wasn't that situation, that it was a

22   stain, a different colored stained on my tongue.

23   Q.  Was there a hearing on the grievance?

24   A.  Yes, at the lower level.  The upper levels there aren't any

25   hearings, it's just the IGRC hearing, the Inmate Grievance

1    Resolution Committee hearing by the committee, and it's a

2    sergeant and another staff member.  They agreed on that level

3    that it should be ruled in my favor, but once we got to the

4    superintendent's level and in the CURC, they denied my

5    grievance.

6    Q.  Just, again, to be clear, when you got to Green Haven,

7    you're in the infirmary and the doctor was trying to prescribe

8    you that medication; is that correct?

9    A.  Yes, Dr. Silver.  That's what he told me, he said he was

10   putting another request, he's, you know, doing it, but they

11   keep getting denied by his bosses, his supervisors and his

12   superiors.

13   Q.  Just because I'm a little confused.  If I remember your

14   testimony correctly, when you got to Green Haven, you were in

15   the infirmary and you were being treated by nurse practitioner

16   Infantino?

17   A.  Correct.

18   Q.  And it was Infantino who first told you that you weren't

19   going to be prescribed your medication?

20   A.  Yes, that it was going to be tapered and that she put in

21   her original request, the MWAP reform request and it was denied

22   and suggested that the (technical interruption) discontinued

23   with the tapering of the -- 60 days in total, 30 with one and

24   then finally -- but it was a whole lot quicker process.  And

25   they just --

```
 1    Q.  So how long after this meeting with nurse practitioner
 2    Infantino, when you first arrived to Green Haven, to the
 3    discussion with Dr. Silver when he said he was trying to put in
 4    another request for the medication, if you recall?
 5    A.  Oh, this had to be well over three months, I would say,
 6    around that time, because that's one of my complaints, that I
 7    didn't see a primary care physician, didn't have anyone to
 8    follow up, getting all these other assessments and appointments
 9    done for me.  On any of my other issues, my sickle cell
10    retinopathy for my eyes and -- I needed to see a doctor or
11    whatever.
12            So, I actually went out, I believe, to a hematologist,
13    a specialist, Dr. Asif, and once I got back, that's when I
14    explained to the nurse that I had never seen a doctor.  She
15    was, you know, kind of bugged out about it.  And she said okay,
16    I'm going to put you in right now because that's ridiculous
17    that you haven't seen a doctor and you've been here for so
18    long.
19    Q.  So it was this first time that you actually saw your
20    provider months after you arrived at Green Haven that
21    Dr. Silver said he's going to try to put in another request for
22    your narcotic pain medication; correct?
23    A.  Yes.
24    Q.  Is it your understanding that that request was denied?
25    A.  Yes.
```

Q.   How long were you at Green Haven, being deprived of

narcotic pain medication to treat your sickle cell?

A.   Too long.  I believe it was all the way to 2021 after I

obtained the help of Ms. Agnew, my counselor, that she started

making some arrangements and we started getting some headway on

getting reevaluations.  And I was sent to -- I believe it was

Fishkill -- no.  I think it was in Coxsackie RMU, over there.

I was reevaluated by the pain management specialists.  After

that is when they tried to start giving me other medications.

        The first medications they gave me, I always had a

problem with, even in my last incarceration, because I have an

allergic reaction to it, gabapentin.  So they gave me -- they

still gave me gabapentin, and I was really sick, my stomach was

crazy, diarrhea, throwing up, I couldn't stomach it, keep it

down or whatever.

        Shortly after that, I went to sick call and the nurse

informed me, she was like, well, how's the other pain medicine

going for you.  I was like, what other pain medicine.  That's

when she told me that the other OxyContin had already started

and I was supposed to have been got it already, nobody ever

informed me.  So after that, that's when I started reporting

down there and she made sure I could come down there on a daily

basis to get it twice a day.

Q.   That was at Green Haven or Coxsackie RMU?

A.   No, that was at Green Haven.  The RMU, because I go to a

1    couple of them, that's where they have their little meetings

2    sent up with certain specialists.  But I believe that was where

3    the assessment, the pain management assessment was.  It was at

4    Green Haven that they actually did the -- that they started

5    giving me the pain medicine, first the gabapentin that I wasn't

6    supposed to get again because it makes me sick, then I got the

7    OxyContin.

8    Q.  What effects, if any, did your prescription of OxyContin

9    have for you in 2021 when it was prescribed?

10   A.  It relieved a lot of my pain, especially because, with me,

11   I know how this opiate thing works, so I try to maintain the

12   lowest possible dose possible.  I asked for permission from

13   Dr. Silver that, at those times, instead of increasing -- and

14   this is why I maintain the lowest level possible of

15   15 milligrams.  Instead of increasing, to just give me a day,

16   maybe a day or two reset where I could just -- before I go into

17   detox, full detox, I just stay there.  But that medicine,

18   that's been managing my pain ever since, you know, very good.

19          I have recently had some instances with standing

20   outside in the cold here, med lines, you know, a mile away and

21   they have you travel or whatever.  That's been exacerbating my

22   pain a lot, but it's hard to see a doctor there.  If I don't go

23   to the doctor, I have to go to the practitioner for Percocets.

24   So I didn't to try even see her to talk to her about decreasing

25   or whatever.

N27CallH                        Wilkerson - Direct

1          But, for the most part, I've been maintaining, I

2     haven't been hospitalized, I haven't gone into major crisis,

3     minor ones, yes, that's inevitable, but I know with my age and

4     my wisdom, I know how to catch that now, I know how to, you

5     know, lay down and drink and overfluid, you know, rinse myself

6     out and fight those.  I've been pretty -- thank God, I've been

7     pretty successful at fighting hospitalizations with this pain

8     management.

9     Q.  That period of time when you were discontinued and not

10    provided narcotic pain medication while you were at Green

11    Haven, do you have an idea or some sort of feeling about

12    whether that has affected you in any way or deteriorated

13    yourself in any way?

14         I'm sorry.  That's a terrible question, but if you

15    understand it.

16    A.  Yeah.  Yeah.  Yes.  Yes.  Like I said, my sleeping, my

17    eating, my mental state, everything depreciates along with this

18    pain level.  The higher the pain level, the less I want to do,

19    the less I can do.  I can take some short steps now.  Once the

20    pain management started, I'd be able to, you know, lay down and

21    do some type of physical therapy for myself.  They supposed to

22    give it to me, but I never made it there.  So I've been a

23    little bit more able to be more proactive and do what I can for

24    myself, it does make a big difference, and those times that I

25    don't have it, I deteriorate quick, very fast.  When I first

1   got to Marcy, just in that week's time, I lost a lot of weight.

2   I suffered and went through a lot of pain and, you know,

3   because they -- as soon as I got here, they said this is just

4   not a jail we do that in.  I started to explain, like, look,

5   I've been fighting tooth and nail, you know, just to get some

6   help, and I finally got it and I need it bad.  They said sorry,

7   we don't do that here.

8   Q.  Let me stop you for a second, Mr. Wilkerson, because that's

9   actually where I wanted to address and direct your attention

10  to.

11          You said you arrived in Marcy in around April of 2022?

12  A.  Yes.

13  Q.  When you came to Marcy from Green Haven, were you

14  prescribed OxyContin at Green Haven?

15  A.  Yes.

16  Q.  What happened when you were transferred to Marcy with your

17  medication?

