N28CallH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PETER ALLEN, et al.,

4                 Plaintiffs,

5          v.                              19 Civ. 8173 (LAP)

6   NEW YORK STATE DEPARTMENT OF
    CORRECTIONS AND COMMUNITY
7   SUPERVISION, et al.,

8                 Defendants.

9   ------------------------------x
                                          New York, N.Y.
10                                        February 8, 2023
                                          9:30 a.m.
11
    Before:
12
                      HON. LORETTA A. PRESKA,
13
                                          District Judge
14
                           APPEARANCES
15
    LAW OFFICE OF AMY JANE AGNEW PC
16       Attorneys for Plaintiffs
    BY:  AMY J. AGNEW
17       JOSHUA L. MORRISON

18  NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
         Attorneys for Defendants
19  BY:  MICHAEL J. KEANE
         IAN RAMAGE
20
    WHITEMAN OSTERMAN & HANNA LLP
21       Attorneys for Defendant Dr. Carol Moores
    BY:  ORIANA L. KILEY
22       WILLIAM S. NOLAN
         GABRIELLA LEVINE
23       JENNIFER M. THOMAS

24  ALSO PRESENT:
         MERCEDES AVALOS, Spanish Interpreter
25       VIVIAN GOA, Spanish Interpreter

N28CallH

1          THE COURT:  As we start, would you all give your

2     attention to Ms. Phillips.

3          THE INTERPRETER:  Good morning, your Honor.

4          THE DEPUTY CLERK:  Are you certified court

5     interpreters?

6          THE INTERPRETER:  That's fine.  Yes, we do have a

7     standing oath with this Court.

8          THE DEPUTY CLERK:  Time out.  We have two witnesses.

9          MS. AGNEW:  Could we please have Mr. Moronta --

10    interpreter, if you can help me.  We're going to ask him to sit

11    aside for a little bit while we take Mr. Felipe Rivera-Cruz's

12    testimony and then we'll move right to him.

13          THE WITNESS:  Okay.

14          MS. AGNEW:  If Mr. Moronta can get someone in his room

15    to mute his computer.  Mr. Moronta, we're going to mute you

16    from here and sit tight, we'll get to you as soon as we can.

17          MR. NOLAN:  Your Honor, one issue.  Shouldn't we have,

18    because he's going to be testifying and I don't believe he's in

19    the caption, the non-testifying witness removed from

20    proceedings from now?

21          THE DEPUTY CLERK:  We're moving him into a breakout

22    room.

23          MR. NOLAN:  Okay.  I wasn't sure.

24     FELIPE RIVERA-CRUZ,

25         called as a witness by the Plaintiffs,

1      having been duly sworn, testified as follows:

2              THE DEPUTY CLERK:  Please state your name and spell it

3      for the record.

4              THE WITNESS:  My name is Felipe Rivera-Cruz.

5              MR. MORRISON:  Do you want to put on the record the

6      instructions provided to Mr. Rivera-Cruz before.

7              THE INTERPRETER:  Prior to starting the session, the

8      interpreters had a brief exchange with Mr. Rivera-Cruz to

9      instruct him about how consecutive interpreting works, that

10     there will be a session of question and answers for him to

11     please wait for the question to be interpreted into Spanish for

12     him and to give his answer in Spanish and that the interpreters

13     will interpret it into English, to please make his answers

14     brief, sentence by sentence or phrase by phrase, and to allow

15     us the opportunity to interpret them and the interpreters will

16     let him know at any point if his answers are long enough for

17     him to pause.

18             THE COURT:  Yes.

19     DIRECT EXAMINATION

20     BY MR. MORRISON:

21     Q.  Good morning, Mr. Rivera-Cruz.  How are you doing?

22     A.  I'm good.

23     Q.  Before we start, I want to make sure, is there anyone else

24     in the room with you right now?

25     A.  No, I am alone in the room.

1    Q.  Great.  Let me ask you, Mr. Rivera-Cruz, how old are you

2    right now?

3    A.  64.

4    Q.  And what correctional facility are you living in?

5    A.  In Shawangunk.

6    Q.  And do you have a current medical provider at Shawangunk?

7    A.  Yeah, so I have problems in my legs, and I don't know if

8    you can see it, but I have a bump here on the left of my neck.

9    Q.  Mr. Rivera-Cruz, who is your medical provider right now, if

10   you know?

11   A.  His name is Dr. Win

12   Q.  How long have you been living at Shawangunk?

13   A.  I've been here for seven years.

14   Q.  And has Dr. Win always been your provider while you've been

15   at Shawangunk?

16   A.  Yes.  Yes, at first, it was Dr. Lee and now it's Dr. Win.

17   Q.  How long ago did Dr. Win become your medical provider?

18   A.  So, Dr. Win was placed here about a year ago.  So that

19   means that out of the seven years that I have been here, it is

20   Dr. Win that is providing me with care now for a year.

21   Q.  When did you get transferred to the New York State

22   Department of Corrections?

23   A.  Well, I have been in prison from the first time that I was

24   arrested, which was in 2009.  Well, at first, I was in Rikers

25   Island until about the time of trial.  Then, about three and a

1   half years later, I was transferred to Five Points

2   Q.  Do you remember what year you were transferred to Five

3   Points?

4   A.  I'm not quite sure, but around 2013.

5   Q.  Prior to entering Five Points, did you suffer from any

6   medical condition that caused you pain?

7   A.  Well, I have had this pain ever since I received the 17

8   shots that I received all over my body, and since then, I have

9   been suffering from this pain.  I am supposed to be on

10  medication.

11  Q.  Let's talk about those 17 shots.  When did that occur?

12  A.  That was in Puerto Rico on August 27th, 2003.

13  Q.  Can you describe to the Court where you were shot.

14  A.  Well, those shots were at the entry point of the La Lula

15  complex in Ponce.

16  Q.  Where in your body were you shot?

17  A.  One on my face, it came in through my face and it went out

18  through my neck, another one on my hand, and nine shots on my

19  back, and then others on my belly.

20  Q.  After you were shot, can you just describe the care you

21  received and any injuries that remain today as a result.

22  A.  There or here?

23  Q.  Let's start, you were shot in Puerto Rico; correct?

24  A.  Yes.

25  Q.  What treatment did you receive in Puerto Rico after being

1    shot?

2    A.   So while I was in Puerto Rico, I was receiving therapy on

3    several occasions.  I was receiving -- or supposed to get

4    medication.  The thing is the medical insurance there, the SSS

5    would not cover those medications, so I had to come here to the

6    United States to receive the proper care.

7    Q.   When did you arrive to the United States to receive

8    treatment?

9    A.   That was in 2003.  I had to wait for some time so I could

10   recover some and be able to get on a plane.  I had to wait for

11   one year.

12   Q.   After you were shot, were you able to walk or did it have

13   any effect on your ability to walk?

14   A.   Well, the thing is that one of the shots entered my spine,

15   it hit my spine at the T6 level, and that's prevented me from

16   walking.  I have been unable to walk since 2003 until now.

17   Q.   As a result of the shots you received in 2003, have you

18   been required to use catheters, urinary catheters?

19   A.   Yes, I have them right now because I am unable to hold my

20   urine.

21   Q.   What other conditions occurred, that you understand, as a

22   result of your injuries from being shot?

23   A.   So my pain is permanent.  And I have a problem in both legs

24   such that when I sit in a chair, my legs turn black.

25   Q.   I want to talk about when you came to America for treatment

1    in 2003.  Where did you go, what part of the United States did

2    you go to?

3    A.  I went to my niece's home in the Bronx.

4    Q.  Did you receive treatment in a hospital or a clinic when

5    you came to the Bronx?

6          THE INTERPRETER:  Your Honor, may the interpreter ask

7    the witness to repeat the name of the hospital?

8          THE COURT:  Yes, ma'am.

9    A.  Mount Sinai.  Yes, so the doctor that provided care for me

10   gave me instructions to go to Mount Sinai Hospital.

11   Q.  Was that the doctor from Puerto Rico?

12   A.  Yes.

13   Q.  Can you tell me the type of care you received when you

14   started to be treated at Mount Sinai Hospital in 2003?

15   A.  Yes.  So there, I was given prescriptions, pain medication,

16   and I was referred to therapy twice per week.

17   Q.  Let's start with the pain medication that you were

18   prescribed.  Do you remember what the names of the medications

19   were?

20   A.  It was Lyrica, and there are others that I do not remember.

21   The thing is that the names are in English and I don't read

22   English.

23   Q.  That's fair, but let's talk about the Lyrica.  Was Lyrica

24   helpful for your pain?

25   A.  Yes, it was helpful because it keeps the nerves under

1    control, which is what is affected.

2    Q.  You also said that you were taking physical therapy; is

3    that right?

4    A.  Here in prison, you mean?

5    Q.  No, in 2003 when you came to the Bronx.

6    A.  Yes, I was referred to therapy.

7    Q.  How often would you receive physical therapy before you

8    were incarcerated and living in the Bronx?

9            THE INTERPRETER:  Your Honor, the connection was

10   interrupted there.  May the interpreter ask the witness to

11   repeat his answer?

12           THE COURT:  Yes, ma'am.

13   A.  So I was referred to therapy twice a week and I was

14   receiving therapy twice a week every week.  It helped somewhat

15   because I was able to recover some of my mobility.  Up until

16   that point, I was unable to move from my chair to my bed and

17   from my bed to a chair.  And I did recover my mobility in

18   therapy, which remains so to date.  However, there has been no

19   further development, it just got stalled there.

20   Q.  From 2003 to the time that you were arrested, I believe you

21   said in around 2009 or so and put in Rikers, were you being

22   prescribed Lyrica continuously?

23           It looks like the connection froze.

24           Mr. Cruz, can you hear me?

25           (Pause)

1    Can you hear me, Mr. Cruz?  You froze.

2    A.  Yes, I can hear you.

3    Q.  Let me re-ask the question.  From the point you arrived in

4    the Bronx for treatment in 2003 to when you were arrested, did

5    you continuously receive the prescription Lyrica to treat your

6    pain?

7    A.  Yes, that's correct.

8    Q.  And during that same period of time, were you also

9    regularly seeing a medical doctor or provider regarding your

10   pain and issues?

11   A.  Yes.

12   Q.  At any point in time, did any of those medical providers --

13           MR. MORRISON:  Strike that.

14   Q.  When you arrived and were arrested and sent to Rikers

15   Island, did you continue to receive Lyrica medication for your

16   pain?

17   A.  Yes, that's correct.

18   Q.  At any point in time, did they stop your Lyrica when you

19   were on Rikers Island?

20   A.  No.

21   Q.  When you were transferred to the New York State Department

22   of Corrections from Rikers Island, did your Lyrica prescription

23   continue?

24   A.  Yes, that's correct.

25   Q.  And what correctional facility did you first enter into?

1     A.   Five Points.

2     Q.   At any point in time, did your Lyrica prescription change

3     or get discontinued while you were in the Department of

4     Corrections, New York State Department of Corrections?

5     A.   No, they always gave it to me, they always did, and still,

6     when I went to Five Points, I was receiving it.  When I got

7     here, the doctor here took it away from me.  He just didn't

8     give it to me anymore.  Since then, I started to feel unwell.

9     Q.   What year did you transfer from Five Points to Shawangunk

10    Correctional Facility?

11    A.   If I'm not mistaken, in 2015.

12    Q.   And when you arrived at Shawangunk in 2015, how did you

13    learn that your Lyrica prescription was taken away?

14    A.   Well, because the pill is kind of red, so when I asked for

15    it, the nurse told me that the doctor had discontinued it.

16    Q.   Prior to that, did you ever talk to your provider about

17    your pain and your medication?

18    A.   Yes, I told them, but when I did, what he wanted to give me

19    was aspirin or some other type of medication, and that's not

20    the one, that is not what I use.  What I use is Lyrica because

21    Lyrica is what calms my nerves and my pain.

22    Q.   Mr. Rivera-Cruz, when you spoke to your doctor after you

23    arrived in Shawangunk, do you recall whether there was someone

24    there to interpret for you?

25    A.   No, I have never been provided an interpreter here.  I just

1   get by with the very little English that I know and that's it.

2   Q.  And when you arrived at Shawangunk, Dr. Lee was your

3   provider?

4   A.  Yes, that's correct.

5   Q.  And just to be clear, does Dr. Lee speak Spanish?

6   A.  No, because I think his language is Chinese.

7   Q.  You informed Dr. Lee that Lyrica worked to treat your pain;

8   correct?

9   A.  Yes, that's correct.

10  Q.  What is your understanding of why Dr. Lee didn't prescribe

11  that medication for you?

12  A.  Well, he told me that that medication had been discontinued

13  by the company.  I don't know whether that was true or not

14  because that had never happened to me before.

15  Q.  What medications were you provided for pain while at

16  Shawangunk?

17  A.  Well, I tried Motrin, which is what he prescribed, and

18  aspirin, but that type of medication does not work for me.

19  Q.  Can you describe to me the consequences or how you feel

20  when you are not on Lyrica medication?

21  A.  I feel pain all over my body, my nerves start to jump, I

22  get cramps in my legs, and that doesn't let me sleep.  So, I

23  can't sleep, and then the following day the spasms start again,

24  I can't control them, I can't sleep, I can't do anything.  You

25  understood?

1    Q.  Have you informed your medical providers now or at any

2    point in time about these effects of not having Lyrica?

3    A.  So, yes, I spoke with them with the little bit of English

4    that I have, telling them that I have a lot of pain and that my

5    legs start to jump, from one day to the next, I don't sleep,

6    and they're going to have to do something about it.

7    Q.  And what, if anything, do they do about it?

8    A.  No, they didn't do anything.  So then I go back to my cell

9    to pass the pain.  So I'm going to be in pain the entire time

10   that I'm going to be here?  That's not possible.

11   Q.  Just to jump ahead a little bit to be clear, do you know

12   what medication you are on right now for pain?

13   A.  No, they're not giving me anything.  I have to withstand

14   it.

15   Q.  Are you on any medication for muscle spasms right now that

16   you're aware of?

17   A.  None.

18   Q.  Are you aware if you're taking a medication called

19   baclofen?

20   A.  I'm not sure.  When I take pills for my urine to remove the

21   water and three other pills, whose name I don't know.  Then I

22   take another pill at 5:30 in the afternoon.

23   Q.  Since you've been in Shawangunk, have you ever been sent

24   out to an outside specialist for a consultation?

25   A.  Well, since I used to take that pill, I was under control.

1    So they recommended me to a specialist outside of the jail to

2    get braces because I use braces on both legs.

3    Q.  How long ago was that?

4    A.  I came with the braces on from the street.  I came with

5    them.

6    Q.  Can you use your braces -- I'm sorry.  Continue.

7    A.  So the problem with those braces is the first one that I

8    had, they break.  The doctor that saw me when I went to Five

9    Points had some new ones made for me.

10   Q.  Were you able to use the braces while you were at Five

11   Points while on your pain medication?

12          THE INTERPRETER:  Could you repeat the question?

13   Q.  Were you able to use your braces when they were fixed at

14   Five Points while you were on your pain medication?

15   A.  Yes.

16   Q.  How about right now, do you use your braces at Shawangunk?

17   A.  So initially, I was using them and going to physical

18   therapy, but then something new started in my feet.  My feet

19   get black.

20   Q.  Are you currently able to use your braces?

21   A.  So, no, I can't use them because when the swelling starts,

22   I can't use them.  Right now, that's what's happening.

23   Q.  When did your feet start getting black?

24   A.  About two years ago.

25   Q.  Your feet getting black, does that cause pain?

1    A.   It causes pressure and they start to beat, pulse, pulsate.

2    Q.   Does that hurt?

3    A.   Yeah, I went to the hospital, it hurts.  October of 2002, I

4    went to the hospital and they were going to amputate my legs.

