N26CallH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PETER ALLEN, et al.,

                    Plaintiffs,

            v.                            19 Civ. 8173 (LAP)

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                    Defendants.

------------------------------x

                                      New York, N.Y.
                                      February 6, 2023
                                      10:41 a.m.

Before:

                    HON. LORETTA A. PRESKA,

                                      District Judge

                         APPEARANCES

LAW OFFICE OF AMY JANE AGNEW PC
     Attorneys for Plaintiffs
BY:  AMY J. AGNEW
     JOSHUA L. MORRISON

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     Attorneys for Defendants
BY:  MICHAEL J. KEANE
     IAN RAMAGE

WHITEMAN OSTERMAN & HANNA LLP
     Attorneys for Defendant Dr. Carol Moores
BY:  ORIANA L KILEY
     WILLIAM S. NOLAN
     GABRIELLA LEVINE
     JENNIFER M. THOMAS

N26CallH

|   |   |
|---|---|
| 1 | THE COURT:  Good morning, Ms. Agnew. |
| 2 | MS. AGNEW:  Good morning, your Honor. |
| 3 | THE COURT:  Good morning, Mr. Morrison. |
| 4 | MR. MORRISON:  Good morning, your Honor. |
| 5 | THE COURT:  How are you feeling? |
| 6 | MR. MORRISON:  Much better. |
| 7 | THE COURT:  Good.  Glad to hear it. |
| 8 | Ms. Kiley. |
| 9 | MS. KILEY:  Good morning, your Honor. |
| 10 | THE COURT:  Good morning.  And who else is with you? |
| 11 | MS. KILEY:  I have Will Nolan, Jennifer Thomas, and |
| 12 | Gabriella Levine. |
| 13 | THE COURT:  Okay.  Are we able to begin with a witness |
| 14 | or do we have to talk about documents first? |
| 15 | MS. AGNEW:  I think we have one pending motion, your |
| 16 | Honor, and then we would like to make an oral motion.  We did |
| 17 | not ever receive any form of expert disclosure for defendant |
| 18 | Moores, so we want to make sure that no expert testimony will |
| 19 | be tendered this morning.  I did remind Mr. Nolan during a |
| 20 | December 5th, 2022 meet and confer that we would move to |
| 21 | preclude any expert testimony if we didn't get the disclosure — |
| 22 | we have not.  Then we also have the pending motion about the |
| 23 | related disclosures from Friday. |
| 24 | THE COURT:  And we're okay on the expert, Ms. Kiley? |
| 25 | MS. KILEY:  There will be no expert testimony. |

N26CallH                    Moores - Direct

1           THE COURT:  Do we have to do the document discussion

2    now before we take testimony or can we start the testimony?

3           MS. KILEY:  No, your Honor, we can start with

4    testimony.

5           THE COURT:  Shall we go ahead with that, then?

6           MS. AGNEW:  Sure.  That's fine with me, your Honor.

7           THE COURT:  Very good.  Let's go.

8           MS. KILEY:  Your Honor, we would like to call

9    Dr. Moores.

10    CAROL MOORES,

11        called as a witness by the Defendants,

12        having been duly sworn, testified as follows:

13           THE DEPUTY CLERK:  State your name and spell it for

14    the court reporter.

15           THE WITNESS:  Carol Moores, C-a-r-o-l M-o-o-r-e-s.

16           THE COURT:  Ms. Kiley.

17    DIRECT EXAMINATION

18    BY MS. KILEY:

19    Q.  Good morning, Dr. Moores.

20    A.  Good morning.

21    Q.  Dr. Moores, can you please share with the Court your

22    educational background.

23    A.  I went to medical school and have an MD.  I have a master's

24    in public health and a master's of science in health

25    administration.  I completed residencies in family medicine and

N26CallH                        Moores – Direct

1   public health.

2   Q.  Where did you attend medical school?

3   A.  The Uniformed Services University of the Health Sciences.

4   Q.  Were you in the army?

5   A.  Yes, I was.

6   Q.  And can you please share with the Court for how long you

7   were in the army?

8   A.  I was active duty for 24 years.

9   Q.  And thank you for your service.

10  A.  Thank you.

11  Q.  Can you tell the Court a little bit more in detail about

12  your role as a doctor in the U.S. Army?

13  A.  I was primarily primary care doing family medicine for most

14  of that time.  That included providing direct care to patients,

15  both inpatient and outpatient, all ages, active duties or

16  family, retirees and their families.  I also was a flight

17  surgeon.  So I transported patients on med evacs and took care

18  of aviation units.  I also was faculty for numerous residency

19  programs.  I was full-time for family medicine residency and

20  part-time at other places for family medicine residencies, and

21  a public health residency.

22  Q.  When did you complete your service with the United States

23  Army?

24  A.  I was retired in 2010.

25  Q.  And what did you do after 2010?

1    A.   Initially, I had to be without work because I was retired

2    due to a medical disability, which was still symptomatic and I

3    wasn't well enough to work for a few years.  I then went

4    onto -- when I started having improvement with my treatments, I

5    started doing some volunteer work, which was administrative in

6    nature, until I started working with Department of Corrections.

7    Q.   When did you begin working with the Department of

8    Corrections?

9    A.   In 2016.

10   Q.   What were you hired to do with the Department of

11   Corrections?

12   A.   Initially, I was a regional health services administrator.

13   Q.   What does that mean?

14   A.   I did administrative work for the agency, mostly dealing

15   with -- my position was dealing with providing and obtaining

16   the documents for FOIL requests, for discovery requests, and to

17   assist with creating documents for the policy committee.  I

18   would visit facilities with certain outside organizations in

19   order to report back to the chief medical officer about any

20   issues that he wanted to hear about.  I also helped them with

21   some efficiency projects with the New York State Lien Program.

22   Q.   For how long were you a health services administrator?

23   A.   About three years.

24   Q.   What did you do after that?

25   A.   Then my disability improved enough so that I could do

1    physical exam again.  So I got a New York State medical license

2    and approached the chief medical officer to offer my services

3    in the clinical arena.

4    Q.  What was your position once you were able to do that?

5    A.  Clinical physician 2.

6    Q.  Where were you assigned?

7    A.  I was assigned to central office to work for the chief

8    medical officer for whatever he had -- whatever projects he

9    wanted me to work on.

10   Q.  And where did you do the clinical work?

11   A.  Initially, I spent time shadowing some of our strong

12   physicians.  I did some shadowing at Washington and Great

13   Meadow correctional facilities and Coxsackie, where the main

14   area is.

15   Q.  How often were you seeing patients initially?

16   A.  Initially, I did -- I was just shadowing with them until I

17   started working regularly at Elmira Correctional Facility in

18   2019.

19   Q.  And for how long were you doing clinical work at Elmira?

20   A.  Nine months.

21   Q.  When did you become the deputy chief medical officer?

22   A.  It was, I believe, September 2020.

23   Q.  When you became deputy chief medical officer, were you

24   still doing the clinical work?

25   A.  Intermittently, yes.

N26CallH                     Moores - Direct

1   Q.   Can you please describe for the Court a little bit more

2   about what your duties were as the deputy chief medical

3   officer.

4   A.   They were to do any project that the chief medical officer

5   asked me to do.  Most commonly, it was where he knew that maybe

6   there was an issue at a specific facility and asked me to go

7   and try and figure out the origins of the issue and how we

8   might solve it.

9   Q.   For how long were you deputy chief medical officer?

10   A.   Until Dr. Morley resigned his position in March 2022.

11   Q.   And what is your title now?

12   A.   Chief medical officer and deputy commissioner.

13   Q.   What are your duties now as the chief medical officer?

14   A.   To oversee the health services for the department.

15   Q.   Dr. Moores, what other licenses or certifications do you

16   currently have?

17   A.   I'm certified with the American Correctional Association as

18   a professional and with the National Commission for

19   Correctional Healthcare as a health services administrator.

20   Q.   Can you explain a little bit more about what those two

21   certificates mean?

22   A.   I had to do -- I had to pass exams for each and complete

23   the required education for each, which has to do with

24   correctional healthcare.

25   Q.   And could you speak generally, how is correctional

N26CallH                    Moores - Direct

1   healthcare different from healthcare in the community?

2   A.  We have to be concerned about the security issues and the

3   fact that we have -- our patients are moving on a very regular

4   basis from one facility to another or in and out of the agency.

5   With those circumstances -- some of them, when they come in,

6   they've not had the opportunity to have adequate healthcare for

7   some period of time.  Although, some of those can be -- some of

8   the community can also have that same situation.  Those are the

9   things we have to pay particular attention to.

10  Q.  Dr. Moores, how many facilities are in New York State?

11  A.  44 in the state system.

12  Q.  Approximately how many individuals are in DOCCS' custody?

13  A.  A little over 31,000.

14  Q.  How many medical providers are employed by DOCCS?

15  A.  We've got a little over 120.

16  Q.  What is the breakdown of that 120?

17  A.  At least a little more than half are physicians and the

18  rest are nurse practitioners and physician assistants.

19  Q.  What is the role of the facility health services directors?

20  A.  They have a responsibility of overseeing the healthcare

21  within their facility.  They are responsible for overseeing the

22  supervision of the other providers, also.

23  Q.  Is there a facility health services director at each

24  facility?

25  A.  Not currently.

N26CallH                    Moores - Direct

1   Q.   What about the role of the regional medical directors?

2   A.   The regional medical directors have some specific tasks

3   that are assigned to them, primarily to review the referrals

4   back at preliminary denials by Kepro, which is the vendor

5   agency that reviews for criteria to see if they'll be approved.

6   They also go to mortality reviews and they go to the quarterly

7   QI meetings.  They're available to answer questions to facility

8   staff.

9               THE COURT:  Doctor, would you spell the agency for the

10              court reporter.  Referrals that are denied by --

11              MS. AGNEW:  He has a key, your Honor, that has it for

12  him.

13              THE COURT:  Thank you.  I take it back.

14  Q.   Are the facilities' health services directors and the RMDs

15  part of that 120 providers that you just testified to?

16  A.   Yes.

17  Q.   Are there any other titles within health services that we

18  haven't already talked about?

19  A.   There are the nursing staff.  There's a nurse administrator

20  that's supposed to be assigned to each facility, sometimes more

21  than one if it's a -- if it has a bigger health services

22  contingency.  And there are the staff nurses.  There are dental

23  staff.  Sometimes there are x-ray techs.  There are pharmacists

24  and pharmacy techs.  There are office assistants that help with

25  medical records keeping.  At the executive level at the

1   facilities, there are -- some of the facilities have a deputy

2   superintendent for health.

3   Q.   Who do the providers report to?

4   A.   The providers within a facility, it depends on who they

5   have there, but ultimately it is to the superintendent.  So, a

6   direct supervisor will be chosen depending on the personnel

7   they have at that facility.  So it will -- the nurses usually

8   will report to the nurse administrator.  The nurse

9   administrator sometimes reports to the FHSD and sometimes to

10  one of the executive team.  The FHSD usually reports to one of

11  the executive team.  The executive team will be one of the

12  deputy superintendents or a first deputy superintendent.

13  Q.   Dr. Moores, when you received your medical license, did you

14  take an oath?

15  A.   Yes.

16  Q.   And what is that oath?

17  A.   The Hippocratic Oath.

18  Q.   What does that mean?

19  A.   First, and as everyone always recalls, is first do no harm.

20  You do everything you can to try to take care of your patients,

21  but always keep in mind that you're of service to them and you

22  need to look at the big picture.

23  Q.   What are your ethical duties as a healthcare provider?

24  A.   To make sure that my patient is taken care of to the best

25  of my ability.

N26CallH                          Moores - Direct

1    Q.   To uphold some of your ethical responsibilities, do you

2    have to stay up to date on medical literature?

3    A.   Yes.

4    Q.   Are you required to do so?

5    A.   Yes.

6    Q.   How do you access medical literature?

7    A.   I have various internet sites that I go to and I use very

8    specific references, like uptodate.com.

9    Q.   And do you read literature specific to pain management?

10   A.   I do.

11   Q.   What is chronic pain?

12   A.   Chronic pain is the condition where the patient has a

13   discomfort that is there at such a frequency and time period.

14   That's really -- anything that falls in that category is

15   chronic pain.

16   Q.   What causes chronic pain?

17   A.   There are all kinds of ideologies for chronic pain.  For

18   some patients, it can be identified and some patients it is

19   very difficult, and that's an area of ongoing research within

20   the pain management specialty area to get a better idea of why

21   there are some scenarios where we can't figure out exactly what

22   is causing it and how we might be able to intervene.

23   Q.   And generally, how is chronic pain treated?

24   A.   Chronic pain requires an assessment by the provider with --

25   the first goal is to see if they can figure out the diagnoses

N26CallH                          Moores – Direct

1    that are contributing to that chronic pain.  If you know the

2    diagnoses, you're more likely to come up with a treatment that

3    is going to be effective, and also because, depending on the

4    diagnoses, some conditions can be treated with intervention

5    such as procedures, surgical procedures and such rather than

6    just medication or a change in their activity levels and

7    lifestyle changes.

8    Q.  Can chronic pain be cured?

9    A.  Unfortunately, with a very significant portion of people

10   with chronic pain, even the experts can't come up with ways to

11   cure it entirely.  The goal for somebody where they do not have

12   a curable type of chronic pain, the goal is to figure out using

13   the tools that are available to improve it so that it's more

14   tolerable and that the person is more functional in their

15   chosen life.

16   Q.  Do you have experience with chronic pain patients?

17   A.  Yes, I do.

18   Q.  Can you briefly describe your experience.

19   A.  I took care of thousands of chronic pain patients within

20   the army and had chronic pain patients when I took care of

21   patients within the DOCCS facilities.

22   Q.  Approximately how many prescription pain medications exist

23   to treat chronic pain?

24   A.  I don't -- I don't even know.  There's a lot.

25   Q.  Could you please explain the different categories of

N26CallH                    Moores - Direct

1   chronic pain medication, beginning with the strongest level.

2   A.   There are go-to categories of pain medications, which are

3   generally thought about when you have somebody with either

4   acute or chronic pain.  The strongest pain medications are the

5   opioids.  There is quite a few in that category, such as

6   Oxycodone, methadone, fentanyl.  Then there are other

7   categories of medications that aren't necessarily considered

8   specifically pain medications, but can sometimes be helpful

9   with chronic pain scenarios or with certain types of pain

10  etiologies such as the muscle relaxants and some

11  antidepressants and some seizure medications.  For those

12  medications, it's not really clear how they might work for

13  chronic pain, but they have been shown to work in some

14  scenarios.

15          Then the lighter medications -- we call them lighter

16  because they tend not to be the strongest ones for thoughts

17  such as post-surgical pain.  That would be the nonsteroidal

18  antiinflammatory drugs such as ibuprofen and naproxen, and then

19  there is acetaminophen.

20  Q.   For the opioids, what are they primarily used for?

21  A.   They are primarily used for a higher level acute pain, such

22  as postoperative pain.  They're also used when it is in a

23  situation where that level of pain control is necessary and

24  other medications haven't been successful.  A very typical

25  scenario is with severe hip degeneration that occurs within

1   individuals with sickle cell disease.

2   Q.  You testified to the category of muscle relaxers.  Can you

3   please share with us some examples of what you mean by muscle

4   relaxers?

5   A.  Some of the common ones are baclofen or Flexeril.  There is

6   quite a few different ones.  Even though they're all put in

7   that one category, they actually have different modes of effect

8   and many times we don't exactly know why they might be helpful.

9   For some people who have a disorder that causes muscle spasm,

10  they're more likely to be helpful.

11  Q.  For the anti-inflammatories that you referenced a moment

12  ago, could you please share a few examples of what that might

13  be.

14  A.  So what the medications might be?

15  Q.  Yes.

16  A.  Such as ibuprofen or naproxen.  There is quite a few in

17  that category.  Some of them have slightly different ways of

18  working.  They tend to be a main stage just because they don't

19  have an addiction potential; however, they have other side

20  effects.  So sometimes they're not an option for some patients

21  because there are slight differences in the subcategories, if

22  one wasn't useful, another one might be.  So for some

23  situations, especially some musculoskeletal situations, it's

24  worth trying more than one.

25  Q.  So would a prescription for ibuprofen be considered part of

N26CallH                         Moores - Direct

1   a pain management plan?

2   A.  Yes, it would.

3   Q.  What are gabapentinoids?

4   A.  That is a category of medication that is often used with

5   certain chronic pain scenarios, and most commonly with certain

6   types of neuropathies.

7   Q.  Are there any other off-label uses for gabapentinoids?

8   A.  Yes.  Well, also, Neurontin can be used as a seizure

9   medication.  There are many situations where even though

10  somebody might have a chronic pain condition that is not a

11  neuropathy, there are certain circumstances where it's

12  reasonable to give the medication a try.

13  Q.  You mentioned Neurontin.  Are there any other commonly

14  prescribed gabapentinoids?

15  A.  Lyrica.

16  Q.  Anything else?

17  A.  Those are the common ones.

18  Q.  You testified earlier that you stay current on medical

19  literature specific to pain management.  Dr. Moores, is there

20  any current medical literature on gabapentin?

21  A.  There is a lot of literature on gabapentin.

22  Q.  What does that literature say?

23          MS. AGNEW:  Your Honor, I'm going to object.  I think

24  this is getting into expert testimony.

25          THE COURT:  Ms. Kiley.

1    MS. KILEY:  Dr. Moores testified a moment ago that as

2    part of her -- to uphold her ethical standards, she needs to

3    stay current on medical literature.  We know that gabapentin is

4    relevant to this case.  So I think I would like to get into

5    some testimony where the medical literature currently stands on

6    the use of gabapentin.

7        THE COURT:  The question is why is this not expert

8    testimony?

9        MS. KILEY:  Because I'm asking Dr. Moores to testify

10   as to what she has read.

11       MS. AGNEW:  Your Honor, no, forgive me, but it is

12   expert testimony.  Frankly, it's hearsay about what she has

13   read.  We haven't determined the sources of what she's read, we

14   haven't determined how she used them in her practice, we

15   haven't determined if she treated any of the patients that

16   we're here to talk about today.  They're trying to bootstrap

17   expert testimony in through a lay witness.

18       THE COURT:  Isn't this testimony based on scientific,

19   technical, or other specialized knowledge; isn't that right,

20   Ms. Kiley?

21       MS. KILEY:  Your Honor, the testimony that I was

22   planning to get into was going to be about the substance of

23   where the current medical literature stands.  I was not going

24   to ask for Dr. Moores' opinion on anything, other than to

25   educate the Court on the current status of gabapentinoids.

1              MS. AGNEW:  Right, your Honor, that's the role of an

2      expert.

3              THE COURT:  Rule 702 says a witness who is qualified

4      as an expert by knowledge, skill, experience, training, or

5      education may testify, et cetera, et cetera.

6              Why is this not that type of testimony?  It's not lay

7      testimony; right?

8              MS. KILEY:  No, but Dr. Moores already testified as to

9      all of her background and experience leading up to her position

10     now as the chief medical officer of DOCCS.

11             THE COURT:  Okay.  But isn't that based on scientific,

12     technical, or other specialized knowledge?

13             MS. KILEY:  I would think to be a medical doctor, it

14     would have to be.

15             THE COURT:  Therefore, it's expert testimony.

16             MS. KILEY:  It is not being entered for expert

17     opinion.

