```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```

| | |
|---|---|
| PETER ALLEN, et al., | |
| Plaintiffs, | No. 19-CV-8173 (LAP) |
| -against- | OPINION & ORDER |
| CARL KOENIGSMANN, et al., | |
| Defendants. | |

LORETTA A. PRESKA, Senior United States District Judge:

Before the Court are two related motions: State Represented Defendants' ("SRDs")[1] and Dr. Carol Moores' motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") pursuant to Fed. R.

---

[1] The SRDs are Defendants Carl Koenigsmann, John Morley, Susan Mueller, David S. Dinello, John Hammer, and Kristin Salotti.

Civ. P. 12(b)(1)[2] and Plaintiffs' motion for injunctions.[3] For the reasons below, Defendants' motion to dismiss is <u>DENIED</u>, and Plaintiffs' motion for a preliminary injunction is <u>GRANTED</u>.

---

[2] (The SRDs' Supplemental Memorandum of Law in Support of their Motion to Dismiss the SAC ("SRD 12(b)(1) Br."), dated July 30, 2021 [dkt. no. 273]; Expert Report: Allen, et al. v. Koenigsmann, et al., 19-cv-8173 by Adam J. Carinci, M.D. ("Carinci Rep."), dated March 5, 2022 [dkt. no. 348-2]; Peter Allen, et al. v. NYS DOCCS, et al., 19 Civ. 8173 (LAP), Expert Report for the Case by Neel Mehta, MD ("Mehta Rep."), dated March 7, 2022 [dkt. no. 430-1]; Declaration of Joshua Morrison, dated May 22, 2022 [dkt. no. 374]; Plaintiff and Plaintiff-Intervenors' Memorandum of Law in Support of Motion for Injunctions and in Opposition to the SRDs' Rule 12(b)(1) Motion ("Pl. Inj. Br."), dated May 31, 2022 [dkt. no. 378]; Comments and Rebuttal to Report provided by Plaintiffs' Expert Dr. Adam Carinci, MD, MBA, Drafted by Dr. Neel Mehta, MD ("Mehta Reb. Rep."), dated July 5, 2022 [dkt. no. 430-16]; Declaration of Oriana L. Kiley, Esq. in Support of Defendant Moores' Opposition to Preliminary Injunction; Opposition to Class Certification; and in Further Support of Defendants' 12(b)(1) Motion to Dismiss, dated November 15, 2022 [dkt. no. 447]; Dr. Moores' Reply Memorandum of Law in Further Support of Defendants' Rule 12(b)(1) Motion to Dismiss Plaintiffs' SAC ("Moores 12(b)(1) Reply"), dated November 15, 2022 [dkt. no. 448].)

[3] (Pl. Inj. Br.; Declaration of Carol A. Moores, M.D. ("Moores Decl."), dated November 14, 2022 [dkt. no. 489-491]; Dr. Moores' Memorandum of Law in Opposition to Motion for Injunctive Relief ("Moores Inj. Opp."), dated November 15, 2022 [dkt. no. 449]; Declarations in Reply to Motion for Injunctions from Jose Burgos [dkt. no. 474], Mark Daniels [dkt. no. 475], Hugh Knight [dkt. no. 476], Rashid Rahman [dkt. no. 477], Felipe Rivera-Cruz [dkt. no. 478], and Reply Declaration of Joshua Morrison in Support of Motion for Injunctions [dkt. no. 480], all dated December 12, 2022; Declaration in Reply to Motion for Injunctions from Richard Vasquez, dated December 19, 2022 [dkt. no. 485]; Plaintiffs' Reply Memorandum of Law in Support of Motion for Injunctions ("Pl. Inj. Reply"), dated December 12, 2022 [dkt. no. 481]; Defendant Dr. Carol Moores' Post-Hearing Brief ("Moores PH Br."), dated February 17, 2023 [dkt. no. 536]; Plaintiffs' Post-Hearing Brief (footnote continued)

I.    **Procedural History**

   A. **Plaintiffs' Claims for Relief in the SAC**

      In the SAC, Plaintiffs made two claims for relief based on
deliberate indifference under 42 U.S.C. § 1983. The first was
made against DOCCS' Chief Medical Officer ("CMO"), Regional
Medical Directors ("RMDs"), and other administrators who
promulgated, implemented, and enforced the Medications with
Abuse Potential ("MWAP") Policy.[4] (SAC at ¶¶ 1045-54.) The second

---

(footnote continued) ("Pl. PH Br."), dated February 22, 2023
[dkt. no. 545]; Declaration of Amy Jane Agnew, dated February
22, 2023 [dkt. no. 546].)

[4] DOCCS' official MWAP policy was drafted by Dr. David Dinello,
then an RMD, promulgated by Dr. Carl Koenigsmann, then CMO, on
June 2, 2017 (dkt. no. 541 ("Feb. 6 Tr.") at 31:11-16), and
revised on September 10, 2018, (SAC at ¶¶ 156-58). The MWAP
Policy included a list of medications, including Oxycodone and
the gabapentinoids (Feb. 6 Tr. at 32:9-19; SAC at ¶¶ 88-106),
and Plaintiffs alleged that as implemented, the MWAP Policy was
"an almost wholesale restriction on the prescription of MWAPs,
except in cases of acute need or palliative care," (SAC at
¶ 117). Plaintiffs alleged that a complete ban on use of these
medications to treat chronic conditions "d[id] not comport with
the standards adopted by other prison systems or the Standard of
Medical Care in the community." (Id.)

The MWAP Policy required primary care providers who wanted to
prescribe an MWAP to submit an MWAP Request Form to the RMD who
supervised the provider's facility. (Id. at ¶ 168.) The RMD
would then review the MWAP Request Form while having access to
the "limited portions of the patient's medical history available
on the DOCCS' FHS1 database." (Id. at ¶ 171.) Plaintiffs alleged
that "[b]ased on the MWAP Request Form contents the RMD -- and
not the patient's medical provider -- determine[d] whether a
patient w[ould] receive an MWAP." (Id. at ¶ 173.) Plaintiffs
alleged that under the MWAP Policy, DOCCS' primary care
providers had to discontinue an MWAP if it was not approved by
the RMD because DOCCS pharmacies would not (footnote continued)

was made against DOCCS medical care providers for discontinuing MWAP medications "regardless of the patient's medical needs." (SAC at ¶¶ 1055-67.) In the SAC, Plaintiffs seek the following equitable relief:

> allow individualized assessments of class members' MWAP needs by their primary care physicians, consultants and specialists based on a medically appropriate review of the patient's medical history, physical examination, consideration of real function; and where those efforts fail, ordering assessment by a properly certified, independent pain management specialist; and, creating a monitoring person or body to ensure that patients who require MWAP medications are not denied based on anything other than a comprehensive individualized assessment.

(SAC at ¶ 1108.)

### B. **Motion Practice**

On July 30, 2021, the SRDs filed a supplemental memorandum of law asserting that Plaintiffs' claims for injunctive relief were moot based on the rescission of the MWAP Policy on February 8, 2021, and its replacement by Health Services Policy Number 1.24A ("Policy 1.24A").[5] (SRD 12(b)(1) Br. at 2-3.) On May

---

(footnote continued) fill a prescription for an MWAP without RMD approval. (Id. at ¶ 177; see also Defendants' Exhibit 1 (MWAP Policy 1.24).) Plaintiffs alleged that the MWAP Policy "d[id] not operate to create 'oversight,' it had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates on MWAPs." (Id. at ¶ 184.)

[5] Policy 1.24A states:

> I. Policy. The Department of Corrections and Community Supervision (DOCCS) provides (footnote continued)

(footnote continued) appropriate medical evaluation and treatment of chronic pain syndromes for its patient population.

II.  Procedure. <u>Each patient with a chronic pain condition will be given the Problem List Code 338 "Pain Management"</u>. This code will enable us to identify and ensure continuity of care and appropriate pain management follow-up. This identification will be used for patients whether or not they are receiving medication to control their pain. Code 338 indicates that the patient is to be assessed periodically for pain levels, functionality, and needs based on the patient's underlying medical condition contributing to the chronic pain. Individual specific treatment plans may include a Patient Pain Management Agreement.

The primary care provider (PCP) will prescribe any medications deemed appropriate for treatment of the patient's chronic pain condition. There is no requirement for an approval process except when a non-formulary medication is requested. Non-formulary medications will be approved in cases where it is documented that other formulary treatments were tried and shown to be unsuccessful in achieving functional treatment goals.

Specialty consults will be ordered as indicated for the evaluation and care of chronic pain patients. <u>In the event that the PCP does not accept the recommendations of the specialist, the PCP will</u>:

- <u>Document in the AHR regarding the reasons why the PCP does not accept the recommendations</u>;
- Call the specialist to discuss the case to clarify that the specialist understands the pertinent details of the patient's situation;
- If the PCP still does not accept the specialist's final recommendations, the PCP will discuss the case with another DOCCS provider. Facility Health Services Director, or the Regional Medical Director;
- Documentation of these discussions will be recorded in the AHR; and (footnote continued)

19, 2022, this Court filed an opinion largely denying

Defendants' motions to dismiss the first amended complaint.

Allen v. Koenigsmann, 2022 WL 1597424, at *1 (S.D.N.Y. May 19,

2022).However, the Court did not decide the Rule 12(b)(1) motion

because Plaintiffs had not yet submitted their opposition

papers. Id. at *1, n.3. On May 20, 2022, Plaintiffs submitted

their motion for a preliminary injunction and on May 31, 2022,

their supporting memorandum of law, which included Plaintiffs'

opposition to the SRDs' Rule 12(b)(1) motion to dismiss. (Pl.

Inj. Br.) On December 12, 2022, Plaintiffs submitted their reply

in support of their motion for a preliminary injunction. (Pl.

Inj. Reply.)

---

(footnote continued)

- All treatment decisions will be made by the PCP

  Pain management medication should only be discontinued
  after a provider has met with the patient, discussed the
  issues regarding the use of the medication, analyzed the
  patient's situation, and subsequently determined that it
  is in the best interest of the patient for the medication
  to be discontinued. The discussion with the patient and
  the reasons for discontinuation of the pain medication
  will be recorded in the AHR.

  Patients with the Pain Management designation Code 338
  will be seen at least every 90 days by a PCP. At least
  annually, the PCP will meet with the patient to discuss
  the patient's treatment plan.

(Defendants' Exhibit 2, emphasis added.)

Shortly before submitting their motion for a preliminary injunction, on May 12, 2022, Plaintiffs submitted the declaration and report of their expert, Dr. Adam Carinci. (Carinci Rep.) In his report, Dr. Carinci wrote that he reviewed curated medical records for seventy DOCCS patients, including eighteen named Plaintiffs and Plaintiff-Intervenors, and physically examined and spoke to seventeen patients at three different DOCCS facilities. (Id. at 9.) Dr. Carinci's report included opinions on nearly all seventy patients whose records he reviewed. (Id. at 10-40.) Dr. Carinci found issues with each of their treatment, writing that patients' pain medications were discontinued "without sufficient medical rationale" (id. at 12), "medical justification" (id. at 26), or "individualized assessment" (id. at 13), and "irrespective" of the patient's "individual response" to the medication, (id. at 13).

