```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

PETER ALLEN, on behalf of
themselves and others
similarly situated, et al.,
              Plaintiffs,

         v.                              19 CV 08173(LAP)

CARL KOENIGSMANN, MD, et al.,
              Defendants.

------------------------------x
                                         New York, N.Y.
                                         May 9, 2023
                                         12:10 p.m.

Before:

                    HON. LORETTA A. PRESKA,

                                         District Judge

                            APPEARANCES

LAW OFFICE OF AMY JANE AGNEW
     Attorneys for Class Plaintiffs
BY:  AMY JANE AGNEW
     JOSHUA LEE MORRISON

WHITEMAN OSTERMAN & HANNA
     Attorney for Defendant Moores
BY:  ORIANA KILEY

CONWAY, DONOVAN & MANLEY PLLC
     Attorney for Defendants Andola, Gusman, Lee, Mantaro,
Karandy, Acrish, Ashong, Braselmann
BY:  RYAN E. MANLEY

NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
     Attorneys for Defendants Koenigsmann, Mueller, Dinello,
Hammer, Salotti
BY:  MICHAEL J. KEANE
     DANIEL SHULZE
     IAN RAMAGE
```

1                THE COURT:  For plaintiff, please.
2                MS. AGNEW:  Good afternoon, your Honor.
3                Amy Jane Agnew for plaintiff class, Law Office of
4      Amy Jane Agnew.
5                MR. MORRISON:  And Josh Morrison.
6                THE COURT:  Good morning.
7                For defense.
8                MS. KILEY:  Good morning, your Honor.
9                Oriana Kiley on behalf of Dr. Moores in an official
10     capacity.
11               MR. MANLEY:  Good morning, your Honor.
12               Ryan Manley from Conway Donovan & Manley on behalf of
13     the non-state representative defendants.
14               THE COURT:  Mr. Manley.
15               MR. KEANE:  Good afternoon, your Honor.
16               Michael Keane from the Office of the
17     Attorney General --
18               THE COURT:  Yes, sir.  Good afternoon.
19               MR. KEANE:  -- for the CMOs.
20               MR. SCHULZE:  Daniel Schulze, also for the
21     state-represented defendants.
22               THE COURT:  Good afternoon, Mr. Shulze.
23               MR. RAMAGE:  And Ian Ramage --
24               THE COURT:  Good afternoon.
25               How would you like to proceed, counsel?  How are going

1     to get the language of the preliminary injunction, please?
2              And, Ms. Kiley, let me just say this:  In my view, the
3     order which you folks sent in with your May 4 letter is really
4     bordering on bad faith, that in your view, the only order would
5     be that the state medical providers provide pain treatment to
6     the mentioned individuals is really quite ridiculous.  So it
7     was not a very helpful proposed order.  So I ask again, how are
8     we going to get the language of a preliminary injunction?
9              And I will point you folks to the language in the
10    second amended complaint that is quoted at the top of Page 4 of
11    the Court's opinion and order at Docket Number 552.  And that
12    recounts the equitable relief that plaintiffs were seeking and
13    are seeking in the second amended complaint.
14             So how are we going to get this written down, counsel?
15             MS. KILEY:  Your Honor.  Sorry.  May I be heard?
16             THE COURT:  Yes.
17             MS. KILEY:  The order that follows the details of the
18    findings of the Court for each of the seven witnesses who
19    testified was written because we took all the findings and
20    analyzed the conclusions made by the Court with respect to the
21    analysis' unlikelihood of success on the merits, which the
22    Court found that there was failure across several DOCCS
23    facilities that medical providers are not prescribing pain
24    medication reasonably.  So that was what formed the basis of
25    the language that we have in there.

1      We understand that throughout this litigation, that my
2 adversary has been advocating for what is referred to as
3 individualized assessments and monitoring.
4      During a meet-and-confer, I asked my adversary if we
5 can carve out some time to discuss what those terms actually
6 mean, to which the response was no.  I turned to my client,
7 Dr. Moores, to ask what is an individualized assessment with
8 respect to chronic pain, and Dr. Moores explained that it's
9 actually not something that's utilized or recognized in
10 medicine.
11      She explained that outside of this litigation, the
12 only time she's ever really heard the term individualized
13 assessment is in the context of patients with disabilities, to
14 assess whether or not they need reasonable accommodations.  So
15 even my client is confused, because as far as she knows, every
16 time a patient is seeing a provider, they are being assessed,
17 they are being evaluated.
18      THE COURT:  Counsel, you're ignoring the findings that
19 were made in the March 31 opinion and order.  And the findings
20 specifically say that DOCCS medical providers continue to deny
21 and discontinue their patients' MWAP medications without
22 medical justification.  There were examples given in the
23 opinion of discontinuation for none medical reasons.  What we
24 are looking for and what should be abundantly clear from
25 reading the request for equitable relief is that pain

