N5v2AllC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     PETER ALLEN, on behalf of
3    themselves and others
     similarly situated, *et al.,*
4
                      Plaintiffs,
5
                 v.                            19 Civ. 8173 (LAP)
6
     CARL KOENIGSMANN, M.D.,*et al.,*
7
                      Defendants.
8    ------------------------------x
                                               New York, N.Y.
9
                                               May 31, 2023
10                                             10:30 a.m.

11   Before:

12                   HON. LORETTA A. PRESKA,

13                                             District Judge

14
                              APPEARANCES
15
     LAW OFFICE OF AMY JANE AGNEW
16        Attorneys for Class Plaintiffs
     BY:  AMY JANE AGNEW
17        JOSHUA LEE MORRISON

18   WHITEMAN OSTERMAN & HANNA
          Attorney for Defendant Moores
19   BY:  ORIANA KILEY
          WILLIAM S. NOLAN
20
     CONWAY, DONOVAN & MANLEY PLLC
21        Attorney for Defendants Andola, Gusman, Lee,
          Mantaro, Karandy, Acrish, Ashong, Braselmann
22   BY:  RYAN E. MANLEY

23   NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
          Attorneys for Defendants Koenigsmann, Mueller,
24        Dinello, Hammer, Salotti
     BY:  MICHAEL J. KEANE
25        IAN RAMAGE
          PAMELA KNIGHT

N5v2AllC

```
 1              (Case called)
 2              THE COURT:  Good morning, counsel.  Judge Preska here.
 3              COUNSEL:  Good morning.
 4              THE COURT:  Who is on for plaintiffs, please?
 5              MS. AGNEW:  Good morning, your Honor.  A.J. Agnew here
 6    with Josh Morrison, and we have three summer law clerks.
 7              THE COURT:  Wonderful.  And who is on for Dr. Moores,
 8    please?
 9              MS. KILEY:  Good morning, your Honor.  Oriana Kiley
10    and Will Nolan.
11              THE COURT:  Good morning.
12              Anybody else on?
13              MR. KEANE:  Yes.  Michael Keane, from the Office of
14    the Attorney General.  Good morning.
15              THE COURT:  Good morning, Mr. Keane.
16              MR. RAMAGE:  And Ian Ramage and Pamela Knight, also
17    with the Attorney General's office.  Good morning, your Honor.
18              THE COURT:  Good morning.
19              MR. MANLEY:  Ryan Manley, from Conway Donovan &
20    Manley, on behalf of the non-State represented defendants.
21    Good morning, your Honor.
22              THE COURT:  Good morning, Mr. Manley.
23              Who else?  Okeydoke.
24              I received Dr. Moores' letter dated May 30.  Do
25    plaintiffs have a response?
```

N5v2AllC

1          MS. AGNEW:  We don't, your Honor.  We actually spent a

2     lot of time on that proposed form of order.  We think it is

3     quality.  We think it does what it needs to do.

4          I don't know what more I can say.  If they have a

5     problem with the temporal constraints, I didn't see them

6     actually offer alternative suggestions.  So if they need six

7     months to comply, I think that's something we are happy to talk

8     about, but all I heard was, *We can't get it done.*  I didn't

9     hear when we can get it done.

10          THE COURT:  Okay.  With respect to the items -- by the

11     way, Ms. Kiley, do you want to respond now?  Do you have

12     anything else to say on that?

13          MS. KILEY:  Yes.  Just that, you know, I wasn't sure

14     how far we were going to go as far as letting both parties

15     offer proposals, which is the only reason I didn't offer

16     further suggestions or proposals in response to plaintiffs'

17     proposal.  But I do -- I just have more to say on Dr. Moores'

18     behalf as far as the terms and the way they are phrased.  It is

19     just very vague and there are a lot of terms that need to be

20     defined.  I know that Dr. Moores is not going to be comfortable

21     executing the order the way it is drafted by plaintiffs, and I

22     hope that the Court, you know, would consider, at the very

23     least, the second draft that Dr. Moores put forward to the

24     Court.

25          THE COURT:  Ms. Agnew.

N5v2AllC

```
 1              MS. AGNEW:  Your Honor, look, our position is that
 2     policy 1.24A was put forth by Dr. Moores and by DOCCS as a
 3     solution to the ongoing constitutional violation.  We think
 4     that we evoked testimony during our evidentiary hearing that
 5     the primary problem right now is compliance and enforcement.  I
 6     think this preliminary injunction just asks that they comply
 7     with and enforce the policy.  And, in fact, it really just
 8     mimics what Dr. Moores has told the Court that she was going to
 9     do.
10              I have to say, I was a little surprised to see in
11     Ms. Kiley's letter that Dr. Moores "intends on training the
12     staff," because Dr. Moores said to the Court in November of
13     2022 she was going to do that.  It is now June of '23 and we
14     still don't have staff training.  I'm at a loss as to why that
15     would be.
16              But I do think that our proposed form of order just
17     generally tracks what DOCCS has already said it's willing to do
18     and, in fact, intends on doing.
19              THE COURT:  Anything else, Ms. Kiley?
20              MS. KILEY:  Yes, your Honor.
21              Respectfully, the Court and plaintiffs asked for a
22     plan.  We put together a specific plan in our second proposal,
23     and now plaintiffs' counterproposal now backtracks and gets
24     very vague again.
25              So just by way of example, paragraph 4 that says
```

N5v2AllC

"identify those who suffer," well, when Dr. Moores reads that,
she says, *Well, okay, there's 32,000 incarcerated individuals.*
*Are we supposed to review all their records or do we interview*
*them and take a survey?*

          And again, the time constraints are completely
unrealistic to do that.  We are looking at at least an hour, if
not more, for each and every evaluation.  It is unworkable as
it is written, and we are very concerned.