18  A.  They transferred me and another individual in a wheelchair,

19  they brought us over.  We went to the draft room and they told

20  me I had to be seen by the nurse.  The nurse gave us the spiel

21  about how sick call works here and what days are what.  Then

22  she said I also must inform you that this is a facility that we

23  don't give out pain meds here.  I was like, why not?  The

24  policy changed, we got a new policy now that we've been

25  fighting for for years or whatever, like, I don't understand.

N27CallH                    Wilkerson - Direct

1   She's like, I'm sorry, it just doesn't -- she's like, I'm going

2   to put you in to see the doctor immediately because I know, in

3   your condition, with sickle cell and necrosis, you're in a lot

4   of pain, and see what happens from there or whatever, but I'm

5   going to let you know it's not worth it to fight because it

6   just doesn't happen here.

7   Q.  Were you weaned off the medication or was it just stopped?

8   A.  It was just stopped.  Just stopped.

9   Q.  How long after you saw this nurse upon your arrival did you

10  meet with a doctor?

11  A.  About a day or two.  Dr. Burke.

12  Q.  Describe to me that interaction you had with Dr. Burke.

13  A.  He was also a surprise, too, in saying that, you know, his

14  hands are tied because this is how DOCCS does things and, you

15  know, he can't really -- if I was in his private practice in

16  the streets, automatically, I would get the pain meds because

17  my conditions, you know, call for it, it's textbook stuff.

18          He said as soon as I get home, I need to look into

19  doing the hip surgery.  He showed me his scars from his hip

20  surgery and said, you know, look, I'll dance around, you know,

21  I'm much better.  I had my concerns about the hip surgery and

22  stuff because I have a twin brother and his didn't -- he had

23  one of those types of hips (technical interruption) and it was

24  bad, like hip surgery after hip surgery.  I told him I was kind

25  of nervous.  He said it's a (technical interruption) surgery.

He told me about that, showed me his scars, jumped around.  He

said, you know, it's nothing you can do about it or whatever

the case may be.  So then I said all right, I need (technical

interruption) we'll figure this out or whatever the case may

be.  But I didn't mention anything about the class action

that's going on.  I said I'll figure it out.  I asked him for

some other -- like ibuprofen or something else to help me to at

least ease the pain.  He prescribed me the ibuprofen, which I

had to stop taking because I have a lot of (technical

interruption) issues.  So I had to stop taking them because

that was the only thing they was trying to substitute once they

took me off throughout this incarceration.

Q.  Let me stop you, Mr. Wilkerson.

        When you met with Dr. Burke, did you agree to

discontinue your medication?

A.  No, absolutely not.

Q.  Did you ask Dr. Burke to be prescribed the OxyContin and

the pain medication?

A.  Yes, and he said his hands was tied, it's not up to him and

it's just a situation that he can't do because it's not up to

him.

Q.  How long were you deprived of that medication after you

arrived at Marcy in April 2022, if you recall?

A.  A week and a couple days.

Q.  What is your understanding why or how that medication was

1 provided to you again?

2 A.  I called my attorney.  I had my wife contact my attorney,

3 let her know it was an emergency, that I was already feeling

4 like I was ready to go into crisis.  My wife explained what

5 they did, that they just stopped the pain medicine or whatever

6 the case may be.  Ms. Agnew told her to sit tight, she's going

7 to do what she can.  The next thing you know, they called me

8 down and said -- it was an evening, I believe like a Thursday

9 or a Friday evening, and they said, here you go, good job,

10 because nobody else getting it, like, they said here you go,

11 good job.

12 Q.  And your medication was he instated?

13 A.  Yes.

14 Q.  Are you concerned that if you get transferred to another

15 facility that this same situation could occur again?

16 A.  Very.  It only happened once, it's bound to happen again.

17         But when I had the conversation with Dr. Burke and I

18 explained to him, you know, this is ridiculous because the MWAP

19 policy is supposed to changed, it's not effective, he looked at

20 me like I had two heads, like he didn't know about any policy

21 change.  As far as he know he had to fill in all of this

22 paperwork to get approvals from higher up.

23         MR. NOLAN:  Your Honor, I'm going to object to the

24 testimony to the extent it's offered for truth of the

25 assertions from Dr. Burke to him, understanding that they're

N27CallH                      Wilkerson - Direct

1    offering it for perhaps what the conversation was, the fact
2    that he said it.
3              THE COURT:  You're offering it for the fact he said
4    it, aren't you, counsel?
5              MR. MORRISON:  Correct.
6              MR. NOLAN:  As long as it's limited to that, your
7    Honor.
8              MR. MORRISON:  Mr. Wilkerson, I have no further
9    questions.  Thank you very much.
10              THE COURT:  Cross examination, please, counsel.
11              MR. NOLAN:  Can we take five to ten minutes, your
12    Honor.
13              THE COURT:  We're going to take a little break,
14    Mr. Wilkerson.  We'll see you in about five minutes.
15              THE WITNESS:  It's okay.  I can run to the bathroom.
16              THE COURT:  What are you thinking for cross, counsel?
17              MR. NOLAN:  Probably 10 to 15 minutes.
18              THE COURT:  How long will the next witness be, please,
19    friends?
20              MS. AGNEW:  Probably the same.  Actually a little
21    shorter.  Mr. Johnson is of shorter thought streams.
22              (Recess)
23              THE COURT:  Shall we cross?
24              MR. NOLAN:  I'm just waiting for one second.  My
25    colleague is going to grab a piece of paper for me and I'll be

N27CallH                    Wilkerson – Cross

1    right up.

2                   THE COURT:  Yes, sir.  You ready to go?

3                   MR. NOLAN:  Yes.

4                   THE COURT:  Cross examination of Mr. Wilkerson,

5    please.

6    CROSS-EXAMINATION

7    BY MR. NOLAN:

8    Q.  Good afternoon, Mr. Wilkerson.  Can you hear me?

9    A.  Yes, sir.

10   Q.  You mentioned earlier that someone told you upon arrival to

11   a facility in 2022, I think it was, that we don't give that out

12   here, meaning a specific medication; correct?

13   A.  Yes.

14   Q.  Can you identify who that was for me?

15   A.  It's been a while.  I'm not sure which nurse it was.  It

16   was a nurse that did the screening that does all of the

17   intakes, the draft intakes.  I'm not sure who that was.

18   Q.  Was it a nurse practitioner, if you know?

19   A.  No, it was just a regular nurse.  I believe she was -- I'm

20   not sure.  I'm not sure.

21   Q.  Was it somebody, to your knowledge, who was in a position

22   to prescribe medication?

23   A.  That I'm not sure of either.

24   Q.  When the unidentified nurse told you that, did she mention

25   the word "MWAP" or "MWAP policy"?

1   A.  No.

2   Q.  Did she say why they don't give it out?

3   A.  No.  She just said we don't give it out here at this jail.

4   Q.  What drugs are you on right now today, what prescriptions

5   do you have?

6   A.  I'm on folic acid, I have a stool softener, Omega-3 oils, a

7   multivitamin for minerals, the OxyContin 15 milligrams,

8   Claritin.  Did I say folic acid already?  Probably.  Long list,

9   pretty long list.  And the ibuprofen and Tylenol.

10  Q.  You mentioned the OxyContin, which sounds like the one

11  that's probably most effective for your pain; is that right?

12  A.  Yes.

13  Q.  Are you on that today?

14  A.  Yes.

15  Q.  And how long have you had continuous access to OxyContin

16  until today?

17  A.  Up until after they gave it back to me here on arrival, a

18  week after I arrived here.