5    Q.   And what happened?

6    A.   When I went to Albany, I was seen by a doctor --

7         THE INTERPRETER:  I'm saying this phonetically.

8    A.   -- Dr. Alo.

9    Q.   What was the result, were you diagnosed with anything, that

10   you're aware of?

11   A.   I checked me out and he marked my leg where he was going to

12   amputate it.  So it was going to be a little bit below the knee

13   and he said if the infection got to my bones, then he would

14   have to amputate them.

15   Q.   So it's your understanding you had an infection in October

16   when you were in the hospital?

17   A.   Yes, that's right.

18   Q.   How long were you in the hospital for?

19   A.   Five days.

20   Q.   During that five days, are you aware of whether you were

21   put on any pain medication by the hospital doctors?

22   A.   Yes, they gave me medication, morphine.  They gave me

23   morphine and another medication that I really don't remember

24   very well.  They gave me a CAT scan and they took a bunch of

25   x-rays.

1   Q.  After those five days at the hospital when you returned to

2   Shawangunk, were you provided any pain medication?

3   A.  Yeah, he gave me pills for the pain.  And I got an

4   infection, I don't know where I got it.  I was telling the

5   doctor here that I think I have an infection in my legs, I was

6   telling him.  So the treatment he gave me was giving me pills

7   for six days, that's all.

8   Q.  Do you know what those pills were?

9   A.  I don't remember.  They were big pills.  They were like

10  light red.

11  Q.  Was it your understanding they were for pain or for

12  something else?

13  A.  No, for the infection.

14  Q.  So after you got back from the hospital, to be clear, you

15  weren't prescribed any pain medication by your medical

16  provider?

17  A.  The one outside gave me medication, prescribed medication

18  for just a short amount of time.

19  Q.  Did your providers at Shawangunk continue that medication?

20  A.  Yeah, they gave it to me until I finished the prescription

21  of the pills, until I finished them all.

22  Q.  Are you talking about the pills you got for six days?

23  A.  No, the pills that he gave me for six days was for

24  something different.  It was when I started to see that my legs

25  were swelling and I went to see the doctor here.

1  Q.  Did the pills that you received help relieve the pain you

2  were in?

3  A.  No, because the infection continued.  So, no, the infection

4  continued.  What he should have done was send me out there to

5  get proper care, not wait until the end.  I don't want to lose

6  my legs.

7  Q.  Mr. Rivera-Cruz, do you remember when I came out to see you

8  a few weeks ago?

9  A.  Yes.

10  Q.  Well, first, I want to apologize for exposing you to COVID,

11  just up front, I'm sorry about that.

12  A.  Well, no problem.  You know that illness was brought on by

13  God and you can't go against God.

14  Q.  I do want to ask you, since I came and saw you with

15  Ms. Agnew, has any doctor or provider called you in or examined

16  you about your legs and feet right now?

17  A.  No, when I was up there, because the hospital is upstairs

18  or up there.  No, well, they put us there and we stayed there

19  for 10 days because they said it was one of the lawyers who had

20  COVID.

21  Q.  I understand that.  Has any doctor, since I came and saw

22  you with Ms. Agnew, come and examined you and discussed what is

23  going on with your feet right now?

24  A.  So, no, not yet.  When I went up there because of the

25  COVID, he did check out my legs and he told me to raise them

1  high for the blood to circulate, but that's all.

2  Q.  Are you aware of any other treatment plan that has been

3  entered for you in regards to your feet and pain since

4  Ms. Agnew and I came and saw you at Shawangunk?

5  A.  No.  He told me that he had signed me up to see the doctor

6  for the legs outside, but they still haven't called me yet.

7  Q.  And I don't think I asked this, but just to be clear, does

8  Motrin or aspirin or Tylenol effectively treat the pain that

9  you are in?

10       MR. NOLAN:  Objection.  To the extent it requires an

11  expert.

12       THE COURT:  It doesn't require an expert.

13       MR. NOLAN:  He asked does it treat his pain.  We can

14  talk about symptoms, but whether it's the proper effective

15  treatment, I'm not sure that's the proper question.

16       THE COURT:  Overruled.  You may answer, sir.

17       THE INTERPRETER:  Could you please repeat the

18  question.

19  Q.  Just to be clear, does Motrin, Tylenol, or aspirin

20  effectively treat your pain?

21  A.  No, that kind of medication, that's not for me.  It doesn't

22  do anything to me.

23  Q.  Does Lyrica effectively treat your pain, in your

24  experience?

25  A.  That's the one that controls my nerves, my spasms and

1    everything, that's the one that I need.

2    Q.  And you have informed Dr. Win about the effect Lyrica has

3    to your pain?

4    A.  No, the thing is that my English is not good, so I can't

5    explain it to him in English as well as I could in Spanish.

6            MR. MORRISON:  One moment.

7            Nothing further.  Thank you, Mr. Cruz.

8            THE COURT:  Cross examination, please, counsel.

9            MS. KILEY:  Can we take a recess, please.

10           THE COURT:  All right.  Five minutes.  We don't need

11   to do this each time.

12           MS. AGNEW:  Interpreter, please tell Mr. Rivera-Cruz

13   we're going to take a five-minute break and the other lawyers

14   are going to ask him questions.

15           THE WITNESS:  Okay.  That's fine.

16           (Recess)

17           THE COURT:  Cross examination, counsel, please.

18           MS. THOMAS:  Thank you, your Honor.

19   CROSS-EXAMINATION

20   BY MS. THOMAS:

21   Q.  Sir, I have just a few questions for you this morning.

22   A.  Yes, ma'am.

23   Q.  Sir, you testified earlier that you cannot read English; is

24   that correct?

25           MS. AGNEW:  Objection.  That wasn't his testimony,

1    your Honor.

2            MS. THOMAS:  Your Honor, respectfully, it was his

3    testimony.  He did say specifically that he could not read

4    English.

5            THE COURT:  He said he couldn't read it well, isn't

6    that what he said?

7            MS. THOMAS:  I'm happy to rephrase my question.

8            THE COURT:  Does the interpreter have to interpret the

9    back and forth between counsel and the Court?

10           MS. AGNEW:  I don't think so.

11           MR. MORRISON:  If it's distracting to you, your Honor,

12   no.

13           THE COURT:  Is that all right with everybody?  Okay.

14           Counsel, would you ask the question again, please.

15   BY MS. THOMAS:

16   Q.  Sir, can you read any English on paper?

17   A.  I tried to, but it's very hard for me and I don't

18   understand very well what they're trying to say.

19   Q.  Sir, you had testified earlier about going to a hospital

20   for an infection.  Could you please state when that occurred?

21   A.  It was October 1st of 2002.

22           MS. AGNEW:  Interpreter, is it possible he means '22?

23           THE WITNESS:  2002.

24   Q.  Sir, you had testified earlier that you had Lyrica

25   discontinued in 2015; is that correct?

1   A.  Yeah, when I got to this prison.

2   Q.  And when your Lyrica was discontinued in 2015, that was not

3   because of a policy referred to as MWAP; is that correct?

4   A.  What was the question?

5   Q.  In 2015 when your Lyrica was discontinued, that was not

6   because of a policy referred to as MWAP; is that correct?

7           MR. MORRISON:  Objection.

8           THE COURT:  Yes.

9           MR. MORRISON:  Calls for speculation.

10          THE COURT:  Are you able to answer the question, sir?

11          THE WITNESS:  I can't explain it because I don't know

12  what their policy is.

13  Q.  Sir, have you ever heard of a policy referred to as

14  M-W-A-P, medications with abuse potential?

15  A.  No.

16  Q.  And in 2015 when your Lyrica was discontinued, you were not

17  told it was the result of any policy; is that correct?

18  A.  No, they didn't tell me that, no.

19  Q.  And I believe you had previously testified that Dr. Lee

20  told you that he would not prescribe you Lyrica; is that

21  correct?

22  A.  Yeah, he discontinued it.

23  Q.  And when Dr. Lee discontinued your Lyrica, he did not tell

24  you that was the result of a policy; is that correct?

25  A.  He didn't give me a reason.

N28CallH                           Rivera-Cruz – Cross

1    Q.  And you had testified earlier that Dr. Win would not

2    prescribe you Lyrica; is that correct?

3    A.  No, it wasn't Dr. Win, it was Dr. Lee, the first one.

4    Q.  Did you ever have discussions with Dr. Win specifically

5    about Lyrica?

6    A.  Yeah, I spoke to him about the pain, but I can't complain

7    to him or demand that medication because he discontinued it.

8    Q.  Is it your testimony, sitting here today, that Dr. Win

9    discontinued your Lyrica?

10   A.  No, the one who discontinued it was Dr. Lee, the first one.

11   Q.  And at any -- sorry, sir.  There is no question pending.

12            THE COURT:  Let him finish the answer.

13            Sir, would you finish your answer, please.

14   A.  Dr. Lee took it way.  Dr. Win came later because he didn't

15   work anymore.

16   Q.  I understand.

17            Did you ever specifically mention the name "Lyrica" to

18   Dr. Win?

19   A.  I couldn't talk to him about it because he's not the one

20   who discontinued it.

21   Q.  Sir, do you recall submitting a declaration in support of

22   plaintiffs' motion for a preliminary injunction in this matter?

23   A.  Not that I know of, no.

24   Q.  Did you ever sign a document containing testimony or facts

25   about this particular case in the fall of 2022?

1        THE INTERPRETER:  I'm sorry.  Could you please repeat

2   the question.

3   Q.  Do you recall signing a document containing testimony on

4   your behalf in the fall of 2022?

5   A.  As far as I know, I haven't signed.

6        MS. THOMAS:  Nothing further, your Honor.

7        THE COURT:  Thank you.  Redirect, please, counsel.

8        MR. MORRISON:  Yes, briefly.

9        MS. AGNEW:  Your Honor, we're just pulling up the

10  Spanish version of his declaration so he can see.

11        THE COURT:  Yes, ma'am.

12        MS. AGNEW:  Thank you.

13  REDIRECT EXAMINATION

14  BY MR. MORRISON:

15  Q.  Mr. Rivera-Cruz, how are you?

16  A.  I'm well.

17  Q.  Do you see a document on the screen?

18  A.  Yes.

19  Q.  Mr. Rivera, can you take a moment and just read through

20  this document briefly and tell me if you recognize it.

21  A.  Okay.

22  Q.  Do you recognize this document, Mr. Rivera-Cruz?

23  A.  Yes, I do know the document.

24  Q.  Do you remember reading this document and declaring the

25  truth of what is asserted in this document?

N28CallH                          Rivera-Cruz – Redirect

A.  Yes.

          MR. MORRISON:  Your Honor, I would like to mark this
as Exhibit P59.

          THE COURT:  Okay.

          MR. MORRISON:  And move to admit it.  We'll get it
printed and distributed.

          THE COURT:  Any objection?

          MR. NOLAN:  We're going to object to the admission of
it.  We've never seen it before.  We've received no certified
copy of any translation with the affidavit.

          We note for the record that at the top left-hand of
the document, it says it was last modified on December 23rd,
2022, long after the declaration in question was submitted in
English.

          MS. AGNEW:  Your Honor, that's the date the document
was last opened on our system.  It says "modified" when the
version was opened.

          MR. NOLAN:  Therefore, it's a different version than
he saw.

          THE COURT:  "Open" doesn't mean necessarily
"modified."

          MR. NOLAN:  But it says "modified," Judge.

          MS. AGNEW:  Your Honor, we can get a forensic expert
to submit a declaration that explains --

          THE COURT:  In the meantime, let's take the testimony.

1    If there is an issue, counsel can move to strike it.

2              MR. MORRISON:  I think I can clear that up.

3    BY MR. MORRISON:

4    Q.  Mr. Rivera-Cruz, do you remember receiving a paper version

5    of this document in the mail, sent to you from our office?

6    A.  Well, who was it sent from?

7    Q.  From the Law Office of Amy Jane Agnew to you at Shawangunk.

8              Do you remember receiving this in the mail?

9    A.  Yes, I believe so.

10   Q.  I want to talk briefly about the testimony regarding you

11   going to the hospital about infections in your leg.  Do you

12   remember that?

13   A.  Yes, that's right.

14   Q.  When you went to the hospital for that infection in your

15   legs, was that recently or a long time ago?

16   A.  No, that was recently.

17   Q.  When did that happen?

18   A.  Well, that happened on 1/10/22.

19   Q.  In the year 2022; correct?

20   A.  Uh-huh.

21   Q.  Mr. Cruz, one last question, when you do see Dr. Win, does

22   he have a medical file with him?

23   A.  So that day was a Saturday and I had lots of pain and my

24   legs were swollen.  So it was a nurse that I saw that day and

25   she was the one that sent me somewhere on the outside of the

1    facility, but she spoke to Dr. Win on the phone first and she

2    told him what I had.

3    Q.   Thank you.  Forget about going to the hospital for a

4    second.  Generally, when you see Dr. Win for an appointment,

5    where do you see him?

6    A.   His office.

7    Q.   Does he have or are you aware of whether he has a paper

8    file or a chart of your medical history when he sees you?

9    A.   Yeah, that's right.  So he always -- for anybody that goes

10   to see him, he has the person's record ready and he opens it up

11   to see it.

12           MR. MORRISON:  Thank you, Mr. Rivera-Cruz.  Nothing

13   further.

14           THE COURT:  Recross, counsel.

15           MS. THOMAS:  Yes, I have brief recross.

16           If you wouldn't mind pulling up Plaintiffs'

17   Exhibit 59, please.

18   RECROSS EXAMINATION

19   BY MS. THOMAS:

20   Q.   Sir, did you meet with your attorney, Josh Morrison, on

21   December 9th, 2022, at Shawangunk?

22   A.   Can you please repeat that question.

23   Q.   Sure.  Of course.  Sir, did you have a meeting with your

24   attorney, Josh Morrison, on December 9th, 2022?

25   A.   Yes.

1    Q.  And was there a translator present at that meeting?

2    A.  Yes.

3    Q.  We're now looking at Plaintiffs' Exhibit 59, and you

4    testified that you recognize this document; correct?

5    A.  Yes.

6    Q.  And did you sign this document?

7    A.  Well, no, I don't remember so well.

8              MS. THOMAS:  If we could please scroll to the last

9    page of this document.

10             MS. AGNEW:  Your Honor, this is our electronic

11   version, he signed the one that was filed on the docket.

12             MS. THOMAS:  I understand that.  We are trying to make

13   a record and demonstrate that the document that was filed on

14   the record is in English and that was signed by

15   Mr. Rivera-Cruz, this document is in Spanish.  And I'm trying

16   to establish how this came to be.

17             MS. AGNEW:  Okay.  Have fun.

18             MS. THOMAS:  I don't appreciate the commentary.

19             THE COURT:  Okay, boys and girls, let's go.

20   Q.  Sir, do you see your signature anywhere on this page?

21   A.  No.

22   Q.  And during your meeting on December 9th, 2022 with

23   Mr. Morrison, did you sign a declaration?

24   A.  No.

25   Q.  Did you sign a document on December 9th, 2022, with your

1   counsel present?