18             THE COURT:  But it is, is it not?

19             MS. KILEY:  I can withdraw.

20             THE COURT:  Sustained.

21     BY MS. KILEY:

22     Q.  Dr. Moores, can you please share with the Court a commonly

23     prescribed --

24             MS. KILEY:  Withdrawn.

25     Q.  You testified earlier that there are some antidepressants

N26CallH                          Moores - Direct

1    that can be prescribed to treat pain.  Could you share with the
2    Court some examples of an antidepressant that might be used.
3    A.  Cymbalta.
4    Q.  Given all these options and categories that you've just
5    described, what is your approach when you have a patient who
6    presents with chronic pain?
7    A.  I get history and physical and with primary goal to try to
8    figure out the ideology of the pain.  Based on the ideology, it
9    makes it much more likely that the first types of medications
10   that I would choose would be useful and to give me an idea
11   whether or not it's appropriate to consider some kind of
12   procedure, and if they need a referral to a specialist for
13   that.
14   Q.  Is this your approach or would you say this is generally
15   the approach that providers take at DOCCS?
16           MS. AGNEW:  I'm going to object again, your Honor.  If
17   she wants to talk about how she approaches doing an assessment
18   of a patient, I'm comfortable with that.  I'm not comfortable
19   with her speaking for other providers.
20           THE COURT:  That's right, same rule, specialized
21   technical knowledge.  Sustained.
22   Q.  What are some of the factors that you might consider when
23   determining the best pain treatment plan for a patient?
24   A.  The diagnoses.
25   Q.  Does the feedback from a patient factor into a pain

N26CallH                        Moores - Direct

1   treatment plan?

2   A.  Yes, it does.

3   Q.  How?

4   A.  It's important to know the quality of their pain, what they

5   understand of the diagnoses and the potential risks and

6   benefits of the medication.  There is many times where there is

7   more than one option to consider as a next step and their

8   opinion should be considered.

9   Q.  What about the risks associated with certain pain

10  medications?

11  A.  All of the medications have risks, so therefore it's

12  important that that be taken into consideration.  If a patient

13  has a contraindication to one of the risks of a medication,

14  sometimes we have to consider not using that medication.

15  Q.  What are some examples of some risks?

16  A.  With NSAIDs, they can be associated with bleeding in the

17  gastrointestinal tract.  With acetaminophen, we have to be very

18  careful with the dosing on that.  For almost all the other

19  medications, the concern is whether we've got somebody who has

20  a real history of substance abuse and what types of substances

21  they had an issue with and whether or not they have active

22  addictions.

23  Q.  Is there a one-size-fits-all solution for any one

24  particular patient?

25  A.  Not at all.

N26CallH                    Moores - Direct

1    Q.  Why is that?

2    A.  Every single patient who has chronic pain is different.

3    They all have different factors.

4    Q.  And so, could two providers examining the same patient have

5    different views on an appropriate course of treatment?

6    A.  They could.

7    Q.  Could those two different views still be considered

8    appropriate care?

9    A.  Yes.

10   Q.  Why is that?

11   A.  Because unless it's very clear what the diagnosis is, a lot

12   of chronic pain patients have a very complex situation.  The

13   options for treating pain sometimes are a little bit of a

14   trial-and-error situation.  Therefore, it comes down to the

15   impression of the provider, what they think might be next --

16   what will be the next thing to try, what would be best to do

17   next with their communication with the patient.

18   Q.  So what challenges, if any, are providers faced with

19   specific to the population at DOCCS when administering pain

20   medication?

21        MS. AGNEW:  Again, your Honor.  If she wants to lay a

22   foundation with a policy or something like that, I'd feel more

23   comfortable, but if she's just talking about what other

24   providers are faced with versus what she's been faced with, I'm

25   going to object.

1              MS. KILEY:  I can rephrase the question.

2              THE COURT:  Yes, ma'am.

3    Q.  What challenges are present with the population at DOCCS

4    with the administration of pain medication?

5    A.  We have a few challenges.  One is that there is -- because

6    of substance use disorder issues and recreational drug issues

7    within the facilities, there is great pressure to divert their

8    medication and sell it to others, stockpile it, and then we

9    worry that either somebody is going to overdose because they've

10   stockpiled their medication or somebody else is going to

11   overdose who has purchased medication from others.

12             The other issue is that when we have the patient

13   themselves, if they have a history of an addiction issue, we

14   don't want to contribute to that addiction problem, we want to

15   help keep that under control and move in the right direction so

16   they can work on the programs that they've chosen or that have

17   been set up as being appropriate for them to work towards being

18   effective, especially upon the time they're going to be

19   released.

20   Q.  What is the MAT program?

21   A.  Medication for addiction treatment is specifically for the

22   substance use disorders that wherein the FDA has approved

23   specific medications that can assist with recovery.  Our

24   biggest group that uses that program, and we've been expanding

25   it because it hasn't been around for a long time, are those

N26CallH                          Moores – Direct

1   with a history of opioid use disorder.

2   Q.  How long has the MAT program existed?

3   A.  We have –– for several years, we have taken folks from

4   county jails into reception who were already on methadone.

5   Then, this past fall, we expanded it so that we'll take

6   whichever medication they're on, we'll accept them in.  We also

7   have a program within our system where, either by referral from

8   staff within the facility or self-referral by the patient.  And

9   also because we also have a list of those who, on entry, did

10  report that they had been using opiates from the street for the

11  year before their arrest, that we assess all of them for

12  potential opioid use disorder and see if they're an appropriate

13  candidate for medication and get them started on medication if

14  that is something that they'd like to do.

15  Q.  What are some examples of those medications?

16  A.  Methadone and buprenorphine products are the most common.

17  We also have naltrexone for opioid use disorder.

18  Q.  So if you have a patient that is in the MAT program that

19  also presents with chronic pain, how does the participation of

20  the MAT program –– how could that affect the decisions in a

21  proper course of treatment?

22  A.  Well, we're considering the medications for MAT, two of

23  them are also pain medications.  Methadone and buprenorphine

24  are also pain medications.  So they would be preferred for an

25  individual such as that.  When we get the medication for MAT up

1    to the proper dose for their opioid use disorder symptoms, once

2    we're at that point, then we can reassess to see if how much

3    that has helped with their chronic pain situation and what

4    would be -- if anything would need to be added after that.  We

5    do have to be concerned about some mixes of medication because

6    opioids, if taken at a high dose, can be risky for overdose and

7    respiratory depression, and some medications mixed together can

8    increase that likelihood.

9              THE COURT:  Doctor, will you tell me again, please,

10   the name of the two medications you made reference to.

11             THE WITNESS:  Methadone and buprenorphine.

12             THE COURT:  Thank you.

13   Q.  How might a patient become part of the MAT program?

14   A.  They can self-refer via sick call.  Also, if anybody has an

15   overdose that we treat as an emergency, we will refer them for

16   assessment after they are recovered.  The executive team can

17   make a referral.  Other faculty -- I mean other facility staff

18   can make referral to the exact team to send to the MAT program.

19   Again, there was a list of about 2500 that, on intake, when

20   they were being interviewed by the guidance intake people, had

21   admitted to using opioids -- opiates in a non-prescribed manner

22   during the year prior to their arrest.  So we automatically

23   pulled them in to ask if they would be interested.

24   Q.  Approximately how many patients are part of the MAT

25   program?

1   A.  Right now, we have over 1700, but we still have constant

2   referrals in.  I don't know how high our numbers are going to

3   get.

4   Q.  Are there any rules or guidelines for the patients once

5   they are part of the MAT program?

6   A.  Can you clarify.

7   Q.  Do they have to fill out any forms?

8   A.  They don't have to fill out any forms to qualify.  If

9   they're asking to be assessed, they just need to do a sick call

10  request saying that's why they want to, that they'd like to be

11  considered.  Then they meet with a provider who goes through

12  their history with substance use and goes through the DSM-5

13  criteria for opioid use disorder.

14  Q.  Earlier you referenced, among the challenges had to do with

15  diverting.  So my question is, what is diversion?

16  A.  It's when a patient who comes to a medication line to be

17  administered their medication, and instead of them taking the

18  medication as prescribed and instructed, they hide the

19  medication to do something else with it later.

20  Q.  And in your experience, what do they do with that

21  medication later?

22          MS. AGNEW:  Objection.

23          THE COURT:  Basis.

24          MS. AGNEW:  I think it's hearsay, your Honor, how does

25  she know exactly what they do.  The only way she would know is

N26CallH                        Moores - Direct

1    if a patient told her, and that's hearsay.

2              THE COURT:  Ms. Kiley.

3              MS. KILEY:  She testified that she has experience

4    dealing with pain patients, she has worked with DOCCS since

5    2016.  I'm just asking her collectively, in her experience,

6    when patients are caught diverting, what ends up being the

7    reason as why they've diverted.

8              THE COURT:  Why is it hearsay.  That's the question.

9              MS. KILEY:  I can rephrase.

10             THE COURT:  Yes, ma'am.

11   Q.  As a healthcare provider, why would you not want a patient

12   to divert their medication?

13   A.  I would be concerned for their health and the health of the

14   population within the facility based on what we have with

15   emergencies with overdoses, what is found either when cells are

16   searched or when somebody is watching diversion occur, we know

17   it occurs.  What I worry about is either that patient is

18   stockpiling the medication to take it all at once or they are

19   selling it to others.

20   Q.  Have patients ever been taken off of a pain medication

21   because they were caught diverting?

22   A.  Yes.

23   Q.  And is it appropriate for a provider to do that under those

24   circumstances?

25   A.  If there is concern for the health risk of that patient or

N26CallH                    Moores - Direct

1   the population in the facility, yes.

2   Q.  Would that be considered a medical justification?

3   A.  Yes.

4           MS. AGNEW:  Objection.

5           THE COURT:  Ms. Kiley, isn't that expert testimony?

6           MS. KILEY:  No.

7           THE COURT:  It isn't?  It's based on medical

8   expertise, isn't it?

9           MS. KILEY:  I'm asking if the chief medical officer

10  thinks it's appropriate --

11          THE COURT:  I know what you're asking.  My question is

12  why is that not expert testimony based on this witness's

13  expertise; right?

14          MS. KILEY:  I'm asking based on her professional

15  experience as the chief medical officer.

16          THE COURT:  Scientific, technical, or other

17  specialized knowledge; right?  It's obviously expert testimony.

18  Sustained.

19          MS. AGNEW:  Can we also strike it, your Honor, please.

20          THE COURT:  Stricken.

21  BY MS. KILEY:

22  Q.  Would taking a patient off of a pain medication for

23  diverting be considered a medical justification within DOCCS?

24          MS. AGNEW:  Objection.

25          THE COURT:  Sustained.

1  Q.  Dr. Moores, what is drug-seeking behavior?

2  A.  When an individual makes efforts to get medications that

3  are for recreational or addiction reasons rather than to treat

4  a specific diagnosis from a medical standpoint.

5  Q.  How might you be able to identify that type of behavior?

6  A.  If somebody is found to be inconsistent with their

7  presentation in a medical encounter or if we see that they have

8  made efforts to get medication through other sources.

9  Q.  Did you receive training on this within DOCCS?

10  A.  On?

11  Q.  Identifying drug-seeking behavior.

12  A.  It is something that is discussed during our orientation

13  and on a regular basis with executive team and central office,

14  the executive teams at the facility, and with the programs that

15  treat the substance use disorders, such as the programs for the

16  drug rehab and for our alcohol use disorder programs.

17  Q.  And have patients been taken off of a particular pain

18  medication because of drug-seeking behavior?

19          MS. AGNEW:  Objection.  If she wants to testify if

20  she's taken a patient off, I don't have a problem with that.

21          THE COURT:  Ms. Kiley.

22          MS. KILEY:  Your Honor, all of Dr. Moores' testimony

23  is speaking generally as to how providers practice within DOCCS

24  and what is acceptable and appropriate per the professional

25  opinion of the chief medical officer.  This is why she's here

1   today.

2            THE COURT:  Isn't that exactly the problem, the

3   professional opinion of the chief medical officer?  That's the

4   point, it's expert testimony.

5            At the outset of the testimony, you started asking

6   Dr. Moores how chronic pain should be treated, she started out

7   by talking about the diagnosis.  This is almost in line with

8   plaintiffs' expert's declaration where he talks about how one

9   assesses a chronic pain.  This is clearly expert testimony.

10           MS. KILEY:  Okay.

11           THE COURT:  In Dr. Moores' declaration, she talks

12   about what she did to put together the new policy, her audits,

13   how they're managing it, that she and others are -- I've

14   forgotten what the word is, but a team to review the treatment

15   of chronic pain.  I thought that's what she was going to talk

16   about, not how one diagnoses it in this sort of thing.

17           MS. KILEY:  We will be getting to that testimony

18   shortly.

19           THE COURT:  Okay.  But the point is she can't give

20   expert testimony if she hasn't been proffered as an expert.

21   You con present the expert disclosures and the like.

22           MS. KILEY:  Okay.

23           THE COURT:  Yes, ma'am.

24           MS. KILEY:  Your Honor, can I take one moment to

25   confer with my team?

N26CallH                        Moores - Direct

```
 1              THE COURT:  Yes, ma'am.  Do you want to take five
 2    minutes?
 3              MS. KILEY:  Please.
 4              THE COURT:  Let's take a five-minute break.
 5              (Recess)
 6              THE COURT:  Ms. Kiley.
 7    BY MS. KILEY:
 8    Q.  Dr. Moores, what was your position in DOCCS in 2017?
 9    A.  In 2017, I was the regional health services administrator.
10    Q.  At the time, was there a DOCCS policy in place specific to
11    the admission of chronic pain medication?
12    A.  I can't remember the exact date that the MWAP policy went
13    in, but other than the MWAP policy, the 1.24, there was no
14    policy that was specific to chronic pain care.
15    Q.  And what does MWAP stand for?
16    A.  Medications with abuse potential.
17    Q.  What are MWAPs?
18    A.  There was a list of medication there was linked in that
19    policy, and it was chosen by Dr. Koenigsmann for medications
20    they thought had abuse potential.  It was primarily pain
21    medications, but there was also at least one medication for
22    diarrhea.
23    Q.  Dr. Moores, I'd like to show you what is --
24              MS. KILEY:  I'd like to have Exhibit 1 marked for
25    identification.
```

N26CallH                          Moores - Direct

1                   THE COURT:  Are these all marked?

2                   MS. KILEY:  No.

3                   THE COURT:  Mine are in a binder.

4                   MS. KILEY:  It's now under tab 2.

5                   THE COURT:  All I was trying to decide was whether we

6        need to go through and mark them.  The answer is yes?

7                   MS. KILEY:  I believe they're marked.

8                   THE COURT:  Why don't you just slap a label on them

9        and mark them so you don't have to go through all the time.  It

10       would be different if it were a jury trial.

11                  So it's under tab 2?

12                  MS. KILEY:  Yes.

13                  THE COURT:  Thank you.

14                  MS. KILEY:  May I approach the witness?

15                  THE COURT:  Yes, ma'am.

16       Q.  Dr. Moores, do you recognize this document?

17       A.  I do.

18       Q.  What do you recognize it to be?

19       A.  It is the medications with abuse potential policy, 1.24.

20       Q.  Is this a true and accurate copy of the policy that you

21       just testified to that was in place in 2017?

22       A.  Yes.  I know that it shows that there was -- prior to this,

23       there was a version that was put in place June 1st, 2017.

24                  MS. KILEY:  I'd like to have Defendant's 1 entered

25       into evidence.

N26CallH                         Moores - Direct

1          MS. AGNEW:  I don't have an objection, your Honor, but

2     there was a medication list affixed to this with the MWAP

3     medication.  So this version is incomplete.  If counsel wants

4     to provide that tomorrow so we have a complete exhibit, I'd

5     appreciate that.

6          MS. KILEY:  I can do that.

7          THE COURT:  Received.

8          (Defendant's Exhibit 1 received in evidence)

9     Q.  Dr. Moores, is the term MWAP used in the community?

10    A.  No.

11    Q.  Do you know who created this policy?

12    A.  The policy was created, from what I understand, it was the

13    leader to create the policy was Dr. Dinello, who was one of the

14    regional medical directors.  From what I understand, it was

15    with discussion with the other regional medical directors and

16    Dr. Koenigsmann who was the Chief Medical Examiner at the time.

17    Q.  Do you know why it was enacted?

18         MS. AGNEW:  I'm going to object, unless she had a role

19    in formulating the policy.

20         MS. KILEY:  My question is if she had personal

21    knowledge as to why it was enacted.

22         THE COURT:  The question is non-hearsay knowledge,

23    isn't that what you mean?

24         MS. KILEY:  I'm not asking for hearsay knowledge.

25         THE COURT:  So that was the nature of the objection.

N26CallH                          Moores - Direct

1   The objection was, does this witness have personal knowledge of

2   whatever it is.

3            MS. KILEY:  Right.

4            THE COURT:  Okay.  Go ahead.

5   A.  Dr. Dinello told me that it was because of overuse --

6            MS. AGNEW:  Objection.  Forgive me.  She testified

7   under oath that she wasn't a part of this.  That's why I'm --

8            THE COURT:  Sustained.

9   Q.  What are some examples of MWAP medications?

10  A.  Oxycodone and -- what else?  The gabapentinoids were on

11  there.  Now I can't remember the list.

12  Q.  Approximately how many MWAP medications were there, if you

13  remember?

14  A.  I know that the list was on the front of one sheet of

15  paper.

16  Q.  Who decided that those would be the medications designated

17  as MWAP medications?

18  A.  The approval for anything to be on there or for the list to

19  be changed was via Dr. Koenigsmann.

20  Q.  Can you explain, step by step, how MWAP was carried out?

21  A.  You mean as far as what the procedure is that's explained

22  in there?

23  Q.  Yes.

24            THE COURT:  I'm sorry.  Could I just interrupt for a

25  moment.

N26CallH                          Moores – Direct

1          You said how was it carried out, the witness said the

2     procedure.  Are you asking the witness to summarize the MWAP

3     procedure?

4               MS. KILEY:  I am.

5               THE COURT:  Doctor.

6     A.  If a primary care provider wanted to prescribe one of the

7     medications that was on that list, they had to fill out an

8     electronic form with what they were requesting and why they

9     were requesting it.  That form was sent via email to their

10    regional medical director.  The regional medical director then

11    reviewed it and either approved it or denied it.

12    Q.  I'm sorry.  How exactly did it get to the regional medical

13    director?

14    A.  It was via email.

15    Q.  How would you describe the role of the regional medical

16    directors during MWAP?

17    A.  They had the authority to approve or deny any of these

18    medication requests and they were the final decision maker.

19    Q.  How many regional medical directors were there at the time?

20    A.  I believe there were four.

21    Q.  Did MWAP pose any challenges to providers?

22    A.  Yes.  When a provider had evaluated their patient and

23    decided a certain medication was what they thought was

24    appropriate, sometimes the RMD would deny that medication and

25    then they would have to come up with an alternative treatment

```
 1   plan.
 2   Q.   Why was that a challenge?
 3   A.   Because they weren't able to do what they thought was
 4   optimal treatment for that patient at that time.
 5   Q.   So what was the result of some of the MWAP requests that
 6   were denied?
 7   A.   There are situations where the provider had to go to an
 8   alternate therapy that they thought wasn't as likely to be
 9   successful or wasn't as optimal, and then, potentially, the
10   patient suffered as a result.
11   Q.   Doctor, does MWAP still exist?
12   A.   No.
13   Q.   When was it rescinded?
14   A.   In February 2021.
15   Q.   Were you involved in that rescission?
16   A.   I knew of it because Dr. Morley discussed with me and the
17   other RMDs and the health services leadership about -- that
18   that was going to be occurring.
19   Q.   What was the result of the MWAP policy being rescinded?
20   A.   The providers did not have to do a request for these
21   medications anymore to get approval and they could just
22   prescribe the medications.
23   Q.   What was the reaction of the providers after this change?
24   A.   Most of the providers were very happy with that because
25   then they were allowed to do the care that they thought was
```

N26CallH                          Moores - Direct

1    appropriate for their patient.  There were a few that were not

2    happy with it because they used it as a way to say no to

3    patients where the patient was asking for a medication they

4    didn't think was appropriate and they could then use it as the

5    wall saying, I would love to give it to you, but they're not

6    letting me.