For example, Dr. Carinci found that Mr. Ronald Digg's Flexeril prescription was "discontinued and further medication recommendations were denied and not even tried without medical rationale and irrespective of Mr. Diggs' individual needs." (Id. at 16.) Dr. Carinci wrote that despite Flexeril's efficacy in treating Mr. Digg's lumbar myofascial pain and muscle spasms, and the "numerous specialist recommendations for starting neuropathic pain medications," Mr. Digg's Flexeril was "repeatedly denied or discontinued." (Id.) Dr. Carinci wrote

that Mr. Diggs was provided ineffective substitute medications that were "associated with intolerable side effects" even while further "appropriate alternatives were recommended repeatedly by specialists." (Id.)

On April 8, 2022, Dr. Moores, the new DOCCS CMO, was substituted as the party representing the CMO's office. (Dkt. no. 342.) On August 2, 2022, representatives for the New York State Attorney General ("NY AG" or "AG") informed the Court that they had conducted a representational analysis regarding Dr. Moores – four months after she was substituted into the case – and concluded that the AG's continued representation of Dr. Moores was inappropriate, certifying Dr. Moores for representation by outside counsel. (Dkt. no. 396.) On August 5, 2022, Whiteman Osterman & Hanna L.L.P. appeared as counsel for Dr. Moores. (Dkt. no. 397.)

On November 15, 2022, Dr. Moores submitted her reply supporting the Rule 12(b)(1) motion to dismiss (Moores 12(b)(1) Reply) and her opposition to Plaintiffs' motion for a preliminary injunction (Moores Inj. Opp.). Submitted alongside these briefs was Dr. Moores' declaration. (Moores Decl.) In her declaration, Dr. Moores wrote that she reviewed "the files of the named Plaintiffs and specific patients listed in Plaintiffs' motion papers to determine whether, and to what extent, they may

have been denied necessary pain medication." (Id. at ¶ 86.) Dr. Moores asserted that none of the patients' treatment had "lapsed or become urgent" and that she had found "no evidence that pain medications were discontinued for non-medical reasons." (Id. at ¶¶ 90-91.) It was the contrast between Dr. Carinci's report and Dr. Moores' declaration that set up the issue of fact to be tried.

### C. **February 2023 Evidentiary Hearing**

In a telephone conference with the parties on December 23, 2022, the Court found that there was a disputed issue of fact raised in both the Rule 12(b)(1) and the preliminary injunction papers as to whether the constitutional violations Plaintiffs complained of had ceased. (Dkt. no. 496 at 21:11-21:21.) To resolve this fact issue, the Court ordered an evidentiary hearing focused on the prongs of the voluntary cessation doctrine. (Id. at 21:21-22:3.)[6]

The hearing commenced on February 6, 2023, and continued through February 8, 2023. Both Dr. Moores and Plaintiffs called

---

[6] "At that hearing, the parties shall offer evidence as to:
  1. Whether the conduct complained of has, in fact, ceased;
  2. Whether there is a reasonable expectation that violations will reoccur; and
  3. Whether policy 1.24A has completely and irrevocably eradicated the effect of the MWAP policy."

(Dkt. no. 496 at 21:21-22:3.)

witnesses who presented testimony. On February 17, 2023, Dr. Moores submitted her post-hearing brief (Moores PH Br.), and on February 22, 2023, Plaintiffs submitted their post-hearing brief (Pl. PH Br.).[7] What follows is a review of the evidence relevant to the two motions currently at issue that were presented in the parties' briefs, the evidentiary hearing, and other associated submissions. The Court presumes the parties' familiarity with the more general facts of the case.

---

[7] Dr. Moores appears to take issue with the fact that the Court put the burden on her to disprove the existence of ongoing constitutional violations without the Court's having found that Plaintiffs met their prima facie burden of proving the irreparable harm prong of the preliminary injunction standard. (Moores PH Br. at 3.) However, the Court clearly articulated that the hearing was focused on the voluntary cessation doctrine, which the SRDs relied on in their motion to dismiss. (SRD 12(b)(1) Br. at 9-11.)

Part of Dr. Moores' confusion appears to stem from a belief that the Court denied Defendants' Rule 12(b)(1) motion in its entirety during the December 23, 2022 conferences. (See dkt. no. 508 at 5:14-17.) During the December 23 conference, the Court made a series of findings and rejected some of the arguments made in Defendants' 12(b)(1) and preliminary injunction papers while finding a disputed issue of fact as to whether DOCCS' constitutional violations had ceased. (Dkt. 496 at 21:11-22:3.) The Court ordered an evidentiary hearing on the issue of whether the constitutional violations had ceased, and the case law is clear that Defendants carry the burden when asserting the voluntary cessation doctrine. (See discussion infra, Section (III)(A).)

Further, even in the context of the preliminary injunction papers, the Court clarified for Dr. Moores' counsel on January 5, 2023, that the Court held that Plaintiffs had made their showing of irreparable injury in that they showed that constitutional violations were ongoing, and the burden was on Dr. Moores to show mootness. (Dkt. no. 508 at 6:7-11.)

## II. <u>Relevant Facts from Evidentiary Hearing</u>

### A. <u>Dr. Moores' Evidence</u>

#### i. <u>Testimony of Dr. Carol Moores and Dr. Asfar Kahn</u>

Counsel for Dr. Moores offered testimony from her[8] and from Dr. Asfar Kahn, a physician serving as Deputy CMO to Dr. Moores. The doctors' testimony iterated that the MWAP Policy was rescinded in 2021 and the new Policy 1.24A adopted. The new policy: 1) allows DOCCS medical providers to prescribe "their choice of pain treatment;" 2) eliminates "any future risk of providers being unable to prescribe their pain medication of choice;" 3) "permits PCPs[9] to order specialty pain consults for a patient;" and 4) "vests with PCPs the ultimate decision of whether the follow" a specialist's recommendations. (Moores PH Br. at 3-5.)[10] Doctors Moores and Kahn also reviewed some of the additional steps they have taken to ensure compliance with Policy 1.24A. (<u>Id.</u> at 6; Feb. 6 Tr. at 47:20-50:13, 57:1-22; dkt. no. 537 ("Feb. 7 Tr.") at 169:24-170:17.)

Dr. Moores and Dr. Kahn largely provided testimony relevant to Plaintiffs' first cause of action and not the second. Neither Dr. Moores nor Dr. Kahn discussed the issues raised in

---

[8] Dr. Moores declared that she became CMO of DOCCS on July 18, 2022. (Moores Decl. at ¶ 10.)

[9] Primary care physician.

[10] <u>See</u> Policy 1.24A <u>supra</u>, at 4-6, n.5.

Plaintiffs' preliminary injunction motion regarding ongoing deprivations of pain medication, including DOCCS' failure to identify and reassess patients whose pain medications were discontinued under the MWAP Policy, failure to train DOCCS medical providers on Policy 1.24A, or instances when patients' pain medications are currently being discontinued without medical justification, such as upon transfer to a new facility or following allegations of misuse.

The Court found both Dr. Moores and Dr. Khan to be credible witnesses. For example, Dr. Moores was forthright in acknowledging the failures of her subordinates (and indeed she removed one, Dr. Paula Bozer, for failing to approve non-formulary requests properly). (Feb. 6 Tr. at 100:22-101:20, 107:10-20.) The problem is that Dr. Moores' subordinates are not with the program – Policy 1.24A. As will be set out below in more detail, they still deny MWAP medications because "we don't do that here" and the like, or because an inmate transferred to a different facility.

And there has been no organized effort to encourage the DOCCS medical providers to get with the program. As Dr. Moores acknowledged, no effort has been made to identify those inmates whose pain medications were discontinued without medical reason under the MWAP regime (id. at 79:6-15), medical providers

12

received no training on Policy 1.24A (id. at 70:13-22), and no training on how to perform individualized assessments or why they were being performed, (id. at 71:24-72:6).

Because the issues of fact presented pertain to the time after Policy 1.24A was adopted, that is, after February 2021, the Court only makes finding as to that time period; it does not make findings here about the apparently numerous examples demonstrated in this record of deprivations of inmates' pain medications without medical justification under the prior MWAP policy.

## B. **Plaintiffs Evidence**

Plaintiffs called several putative class members and PCPs to offer testimony about the ongoing violations in the DOCCS medical system.

### i. **Plaintiffs Lose MWAP Medications for Non-Medical Reasons**

#### a. **Testimony of Mali Wilkerson**

Mr. Mali Wilkerson suffers from sickle cell anemia (Feb. 7 Tr. at 247:18) and needs narcotic pain medication to manage his pain and prevent sickle cell crises, hospitalization, and death, (id. at 257:17-258:8). Mr. Wilkinson testified that when he is not able to take medication, he suffers from "a lot of pain," cannot move around or care for himself, and that he "can't really function." (Id. at 257:21-25.) Mr. Wilkerson testified

that in 2021 at the Green Haven Regional Medical Unit ("RMU"),
he was prescribed OxyContin, which "relieved a lot of [his]
pain."  (Id. at 268:16-269:12.)

Mr. Wilkerson testified that when he was transferred from
Green Haven Correction Facility ("Green Haven") to Marcy
Correctional Facility ("Marcy") around April 2022,[11] the nurse at
Marcy informed Mr. Wilkerson that "this is a facility that we
don't give out pain meds here" and "it's not worth it to fight
because it just doesn't happen here." (Id. at 271:11-272:6.)
Mr. Wilkerson testified his prescription for OxyContin was
discontinued before he met with a doctor. (Id. at 272:7-11.)
Mr. Wilkerson said that when he did see the doctor, Dr. Burke
confirmed that Mr. Wilkerson could not get OxyContin at Marcy;
Dr. Burke said his "hands [we]re tied because this is how DOCCS
does things." (Id. at 272:14.) Mr. Wilkerson testified that he
did not agree to discontinue his medication and that he was
without his medication for around nine days.[12] (Id. at 273:14-
24.)

Dr. Moores asserts in post-hearing briefing that "[t]here
is nothing in Plaintiffs' medical records to support

---

[11] Plaintiffs' papers say May 19, 2022. (Pl. PH Br. at 11.)

[12] The Court notes that Mr. Wilkerson's prescription was
reinstated after a conference between the Court and the parties
on May 27, 2022. (See dkt. nos. 375-377.)

Mr. Wilkerson's claims." (Moores PH Br. at 10.) The records at issue show an initial entry on May 20, 2022, that reflects Mr. Wilkerson's discussing his MS Contin prescription from his previous facility and wanting to "know what's going to happen now." (Dkt. no. 480-25 at M Wilkerson 309.) The entry ends with the note "Provider to review chart." (Id.) Next, there is another entry from May 20, 2022, ostensibly written by Dr. Burke, listing medications including Tylenol and Ibuprofen, but not MS Contin. (Id. at M Wilkerson 314.)

The Court then held a conference with counsel on May 27, 2022 at 1:00 p.m. (Dkt. no. 376.) During the conference, State Defendants' counsel professed to have spoken with Dr. Burke that morning and repeated that Mr. Wilkerson had agreed to discontinue his medication.

Dr. Burke made an entry dated May 27, 2022, at 9:30 a.m. (perhaps after speaking with counsel) that reads:

> I discussed the ongoing use of MS Contin . . . with the inmate. He stated that he does not always use the medication and that he would be willing to try to stay off it using Tylenol and Ibuprofen in its place. I discussed addition & potential side effects with him ~~today on~~ on the day of 5/20/22.