1   medications be prescribed or discontinued only for medical
2   reasons.
3               Is there any reason that you can't figure out how to
4   write that down?  And I'll also point you to Dr. Moores'
5   declaration, which is summarized at Page 57 of the opinion and
6   order, where she goes on to talk about some of the actions she
7   has taken to assure the proper implementation of policy 1.2
8   4(A).  That should be a starting point.  Why is it that you
9   can't write this down?
10              MS. KILEY:  Your Honor, our apologies.  We certainly
11  didn't mean any bad faith.  We're hoping to engage in
12  productive discussions with our adversary.  But, unfortunately,
13  it didn't happen that way.  We do think there are some terms
14  that need to be further refined.
15              THE COURT:  Why don't you write them down, counsel?
16  As I recall it, I instructed your side of the table to write
17  down a proposed order.  When are we going to do that?  Your
18  time to appeal is not going to start until we get an order.  If
19  you want to appeal, which I know you do because you've already
20  filed a notice, you better get the order together.  And the
21  90 days does not start running until we get an order.  So how
22  are we going to do that?
23              MS. KILEY:  We can certainly continue a draft and
24  communicate with our adversary prior to filing another draft
25  with the Court.

1        THE COURT:  All right.  Do you understand that the
2   relief granted is to extend to all chronic pain patients, not
3   just the named individuals who you included in Exhibit A to
4   your May 4 letter?  Do you understand that, counsel?
5        MS. KILEY:  Respectfully, your Honor, to have the
6   preliminary injunction apply to the class we think is at odds
7   with both the PLRA and with 23(b)(2).  The PLRA, as we know,
8   requires that the injunction be narrowly tailored with the
9   least intrusive means.  If my adversary is looking for
10  individualized assessments of 600-plus patients in 90 days,
11  that's not -- we don't believe that's realistic or reasonable.
12       THE COURT:  I also don't think that's what's being
13  requested.
14       Could someone from plaintiff's table enlighten us on
15  that topic?
16       MS. AGNEW:  Your Honor, I've had some concerns since
17  this opinion was issued that what defendants really wanted us
18  to do was draft the injunction so that they would have further
19  grounds for appeal.  I get it.  But what we need, and they
20  actually ask the Court for, was to put forward a plan pursuant
21  to the Second Court's holding in *Dean v. Coughlin.*  We gave
22  them this opportunity, and we agree with the Court, this is
23  incredibly bad faith for a whole host of reasons.
24       I want to circle back to this notion of individualized
25  assessments.  There are actually two moments during our hearing

when Dr. Moores endorsed her definition of individualized assessments that she had sent via e-mail to her own providers. We simply ask that she adopt what she has recognized in her own writing to be an individualized assessment so that it can be done.

And I think the main salient points in that hearing were, one, that DOCCS hadn't identified the people who were injured; two, that they hadn't trained providers to stop the Constitutional violations; and three, that they had come forward with no plan for implementing individualized assessments. We certainly don't anticipate that they can get that done in 90 days, but we need a plan. And we gave them the ascertainability tools to start to identify those people. And I think when we get back this thing about the seven putative class members when I've got a class certified, it's bad faith.

We know who these people are. We at least know who 660 of them are. What's the plan? And we don't have a plan.

And, in fact, what I will say, I was told by Defendant Moores' counsel she'd be happy to sign a consent order, but she doesn't want to pay my fees and costs. And I get that. And I'll draft the consent order, but we are going to get our fees and draft orders anyway. The goal right now is to get injunctions and to get people treated.

And as I pointed out to the Court, we had to intervene just this last week to get medication for Mark Daniels, who sat

1   on the stand and said he had no medication.  He got it, they

2   transferred him, he got caught off.  This has to end, and it

3   has to move fast.