          THE COURT:  Except for I don't expect that you will
have to reevaluate all 38,000 inmates, right?

          MS. KILEY:  We certainly hope not, but the way that it
is written in plaintiffs' proposal, it is not clear.

          THE COURT:  Okay.  How do you want to write it?  I'm
looking at paragraph 4.  What do you want it to say?

          MS. KILEY:  I would respectfully defer to the language
that was put into the second proposal, and when I say --

          THE COURT:  Tell me what the language is.

          MS. KILEY:  I would respectfully turn the Court's
attention to Docket 579-1.

          THE COURT:  Read it out loud, please.  I have my copy
in front of me.  We are doing this now together because you
people can't sit down and do it yourselves.  So read to me the
language you propose.

          Ms. KILEY:  Okay.  So paragraph (g) on page 5 of our
proposal states, "Dr. Moores, or her designees, shall review

N5v2AllC

1    records maintained by DOCCS central pharmacy to determine

2    whether any incarcerated individual had medications

3    discontinued under the MWAP policy between 2017 and 2019."

4              THE COURT:  That's not the text.  That's not the text.

5              MS. KILEY:  Excuse me?

6              THE COURT:  That's not the text.  That's part of the

7    text, but that's not the text.  There are other -- I assume,

8    based on the testimony, there are other individuals suffering

9    from chronic pain who were not discontinued under the MWAP

10   policy.

11             MS. KILEY:  Well, when read in its entirety, your

12   Honor, we do address that in our proposed order, 579-1.

13             THE COURT:  Ms. Agnew, what do you say to that

14   language?

15             MS. AGNEW:  Well, your Honor, the policy already

16   states that they are going to give chronic pain patients the

17   code 338.  That's all we are asking them to do.  That's what

18   they have said is already underway.

19             We are then asking that those patients, once coded,

20   get an assessment.  That's what they have already said they are

21   going to do.  That's what we want the order to say.

22             I don't think that this is complicated at all, but I

23   certainly cannot sign on to language that restricts the

24   universe of patients they are going to look at as to those who

25   lost medications between '17 and '19, because we already know

N5v2AllC

```
1   of hundreds of people who come in after that date and whose

2   medications were summarily discontinued at intake.  They are

3   not going to show up in those records.  So if they go and they

4   do their normal 338 analysis, which they claim they are already

5   doing, it should sweep up everybody in every group.

6            THE COURT:  Ms. Kiley.

7            MS. KILEY:  Your Honor, the individuals that are

8   already coded 338 are on track to getting the care that they

9   need under 1.24A.  Ms. Agnew --

10           THE COURT:  That's not this paragraph.  We had

11  evidence during the hearing of people whose medications were

12  discontinued when they transferred facilities and people whose

13  medications were discontinued after years on the outside upon

14  intake.  I assume that when 1.24A was instituted, we were going

15  to look for those folks.

16           MS. KILEY:  Well, the proposed -- our second proposal

17  has an entire section on transfers and what the protocols are

18  supposed to be on intake.  As far as reviewing diagnostic tests

19  and meeting with the patient to figure out whether or not they

20  have --

21           THE COURT:  Let me just ask you this.  In your first

22  point in your letter, you say that the order is too intrusive,

23  and yet now you are asking me to make it even more detailed as

24  to what DOCCS has to do to identify the folks that are the

25  subject of paragraph 4.  You can't have it both ways.  We can
```

N5v2AllC

 1    write a protocol for intake, we can write a protocol for

 2    transfer, but it seems to me that something more general like

 3    paragraph 4——and I will pass the 60 days for a

 4    moment——something more general allows Dr. Moores to take the

 5    steps she deems necessary in order to identify these people.

 6    Doesn't that seem to be less intrusive than our sitting here

 7    and writing five different protocols for five different

 8    situations and probably then not getting them all anyway?

 9              MS. KILEY:  Respectfully, I don't think that level of

10    detail necessarily is intrusive.  Our position under the

11    intrusiveness has to do with turning a DOCCS policy into law of

12    the case.

13              THE COURT:  I understand that.  But on your

14    intrusiveness point, isn't it more intrusive to be more

15    granular?

16              MS. KILEY:  Our position on intrusiveness would be --

17    with the Court's, again, creating a binding policy on DOCCS

18    indefinitely, that would be intrusive as to Dr. Moores --

19              THE COURT:  To that point, and I had not actually

20    gotten to that point in ruling on it, but you can always ask

21    for something to be amended.  That's not the point here.

22              Let me do this.  It seems to me that it is better to

23    give Dr. Moores the flexibility she needs in the ways the

24    individuals who are the subject of paragraph 4 are identified,

25    and therefore I will keep this language.  But I have to say, I

N5v2AllC

```
 1    was a little skeptical of the 60-day time limit also.

 2              What else, Ms. Kiley?  Let's hold the 60-day time

 3    limit off to the side and continue through, please.  I had

 4    started, Ms. Kiley, with your letter.  Do you want to continue

 5    and talk about, for example, your point "second."  It seems to

 6    me that this could easily be remedied by talking about an

 7    individualized assessment within X days of the entry of this

 8    order or X days of the patient's most recent evaluation,

 9    whichever is later.

10              Doesn't that take care of you?

11              MS. KILEY:  I'm sorry.  Just so I'm understanding,

12    the -- so you are saying --

13              THE COURT:  I'm looking at number two of your letter,

14    the full paragraph says "second," and you say, "Plaintiffs'

15    proposed order would impose additional evaluations termed

16    'individual assessments' to take place within 30 days of the

17    entry of the order," and then you write "irrespective of when

18    each patient's last follow-up or assessment actually takes

19    place."  I get that.  If the assessment took place within the X

20    days—whatever X is going to be here—that's fine.  We can

21    write it that way.  Right?

22              MS. KILEY:  Yes.

23              THE COURT:  And again, it might not necessarily be 30

24    days.  But doesn't that address your point?

25              MS. KILEY:  Yes.
```

N5v2AllC

1          THE COURT:  Okay.  So we will insert language to that

2     effect.