19  Q.  Can you tell me, to the best of your ability, when exactly

20  you think you arrived at that facility you're at now?

21  A.  About around April of last year, 2022.

22  Q.  Do you recall a conversation with one of your providers

23  where you discussed your ongoing use of OxyContin with her and

24  the risks of addiction, did you have that discussion?

25  A.  With one of my providers?

1    Q.  Yes, in May of 2022.

2    A.  In May of 2022?

3    Q.  Yes.

4    A.  No.  Well, I've always expressed that I don't want to be on

5    higher doses because I don't want to be too dependent on them

6    or have to be taken off where the withdrawals are too strong.

7    The stronger the medication, the stronger the dose, the

8    stronger the withdrawals.  On top of that, that means I go into

9    sickle cell crisis along with the withdrawal.  Those are the

10   type of things I discuss with them.

11   Q.  Are there times when you advised your healthcare providers,

12   since May of 2022, that you would like to stay off it to the

13   extent possible?  And by that I mean OxyContin.

14   A.  No, and I know I have to have it.  If it was an option, no,

15   I wouldn't want to take it at all.

16   Q.  When are you scheduled to be released from prison?

17   A.  February 16th, next week.

18   Q.  So when you said you were worried about being transferred

19   in the future, you meant between now and February 16th, you're

20   worried about losing your OxyContin?

21   A.  Well, if there is a transfer between then, which I highly

22   doubt because I'm on my way out now, yes, I would be worried.

23   Q.  But barring a transfer between now and then, you have no

24   reason to worry about losing your OxyContin that you're aware

25   of; is that fair?

N27CallH                     Wilkerson - Cross

```
1    A.  It's not a reason right now, no.

2              MR. NOLAN:  Thank you for your time.  Appreciate it.

3              THE WITNESS:  No problem.

4              THE COURT:  Redirect, please?

5              MR. MORRISON:  Nothing further.

6              (Witness excused)

7              MS. AGNEW:  Your Honor, should we talk about

8    scheduling?

9              THE COURT:  Do you want to be on the record?

10             MS. AGNEW:  Sure.

11             THE COURT:  Yes, ma'am.

12             MS. AGNEW:  So, plaintiffs are actually going to rest

13   at the close of tomorrow.  I wanted to let defense counsel know

14   that so they can line up their rebuttal witnesses for Thursday,

15   if any.

16             THE COURT:  Do we have anything in mind yet, friends?

17             MR. NOLAN:  I don't know exactly who she has scheduled

18   for tomorrow to know about our rebuttal witnesses.

19             THE COURT:  It's going to be more of the same

20   probably.

21             Do you have anyone in mind yet?

22             MR. NOLAN:  Yes.

23             THE COURT:  How long?

24             MR. NOLAN:  Not long at all.  Probably half hour for

25   each.
```

N27CallH                          Johnson - Direct

1          THE COURT:  For each?  How many?

2          MR. NOLAN:  However many we need.  I don't think it's

3    more than two.

4          MS. AGNEW:  Just so you know, tomorrow is going to be

5    a gentleman from Eastern and then the gentleman from

6    Shawangunk, then Dr. Win.

7          THE COURT:  We have Mr. Johnson.

8          Mr. Johnson, may I ask you to give your attention to

9    Ms. Phillips and raise your right hand, please, sir.

10   CLAUDIO JOHNSON,

11       called as a witness by the Plaintiffs,

12       having been duly sworn, testified as follows:

13         THE DEPUTY CLERK:  Please state your name and spell it

14   for the record.

15         THE WITNESS:  Claudio Johnson, C-l-a-u-d-i-o

16   J-o-h-n-s-o-n.

17         THE COURT:  Ms. Agnew.

18   DIRECT EXAMINATION

19   BY MS. AGNEW:

20   Q.  Good afternoon, Mr. Johnson.

21   A.  Good afternoon.

22   Q.  Could you please tell the Court how old are you?

23   A.  61.

24   Q.  And how long have you been incarcerated on this bid?

25   A.  Since 2009.

N27CallH                    Johnson - Direct

1    Q.  Do you have any prior bids before this one?

2    A.  Yes, ma'am.

3    Q.  How many, sir?

4    A.  I'm ashamed to say four move before this.

5    Q.  So when this bid started in 2009, did you have any major

6    health issues that you recall?

7    A.  Yes, just my spine with a PITUITARY tumor, asthma.

8    Q.  So did you know that you had a pituitary tumor before you

9    started your bid in 2009?

10   A.  Yes.

11   Q.  And can you describe for us what your spinal issues were

12   around 2009.

13   A.  Around 2009, I was getting a lot of pain, I wasn't able to

14   stand straight, pain shooting down my leg, shooting down my

15   hip.

16   Q.  How had you had any surgeries before 2009?

17   A.  Yes, ma'am.

18   Q.  And what surgeries have you had?

19   A.  It was just the one surgery when they removed a bullet --

20   Q.  And when did that occur?

21   A.  -- from my spine.

22            Back in 1990.

23            THE COURT:  I'm sorry, Mr. Johnson.  Did you say from

24   where the bullet was removed?

25            THE WITNESS:  Excuse me?

1          THE COURT:  Where was the bullet removed from, please?

2          THE WITNESS:  Where?

3          THE COURT:  Yes, sir.

4          THE WITNESS:  From my lower spine.

5          THE COURT:  Thank you.

6   Q.  And is it your understanding that the bullet was the source

7   of your pain in your spine?

8   A.  Yes, ma'am.

9   Q.  So can you generally describe your medical history from

10  2009 to present.  I think what we should do is talk about your

11  major surgeries briefly so that the Court is aware.  Okay?

12  A.  Okay.  Okay, we're going to start with the gunshot wound.

13  I was shot in my lower spine and I had the surgery for that.  I

14  do have bullet fragments and bone fragments back there.  I had

15  two fusions because one of the fusions popped out and I had to

16  get another surgery and get another one put in.

17  Q.  Let's slow down.  Where were the fusions done?

18  A.  When?

19  Q.  What was fused?

20  A.  My S1 to my L4.

21  Q.  And so that's in your back; correct?

22  A.  Yes, ma'am.

23  Q.  Do you recall approximately when that fusion took place?

24  A.  Let me look at my notes.  Can you give me a minute, please.

25  Q.  You can refresh your recollection, but I don't want you to

N27CallH                      Johnson - Direct

1   read from them.  Just look at them to refresh.

2           Mr. Johnson, let's do this, I don't want you to get

3   rattled.  Can you look up again?

4   A.  Yes.

5   Q.  Have you ever suffered from a stroke?

6   A.  Yes.

7   Q.  Do you remember when that happened, approximately?

8   A.  I think that was like 2010, 2011.

9   Q.  After that happened, did you spend time in a regional

10  medical unit?

11  A.  Yes, ma'am.

12  Q.  Did you completely heal after that stroke?

13  A.  No, ma'am.  I still have slight weakness in my left leg.

14  Q.  Did there come a time after 2011 when you had a brain

15  surgery?

16  A.  Yes, ma'am.

17  Q.  Do you recall what the brain surgery was addressing?

18  A.  It was a pituitary surgery.  I got it removed twice, if I

19  could recall.  The third time was gamma knife.

20  Q.  Do you have an understanding of what had to be removed from

21  your pituitary gland?

22  A.  Yes, ma'am.

23  Q.  What was removed?

24  A.  It was a tumor that was pressing against my brain that

25  could affect my vision, my thyroid, my male hormones.