2   A.  No, I haven't signed.

3           MS. THOMAS:  No further questions, your Honor.

4           THE COURT:  Thank you.  Redirect, counsel?

5           MR. MORRISON:  No, your Honor, nothing based on that.

6           THE COURT:  Thank you.

7           MS. AGNEW:  Thank you, Mr. Cruz.

8           THE WITNESS:  Okay.  Thank you.  So we're done?

9           MS. AGNEW:  We're done.  Yes, sir.

10          THE COURT:  You are excused, sir.

11          THE WITNESS:  Okay.  That's fine.

12          (Witness excused)

13          THE COURT:  Mr. Moronta, would you give your attention

14  to Ms. Phillips, please.

15   JULIO MORONTA,

16      called as a witness by the Plaintiffs,

17      having been duly sworn, testified as follows:

18          THE DEPUTY CLERK:  Please state your name and spell it

19  for the court reporter.

20          THE WITNESS:  Julio Moronta, M-o-r-o-n-t-a.

21  DIRECT EXAMINATION

22  BY MR. MORRISON:

23  Q.  Good afternoon, Mr. Moronta.  How are you doing?

24  A.  Good afternoon.  Somewhat better.

25  Q.  How old are you?

1   A.  55.

2   Q.  What current correctional facility do you live in?

3   A.  In Eastern.

4   Q.  How long have you been in Eastern Correctional Facility?

5   A.  I will be making four years here now.

6   Q.  When did you first become incarcerated with the New York

7   State Department of Corrections?

8   A.  In 2008.

9   Q.  In 2008, were you in the Department of Corrections or were

10  you in a county jail?

11  A.  No, I was still in Rikers Island.

12  Q.  When did you leave Rikers Island and come to your next

13  facility?

14  A.  In 2010.

15  Q.  When you arrived in 2010 to your next facility, what

16  facility was it?

17  A.  Clinton.

18  Q.  When you arrived at Clinton, did you have any medical

19  conditions that were causing you pain or discomfort?

20  A.  Yes.

21  Q.  And can you describe what those were?

22  A.  Yes, I was feeling a lot of pain on my back always.

23  Q.  Did that pain have any effect on your daily life that you

24  felt?

25  A.  Yes, sir.

N28CallH                    Moronta - Direct

1    Q.  What was that?

2    A.  Well, I was barely able to sleep.  In fact, I still can't

3    really sleep because of the sharp pain in my lower back.

4    Q.  When you were in Clinton, did any of the medical providers

5    provide you any medication to treat that pain you were having

6    in your back?

7    A.  No, I don't think they prescribed it, no.

8    Q.  How long were you in Clinton?

9    A.  I spent two years in Clinton, two-plus years.

10   Q.  Do you recall ever being prescribed, while you've been in

11   DOCCS custody, a medication called Neurontin?

12   A.  Yes, sir.

13   Q.  Do you recall about what time or what year you were

14   prescribed Neurontin?

15   A.  I don't recall the exact date, but I did use it for about a

16   year or so.

17   Q.  Do you remember what correctional facility you were in when

18   you were being prescribed Neurontin?

19   A.  Yes, Sullivan.

20   Q.  Prior to being in eastern, what correctional facility were

21   you in?

22   A.  Sullivan.

23   Q.  How long were you living at Sullivan Correctional Facility?

24   A.  About seven years.

25   Q.  Do you remember who your provider was at Sullivan when you

1    were receiving Neurontin?

2           THE INTERPRETER:  Your Honor, may the interpreter to

3    ask the witness to repeat his answer?

4           THE COURT:  Yes, ma'am.

5    A.  Yes.  Well, it was Mrs. Maria Diaz.

6    Q.  How did the Neurontin medication affect the pain you were

7    in?

8    A.  Well, I used to feel somewhat better.  It would kind of put

9    me to sleep and it would calm the pain.  It wasn't like it

10   would completely go away either.

11   Q.  When you were on Neurontin, were you able to sleep at

12   night?

13   A.  Somewhat, yes.

14   Q.  Did there come a time when your Neurontin medication and

15   prescription was taken away from you?

16   A.  Yes, sir.

17   Q.  Can you describe to the Court how you learned your

18   Neurontin medication was being taken away from you?

19   A.  No.  So I went to the clinic and the female doctor there,

20   when I complained about the medication being taken away, she

21   told me that, from security, she had been told that she can no

22   longer prescribe that medication.

23   Q.  So is it true that you learned that your medication was

24   taken away before you spoke to your provider?

25   A.  Yes, sir.

1    Q.  At any point in time, did you ask that you stop taking the

2    Neurontin medication.

3             THE INTERPRETER:  Counsel, would you please repeat for

4    the interpreter?

5    Q.  At any point in time prior to it being discontinued, did

6    you ask for the medication to be stopped?

7    A.  No, sir, never.

8    Q.  What were the effects of your pain and symptoms after the

9    Neurontin medication was stopped?

10   A.  Even more pain, more pain even, because the medication that

11   was being given to me had no effect whatsoever.

12   Q.  Mr. Moronta, have you ever been accused of hoarding

13   Neurontin medication before?

14   A.  No, sir.

15   Q.  Have you ever been accused of cheeking Neurontin medication

16   or any medication before?

17   A.  No, sir.

18   Q.  Is have you ever been accused of selling Neurontin

19   medication before while in custody?

20   A.  Never.  Never.

21   Q.  Mr. Moronta, have you ever received a ticket by the

22   Department of Corrections while you've been incarcerated?

23   A.  No, sir, in the years that I have been incarcerated, I have

24   never gotten a ticket.

25   Q.  After they discontinued your Neurontin medication while in

1   Sullivan, were you prescribed any alternative medications for

2   your pain?

3   A.  Yes, they used to give me something that had no effect at

4   all.

5   Q.  Do you remember being prescribed a prescription called

6   Elavil before?

7   A.  I think so.

8   Q.  Did that help with your pain?

9   A.  No.  No.  No.

10  Q.  How about a medication called Cymbalta?

11  A.  I really don't remember that one.  But anytime that

12  anything was prescribed to me, I would then go back and I would

13  tell them to give me something else because that was not really

14  having any effect.

15  Q.  Mr. Moronta, did you ever inform a medical provider or

16  medical staff that Neurontin did help you?

17  A.  Yes, I did speak to Dr. Diaz about the fact that it did

18  help.  It wasn't like it completely got rid of the pain, not

19  fully, but it did help, yes.

20  Q.  And what was the response you received from Dr. Diaz when

21  you told her that?

22  A.  Well, what Dr. Diaz answered or her response to me before

23  leaving was that, well, that pain that you have is because your

24  bone is bent, but that was never something that they had told

25  me before, but she said, you know, your bone is bent and that

1   is what the x-rays and the MRI show.

2   Q.  Did Dr. Diaz speak Spanish?

3   A.  Yes, sir.

4   Q.  When you met with Dr. Diaz, you were communicating with

5   they're her in Spanish; correct?

6   A.  Yes.

7   Q.  Did she ever inform you why she took you off Neurontin and

8   wasn't prescribing it anymore?

9   A.  Well, what she told me was that they were just not

10  prescribing it anymore, that the administration was not

11  prescribing it anymore.

12  Q.  Do you remember roughly what year that was?

13  A.  Well, that was before she left the place, I don't quite

14  remember the year, but maybe approximately 2013, 2014.  I

15  really don't remember the year well.

16  Q.  When you were transferred to Eastern Correctional Facility

17  where you're at now, were you assigned a specific provider?

18  A.  Yes, I found the same doctor, Dr. Guzman, who is the same

19  doctor that was there, I also ran into him here.

20  Q.  So after Diaz left Sullivan, Dr. Guzman became your

21  provider at Sullivan?

22  A.  No.  No.  Well, Dr. Guzman had already always been the

23  medical provider there.  There was another female doctor, as

24  well, whose name I don't remember.

25  Q.  So in Eastern, who is your provider right now?

N28CallH                         Moronta - Direct

1    A.  Dr. Guzman.

2    Q.  Does Dr. Guzman speak Spanish?

3    A.  No, sir.

4    Q.  Do you speak English at all?

5    A.  No.

6    Q.  So when you have a medical appointment with Dr. Guzman, how

7    do you communicate with each other?

8    A.  Well, so sometimes I find someone who would write a note in

9    English for me so that I -- and then I give it to him.

10   Sometimes, seldomly, not frequently, they put an interpreter on

11   the phone.

12   Q.  Have you ever communicated to your provider through a note

13   written by someone else on your behalf or through the language

14   line about the pain you were in?

15   A.  Yes, sir.

16   Q.  Have you discussed or attempted to communicate with medical

17   staff about the effects Neurontin has on your pain?

18   A.  Yes, I have, but they never pay any mind.

19   Q.  Do they ever tell you why you are not being prescribed

20   Neurontin?

21   A.  No, they haven't said anything to me.

22   Q.  Have you received any type of treatment for your pain while

23   at Eastern Correctional Facility?

24   A.  Yes, they have given me injections, they have given me a

25   couple of injections for the pain.

N28CallH                       Moronta - Direct

1   Q.  And how do those injections affect your pain, are they

2   effective?

3   A.  Yes.  So I have two or three months of relief.  I'm just --

4   I'm calm, yes.

5   Q.  How long between injections is the time?

6   A.  I don't understand that.

7   Q.  Neither did I.

8            How long does it take from your injection

9   appointments, one month, two months, three months?

10           THE INTERPRETER:  The interpreter, your Honor, needs

11  to ask the witness to repeat the last part.

12           THE COURT:  Yes, ma'am.  Go ahead.

13  A.  So, well, I mean, three months or so.  It's not like

14  they're continuous.  They're not continuous at all.  In fact, I

15  haven't had one for years now.  I have requested them, but

16  they're not given to me.

17  Q.  When was the last time you remember having injections?

18  A.  Oh, it's been a year-plus or even two years.

19  Q.  Do you recall ever being sent to a specialist by a doctor

20  by the name of Omar Hussein?

21  A.  Yes.

22  Q.  Do you remember that specialist recommending to you to be

23  prescribed a muscle relaxant?

24  A.  I don't remember, no, because it's the officer who takes

25  the papers and the doctor is the one who sees it, we don't see

1   it.  We don't know anything.

2   Q.  What is the medication you are on right now, if anything,

3   for pain?

4   A.  They're giving medication, but I haven't received it for

5   several days because I have to go to Albany.  Actually, I'm at

6   the clinic right now.  I have to go to Albany tomorrow.

7   Q.  What medication are you receiving right now?

8   A.  I really don't remember.  My mind can't keep track of it

9   because there's many medications that I take.

10  Q.  How about medications for pain, do you recall any?

11  A.  No, sir.

12  Q.  What are you going to Albany for, if you know?

13  A.  I thought I was going for my arm, but also, I have a hernia

14  that came back after I've had surgery for it.

15  Q.  What is wrong with your arm?

16  A.  When I had the surgery, it locks, and I also feel quite a

17  bit of pain.

18  Q.  How long has that been going on?

19  A.  Over two years.

20  Q.  Have you received any medication for that pain?

21  A.  No, they gave me the same medication that I get for my

22  back.  In recent days, I got an MRI and they told me that I had

23  to get some followup from a professional.

24  Q.  Mr. Moronta, do you know when you are expected to be

25  released from prison, if at all?

N28CallH                        Moronta - Cross

1  A.  I got 33, but I'm doing 25 to life.

2          MR. MORRISON:  Thank you, Mr. Moronta.  I have no

3  further questions.  I wish you the best of luck on your medical

4  trip tomorrow.

5          THE WITNESS:  Thank you, sir.

6          THE COURT:  Cross examination, counsel, please.

7          MS. THOMAS:  Thank you, your Honor.

8  CROSS-EXAMINATION

9  BY MS. THOMAS:

10  Q.  Good afternoon, Mr. Moronta.  I have a few questions for

11  you today.

12  A.  Okay.

13  Q.  Are you able to speak English to any degree?

14  A.  No, I can't communicate like that, no.

15  Q.  Are you able to read English to any degree?

16  A.  No.

17  Q.  And are you able to write in English to any degree?

18  A.  No.

19  Q.  You had testified earlier that you were housed at the

20  Sullivan Correctional Facility; correct?

21  A.  Yes.

22  Q.  And during what years were you housed at the Sullivan

23  Correctional Facility?

24  A.  Seven years.

25  Q.  And did you enter Sullivan in 2010?

N28CallH                         Moronta - Cross

1   A.  No, Clinton.  I went to Clinton in 2010.

2   Q.  And what year did you enter Sullivan Correctional Facility?

3   A.  Around '12 or '13.

4   Q.  And you had testified earlier that you were prescribed

5   Neurontin while you were at Sullivan; is that correct?

6   A.  Yes, sir.

7   Q.  And what year were you prescribed Neurontin?

8   A.  '15, '16, around then.

9   Q.  Is it your testimony today that you were on Neurontin for

10  approximately one year?

11  A.  Yes.

12  Q.  Is it your testimony that you were on Neurontin for one

13  year during the time of approximately 2015 and 2016?

14          MR. MORRISON:  Objection.  Misstates his testimony.

15  He clearly doesn't know.

16          MS. THOMAS:  I was asking for clarification.  I

17  apologize.  I will rephrase the question.

18          THE COURT:  Yes, ma'am.

19  Q.  So to confirm, sir, you were on Neurontin for approximately

20  one year; correct?

21  A.  Yes.

22  Q.  And to the best of your recollection, you believe that that

23  one year was during the years of either 2015 or 2016; is that

24  correct?

25          THE DEPUTY CLERK:  Stop.  Stop.  We have another

1   facility on right now.

2            THE COURT:  There are faces appearing on the screen.

3            MS. AGNEW:  We think that's Dr. Veronica Ruiz, I'm

4   guessing.  If we get to her testimony, it will not be until

5   late in the day.  If she's not available, we will not be taking

6   it.  I've conveyed that several times to the AG's office.

7            TECHNICAL ASSISTANT:  Dr. Ruiz is here.  Can you see

8   us?

9            MS. AGNEW:  Ma'am, we have to get through the

10  testimony of a lot of other witnesses first.  If we get to

11  Dr. Ruiz, it cannot be until late in the afternoon.  Well,

12  that's fine.  If she's not available, she's not available.

13  Okay?

14           TECHNICAL ASSISTANT:  Okay.

15           MS. AGNEW:  So we'll excuse her.  We're going to

16  withdraw her subpoena.  We do thank her for her time and trying

17  to be available.

18           TECHNICAL ASSISTANT:  No problem.  Thank you.

19           I'm sorry, your Honor.  We tried.

20           THE COURT:  The question that I have on the table is:

21  "Q.  So to confirm, sir, you were on Neurontin for

22  approximately one year; correct?

23  "A.  Yes.

24  "Q.  And to the best of your recollection, you believe that

25  that one year was during the years of either 2015 or 2016; is

N28CallH                         Moronta - Cross

1   that correct?"

2              THE COURT:   Sir, can you answer that question, please.

3   A.   Yeah, I don't remember very well, but it was when I arrived

4   to Sullivan, during that time.

5   Q.   After that one-year period that you were on Neurontin, was

6   there any other period of time that you were on Neurontin?

7   A.   No.

8   Q.   Is it your testimony today that the Neurontin was

9   prescribed to treat lower back pain?

10  A.   Yes.

11  Q.   And for the one year that you took Neurontin, did that cure

12  your lower back pain?

13  A.   It didn't cure it, it improved it somewhat, but it wasn't

14  cured, I still feel the pain.

15  Q.   When you were taken off of Neurontin, did your provider

16  tell you that you were taken off of Neurontin due to any

17  policy?

18  A.   Yeah, they said that, that the administration had removed

19  it, they were not prescribing it anymore.