7    Q.  After MWAP was repealed, was a new policy put in place to

8    address chronic pain patients at DOCCS?

9    A.  Yes, the 1.24A policy.

10            MS. KILEY:  Your Honor, may I approach the witness?

11            THE COURT:  Yes, ma'am.

12   Q.  Dr. Moores, I've just handed to you what's been marked for

13   identification as Defendant's Exhibit 2.  Do you recognize this

14   document?

15   A.  I do.

16   Q.  What do you recognize it to be?

17   A.  It is the policy we were just talking about, 1.24A,

18   prescribing for chronic pain.  That was put in place when the

19   prior MWAP policy was rescinded.

20   Q.  Is the copy you have a true and accurate copy of the policy

21   1.24A?

22   A.  Yes.

23            MS. KILEY:  Your Honor, I'd like to have Defendant's

24   Exhibit 2 entered.

25            MR. MORRISON:  No objection.

1           THE COURT:  Received.

2           (Defendant's Exhibit 2 received in evidence)

3           MS. KILEY:  Thank you.

4    Q.  Dr. Moores, what was your position when 1.24A came to be?

5    A.  I was deputy chief medical officer.

6    Q.  Were you involved in the enactment of 1.24A?

7    A.  I assisted Dr. Morley in formatting the policy.  He gave me

8    the information, the content that he wanted and he would

9    discuss it with counsel's office and periodically let me know

10   what revisions to make until it was finalized.

11   Q.  Do you know who, besides Dr. Morley, was involved in

12   creating it?

13   A.  I know that there was discussion with the AG's office.  I

14   was led to believe by Dr. Morley that Ms. Agnew was part of the

15   choices.

16   Q.  Can you describe in your own words what 1.24A requires?

17   A.  It requires that we identify patients that have chronic

18   pain, that to help keep that identification easy to identify,

19   put it in our patients' problem list and using code 338.  It

20   points out that there is no longer an approval process for pain

21   medications unless it's non-formulary, then they have to put in

22   a non-formulary request.

23           It also points out the specialty consult.  When you

24   get the report back, that you make a note in the medical record

25   about anything with the specialist recommendations that you're

1   not going to follow, that you contact the specialist, if

2   necessary, to clarify details about the patient that the

3   specialist may not understand or have complete information for,

4   and to document your decision-making regarding those

5   recommendations.  And that the -- that if a provider is

6   choosing to stop a pain medication, that they should sit down

7   and discuss that with the patient rather than just to stop it

8   and have no conversation.  And then finally, with that code,

9   that we make sure that we're seeing chronic pain patients at

10  least quarterly, and that, annually, there be a more thorough

11  assessment.

12  Q.  What would you describe is the main difference between the

13  MWAP policy and 1.24A?

14  A.  1.24A talks about how to try to organize and manage the

15  administration of chronic pain care.  1.24 just talked about if

16  you wanted to prescribe something on this list of medications,

17  the RMD had to review and approve or deny.

18  Q.  Does 1.24A speak to the RMDs at all?

19  A.  No.

20  Q.  How was this change communicated to providers?

21  A.  There was an announcement memo that was the announcement

22  that 1.24 is rescinded and that they're putting 1.24A in place,

23  and that was sent by email to all of the leadership positions

24  throughout the facilities, the FHSDs, the NAs.  When they get

25  announcements like that, they are required to share it with

1   their providers.

2   Q.  Was there anything else done to facilitate this transition

3   away from the MWAP policy?

4   A.  The 1.24 request form, the online electronic form and the

5   process of that going through central pharmacy, that was

6   removed.

7   Q.  I'm sorry.  Can you repeat what was removed?

8   A.  The online MWAP request form that the provider had to fill

9   out if they wanted to prescribe one of those listed

10  medications, that then went to the RMD for approval or denial.

11  Q.  So even if a provider wanted to try to fill out an MWAP

12  form, would they have been able to?

13  A.  No.

14  Q.  As you sit here today, do the regional medical directors

15  still review MWAP requests?

16  A.  No.

17  Q.  Is there a system in place that would allow an RMD to deny

18  the patient the right to receive the treatment that they're

19  being prescribed?

20  A.  No.

21  Q.  Are you aware of any providers who are still trying to

22  follow the MWAP policy?

23  A.  No.

24  Q.  I want to go through each part of 1.24A very briefly.

25          You mentioned the 338 code.  Dr. Moores, what is the

N26CallH                          Moores – Direct

1    medical problems list?

2    A.   It is within the part of the medical record, which is

3    electronic on what is called our FHS1 system in our mainframe.

4    We have a list of potential codes for conditions or certain

5    treatments that get done, such as vaccines.  So that is

6    something that's available to all the healthcare staff to look

7    at, at any given time, and we can run some reports off of it.

8    Q.   What is the purpose of the medical problems list?

9    A.   So that anybody who is referring to that patient's

10   situation can hopefully see, in a nutshell, the main things

11   that that patient has as acute and chronic conditions.

12   Q.   In your experience, is the medical problems list helpful to

13   providers?

14   A.   It is.

15   Q.   Was the medical problems list intended to track symptoms?

16   A.   No.

17           MS. AGNEW:   Objection.

18   Q.   What is the purpose of the medical problems list?

19   A.   It is to list the diagnoses that a patient has.

20   Q.   What does 338 stand for?

21   A.   For pain management.

22   Q.   Is pain management a diagnosis?

23   A.   No.

24   Q.   Then what is pain management?

25   A.   Pain management, that code is a tool to use to be able to

1   run reports and follow whether or not their frequency of care

2   meets the criteria within the policy.

3   Q.  Are there any other codes besides 338 that track symptoms?

4   A.  That track symptoms --

5           THE COURT:  I thought the witness said that 338

6   doesn't track symptoms, rather tracks diagnosis.

7           THE WITNESS:  338 actually is just -- it tracks if

8   there's a patient that needs pain management.  So we generally

9   don't consider pain management as a diagnosis, but having that

10  on that problem list can make it easy for us to pull reports to

11  say that patient needs to be seen this often.  Usually, when we

12  do that, we'll do it off of diagnosis.

13          THE COURT:  Thank you.

14  Q.  Since becoming chief medical officer, have you come to

15  learn that there are still patients that have chronic pain that

16  might not be coded with 338?

17  A.  Yes.

18  Q.  If those patients don't have the 338 code, are they still

19  being treated for pain?

20  A.  Yes.

21  Q.  Does the presence of a 338 code dictate what course of

22  treatment a patient's going to receive?

23  A.  No.

24  Q.  The next section of 1.24A you mentioned earlier says that

25  the only type of medication that needs approval are those on

N26CallH                         Moores – Direct

the non-formulary list.  So my question to you is, what does it

mean for a medication to be on non-formulary?

A.  We keep a formulary that includes medications from almost

all common categories of medications that are used in the

community.  The reason there's a formulary list is because

there are so many thousands of medications, and even in some of

those categories, the number of choices is tremendously high.

So we have certain ones that are common and that's on the

formulary.  But that doesn't mean there might not be situations

where somebody should be considered to get a medication that's

not on our formulary, and that's the non-formulary process.

The most common medications that come through that are some of

the newer, more novel and more expensive chemotherapy agents

for cancer, and some of the newer medications for

rheumatological diseases.

Q.  How might a provider know what medications are on formulary

versus not on formulary?

A.  There is a published formulary, and that's available for

them to refer to.  There are periodic memos for additions in

between the regular publications.  Then, periodically, somebody

will put in a non-formulary request for a medication that

actually got on the formulary and they didn't have the most

recent version of the formulary, and then we'll let them know

that wasn't required, they can just order the medication.

Q.  Are the MWAP medications that you testified to earlier

N26CallH                          Moores - Direct

1    today, are those on formulary or not?

2    A.   I believe the great majority are on formulary.  I know that

3    gabapentinoids got on there.  We very rarely, because I do a

4    good portion of non-formulary reviews now, it's very rare I'll

5    end up having something that is specifically a pain medication.

6    I did get one, like the other day, which was for gabapentin,

7    but it was for a dose that we normally don't keep around, but

8    it made sense to do it for that patient, so that was approved.

9    Q.   When 1.24A was first promulgated, who approved the

10   non-formulary requests?

11   A.   The RMDs.

12   Q.   Has that changed?

13   A.   Yes.

14   Q.   Why did that change?

15   A.   When I was officially placed into the chief medical officer

16   position, I started doing audits of what the RMDs were doing,

17   and I found that my that audits had been on formulary review on

18   denials they had done, and there were situations where their

19   denials were for medications that were to treat a chronic pain

20   condition and I didn't agree with their reasoning.  So I just

21   chose to just take them off that review process.

22   Q.   How did you do that?

23   A.   I took away their access to that system.  I changed

24   where -- there are only, including myself, five of us that I

25   think -- me plus four other physicians that I believe are very

N26CallH                         Moores - Direct

1   knowledgeable, very sophisticated, and have a very good

2   communication base so that if they see that there's a

3   medication request on there that might not be optimal, they

4   reach out to the provider, they'll see the patient with them if

5   necessary and make sure the right thing is done for the

6   patient.

7   Q.  How were you able to ensure that the RMDs were no longer

8   part of the non-formulary review process?

9   A.  Their access to that system was removed.  Those requests go

10  to a shared mailbox and they no longer can access that mailbox.

11  Q.  How did you communicate this change to the regional medical

12  directors?

13  A.  Via email, and they were also told over telephone.

14          MS. KILEY:  Your Honor, may I approach the witness?

15          THE COURT:  Yes, ma'am.  I don't think you have to

16  ask.  I don't think the doctor is worried you're going to leap

17  over the stand.

18          MS. KILEY:  This will be behind tab No. 5.

19  Q.  Dr. Moores, I've just handed to you what's been marked

20  defendant's 3 for identification.  Do you recognize these

21  documents?

22  A.  Yes.

23  Q.  What do you recognize them to be?

24  A.  So the top one is an email from me with the primary

25  individuals that it was going to, are the three RMDs that were

1    in place at the time, and then copied to my top leadership from

2    health services.

3           The second one is the memo on October 31st, which

4    served to give a reminder about 1.24A and the specific pieces

5    within that policy that need to be adhered to, a reminder for

6    the providers.  That went to the deputy superintendents that

7    oversee health services at the facilities, the facility health

8    services directors, and the nurse administrators.

9    Q.  And are these documents that you've just described, were

10   they drafted by you?

11   A.  Yes.

12   Q.  And are these true and accurate copies of the emails and

13   memo that you put out to describe the change that you just

14   testified to?

15   A.  Yes.

16          MS. KILEY:  Your Honor, I'd like to have defendant's 3

17   in evidence.

18          MS. AGNEW:  No objection.

19          THE COURT:  Received.

20          (Defendant's Exhibit 3 received in evidence)

21   Q.  Dr. Moores, since you've made this change for the

22   non-formulary review, have the RMDs inserted themselves into

23   the process?

24   A.  I saw one incident where, potentially, that person could

25   have.  One of the RMDs was notified about an unusual

N26CallH                         Moores - Direct

1    non-formulary request, meaning that it had been approved, but

2    the situation was that this medication, which is an injectable

3    medication, needed to be injected by a specialist, an

4    orthopedic surgeon because it's an expensive medication and

5    sometimes our patients will refuse the trip or the procedure at

6    the last minute, he didn't want to be ordering the medication

7    at his office and find out the patient wasn't going to come and

8    that he wouldn't get paid for it.  So we agreed to arrange to

9    order the medication for him.  So I had to go through our

10   process and our purchasing because it was unusual and a little

11   bit more expensive.

12           One of the people who ended up being involved with the

13   budget review misunderstood what was going on and sent it on to

14   one of the RMDs who then emailed back to several people saying

15   this specific medication was denied by Dr. Morley in the past,

16   maybe this needs to be reviewed by others.  So I made sure that

17   the medication was ordered and that she and the others who were

18   not following protocol were removed from the process so that

19   that medication was taken care of.  That RMD was counseled on

20   this immediately and afterward, counseled on other things.

21   This RMD is no longer doing RMD work.

22   Q.  Are any of the commonly prescribed pain medications that

23   you've testified to earlier today, are they on the formulary or

24   not?

25   A.  Formulary.

N26CallH                        Moores - Direct

1    Q.  What are the circumstances under which someone, other than

2    the provider, would be making a decision on a prescription?

3    A.  Only with a non-formulary process.

4    Q.  I want to move on to the section on 1.24A that talks about

5    your recommendation of a specialist.  Dr. Moores, are any of

6    the providers at DOCCS pain specialists?

7    A.  No.

8    Q.  What might a patient receive in pain management that they

9    cannot receive from a provider at DOCCS?

10   A.  A pain specialist can provide a more sophisticated and

11   knowledgeable evaluation and treatment plan and offer

12   procedures that we cannot offer.

13   Q.  Are specialists able to prescribe DOCCS patients

14   medication?

15   A.  No.

16   Q.  Why is that?

17   A.  The way the policies are set up within our system, the

18   orders for medications and the orders for administration of

19   medications have to come from our own providers.  So,

20   therefore, when a specialist recommends things, the primary

21   care provider has to review and implement those

22   recommendations, which would include orders for medication as

23   opposed to in the community, if you see a specialist, they can

24   prescribe for you, you can go to the pharmacy and pick it up

25   despite what your primary care provider would agree to or not

1    agree to.

2    Q.  What do providers generally do when they receive a

3    recommendation from a specialist?

4    A.  They generally implement all the recommendations.

5    Q.  In the community, do providers always, 100 percent of the

6    time, follow the recommendation of a specialist?

7                MS. AGNEW:  Objection.

8                THE COURT:  Sustained.

9    Q.  What are some reasons that a provider might not follow the

10   recommendation of a specialist?

11   A.  If they realize that, for example, a medication order may

12   have significant risk for that patient or interaction with

13   other medication.  If their recommendation has a security risk,

14   such as a brace that has a lot of metal in it which can be used

15   inappropriately in that setting.  Also, if the patient actually

16   is not interested in following that recommendation.

17   Q.  Are those circumstances you just described, would that be

18   appropriate?

19   A.  Yes.

20   Q.  During this litigation, have you had the opportunity to

21   review specialist recommendations?

22   A.  I have.

23   Q.  Approximately how many?

24   A.  I don't know.  I review specialist recommendations

25   regularly in addition to the reviews for this case.  I

N26CallH                    Moores - Direct

1    regularly end up with other cases coming across my -- other

2    patient cases coming across my desk because of issues somebody

3    has identified, whether it was the patient themselves reaching

4    out or a healthcare staff or an advocate for the patient from

5    outside our agency.  So it's hard for me to recall that.  I

6    look at these types of records all of the time.  That is one of

7    the things that is concerning to me is that the specialist is

8    making recommendations and the primary care provider is not

9    following that and that, to figure out why, whether it makes

10   sense, and if I have a provider who's doing that on a regular

11   basis.

12   Q.  And to the extent you haven't been able to figure out the

13   "why," what have you done to determine the rationale for not

14   following a recommendation?

15   A.  If it's not in the record as it's supposed to be, I'll

16   reach out to the facility or I'll have somebody reach out to

17   the facility to get that information and see if there's a -- if

18   there was a misunderstanding, if there was a missing-knowledge

19   base, if I have to arrange for somebody else to see the

20   patient.

21   Q.  In these scenarios that you've just described where it was

22   unclear from the record and you, yourself, had to follow up

23   with the provider, have you found out that any of the reasons

24   for not following the specialist's recommendation were for

25   nonmedical reasons?

N26CallH                    Moores - Direct

A.  Yes.  Well, there are situations where the patient actually

has told them that they didn't want a certain recommendation to

be implemented.  Then there's concerns about security, but

that's not an issue with -- that doesn't come up with

medications, that comes up more with durable medical equipment

and what can be allowed to be in a cell.

Q.  In the times where you've come to learn that it's the

patient that doesn't want a medication anymore, why might that

be significant?

A.  Well, it's important to know if a patient does not want

something and that we take that into consideration with a

treatment plan and then adjust the treatment plan.  It's

important to be able to discuss with the patient what the risks

and benefits might be to stopping that medication or

considering a different treatment option.  Finally, since an

awful lot of these medications have to be one-to-one and

there's a decent amount of workload with setting those

medications up with each of the med lines at least twice a day

for many things, and that nursing needs to go through all of

that process and get it ready and document what occurs,

security has to call the patient out.  If we know that the

patient has shown that they want to stop taking a medication,

we want to stop the order as soon as possible in order to be

more efficient with the care that we give.

Q.  Is stopping a medication because a patient has orally

1    communicated that they don't want to take it anymore, is that

2    appropriate?

3    A.   It is reasonable to do that.

4    Q.   The piece in 1.24A that speaks to documenting or reason for

5    not following a specialist recommendation, is documenting the

6    reason behind a treatment plan, is that something new to DOCCS?

7    A.   No.

8    Q.   And how long has that -- can you explain?

9    A.   We have another policy that talks about specialty care, and

10   that when a specialist report comes back, the provider is

11   supposed to review that report and document in the record about

12   what the diagnosis and recommendations were and what the plan

13   is.  That policy was in place before the 1.24A.

14   Q.   Do you expect the providers at DOCCS are to document every

15   single word exchanged between the provider and a patient during

16   every encounter?

17   A.   No.

18   Q.   Why not?

19   A.   That it wouldn't be reasonable if we keep a transcript of

20   absolutely everything, it would be too time consuming, and

21   that's not expected in standard care medicine to write every

22   single word.

23   Q.   If every single thing is not documented, does that

24   necessarily mean that the patient hasn't received adequate

25   care?

N26CallH                    Moores - Direct

1    A.  No.

2    Q.  To confirm, who was the individual that decides whether or

3    not to follow a specialist's recommendation?

4    A.  The primary care provider.

5    Q.  Are the regional medical directors involved in that

6    process?

7    A.  No.

8    Q.  I want to talk about the final piece on 1.24A that talks

9    about followup appointments every 90 days.  Is a followup visit

10   every 90 days appropriate for a pain patient?

11   A.  It would depend on what the diagnoses are for that patient

12   and how well things are stabilized.

13   Q.  How does this compare to followup visits in the community

14   for pain?

15           MS. AGNEW:  Objection.

16           THE COURT:  Sustained.

17   Q.  How often are pain patients at DOCCS seen?

18   A.  The primary provider taking care of the patient would make

19   the decision.  There are some situations with chronic pain

20   patients where we would want to see them much more often than

21   that.  There are some that are very stable and they feel

22   comfortable with how to access the system if they have

23   exacerbations in between and they would be seen less often.

24   Q.  If a patient believes they need to be seen before their

25   next scheduled appointment, are they able to see a provider?

N26CallH                         Moores - Direct

1    A.   They can put in a sick call request.

2    Q.   What does that mean?

3    A.   The sick call requests get triaged, anything that looks

4    emergent or that security thinks is emergent gets taken care of

5    immediately.   Otherwise, the nurses triage then and they'll be

6    seen -- most commonly seen in sick calls and the nurse can take

7    the information and do whatever part of the assessment that the

8    nurse normally does, decide whether or not they need to be seen

9    by a provider, and then set that up as needed.

10   Q.   Typically, after a patient puts in a sick call slip,

11   generally, how long does it take for them to see a provider?

12   A.   That can vary depending on what the complaint is and the

13   facility.   So there are times, like when I was working as a

14   provider in a facility, I had a setup where if the nurse needed

15   them seen the same day, they were seen the same day.   There

16   were other ones where they knew it was just a routine item,

17   they would put in a referral within our appointment system to

18   be seen.   Most places, they'll get seen within a few days to

19   two weeks.   And it depends on the staffing.

20   Q.   If a patient was not scheduled for a 90-day followup visit,

21   are they still able to see a provider?