(Dkt. no. 480-25 at M Wilkerson 314.) The date of the entry that follows immediately thereafter is in dispute. Dr. Burke wrote May 23 on the date line, but the nurse initialed the prescription on May 27. Based on the testimony and records, the

Court finds that the entry was written on May 27 and Dr. Burke ordered MS Contin for Mr. Wilkerson the same day – a week after he arrived at the facility and a week after his medication was discontinued. (Id.)

The Court found Mr. Wilkerson to be credible, particularly with respect to his virtually lifetime history with his disease. He also had accurate recall of dates, events, medications, and conversations with medical providers. Mr. Wilkerson testified credibly as to his interactions with Dr. Burke, including that he did not agree to discontinue his OxyContin and that he asked that it be prescribed. (Feb. 7 Tr. at 273:14-21.)

The Court finds that Mr. Wilkerson was deprived of his pain medication without medical cause at Marcy from May 20 through May 27, 2022, by a medical provider with the requisite culpable state of mind. Mr. Wilkerson's testimony also establishes a violation of Policy 1.24A's requirement that an inmate's pain medication not be discontinued without a documented discussion of the reasons for such discontinuance. His credible testimony that DOCCS providers told him "this is a facility that we don't give out pain meds here," "it's not worth it to fight because it just doesn't happen here," and our "hands are tied because this is how DOCS does things" – even in the face of Policy 1.24A - illustrates the necessity of an injunction.

16

### b. <u>Testimony of Claudio Johnson</u>

Mr. Claudio Johnson suffers from "chronic lower back pain stemming from a 1990 bullet wound" followed by spinal fusions. (Pl. PH Br. at 13; Feb. 7. Tr. at 281:11-22; 282:9-22.)  After his surgeries, he was prescribed Neurontin, morphine, and Percocet (Feb. 7 Tr. at 286:2-6), though Mr. Johnson testified that he was then transferred to Green Haven, where his medications were discontinued, (<u>id.</u> at 286:12-287:2). Mr. Johnson was subsequently transferred to Marcy, and Plaintiffs previously represented to the Court that while at Marcy on June 18, 2021, Mr. Johnson's Neurontin prescription was reinstated following the rescission of the MWAP Policy. (Dkt. no. 304 at 1.)

Mr. Johnson was transferred from Marcy to Woodbourne Correctional Facility ("Woodbourne") on August 10, 2021. (Dkt. no. 354-23 at C Johnson 592.) Mr. Johnson testified that, like Mr. Wilkerson, when Mr. Johnson was transferred to Woodbourne, the Neurontin he received at Marcy was discontinued. (Feb. 7 Tr. at 289:15-20; 297:1-4.) Mr. Johnson said that two weeks after he arrived at Woodbourne, he met with a Dr. Ruiz, who told him that "we don't give the Neurontin out in Woodbourne." (<u>Id.</u> at 289:19-290:1.) After Court intervention (Pl. PH Br. at 14), Mr. Johnson was transferred back to Marcy where he was re-prescribed Neurontin. (Feb. 7 Tr. at 288:25-289:1, 291:1-5.) Mr. Johnson

testified that when he did not receive medications for his chronic pain, the pain became "[s]evere, I mean excruciating." It was "hard for [him] to get out the bed, go to the bathroom. It was hard for [him] to do daily activities, period." (Id. at 287:13-19.)

Dr. Moores explains in post-hearing briefing that Dr. Ruiz's discontinuation of Mr. Johnson's Neurontin prescription was a product of Dr. Ruiz's medical judgment that "Neurontin raised Mr. Johnson's risk of a potentially fatal blood clot, so she prescribed him Celebrex for his pain instead." (Moores PH Br. at 8.) Dr. Moores casts the decision to transfer Mr. Johnson back to Marcy as an opportunity for Mr. Johnson to "consult with a different provider and receive a different opinion" because Dr. Ruiz was "unwilling to compromise her own medical judgment that the risk of prescribing Neurontin to Mr. Johnson was too high given his medical history." (Id. at 9.) In turn, Plaintiffs assert that the record shows Mr. Johnson's risk of blood clots is "not affected by [his] use of Neurontin." (Pl. PH Br. at 14, citing dkt. nos. 307, 308, and 308-1.)

The Court found Mr. Johnson to be a credible witness, particularly with respect to interactions with DOCCS providers. He was not as precise as others on dates and was initially

confused over what he takes Coumadin for. (See Feb. 7 Tr. at 292:23-293:6.)[13]

> Dr. Carinci opines:
>
> Upon Mr. Johnson's transfer back to another prison, his medications were once again discontinued without medical justification.  Even after Mr. Johnson's Neurontin was finally represcribed in 2021, his effective medication was once again discontinued with no medical rationale. Counsel in this case had to arrange Mr. Johnson's transfer back to his previous facility so his Neurontin could be reinstated.

(Carinci Rep. at 23.) Dr. Mehta's report[14] does not appear to cover this time period. (See Mehta Rep. at 33; Mehta Reb. Rep. at 132-133.)

---

[13]    Q. If you know, what do you take the Coumadin for?

A. Coumadin is for my back pain.

Q. And the Celebrex, what do you take that for?

A. It's for my back pain.

Q. And how about the Neurontin, back pain?

A. Back pain. The Coumadin is for blood thinners. I'm sorry.

Q. That's okay. So Celebrex and Neurontin for back pain and the Coumadin for blood thinners; right?

A. Yes.

(See Feb. 7 Tr. at 292:23-293:6.)

[14] As reflected in the Court's opinion precluding Dr. Mehta's expert report, out of an abundance of caution, the Court will still consider Dr. Mehta's report in its preliminary injunction analysis. (Dkt. no. 550 at 15.)

The Court finds that Mr. Johnson was deprived of pain medication by a provider with the requisite culpable state of mind, starting on or about August 10, 2021, when he was transferred to Woodbourne, until he was transferred back to Marcy. It was only after Plaintiffs' counsel's intervention that he was transferred back to Marcy and represcribed pain medication. The Court also finds that Dr. Ruiz failed to comply with Policy 1.24A in failing to explain to Mr. Johnson the supposed medical reason for discontinuing his pain medication.

### c. **Testimony of Aaron Dockery and Nurse Practitioner Amy Ferguson**

Mr. Aaron Dockery was diagnosed with multiple sclerosis in 2016. He was given Neurontin to "help with the tingling in [his] hands and [his] feet" and Baclofen to manage "muscle spasms in [his] legs." (Feb. 6 Tr. at 119:2-20, 131:1-7.) Mr. Dockery described the tingling in his extremities as being painful and inhibiting his ability to walk. (Id. at 119:24-120:22.) He testified that on December 2, 2022, while he resided at Marcy, his medication was discontinued because he "refused to let a nurse flash a flashlight in [his] mouth before she wiped it down." (Id. at 129:5-18.) Mr. Dockery clarified that his objection was not to the use of the flashlight for a mouth check ("they do have a right to use a flashlight," id. at 129:23) but to the fact that the flashlight had been very close to other

patients' mouths directly before the check and Mr. Dockery did not want the flashlight close to his mouth unless it was cleaned. (Id. at 129:24-130:13.)[15] Mr. Dockery testified that he learned his medication had been discontinued only when he went to the nurse's window to receive the medication. (Id. at 130:22-131:13.) Mr. Dockery said that no medical provider discussed the discontinuation with him prior to his learning of it at the nurse's window and he was not given the chance to explain why he refused to take his medication on December 1, 2022. (Id. at 131:14-24.) Mr. Dockery's medications were reinstated on

---

[15]     Q. Do you have any objection to a nurse using a flashlight to make sure you're taking your medication while at Marcy?

A. Not at all.

Q. What was your objection?

A. So my objection was the previous day, I allowed her to do it, but the second day, there was five other gentlemen, they were part of the MAT program [a substance abuse program]. So, really, the flashlight, it was really reserved for those guys, and she puts it really close to their face. This was the time we just had a COVID outbreak, we had the flu going on, and we had some other respiratory illnesses that was going on. I'm watching her flash the other guys, and when she goes to put the flashlight in my face, I see specs [sic.] on the lens. I asked her, can you please wipe the flashlight down before you stick the flashlight so close into my face. She told me she didn't need to.

(Feb. 6 Tr. at 129:24-130:13.)

December 24, 2022, leaving Mr. Dockery without his medication for twenty-two days. (Pl. PH Br. at 17.)[16]

Nurse Practitioner ("NP") Amy Ferguson and NP Brandi Lynn Corigliano are the two medical providers who work at Marcy; there is no physician employed there. (Feb. 7 Tr. at 208:9-25.) Together, NPs Ferguson and Corigliano are responsible for eight or nine hundred patients. (Id. at 209:10-16.) Mr. Dockery was normally NP Corigliano's patient. (Id. at 222:3-7.)

NP Ferguson testified that she discontinued Mr. Dockery's Neurontin because she had been informed that he had refused a mouth check to administer the Neurontin three times and DOCCS has a policy that a patient's third refusal of medication "results in a discontinuation." (Id. at 223:2-224:9, 225:24-25.) NP Ferguson testified that she did not prescribe any alternative for Mr. Dockery to manage his multiple sclerosis pain. (Id. at 229:18-20). Indeed, NP Ferguson testified that she did not know why Mr. Dockery was taking the Neurontin when she discontinued it and that she did not talk to Mr. Dockery before discontinuing his Neurontin prescription. (Id. at 226:1-25.) She also testified she had not received any training that she should sit

---

[16] Mr. Dockery's medication was only reinstated on December 24 after the Court and the parties discussed the issue in two separate conferences on December 23, 2022. (See dkt. no. 496 at 23:21-27:7, noting at 24:19 that Mr. Dockery "has muscular [sic.] sclerosis and autoimmune issues.")

down and speak to a patient before discontinuing his or her pain medications. (Id. at 228:22-25.)

NP Ferguson testified that she did not know that Mr. Dockery's issue was with the flashlight "until [sh]e heard from legal." (Id. at 226:24-227:6.) NP Ferguson then testified that if Mr. Dockery had reported his concerns to sick call or the nurse team, "this would have been avoided" and "we would have dealt with it at that time, but instead, here we are." (Id. at 226:18-24.) NP Ferguson then reviewed a note from Mr. Dockery to the nurse administrator dated December 8, 2022, in which he explained his reasoning for refusing the mouth check. (Id. at 227:21-228:15.) Apparently, NP Ferguson did not see the note at the time because she is not the nurse administrator. (Id. at 227:24-228:15.) Mr. Dockery's medications were not restored until December 24, 2022 – some twenty-two days after they were discontinued and then only after Court intervention. (Pl. PH Br. at 17.)

NP Ferguson also reviewed a page from Mr. Dockery's medical records and testified that the records stated that on November 9, 2022, Mr. Dockery was "was brought to medical and possibly under the influence of an unknown substance. Slow to respond." (Feb. 7 Tr. at 231:9-13.) NP Ferguson said that Mr. Dockery "may have been high on something" and was "brought to medical to be

evaluated." (Id. at 231:15-16.) NP Ferguson also testified that
when a patient refuses to follow procedures for receiving
medication, the patient might be diverting his medication, and
Mr. Dockery's medical records "possibly" suggested a substantial
risk of diversion. (Id. at 233:9-234:12.) NP Ferguson said that
a patient presenting a substantial risk of diversion generated
concerns that might impact the decision to continue the
patient's medication, such as concerns for patient safety
stemming from possible overdose. (Id. at 234:13-235:14.)