4              She asked me for three weeks for this, and this is

5   what we got.  I think they get one more than week, we get a

6   real plan, we get a real plan for identifying people, and for

7   getting them assessed.

8              MS. KILEY:  Your Honor, two things I want to address.

9   As far as identifying victims of MWAP, the definition that was

10  recognized -- excuse me.  The definition of the injunctive

11  class that was put forward by plaintiffs that was recognized by

12  the Court are individuals who are or will be incarcerated, and

13  individuals who are or will suffer from chronic neuropathies.

14  Identifying victims of MWAP from the past doesn't fit this

15  definition.  And I don't believe there's been any case law or

16  authority to put this onus on the defendants to identify who

17  might be in plaintiff's class.

18             Further, we also know that at the beginning of this

19  litigation, all of the MWAP request forms were already turned

20  over to plaintiffs.  So they have the information available to

21  them as far as which patients were denied MWAP medications

22  during the time period alleged in the second amended complaint.

23  So as to --

24             THE COURT:  And so what?

25             MS. KILEY:  And so we don't believe that incorporating

1  a term that Dr. Moores should go back and identify the victims

2  of MWAP fits into a preliminary injunction.  It would be the

3  plaintiffs who should identify who's in their class.

4           MS. AGNEW:  Your Honor, please.  First of all, I can't

5  use the names in the database because of our HIPAA qualified

6  protective order.  They know that.  They asked me to sign it.

7  I actually drafted it for them.  This is actually Dr. Moores'

8  Constitutional violation to correct.  It's not my

9  Constitutional violation to correct.  They know who they are.

10 They gave me the forms.  Start going down the list.

11          MS. KILEY:  If I may.  The Court in *Walmart* expressly

12 went into great detail about what (b)(2) actually means.  The

13 (b)(2) class is regarded as having no individual right to a

14 particular relief independent of any other class member.  So to

15 ask for an injunction to apply to 600-plus patients, who, which

16 already goes beyond the scope of what the PLRA allows, and to

17 have them looked into individually, they don't fit into the

18 PLRA or the (b)(2) class for purposes of a preliminary

19 injunction.

20          THE COURT:  I'm actually not understanding what you're

21 saying, counsel.

22          MS. KILEY:  For the scope of the injunction to be

23 600-plus goes outside of what the PLRA requires.  The PLRA

24 requires that it be narrow and least intrusive mean "and no

25 more than necessary."

1           The (b)(2) class also --

2           THE COURT:  I'm not sure that the 600 people is not
3  exactly that.  How are you going to identify the individuals
4  who need to be looked at to be sure they are getting the pain
5  medication they need?  What's your idea?

6           MS. KILEY:  Our idea is that the plaintiffs tell us
7  who is in their class.

8           THE COURT:  It's not their job.  It is the job of the
9  defendants to identify who might be a chronic pain victim to
10 assess whether those individuals are getting the proper
11 treatment or not.  And then there's the training aspect of it.

12          I thought all of this was pretty clear in the opinion.
13 And, indeed, Dr. Moores, in her testimony, admitted that there
14 had been no effort to identify the individuals.  She, herself,
15 as I recall it, undertook some auditing, but that was by no
16 means a comprehensive review of who might be requiring chronic
17 pain treatment.

18          MS. KILEY:  Your Honor, our reading of the case law is
19 a certified (b)(2) class is one that challenges a system or
20 policy of practice, and it's not to evaluate individually the
21 needs of each class member.

22          THE COURT:  The system or practice that is being
23 challenged here and which was found to exist was the practice
24 of medical providers discontinuing or failing to prescribe pain
25 medications for chronic pain victims who needed them.  That's

1    what the practice was.  The question is, how are we going to
2    write the order that requires not only that practice to cease
3    but requires the review of all of the chronic pain patients to
4    be sure they are getting the medication that they need.
5             Again, I'll point you back to Dr. Moores' declaration.
6             MS. AGNEW:  We can certainly go back and talk to
7    Dr. Moores to draft additional terms.
8             THE COURT:  Why don't you folks go in the jury room
9    and see what you can come up with?  I will give you pads of
10   paper.  I see you have pads of paper.  Why don't you go in
11   there and sit down and take a look and start writing?  I think
12   that's going to be a lot more useful than waiting two weeks and
13   getting two more pieces of paper.
14            Is there any reason we shouldn't do that?
15            MS. KILEY:  No.  But, your Honor, at the conclusion of
16   a discussion, I, of course, have to go back to Dr. Moores.
17            THE COURT:  Of course.  But you people need to start
18   writing it down so that you know what is going to happen, and
19   with great specificity, so that there are no questions about
20   it.  Let's go.
21            Is there anything else you want to talk about before
22   we break to allow you to write?  Anything else?
23            MS. AGNEW:  I do think, your Honor, plaintiffs would
24   like to address a notion of a trial for permanent injunctions.
25   We don't share defendants' view that we can't motion for that,