3          I actually wasn't sure what your objection on the

4     "narrowly tailored" was.  The point is that the members of the

5     class have been shown to have had their pain medication

6     discontinued for nonmedical reasons.  And they might be

7     different nonmedical reasons.  It might be the transfer.  It

8     might be upon intake.  It could be a lot of things.  But that

9     is the issue we are looking at and, in my view, that doesn't

10    make the proposed term not narrowly tailored, to use a double

11    negative.

12          Is there anything else you want to say about that?

13          MS. KILEY:  No, your Honor.

14          THE COURT:  Okay.  That objection is rejected.

15          With respect to the time period, I take your point

16    that 30 days is probably a little light on some of these items,

17    but I also think this is related to your last point, which is

18    the period of the injunction.  For example, I'm looking at the

19    case you cited in the Northern District.  "Plaintiffs may seek

20    to renew the preliminary injunction for an additional 90 days

21    by making a request with the Court in writing seeking such an

22    extension or the parties may file with the Court a stipulation

23    agreeing to keep the preliminary injunction in place," etc.,

24    etc.

25          It seems to me we have to think about that and decide

N5v2AllC

```
 1    what we are going to do.  If the answer is we are going to

 2    insert language similar to that in the *Barrett* case that you

 3    cite, then let's do it, and then we will see where we are.  But

 4    what we are not going to do is we are not going to have a new

 5    preliminary injunction hearing every time if matters are not

 6    resolved.  On the other hand, as you know, we have a date for

 7    the hearing on the permanent injunction, and we can certainly

 8    keep that.

 9            But with all of that behind us, I think you people

10    need to figure out what time periods you want in the

11    preliminary injunction order so that we know what we are doing

12    here.  Again, I will go back to your objection that it is

13    probably a little ambitious to have every patient seen, having

14    an assessment within 30 days of the order and the like.

15            So what do you say, Ms. Kiley?  What do you want to

16    do?

17            MS. KILEY:  I would propose extending it until

18    certainly after the close of discovery and after the parties

19    have had an opportunity to file motions for summary judgment.

20            THE COURT:  Okay.  That was my last question.  What in

21    the hell are you talking about?  Summary judgment on what?

22    This is a preliminary injunction motion.  What are you taking

23    discovery on?  You just had discovery.

24            MS. AGNEW:  Your Honor?  Sorry.

25            THE COURT:  Yes.
```

N5v2AllC

1          MS. AGNEW:  I am similarly bemused because, as far as

2     I know, the only discovery being taken right now is on

3     liability for the individual plaintiffs.  That discovery

4     deadline is August 1.  Everybody's been working very hard to

5     meet it.  But there is no discovery going on right now on

6     injunctions nor has any been requested of us.

7          THE COURT:  I have no idea what you are talking about,

8     Ms. Kiley.  What do you mean by summary judgment motions?  We

9     have had a hearing, a resolution, and we are now trying to

10    translate the resolution into an order.  So I have no idea what

11    you are talking about.

12         MS. KILEY:  The second amended complaint seeks relief

13    in the form of a mandatory injunction, as well.  We would like

14    an opportunity to move to dispose of the case before that

15    decision is made on whether or not there is going to be a

16    mandatory injunction imposed.

17         With that --

18         THE COURT:  What do you think this injunction is?

19         MS. KILEY:  It's preliminary relief pending the

20    outcome on the merits.

21         THE COURT:  Right.  And the merits would be the final

22    injunction, the permanent injunction, the hearing date of which

23    has been set.

24         And by the way, what's your basis for summary

25    judgment?

N5v2AllC

1              MS. KILEY:  We would like to preserve our record to

2        make our arguments to dispose of the case on summary judgment.

3              THE COURT:  What is your basis for summary judgment?

4              MS. KILEY:  That the plaintiffs have not been able to

5        state a claim to succeed in actual success on the merits.

6              THE COURT:  You have lost that.

7              MS. KILEY:  Well, the standard for preliminary

8        injunction --

9              THE COURT:  The preliminary injunction has been

10       ordered.  The only question now is we are trying to write it

11       down, which you people don't seem to be able to do, and the

12       only then question is whether there will be a final injunction.

13       The hearing date for that has been set.  What are you talking

14       about?

15             MS. KILEY:  Respectfully, it's my understanding that a

16       permanent injunction gets entered after a trial on the merits.

17       So this is where I am also -- forgive me, but I'm confused.

18             THE COURT:  That's what the final injunction motion --

19       that's the hearing on the final injunction.

20             MS. KILEY:  But the standard for --

21             THE COURT:  They mean the same thing.

22             MS. KILEY:  But the standard for a permanent

23       injunction we know is different than preliminary.  It is actual

24       success on the merits.  The merits of the case are still being

25       litigated on the liability side.  So I don't -- my

N5v2AllC

1    understanding is that you actually have to proceed with a trial

2    on the merits as to my colleagues they (unintelligible)

3    represent a defendant --

4           THE COURT:  I'm sorry.  I missed the last part,

5    please.  You said, "My understanding is you have to proceed

6    with a trial on the merits," and I missed what happened next.