1          THE COURT:  May I interrupt for a moment.

2          Mr. Johnson, did you say the third time was a gamma

3    knife?

4          THE WITNESS:  Yes, ma'am.

5          THE COURT:  Thank you.

6    Q.  Can you tell the Court what that means, how is that

7    different than what happened before?

8    A.  Gamma knife is a new -- it's something new that they do

9    where they attach some helmet to my head and screw it in.  Then

10   they take a picture of the pituitary tumor and stick my head

11   into a machine and they zap the tumor and hit it with

12   radiation.  It's supposed to kill the cells inside the

13   pituitary tumor, it stops it from growing.

14   Q.  The pituitary surgeries and the gamma knife procedure, have

15   those been successful in eradicating your pituitary issues?

16   A.  Well, ever since the gamma knife, it had stopped growing.

17   They said it's stable.  I still get headaches, not as much.

18   Q.  When you do get headaches, how do those affect you,

19   Mr. Johnson?

20   A.  It's the kind of migraines where the light bothers my eyes,

21   makes me feel nauseous.

22   Q.  When you suffer from those migraines, does it affect your

23   daily living?

24   A.  Yes, ma'am.

25   Q.  Is it a negative effect or a positive effect?

1    A.   Negative.

2    Q.   How does it affect your daily living when you have those

3    migraines?

4    A.   When I sleep in the bed, I put something over my eyes to

5    just make everything look black, just lay in my bed, don't

6    move.

7    Q.   Other than the migraines, let's just say since 2017, have

8    you suffered from chronic pain?

9    A.   Yes.

10   Q.   Where do you suffer from chronic pain in your body?

11   A.   In my lower back.

12   Q.   And do you believe that to be from the bullet wound?

13   A.   Yes, ma'am.

14   Q.   After you had the fusion, did that chronic pain improve in

15   your lower back?

16   A.   No, ma'am.

17   Q.   So what I want to know is, there was a period of time when

18   you stayed at the Walsh Regional Medical Unit.  Do you remember

19   that?

20   A.   Yes, ma'am.

21   Q.   Can you tell me what procedures you had when you were at

22   Walsh?

23   A.   When I was at Walsh, that's when I believe I got the

24   pituitary tumor removed.

25   Q.   Did you also get a back surgery when you were at Walsh?

1  A.  Yes, I did get the back surgery done, too, twice.

2  Q.  After the surgeries took place, were you treated with any

3  medications for your chronic pain?

4  A.  Yes.

5  Q.  Which medications, Mr. Johnson?

6  A.  I was on Neurontin, I was on morphine, I was on Percocet.

7  Q.  Do you remember who your doctor was at Walsh?

8  A.  I can't remember his name.

9  Q.  Would it refresh your recollection if I said Dr. Michael

10  Salvana?

11  A.  Yes.

12  Q.  Did there come a time when you left Walsh and you were

13  transferred somewhere else?

14  A.  When I left Walsh -- where did I go when I leave Walsh?  I

15  went back to Green Haven.

16  Q.  When you went to Green Haven from Walsh, do you remember

17  approximately what year it was?

18  A.  No, I really don't.  I can't remember.

19  Q.  Was it after 2017?

20  A.  No.

21  Q.  When you went from Walsh to Green Haven, were you able to

22  continue taking your chronic pain medications?

23  A.  No.

24  Q.  Do you recall what happened?

25  A.  Yeah, they discontinued all my meds.  They just gave to me

 1  for like -- for a short period of time and took me off

 2  everything.

 3  Q.  Did you have any conversations with anyone about why you

 4  were taken off your medications?

 5  A.  No.

 6  Q.  Did you bring it up with anyone as to why you were taken

 7  off your medications?

 8  A.  Yes.  Dr. Kournikova.

 9  Q.  Do you remember the substance of your conversations with

10  Dr. Kournikova?

11  A.  She just said that she wasn't given me my pain medication

12  back, she was just given me, if I'm not mistaken, Tylenol.

13  Q.  What was the effect on your chronic pain when you stopped

14  getting your pain medications?

15  A.  Severe, I mean excruciating.

16  Q.  Explain to the Court how you felt in the time afterward

17  when you weren't getting medications for your chronic pain?

18  A.  It was hard for me to get out the bed, go to the bathroom.

19  It was hard for me to do daily activities, period.

20  Q.  Did it affect how you were able to ambulate around Green

21  Haven?

22  A.  Yes, ma'am.

23  Q.  How so, sir?

24  A.  I mean, I couldn't even function.  I mean, I would get

25  angry at my family.  It was frustrating.

1    Q.  Can you tell me, did there come a point in time when you

2    got your medications back?

3    A.  What they was doing was, they would give it to me for a

4    couple of days and then take me off of it.

5    Q.  Who would put you on it for a couple of days and take you

6    off?

7    A.  It would have -- I forgot the name of the doctor, but he

8    would do it when Ms. Kournikova wasn't there.

9    Q.  So it was a doctor at Green Haven?

10   A.  Yes, ma'am.

11   Q.  Would he check you into the infirmary when he would give

12   you the medications for a few days?

13   A.  Yes, ma'am.

14   Q.  And then when you got checked out of the infirmary, did you

15   still take them?

16   A.  No, ma'am.

17   Q.  So did there come a point in time when you and I met each

18   other?

19   A.  Yes.

20   Q.  After you and I met each other, did your medications get

21   reinstated by DOCCS at some point?

22   A.  No.

23   Q.  Are you taking anything for your chronic pain now,

24   Mr. Johnson?

25   A.  Yes, I'm taking Neurontin and -- what's the name of it --

1    Celebrex.

2    Q.   Since you started Neurontin and Celebrex again, has that

3    helped you with your chronic pain?

4    A.   A little bit.

5    Q.   Better or worse than when you weren't on them?

6    A.   1 out of 10, I give it like a 4.

7    Q.   Is there something you feel that you could take that would

8    help more?

9    A.   What I was taking in Green Haven when I was on my morphine

10   and my Neurontin.  I was able to function, I was able to stand

11   up straight instead of crouched down like I'm an old man.

12   Q.   Do you remember, last year, getting transferred to

13   Woodbourne?

14   A.   Yes, ma'am.

15   Q.   Do you remember if anything happened to your pain

16   medications when you got transferred to Woodbourne?

17   A.   Yes.  When I got to Woodbourne last year, they didn't give

18   me the medications that I was getting here in Marcy because she

19   said we don't give those medications out here, we don't give

20   the Neurontin out in Woodbourne.

21   Q.   Do you recall who told you we don't give those medications

22   here at Woodbourne?

23   A.   Yes, Dr. Ruiz.

24   Q.   How long after you got to Woodbourne did you sit down with

25   Dr. Ruiz?

1   A.  I saw her maybe two weeks after I got there, maybe.

2   Q.  Did you receive your Neurontin between the time you arrived

3   and the time you sat down with Dr. Ruiz?

4   A.  Not at all.

5   Q.  Did you speak with anyone when you got to Woodbourne and

6   you weren't getting your medications, besides Dr. Ruiz?

7   A.  Yes.

8   Q.  Who did you speak with?

9   A.  I grieved it because she didn't want to give it to me.  I

10  signed up for sick call and went back to see her and told her

11  how I'm going to need my pain meds.  She said she is not giving

12  me my pain meds.  She said I could write Albany and tell them

13  that she's not going to give me my pain meds.  I told her I

14  wasn't going to write Albany, I was going to write my attorney.