20  Q.   So in approximately 2016 when you were taken off of

21  Neurontin, you were told that there was a policy, that was the

22  justification for your removal of Neurontin; is that correct?

23  A.   Yes.

24  Q.   Sir, are you currently taking Cymbalta?

25  A.   Excuse me?

1   Q.  Sir, are you currently prescribed the medication Cymbalta,

2   also known as duloxetine?

3   A.  I think so.  I think that's it.

4   Q.  Do you have an understanding as to what the Cymbalta does

5   for you?

6   A.  No, I really don't understand actually because it doesn't

7   create any effect.

8   Q.  Sir, isn't it true you have seen pain management

9   specialists in the last 12 months?

10  A.  No, I don't think so, not for the pain.

11  Q.  But you've seen pain management specialists since 2010; is

12  that correct?

13  A.  Yes.

14  Q.  Would you agree that you've seen pain management

15  specialists in the year 2022?

16  A.  No, I don't remember.  I don't think I saw them, no.

17  Q.  Sir, did your primary care provider recommend that you go

18  see pain management again this past fall?

19  A.  No, not yet.  It's in process.

20  Q.  But it was recommended for you; is that correct?

21  A.  Yeah, I was referred for that, but when they did the MRI on

22  my arm and to get an injection, but I still haven't been

23  referred.

24  Q.  Sir, you had testified that today, you're preparing for a

25  procedure in Albany; is that correct?

N28CallH                          Moronta – Cross

1    A.  Yeah, I think it's for my colon.  Now I have to go and

2    drink this water that I have to drink to clean out my

3    intestine.

4    Q.  Thank you, sir.  Understood.

5         Will you still be attending your medical procedure

6    this week?

7    A.  Yeah, tomorrow, God willing.  I'm in the middle of it.

8    Q.  Sir, when did you first become involved with this

9    litigation?

10   A.  I don't remember well when it was.  I don't know.

11   Q.  Did you become involved in this litigation within the last

12   year?

13   A.  No, in '22, yes.

14   Q.  You became involved in this litigation in 2022; is that

15   correct?

16   A.  Yes.

17   Q.  Do you recall what month in 2022 you became involved in

18   this litigation?

19   A.  I don't remember very well, but at the beginning, yes.

20        MS. THOMAS:  Nothing further, your Honor.

21        THE COURT:  Thank you.  Redirect, counsel?

22        MR. MORRISON:  Nothing based on that.  Thank you,

23   Judge.

24        THE COURT:  Thank you.  Mr. Moronta, you're excused,

25   sir.  Thank you.

1              THE WITNESS:  Thank you.

2              (witness excused).

3              THE COURT:  What do you want to do next, friends?

4              MS. AGNEW:  So I think we need to move the video back

5    to Shawangunk.

6              MS. KILEY:  Your Honor, one administrative issue.

7              THE COURT:  Yes, ma'am.

8              MS. KILEY:  We understand that plaintiffs are holding

9    off on Dr. Ruiz who just showed up on the screen, however, we

10   were already planning to call Dr. Ruiz on rebuttal.  She leaves

11   at 2:00 p.m.  So we would like to ask the Court if we could

12   call her out of turn since she's not going to be available

13   after 2:00 p.m. and she's not available tomorrow.

14             THE COURT:  What do you want me to do with the guy

15   who's been waiting at Shawangunk?

16             MS. KILEY:  My understanding is that when the screen

17   showed up for Shawangunk, Dr. Ruiz was sitting right there.

18             MS. AGNEW:  She wasn't at Shawangunk.

19             THE COURT:  Could you confer off the record, tell me

20   what you want to do, please.

21             MS. AGNEW:  We just withdrew our subpoena.

22             MR. NOLAN:  She's ready to go for us.  So would it

23   take about 20 minutes?

24             MR. KEANE:  1:00 p.m.

25             MS. AGNEW:  We have people at Shawangunk, including

N28CallH                    Moronta - Cross

1    Dr. Win.  So it's our case.  I'm not trying to jeopardize this.

2    We were going to take her late in the day if we got to her.  We

3    would like to get Shawangunk done and they can call her for

4    their rebuttals tomorrow.

5          MS. KILEY:  She's not available tomorrow, and we also

6    called Dr. Dockery out of turn, so we would ask for the same

7    courtesy.

8          MS. AGNEW:  Mr. Dockery testified because you weren't

9    ready to go with your witnesses and he was sitting in this

10   room.

11         MS. KILEY:  Dr. Ruiz is sitting in the room at

12   Woodbourne waiting to go, as well.

13         THE COURT:  All right.  How long is the prisoner

14   witness going to be?

15         MS. AGNEW:  We have Dr. Win and then we have three

16   more prisoners at Shawangunk.  If we're going to do Ruiz, she's

17   going to take me a long time on cross.  That means all our

18   Shawangunk people don't get to testify, your Honor, and I have

19   a problem with that.

20         THE COURT:  We're not going to do that.  I don't

21   understand why she's not available tomorrow.  That's the

22   rebuttal day.

23         MS. KILEY:  She's leaving the country.

24         MS. AGNEW:  This is the first we are hearing that they

25   were going to call her.  Your Honor asked several times if they

1    were calling a rebuttal witness, they said it depends.

2                THE COURT:  You said half an hour, two people.

3                By the way, we have a sentencing that's going to

4    happen at some point in the middle here.

5                Let's go with the prisoner who was in line first,

6    whoever that was.

7                Ms. Phillips.

8     HLA PE WIN,

9         called as a witness by the Plaintiffs,

10        having been duly sworn, testified as follows:

11               THE DEPUTY CLERK:  Please state your name and spell it

12   for the record.

13               THE WITNESS:  Hla Pe Win, medical doctor, Shawangunk

14   Correctional Facility.

15               THE COURT:  Spell your first name for us, sir.

16               THE WITNESS:  H-l-a P-e, last name W-i-n.

17   DIRECT EXAMINATION

18   BY MS. AGNEW:

19   Q.  Good afternoon, Dr. Win.  First, I want to very quickly go

20   over your educational background for the Court.

21   A.  I came from (technical interruption) I graduated in 1990.

22   And I finished my residency in 1996 from (technical

23   interruption) Institute.  (Technical interruption).

24   Q.  Dr. Win, forgive me, just like the other day, I'm going to

25   ask you to slow down and I'm going to go a little slower

1   myself.  You and I both speak fast.  Okay?

2   A.  Sure.

3   Q.  Isn't it true, sir, you are a licensed physician in New

4   York State?

5   A.  Correct.

6   Q.  And you're certified.  Do you have a board certification?

7   A.  Yes, I do.

8   Q.  What is that in?

9   A.  Family medicine.

10  Q.  And isn't it true, sir, you worked for the office of mental

11  health for several years as a physician; correct?

12  A.  Correct.

13  Q.  And then you came to the New York State Department of

14  Corrections; correct?

15  A.  Correct.

16  Q.  And you've only ever worked at Shawangunk Correctional

17  Facility; right?

18  A.  Yes.

19  Q.  And right now, you serve as the facility health services

20  director at Shawangunk; correct?

21  A.  Correct.

22  Q.  And can you tell the Court, approximately how many patients

23  are housed at Shawangunk?

24  A.  It's around 400 inmates here.

25  Q.  And at Shawangunk, you have a wheelchair unit; correct?

N28CallH                         Win - Direct

1   A.  Correct, we do.

2   Q.  And that houses inmates with disabilities; correct?

3   A.  Correct.

4   Q.  And are you right now the only doctor or is Dr. Lee still

5   coming in sometimes?

6   A.  He doesn't come in anymore.

7   Q.  Are there any other providers coming in to help out?

8   A.  Yes.  There is nurse practitioners and physician

9   assistants.  They come help us out when the facility arrange

10  it.

11  Q.  Can you repeat that last part, sir.  When do they come in?

12  A.  When the facility arrange that.

13  Q.  And it's true you don't arrange them; correct?

14  A.  No, I don't.

15  Q.  Sir, when you came into DOCCS, what year was that?  Do you

16  recall when you started at DOCCS, the year?

17  A.  February 2020.

18  Q.  When you came in in February 2020, did there come a time

19  when you learned about the MWAP policy?

20  A.  Yes.

21  Q.  And what was explained to you in February 2020 about the

22  MWAP policy?

23  A.  When certain medications are needed, you need to get

24  approval from regional medical director or covering physicians

25  of that position.

N28CallH                        Win - Direct

1   Q.  How did you go about getting approval for those

2   medications?

3   A.  We have a form to fill out, we send it and they send

4   approval, and we submit it to regional authority, the policy.

5   Q.  Did you then become aware, in February of 2021, that there

6   was a new policy?

7   A.  There's a new policy, I don't know exact date, but there's

8   a policy change, yes.

9   Q.  And can you tell us the substance of that policy change?

10  A.  The medication (technical interruption) produced

11  potential -- we don't need that approval anymore.

12  Q.  Sir, isn't it true between February of 2020 and February of

13  2021, you only submitted one MWAP request form before you

14  reassessed the plaintiffs in this case?

15  A.  I cannot deny or confirm because I don't know how many

16  requests that I made.

17  Q.  Do you recall, did it take you a long time to fill out an

18  MWAP request form?

19  A.  I think it's one-page form.  I am not positive.  And

20  medications and stuff like that.

21          MS. AGNEW:  Dr. Win, we need to take a break so that

22  the Judge can take care of some business, and I apologize.

23  Let's come back in about 25 minutes, Dr. Win.  I apologize.

24          THE WITNESS:  Okay.  1:30.

25          (Recess)

1                          AFTERNOON SESSION

2                              1:37 p.m.

3            THE COURT:  I apologize for the interruption,

4    everyone, but business has to be done.

5            Thank you.  Would you like to continue, Ms. Agnew.

6            MS. AGNEW:  Sure.

7    BY MS. AGNEW:

8    Q.  Dr. Win, when we were talking, we were speaking about the

9    period of time when you on-boarded to DOCCS and the MWAP

10   policy.

11           I want to ask you, when you first started at

12   Shawangunk, was there a rule that a patient could only be

13   administered narcotics if they were housed in the infirmary?

14   A.  It's not true.

15   Q.  When you started at Shawangunk, was that the rule?

16   A.  It's not.

17   Q.  So it was not the rule when you started at Shawangunk?

18   A.  It's not.

19   Q.  We're going to talk now about policy 1.24A.  We spoke about

20   it a few weeks ago at your deposition.  Do you recall your

21   deposition?

22   A.  I do.

23   Q.  We're going to put that on the screen.

24           Did you bring the documents that I sent you, sir?

25   A.  The box?

N28CallH                      Win - Direct

1    Q.  Yes.

2    A.  I have it here.  Do you want me to open it?

3    Q.  I do.  Another good rule follower.

4    A.  I was following the rule not to open it until you're told

5    to do so.

6              MS. AGNEW:  We can take this down, then.

7    Q.  I think it will be better for you, Dr. Win.  It's like

8    Christmas, only bad.

9    A.  What do you want me to do.

10   Q.  There is a pile of documents in there.  Can you pull them

11   out.  There should be a page that has an exhibit sticker on it

12   that says P1, and it's a copy of policy 1.24A.  Wonderful.

13             MS. AGNEW:  For the record, your Honor, that's already

14   been admitted into evidence as D2.

15             THE COURT:  Yes, ma'am.

16   Q.  Dr. Win, are you familiar with policy 1.24A?

17   A.  Yes, I am.

18   Q.  Since the time I took your deposition, have you discussed

19   your testimony with anyone?

20   A.  Nope.

21   Q.  Can you tell me, Dr. Win, when did you first become aware

22   of policy 1.24A?

23   A.  The starting date, as per the document, February 8, 2021.

24   So it must be before that because we start using the policy on

25   February 8, 2021.

1    Q.  Do you recall how you received a copy of the policy?

2    A.  It must be a reminder that what I relied on is there is an

3    intranet healthcare policy and policy in our system.  Any

4    document, any let's say policy, 1.24, I can go there and look

5    at it.  That's where the most current policy is that we can

6    remove, we can pull it, we can read it.

7    Q.  That's on your computer; right?

8    A.  I think it's a government computer.  I don't know.  It's

9    somewhere in the server.

10   Q.  Sir, do you get an alert when there is a new policy in the

11   health services policy manual?

12   A.  I do.

13   Q.  How do you get the alert?

14   A.  I'm not positive, but most likely we get an email from our

15   administration or from somewhere.  I'm aware that there is a

16   new policy there and we read it and we try to understand that.

17   Q.  So sitting here today, sir, since policy 1.24A came out, do

18   you follow the policy?

19   A.  I did.

20   Q.  So I just want to go over the important parts of the

21   policy, at least from my perspective, and make sure you and I

22   understand the same thing.

23        Under procedure, it says "Each patient with a chronic

24   pain condition will be given the problem list code 338 pain

25   management."  Right?

N28CallH                        Win - Direct

A.  Correct.

Q.  Does every patient in your facility who suffers from a
chronic pain condition have the problem list code 338?

A.  I cannot say every patient, but in our facilities, we are
doing the code as was supposed to be.

Q.  Did you talk with someone who told you that you should
start adding the codes?

A.  Talk to someone?  We have nurses, we have RN, we have a
regional medical director.  We update our problem base as much
as up to date.  I don't know if you talk to someone.  Maybe my
nurses and my nurse administrator mostly.

Q.  So have you directed your nurses and your nurse
administrators to go through all the charts and make sure that
every patient who suffers from a chronic pain issue is coded
338?

A.  We try our best.

Q.  That wasn't my question.  I appreciate that.

        Have you directed them to go through all the charts
and add the code?

A.  I did not.  I did not.

Q.  So let's go back to the policy 1.24A, in the third
paragraph down, after procedure, it says "Specialty consults
will be ordered as indicated for the evaluation and care of
chronic pain patients.  In the event the PCP does not accept
the recommendations of the specialist, the PCP will document in

1    AHR regarding the reasons why the PCP does not accept the

2    recommendations."

3            Do you understand that part of the policy?

4    A.  I do.

5    Q.  Have you been following that part of the policy since it

6    was promulgated?

7    A.  I did.

8    Q.  Now, the next paragraph after the bullet says "Pain

9    management medication should only be discontinued after a

10   provider has met with the patient, discussed the issues

11   regarding the use of the medication, analyzed the patient's

12   situation, and subsequently determined that it is in the best

13   interests of the patient for the medication to be

14   discontinued."

15           Have you been following that part of the policy

16   consistently since it was promulgated?

17   A.  I did.

18   Q.  So I want to look at the records.  Are you aware that there

19   are some patients in your facility that are a part of this

20   lawsuit?

21   A.  Yes, I do.

22   Q.  Do you know who those patients are?

23   A.  I don't know exactly how many are, but I kind of know a

24   few.

25   Q.  Do you recall a time in late 2020 when you conducted

N28CallH                      Win - Direct

1    reassessments of some of those patients?

2    A.   I don't understand your question.

3    Q.   Let's do this, can you find the document there, it's

4    labeled P10, and it's for Rashid Rahman.  There is a package of

5    medical records.

6    A.   P10, yup.

7    Q.   Dr. Win, I'm going to tell you for the record, those aren't

8    complete.  We have just taken out what we feel are the most

9    important things.  Okay?

10   A.   Sure.

11   Q.   Are you familiar with Mr. Rahman?

12   A.   I kind of know who he is.

13   Q.   Do you recall him being a patient of yours?

14   A.   Yes, I do.

15   Q.   So I want you to look at page 282, and it's in the bottom

16   center.  It says R. Rahman, 282.

17          MS. AGNEW:  Your Honor, I'll move all these into the

18   record when I'm done.