22   A.   Yes.

23   Q.   And how would they do that?

24   A.   Via the sick call system.

25   Q.   Finally, I want to talk about the annual evaluation

1   referenced at the end of 1.24A.  1.24A requires a provider to,

2   quote, discuss at least annually a patient's treatment plan.

3             MS. AGNEW:  I'm just going to object to the

4   characterization of what the policy says, because that's not

5   what it says.

6             THE COURT:  Are you making reference, Ms. Kiley, to

7   the last bullet point on the first page of the October 31, 2022

8   memorandum?

9             MS. KILEY:  No, I was referring to the last line of

10  1.24A.  I was just summarizing what it says.

11            THE COURT:  Why don't you just say with respect to

12  that line, and go ahead and ask your question, please.

13            MS. KILEY:  Yes.  I will withdraw the question.

14            THE COURT:  Yes, ma'am.

15  BY MS. KILEY:

16  Q.  Dr. Moores, is the term "reassessment" used in the

17  community?

18            MS. AGNEW:  Objection.

19            THE COURT:  Sustained.

20  Q.  Dr. Moores, 1. 24A requires an annual evaluation, what is

21  your understanding of an annual evaluation in this context of

22  1.24A?

23  A.  Well, the sentence says that at least annually, the primary

24  care provider will meet with the patient to discuss the

25  proposed treatment plan, but we don't have anything specific,

N26CallH                        Moores - Direct

1   like as far as forms go or details, regarding what that has to

2   include.

3   Q.  In the community, how might an annual evaluation be

4   conducted?

5   A.  It would depend what the annual evaluation is for.  You

6   mean for chronic pain?

7   Q.  Yes.

8   A.  I'm not sure if there is something they call an annual

9   evaluation for chronic pain.  I think generally they, at least

10  what I've seen with the pain specialists and what they

11  recommend and what they write is that they see the patient do

12  the evaluation and treatment plan they come up with.  Then as

13  far as how often they follow up depends on their impression and

14  what they would like to do.  Sometimes it's more often and

15  sometimes it's less often, but every single time they do a

16  treatment plan on some level.

17  Q.  Is discussing a treatment plan something that would come up

18  in a routine visit?

19  A.  Yes.  Every time you see a patient, you're evaluating them

20  for some issue or multiple issues, you are going to have a

21  treatment plan.

22          MS. AGNEW:  Objection.  Dr. Moores may have a

23  treatment plan.  She can't testify as to what every provider

24  does.

25          THE COURT:  And that's right; isn't that right,

1    Ms. Kiley?

2              MS. KILEY:  Yes.

3    Q.  Dr. Moores, are the regional medical directors involved in

4    the annual evaluation process?

5    A.  For the pain, the requirement for this policy?

6    Q.  Yes.

7    A.  No.

8    Q.  Is anyone, other than the provider, conducting an

9    evaluation?

10   A.  No.

11   Q.  Would the presence of a form and a formalized evaluation

12   process, would that change the provider's ability to prescribe

13   pain medication?

14   A.  No.

15   Q.  Does the lack of a form mean that a patient is not getting

16   the treatment that they need?

17   A.  No.

18   Q.  And if a patient believes that they're not receiving proper

19   treatment for pain, is a formalized evaluation going to resolve

20   that issue?

21   A.  No.

22   Q.  Why not?

23   A.  Because it still comes down to what that provider's

24   personal opinion is about the diagnoses and appropriate

25   evaluation and treatment for that patient, regardless of what

N26CallH                      Moores - Direct

1    form they might put the information on.

2    Q.  Dr. Moores, I want to switch gears now and touch on briefly

3    some of the audits that you describe in your declaration.

4            In your career, have you had experience with auditors

5    specific to a medical organization?

6    A.  Yes.  I was involved with quite a few audits at hospitals

7    and outpatient clinics by the Joint Commission of

8    Accreditation, is one of the main accreditors of hospitals, and

9    also have other audits from a variety of organizations that

10   would come to audit within healthcare settings.

11   Q.  What is the purpose of an audit?

12   A.  To check whether or not -- in general, it's to check

13   whether or not standards are being adhered to.

14   Q.  Are audits of medical organizations and clinics standard

15   practice in the community?

16   A.  Yes.

17   Q.  In your experience, is it customary that an entire health

18   services staff has 100 percent compliance with all policies?

19   A.  No.

20   Q.  And the audits that you've described in your declaration,

21   are some of them new to DOCCS?

22   A.  Yes.

23   Q.  Which ones?

24   A.  The audits that we have initiated specifically for the

25   policy 1.24A.

N26CallH                         Moores - Direct

Q.  Can you briefly describe how you are auditing 1.24A?

A.  Our SURN unit — SURN is for senior utilization review nurse

unit — they regularly do audits at our facilities to check on a

number of standards and policy adherence.  So they have started

this and were continuing to expand what it is they audit and

how they audit.  The key pieces of this that are objective are

what we're trying to look at, whether or not the 338 code is

being used.  If someone has a 338 code, are they being seen at

least according to the time requirements listed at the bottom

there.  If they get a specialty referral report back, have they

documented what they did with those recommendations.  So things

like that are the main issues.

        Figuring out whether or not they have put the 338 on

can be challenging because if the 338 is not there, how do you

look to decide which ones would you check?  So, in addition to

doing some random chart looks, they also are looking at other

diagnoses that are on problem lists already that you know the

likelihood if somebody has low back pain, the likelihood they

have chronic pain is very high.  So those are examples of what

they can pull reports of with a number of other diagnosis codes

that we know of where we really should be looking to see is

that person a chronic pain management patient.

Q.  You testified that some of these components are objective.

So my question is, is there anything about the 1.24A audit

subjective?

N26CallH                        Moores - Direct

1   A.  No, it's basically looking for the 338, are they being seen

2   in time, are they documenting when the specialist report comes

3   back and putting the correct details in place, and also to look

4   at the situation about when medications are stopped and are the

5   appropriate documentation items in place for that, also.

6   Q.  In your experience, is the audit that you've just described

7   for the Court today any different than what an independent

8   auditor might do for DOCCS?

9           MS. AGNEW:  Objection.

10          THE COURT:  Sustained.

11  Q.  Dr. Moores, if you come to learn that a patient is

12  complaining that they haven't received effective medication to

13  treat their pain, what obligation, if any, do you have?

14  A.  I have key people look into the situation by talking with

15  the healthcare staff there, by getting copies of the medical

16  record and reviewing the medical record, and pursuing through

17  those avenues.  Sometimes it's because there's a communication

18  drop in that there needs to be more information given to the

19  patient.  Sometimes there is something that needs to be

20  addressed further and we'll arrange for that.  Sometimes a

21  patient is asking for a medication that's not appropriate for

22  them, but that still needs to resolve in communication with the

23  patient.

24  Q.  And in these circumstances where you've come to learn that

25  a patient is complaining of pain, can you call the provider and

1   order them to order the medication that the patient is asking

2   for?

3   A.  No.  Ethically, it's not appropriate to ask another

4   provider to just order a drug.  It has to be the case where the

5   person who's ordering the medication has done the assessment

6   and treatment plan for the patient and is ordering what they

7   believe to be appropriate.

8   Q.  What do you mean by, ethically, you can't do that?

9   A.  I cannot order somebody to prescribe a medication that they

10  don't feel comfortable with for the care of a specific patient

11  that they've been seeing.  If I have a situation like that

12  where I -- with the information I have about a patient where I

13  am suspicious that maybe another medication should be strongly

14  considered for a patient, but I'm not seeing the patient, then

15  there are some different things that can be done.  I can

16  discuss with the provider to see if there is a piece of

17  information that I don't have that would make this logical or

18  is it a situation where I might be concerned that that provider

19  maybe doesn't have the optimal knowledge base and experience to

20  take care of that patient and something else should be

21  considered.

22          So it could result -- just talking to that provider on

23  the phone doesn't resolve the problem and I still have

24  questions, it can be resolved by either arranging the patient

25  be seen by somebody else or having that provider's work

1  reviewed to see if it is competent in that scope of practice.

2  Q.  Going along with the circumstance where you find that a

3  patient is complaining that they haven't received effective

4  pain medication, do you consider this an emergency

5  circumstance?

6  A.  Not unless there is something that is giving information

7  that makes me think it requires an emergency room or there's

8  something that's going to immediately require a procedure or

9  immediate imaging study that something could be

10 life-threatening, that could threaten a loss of limb, those I

11 treat in an emergent manner.

12         MS. KILEY:  Your Honor, could we take a five-minute

13 recess?

14         THE COURT:  Sure.  Thank you, counsel.

15         (Recess)

16         THE COURT:  Inquiring minds want to know how we're

17 doing with this witness?

18         MS. KILEY:  We're almost wrapping up, so I would say

19 15 minutes.

20         THE COURT:  Cool.  We have a 1 o'clock, I think.  When

21 you see 12 people and they're ready to go, why don't you stop.

22         Won't you be seated.

23         Ms. Kiley.

24         MS. KILEY:  Thank you.

25 BY MS. KILEY:

1   Q.  Dr. Moores, can you please describe the process of when an

2   incarcerated individual transfers from one facility to another,

3   from the medical standpoint?

4   A.  Their medical records are supposed to go with them.

5   Sometimes their medications go with them, sometimes not.

6   There's different rules for that, the situation, based on what

7   pharmacies are where.  However, the one key piece is that our

8   policy is such that the orders for medication, the orders for

9   administration of medication have to come from a provider who's

10  assigned to that facility.  So, therefore, when they move to a

11  new place, the orders have to be restarted, they need to be

12  reviewed and restarted.  The nurses are not allowed to go on

13  orders from the last facility.

14  Q.  Why is that?

15  A.  That is how our policy is set up.

16  Q.  You believe you testified that there are certain

17  circumstances when medications will travel with the patient and

18  sometimes they do not.  So can you explain the circumstances

19  when medications do travel with the patient?

20  A.  Most commonly, it's when they're what we call keep on

21  person medication where they can be prescribed, just like when

22  we get medication from a pharmacy, the bottles of medication

23  are dispensed directly to the patient and they're kept in their

24  cell and they'll be transported with their cell belongings.

25  There are sometimes medications which are one-to-one, meaning

1   that they have to be administered by a nurse and they have to

2   come to the medication line for that medication.  Some of those

3   medications will also accompany the patient and some of those

4   medications will not.

5   Q.  At what point in the intake process will a patient be

6   physically examined?

7   A.  For those that come into reception -- so they've come from

8   a county jail or Rikers -- within the first few days that

9   they're there, they'll have a history and physical.  However,

10  immediately, within 24 hours of being there, a nurse will do a

11  quick assessment with them to see if there's anything acute

12  going on.

13  Q.  Are there any rules or guidelines as to when in that

14  timeline any new medications should be ordered?

15  A.  The medications, for example, for reception, generally, we

16  do get medication lists from the county jails prior to the

17  arrival of the individual, and when everything goes right, we

18  have that medication far enough ahead of time that the

19  providers can review those lists and start the orders.  There

20  are times where the provider will just order everything, there

21  is times where they'll substitute something because they know

22  there is a similar medication that is easier -- has easier

23  availability for us, for example, that it's formulary and is

24  basically the same category of medication.  Then there's times

25  where the provider will decide to wait until they see the

1    patient and have a chance to review everything before

2    continuing that medication or deciding what is going to happen

3    with that issue.

4    Q.  Is it appropriate if a provider at a new facility makes a

5    clinical decision not to reorder every single thing that a

6    patient was on at their prior facility?

7         MS. AGNEW:  Objection.  The characterization as

8    appropriate.  If she wants to say it conforms to a policy, I

9    think that's okay.

10        THE COURT:  Sustained.

11   Q.  Are providers expected to order everything from a

12   medication list from a prior facility?

13   A.  No, providers are expected to use their judgment.

14   Q.  What do you mean by use their judgment?

15   A.  To look at that list, look at the information that they

16   have, make a decision about what absolutely has to continue,

17   what the timing of that is, whether they would prefer to see

18   the patient first, and those are the kind of things that they

19   would consider when they're looking at which medications to

20   order immediately.

21   Q.  And in any of those scenarios, do you have any reason to

22   believe that medications that might not be reordered at a

23   receiving facility are because the provider believes that the

24   MWAP policy exists?

25        MS. AGNEW:  Objection.

1    A.  No.

2             MS. AGNEW:  It calls for speculation as to why the

3    provider may or may not prescribe.

4             MS. KILEY:  Your Honor, I'm asking if she has any,

5    based on her personal knowledge, if she knows if there are any

6    providers making decisions based on the MWAP policy.

7             THE COURT:  Can you answer that one, please, doctor.

8    A.  No.

9             THE COURT:  Thank you.

10   Q.  Dr. Moores, are the regional medical directors involved at

11   all in the administration of pain medications to patients at

12   DOCCS?

13   A.  No.

14   Q.  How are you able to ensure that the practices of the RMD

15   involvement under MWAP are no longer taking place?

16   A.  We moved the MWAP request procedure and removed the RMDs

17   from the non-formulary request procedure.

18   Q.  Will DOCCS ever go back to the MWAP policy?

19   A.  No.

20            MS. AGNEW:  Objection.

21            THE COURT:  Basis.

22            MS. AGNEW:  Calls for speculation.  She can say what

23   she would do.  She can't say what a chief medical officer ten

24   years from now would do.

25            THE COURT:  Do you want to try that again, Ms. Kiley.

N26CallH                    Moores - Direct

1    Q.  Dr. Moores, would you ever bring back the MWAP policy?

2    A.  No.

3    Q.  Why not?

4    A.  Because the way that it's set up, it's not -- it wouldn't

5    perform what I believe the intent was.  Although, it's really

6    very typical and considered appropriate oversight to pay

7    attention to whether or not you have providers that are

8    overprescribing certain medications --

9            MS. AGNEW:  Objection.

10           THE COURT:  Sustained.  It's clearly expert testimony.

11   Q.  Dr. Moores, since you've taken over as chief medical

12   officer and based on all of your auditing that you've described

13   today, what, if anything, stands between a provider and their

14   ability to prescribe pain medication?

15   A.  Only if it's a non-formulary medication, then it has to go

16   through review by one of the five individuals, including

17   myself.

18   Q.  And if it's a formulary medication?

19   A.  They can order anything off formulary.

20           MS. KILEY:  I have nothing further.

21           THE COURT:  Thank you.

22           Do you want to start a little cross?

23           MS. AGNEW:  I can, but it's going to be extra and I'm

24   going to have to hand out everything.

25           THE COURT:  All right.  All right.

N26CallH                      Moores - Direct

1              MS. AGNEW:  I'm sorry.  Just being honest.

2              THE COURT:  2 o'clock, friends.

3              Anything else on the record, friends?

4              MS. AGNEW:  Not right now, your Honor.  Thank you.

5              THE COURT:

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION

 2                           2:05 p.m.

 3             THE COURT:  Thank you, friends.  Won't you be seated.

 4             Come on up, Dr. Moores.  You don't get off that

 5   easily.  And I'll just remind you you're still under oath.

 6             Ms. Agnew.

 7   CROSS-EXAMINATION

 8   BY MS. AGNEW:

 9   Q.  Good afternoon, Dr. Moores.  As we get started here, I want

10   to turn your attention to the exhibit that was already admitted

11   as D2, and I think I put it right back up there for you.

12   A.  Yes.

13   Q.  Do you see that?

14   A.  Yes.

15   Q.  One of the elements of 1.24A that your counsel didn't go

16   over with you shows up right under the bullet point, do you see

17   that about three quarters of the way down the page?

18   A.  Yes.

19   Q.  Can you just read to me the first sentence of the paragraph

20   following the bullet points.

21   A.  Pain management medication should only be discontinued

22   after provider has met with the patient --

23             THE COURT:  Doctor, see this gentleman in front of

24   you, he's taking down what you're saying.  So go a little more

25   slowly when you're reading, please.
```

N26CallH                       Moores - Cross

1    A.  Pain management medication should only be discontinued

2    after provider has met with the patient, discuss the issues

3    regarding the use of the medication, analyze the patient's

4    situation, and subsequently determined that it is in the best

5    interest of the patient for the medication to be discontinued.

6    Q.  The next sentence, can we agree, says the discussion with

7    the patient and the reason for discontinuation of the pain

8    medication will be recorded in the AHR; correct?

9    A.  Yes.

10   Q.  Do you see a carve-out there for transfers?

11   A.  Do I see any mention of transfers?

12   Q.  Is there an exception in policy 1.24A when a patient is

13   transferred to the policy that a provider must seek down before

14   discontinuing pain medications?

15   A.  I don't see any reference to doing things differently with

16   a transfer.

17   Q.  Let's start to go over your testimony that you gave

18   earlier.  You talked about a chronic pain assessment, correct,

19   as part of 1.24A?

20   A.  I may have discussed about what is in the last two

21   sentences.

22   Q.  And does that say that there should be a chronic pain

23   assessment?

24   A.  It says that patients with pain management designation code

25   338 will be seen at least every 90 days by a PCP, and code 338

N26CallH                         Moores - Cross

1    above is designated for pain management.

2    Q.  And then I believe earlier you discussed the document

3    that's marked as D3; correct?

4    A.  Yes.

5    Q.  And can you look at the second page of D3.

6    A.  Yes.

7    Q.  That's a memorandum from you; correct?

8    A.  Correct.

9    Q.  And it's dated October 31st of 2022; correct?

10   A.  Yes.

11   Q.  And you sent it to the deputy superintendents for

12   administration and health, the facility health services

13   directors, and nurse administrators; correct?

14   A.  Yes.

15   Q.  Did you send it to facility providers?

16   A.  Not directly.

17   Q.  What do you mean when you say not directly?

18   A.  When memos and announcements come to an FHSD, they are

19   supposed to get it to all of their staff.

20   Q.  When you say they're supposed to get it to all of their

21   staff, how do you, as the chief medical officer of DOCCS,

22   ensure that each member of a facility's medical staff reads one

23   of your memos or policies?

24   A.  I don't have a way to ensure that.

25   Q.  So when you sent out this memorandum, I think you testified

N26CallH                        Moores - Cross

1   you did it via email; is that correct?

2   A.  Correct.

3   Q.  Did you have anyone call each facility or did you do it

4   yourself and ensure that this memorandum was, in fact,

5   distributed throughout the medical staff?

6   A.  Nobody called the facilities about this memo.

7   Q.  But isn't it true that at the facility level, there is a

8   verification form that providers can sign when they go over a

9   policy, and they all sign it and they get a little credit for

10  it?

11  A.  I assume you're thinking of the RTF, which is a record for

12  training form, and that is used when there's trainings.

13  Q.  Isn't it true that in DOCCS medical, there are trainings on

14  policies?

15  A.  Sometimes, yes.

16  Q.  So isn't it true that when you distributed this memo, you

17  could have also said let's have an RTF, and you could have had

18  every member of the medical staff at a facility verify that

19  they had, in fact, read your memo?

20  A.  That would be an option.

21  Q.  And you didn't do that; correct?

22  A.  Correct.

23  Q.  And now let's look at the content of this memo at the last

24  part, at the bullet point, you see at least annually, patients

25  must receive an individualized assessment to evaluate their

1   general treatment plan for that chronic pain syndrome, an

2   individualized assessment must include; is that correct?

3   A.  That's correct.

4   Q.  Isn't it true this memo was intended to offer

5   interpretation to the facility providers on the ground?

6   A.  It was intended to give them detail of what is reasonable

7   to expect for an annual assessment.

8   Q.  And when you submitted a declaration to this court with the

9   opposition papers, isn't it true you also delineated what you

10  expected in an individualized assessment?

11  A.  I would have to know which part you're talking about and

12  look at it.

13  Q.  Sure.  So I've pre-marked your declaration up there, it

14  says P32.

15          MS. AGNEW:  Your Honor, I'm no the going to move it

16  into the record because it's already there, it's docket No.

17  489.

18          THE COURT:  Yes, ma'am.

19  Q.  Dr. Moores, if I could direct your attention to paragraph

20  21 on page 5, and just take your time finding that.

21  A.  Yes.

22  Q.  Have you found it?

23  A.  Yes.

24  Q.  Great.  So in paragraph 21, isn't it true you defined what

25  an annualized individual assessment should be for the Court?

N26CallH                    Moores - Cross

1   A.   I did define details of what an annual individualized

2   assessment should include.

3   Q.   And when did you offer training on what an annual

4   individualized assessment should include to your facility

5   providers on the ground?

6   A.   I have not offered that training.

7   Q.   I want to talk to you for a moment and offer some

8   clarification on non-formulary drugs.  I think you testified

9   earlier that non-formulary drugs are those that are not kept in

10  stock in the facilities or in the pharmacies; correct?

11  A.   That's not correct.

12  Q.   Could you please tell me the difference again?

13  A.   Non-formulary medications are those that are not on

14  formulary, but stock medications are medications that certain

15  facilities can keep in stock.  There are also other facilities

16  that have pharmacies and then they can have additional items

17  that are kept on the shelf there.  So, all stock meds and,

18  also, additional medications are on formulary.  Non-formulary

19  is if it's not listed in our formulary or our memos that have

20  updated the last formulary, and those would be non-formulary

21  medications.

22          THE COURT:  I'm sorry.  I'm confused.  Formulary,

23  non-formulary, just means on the list, off the list; right?

24          THE WITNESS:  Correct.

25          THE COURT:  And stock medications can vary from

N26CallH                    Moores - Cross

```
 1   facility to facility, that is what they keep in stock?