Mr. Dockery testified that he had used marijuana once while
incarcerated, been disciplined for marijuana use twice, and
participated in an alcohol and substance abuse treatment
program. (Feb. 6. Tr. at 134:12-23.) Mr. Dockery denied being
high when he was brought down to sick call by security on
November 9, denied that he had been under the influence of a
substance not prescribed to him, and denied slurring his words.
(Id. at 137:8-19.)

In post-hearing briefing, Dr. Moores presents NP Ferguson's
decision to discontinue Mr. Dockery's medications as resulting
from NP Ferguson's concerns regarding diversion and
Mr. Dockery's safety. (Moores PH Br. at 7.) However, NP Ferguson
was clear in her testimony that she discontinued Mr. Dockery's
medications solely because he refused the mouth check three

times. Because Mr. Dockery's alleged prior drug use did not play a part in NP Ferguson's decision to discontinue Mr. Dockery's pain medication, the Court does not consider it. NP Ferguson was also clear that she did not follow up either before or after the discontinuation of pain medication to explain to Mr. Dockery why it had occurred or to understand Mr. Dockery's reasons for refusing the mouth check.

The Court found Mr. Dockery to be a credible witness. He was forthright in acknowledging efforts made by DOCCS providers to "really fight for [him]," e.g., Feb. 6. Tr. at 125:3-15, and that he felt the doctors "were trying to treat [him] with medications as an alternative to Neurontin," (id. at 134:9-11). The Court also credits his testimony that he saw "specs [sic.] on the lens" of the flashlight. (134:6-10.)

The Court did not find NP Ferguson to be a credible witness. Her attitude and demeanor were antagonistic to Plaintiffs' counsel, and she volunteered information she believed would be helpful. See, e.g., Feb. 7 Tr. at 227:24-228:1; 228:5-6; 229:1-11. The Court is also skeptical of NP Ferguson's testimony that the flashlight supposedly used by Nurse Riley in attempting the mouth check on Mr. Dockery was "wider than an inmate's mouth" (id. at 236:19-237:2), and that it was held "6 to 12 inches" from his mouth (id. at 236:8-10).

The Court finds that the discontinuation of Mr. Dockery's pain medication from December 2 to December 23, 2022, was without a medical reason. As noted above, Mr. Dockery suffers from multiple sclerosis and is immunocompromised. He credibly testified that he saw the nurse put her flashlight in or near five other inmates' mouths, saw "specs [sic.] on the lens," asked the nurse to clean the flashlight, and she refused. Even if that were a legitimate medical reason for the discontinuance, NP Ferguson failed to explain to Mr. Dockery why his pain meds were discontinued[17] and failed to prescribe an alternative – a clear violation of Policy 1.24A.

### ii.  DOCCS Fails to Adequately Treat Plaintiffs' Pain

#### a. Testimony of Rashid Rahman and Dr. Win

Mr. Rashid Rahman suffers from "excruciating and chronic pain in his back and neck as well as numbness in the left side of his body" resulting from a failed back surgery. (Pl. PH Br. at 18; dkt. no. 539 ("Feb. 8 Tr.") at 391:5-392:25.) Following Mr. Rahman's surgery, he was housed at the Coxsackie RMU, where he was prescribed Ultram and Xanax for his pain. (Id. at 393:7-16.) He was then transferred to the Walsh RMU where he continued to receive his pain medication. (Id. at 393:17-394:15.) After

---

[17] Indeed, had NP Ferguson met with Mr. Dockery as prescribed by Policy 124.A, she persuasively testified: "we would have dealt with it at the time." (Feb. 7 Tr. at 226:22-25.)

the Walsh RMU, Mr. Rahman was transferred to Shawangunk
Correctional Facility ("Shawangunk"), and his pain medication
was discontinued. (Id. at 394:18-395:14.) Mr. Rahman testified
that the discontinuation of his pain medication left him in
chronic pain, unable to sleep or participate in the outside
medical trips DOCCS scheduled for him. (Id. at 396:19-24.)
Mr. Rahman said that he "continuously expressed [his] pain" to
Shawangunk medical staff, that Ultram helped with his pain, and
asked for his Ultram prescription to be reinstated. (Id. at
396:25-397:8.)

Mr. Rahman said that he continued these communications with
his current provider, Dr. Win, asking "all the time" to be put
back on Ultram. (Id. at 398:8-19.) Mr. Rahman said that Dr. Win
told him that he could not give Mr. Rahman Ultram unless he sent
Mr. Rahman out to see a specialist. (Id. at 398:20-23.)
Mr. Rahman saw a pain specialist, Dr. Hussein, in April 2021 and
Mr. Rahman said that Dr. Hussein told him that he would
prescribe Ultram for him. (Id. at 398:24-399:18.) When
Mr. Rahman returned to Shawangunk and did not receive Ultram, he
again asked Dr. Win about it. Mr. Rahman said that Dr. Win told
him he could only receive Ultram if Mr. Rahman went to the
infirmary. (Id. at 399:22-401:5.) Mr. Rahman said that going to
the infirmary was like being held "hostage" and that there was
no reason he needed to go to the infirmary and be away from his

cell or general population to receive medication that was approved. (Id. at 401:6-13.)[18]

Dr. Win testified that he serves as the facility health services director for Shawangunk. (Id. at 360:19-21.) He reviewed some of Mr. Rahman's medical records, including a report of consultation form filled out by Dr. Hussein. (Id. at 372:16-374:21; Ex. P-10 "Rahman, Rashid" at R Rahman 299.) Dr. Hussein's report included a plan of care with three parts: 1) schedule a cervical epidural steroid injection; 2) something regarding certain vertebrae in Mr. Rahman's back; and 3) "consider" using Ultram. (P-10 at 299.) Dr. Win testified that the first part of the plan, the injection, was the "treatment the pain management recommended." (Feb. 8 Tr. at 373:10.) Dr. Win said he interpreted Dr. Hussein's third instruction to "consider" Ultram to mean that if Dr. Win had "no other choice" given the other options listed, he could "consider" using Ultram. (Id. at 374:15-21.) Dr. Win opined that was why Dr. Hussein wrote to "consider" using the Ultram rather than writing the prescription amount and frequency. (Id. at 373:5-16, 374:15-19.) When Plaintiffs' counsel pointed out that

---

[18] Dr. Win testified that when a patient has acute medical issues such as acute pain, he recommends he go to the infirmary for "better patient-nurses ratio and more higher [sic] level of care." (Feb. 8 Tr. at 372:6-15.)

the second part of Dr. Hussein's care plan did not appear to be framed as an alternative to the injection but, rather, additional directions for Mr. Rahman's care, Dr. Win answered "I cannot interpret the thinking process by the pain specialist. If you want to ask that type of specialized specialist recommendation, you have to ask the pain management doctor, Dr. Hussein." (Id. at 373:21-374:6.) Dr. Win testified that he did not see anywhere in Mr. Rahman's medical records where he explained to Mr. Rahman why he was not prescribing Ultram. (Id. at 375:14-18.)

Mr. Rahman testified on cross that he refused the injections Dr. Hussein recommended because on the date when the procedure was scheduled, Mr. Rahman was also scheduled to meet with Plaintiffs' counsel and that he was scared to receive the injections because another DOCCS patient had died recently from the procedure. (Id. at 404:10-405:18.) Mr. Rahman also testified that he refused the opportunity to go to a pain management consult in November 2022 because he "was in excruciating pain" and he did not understand why he had to "to go out and see the same pain management again when [he] was already approved for that same drug." (Id. at 405:19-407:6.) He also testified that he was prescribed Ultram when he first arrived at the facility and that he was not in the infirmary then. (Id. at 408:5-9.)

In post-hearing briefing, Dr. Moores notes Mr. Rahman's refusing to go to the infirmary to receive the Ultram and Dr. Win's testimony that he recommended Mr. Rahman go to the infirmary so Mr. Rahman could receive a higher level of care. (Moores PH Br. at 14.) Dr. Moores also notes Mr. Rahman's refusals of the injections and the November 2022 pain management consult without discussing Mr. Rahman's explanations for why he refused these services. (Id. at 14-15.) Meanwhile, Plaintiffs point out that Dr. Win never offered fully to restart Mr. Rahman's Ultram prescription; Dr. Win only noted he would give Mr. Rahman Ultram for "5-7 days" upon admission to the infirmary. (Pl. PH Br. at 19.)

> Regarding Mr. Rahman, Dr. Mehta's report states:
>
> An MWAP and chronic pain reassessment on 11/10/2020 was completed.  Pain assessment reported no pain with current treatments.  No MWAP medications were requested by the practitioner.  A pain management and neurosurgery evaluation were also requested.

(Mehta Rep. at 40.) With respect to the same time period, Dr. Carinci's report states:

> In November 2020, he [Mr. Rahman] underwent a reassessment which noted his paraplegia and prior history of laminectomy, however, the assessment failed to note his previous effective treatment with ultram and his neuropathic pain.  A subsequent hospital visit clearly diagnosed the peripheral neuropathy and a specialist recommended treatment with ultram.  This recommendation was ignored.  In this case, Mr. Rahman's tramadol was discontinued without medical rationale and irrespective of his response to the medication and was subsequently refused despite a history of efficacious

30

> treatment.    There  is  no  evidence  that  effective
> alternatives were prescribed.

(Carinci Rep. at 31.) Dr. Mehta's rebuttal report opines:

> On 4/19/21, Dr. Hussein from pain management recommended
> scheduling for an epidural and facet procedure and noted
> "consider" Ultram (299). The primary team noted the pain
> specialist  recommendations  and  scheduled  the  epidural
> injection  and  facet  block  and  also  noted  that  the  pain
> management  specialist  recommended  "consider"  Ultram  and
> plan  to  admit  to  Infirmary  for  acute  exacerbation  of
> pain for Ultram treatment due to adverse effects (300).
> Thus, the primary team follow the recommendations of the
> pain  specialist  and  schedule  the  procedure  and  also
> considered giving the patient Ultram if needed.
>
> "Consider"  as  a  recommendation  by  a  specialist  leaves  an
> open,  back-up  recommendation  to  the  primary  team,
> similar to a plan B option to be viewed in context with
> other  treatments  as  appropriate.  In  my  opinion,  it  was
> not  a  strong  and  absolute  recommendation  that  was  denied
> by DOCCS as per Dr. Carinci's interpretation.
>
> . . . Thus, based on my review of the chart and the
> patient's  history  including  evaluation  by  physical
> therapy,  occupational  therapy,  neurology,  neurosurgery
> and  based  on  remainder  of  the  chart  notes,  it  is
> medically  appropriate  to  discontinue  the  Ultram  and
> administer alternative treatment. The provider noted the
> patient's history and provided their medical rationale
> in  administering  appropriate  medical  care  with
> appropriate pain management.

(Mehta Reb. Rep. at 207-208.)

The Court found Mr. Rahman to be a credible witness. In

particular, Mr. Rahman was convincing in his testimony that

after Dr. Win told him he had to be confined in the infirmary to

receive Ultram, "[e]very single time I went to see Dr. Win or

had a call out to see Dr. Win, [I] expressed [my] concerns and

[my] pain to him about my Ultram that was approved." (Feb. 8.