1  especially given the record that was created on the preliminary
2  injunction.  And we would even point out that the cases
3  defendants cited even say that it is proper when there are no
4  questions of fact.  We don't think there's no question of fact
5  that they didn't train anyone, they didn't identify anyone, and
6  they didn't fix the problem.
7       So we want that discussion to be live.  I don't read
8  the PLRA as to be giving them 90 days to fix it and try to moot
9  our preliminary injunctions.  I read the PLRA as not having
10  temporary relief floating out there that has no buttressing.
11  So we want to do that, and we want to do it quickly.  We think
12  our clients need it.  We especially think our clients need it
13  in light of this.
14       THE COURT:  Why don't you do that while you are
15  breaking to write.  We will get together some dates in about
16  90 days out, and you put them on your calendar for trial, if
17  that needs to be done.  If it doesn't need to be done, we can
18  always erase the dates.  If, for some reason, you think it has
19  to be done on papers, then you can do that too.  But we'll give
20  you dates now to put on your calendars.
21       Anything else before you break?
22       MS. KILEY:  Just a viewpoint on the --
23       THE COURT:  Yes, ma'am.
24       MS. KILEY:  Should I address them now or later?
25       THE COURT:  Tell me what you want.

1     MS. KILEY:  Okay.  Very briefly, your Honor.  We think
2  the substitution of a permanent injunction is very premature
3  right now.  We would ask that the Court give us an opportunity
4  to show that whatever terms we ultimately put in, that we be
5  given an opportunity to show we can comply with them.  And
6  additionally, we, if there is a trial date set just in case, we
7  definitely would like an opportunity to move for summary
8  judgment before that.
9     THE COURT:  I think I said we will put the trial date
10 down so you have it on your calendars.  If you think you can do
11 it on papers, you're welcome to do that too.
12    MS. KILEY:  Okay.  Thank you.
13    THE COURT:  All right.  Thank you.  Off the record.
14    (Discussion off the record)
15    (Recess)
16    THE COURT:  So what do we have to report?
17    MS. KILEY:  Your Honor, we had the opportunity to meet
18 and confer, and we were able to articulate terms that I'm able
19 to draft an updated proposed preliminary injunction.  Of
20 course, I do need time to draft it and discuss it with
21 Dr. Moores.  Plaintiff's counsel is willing to work with me in
22 that process to make sure that the language is appropriate, and
23 we believe we are able to file an updated draft with the report
24 next week.
25    THE COURT:  Wonderful.  Wonderful.

Case 1:19-cv-08173-LAP   Document 583   Filed 05/19/23   Page 14 of 14      14
N596ALLC                        CONFERENCE

1           What would you like to do?  I can give you three
2    dates.  You can have the week of August 7, you can have
3    September 5, which is the day after Labor Day, or October 2.
4    Obviously, the 90 days is going to run, but perhaps you can
5    confer.  Do you want to put down the week of October 7?
6    Because that's as close as we can probably get to 90 days.
7           MS. AGNEW:  We can do August 7.
8           THE COURT:  August 7?  Forgive me.  That's what I
9    meant, August 7.
10          Put that in your books for trial, and then we can talk
11   about summary judgment some other time.
12          MS. KILEY:  Okay.
13          THE COURT:  Before you go making any motions, why
14   don't we talk about it.  Okay?
15          MS. AGNEW:  I did suggest to counsel that maybe
16   pre-motion letters are in order.
17          THE COURT:  Yes, indeedy.
18          MS. AGNEW:  The normal trigger conversation?
19          THE COURT:  The usual.
20          MS. AGNEW:  Okay.
21          THE COURT:  What else, friends?
22          MS. AGNEW:  I think we're good, your Honor.
23          THE COURT:  All right.  Nice to see you.  Thank you.
24          (Adjourned)
25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300