7           MS. KILEY:  For the liability claims, so the trial

8    would be for my colleagues so that there would be a judgment

9    entered and then, following that, would be whether -- the

10   decision on whether or not it requires a permanent injunction.

11          THE COURT:  Why would you have to do it in that order?

12          Ms. Agnew.

13          MS. AGNEW:  Yeah.  Your Honor, forgive me.  We don't

14   read the law the same way as defendants.  I think it goes back

15   to a fundamental question which they have raised in their

16   questions on appeal.  We think they are very incorrect on the

17   reading of the law there.

18          But I certainly think there is no grounds for summary

19   judgment.  I think it's a waste of judicial resources.  I think

20   it's a waste of all the parties' time.  I think that if the

21   state representative defendants and the non-state

22   representative defendants wanted to file motions for summary

23   judgment on the individual damages claims of the plaintiffs,

24   that's another matter, but they are trying to scoop it all in

25   together.  We are happy to meet that obligation in the

N5v2AllC

1      permanent injunction hearing, but I don't think it is necessary

2      for us to gain permanent injunctions under Second Circuit law.

3      In fact, your Honor even cited to those cases in your opinion,

4      if everybody in the room is paying attention.

5              So that's our position.  We have already sent out

6      subpoenas for August 7.  We are ready to go.  We need these

7      permanent injunctions for all of the reasons that are being be

8      regurgitated on the record here today.

9              THE COURT:  Let me just ask Mr. Keane and Mr. Manley

10     if they have anything to add on this.

11             MR. MANLEY:  This is Ryan Manley.

12             This actually brings up an interesting angle, and

13     maybe we can just get some clarification here.  But, you know,

14     the determination by the Court as for a permanent injunction

15     will be actual success on the merits.  And the success on the

16     merits we are talking about, if I'm reading the preliminary

17     injunction decision correct, is the individual claims against

18     the DOCCS treating physicians, being my clients.  If there is

19     to be a determination of actual success on the merits, I

20     don't -- you know, I have questions regarding estoppel, I have

21     questions regarding law of the case, and I think that to have a

22     determination on the claims against my clients with regard to

23     the actual success on the merits prior to summary judgment and

24     basically without their right to a jury trial, I think

25     prejudices them.

N5v2AllC

1            THE COURT:  I'm not --

2            MR. MANLEY:  And I --

3            THE COURT:  I'm not understanding what I think is the

4    leap you are making.  An injunction essentially is systemwide.

5    It really is not a finding, I don't think, of liability with

6    respect to any individual healthcare provider within the

7    system.  I mean, the titular head, of course, Dr. Moores, in

8    her official capacity is involved, but I don't see how it

9    affects your client, Mr. Manley.  I would think each of them is

10   affected in the individual liability suits that have been filed

11   so far.  Am I reading that wrongly?

12           MR. MANLEY:  No.  And I would agree with you, Judge,

13   except -- for the individual lawsuits that have been filed.

14   Right now, with regards to this case, we are still all

15   operating under the same index number and the same pleading,

16   and the hinge of the meritorious claims here are all tied into

17   this Count Two, right?  It's the Count Two against the --

18           THE COURT:  The injunctive count, right?

19           MR. MANLEY:  No, that's the liability count, Judge.

20           THE COURT:  I guess -- yeah.

21           MR. MANLEY:  In the preliminary injunction decision,

22   you know, you found there to be a likelihood of success on the

23   merits with regard to the treating physicians.  And if I'm

24   reading the proposed order submitted by the plaintiffs, it also

25   states that specifically "the Court found that members of the

N5v2AllC

1    plaintiff class were likely to prevail on the merits of their

2    claims that DOCCS medical providers are deliberately

3    indifferent to the serious medical needs of treatment."  So it

4    would seem to me -- and that's why I am just kind of throwing

5    this out there right now, it would seem to me that an actual

6    determination of success on the merits, that your Honor would

7    have to find that certain DOCCS physicians were deliberately

8    indifferent to or are deliberately indifferent to specific

9    plaintiffs.  That is a determination that is typically --

10   that's why permanent injunctions are typically last, like

11   Ms. Kiley was talking about.  But it's but for this 90 day

12   thing for the PLRA that this cart has literally been put before

13   the horse.  And that's why I would also support language to

14   this -- I don't have standing, because I don't have standing in

15   this injunction area, but I would support language in the PI

16   with regard to reapplying to the Court for preliminary relief

17   as opposed to all of us, you know, slamming this permanent

18   injunction thing in which, like I said, I think it prejudices

19   my client.

20            MS. AGNEW:  Your Honor?

21            THE COURT:  Yes.

22            MS. AGNEW:  I guess I think we have to go back to some

23   basic constitutional law.  It's long been held that a series of

24   violations -- which, by the way, any individual violation does

25   not have to rise to the level of a constitutional violation.

N5v2AllC

1    When you read that series together, you can have a finding of

2    constitutionally violative behavior that has to be corrected

3    through an injunction.  We did a lot of work before we ever

4    filed this case and we did it because we needed to.  I

5    understand everyone's apprehensions about the law, but I think

6    we have got to go back to the case law.

7              THE COURT:  The part I guess I am confused about is we

8    have a finding on the need for the injunction because of the

9    essentially systemwide breakdown.  Although there were factual

10   findings within the preliminary injunction opinion, the

11   specific occasion when specific healthcare providers did

12   violate individuals' constitutional rights, those were few and

13   far between.  There weren't a lot of them.  But the finding of

14   the need for the preliminary injunction reflected the finding

15   of systemwide breakdown.  That's why we need the injunction.