15  She said, well, make sure you spell my name right.

16  Q.  Did there come a time when Dr. Ruiz re-prescribed you your

17  pain medications?

18  A.  No.

19  Q.  Mr. Johnson, when you went to Woodbourne, do you remember

20  being on a blood thinner?

21  A.  Yes.

22  Q.  Did Dr. Ruiz talk to you at all about your blood thinner?

23  A.  No, she didn't.  But, what I found out was that when I came

24  back to Marcy, that the milligrams that she had me on was

25  wrong.

N27CallH                    Johnson - Cross

1   Q.  Let's back up.  How did you come back to Marcy, do you have

2   an understanding of how you went back to Marcy?

3   A.  Yes.  I couldn't take the pain and I called you.

4   Q.  And then what happened?

5   A.  You did what you did and got me back to Marcy.

6              MS. AGNEW:  All right, Mr. Johnson.  I have no further

7   questions for you.  Another gentleman, he's going to get to ask

8   you questions.  All right?

9              THE WITNESS:  Yes, ma'am.

10             THE COURT:  Thank you.  Cross examination, counsel.

11  CROSS-EXAMINATION

12  BY MR. NOLAN:

13  Q.  Good afternoon, Mr. Johnson.  Can you hear me?

14  A.  Yes, sir.

15  Q.  I have just a few questions for you.

16             Can you clarify what medications you're on right now?

17  A.  Right now, I'm on -- as far as self-carry or when I go to

18  the clinic?

19  Q.  Let's do both, let's start with self-carry, you can tell me

20  that, and then we'll do the clinic.  Okay?

21  A.  Where do I start?  Self-carry, I take Metformin -- I take

22  like 13 different medications, sir.  Metformin, Lipitor,

23  Claritin, iron pills, vitamin D -- what else do I take?

24  Q.  Let me ask it this way, for the self-carry ones, do you

25  have any that are addressed to pain?

N27CallH                          Johnson - Cross

1    A.  Excuse me?

2    Q.  For self-carry, are any of those for pain, say ibuprofen,

3    Tylenol, anything like that?

4    A.  Oh, I take Topamax and Keppra.

5    Q.  Are Topamax and Keppra self-carry?

6    A.  Yes, sir.

7    Q.  How many milligrams of Topamax?

8    A.  Topamax I think is 100.

9    Q.  What about Keppra?

10   A.  Keppra is 500.

11   Q.  And the Topamax, what do you take that for?

12   A.  Supposed to be for headaches.

13   Q.  How about the Keppra?

14   A.  Supposed to be for seizures, headaches.

15   Q.  So as far as you know, you're on about 13 self-carry

16   medications, and at least two of those are for pain; right?

17   A.  Yes, for headaches.

18   Q.  How about the other ones, I guess what we would call the

19   one-to-one medications, what are you on for that?

20   A.  The ones I go to the clinic to take?

21   Q.  Those, yes.

22   A.  Coumadin, Celebrex, and Neurontin.

23   Q.  If you know, what do you take the Coumadin for?

24   A.  Coumadin is for my back pain.

25   Q.  And the Celebrex, what do you take that for?

N27CallH                          Johnson - Cross

1    A.   It's for my back pain.

2    Q.   And how about the Neurontin, back pain?

3    A.   Back pain.  The Coumadin is for blood thinners.  I'm sorry.

4    Q.   That's okay.  So Celebrex and Neurontin for back pain and

5    the Coumadin for blood thinners; right?

6    A.   Yes.

7    Q.   What is your current dose of Neurontin?

8    A.   I think it's 500.

9    Q.   Since you've been on Neurontin, since the last time it got

10   prescribed to you, has it always been 500?

11   A.   No, it was raised a little bit.

12   Q.   When was it raised?

13   A.   Couple of months ago maybe.

14   Q.   Do you know which provider raised it for you?

15   A.   I don't know her name.  It starts with a C.  She's a PA.

16   Q.   Would it be nurse practitioner Corigliano?

17   A.   Yeah.  Yes, sir.

18   Q.   You have a pretty good relationship with her?

19   A.   I don't have a bad relationship with anybody, sir.

20   Q.   How long until you believe you're going to be released from

21   prison, sir?

22   A.   Five months.

23   Q.   Would that put us into July?

24   A.   August.

25   Q.   When Dr. Ruiz -- it sounded like you testified that

1   Dr. Ruiz didn't want to prescribe you morphine; is that fair?

2   A.  Doctor who?

3   Q.  I believe you said Ruiz?

4   A.  Ruiz.

5   Q.  She didn't want to prescribe you morphine.  Was that your

6   testimony?

7            MS. AGNEW:  Objection, your Honor.

8            THE COURT:  Sustained.

9   A.  No, she didn't want to prescribe me Neurontin.

10  Q.  Neurontin.  That's why I asked if it was your testimony.

11           So when was that that Dr. Ruiz didn't want to

12  prescribe you Neurontin?

13  A.  Last year.

14  Q.  Do you remember when last year?

15  A.  I can't recall.  Give me a second.

16  Q.  It's okay.  You don't need to look at anything.  It's not

17  that important.

18           How about I ask you this way, just to clarify for the

19  record, looking backwards from today, how long have you had a

20  prescription for Neurontin?

21  A.  How long?

22  Q.  Yeah.

23  A.  When the procedures changed.

24  Q.  I'm sorry, I didn't quite catch what you said, sir.

25  A.  I said when the procedures changed, Dr. Zaki gave me a

N27CallH                    Johnson - Cross

1    script for Neurontin -- I'm just --

2            MS. AGNEW:  Counsel, I'd ask him to look up again.

3    Q.  Before you do anything, sir, are you looking at some

4    documents?

5    A.  Yes, I am.

6    Q.  Can you identify what those are for us for the record.

7    A.  It's just when I was prescribed meds and stuff like that,

8    the dates.  That's all.

9    Q.  When you say the dates, can you hold up the document you're

10   looking at, sir.

11           Have you been looking at that document this whole

12   time, sir?

13   A.  No.

14   Q.  What is that document titled?

15   A.  There's no title on it.

16   Q.  What does it say at the top?

17   A.  Claudio Johnson.

18   Q.  Who sent you that document?

19   A.  This is my document.

20   Q.  How did you get it to where you are today?

21   A.  I brought it with me.

22   Q.  Did anybody tell you to bring that with you?

23   A.  No.

24   Q.  Were you looking at that document in preparation for your

25   testimony today?

N27CallH                    Johnson - Cross

1    A.  Yes, because I'm bad with dates.

2    Q.  Who drafted that document?

3    A.  I did.

4    Q.  Can you hold it up again.  Closer to the camera, please.

5    Back a little bit.  Hold it up, because we need to understand

6    what you're looking at, and bring it forward slowly.

7         Okay.  You typed that up yourself physically?

8    A.  Yes, I did.  I went over to the library and typed it up.

9    Q.  So those are your notes that you studied in preparation for

10   your testimony today; is that a fair way to say it?

11   A.  Yes, sir.

12   Q.  What did you use to prepare those notes?

13   A.  Notes that I've been sent by my attorney and I put them all

14   together.

15   Q.  So your attorney sent you notes and then you took notes

16   from that?

17   A.  Yes.

18   Q.  And then you testified from those notes today?

19   A.  No, I read them last night.

20   Q.  So what you're testifying to today is based on what your

21   attorney told you; is that fair?

22   A.  No, she didn't tell me anything.

23   Q.  It's based on what your attorney wrote to you; is that

24   fair?