19          THE COURT:  So you say.

20   A.   282, okay.

21   Q.   Do you recognize that document, Dr. Win?

22   A.   That's my handwriting.

23   Q.   Do you remember when you did these reassessments?

24   A.   I don't remember, but I can read it.

25   Q.   Can we agree you did this reassessment on November 10th of

N28CallH                          Win - Direct

1   2020?

2   A.  Yes, I did.

3   Q.  Do you remember, when you did this reassessment, did anyone

4   speak with you and tell you how to conduct the reassessment?

5   A.  This is the form that I fill out.  So it was the form

6   initially that I would fill out.  That's what I did.

7   Q.  So if we look at page 283, the second page, the last

8   question was, do you believe that it might be beneficial to

9   initiate a trial of an MWAP medication at this time.

10  A.  I put not applicable.

11  Q.  Why did you put it was not applicable?

12  A.  There is a scenario there --

13  Q.  Doctor, can you move forward a little bit.  It's very hard

14  to hear your voice.

15  A.  At that time, my clinical assessment of this incarcerated

16  individual has other medication so that MWAP medication is not

17  needed.  That's what I meant on that page.

18  Q.  What other medication was he getting?

19  A.  If you have the record, show it to me because I cannot

20  remember each and every details of these medication.

21  Q.  So did Mr. Rahman tell you that he was being treated

22  effectively with the medication he was on?

23  A.  I (technical interruption) could you repeat the question.

24  Q.  Did Mr. Rahman tell you, when you completed this form, that

25  he was not suffering from any pain?

1    A.  I have to look at that corresponding AHR, the recent --

2    around that time, what are the complaints, what are the things

3    that you would see, what are the reasons I saw him, I need to

4    see those health records, AHR, that's what we call.

5    Q.  When you completed this form, were you sitting with

6    Mr. Rahman?

7    A.  No.  I take it back.  I am not positive.

8    Q.  I want you to look now at page 297.  Are you familiar with

9    this document, Dr. Win?

10   A.  Yes.

11   Q.  What is this document?

12   A.  This is form number 3194 New York State Department of

13   Corrections, request and report of consultation.

14   Q.  Is that your handwriting on the bottom of the document?

15   A.  Bottom is mine, correct.

16   Q.  Can you read that for us.

17   A.  Inmate, they said we shouldn't do it.  Incarcerated

18   individual was seen in the ER, Saint Luke's.  Diagnosis, prior

19   neuropathy, numbness of the left arm, using wheelchair,

20   self-pushing.  Follow up for prior neuropathy.  Neurologic PRN,

21   CHR 4/4/21.  And that's at 4/12/21 I signed it.  And there is

22   something there, I cannot read it.

23   Q.  Let's look at 296.

24   A.  Okay.

25   Q.  I believe that's your corresponding AHR; correct?

1   A.  Correct.

2   Q.  And what did you write there?

3   A.  Inmate was seen at Saint Luke's ER for numbness of the

4   left.  Diagnosis peripheral neuropathy of -- with EMG

5   suggestion.  Inmate was seen and evaluated by physical medicine

6   and rehab on March 8th, 2019.  History of laminectomy with

7   wheelchair use since June 2016.  With appropriate -- I think

8   care as reasonable by PNMR.  PNMR is physical medicine and

9   rehab.  Inmate was -- has signed against medical advice for

10  observation in infirmary due to -- this is a copy, so it's not

11  clear as the original.

12  Q.  Dr. Win, that's okay.  I'm going to stop you.

13          Looking at your notes, isn't it true that Mr. Rahman

14  was diagnosed with peripheral neuropathy at Saint Luke's ER;

15  correct?

16  A.  As per document, it's not a new diagnosis.  It's maybe a

17  current diagnosis, I cannot confirm that, but he was seen in

18  the ER, correct.

19  Q.  This also notes he has a history of a laminectomy; correct?

20  A.  Yes, I wrote that.

21  Q.  And he uses a wheelchair; correct?

22  A.  He uses a wheelchair, correct.

23  Q.  On this date, he didn't want to go into the infirmary for

24  observation; right?

25  A.  Unfortunately, he was at infirmary for 10 days recently and

N28CallH                         Win - Direct

1    he was discharged I think yesterday or the day before

2    yesterday.  He was at the infirmary for 10 days.

3    Q.  Yes, I understand that.  He was in the infirmary for COVID

4    quarantine; right?

5    A.  That's correct.

6    Q.  But what I'm talking about is in April of 2021, you noted

7    that against medical advice, he didn't want to be in the

8    infirmary?

9    A.  So the clinical situation is once any patient has acute

10   medical issues, such as acute pain, severe pain, as a

11   clinician, we observe in the higher level of care, which the

12   nurse to patient ratio is a lot more than the GP, so that we

13   can provide higher level of care and observe.  That is a reason

14   that I suggested or recommended being in the infirmary for

15   better patient-nurses ratio and more higher level of care.

16   Q.  Let's look at 299, Dr. Win.

17   A.  Okay.

18   Q.  Do you see your initials somewhere on 299?

19   A.  Yes, I saw that.

20   Q.  And when you initial a consult, that means you read it;

21   correct?

22   A.  Correct.

23   Q.  And isn't it true that Dr. Hussein, in his plan of care,

24   said, one, schedule for cervical epidural steroid injection;

25   two, left C -- I'm going to mess this up, but those are

N28CallH                          Win - Direct

1    vertebrae; right?

2    A.   Correct.

3    Q.   And then three, consider using the Tramadol.

4    A.   Correct.

5    Q.   So under that, you wrote for acute pain, RX will admit to

6    infirmary 5 to 7 days for Tramadol; correct?

7    A.   You can interpret whatever the way that you want, but in

8    this consult, (technical interruption) is considered, and the

9    first line of treatment is epidural steroid injection.  So that

10   is the treatment that pain management recommended.  If I had no

11   other choice, that's why (technical interruption) as a pain

12   management instead of writing Tramadol 50 BID or whatever, he

13   writes "consider Tramadol."  There are four or five different

14   types of medication that we have for the pain treatment there.

15   Whenever I treat any pain management patient under my regular

16   care and practice, I consider all other options.

17   Q.   I understand that.  Dr. Win, I need you to answer my

18   questions.  Okay?

19   A.   Okay.

20   Q.   I do appreciate your narrative.

21            What's the second line of Dr. Hussein, what did he

22   write next to 2?

23   A.   Next to 2 is consider -- hang on.

24   Q.   No, No. 2.  It says left --

25   A.   Oh, No. 2.  Left C4 -- C5, I think, C8 and C7, facet block.

1   Q.  That's not an alternative to the cervical epidural steroid

2   injection, that's more directions; correct?

3   A.  I cannot interpret the thinking process by the pain

4   specialist.  If you want to ask that type of specialized

5   specialist recommendation, you have to ask the pain management

6   doctor, Dr. Hussein.

7   Q.  I want to know, sir, why didn't you reuse Tramadol for

8   Mr. Rahman?

9   A.  As I told you before, he consider his different.  As soon

10  as I get this, I submit it for the procedure, which you can see

11  that with the checkbox there.  So we would try to get that

12  thing done as soon as possible if the inmates are suffering.

13  At the same time, we would treat the written -- the exact word

14  is consider.  So that was what I did.

15  Q.  When did Dr. Hussein tell you that "consider" is not a

16  recommendation?

17  A.  You can ask Dr. Hussein why he didn't write Tramadol

18  50 milligram twice a day or three times a day instead of

19  consider.  Consider mean if I have no other choice, if I look

20  at other options there, I can consider it.  That's how I

21  interpret that.

22  Q.  So if you look at 304, that's the next AHR record in

23  Mr. Rahman.  Do you see anywhere where you explain why you were

24  not prescribing Tramadol?

25  A.  I cannot answer this question because the recommendation, I

N28CallH                    Win - Direct

1   followed that, and I told you already, it was considered.  If

2   he has an acute medical condition there, I will see him, I will

3   evaluate him, I will do whatever level of care that I can

4   provide in my facility.  If I cannot, I have an option to send

5   to further evaluations or further treatment and other higher

6   level of care.

7           THE COURT:  Dr. Win, the question that counsel asked

8   was:

9   "Q.  Do you see anywhere where you explain why you were not

10  prescribing Tramadol?"

11          THE COURT:  Looking at 304, can you answer that

12  question, please.

13          THE WITNESS:  Your Honor, the exact word was consider.

14          THE COURT:  That's not the question, sir.  That's not

15  the question.  The question is, looking at the document that's

16  marked 304, do you see anywhere where you explain why you were

17  not prescribing Tramadol.  That's the question.

18          THE WITNESS:  I don't have it.

19  Q.  Dr. Win, please turn to page 317.  Do you recognize that

20  document, Dr. Win?

21  A.  I don't.

22  Q.  So sitting here today, you don't remember ever receiving

23  this letter from me?

24  A.  I don't.

25  Q.  Let's turn to 322, Dr. Win.  Can you tell us, is that your

1   handwriting on 322?

2   A.  Pain management followup.  Pain management will request RI

3   on 4/27/21, referral number 20310653, refused.  Pain management

4   refused by referral number 2292291881, sent October 3, '22.

5   Q.  So on October 3rd of 2021, you were putting in another

6   referral to pain management?

7   A.  I guess what you said was 2022, not '21.

8   Q.  I'm sorry.  This is October 3rd of 2022; correct?

9   A.  Correct.

10  Q.  And you're sending him for a followup with pain management;

11  correct?

12  A.  Correct.

13  Q.  And then you say there that on April 27th of '21, he

14  refused?

15  A.  That's what I said.  Per policy, pain management need to be

16  arranged to follow up every three months with the pain

17  management.  So I'm not sure when was the last time this

18  patient was seen by the pain management, but according to here,

19  he didn't go in April of 2021.  So as a physician, treating

20  physician, I requested again to follow up with the pain

21  management.

22  Q.  But he did go in April of 2021; correct?

23  A.  See, I'm not positive.  If you can find that, it might

24  be -- according to my reading here --

25  Q.  Let's try 299, Dr. Win.  So on 299, it's 4/16/21, and he

N28CallH                     Win - Direct

1   went to pain management; correct?

2   A.  Oh, so now I want to -- since I saw this one, he refused

3   me, not the pain management consult.  He refused the spinal

4   cord injection.  I don't see the --

5   Q.  He didn't want to get the injections, right, he refused the

6   injections; correct?

7   A.  As a clinician, what I'm saying is it's a note that we just

8   read in October 2022.  I might refer to this refusal of this

9   injection, I might be.  I am not 100 percent sure.  The thing

10  is he went there on that day, 4/16/21.

11  Q.  Between April of 2021 and October 3rd of 2022, why didn't

12  you restart Mr. Rahman's Tramadol prescription?

13          MS. KILEY:  Objection.  It was never established that

14  he was on Tramadol before this --

15          MS. AGNEW:  His medical records are already in the

16  record for this case, your Honor, in fact on this motion.

17          MR. NOLAN:  Why don't we enter the whole thing now

18  then?

19          MS. KILEY:  It hasn't been established he was on

20  Tramadol beforehand.

21          THE COURT:  Ms. Agnew.

22  Q.  Dr. Win, I'm going to rephrase my question.  When you

23  reviewed Mr. Rahman's records, did you go over his past

24  medications?

25  A.  I'm not positive, but there's a way that we can look at

N28CallH                          Win - Direct

1    previous medication list if there's a record available, either

2    in the computer or in the chart.

3    Q.  When you did that reassessment, you were supposed to look

4    at which medications he tried before; right?

5    A.  The pain management or any acute medical conditions, the

6    specialist on that specific area will recommend his suggestion,

7    his evaluation, that's what it is now.  Let's say 10 years ago,

8    5 years ago, 2 years ago, treatment may be not the corrective

9    guideline at this point, so my final question is current pain

10   management treatments for the current pain, patient required to

11   get evaluated by the pain management specialist and with plan

12   of taking care of the inmates by coordination of the care and

13   the specialist.

14          THE COURT:  Doctor, the question was:

15   "Q.  When you did that reassessment, you were supposed to look

16   at which medications he tried before; right?"

17          THE WITNESS:  Correct.

18   Q.  On your reassessment, and that was page 282, tell me this,

19   do you list Tramadol?

20   A.  Which are you talking about?

21   Q.  I'm sorry.  Give me a second.  I apologize, sir.  It's 282.

22   A.  Which number that you were talking about, the one page

23   or --

24   Q.  No. 3 says, what treatments, pharmacologic and

25   non-pharmacologic, have been tried.  Please indicate whether

1   each therapy was helpful or not helpful in improving the pain

2   level or overall function of the patient.

3          All I'm asking is, did you list Tramadol there?

4   A.  It's not.

5   Q.  And do you remember if you talked to Mr. Rahman and asked

6   him if any pharmacologic treatment helped him?

7   A.  The treatment, as I -- Tramadol, patient might be treated

8   with Tramadol in the past, but the current treatment is by the

9   current physicians and the specialists who practice in the pain

10  management for the current time is the making decision for the

11  treatment.

12         THE COURT:  Doctor, the question was: "Do you remember

13  if you talked to Mr. Rahman and asked him if any pharmacologic

14  treatment helped him?"

15         Can you answer that question?

16         THE WITNESS:  No, I can't.

17         THE COURT:  It's going to go a lot more quickly if you

18  listen to the question counsel is asking and answer that

19  question.

20         THE WITNESS:  Sure.

21  Q.  Dr. Win, can you pick up P11.  Those are the records from

22  Dr. Hinespeter.

23  A.  P11, okay.

24  Q.  I want you to turn to Hinespeter 315, and again, it's in

25  the bottom in the middle.  Before we start, do you know who

1    Mr. Hinespeter is, sitting here today?

2    A.  I know him.

3    Q.  What does Mr. Hinespeter suffer from, do you know off the

4    top of your head?

5    A.  No.  He was in the wheelchair.

6    Q.  So let's look at 315.  Do you recognize what kind of

7    document this is?

8    A.  It's discharge from RMU.

9    Q.  Can you tell me the first two medications that

10   Mr. Hinespeter was taking when he was discharged from the RMU,

11   according to this document?

12   A.  It said Flexeril, 10 milligrams, POTID, PRN, and Tramadol

13   15 milligrams, POBID, PRN.

14   Q.  Can we agree this document is dated April 1st, 2022?

15   A.  Yeah, it's dated April 1st, 2022.

16   Q.  And policy 1.24A had already been in effect for over a

17   year; correct?

18   A.  Correct.

19   Q.  So let's look also at 325, do you recognize what this

20   document is?

21   A.  This is from RMU.  What do you want me to look at?

22   Q.  Can we agree it's a discharge summary?  If you look at the

23   top of 325, top left-hand corner, can we agree it says Horizon

24   Health at Coxsackie Regional Medical Unit, date, time of visit,

25   April 1, '22 at 9:30.  And then it says discharge summary,

1    monthly review; right?

2    A.  Correct.

3    Q.  Why does an RMU write a discharge summary, if you know?

4    A.  Discharge summaries are the summary of what happened during

5    the time that he was admitted in RMU.

6    Q.  How will you use that document when an RMU patient is draft

7    to Shawangunk?

8    A.  RMU is regional medical unit with just higher level of

9    care.  When we discharge them to our facilities, compared to

10   RMU, we are more -- I think we got less level of care than we

11   can provide.  So, most likely, from RMU discharge, patients are

12   more medically stable compared to the time that they went

13   there.

14   Q.  How do you use a discharge summary in your practice, do you

15   read it?