 2           THE WITNESS:  Correct.

 3           THE COURT:  Is that right?

 4           THE WITNESS:  Correct.

 5           THE COURT:  But all of them will be formulary?

 6           THE WITNESS:  Correct.

 7           THE COURT:  Thank you.

 8   Q.  So just to kind of clarify the distinction a little bit

 9   more, it could be true that there are non-formulary medications

10   stocked; correct?

11   A.  No.

12   Q.  Forgive me.

13           THE COURT:  Let me try it differently.

14           A non-formulary medication could be in the facility if

15   it was ordered specially for someone, but it would not be

16   stocked in the ordinary course?

17           THE WITNESS:  Correct.

18   Q.  But isn't it true, Dr. Moores, that Lyrica, for instance,

19   is a non-formulary drug?

20   A.  I would have to reference my formulary to see which of the

21   pregabalin and which of the gabapentinoids are on our

22   formulary, which dosings, and I was under the impression that

23   Lyrica was on our formulary, or at least one form.

24   Q.  Are controlled substances on the formulary?

25   A.  There are some.
```

1   Q.  Isn't it true that Lyrica is a controlled substance?

2   A.  Lyrica is not considered a controlled substance in our

3   setting.

4   Q.  What's the distinction between your setting and the FDA?

5   A.  Well, it's not a federal controlled substance.  It is

6   controlled in some states.  Wait.  It may be on one of the

7   schedules.

8   Q.  You may be confusing Lyrica and gab pen tin.

9               THE COURT:  Ladies, you can't talk over each other.

10  The court reporter is able to take you both, but it is hard.

11  Q.  You testified earlier that all medications have risks;

12  correct?

13  A.  That's reasonable.

14  Q.  And you talked about when you, I think, are doing a kind of

15  workup about the risk benefit analysis of a medication, though

16  you didn't use that term, that you might consider whether or

17  not the patient has an active addiction; is that correct?

18  A.  Yes.

19  Q.  And what do you, as a provider, consider to be an active

20  addiction?

21  A.  Based on the criteria in the DSM.

22  Q.  And do you know that criteria sitting here today?

23  A.  It's long.

24  Q.  Is there some kind of temporal range for active addiction,

25  like how long the user last used the drug?

N26CallH                    Moores - Cross

1   A.   In the DSM, they do make that -- it's one of the criteria

2   that they do consider.  However, there's also situations where

3   we'll get the diagnosis from OMH, and also to consider that

4   just because somebody has not had access to a drug for a while

5   doesn't mean that they don't have a substance use disorder,

6   they may not have been active recently.

7   Q.   In your knowledge as chief medical officer of DOCCS, is

8   there a way to test patients for whether or not they've used

9   the substance very recently?

10  A.   It depends on the substance, but for most opioids, yes.

11  Q.   Isn't it true you could also test for gabapentinoids?  Or

12  let's say gabapentin in particular.

13  A.   Yes.

14  Q.   Do you know whether or not, since you've been the chief

15  medical officer, you've provided any training to your facility

16  providers on how to calibrate whether or not a patient has an

17  active addiction?

18  A.   I have only made sure that they had access to the DSM-5

19  criteria.  That has been it.  They also can access -- they can

20  consult with OMH professionals and Oasis professionals.

21  Q.   That wasn't my question, though.  I'm asking, since you've

22  been the chief medical officer, have you arranged for there to

23  be training of facility providers of how to make an analysis of

24  whether or not a patient has active addiction?

25  A.   No.

N26CallH                        Moores – Cross

Q.  Tell me this, in your role as the chief medical officer of
DOCCS, have you made any efforts to pull data on diversion of
medications?

A.  No.

Q.  In your role as the chief medical officer of DOCCS, have
you made any efforts to call data on active abuse among the
patients within DOCCS?

A.  No.

Q.  You also talked, I think, for a little bit about the MAT
program, and that's M-A-T?

A.  Yes.

Q.  Are there currently backlogs of getting patients into the
MAT program?

A.  We did have a backlog for a little bit because of an issue
with supplies of buprenorphine, but we're catching up on that
now.  We've added other pharmacy sources for getting the
medication and have added sublocade, also, as another option.

Q.  You just testified that you're catching up; correct?

A.  Correct.

Q.  Are you caught up or is there still currently a backlog?

A.  I believe that there will be a backlog for a while, and the
reason being that we just started the process, and initially,
we only had a certain number who were asking for it.  We
continue every single week to get more requests to join the
program.

N26CallH                          Moores - Cross

Q.  I think you testified earlier that the MAT program is an

option for some providers who want to treat chronic pain in

their patients; correct?

A.  Correct.

Q.  Are you aware of instances where instead of immediately

treating the patient, the provider is trying to get the patient

into the MAT program, which has a backlog?

A.  If a provider has already seen the patient and assessed

them, they can start them.  The only backlog has to do with if

somebody put in their request through sick call and then they

get put into the referral system to be added to the assessment

clinics, but if the provider's already assessed them and

realizes what they need to have or what they're going to

recommend, they can start the medication.

Q.  So if I understand your testimony, the backlog is with the

assessments; correct?

A.  Correct.

Q.  How are you tackling the backlog in assessments?

A.  I have a staff in central office who have been working with

each of the facilities to look at the backlogs and figure out

what might be getting in the way.  We've had a couple of

providers who have seen patients for other facilities to come

in to get the assessments done.

Q.  So it sounds to me like you're resorting staff; would that

be correct?

N26CallH                        Moores - Cross

1   A.  I don't know what you mean by resorting.

2   Q.  I apologize.  Reassigning staff.

3   A.  They're not reassigned.  They're just temporarily going to

4   get the assessment done for a facility and making the initial

5   treatment plan.

6   Q.  Are you familiar with the process for assessing a patient

7   for participation in the MAT program?

8   A.  Yes.

9   Q.  And can you describe that process for the Court.

10  A.  They meet with a provider who then goes through at least a

11  form, has them answer the main pieces of the DSM-5.  They can

12  also choose to ask other questions during the interview process

13  and they can also choose to request medical records from prior

14  places where they've been treated.  They can also request to

15  discuss with OMH, if OMH has been involved with a patient, and

16  to check with guidance to see what kind of history they have

17  and understanding of evidence that a substance use disorder is

18  there.

19  Q.  So it sounds like a pretty comprehensive process for

20  getting a patient fully assessed for participation in the MAT

21  program; correct?

22  A.  That is the goal.

23  Q.  Is there a reason that you couldn't adopt a very similar

24  process to reassess the patients who've been injured by the

25  MWAP policy who are still not getting treated?

N26CallH                      Moores - Cross

1           MR. NOLAN:  Objection.  Calls for speculation.

2           THE COURT:  Are you able to answer that question,

3  ma'am?

4  A.  I would need you to clarify what you mean by those who were

5  injured by the MWAP policy.

6  Q.  Earlier you testified that there were patients who lost

7  their medications that might have been optimal, I think was the

8  word you used, under the MWAP policy; correct?

9  A.  Correct.

10 Q.  What efforts have you taken to identify those patients?

11 A.  I have not worked to identify the patients that, several

12 years ago, had a denial through the MWAP request program.

13 Q.  Could you identify those patients if you wanted to?

14 A.  I believe that we can pull that data out of central

15 pharmacy.

16 Q.  And can you just explain for the record why you haven't

17 done that, to identify the patients whose medications were

18 discontinued under MWAP?

19 A.  Because the patients continued to have access to our care

20 and are continuing to be evaluated and treated by providers.

21 If there was a medication that was denied several years ago by

22 the same provider -- when they were seen by the same provider

23 or different provider, that doesn't necessarily mean that that

24 specific medication is appropriate right now.  The fact that

25 they didn't get a medication at some point in the past doesn't

N26CallH                         Moores - Cross

1    mean that there's something that is automatically being left

2    out of their evaluation treatment process by their providers

3    now.

4    Q.  So sitting here today under oath, do you think that there

5    are any patients whose medications were discontinued under MWAP

6    who are not getting effective treatment for their chronic pain

7    today?

8              MR. NOLAN:  Objection.  She's asking what she thinks

9    without any basis.

10             THE COURT:  Do you think that there are any patients.

11             MR. NOLAN:  She's just asking for her belief, your

12   Honor, without any questions about facts.

13             THE COURT:  Why don't you rephrase the question.

14             MS. AGNEW:  Sure.

15   Q.  Let's talk about a period of time, Dr. Moores, when you

16   were operating the reassessments for this litigation.  Do you

17   recall that?

18   A.  Yes.

19   Q.  And do you recall your participation in that process?

20   A.  Yes.

21   Q.  Can you explain to the Court how you participated in having

22   patients reassessed?

23   A.  Dr. Morley asked for my assistance with this.  He told me

24   that he was, as part of the litigation process, needed to

25   arrange for patients to have a reassessment based on a list of

1   patients and that there was discussion about what that would

2   be.  I had come up with a form to make sure we at least had

3   some minimal pieces of information that would come back.  He

4   asked me to contact all the facilities and the primary

5   providers for those patients, ask them to do the reassessment.

6   When the forms came back, I forwarded them to Dr. Morley and

7   counsel's office.  And if somebody was late on the form, I

8   would contact them and have them come back.  I also let them

9   know that if they wanted -- because the MWAP policy was still

10  in place, if they wanted to prescribe an MWAP medication at

11  that time, that the review and approval would come from me

12  rather than the assigned RMD so that they didn't have to worry

13  that there was going to be a denial.

14  Q.  And that form that you created for the providers, was that

15  called the chronic pain assessment form?

16  A.  I do not know.

17  Q.  Can we agree it was about a two-page form with question

18  prompts for the providers?

19  A.  Yes.

20  Q.  And isn't it true those question prompts asked, for

21  instance, was there an effective medication that was

22  discontinued?

23  A.  I would have to look at it to be sure.

24          MR. NOLAN:  Objection.  If she wants to produce the

25  form.  I don't want my client to speculate on what the form

1   might say.

2               MS. AGNEW:  She drafted the form, your Honor.  She can

3   tell me if she doesn't remember.

4               MR. NOLAN:  That's not the best evidence.

5               THE COURT:  I think the answer was recorded as I would

6   have to look at it to be sure.

7   Q.  Could you pick up, and it's right on your left, and I

8   apologize, Dr. Moores, there's going to be a document in the

9   lower right-hand corner that says P44.  I've tried to put these

10  in order so when we're finished, you can set them aside.  Does

11  that make sense to you?

12  A.  Say that again, please.

13  Q.  I tried to put them in order so when we're finished with

14  it, you can set them aside.  Does that make sense?

15  A.  Thank you.

16  Q.  Looking at P44, do you recognize this document?

17              MS. AGNEW:  Let the record reflect, this is a

18  three-page email that bears Bates numbers OAGMWAP-54250 to

19  54253.

20  A.  I recognize that as an email, and I assume that that was

21  the attachment that was with it.

22  Q.  The original email at the bottom is from you; correct?

23  A.  Correct.

24  Q.  Do you have any reason to believe, sitting here today, that

25  you did not send that email?

N26CallH                    Moores - Cross

1   A.  No, I believe that it's my email.

2   Q.  Do you think that the attachment, which is a list of

3   patients, is an accurate depiction of the list that you

4   attached?

5   A.  I really can't say, but I don't see why it wouldn't be.

6   Q.  Since you've become the chief medical officer, have you

7   ensured that each of the patients on this list is now being

8   effectively treated for the chronic pain?

9   A.  No.

10  Q.  When you did these reassessments, and you just described

11  the process for the Court and I appreciate that, you described

12  collecting the reassessment forms back from the providers;

13  correct?

14  A.  Correct.

15  Q.  Did any of those providers, in fact, find that the patient

16  should be re-prescribed an MWAP medication?

17        MR. NOLAN:  Objection.  She's asking her to speak to

18  what somebody else did.

19        MS. AGNEW:  I'm asking --

20        MR. NOLAN:  You need to rephrase the question.

21        THE COURT:  I'm sorry, sir.

22        MR. NOLAN:  She asked what other providers found, not

23  what Dr. Moores found.  You can have the question read back.

24        THE COURT:  I thought the witness testified that the

25  reassessment forms were returned to her?

1           MR. NOLAN:  Correct.  And she asked what other

2    patients found --

3           MS. AGNEW:  No, I asked what she saw on the forms.

4           THE COURT:  Is there a reason she can't answer that

5    question?

6           MR. NOLAN:  Again, if she's asking what she saw on the

7    forms about providing the forms, how can she remember?  Again,

8    we're asking questions about documents, your Honor.

9           THE COURT:  The question was did any of those

10   providers, in fact, find that the patient should be

11   re-prescribed an MWAP medication.

12          Are you able to answer that, ma'am?

13   A.  I don't know if it would apply as re-prescribed, but there

14   were some forms that came back where, under the question, would

15   you recommend an MWAP medication now that they said yes, put

16   something down.

17   Q.  As part of that reassessment process, you also testified

18   that you told providers they could send the MWAP request form

19   to you; correct?

20   A.  Correct.

21   Q.  And did you approve any MWAPs after this reassessment took

22   place?

23   A.  I can't be 100 percent sure.  I think I did.

24   Q.  Let's now turn to P45.

25          MS. AGNEW:  For the record, this bears the Bates

1   number OAGMWAP 54790 to 54792.

2   Q.  I'll give you a moment to look at that.  You good?

3   A.  Yes.

4   Q.  So looking at P45, do you recall getting this email from

5   Dr. John Morley?

6   A.  I don't recall this email.

7   Q.  Do you have any reason to believe, sitting here today, that

8   this, in fact, didn't land in your inbox from Dr. Morley?

9   A.  I probably got it.

10  Q.  Isn't it true, attached to the email from Dr. Morley, is a

11  list of patients who at least my office suggests were injured

12  by losing MWAP medications?

13  A.  Can you repeat that question.

14  Q.  I can try.  Isn't it true that attached to this email are a

15  list of patients who at least my office believes were injured

16  when they lost their MWAP medications?

17  A.  I don't really know the origin of this list.

18  Q.  But Dr. Morley's email says these are some of the MWAP

19  inmates currently suing us, plus two more; correct?

20  A.  That's what the line says there.

21  Q.  And wasn't this the list, in fact, you worked off when you

22  were doing those reassessments?

23  A.  Most of these names -- most of them look familiar to me.

24  So that's -- that's likely.

25  Q.  So since you've become the chief medical officer, have you

N26CallH                    Moores - Cross

1   taken that list and ensured that every patient on it is

2   receiving effective chronic pain medication?

3   A.  No.

4   Q.  I think you testified earlier that MWAP did not allow the

5   providers to give optimal care, and I'm paraphrasing, so

6   forgive me, but is that the gist of your testimony?

7   A.  The MWAP policy prevented providers sometimes to use their

8   first-choice medication for a patient.

9   Q.  And I think you said there were situations in which they

10  had to go to alternative therapies; correct?

11  A.  Correct.

12  Q.  And you also said, potentially, the patients suffered;

13  correct?

14  A.  That is potentially what happened.

15  Q.  Have you made any efforts to identify those patients who

16  potentially suffered?

17  A.  No.

18  Q.  And I think when you testified about the new policy, 1.24A,

19  I think that was defendant's 2, you didn't have a role in

20  actually scribing the policy, but you accepted the info and the

21  content from Dr. Morley; correct?

22  A.  Correct.

23  Q.  Did you then discuss the formulation of 1.24A with

24  Dr. Morley, beyond him just handing you the content?

25  A.  I asked him about the origin of what the intent would be

N26CallH                         Moores - Cross

1    for the various details.  From what I recall, he said it was

2    pretty much based on the conversations that were occurring due

3    to the case.

4    Q.  And so, sitting here today, would you say that the creation

5    of 1.24A was driven by this litigation?

6    A.  That was my understanding at the time.

7    Q.  What about the rescission of the MWAP policy itself, was

8    that driven by this litigation?

9    A.  That is also my understanding.

10   Q.  And what about the reassessments that you were in charge

11   of, was that driven by this litigation?

12   A.  That was my understanding, also.

13   Q.  When 1.24A came out, did providers have a problem

14   understanding what you wanted them to do under the new policy?

15   A.  Can you clarify whether you're talking about based on what

16   I saw them do or what they were asking?

17            MS. AGNEW:  I'm going to strike that, and I do

18   apologize.

19   Q.  I want to go back to the reassessments quickly before I

20   move on.  When you did the reassessments, did you notice any

21   reassessments that were what you might consider exemplary?

22   A.  Yes, there were some that were done very, very well.

23   Q.  I want you to look at D52, and I know you have to shuffle

24   around and I'm sorry.

25            MS. AGNEW:  For the record, your Honor, I am not going

1  to use P46.

2          THE COURT:  Is it P52?

3          MS. AGNEW:  P52 is what I want her to look at.  I'm

4  not going to use P46 because my office inadvertently failed to

5  redact HIPAA information, so we're going to set that aside.

6  Q.  Dr. Moores, you can let me know when you're ready so I

7  don't stare at you oddly.

8  A.  I'm ready.

9  Q.  Do you recognize the document I've marked as P52?

10 A.  Yes.

11 Q.  And can you tell us what it is?

12 A.  It is an email that I received from Great Meadow, and it

13 had been cc'd at the top, that it goes to Dr. Morley.  And it

14 included reassessment forms done by Dr. Karandy for two

15 patients.

16 Q.  So I don't know why, but the state defendants' emails cut

17 off the "from" line on many of these.  My belief is this is

18 from you, the top email.  Do you have any reason, sitting here

19 today, to believe that was not from you to Dr. Morley?

20 A.  I'm pretty sure it was because I remember wanting to show

21 him Dr. Karandy's work.

22 Q.  Isn't it true you wrote to Dr. Morley, perfect examples of

23 reassessments by Dave Karandy; correct?

24 A.  That probably is my statement.

25 Q.  Did you then discuss with Dr. Morley having the other

N26CallH                    Moores - Cross

1    providers go back and do their reassessments so that they were

2    as comprehensive as Dr. Karandy's?

3    A.   I did not.

4    Q.   Do you know if anyone made any efforts to have the

5    reassessments done with the comprehension and care that was

6    done by David Karandy?

7    A.   Say that again.

8    Q.   Did anyone else make an effort to have the reassessments

9    redone with the comprehension and care that was taken by David

10   Karandy?

11   A.   No.

12   Q.   But you did discuss with Dr. Morley that these were perfect

13   examples; correct?

14   A.   Yes.

15   Q.   Can you just tell us, sitting here today, why did you think

16   these examples were perfect?

17   A.   There were several things that I noticed with this.  One is

18   that it includes significant detail that is appropriate for

19   figuring out diagnosis and options, and that there was evidence

20   that figuring out what would be best for the patient was utmost

21   in this provider's mind.

22   Q.   Do you recall in that reassessment process, that you sent

23   some of these patients to see Dr. Charles Argoff?

24   A.   Yes.

25   Q.   Can you please tell the Court who Dr. Charles Argoff is?

N26CallH                    Moores - Cross

1   A.  He's a pain specialist out of Albany Medical Center.

2   Q.  Do you have any knowledge, sitting here today, what

3   Dr. Argoff's specialty is in?

4   A.  His primary specialty, I'm not sure.  I just know he does

5   pain specialty care, also.

6   Q.  Is he highly regarded by DOCCS, in your experience?

7   A.  Yes.

8   Q.  And do you have any recollection of why you sent these

9   particular patients to Dr. Argoff as opposed to whomever might

10  have been the normal pain specialist in the hub?

11  A.  There were several people that we send to pain specialists,

12  and Dr. Argoff was added on because we didn't have enough pain

13  specialists and the waiting for the regular pain specialist was

14  too long for appointments.  Dr. Morley knew Dr. Argoff and

15  arranged to -- coordinated a new clinic that would be out of

16  the Coxsackie -- our new hub clinics in order to get more

17  access to pain specialists.

18  Q.  Do you recall inputting the specialty referrals for

19  Dr. Argoff?

20  A.  I put in special referrals for several.

21  Q.  My question was, do you recall putting in the specialty

22  referrals for Dr. Argoff?

23  A.  When I put specialty referrals in, I don't put who the

24  provider is going to be.

25  Q.  Very good.  I didn't understand the distinction.

1          As part of the reassessment process that you were in

2     charge of, did you ever ensure that the recommendations made by

3     Dr. Argoff were followed by the providers on the ground?

4     A.  I know that I got some reports, I didn't follow all of

5     them.

6     Q.  Do you know, sitting here today, why you didn't follow all

7     of them?

8     A.  Because I was not instructed to do so by my supervisor.

9     Q.  Do you know whether or not anyone else from central office

10    or DOCCS medical actually followed up to see whether these

11    patients, who went out to see pain management, had those

12    recommendations adopted by the providers in the facilities?

13    A.  Not that I know of.

14    Q.  Would that be important to see whether or not these

15    patients actually got what the pain specialist recommended?

16    A.  My experience is that most of the providers do implement

17    what pain specialists recommend.

18    Q.  I want to go back over your testimony about medical problem

19    lists, and to do so, I'm going to ask you to find P4, which is

20    a bound subset of the records of Mali Wilkerson.

21          MS. AGNEW:  Your Honor, what we're going to do is if

22    we talk about specific pages, we're going to make an explicit

23    exhibit, but we wanted to have everything available here for

24    all the parties, if that makes sense.

25          THE COURT:  Yes, ma'am.

N26CallH                    Moores - Cross

1    Q.  So once you have Mr. Wilkerson's documents, I'm going to

2    direct your attention to the page marked 160.  It says Mali

3    Wilkerson, 160.  That's the big numbers in the bottom there.

4    A.  I found it.

5    Q.  And forgive me, Dr. Moores, I really want the Court to

6    understand the medical problem list.  So, can you tell me,

7    looking at Mali Wilkerson 160 and 161, generally speaking, what

8    is that document?

9    A.  This is the problems that is in our mainframe FHS1 for this

10   patient, Mali Wilkerson.

11   Q.  Do most, if not all of the patients being treated by DOCCS

12   have a medical problem list?

13   A.  Yes.

14   Q.  And I think you provided some testimony earlier, I just

15   want to fill in the gaps for everyone.

16            At some point in time, did you work for Elmira's

17   reception area?

18   A.  Yes.

19   Q.  Did you, in fact, code medical problems for patients who

20   came in through reception?

21   A.  I was involved with the coding process.

22   Q.  Can you explain the coding process to the Court.

23   A.  So there are certain things that need to be coded