Tr. at 401:18-24.) Thus, the Court rejects Dr. Mehta's finding that the "[p]ain assessment reported no pain with current treatments." (Mehta Rep. at 40.)

Mr. Rahman was also convincing in his reasons for not wanting to go to the infirmary:

> Q. Can you tell me, what does it mean to go upstairs in the infirmary, does it affect you in any way?
>
> A. Yes, they hold you hostage in this infirmary in this jail. When you go upstairs -- I'm going to use it in the terminology and what it really is. There should be no reason I can get all my medications at the window that I got to go upstairs and be away from my cell or population just to retrieve something that was approved.
>
> Q. Are you allowed to bring your belongings into the infirmary?
>
> A. You're not allowed to bring nothing up there, absolutely nothing.

(Feb. 8 Tr. at 401:6-17.)

> Q. Mr. Rahman, why did you not want to go and live in the infirmary so you can have Ultram medication?
>
> A. It's not nowhere that any person that is incarcerated, that has some form of liberty living in population to then live in the infirmary. It just can't work. It's not a good thing. Not that I refused my medication, I refused the point that why should I, that out of everybody that went out to the specialist, why do I, me, have to go up to the infirmary to get my medication, why?
>
> Q. Did he ever explain to you why, Dr. Win?
>
> A. No. But I know that I was getting my Ultram when I first came here. So what's the problem?
>
> Q. When you were being prescribed and taking Ultram before, were you living in the infirmary?
>
> A. No, I was not.

(Id. at 407:20-408:9.)

The Court did not find Dr. Win to be a credible witness.
Aside from his snippy answers about interpreting the pain
specialist's instructions, essentially "you should ask him, not
me," (see, e.g., id. at 372:21-374:21), he seemed to know very
little about Mr. Rahman. For example, with respect to performing
Mr. Rahman's 2020 pain reassessment, Dr. Win testified:

> Q. So if we look at page 283, the second page, the last
> question was, do you believe that it might be beneficial
> to initiate a trial of an MWAP medication at this time.
>
> A. I put not applicable.
>
> Q. Why did you put it was not applicable?
>
> A. There is a scenario there --
>
> Q. Doctor, can you move forward a little bit. It's very
> hard to hear your voice.
>
> A. At that time, my clinical assessment of this
> incarcerated individual has other medication so that
> MWAP medication is not needed. That's what I meant on
> that page.
>
> Q. What other medication was he getting?
>
> A. If you have the record, show it to me because I cannot
> remember each and every details of these medication.
>
> Q. So did Mr. Rahman tell you that he was being treated
> effectively with the medication he was on?
>
> A. I (technical interruption) could you repeat the
> question.
>
> Q. Did Mr. Rahman tell you, when you completed this form,
> that he was not suffering from any pain?
>
> A. I have to look at that corresponding AHR, the recent
> --around that time, what are the complaints, what are

33

the things that you would see, what are the reasons I
saw him, I need to see those health records, AHR, that's
what we call.

Q. When you completed this form, were you sitting with
Mr. Rahman?

A. No. I take it back. I am not positive.

(Id. at 369:7-370:7.) For example, it is truly incredible that
in response to "whether it might be beneficial to initiate a
trial of an MWAP medication," a question on Mr. Rahman's MWAP
reassessment form, Dr. Win wrote "not applicable." (Id. at
368:3-369:10.) Also, Dr. Win often did not answer the question
asked. See, e.g., id. at 378:3-17; id., 379:5-16.

The Court finds that Mr. Rahman was deprived of his pain
medications without medical reason from the time he arrived at
Shawangunk by a provider with the requisite culpable state of
mind. The Court also finds that Dr. Win failed to follow Policy
1.24A in failing to explain to Mr. Rahman why his pain
medication was discontinued, failing to deal with Mr. Rahman's
objection to the injections, failing to explain why he did not
follow the pain specialist's recommendation for Ultram, and
requiring Mr. Rahman to live in the infirmary to receive his
pain medication. Contrary to Dr. Mehta's view, the Court is
persuaded that Mr. Rahman did not receive effective pain
treatment.

### b. **Testimony of Mark Daniels**

Mr. Mark Daniels suffers from back injuries that necessitated two spinal fusion surgeries. (Feb. 8 Tr. at 409:10-24.) He reports dealing with chronic pain in his shoulders, neck, back, and left foot and losing feeling in his hands, resulting in "a lot of discomfort." (Id. at 409:13-410:10.) Mr. Daniels testified that he has only been given ibuprofen to manage his pain (id. at 413:5-16), and that without additional medication he is in "constant pain" and cannot do anything that he wants to do and he "suffer[s] every day," (id. at 413:17-414:4).

Mr. Daniels testified that he was a plaintiff in this case because he was "pretty much being denied all medical treatment." (Id. at 412:1.) On August 20, 2021, Dr. Hussein met with Mr. Daniels, and his report recommended that Mr. Daniels be given Neurontin. (Dkt. no. 349-38 at M Daniels 220.) On Mr. Daniels' medical record, Dr. Lee wrote "consider Neurontin" and "refer to Dr. Win" but did not record why he did not order the prescription. (Id. at 221.) Mr. Daniels testified that Neurontin "really didn't work for [him]" and gave him stomach problems (Feb. 8 Tr. at 411:15-17), and that the ibuprofen he currently takes for his pain is about as effective in treating his pain as the Neurontin he once received, (id. at 413:10-16). Mr. Daniels testified that he requested that Dr. Lee prescribe

him something other than Neurontin for his pain but "nothing was given" to him. (Id. at 412:15-17.) On May 20, 2022, Dr. Hussein again met with Mr. Daniels and noted that "patient may benefit from medical treatment." (Dkt. no. 480-7 at M Daniels 239.) Mr. Daniels testified that prior to his surgeries, he received Ultram to manage his pain and Ultram was effective. (Feb. 8 Tr. at 411:19-24.)

Dr. Moores responds in post-hearing briefing that Mr. Daniels has received medical treatment. Dr. Moores notes that Mr. Daniels met with pain specialists in June and August of 2021 who "recommended that Plaintiff Daniels receive cervical epidural steroid injections and that pain medications be considered as possible additional treatment." (Moores PH Br. at 16; dkt. no. 349-38 at M Daniels 212, 220.) Dr. Moores notes that on December 1, 2021, Mr. Daniels refused the recommended steroid injection, though Mr. Daniels refused to sign the refusal form. (Dkt. no. 480-7 at M Daniels 229.) Dr. Moores also points out that Mr. Daniels eventually received an epidural injection in March 2022. (Id. at 232.)

Plaintiffs reply that in his May 20, 2022 report, right above where he wrote that Mr. Daniels may benefit from medical treatment, Dr. Hussein also wrote "no need for injection for the time being." (Id. at 239.) Given that specialists have

36

recommended Mr. Daniels receive Neurontin or other medical
treatment, and knowing Neurontin does not work for Mr. Daniels,
Plaintiffs ask why Dr. Win has not tried prescribing alternative
pain medication beyond ibuprofen. (Pl. PH Br. at 20-21.)

Dr. Mehta reports that in his November 10, 2020
reassessment, Dr. Win wrote that "[Mr. Daniels] was noted to be
in pain, but mainly to 'have it on file.' He was referred for
further neurosurgery management on 11/12/2020." (Mehta Rep. at
25.)

Dr. Carinci opines that "[t]he reassessment that was
performed was inadequate as it did not address critical aspects
of the [sic.] Mr. Daniels' medical history including the fact
that he had myelopathy, nor did it address the fact that several
specialists had made medication recommendations including trials
of Lyrica and baclofen. Mr. Daniels is obviously in pain and has
not been effectively treated." (Carinci Rep. at 15.)

In rebuttal, Dr. Mehta opines:

> Dr Hussein, the pain specialist did not recommend any
> change in pain medication during 6/18/21 visit and
> recommended cervical epidural injection and facet block
> (212). . . .

> Dr Hussein on 8/20/21 visit, planned to schedule patient
> for cervical epidural injection and also noted "consider
> neuropathic pain meds, Neurontin or Trileptal,
> nortriptyline to help with the sensory discomfort"
> (220). Thus, the primary team had to balance painted
> care [sic.] with differing recommendation for
> medications based on specialist recommendations and the

> patient's history and decided to continue with an
> appropriate course.

(Mehta Reb. Rep. at 65.)

The Court found Mr. Daniels to be a credible witness although with less-than-perfect recall of his medication history. He was credibly adamant, however, that he is in constant pain with no effective medications being offered. Accordingly, the Court rejects Dr. Mehta's conclusion that the course of treatment was "appropriate" because it did not assist with Mr. Daniels' pain and thus finds that Mr. Daniels has been unlawfully denied effective pain treatment since at least August 20, 2021 by a provider with the requisite culpable state of mind. The Court also finds that Mr. Daniels' medical providers violated Policy 1.24A in failing to explain why they did not follow the pain specialist's recommendations.

### c. **Testimony of Felipe Rivera-Cruz**

Mr. Felipe Rivera-Cruz suffers from pain resulting from having been shot seventeen times in Puerto Rico in August 2003. (Feb. 8 Tr. at 319:5-10.) He testified that when he started treatment at Mount Sinai in 2003, he was given Lyrica to manage his pain, which he described as helpful. (Id. at 321:17-322:1.) Mr. Rivera-Cruz said that he received Lyrica continuously from when he arrived at Mount Sinai in 2003, through his entry into the DOCCS system, until he arrived at Shawangunk in 2015 when

38

his medication was discontinued. (Id. at 322:20-324:8.) Dr. Lee told him "that medication had been discontinued by the company." (Id. at 325:10-13.) Mr. Rivera-Cruz testified that when he does not take Lyrica, he feels "pain all over [his] body," his nerves jump, his legs cramp, and he cannot sleep. (Id. at 325:19-24.) He also testified that he is not currently receiving medication to manage his pain. (Id. at 326:11-14.)

Mr. Rivera-Cruz said that in October 2022, he was sent to a hospital for five days to treat an infection in his legs (id. at 328:3-19),[19] and that while he was at the hospital, he received morphine to manage his pain, (id. at 328:20-24.) Mr. Rivera-Cruz said that since his return to Shawangunk, no medical provider examined him or discussed with him what was going on with his legs. (Id. at 330:21-331:1.) Mr. Rivera-Cruz also testified that he was not aware of any treatment plan that had been proposed regarding his legs, that he was told he had been signed up to see an outside doctor, but that DOCCS had not yet contacted him regarding that appointment. (Id. at 331:2-6.)[20]

---

[19] Mr. Rivera-Cruz appeared to misspeak about the date of the hospital visit, testifying that it occurred in October 2002. (Feb. 8 Tr. at 333:19-23.) However, the parties appear to agree that the visit occurred in October 2022. (See Moores PH Br. at 12; Pl. PH Br. at 21.)

[20] Separate from the issues in this case, the Court finds it concerning that Mr. Rivera-Cruz does not seem to have received any immediate follow-up, communication, or (footnote continued)

Mr. Rivera-Cruz testified that when his Lyrica prescription was discontinued at Shawangunk, he spoke to his medical provider, Dr. Lee, about his pain and his medication, saying that he needed Lyrica and not aspirin or some other type of medication. (Id. at 324:12-21, 325:7-9.) He also testified that he speaks Spanish and he has never been provided with an interpreter for his meetings with his medical providers; he "get[s] by with the very little English that [he] know[s]." (Id. at 324:22-325:6.) Mr. Rivera-Cruz said that he had not informed Dr. Win about the effect Lyrica has on his pain because the language barrier prevented him from explaining (id. at 332:2-5) and because Dr. Win was "not the one who discontinued it," (id. at 335:17-20).