16             With respect to Mr. Manley's situation, I guess we

17   will have to rethink what, if anything, is open to the

18   healthcare providers.  And I don't know if they are

19   Mr. Manley's clients or Mr. Keane's clients, but we have to

20   rethink what, if anything, is open to those individual

21   healthcare providers on the liability damages phase later on.

22   But I, again, am not understanding why the injunction phase is

23   not separate and should not move forward.

24             MR. KEANE:  Your Honor, Michael Keane for the state

25   defendants.

N5v2AllC

1          THE COURT:  Yes, sir.

2          MR. KEANE:  We share some of the same concerns that

3     Mr. Manley articulated, also the concerns that Ms. Kiley had.

4     It is awkward that the injunction finding, if it relies on a

5     breakdown of the system, to the extent that any defendant in

6     the damages cases is involved in what the Court would be

7     finding in August as a breakdown of that system, that seems to

8     put the cart before the horse in that if there is a finding

9     that there is a breakdown that could have involved any of the

10    individual defendants, then that is a problem, as Mr. Manley

11    said, as to its impact on the liability cases.  Is it an

12    estoppel?  And further, is it a situation in which the

13    individual defendants have been -- since they have no standing

14    in the injunction hearing, are they able to defend themselves

15    against allegations?

16         THE COURT:  I hear you.

17         MR. KEANE:  That would be the concern, your Honor.

18         THE COURT:  I hear your concerns.  And with respect to

19    the injunction, it seems to me one would expect evidence in

20    support of the request for the injunction to include, as it did

21    here, instances of constitutional violations.  I'm not saying

22    as I sit here now that those findings are automatically

23    liability findings with respect to the individual healthcare

24    providers.  Taking Mr. Manley's point, and I don't know the

25    answer to this, maybe they are entitled to a jury trial?  I

N5v2AllC

1    don't know.  But that's not today's problem.  We will worry

2    about that when we get to the damages question with respect to

3    the individual plaintiffs.

4              Today's problem is writing a preliminary injunction

5    for Pete's sake.  I don't understand why we can't get this

6    done, and I certainly don't understand why our writing down on

7    a piece of paper what policy 1.24A requires and saying, okay,

8    you've got to do that now, I don't understand why that's some

9    kind of overreach.

10             Who else wants to be heard?  I'm sorry, Mr. Keane.

11   Had I interrupted you probably?

12             MR. KEANE:  No, your Honor.  And I apologize, I'm at a

13   rest stop on the LIE on my way to our Long Island office, and

14   there may be noise in the background, but I completed my

15   thought.  Unless your Honor has something else, I can stop

16   talking.

17             THE COURT:  Okay.  So sorry that you are on the LIE.

18   Shouldn't happen to a dog.

19             Who else wants to be heard, please?

20             MR. MANLEY:  Your Honor, just to kind of sum up my

21   position here.

22             THE COURT:  Mr. Manley, is that you?

23             MR. MANLEY:  Yes, it is.  I apologize.  I didn't

24   identify myself.  Yes, it's Ryan Manley.

25             You know, Judge, with these questions looming with

N5v2AllC

1    regard to the status of what the final determination on a

2    permanent injunction would mean for my client's rights, I am

3    fully in support of kicking out the preliminary injunction

4    hearing and instead, if the government's willing to stipulate

5    to its -- and I don't know this, but if the government is

6    willing to stipulate beyond the 90 days for the preliminary

7    injunction or -- I don't know this either, or stipulate to the

8    terms of the *Barrett* case, I think that putting off the

9    permanent injunction is warranted to avoid the potential of

10   prejudice to my clients.

11              THE COURT:  Ms. Kiley, are you in a position to agree

12   to that?  What I understand --

13              MS. AGNEW:  Your Honor?

14              THE COURT:  Ms. Agnew.  So sorry.

15              MS. AGNEW:  I'm sorry.  I'm being a pain this morning.

16              You know, that's called a consent order.  We are happy

17   to do it.  we have been happy to do it from day one.  I have

18   clients right now who are being transferred and are losing

19   their medications literally as we speak.  It is now seven

20   months since Dr. Moores swore under oath to this Court that she

21   was going to train her own staff on a policy she wrote.  It

22   still hasn't happened.  I would love to kick this out.  I love

23   August at the beach.  But guess what?  I've got clients who are

24   suffering, and I have no motion on the other side, and that's

25   our concern, and I have to do the best thing for my clients

N5v2AllC

1    here.  If they don't want to have a hearing in August, it's

2    called a consent order.

3           And everybody wants to go back to this Judge

4    D'Agostino case.  But if you actually look at Pacer and the

5    docket, the reason the judge inserted that language is because

6    the parties were close to a settlement.  Within five months I

7    think they signed the settlement documents and everybody on

8    this phone call knows that they were deep in negotiations at

9    that point and the judge was trying to insert something to get

10   this settlement done.

11          THE COURT:  Let me ask this question.  I promise you

12   within a few days we are going to have a preliminary

13   injunction, and it's going to be along the lines in a

14   submission, which is along the lines of what defendants said

15   they were going to do.

16          Let me ask you this, Ms. Agnew.  Let's assume we

17   adjust some of the time periods in here.  What I am trying to

18   say is aren't your clients protected by the entry of the

19   preliminary injunction with respect to these, either intake,

20   discontinuations of medication, or discontinuations upon

21   transfer?  Those are clear terms in the injunction which can be

22   remedied immediately.  I take your point, Ms. Agnew, that it

23   will take a while for the assessments and the identifications

24   through the system, but it seems to me that once the

25   preliminary injunction is entered, your clients are protected

1   from those immediate discontinuations.