25   A.  You could say that.

N27CallH                    Johnson – Cross

1   Q.  When Dr. Ruiz told you she was not going to prescribe you

2   Neurontin, did she tell you why?

3   A.  She said because they don't get those medications out here

4   in the jail.

5   Q.  When she said "they," do you know who she was referring to?

6   A.  She said we don't give out these medications out here.

7   Q.  Was she referring to herself in the "we," if you know?

8   A.  I don't know what she meant by that.  She said Neurontin is

9   not given out in this jail, in Woodbourne.  Whatever she meant

10  by that, I didn't get my medication.

11  Q.  Did she mention anything with regard to the term MWAP when

12  she said that?

13  A.  In term of what?

14  Q.  MWAP.

15  A.  No.

16          MR. NOLAN:  One second?

17          THE COURT:  Yes, sir.

18          MR. NOLAN:  Your Honor, I don't have any further

19  questions.

20          I do have an administrative issue here.

21          THE COURT:  Why don't we see if we have any redirect.

22          MR. NOLAN:  It does have to do with his testimony.

23          THE COURT:  What do you want to know?

24          MR. NOLAN:  I would move to strike his entire

25  testimony because it was based on a document sent to him by his

1    attorney that's not in evidence today.  He was reading from it,

2    it wasn't used in a way to refresh his recollection properly.

3    It seems entirely inappropriate, your Honor.

4              THE COURT:  Ms. Agnew.

5              MS. AGNEW:  Your Honor, I asked him just to look at

6    the document to refresh his recollection if he needed that, he

7    said that's what he did.  In fact, I asked him to look up at me

8    while he testified for just that reason.  Mr. Johnson did so, I

9    think to the best of his ability.  In fact, the longest period

10   of time he's been looking at the document is when my counsel

11   allowed him to do so for a long period of time.

12             MR. NOLAN:  Your Honor, I'll just represent that what

13   I saw was the summary of the medical records prepared by

14   Ms. Agnew's office.  It looked like what was in the Carinci

15   report.  It doesn't look like anything that this gentleman

16   prepared himself.  I can't see it right here and it was unclear

17   on the screen, but it certainly wasn't evidence.

18             THE COURT:  Anything else?

19             MS. AGNEW:  He's allowed to use anything to refresh

20   his recollection that helps him.

21             MR. NOLAN:  That's actually not true, unless he's

22   having trouble recalling and meeting certain thresholds, that's

23   obvious.

24             THE COURT:  Anything else?

25             MS. AGNEW:  I think he had trouble recalling, your

1    Honor.  I think that's why counsel allowed me to lead as much

2    as he did, which I do appreciate given the circumstances of

3    this witness.

4              THE COURT:  Anything else?

5              MR. NOLAN:  That's all, your Honor.

6              THE COURT:  Two things.  Number one, he was instructed

7    only to look at the documents to refresh his recollection.

8    Number two, my observation of him was that he was not looking

9    down at it much at all until defense counsel told him to look

10   at it and examined him about the document.  So I will permit it

11   and the motion to strike is denied.

12             Redirect.  Please, counsel.

13   REDIRECT EXAMINATION

14   BY MS. AGNEW:

15   Q.  Mr. Johnson, can you see me?

16   A.  Yes, ma'am.

17   Q.  Very good.  Just a couple questions.

18   A.  I put the documents down.

19   Q.  I appreciate that.  Don't worry about the document and

20   let's not look at it anymore.  Okay?

21   A.  Okay.

22   Q.  Mr. Nolan asked you about when Brandi Lynn Corigliano

23   increased your Neurontin; correct?

24   A.  Yes.

25   Q.  Do you remember who visited you right before she increased

N27CallH                    Johnson - Redirect

1   your Neurontin?

2   A.  You did.

3   Q.  Can you please tell the Court what happened after I visited

4   you with Brandi Lynn Corigliano?

5   A.  Well, when you came to visit, right after you left, they

6   took my double mattress.  As a matter of fact, right after you

7   left, they took everybody's double mattress.  A whole lot of

8   weird stuff started happening at the facility as far as

9   medical-wise.  I got -- well, she did add my Celebrex.

10  Q.  But do you remember the interaction you had with

11  Ms. Corigliano after I visited you?

12  A.  Oh, yeah.  Oh, oh, oh, yeah.  She called me into her office

13  and -- I didn't put in for sick call or anything, she just

14  called me down and asked me to have a seat.  So I asked her

15  what is it about, and she said listen, I know your name is

16  filed with this lawsuit.  I said excuse me?  She said, I know

17  your name is on a list of the lawsuit.  I said how did you know

18  this, how do you know this, and she wouldn't answer my

19  question.  She said I just want you to know we start from

20  scratch, whenever you need something, all you have to do is

21  ask.  I said wait a minute, how do you know my name is on this

22  lawsuit, and she said we're starting off fresh as of right now.

23  Q.  After that, isn't it true Ms. Corigliano increased your

24  Neurontin?

25  A.  Yes, ma'am.

1          MR. NOLAN:  Objection.

2          THE COURT:  Mr. Johnson, at the end of your last

3     answer, you said, "I said wait a minute, how do you know my

4     name is on the lawsuit."  Then you said, "she said, 'something,

5     something, something'" right now, and I missed it.  Could you

6     repeat that for me?

7          THE WITNESS:  Yes, your Honor.  She said -- I said how

8     do you know my name is on the lawsuit and she wouldn't answer

9     me.  She said as of right now, we're starting from scratch, you

10    want to erase, you know, in other words she's telling me as of

11    right now, it's a clean slate.  I asked her again, how do you

12    know my name is on this lawsuit, she wouldn't answer me.

13         THE COURT:  Thank you.

14         MS. AGNEW:  No further questions, Mr. Johnson.  Thank

15    you.

16         THE WITNESS:  Thank you, Ms. Agnew.

17         THE COURT:  Mr. Nolan, recross?

18         MR. NOLAN:  No, your Honor.

19         THE COURT:  Thank you, Mr. Johnson.

20         MS. AGNEW:  We're going to see you in a couple weeks,

21    Mr. Johnson.  Okay?

22         THE WITNESS:  Okay.

23         THE COURT:  Take care of yourself.

24         THE WITNESS:  You, too.

25         (Witness excused)

N27CallH

1              THE COURT:  All right, friends, what are we doing

2    next?

3              MS. AGNEW:  Your Honor, we have exhausted our

4    witnesses for the day.  I do think that we want to make our

5    motion now, which you marked for the record earlier.

6              THE COURT:  Counsel.

7              MR. MORRISON:  Thank you, your Honor.  I'll be brief.

8              Just to be clear, we're going to make a motion for a

9    directive finding based on the opening questions that are

10   relevant to this proceeding, and this motion is obviously just

11   then based on the two witnesses called by the defendants,

12   Dr. Moores and Dr. Khan.

13             To be clear, on December 23rd, 2022, the Court made an

14   oral ruling on the plaintiffs' motions for injunctions, setting

15   forth certain findings of facts based on the motion papers and

16   the record itself.  However, in such ruling, your Honor

17   detailed three specific outstanding questions of facts that

18   could not be resolved on the papers alone, and thus

19   necessitated this evidentiary hearing.