16   A.  When we receive the patient, we observe or we monitor the

17   patients in the infirmary and we adjust medication as needed.

18            THE COURT:  Question, doctor:  "How do you use a

19   discharge summary in your practice, do you read it?"

20            THE WITNESS:  We read it.

21   Q.  Now, I want you to look at 338, Dr. Win.  The first section

22   of that document, can we agree that's an AHR; correct?

23   A.  Correct.

24   Q.  And it's for John Hinespeter; correct?

25   A.  Correct.

1    Q.  And the first note on April 14th of '22 says, only RMU

2    chart available, new chart made.  In your experience, does that

3    mean this RMU chart was there in Shawangunk for Mr. Hinespeter?

4    A.  Can you say that again.  I lost that.  What are you talking

5    about?

6    Q.  The top box, dated April 14th of '22, that's your

7    signature, right, in the middle?

8    A.  No, this is the nurse wrote it and I sign it.

9    Q.  Yes, that's your initials; right?

10   A.  Correct.

11   Q.  And the nurse wrote:  "Only RMU chart available."  Correct?

12   A.  Correct.

13   Q.  Below that are your notes from April 28th of '22; correct?

14   A.  Correct.

15   Q.  Is that the first time you saw Mr. Hinespeter after he came

16   from Coxsackie RMU?

17   A.  I cannot confirm or deny.

18   Q.  Let's look in the top square.  Doesn't it say morbid

19   obesity, no apparent distress, MD rescheduled April 28th of

20   '22?

21   A.  I cannot read that.

22   Q.  But your notes are underneath that; right?

23   A.  Correct.

24   Q.  Where are the prescriptions for Mr. Hinespeter's Tramadol

25   and Flexeril that are listed on 322?

N28CallH                        Win - Direct

1    A.   322, this one, I have to look at the discharge day, how

2    many days he stayed at infirmary, and those are the things I am

3    not sure in this because hospital --

4              THE COURT:   Dr. Win, the question was, "Where are the

5    prescriptions for Mr. Hinespeter's Tramadol and Flexeril that

6    are listed on 325?"

7              THE WITNESS:   I -- honestly, I cannot answer the

8    question because I am not here every day and there's a process

9    that was -- even my absence there, there are other covering

10   physicians and they're going to read through to include that.

11   So honestly, I cannot answer that question.

12   Q.   You're the only doctor at Shawangunk; right?

13   A.   I am the only one, but I'm not here 24/7.

14   Q.   Did you re-prescribe Mr. Hinespeter's Tramadol and Flexeril

15   after he arrived from the Coxsackie RMU?

16   A.   I don't exactly know, but most likely I didn't prescribe

17   the Tramadol.

18   Q.   Why not?

19   A.   Because when we are seeing, evaluating the patients under

20   any close observation, if there is no signs of acute pain

21   condition there, we will try other medication.

22   Q.   Did you talk to Mr. Hinespeter before you discontinued both

23   his Flexeril and Tramadol, and explained to him why you were

24   doing that?

25   A.   Because if you look at the record there, it's not standing

1  order, that's what we call --

2          THE COURT:  Dr. Win, Dr. Win, this is a yes, no, or I

3  don't recall question.

4  "Q.  Did you talk to Mr. Hinespeter before you discontinued

5  both his Flexeril and Tramadol, and explain to him why you were

6  doing that?"

7          THE COURT:  Yes, no, I don't remember.

8          THE WITNESS:  Yes, no, what is the other one?

9          THE COURT:  Can you answer that question, please, sir.

10          THE WITNESS:  Oh, okay.  Because this is a clinic

11  indication there, I usually discuss with the other medication

12  there.  So in this one, I didn't say that I said that

13  specifically Tramadol that I discussed with him, the Flexeril,

14  that I discussed with him.

15          MS. AGNEW:  I have no further questions, your Honor.

16          THE COURT:  Cross examination, please, counsel.

17          MS. AGNEW:  Your Honor, why don't I move those into

18  the record.  And, your Honor, of course, predictably, I also

19  failed to move P58 into the record or asked to have it

20  admitted.  We used it for the testimony of Dr. Khan yesterday.

21  It's the February 3rd, 2021 email from David Dinello to his

22  staff.  So I'd like to admit that into evidence, as well as

23  P10, pages 282, 283, 297, 296, 304, 317, 322, and 299, as well

24  as P11, 315, 325, and 338.

25          THE COURT:  Any objection?

1          MR. NOLAN:  Honestly, we don't know which ones those

2    were because they weren't moved at the time.

3          MS. AGNEW:  I gave them all to you.

4          MR. NOLAN:  No objection.

5          THE COURT:  Received.

6          (Plaintiffs' Exhibits P10, pages 282, 283, 297, 296,

7    304, 317, 322, and 299.  P11, 315, 325, and 338 received in

8    evidence)

9          THE COURT:  Cross examination, please, counsel.

10         MS. KILEY:  Yes, your Honor.

11   CROSS-EXAMINATION

12   BY MS. KILEY:

13   Q.  Good afternoon, Dr. Win.

14   A.  Good afternoon.

15   Q.  Just very few followup questions I have for you today.

16         Dr. Win, do you recall your testimony regarding the

17   338 problem code?

18   A.  Yes, I do.

19   Q.  Have you ever not treated a patient because they did not

20   have the 338 code on their medical problems list?

21   A.  I do treat every patient, even though there's a code or

22   not, if they have pain.

23   Q.  Regarding Mr. Rahman, do you recall -- if I could just

24   direct your attention to 299, the specialist recommendation,

25   dated April 16th of 2021.  I'll give you a minute to take a

N28CallH                          Win – Cross

1  look.

2  A.  Yes.

3  Q.  And to confirm, and I want to make sure I understand your

4  testimony today, you read that the first line of treatment from

5  the specialist was for two injections; correct?

6  A.  Correct.

7  Q.  And that was your understanding of what the recommendation

8  was; correct?

9  A.  That was correct.

10 Q.  And you indicated today that he, in fact, refused those

11 injections; correct?

12 A.  He refused those injections, correct.

13 Q.  And you would have been more comfortable prescribing the

14 Tramadol had he received those injections; correct?

15         THE COURT:  We're not leading excessively, are we,

16 counsel?

17         MS. KILEY:  It's cross examination, your Honor.

18         THE COURT:  He's certainly not -- anyway.

19 A.  The pain management physician will do the procedure as

20 quick as possible, then the patient will follow up with the

21 pain management.  Then, depending on the response of that

22 procedure or injections or whatever the pain management

23 treatment is, then the situation will need to be followed up

24 with the pain management.

25 Q.  Dr. Win, your decision not to prescribe Tramadol for

N28CallH                    Win - Cross

1   Mr. Rahman following his April 16th, 2021 consult, did that

2   decision have anything to do with the medications with abuse

3   potential policy?

4   A.  No.

5   Q.  Regarding Mr. Hinespeter, when you reviewed his discharge

6   form -- do you recall reviewing his discharge form?

7   A.  I don't.

8   Q.  Do you recall seeing Mr. Hinespeter for the first time when

9   he came to Shawangunk after being discharged from the Coxsackie

10  RMU?

11  A.  I might saw him after that.

12  Q.  But do you have a recollection of seeing him?

13  A.  Not in my memory.  I have to look at the chart.

14  Q.  Do you know if he was asking for Tramadol?

15  A.  I don't know.  I don't recall.

16  Q.  Dr. Win, you are aware that the medications with abuse

17  potential policy no longer exists; correct?

18  A.  Correct.

19  Q.  And you are aware that you do not need any approval from an

20  RMD before you prescribe any medications for pain; correct?

21  A.  Correct.

22  Q.  And you would agree that all of your decisions are based on

23  your own clinical judgment; correct?

24  A.  Correct.

25  Q.  And you do not feel as though there's anything holding you

N28CallH                    Win - Redirect

1   back from exercising your own independent clinical judgment;

2   correct?

3   A.  Correct.

4           MS. KILEY:  Thank you.  I have no further questions.

5           THE COURT:  Thank you.  Redirect, counsel.

6   REDIRECT EXAMINATION

7   BY MS. AGNEW:

8   Q.  Dr. Win, earlier you testified that you follow all of the

9   provisions of policy 1.24A; correct?

10  A.  Correct.

11  Q.  Do you sit down with a patient who transfers into your

12  facility every time before you discontinue their medications?

13  It's a yes or no question, sir.

14  A.  Yes.

15  Q.  Do you recall when we sat and I took your deposition a

16  couple weeks ago on January 11th of 2023?

17  A.  Uh-huh.

18  Q.  And Ms. Kiley was there; correct?

19  A.  Correct.

20  Q.  And there was a court reporter on the laptop; correct?

21  A.  Correct.

22  Q.  And I asked you:

23  "Q.  Okay, so based on the medical scenario, you might not

24  re-prescribe the medication; right?

25  "A.  If there is -- if there is acute medical condition, we

1    will handle the acute medical condition.  For example, patient

2    has acute medical chest pain that we thought is related to

3    cardiac origin.  Ordering any medication is not the choice.  If

4    you think it's a cardiac origin there, they need to send to the

5    emergency room to rule out heart attack or something there,

6    infarct, which lead facility cannot do that.  So at that level

7    of care, we'll send out.

8    "Q.  So I'm talking about a patient with a chronic pain

9    condition, and let's pretend he comes in on gabapentin.  Are

10   you going to automatically re-prescribe the gabapentin that he

11   was on at Coxsackie RMU?

12   "A.  80 years old with some kidney problems.

13   "Q.  Does gabapentin treat a kidney problem?

14   "A.  No.

15   "Q.  Okay.  So let's --

16   "A.  The reason -- kidney.  I don't know how come it gets to my

17   brain, but chronic kidney disease are the ones to not give

18   NSAIDs a lot of time.

19   "Q.  Sure.

20   "A.  Because there's a side effect.  This goes on forever, sir.

21   "Q.  Okay.  So when you say you have to review that --

22   "A.  I need to see the patient or review it.

23   "Q.  Okay.  So you are not necessarily going to re-prescribe

24   what the old doctor had them on; correct?

25   "A.  Not necessarily.  You might have to examine them."

1              MS. AGNEW:  That's all, your Honor.

2              THE COURT:  Recross, counsel?

3              MS. KILEY:  No, your Honor.

4              THE COURT:  Thank you.  Thank you, Dr. Win, we're

5    finished.  You're excused, sir.

6              THE WITNESS:  Thank you very much.

7              THE COURT:  Who do you want next, counsel?

8              MR. MORRISON:  Rashid Rahman.

9              THE COURT:  Yes, please.

10             Mr. Rahman, would you give your attention to

11   Ms. Phillips, please.

12    RASHID RAHMAN,

13        called as a witness by the Plaintiffs,

14        having been duly sworn, testified as follows:

15             THE DEPUTY CLERK:  Please state your name and spell it

16   for the court reporter.

17             THE WITNESS:  My name is Rashid Rahman.  You spell my

18   name R-a-s-h-i-d, and my last name is spelled R-a-h-m-a-n.

19             THE COURT:  Mr. Morrison.

20             MR. MORRISON:  Thank you, Judge.

21   DIRECT EXAMINATION

22   BY MR. MORRISON:

23   Q.  Good afternoon, Mr. Rahman.  Let me just start by

24   apologizing for forcing you into quarantine by exposing you to

25   COVID, I know it's not a good place for you to be, but I'm

1   sorry.

2   A.  It's all right.

3   Q.  How old are you?

4   A.  I am 33 years old.

5   Q.  I want to kind of just cut to the chase right now.  Can you

6   describe for the Court your current medical conditions and

7   associations it has with any pain you are receiving, you feel?

8   A.  As I'm talking, if you can see me, I am bent over because I

9   live in excruciating pain.  My whole entire back and my neck

10  and everything, I hurt right now.

11  Q.  What is your understanding of why your back and your neck

12  is causing you pain?

13  A.  It is when they took away my medical medicine that I was --

14  that they was giving me to use for my surgery was Ultram and

15  Xanax, it was working.

16  Q.  Let me go back a little bit.  At some point in time, did

17  you have a surgery that affected you positively or negatively?

18  A.  It affected me in a bad way because I'm still in the

19  position right now where I can't do really for myself what I

20  would like to do.

21  Q.  Tell me what that surgery was?

22  A.  They removed two vertebrae from out of my back because they

23  said it was decompression on my spinal cord and they were

24  supposed to put some titanium rods and screws in that they

25  never did.

N28CallH                      Rahman - Direct

1   Q.  After you had that surgery, was there any complications

2   that occurred?

3   A.  Yes, there were.

4   Q.  What year was that surgery?

5   A.  That was in 2016, sir.

6   Q.  And tell me about the complications you had after your back

7   surgery?

8   A.  Like my whole entire back ache feels like my neck going

9   down to my spine, to my lower ribs in the back.  It's just I'm

10  always in a throbbing pain.  As I'm speaking to you now, my

11  whole left side is numb.

12  Q.  After that first surgery, did you have to have another

13  surgery or another operation?

14  A.  Yes, I did.

15  Q.  And when did that occur in relation to the first surgery?

16  A.  It happened a day and a half after that because it seemed

17  like I almost died.  What happened is they said there was fluid

18  left from the first surgery that was leaking on my spinal cord.

19  Q.  Was it your understanding you had to go into an emergency

20  surgery?

21  A.  Yes.

22  Q.  After that surgery, that second surgery was done, tell me,

23  did your pain increase or did it decrease?

24  A.  It felt a little bit more like bearable, but it was a

25  hurricane of a problem that I'm still feeling and dealing with.

N28CallH                        Rahman - Direct

1   Q.  At any point in time, were you prescribed any pain

2   medication to deal with your back pain?

3   A.  Immediately after surgery, yes, I was.

4   Q.  Prior to surgery, were you prescribed any pain medication?

5   A.  Nothing they was giving me in the Department of Corrections

6   but Motrin.

7   Q.  Tell me about the medication that you received after

8   surgery, what was that?

9   A.  They was giving me a medication Ultram and Xanax.

10  Q.  And at that time, where were you housed in the Department

11  of Corrections?

12  A.  At that time, I was still in the hospital with Albany

13  medical, and then I was moved to Coxsackie RMU.

14  Q.  When you were at Coxsackie RMU, did they continue to

15  prescribe you Ultram?

16  A.  Yes, sir, that and Xanax.

17  Q.  At some point in time, did you get discharged from

18  Coxsackie RMU?

19  A.  Yes, sir, there was a time that I got discharged from

20  Coxsackie.

21  Q.  And where did you get transferred to, what facility?

22  A.  They transferred me to a medical unit called Walsh.

23  Q.  Describe for me the treatment you received at Walsh.

24  A.  Well, it's like a medical facility that they transfer you

25  to that's within the Department of Corrections.  It was

N28CallH                      Rahman - Direct

```
 1  horrific and it was like almost as if anything happens to you,

 2  this is the place normally they send you because I couldn't

 3  move none of my body parts from my midsection going down.

 4  Q.  Were you continued on Ultram and Xanax medication while you

 5  were at Walsh RMU?

 6  A.  Yes, sir, I was.

 7  Q.  How long were you at Walsh RMU?

 8  A.  About maybe almost three months, something like that.

 9  Q.  In that three months, did you progress at all, get any

10  better?

11  A.  I was doing the therapy and I felt like I was getting a

12  little bit more strength in my upper extremities.

13  Q.  This is a time that you were continuing on your medication,

14  the Ultram and Xanax?

15  A.  Correct, sir.

16  Q.  After Walsh, where did you get transferred to?

17  A.  I was transferred to Shawangunk.

18  Q.  When you were transferred to Shawangunk, was your Ultram

19  and Xanax medication continued?

20  A.  The Xanax, they discontinued.  They kind of like waned me

21  off a little bit at Walsh.  When I got here, I was still on

22  Ultram.

23  Q.  How long after you got to Shawangunk did you continue on

24  Ultram?

25  A.  I would say maybe eight to ten months.
```

N28CallH                    Rahman – Direct

1    Q.  And was Ultram effectively treating your pain symptoms?

2    A.  Yes, I could sleep at night.

3    Q.  Did you ever request to come off the Ultram medication?

4    A.  No, I did not.

5    Q.  Do you know, roughly, what year this was?

6    A.  That was in 2017.

7    Q.  When you returned to Shawangunk?

8    A.  When I got to Shawangunk.

9    Q.  At some point in time -- well, who was your medical

10   provider at Shawangunk?