24   immediately with reception and key areas such as their status

25   for certain infectious disease situations because we're

1    required to do that before they can be placed into a facility.

2    Also, any significant medical problems get coded there, and

3    vaccines, and certain testing gets coded on a regular basis.

4    Q.  If you look at Mr. Wilkerson's, he's got a code, for

5    instance, there V801, wheelchair required, independent ADL;

6    correct?

7    A.  Correct.

8    Q.  And would you code things like that in order for movement

9    and placement, to know the best facilities for a patient?

10   A.  Correct.  There are certain items that have been added into

11   the problems coding systems so that when class and movement is

12   considering a move for an individual, they take those into

13   consideration, and wheelchair is one of them.

14   Q.  So when you were working in Elmira reception, the accuracy

15   of the codes, would you describe it as important to movement

16   and classification in getting a patient to where he needs to be

17   housed?

18   A.  Yes.

19   Q.  And I'm also going to note that you also at the top of the

20   medical problem list, you put a medical classification number;

21   correct?

22   A.  There is a medical classification number towards the top.

23   Q.  Right.  And can you tell us, just based on this document,

24   what Mr. Wilkerson's was when he came into DOCCS' custody?

25   A.  1.

N26CallH                        Moores - Cross

1   Q.  What does that mean?

2   A.  Let me just clarify.  It's a medical level 1 that can be

3   changed over time.  So I can't be sure if it was changed at any

4   point for this patient.

5   Q.  Okay.  But the medical level of 1, what does that mean?

6   A.  There are three medical levels.  1 is the highest, meaning

7   they require the highest level of access to nursing care

8   primarily.  So if somebody has a situation, we want to make

9   sure there is 24-hour nursing available, then they would be a

10  level 1.

11  Q.  Do the medical levels also try to indicate where a patient

12  should be housed?

13  A.  They do, because we have facilities where the higher

14  levels, like a level 1, has to be in a facility that has

15  24-hour nursing.

16  Q.  When you were a provider at Elmira, generally speaking,

17  where was the medical problem list kept in a patient's chart?

18  A.  They would print it out periodically and keep it in front

19  of their chart.

20  Q.  Do you have any notion of why it was kept in the front of

21  the chart?

22  A.  For easy reference.

23  Q.  So could we agree that a medical problem list is a

24  reference tool for the providers to dictate the care for a

25  patient in DOCCS' custody?

N26CallH                    Moores - Cross

1    A.  I don't know if it would dictate the care, but it's

2    important to know what's on the problem list in order to take

3    care of the patient.

4    Q.  So I think your counsel was eliciting some testimony from

5    you about the code 338; correct?

6    A.  Correct.

7    Q.  And how does code 338 fold into this case, so the Court's

8    clear?

9    A.  338 by itself was introduced with the new policy 1.24A.

10   With it being on the problem list, it makes it easy for us to

11   run reports to make sure that the frequency of appointments for

12   the pain management occur.

13   Q.  And 338, if I'm a provider, it's also going to tell me in

14   the front of the chart that this patient has to be followed for

15   chronic pain management; correct?

16   A.  Correct.

17   Q.  So it's an indicator to the provider of the medical needs

18   of the patient; correct?

19   A.  It's not a typical term that we would use for somebody

20   following.  Generally, we choose the diagnoses that need to be

21   followed that might result with the chronic pain.

22   Q.  So you described doing an audit; correct?

23       I apologize.  You didn't do the audit.  You oversaw a

24   338 audit; correct?

25   A.  We have 338 audits that have started and continue.

N26CallH                    Moores - Cross

1    Q.  And you did an audit, though, as you described in your

2    declaration of 38 patients, didn't you?

3    A.  I did look for 338 on that list of patients.

4    Q.  As a preliminary matter, where did the names of the 38

5    patients you audited come from?

6    A.  From my counsel.

7    Q.  Isn't it true you had the medical records of those 38

8    patients printed out and sent to you as PDFs from their

9    facilities; correct?

10   A.  They were scanned to me, yes.

11   Q.  And included in the patients' medical records, hopefully,

12   since February of 2021, would be a copy of their medical

13   problem list; correct?

14   A.  Correct.

15   Q.  And were you then looking at those to see whether or not

16   338 had been added?

17   A.  Yes.

18   Q.  And had 338 been added to all of those 38 patients?

19   A.  No.

20   Q.  And then what steps did you take to add 338, which I

21   believe is what you've testified to, to those 38 patients?

22   A.  So either I attempted to put the code in or I had one of

23   the nursing personnel in central office attempt to put the code

24   in.

25   Q.  And why was it important to put the code in on those 38

N26CallH                    Moores - Cross

1    patients?

2    A.   To be in compliance with our policy.

3    Q.   Which policy is that?

4    A.   1.24A.

5    Q.   Did you have an awareness, when you were going over that

6    list of 38 patients, that there were more than 38 patients

7    implicated in this lawsuit?

8    A.   I only have the names that I had gotten from counsel.

9    Q.   But you've got a list from me, which I think we talked

10   about a little bit ago, actually, Dr. Morley sent it to you,

11   this has way more than 38 patients on it; right?

12   A.   The list that I had when they asked to do -- to have me

13   contact for doing those reassessments in the fall of 2020 was a

14   longer list.

15   Q.   Did you take this list from the fall of 2020 and check it

16   to make sure that each patient had 338 indicated?

17   A.   No, I've not done that.

18           THE COURT:   The list you're referring to is exhibit?

19           MS. AGNEW:   P45, your Honor.   I apologize.

20           THE COURT:   Thank you.

21   Q.   So what steps did you take to ensure that each patient

22   injured by the MWAP policy has 338 added to their medical

23   problem list?

24           MR. NOLAN:   Objection.   There's no foundation for the

25   injury of the MWAP policy.

N26CallH                         Moores – Cross

1          MS. AGNEW:  Well, I asked her if she took any steps to

2     identify the patients, right, and she said no.  She didn't say

3     there are no patients.  I think we all know there are patients.

4          MR. NOLAN:  Objection.  She has not established that

5     there are patients injured by the MWAP policy.  She testified

6     that there were potentially people who had potentially adverse

7     effects, but there's been no testimony from anybody that there

8     was ever any individual patient who was a victim or injured by

9     the MWAP policy.

10         MS. AGNEW:  Your Honor, papers are already a part of

11    the record.  They're certainly listed in our papers submitted

12    to this Court for a motion for injunction delineating almost by

13    name the patients injured by the MWAP policy.

14         THE COURT:  The only question is whether the witness

15    can answer the question.

16         MR. NOLAN:  Is there a ruling on the objection, your

17    Honor?

18         THE COURT:  The witness's word was potential.  Are you

19    able to answer the question as it's phrased or do you need it

20    rephrased, ma'am?

21         THE WITNESS:  I don't understand what the definition

22    of "injured" means for this.

23    BY MS. AGNEW:

24    Q.  You're aware, Dr. Moores, that there were MWAP request

25    forms; correct?

N26CallH                     Moores - Cross

1  A.  In the past when the policy was in place, there were MWAP

2  request forms.

3  Q.  Does DOCCS still possess those MWAP request forms?

4  A.  I don't know if they have the forms.  I know that the key

5  information from them was kept by central office as far as the

6  number of -- as far as the patients, what they were asking for,

7  whether it was approved or denied.

8  Q.  Have you asked for a copy of that key information that

9  identifies patients whose medications were discontinued under

10 MWAP?

11 A.  I've not asked for the list of those that had medications

12 denied.

13 Q.  Did you ask for any list?

14 A.  Not involving MWAP.

15 Q.  So did you ever take any action with those people whose

16 information has been retained by central office whose MWAP

17 requests were denied to cross-reference and make sure that

18 those patients had 338 in their medical problem list?

19 A.  No.

20 Q.  You testified earlier about a non-formulary audit; correct?

21 A.  Are you referring to the non-formulary review I did for

22 regional medical directors?

23 Q.  I am.  Can you tell me when you conducted that

24 non-formulary audit?

25 A.  I did one audit around August of last year.

N26CallH                      Moores - Cross

1   Q.  I'm going to direct your attention to the document, it says

2   P53.

3          MS. AGNEW:  For the record, this bears Bates number

4   Moores 7355 to 7362.

5          Your Honor, I'd like the record to reflect this was

6   produced to us with HIPAA protected information, we did redact

7   it.

8          THE COURT:  Yes, ma'am.

9   Q.  Did you find --

10  A.  I did.

11  Q.  Do you recognize the document that I've marked P53?

12  A.  I do.

13  Q.  What do you recognize that to be?

14  A.  These are my personal recordings of the non-formulary

15  denials done by the RMDs in August.  Then, after that is the --

16  of my audit of denied referrals by the RMDs.

17  Q.  So is it fair to say the first one, two, three, four, five

18  pages are your typed notes, and then the last three pages are

19  handwritten notes where you actually went over the

20  non-formulary requests?

21  A.  Yes.

22  Q.  And so, can you tell me, what were your findings after you

23  did that RMD non-formulary audit in August of 2022?

24  A.  In general, I had concerns about the RMD's assessment of

25  what to deny.

N26CallH                          Moores - Cross

1   Q.  Isn't it true for defendant Mueller, you wrote, asking for

2   multiple evaluations before the med is to be given.  That is an

3   inappropriate process within the NF request procedure — I'm

4   going to skip a little — these were specialist recommended.  SM

5   does not have the credentials to review the work of a

6   rheumatologist.

7            Does "SM" refer to Susan Mueller?

8   A.  Yes.

9   Q.  And let's move down to Paula Bozer.  Does PB refer to Paula

10  Bozer?

11  A.  Yes.

12  Q.  And you say all inappropriate denials; correct?

13  A.  The 3 out of the 20 that were denied are inappropriate.

14  Q.  And you wrote, PB's comments implied she knew more about

15  the foot problems of a specific patient than the podiatrist and

16  PCP did; correct?

17  A.  Correct.

18  Q.  So what was your overall impression of the RMD's

19  performance when doing non-formulary audits?

20  A.  It was inadequate.

21  Q.  And yet, in October of 2022, you finally removed the RMDs

22  from that process; correct?

23  A.  Correct.

24  Q.  In fact, it was October 31st of 2022; correct?

25  A.  Correct.

N26CallH                      Moores - Cross

1   Q.  In fact, October 31st of 2022 was less than two weeks

2   before you signed your declaration for this Court; correct?

3   A.  I don't recall.

4   Q.  Do you want to go back to your declaration and look at the

5   date you signed it?  It's P32, and your signature is on page

6   26.

7   A.  So that was November 14th.

8   Q.  So why did you wait from August of 2022 when you knew the

9   RMDs were conducting inappropriate denials, until October 31st

10  of '22 to take them off?

11  A.  I -- there were a couple of things.  One is that I had

12  to -- I got sent to peace officer school.  I also got sent to

13  required training with the ACA, American Correctional

14  Association.  I also had to set up and make sure we were ready

15  to go with others to do the review process.

16  Q.  And I just want to frame this.  In August of 2022, you

17  found that their denied referrals were generally speaking

18  inappropriate; correct?

19  A.  That -- not the majority, just 3 out of 20 for each, each

20  of those.

21  Q.  But 3 out of 20 were denied, right, 17 were approved?

22  A.  Correct.

23  Q.  So all of their denials were inappropriate?

24  A.  Correct.

25  Q.  So at what point did you go back and review all the denied

N26CallH                    Moores - Cross

1    non-formularies from August to October 31st when you took them

2    out?

3    A.  I haven't done all of them.

4    Q.  Have you done any of them?

5    A.  I -- no, actually, I have not.  I have not.

6    Q.  Wouldn't it be important, since you know that the RMDs were

7    making inappropriate denials, to go back over all of those

8    medications that were denied to see if there were patients who

9    were waiting for stuff they need?

10   A.  That is reasonable.  It would be appropriate.

11   Q.  And I think you testified that you also did an audit of

12   specialty referrals; correct?

13   A.  The denied referrals that the RMDs had denied.

14   Q.  I'd like to direct your attention to the document I marked

15   as P54.

16        MS. AGNEW:  For the record, that bares Bates numbers

17   Moores 7363 through 7398.

18   Q.  Are you ready?

19   A.  I am ready.

20   Q.  Do you recognize this document?

21   A.  Yes.

22   Q.  What do you recognize it to be?

23   A.  This is more of the notes that I had with doing the

24   non-formulary audits -- not the non-formulary.  The denied

25   referrals audits on the RMDs.

N26CallH                    Moores - Cross

Q.  I just want to make the record really clear, what are we

talking about when we talk about these referrals?  And I want

to contextualize it.  Specialty referrals; correct?

A.  Yes.

Q.  And what does that mean?

A.  Our specialty referrals are reviewed by a vendor, Kepro,

very similarly to what health insurance companies do to decide

whether they're going to approve a specialty visit for what is

being requested.  And so, Kepro uses primarily InterQual

criteria so that it's equivalent for the most part to Medicaid

approvals.  They have some other things where they have special

instructions to do otherwise for us.  If they find that based

on what the provider wrote in the referral, it doesn't meet the

InterQual criteria, they don't do a denial because we haven't

given them the right to deny the referrals, but it's listed as

a preliminary denial.  Then it is to be reviewed by -- at least

previously, it was only the RMDs that reviewed them who would

then look and decide whether it needed to be approved or have a

final denial, and they would enter their impressions and make

the choice.

Q.  Just to be very clear, it only gets kicked from Kepro when

they give that preliminary denial; correct?

A.  Correct.

Q.  So if Kepro says everything aligns with Medicare or

Medicaid, I apologize, the patient goes to the specialist;

1    right?

2    A.   Right.

3    Q.   When it gets kicked, under the old regime, it went to an

4    RMD; correct?

5    A.   Correct.

6    Q.   Among those specialty referrals might also be referrals out

7    to pain management; correct?

8    A.   Correct.

9    Q.   And so, you did an audit here, and can you describe for the

10   Court what you did?

11   A.   I had somebody pull a certain number of denied referrals

12   for each of the RMDs so I can review what was written and

13   what -- what the referral request was for and what the RMD

14   review details were entered as to why they denied it.

15   Q.   And what did you find after you conducted this audit?

16   A.   I don't recall all the details, but I -- there's -- because

17   I don't have my summary here.  There's definitely some that

18   were concerning and to help to make me realize, at least for

19   pain specialty -- the InterQual criteria are very complex, so

20   it makes it very difficult for the providers to write the

21   correct things to have it approved.  So I had called Kepro and

22   asked them to just do automatic approvals on that and we would

23   follow over time to see if that would cause a problem.

24   Q.   When I flip through this, there is handwriting after each

25   referral.  Is that your handwriting.

N26CallH                    Moores - Cross

1   A.  It is.

2   Q.  And there are several, at least, that say inappropriate

3   denial; correct?

4   A.  Yes.

5   Q.  And so, when did you do this, this particular audit?

6   A.  This, I believe, was also in August.

7   Q.  Was there a time when you finally took the RMDs off of

8   these reviews, at least for pain specialists?

9   A.  For the pain specialists, yes, that month I did call Kepro

10  and told them that they're just to do automatic approvals on

11  all pain specialty requests.  So that would be with a pain

12  specialist or a physiatrist.

13  Q.  When you did this audit, you also found instances where

14  denials for other specialty providers implicated chronic pain;

15  correct?

16  A.  Yes, that can happen.

17  Q.  In fact, in your audit, you saw it; right?

18  A.  I don't recall this audit specifically.

19  Q.  Let's go to Moores 7397.  I'm sorry.  It's in the lower

20  right-hand corner.  I think you said earlier you made a comment

21  that your summary was in here; is that correct?

22  A.  Well, it was in the other document.

23  Q.  I'm sorry.  I did my best.

24  A.  But these have the details written on them.

25  Q.  You want to refresh your recollection and read over this

1   real quick and tell the Court what your summation was.

2   A.  My review of this referral, and then also reevaluating the

3   details of what the diagnosis and concern is for the patient

4   and looking it up and up to date to see if it was recommending

5   anything else led me to believe that the appropriate thing was

6   to allow this orthopedic referral to occur.

7   Q.  And would an orthopedic referral implicate potentially

8   chronic pain in a patient?

9   A.  It could.

10  Q.  So what steps have you taken since you conducted this audit

11  to keep the RMDs from making inappropriate decisions?

12  A.  It takes a bit to do the due process with the RMDs,

13  especially, unfortunately, with the other scheduling conflicts

14  that I had.  However, I have done it with one RMD so far and

15  have totally removed them from RMD work, and I will be doing

16  counseling sessions with the others.

17  Q.  Have you done those counseling sessions as of today?

18  A.  No.

19  Q.  Can you tell us for the record, who's the RMD you removed?

20  A.  Dr. Bozer.

21          MS. AGNEW:  Your Honor, could I take five minutes?

22          THE COURT:  Yes, ma'am.

23          (Recess)

24  BY MS. AGNEW:

25  Q.  Are you ready, Dr. Moores?

1    A.  I'm ready.

2    Q.  Thank you.  I want to talk about now the SURN audits.

3           Isn't it true the SURN audits for chronic pain started

4    November of 2022?

5    A.  I'm not absolutely sure, but that sounds correct.

6    Q.  Do you know, did you direct those audits to start taking

7    place before or after you submitted your declaration to this

8    Court?

9    A.  I don't recall it being associated with the declaration.

10   Q.  Do you think that any of the steps that you took were

11   prompted by the fact that we were going to have this hearing?

12   A.  I actually didn't know about the hearing for a while.  I

13   did know, having taken over for -- officially for chief medical

14   officer in the middle of the summer and that this -- and I had

15   found out about the injunction and that we'd be moving in a

16   direction -- that was one of the things I knew needed to be

17   done, was to look at the new policy that had been out, meaning

18   newer than the MWAP, and whether or not we're compliant in what

19   we need to do to become compliant.

20   Q.  Did you have a list somewhere of things you knew needed to

21   be done?

22   A.  Yes, actually.

23   Q.  Did you provide that list to your attorneys to give to us?

24   A.  I don't recall.

25   Q.  I'm going to turn your attention to the document I marked

N26CallH                    Moores – Cross

1    as P55.

2            MS. AGNEW:  For the record, that bears Bates numbers

3    OAGMWAP 103561 through 103564.

4            Your Honor, we have redacted this to comply with

5    HIPAA.

6            THE COURT:  Yes, ma'am.

7            MS. AGNEW:  The patient names that are unredacted are

8    ours for whom we have releases.

9    Q.  Dr. Moores, do you recognize this document?

10   A.  This is the document that the SURN unit initially created

11   to start the process for auditing compliance with 1.24A.

12   Q.  Did you have a hand in developing this document?

13   A.  They developed it based on the policy, but did bring it to

14   my attention when they had completed it.

15   Q.  Did you review it before it was kind of put in to

16   circulation, so to speak?

17   A.  I at least reviewed it around the time they started.

18   Q.  Can we agree that this is an assessment tool used by a

19   senior utility review nurse to conduct an audit of patient

20   records for compliance with policy 1.24A?

21   A.  Yes.

22   Q.  And have the SURNs who are completing these audits been

23   sending these to your office?

24   A.  When they complete a facility audit, which includes this,

25   the reports eventually get to me.

N26CallH                        Moores - Cross

1   Q.  And we requested these from you.  Did you hand those over

2   to your counsel to produce to us?

3   A.  I don't know how they got there.

4   Q.  Yes or no, did you give them to your counsel?

5   A.  I don't recall if I did or not, if I had given her copies.

6   Q.  About how many of these chronic pain management assessment

7   tools have you collected since the audit started?

8   A.  It's not many because they've just gotten started, and they

9   do it with a comprehensive facility audit.

10  Q.  I want to look at P55 itself.  There's these lists and they

11  say indicator number above the start of the list.  Do you see

12  that?

13  A.  Yes.

14  Q.  And it looks to me, and correct me if I'm wrong, that these

15  are certain elements of 1.24A that the SURN wants to see

16  reflected in the records he or she is reviewing; correct?

17  A.  Correct.

18  Q.  And so if you look at number 5, it says specialty consults

19  in the chart.  What does that mean?

20  A.  I would assume that it's a specialty consult report that

21  they could identify whether it's been filed in the chart.

22  Q.  And is that because the SURN wants to make sure that

23  specialty consult is getting, from wherever it comes in,

24  actually placement of the patient's chart so the provider can

25  see it; correct?

N26CallH                    Moores - Cross

A.  It's not so that the provider can see it.  It's so that

after the provider reviews, it needs to be filed in the chart.

Q.  To your knowledge, do most providers initial that specialty

consult once they've reviewed it?

A.  Most of them do.

Q.  And then under policy 1.24A, isn't it true that the

provider, if they're not going to follow the recommendation of

the specialist, they need to be noting that in the patient's

AHR; correct?

A.  Correct.

Q.  And there are, in fact, systemic compliance issues with

that element of 1.24A; correct?

A.  Commenting on systemic, I'm not sure to what degree.

Q.  Are there compliance issues?

A.  We definitely are not 100 percent compliant.

Q.  You reviewed, in fact, 38 patient charts; correct?

A.  Correct.

Q.  Isn't it true, there were compliance issues with that

element of 1.24A in those 38 charts?

A.  There were.

Q.  So what I need to understand is how does checking to see if

the specialty consult is in the chart, also audit whether or

not the provider has recorded why he or she is not following a

recommendation, because I don't see that here.

A.  That's correct, it's not here.

N26CallH                    Moores - Cross

1   Q.  Why isn't it here?

2   A.  Because this audit form needs to be revised.  It's a

3   missing element.

4   Q.  So as this audit form was developed and disseminated and

5   used to date, it is not going to catch when a provider does not

6   follow the recommendation of a specialty provider and make the

7   proper notations in accordance with 1.24A; correct?

8   A.  We would assume it may not if the SURN is only looking to

9   see whether the consult is in the chart.

10  Q.  To your knowledge, was there SURN training conducted on how

11  to review for compliance with 1.24A?

12  A.  The supervisor of the SURN unit had done training with them

13  about what was expected in the audit, but I don't know the

14  details of the training.

15  Q.  I want to talk last about these medication discontinuations

16  at transfer.  Have you done any training of providers to ensure

17  that they sit down with a patient after the patient is

18  transferred before they discontinue their medications?

19  A.  No.

20          MS. AGNEW:  I have no further questions, your Honor.

21          THE COURT:  Thank you.

22          Redirect, counsel.

23          MS. KILEY:  Your Honor, may I have five minutes,

24  please.

25          THE COURT:  Yes, ma'am.