Dr. Moores asserts in post-hearing briefing that Dr. Win has never denied Mr. Rivera-Cruz Lyrica and never discontinued a Lyrica prescription for Mr. Rivera-Cruz. (Moores PH Br. at 12.) Dr. Moores writes that Mr. Rivera-Cruz has received other medical care while in DOCCS custody, including years of physical therapy. (Id.; dkt. nos. 490-24, 25, and 26.) Dr. Moores cites to one medical record entry from August 12, 2022, that noted Mr. Rivera-Cruz "denies pain." (Dkt. no. 490-25 at Moores-2920.) Dr. Moores also cites records from August 12, 2022 (dkt. no.

---

(footnote continued) treatment from DOCCS medical personnel following a five-day hospital stay.

490-24 at Moores-2873; dkt. no. 490-25 at Moores-2919), and September 26, 2022 (dkt. no. 490-24 at Moores-2866), that show Mr. Rivera-Cruz received Botox injections for his pain. (Moores PH Br. at 12.)[21] Finally, Dr. Moores notes that Mr. Rivera-Cruz testified he had recently been signed up for an outside medical consultation. (Feb. 8 Tr. at 331:2-6.)

The Court found Mr. Rivera-Cruz to be a credible witness, although sometimes confused about dates and whether he signed a document or not. He was, however, adamant – and credible – that he had not been given effective pain medication after his October 2022 hospitalization. The Court also finds that Mr. Rivera-Cruz was never given an explanation – much less one he could understand – about why his pain medication was discontinued.

### d. **Testimony of Julio Moronta**

Mr. Julio Moronta suffers from chronic lower back pain that affects his ability to sleep. (Feb. 8 Tr. at 342:18-343:3.) Mr. Moronta testified that at Sullivan Correctional Facility ("Sullivan"), he had been prescribed Neurontin and the medication made him "feel somewhat better. It would kind of put

---

[21] The Court notes that these Botox injections both preceded Mr. Rivera-Cruz's recent hospital visit for his leg infection, where he was treated with morphine to manage his pain. See supra, at 39, n.19.

[him] to sleep and it would calm the pain. It wasn't like it would completely go away either," (id. at 344:6-13.) Mr. Moronta testified that his Neurontin prescription was discontinued (id. at 344:14-16) and that he had been prescribed alternative medications for his pain but that he would always go back and ask for something else because what his providers prescribed "was not really having any effect," (id. at 345:25-346:14.) Mr. Moronta testified that he told a previous provider, Dr. Diaz, sometime before she left in 2013 or 2014, about the fact that Neurontin helped with his pain. (Id. at 346:15-347:15.) Mr. Moronta said that he attempted to communicate with his current provider, Dr. Guzman, about the pain he experienced through notes written by others because Mr. Moronta only speaks Spanish and Dr. Guzman does not understand Spanish. (Id. at 347:25-348:15.) Mr. Moronta said that despite his communications regarding his pain, his providers at Eastern Correctional Facility ("Eastern") "never pa[id] any mind" and have not explained why Mr. Moronta is not receiving Neurontin. (Id. at 348:16-21.) Mr. Moronta testified that at some point during his time at Eastern, he received injections that relieved his pain for a few months at a time, but that it had been at least a year since he last received an injection despite his requesting them. (Id. at 348:22-349:18.) Mr. Moronta said he thought he was currently receiving Cymbalta but he did not understand what the

Cymbalta did because it "doesn't create any effect." (Id. at 354:24-355:7.) Mr. Moronta also testified that he had not seen a pain management specialist in the last twelve months, that he had been referred for a pain management consultation in the fall, but that it had not yet occurred. (Id. at 355:8-23.)

The Court found Mr. Moronta to be credible but often imprecise about time periods, pain specialists, and his medications. Mr. Moranta was, however, clear and credible in testifying that he has received injections that effectively treat his pain for about three months at a time, but he has not received them in "a year-plus or even two years." (Feb. 8 Tr. 349:17-18.) Thus, the Court finds that Mr. Moranta has been denied effective pain medication for one to two years.

## III. __Defendants' Fed. R. Civ. P. 12(b)(1) Motions to Dismiss and Voluntary Cessation Doctrine__

### A. __Legal Standards__

On a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "[t]he plaintiff bears the burden of alleg[ing] facts that affirmatively and plausibly suggest that it has standing to sue." Cortlandt St. Recovery Corp. v. Hellas Telecommunications, S.À.R.L, 790 F.3d 411, 417 (2d Cir. 2015) (quotation marks and citations omitted). The Court "accept[s] as true all material allegations of the complaint[ ] and . . .

43

construe[s] the complaint in favor of the complaining party."
Id. (quotation marks and citations omitted).

"A case becomes moot only when it is impossible for a court
to grant 'any effectual relief whatever' to the prevailing
party." Am. Freedom Defense Initiative v. MTA, 815 F.3d 105, 109
(2d Cir. 2016) ("AFDI") (citing Knox v. Serv. Emps. Int'l Union,
Local 1000, 567 U.S. 298, 307 (2012)). "The voluntary cessation
of challenged conduct does not ordinarily render a case moot
because a dismissal for mootness would permit a resumption of
the challenged conduct as soon as the case is dismissed." Knox,
567 U.S. at 307. As a threshold matter, when a defendant claims
to have voluntarily ceased the challenged conduct, a court must
determine:

> whether the challenged conduct has, in fact, ceased. A
> claim will not be found moot if the defendant's change
> in conduct is "merely superficial or . . . suffers from
> similar infirmities as it did at the outset." The
> relevant question is whether the defendant's conduct has
> been "'sufficiently altered so as to present a
> substantially different controversy from the one' that
> existed when . . . suit was filed."

AFDI, 815 F.3d at 109 (quoting Lamar Advertising of Penn, LLC v.
Town of Orchard Park, New York, 356 F.3d 365, 378 (2d
Cir.2004)). Even when a court is convinced that the defendant
has sufficiently altered its conduct, voluntary cessation can
only render a case moot if "(1) it can be said with assurance
that there is no reasonable expectation that the alleged

violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Id. (quoting Cty. of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)) (quotation marks omitted).

"Some deference must be accorded to a [legislative body's] representations that certain conduct has been discontinued." Lamar, 356 F.3d at 376 (quoting Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 59 (2d Cir. 1992)) (alteration in original). "[D]eference to the legislative body's decision to amend is the rule, not the exception." Id. at 377 (quoting Harrison, 981 F.3d at 61). However, for other government entities, the Court must give "some deference" only to their representations on whether they would revert to the previous policy or conduct. Cf. AFDI, 815 F.3d at 110 (after analyzing whether the MTA's conduct was sufficiently altered, held that the MTA's representations regarding reversion were entitled to some deference).

**B. Discussion**

In their moving papers, the SRDs argue that Plaintiffs' equitable claims are moot because DOCCS rescinded the MWAP Policy on February 8, 2021, and replaced it with Policy 1.24A. The SRDs assert that Policy 1.24A gives Plaintiffs the relief they sought in this lawsuit: individualized assessment of

patients and the ability of primary care providers to prescribe appropriate medications without interference by the RMDs. (SRD 12(b)(1) Br. at 8.)[22] Dr. Moores asserts that Plaintiffs lack standing to assert their claims because they have "failed to allege any injury based on Policy 1.24A." (Moores 12(b)(1) Reply at 4.)

Plaintiffs "concede that rescinding MWAP and removing the RMDs mooted any claims for injunctive relief based on their First Claim for Relief." (Pl. PH Br. at 1.) However, the equitable relief that Plaintiffs now seek is tied to their second claim for relief regarding discontinuation of MWAP medications "regardless of the patient's medical needs." (SAC at ¶ 1063.) This connection is further reinforced by the equitable measures Plaintiffs seek in the SAC. (SAC at ¶ 1108 (achieve individualized assessments of Plaintiffs' MWAP needs, create a monitoring body to ensure patients who require MWAP medications are only denied them following a comprehensive individualized assessment).) Plaintiffs' second claim for relief exists independent from the MWAP Policy.  Rather, Plaintiffs challenge

---

[22] The SRDs also contend that DOCCS' rescission of the MWAP Policy is entitled to deference. (SRD 12(b)(1) Br. at 10.) The Court finds that it need not defer to Defendants' representations on whether the violative conduct has, in fact, ceased, because none of the defendants is a legislative body. The Court will, however, give appropriate deference to Dr. Moores' representations that she will not revert to the MWAP Policy.

"the ongoing violations created by continued denials and discontinuations at transfer and other times based on the abuse potential of MWAP medications alone." (Pl. PH Br. at 2.)

Defendants' standing and mootness arguments fail for the same reason: the Court finds that the injuries alleged in the second claim in the SAC continue today. In the SAC, Plaintiffs alleged that DOCCS medical providers deny or discontinue patients' MWAP medication regardless of their medical needs. (SAC at ¶ 1063.) Based on the evidence in the record, presented in the parties' written submissions and hearing presentations, the Court finds that DOCCS medical providers continue to deny and discontinue their patients' MWAP medications without medical justification.

Dr. Moores' evidence showed that the MWAP Policy was replaced by Policy 1.24A and that Policy 1.24A attempted to address many of the shortcomings of the MWAP Policy. Dr. Moores' evidence also showed that she and her deputy, Dr. Kahn, are genuinely attempting to improve DOCCS' standard of care for its chronic pain patients. But Dr. Moores' evidence failed to show that DOCCS providers have stopped denying and discontinuing MWAP medications without medical justification. As noted above, Plaintiffs' evidence demonstrated that chronic pain patients in DOCCS' care frequently have their MWAP medications discontinued

upon transfer to a new facility before they have been seen or assessed by a provider.[23] See supra Sections (II)(B)(i)(a) and (b), testimony of Messrs. Wilkerson and Johnson. Plaintiffs' evidence showed that MWAP medications are discontinued indefinitely upon uninvestigated allegations of misuse. See supra Section (II)(B)(i)(c), testimony of Mr. Dockery. Plaintiffs' evidence also showed that DOCCS providers sometimes fail to provide any consistent, effective treatment to chronic pain patients. See supra Section (II)(B)(ii)(a) and (d), testimony of Messrs. Rahman and Moronta.[24]

Plaintiffs' evidence of current constitutional violations mirrors the allegations they made in the SAC. Thus, Defendants' conduct "suffers from similar infirmities as it did at the outset" and has not been "'sufficiently altered so as to present a substantially different controversy from the one' that existed

---

[23] Dr. Moores' witness, Dr. Kahn, testified that this kind of discontinuation should not happen. Feb. 7 Tr. at 168:6-13:

> Q. Is there a requirement that a provider at a new facility has to reorder all of the medications prescribed from a previous provider?
>
> A. Yes, we continue all the medication the previous provider has written, yes, at least in the start. Subsequently, when we examine the patient, that's the time if we need to make adjustment after talking to the patient, that's something different.

[24] Any deference given to Dr. Moores' representation that she will not revert to the MWAP Policy is overwhelmed by the evidence of on-going denials of effective pain medication.