2           What do you say to that?

3           MS. AGNEW:  With all due respect, your Honor, only if

4   DOCCS medical staff are trained.  And I say this because 1.24A

5   has actually been the policy of DOCCS since February of 2021,

6   and that's why we spent so much time putting evidence before

7   the Court that, as wonderful as this piece of paper is, it

8   hasn't made an impact because people weren't trained.

9           THE COURT:  Right.

10          MS. AGNEW:  So I hear you and I think if we bumped up

11  the training and that became a priority and I knew that these

12  people not only are getting a copy of this order but they are

13  being trained within 30, 45, 60 days, I do think that has a

14  direct and immediate impact on those transferees, and I agree

15  with you.  But if they are not trained for another six months,

16  it doesn't do anything, in my mind and experience.

17          THE COURT:  Okay.  I would think, Ms. Kiley, that the

18  training materials are ready.  We know we have to do this.  We

19  have known it since the day the policy was entered.  Why can't

20  that be done quickly?

21          MS. KILEY:  Your, Honor we can certainly work to get

22  it done within an appropriate time period.  I still think that

23  30 days is very aggressive, so I would ask for something more

24  than that to complete training.

25          THE COURT:  I'm going to change it to 45.

N5v2AllC

1          How many facilities do we have, please?  Remind me.

2          MS. AGNEW:  It should be 44.

3          THE COURT:  Okay.  I think we can do this.

4          On paragraph 2, on page 7 of the order, I'm changing

5    it to 45.

6          Somebody is squeaking.

7          MS. AGNEW:  I'm going to mute again.  I apologize,

8    your Honor.  I'm walking into the federal courthouse in Albany

9    for an appearance before Judge Sharpe.  So I'm going to go mute

10   unless you need me and scream my name.

11         THE COURT:  Thank you.

12         Ms. Kiley, what's your position on the *Barrett*

13   language?

14         MS. KILEY:  I would respectfully ask the Court to

15   include language that we included in our --

16         THE COURT:  I don't know what language you are talking

17   about because I have not memorized all the orders.

18         What is your position on the *Barrett* language?

19         MS. KILEY:  That the parties may renew the terms of

20   the injunction for an additional 90 days after its entry.

21         THE COURT:  Plaintiffs may seek to renew by making a

22   request in writing or the parties may stipulate.  You can't

23   argue with that, can you?

24         MS. KILEY:  No.

25         THE COURT:  All right.  So that's going in.

N5v2AllC

1          What else do you want to talk about now?

2          MS. AGNEW:  Your Honor, I would just say I want to

3     address a point that Ms. Kiley raised in her letter which I

4     think is a valid one but I also think we tried to cover in

5     advance.  I think she made the suggestion that Dr. Moores

6     should be free to change 1.24A if she thinks it is medically

7     necessary or in the best thoughts at the agency, etc., etc.  We

8     did put in the provision she can certainly -- she could change

9     any policy any day.  We just want to have notice.  We want to

10    know what's happening.  Because usually what I do is I get a

11    call from some other lawyer whose gotten a copy of a policy,

12    and that's how I find out.  And I do think that if that

13    happens, and I'm sure she will have very valid reasons or she

14    wouldn't do it, we just are on notice and we kind of figure out

15    the implications of this for our clients so that we can seek

16    relief if we need it.

17         THE COURT:  I don't think that I saw that in here.

18    Did I miss it?

19         Ms. KILEY:  Respectfully, your Honor, I didn't see it

20    and I don't think that's appropriate that the chief medical

21    officer should run by plaintiffs' counsel --

22         MS. AGNEW:  Not run by.

23         THE COURT:  Not run by.  She said notice.

24         Any objection?

25         MS. KILEY:  I would respectfully -- yes, I would ask

N5v2AllC

1    that the Court not include language to that effect.

2            THE COURT:  Why?

3            MS. KILEY:  Because Dr. Moores is specifically

4    qualified to implement policy administration and amendment as

5    she sees fit based on her very extensive experience in clinical

6    administration and she -- that is essentially why she was hired

7    to do what she does.  She is permitted to do that, and she does

8    not need to go outside of the agency in order to conduct her

9    job.

10           THE COURT:  That's not what is being requested.  What

11   is being requested is mere notice that she is going to make a

12   change to 1.24A.

13           Given the situation, I will include that.  Ms. Agnew,

14   send me language.  Run it by Ms. Kiley, please.

15           MS. AGNEW:  Okay.  It's in the proposed order now,

16   your Honor, that we put forth, but if Ms. Kiley wants to shoot

17   me an e-mail with an alternative, I'm happy to looking at it.

18           THE COURT:  Forgive me.  I didn't memorize it.

19           MS. AGNEW:  That's okay.

20           THE COURT:  But if you people want a change, you will

21   let me know in two days.

22           What else do you want to talk about with respect to

23   this order?

24           MS. KILEY:  Your Honor, the very last point that

25   "failure to comply with this order shall not be excused by

N5v2AllC

1    allegations of inadequate staffing," I would respectfully ask

2    the Court to exclude that language.  Staffing is without a

3    doubt an issue, and it is going to be an issue if we are going

4    to now focus on evaluations and review of medical records and

5    coding and a lot of new administrative responsibilities that

6    this order is going to ask of DOCCS staff.  It is a very big

7    undertaking.  I know plaintiffs like to say that this is

8    simple.  It is not going to be simple, and I think that

9    essentially putting, again, the cart before the horse and not

10   anticipating what some of our, you know, issues might be along

11   the way is unfair.  I think this Court has to consider that

12   staffing will be an issue, and I don't think that language to

13   this effect should be included.