20             As the defendants have rested their case calling two

21   witnesses, Dr. Moores and Dr. Khan, plaintiffs are now moving

22   for a directed verdict on that limited questions of fact this

23   Court ordered to be addressed in this hearing.  The three

24   questions, which have seemed often at times peripheral to the

25   testimony in this hearing that your Honor ordered evidence to

N27CallH

be presented on are as follows:

One, whether the conduct plaintiffs complained of in this lawsuit has, in fact, seized — it hasn't;

Two, whether there is a reasonable expectation that the violations will recur — yes; and

Three, whether policy 1.24A has completely and irrevocable eradicated the effects of the MWAP policy.

These three questions stem directly from the voluntary cessation that defendant Moores asserted in her response papers to plaintiffs' motions for injunctions.  Specifically, Dr. Moores' assertion that DOCCS has mooted the plaintiffs' claims for injunctions because remedial measures have been taken by rescinding the MWAP policy and instituting policy 1.24A, which defendant Moores alleged cured all past violations and all past effects of the MWAP policy.

As this Court is aware, defendant Moores holds the burden with respect to each of these three questions by raising this defense.  Courts are consistent that the burden for the voluntary cessation doctrine is a stringent and a heavy one.  I cite American Freedom Defense Initiative v. Metropolitan Transportation Authority, 815 F.3d 105 (2d Cir. 2016).  Here, Dr. Moores' evidence presented at the trial has failed to come even close to meeting that heavy burden.

I'll briefly, really briefly highlight why.  First, and most importantly, I think what is clear, and this comes

1    from the testimony of Dr. Moores herself, policy 1.24A does

2    nothing to even attempt to identify any of the patients in

3    DOCCS custody that had their pain medication discontinued

4    during the MWAP policy period.  No attempts have been made to

5    identify these patients by DOCCS to ensure that the deprivation

6    of that medication that was requested by their providers at the

7    time and denied by RMDs, who had no association, physical

8    association with treating those patients have been reassessed

9    and evaluated for what treatment they're receiving now in their

10   pain management needs individually.  Dr. Moores admitted she

11   has the ability to identify these patients.  I believe her

12   testimony was that the central pharmacy can identify these

13   patients, yet nothing has done to attempt to do so.

14        I also would add that on the face of policy 1.24A, it

15   makes no mention of trying to cure any of those patients that

16   were affected by MWAP.  Dr. Moores admitted that the effects of

17   the MWAP policy prevented patients from receiving optimal

18   medication their providers deemed appropriate.  Now that the

19   MWAP policy has been rescinded for two years now, nothing has

20   been done.  Instead, DOCCS has done nothing but play whack a

21   mole, chaotically reviewing patients that plaintiffs' counsel

22   has identified for them and to the Court, spoonfed to them

23   through discovery, but it's DOCCS that holds the information

24   for all the patients that were affected, not the plaintiffs,

25   and injunctions are necessary to ensure that DOCCS takes the

necessary efforts to identify, assess, and treat all the

patients that suffered and to cure the continuing violations

that those patients who still have not been provided that

medication requested from their providers.

The second and other really important fact that came

out during this hearing is that no efforts were done to train

the providers on the new 1.24A policy. For two years now, this

policy has been in effect, but no training has been implemented

or even considered to be implemented on this policy. As set

forth in plaintiffs' papers, patients remain losing their

medication without assessments and transfer, losing effective

medication without seeing or sitting down with a provider, as

mentioned as a requirement in 1.24A, and these are the same

exact issues that were occurring during the MWAP policy period

that continue today, uncured.

I would like to briefly end with the last-minute

efforts that Dr. Moores did testify she was undertaking through

audits. Courts looked at effect of atonement of remedial

measures to gauge the credibility and determine whether

violations will likely reoccur. I'll cite to U.S. v. New York

City Transit, 97 F.3d 672 (2d Cir. 1996); Ahrens v. Bowen, 852

F.2d 49 (2d Cir. 1988). Here, all of Dr. Moores' efforts and

audits were done after the objections motions were filed and

years after the policy 1.24A was implemented.

Plaintiffs admit, these are simply attempts to

1  manufacture a mootness argument for this litigation and avoid

2  court intervention.  Certain reviews that were discussed during

3  the testimony occurred just a few months ago in November of

4  '22, audits, by the way, that failed to even attempt to audit

5  when providers failed to follow specialists' recommendations

6  for a pain medication.  Again, the failure to follow

7  specialists' recommendations is the same issue that occurred

8  under the MWAP policy and is an effect of the MWAP policy, and

9  it continues today despite policy 1.24A.

10          In short, your Honor, the testimony of Dr. Moores and

11  Dr. Khan has failed to meet the heavy burden required to

12  establish mootness under the voluntary cessation doctrine.

13  Policy 1.24A was implemented in February of 2021.  For two

14  years, DOCCS has done nothing to cure these effects.  The fact

15  that RMDs are no longer require to approve pain medication

16  prescription is not what this hearing and this case is about.

17  True, it is a good step to cure the barriers that the NY policy

18  placed on patients, but that was a process change.  This

19  remedial measure does not fully respond to the plaintiffs'

20  allegations of wrongdoing, and therefore cannot reasonably

21  assure either the conduct at issue will not reoccur in the

22  future or that its effects have been eradicated.  And I'll cite

23  to Davis v. City of New York 812 F.Supp.2d 333 (S.D.N.Y.2011).

24          The defendants have simply failed to meet their

25  burden, the MWAP policies have not been cured by DOCCS, there

1    is nothing presented before the Court to believe that it will

2    be cured by anything they are doing now.  Patients continue to

3    suffer, patients continue to remain in danger of losing their

4    needed medication.  Therefore, we respectfully request a

5    directive finding to be ordered on these open questions

6    pertinent to this hearing and that our motions be granted.

7             THE COURT:  Thank you.

8             Ms. Kiley.

9             MS. KILEY:  Yes.  Thank you, your Honor.

10            As an initial matter, it appears that plaintiffs are

11   making their motion for a directed verdict under Rule 50.

12   Respectfully, Rule 50 does not apply.  This is obviously not a

13   jury trial.  We will take their motion to be made under 52(c),

14   which is a request for judgment on partial findings.  That

15   standard is whether defense had made a prima facie showing on

16   the issues, which we believe that we have based on the

17   testimony of Dr. Moores and Dr. Khan.

18            Whether the conduct has ceased, we want to draw

19   attention to the fact that the complaint of conduct in the

20   second amended complaint is that plaintiffs have had their

21   medications discontinued based on a policy that, quote,

22   stripped the medical treatment decisions from the providers at

23   the hands of the regional medical directors.  That is the

24   complaint of conduct in the second amended complaint.  The

25   testimony we've heard from Dr. Moores and Dr. Khan

N27CallH

1   unequivocally shows that the RMDs are not involved in this

2   process at all anymore.  Providers are free to exercise their

3   independent judgment when they treat a patient.

4         Dr. Moores has made it clear that there's no

5   reasonable expectation that these violations will recur.  The

6   testimony is that the policy is no longer followed in any

7   capacity.  Dr. Moores also testified that she has no intention

8   of reinstating the MWAP policy.

9         What was also made clear is that the difference

10  between the MWAP policy and 1.24A is that the MWAP policy gave

11  the regional medical directors the authority to step in on

12  medical decisions, and 1.24A removed that authority.  That is

13  the difference and that is why MWAP can no longer be carried

14  out in practice.  The RMDs are not part of this process

15  anymore.

16        I'd like to just touch on the argument that plaintiffs

17  have made that Dr. Moores has made, quote, last-ditch efforts.