11   A.  At that time, it was Dr. Lee.

12   Q.  At any point in time, did your Ultram medication get

13   discontinued?

14   A.  Yes, it did.

15   Q.  Do you recall when that occurred?

16   A.  May I reflect my records?

17   Q.  No, if you don't remember, it's okay.

18           How long were you at Shawangunk until, roughly

19   estimate, until your medication was discontinued?

20   A.  I would say around going to June or July of 2017.

21   Q.  How did you learn your Ultram medication was being

22   discontinued?

23   A.  Because Dr. Lee had told me I can't give you Ultram no

24   more.  I said nah, you can't do this to me.

25   Q.  Did Dr. Lee tell you that before he discontinued you from

1    the Ultram or after you were discontinued?

2    A.   There was a time I went to medical, I said what is this, he

3    said I can't give you Ultram no more.  I said nah, I'm not

4    taking something I don't know.

5    Q.   Was that someone at the nurses window or was that the

6    doctor?

7    A.   That was at the nurses window when I went to pick up my

8    medication.

9    Q.   What did Dr. Lee tell you, when you next spoke to him,

10   about the Ultram?

11   A.   He said something pertaining to the fact that Department of

12   Corrections is stopping all narcotic medications.

13             MR. NOLAN:  I'm going to object to the extent he was

14   offering it for the truth of the matter asserted.

15             THE COURT:  I assume it's being offered for the fact

16   that it was said.

17             MR. NOLAN:  Yes, your Honor.

18             THE COURT:  Thank you.

19   Q.   Mr. Rahman, after you were discontinued from the Ultram

20   medication, how did that affect you, if at all?

21   A.   It affected me in multiple different ways.  I couldn't

22   sleep.  I was in chronic pain.  I couldn't go to some call outs

23   that they were scheduling me to go to outside trips for.  I

24   just couldn't do it.

25   Q.   Did you explain these symptoms and what was occurring to

N28CallH                          Rahman - Direct

1    you to any medical staff at Shawangunk?

2    A.  I continuously expressed my pain to medical staff here at

3    Shawangunk.

4    Q.  Would you tell them that your Ultram medication helped you

5    with your pain?

6    A.  Yes.

7    Q.  Did you ask for that medication to be reinstated?

8    A.  Yes.

9    Q.  During this time, were they trying any other medications on

10   you?

11   A.  A slew of all type of different medications they tried.

12   Q.  When they tried them and prescribed them, did you take

13   them?

14   A.  I tried it to see if it was going to help for my pain.

15   Q.  Did it help for your pain?

16   A.  No, it made me feel funny, very funny.

17   Q.  Roughly, how many other medications do you believe they

18   tried on you?

19   A.  Maybe five or six.

20   Q.  After those medications were tried and you informed them

21   they weren't working, at any point in time, did they discuss

22   putting you back on Ultram?

23   A.  I asked Dr. Lee one time I went out to a medical call and

24   he gave me the Ultram back, but just for a limited time.

25   Q.  What do you mean, just for a limited time, how long?

N28CallH                    Rahman - Direct

1   A.  Maybe like a week or a month, something like that.

2   Q.  And then what --

3   A.  A week or a month.

4   Q.  Was it discontinued again?

5   A.  Yes, it was.

6   Q.  Were you ever informed why it was discontinued again?

7   A.  No, I was not.

8   Q.  Who is your current medical provider at Shawangunk?

9   A.  In the present day, it's a Dr. Win.

10  Q.  When is the last time you met with Dr. Win?

11  A.  Approximately, maybe three to four weeks ago.

12  Q.  Roughly, how many times do you think you've met with

13  Dr. Win since he became your provider?

14  A.  I would say about maybe nine.

15  Q.  Have you ever discussed with Dr. Win Ultram?

16  A.  Several times, all the time.

17  Q.  And describe to me what you talk about with Dr. Win about

18  Ultram?

19  A.  Can I please have my Ultram medication back, please.

20  Q.  And what response does he give you to that request?

21  A.  I can't give it to you unless I send you out to see a

22  specialist, but I'm going to try you on some other kind of pain

23  medication.

24  Q.  I want to direct your attention to around April of 2021.

25  Do you recall around April 2021 going to see a specialist by

N28CallH                        Rahman - Direct

1    the name of Dr. Omar Hussein?

2    A.  Very well.

3    Q.  Tell me what you recall about that encounter with Dr. Omar

4    Hussein?

5    A.  I have expressed my pain to Dr. Omar.  And I also told him

6    that I was sent down here because I needed to see a specialist

7    in order for me to get my Ultram back, and it was something

8    like a neuro-type needle they can put into the spinal cord in

9    your back, either that or the Ultram.  So I had opted to try

10   it, but then they after they didn't take so long of not giving

11   it to me, but he approved for me to have the Ultram back.

12   Q.  Did you recall Dr. Hussein giving you an examination?

13   A.  Yes, he did examine me.

14   Q.  Was it your understanding after that encounter with

15   Dr. Hussein that he recommended that you would be returned to

16   Ultram?

17   A.  He most positively did say that I'm going to return you

18   back on Ultram.

19   Q.  And just for the record, do you understand Ultram to be the

20   same medication as Tramadol?

21   A.  Yes, sir.

22   Q.  When you returned after that consultation with Dr. Hussein,

23   did you speak to Dr. Win about those recommendations?

24   A.  When I went to see Dr. Win, when he put me on a doctor's

25   call out, I spoke to him, I said can you please check the

N28CallH                    Rahman - Direct

```
 1   computer because I don't understand why it is I'm not getting
 2   my Ultram at the window when you sent me out to see the
 3   specialist and he approved it.
 4   Q.  And did he tell you why he wasn't giving you a prescription
 5   of Ultram?
 6   A.  Yes.  He said I can send you upstairs to the infirmary and
 7   I can give it to you upstairs.  I said why do I have to go up
 8   to the infirmary when I went to see the specialist, as you
 9   said, you recommended me to go see a specialist, and if a
10   specialist approved of me, I could have it.
11   Q.  So is it fair to say that he did not allow you or prescribe
12   you the Ultram medication?
13            MR. NOLAN:  Objection.
14            THE COURT:  Basis.
15            MR. NOLAN:  To the extent it's not what he testified
16   to.  He actually testified that he offered it to him in the
17   infirmary and he refused to go.
18            THE WITNESS:  I didn't say that.
19            THE COURT:  Excuse me.  Mr. Rahman, you got to let
20   counsel do this.
21            THE WITNESS:  Oh, I'm sorry.
22            THE COURT:  Mr. Morrison.
23   BY MR. MORRISON:
24   Q.  So it's your testimony that he said that you have to go and
25   stay in the infirmary to receive Ultram?
```

1   A.  Are you talking to me?

2   Q.  Yes, sir.

3   A.  Yes.  And then I said why should I have to go upstairs when

4   it was approved?  I did everything you told me to do and you

5   approved it.

6   Q.  Can you tell me, what does it mean to go upstairs in the

7   infirmary, does it affect you in any way?

8   A.  Yes, they hold you hostage in this infirmary in this jail.

9   When you go upstairs -- I'm going to use it in the terminology

10  and what it really is.  There should be no reason I can get all

11  my medications at the window that I got to go upstairs and be

12  away from my cell or population just to retrieve something that

13  was approved.

14  Q.  Are you allowed to bring your belongings into the

15  infirmary?

16  A.  You're not allowed to bring nothing up there, absolutely

17  nothing.

18  Q.  At any point in time after this meeting with Dr. Win, did

19  you meet with Dr. Win again regarding your pain?

20  A.  Yes.

21  Q.  Can you tell me roughly when that encounter occurred?

22  A.  Every single time I went to see Dr. Win or had a call out

23  to see Dr. Win, I expressed my concerns and my pain to him

24  about my Ultram that was approved.

25          MR. MORRISON:  One second.

1          Mr. Rahman, thank you so much.  I have nothing further

2     right now.

3          THE WITNESS:  Okay.

4          THE COURT:  Cross examination, please, counsel.

5     CROSS-EXAMINATION

6     BY MR. NOLAN:

7     Q.  Good afternoon.  Can you hear me okay?

8     A.  Yes, sir.

9     Q.  I just have a few questions for you.

10         You testified that you could have gotten the pain

11    medication you wanted had you gone to the infirmary, but you

12    didn't want to go to the infirmary; is that right?

13    A.  To that extent, but it's more than just that.

14    Q.  But fair to say the infirmary is somewhere you didn't want

15    to go, even if it meant you could get your medication?

16    A.  But that's not how the procedure goes and it's a violation.

17    Q.  I'm not asking you that.  I'm just asking you, would you

18    rather go to the infirmary and have your pain relieved from

19    medication or just not go to the infirmary?

20    A.  Yes, but what I'm saying to you, I went out on the trip to

21    see the specialist with several people, and they all got their

22    pain management drugs that day, and they went to the window to

23    get theirs that same day.  So why do I have to be the only one

24    to have to go upstairs.

25    Q.  So this is unique to you then; is that fair to say?

1   A.  It's not unique to me, it's the games that they play.

2   Q.  But there were others who went to the same specialist,

3   seeking pain medication, got the pain medication, and were able

4   to get it on terms they liked; is that your testimony.

5           MR. MORRISON:  Objection.

6           THE COURT:  Sustained.

7           Mr. Rahman, if you hear counsel say objection, please

8   just hold your answer and then we'll work it out.  In this

9   instance, you don't have to answer that question.

10          THE WITNESS:  Thank you.

11          THE COURT:  Yes, sir.

12          Counsel.

13  Q.  You are given a choice, essentially, to get the pain

14  medication you wanted if you wanted to go to the infirmary; is

15  that fair?

16  A.  It would be fair to say that once I work out with a

17  specialist -- see the specialist according to the direction of

18  Dr. Win, I did exactly what he asked me to do.  He said the

19  only way you can get the Ultram back is to go out and see a

20  specialist.  I did that, the specialist approved it — I

21  shouldn't have to go up in the infirmary to receive something

22  that was approved for me at your window.  You told me to go see

23  a specialist and I did that.

24  Q.  When you got back and saw Dr. Win, he gave you the option

25  of getting the Ultram in the infirmary; correct?

N28CallH                        Rahman - Cross

1    A.  Yes, he did.

2    Q.  So you would rather not get the Ultram than go to the

3    infirmary?

4    A.  I wrote to my attorneys and told my attorneys exactly what

5    had happened.

6    Q.  Have you had an opportunity to see or to have a pain

7    management consult within the last two years?

8    A.  In 2021 when I went out to see Dr. Omar, that was when it

9    was, but to have somebody else come in here and assess me, no.

10   Q.  Do you recall being offered the ability to get a cervical

11   epidural steroid injection for your back pain in December of

12   2021?

13   A.  Yes.

14   Q.  Do you recall refusing that opportunity?

15   A.  Yes.

16   Q.  And do you recall signing an inmate refusal form,

17   recognizing that that could affect your health and wellness?

18   A.  I recall signing it for the reasons stated that -- I don't

19   know if I can state the reason, but if I can, the date they

20   wanted to give it to me was the date I was seeing my attorney.

21   I find it very odd that all of a sudden you want me to go out

22   to the hospital on the day I got to see my attorneys.  Really,

23   after almost 10 months?

24   Q.  So seeing your attorney was more important than getting

25   pain relief; correct?

N28CallH                        Rahman – Cross

1          MS. AGNEW:  Objection.

2          THE COURT:  Sustained.

3   Q.  Was seeing your attorney more important than getting --

4          THE COURT:  I think I just sustained that objection.

5          MR. NOLAN:  I rephrased it, your Honor.

6          THE COURT:  I don't think you rephrased it.

7          MR. NOLAN:  I initially led him.  This time I said was

8   seeing your attorney more important than going to get pain

9   relief that day.

10         MS. AGNEW:  Let him answer it.

11         THE COURT:  You may answer, sir.

12  A.  I came to the conclusion after almost 10 months, because

13  they had told me when I went to see the specialist that I would

14  be going out next week.  After 10 months, almost 10 to 9 months

15  passed and I heard a lot of different stories about the

16  epidermic needle in your back that they got to sedate you, laid

17  out.  I got scared because an inmate died in the Department of

18  Corrections from that same procedure.

19  Q.  So how about moving forward to November of 2022.  Do you

20  recall, on November 18th, 2022, having the ability of going to

21  a pain management consult?

22  A.  Yes, I do.

23  Q.  Do you recall refusing that opportunity?

24  A.  Yes, I did, with an explanation with a letter to my

25  attorneys.

N28CallH                    Rahman - Redirect

1    Q.  Do you recall signing an inmate refusal form, acknowledging

2    that you were making that refusal?

3    A.  Yes, sir.  And I also remember what I said.

4    Q.  Do you recall saying that you were in excruciating pain

5    when you signed that refusal?

6    A.  Yes, I do.

7            MS. KILEY:  That's all, sir.  Thank you.

8            THE COURT:  Thank you.  Redirect, counsel.

9            MR. MORRISON:  Briefly, your Honor.

10           THE COURT:  Yes, sir.

11   REDIRECT EXAMINATION

12   BY MR. MORRISON:

13   Q.  Mr. Rahman, can you explain to the court why you refused to

14   go to the pain management specialist appointment recently?

15   A.  One, I was in excruciating pain, and two, I felt that it

16   was -- like it was a hoax of the department because I gave my

17   explanation on that sheet.  I said why should I have to go out

18   and see the same pain management again when I was already

19   approved for that same drug.  He said you just got to go and

20   see him.  I said, for you to refuse me again?

21   Q.  Did you talk to Dr. Win about your refusal?

22   A.  No, it's on the refusal form.

23   Q.  Did you ever talk to Dr. Win about the refusal?

24   A.  Yes, I did.

25   Q.  What did you tell him?

N28CallH                     Rahman - Redirect

1    A.  I told him the reason I didn't want to go that day is

2    because why should I have to go when you already told me to go

3    out to see pain management and you would give me the Ultram and

4    you turned around after I was approved and you did not give it

5    to me, so when you want to send me again, what would make me

6    think that it would be a different outcome?

7    Q.  Mr. Rahman, do you believe that you can spend the rest of

8    your sentence living in the infirmary?

9    A.  No, I can't.  I cannot do that.

10   Q.  Do you believe that being ordered by Dr. Win that you could

11   only receive your medication, your Ultram medication, if you

12   lived in the infirmary as punishment.

13              MR. NOLAN:  Objection.  His belief is totally

14   irrelevant.

15              THE COURT:  Mr. Morrison.

16              MR. MORRISON:  I'm just trying to find out why he

17   didn't go to the infirmary to take his medication, but I can

18   rephrase, your Honor.