```
 1            MS. KILEY:  Thank you.

 2            (Recess)

 3            THE COURT:  Did you want to admit some documents?

 4            MS. AGNEW:  Yes, your Honor.  Your Honor, if I may,

 5    due to my own clerical errors that are never ending, I'd like

 6    to move into evidence the documents that we just used during

 7    Dr. Moores' cross.  That would be P32, P44, P45, P52, P4, but

 8    only pages Mali Wilkerson 160 to 161, P53, P54, and P55.

 9            THE COURT:  Any objection?

10            MR. NOLAN:  No objection.

11            THE COURT:  Received.

12            (Plaintiff's Exhibits P32, P44, P45, P52, P4, P53,

13    P54, P55 received in evidence)

14            THE COURT:  Yes, ma'am, Ms. Kiley.

15            MS. KILEY:  Thank you, your Honor.

16    REDIRECT EXAMINATION

17    BY MS. KILEY:

18    Q.  Dr. Moores, you testified quite a bit on your cross about

19    the annual individualized assessments.  What, if anything, does

20    the presence of an individualized assessment have to do with

21    the MWAP policy?

22    A.  Nothing.

23    Q.  Under 1.24A, if a patient previously discontinued -- excuse

24    me.  If a patient previously had a medication discontinued

25    under MWAP, under 1.24A, can their provider now prescribe that
```

N26CallH                     Moores - Redirect

1    medication?

2    A.   It's not related.   1.24A has no limitations on prescribing.

3    Q.   And to go along with that, does anything in 1.24A dictate

4    choice of care?

5    A.   No.

6    Q.   You talked earlier about the presence of the 338 code and

7    how it's --

8             MS. KILEY:   Withdrawn.

9    Q.   The presence of a 338 code, can a patient coded 338 receive

10   a medication that was previously discontinued under MWAP?

11   A.   Yes.

12   Q.   Is there any policy in place that would preclude that?

13   A.   No.

14   Q.   Does the existence of a 338 code on a medical problems list

15   have anything to do with the MWAP policy?

16   A.   No.

17   Q.   I want to go back to your testimony regarding the review of

18   the non-formulary requests.

19            During the course of your review, when a non-formulary

20   request is denied, does that mean a patient is being denied

21   adequate care?

22   A.   No.

23   Q.   Why is that?

24   A.   If the non-formulary request is denied, at least as things

25   are now, we reach out to that provider to talk about options.

N26CallH                        Moores - Redirect

1    Generally, the only time it's denied is if it sounds like it

2    might not be the optimal care for that patient.

3    Q.  I'd like to talk about Plaintiff's Exhibit 45, if you

4    wouldn't mind just pulling that up for a second.

5    A.  Okay.  I have it.

6    Q.  Dr. Moores, what is the date on plaintiff's 45?

7    A.  September 28th, 2020.

8    Q.  Can you please repeat for the Court what it says on that

9    first line.

10   A.  These are some of the MWAP inmates currently suing us, plus

11   two more.

12   Q.  Receiving this email with this attachment, do you know

13   anything about these patients, other than the fact that they

14   were suing DOCCS?

15   A.  No.

16   Q.  Just because an inmate might start a litigation, does that

17   mean that they're not getting adequate care?

18   A.  No.

19   Q.  Why is that?

20   A.  Because until you investigate, you can't tell if there's --

21   what the issues are and if there's anything that's a problem.

22   Q.  And so was there anything to suggest at the time that they

23   weren't getting treated for their pain?

24   A.  Nothing that I knew of.

25   Q.  Could the patients on this list in this email in this

1   attachment, can they currently receive a medication that was

2   previously denied under MWAP?

3   A.   Yes.

4   Q.   What would be the circumstances?

5   A.   If they're being evaluated by a current primary care

6   provider and the primary care provider believes that what was

7   previously on the MWAP list is an appropriate medication right

8   now, they can prescribe it.

9   Q.   Is there anything in place to prohibit their primary care

10  provider from getting the pain treatment that they need?

11  A.   They can prescribe anything.

12  Q.   Dr. Moores, have you heard anything today from Ms. Agnew to

13  suggest any patient is being denied adequate care today?

14  A.   No.

15          MS. KILEY:  I have no further questions.

16          THE COURT:  Thank you.  Recross.

17          MS. AGNEW:  Your Honor, we're done.  Thank you very

18  much.

19          THE COURT:  You may step down.

20          (Witness excused)

21          Who's next?

22          MS. KILEY:  Your Honor, we would like to call

23  Dr. Khan, he's not available until tomorrow morning.

24          THE COURT:  All right.  Anything else we can do today?

25  You want to talk about your documents?

1            MS. KILEY:  Sure.

2            THE COURT:  Have you folks had a chance to confer

3     about this some more to find out if it's really going to be a

4     problem?

5            MS. AGNEW:  We have not, your Honor.

6            THE COURT:  Is that worth doing or do you want to just

7     dive into it?

8            MS. AGNEW:  Let's just dive into it.  If they want to

9     stipulate they'll only use them for rebuttal, that's fine,

10    we'll withdraw our motion.

11           THE COURT:  Ms. Kiley.

12           MS. KILEY:  We'll stipulate to that.

13           THE COURT:  That solves that.

14           Anything else today?

15           MS. AGNEW:  Not from plaintiffs, your Honor.

16           THE COURT:  Off the record.

17           (Discussion off the record)

18           THE COURT:  Mr. Dockery, would you raise your right

19    hand and give your attention to Ms. Phillips, please.

20     AARON DOCKERY,

21        called as a witness by the Plaintiffs,

22        having been duly sworn, testified as follows:

23           THE DEPUTY CLERK:  State your name and spell it for

24    the court reporter, please.

25           THE WITNESS:  Aaron Dockery, A-a-r-o-n D-o-c-k-e-r-y.

N26CallH                        Dockery – Direct

1    DIRECT EXAMINATION

2    BY MR. MORRISON:

3    Q.  Good afternoon, Mr. Dockery.  How are you?

4    A.  Good afternoon.  I'm all right.

5    Q.  How old are you?

6    A.  37.

7    Q.  Do you have any children?

8    A.  Yes.

9    Q.  How many children do you have?

10   A.  Two.

11   Q.  What are their ages?

12   A.  12 and 7.

13   Q.  I know you're currently at the MDC, but where do you

14   currently reside?

15   A.  Marcy Correctional Facility.

16   Q.  Is that a facility for the New York City Department of

17   Corrections?

18   A.  Yes, it is.

19   Q.  You're currently in custody; correct?

20   A.  Yes.

21   Q.  How long have you been in custody?

22   A.  A little over eight years.

23   Q.  During your time in custody, did there come a point where

24   you received a diagnosis for an illness?

25   A.  Yes.

1   Q.  And about when was that?

2   A.  I was diagnosed with multiple sclerosis in 2016.

3   Q.  Can you just briefly tell the Court a little bit about what

4   you're feeling or what led up to that diagnosis?

5   A.  My initial symptoms were facial numbness, loss of fine

6   motor skills, loss of balance, and tingling in my hands and my

7   feet.

8   Q.  And when you started experiencing these symptoms, what

9   facility were you living in?

10  A.  Five Points.

11  Q.  Do you recall who your primary care provider was at Five

12  Points at that time?

13  A.  No.

14  Q.  How long after you were receiving these symptoms did you

15  ultimately get diagnosed?

16  A.  About 45 days.

17  Q.  After the diagnosis, can you describe what type of

18  treatment you were provided?

19  A.  Yes.  When I was first diagnosed, I was given Neurontin to

20  help with the tingling in my hands and my feet.  I was given

21  Ditropan to help with my bladder issues.  I was given Elavil.

22          But these are initially; right?

23  Q.  Yes, originally.

24          You mentioned you were given Neurontin for the

25  tingling in your feet.  Can you describe a little bit the

N26CallH                          Dockery - Direct

1    tingling in your feet, was it painful or was it --

2    A.   Yes.

3    Q.   So elaborate.

4    A.   It's like your foot falls asleep.  When your foot first

5    falls asleep, you're not going to walk on it.  It's like you

6    got to tap it for it to come back alive, and then, eventually,

7    you could start walking on it.  That's what it's like, it just

8    don't go away.  So I could tap it, but the tingling and the

9    needles are still there.

10   Q.   How long would these episodes with the tingling in your

11   feet and the pain go on?

12   A.   Hours, sometimes days.

13   Q.   Were there specific times of the day that would happen or

14   was it random?

15   A.   Random.

16   Q.   You said you were prescribed Neurontin.  How did that

17   Neurontin medication treat those symptoms, if at all?

18   A.   It didn't make it totally go away, it just takes the pins

19   and needles sensation out of it.  So I still feel like, you

20   know, the sleepiness of my hands and my feet, I still could

21   feel that, but it doesn't hurt where I can't walk or I can't

22   deal with it.

23   Q.   Would you describe that medication as effective?

24   A.   Yes.

25   Q.   Were you informing your medical providers at the time that

N26CallH                         Dockery - Direct

1   the medication was effective in helping you manage the tingling

2   in your feet?

3   A.  Yes.

4   Q.  Was there a point in time while you were in DOCCS' custody

5   after you were prescribed the Neurontin that that prescription

6   was taken away?

7   A.  Yes.

8   Q.  How long after you first started the Neurontin was it taken

9   away?

10  A.  Not too long.  I was diagnosed at 16, I started the

11  Neurontin at 16, it was taken away in '16.

12  Q.  Can you tell me what, if anything, you were informed about

13  why that medication was taken away?

14  A.  I was told that they're not giving it anymore.

15  Q.  And who told you that?

16  A.  The doctor.

17  Q.  What did you say in response, if anything?

18  A.  I asked why and then I asked if there was any alternatives,

19  if anything else would work.

20  Q.  Was any other alternative medication provided at that time?

21  A.  Yes.

22  Q.  Do you recall what type of medication that was?

23  A.  It was a lot.  I'm not too sure of everything in order.

24  But it was, like I said, Elavil, before it was Depakote.  It

25  was a lot.  It was probably five or six different medications

N26CallH                          Dockery - Direct

1    over a few months' span.

2    Q.  Were all these medications you just mentioned provided at

3    the same time or separately?

4    A.  Some of them were and some of them weren't.  Some of them

5    were thought to be maybe be more effective together and some

6    were given singly, like the Cymbalta.

7    Q.  When you were prescribed these alternative medications

8    after Neurontin was prescribed, did you take them willingly?

9    A.  Yes.

10   Q.  Why did you do that?

11   A.  Because I needed help.

12   Q.  Did you trust the doctors were trying to get you effective

13   medication?

14   A.  I was a little leery at first because I was wondering why I

15   was changing from something that was working.  And then, over

16   time, like, I would get -- another one I took was Tegretol and

17   it gave me real bad diarrhea.  So, at some point, I started to

18   question the whole process of, like, how many different

19   medications am I going to go through.

20   Q.  While they were trying these new medications on you, did

21   you ever inform your provider that, hey, the Neurontin worked

22   for me?

23   A.  Yes.

24   Q.  Did you ask them at that point, why can't I get the

25   Neurontin back?

1    A.  Yes.

2    Q.  What type of response would you get, if anything?

3    A.  At several different times, I wrote grievances to try to

4    see what was the reasoning.  Like I said, I wasn't given a

5    reason why I wasn't getting it.  So I did some research on it,

6    I found out it's not a narcotic nor did it make me high or

7    anything, but it helped with allowing me to move up to motivate

8    to not have to be in a wheelchair, and also to deal with my

9    illness, so it was important to me that I got it back.

10   Q.  Did the alternative medications that you were provided, I

11   think you said Elavil, Depakote, did they cause any side

12   effects for you?

13   A.  Yes.

14   Q.  And did you inform your medical provider about those side

15   effects?

16   A.  Yes.

17   Q.  And what, if anything, happened after you informed your

18   medical provider about those side effects?

19   A.  Well, most times, they would discontinue it and try to find

20   me something else.

21   Q.  How long did this go on for?

22   A.  Can you be more specific.

23   Q.  Fair enough.  How long were you being prescribed

24   alternative medications after the Neurontin was discontinued?

25   A.  For years.

1    Q.  At some point in time, did you get re-prescribed Neurontin?

2    A.  Yes.

3    Q.  And about what year or what time was that?

4    A.  That's a hard question to answer because I was restarted

5    and stopped several times over the course of a few years.

6    Q.  Tell me a little bit about that, why did that occur, if you

7    know?

8    A.  All right.  So I was having really bad episodes in the

9    beginning because I was still learning my disease, what I

10   could, what I couldn't do, so I was kind of pushing myself at

11   times.  So I was having really bad episodes where I was

12   requiring hospitalization and ambulance trips.  After going to

13   the hospital so many times, they would write on their discharge

14   papers that I needed the Neurontin in order to, you know,

15   control my symptoms better.

16   Q.  Can I stop you for a second.

17   A.  Yes.

18   Q.  When you were going to these hospitals, was this a point in

19   time that you're on Neurontin or were you off Neurontin?

20   A.  I was off.

21   Q.  So you would go to the hospital, and your discharge papers,

22   as you understand, would suggest you be provided Neurontin?

23   A.  Yes.

24   Q.  Would you tell the outside specialists or doctors, when you

25   were in the hospital, that Neurontin was effective in treating

N26CallH                    Dockery - Direct

1   your pain?

2   A.  Yes.

3   Q.  I'm sorry.  Continue about being taken on and off

4   Neurontin.

5   A.  There would come times where I would run into certain

6   providers.  I know Dr. Miller was one of them, and they would

7   really fight for me.

8   Q.  Was that at Five Points?

9   A.  This was in Coxsackie.  I know he was really trying to

10  fight for me.  So he would take certain paperwork and put a

11  standby request in using that paperwork.  And sometimes he

12  would go over the regional medical director, whether it was

13  Dinello or Mueller, and he would go right to Koenigsmann, which

14  was the CMR at the time, and I would get it approved that way

15  through certain other doctors.

16  Q.  Would Dr. Miller show you the MWAP request forms?

17  A.  Yes.

18  Q.  Did he talk to you about the MWAP policy?

19  A.  Yes.

20  Q.  So when he would get this, the approval, according to your

21  understanding that Dr. Miller would go over the RMD's head to

22  the chief medical officer, how long would you remain on

23  Neurontin?

24  A.  For a while.  Mostly, unless I changed another facility,

25  which happened in this case.  In this case, Koenigsmann had

N26CallH                      Dockery - Direct

1   approved me himself.  And I thought I was all right for a while

2   because the refills was 100 or something, it was something

3   ridiculous, so I'm like I'll be alright for a while.  Then I

4   moved to Shawangunk, and when I moved to Shawangunk, everything

5   changed back to normal.

6   Q.  Can you tell me, roughly, about what time, what year you

7   moved from Coxsackie to Shawangunk?

8   A.  I believe it was 2018 or 2019.

9   Q.  And when you got to Shawangunk, do you remember who your

10  medical provider was?

11  A.  It was Dr. Lee.

12  Q.  And you said everything changed.  What did you mean by that

13  when you got to Shawangunk?

14  A.  They started taking me off the Neurontin.

15  Q.  Was that immediately upon your transfer to Shawangunk?

16  A.  Yes.

17  Q.  And how did you learn that you were being tapered off of

18  Neurontin when you got to Shawangunk?

19  A.  I was told by the nurse.

20  Q.  Did Dr. Lee ever sit down and talk to you about that?

21  A.  No.

22  Q.  How long after you got to Shawangunk do you recall first

23  seeing Dr. Lee?

24  A.  It was a while, a few months, two or three months.

25  Q.  When you saw Dr. Lee for the first time, had you already

N26CallH                          Dockery - Direct

1  been tapered off of Neurontin?

2  A.  Yes.

3  Q.  And by the way, what do you mean by tapered, just to be

4  clear?

5  A.  Tapered, it was a couple days they were giving me for a

6  little bit, for maybe like two or three days, and then it would

7  discontinue.

8  Q.  During this period of time, were you informing nursing

9  staff or medical staff that Neurontin was effective in treating

10  your pain?

11  A.  Yes.

12  Q.  Did they provide you any alternative medications when they