when . . . suit was filed." <u>AFDI</u>, 815 F.3d at 109 (citation omitted). The Court finds that the conduct Plaintiffs challenged in the SAC has not ceased, the implementation of Policy 1.24A has not "completely and irrevocably" eradicated the effects of DOCCS' deliberate indifference, and the constitutional violations resulting from the unjustified denials and discontinuations of MWAP medications are ongoing.

For the foregoing reasons, Defendants' Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is <u>DENIED</u>.

## IV. <u>Plaintiffs' Motion for Preliminary Injunction</u>
### A. <u>Dr. Moores' Affirmative Arguments</u>

The Court begins this section by addressing some affirmative arguments made by Dr. Moores as to why Plaintiffs' motion for a preliminary injunction is improper.

#### i. <u>Court's Jurisdiction and the Eleventh Amendment</u>

Dr. Moores first claims that the Court lacks jurisdiction to review Plaintiffs' motion for preliminary injunctive relief because it is "based on claims and allegations not alleged in the underlying complaint." (Moores Inj. Opp. at 8.) In support of this claim, Dr. Moores notes that the SAC is based on "events occurring between the years of 2017 and 2019" and that the MWAP Policy was replaced in February 2021 by Policy 1.24A, which Dr. Moores asserts is "an entirely new regime that supersedes,

in all respects, the MWAP Policy that formed the basis of
Plaintiffs' claims" in the SAC. (Id. at 10-11.) Dr. Moores then
accuses Plaintiffs of "improperly . . . alleging a new claim for
the first time in their motion papers – that Section 1.24A is
unconstitutional and gives rise to deliberate indifference in
its implementation because it 'has failed to spur sweeping
changes.'" (Id. at 11.) Dr. Moores writes that Plaintiffs' new
claim is based "solely on events and patient cases from 2021"
which post-date the allegations in Plaintiffs' SAC and "on
allegations of deliberate indifference faced by non-parties to
this case, over whom this Court has no jurisdiction." (Id. at
11.) Dr. Moores also asserts that Plaintiffs' injunction claim
is precluded by the Eleventh Amendment. (Id. at 13-14.)

These arguments fail for the same reasons as the Rule
12(b)(1) arguments discussed above: Plaintiffs' motion for
injunctive relief is based on claims and allegations made in the
SAC, namely those contained in Plaintiffs' second claim for
relief, and the evidence demonstrates that the constitutional
violations alleged are ongoing.

### ii.  Section 1983 Causation and Claims Against Dr. Moores

Dr. Moores next argues that Plaintiffs cannot demonstrate a
"clear and substantial likelihood of success on the merits on
their official capacity deliberate indifference claim" (id. at

13) because "Plaintiffs fail to demonstrate that DOCCS is the
moving force behind any alleged constitutional deprivation,"
(id. at 15). Dr. Moores makes this argument based on the
standard for proving a Monell claim as set out in Kravitz v.
Annucci, 2019 WL 1429546, at *9 (S.D.N.Y. 2019). Dr. Moores
relies on Reynolds v. Giuliani for the proposition that "a state
official may be sued in his or her official capacity for
injunctive or other prospective relief, but only when the state
itself is the moving force behind the deprivation." 506 F.3d
183, 191 (2d Cir. 2007).

Plaintiffs have not asserted a Monell claim against
Dr. Moores. Instead, Plaintiffs seek injunctive relief related
to DOCCS providers' unjustified denial and discontinuation of
MWAP medications, as described in Plaintiffs' second claim for
relief. Where a plaintiff seeks only injunctive relief,
"personal involvement of an official sued in his official
capacity is not necessary." Davidson v. Scully, 148 F. Supp. 2d
249, 254 (S.D.N.Y. 2001) (quotation marks and citations
omitted). Instead, "claims for prospective declaratory or
injunctive relief are permissible provided the official against
whom the action is brought has a direct connection to, or
responsibility for, the alleged illegal action." Id. (citing
Koehl v. Dalsheim, 85 F. 3d 86, 89 (2d Cir. 1996)). Because
Dr. Moores has responsibility as DOCCS' CMO for the alleged

illegal action of her subordinates, Plaintiffs may properly seek injunctive relief targeted to Dr. Moores. As such, Plaintiffs need not establish a deliberate indifference claim against Dr. Moores. If Plaintiffs can establish that the DOCCS providers continue to deny and discontinue MWAP medications without proper medical justification, then the Court may order injunctive relief remedying these harms through Dr. Moores' office.

The Court next turns to the legal standards for granting preliminary injunctions and proving Eighth Amendment claims of deliberate indifference.

### B. <u>Legal Standards</u>

#### i.   <u>Preliminary Injunction</u>

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." <u>Winter v. Natural Res. Def. Council, Inc.</u>, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L. Ed. 2d 249 (2008). A plaintiff who seeks a preliminary injunction that will alter the status quo must demonstrate a "substantial" likelihood of success on the merits. <u>Sunward Elecs., Inc. v. McDonald</u>, 362 F.3d 17, 24 (2d Cir. 2004).

<u>New York Progress and Protection PAC v. Walsh</u>, 733 F.3d 483, 486 (2d Cir. 2013). Once a plaintiff has established a likelihood of success on the merits, an "alleged violation of a constitutional right . . . triggers a finding of irreparable harm." <u>Weisshaus v. Cuomo</u>, 512 F. Supp. 3d 379, 390 (E.D.N.Y.

2021) (quoting Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996)).

### ii.   Eighth Amendment Deliberate Indifference

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). A plaintiff who alleges deliberate indifference to his medical needs must show that "(1) his medical condition was objectively serious (the objective test); and (2) the defendant acted with deliberate indifference to his medical needs (the subjective test)." Bradshaw v. City of New York, 855 F. App'x 6, 10 (2d Cir. 2021) (citing Brock v. Wright, 315 F.3d 158, 162 (2d Cir. 2003)).

The objective test asks "(1) 'whether the prisoner was actually deprived of adequate medical care,' meaning that the officials responsible for his treatment 'fail[ed] to take reasonable measures in response to a medical condition'; and (2) 'whether the inadequacy in medical care is sufficiently serious.'" Green v. Shaw, 827 F. App'x 95, 96 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006)).

> [I]f the unreasonable medical care is a failure to
> provide any treatment for an inmate's medical condition,
> courts examine whether the inmate's medical condition is
> sufficiently serious. <u>Smith v. Carpenter</u>, 316 F.3d 178,
> 185-86 (2d Cir. 2003). Factors relevant to the
> seriousness of a medical condition include whether "a
> reasonable doctor or patient would find [it] important
> and worthy of comment," whether the condition
> "significantly affects an individual's daily
> activities," and whether it causes "chronic and
> substantial pain." <u>Chance v. Armstrong</u>, 143 F.3d 698,
> 702 (2d Cir. 1998) (quotation marks omitted). In cases
> where the inadequacy is in the medical treatment given,
> the seriousness inquiry is narrower. For example, if the
> prisoner is receiving on-going treatment and the
> offending conduct is an unreasonable delay or
> interruption in that treatment, the seriousness inquiry
> "focus[es] on the challenged delay or interruption in
> treatment rather than the prisoner's underlying medical
> condition alone." <u>Smith</u>, 316 F.3d at 185 (emphasis
> omitted).

<u>Salahuddin</u>, 467 F.3d at 280.

The subjective test requires that the charged official act with a "sufficiently culpable state of mind" called deliberate indifference. <u>Salahuddin</u>, 467 F.3d at 280. "Deliberate indifference is a mental state equivalent to subjective recklessness" such that the charged official must act "while actually aware of a substantial risk that serious inmate harm will result." <u>Id.</u> (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 836-37, 839-40, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). "[E]vidence that the risk was obvious or otherwise must have been known to a defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." <u>Brock</u>, 315 F.3d at 164 (citing <u>Farmer</u>, 511 U.S. at 842).

54

If the charged official "'knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent,'" then the official did not act with deliberate indifference. Salahuddin, 467 F.3d at 281 (citing Farmer, 511 U.S. at 844). If a charged official "sincerely and honestly believed . . . that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable," then a jury could infer the absence of a sufficiently culpable state of mind. Id. (quoting Johnson v. Wright, 412 F.3d 398, 404 (2d Cir.2005)). "[A] physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." Chance, 143 F.3d at 703.

### C. Discussion

####    i.   Substantial Likelihood of Success on the Merits of the Deliberate Indifference Claim

#####       a. Restatement of Relevant Facts

The Court begins the preliminary injunction analysis with the prong most likely to decide Plaintiffs' motion: whether Plaintiffs have a shown a substantial likelihood of success on the merits of their deliberate indifference claims against DOCCS medical providers. In the SAC, Plaintiffs alleged a pattern of DOCCS medical providers' discontinuing medications for non-medical reasons and without regard to a patient's individualized

needs. (SAC at ¶¶ 270-1044.) In their moving papers, Plaintiffs asserted that these treatment failures continued after promulgation of Policy 1.24A and detailed the failure of DOCCS medical providers to engage in effective reassessments for the named Plaintiffs. (Pl. Inj. Br. at 4-18.) Plaintiffs describe medical providers who never understood the purpose for the reassessments, did not conduct physical exams, ignored specialist recommendations for effective MWAP medications, dismissed Plaintiffs' pain as not requiring serious treatment, and discontinued needed prescriptions "based on remote incidents of substance addiction, diversion and, even, criminal records." (Id. at 7.) Plaintiffs also offered examples of patients who had not received reassessments or treatment (id. at 19-20) and asserted that DOCCS was still discontinuing effective treatment based on non-medical reasons such as transfers or allegations of misbehavior, (id. at 20-21). Plaintiffs contend that of the sixty-nine patients that Plaintiffs' expert studied, about a third still required proper reassessments and treatment. (Id. at 21.) In their post-hearing brief, Plaintiffs summarize the flaws in DOCCS' curative efforts:

> 1) DOCCS never communicated the change in policy to the outside specialists; 2) DOCCS never trained its own providers on 1.24A; 3) many patients never received effective treatment even after the reassessments indicated such treatment was appropriate; 4) many patients have not received reassessments or treatment at

all, and [5]) patients were still being discontinued
from effective treatment upon transfers.

(Pl. PH Br. at 3.)

Against this evidence, Dr. Moores offered her declaration
describing the steps she has taken to "reform[] the prior system
for prescription of pain management medication" and implement
the DOCCS' new health Policy 1.24A. (Moores Decl. at ¶ 18.)
Dr. Moores asserted she had conducted audits to assess the
implementation of Policy 1.24A; modified Policy 1.24A to
eradicate RMD involvement in approving non-formulary
medications;[25] established an auditing and monitoring body to
oversee the treatment of chronic pain patients; proposed draft
credentialing and competency policies; directed DOCCS' vendor to
approve all specialty pain referrals; implemented new mandatory
training regarding chronic pain evaluation and treatment;
drafted new forms to conduct annual pain reassessments;
initiated the process of transitioning DOCCS to electronic
medical records; and circulated a memo to DOCCS' staff

---

[25] The term "non-formulary medication" refers to DOCCS' Formulary
Book, which lists "what specific drugs in each therapeutic class
are available to physicians to prescribe without further
approval." (SAC at ¶ 45.) Non-formulary medications "are not
kept in stock on site at a DOCCS facility and require approval
before they can be ordered." (Moores Decl. at ¶ 26.) On October
31, 2022, Dr. Moores issued a memo that read in part: "all non-
formulary medication requests are reviewed only by the Chief
Medical Officer, the Deputy Chief Medical Officer and select
PCPs." (Dkt. no. 489-3 (emphasis in original).)