14            THE COURT:  Ms. Agnew.

15            MS. AGNEW:  First of all, your Honor, I copied that

16   language precisely from some other similar injunctions across

17   the country.  Second of all, we know they are going to do it,

18   and I appreciate that.  Obviously, as the Court knows, I'm well

19   aware of the staffing issues within DOCCS.  What I say is,

20   don't strike the provision, but tell us when you can get it

21   done with the resources you are going to be able to muster.

22   And when we look at the contempt standard, the question is

23   really did you muster all of the resources that you have.  If

24   they didn't have the resources, I can't hold them -- or the

25   Court can't hold them in contempt.  So this is a nonissue.  But

N5v2AllC

```
 1    I don't want to start out of the gate with this injunction's
 2    nice but we can't get it done when in fact the entire
 3    injunction comes from their own policy, and I would assume they
 4    don't just have policies that they can't implement.
 5             THE COURT:  All right.  Denied.
 6             Page 8, paragraphs six and seven, those are the 30-day
 7    paragraphs.
 8             Ms. Kiley, what do you say to those?
 9             MS. KILEY:  It is not going to be possible to get
10    evaluations done in 30 days.  I would ask for extended -- I
11    would ask that there not be a deadline imposed for these
12    evaluations to happen.
13             THE COURT:  Ms. Agnew.
14             MS. AGNEW:  Well, your Honor, in November of 2022 --
15    '20, they actually did 83 evaluations within what I am going to
16    say was about a 45-day period.  I think when there is a will
17    there is a way.  I'm not suggesting 30 days is appropriate, but
18    they need to come back and say to us, *Hey, we can get this done*
19    *within six months, we can get it done within nine months.*
20    Like, I need to hear some rational numbers, not just *we don't*
21    *like yours.*
22             THE COURT:  Ms. Kiley.
23             MS. KILEY:  Respectfully, your Honor, now we are
24    talking about six months and nine months, which is a little bit
25    more reasonable than -- I would ask that that is the time
```

N5v2AllC

```
1    period over which the Court has jurisdiction over the order.

2            THE COURT:  What time period is it that you want?

3            MS. KILEY:  Nine months.

4            THE COURT:  You are not getting nine months.

5            MS. KILEY:  Six months?

6            THE COURT:  Ms. Agnew.

7            MS. AGNEW:  I think six months with some kind of

8    rolling disclosures as to where they are in the process is

9    completely fair and appropriate, your Honor.  I'm not asking

10   them to reevaluate hundreds, if not thousands, of prisoners in

11   30 days.  But they know how long this is going to take.  They

12   need to let us know.

13           THE COURT:  All right.  In six and seven you will

14   change it to I think it's 180 days, and would you propose some

15   language with respect to rolling reporting.  I will look for

16   that in two days, please.

17           What else, friends?

18           MS. KILEY:  Well, what exactly is rolling?  To what --

19   to what extent is rolling reporting?  What does that mean?

20   Like I know what it means.

21           THE COURT:  I don't know, that means you will let them

22   know how many you are doing, when you are doing them, on a

23   contemporaneous basis, so that if we are falling behind and we

24   are doing one a week, they can come back and say what's going

25   on here?  So you people work on the language.
```

N5v2AllC

1              What else?

2              MS. AGNEW:  Plaintiffs are good, your Honor.

3              THE COURT:  Ms. Kiley.

4              Mr. Manley?  Mr. Keane?  Anything you want to add on

5    the order?

6              MR. KEANE:  Nothing from state representative

7    defendants, just to reiterate our prior concerns, but that has

8    nothing to do with what is being discussed now.  Thank you.

9              THE COURT:  Yes, sir.

10             Mr. Manley?

11             MR. MANLEY:  No, your Honor.  I will just state that

12   now that the bare language has been agreed to and is in there

13   that I still fully support pushing out the permanent injunction

14   hearing date.

15             THE COURT:  Let's do this.  Let's keep the date we

16   have for now and, then we will see where we are later.

17             Mr. Keane, Mr. Manley, obviously we are going to have

18   issues going forward with how your individual folks are to be

19   treated, the folks who were the subject of findings in the long

20   memorandum.  Do whatever you want to do about getting that

21   straightened out.  You know, if we have to litigate it,

22   obviously we will do it.  So do your work in case so that we

23   don't have to extend this unnecessarily.

24             I will just recall to you our conversation when we

25   were together that after we gathered a reasonable number of

N5v2AllC

1    these individual cases, we might sit down and discuss an

2    efficient way of disposing of them.  So I am not asking you to

3    do a lot of work and billing right now, but I am asking to you

4    consider it and take your best guess as to where we are going

5    to be, so that if the time comes when we have to litigate the

6    import of the findings on the individual healthcare providers,

7    we don't need six months to brief it.

8              Do you understand, gents?

9              MR. KEANE:  Yes, your Honor.

10             MR. MANLEY:  Yes, your Honor.

11             MR. KEANE:  We will take that to heart.  Thank you.

12             THE COURT:  Thank you so much.

13             With respect to Ms. Agnew's student law clerk,

14   whatever, summer clerks, any objection to the proposal she has

15   submitted in her letter of May 29, Ms. Kiley?

16             MS. KILEY:  No, your Honor.

17             THE COURT:  Mr. Keane?

18             MR. KEANE:  No, your Honor.

19             THE COURT:  Okay.  So that will be taken care of.

20             With respect to the billing records, I am not sure,

21   Ms. Kiley, what the objection is.  The rate is not privileged

22   information.  Counsel has allowed as how there will be

23   privileged information that can be and should be redacted.  I'm

24   not sure what the argument is against production.

25             MR. NOLAN:  Your Honor, this is William Nolan in

N5v2AllC

1    response to that request.

2            We oppose any production of our own billing records.

3    She is not seeking production of our rates necessarily, which

4    is one thing.  She is seeking the actual time entries, and we

5    think it is inappropriate.  We don't think that there is any

6    relevance to the issues before the Court, particularly because

7    we came into this case far later than anybody else and had been

8    working at a different pace and on different tasks than

9    plaintiff has.  And I think that the concerns really go -- are

10   laid out by the Western District in a case called *Costa v.*

11   *Sears Home Improvement*.

12           THE COURT:  I have it memorized.

13           MR. NOLAN:  You have seen that case, your Honor?

14           THE COURT:  I have not.  I am being facetious.  Do you

15   want to give me a cite?

16           MR. NOLAN:  Yeah, it is 178 F.Supp.3d 108.

17           Basically, our concerns are the same there.  Right?

18   The importance of our billing records to a potential request in

19   the future if Ms. Agnew is successful on the merits and gets a

20   permanent injunction is minimal in this situation, frankly,

21   because we are doing different things.  Her job is very

22   different than our job.

23           And what's more important, really, is the Court's

24   experience in this area with the rates in these types of cases,

25   rather than us producing our billing records, which I

1    understand actually have been FOIL'd by Ms. Agnew anyway.  So

2    to the extent there is anything in there that she is seeking,

3    they would be redacted anyway.  So I don't see a real -- we

4    would oppose any motion.  If she wants to make that motion, we

5    are happy to put in our opposition on that, to brief it.  We do

6    think it's premature and, as Ms. Agnew pointed out in her

7    letter, you know, we can do this at a later time if and when

8    potentially necessary.

9              THE COURT:  Did I understand that your billing records

10   have been successfully FOIL'd by Ms. Agnew?  Am I wrong on

11   that?

12             MR. NOLAN:  That was my understanding from our

13   conversation was that they were either in the process of being

14   produced or they already had them.

15             THE COURT:  Ms. Agnew.

16             MS. AGNEW:  Your Honor, if I may, certainly we FOIL

17   everything.  But as I laid out in my letter, we have not

18   received theirs.  And when we do receive them, the entire

19   description blocks are redacted.  That's not a battle I'm going

20   to have with Michael Ranieri over at DOCCS.  As I said, they

21   can all redact privileged content.  I do the same.  I think

22   that's completely appropriate.  But I also offered to them that

23   if they don't want to produce them, they can stipulate that

24   they are not going to fight our lodestar rates or the amount of

25   time we have spent on any given issue.  I did provide the Court

N5v2AllC

1    with some case law, so there is authority for what I am asking

2    for, and it is within our rights to ask for it.  It is up to

3    the Court.

4            THE COURT:  Is there any objection to producing the

5    rates, Mr. Manley?

6            MR. NOLAN:  It's Mr. Nolan.

7            We don't have an objection to producing the rates.

8    And frankly, your Honor, we don't take any issue with

9    plaintiffs' rates.  They are laid out in the Rule 26

10   disclosure——Ms. Agnew at 425 an hour and Mr. Morrison at 375 an

11   hour——and they seem to be in line with precedent in the

12   Southern District as to rates in these types of cases.  So we

13   have no objection to those.  I really think it is a battle that

14   doesn't need to be fought.

15           THE COURT:  Ms. Agnew.

16           MS. AGNEW:  Then they should have disclosed the

17   documents, your Honor.  But thank you for hearing me.

18           THE COURT:  All right.  Let me just say this.  Once we

19   see the fee application, if there are objections to how long

20   counsel and support staff spent on such things, it might well

21   be that the billing records are relevant.  So be prepared.  If

22   that's what it turns out to be, they are going to be ordered to

23   be produced.  So be ready so that we are not sitting around for

24   months waiting on it.

25           I hesitate to ask, but when is the fee application

N5v2AllC

1    coming in?

2              MS. AGNEW:  Well, your Honor, we are thinking about

3    that strategically.  I don't want to write two fee

4    applications.  You know, it is a ton of work.  If we are going

5    to move forward with the permanent injunction hearing in

6    August, I would then ask the Court to allow us to submit the

7    fee application after that order is issued.  But if it looks

8    like they are going to keep kicking this out, we are going to

9    go ahead and put in our fee application for the preliminary.

10             I just don't want to do it twice.  I'm sure you can

11   appreciate that.

12             THE COURT:  I'm sorry.  I don't want to do it twice

13   either.

14             You people be in touch with each other as we go

15   forward, and I will ask you for a monthly update on what you

16   foresee in terms of the preliminary injunction hearing.  So a

17   month from today I need a letter.

18             In the meantime, I will look for the modifications

19   that we talked about today in the next two days or so, so that

20   the order can be entered.

21             Is there anything else we have to talk about?

22             MS. AGNEW:  Not from plaintiffs, your Honor.

23             MS. KILEY:  Not from Dr. Moores.

24             MR. KEANE:  Not from state defendants.

25             MR. MANLEY:  Not from non-state defendants.

N5v2AllC

1           THE COURT:  Thank you.

2           Folks, please be in touch with each other so that we

3  don't need to continue beating our heads against the wall.

4           For those of you who are out of your offices, thank

5  you for taking the time to be on the phone.

6           Good morning and thank you.

7           COUNSEL:  Thank you.

8                         oOo

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25