18  Respectfully, your Honor, Dr. Moores officially became the

19  chief medical officer in July of 2022, which was two months

20  after the injunctions were filed.  Any efforts that she made

21  were not because of the injunctions, but because she felt that

22  any changes she made were necessary.  That was made clear in

23  her declaration.

24        It is our position that it is abundantly clear that

25  DOCCS is not a moving force behind the continuation of the MWAP

N27CallH

1    policy, and therefore we simply ask the Court to deny

2    plaintiffs' motion.

3         Thank you.

4         THE COURT:  Anything else, Mr. Morrison, that you

5    wanted to add?

6         MR. MORRISON:  No, your Honor.

7         THE COURT:  Ms. Kiley, let me ask you one thing,

8    please.  I'm looking at the second amended complaint at

9    paragraphs 1106 to 1108.  I'll read it to you, you don't have

10   to go if you don't want.  I'm responding to your argument that

11   the MWAP policy is rescinded and RMDs don't have any place in

12   the policy and the prescription of these pain meds anymore.

13        The relief that plaintiffs are seeking is that the

14   Court declare that the policy, practice, omission and

15   conditions described above are in violation of the rights of

16   plaintiffs and members of the class secured by the Eighth

17   Amendment.  And then I'm just adding a portion here, that the

18   Court permanently enjoin "defendants, their agents, et cetera,

19   et cetera, et cetera, from subjecting plaintiffs and members of

20   the class to the illegal policies, practices, omissions, and

21   conditions described in the second amended complaint."  And

22   then I'm just adding here, that the Court direct "defendants to

23   allow individualized assessments of class members' MWAP needs

24   by their primary care physicians, consultants, and specialists

25   based on medically appropriate review with the patient's

1    medical history, physical exam, consideration of real

2    functions; and where those efforts fail, ordering assessment by

3    a properly certified, independent pain management specialist;

4    and, creating a monitoring person or a body to ensure that

5    patients who require MWAP medications are not denied based on

6    anything other than a comprehensive individualized assessment."

7           So I think the question is, wasn't Mr. Morrison right

8    at the end of his presentation, when he said the fact that the

9    RMDs are no longer required to approve pain meds is not what

10   this hearing is about.  And I'll refer you to what I read from

11   the complaint, it's about the conditions that the complaint

12   alleges to continue to persist on the ground.

13          MS. KILEY:  Your Honor, the role of the RMD is so

14   significant in the MWAP policy, and that has been made clear,

15   and removing them from the prescription of pain medication is a

16   tremendous and significant effort.  All we have heard today is

17   that the decision to prescribe for pain medication comes from

18   the provider, they are free to exercise their independent

19   judgment, and that is what they are doing.

20          THE COURT:  We have certainly heard testimony to the

21   effect that the providers on the ground are not doing so

22   consistent with their best medical judgment, but, if the

23   witnesses are to be believed, are doing so based on items such

24   as we don't do those meds at this facility.

25          MS. KILEY:  Respectfully, that testimony was not part

N27CallH

1    of our case.  We only presented Dr. Moores and Dr. Khan.  As we

2    understand it, this motion is being made solely after we rested

3    and that the Court was not going to consider anything that came

4    on to support plaintiffs' position.

5            THE COURT:  What do you say, then, to the suggestion

6    in the amended complaint that the conditions still persist and

7    that DOCCS has not done anything to train the providers on the

8    ground in connection with the new policy, 1.24A, and has made

9    no effort to identify patients who might have been harmed by

10   the prior policy?

11           MS. KILEY:  There has been no evidence of any ongoing

12   constitutional violation that was presented here or in the

13   record.

14           THE COURT:  So not training on the new policy and not

15   making any effort to identify folks who were impacted

16   negatively by the prior policy is sufficient for the Court, you

17   say, to find that the conduct complained of has completely

18   ceased, there's no reasonable expectation the violation will

19   reoccur, and the new policy has eradicated the effects of the

20   old policy.

21           MS. KILEY:  Your Honor, the reason that the

22   medications were discontinued under MWAP is because there was a

23   mechanism in place --

24           THE COURT:  I got that.  I got that.

25           MS. KILEY:  What I'm saying is that 1.24A on its face

1    is -- there's is objective administrative criteria that needs

2    to be followed and we understand that.  Training, to the extent

3    that there might be some evidence that there's lack of

4    training, is not indicative of ongoing constitutional

5    violation.  The constitutional violation --

6                THE COURT:  How about whether 1.24A will eradicate the

7    effects of MWAP?  How do I know that based on no training?

8                MS. KILEY:  There's no evidence in the record of who

9    is an MWAP victim at this point, your Honor.

10               THE COURT:  I'm not sure that's the issue either.  If

11   there's no training of the people on the ground, how can I make

12   a finding of mootness that includes there's no reasonable

13   expectation the violation will reoccur and the new policy has

14   completely eradicated the effects of the old policy?

15               MS. KILEY:  Respectfully, your Honor, Dr. Moores

16   didn't even allude to the fact that providers need training on

17   how to exercise their medical judgment.  The complaint has to

18   do with decisions based on nonmedical justifications, and

19   Dr. Moores and Dr. Khan repeatedly testified that decisions are

20   based on the medical judgments of the providers.

21               THE COURT:  Thank you.  Mr. Morrison, do you have

22   anything you want to add?

23               MR. MORRISON:  I did, but it's ran away from my mind.

24               THE COURT:  It's late in the day.

25               All right, counsel.  Reserved.

N27CallH

1          What time do you want to come in, friends, to be sure

2     you finish tomorrow?

3          MS. AGNEW:  We're just checking to see what time the

4     video link is set for.  My calendar has 9 o'clock.

5          THE COURT:  I can do 9:00 if you can do 9:00.

6          MS. AGNEW:  Your Honor, what if we did 9:30 just so we

7     can interface with the facility and make sure -- the other

8     thing is we also have two interpreters coming in because they

9     have all these rules about how long they interpret.

10         THE COURT:  Is that all right with you folks, 9:30?

11         MS. KILEY:  Yes, your Honor.

12         THE COURT:  Good enough.  Thank you, friends.  Good

13    evening.

14              (Adjourned to February 8, 2022 at 9:30 a.m.)

15                              * * *

1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3     AFSAR KHAN

4    Direct By Ms. Kiley . . . . . . . . . . . . 149

5    Cross By Ms. Agnew . . . . . . . . . . . . . 173

6    Redirect By Mr. Nolan . . . . . . . . . . . 203

7     AMY FERGUSON

8    Direct By Ms. Agnew . . . . . . . . . . . . 204

9    Cross By Mr. Nolan . . . . . . . . . . . . . 230

10   Redirect By Ms. Agnew . . . . . . . . . . . 238

11   Recross By Mr. Nolan . . . . . . . . . . . . 243

12   Redirect By Ms. Agnew . . . . . . . . . . . 244

13    MALI WILKERSON

14   Direct By Mr. Morrison . . . . . . . . . . . 246

15   Cross By Mr. Nolan . . . . . . . . . . . . . 276

16    CLAUDIO JOHNSON

17   Direct By Ms. Agnew . . . . . . . . . . . . 280

18   Cross By Mr. Nolan . . . . . . . . . . . . . 291

19   Redirect By Ms. Agnew . . . . . . . . . . . 299

20                          PLAINTIFF EXHIBITS

21   Exhibit No.                              Received

22    P3, PAGES 312, 313, 314  . . . . . . . . . 230

23    P3, page 309  . . . . . . . . . . . . . . . 238

24    Aaron Dockery 310  . . . . . . . . . . . . 243

25