19              THE COURT:  Yes, sir.

20   Q.  Mr. Rahman, why did you not want to go and live in the

21   infirmary so you can have Ultram medication?

22   A.  It's not nowhere that any person that is incarcerated, that

23   has some form of liberty living in population to then live in

24   the infirmary.  It just can't work.  It's not a good thing.

25   Not that I refused my medication, I refused the point that why

N28CallH                    Rahman - Redirect

1    should I, that out of everybody that went out to the

2    specialist, why do I, me, have to go up to the infirmary to get

3    my medication, why?

4    Q.  Did he ever explain to you why, Dr. Win?

5    A.  No.  But I know that I was getting my Ultram when I first

6    came here.  So what's the problem?

7    Q.  When you were being prescribed and taking Ultram before,

8    were you living in the infirmary?

9    A.  No, I was not.

10            MR. MORRISON:  Nothing further.  Thank you, your

11   Honor.

12            THE COURT:  Cross examination.

13            MR. NOLAN:  Nothing further, your Honor.

14            (Witness excused).

15            THE COURT:  Remind me who we have next, please.

16            MS. AGNEW:  Mark Daniels, your Honor.

17            Your Honor, this will be our last witness.

18            THE COURT:  Yes, ma'am.

19    MARK DANIELS,

20        called as a witness by the Plaintiffs,

21        having been duly sworn, testified as follows:

22            THE DEPUTY CLERK:  State your name and spell it for

23   the record.

24            THE WITNESS:  Mark Daniels, M-a-r-k D-a-n-i-e-l-s.

25            THE COURT:  Ms. Agnew.

1   DIRECT EXAMINATION

2   BY MS. AGNEW:

3   Q.  Good afternoon, Mr. Daniels.  First, I want to apologize

4   that you got quarantined.  I want you to remember it's

5   Mr. Morrison's fault.  Okay?

6   A.  Okay.

7   Q.  Okay.  I'm sorry about that.

8   A.  We'll deal with him later.

9   Q.  We'll deal with him later, that's right.

10          I want to go over your medical history.  We don't want

11  to belabor this too much, but can you give us a little synopsis

12  of your medical history?

13  A.  Yes.  I have back injuries and they pretty much

14  deteriorated to the point where I had to have two final

15  fusions.  Since then, since that time, I'm still in pain, I've

16  lost feelings in my hands, both hands, shoulder pain, neck

17  pain, and I have problems with my equillibrium.

18  Q.  Can you tell me approximately when did you have your two

19  spinal fusions performed?

20  A.  The first one in my lower back was, I want to say around

21  February or March of 2015.  The second one was in 2016,

22  probably around the same time, around May.

23  Q.  Were you in DOCCS custody when you had those surgeries?

24  A.  Yes.

25  Q.  Can you just tell the Court, how old are you now,

N28CallH                    Daniels - Direct

1    Mr. Daniels?

2    A.  I'm 58.

3    Q.  So you mentioned that you lost feeling in your hands.  Can

4    you describe that for the record, what that feels like?

5    A.  Well, it's just a numbness in all -- like the tips of all

6    my fingers to the point where I can't feel -- to button my

7    shirt or something, I have to look down to make sure I'm

8    buttoning my shirt.  Same thing with tying my shoes.  I can't

9    feel in my pockets if I reach in my pocket to find something.

10   It's just discomfort, a lot of discomfort.

11   Q.  Other than your hands, do you have other sources of chronic

12   pain?

13   A.  Yes, my neck, my back, and sometimes my left foot, my left

14   foot area.

15   Q.  I noticed when you came in, you're not in a wheelchair,

16   though; correct?

17   A.  Right.

18   Q.  Do you use any devices to ambulate?

19   A.  I use a cane.  The wheelchair is just for long distance, I

20   can't go too long, but I've been pretty much -- I'm trying to

21   stay active.  As long as I stay moving, I'm pretty good.  The

22   pain is routine now.

23   Q.  Do you have any jobs right now in DOCCS?

24   A.  No, not really.  I'm a clerk.  I just -- I'm in the

25   clerking facility in the block that I'm in.  I do the paperwork

1  for the block officers.

2  Q.  Recently, did you try to work as a pusher?

3  A.  Right.  Yeah, mobile assistance, go around and do whatever

4  they need to go through, any of their call outs and anything

5  like that.

6  Q.  Is it easy for you to work as a pusher with your chronic

7  pain ailments?

8  A.  Well, yeah, because pushing, holding onto the wheelchair

9  pretty much stabilizes me to push around.  (Technical

10  interruption) holding onto the wheelchair stabilizes me.  I'm

11  not going that far in distance, so I work with it.

12  Q.  Since your surgeries, were you ever prescribed a medication

13  that helped with your chronic pain?

14  A.  No.

15  Q.  Do you recall a time when you took Neurontin?

16  A.  Neurontin, yes.  Yes, I do.  Neurontin really didn't work

17  for me, pretty much just gave me stomach problems.  Nothing

18  really went too far.

19  Q.  Were you ever prescribed anything that helped with your

20  chronic pain?

21  A.  No.  Maybe prior to the facility, there was one called

22  Ultram.  That worked pretty good, but that was prior to my

23  surgeries.  But that was really the only one that gave me

24  relief.

25  Q.  Do you know why you are a plaintiff in this case?

N28CallH                    Daniels - Direct

1   A.  Because I'm pretty much being denied all medical treatment.

2   Q.  Did there come a time when your Neurontin was discontinued?

3   A.  Yes.

4   Q.  When it was discontinued, do you know who your provider

5   was?

6   A.  Dr. Lee.

7   Q.  Did you have any conversations with Dr. Lee about that

8   discontinuation?

9   A.  Yes, I did.  I told him numerous times, you know, that it

10  really wasn't working for me, it was giving me stomach

11  problems.  Instead of them giving me something else, he upped

12  the doses.  So I was getting like maybe 1200 milligrams of that

13  stuff a day and it really wasn't doing nothing for me but

14  making me sick.

15  Q.  Did you request alternatives?

16  A.  Yes, I asked him to put me on something else and nothing

17  was given to me.

18  Q.  Can you tell me, have you ever seen any specialist for your

19  pain?

20  A.  Yes.

21  Q.  Who have you seen?

22  A.  I seen several specialists.  I seen a doctor who actually

23  did my surgery, Dr. Delfino.  He recommended some medications

24  for me.  The other doctor that I seen besides him also

25  recommended medications, but he never gave it to me.

1  Q.  Do you recall what medications they recommended for you?

2  A.  Yes.  I know one was called Lyrica, that was denied.  I'm

3  really not good with the names of these medications, but there

4  was several, there definitely was several.

5  Q.  And since those recommendations have been made, have you

6  ever received any of the medications recommended by the

7  specialists you saw?

8  A.  No, I've never seen any, nothing.  The only thing that's

9  given to me was ibuprofen.

10  Q.  Does the ibuprofen help you, sir?

11  A.  A little, but it's not effective, like, not really.

12  Q.  Is the ibuprofen more or less effective than Neurontin when

13  you took it?

14  A.  It's pretty much the same.  I think the ibuprofen would

15  work a little more, but it's still just -- just really, you

16  know, it's pretty much the same, I guess.

17  Q.  Tell me, Mr. Daniels, currently, how does your chronic pain

18  affect your daily living?

19  A.  I mean, if I don't get up and stretch, I'm in pain.  Even

20  when I'm stretching I'm in pain.  It's just a constant pain.

21  Everyday living, I can't do nothing that I want to do.  I'm a

22  barber, so if I attempt to hold the equipment in my hand to cut

23  hair because the trimmers will fly out of my hand unknowingly,

24  I can't feel it.  There's nothing I could really do physically

25  to -- I keep counting my time, and everyday living is hard

1   right now because I can't do nothing and I can't get no relief.

2   I ask for physical therapy, I can't get physical therapy.  I

3   ask for pain medication, I can't get that.  I'm sitting back,

4   suffering.  I suffer every day.

5           MS. AGNEW:  I have no further questions.

6           THE COURT:  Thank you.  Cross examination, please,

7   counsel.

8   CROSS-EXAMINATION

9   BY MS. THOMAS:

10  Q.  Hi, Mr. Daniels.  I have a few questions for you.

11  A.  Hello.

12  Q.  In 2020, you wrote a document stating that you were unable

13  to walk upstairs due to your pain; is that correct?

14  A.  Due to my pain?  Well, it was due to my dropped foot that I

15  had, you know, because I wasn't getting no type of physical

16  therapy to build my muscle and stuff like that.  So I was

17  really having problems lifting my legs at that time, yes.

18  Q.  So in 2020, you had difficulties moving around; is that

19  correct?

20  A.  Right, I had good days and bad days.

21  Q.  In April 2022, you were medically cleared for your job as a

22  wheelchair pusher; is that correct?

23  A.  Right.

24  Q.  And Dr. Win determined that you were physically able to

25  perform that job at your facility; is that correct?

N28CallH                          Daniels - Cross

1    A.  Yes.

2    Q.  And in your testimony that you just went over with

3    Ms. Agnew, were you relying on documents in front of you?

4    A.  Am I relying on documents in front of me?

5    Q.  Yes.  Did you refer to any documents that are in front of

6    you?

7    A.  No.

8    Q.  As you sit here today, do you have any documents in front

9    of you that you are reviewing?

10   A.  I was looking for the name of medications that was offered

11   to me that I never got, but that was it.

12   Q.  And what document were you looking for that information on?

13   A.  Documents that I had prior to coming here from the medical

14   department here.

15   Q.  Are those sitting on the table in front of you right now?

16   A.  Right.

17   Q.  Could you please hold up those documents to the camera,

18   please.

19         Could we see the front page of the document, please.

20   A.  All the pages are pretty much the same.  It's just

21   paperwork that I have with me.

22   Q.  Did you use that document today to guide the answers to the

23   questions that you were asked?

24   A.  To what?

25   Q.  To form the basis for the answers of the questions that you

1    were asked?

2    A.  No, I did not.

3              MS. THOMAS:  Thank you, sir.  Nothing further.

4              THE COURT:  Thank you.  Redirect.

5              MS. AGNEW:  Nothing further.

6              THE COURT:  Sir, you're excused.

7              (Witness excused)

8              MS. AGNEW:  Your Honor, the plaintiffs are going to

9    rest their opposition.

10             THE COURT:  Yes, ma'am.

11             Rebuttal, friends.

12             MR. NOLAN:  Your Honor, we think we might be able to

13   make rebuttal very simple if we can enter some documents, but

14   also depending on whether your Honor is going to allow

15   post-hearing briefing so we can point to some of the documents

16   that are already in the record.

17             THE COURT:  I think we can have briefing, but it has

18   to be prompt.

19             MR. NOLAN:  Of course.

20             THE COURT:  A week, a week.

21             MR. NOLAN:  I think then we can point to the documents

22   that are already in the record.

23             THE COURT:  Do we have rebuttal witnesses is my

24   question.

25             MR. NOLAN:  We need to confer shortly on that, but it

1   might be one at the most.

2           THE COURT:  Why don't you let me know.

3           (Recess)

4           THE COURT:  Friends, what's the good word?

5           MS. KILEY:  Your Honor, we are not calling any

6   rebuttal witnesses.  The only administrative thing we do ask is

7   we would ask 10 days for a brief.

8           THE COURT:  I'll give it to you, but it gets stale in

9   my brain, and the longer you wait, the longer you're going to

10  have to wait for a decision.

11          MS. KILEY:  Thank you.  We appreciate it.

12          MS. AGNEW:  Your Honor, after the 10 days, we'll turn

13  over our opposition five days later.

14          THE COURT:  Okay, friends.  Let's go.

15          MR. NOLAN:  One other thing before we adjourn, your

16  Honor.  I wanted to, just for the record, these are stipulated

17  to, can we put P4 into the record?

18          MS. AGNEW:  No.

19          MR. NOLAN:  We stipulated to the admissibility of them

20  already.

21          MS. AGNEW:  No.

22          THE COURT:  Which one is that?

23          MR. NOLAN:  This is Wilkerson's records.  You have

24  them, your Honor.  It's plaintiffs' exhibit.

25          THE COURT:  I thought it was an incomplete set?

```
 1              MS. AGNEW:  May I, your Honor?

 2              THE COURT:  Yes.

 3              MS. AGNEW:  We admitted a couple pages from it.  The

 4   very bulk of that document is already in the record on the

 5   docket, but I'm not creating exhibits for you, sir.  You need

 6   to do that.

 7              MR. NOLAN:  Your Honor, is there a problem --

 8              THE COURT:  Guys, you can't talk over each other,

 9   especially late in the day.

10              MR. NOLAN:  We would like to enter P4 into the record.

11   It's plaintiffs' exhibit.  She entered pieces of it.  I think

12   it's better to have a complete P4 in the record to be complete,

13   your Honor.  These are documents she's had, we've had.

14   Probably a lot of them are already in the docket --

15              THE COURT:  It's not the complete record.  I

16   understand it was here and there.

17              MS. AGNEW:  It was this hearing.

18              MR. NOLAN:  I'm not offering it for the complete

19   record, your Honor.  If we have only selected pieces of what's

20   here, we're certainly not going to have a complete record on

21   the docket.

22              THE COURT:  You're the one who's arguing you want the

23   complete document on the docket, it's not complete.

24              MR. NOLAN:  Just P4.  These are all medical records,

25   she has already stipulated to their admissibility.
```

1          MS. AGNEW:  Your Honor, he could have done that when

2     he crossed Mr. Wilkerson.

3          MR. NOLAN:  We can bring rebuttal witnesses back, your

4     Honor.

5          MS. AGNEW:  Please do.

6          MR. NOLAN:  The page we want is already on the docket,

7     your Honor.  I suppose if we're going to be that difficult and

8     not grant a single professional courtesy as has been this case,

9     the entire case, that's fine.

10          MS. AGNEW:  Yes, so stipulated.

11          THE COURT:  All right, friends.  Would you be kind

12     enough, counsel, when you file your briefs to give us two hard

13     copies, please.

14          MS. KILEY:  Yes, your Honor.

15          THE COURT:  Thank you.  All right, friends.  Thanks

16     very much.  Good afternoon.

17                                   * * *

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2     Examination of:                              Page

 3      FELIPE RIVERA-CRUZ

 4     Direct By Mr. Morrison . . . . . . . . . . . 317

 5     Cross By Ms. Thomas  . . . . . . . . . . . . 332

 6     Redirect By Mr. Morrison . . . . . . . . . . 336

 7     Recross By Ms. Thomas  . . . . . . . . . . . 339

 8      JULIO MORONTA

 9     Direct By Mr. Morrison . . . . . . . . . . . 341

10     Cross By Ms. Thomas  . . . . . . . . . . . . 351

11      HLA PE WIN

12     Direct By Ms. Agnew  . . . . . . . . . . . . 359

13     Cross By Ms. Kiley . . . . . . . . . . . . . 385

14     Redirect By Ms. Agnew  . . . . . . . . . . . 388

15      RASHID RAHMAN

16     Direct By Mr. Morrison . . . . . . . . . . . 390

17     Cross By Mr. Nolan . . . . . . . . . . . . . 402

18     Redirect By Mr. Morrison . . . . . . . . . . 406

19      MARK DANIELS

20     Direct By Ms. Agnew  . . . . . . . . . . . . 409

21     Cross By Ms. Thomas  . . . . . . . . . . . . 414

22                        PLAINTIFF EXHIBITS

23     Exhibit No.                              Received

24      P10, pages 282, 283, 297, 296, 304, . . . . . 385

25            317, 322, and 299.  P11, 315,
```

1          325, and 338

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25