13  were weening you off or taking you off Neurontin at Shawangunk?

14  A.  No.

15  Q.  What pain medication, if at all, being on at Shawangunk?

16  A.  They reverted back to a lot of the old stuff that I had

17  already, the Elavil or the Cymbalta or the Tegretol, you know,

18  a lot of the old medication that wasn't working before, they

19  just re-prescribing them to me.

20  Q.  At some point, did you get your Neurontin back, though?

21  A.  Yes.

22  Q.  And when was that?

23  A.  I don't know because I think I had got it back -- I believe

24  I got it back again and then they took it away again, then I

25  believe I got it back one more time before they took it away.

N26CallH                        Dockery - Direct

1    But the final time I got it back I think was maybe two years
2    ago, almost three.
3    Q.  Did you ever learn that when you got your Neurontin back
4    the final time, it was during the MWAP policy period or after
5    the MWAP policy period concluded?
6    A.  It was after.
7    Q.  And what facility were you at at that time, if you recall?
8    A.  Five Points.
9    Q.  At some point, you transferred to Marcy Correctional
10   Facility?
11   A.  Yes.
12   Q.  When you transferred to Marcy Correctional Facility, it's
13   fair to say that you transferred on a prescription of
14   Neurontin?
15   A.  Yes.
16           MR. NOLAN:  There's been a lot of leading and I
17   understand why, but if we could do more of a traditional
18   direct, I'd appreciate it.
19           THE COURT:  Okay.  Although I'm not sure that these
20   facts are much in dispute.  I mean, you have the medical
21   records.
22           MR. NOLAN:  Understood, your Honor.  I just want to
23   make sure that we're doing this correctly.
24   Q.  After Five Points, what was the next facility you were
25   housed?

N26CallH                      Dockery - Direct

1    A.  Marcy Correctional.

2    Q.  And when you arrived at Marcy Correctional Facility, did

3    you have an active prescription of Neurontin?

4    A.  Yes.

5    Q.  Now I'm going to direct your attention to early December of

6    2022, just a few months ago.  Okay?

7    A.  Yes.

8    Q.  Around that time, do you recall your Neurontin medication

9    being discontinued?

10   A.  Yes.

11   Q.  Do you recall any other medication being discontinued?

12   A.  Yes.

13   Q.  And can you tell the Court what is your understanding of

14   why that medication was discontinued?

15   A.  Would you like the story or just a straight explanation?

16   Q.  Start with a straight explanation.

17   A.  The straight explanation is I refused to let a nurse flash

18   a flashlight in my mouth before she wiped it down.

19   Q.  Your understanding, why would a nurse being using a

20   flashlight in your mouth?

21   A.  They're allowed to if they feel that you're taking

22   medication and they might not have maybe seen the medication in

23   your mouth, so they do have a right to use a flashlight.

24   Q.  Do you have any objection to a nurse using a flashlight to

25   make sure you're taking your medication while at Marcy?

1    A.  Not at all.

2    Q.  What was your objection?

3    A.  So my objection was the previous day, I allowed her to do

4    it, but the second day, there was five other gentlemen, they

5    were part of the MAT program.  So, really, the flashlight, it

6    was really reserved for those guys, and she puts it really

7    close to their face.  This was the time we just had a COVID

8    outbreak, we had the flu going on, and we had some other

9    respiratory illnesses that was going on.  I'm watching her

10   flash the other guys, and when she goes to put the flashlight

11   in my face, I see specs on the lens.  I asked her, can you

12   please wipe the flashlight down before you stick the flashlight

13   so close into my face.  She told me she didn't need to.

14   Q.  When you say she, who is she?

15   A.  Nurse Reilly.

16   Q.  And she's a nurse at Marcy?

17   A.  Yes.

18   Q.  So what happened after she said she wouldn't wipe down the

19   flashlight before she checked into your mouth?

20   A.  They discontinued my -- that was on the 1st, they

21   discontinued my meds on the 2nd.

22   Q.  Can you tell the Court how you learned your medication was

23   discontinued?

24   A.  When I went down to receive my meds the next day, I was

25   told that they were discontinued.

N26CallH                          Dockery - Direct

1   Q.  What medications were discontinued, just to be clear?

2   A.  Neurontin and baclofen.

3   Q.  What is baclofen, to your understanding?

4   A.  Baclofen is a muscle -- an anti-muscle spasm medication.

5   Q.  What's your understanding of why you're prescribed

6   baclofen?

7   A.  Because I have muscle spasms in my legs.

8   Q.  So when you went to the nurse's window and learned that

9   your medication was discontinued, what did you do?

10  A.  I asked why, she said because I refused the mouth check.  I

11  explained to the nurse that I'm not refusing the mouth check, I

12  just wanted to be sanitary and I felt it was unhealthy for you

13  to have the flashlight so close to my face.

14  Q.  Prior to you learning at the window, just to be clear, did

15  any medical provider at Marcy sit down with you and discuss

16  this incident?

17  A.  No.

18  Q.  Did any medical provider sit down with you and inform you

19  why your medication was discontinued?

20  A.  No.

21  Q.  Did you get a chance to tell any medical provider why you

22  refused to take your medication on, I think you said

23  December 1st?

24  A.  No.

25              MR. MORRISON:  I have nothing further.  Thank you,

N26CallH                          Dockery – Cross

1   Mr. Dockery.

2          THE COURT:  Cross examination, counsel.

3          MR. NOLAN:  Just a quick cross, your Honor.

4          THE COURT:  Yes, sir.

5   CROSS-EXAMINATION

6   BY MR. NOLAN:

7   Q.  Good afternoon, Mr. Dockery.

8   A.  Good afternoon, sir.

9   Q.  You were talking about the MWAP period of the policy.  Do

10  you recall that?

11  A.  Yes.

12  Q.  You were talking about the various medications that you

13  were trying during that time and your doctors were trying.  Do

14  you recall that?

15  A.  Yes.

16  Q.  I just want to make sure we go over what those were.  You

17  said you tried Depakote; is that correct?

18  A.  Yes.

19  Q.  You tried Elavil?

20  A.  Yes.

21  Q.  You tried Tegretol?

22  A.  Yes.

23  Q.  Did you try something called Copaxone?

24  A.  Yes.

25  Q.  Did you try Ditropan?

N26CallH                          Dockery - Cross

1    A.  Yes.

2    Q.  Tecfidera?

3    A.  Yes.

4    Q.  Cymbalta?

5    A.  Yes.

6    Q.  How about Topamax?

7    A.  Yes.

8    Q.  And those were all alternatives, if you will, as you

9    understood it, to Neurontin or what the doctors were trying to

10   use as alternatives?

11   A.  Yes, most of them were.

12   Q.  Did any doctor suggest that you weren't entitled to try an

13   alternative?

14   A.  I don't understand.

15   Q.  In other words, they were prescribing you medications in

16   order to treat your pain; correct?

17   A.  Yes, they were.

18   Q.  They weren't willfully trying to deprive you of any

19   medication for your pain, were they?

20              MR. MORRISON:  Objection.

21              THE COURT:  Sustained.

22   Q.  Are you claiming that those doctors were willfully trying

23   to deprive you of any medication for your pain?

24              THE WITNESS:  I can answer that?

25   Q.  It's a yes or no question.

N26CallH                          Dockery - Cross

1          THE COURT:  Yes, sir.  Are you able to answer that?

2     A.  Yes.

3     Q.  You believe so, yes?  Which doctor is that?

4     A.  Well, it was a convoluted question because you said are

5     they willingly?

6     Q.  Is it your claim that any specific doctor was willfully

7     trying to deprive you --

8     A.  Oh, no, I do not feel that.

9     Q.  They were trying to treat you with medications as an

10    alternative to Neurontin; correct?

11    A.  Yes.

12    Q.  You've done marijuana in prison; correct?

13    A.  Yes.

14    Q.  On more than one occasion; correct?

15    A.  No.

16    Q.  You've been found guilty twice in prison of having used

17    marijuana; correct?

18    A.  No.

19    Q.  You've been disciplined twice for it; correct?

20    A.  Yes.

21    Q.  You were part of an alcohol and substance abuse treatment

22    program, too; correct?

23    A.  Yes, I was.

24    Q.  You're on Neurontin today?

25    A.  Yes.

N26CallH                    Dockery - Cross

1   Q.  You're going to be released in how long, three weeks?

2   A.  About that.

3   Q.  And do you plan to continue to use Neurontin then?

4   A.  Yes.

5   Q.  And you'll be outside of DOCCS' care at that point;

6   correct?

7   A.  Yes.

8   Q.  Has anybody told you in the last six months that you

9   couldn't take Neurontin because of MWAP?

10  A.  In the last six months?

11  Q.  Yeah.

12  A.  I knew that before six months.

13  Q.  Let me ask you this, as you sit here today, is MWAP, the

14  policy, depriving you of Neurontin in any way?

15  A.  Not any longer.

16  Q.  Not any longer.  Since it was rescinded and you haven't

17  been deprived of Neurontin because of MWAP; correct?

18  A.  Not because of MWAP.

19  Q.  What is your claim, you've been deprived for other reasons

20  is what your claim is?

21  A.  I believe that there's also -- I think it's being missed,

22  as well -- yes, it was a policy that was instituted and it

23  wasn't going the right way for several reasons, but there's

24  also a mindset that I think nobody's talking about, as well.

25  Like, these doctors automatically say you're not going to get

N26CallH                    Dockery - Cross

1   that medication or you're not going to get that.  So even

2   though the policy is rescinded, that mindset, I still hear it,

3   you know, like, oh, you're not going to get this medication

4   because of this.

5   Q.  But since it's been rescinded, you haven't been denied

6   medication, Neurontin, because of any specific MWAP policy;

7   correct?

8   A.  No.

9           MR. MORRISON:  Objection.  Speculation.

10  A.  Not that I know of.

11  Q.  Do you recall being brought down to sick call in November

12  of 2022 by security?

13  A.  By security?

14  Q.  Yes.

15  A.  No.  You got to refresh my memory.

16  Q.  Do you recall being brought to the nurse while you were

17  high?

18  A.  No.

19  Q.  Are you claiming that you were not high when you were

20  brought to the nurse?

21          MR. MORRISON:  Objection.

22  A.  I --

23          THE COURT:  Excuse me.  When they say "objection,"

24  would you just hold your answer and then I'll tell you if you

25  have to answer or not.

N26CallH                    Dockery - Cross

1              THE WITNESS:  Okay.  That's fine.

2              THE COURT:  Objection.

3              MR. MORRISON:  It's an improper question.

4              MR. NOLAN:  Withdrawn.

5    Q.  You testified earlier that you've used marijuana in prison;

6    correct?

7    A.  Yes.

8    Q.  And I asked you earlier if, in November of this year,

9    security brought you to sick call to see medical personnel.  Do

10   you recall that?

11   A.  Yes, I do now.

12   Q.  And when you were brought down, were you or were you not

13   high?

14   A.  I was not high.

15   Q.  Were you under the influence of a substance that was not

16   prescribed to you?

17   A.  No, I was not.

18   Q.  Were you slurring your words?

19   A.  No, I was not.

20   Q.  Do you think your medical records would actually reflect

21   that?

22   A.  I'm not sure.

23   Q.  You would agree that in prison, there are other prisoners

24   who hoard medication; correct?

25   A.  I would assume that.

N26CallH                    Dockery - Cross

 1   Q.  Do you recall testifying in your deposition that you know

 2   that to be the case?

 3   A.  I mean, I don't really see it that often, but I would

 4   assume that it happens.

 5   Q.  You know it happens; correct?

 6             MR. MORRISON:  Objection.  Argumentative.

 7             THE COURT:  This is cross.

 8             Are you able to answer that, sir?

 9             THE WITNESS:  Yes.

10             THE COURT:  Go ahead.

11   A.  Yes, I would assume that, yes.  You hear about it, I don't

12   see it, but you hear about it.

13   Q.  And you hear about it being bought and sold; correct?

14   A.  Yes.

15   Q.  Are you claiming damages in this case?

16             MR. MORRISON:  Objection.  Irrelevant.

17   Q.  Are you claiming damages in this case?

18             THE COURT:  I don't know that we're at that issue, are

19   we?  This is a PI hearing, isn't it?

20             MR. NOLAN:  He's going to be released in three weeks.

21   There's the question of whether there is irreparable harm or if

22   there is alternative remedy.

23             THE COURT:  I'm not sure we're there.  Forgive me for

24   not having memorized everything, but I think the only relief

25   being sought is the PI at this point; isn't that right?

N26CallH                    Dockery - Cross

1          MR. NOLAN:  Well, it looks that way from their latest

2     set of disclosures that there's now actual damages claim and I

3     just want to make sure --

4          THE COURT:  Okay.  So I think, probably, we need to

5     move on.

6          MR. NOLAN:  Okay.

7     Q.  As you sit here today, what medications, other than

8     Neurontin, are you on?

9     A.  There's a whole list.

10    Q.  Can you take me through it?

11    A.  I'm on Tecfidera for my MS, I'm on baby aspirin from side

12    effects from that.  I'm also on Neurontin.  I'm also on

13    something called Keppra — this is an antiseizure medication,

14    which is supposed to also help in conjunction with the

15    Neurontin.  I'm also on ibuprofen.  I'm also on vitamin D3.

16    I'm also on something for heartburn, I forget the name of it.

17    Q.  In addition to the medications you're on, do you receive

18    any equipment, do you receive any other type of treatment?

19    A.  Yes.  And also Baclofen.  And yes, I do have a TENS unit.

20    Q.  What's a TENS unit?

21    A.  A TENS unit is an electrical device that's supposed to

22    relieve you of pain.

23    Q.  When is the last time that you saw your provider?

24    A.  It's been a while.

25    Q.  Were you recently offered the ability to go to a pain

N26CallH                    Dockery – Redirect

1  specialist?

2  A.  Yes.

3  Q.  And did you deny that request?

4  A.  Yes.

5           MR. NOLAN:  I have no further questions.

6           THE COURT:  Thank you.  Redirect, counsel?

7           MR. MORRISON:  Yeah, real quickly, your Honor.

8  REDIRECT EXAMINATION

9  BY MR. MORRISON:

10  Q.  Mr. Dockery, you were just asked whether you recently

11  requested or offered to go to pain management specialists and

12  you denied that offer; correct?

13  A.  Yes.

14  Q.  Why did you do that?

15  A.  Well, I can't remember specifically for that trip, but

16  there's been three trips that I did deny.  One I had parole, so

17  I denied the trip and asked for it to be rescheduled.  One trip

18  I did not have a wheelchair to ambulate to and from the trip,

19  so I asked for it to be rescheduled.  Another trip, I actually

20  had a legal visit from my counsel that's here.  So, instead of

21  having them come all the way here and not go on my legal visit,

22  I refused that one.

23  Q.  When you were offered to go to pain management, were you

24  being prescribed Neurontin, Baclofen, and the other medications

25  I think you said you kept for pain?

1    A.  Yes.

2    Q.  Was that adequate in treating you for the pain that you

3    were in?

4    A.  Yes.

5              MR. MORRISON:  Nothing further.

6              THE COURT:  Thank you.  You may step down, sir.

7              (Witness excused)

8              All right, friends, what now?  Do we have anything

9    else we can do?

10             MS. AGNEW:  We filled the spaces as much as we could

11   for defendants, your Honor.

12             THE COURT:  So nothing else; right?

13             MS. AGNEW:  No.

14             THE COURT:  So let's go ahead and break.

15             What time are we starting in the morning, friends?

16   10:00, 9:30?  Is it Dr. Khan coming in?

17             MS. KILEY:  Yes.

18             THE COURT:  10 o'clock.  Thank you, counsel.  Good

19   afternoon.  Thank you, Mr. Marshal, Ms. Marshal.

20             (Adjourned to February 7, 2023 at 10:00 a.m.)

21                              *  *  *

22

23

24

25

```
1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3    CAROL MOORES

4   Direct By Ms. Kiley  . . . . . . . . . . . . . 3

5   Cross By Ms. Agnew . . . . . . . . . . . . . .67

6   Redirect By Ms. Kiley  . . . . . . . . . . . 113

7    AARON DOCKERY

8   Direct By Mr. Morrison . . . . . . . . . . . 118

9   Cross By Mr. Nolan . . . . . . . . . . . . . 132

10  Redirect By Mr. Morrison . . . . . . . . . . 140

11                   PLAINTIFF EXHIBITS

12  Exhibit No.                              Received

13   P32, P44, P45, P52, P4, P53, P54, P55  . . . 113

14                   DEFENDANT EXHIBITS

15  Exhibit No.                              Received

16   1   . . . . . . . . . . . . . . . . . . . .31

17   2   . . . . . . . . . . . . . . . . . . . .36

18   3   . . . . . . . . . . . . . . . . . . . .44

19

20

21

22

23

24

25
```