"reminding them of their obligations under Policy 1.24A and
advising that strict compliance was required." (Moores Inj. Opp.
at 7-8.) Dr. Moores also wrote that she had personally reviewed
the medical records of thirty-eight patients mentioned in
Plaintiffs' moving papers from February 2021 through October
2022. (Moores Decl. at ¶¶ 86-87.) Dr. Moores declared that after
this review, she did not find that "any patient's treatment has
lapsed or become urgent," any evidence that pain medications
were discontinued or specialty referrals denied "for non-medical
reasons" (except in the case of one specialty referral), or any
evidence that pain medications or specialty referrals were
denied "because of any policy." (Id. at ¶¶ 90-94.) Dr. Moores
listed thirteen patients where she had followed up to "ensure
that the patient was receiving the appropriate care." (Id. at
¶ 95.) Dr. Moores also disclosed that on November 21, 2022, she
would visit Shawangunk, a facility where Dr. Win is the only
medical provider, to "initiate a review of Dr. Win's work and to
assess the needs of the facility." (Id. at ¶ 96.) Dr. Moores
indicated her desire to discuss patients Mark Daniels, Hugh
Knight, Rashid Rahman, Felipe Rivera-Cruz, Jose Burgos, and
Ronald Diggs with Dr. Win during her visit. (Id.)

In Plaintiffs' reply papers, they note that despite
Dr. Moores' specific attention to the treatment of Plaintiffs
Daniels, Knight, Rahman, Rivera-Cruz, Burgos, and Diggs, as of

December 9, 2022, only Mr. Knight had received treatment recommended by specialists. (Pl. Inj. Reply at 6.) Plaintiffs also noted two instances of discontinuation that occurred after Dr. Moores filed her papers opposing the preliminary injunction. Mr. Dockery's treatment was discontinued after he refused a mouth check with a flashlight that had been in the mouths of other inmates. See supra Section (II)(B)(i)(c). Mr. Johnny Lopez's Neurontin was discontinued after he transferred between DOCCS facilities. (Pl. Inj. Reply at 6-7.)

Bolstering Plaintiffs' case for both the objective and subjective prongs of deliberate indifference are several admissions Dr. Moores made in her declaration. Dr. Moores wrote that "the MWAP Policy placed all decision-making authority into the hands of the [RMDs] regarding the prescription of pain management medication and as a result, many patients were denied the pain treatment they needed." (Moores Decl. at ¶ 13.) Further, from July to October 2022, Dr. Moores conducted a series of audits in which she found that "some" of DOCCS' forty-four facilities "were following 1.24A properly, consistently and meeting expectations." (Id. at ¶ 32.) Based on her audits, Dr. Moores

> determined that it was necessary to implement certain department-wide changes and continue to strategize further changes so that there is consistency in how Policy 1.24A is implemented. [Her] goal in making this determination was to ensure that all DOCCS medical staff

are providing medical services to pain patients in accordance with the standard of care.

(Id. at ¶ 33.)

### b. **Analysis**

Deciding whether Plaintiffs have shown a substantial likelihood of success on the merits requires an analysis of the Eighth Amendment violations they have documented. The Court returns to the evidence presented in the February 2023 hearing and underlying papers to highlight some representative examples from the wider record.

Mr. Wilkerson's narcotic pain medication was discontinued in May 2022 upon transfer to a new facility before he met with a medical provider. (Feb. 7 Tr. at 271:11-272:11.) Mr. Wilkerson testified that without his medication, his sickle cell anemia renders him immobile and unable to care for himself. (Id. at 257:21-25.) Mr. Wilkerson said that his medication is essential to avoiding sickle cell crises that could lead to hospitalization and even death. (Id. at 257:17-258:8.) Though the discontinuation was relatively brief at nine days, Mr. Wilkerson's medication was only restarted after intervention by counsel and the Court. (See dkt. nos. 375-377.) Mr. Wilkerson testified that his provider, Dr. Burke, told him that Dr. Burke's "hands [we]re tied because this is how DOCCS does things" (Feb. 7 Tr. at 272:14.), leading the Court to believe

that Mr. Wilkerson's discontinuation might have lasted longer
had the parties not acted.

Together, these facts meet the objective seriousness prong
of deliberate indifference. Sickle cell anemia should certainly
be "worthy of comment" to a reasonable doctor or patient, and
Mr. Wilkerson testified that his disease "significantly affects"
his daily activities and causes "chronic and substantial pain."
Salahuddin, 467 F.3d at 280. Though the discontinuation was
relatively brief, the Court credits the brevity to counsel's
quick intervention and not any choice on the part of
Mr. Wilkerson's DOCCS providers. Further, for an illness with
such drastic consequences as sickle cell anemia, where a lapse
of treatment could spur a crisis resulting in hospitalization or
death, any discontinuation of treatment should be considered
objectively serious.

DOCCS' mistreatment of Mr. Wilkerson also meets the
standard for a provider acting with a sufficiently culpable
state of mind. Mr. Wilkerson testified that Dr. Burke told him
that if Dr. Burke was Mr. Wilkerson's private practice doctor
outside of DOCCS, then Mr. Wilkerson would "automatically" get
narcotic pain medication because his sickle cell anemia required
such treatment: "it's textbook stuff." (Feb. 7 Tr. at 272:15-
17.) Such a statement suggests that Dr. Burke acted "while

61

actually aware of a substantial risk that serious inmate harm will result." Salahuddin, 467 F.3d at 280. Further, Dr. Moores' and Dr. Kahn's testimony that "there is no policy, custom or practice in place at DOCCS that prohibits [PCPs] from prescribing their choice of pain treatment" (Moores PH Br. at 3-4) discredits the assertion that Mr. Wilkerson testified his PCP, Dr. Burke, made in denying Mr. Wilkerson narcotic pain medication – that Dr. Burke's "hands [we]re tied because this is how DOCCS does things," (Feb. 7 Tr. at 272:12-15). Thus, DOCCS' treatment of Mr. Wilkerson meets the subjective prong of deliberate indifference as well.

DOCCS treatment of Mr. Rahman also meets the deliberate indifference standard. Mr. Rahman suffered a failed back surgery that left him in "excruciating" chronic pain (Feb. 8 Tr. at 391:8-10) and required lengthy stays at two DOCCS RMUs, Coxsackie and Walsh, where DOCCS treats "patients who are really sick who cannot stay in the general population" because "they need a lot more care and treatment," (Feb. 7 Tr. at 151:6-11.) Mr. Rahman testified that while he was at Coxsackie and Walsh, he received Ultram to manage his pain (Feb. 8 Tr. at 393:7-394:15,) but that his pain medication was discontinued when he was transferred to Shawangunk, (id. at 394:18-395:14). Mr. Rahman also testified that his chronic pain is serious enough that without his medication, he is prevented from

sleeping and sometimes unable to attend outside medical appointments. (Id. at 396:19-24.) Once again, these facts meet the objective prong of the deliberate indifference standard. Excruciating chronic pain resulting from a failed surgery meets the "chronic and substantial pain" standard contemplated by the objective test, and Mr. Rahman testified credibly that his pain affects his daily activities such as his ability to sleep and attend medical appointments. Salahuddin, 467 F.3d at 280.

Regarding the subjective prong of the test, Mr. Rahman testified that he "continuously expressed" his pain to Shawangunk medical staff, that Ultram helped with his pain, and asked for his Ultram prescription to be reinstated. (Feb. 8 Tr. at 396:25-397:8.) When Mr. Rahman's provider, Dr. Win, sent Mr. Rahman for a pain management consultation with a specialist, the specialist recommended Ultram to treat Mr. Rahman's pain. (P-10 at 299.) However, Dr. Win refused to reinstate Mr. Rahman's prescription, instead telling Mr. Rahman that Dr. Win would prescribe Ultram for Mr. Rahman only in short spurts while under observation in the Shawangunk infirmary. (Pl. PH Br. at 19.) Under the circumstances, it should have been obvious to Dr. Win that refusing to prescribe consistent effective pain medication to Mr. Rahman would leave Mr. Rahman in an unacceptable amount of pain, which is sufficient to allow the Court to conclude that Dr. Win was actually aware of the serious

risk of inmate harm that would result from his actions. Brock, 315 F.3d at 164 (citation omitted). Further, the Court finds that Dr. Win consciously chose "an easier and less efficacious treatment plan" because he knew that the pain management specialist had recommended that Mr. Rahman be treated with Ultram. Chance, 143 F.3d at 703.

The Court acknowledges that one or two random examples of inmates' being denied adequate pain medications might not be sufficient to demonstrate a likelihood of success on the merits, but that is not this case. Here, despite the best intentions of Dr. Moores and Dr. Khan, the totality of the evidence detailed above demonstrates a pervasive failure across multiple DOCCS facilities of multiple DOCCS medical providers to provide reasonable pain medications to inmates suffering from debilitating pain while actually aware that the lack of medication would result in such pain – that is, with the requisite objective pain and subjective state of mind. Thus, the Court concludes that Plaintiffs have met their burden of showing a substantial likelihood of success on the merits of their Eighth Amendment claim. Because Plaintiffs have made this showing and alleged a constitutional violation, this triggers a finding of irreparable harm. Weisshaus, 512 F. Supp. 3d at 390 (quoting Jolly, 76 F.3d at 482).

### ii.   <u>The Balance of Equities and In the Public Interest</u>

In their brief, Plaintiffs assert that there is no reason "medical, penological, or otherwise" for DOCCS' ongoing constitutional violations. (Pl. Inj. Br. at 28.) Plaintiffs balance that against their interest in remedying the "cruel and inhumane treatment" they have endured. (<u>Id.</u>) Defendants ask the Court to add to the other side of the scale the interest New York State has in the "administration of its own facilities" and the interest of the federal courts in giving "appropriate consideration" to principles of federalism when "determining the availability and scope of equitable relief." (Moores Inj. Opp. at 22-23 (quoting <u>Dean v. Coughlin</u>, 804 F.2d 207, 213 (2d Cir. 1986) (citations omitted)).) The Court finds that remedying the constitutional violations in DOCCS' pain management practices outweighs New York State's administration interest and the federalism principles that caution against intervention by federal courts. Therefore, the Court finds that the balance of equities tips in Plaintiffs' favor and that a preliminary injunction would be in the public interest. Plaintiffs' motion for a preliminary injunction is <u>GRANTED</u>.

## V.   <u>Conclusion</u>

For the reasons above, Defendants' motion to dismiss for pursuant to Rule 12(b)(1) (dkt. no. 101) is <u>DENIED</u>. Plaintiffs' motion for a preliminary injunction (dkt. no. 373) is <u>GRANTED</u>.

Out of consideration for the cautions embodied in Dean v. Coughlin, 804 F.2d 207, 213 (2d Cir. 1986), the Court will reserve ruling on the provisions of the injunction until it has heard from the parties. Counsel shall confer and submit a proposal for the provisions of the preliminary injunction.

The Clerk of the Court shall close the open motion. (Dkt. no. 373.)

**SO ORDERED.**

Dated:     March 31, 2023
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge