1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  PETER ALLEN, *et al.*,

4              Plaintiffs,

5       v.                              19 Civ. 8173 (LAP)

6  CARL KOENIGSMANN, *et al.*,

7              Defendants.
                                        Trial
8  ------------------------------x
                                        New York, N.Y.
9                                       September 5, 2023
                                        9:00 a.m.
10
   Before:
11
                    HON. LORETTA A. PRESKA,
12
                                        District Judge
13

14                       APPEARANCES

15 AMY J. AGNEW
   JOSHUA L. MORRISON
16 VERONICA JOSIAH-ARYEH
        Attorneys for Plaintiffs
17
   WHITEMAN OSTERMAN & HANNA LLP
18      Attorneys for Defendant Moores
   BY:  WILLIAM S. NOLAN
19      ORIANA L. KILEY
        GABRIELLA R. LEVINE
20      JENNIFER M. THOMAS

21

22 Also Present:  Baron Jones, Law Student Clerk

23

24

25

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

N95BALL1

1

2              THE COURT:  Are the plaintiffs ready?

3              MS. AGNEW:  To begin, are we going to discuss the

4      pretrial order?  What are we doing?

5              THE COURT:  Are you ready?

6              MS. AGNEW:  I am ready, once the AV is set up.

7              THE COURT:  Defendants ready?

8              MR. NOLAN:  We're ready.

9              THE COURT:  Wonderful.  Okay.  Counsel, with respect

10     to documents just to reiterate what we said on our call last

11     week, with respect to any medical encounters for which

12     documents were not produced by August 21, that testimony will

13     not be permitted.

14              With respect to the pretrial orders, what did you

15     folks want to discuss, please?  I know there are different

16     witnesses and whatnot.  What is it that we want to discuss

17     before we start trial, please?

18              MS. AGNEW:  Your Honor, it's very important to the

19     plaintiff class that we at least have a signed pretrial order.

20     And I do apologize to the Court, but the issue is that on

21     appeal the last time it was defendant's position that they

22     didn't know what the case was about; that they didn't know what

23     we were trying.  We had to spill a lot of ink in the Second

24     Circuit.  We don't believe that argument was persuasive, but

25     nonetheless if we could have a signed order that is going to

N95BALL1

1  cut down on our time and energy after these exercises are over.

2          THE COURT:  All right.  Is there any objection to the

3  summary of claims and defenses set out in the plaintiffs'

4  proposed pretrial order?

5          MR. NOLAN:  We have no objection to the summary of

6  claims and defenses.

7          MS. AGNEW:  That's great, your Honor.  I just

8  respectfully request then that the Court sign the order so it's

9  on the docket, and then we're ready to go.

10          THE COURT:  Okay.  Any objection to that, Mr. Nolan?

11          MR. NOLAN:  We only object to the portion of the

12  plaintiffs' order which attempts to put artificial constraints

13  on the dates for each of the proposed witnesses' medical care.

14  We think the medical records speak for themselves and provide

15  the dates.

16          MS. AGNEW:  Forgive me, your Honor.  I just handed

17  Mr. Nolan the pretrial order that I filed.  It does not include

18  those dates.  Those are the dates in Ms. Haas's declaration

19  that your Honor was just alluding to.  We provided those to the

20  Court so there's no confusion as this trial moves forward, but

21  I did take them out of the proposed pretrial order because we

22  could not get a consensus among the parties, so I'm hoping

23  Mr. Nolan will take a second look.

24          THE COURT:  Want to hand it up.  Thanks so much, just

25  because my is two-sided.  Thank you.  Anything else you would

N95BALL1

1    like to discuss before we start?

2              MS. AGNEW:  Not from the plaintiff class, your Honor.

3              THE COURT:  Mr. Nolan, anything for you?

4              MR. NOLAN:  No, your Honor.

5              THE COURT:  Thank you.  Ms. Reporter, do you need

6    everybody to identify themselves?

7              THE COURT REPORTER:  Yes.

8              THE COURT:  Ms. Agnew, why don't you start.

9              MS. AGNEW:  This is Baron Jones, your Honor.  With us

10   today is Veronica Josiah-Aryeh.  She is a new lawyer working

11   with our office.  She will not be speaking.  She's seeing how

12   the sausage is made.

13             With me today is Mr. Joshua Morrison, myself, Amy J.

14   Agnew, our litigation assistant Kathryn Haas, and we have Kai

15   Mevorach.

16             THE COURT:  Thank you.  Mr. Nolan.

17             MR. NOLAN:  William Nolan, Whiteman, Osterman & Hanna

18   for the defendant Dr. Carol Moores.  Along with me is Oriana

19   Kiley.  Dr. Moores is sitting in the middle, Jennifer Thomas

20   and Gabriella Levine.

21             THE COURT:  Thank you.  Counsel, do I correctly

22   understand you want to do five-minute openings?

23             MS. AGNEW:  I'd like to do a five-minute opening. I

24   don't know about defense counsel, your Honor.

25             THE COURT:  Okay.  Let's roll.

1          MS. AGNEW:  Good morning, your Honor.  I'm here on

2     behalf of the plaintiff class, and very briefly I just want to

3     run through a roadmap of what we anticipate proving to the

4     Court over the next seven days, both in our case and chief and

5     when we rebut the case put on by Defendant Moores.

6          First of all, what we'd like to lay out for the Court

7     is what happened here.  It's plaintiffs' class's position that

8     DOCCS has undertaken a number of policies which

9     unconstitutionally discontinued or denied effective medications

10     from the plaintiff class who all suffered from chronic pain and

11     who were in the care and custody of DOCCS.  It's our contention

12     that these customs and practices started in 2015, and we're

13     going to show that with the testimony of Dr. David Dinello, as

14     well as and Dr. Susan Mueller.  They were then promulgated into

15     a policy on June 1, 2017.

16          And you're going to hear Dr. Dinello tell you that the

17     objective was to create a uniformity of thought.  Those are his

18     terms, and that they wanted to apply it across all DOCCS

19     facilities, and the practices of all DOCCS providers.  We would

20     argue to the Court that the implementation of this policy was

21     unconstitutional because it derived not only from the

22     standard -- deviated, forgive me, not only for the standard of

23     care, but from constitutional ramparts. What it did is it took

24     patients who had been effectively treated for years and

25     similarly discontinued their medications without an

N95BALL1                          Opening - Ms. Agnew

1    individualized assessment.

2                The Court may hear from defendants that the

3    individualized assessment is a term that the plaintiff class

4    has made up, and indeed is not one that is used by pain

5    management doctors regularly.  And we will then put on our

6    expert Dr. Adam Carinci, who is a very renowned expert in pain

7    management.

8                Dr. Carinci went through and studied the cases of 70

9    prisoners, one of whom was excluded from his report, and he did

10   that to demonstrate the pattern and practice of these

11   discontinuations and denials across the plaintiff class.  Of

12   course we chose 70 because it was a number that we felt would

13   be helpful to the Court while also not burdening us all with

14   too many examples and repetition.

15               Dr. Carinci will say that these policies as

16   implemented did not meet the standard of care, and in fact on

17   the aggregate harm to the patients that they were suppose to be

18   helping.  We then are going to turn to whether or not Court

19   oversight needs to be continued.  This Court entered a

20   preliminary injunction around March 31, 2023. It was then

21   formalized into the actual injunction June 12, 2023.  We would

22   argue that Dr. Moores has made some progress.  We're very, very

23   happy about that.  I think that some effort has been put in to

24   try to solve this problem, but we would argue that Court

25   oversight is going to be necessary moving forward.

1          And our concern is that the effort and intention that

2     has gone into date has only been because of this litigation,

3     and that if we pull this litigation back, that effort is going

4     to cease. We're going to put a number of patients on the stand

5     over the next three days who are not only going to tell the

6     Court about their chronic pain, they're going to tell them

7     about their history of medical care within DOCCS and how it was

8     affected by these policies and practices.  But many of them are

9     also going to tell the Court that they were just recently

10    treated.

11         And in fact when we lay this out for the Court in

12    closing, we're going to demonstrate that they were recently

13    treated because of this litigation.  They were not treated

14    because DOCCS all of a sudden had a epiphany that it was going

15    to give constitutionally mandated care to all of its patients,

16    but rather because we were standing here writing letters,

17    arguing in this court, and getting court orders to make it

18    happen.

19         We're also going to very honestly acknowledge the fact

20    that we are thrilled that these people have been treated, but

21    they were only treated because they were identified by us.  And

22    there are a couple among that class who have not been treated

23    yet, as far as we knew a week ago.  They may miraculously get

24    on the stand and tell us they've received medication.

25         So finally we're going to argue to the Court that the

1   preliminary injunction entered needs to be reentered as a

2   permanent injunction with a couple of derivations, including

3   the fact that we understand that the providers at DOCCS have

4   been trained. We're grateful for that.  We're going to see the

5   benefits of that training, and we understand some other aspects

6   of the preliminary injunction have been resolved, and we would

7   ask the Court to strike those.  And we will get you a conformed

8   order when we get to that point.  Thank you very much.

9           THE COURT:  Yes, ma'am.  Mr. Nolan, Ms. Kiley.

10          MS. KILEY:  Your Honor, we would respectfully ask the

11  Court, we're going to rely on our pretrial submission in lieu

12  of an opening.

13          THE COURT:  Thank you.  Let's begin with the

14  testimony.  Off the record.

15          (Discussion held off the record)

16          MS. AGNEW:  Your Honor, I'm not sure how we would

17  sequester these.  Ladies and gentlemen if you disappear from

18  the screen please don't leave we will call you in turn, okay.

19  Be patient with us this morning.

20          Your Honor, we're going to call to the stand Ms. Tina

21  Vivenzio.

22          MR. NOLAN:  Your Honor, I just ask that everyone else

23  be fully sequestered.

24          THE COURT:  We're working on it.

25          MR. NOLAN:  I just want to make a record.

N95BALL1                           Vivenzio- Direct

1              THE COURT:  We're trying to do that.

2              MR. NOLAN:  Understood.

3              THE COURT:  Ms. Agnew.

4              MS. AGNEW:  Your Honor, the plaintiff class calls to

5    the stand Tina Vivenzio.  And Ms. Vivenzio will be testifying

6    from Albion Correctional Facility.

7    TINA VIVENZIO,

8         called as a witness by the Plaintiffs,

9         having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please state your name and spell it

11   for the court reporter.

12             THE WITNESS:  Tina Vivenzio, V-I-V-E-N-Z-I-O.

13             THE COURT:  Ms. Agnew.

14   DIRECT EXAMINATION

15   BY MS. AGNEW:

16   Q.  Good morning, Ms. Vivenzio.

17   A.  Good morning.

18   Q.  I know you can't see me.  I'm at the lectern in the corner,

19   but you can hear me clearly; is that correct?

20   A.  Yes.

21   Q.  Very good.  So can you tell me, Ms. Vivenzio, when did you

22   come into DOCCS on this bid?

23   A.  2014.

24   Q.  Can you tell us what facility did you come to first when

25   you came into DOCCS?

1    A.   Bedford correctional.

2    Q.   Is that Bedford Hills, ma'am?

3    A.   Yes, it is.

4    Q.   When you came in, in 2014, what, if any, symptoms did you

5    have of chronic pain?

6    A.   I suffer from degenerative back disease and neuropathy,

7    restless legs.  I request disability at home before I was

8    incarcerated.

9    Q.   When you came into DOCCS, to your recollection what

10   medications, if any, were you taking to treat that chronic

11   pain?

12   A.   I was given Indocin.  I was given Mobic to try.  I believe

13   I tried Belbuca, and I was on Neurontin.

14            THE COURT:  Off the record.

15            (Discussion held off the record)

16   BY MS. AGNEW:

17   Q.   Ms. Vivenzio, when you first came into DOCCS at Bedford

18   Hills, do you recall who your provider was?

19   A.   Dr. O'Dell.

20   Q.   And what, if any, adjustments did Dr. O'Dell make to your

21   medications while you were in his care?

22   A.   He tried quite a few medications to see what would work for

23   me, and I started with the Indocin and Neurontin.

24   Q.   When you took the Neurontin, did it have a demonstrable

25   effect on your pain?

N95BALL1                        Vivenzio- Direct

1   A.  Yes, it did help very much so.

2   Q.  Can you describe for the Court how the Neurontin helped

3   your chronic pain ailments?

4   A.  It help me to move around better.  I suffered a little less

5   pain with the neuropathy.  I was able to move around, walk

6   around, do more activities.

7   Q.  And what, if any, effect did your treatment with Neurontin

8   have on your ability to sleep?

9   A.  I slept much better with it.

10  Q.  When, if ever, were you transferred from Bedford Hills?

11  A.  When I was transferred?

12  Q.  Yes.  Can you tell the Court when, if ever, were you

13  transferred?

14          I imagine you were transferred because you're now at

15  Albion, correct?

16  A.  Yes, I was transferred in 2017.

17  Q.  Do you remember approximately when in 2017 you were

18  transferred?

19  A.  It was sometime in December, maybe the 14th.  I don't

20  really know the exact date.

21  Q.  Can you tell the Court before you were transferred in

22  approximately December of 2017, was Dr. Adel still treating you

23  with Neurontin?

24  A.  Yes, he was.

25  Q.  And can you tell the Court where were you transferred to in

1    December of 2017?

2    A.  To Albion correctional facility.

3    Q.  Can you tell me upon your transfer what, if any, changes

4    were made to your medication regime?

5    A.  I was on Neurontin when I came to Albion, and then not even

6    a month --

7    Q.  Ms. Vivenzio, forgive me.  You froze for a moment, and we

8    caught, when you went to Albion, I was there for not even a

9    month.

10   A.  Yes.  And then they discontinued my Neurontin.

11   Q.  Can you tell us who "they" was?

12   A.  Oh my God.  I don't know the exact doctors because there's

13   been so many of them here, so I really cannot recall who it

14   was.

15   Q.  Can you tell us how you found out after you were

16   transferred that your Neurontin had been discontinued?

17   A.  When I had to go receive my medication and at the med

18   window, I was told that they was discontinuing my Neurontin.

19   Q.  Did you sit down with a medical provider and speak with him

20   or her before your Neurontin was discontinued?

21   A.  I'm not sure, but, yes.

22   Q.  Can you tell us what, if any, effect did the

23   discontinuation of your Neurontin have on your chronic pain?

24   A.  It was terrible.  I can't sit for very long.  I can't stand

25   for very long.  The pain in my back was terrible, plus the

1   neuropathy that shoots down my leg.

2   Q.  To your knowledge when your Neurontin was discontinued,

3   were you prescribed an effective alternative that managed your

4   chronic pain symptoms?

5   A.  No, because there really isn't anything that really helps

6   me besides Neurontin.  I was put on Indocin which I'm still on.

7   Q.  And that's Indocin, is that correct, Ms. Vivenzio?

8   A.  Yes, it is.

9   Q.  If you could just try to stay still in front of the

10  microphone.  I know you're rocking a little bit.  It will help

11  us just get through this.  Okay?

12  A.  Yeah, sorry.

13  Q.  Okay.  Don't be sorry.  Okay.  Do you recall did you ever

14  speak with a provider after your Neurontin was discontinued

15  about the discontinuation, about what had happened?

16  A.  I believe I did speak to my provider at the time, and he

17  had said that it was cut off by Albany because it was now a

18  controlled substance.

19  Q.  Can you repeat that last part.  It was a what substance?

20          MS. THOMAS:  Objection, your Honor.  This is hearsay,

21  and I would move to strike the testimony for any hearsay

22  testimony she provided.

23          MS. AGNEW:  Your Honor, it's an admission against

24  parties' interest, as an agent of DOCCS saying it's been cut

25  off by central office or someone else.

1          THE COURT:  Ms. Thomas.

2          MS. THOMAS:  The witness has not identified any

3     individual to clarify who this person is or who the party

4     statement is against.

5          THE COURT:  Two things.  One, I don't think we're

6     quite there yet in that the witness has frozen on the screen,

7     and I thought counsel elicited that it was a DOCCS health

8     provider who told her that.

9          MS. THOMAS:  My understanding was that she had said

10    that someone told her that and then that someone might have

11    also been central office, but it's unclear if it was a provider

12    or if it was someone in central office.

13         THE COURT:  Ms. Agnew.

14         MS. AGNEW:  Let me continue and I'll clarify the

15    record.

16    BY MS. AGNEW:

17    Q.  Ms. Vivenzio, can you hear me?

18    A.  Yes.

19    Q.  You freeze a little bit.  It's not your fault.  Let's go

20    back to this moment.

21         Can you tell me if you recall who told you that it was

22    cut off?  Was it Albany?  Just restate that answer first

23    because I don't remember the details, and I apologize.

24    A.  It was the provider that I had at the time said they can no

25    longer give out Neurontin.

1   Q.  To your recollection was that your medical provider at

2   Albion medical facility?

3   A.  Yes.

4               THE COURT:  Ms. Thomas, anything else?

5               MS. THOMAS:  I would object unless the witness can

6   identify who that provider is.  That's hearsay and it should

7   not be permitted.

8               THE COURT:  What difference does it make if the person

9   is identified or not so long as the person's position is

10  identified?  It doesn't make it unmake it hearsay, right?

11              MS. THOMAS:  Because it can't be subject to cross if

12  we don't know who this witness is that this witness is

13  identifying.

14              THE COURT:  Counsel.

15              MS. AGNEW:  Ms. Vivenzio is here for cross, your

16  Honor.

17              MS. THOMAS:  Right. But the provider that she is

18  referencing can't be provided to examine if we don't know who

19  that individual is.

20              THE COURT:  Counsel.

21              MS. AGNEW:  They have the medical records, your honor,

22  and I'm sure they can ascertain with the help of Dr. Moores who

23  Ms. Vivenzio's provider was in early 2018 when her Neurontin

24  was discontinued.

25              THE COURT:  Ms. Thomas.

1          MS. THOMAS:  Certainly we can review any records, but

2     this is based on the witness's testimony that she's providing,

3     and I don't believe there's a sufficient ground to permit

4     hearsay of an unidentifiable witness.

5          THE COURT:  I thought Ms. Agnew's position was that

6     the witness is identifiable in that the record would reflect

7     who was Ms. Vivenzio's provider at the time her Neurontin was

8     discontinued.

9          MS. THOMAS:  Ms. Agnew has also not told us which

10     record or where in the records if it is actually identifiable.

11          THE COURT:  You're telling me that DOCCS records will

12     not show who Ms. Vivenzio's provider was in whatever the date

13     was.

14          MS. THOMAS:  Right now we don't have a date that this

15     occurred, an individual --

16          THE COURT:  The records should reflect when the

17     Neurontin was cut off, right?

18          MS. THOMAS:  Frankly this is based off of this

19     witness's testimony, and there's over 1200 pages of medical

20     records.  If there's some more conclusive information that we

21     can look to, I'd be happy to look at that.  But as it stands, I

22     don't think this should be permitted.

23          THE COURT:  Ms. Agnew.

24          MS. AGNEW:  Your Honor, it's not my client's fault

25     that she can't recollect the identity of her provider in early

1    2018.  I do think we provided a timeframe, and I would ask

2    defendants provide some authority for their objection, and then

3    the Court can review that afterward.

4            THE COURT:  All right.  You may renew it whenever you

5    want, Ms. Thomas.  Ms. Agnew.

6    BY MS. AGNEW:

7    Q.  Ms. Vivenzio, just to give it a timeframe.  You recollect

8    being transferred to Albion correctional facility in late 2017,

9    correct?

10   A.  Yes.

11   Q.  And is it your recollection that you met with the provider

12   who told you Neurontin was no longer allowed to be prescribed

13   within a few months after your transfer, or do you recall?

14           MS. THOMAS:  Your Honor, I object again to this

15   question with the same objection that I previously laid, but I

16   like to lay the record that we object to this.

17           THE COURT:  I'm not sure what your objection is.  Just

18   to correct it.  My recollection is Ms. Vivenzio said that the

19   Neurontin was discontinued about a month after her transfer.

20           MS. THOMAS:  Right. This is asking about statements

21   from the unidentified provider.  I just would like to maintain

22   that objection for the record.

23           THE COURT:  Yes, ma'am.

24   BY MS. AGNEW:

25   Q.  After that date, Ms. Vivenzio, did you speak with any

1   provider at DOCCS about reinstating Neurontin?

2   A.   That I'm not sure.   I'm sure I did request it, but there

3   was nothing they could do because they were not allowed to give

4   it out anymore.

5   Q.   Did someone tell you, and who was that person that there

6   was nothing they could do?

7   A.   Like I said earlier, I went to at least three or four,

8   five, different providers.   I can't remember who it was.

9           MS. THOMAS:   I would object again, your Honor, to the

10   statement that there's nothing they can do as hearsay without

11   identifying who the person speaking is.

12          THE COURT:   Yes, ma'am.   Same ruling.

13   BY MS. AGNEW:

14   Q.   Ms. Vivenzio, can you then tell me subsequent to your

15   Neurontin being discontinued, were you ever given treatments in

16   any form that were effective to treat your neuropathic

17   symptoms?

18   A.   No.

19   Q.   Were alternatives tried on you?   Did your provider try to

20   prescribe something else?

21   A.   Yes, I had tried a few medications that did not help.

22   Q.   Do you recall sitting here today what those medications

23   were that you tried?

24   A.   I tried Mobic.   I can't remember the other one.   I think

25   Elavil.

N95BALL1                           Vivenzio- Direct

1  Q.  Just to clarify, did you say Elavil?

2  A.  Yes.

3  Q.  Did you engage in any other forms of treatment?

4  A.  No.

5  Q.  Ms. Vivenzio, did you ever undertake physical therapy?

6  A.  No, not while I was in Albion, no, I have not.

7  Q.  Ms. Vivenzio, did you ever go see an outside specialist to

8  your knowledge who recommended that you be reinstated on

9  Neurontin?

10 A.  I had gone to see a neurologist within the last couple of

11 months.

12 Q.  Do you recall the neurologist name, Ms. Vivenzio?

13 A.  No, ma'am, I don't.  It was in Wendy's facility.

14 Q.  You just testified you believe that was a couple of months

15 ago; is that correct?

16 A.  Yes.

17 Q.  Can you tell me when you went out to see that neurologist

18 who was your provider at Albion correctional facility?

19 A.  Nurse Practitioner Bode.

20         MS. AGNEW:  For the record, your Honor, that's

21 B-O-D-E.

22         THE COURT:  Thank you.

23 Q.  Do you recall when you started seeing Nurse Practitioner

24 Bode?

25 A.  I would say almost a year, maybe somewhere around that.

N95BALL1                        Vivenzio- Direct

1   Q.  Had Ms. Bode been at Albion correctional facility treating

2   other patients before she became your provider?

3             MS. THOMAS:  Objection, outside the witness's scope of

4   knowledge.

5             MS. AGNEW:  She may have knowledge.

6             THE COURT:  We'll find out how she knows.  Are you

7   able to answer the question?

8   A.  I don't know.  Am I answering it?

9             THE COURT:  Yes, ma'am, if you can.

10  A.  Okay.  I was seeing doctor --

11            THE COURT:  Ms. Vivenzio, please stop for just a

12  second.  We have to correct something on our end.

13  BY MS. AGNEW:

14  Q.  Ms. Vivenzio, can you hear me?

15  A.  Yes.

16  Q.  Okay.  Thank you for your patience this morning.

17            THE COURT:  You may answer, ma'am.

18  A.  She hasn't been at this facility very long.  She's been

19  here maybe I would say almost a year.  I was transferred over

20  to her.

21  Q.  Okay.  Very good.  So what, if any changes, has Ms. Bode

22  made to your treatment after you saw the neurologist?

23  A.  I was put on Neurontin.

24            THE DEPUTY CLERK:  Stop.

25            (Discussion held off the record)

1    BY MS. AGNEW:

2    Q.  Can you recall when specifically Ms. Bode re-prescribed the

3    Neurontin?

4    A.  Two months maybe.

5    Q.  Can you answer that again.  You froze a little bit.

6    A.  About two months or so.

7    Q.  And what, if any, effect has the re-prescription of

8    Neurontin had on your chronic pain?

9    A.  It helps my mobility much better.  I could do a little bit

10   more, standing more, working more.  It helps me all the way

11   around.

12   Q.  Do you have any knowledge of why your Neurontin was

13   re-prescribed after several years?

14   A.  I have no idea.  I went to see the neurologist and that is

15   what she recommended, and I do believe it came together when

16   they prescribe to me the MAT program.

17   Q.  Explain to you the Court it came together with the MAT

18   program?  What do you mean?

19   A.  They had recently started the MAT program for opioid abuse

20   users, a sponsored program.  And I was seen with her and I did

21   a referral with her, but I had said to her I don't want to be

22   on the MAT program, if I could be put on Neurontin.  That's

23   what I want.

24   Q.  And why did you tell Ms. Bode that you preferred Neurontin

25   to being on the MAT program?

1    A.  I don't want to be on any type of opioid drug, none of

2    that. I am recovered for five years.

3    Q.  And so after you had that discussion with Ms. Bode, is that

4    when you were sent to the neurologist?

5    A.  It took a little while to get there.  It took a while to

6    get there.

7    Q.  Ms. Vivenzio, can you just tell the Court what is your

8    underlying criminal conviction for which you're in prison?

9    A.  A sexual crime.

10   Q.  How much longer do you have on your sentence, Ms. Vivenzio?

11   A.  I go to the board in July.

12   Q.  Very good.  Can you tell us have you spoken with Ms. Bode

13   about your Neurontin prescription or your chronic pain since it

14   was re-prescribed?

15   A.  Yes.

16   Q.  What did you tell Ms. Bode?

17   A.  That it was helping me and I'm going to be starting the PT

18   for my back soon.

19   Q.  That's great.  I'm very glad to hear that.

20        I have no further questions, Ms. Vivenzio, but now

21   defendants counsel are going to ask you questions and I may

22   come back, okay?

23   A.  Yes.

24        THE COURT:  Cross-examination, counsel.

25        MS. THOMAS:  Thank you, your Honor.

1   CROSS-EXAMINATION

2   BY MS. THOMAS:

3   Q.  Good morning, Ms. Vivenzio.  My name is Jennifer Thomas and

4   my office represents Dr. Carol Moores in her official capacity

5   as the chief medical officer for the department of corrections,

6   and I have a few questions for you today.

7             Do you have any documents that are in front of you as

8   you sit here today?

9   A.  No, I do not.

10  Q.  Did you do anything to prepare for your testimony today?

11  A.  Yes, I've been going through my medical paperwork.

12  Q.  And you said you are going through your medical paperwork,

13  what exactly was it that you reviewed?

14  A.  Since I set foot in -- since I was incarcerated in 2014, I

15  have records going up until now.

16  Q.  Did you review all your records from 2014 until today?

17  A.  I tried to get through them all, but it was very

18  overwhelming.

19  Q.  And you testified that your current provider is Nurse

20  Practitioner Bode, right?

21  A.  Yes.

22  Q.  And you said that you've been seeing her for about a year;

23  is that correct?

24  A.  Yes.

25  Q.  And so would the first time that you've seen Nurse

1   Practitioner Bode been approximately the fall of 2022?

2   A.   Possibly.

3   Q.   Earlier you testified that you've never participated in

4   physical therapy at Albion, correct?

5   A.   Not for my back, no.

6   Q.   Have you participated in any physical therapy at Albion?

7   A.   For my legs, I had to have surgery on my leg, my knee.

8   Q.   And what was the physical therapy for your leg?

9   A.   What do you mean what was it?  It was doing physical

10  therapy to get my leg stronger.

11  Q.   Was that to treat pain in your leg?

12  A.   No, that is to help me from the surgery to get my mobility

13  back with my knee.

14  Q.   And I believe you testified that you've been on Neurontin

15  for two months; is that correct?

16  A.   Yes, roughly about that.

17  Q.   So I just want to clarify what you meant by two months.

18          When approximately do you believe you started taking

19  Neurontin as prescribed by Nurse Practitioner Bode?

20  A.   Like I said, it could be between two months, three months.

21  I'm really not sure of the exact time.

22  Q.   Would it surprise you to know that your medical records

23  show that you started Neurontin per Nurse Practitioner Bode in

24  October of 2022?

25  A.   That doesn't sound right to me unless I'm wrong.  I don't

N95BALL1                         Vivenzio - Cross

1    know.

2    Q.  You testified that you had a discussion with Nurse

3    Practitioner Bode with respect to the MAT program, correct?

4    A.  Yes.

5    Q.  When did that discussion occur?

6    A.  This year, I really can't tell you a date.

7    Q.  And just to clarify, the MAT program refers to Medications

8    Assisted Treatment, right?

9    A.  Yes.

10   Q.  And that's a program for incarcerated individuals with a

11   history of opioid abuse, right?

12          THE COURT:  Ms. Vivenzio, did you hear counsel's

13   question about the MAT program?

14          THE WITNESS:  Yes.

15          THE COURT:  Are you able to answer?  Please answer it

16   because if you did, we didn't hear you.

17   A.  She just ask me if I was aware of that program.  I said

18   yes.

19          THE COURT:  Thank you.

20   Q.  And my next question is, the MAT program is for

21   incarcerated individuals with a history of opioid abuse, right?

22   A.  Yes.

23   Q.  And that was because at some point you had a history of

24   opioid addiction, right?

25   A.  Yes.

N95BALL1                          Vivenzio - Cross

1   Q.   And at some point between 2015 and 2016, you have taken
2   suboxone without a prescription, correct?
3   A.   Yes, I had a dirty urine, yep.
4   Q.   And you've taken suboxone without a prescription as
5   recently as 2017, right?
6   A.   Yes.
7   Q.   And isn't it true that after you found out that Nurse
8   Practitioner Bode would prescribe you Neurontin, you were
9   happy, right?
10  A.   Yes.
11  Q.   And in fact you told Nurse Practitioner Bode that?
12  A.   Yes.
13  Q.   And you were happy when you found out that you would be
14  able to receive Neurontin instead of participating in the MAT
15  program, correct?
16  A.   Yes.
17  Q.   And isn't it true that in August of 2023, Nurse
18  Practitioner Bode performed an annual pain assessment?
19  A.   Yes, she did.
20  Q.   And you participated in that annual pain assessment with
21  Nurse Practitioner Bode, correct?
22  A.   Yes.
23  Q.   And that required you to answer a series of questions about
24  your chronic pain, correct?
25  A.   Yes.

1   Q.  And during your pain assessment, you reported that you

2   currently take Baclofen, Neurontin and Indocin for your pain,

3   right?

4   A.  Yes.

5   Q.  And that's true, you do receive Baclofen for your pain at

6   Albion, right?

7   A.  Yes.

8   Q.  And you also receive Indocin for your pain at Albion?

9   A.  Yes.

10  Q.  And you also receive Neurontin for your pain at Albion?

11  A.  Yes.

12  Q.  And you also indicated in your pain assessment that you had

13  previously used a TENS unit for pain; is that correct?

14  A.  Yes.

15  Q.  And that was while you were incarcerated with DOCCS, right?

16  A.  Yes.

17  Q.  And isn't it true that you reported to Nurse Practitioner

18  Bode that the TENS unit was helpful?

19  A.  Yes.

20  Q.  And you also reported to Nurse Practitioner Bode that the

21  TENS unit provided you with pain relief, right?

22  A.  Yes.

23  Q.  Isn't it also true that you indicated in your pain

24  assessment to Nurse Practitioner Bode that you currently use a

25  knee brace?

N95BALL1                         Vivenzio - Cross

1   A.   Yes.

2   Q.   And you also reported to Nurse Practitioner Bode that the

3   knee brace does provide you with some pain relief?

4   A.   Yes.

5   Q.   And you also indicated in your pain assessment that you

6   currently use a wrist brace, right?

7   A.   Yes, yeah, I use two.

8   Q.   And you also indicated in your pain assessment that the

9   wrist brace does provide you with pain relief, right?

10  A.   I said minor relief.

11  Q.   And you also reported that taking care of your other

12  medical issues helps relieve your pain, right?

13            Ms. Vivenzio, can you hear me okay?

14  A.   Yes.

15  Q.   And I'm going to repeat my last question just to make sure

16  that you heard it.

17            You also reported in your pain assessment that when

18  you take care of your other medical issues, it helps with your

19  pain, right?

20  A.   Yes.

21  Q.   You also told Nurse Practitioner Bode that placing heat on

22  the source of your pain has helped alleviate your pain, right?

23  A.   Yes.

24  Q.   And you also told Nurse Practitioner Bode during the

25  assessment that ice makes your pain better, right?

N95BALL1                        Vivenzio – Cross

```
 1   A.  Yes.
 2   Q.  And isn't it true that you've seen a neurologist while
 3   incarcerated?
 4   A.  Yes.
 5   Q.  And you saw the neurologist at sometime in either June or
 6   July of 2023, right?
 7   A.  Yes.
 8   Q.  And would you agree that the neurologist recommended
 9   Baclofen for your back spasms?
10   A.  I'm sorry.  I didn't hear that last part.
11   Q.  Would you agree that the neurologist recommended that you
12   take Baclofen for your back spasms?
13   A.  Yes.
14   Q.  And you currently take Baclofen, correct?
15   A.  Yes.
16   Q.  And you would agree that Nurse Practitioner Bode follows
17   the recommendations of the neurologist, correct?
18   A.  Yes.
19   Q.  And isn't it true that you asked Nurse Practitioner Bode to
20   put you on a lidocaine patch for your chronic pain?
21   A.  Yes.
22   Q.  And isn't it true that after your conversation with Nurse
23   Practitioner Bode she did in fact prescribe you lidocaine
24   patches?
25   A.  Yes.
```

N95BALL1                    Vivenzio - Cross

1  Q.  Isn't it also true that you ask Nurse Practitioner Bode to

2  put on Diclofenac gel to treat your pain?

3  A.  Yes.

4  Q.  And isn't it true that after your conversation with Nurse

5  Practitioner Bode, she also prescribed you diclofenac gel?

6  A.  Yes.

7  Q.  Isn't it true that in July of 2023, Nurse Practitioner Bode

8  increased your Neurontin to 800 milligrams in the morning and

9  1200 milligrams at night on a daily basis?

10 A.  That's what the neurologist recommended.

11 Q.  Isn't it true that you have carpel tunnel syndrome?

12 A.  Yes.

13 Q.  And that causes you pain?

14 A.  Yes.

15 Q.  And while incarcerated, your providers have offered to

16 treat your carpel tunnel syndrome with pain injections, right?

17 A.  Yes.

18 Q.  But you've refused those injections, right?

19 A.  Yeah, I did not want the injections.

20 Q.  You've submitted sick-call request in the past, right?

21 A.  Yes.

22 Q.  And you've submitted sit-call request as it relates to your

23 knee pain, correct?

24 A.  Yes.

25 Q.  And you've submitted sick-call request as it relates to

1  your back pain, right?

2  A.  Yes.

3  Q.  And you've submitted several sick-call requests in the last

4  few months for your knee and back pain, right?

5  A.  Not sure.  I know I put some in.  I don't really know how

6  many.

7  Q.  And in response to your sick-call request, you have seen

8  Nurse Practitioner Bode, correct?

9  A.  Yeah, maybe in a couple of days or so, maybe a week.  It

10  depend.

11  Q.  And you would agree that you see Nurse Practitioner Bode

12  approximately one to two times a month?

13  A.  Yeah, roughly.

14  Q.  And while incarcerated with DOCCS, you've received

15  prescriptions for Baclofen, correct?

16  A.  Yes.

17  Q.  And you're currently on Baclofen?

18  A.  Yes.

19  Q.  And the Baclofen is intended to help with your back spasms

20  and associated pain, correct?

21  A.  Yes.

22  Q.  And the Baclofen does in fact help with your back spasms

23  and your pain, correct?

24  A.  Yes, with the Neurontin.

25  Q.  And while incarcerated with DOCCS, you've received

1     Neurontin, correct?

2     A.   Yes.

3     Q.   And you're currently on Neurontin, correct?

4     A.   Yes.

5     Q.   And the Neurontin is intended to help with your pain,

6     correct?

7     A.   Yes.

8     Q.   And the Neurontin does in fact help relieve your pain,

9     correct?

10    A.   It helps relieve, yes.

11    Q.   And while incarcerated with DOCCS, you've also received

12    Indocin, correct?

13    A.   Yes.

14    Q.   And you're currently on Indocin, correct?

15    A.   Yes.

16    Q.   And the Indocin is to help with your pain, right?

17    A.   It's a mild pain reliever and I take it as needed.

18    Q.   But the Indocin is intended to help with your pain, right?

19              MS. AGNEW:   Objection.   I think that calls for a

20    medical conclusion.   She doesn't know what it's intended to do.

21              THE COURT:   Ms. Vivenzio, are you able to answer that

22    question?   Do you know what that drug is intended to do?

23              THE WITNESS:   No, all I know it's a mild pain

24    reliever.

25              THE COURT:   Go ahead, counsel.

N95BALL1                         Vivenzio – Cross

1              MS. THOMAS:  Thank you, your Honor.

2    Q.   The Indocin does help with your pain?

3    A.   Very mildly.  It doesn't even touch it.

4    Q.   And you're also taking amlodipine for blood pressure,

5    correct?

6    A.   Yes.

7    Q.   And you're taking Metformin for diabetes, correct?

8    A.   Yes.

9    Q.   And Synthroid for your thyroid?

10   A.   Yes.

11   Q.   And omeprazole for your GI issues?

12   A.   Yes.

13   Q.   And you're also taking vitamins C and D.?

14              Are you there, Ms. Vivenzio?

15   A.   Yes.

16   Q.   My last question was you're also taking vitamin C and D,

17   correct?

18   A.   Yes.

19   Q.   And you also take clonidine for hot flashes, right?

20   A.   Yes.

21   Q.   And you take Cetirizine for allergies?

22   A.   Yes.

23   Q.   And Atorvastatine for cholesterol?

24   A.   Yes.

25   Q.   And Excedrin for migraines?

N95BALL1                    Vivenzio - Redirect

1   A.  Yes.

2   Q.  And you're also prescribed two inhalers; is that correct?

3   A.  Yes.

4   Q.  And you also take antacids?

5   A.  Yes.

6   Q.  And you also take Effexor?

7   A.  Yes.

8   Q.  And you also take Trileptal?

9   A.  Yes.

10  Q.  Are there any other medications that you take that I

11  forgot?

12  A.  I do take ReQuip for my restless legs.

13          MS. THOMAS:  I have no further questions.  Thank you

14  very much for your time.

15          THE COURT:  Thank you.  Redirect, counsel, please.

16          MS. AGNEW:  Very briefly.

17  REDIRECT EXAMINATION

18  BY MS. AGNEW:

19  Q.  Ms. Vivenzio, you just testified that you got a pain

20  assessment from Nurse Bode in August; is that correct?

21  A.  Yes.

22  Q.  Can you just describe for the Court what that was like?

23  How did that happen?

24  A.  I really don't even know, that just seem to have come out

25  of the blue.

N95BALL1                         Vivenzio - Redirect

1   Q.  Can you describe the encounter for the Court?

2   A.  I had gone in to see her and she had a packet and a

3   booklet, and she said she had to do an assessment with me,

4   which in all my years I don't remember ever doing any.

5   Q.  Do you recall approximately how long it took?

6   A.  Probably over 30 minutes.

7   Q.  Had you ever spent over 30 minutes with a DOCCS provider

8   before talking about your healthcare?

9   A.  I've spoken with her a few times, maybe 20 minutes or so.

10  Q.  So in this current bid with DOCCS, have you ever sat down

11  with a provider as you did with Ms. Bode and talked about your

12  chronic pain and your treatments?

13  A.  I might have spoken to them, but I didn't get any help or I

14  didn't get any feedback really.

15  Q.  And so can you tell us in the past let's say since the end

16  of 2022, has the help and feedback you've gotten from your

17  DOCCS provider been better or worse?

18  A.  I don't think it's gotten any better.

19  Q.  I'm sorry.

20  A.  I really feel it hasn't gotten any better medical.

21  Q.  But you've gotten Neurontin, correct?

22  A.  Yes.

23  Q.  And that has improved your health, correct?

24  A.  Yes.

25  Q.  And you just got a pain assessment, correct?

N95BALL1                        Pine- Direct

1    A.  Yes.

2    Q.  And did you have those things before at Albion correctional

3    facility?

4    A.  No.

5              MS. AGNEW:  I have no further questions.  Thank you

6    so, Ms. Vivenzio.  You're going to hear from us soon, okay.

7              THE WITNESS:  Thank you.

8              MS. AGNEW:  We'd like to call Mr. Pine to the stand.

9              MR. JONES:  This is Mr. Baron Jones.  I would like to

10   call Mr. James Pine, Sr., for the plaintiff class to the stand,

11   testifying remotely from Clinton correctional facility.

12             THE COURT:  Ms. Flip lips.

13   JAMES PINE,

14        called as a witness by the Plaintiffs,

15        having been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  Please state and spell your name

17   for the record.

18             THE WITNESS:  James R. Pine, Sr., P-I-N-E.

19             THE COURT:  Thank you.  Mr. Jones.

20   DIRECT EXAMINATION

21   BY MR. JONES:

22   Q.  Thank you, your Honor.  Good morning, Mr. Pine.  How are

23   you feeling today.

24   A.  I'm well. Thank you.

25   Q.  You can hear me well?

N95BALL1                        Pine- Direct

1    A.  Yes, I can hear.

2    Q.  Okay.  Can you please identify yourself one more time for

3    the Court.

4    A.  James Pine, Sr.

5        (Continued on next page)

N95Wall2                        Pine - Direct

1   BY MR. JONES:

2   Q.  One more time.  You cut out for a second there.

3   A.  James R. Pine, Sr.

4   Q.  Thank you, Mr. Pine.

5       Where are you from, Mr. Pine?

6   A.  Originally?

7   Q.  Yes.

8   A.  Greene County.

9   Q.  And you grew up in Greene County?

10  A.  Yes, sir.

11  Q.  All right.  How old are you?

12  A.  I'm 54 years old.

13  Q.  Are you married?

14  A.  No, sir.

15  Q.  Do you have any kids?

16  A.  Yes, sir.

17  Q.  How old?

18  A.  I have a -- one nine-year-old son and one ten-year-old son.

19  Q.  Amazing.  Awesome.

20      Are you currently incarcerated in the New York State

21  Department of Corrections?

22  A.  Yes, I am.

23  Q.  Do you suffer from chronic pain or neuropathy?

24  A.  Yes, I do.

25  Q.  Where do you currently reside; what facility?

N95Wall2                          Pine - Direct

1    A.  Clinton Correctional Facility.

2    Q.  OK.  And how long have you been in the custody of New York

3    State Department of Corrections?

4    A.  Since February of 2008.

5    Q.  All right.  And how many facilities have you been housed in

6    throughout your bid in New York State Department of Corrections

7    custody?

8    A.  One, two, four different facilities.

9    Q.  All right.  If you can, can you please name which ones?

10   A.  Downstate Correctional Facility.  Then Great Meadow.  Then

11   Green Haven.  Then back to Great Meadow.  Now at Clinton.

12   Q.  OK.  Amazing.  Thank you.

13       What are your current -- what, if any, are your current

14   medical conditions?

15   A.  Currently, my worst, neuropathy in my right leg.  I think

16   that resulted from my hip injury, where I had hip replacement.

17   Q.  All right.  And how many times did you get your hip

18   replaced?  Was it only once?

19   A.  No.  It was repaired in 1987, they gave a total hip

20   replacement.  In 1995, they did a hip revision.  They did

21   another revision in 2005.

22   Q.  All right.  And can you describe your issues that you're --

23   that are coming, that are coming from your hip replacement and

24   the conditions that you just described for us, for the Court?

25   A.  Again, it -- I only sleep eight to 12 minutes at a time,

N95Wall2                          Pine - Direct

1   because my leg will cramp up -- my right leg, especially --

2   burning, shooting pains constantly down my leg.  Sometimes it's

3   a tingle, but then there's a spasm, where it's like a bolt of

4   electricity.  And that's mostly my left leg.

5   Q.  OK.  Thank you for that.

6       And in regards to the pain that you described, if anything,

7   how has this pain affected your daily life?

8   A.  Some days I have -- the facility I'm in now there's a lot

9   of stairs, and just because of the pain it's tough to go up and

10  down the stairs.  So sometimes I don't leave my bed all day.

11  It's just, and like I said, sleeping eight to 12 minutes.  I'll

12  fall asleep, and then my leg will either, will go into a severe

13  cramp or just a burning, and it will wake me up.  And I'll look

14  at my clock and I'll see eight to 12 minutes has gone.  Then

15  I'll fall back asleep a few minutes later, and it's a cycle

16  like that constantly.

17  Q.  OK.  Thank you.

18      How long have you been suffering from these conditions that

19  you just described?  Was it before your incarceration, or was

20  it while you were incarcerated?

21  A.  Well, it -- in 2009, when I was at Great Meadow

22  Correctional Facility, I slipped on the floor and actually

23  fractured my pelvis because the hip had come out of joint, and

24  that pain was so intense, I can't even describe it.  And from

25  that moment on, it seems the neuropathy just increased.

N95Wall2                        Pine - Direct

1   Q.  Got it.  Thank you.

2       And what, if any, diagnosis, diagnoses have you been told

3   regarding your chronic pain from a medical provider?

4   A.  They did an EMG nerve study, and the diagnosis was that

5   yes, there was nerve damage.

6   Q.  All right.  And when was that?

7   A.  I don't recall.  I don't recall.

8   Q.  OK.  Do you remember where that diagnosis was given?

9   A.  Yes.  That was in Green Haven.

10  Q.  OK.  Do you remember the provider that gave you that

11  diagnosis?

12  A.  Dr. Silver was my primary care provider, so I'm sure he

13  arranged the nerve study.

14  Q.  OK.  Thank you.

15      Have you ever received any effective medication to treat

16  your described pain before incarceration or while being

17  incarceration?

18  A.  Yes.  Before my incarceration, since 1986, when I came out

19  of the hospital with a total hip replacement, they were giving

20  me hydrocodone and Neurontin and that controlled it.  And then

21  once I became incarcerated, you know, it's been sporadic.

22  Q.  OK.  When -- who -- where were you and what was the

23  first -- who was the -- I'm sorry.  Strike that, please.

24      Who was the first medical provider to give you effective

25  medication?

N95Wall2                          Pine - Direct

1          THE COURT:  While incarcerated or not?

2          MR. JONES:  While incarcerated.  Sorry, your Honor.

3    A.  While incarcerated, I believe it was Dr. Silver.

4    Q.  OK.  And what medications did Dr. Silver give you that was

5    effective?

6    A.  Neurontin and, until they took it away, the MS Contin.

7    Q.  OK.  And the Neurontin and MS Contin -- let's focus on the

8    Neurontin.

9          The Neurontin was refilled, correct, after --

10   A.  For a while, yes.

11   Q.  OK.  For a while.

12         Was the Neurontin ever discontinued?

13   A.  Yes.

14   Q.  When was Neurontin discontinued, Mr. Pine?

15   A.  It was when all the MWAP policy came into effect.  It might

16   have been -- I can't remember the exact year right now.  I'm

17   sorry.

18   Q.  Do you have any idea what year it was around, what was the

19   date around?

20   A.  I believe it was 2017.

21   Q.  OK.  Do you remember what -- do you remember which provider

22   discontinued the Neurontin?

23   A.  Dr. Silver was my primary, and when the refill had ran out,

24   I, I told him that it was time for a refill.  I put down for

25   sick call (inaudible).  He said his hands were tied, and I

N95Wall2                    Pine - Direct

1   believe it was a Dr. Hammer told him that it was discontinued.

2              MR. JONES:  OK.

3              MS. KILEY:  Objection, your Honor.  That's hearsay.

4   He said that the provider said that someone told him that his

5   hands were tied, so it's a hearsay statement.  So I object.

6              THE COURT:  Yes, ma'am.

7              Sir.

8              MS. AGNEW:  Your Honor, may I?

9              THE COURT:  Yes, ma'am.

10             MS. AGNEW:  Thank you.

11             We've actually identified the provider in this

12  instance, and it is an admission against a party.  Dr. Silver

13  certainly is an agent of DOCCS.  And in fact, what he's saying

14  is that Dr. Hammer is the one who discontinued it.

15             THE COURT:  Ms. Kiley.

16             MS. KILEY:  Your Honor, DOCCS is not a party.

17  Dr. Silver is not a party.  Nor any -- there was no testimony

18  that it was Dr. Hammer that denied the, that discontinued, did

19  not approve the Neurontin.

20             THE COURT:  That is exactly what the witness is

21  saying.

22             Overruled.

23             Mr. Jones.

24             MR. JONES:  Thank you, your Honor.

25  Q.  Mr. Pine, do you remember what facility you were in when

N95Wall2                          Pine - Direct

1   you talked to Dr. Silver and heard that Dr. Hammer was

2   discontinuing your Neurontin?

3   A.  Yes.  That was in Green Haven.

4   Q.  OK.  And can you just please one more time tell the Court

5   how you learned that your medication was discontinued?

6   A.  (inaudible) going to the medication window, and one day I

7   went to the window and requested my meds, and I was told that

8   it was discontinued.

9   Q.  OK.

10  A.  So then --

11  Q.  Sorry.  What was the last thing you said?

12  A.  Oh.  So, again, I dropped a sick call to go see my

13  provider, Silver, and wanted to know why, what happened that I

14  wasn't getting Neurontin anymore, and he said -- his exact

15  words to me, his hands were tied, and he actually showed me --

16          MS. KILEY:  Your Honor, I'm going to move to strike

17  again.  I'm sorry.  He said again the doctor said his hands

18  were tied.

19          THE COURT:  OK.  Let's listen to the answer, and then

20  obviously you may move.

21  BY MR. JONES:

22  Q.  You can continue, Mr. Pine.

23          THE COURT:  Mr. Pine, the last thing we heard was "I

24  dropped a sick call to go see my provider, Silver" --

25          THE WITNESS:  Right.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N95Wall2                              Pine - Direct

1            THE COURT:  -- "and wanted to know why, what happened

2    that I wasn't getting Neurontin anymore, and he said -- his

3    exact words to me, his hands were tied, and he actually showed

4    me" --

5            Would you continue.

6            THE WITNESS:  Yes.  He showed me the requisition where

7    he was requesting, via Dr. Hammer, that my Neurontin be

8    refilled, and Dr. Hammer (inaudible) that was it, it was over.

9    BY MR. JONES:

10   Q.  And how did you feel physically after your medication was

11   discontinued?

12   A.  I was just left to suffer from that point on.

13   Q.  Can you describe to the Court what you mean by suffering?

14   You were, you suffered --

15   A.  Yes.  The intensity of my nerve pain, the neuropathy was

16   horrible.  Horrible.

17   Q.  What exactly was horrible?

18   A.  The burning, and my leg would be numb and cramp all

19   nightlong.

20   Q.  Thank you.

21        What, if anything, are you unable to do because of your

22   untreated pain that you once may have been able to do?

23            MS. KILEY:  Objection, your Honor.  Leading.

24            THE COURT:  What, if anything, counsel.  Say it again.

25   BY MR. JONES:

N95Wall2                          Pine - Direct

1  Q.  What, if anything, are you unable to do because of the

2  discontinuation of your Neurontin?

3  A.  For a while, when it was treated and the pain wasn't as

4  bad, I would regularly exercise, just go for walks in the yard,

5  and just be able to get out of bed in the morning and be able

6  to walk.

7  Q.  Did you speak to your providers during the time that you

8  did not have your medication through sick call or any type of

9  grievance?

10  A.  At numerous times with -- because I saw my provider,

11  Dr. Silver, on a regular occasion, and I would always,

12  constantly ask what was going on with the Neurontin.

13  Q.  When you say regular occasion, how often would that be?

14  A.  I would see Dr. Silver -- I'm sorry.  I would see

15  Dr. Silver once a month, because he --

16  Q.  Mr. Pine, can you hear me?

17     Mr. Pine, can you hear me now?

18  A.  Yes.

19  Q.  I'm sorry.  Can you repeat that?  I asked what do you mean

20  by a regular -- you would see your provider regularly; what's

21  the time frame looking like?

22  A.  Like, I would regularly see him once a month, treating for

23  hypertension.

24  Q.  OK.

25  A.  And I would constantly ask him what was going on with the

N95Wall2                          Pine - Direct

1  Neurontin specifically.

2  Q.  And when you asked him what was going on with the

3  Neurontin, what was the response that you would get?

4  A.  He just said it wasn't -- that it was discontinued.  That

5  was it.  It was over.

6  Q.  Can you say that one more time?

7  A.  He said -- yes, sir.  He said it was a discontinued

8  medication.

9  Q.  OK.

10     Now, did you ever get the Neurontin back?

11 A.  I -- when I transferred to Great Meadow, I was -- initially

12 I told my doctor that, my primary doctor there that I was

13 getting gabapentin -- or Neurontin.  And he ignored me.  He

14 basically threw me out of his office, and then six months later

15 I transferred to Clinton and I dropped a sick call as soon as I

16 got here, and my provider here eventually put me back on.

17 Q.  OK.  After Dr. Silver discontinued your Neurontin, what was

18 the -- how did you get it back exactly, in detail, for the

19 Court?

20 A.  I would drop (inaudible) because I had self-care

21 medications.  So once a month I would drop a (inaudible)

22 requesting medications or refills for my self-care meds, for

23 the blood pressure.  And as an aside, I would say I wanted to

24 see my primary care provider, and I believe that in my record

25 it showed that I was on gabapentin, so I asked them to look

N95Wall2                        Pine - Direct

1    through it and possibly prescribe it again.

2    Q.  OK.  Thank you.

3        And who was the provider that put you back on Neurontin; do

4    you remember?

5    A.  Yes.  It was Devlin-Varin.

6    Q.  Dr. Devlin?

7    A.  Yeah.

8    Q.  When did Dr. Devlin put you back on Neurontin?

9    A.  I believe it was January of this year.

10   Q.  OK.  Thank you.

11       And have you ever seen any specialists regarding your pain?

12   A.  Not, not for pain specifically, no.

13   Q.  OK.  And once again, you said earlier that you have had

14   numerous hip surgeries, correct?

15       Mr. Pine, can you hear me?

16   A.  I'm sorry.  (inaudible).

17   Q.  I'm sorry.  You said earlier you were, you suffered from --

18   I'm sorry.  Strike that.

19       You went through numerous hip surgeries, hip replacement

20   surgeries, correct?

21   A.  Correct.

22   Q.  OK.  Have you had any physical therapy while incarcerated?

23   A.  Yes, I have.

24   Q.  How many sessions, if so?

25   A.  I believe I went for eight weeks.

N95Wall2                          Pine - Direct

1    Q.  OK.  And was it effective?

2    A.  No.

3              THE DEPUTY CLERK:  Hold on.

4              All right.  Good.

5              MR. JONES:  Thank you.

6    Q.  Mr. Pine, can you hear me?

7         Can you hear me, Mr. Pine?

8         Mr. Pine.

9         Mr. Pine, can you hear me now?

10   A.  Now I can, yes.

11   Q.  OK.  Mr. Pine, if you don't mind, I would like to just go

12   back to 2017 when you got discontinued from your Neurontin.

13   Can you lay out for the Court, if you can, when did you get

14   transferred from Green Haven to Great Meadows?

15   A.  I left Green Haven in 2021, I believe.

16   Q.  OK.  And did you tell the providers at Great Meadows that

17   you would like to get put back on Neurontin?

18   A.  Yes.

19   Q.  And what did they -- what was the provider's response?

20   A.  I believe that was Dr. Silverberg, and I -- I was there for

21   the initial consult, and I said can you look into my

22   gabapentin?  And he said you're not here for that.  And I said:

23   Well, can you look into my records?  I'm sure -- I know I was

24   on gabapentin at my last facility.

25        And he threw me out of his office; he didn't want to hear

N95Wall2                          Pine - Direct

1   it.

2   Q.  OK.  And after that, who was the next provider after

3   Dr. Silverberg?  Who was the next provider that you told about

4   your wanting -- that you told about wanting to get your

5   gabapentin back?

6   A.  That was when I got transferred to Clinton and my primary

7   care was Devlin-Varin.

8   Q.  OK.  And when was that?

9   A.  That was December.

10  Q.  OK.  Thank you.

11      December of 2022?

12  A.  Yes.

13  Q.  OK.  And what did you relay to Dr. Devlin-Varin?  What did

14  you say to her regarding your Neurontin?

15  A.  I told her that I knew that it was in my medical files that

16  I was receiving it and that she could look into it, so

17  (inaudible) went through my files, so I was getting it so

18  (inaudible).

19  Q.  Can you repeat that last part?  I didn't hear you.

20  A.  She went through my files.  She probably noticed that I was

21  receiving Neurontin, and she prescribed it.

22  Q.  OK.

23  A.  And that was beginning in (inaudible).

24              MR. JONES:  Your Honor, can I take one minute, please?

25              THE COURT:  Yes, sir.

N95Wall2                          Pine - Cross

1              MR. JONES:  Thank you.

2    Q.  All right.  Mr. Pine, how does the Neurontin affect you

3    now?

4    A.  It -- I'd describe it as (inaudible).

5    Q.  OK.  Is it helping?

6    A.  I can't hear you.  Excuse me?

7    Q.  Does the Neurontin help you?

8    A.  Oh.  Absolutely.

9              MR. JONES:  OK.  Thank you, Mr. Pine.

10             Thank you, your Honor.

11             THE COURT:  Yes, sir.

12             Cross-examination, counsel, please.

13             MS. KILEY:  Yes, your Honor.  Briefly.

14   CROSS-EXAMINATION

15   BY MS. KILEY:

16   Q.  Good morning, Mr. Pine.  My name Oriana Kiley.  I'm going

17   to be asking you just a few follow-up questions.

18       Mr. Pine, when you got to Clinton and you first met with

19   Nurse Practitioner Devlin-Varin, how -- you -- wasn't there a

20   time that you specifically asked to be part of the MAT program?

21   A.  Yes.

22   Q.  OK.  And when was that?

23   A.  It may have been March.

24   Q.  March of 2023?

25   A.  Yes.

N95Wall2                        Pine - Cross

1   Q.  OK.  And when you began the MAT program, is that because

2   you have a history of substance abuse?

3   A.  That wasn't my intention from the start for the MAT

4   program.

5   Q.  Mr. Pine, you do, in fact, have a history of substance

6   abuse, though, isn't that right?

7   A.  Yes.

8   Q.  OK.  And when was the last time that you used illegal,

9   illicit substances?

10  A.  2012.

11  Q.  OK.  Mr. Pine, do you remember a few weeks ago, maybe about

12  a month ago, when I took your deposition via videoconference?

13  Do you remember that?

14  A.  Yes.

15  Q.  Do you remember that I actually asked you the same

16  question?  I said when was the last time you used illicit

17  substances --

18          THE COURT:  Ma'am.  Ma'am, you know how to do this.

19  A.  Do I remember?

20          THE COURT:  Hold on for just a minute, Mr. Pine.

21  Counsel's going to say the question again.

22  BY MS. KILEY:

23  Q.  Do you recall that -- do you recall being asked when was

24  the last time you used --

25          THE COURT:  No, no, no, no.  You know how.  Do you

N95Wall2                          Pine - Cross

1  recall being asked this question and giving this answer?

2  "Q.  Blah, blah, blah."?

3          MR. NOLAN:  Your Honor, are you objecting for the

4  plaintiff?

5          THE COURT:  I am asking counsel to do it in the proper

6  manner.

7          MR. NOLAN:  OK.  But without an objection, it should

8  be admissible.

9          THE COURT:  I'm sorry, counsel.  We have an inmate

10  testifying by video.  It's difficult enough as it is.  I think

11  we can expect counsel to do this in the proper manner.

12          Ms. Kiley.

13  BY MS. KILEY:

14  Q.  When I took your deposition on Tuesday, August 1, of 2023,

15  I asked you:  OK, well -- excuse me.

16  "Q.  Well, when was the last time you used illicit drugs?"  And

17  your answer was "maybe 2020."

18      Do you remember giving that response?

19  A.  Yes.  The date was definitely off.  I specifically remember

20  the last time I used, and that was in 2012.

21  Q.  2012.  OK.  And is your memory better today, or was it

22  better in August, one month ago?

23  A.  I'm clearheaded right now.

24  Q.  OK.  And when you were evaluated for the MAT program, do

25  you recall telling Nurse Devlin-Varin that the last time you

1    used illicit drugs was in March of 2023?

2    A.  I don't remember that.

3    Q.  OK.  Mr. Pine, Nurse Devlin-Varin, she -- as soon as you

4    asked her to put you back on gabapentin, she did that, isn't

5    that right?

6    A.  As soon as?

7    Q.  Well, after the first time you asked her to be put back on

8    gabapentin, you were then represcribed gabapentin, isn't that

9    right?

10   A.  Yes.

11   Q.  And in April of 2023, you asked Nurse Devlin-Varin to

12   increase your dosage to 600 milligrams, isn't that right?

13   A.  I believe I did.

14   Q.  OK.  And then in July, you asked Nurse Devlin-Varin to

15   increase your dosage again to 900 milligrams, isn't that right?

16   A.  Yes.

17   Q.  OK.  Mr. Pine, to confirm, so, the interactions that you

18   described today with Dr. Silver and Dr. Silverberg, you, in

19   fact, just filed a lawsuit in the Southern District of New York

20   earlier this month for Eighth Amendment deliberate indifference

21   as to Dr. Hammer, Dr. Silver and Dr. Silverberg specifically

22   surrounding the incidents that you've just described today,

23   isn't that right?

24   A.  Yes.

25          MS. KILEY:  OK.  I have nothing further.  Thank you.

N95Wall2                        Pine - Redirect

1            THE COURT:  Thank you.

2            MR. MORRISON:  Your Honor, if I can do --

3            THE COURT:  Redirect?  Yes, counsel.

4   REDIRECT EXAMINATION

5   BY MR. MORRISON:

6   Q.  Hi, Mr. Pine.  My name is Josh Morrison.  I haven't met you

7   in person.  I think I've talked to you over the phone.  I work

8   for Ms. Agnew's office.  I'm just going to ask you some

9   follow-up questions.  OK?

10  A.  Sure.

11  Q.  Just to go back, so the record is clear, do you remember

12  what year you were in Green Haven, how long you were in Green

13  Haven?

14  A.  Two thousand -- 2011 until I left, 2022.

15  Q.  OK.  And you testified earlier that your -- Dr. Silver

16  discontinued your gabapentin while you -- around 2007 at Green

17  Haven, right, after, after you, he submitted a request to

18  Dr. Hammer?  Do you remember that testimony?

19  A.  Yes.

20  Q.  After that discontinuation, did Dr. Silver ever put you

21  back on gabapentin while you were at Green Haven?

22  A.  Yes.

23  Q.  OK.  And in -- you said you transferred out of Green Haven

24  in what year?  2022?

25  A.  Correct.

N95Wall2                    Pine - Redirect

1   Q.  OK.  And when you transferred out of Green Haven in 2022,

2   were you being prescribed gabapentin?

3            THE COURT:  Mr. Morrison, hold on.  Hold on.

4            While we're trying to get the witness --

5            THE DEPUTY CLERK:  It's on their end.

6            THE COURT:  Mr. Morrison, while we're trying to get

7   the witness back, I was confused.  I thought the original

8   testimony was that the witness was discontinued on the

9   Neurontin pursuant to the MWAP policy around 2017.  But now he

10  just said 2007.  I thought that's what I heard.

11           MS. AGNEW:  I heard '17, but your Honor, we'll

12  clarify.

13  BY MR. MORRISON:

14  Q.  Mr. Pine, you're back?

15           THE COURT:  I don't think he is back.

16           I'm sorry.  Forgive me.

17           MR. MORRISON:  I'm starting to figure it out.

18           THE COURT:  OK.

19           Go ahead.

20  BY MR. MORRISON:

21  Q.  Mr. Pine, I just want to clarify something real quick.

22  When Dr. Silver -- strike that.

23      While at Green Haven when your gabapentin was first

24  discontinued, do you remember what -- that was in 2017.  Is

25  that accurate?

N95Wall2                          Pine - Redirect

1    A.  Correct.

2    Q.  OK.

3    A.  I believe so, yes.

4    Q.  And then you said at some point after Dr. Silver then

5    represcribed gabapentin to you.  Is that accurate?

6    A.  Yes, I believe so.

7    Q.  Do you remember how -- when that was, roughly?

8    A.  I don't remember the year right now.  I'm sorry.

9    (inaudible).

10   Q.  OK.  Let me ask this way.  Do you know after that first

11   time you were discontinued at Green Haven, around 2017, how

12   many years -- if it was years -- or months, were you off the

13   medication until it was represcribed?

14   A.  Yes.  It was at least (inaudible) years.  Three, four

15   years, I believe.

16   Q.  OK.  And when it was represcribed, do you have any idea why

17   it was represcribed?

18   A.  Can you repeat that?

19   Q.  Sure.

20       Do you have any idea why the gabapentin was represcribed by

21   Dr. Lester two or three years after it was discontinued?

22   A.  I had just heard that the MWAP policy was rescinded.

23   Q.  OK.  And then at some point, you testified, you were

24   transferred from Green Haven to Great Meadows in around 2022,

25   sometime in 2022, right?

N95Wall2                    Pine - Redirect

1    A.  Correct.  Right.

2    Q.  And when you -- just to clarify.  When you left Green

3    Haven, you were taking gabapentin, being prescribed gabapentin?

4              MS. KILEY:  Objection.  Leading.

5              THE COURT:  I'll permit it by way of clarification.

6              You may answer, sir.

7    A.  Can you repeat that?

8    Q.  Sure.

9         When you were transferred out of Green Haven, in around

10   2022, you were --

11   A.  Right.

12   Q.  -- being prescribed gabapentin.  Is that accurate?

13   A.  I believe so, yes.

14   Q.  OK.  And then you get to Great Meadows, right?

15   A.  Correct.

16   Q.  And when you got to Great Meadows after being transferred

17   from Green Haven, was your gabapentin prescription continued?

18   A.  No.

19   Q.  And is that -- and who was your -- strike that.

20        How did you learn when you got to Great Meadows that your

21   gabapentin prescription was not continued?

22   A.  Because I asked my provider when I went to see him, look

23   through my file to see if it was there, that I was getting it

24   and then he would prescribe it.  But he never did.  He threw me

25   out of his office.

N95Wall2                          Pine - Redirect

1    Q.  And when you're saying your provider, you're talking about

2    Dr. Silverberg?

3    A.  Silverberg, yes.

4    Q.  When you first saw your provider at Great Meadows, did you

5    already know you were not being prescribed gabapentin?

6    A.  I'm not -- I didn't know, no.

7    Q.  Well, were you being --

8    A.  (inaudible).

9    Q.  Strike that.

10   A.  I'm sorry?

11   Q.  Strike that.  Let me ask, let me try to ask you, because

12   I'm asking confusing questions.  I'm sorry.  It's my fault.

13       Before your gabapentin was discontinued at Great Meadows,

14   did you speak to your medical provider about that medication?

15   A.  Yes.

16   Q.  And -- well, did you speak to Dr. Silverberg about that

17   medication?

18   A.  Yes, I did.

19   Q.  And what, if anything, did you tell him about that

20   medication, gabapentin?

21   A.  I told him that my leg pain was horrible because of the

22   neuropathy, and I asked him to look through my file; he would

23   see that I had gabapentin and then he could write the scrip and

24   I could go to the window and get it.

25   Q.  And how long at that time were you at Great Meadow?

N95Wall2                          Pine - Redirect

1    A.  I was only there a little over five months.

2    Q.  And --

3    A.  I had (inaudible).

4    Q.  And throughout that five months, were you ever prescribed

5    gabapentin?

6    A.  No.

7    Q.  OK.  And then you transferred to Clinton, correct?

8    A.  Correct.

9    Q.  And how long were you at Clinton until you were

10   represcribed gabapentin?

11   A.  I believe a month.

12   Q.  And to your knowledge, do you know the reason why your

13   gabapentin was represcribed at Clinton?

14   A.  I believe the MWAP policy was rescinded.

15          MS. KILEY:  Objection, your Honor.  The witness

16   already testified that he got the gabapentin back because he

17   spoke to Nurse Devlin-Varin about it.

18          THE COURT:  Mr. Morrison.

19          MR. MORRISON:  I'm just asking if he had any knowledge

20   of any reasons.

21          THE COURT:  I think that he did testify with respect

22   to Nurse Devlin-Varin.  Am I wrong on that?

23          MR. MORRISON:  No.  I guess I can ask if he knows of

24   any other reasons.

25          THE COURT:  Whatever you want.

N95Wall2                        Pine - Redirect

1          MR. MORRISON:  I'll move on.

2          THE COURT:  If that's what you want to get at.

3          MR. MORRISON:  Yeah.  I'll move on.

4   Q.  And one more question for you, Mr. Pine, just to be clear.

5   I believe earlier in your testimony, in 1986 you were first

6   prescribed Neurontin with hydrocodone?

7   A.  In 19 -- no.  There was no Neurontin then.  That was just

8   hydrocodone.

9   Q.  OK.  Before being incarcerated, were you ever prescribed

10  Neurontin by any outside provider?

11  A.  I --

12  Q.  If you recall.

13  A.  I don't believe so.  There was something else, but there

14  wasn't --

15         MR. MORRISON:  OK.  I have nothing further, Judge.

16  Thank you.

17         THE COURT:  Thank you.

18         Recross, counsel.

19         MS. KILEY:  None, your Honor.

20         THE COURT:  Thank you.

21         Thank you, Mr. Pine.

22         (Witness excused)

23         MS. AGNEW:  Mr. Pine, you'll hear from us soon, sir.

24  Thank you.

25         THE WITNESS:  All right.  Thank you.

1          THE COURT:  Do you want to take five minutes, counsel?

2   Who is our next witness, please?

3          MS. AGNEW:  We would love that.

4          And Ms. Phillips, if we could get to Fishkill, great.

5          MR. MORRISON:  Fishkill or Woodbourne.

6          MS. AGNEW:  Or Woodbourne.

7          THE DEPUTY CLERK:  Which one do you want?

8          THE COURT:  OK.  Can we take five, friends?  Thank

9   you.

10          (Recess)

11          THE COURT:  Mr. Morrison.

12          MR. MORRISON:  At this point, plaintiffs would like to

13   call Mr. Eric Lindemann to the stand.

14          THE COURT:  Thank you.

15    ERIC LINDEMANN,

16       Plaintiff, called as a witness on his own behalf,

17       having been duly sworn, testified as follows:

18          THE COURT:  Mr. Morrison.

19          MR. MORRISON:  Thank you, Judge.

20   DIRECT EXAMINATION

21   BY MR. MORRISON:

22   Q.  Good morning -- afternoon, Mr. Lindemann.

23       How are you doing today?

24   A.  I'm good.  Yourself?

25   Q.  I'm OK.

N95Wall2                          Lindemann - Direct

1      First off, where are you currently testifying from?

2   A.  Fishkill Correctional Facility.

3   Q.  OK.  And to your understanding, that's part of the New York

4   State Department of Corrections, correct?

5   A.  Yes.

6   Q.  How long have you currently been incarcerated with the New

7   York State Department of Corrections and Community Supervision?

8   A.  With New York, with New York DOCCS, since May of --

9   actually, June of 2021.  I've been incarcerated since September

10  2020.

11  Q.  OK.  But you've been in DOCCS custody since May of 2021?

12  A.  Yes.  May, June of 2021.

13  Q.  OK.  Do you currently suffer from any condition that causes

14  chronic pain or neuropathies?

15  A.  Yes.

16  Q.  Can you describe what those conditions are?

17  A.  Shooting nerve pains down my lower back, down my right leg

18  to my right foot.  Constant cramping and pain in the lower back

19  from, I guess, my L4, L5.  That's still herniated and bulging,

20  the disks.

21  Q.  How long have you been suffering from those pain

22  conditions?

23  A.  Oh, since about my early 20s.

24  Q.  OK.  Is there any specific events or occurrence that caused

25  those conditions, as you understand?

1   A.  Yes.  I -- yes, I was involved in two car accidents, one

2   when I was about 17 and the other one when I was about 21, 22,

3   and they damaged my lower back pretty bad.

4              THE COURT:  Mr. Lindemann, how old are you now, sir?

5              THE WITNESS:  37, ma'am.

6              THE COURT:  Thank you.

7              THE WITNESS:  You're welcome.

8   BY MR. MORRISON:

9   Q.  After those events, were you ever prescribed any

10  medications to treat your pain?

11  A.  Yes.  Doctors had me on painkillers -- Oxycontin,

12  hydrocodone, all those types of medications -- for a long time.

13  And eventually I didn't want to take those medications anymore,

14  so we stopped, and then we tried a medication called gabapentin

15  and that medication seemed to help alleviate the nerve damage

16  or nerve pain (inaudible) that radiates down my right leg.

17  Q.  How long were you being prescribed, I'm going to call them,

18  like, opioid medications before you started gabapentin?

19  A.  I'm going to say probably around my 20s.  They had me on

20  the pain medication.  And then after that I didn't want to take

21  it anymore, so they decided to try the gabapentin.

22  Q.  Why did you not want to take the opioid medications

23  anymore?

24  A.  I didn't like how they made me feel anymore.

25  Q.  And when you decided you didn't want to take those

N95Wall2                        Lindemann - Direct

1    medications anymore, were you in custody or were you outside in

2    the free world?

3    A.  What was that question?

4    Q.  When you decided you didn't want to take the opioid

5    medications anymore, were you in custody or were you outside?

6    A.  No.  I was outside.

7    Q.  OK.  And you had a discussion with your doctor about that?

8    A.  Yes.

9    Q.  Do you remember who your doctor was?

10   A.  For that, I don't remember.  I was seeing a bunch of

11   doctors and pain management specialists at the time.

12   Q.  OK.  And was it a result of that conversation that you had

13   with your doctors that you started taking gabapentin?

14   A.  Yes.

15   Q.  And what year was that, roughly?

16   A.  What was that?

17   Q.  What year did you start taking gabapentin?

18   A.  I want to say about 2018, 2019 I really got on the

19   gabapentin.

20   Q.  OK.  And how did the gabapentin affect your pain?

21   A.  Oh, it alleviated it.  It stopped the radiating pain that

22   started in my lower back and went down my right leg.

23   Q.  OK.

24   A.  And helped with sleeping and sitting, because I can't sit

25   for long periods of time.  So it was helping with that

N95Wall2                        Lindemann - Direct

1    (inaudible) me focus.

2    Q.   And when you were on the outside receiving that medication,

3    how would you receive that medication?

4    A.   Go pick it up from the pharmacy and take it as prescribed.

5    Q.   OK.  Would you just -- how many pills?  Was it pill form,

6    or how did you take it?

7    A.   It was pill form.

8    Q.   OK.  And each prescription -- do you recall how many pills

9    were provided to you with each prescription?

10   A.   I don't recall the exact number.

11   Q.   OK.  During your time on the outside when you were being

12   prescribed gabapentin, did you ever have to get your

13   prescription refilled?

14   A.   Yes.

15   Q.   And would you continue going to your provider in regards to

16   getting your prescriptions refilled?

17   A.   Yes.

18   Q.   You said that you first came into custody in June of 2020,

19   correct?

20   A.   With New York Department of Corrections, June of 2020 --

21   2021, but I've been incarcerated since September 2020.

22   Q.   Yeah.  Let's talk about your time incarcerated before

23   coming to DOCCS.

24   A.   OK.

25   Q.   What jail were you housed at?

N95Wall2                          Lindemann – Direct

1   A.  I was at Yaphank Correctional Facility and Riverhead

2   Correctional Facility in Suffolk County, Long Island.

3   Q.  And were those, to your understanding, county jails?

4   Correct?

5   A.  Yes, that's correct.

6   Q.  And while you were in those county jails, were you

7   prescribed any medication in regards to your pain?

8   A.  Yes.  I was receiving gabapentin.  They continued my

9   prescription from when I was out in the street.  They continued

10  it while I was in (inaudible) county.

11  Q.  OK.  And did you see a doctor to get those medications?

12  A.  Yes --

13  Q.  Sorry.  Go ahead.

14  A.  Yes.  Of course I saw a doctor.

15  Q.  OK.  And in May of 2021, when you were transferred to the

16  custody of the New York State Department of Corrections, do you

17  remember what facility you transferred into?

18  A.  Yes.  The first facility I went to was Downstate

19  Correctional Facility.

20  Q.  OK.  And while you were at Downstate Correctional Facility,

21  what medications were you receiving for your pain, if any?

22  A.  Gabapentin.

23  Q.  OK.  And did you see a provider at Downstate Correctional

24  Facility regarding your gabapentin?

25  A.  Yes.

N95Wall2                        Lindemann - Direct

1  Q.  And to your understanding, did that provider continue to

2  prescribe that to you?

3  A.  Yes.  They continued to prescribe it, and they increased

4  the dose as well.

5  Q.  OK.  Did you have a discussion with them about increasing

6  the dosage?

7  A.  Yes.  Yeah, I told them that in, you know, due to the

8  circumstances, I was sleeping on steel beds and mattresses, my

9  pain was getting worse.

10 Q.  OK.

11 A.  So he decided to increase it.

12 Q.  How long were you at Downstate Correctional Facility?

13 A.  About a month and a half to two months.

14 Q.  OK.  And where did you transfer, if at all, after Downstate

15 Correctional Facility?

16 A.  After Downstate, I went to Marcy Correctional Facility.

17 Q.  OK.  And can you describe to me when you transferred to

18 Marcy Correctional Facility whether your Neurontin prescription

19 continued, or was it discontinued?

20 A.  No.  The prescription was continued, and I saw Dr. Zaki at

21 Marcy Correctional Facility.

22         THE COURT:  And gabapentin and Neurontin are the same

23 thing, right?

24         MS. KILEY:  Yeah.  That's correct.

25 Q.  You understand gabapentin and Neurontin being the same

N95Wall2                         Lindemann - Direct

1   medication?

2   A.  Yes.

3        MR. MORRISON:  And I apologize.  I should stick to

4   one, but I go back and forth, so I'm sorry.

5   Q.  How long were you at Marcy Correctional Facility?

6   A.  From about June of 2021 until December of 2021.

7   Q.  And during that time your provider was Dr. Zaki?

8   A.  Yes, correct.

9   Q.  And during your time at Marcy, did Dr. Zaki keep you on

10  Neurontin/gabapentin (inaudible)?

11  A.  Yes, he did.  And he actually increased the dose as well

12  before I came here to Fishkill Correctional Facility.

13  Q.  And during your time at Marcy, would you meet with Dr. Zaki

14  regarding your pain or any symptoms you were having?

15  A.  Yes.  Yes, he had me doing physical therapy as well.

16  Q.  And was the physical therapy helping with your pain as

17  well?

18  A.  Yes, it was helping a little bit, but it, you know, the

19  pain -- I've been dealing with it for almost 17 years now,

20  so --

21  Q.  And by the way, when you were at Marcy, how were you being

22  administered your gabapentin medication?

23  A.  They had medical rooms down there, so you would go down,

24  (inaudible) medication, you would go down to the medical

25  building and the nurses there distribute the medication to us.

N95Wall2                     Lindemann – Direct

1    Q.  OK.  And when you say distribute, are they distributing it

2    for each dosage?  Are they giving you, like, a month's supply?

3    How does that work?

4    A.  No (inaudible).  You have to go down to get your medicine

5    every day.

6    Q.  OK.  How often at Marcy would you go down and get your

7    medication?

8    A.  At first I was going in the morning, afternoon and night,

9    but then because of program issues, I was only going in the

10   morning and night.  And that's why he increased the dosage in

11   the morning and evening (inaudible).

12   Q.  At some point in time did you transfer out of Marcy

13   Correctional Facility?

14   A.  Yes.  December 12, 2021, I came to Fishkill Correctional

15   Facility.

16   Q.  Can you tell me when you got to Fishkill Correctional

17   Facility December 12, 2021, did your gabapentin/Neurontin

18   prescription continue?

19   A.  It continued for one day, but I was told by Nurse

20   (inaudible) on my intake on December 12 that don't expect to be

21   on medication too long.

22          MR. NOLAN:  Objection.  Move to strike as to hearsay

23   as to what somebody said.

24          MR. MORRISON:  It's being offered just for, just for,

25   just being offered for, not for the truth of the matter

N95Wall2                          Lindemann - Direct

1   asserted, just for what occurred.

2             MR. NOLAN:  If it's not being offered for the truth of

3   the matter asserted, it has absolutely no relevance.

4             MR. MORRISON:  Yeah, but also true this is a case

5   against the state, and this is a -- the nurse is a

6   representative, employee of the state.  It's an admission

7   against a party.

8             MR. NOLAN:  Your Honor, again, it's another

9   unidentified individual who is not a party to the action, whose

10  mental state has not been put in issue by anybody, and none of

11  this was ever pled.  You know, these are -- it seems to be a

12  pattern that we keep hearing these types of hearsay statements

13  that plaintiffs keep trying to rely on to prove their case.

14            THE COURT:  I believe the witness identified the

15  nurse's name.  I don't see it in the transcript, but maybe you

16  could ask again, Mr. Morrison.

17            MS. KILEY:  Sure.

18  Q.  Mr. Lindemann, who -- what was the name of the nurse at

19  intake that provided you the information about your Neurontin?

20  A.  Nurse Davis.

21            MR. NOLAN:  And again, Ms. Davis is not a party, so

22  it's not an admission.

23            THE COURT:  OK.  But isn't she an agent of DOCCS?

24            THE WITNESS:  He,

25            MR. NOLAN:  DOCCS is not a party.

1            THE COURT:  I'm sorry.  He.  Forgive me.

2            MR. NOLAN:  DOCCS is not a party, and plaintiffs

3    submissions in this case have made that clear time and time

4    again, as has your Honor's decision in the preliminary

5    injunction motion, which was that Dr. Moores is named because

6    she has the power to stop the other named individuals from

7    violating constitutional rights.  Those named individuals do

8    not include that nurse.

9            MR. MORRISON:  Your Honor, the party of interest in

10   this case is actually the state of New York.  DOCCS is an

11   agency of the New York.  These are all employees of DOCCS who

12   are employees of the state of New York.  Their interests --

13           MR. NOLAN:  Now we're back to the *Monell* claim.

14   Plaintiffs are now making a *Monell* claim, which they've said

15   routinely they are not making.

16           MR. MORRISON:  This is not a claim for damage.  It's a

17   claim for injunctive relief.  *Monell* claim is a claim for

18   damages, period.

19           MR. NOLAN:  No, it's not.  It's not an accurate

20   statement of the law.

21           THE COURT:  I will permit it as a statement of the

22   agent.  In the expectation that we will have these again, just

23   stand up and preserve your objection.

24           MR. NOLAN:  Thank you.

25           THE COURT:  Mr. Morrison.

N95Wall2                          Lindemann - Direct

1              Mr. Nolan, when you stand up again, it would help the

2     court reporter if you'd use the microphone a little better.

3              MR. NOLAN:  Yes, absolutely.

4              THE COURT:  Yes, sir.  Thank you.

5              Mr. Morrison.

6              MR. MORRISON:  Thank you, Judge.

7     Q.  Mr. Lindemann, going back to when you were transferred and

8     arrived at Fishkill, you said you saw the intake nurse, right?

9     A.  Yes.

10    Q.  And how long after you were transferred to Fishkill did you

11    see that intake nurse?

12    A.  Immediately that evening, on December 12.  I think it might

13    have been December 12 or December 13 at that point, because we

14    got there at about midnight that evening.

15    Q.  OK.  Can you describe to me what happened during that

16    intake?  Was there a physical exam?  Describe that.

17    A.  Well, basically you come in.  You would give your

18    medication to the nurse.  The nurse goes through your

19    medication and then distributes the medication if you need it

20    at that moment.  If not, they give it to the medication window.

21    But at that time, basically they just talk to you, make sure

22    you're OK, you're not under any stress or anything like that,

23    and then that's basically it.

24    Q.  And when you say that you give your medication to the

25    nurse, did you physically have your gabapentin/Neurontin

N95Wall2                          Lindemann - Direct

1   medication with you?

2   A.  Yes.  They give it to us as we come in the RMD building,

3   and then we get handed over to the nurses and they take it from

4   there.

5   Q.  OK.

6   A.  (inaudible).

7   Q.  And at that point is when you had a conversation with the

8   nurse -- what was her name again?

9   A.  His name was Nurse Davis.

10  Q.  Nurse Davis.  His name, Nurse Davis.

11  A.  Yes.

12  Q.  And he said that don't expect to keep this medication?

13          MR. NOLAN:  Objection, again.

14  A.  Yes, correct.  He said Nurse Practitioner Sullivan does not

15  prescribe this medication.

16          MR. NOLAN:  Objection.  That's a new statement.

17  Again, same --

18          THE COURT:  All right.  Same objection.  Same ruling.

19  BY MR. MORRISON:

20  Q.  And what, if anything, happened after that conversation

21  with Nurse Davis?

22  A.  After that conversation, our meeting was over.

23  Q.  OK.  And you said you got prescribed Neurontin for one day,

24  correct?

25  A.  Yes, because I had an existing prescription from Marcy from

1    Dr. Zaki, so they distributed it to me up until Nurse Sullivan

2    discontinued the medication, I believe, the following day.

3    Q.   And prior to Nurse Sullivan or -- strike that.

4         Who is Nurse Sullivan?

5    A.   Nurse Sullivan is my provider here at Fishkill Correctional

6    Facility.

7    Q.   OK.  Is it your understanding that she is a nurse

8    practitioner?

9    A.   Yes, correct.

10   Q.   OK.  And when -- did you speak to Nurse Practitioner

11   Sullivan about renewing your gabapentin/Neurontin?

12   A.   Yes.  After I went to the medication window and they told

13   me they didn't have anything for me anymore, I filed for a sick

14   call to speak to my provider, and upon speaking with her, she

15   told me I cannot prescribed this medication.

16   Q.   OK.  Did she tell you why she can't prescribe that

17   medication?

18   A.   Because, she said she does not prescribe it and she won't

19   prescribe it.

20   Q.   Did you have any discussion with her about the effects that

21   Neurontin/gabapentin had for your condition?

22   A.   Yes, of course.  I made her aware of the neuropathy, the

23   nerve damage, the pains that I was experiencing as well I

24   updated her and made her aware, which I'm sure she was, Dr.

25   Zaki just the day before actually increased my dosage.  And I

1     came there with a full prescription.

2     Q.  After you were taken off the gabapentin and Neurontin, did

3     that have any physical effect on you?

4     A.  Yes, of course.  I developed a limp now in my right leg,

5     and I constantly have pain and shooting pains down my right

6     leg.  It affects me every day.

7     Q.  Is there anything that -- well, strike that.

8         Are you currently prescribed Neurontin?

9     A.  No, I'm not.

10    Q.  Is there anything that you can't do now or have more

11    difficulty doing now because you're not being prescribed

12    Neurontin?

13    A.  Yeah.  Exercising is hard.  Sometimes getting out of bed is

14    a little rough.  You know, moving around.  We climb a lot of

15    stairs (inaudible) there's a lot of walking that we do, and

16    like I said, it bothers me every day.

17    Q.  Have you talked to your provider, Nurse Practitioner

18    Sullivan, about this?

19    A.  Numerous times.

20    Q.  How many times would you estimate?

21    A.  Through 2022, I was going down there on a weekly basis to

22    complain and request to be put back on the medication, and I

23    was constantly denied.

24    Q.  And you would do this directly to your provider?

25    A.  Yes, correct.  I would do it to the nurses down there

N95Wall2                         Lindemann - Direct

1   because when you put in the sick call you don't see your

2   provider right away.  You see the nurses first.  You explain

3   your situation to the nurses.  They forward it to your

4   provider, and eventually at some point you will see a provider.

5   Q.  How -- on average, how long does it take after you put in a

6   sick call to see a provider?

7   A.  It could be any -- depending on how concerned they are

8   about you, it could be a couple of weeks to a couple of months.

9   Q.  OK.  And in your experience, how long does it take --

10  strike that.

11       During your time at Fishkill, have you ever been sent out

12  to any specialist appointments to see a specialist?

13  A.  Well, not actually sent out.  Orthopedic surgeon came here

14  to Fishkill, and I saw him here, Dr. Holder.

15  Q.  OK.  Do you remember roughly when that was?

16  A.  That was a little bit before May of 2022.

17  Q.  And do you have an understanding of why you saw the

18  orthopedic specialist -- Dr. Holder?

19  A.  What was the question?

20  Q.  Do you have an understanding why you were scheduled and you

21  saw Dr. Holder?

22  A.  Yes, because I was getting prepared for surgery for my left

23  shoulder.

24  Q.  OK.  And do you recall after that appointment with

25  Dr. Holder if he made any recommendations that you be

N95Wall2                          Lindemann - Direct

1   prescribed medication?

2   A.  Yes.  Dr. Holder put it on this form that he sent to Nurse

3   Sullivan that he wanted me to be put back on gabapentin.

4           MR. NOLAN:  Objection.  Foundation.  Best evidence.

5   Hearsay.

6           THE COURT:  Sir.

7           MR. MORRISON:  Well, I can clear it up.

8           THE COURT:  Do you want to ask a new question?

9           MR. MORRISON:  Yeah, let me ask a new question.

10          THE COURT:  OK.

11  BY MR. MORRISON:

12  Q.  Did Dr. Holder ever tell you about any medication that he

13  wanted to prescribe?

14  A.  Yes, he wanted me put back on gabapentin.  It was put on

15  this form.

16  Q.  And when you returned, or after seeing Dr. Holder, do you

17  recall ever having another appointment with your provider,

18  Nurse Practitioner Sullivan?

19  A.  Yes.  I saw Nurse Sullivan right after that, and she

20  basically said she doesn't care what he recommends.

21          MR. NOLAN:  Objection.  Move to strike.

22          THE COURT:  Same ruling.

23  BY MR. MORRISON:

24  Q.  Fair to say that she didn't prescribe you the gabapentin,

25  right?

N95Wall2                         Lindemann - Direct

1    A.  No.  Of course not.

2    Q.  Mr. Lindemann, are you currently in the MAT program?

3    A.  What was that?

4    Q.  Are you currently on or in the MAT program?

5    A.  Yes, I am.

6    Q.  And do you understand what is a MAT -- what is the MAT

7    program, M-A-T?

8    A.  It's for individuals that suffer from opiate-use disorder,

9    which I developed while taking all that pain medication through

10   my late teens and 20s.

11   Q.  And are you on the MAT program to treat your chronic pain

12   and neuropathies?

13   A.  No.  It's for opiate-use disorder, which I was being

14   treated for prior, again, to coming to incarceration.

15            MR. MORRISON:  One moment, your Honor?

16            THE COURT:  Yes, sir.

17   BY MR. MORRISON:

18   Q.  Mr. Lindemann, have you ever been on a medication to treat

19   opioid-abuse disorder before?

20   A.  Yes.  Being treated for it prior to my incarceration as

21   well as during my incarceration now.

22   Q.  OK.  So on the outside, you were -- do you remember what

23   was the medication you were receiving on the outside?

24   A.  Yes.  Suboxone.

25   Q.  OK.  And what medication were you receiving in Fishkill for

N95Wall2                         Lindemann – Cross

1   the MAT program?

2   A.  Same thing.  Suboxone.

3   Q.  OK.  And while you were on the outside on Suboxone, were

4   you being prescribed that by a doctor?

5   A.  Yes, correct.

6   Q.  And were you also being prescribed Neurontin on the outside

7   at the same time you were on Suboxone?

8   A.  Yes.

9   Q.  And did you have any negative effects in regards to having

10  taken Suboxone and Neurontin?

11  A.  No.

12  Q.  Was your outside doctor aware of both prescriptions that

13  you were taking?

14  A.  Yes, of course.

15          MR. MORRISON:  I have nothing further.

16          THE COURT:  Thank you.

17          Cross-examination, counsel.

18          MR. NOLAN:  Thanks, your Honor.

19          THE COURT:  Yes, sir.

20  CROSS-EXAMINATION

21  BY MR. NOLAN:

22  Q.  Good afternoon, Mr. Lindemann.  My name is Will Nolan.  I'm

23  the attorney for Dr. Moores, the chief medical officer for

24  DOCCS.  Can you hear me OK?

25  A.  Yes.

N95Wall2                      Lindemann - Cross

1   Q.  OK.  Sir, you were convicted of aggravated vehicular

2   homicide, is that correct?

3   A.  What's the relevance of that?

4   Q.  Sir, were you convicted of aggravated vehicular homicide?

5   A.  I don't understand the relevance of the question.

6          THE COURT:  Sir, would you answer the question,

7   please.  I'm the guy who gets to determine whether it's

8   relevant or not.

9          THE WITNESS:  OK.

10  A.  Yes.

11  Q.  Yes.  And manslaughter in the second degree too?

12  A.  I'm sorry?

13  Q.  Manslaughter in the second degree as well?

14  A.  Yes.

15  Q.  And that involved a car accident in 2019?

16  A.  What was the question?  You're breaking up.

17  Q.  That involved a car accident in 2019, correct?

18  A.  Yes, correct.

19  Q.  Was it the same car accident that involved your injuries?

20  A.  No.

21  Q.  And you killed a man, correct?

22          MR. MORRISON:  Objection, your Honor.

23          THE COURT:  Perhaps we don't need to spend excessive

24  time on this.  I know what homicide means.

25          MR. NOLAN:  OK.

N95Wall2                       Lindemann - Cross

1    Q.  You were under the influence of alcohol at the time you

2    took those charges, correct, the conduct that led to those

3    charges?

4    A.  Yes.

5    Q.  Were you also taking gabapentin at that time?

6    A.  Yes.

7    Q.  You were mixing the two?

8        Correct?

9    A.  Yes.

10   Q.  So you have a problem with alcohol, right?

11   A.  I did at one point, yes.

12   Q.  You said you had the drug addiction too, correct?

13   A.  No.  I wouldn't really call it drug addiction.  The doctors

14   just overprescribed medication throughout my 20s.

15   Q.  OK.

16   A.  (inaudible) news that everybody knows about what the

17   doctors were doing back then.

18   Q.  This all happened back in your 20s, before you were

19   incarcerated; that's your testimony?

20   A.  With the medication and stuff?  Yes.

21   Q.  That's when you became addicted?

22       Is that right?

23   A.  Yes -- after -- while the doctors were overprescribing the

24   medication, yes.

25   Q.  Sir, do you remember testifying on August 1 in a

N95Wall2                    Lindemann - Cross

1   deposition, where I was questioning you?

2   A.  Yes.

3   Q.  And your attorney, Mr. Morrison, was there, correct?

4   A.  Yes.

5   Q.  And you were under oath, correct?

6   A.  Yes.

7   Q.  And there was a court reporter there taking down everything

8   you said, correct?

9   A.  I believe so, if that's what happened.

10  Q.  I'm now going to read to you your own testimony from that

11  deposition, and it's deposition page 16, line 13, through

12  deposition page 17, line 17.

13            MS. AGNEW:  Your Honor, I think we need to see that

14  before he impeaches him.

15  BY MR. NOLAN:

16  Q.  And you --

17            MS. AGNEW:  Objection.

18            THE COURT:  Do you have a copy of that?

19            MR. NOLAN:  Plaintiff should have the deposition

20  transcript.  I assume they reviewed it before coming here

21  today.

22            MS. AGNEW:  No.  We didn't order it, and we're

23  entitled to a copy before he --

24            MR. NOLAN:  I'll provide you a copy --

25            THE COURT:  Ladies and gentlemen, No. 1, use your

1    microphones.  Do not talk over each other.  Make it easy for

2    the court reporter.

3            Do we have a copy counsel can follow along with now

4    while you're reading it?

5            MR. NOLAN:  I don't have an extra copy for them.  I

6    assumed they had it, but I can give it to them when I'm done.

7            THE COURT:  That's not helpful, is it?

8            Look over counsel's shoulder while he reads it.

9            Is it OK if they look over your shoulder while you

10   read it?

11           MR. NOLAN:  Sure.

12           THE COURT:  All right.

13           MR. NOLAN:  (Inaudible) about it.

14   "Q.  Do you suffer from opioid-use disorder?

15   "A.  Yeah.  Doctors put me on it, you know, come off other pain

16   medications that I didn't want to take anymore, so this is the

17   route they suggested.

18   "Q.  When did -- for how long did you -- had you suffered --

19   for how long had you suffered from opioid-use disorder?

20   "A.  About a couple of years.

21   "Q.  Did opioid-use disorder for you start while you were

22   incarcerated?

23   "A.  Yes."

24           MR. MORRISON:  Objection.

25   BY MR. NOLAN:

N95Wall2                      Lindemann – Cross

1    Q.  That was your testimony, correct?

2              THE COURT:  I'm sorry.  I'm sorry.  One at a time.

3    BY MR. NOLAN:

4    Q.  That was your testimony, correct?

5    A.  That's what they diagnosed me with when I became

6    incarcerated.  I didn't know what it was called up until then.

7              THE COURT:  Just a minute.

8              Objection?

9              MR. MORRISON:  Not impeaching.

10             MR. NOLAN:  Directly contradicted what he testified

11   to.

12             THE COURT:  All right.

13             MR. NOLAN:  He clearly testified that he got addicted

14   on the outside, and then he testified in his deposition that he

15   got addicted while incarcerated.

16             THE COURT:  OK.  I have it in mind.  I am the fact

17   finder.  I have it.

18             MR. NOLAN:  OK.

19             THE COURT:  And it is for the fact finder, as you

20   recall, to determine whether it contradicts or not.

21             MR. NOLAN:  Fair enough.

22             THE COURT:  Folks, you really need to talk into the

23   microphones.

24             Mr. Morrison, just move that over in front of you.

25   OK?

N95Wall2                              Lindemann - Cross

1              Mr. Nolan.

2     BY MR. NOLAN:

3     Q.  You said you were currently on the MAT program, is that

4     right?

5     A.  Yes, correct.

6     Q.  OK.  And you are taking Suboxone for that, correct?

7     A.  Yes, correct.

8     Q.  And before you started taking Suboxone, you were offered an

9     injection of some time type, is that correct, that does the

10    same thing?

11    A.  No, it doesn't do the same thing.

12    Q.  OK.  Suboxone is pill form, right?

13    A.  No.  It's a sublingual film.

14    Q.  OK.  You did the film?

15    A.  Yes, correct.

16    Q.  And you're also taking olanzapine right now as well?

17    A.  Taking what?

18    Q.  Olanzapine.  Or Zyprexa.

19    A.  Yes, correct.

20    Q.  And what does that do?

21    A.  It helps me sleep.

22    Q.  OK.  And trazodone you're taking as well?

23    A.  Yes, correct.

24    Q.  And Suboxone, right, all three of those?

25    A.  Yes, correct.

N95Wall2                        Lindemann - Cross

1    Q.  And you've been on all three of those for a substantial

2    period of time, correct?

3    A.  Yes, correct.

4    Q.  And now you want to add gabapentin to the mix?

5    A.  I'm sorry?

6    Q.  You want to add gabapentin to the mix too; that's what you

7    want?

8    A.  If it's going to -- if it's going to alleviate the nerve

9    damage and pain I was experiencing, which was gone prior to

10   coming to Fishkill, then yes, if it's going to help me make my

11   leg better.

12   Q.  And your testimony is you're getting no, nothing out of the

13   other three drugs for your pain?

14   A.  What was your question.

15   Q.  And it was your testimony that you're not getting any help

16   for the pain out of the other three drugs that you're taking?

17   None; that's your testimony?

18   A.  What was your question?  I can't hear you.

19   Q.  You're not getting any help for the pain out of the other

20   three drugs that you're taking; that's your testimony?

21   A.  I'm not getting what?

22   Q.  Any help for the pain from the other three drugs.

23   A.  No.  Those are for pain.

24   Q.  OK.  You testified that Nurse Sullivan declined to allow

25   you to continue to take gabapentin when you first encountered

N95Wall2                    Lindemann - Cross

1   her at Clinton -- at Fishkill, correct?

2   A.  Yes.

3   Q.  OK.  And you met with her very shortly after you arrived,

4   within days, correct?

5   A.  I'm sorry?  What was the question?

6   Q.  You met with her very shortly after you arrived at

7   Fishkill, correct?

8   A.  I can't hear what you're saying before "arrived at

9   Fishkill."

10  Q.  You testified that you met with Nurse Sullivan upon arrival

11  sometime after you got to Fishkill, right?

12  A.  Yes, correct.

13  Q.  Is it was within days, correct?

14  A.  I believe so.

15  Q.  OK.  And Nurse Sullivan explained to you that she was not

16  going to prescribe you gabapentin, correct?

17  A.  She didn't really explain.  She just said I don't prescribe

18  that medication.

19  Q.  She explained to you, didn't she, that she doesn't feel

20  comfortable prescribing that medication to you because it's not

21  FDA-approved for your condition, isn't that true?

22  A.  No.

23  Q.  And you were very aggressive in talking to her and

24  explaining to her that you wouldn't take anything else for

25  her -- for that, for your conditions; you only want gabapentin,

N95Wall2                         Lindemann - Cross

1    right?

2    A.  No.  Never became aggressive with Nurse Sullivan.

3    Q.  So it's your testimony that you were open to other things,

4    other medications at the time for your pain?

5    A.  My what?

6    Q.  You were open to other medications for your pain at that

7    time; is that your testimony?

8    A.  Of course I was open for other medications.

9    Q.  OK.  So you were offered Cymbalta, correct?

10   A.  Yes.  Cymbalta is actually an antidepressant.  It's not

11   made for nerve damage.

12   Q.  It was offered to you?

13   A.  It was --

14        THE COURT:  Gentlemen.  Gentlemen, one at a time.

15   It's hard enough to be doing this remotely, but give the court

16   reporter a break.

17        MR. NOLAN:  My apologies.

18        THE COURT:  Yes, sir.

19        THE WITNESS:  May I speak?

20        THE COURT:  Question:  It was offered to you?

21        Answer.

22   A.  Yes, it was offered to me.

23   Q.  And you refused to take it?

24   A.  No, I did not.  I -- I tried for about six weeks, and I got

25   very bad side effects from it.

N95Wall2                        Lindemann - Cross

Q.   Would it surprise you if your medical records include a
refusal form that shows that you didn't take it; you refused it
and you demanded gabapentin?

A.   Upon experiencing side effects I refused the medication and
told Ms. Sullivan -- Nurse Sullivan I did not want to take it
anymore.  It's an antidepressant.  It was making me depressed,
anxious.  It was doing a lot of bad things.

Q.   Sir, don't you suffer from depression?

A.   I'm sorry?

Q.   Don't you suffer from depression, sir?

A.   Sometimes.

Q.   And you're complaining about an antidepressant being
prescribed to you, sir?

A.   Question?

Q.   Are you complaining that an antidepressant was prescribed
to you for depression, or was it for your pain?

A.   Well, I'm already taking Zyprexa and trazodone to treat
that.  I don't need something that's going to give me horrible
side effects when my other medication's working fine for that.

Q.   You wanted something that was going to get you high, isn't
that right?

          MS. AGNEW:  Objection.

A.   No.

Q.   Just like when you killed a man with your homicide,
correct?

1                    MR. MORRISON:  Objection.

2                    THE COURT:  Counsel, you really know better than that.

3       This is a bench trial, but you really know better than that.

4                    MR. NOLAN:  I'll strike that, your Honor.  Sorry.

5                    THE COURT:  Good move.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   BY MR. NOLAN:

2   Q.  Now, you mentioned Dr. Holder, correct?

3   A.  What's the question?

4   Q.  You mentioned Dr. Holder in your testimony earlier?

5   A.  Correct.

6   Q.  Is he a specialist of some type?

7   A.  He's an orthopedic surgeon.

8   Q.  He's not a pain specialist, is he?

9   A.  He's an orthopedic surgeon.

10  Q.  To your knowledge does he concentrate his practice in pain

11  management?

12  A.  I don't know what he practices outside of that.

13  Q.  You ask him for gabapentin?

14  A.  I didn't ask him for anything.  He made a recommendation.

15  Q.  When you say he made a recommendation, the recommendation

16  was only until you have your surgery, correct?

17  A.  Correct.

18  Q.  And you had your surgery, correct?

19  A.  Correct, and I still never received any medication of any

20  kind.

21  Q.  And your surgery was successful, correct?

22  A.  Yes, my shoulder is great.

23  Q.  So since you've been at Fishkill correctional facility,

24  what medications have you been prescribed that you can recall?

25  A.  Since I been here at Fishkill, I don't remember off the top

1    of my head.  I just know what I'm taking now.

2    Q.  How about meloxicam, you were prescribed that, correct?

3    A.  Correct.

4    Q.  Do you know what that's for?

5    A.  I don't know.  I believe it was for pain, pain management

6    as well, but that was discontinued also.

7    Q.  And that was prescribed to you though by Nurse Sullivan,

8    correct?

9    A.  At one point, yes.

10   Q.  How about Duloxetine that was prescribed to you by Nurse

11   Sullivan, correct?

12   A.  If she prescribed it, then, yes.

13   Q.  Do you know what Duloxetine is for?

14   A.  Not off the top my head.  She tried numerous medications.

15   Q.  How about Buspirone, was that prescribed to you while you

16   were at Fishkill?

17   A.  What is that?

18   Q.  Buspirone.

19   A.  Yes, that was for something completely different.

20   Q.  Have you ever received analgesic balm for your pain while

21   at Fishkill?

22   A.  Received what?

23   Q.  An analgesic balm, a topical analgesic balm?

24   A.  Yes.

25   Q.  And that was prescribed to you by Nurse Sullivan, correct?

1   A.  Yes.

2   Q.  Have you ever had access to a TENS unit while you were at

3   Fishkill correctional facility?

4   A.  Yeah, they tried it, but the TENS unit here are used and

5   they don't work.

6   Q.  That was also available to you through Nurse Sullivan,

7   correct?

8   A.  Yes, upon me requesting for it, upon me requesting for all

9   these things is why she tried them.

10  Q.  And then she gave them to you, correct?

11  A.  I'm sorry.

12  Q.  You requested them, and she gave them to you, correct?

13  A.  At times, yes.  It took months, sometimes a long time to

14  get anything.

15  Q.  She also prescribed you acetaminophen, correct?

16  A.  If she did, she did.  If you have the paper in front of you

17  that says that, then she did.

18  Q.  How about Mirtazapine, was that prescribed to you?

19  A.  I don't recall.  A lot of those medications were

20  continuation from Marcy correctional facility.  She was just

21  renewing prescriptions.

22  Q.  So she was renewing pain medications for you that you had

23  while you were at Marcy correctional facility?

24          MS. AGNEW:  Objection to the characterization of pain

25  medication.

N95BALL3                          Lindemann – Cross

1              MR. NOLAN:  I'm just trying to understand.

2              THE COURT:  Maybe if you would amend it to

3    medications.

4    Q.  Sir, we just went over a number of pain medications, did we

5    not?

6    A.  I don't know if those are all for pain.

7    Q.  So you don't know whether Meloxicam is for pain?

8    A.  I'm sorry.

9    Q.  You don't know whether Meloxicam is for pain or not?

10   A.  That one I know is help for pain.  Like again, she was

11   trying trial and error, trial and error, when she discontinued

12   something that was working.

13   Q.  So she was trying to treat your pain, correct?

14   A.  Only upon my request.

15   Q.  And again, that request was met, correct?

16   A.  Yes, after I had numerous letters sent to her.  The Legal

17   Aid Society even got involved.

18   Q.  Now, you indicated that Nurse Sullivan said she doesn't

19   prescribe gabapentin; is that correct?

20   A.  She said she doesn't prescribe it at all.

21   Q.  But you yourself, sir, are aware that there are other

22   patients she does prescribe it to, correct?

23   A.  Correct, I know she prescribes it to other people.

24   Q.  But not you, correct?

25   A.  I guess so.

N95BALL3                          Lindemann - Cross

1   Q.  So the statement that she doesn't prescribe gabapentin

2   isn't true, is it?

3               MR. MORRISON:  Objection.

4               THE COURT:  Sir.

5               MR. MORRISON:  The way it's being phrased is a

6   mischaracterization of the testimony.

7               MR. NOLAN:  They were offering it for the truth of the

8   matter asserted.

9               THE COURT:  Counsel, are you standing next to your

10  microphone.

11              MR. NOLAN:  They were offering it for the truth of the

12  matter asserted.  Your Honor accepted the testimony that Nurse

13  Sullivan.  He has to admit the truth or falsity of it.  He

14  seems to know that it's not true.

15              MR. MORRISON:  It was told to him at the point in time

16  of him arriving.

17              THE COURT:  Are you in front of your microphone.

18              MR. MORRISON:  It was told to him at the point in time

19  that he arrived at Fishkill.  There's no context of what date

20  and time he's talking about now.

21              THE COURT:  Look it, the testimony is in.  The witness

22  said yes other people receive it.  It's all here.

23              MR. NOLAN:  Can I have the question read back, and I

24  apologize to the court reporter.

25              (Record read)

1   A.  Yes, I found that out months later.

2   Q.  And Nurse Sullivan actually talked to you and you had a

3   discussion with her about going on something called Lyrica

4   correct?

5   A.  Yes, I brought that up to her.

6   Q.  And she told you what you needed to do before going in that

7   direction, correct?

8   A.  No, she told me she's not going to prescribe that.

9   Q.  Didn't she tell you, you needed to do physical therapy

10  first?

11  A.  Yes, which I still haven't received.

12  Q.  You actually received physical therapy at least five times;

13  isn't that right?

14  A.  No, that is not true.

15  Q.  So if your medical records indicated that you refused it

16  five times or more you'd be surprised?

17  A.  I've been going through those medical records myself, and

18  there's a lot of refusals in there for things I've never even

19  been called down for or been involved with.

20  Q.  So you didn't see any refusal forms or write any of those

21  yourself; is that your testimony?

22  A.  No. When I was going for my shoulder, yes, I refused a

23  couple.  That was for my shoulder.  We're talking about my

24  lower back and my injuries from nerve damage. We're not talking

25  about my shoulder.

N95BALL3                    Lindemann - Redirect

1   Q.  So you did refuse physical therapy on several occasions,
2   correct?
3   A.  For my shoulder after I was complete, yes.
4   Q.  And you haven't done the physical therapy, correct?
5   A.  There's been no physical therapy done for my lower back
6   since I've been in Fishkill.
7   Q.  And your lower back, describe for me what the diagnosis is
8   to your knowledge?
9   A.  I'm sorry.
10  Q.  What is the diagnosis for your lower back that you have?
11  A.  My L4 and L5 are herniated and bulging to my knowledge, and
12  they said I have pinch nerves in my lower back that I will
13  eventually need surgery for.
14  Q.  And it's your testimony that that would be backed up by
15  your medical records; is that what your testimony is, sir?
16  A.  I'm sorry.
17  Q.  You believe your medical records would back that up?
18  A.  I believe they should.
19          MR. NOLAN:  Thank you.  No further questions.
20          THE COURT:  Thank you.  Redirect, counsel.
21  REDIRECT EXAMINATION
22  BY MR. MORRISON:
23  Q.  Mr. Lindemann, has Nurse Practitioner Sullivan conducted to
24  your knowledge a chronic pain assessment for you?
25  A.  No.

N95BALL3                        Lindemann - Redirect

1   Q.  Has she ever physically examined you?

2   A.  No.

3   Q.  Can you describe what on a general patient-client,

4   patient-doctor encounter is like with Nurse Practitioner

5   Sullivan?

6   A.  I mean at first when I got here, like I said, met with her,

7   medication was discontinued, was trying to get back on it; and

8   then eventually that stopped, and I stopped pursuing her on

9   that.  So we had a normal nurse-patient relationship.  I go if

10  I have any issue. I explained them to her, and she either tell

11  me she can help me or she tells me she can't help me.

12  Q.  Has Nurse Practitioner Sullivan to your knowledge ever sent

13  you or referred you to go to a pain management specialist in

14  regards to your pain?

15  A.  No, she has not.

16  Q.  Have you ever refused to go to a pain management specialist

17  in regards to treating your pain?

18  A.  No.

19  Q.  Right now today do you -- is your back pain -- would you

20  consider your back pain controlled?

21  A.  No, it's not controlled.

22  Q.  As you sit here today, are you aware of a medication that

23  has in the past effectively controlled your back pain?

24  A.  What was the question?

25  Q.  As you sit here today are you aware of a medication that in

1    the past has effectively controlled your back pain?

2    A.   Yes.

3    Q.   What medication is that?

4    A.   Gabapentin.

5    Q.   Have you informed Nurse Practitioner Sullivan regarding the

6    effects that gabapentin has on controlling your back pain?

7    A.   Yes, numerous times when we were going through the trial

8    and error of all these numerous medications she was trying on

9    me.

10            MR. MORRISON:  I have nothing further.

11            THE COURT:  Recross, counsel?

12            MR. NOLAN:  Real quick.

13   RECROSS EXAMINATION

14   BY MR. NOLAN:

15   Q.   Mr. Lindemann, your issue with Nurse Practitioner Sullivan

16   comes down to a disagreement between you and her about

17   gabapentin; isn't that true?

18   A.   I don't feel we have any issues.

19            MR. NOLAN:  Okay.  Thank you.

20            THE COURT:  Anything further?

21            MR. MORRISON:  Nothing further.

22            THE COURT:  Who would you like next, ladies and

23   gentlemen?  Off the record.

24            (Discussion held off the record)

25            THE COURT:  Mr. Morrison.

N95BALL3                          Daniels- Direct

1              MR. MORRISON:  Plaintiff would like to call Mr. Mark

2      Daniels from Woodbourne correctional facility.

3      MARK DANIELS,

4           called as a witness by the Plaintiffs,

5           having been duly sworn, testified as follows:

6              THE DEPUTY CLERK:  State your name and spell it for

7      the record.

8              THE WITNESS:  Mark Daniels, M-A-R-K, D-A-N-I-E-L-S.

9              THE COURT:  Mr. Morrison.

10     DIRECT EXAMINATION

11     BY MR. MORRISON:

12     Q.  Good afternoon, Mr. Daniels.  How are you doing?

13     A.  Okay, and you.

14     Q.  I'm doing well.  I know you previously testified during the

15     preliminary injunction hearing.

16     A.  Right.

17     Q.  And that testimony has been incorporated into this hearing,

18     so I'm not going to go over everything again, okay.

19     A.  Okay.

20     Q.  Having said that, just a little to refresh everyone's

21     recollection of you, can you please let me know how old are

22     you?

23     A.  59.

24     Q.  And where do you currently reside?

25     A.  Woodbourne correctional facility.

N95BALL3                         Daniels- Direct

1   Q.  Can you just remind the Court about any chronic pain or

2   neuropathies that you suffer from?

3   A.  Yes, lower back, had a spinal fusion there, and the

4   upper-spine area around my neck area had a spinal fusion there.

5   And since the surgeries, I've been having pain.  I lost feeling

6   in both my hands, upper-body strength, and just constantly in

7   pain from it.

8   Q.  Now since you testified at the preliminary injunction

9   hearing, have you been provided or prescribed any new pain

10  medication?

11  A.  Yes, just past April they started giving me Lyrica.

12  Q.  And in April when you were prescribed Lyrica, do you

13  remember what facility you were living in at the time?

14  A.  Shawangunk in Wallkill, New York.

15  Q.  Do you remember who your provider was that prescribed you

16  the Lyrica back in April?

17  A.  Yes, Dr. Wiggan.

18  Q.  And after you were prescribed the Lyrica, did you take that

19  medication?

20  A.  Yes.

21  Q.  How often would you take that medication after it was

22  prescribed to you?

23  A.  Three times a day.

24  Q.  How did that medication effect the pain conditions that you

25  suffer from?

N95BALL3                          Daniels- Direct

1    A.  It helped a little.  It helped a little.

2    Q.  Did you report that to your providers?

3    A.  Yes.

4    Q.  Did you ever request to be taken off Lyrica completely

5    after it was prescribed to you?

6    A.  Yes, I did.  The side effects I didn't like.  The side

7    effects was a little too much for me, so I ask them if they

8    could find something else or figure this out cause, like I

9    said, the side effects wasn't working for me.

10   Q.  After you told them that, what was the response?  Did they

11   take you off the Lyrica?

12   A.  No, she made a decision to wait for me to talk to my pain

13   management doctor and told me once I spoke to him, talk about

14   giving me a lesser dosage of it.

15   Q.  Did you agree with that suggestion to not take you off and

16   wait till you see pain management to discuss?

17   A.  Yes.

18   Q.  After April when you were prescribed Lyrica and taking the

19   Lyrica, were you ever transferred out of Shawangunk

20   correctional facility?

21   A.  Yes, I was.

22   Q.  And when was that?

23   A.  That was in April, same month that I started the Lyrica, a

24   week later, a week after I started Lyrica I was transferred

25   here to Woodbourne.

1   Q.  A week after.  And this is, just to be clear, 2023, right?

2   A.  Right.

3   Q.  Can you tell me what happened, if anything, to your Lyrica

4   prescription when you transferred from Shawangunk to

5   Woodbourne?

6   A.  When I arrived to Woodbourne, they call me for the initial

7   medical interview and I told them about me just being

8   prescribed this Lyrica and they knew nothing about it.

9          They told me that they never given that out here, and

10  my chances of getting it here were not good.

11         MS. THOMAS:  Objection to hearsay for an undisclosed

12  provider.

13         THE COURT:  Mr. Morrison.

14         MR. MORRISON:  Let me follow-up, your Honor.

15         THE COURT:  Yes.  Go ahead.

16  BY MR. MORRISON:

17  Q.  Mr. Daniels, do you know who provided you that information?

18  A.  Yes, she was the nurse administrator Ms. Roycroft.

19  Q.  Roycroft?

20  A.  Yeah, I think that's it.

21         MS. THOMAS:  I would like to renew my objection.

22         THE COURT:  Noted.  Same ruling.

23  Q.  After you were transferred into Woodbourne, were you

24  prescribed Lyrica to be clear?

25  A.  Well, after I had that interview with the administrative

1   nurse, I was called down probably a week later to speak to

2   another provider here named Ms. Baker, and she spoke to me.

3   All of a sudden, she knew about the prescription, me being

4   prescribed the Lyrica from Shawangunk.

5          She broke everything down to me, told me it would be

6   ordered and I should get it soon.

7   Q.  After you were transferred from Shawangunk to Woodbourne,

8   how long were you there without being prescribed -- without

9   being administered Lyrica?

10  A.  I would say two weeks, maybe a little over two weeks.

11  Q.  Do you have any understanding of why and how you got

12  re-prescribed the Lyrica?

13  A.  Well, after I had the initial interview with the nurse

14  administration, I did contact my attorney Ms. Agnew and I put

15  it in her hands after that.

16  Q.  So after a couple of weeks without the medication, it was

17  re-prescribed to you?

18  A.  Right, yes.

19  Q.  At any point in time did you get transferred out of

20  Woodbourne correctional facility?

21  A.  Yes.

22  Q.  How long was that and when was that?

23  A.  I was transferred to Fishkill correctional facility.

24  Q.  Do you just briefly understand why you were transferred out

25  of Woodbourne to Fishkill correctional facility?

N95BALL3                    Daniels- Direct

1   A.  On August 2nd, I had an earlier medical call out to the

2   infirmary. While I was there, I seen one of the nurses that

3   usually administer the medication.

4        She said while you're here, you're here early today so

5   why don't you get your stuff, get your medicines now.  You

6   don't have to come back at 3:30, so that's what I did.

7        MS. THOMAS:  I'd like to first object to the

8   unidentified individual as hearsay.

9        THE COURT:  I take it you're going to clarify.

10       MR. MORRISON:  Yes.

11  Q.  First, Mr. Daniels, when you're at Woodbourne, how often

12  would you get your Lyrica prescription?

13  A.  Three times a day.  I get it at 7:40 in the morning, 3:40

14  in the afternoon and 8:40 at night.

15  Q.  Three times a day, right?

16  A.  Right.

17  Q.  And so we're going back to August 2nd.  You get called down

18  for a medical call out and you're seeing a nurse, and do you

19  remember the name of the nurse?

20  A.  No, I don't remember the names, but I know the nurse's

21  first name is Tatiana, but I just don't know the last name. It

22  starts with a K.

23       MS. THOMAS:  I just renew my objection as to the

24  provider still being unidentified.

25       THE COURT:  Yes, ma'am.  Same ruling.

N95BALL3                          Daniels- Direct

1   Q.  After you're informed this by nurse Tatiana, what do you

2   do?

3   A.  I go to the window -- and this is the approximately like

4   1:30 that afternoon and I get my meds earlier because she

5   requested that I did so.  Yeah, I did.

6   Q.  Continue.

7   A.  At 3:30, at 3:30, 3:40, when the next med run was running,

8   I also was called to -- I had legal mail come in from you guys.

9   And while they were there, while I was there, they called the

10  medication run.

11          Me forgetting that I went earlier, I went back to the

12  window, and there was a nurse there name Vitess.  He reminded

13  that I had taken it earlier.  I was like, okay, yeah, you're

14  right. I forgot.  My bad and I left.

15          Later that evening at 8:40 when I go back for the last

16  one, somebody approach me and said, yo, the nurse wrote you up

17  for trying to deceive her, saying you were trying to get

18  another dosage of your medication.

19  Q.  Let me stop you for a second Mr. Daniels.

20          At 3:30 when you went back to get the medication, what

21  was the nurse's name behind the window again?

22  A.  Vitess, V-I-T-E-S-S.

23  Q.  And he informed you that, hey, Mr. Daniels, you already had

24  your medication earlier.  Was there an argument or any type of

25  confrontation there?

1  A.  No, I just remembered that I was there earlier.  I made an

2  honest mistake and went back. Like I said, I just went there. I

3  was in the area to pick up my legal mail, and the medication

4  window is probably like 20 feet away.

5  Q.  So describe then what happened at around 8:30 when you come

6  back for your evening dosage of Lyrica?

7  A.  As I was coming into the door, another guy was leaving and

8  he told me that earlier that the nurse wrote me a misbehavior

9  report stating that I was trying to double dose on the

10  medication.

11         When I went into the infirmary, I ask the officer was

12  that true.  He told me to speak to the nurse.  As I speaking to

13  the nurse, he was like, yeah, you tried to deceive me.  You

14  tried to manipulate me into getting another dosage of the

15  medication.

16  Q.  Mr. Daniels, was this the same nurse that you were speaking

17  to?

18         MS. THOMAS:  I object to --

19         THE COURT:  All right. Stop.  The last answer says

20  toward the end, As I speaking to the nurse, he was like, yeah,

21  you tried to deceive me.  You tried to manipulate me to getting

22  another dosage.

23         "Q. Mr. Daniels, was this the same nurse.

24         Counsel objected.

25         MS. THOMAS:  I just would like to object.  There were

1   several individuals unidentified as he said, they said, so I

2   would object to hearsay as unidentified witnesses.  It's

3   unclear who is being spoken about at this point.

4          THE COURT:  I'll rule on it if counsel finishes

5   clarifying.

6   BY MR. MORRISON:

7   Q.  Mr. Daniels, when you first walked into the medication room

8   and you spoke to a security guard --

9          THE COURT:  At 8:40.

10  Q.  -- at 8:40 p.m. for your evening Lyrica, what was the name

11  of the security guard?

12  A.  Officer Soule, S-O-U-L-E.

13  Q.  And just to be clear, when you're saying security guard,

14  this was a correctional officer, correct?

15  A.  Right.

16  Q.  And then when you walked to the window and spoke to the

17  nurse, what was the name of that nurse?

18  A.  Vitess.

19  Q.  The same nurse from the afternoon?

20  A.  Right.

21  Q.  What happened after that?

22  A.  So that's when he went into his spiel about me trying to

23  deceive him, manipulate him into getting another dosage.  I

24  told him, listen, I made a honest mistake.

25          And prior to this last week I spoke to the provider

1  telling him how I didn't even want this medication no more, so

2  why would I be here trying to get an extra dosage if I don't

3  want it from the start.

4  Q.  And what happened?

5  A.  He said tell that to the hearing officer when you go

6  through your hearing.  I wrote you a ticket.

7          MS. THOMAS:  I would just renew my objection as to

8  hearsay as to the officer's statements.

9          THE COURT:  Okay.  Overruled.  Same reason.

10  Q.  Continue.  What happened after that?

11  A.  After that, there was another officer sitting at the desk

12  with Officer Soule.  His name was Picard, P-I-C-A-R-D.

13          So once the nurse finish saying what he said, Picard

14  jumps up behind the desk and tells me, listen -- excuse my

15  expression -- but he said, get your medication and get the fuck

16  out.  This is what he said to me.

17  Q.  What did you do?

18  A.  I asked him, I said, Why is it every time you see me you

19  got a bunch of harassment for me.  I said, I don't bother you.

20  I don't know you, but every time you see me, you just got

21  something you feel like you want to say.  What is it that you

22  dislike about me.  He said, like I said, get your meds and get

23  the fuck out.

24  Q.  That's what the correctional officer said?

25  A.  Yeah, that's what Officer Picard said.

N95BALL3                          Daniels- Direct

1          MS. THOMAS:  I object to both hearsay and relevance.

2          THE COURT:  Hearsay, same ruling.  Relevance?

3          MR. MORRISON:  I'll move on, but it's just to

4    establish why he was transferred again.

5          THE COURT:  All right.  Overruled.  Go ahead.

6    Q.  Mr. Daniels, let's not get into so many details of it.

7          But at some point, what happened to result in you

8    being transferred out of Woodbourne?

9    A.  After I went through that with Officer Picard, I was

10   attempting to leave.  I said, you right.  I'm just going to

11   walk away.  I don't want my meds tonight.  I'll get it in the

12   morning.

13         And then Nurse Vitess said I needed to sign the

14   refusal.  I said, okay. I'm good.  I'm just going to leave.  I

15   want to get out of here.  Then Picard, he went and blocked the

16   door and said you're going to sign this fucking refusal.  And I

17   attempted to walk around him. He grabbed my arm and took out

18   his can of mace and just started spraying me with his mace.

19         MS. THOMAS:  Objection to hearsay and relevance again.

20         THE COURT:  Overruled.

21   Q.  Go ahead.

22   A.  Then when I was being sprayed with the mace, I turn my back

23   to him trying to get away from him, and he just continued to

24   spray me.  then he shove me from behind into a wall.  My face

25   hit the wall.

1   Q.  At any point in time did you receive a misbehavior report

2   for something in regards to this event?

3   A.  Yes, the next morning.  The next morning I received two

4   misbehavior reports.  One was from Vitess about me trying to

5   get another dose of medication, and another one was from

6   Officer Picard saying I caused a disturbance.

7           THE COURT:  Remind me who the first report was from,

8   please, sir?

9           THE WITNESS:  The nurse Vitess.

10  Q.  After you received those misbehavior reports, what, if

11  anything, happened?

12  A.  After I received misbehavior reports probably a hour or so

13  later, a sergeant name Ms. Davis came to my cell, told me to

14  put on my stuff and that I was going somewhere.

15          I thought I was going to a hospital because I wasn't

16  given no medical treatment after that, but I ended up in

17  Fishkill special housing unit.

18  Q.  When you got transferred from Woodbourne to Fishkill

19  special housing unit, do you remember during the transfer

20  whether you were provided your medication Lyrica to bring with

21  you?

22  A.  I had to go through the same process again.  They knew

23  nothing about it, and they told me that they don't prescribe

24  that there and that I would have to put in for sick call.

25          MS. THOMAS:  Objection, hearsay as an unidentified

1    provider making the statement.

2              THE COURT:  Counsel.

3              MR. MORRISON:  Again, let me try to clarify first,

4    give me an opportunity, and then we can go from there.  I

5    assume you'll be able to identify.

6    Q.  Mr. Daniels, do you know who told you when you arrived at

7    Fishkill that they won't prescribe you the Lyrica?

8    A.  I forget his name, but I know the two nurses that I spoke

9    to.  One name was Ms. Hasan and one was Ms. Pitt.

10   Q.  Ms. Hasan, and what was the other one?

11   A.  Ms. Pitt, P-I-T-T.

12   Q.  What did Ms. Hasan and Ms. Pitt tell you?

13   A.  She told me -- Ms. Hasan is the one who took all the

14   information and gave it to the provider.  I don't know his

15   name.  I forget his name, but he did come and see me about it.

16             But I went without my medication probably for another

17   week or so in Fishkill before they figured it out.  That was

18   after I contacted you guys again telling you what was going on.

19   Q.  After you were transferred to Fishkill, it was about a week

20   before you were prescribed Lyrica again; is that accurate?

21   A.  Right.

22   Q.  I want to go back to your transfer from, just to be clear,

23   from Shawangunk to Woodbourne.

24             When you were transferred to Woodbourne from

25   Shawangunk, did they give you a bag with your medications to

```
1    bring with you when you were being transferred?

2    A.  Yes, my self-carries, yes.

3    Q.  Was your Lyrica prescription in that bag?

4    A.  No.

5    Q.  Just your self-carry medication?

6    A.  Right.

7    Q.  Mr. Daniels, thank you very much.

8            MR. MORRISON:  I have nothing further at this time.

9            THE COURT:  Thank you.  Cross-examination.  Counsel.

10           MS. THOMAS:  Yes.  Thank you, your Honor.

11   CROSS-EXAMINATION

12   BY MS. THOMAS:

13   Q.  Good afternoon, Mr. Daniels.  My name is Jennifer Thomas,

14   and my firm represents Dr. Carol Moores in her official

15   capacity as the chief medical officer for the department of

16   corrections, and I have just a few questions for you today.

17           Do you have any documents in front of you today?

18   A.  No.

19   Q.  Did you review any documents to prepare for your testimony

20   today?

21   A.  No.

22   Q.  I just want to clarify something that you had testified to

23   just a few minutes.  I believe you testified that when you were

24   at Shawangunk you told your provider that you didn't want

25   Lyrica anymore; is that correct?
```

A.  I told him that the side effects were too much and if they

could change it to something else, yes.

Q.  And you told them that at Shawangunk, correct?

A.  No, it wasn't Shawangunk.  It was Woodbourne.  I was only

there for one week in Shawangunk before I started getting these

effects.

Q.  So it's your testimony that you didn't tell a provider

until you were at Woodbourne that you did not want to be on

Lyrica; is that correct?

A.  I told the provider at Woodbourne about the Lyrica, not at

Shawangunk.

Q.  And when you were at Woodbourne and you told your provider

that you didn't want to be on Lyrica, they still prescribed you

Lyrica anyway; is that correct?

A.  I was already prescribed it.  I was having problems with

the side effects and I spoke to him about it and we were

working on doing something about it now.

Q.  While you were at Woodbourne, you didn't want Lyrica, but

is it your testimony today that you do want Lyrica?

A.  No, that's not my testimony.

Q.  Do you currently wish that one of your providers would

prescribe you with Lyrica; is that correct?

A.  I'm already prescribed Lyrica.

Q.  Do you want to stay on your Lyrica?

A.  I just want this pain relief, that's what I want.  If I

N95BALL3                          Daniels - Cross

1   could find something to relieve me of this pain, that's what I

2   want.

3   Q.  But you testified Lyrica provides you little relief, right?

4   A.  Yes, it works.

5           THE DEPUTY CLERK:  Hold on.

6           THE COURT:  Just a minute please, counsel.

7           (Pause)

8   Q.  Isn't it true that your provider at Shawangunk recommended

9   that you take Lyrica three times a day?

10  A.  That came from the pain management, not from Shawangunk,

11  not from the provider at Shawangunk.

12  Q.  But that recommendation was made while you were at

13  Shawangunk, correct?

14  A.  Yes.

15  Q.  And isn't it true that you told your provider while at

16  Shawangunk that you were concerned about taking Lyrica three

17  times a day?

18  A.  I did ask them was that -- being that I had waited almost

19  six years to get anything, for them to give me the maximum

20  dosage right from the start was concerning, yes.

21  Q.  And you did not want to be taking Lyrica three times a day,

22  correct?

23  A.  I questioned them about it.  Like I said in Shawangunk, I

24  wasn't aware of the effects that it was going to have.  All I

25  was concerned about at that time was the amount of time they

N95BALL3                        Daniels - Cross

1   gave it to me a day and at the top dosage.

2   Q.  Isn't it true that you indicated to your provider at

3   Shawangunk that you were willing to wait a few days and even

4   skip a dose of Lyrica if you felt that was necessary?

5   A.  I don't remember that.

6   Q.  You were prescribed Lyrica in April 2023, correct?

7   A.  Right.

8   Q.  And the Lyrica was renewed in May 2023, correct?

9   A.  Right.

10  Q.  And your Lyrica was again renewed in June 2023, right?

11  A.  August, June, yes.  It was renewed.  It's been renewed a

12  few times.  Each time I move, it has to be renewed.

13  Q.  Your Lyrica was also renewed in July 2023, right?

14  A.  I'm not sure, miss.  I remember April, May and August.

15  Q.  And you've taken Ultram before to treat your pain, correct?

16  A.  Prior to my surgeries.

17  Q.  And you found Ultram was effective, correct?

18  A.  Prior to my surgeries.

19  Q.  Did you ever tell your medical providers that Ultram was

20  effective for your pain?

21  A.  Yes.

22  Q.  And who did you tell that information to?

23  A.  I don't remember.  I remember telling it to my attorney.

24  Q.  Sitting here right now do you recall any instances when you

25  informed your provider, your medical provider of that

N95BALL3                          Daniels - Cross

1   information?

2   A.  Yes, I did.  I did speak to one of my providers about

3   Ultram.

4   Q.  When was that?

5   A.  That was here in Woodbourne.

6   Q.  Was that in 2023 that you told your provider that?

7   A.  Yes.

8   Q.  Which provider was that?

9   A.  Ms. Baker.

10  Q.  You've also been prescribed Ibuprofen while you were at

11  DOCCS; is that correct?

12  A.  Yes.

13  Q.  Do you currently take Ibuprofen for your pain?

14  A.  As needed.

15  Q.  And Ibuprofen provides you some relief from your pain,

16  right?

17  A.  Yeah, it does.  It's a different pain.

18  Q.  And you've also participated in physical therapy while

19  incarcerated; is that correct?

20  A.  Years ago, prior to my surgeries.

21  Q.  And you didn't participate in any physical therapy in 2020?

22  A.  Like I said years ago, yes.

23  Q.  I apologize. You didn't participate in any physical therapy

24  in 2023?

25  A.  I was going through the process of being processed to do

N95BALL3                          Daniels - Cross

1    it, but I went over there, and think I had one session out of

2    the eight that I was supposed to get.

3    Q.  And would agree that physical therapy provides you some

4    relief from your pain; is that correct?

5    A.  Yeah, it works.

6    Q.  And you were happy with the physical therapist that you

7    worked with at the department of corrections; is that correct?

8    A.   It was the only relief I was getting, so I was feeling

9    better, yeah.

10   Q.  And you even learned different workouts from your physical

11   therapist that you currently do on your own; isn't that

12   correct?

13   A.  Yes.

14   Q.  And in fact you believe the best pain relief that you've

15   gotten is from the stretches and workouts that you perform that

16   you learned from physical therapist while at DOCCS, right?

17   A.  I'm not going to say all that, but it helped.

18   Q.  And while at DOCCS, you've been referred to pain

19   specialists, right?

20   A.  Right.

21   Q.  And you went to see those pain specialist, right?

22   A.  Yes, I have.

23   Q.  And while --

24   A.  Twice.

25   Q.  Sorry, sir.  Would you like to finish?

1   A.  I've been maybe twice, two or three times to see a pain

2   management person, yeah.

3   Q.  And while at DOCCS, you've also been referred to

4   neurologist, right?

5   A.  Yes.

6   Q.  And you've seen those neurologist, right?

7   A.  Yes.

8   Q.  And that includes neurosurgeons?

9   A.  Yes.

10  Q.  And in fact you've seen at least 15 different neurosurgeons

11  while with DOCCS, right?

12  A.  Yes.

13  Q.  And you've also had multiple surgeries on your neck, back

14  and spine while at DOCCS, right?

15  A.  Right.

16  Q.  And those surgeries were an attempt to treat your pain,

17  right?

18  A.  No, the pain didn't come till -- well, pain, yes, plus I

19  had a spinal situation, so I had to get the whole thing

20  treated.

21  Q.  So those surgeries were intended to correct the causes of

22  pain, correct?

23  A.  I'm always in pain, so nothing really works as far as that.

24  If surgery are for to correct my spinal problems that I was

25  having, that's all I'm aware of.  I was in pain the whole time,

N95BALL3                        Daniels - Cross

1    yes.

2    Q.  But in theory those surgeries were intended to correct

3    issues that were going on with your neck, back and spine,

4    correct?

5    A.  Right.

6    Q.  And your neck, back and spine cause you pain, correct?

7    A.  Right.

8    Q.  And those surgeries were also to ensure that you could

9    walk, correct?

10   A.  Correct.

11   Q.  While at DOCCS, you've been prescribed Neurontin, correct?

12   A.  Correct.

13   Q.  But you've had adverse side effects while on Neurontin,

14   correct?

15   A.  Right.

16   Q.  And the Neurontin upsets your stomach, correct?

17   A.  Yeah, it really wasn't doing nothing for me.

18   Q.  And you've also been prescribed Percocet while at DOCCS,

19   right?

20   A.  No.  Well, that was just after the surgery.  After the

21   surgeries, they gave me a little cycle of that.  That was it

22   though, maybe for one week.

23   Q.  But the Percocet was while you were incarcerated, right?

24   A.  Right.

25   Q.  And you also had adverse side effects from the Percocet,

N95BALL3                         Daniels - Cross

1   right?

2   A.  No, I don't recall that.

3   Q.  But you don't like taking Percocet, right?

4   A.  It worked.  After the surgery, it numb the pain.  It did

5   what it was supposed to do.

6   Q.  And while at DOCCS you've also been prescribed cymbalta,

7   right?

8   A.  Cymbalta, yes.

9   Q.  And you also had adverse side effects while taking

10  Cymbalta, correct?

11  A.  It wasn't really working -- doing nothing for my pain, so,

12  yeah, I did have side effects, right.

13  Q.  And you're currently prescribed Lyrica, right?

14  A.  Right.

15  Q.  Do you have any side effects from the Lyrica?

16  A.  Yes.

17  Q.  And you said that Lyrica is only helping the pain a little,

18  correct?

19  A.  Right, yeah.

20  Q.  What, if anything, at this point do you believe would help

21  alleviate the pain that you're dealing with?

22  A.  I have really no idea what medications that's going to

23  work, what's not going to work.  All I know is I continue to

24  suffer in this pain.  I've been suffering this pain for the

25  last six, seven years now and I'm tired of it.

N95BALL3                          Daniels - Cross

1   Q.  As you sit here today, there's nothing you can think of

2   that you believe would alleviate the pain that you're suffering

3   from; is that correct?

4   A.  Well, like I said, every time I see the neurologist, I even

5   see the surgeon that did the surgery on me.  Every time I go

6   see them, which was like 15 times, they recommend these

7   medications.  But once I get back to the facilities, nothing

8   happens.  I don't get anything.  I get ignored.

9   Q.  Are there any medications as you sit here today that you've

10  been recommended but not prescribed?

11  A.  Yeah, there's been plenty.

12  Q.  Could you identify what those medications are?

13  A.  I don't remember the names right offhand, but there's been

14  plenty of surgeons that recommended medications that I never

15  received.

16          They won't even treat me no more at these neuro

17  interviews because their recommendations are not being

18  respected, so there's nothing else they can do to treat me.

19  Q.  Isn't it true that the neurologist that you saw recommended

20  that you take gabapentin?

21  A.  He said gabapentin, Lyrica.  The surgeon that did my

22  surgery recommended Lyrica, so I went with his choice.

23  Q.  So the surgeon who recommended Lyrica, you ultimately were

24  prescribed Lyrica, correct?

25  A.  Yeah, few years later, years later, yes.

1   Q.  And you just testified that a neurologist has recommended

2   gabapentin in the past, correct?

3   A.  I'm not sure.  I don't remember that, but I remember that

4   name.  Like I said, there's been numerous drugs that they

5   recommended.

6           But like I said, the facility, once I get to the

7   facilities, I never get anything.  I get ignored.  We all do.

8   Q.  Is it your testimony as you sit here today that you were

9   denied gabapentin?

10  A.  I was never given it, so.

11  Q.  Are you aware --

12  A.  They knew about the recommendations, and I never received

13  it.

14  Q.  Sir, are you aware that gabapentin and Neurontin are the

15  same thing?

16  A.  No, I'm not.  I'm not a doctor.  I don't know these things.

17          MS. THOMAS:  I have no further questions.  Thank you.

18          THE COURT:  Redirect, counsel.

19  REDIRECT EXAMINATION

20  BY MR. MORRISON:

21  Q.  Mr. Daniels, when you were transferred from Shawangunk to

22  Woodbourne and you weren't provided the Lyrica medication at

23  Woodbourne, did any medical provider discuss the reasons why

24  you were not being provided Lyrica?

25  A.  The conversation I had about Lyrica, prior to going to the

1   Woodbourne in Shawangunk, Dr. Lee he stated --

2   Q.  Mr. Daniels, I'm talking about when you were transferred to

3   Woodbourne, after being prescribed Lyrica, did any Woodbourne

4   doctor tell you why they did not prescribe you and you were not

5   getting Lyrica upon your transfer?

6   A.  Yes.  They told me that they wasn't aware of me getting

7   this Lyrica, and that Shawangunk -- was a bad planning on

8   Shawangunk's behalf.  They should have notified Woodbourne

9   prior to me getting there about this.

10          Like I said they said I probably -- good luck with

11  getting this is what she said.  She said it was a controlled

12  substance and they don't give that out here.

13          MS. THOMAS:  Objection.

14  A.  It would be the first time ever.

15          MS. THOMAS:  Objection to hearsay.  There's several

16  different quotes and statements with pronouns of unidentified

17  witnesses, so I would object to that testimony.

18          THE COURT:  Mr. Morrison.

19          MR. MORRISON:  I can ask him to clarify who he talked

20  to.

21  Q.  Mr. Daniels, when you arrived at Woodbourne, who was

22  telling you that they don't prescribe controlled substances

23  like Lyrica at Woodbourne?

24  A.  The nurse administrator Ms. Roycroft.

25  Q.  And the same question when you were transferred from

N95BALL3                          Daniels - Redirect

1    Woodbourne to Fishkill correctional facility on August 3rd of

2    2023, did any medical provider at Fishkill tell you why you

3    were not being prescribed Lyrica when you got there?

4    A.   They pretty much said the same thing, that they weren't

5    aware of it.  They would have to speak to the provider and that

6    they don't have that there.  They don't give that out there.

7             MS. THOMAS:  I would object on the same grounds as the

8    previous objection.

9             THE COURT:  Mr. Morrison.

10            MR. MORRISON:  I'll follow-up.

11   Q.   Mr. Daniels, do you remember the name of the provider or

12   nurse that told you that information at Fishkill?

13   A.   No, I don't know his name.

14   Q.   Was this information that was provided to you by Nurse

15   Hasan or Nurse Pitts that you identified earlier in your

16   testimony?

17   A.   Yes, Ms. Hasan was the one that really assisted me in

18   getting to the provider, and she really didn't have all the

19   answers; but she said the provider was supposed to be seeing me

20   soon.  On the day the provider was supposed to see me, I never

21   seen them.

22            MR. MORRISON:  Mr. Daniels, I have nothing further.

23   Thank you very much.

24            THE COURT:  Any recross, Ms. Thomas?

25            MS. THOMAS:  No.  Thank you, your Honor.

N95BALL3                        Daniels – Redirect

1              THE COURT:  Yes, ma'am.  Thank you.  Thank you,

2    Mr. Daniels.  Counsel, is this a good time for the lunch break?

3              MS. AGNEW:  I think so, your Honor.  Hopefully we can

4    line up our parade.

5              THE COURT:  Very good.  So we'll see you around 2:00.

6              (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N95Wall4                        Vasquez – Direct

                            AFTERNOON SESSION

1                                2 o'clock p.m.

3    RICHARD VASQUEZ,

4          Plaintiff, called as a witness on his own behalf,

5          having been duly sworn, testified as follows:

6              THE COURT:  Ms. Agnew.

7    DIRECT EXAMINATION

8    BY MS. AGNEW:

9    Q.  Good afternoon, Mr. Vasquez.  We do apologize for the

10   delay.  We've got a lot of moving parts here, and I thank you

11   for your patience.

12        Can you tell me, Mr. Vasquez, when did you come into DOCCS

13   on this bid?

14   A.  In 1920 -- excuse me.  In 2020.

15   Q.  OK.  Do you remember approximately what month in 2020?

16   A.  January.

17   Q.  OK.  And prior to your intake at DOCCS, had you been held

18   at a county jail?

19   A.  Yes.

20   Q.  Which one, sir?

21   A.  Albany correctional.

22   Q.  OK.  Can you tell me at the time of your intake with DOCCS,

23   in January of 2020, what, if any, symptoms or diagnoses were

24   you suffering from that caused you chronic pain?

25   A.  I was suffering from a lower lumbar chronic pain as well as

1    both of my hips -- my left, my right hip and my left foot.  My

2    left foot.

3    Q.  And what, if any, surgeries have you had prior to coming

4    into DOCCS in January of 2020?

5    A.  All of the surgeries that I've had have been DOCCS, but

6    prior to coming in, the surgeries that were done already was a

7    left hip replacement and (inaudible) hernia, two surgeries on

8    my left foot.

9    Q.  OK.  Let's backtrack just a tiny bit.

10       How many prior bids did you have before January of 2020?

11   A.  Unfortunately, five.

12   Q.  OK.  So is this your sixth bid, sir?

13   A.  Yes, sir -- yes, ma'am.  I'm sorry.  Yes, ma'am.

14   Q.  OK.  And what is your underlying crime for this bid, sir?

15   A.  I'm sorry?

16   Q.  What were you convicted of for this bid, sir?

17   A.  Assault.

18   Q.  OK.  So, you mentioned a left hip replacement.  Is that

19   correct?

20   A.  Yes, ma'am.

21   Q.  When did that take place?

22   A.  In 2017.

23   Q.  OK.  And where were you living in 2017 when you had that

24   left hip replacement?

25   A.  I was in Franklin Correctional.

1    Q.  OK.  Around the time when you had that left hip

2    replacement, what, if any, medications were you taking that

3    effectively treated your pain?

4    A.  What did effectively treat it was gabapentin.

5    Q.  And was that prescribed to you while you were in DOCCS

6    custody around the time of the left hip replacement?

7    A.  Yes, I do believe so.

8    Q.  OK.  And when were you released on that bid?

9    A.  Oh, my God.  OK.  That -- when I went in and got the hip

10   replacement in 2017 was during a violation.  I was released

11   from that violation, I believe, in '18.  It must have been,

12   like, late '17 or early '18, somewhere around there.

13   Q.  OK.  Until the time you were released on that bid, were you

14   prescribed gabapentin?

15   A.  Yes, I was.

16   Q.  OK.  And then after you were released on that bid, were you

17   treated while you were on the outside by a medical doctor?

18   A.  Yes, I was.

19   Q.  And who was that doctor, if you recall?

20   A.  I'm sorry.  I don't -- I don't even recall the doctor's

21   name.  Most of these doctors that I had, I -- I had these

22   doctors under a healthcare plan with -- I believe it was

23   Fidelis Care.

24   Q.  OK.  Do you recall the location, sir?

25   A.  Yeah.  They were in Brooklyn, New York.

N95Wall4                          Vasquez - Direct

1    Q.  OK.  And so, your healthcare provider in Brooklyn, New
2    York, did he continue to prescribe you gabapentin?
3    A.  Yes, he did.
4    Q.  OK.  And what, if any, effects did gabapentin have on your
5    chronic pain during this time period?
6    A.  It didn't help with the nerves because my issue was with
7    nerves, and the nerves get so bad in the lower lumbar that they
8    affect my, my urine flow and sometimes I lose control of my
9    bowel system because the nerves are being affected so bad.
10   Q.  OK.  And is there pain associated with those nerve issues?
11   A.  Oh, yeah, very -- terrible pain.  It's a radiating pain
12   that goes from my hip all the way down to my leg, and it feels
13   like -- it feels like a (inaudible), like a (inaudible), you
14   know, (inaudible) on the back of my leg, going all the way
15   down.  When it gets bad it goes to the foot, goes all the way
16   to the foot.
17   Q.  OK.  So, did you continue to take gabapentin until you went
18   to the county jail?
19   A.  Yes, I did.
20   Q.  OK.  And when you were at the county jail, were you
21   continued to be prescribed gabapentin?
22   A.  Yes, I was.
23   Q.  OK.  And then when you came into DOCCS, in January of 2020,
24   where did you do your reception, your intake?
25   A.  Downstate Correctional.

N95Wall4                         Vasquez - Direct

1    Q.  OK.  And when you were at Downstate, do you recall who the

2    doctor was that you saw, the provider?

3    A.  No, I don't remember.  It was a intake doctor.  I don't

4    remember her name.

5    Q.  OK.  And can you tell me, when you were at Downstate, were

6    you continued on gabapentin?

7    A.  I think I did take it for a little while.  But then they

8    took me off of it.

9    Q.  OK.

10   A.  I didn't (inaudible).  I think it was like a week or so.

11   Q.  OK.  Where did you transfer after you were at Downstate?

12   A.  From Downstate I went to Marcy.

13   Q.  OK.  Did you receive your gabapentin when you were at

14   Marcy?

15   A.  No.

16   Q.  OK.  So do you recall whether or not you received the

17   gabapentin up until the point you were transferred to Marcy?

18   A.  I did.  I think I did, because I wasn't there long, at

19   Downstate.

20   Q.  OK.  And when you got to Marcy, what happened to your

21   effective pain medication?

22   A.  They told me that they (inaudible) out and that they

23   switched it and gave me ibuprofen and Tylenol.

24        MS. LEVINE:  Objection, your Honor.  The witness is

25   testifying to hearsay.

1    BY MS. AGNEW:

2    Q.   OK.   I'm going to ask you, Mr. Vasquez, and then we're

3    going to let the Court deal with an objection, can you tell me

4    who told you that they don't give out gabapentin?

5    A.   Dr. Burke.

6           MS. LEVINE:   I renew my objection, your Honor, to

7    hearsay.

8           THE COURT:   Overruled for the same reasons.

9    BY MS. AGNEW:

10   Q.   OK.   Now, can you tell me approximately when did you meet

11   with Dr. Burke after you arrived at Marcy?

12   A.   Yeah.   I met with Dr. Burke a couple of months after I got

13   to Marcy, and I was complaining about my back and my hip, when

14   I had the radiating pain coming down my, my leg.   And then my

15   back was in such a bad position.   I had a cane, but they took

16   the cane away from me, and -- oh, man.

17   Q.   OK.   Mr. Vasquez --

18   A.   Yeah.

19   Q.   -- I'm going to ask you just not to rock around in your

20   seat.   I know you're uncomfortable there, but just if you can

21   try to --

22   A.   I'm sitting (inaudible).   Yeah.

23   Q.   I know.

24   A.   (Inaudible).   I mean I'm sorry.   I've been sitting in this

25   chair for hours all day, and I'm very uncomfortable.

N95Wall4                      Vasquez - Direct

1   Q.  OK.  I appreciate that.  Let me move along and we'll get

2   you out of that chair.  OK?

3   A.  All right.  Thank you.

4   Q.  How did you find out when you got to Marcy that your

5   medication had been discontinued?

6   A.  Well, they called me in after I wrote, and they called me

7   in to the doctor.  Seeing the doctor and they told me that they

8   don't give out that medication and that -- they put me on

9   ibuprofen.  I think it was Tylenol.  And I really can't use

10  that because I have a bad stomach.  That stuff is just going to

11  rot my stomach out.  It's not supposed to be used for long-term

12  use anyway, not (inaudible) two weeks or so.

13  Q.  OK.

14  A.  (inaudible) going on two, three years, now.  That stuff is

15  just making me worse.  I have a hernia again, and things are

16  just not getting better (inaudible).

17  Q.  OK.  Did Dr. Burke, other than ibuprofen and Tylenol, try

18  to prescribe any other medications to effectively treat your

19  pain?

20  A.  Let me think.  It might have been something like a muscle

21  relaxer, but they don't work because my issue is really nerves.

22  I think it must have been carbamazepine, carbo methanol or

23  methocarbonol.

24  Q.  OK.  Can you tell me, do you recall after your medications

25  were discontinued sitting down with Dr. Burke and doing a

1    reassessment?

2    A.  Yes, I did.

3    Q.  Do you recall the outcome of that reassessment?

4    A.  Yes.  He told me that he wanted to put me in for a

5    orthopedic and MRI and that it was more than likely I was going

6    to have to have another hip replacement on the right side of my

7    hip and that when I went to see the pain doctor, they told me

8    that gabapentin and Cymbalta would be the best prescription for

9    medications that (inaudible) working for my issue.

10          MS. LEVINE:  Objection, your Honor.  The witness is

11   now testifying to additional hearsay.  He's testifying that it

12   was a pain doctor that did not work for DOCCS, so it would not

13   be a statement by an opposing party.

14          THE COURT:  Counsel.

15          MS. AGNEW:  We'll strike the answer.  I'm going to ask

16   another question.

17          THE COURT:  All right.

18   BY MS. AGNEW:

19   Q.  Do you recall approximately when you went to see a pain

20   management doctor?

21   A.  I'm sorry?  Say that again.

22   Q.  Do you recall approximately when you went to see the pain

23   management doctor?

24   A.  Can I pull out my paperwork?  Because I have to be

25   (inaudible) exact date.

N95Wall4                          Vasquez - Direct

1    Q.  No.  I'm not asking for an exact date, and I don't want you

2    to look at your paperwork.

3        Do you recall the year --

4    A.  (inaudible).

5    Q.  Well, let me ask you this, Mr. Vasquez.  I'll try to help

6    you.  Were you at Marcy when you sought pain management?

7    A.  I was.

8    Q.  OK.  And did anyone prescribe you Cymbalta after you saw

9    the pain management doctor?

10   A.  Nobody did.

11   Q.  OK.  Did anyone prescribe you gabapentin after you saw the

12   pain management doctor?

13   A.  Nobody did.

14   Q.  OK.  Did there come a time when you were transferred from

15   Marcy?

16   A.  Yes, I -- yes, I was.

17   Q.  OK.  Do you recall why you were transferred from Marcy;

18   what happened to you?

19   A.  I was transferred from Marcy for a surgery on my right hip.

20   Like the left hip I had done, I had a total hip replacement on

21   my right hip.

22   Q.  OK.  And do you recall where you had that total hip

23   replacement done?

24   A.  Yeah.  It was right outside of Utica.  I think it was --

25   was it Rome?  I think it was in Rome.

1    Q.  OK.  That's fair.

2    A.  Yeah.

3    Q.  Can you tell me after you had that right hip replacement,

4    did you go somewhere to get better after the surgery?

5    A.  Yeah, I was transferred to Walsh medical unit in Mohawk

6    facility.

7    Q.  OK.  And were you given medications when you were at Walsh

8    Regional Medical Unit?

9    A.  Yes, I was.

10   Q.  OK.  What were you given at Walsh Regional Medical Unit?

11   A.  The most effective one I was given gabapentin.  That was

12   only for, like, a week.

13   Q.  OK.  And then what happened; do you recall?

14   A.  Yes.  I was taken off of it for some reason I don't know.

15   They never told me why.

16   Q.  OK.  Did there come a time when you were transferred from

17   Walsh?

18   A.  Yes.  I was transferred from Walsh and sent to Midstate

19   (inaudible).

20   Q.  OK.  Now, tell me something.  When you had the total hip

21   replacement of your right hip, did that resolve your chronic

22   pain?

23   A.  No, it didn't.

24   Q.  OK.  And I want you, because we can see you, Mr. Vasquez,

25   can you tell the judge, is there any reason why you're shifting

N95Wall4                        Vasquez - Direct

1    in your chair over and over again?

2    A.  Yeah, because my issue is my fourth and fifth vertebrae and

3    the S1, which is, like, the last vertebrae, and every time I

4    sit down on anything like these chairs, especially for this

5    amount of time, the chair will go and everything just feels

6    numb.  I feel radiating pain down my, the right side of my leg.

7    I lose control of my bowels.  I don't even know if I'm

8    urinating on myself.  The pain is going up and down my spine.

9    Nothing is going to help, especially the medications they're

10   giving me, the Tylenol, ibuprofen.  I need a pain medication

11   that works with nerves, that helps with nerves.  And I'm not

12   getting that.

13   Q.  OK.  When you came to Midstate, did you speak with any

14   provider about effective treatment for your chronic pain?

15   A.  Yes.  I had spoken to -- I don't -- I think she was a nurse

16   practitioner there.  Mrs. Ferguson.  Sarah Ferguson, I think

17   her name was.  Was it Sarah Ferguson?

18   Q.  Would it remind you if I said Amy Ferguson?  Is that

19   correct?

20   A.  Yeah.  Right.  Thank you.  I must've been thinking of the

21   duchess of York or something.

22   Q.  I love you, Mr. Vasquez.

23      OK.  So tell me this.  Do you recall -- what did you say to

24   Ms. Ferguson when you were discussing effective treatment?

25          MS. LEVINE:  Objection.  Calls for hearsay.

N95Wall4                        Vasquez - Direct

1           MS. AGNEW:  I'm asking what he said.

2           THE COURT:  What he said, counsel.

3           MS. LEVINE:  I object to hearsay.  It's an

4    out-of-court statement.

5           THE COURT:  What he said, not what she said.

6           Overruled.

7    BY MS. AGNEW:

8    Q.  Mr. Vasquez, please tell me what you said to Amy Ferguson.

9    A.  OK.  I told her exactly the problems that I was having, and

10   she said she was aware of it and that she couldn't help me.

11   She couldn't give me medication that was recommended,

12   prescribed to me by the specialists.

13          MS. LEVINE:  Your Honor, I'm just going to renew my

14   objection on hearsay, just for the record.

15          THE COURT:  Yes, ma'am.  Overruled.

16          MS. LEVINE:  Thank you, your Honor.

17   BY MS. AGNEW:

18   Q.  OK.  Did Ms. Ferguson expound on why she couldn't prescribe

19   you the medications that were --

20   A.  Yeah -- she said she couldn't --

21   Q.  Sorry.

22   A.  Yes.  Absolutely.  She said she couldn't get it.  She

23   couldn't get it because we're not allowed.  She said they're

24   not allowed to give me that medication.

25          MS. LEVINE:  I will renew my objection on hearsay,

N95Wall4                          Vasquez - Direct

1    your Honor, just for purposes of the record.

2              THE COURT:  Yes, ma'am.  Same ruling.

3    BY MS. AGNEW:

4    Q.  OK.  Can you tell me at this time, and since you've been at

5    Midstate, Mr. Vasquez, do you come to the medication window to

6    receive any medications?

7    A.  Since that time, up until February of this year -- no,

8    February, March -- February, March, April -- May.  I'm sorry.

9    May of this year they started giving me baclofen for spasms,

10   but I don't get spasms.  I used baclofen in the past, and it

11   doesn't work.  And I told them as much, but they still give it

12   to me.

13   Q.  And are you currently taking baclofen?

14   A.  Yes, and I've been taking it and to no advantage since May.

15   And since ordering me the baclofen, I haven't seen my doctor.

16   Q.  OK.  So it's your testimony that since approximately May of

17   2023, you haven't seen a provider?

18   A.  Approximately around that time, right.  She ordered me the

19   medication and said that she would send me out for x-rays,

20   MRIs.  Miraculously, one week before this trial I got sent out

21   for an MRI.

22   Q.  All right.  Tell me about that.  When did you go out for an

23   MRI?

24   A.  Well, she said that I can -- when I seen -- I think I seen

25   her in the first week, the second week of May, something around

1    there, and she said she'll be sending me out for an MRI for my

2    spine because I've been having back pain for good two, three

3    years.  There was changes.

4        Well, she sent me out and I just, since then -- what was

5    it, May, June, July, August, you know, September, five months

6    later -- I just went out for the MRI.

7    Q.  OK.  And have you seen a provider at Midstate since you had

8    that MRI?

9    A.  No, I haven't.  No response from them or nothing.

10   Q.  OK.  Do you know who your provider is right now,

11   Mr. Vasquez?  Who were you asked to see?

12   A.  Schrader.

13   Q.  OK.

14   A.  Mrs. --

15   Q.  Ms. Schrader?

16   A.  Yeah.  She's a nurse practitioner, I believe.

17   Q.  OK.  When was the last time you saw Nurse Schrader?

18   A.  I believe it was in May.

19   Q.  OK.

20   A.  Was it May or late April?

21   Q.  OK.  I'm going to help you out a little bit, Mr. Vasquez,

22   with the Court's indulgence.  Can you just tell us what

23   happened to you this past year regarding your skin?

24   A.  Yeah.  That's a whole 'nother issue, which is very painful.

25   While I was asleep, 2:00 in the morning, a 64-year-old man who

N95Wall4                         Vasquez - Direct

had -- he's rated an S1 mental violent individual, which is the

highest level, he took, it's, like, a two, three-gallon pot of

scalding water and poured it on me while I was asleep, and --

            MS. LEVINE:  Objection, your Honor.  Relevance.

            THE COURT:  Let's wait until we hear it, please,

counsel.

            Go ahead, sir.  The last thing we have is "he took a

two, three-gallon pot of scalding water and poured it on me

while I was asleep."

            Would you continue, sir.

            THE WITNESS:  Yes, ma'am.  Thank you.

A.  I went to the hospital, and I ended up with second degree

burns.  The skin was just slogging off my body, and the nerves

now -- it's, like, anytime my shirt -- I have a shirt on, like,

around certain areas of my body, the nerves -- now I have nerve

pain all around the top of my body and my chest (inaudible) my

face, where the skin is still healing around, underneath my

face.  I had to see an eye doctor because the water burnt my

eyelids.  It went inside of my ear.  I had to see an ear

doctor.  And the nerve pain is just, like, really bad.  You

know, cold or hot water touches it, it just sets it off.  It

just feels like needles just sticking me from everywhere.

            THE COURT:  Ms. Levine, did you want to say anything

about your objection?

            MS. LEVINE:  I renew my objection to relevance.

1          THE COURT:  Counsel.

2          MS. AGNEW:  If I might, your Honor?

3  Q.  Mr. Vasquez, did those burns cause you pain?

4  A.  Yes, they did.

5          MS. AGNEW:  OK.  Your Honor, I think the relevance is

6  pain.

7          THE COURT:  Overruled.  Yes.  Overruled.

8  BY MS. AGNEW:

9  Q.  Can you tell us, Mr. Vasquez, did you go to an outside

10  hospital for those burns?

11  A.  Yes, I did.  I first went to -- I believe it was St.

12  Elizabeth, but they didn't have the expertise, they said, type

13  of burn unit, and they sent me to Syracuse and they had an

14  excellent burn unit over there.  And I stayed, I think, it was

15  two days.  And -- and --

16  Q.  OK.  Tell me this.  When you got back from the burn unit,

17  were you given effective pain management for the pain from your

18  burns?

19  A.  No.

20  Q.  OK.

21  A.  No.  I was -- I was given -- I think it was (inaudible).

22  That was it.

23          THE COURT:  I'm sorry, sir.  We didn't hear what you

24  said.  The last thing we heard was "I was given."

25          THE WITNESS:  Right.  It was Tylenol, ibuprofen.  But,

1    however, I think it was only, like, three days, four days, they

2    gave me gabapentin and Percocet, like, three, four days.

3    BY MS. AGNEW:

4    Q.  OK.  But did they give you the gabapentin and Percocet at

5    Midstate or when you were in the burn unit?

6    A.  At Midstate they did give it to me.  It was only for, like,

7    three, four days.  Then they took me off of it.

8              MS. AGNEW:  OK.  Mr. Vasquez, I'm done with my direct

9    questions.  I want you to listen very carefully to my colleague

10   when she questions you.  OK?

11             THE WITNESS:  Yes, ma'am.

12             MS. AGNEW:  Thank you.

13             THE COURT:  Cross-examination, Ms. Levine.

14             MS. LEVINE:  Yes, your Honor.

15             May I proceed, your Honor?

16             THE COURT:  Yes, ma'am.

17   CROSS-EXAMINATION

18   BY MS. LEVINE:

19   Q.  Good afternoon, Mr. Vasquez.  Can you hear me OK?

20   A.  Yes, ma'am.

21   Q.  My name is Gabriella Levine.  I represent Dr. Moores.  I

22   deposed you about a month ago.  It's good to see you again.

23   I'm going to ask you some questions today.  OK?

24   A.  OK.

25   Q.  All right.  You're currently at Midstate Correctional

N95Wall4                          Vasquez – Cross

1    Facility, is that right?

2    A.   Yes, ma'am.

3    Q.   And you're at DOCCS on this current bid because you were

4    convicted of assault in the second degree, right?

5    A.   Yes, ma'am.

6    Q.   And you have prior convictions as well, right?

7    A.   Yes, ma'am.

8    Q.   One for burglary?

9    A.   I'm sorry?

10   Q.   One for burglary?

11   A.   Yes, ma'am.

12   Q.   And then I believe you've got a few for the criminal sale

13   of controlled substances, right?

14   A.   Yes, ma'am.

15   Q.   And you also used to be a drug dealer, right?

16   A.   Yes, ma'am.

17   Q.   OK.  And as I understand it, you've testified that you have

18   suffered from hip and back pain on this current bid with DOCCS,

19   is that right?

20   A.   Yes, ma'am.

21   Q.   OK.  And you said that you saw a nurse practitioner who

22   prescribed you baclofen in May of 2023, is that correct?

23   A.   Somewhere around there, yeah.

24   Q.   OK.

25   A.   Yes, ma'am.

N95Wall4                           Vasquez - Cross

1   Q.  And was that Nurse Practitioner Schrader?

2   A.  Yes, it was, Mrs. Schrader.

3   Q.  OK.  And she prescribed you the baclofen to treat your

4   pain, right?

5            MS. AGNEW:  Objection.  That wasn't the testimony.

6   A.  Yes.

7            THE COURT:  I'm sorry.

8            MS. AGNEW:  I apologize.  I object.  This was asked

9   and answered, and he did not -- that wasn't the testimony.

10            MS. LEVINE:  He just said yes.

11            THE COURT:  All right.  Go ahead.

12   BY MS. LEVINE:

13   Q.  You had a visit with her when she prescribed you the

14   baclofen, right?

15   A.  Yes, I did have a visit with her.

16   Q.  OK.  And at that visit, she told you that she was giving

17   you the baclofen because she thought it might help treat your

18   pain symptoms, right?

19   A.  She said that, but I had objected to it because I used it

20   in the past and I know what works for me.  Baclofen, especially

21   ten milligrams, will do nothing for my pain.

22   Q.  OK.

23   A.  I did not ask --

24   Q.  I understand, Mr. Vasquez, but my question --

25            THE COURT:  Ms. Levine, you have to let him at least

1    finish.

2              MS. LEVINE:  OK.  Understood, your Honor.

3              THE COURT:  Sir, the last thing we have:  "Baclofen,

4    especially ten milligrams, will do nothing for my pain."

5              Did you finish that?

6              THE WITNESS:  Yes, ma'am.

7              THE COURT:  Thank you.

8              Ms. Levine.

9    BY MS. LEVINE:

10   Q.  And at the time of that appointment, it's fair to say that

11   you believed that she was fishing for a medication that would

12   help you, right?

13   A.  She didn't have to fish.  I told her I know exactly what

14   works.  Why fish?

15   Q.  But you believed at the time, isn't it true, Mr. Vasquez,

16   that she was looking for a medication that might help you?

17   A.  I can't say I believe what she was doing at all.

18   Q.  OK.  Do you remember when I deposed you in August?

19   A.  Yes, I do remember.

20   Q.  OK.  And your attorney was present at that deposition,

21   right?

22   A.  Yes, my attorney was present.

23   Q.  OK.  And before we got started, you took an oath to tell

24   the truth, right?

25   A.  Yes, I did.

N95Wall4                    Vasquez - Cross

1    Q.  And your deposition testimony was, in fact, true, right?

2    A.  I'm sorry?

3    Q.  Your deposition testimony was, in fact, true, right?

4           THE COURT:  Which testimony?

5    A.  Yes, to the best of my recollection --

6           THE COURT:  You know how to do it.

7           MS. LEVINE:  I will.  I'm getting right there, your

8    Honor.  I'm directing opposing counsel to his deposition

9    transcript, page 46 --

10          MS. AGNEW:  We need a copy.

11          MS. LEVINE:  -- lines 6 through 9.

12          I believe you have a copy of this one.  You ordered

13   it, but if you would like to see the page, I can give it to

14   you.

15          THE COURT:  Off the record.

16          (Discussion off the record)

17          MS. LEVINE:  I'm going to read you the questions I

18   asked and that you answered, and for the record I'm reading

19   from page 46, lines 6 through 9:

20   "Q.  Did she say why she was prescribing you baclofen at the

21   time?

22   "A.  She said it might help.  They were fishing, I believe, for

23   a medication that might help."

24   Q.  Do you remember that testimony, Mr. Vasquez?

25   A.  Yes, I do.

N95Wall4                           Vasquez - Cross

1   Q.  OK.  Are you on the baclofen now?

2   A.  Excuse me?

3   Q.  Are you on the baclofen now?

4   A.  Yes, I am.

5   Q.  OK.  Have you received it continuously since you were

6   prescribed it in May of 2023?

7   A.  Yes, I have.

8   Q.  OK.  Are you familiar with the term "MWAP"?

9   A.  M one?

10  Q.  M-W-A-P.

11  A.  Yes, I am.

12  Q.  OK.  What does that term mean to you?

13  A.  Medication with addictive potential.

14  Q.  OK.  Are you aware that baclofen was previously listed as a

15  drug that was covered by the MWAP policy?

16  A.  Every drug that DOCCS was except Tylenol and ibuprofen, if

17  you want to look at it --

18  Q.  OK.

19  A.  -- you know, but yeah.

20  Q.  OK.  Now, you mentioned that for a time you were at Marcy

21  Correctional, right?

22  A.  I'm sorry?  Can you repeat that?

23  Q.  I believe you mentioned on your direct that for a time you

24  were at Marcy Correctional, right?

25  A.  Yes, I was.

N95Wall4                        Vasquez - Cross

1   Q.  OK.  And that was in or around 2020, right?

2   A.  Yes.

3   Q.  OK.  And I believe you also testified that on a prior bid,

4   is that right, you were given gabapentin?

5   A.  Yes.

6   Q.  Do you recall what year that was?

7   A.  It was in the '90s.

8   Q.  OK.  And while you were at Marcy Correctional, you were

9   sent out to see a pain specialist, right?

10  A.  Yes, I was.

11  Q.  And that was in 2020, right?

12  A.  Yes, it was.

13  Q.  And the pain specialist recommended to treat your pain that

14  you be on Cymbalta and baclofen, not gabapentin, right?

15          MS. AGNEW:  Objection.

16  A.  Well, my pain --

17          THE COURT:  Excuse me.  Hold on for one second, sir.

18          Ma'am, if you're going to object, you have to scream

19  it into the microphone so the witness can hear it.

20          MS. AGNEW:  OK.  Objection.  I think we need to lay a

21  foundation, because Ms. Levine did not want him to testify

22  about what the pain management doctor said or recommended, so

23  now we need a foundation if she wants him to testify about it

24  now.

25  BY MS. LEVINE:

N95Wall4                          Vasquez - Cross

1    Q.  Are you aware what the pain specialist recommended in 2020

2    for you to treat your pain?

3    A.  What they recommended, yes.

4    Q.  And that was Cymbalta and baclofen, right?

5    A.  No.  That was Cymbalta and gabapentin.  I have his

6    signature on, on my medical paperwork.

7    Q.  OK.  Do you recall giving a sworn declaration in this case?

8    A.  I'm sorry?

9    Q.  Do you recall giving a sworn declaration in this case?

10   A.  Did I give a sworn declaration?  For what?  I'm trying to

11   understand the questions.

12   Q.  Do you remember when we reviewed it at your deposition?

13   And I'll actually bring it up for you now, and if you'll bear

14   with me for a moment while I try to share the screen here.

15       All right.  Mr. Vasquez, do you see the document I'm

16   putting on the screen?  Can you read it OK?

17   A.  Yeah, I see it.

18           MS. LEVINE:  OK.  For purposes of the record, I'm

19   showing the witness Dkt. No. 485.

20   Q.  Do you see at the top it says declaration in reply to

21   motion for injunctions?

22   A.  Yes, I do.

23   Q.  And do you see it says "Richard Vasquez declares"?  Do you

24   see that?

25   A.  Yes, I --

1    Q.  OK.

2    A.  Yes, I do.

3    Q.  I'm going to just scroll down here.

4        And do you see where it says, "I declare under penalty of

5    perjury that the above is true and correct"?

6    A.  Yes.

7    Q.  And it's dated --

8    A.  (inaudible) yes.

9    Q.  Is this your signature here?

10   A.  I'm sorry?

11   Q.  Is this your signature on this document?

12   A.  Yes, ma'am.

13   Q.  OK.  Do you recall reviewing it before you signed it?

14   A.  I'm sorry?

15   Q.  Did you review this document before you signed it under the

16   penalty of perjury?

17   A.  Yes, I did.

18   Q.  OK.  Let me direct your attention to paragraph 6.  OK?  And

19   it says -- and I'll read it for you -- "In July I requested

20   that my pain medication be reinstated.  I was sent to see a

21   pain management doctor who recommended Cymbalta and baclofen."

22   Do you see that, Mr. Vasquez?

23   A.  Yes, I do.

24   Q.  OK.  Are you looking at something right now?

25   A.  Yes, I am.

N95Wall4                          Vasquez - Cross

1    Q.  OK.  I don't want you to look at anything, because I want

2    you to look at the declaration.  OK?

3    A.  I seen it.  I understand --

4    Q.  OK.

5    A.  -- what you're saying.

6    Q.  And you swore under the penalty of perjury, right?

7    A.  To the best of my ability, yes, ma'am.

8    Q.  OK.  It doesn't say gabapentin in paragraph 6, does it?

9    A.  No, not that (inaudible) it doesn't.

10   Q.  All right.  I'm going to take it down.

11       So the specialist recommended in 2020 that you be put on

12   baclofen, and now you're on it, right?

13   A.  (inaudible) to the best of my recollection -- it says that

14   Cymbalta and baclofen was recommended by a pain therapist.

15   Q.  Mr. Vasquez, are you reading from something right now?

16   A.  Yes, I --

17   Q.  I'd like you to set that aside and not look at it.  OK?

18   Can you do that for me?

19   A.  Well, I don't think that's fair.  Is that fair, though?  I

20   mean I can't (inaudible).

21           THE COURT:  Mr. Vasquez, would you put the papers

22   aside and listen to counsel's questions and answer, to the best

23   of your ability, from your memory.

24           THE WITNESS:  All right.  Yes, your Honor.

25           THE COURT:  Thank you, sir.

1              Ms. Levine.

2              MS. LEVINE:  Can I just have the question read back,

3    please?

4              THE COURT:  Certainly.

5              "So the specialist recommended in 2020 that you be put

6    on baclofen, and you're on it now, right?"

7    A.  Baclofen and Cymbalta, yes.  They put me back on the

8    baclofen, and that was in 2020, and I didn't get it until 2023.

9    Q.  OK.

10   A.  That's when they put me -- in May of 2023.

11   Q.  OK.  You mentioned that you had hip surgery, right?

12   A.  Yes, I did.

13   Q.  And that was around November of 2021, right?

14   A.  Yes, it was.

15   Q.  OK.  And you had the hip surgery to treat your hip pain,

16   right?

17   A.  I'm sorry?  Can you repeat the last question you said?

18   Q.  Sure.

19       You had the hip surgery to treat your hip pain, right?

20   A.  Yes.

21   Q.  OK.  Isn't it true that your pain specialist also

22   recommended that you do physical therapy to help your pain?

23   A.  My pain specialist?

24   Q.  Yes.

25   A.  No.  Physical therapist.

N95Wall4                        Vasquez – Cross

1   Q.   So your physical therapist recommended that you do physical

2   therapy to help your pain?

3   A.   Yeah, in my hip.

4   Q.   OK.

5   A.   (inaudible) complete the question.   Any -- anyone who has a

6   hip surgery has to go through physical therapy for their hip.

7   Q.   OK.   So it was, in fact, recommended to you that you do

8   physical therapy, right?

9   A.   Yeah.

10   Q.   All right.

11   A.   No, no, no.   You keep saying the pain therapist.   I'm

12   saying the physical therapist.

13   Q.   I understand that.

14   A.   A pain --

15       Huh?

16   Q.   I understand that part.   My question was whether it was, in

17   fact, recommended that you do physical therapy to help your

18   pain.

19   A.   Yes.   That's routine.   Everybody.   Everyone who has a

20   hip -- yeah, that's routine.

21   Q.   And isn't it also true that you refused to do physical

22   therapy when you were at Midstate?

23   A.   Yeah.   The reason why is because of my back, my lower back.

24   I could not do that type of physical therapy because of my

25   lower back.   It was impossible.

N95Wall4                     Vasquez - Cross

1  Q.  OK.  So you refused the physical therapy at Midstate,

2  right?

3  A.  Yes, with reasoning.  I gave the -- I gave them a written

4  reason of refusal.  There was (inaudible), like, two or three

5  times they saw I was physically unable to do it because it was

6  too much (inaudible) in my hip and my spine.

7  Q.  OK.  The hip surgery that you had in November 2021, it did

8  help your hip pain, right?

9  A.  It helped it, yeah, right hand -- right side of the hip

10  pain, yes.

11  Q.  Other than the baclofen, as you sit here today, you're also

12  still on ibuprofen, right?

13  A.  I'm sorry?

14  Q.  Other than the baclofen, as you sit here today, you're also

15  still on ibuprofen, right?

16  A.  Ibuprofen?  Yeah.  I've been on ibuprofen for, like, three

17  years.  Doing nothing but rotting my stomach.  That's it.

18  Q.  And you're also on Tylenol, right?

19  A.  Tylenol, yeah.

20  Q.  OK.

21  A.  Yeah.

22  Q.  That's to treat your pain too, right?

23  A.  It's supposed to treat my pain.

24  Q.  And you could also be on a medication called Tegretol for

25  your pain, right?

N95Wall4                        Vasquez – Cross

A.  No, I'm not on a medication called Tegretol.

Q.  That was offered to you while you were at Midstate, though,
correct?

A.  It was offered.  It was prescribed by the doctor,
Mrs. Schrader.  It was never filled out inside the pharmacy.
It was never filled out in the pharmacy.  They never gave it to
me.

Q.  Is it your testimony that you never tried to take Tegretol
while you were at Midstate?

A.  She gave me a prescription for Tegretol at the same time as
the baclofen.  The baclofen was filled.  The Tegretol was not
filled.  I complained about it and got no response.

Q.  OK.  I'm going to go back to your deposition testimony.
OK?

         MS. LEVINE:  And I'm going to direct counsel to page
43, lines 8 through 22.

Q.  Starting at line 8, Mr. Vasquez:

"Q.  OK.  Do you see the next paragraph here, where it says she
prescribed me Tegretol, which does not work?  Do you see that
there?"

A.  Yes.

Q.  "A. Right.

"Q.  OK.

"A.  Yeah.

"Q.  Does that refresh your recollection as to whether

N95Wall4                        Vasquez – Cross

1    Ms. Ferguson prescribed you Tegretol?

2    "A.  She probably did give me Tegretol.  If I did take it, I

3    probably used it for, like, maybe two weeks, a month, maybe as

4    much as that.  If it -- if I get no effects from it within 30

5    days or so, I'll usually go to the doctors and tell them why

6    take the medication that's just, just going to be, you know,

7    I'm not going to use?"

8        Do you recall that testimony?

9    A.  Yes, I do.  And --

10   Q.  Does that refresh your recollection as to whether you were

11   given Tegretol and chose not to take it?

12   A.  It doesn't say the question was I given Tegretol.  It says

13   was I prescribed Tegretol.  I did not take Tegretol.  I took

14   (inaudible) pain.  Tegretol is a medication that they did give

15   me knowing it would not work because it's not a nerve

16   medication.

17   Q.  OK.  Well --

18           THE COURT:  Excuse me, counsel, just for a minute.

19           Mr. Vasquez, we're going to try to conduct ourselves

20   in a professional manner here.  I know the pain is a lot for

21   you, but let's try to address counsel professionally.  All

22   right?

23           THE WITNESS:  OK.  Thank you.

24           THE COURT:  Yes, sir.

25   BY MS. LEVINE:

N95Wall4                          Vasquez – Cross

1    Q.  Let's turn to a different line of your deposition,

2    Mr. Vasquez, page 65, line 16:  "Tegretol, and she gave me that

3    medication and I think I took it for -- I took it, like, a

4    month or so and it didn't work.  So I told her to take me off

5    that medication."

6         That was true testimony, right, Mr. Vasquez, that you gave

7    at your deposition?

8    A.  Yeah, the medication in question was carbamazepine.

9    Q.  Which is Tegretol, right?

10   A.  No.  It's carbamazepine, which is a seizure medication,

11   which I don't have seizures.

12   Q.  Are you aware --

13   A.  And the --

14   Q.  Sorry.  Go ahead.

15   A.  The name of the medication in question I was confused

16   about.  That's why I said if she gave me that medication, then

17   I would probably be on it for, like, two weeks or so, because I

18   let her know.  And that's exactly (inaudible).  They put me on

19   it.  It didn't work, and I got off of it.

20   Q.  Are you aware today that those two are the same medication?

21   A.  Carbamazepine and Tegretol?

22   Q.  Yes.

23   A.  I'm not aware, no.

24   Q.  OK.

25   A.  I'm not aware, but --

N95Wall4                          Vasquez - Cross

1    Q.  When's the last time you tried to take it?

2    A.  As soon as I started having adverse effects.  In my head I

3    was starting to feel, like, dizzy and, like, vertigo and --

4    because it's a, it's a, it's an antiseizure medication, and my

5    issue is nerves.  I don't know why I'm prescribed that.  Like,

6    it doesn't work, so I just -- it doesn't work (inaudible).

7              MS. LEVINE:  One moment, your Honor?

8              THE COURT:  Yes, ma'am.

9    BY MS. LEVINE:

10   Q.  So you don't like taking antiseizure medications?

11   A.  I'm sorry?

12   Q.  Is it your testimony that you don't like taking antiseizure

13   medications?

14   A.  That I don't like taking antiseizure medications?

15   Q.  Yes.

16   A.  If I don't have seizures, I don't take antiseizure

17   medication, all I'm saying.

18   Q.  Are you aware that gabapentin is an antiseizure medication?

19   A.  It was for nerves.  I know that much.

20   Q.  Are you aware that Tegretol also treats nerve pain?

21   A.  Is this the same thing as carbamazepine.

22   Q.  Yes.  When I say Tegretol and carbamazepine I mean the same

23   thing.

24   A.  Then it doesn't work.  And I made that clear.

25   Q.  Are you aware that it's intended to treat nerve pain?

N95Wall4                          Vasquez - Cross

1    A.  From what I understand, no.  It does not work.

2    Q.  That's what you believe --

3    A.  (inaudible).

4    Q.  Sorry.

5    A.  No, it's not that I don't believe this.  I took the

6    medication.  I've tried it, and I've tried, you know, to see if

7    it works for me.  And I took it for the prescribed time they

8    told me to use it.  And it just didn't work, so I told them it

9    doesn't work and I told them (inaudible) refill for medication.

10   Patients that -- I'm more than aware of it.  I'm more than sure

11   what works for me.  So, I don't understand why, you know

12   (inaudible) worse.

13   Q.  Let me ask you this, Mr. Vasquez.  Isn't it true that Nurse

14   Practitioner Schrader prescribed you not just the baclofen but

15   a combination of the baclofen, the Tegretol and the ibuprofen

16   in May of 2023?

17   A.  That she gave me a combination of that stuff?

18   Q.  That those were her orders, that you take baclofen,

19   Tegretol and ibuprofen in May of 2023.

20   A.  I was already on ibuprofen, and I was already on the

21   carbamazepine, the Tegretol, which you said is the same thing.

22   Q.  So she added your baclofen to your current regimen of

23   Tegretol and ibuprofen, right?

24   A.  And the pain med I was on, those two medications, the

25   carbamazepine and the ibuprofen, in May, she gave me baclofen

1  after waiting three years.  After waiting three years, you

2  know, for something that maybe a pain specialist said might

3  work, you know, gave it to me.

4                    (Continued on next page)

N95BALL5                          Vasquez - Cross

BY MS. LEVINE:

Q.  Mr. Vasquez, I think this is going to go quicker if you let me ask the questions and you just answer.  Okay.

        I think you broke up at the beginning, so I'm going to re-ask that question.  Isn't it true that Nurse Practitioner Schrader prescribed you the baclofen in addition to the current regimen that you were on of Tegretol and Ibuprofen?

A.  Yes, and I informed her that it doesn't work, ma'am.  I've took the medication in the past, and I know that it just doesn't work.

        THE COURT:  I think counsel is going to ask you another question now, Mr. Vasquez.

        THE WITNESS:  Okay.

Q.  You asked Nurse Practitioner Schrader to send you out to an orthopedic doctor and a pain specialist, right?

A.  Yes, I have.

Q.  And she did both, right?

A.  I had to wait four to five months to see a MRI, and that was done.  I haven't seen a pain specialist.  I haven't tooken X-rays.  That was it, just the MRIs.

Q.  She submitted the request for you to see the orthopedic doctor and the pain specialist, right?

A.  I don't know that, ma'am.

Q.  Isn't it true that you saw her submit it?  She showed you?

A.  She showed me some paperwork on the screen, but I don't

1   know if she sent it.

2   Q.  She showed you she was submitting it for you though, right?

3   A.  I'm sorry.

4   Q.  She told you that she was putting in for it, and she showed

5   you that she was submitting it, right?

6   A.  Ma'am, you have to ask her that.  What she showed me on the

7   screen and what she sent to the central office, I don't know;

8   but she showed me something on the screen that said that I need

9   to see a pain specialist, an X-ray, an MRI, a heart specialist,

10  so that's what she showed me.

11          THE COURT:  Mr. Vasquez, I want you to listen to

12  counsel's question, please.  Ms. Levine.

13  Q.  You said you had an MRI about a week ago?

14  A.  Yes, ma'am.

15  Q.  Nurse Practitioner Schrader sent you out for the MRI,

16  right?

17  A.  Yes, she did.

18  Q.  And that was in response to your complaints of pain, right?

19  A.  At what point in time was the question?

20  Q.  Can you repeat your answer.

21  A.  Can you repeat your question.

22          MS. LEVINE:  Could you read back the question, please.

23          (Record was read)

24  Q.  Do you understand, Mr. Vasquez?

25  A.  Yeah.  Can you repeat it.  I'm sorry.

1          THE COURT:  And that was in response to your

2    complaints of pain, correct?

3    A.  It was in response to the complaints of pain, yes.

4    Q.  You testified on direct to an incident that you had with

5    somebody by the name of Nurse Practitioner Amy Ferguson.  Do

6    you recall that testimony?

7    A.  Yes, I do.

8    Q.  And you said that you saw her when you got to Mid-State,

9    right?

10   A.  Yes.

11   Q.  When was that?

12   A.  I believe that was in February, March of 2022.

13   Q.  And you said when you saw her she told you that they

14   weren't giving something out at Mid-State; is that right?

15   A.  Yes.

16   Q.  What exactly did she say?

17   A.  When I asked her about the gabapentin, that the specialist

18   had requested with the cymbalta, she said, no, they don't give

19   it out here.

20   Q.  Did she say anything else?

21   A.  I'm sorry.  I can't hear you.

22   Q.  That's all she said, right?

23   A.  I can't hear you.  I'm sorry.

24   Q.  That's all she said, right, Mr. Vasquez?

25   A.  That she doesn't give it out.

N95BALL5                        Vasquez - Cross

1  Q.  Would it surprise you to know that your medical records in

2  March 2022 show that you were requesting a self-carry

3  medication instead of gabapentin or Neurontin?

4  A.  Actually, she requested that I don't come to the med

5  window, and that I get a self-prescribed medication that I can

6  take on my own because I had just came out of surgery.  She

7  said that it would stop you from walking because this is not a

8  flat jail.  It's a lot of stairs and hills.

9  Q.  So are you saying that she thought it would help you to be

10 on a self-carry medication?

11 A.  That's what she said.

12 Q.  You don't see Nurse Practitioner Ferguson anymore at

13 Mid-State, right?

14 A.  No, I don't.

15 Q.  When's the last time you saw her?

16 A.  I can't recall the exact date, but I believe it's been over

17 a year.

18 Q.  Over a year.  Okay.  And do you have any expectation that

19 you'll see her again?

20 A.  Hopefully not.

21 Q.  Are you aware that she's no longer with DOCCS?

22        THE COURT:  Counsel, I think you shocked Mr. Vasquez

23 so much he's frozen.

24 Q.  Are you aware that Ms. Ferguson is no longer with DOCCS?

25 A.  Am I aware of it?

N95BALL5                      Vasquez - Redirect

1   Q.  Yes.

2   A.  No, I'm not aware.

3   Q.  You mentioned an incident when you sustained burns; is that

4   right?

5   A.  I'm sorry.  I can't hear you.  If you can please talk a

6   little slower.

7   Q.  You mentioned an incident on your direct testimony when you

8   sustained some burns, right?

9   A.  Yes.

10  Q.  When was that?

11  A.  That was January of this year.

12  Q.  And you were treated in the hospital for that, right?

13  A.  Yes, I was.

14          MS. LEVINE:  I have no further questions.

15          THE COURT:  Thank you.  Redirect, please, counsel.

16  REDIRECT EXAMINATION

17  BY MS. AGNEW:

18  Q.  Mr. Vasquez, are you in pain right now, sir?

19  A.  Yes, I am.

20  Q.  Can you tell me at any time today when you were giving

21  testimony were you trying to deceive the Court?

22  A.  No, I wasn't, ma'am.

23  Q.  I want to get you out of the chair.  I have no further

24  questions.  Okay.  Go get comfortable.

25          THE COURT:  Anything else, Ms. Levine?

1          MS. LEVINE:  No, your Honor.  Thank you.

2          THE COURT:  Thank you, Mr. Vasquez.

3          (Witness excused)

4          MS. AGNEW:  Your Honor, can we take five minutes?

5          THE COURT:  Yes, ma'am. Off the record.

6          (Pause)

7          MS. AGNEW:  The plaintiff class would like to call

8  Mr. Rafael Montanez to the stand.

9          THE COURT:  Ms. Phillips.

10  RAFAEL MONTANEZ,

11       called as a witness by the Plaintiffs,

12       having been duly sworn, testified as follows:

13          THE DEPUTY CLERK:  State your name and spell it for

14  the record.

15          THE WITNESS:  My name is Rafael Montanez, R-A-F-A-E-L,

16  M-O-N-T-A-N-E-Z.

17  DIRECT EXAMINATION

18  BY MS. AGNEW:

19  Q.  Can you tell me, Mr. Montanez, when did you come into DOCCS

20  on this bid?

21  A.  2011.

22  Q.  Have you had prior bids in DOCCS's custody?

23  A.  Yes, I did.

24  Q.  How many, sir?

25  A.  Two.

N95BALL5                          Montanez- Direct

1   Q.  Can you tell me what were your underlying criminal charges?

2   A.  Burglary.

3   Q.  For all three bids?

4   A.  Burglary, robbery and burglary.

5   Q.  You're not very good at that, right?

6   A.  At all.

7   Q.  Okay.  So tell me, sir, when you came into DOCCS on this

8   bid in 2011, were there any symptoms or diagnoses that you

9   suffered from that caused you chronic pain or neuropathy?

10  A.  Yes.

11  Q.  Can you tell the Court what those are?

12  A.  I had impingement in my nerve, mild case of stenosis,

13  degeneration of my L2, L1 disk, and some other stuff that I

14  don't really understand what it is.

15          THE COURT:  Sir, where was the nerve impingement,

16  please?

17          THE WITNESS:  In my lower back.

18          THE COURT:  Thank you.

19  Q.  And can you tell us how does that cause you pain or

20  neuropathy, what does it feel like?

21  A.  It feels like nerve pinching, like it's hard.  It feel like

22  the nerve is pinched, like my whole back.  How can I explain

23  it?  Feel like something like pressing on my back.

24  Q.  Does it effect your activities of daily living, and if so

25  how?

N95BALL5                          Montanez- Direct

1   A.   It effects me sports.  I don't do as much sports as before,

2   and certain jobs I cannot do.

3   Q.   Was there a time since 2011 when your chronic pain or

4   neuropathy was effectively treated?

5   A.   Yes.

6   Q.   How was it treated?

7   A.   It was treated in Rikers Island.  They was giving me pain

8   medication.

9   Q.   Well, Rikers Island was before you came to DOCCS; is that

10  right?

11  A.   Yes.

12  Q.   Do you know what you were taking on Rikers Island that

13  helped?

14  A.   Yes, I was talking tramadol.

15  Q.   Were you taking anything else?

16  A.   And I was taking Neurontin.

17  Q.   When you came into DOCCS's custody, were you still

18  prescribed tramadol and Neurontin?

19  A.   I was prescribed tramadol before I came into DOCCS.

20  Q.   I'm talking about after you came into DOCCS in 2011.  First

21  tell me this, where were you housed when you first came into

22  DOCCS?

23  A.   Downstate correctional facility.

24  Q.   When you were at Downstate, were you continued on your

25  effective medication?

N95BALL5                         Montanez- Direct

1    A.  Yes, I was.

2    Q.  So when you left Downstate where did you go?

3    A.  I went to Sing Sing correctional facility.

4    Q.  Was that in 2011?

5    A.  Yes.

6    Q.  Were you effectively treated when you were at Sing Sing?

7    A.  Yes, I was.

8    Q.  Do you remember who your provider was at Sing Sing?

9    A.  No.

10   Q.  That's okay.  Do you recall approximately how long you were

11   housed at Sing Sing?

12   A.  About two to three months if I'm correct.

13   Q.  I'm sorry two to three months?

14   A.  Yes.

15   Q.  Then where did you go?

16   A.  I went to Five Points correctional facility.

17   Q.  And how long were you housed at Five Points?

18   A.  Three years.

19   Q.  When you were housed at Five Points, were you receiving

20   effective medical treatment?

21   A.  No, I was not.

22   Q.  What happened at Five Points?

23   A.  As soon as I was seen in the reception area, they took me

24   to the clinic and they started weaning me off my medication.

25   Q.  Did this happen in approximately 2011?

N95BALL5                              Montanez- Direct

1   A.  2013.

2   Q.  Okay.  I apologize.  2013.  They started to wean you off,

3   correct?

4   A.  Yes.

5   Q.  Did you get transferred from Five Points?

6   A.  Yes.

7   Q.  Where were you transferred to?

8   A.  Eastern correctional facility.

9   Q.  How long did you stay at Eastern?

10  A.  About eight months.

11  Q.  Do you recall who your provider was there?

12  A.  No, not really.

13  Q.  Can you tell me when you were at Eastern correctional

14  facility, did you receive effective treatment?

15  A.  No.

16  Q.  When you left Eastern, where were you transferred to, sir?

17  A.  Clinton.

18  Q.  And approximately when were you transferred to Clinton?

19  A.  2017.

20  Q.  How long did you stay at Clinton?

21  A.  A few months.

22  Q.  How many more facilities were you transferred to and from

23  in the rest of your bid from when you went from Clinton?

24  A.  I been to maybe one, two, three -- about four.

25  Q.  And about how long do you stay in a facility approximately,

1   just generally?

2   A.   I was at Coxsackie for four years.

3   Q.   Where was that, Coxsackie?

4   A.   Yes.

5   Q.   What were the years you were at Coxsackie?

6   A.   I was there from 2017 to 2021.

7   Q.   Do you recall who your provider was at Coxsackie?

8   A.   I had different ones.  I don't really know the providers

9   name.

10  Q.   That's all right.  At any time when you were at Coxsackie,

11  Mr. Montanez, did you express to your provider that you

12  suffered from pain?

13  A.   Yes.

14  Q.   How did you describe that pain to your provider at

15  Coxsackie?

16  A.   I told them that there was times that I couldn't get out of

17  bed, that it hurt so much that I had to get up and try to

18  straighten myself out to walk straight.

19           But in all the facilities I been to, I been X-ray,

20  MRI, and they all find the same thing, so.  I complain,

21  sick-call, sick-call, everything.  I don't know.

22  Q.   When you complained to sick-call, can you just describe

23  that process generally for the Court?

24  A.   Yes.  You got to sign a slip the night before and they call

25  you about 6:00 in the morning.  They wake you up at 6:00 in the

1    morning to go to sick-call to be seen.  When you go to

2    sick-call, you see a nurse, and you explain to the nurse what's

3    going on, and she recommends you to a provider.  But they just

4    ask you what's the problem, and they just give you medication.

5         THE DEPUTY CLERK:  Hold on.

6         (Pause)

7    Q.  I'm back, Mr. Montanez.  You were explaining to the Court

8    how sick-call, you see a nurse, and then the nurse will

9    recommend you to a provider; is that correct?

10   A.  Yes.

11   Q.  Do you get called to see the nurse every time you put in

12   the sick-call slip?

13   A.  Yes.

14   Q.  Then how long does it take to see a provider?

15   A.  Sometimes it take a couple of weeks.  Sometimes a couple of

16   days.

17   Q.  To your knowledge can the nurse who sees you at sick-call

18   write a prescription for you?

19   A.  Yes.  They could give you Ibuprofen, Tylenol or Aspirins.

20   Q.  To your knowledge do you need a prescription for Tylenol or

21   Ibuprofen?

22   A.  No.

23   Q.  Tell me this, how many times have you complained -- and

24   let's just say since 2017.  I want you to approximate -- to

25   medical staff in DOCCS facilities about your chronic pain?

1   A.  Wow, I know it's got to be more than 50 times because --

2   because all the facilities I been to complaining about it.  I

3   got to keep following up, following up, then they send me

4   outside to get X rays.  And then they follow-up from there, I

5   don't know, 50 times I complained.

6   Q.  Have you ever seen a pain management doctor?

7   A.  Yes.

8   Q.  After you've seen pain management doctors, have you ever

9   received effective treatment?

10  A.  No.

11  Q.  Can you tell me, Mr. Montanez, when was the last time you

12  saw a pain management doctor approximately?

13          Let's try this, was it within the last year,

14  Mr. Montanez?

15  A.  No.

16  Q.  Who's your provider right now, Mr. Montanez?

17  A.  I don't know his name.  It's a funny name that I can't

18  pronounce.

19  Q.  Is it a woman?

20  A.  Yes, it's a woman.

21  Q.  Does she have an ethnicity that's apparent to you?

22  A.  Yes, she's kind of Muslim.

23  Q.  Is it Dr. Chaudhry, does that refresh your recollection?

24  A.  Say it again.

25  Q.  Dr. Chaudhry?

N95BALL5                         Montanez- Direct

```
1    A.   No.

2    Q.   When was the last time you saw your provider?

3    A.   A few weeks back.

4    Q.   Did you mention your chronic pain to your provider?

5    A.   I didn't go for that.  I went for my feet, and it was

6    swelling up.  I had a swollen foot.

7    Q.   Can you tell me, Mr. Montanez, to your knowledge have you

8    received a chronic pain assessment by any provider in DOCCS

9    while you've been in DOCCS's custody?

10   A.   Yes.

11   Q.   When did you receive a chronic pain assessment?

12   A.   I don't remember.  I can't recollect.

13   Q.   Has it been within the last year, Mr. Montanez?

14   A.   Not that I recall.

15   Q.   Are you being effectively treated for your pain now,

16   Mr. Montanez?

17   A.   No, ma'am.

18   Q.   Are you apart of the MAT program?

19   A.   Yes, I am.

20   Q.   Can you tell the Court what's your understanding of why you

21   take MAT?

22   A.   Because of addiction.

23   Q.   Do you know what medication you take as part of the MAT

24   program?

25   A.   Yes.
```

N95BALL5                          Montanez – Cross

1    Q.  What is it?

2    A.  Buprenorphine.

3    Q.  Is it Buprenorphine?

4    A.  Buprenorphine.

5    Q.  Does the Buprenorphine address your chronic pain or your

6    impinged nerve?

7    A.  No, it does not.

8    Q.  Has it helped with your addiction issues at all?

9    A.  Yes, it has.

10             MS. AGNEW:  I have no further questions, your Honor.

11             THE COURT:  Thank you.  Cross-examination, please,

12   counsel.

13   CROSS-EXAMINATION

14   BY MS. LEVINE:

15   Q.  Good afternoon, Mr. Montanez.

16   A.  Good afternoon.

17   Q.  My name is Gabriella Levine.  I deposed you back in August,

18   and I'm here to ask you some questions today, okay.

19             Can you hear me, Mr. Montanez?

20   A.  Yes, ma'am.

21   Q.  Okay.  You mentioned on your direct testimony that you have

22   some back pain, right?

23   A.  Yes.

24   Q.  And you mentioned two medications called tramadol and

25   Neurontin I believe.  Do you recall that?

N95BALL5                          Montanez - Cross

1   A.  Tramadol and Neurontin.

2   Q.  And the last time you received those medications, tramadol

3   Neurontin, was in 2013, right?

4   A.  Yes.

5   Q.  I want to talk about what you've been treated with on this

6   bid for your back pain, okay.

7   A.  Okay.

8   Q.  You've been on Tylenol, right?

9   A.  Yes.

10  Q.  And you've been on naproxen, right?

11  A.  Yes.

12  Q.  And since you been at Mid-State, you've been on something

13  called omeprazole, right?

14  A.  I've been on that, yes.

15  Q.  And that's to treat your pain, right?

16  A.  Yes.  Actually, the Ibuprofen.

17  Q.  You're on Ibuprofen as well at Mid-State, right?

18  A.  Yes.

19  Q.  And that's also to treat your pain, right?

20  A.  Yes.

21          THE DEPUTY CLERK:  Hold on.

22          THE COURT:  Off the record.

23          (Pause)

24          THE COURT:  Yes, ma'am.

25  Q.  You've been on Ibuprofen for a couple of years, right?

1              THE COURT:  Off the record.

2              (Pause)

3              THE COURT:  Yes, ma'am.

4    Q.  Mr. Montanez, I think we left off with me asking you if

5    you've been on Ibuprofen for a couple of years to treat your

6    back pain, and you said yes, right?

7    A.  Yes.

8    Q.  And your Ibuprofen was continued when you got to Mid-State,

9    right?

10   A.  Yes.

11   Q.  And you said you see a provider at Mid-State, right?

12   A.  Yes.

13   Q.  Is that a nurse practitioner?

14   A.  That's my provider.

15   Q.  Does the name Nurse Practitioner Wiggan ring any bells?

16   A.  Wiggan?

17   Q.  Yes.

18   A.  That was at Adirondack.

19   Q.  Do you recall any name of a provider you see at Mid-State?

20   A.  I can't really pronounce her name.  It's a hard name to

21   pronounce.

22   Q.  Since you've been at Mid-State, your provider that you've

23   seen that you can't remember the name of has also renewed your

24   TENS unit for your back pain, right?

25   A.  Yes.

1    Q.  Can you explain for the Court what a TENS unit is?

2    A.  A TENS unit like physical therapy, little dot magnets you

3    put on your back.  You connect it to the wire and it give you

4    vibration, different vibes to give you TENS.

5    Q.  The TENS unit helps you when you have back pain, right?

6    A.  It helps me when I'm getting really, like, I can't get up

7    and I need to start the day, like a startup.

8    Q.  So it's fair to say it gives you some relief, right?

9    A.  Yes.

10   Q.  And you've told your providers that it helps you, right?

11   A.  Yes.

12   Q.  That's why they keep giving it to you, right?

13   A.  That's why I take it, yes.  I got a permit for it.  I also

14   have a permit for --

15   Q.  A back brace?

16   A.  A back brace, yes.

17   Q.  They renewed your permit for your back brace when you got

18   to Mid-State, right?

19   A.  Yes.

20   Q.  And that's to treat your back pain too, right?

21   A.  That's to give me flexibility so I don't have to put too

22   much pressure on my back.

23   Q.  So it helps give you some flexibility then, right?

24   A.  Yes.

25   Q.  When did you get to Mid-State?

N95BALL5                          Montanez - Cross

1   A.  April.

2   Q.  April of 2023?

3   A.  Yes.

4   Q.  And the provider that you see at Mid-State who you can't

5   remember the name of also recommended that you do some back

6   exercises to relieve your back pain, correct?

7   A.  Correct.

8   Q.  And you only tried those back exercises once then stopped,

9   right?

10  A.  Yes.

11  Q.  You've also been given a permit for compression stockings

12  at Mid-State, right?

13  A.  No.

14  Q.  No you don't recall that?

15  A.  No.

16          MS. LEVINE:  I think I am getting kickback.

17  Q.  Have you ever had compression stockings?

18  A.  No.

19  Q.  And you said that your back pain that you have right now

20  prevents you from participating in sports; is that right?

21  A.  Yes.

22  Q.  What sports?

23  A.  Like handball, baseball.

24  Q.  So your back pain is preventing you from playing handball

25  and baseball; is that right?

N95BALL5                          Montanez - Cross

1    A.  Yes.

2    Q.  So I just want to make sure I have everything.  Since

3    you've been at Mid-State, you've been given Ibuprofen,

4    omeprazole.  You were told to do back exercises.  You have a

5    TENS unit and a back brace for your back pain.  Did I miss

6    anything?

7    A.  No.

8    Q.  And you're currently also in the MAT program you said,

9    right?

10   A.  Yes.

11   Q.  And you're receiving something called suboxone?

12   A.  Yes.

13            MS. AGNEW:  Objection.

14   A.  It's called Buprenorphine.

15   Q.  And you're receiving that because you have a history of

16   substance abuse, right?

17   A.  Yes.

18   Q.  You've done cocaine in the past, right?

19   A.  No.

20   Q.  What about heroin?

21   A.  Yes.

22   Q.  You had an incident in 2021 on this bid when you lost

23   consciousness right, Mr. Montanez?

24   A.  Yes.

25   Q.  And you were administered Narcan, right?

N95BALL5                          Montanez - Cross

1    A.  Yes.

2    Q.  And then you became conscious and oriented after you got

3    the Narcan, right?

4    A.  Yes.

5    Q.  Do you have an understanding of what Narcan is used for?

6    A.  Yes.

7    Q.  What's your understanding?

8    A.  My understanding is if you have a drug overdose.

9    Q.  Did you have a drug overdose on this bid, Mr. Montanez?

10   A.  No.

11   Q.  Then why did you get Narcan?

12            MS. AGNEW:  Objection.  Withdrawn.

13            THE COURT:  You may answer, sir.

14   A.  They took me to outside hospital.  They said it was

15   dehydration.

16   Q.  Are you aware that the doctors you saw at the time

17   determined that the cause of your unconsciousness was likely

18   substance abuse?

19   A.  No.

20   Q.  You're not aware of that?

21   A.  No.

22   Q.  Is there a medication you prefer to be on today?

23   A.  Is there a medication that I prefer to be on?

24            THE COURT:  For back pain, right?

25   Q.  For back pain.

1    A.  Yes.

2    Q.  What medication is that?

3    A.  Tramadol.

4    Q.  Are you aware tramadol is an opioid?

5    A.  No.

6    Q.  If you knew that, would that concern you given your history

7    of drug addiction?

8    A.  No, cause I was taking them in the streets cause parole

9    didn't want me to take no Percocet or Tylenol number three

10   because of my history, so I had to give clean urines.  So

11   tramadol was not considered an opiate.

12   Q.  So is it your testimony that you're not concerned to take

13   opiates today?

14   A.  Take opiates, I don't want to take no opiates. I'm in the

15   MAT program.

16   Q.  You don't want to take opiates, is that it?

17   A.  Yes.

18   Q.  Do you want your doctors to be mindful of your past history

19   with drug addiction when they prescribe you new medications?

20   A.  Yeah, that would be good.

21   Q.  You mentioned that you saw your provider a few weeks ago

22   because your foot was swollen, right?

23   A.  Yes.

24   Q.  And she told you that you were probably a borderline

25   diabetic at that time, right?

N95BALL5                          Montanez - Redirect

A.  Yes.

Q.  And she recommended to treat that, that you go on a special

diet, right?

A.  Yes.

Q.  And that was a control B diet, correct?

A.  Correct.

Q.  That means no sodium, no salt, right?

A.  Correct.

Q.  And you were presented with a contract that you needed to

sign to be on that special diet that was recommended to you,

right?

          THE COURT:  Would you ask the question again, please,

counsel.

Q.  You were presented with a contract that you needed to sign

to be on that special diet, right?

A.  Correct.

Q.  But you refused to sign it, right?

A.  Correct, yes.

          MS. LEVINE:  I have no further questions.

          THE COURT:  Thank you.  Redirect, counsel, please.

REDIRECT EXAMINATION

BY MS. AGNEW:

Q.  Mr. Montanez, Ms. Levine just went over a number of things

that your current provider is giving you at Mid-State, correct?

A.  Yes.

1   Q.  Can you tell me, do you still suffer from chronic pain?

2   A.  Yes, I do.

3   Q.  And is that chronic pain still effect your life and your

4   activities of daily living?

5   A.  Yes, it does.  I don't go nowhere.

6   Q.  Go ahead.

7   A.  I haven't been nowhere since I been in this prison, in this

8   facility, because of my pain.  I don't go nowhere.  I don't go

9   to the yard.  I went to the gym one time try to workout and do

10  some exercises, but because of my back pain I just couldn't do

11  it no more.

12  Q.  Could you tell the court, Mr. Montanez, why you would

13  refuse a special diet?

14  A.  I refuse the special diet because if you don't sign that

15  contract, you have to go to all three meals.  You have to go,

16  mandatory, to all three meals.  If you don't, you get written

17  up.  They write you up, give you a ticket and stuff.

18  Q.  Explain to the Court what it means you get written up?

19  A.  Well, they give you a disposition.  They give you a miss --

20  Q.  Is it a misbehavior ticket?

21  A.  Misbehavior report.  They write you a misbehavior report

22  and they take privileges from you like, commissary, you know.

23  Q.  And so if you signed up for a special diet, under what

24  circumstances might you miss one of those three meals?

25  A.  Because at the three meals if two bad, you don't want to

N95BALL5                    Montanez - Redirect

1   eat it.  You don't want to eat it.  You don't want to go.  You

2   wouldn't have that option to be able to say if you want to go

3   or you don't want to go eat.  But the way they presented it to

4   me, it was mandatory.  I had to take it.  That's why I refused

5   the contract.

6              MS. AGNEW:  Mr. Montanez, I don't have any further

7   questions.  Thank you very much.

8              THE COURT:  Mr. Levine?

9              MS. LEVINE:  Nothing further, your Honor.

10             THE COURT:  Mr. Morrison, who else do you want.

11             MS. AGNEW:  Your Honor, do you mind if we call.  He's

12   an important witness for us.

13             THE COURT:  Folks, if you want to step out for two

14   minutes, just run fast.

15             (Recess)

16             THE COURT:  Who's doing this witness, please.

17             MS. AGNEW:  Mr. Morrison, he's coming.

18             MR. MORRISON:  Plaintiff calls Mr. Ramal mary.

19             THE COURT:  Ms. Phillips.

20             THE DEPUTY CLERK:  Please raise your right hand.

21   RAMAL MYRIEE,

22       called as a witness by the Plaintiffs,

23       having been duly sworn, testified as follows:

24             THE DEPUTY CLERK:  Please spell your name for the

25   record.

1          THE WITNESS:  Ramal Myriee, R-A-M-A-L, M-Y-R-I-E-E.

2          THE COURT:  Yes, sir.  Thank you.  Mr. Morrison.

3   DIRECT EXAMINATION

4   BY MR. MORRISON:

5   Q.  Good afternoon, Mr. Myriee. Thank you for waiting.

6          How old are you?

7   A.  45.

8   Q.  Can you tell the Court your current medical conditions?

9   A.  I have diabetic neuropathy, severe diabetic neuropathy. I

10  got degenerative disk disease, and I believe I may have a ulcer

11  also, stomach ulcer.

12  Q.  With regard to your diabetic neuropathy, when were you

13  first diagnosed with that condition?

14  A.  Around 2010.

15  Q.  When were you first diagnosed with diabetes?

16  A.  2008.

17  Q.  When you diagnosed, were you incarcerated or were you

18  outside in the free world?

19  A.  Yes, I was incarcerated, sir.

20  Q.  Where were you incarcerated at that time?

21  A.  Rikers Island.

22  Q.  And that was in 2008?

23  A.  '08, yes.

24  Q.  When you were incarcerated in 2008 in Rikers Island and

25  diagnosed, what, if any, medication were you provided?

N95BALL5                           Myriee- Direct

1    A.   I was provided gabapentin.

2              THE DEPUTY CLERK:  Hang on.

3              THE COURT:  Hold on.  We have another entrant.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N95Wall6                    Myriee - Direct

1           THE COURT:  Mr. Morrison.

2     BY MR. MORRISON:

3     Q.  Mr. Myriee, I think the last question was when you were

4     diagnosed in 2008, what medication -- in Rikers Island, what

5     medication were you provided for your diabetes and diabetic

6     neuropathy?

7     A.  I was provided with gabapentin, 800 milligrams, three times

8     a day.

9     Q.  And what was your understanding of what that medication was

10    prescribed for?

11    A.  For the nerve pain that I received from my diabetic

12    neuropathy.

13    Q.  OK.  And can you just briefly describe what that pain feels

14    like?

15    A.  It's no describing it, to be honest with you.  It's very,

16    very painful.  It's hard to walk.  My legs are swollen.  My

17    feet are swollen all day, 24 hours a day, and I'm just in

18    severe pain.

19    Q.  OK.

20    A.  Still (inaudible).

21    Q.  OK.  And when you were -- back in 2008, when you were

22    prescribed this medicine, this Neurontin, how did that affect

23    the pain in your feet?

24    A.  It helped a lot.  Alleviated, alleviated it a lot.

25    Q.  After taking that medication, did it allow you to do things

N95Wall6                    Myriee - Direct

1   that you couldn't do when you weren't on that medication?

2   A.  Yes, sir.  I was able to walk, play with the kids, things

3   of that nature.

4   Q.  OK.  So after you were prescribed this medication in

5   Rikers, did you ever get transferred to the custody of the New

6   York State Department of Corrections?

7   A.  Yes, sir.

8   Q.  OK.  And this was -- are we talking about the bid you're

9   currently doing right now or a previous bid?

10  A.  No.  Previous.

11  Q.  OK.  So, do you remember what year, roughly, when you were

12  transferred from Rikers Island while you were receiving

13  Neurontin to the New York State --

14  A.  20 --

15  Q.  Go ahead.

16  A.  2010.

17  Q.  OK.  When you got to the New York State Department of

18  Corrections, do you remember what facility you went to?

19  A.  Yes.  I went to Wende.

20  Q.  And when you got to Wende, did they continue to prescribe

21  you gabapentin to treat your diabetic neuropathy?

22  A.  Yes, sir.

23  Q.  Did you have any issues with having that medication

24  continued?

25  A.  No.  Actually, they -- you would get the whole bottle, up

N95Wall6                           Myriee - Direct

1     to you.  They would give you your meds, it was self-care,

2     actually.

3     Q.  This was back in 2010?

4     A.  Yes, sir.

5     Q.  And how long during that bid were you in DOCCS custody?

6     A.  Two years.

7     Q.  OK.  So --

8     A.  '12, yeah, two and a half years.

9     Q.  OK.  And during that two and a half years that you were in

10    DOCCS custody, were you at Wende the whole time, or did you go

11    to other facilities?

12    A.  I went to other facilities.

13    Q.  And when you --

14    A.  I went to --

15    Q.  Sorry.  Go ahead.

16    A.  All right, sir.

17    Q.  When you transferred from Wende to another facility, did

18    your gabapentin prescription continue?

19    A.  Yes, sir.

20    Q.  OK.  Do you remember what facility that was?

21    A.  Yes.  I went to Wyoming Correctional Facility, and from

22    there I went to Wallkill Correctional Facility.  I was released

23    from Wallkill Correctional Facility.

24    Q.  OK.  And what year were you released?

25    A.  2013.

N95Wall6                         Myriee - Direct

1   Q.  OK.  And during that bid, did you speak to your providers

2   about how Neurontin affected your diabetic neuropathy?

3   A.  Yes, I have, multiple times.

4   Q.  OK.  And they continued to prescribe it to you, is that

5   fair?

6   A.  Yes, sir.

7   Q.  OK.  Now let's talk about after you were released from

8   DOCCS custody.  Did you continue to take the prescribed

9   gabapentin?

10  A.  Yes.

11  Q.  Neurontin?

12  A.  Yes, sir.

13  Q.  And do you remember who was prescribing that medication for

14  you after you were released?

15  A.  Yes.  I had a doctor named Dr. Panish.

16  Q.  And where was Dr. Panish located?

17  A.  Hempstead, Long Island.

18  Q.  Other than Neurontin, were you prescribed any other

19  medication after you were released from DOCCS custody?

20  A.  Yes, sir.

21  Q.  What other medications were you prescribed?

22  A.  I was prescribed aspirin, Percocet, Flexeril, insulin

23  and -- that's about it.

24  Q.  OK.  And were you prescribed these medications by your same

25  doctor?

1    A.  Yes.

2    Q.  And for these medications, did you have to get refills of

3    the medications?

4    A.  Yes, once a month.

5    Q.  And when you got refills of the medications, did you have

6    to see or speak with your doctor?

7    A.  Only for the opioid, the Percocet.  But for the gabapentin,

8    I didn't have to see him.

9    Q.  OK.  How often would you see your, I'll call him your

10   primary care provider when you were outside, before --

11   A.  Once a month.

12   Q.  At some point in time, did you get arrested?

13   A.  Yes, sir.

14   Q.  OK.  Do you remember roughly when you got arrested?

15   A.  Yes.  2015.

16   Q.  And Mr. Myriee, what were you arrested for?

17   A.  Drug sales.

18   Q.  And were you -- when you were arrested, where were you

19   incarcerated?

20   A.  Nassau County correctional -- Nassau County correctional

21   facility.

22   Q.  And is that a county jail?

23   A.  Yes, sir.

24   Q.  And while you were in Nassau County jail awaiting trial,

25   were you being prescribed any medication for your diabetic

N95Wall6                        Myriee - Direct

1   neuropathy and back pain?

2   A.  Yes, sir.  I was prescribed the same gabapentin and the

3   same Percocets and Flexeril.

4   Q.  And during that time was the gabapentin effectively

5   treating your diabetic neuropathy in your feet?

6   A.  Yes, sir, very much so.

7   Q.  And did you --

8   A.  Definitely --

9   Q.  Sorry.  Go ahead.

10  A.  It definitely alleviated a lot of pain I was feeling, like,

11  because this pain is so serious.  Like, it's -- sometimes it's

12  unbearable to sleep.  Like, this is serious -- this is very

13  serious.

14  Q.  OK.  Did you ever receive any testing regarding your

15  diabetic neuropathy before you were incarcerated?

16  A.  Yes.  I had a -- I can't recall what it's called, but they

17  stuck these needles in my legs to test the nerves.

18  Q.  And that was on the outside?

19  A.  Yes, outside and inside.  Both.

20  Q.  And following that testing on the outside -- I'll start

21  with the outside -- did you understand that you had a confirmed

22  diabetic neuropathy in your feet?

23  A.  Yes, sir.  I was told that I had severe diabetic neuropathy

24  and that there was no reverse, no cause to reverse it.  But,

25  like, I would have to live with this pain and it was, like,

1   basically nothing they could do.  They showed me how the nerves

2   start dying and things of that nature.

3   Q.  And you said also, going back to when you were in Nassau

4   County jail, when you were arrested in 2015, you were also

5   taking Flexeril.  What was your understanding of what Flexeril

6   was prescribed for?

7   A.  My spinal disease.  It was a muscle relaxer.

8   Q.  And you were also being prescribed Percocet?

9   A.  Yes, sir.

10  Q.  What was your understanding of what the Percocet was being

11  prescribed for?

12  A.  For my spine.

13  Q.  At some point in time, did you get transferred to the New

14  York State Department of Corrections following your arrest and

15  stay at Nassau County jail in 2015?

16  A.  Yes.

17  Q.  What --

18  A.  I was transferred to Downstate Correctional Facility, which

19  was reception, and from there I went to Wende.

20  Q.  And I apologize.  I'm saying 2015.  When you were in Nassau

21  County jail, what year was that?

22  A.  2015.

23  Q.  2015?

24  A.  Yes.

25          THE COURT:  That's what he said the first time.

1          MR. MORRISON:  Yes.  I think I'm confused.

2    Q.  Mr. Myriee, let me try to back up.

3    A.  Yes.

4    Q.  When did the bid that you're currently serving right now,

5    when did that start?

6    A.  OK.  That started 2021, sir.

7    Q.  That's what I thought.

8         So, prior to you coming in on this bid at the New York

9    State Department of Corrections, when were you arrested?

10   A.  December of 2021.

11   Q.  OK.  That's what I -- let's talk about that arrest, and

12   that --

13   A.  Right.

14   Q.  In December 2021, when you were arrested, what jail or --

15   yeah, what jail did you go to, if any?

16   A.  It was the county jail.  I stayed in the infirmary for,

17   until it was time to come upstate, and then I came straight to

18   Ulster reception, and then I came here to Woodbourne.

19   Q.  OK.  Let's slow down.

20        The county jail that you went into after you were arrested,

21   where was that?

22   A.  Nassau.

23   Q.  Nassau County jail.  And what were you being prescribed for

24   your medical conditions at Nassau County jail in December

25   2021 -- or in 2021?

```
 1   A.  I was being prescribed -- I was being prescribed the same
 2   med, gabapentin.  They had switched it to Lyrica, but the
 3   Lyrica really didn't work, so they switched me back to
 4   gabapentin.  So Percocet, aspirin, tramadol and Cymbalta.
 5   Q.  And were you able to meet with medical providers in Nassau
 6   County jail regarding those medications and prescriptions?
 7   A.  Yes.  The doctor made (inaudible).
 8   Q.  And you said at some point the medication,
 9   gabapentin/Neurontin, was switched to Lyrica at Nassau County
10   jail, right?
11   A.  Yes, sir.
12   Q.  How did that come about happening?
13   A.  Because I had wrote a few sick calls asking the provider if
14   there were any pain -- if I decided to have my feet amputated
15   because the pain was unbearable.  I couldn't sleep and it was,
16   like, I was going through so much.  Like, the pain was too much
17   for me.  I couldn't deal with it anymore.  I asked to have my
18   feet amputated, both of them.
19   Q.  And then they decided to try to switch your medication to
20   Lyrica to see if that would help you?
21   A.  Yes, sir.
22   Q.  And how long were you on Lyrica?
23   A.  A few weeks.  I would say about three weeks, maybe.
24   Q.  OK.  And then at some point I think you testified that you
25   were switched back to gabapentin, right?
```

1    A.  Yes, I was switched back to gabapentin.  I had adverse

2    reaction off the Lyrica also.

3    Q.  OK.  What was that?

4    A.  In the county jail.

5    Q.  No.  What was the adverse reaction?

6    A.  Nausea, vomiting, sweating, chills.  It was almost like a

7    overdose or something.

8    Q.  OK.  And when that happened you talked to your provider

9    about it?

10   A.  Yes, sir.

11   Q.  And then they said let's go back to gabapentin?

12   A.  Yes.

13   Q.  OK.

14   A.  They upped it.

15   Q.  What do you mean they upped it?  They upped what?

16   A.  The dosage of gabapentin.

17   Q.  OK.  And was that helpful, when they increased the dosage?

18   A.  Yes.

19   Q.  And you said -- how long were you in the county jail before

20   you were transferred to DOCCS custody?

21   A.  December -- December to May.  So about six months.

22   Q.  OK.  OK.  Let's talk about when you got transferred to

23   DOCCS's custody.  What was the first facility you recall going

24   to?

25   A.  Ulster, Ulster Correctional Facility for reception.

N95Wall6                          Myriee - Direct

1   Q.  And that was in around May of 2022?

2   A.  Yes.

3   Q.  And when you got to Ulster Correctional Facility, what

4   medications were you prescribed?

5   A.  I was prescribed gabapentin, tramadol, Cymbalta, aspirin

6   and insulin.

7   Q.  OK.  And how long were you at Ulster reception?

8   A.  About a week.

9   Q.  And during that week, did you see any providers, medical

10  providers?

11  A.  No, I didn't see any medical providers.  No.  I just saw,

12  like, the regular nurses and things like that.

13  Q.  OK.  And did you report to those nurses that the Neurontin

14  was effective in treating your neuropathic pain?

15  A.  Yes.  I was never asked, actually.  They just kept me on it

16  because I was on it when I came up.  So they just actually kept

17  me on it.  They never asked me anything.

18  Q.  Did you ever complain about being on that medication?

19  A.  No.

20  Q.  OK.

21  A.  I complained about not being on it.

22  Q.  OK.  We'll get there.

23      So, when you left Ulster Correctional Facility, where did

24  you go?

25  A.  Woodbourne Correctional Facility, where I'm currently

N95Wall6                        Myriee - Direct

1   residing.

2   Q.  OK.  And when, roughly, did you get transferred to

3   Woodbourne Correctional Facility?

4   A.  In May.  May of -- May 20 -- I'd say like May 29, something

5   like that.

6   Q.  Mr. Myriee, if you have any papers, leave them off.  I

7   don't care about that.  OK?  Just to the best of your

8   knowledge.

9       May of 2022, you believe?

10  A.  Yes.

11  Q.  When you transferred into Woodbourne Correctional Facility,

12  did anything happen to your medication?

13  A.  Yes.  They discontinued it.

14  Q.  When you say they discontinued it, how did you learn it was

15  discontinued?

16  A.  Doctor (inaudible).

17  Q.  First, how did you learn it was discontinued?

18  A.  Well, I went to the window where you go for your

19  medication.  When I got to the window, I noticed that my

20  gabapentin was in liquid form and it was a little bit in the

21  cup.  So I asked, you know, what happened to my 800 milligrams,

22  and they said that the doctor take, took me off; they don't

23  give out gabapentin in this facility.

24          MS. THOMAS:  Objection.  Hearsay.

25          THE COURT:  Clarify.

1    BY MR. MORRISON:

2    Q.  Do you know who the nurse was at the window who told you

3    that?

4    A.  Yes.  Nurse -- nurse Winters.  Nurse Ferguson.  The doctor

5    told me.

6    Q.  OK.

7    A.  The PA told me.

8    Q.  OK.  So let me -- before we get to the doctor, when you

9    learned this when you went to the medication window and learned

10   that your gabapentin has been switched to liquid and that they

11   were taking you off, had you previously seen and sat down with

12   any medical provider at Woodbourne?

13   A.  No, I haven't seen anyone before they decided to take me

14   off.  When they decided to take me off, I didn't see any

15   provider.

16   Q.  And tell me how you felt when you went to the window that

17   day and you were informed that your medication, gabapentin, was

18   being discontinued.

19   A.  I was very -- honestly, I was upset, you know, and I was

20   hurting.

21              THE COURT:  Excuse me.

22              With respect to the objection, overruled.  Same

23   reasoning.

24   BY MR. MORRISON:

25   Q.  How long after your, you went to the window did you meet

N95Wall6                    Myriee - Direct

1   with a medical provider?

2   A.   A few weeks later.  I'm not exactly correct on the date.  I

3   don't know the date, but it was -- it was, maybe, a few weeks

4   after I had been in the prison.

5   Q.   And by the time that you met with your medical provider a

6   few weeks after you were at the prison, were you getting any

7   Neurontin at all?

8   A.   No.  I wasn't getting nothing.

9   Q.   What medical provider did you meet with two weeks after you

10  arrived at Woodbourne?

11  A.   A medical PA Switz.

12          THE COURT:  Could we spell that, please.

13          MR. MORRISON:  Sure.  I believe it's S-W-I-T-Z.

14          THE COURT:  Thank you.

15  BY MR. MORRISON:

16  Q.   How did you get to see PA Switz?

17  A.   Because I was writing sick calls every day --

18  Q.   And what was --

19  A.   -- complaining about the pain I was going through.

20  Q.   OK.  And what did you tell PA Switz when you met with her?

21  A.   I expressed to her that I was in severe pain, that I could

22  barely walk and that I needed my medication back.  And she told

23  me that they don't give out that medication in this facility

24  and that they know what's best for me.

25          MS. THOMAS:  Objection.  Hearsay.  Same objection.

N95Wall6                           Myriee - Direct

1           THE COURT:  Same ruling.

2    BY MR. MORRISON:

3    Q.  And when you had this conversation with PA Switz and she

4    said that she doesn't provide that medication in this facility,

5    did you inform her that you had diabetic neuropathy?

6    A.  Yes, sir.  I explained to her that I had diabetic

7    neuropathy and I had been on the medication for over 12 years

8    and still got nowhere.

9    Q.  OK.  How long did that meeting with PA Switz last?

10   A.  I would say about five minutes, if that.

11   Q.  During that meeting, did PA Switz give you a physical

12   examination?

13   A.  No.

14   Q.  Did she discuss any alternative medications to provide to

15   you?

16   A.  No.

17   Q.  Did she -- at any point in time since you've been in

18   Woodbourne, have you been sent to any pain management

19   specialist?

20   A.  Nope.  I haven't even been sent to --

21   Q.  Go ahead.

22   A.  I haven't been sent to a pain specialist.  I haven't even

23   been sent to a doctor specializing in diabetic -- I haven't

24   even seen none of those either.

25   Q.  Can you describe to the Court how your life has been since

N95Wall6                    Myriee - Direct

1   your gabapentin medication was discontinued upon your transfer

2   to Woodbourne Correctional Facility?

3   A.  My life is very hard.  It's hard for me to walk, get up and

4   down steps, to put pressure on my feet.  My legs are constantly

5   swollen.  My body's falling apart.  My feet and legs are

6   falling apart rapidly.  Rapidly.

7   Q.  How many times have you seen your provider since you've

8   been at Woodbourne?

9   A.  Maybe about four, maybe about four or five times.

10  Q.  OK.

11  A.  Maybe.

12  Q.  And has it always been PA Switz that you see?

13  A.  No.  Dr. Ruiz.

14  Q.  OK.  And when was the last time you talked to Dr. Ruiz?

15  A.  I seen her, maybe, a few weeks ago, when I came back from

16  the hospital.

17  Q.  OK.  Have you ever discussed with Dr. Ruiz since you've

18  been at Woodbourne your neuropathic pain in your feet and your

19  diabetic neuropathy or Neurontin?

20  A.  Yes.  Yes, sir.  I actually, every occasion I could speak,

21  when I expressed to her, I pulled my leg, pulled my pants leg

22  up, took my shoes off and showed her how bad my feet and my

23  legs are, how much pain I'm in.  And again, I was told that --

24  she, she specifically told me that she's been a doctor for over

25  40 years and that she knows what's good for me and that I don't

N95Wall6                      Myriee - Direct

1  need that; I do not need gabapentin.

2          MS. THOMAS:  Objection.  Hearsay.  Same objection.

3          THE COURT:  Same ruling.

4  BY MR. MORRISON:

5  Q.  Has Dr. Ruiz ever physically examined you during these

6  encounters?

7  A.  No, sir.

8  Q.  You described that, and you said that you would take off

9  your shoes and show her your feet and how bad they were?

10  A.  Yes.

11  Q.  Can you describe --

12  A.  Yes.

13  Q.  -- what you mean about how bad your feet are?

14  A.  Yes.  They're black.  They're turning black.  My toenails

15  started falling off.  I don't have any -- like, it's, it's --

16  they're swollen.  They're, they're, they're hot.  The pain is

17  just very, very, very, very, very bad.

18  Q.  Does she ever explain to you or send you out anywhere

19  regarding why your feet are black and your toenails are falling

20  off?

21  A.  Well, she sent me, upon my request, to a vascular, but the

22  vascular said that that's not my, that's not my, that's not my

23  problem; my veins aren't the problem.

24  Q.  OK.  So after you returned to the vascular specialist and

25  he explained that your veins are not the problem, did Nurse

N95Wall6                          Myriee - Direct

1    Ruiz or PA Switz provide any other treatment in regards to

2    what's going on with your feet?

3    A.  No, sir.  No, sir.

4    Q.  Now, Mr. Myriee, I understand you are on the MAT program?

5    A.  Yes, sir.

6    Q.  OK.  And when did you start -- well, strike that.

7        You're on the MAT program because you have a history of

8    heroin addiction, is that right?

9    A.  Yes, that's correct.

10   Q.  OK.  And how long have you been suffering with heroin

11   addiction?

12   A.  Since I came to prison.  I started using heroin in prison.

13   Q.  OK.

14   A.  1990 -- 2000.

15   Q.  2000?

16   A.  Yes.

17   Q.  And from 2000 to the date in which you were put on to the

18   MAT program, have you received any treatment in regards to your

19   heroin addiction?

20   A.  No, sir.

21   Q.  Were your medical providers on the outside aware of your

22   heroin addiction when they were prescribing you gabapentin?

23   A.  Yes.

24   Q.  OK.  And were you ever prescribed Suboxone?

25   A.  Yes.

1    Q.   When were you first prescribed Suboxone?

2    A.   I would say two thousand and -- between 2018 and '19,

3    during these times.

4    Q.   And was that when you were in custody or out of custody?

5    A.   Out of custody.

6    Q.   And during that time did you continue to be prescribed

7    gabapentin?

8    A.   Yes, sir.

9    Q.   And is it fair to say that your primary care provider on

10   the outside was aware that you were being prescribed Suboxone

11   and gabapentin at the same time?

12   A.   Yes, because it pops up in the computer.

13   Q.   Pardon me?

14   A.   That's why it's discontinued.  Yes.  That's why they

15   discontinued the Percocet, because they knew I was on Suboxone.

16   Q.   OK.  Fair enough.

17        So when your doctor prescribed you Suboxone and learned

18   that you were on Suboxone, he discontinued your Percocet?

19   A.   Yes, sir.

20   Q.   And that makes sense, right?

21   A.   Of course.

22   Q.   You understand --

23   A.   Of course, very much so.

24   Q.   And so when you got into DOCCS custody, were you on

25   Suboxone?  Were you taking Suboxone for your heroin addiction?

N95Wall6                        Myriee – Cross

1   A.  No.  I was –– no.  I was still using heroin.

2   Q.  OK.  And when you got into DOCCS custody, at any point in

3   time –– oh, strike that.

4           MR. MORRISON:  One moment, your Honor?

5           THE COURT:  Yes, sir.

6           MR. MORRISON:  Mr. Myriee, I have no further questions

7   at this time.  Thank you.  OK?

8           THE WITNESS:  Thank you very much.

9           THE COURT:  Thank you.

10          Cross-examination, please, counsel.

11          MS. THOMAS:  Thank you, your Honor.

12          THE COURT:  Yes, ma'am.

13  CROSS-EXAMINATION

14  BY MS. THOMAS:

15  Q.  Good afternoon, Mr. Myriee.  My name is Jennifer Thomas,

16  and I represent Dr. Carol Moores in her official capacity as

17  the chief medical officer for the Department of Corrections, I

18  just have a few questions for you today.

19  A.  Good evening, Ms. Thomas.  How you doing?

20  Q.  Good.  Thank you.

21      I know you went over this with Mr. Morrison.  I just want

22  to make sure I have the time line correct.

23  A.  Yes.

24  Q.  You were incarcerated from 1999 to 2007.  Is that correct?

25  A.  Yes.

N95Wall6                        Myriee - Cross

1    Q.  And then from 2010 to 2013, correct?

2    A.  Yes.

3    Q.  And then 2015 until August 2017, is that correct?

4    A.  Yes.

5    Q.  And then May 2022 until today, correct?

6    A.  Yes, ma'am.

7    Q.  And just to confirm, you were not incarcerated at any time

8    between August 2017 and May 2022 with the Department of

9    Corrections, right?

10   A.  August what, ma'am?

11   Q.  August 2017.

12   A.  I got released in August 2017.

13   Q.  Right.  So in between August 2017 and May 2022, you were

14   not incarcerated with the Department of Corrections, right?

15   A.  No, ma'am.

16          THE COURT:  Yes, that's correct.  Right, sir?

17          THE WITNESS:  Yes, that's correct, ma'am.

18   BY MS. THOMAS:

19   Q.  And earlier you had testified that the cause of your pain

20   is severe diabetic neuropathy, right?

21   A.  Yes, ma'am.

22   Q.  And you would agree that your provider has prescribed daily

23   finger stick tests to test your blood sugar, right?

24   A.  Yes.

25   Q.  But you don't always show up to test your blood sugar, do

N95Wall6                      Myriee - Cross

1    you?

2    A.  I might have missed a handful of times because I was in so

3    much pain, and my numbers are always excellent.  My A1C is a

4    6.1.

5            THE COURT:  Which we all know from watching television

6    is good, right?

7            THE WITNESS:  Yes.

8    BY MS. THOMAS:

9    Q.  And there have been a few instances in which you refused to

10   show for your blood sugar test, correct?

11   A.  Of course, yes.

12   Q.  OK.  And your provider has also prescribed you insulin

13   while at DOCCS, right?

14   A.  Yes.

15   Q.  But you don't always show for your insulin, do you?

16   A.  Well, actually, ma'am, I believe you have the papers,

17   because you say I didn't show, also it should say that I stated

18   how much pain I was in and that I couldn't wait.  I couldn't

19   sit.  I couldn't sit in the place that they had me.  I couldn't

20   wait because I was in so much pain.  So yes, I did refuse it

21   those days.

22   Q.  OK.  And there were more than a few instances in which you

23   signed refusals saying that you would not be going down to take

24   your insulin, correct?

25   A.  Well, I feel that you're not expressing exactly what was

N95Wall6                          Myriee - Cross

1   said.  You only expressing somewhat of what was said, because I

2   said that, on those refusals that I was in so much pain that I

3   can't wait and that that was the reason for me refusing.  It

4   wasn't just that I didn't want to go down.  And I'm quite sure

5   that it says that.

6   Q.  And in fact, there were two instances in which you told the

7   provider that you, quote, don't want the insulin.  Is that

8   correct?

9   A.  No, that's not correct.

10  Q.  And you didn't sign any form indicating that?

11  A.  No.  What I said, what I signed the form indicating was

12  that I couldn't wait where they had me waiting at with 20 other

13  people when I could barely stand.

14  Q.  OK.  And I just want to clarify.  Is it your testimony as

15  you sit here today that you've never signed a form stating that

16  you don't want your insulin, with no other clarification?

17  A.  What you mean with no other clarification?  I don't

18  understand what you mean.

19  Q.  With just the words "don't want."

20  A.  I may have once or twice.  Yes, I may have once or twice.

21  But I go to insulin every day, so --

22  Q.  And you would agree that treating your diabetes is

23  important to manage your diabetic neuropathy, right?

24  A.  Yes, it is.  That's why my A1C is a 6.1, because I take

25  care of myself to the best I -- to the best of my ability.

N95Wall6                     Myriee - Cross

Q.  And isn't it true you've been counseled by providers about
the importance of insulin management?

A.  Not at all.  I've never been counseled by the providers.
It's just something (inaudible).  I've never been counseled,
ever.

Q.  So no provider has ever indicated to you that there are
risks of not taking insulin --

A.  No.

Q.  -- while at DOCCS?

A.  No.  That's just something (inaudible) the paper I refused.

Q.  You also have asthma, is that correct?

A.  Bronchitis, yes.

Q.  Do you have asthma, chronic asthma?

A.  It's not chronic, but I haven't had an asthma attack in I
don't know how long.

Q.  Do you take any inhalers for your asthma?

A.  No.

Q.  OK.  And when you went to Woodbourne, were you evaluated by
the medical staff upon intake?

A.  No, I wasn't evaluated.  When you come in, they have you
sign a bunch of forms.  They give you a packet telling you what
day is sick call, and then they send you to your cell.  That's
how it goes.

Q.  OK.  And in May of 2022, did you not tell a provider that
you are a smoker?

N95Wall6                    Myriee - Cross

1    A.  Of course I'm a smoker.  I never denied it.  I smoke

2    cigarettes.

3    Q.  OK.  And in May of 2022, you indicated that you have as

4    many as 20 cigarettes a day?

5    A.  No.  Not 20 a day.  I don't smoke a pack a day.  I smoke a

6    pack every two days.  I smoke a pack every two days.

7    Q.  OK.

8    A.  That's not counting the cigarettes I give out, so it's not

9    a full pack, because I give out cigarettes.

10   Q.  OK.  And is it true that you were approved in June of 2022

11   to work in food service employment?

12   A.  I was approved?  That's not something I don't know about

13   because I don't work in food services.  In fact, I haven't had

14   a job since I've been here.  I've been unemployed, unprogrammed

15   since I've been incarcerated.

16   Q.  OK.  So --

17   A.  So I don't know about that.

18   Q.  You're unaware of Dr. Ruiz signing a slip saying that you

19   were approved to work in food service?

20   A.  Yeah, I'm unaware of that, because I never even worked in

21   food service.  So I'm definitely unaware of that.

22   Q.  In April of 2023, isn't it true that you told your

23   providers that you were going through opiate withdrawal?

24   A.  In when?  April of 2023?

25   Q.  Yes.

N95Wall6                        Myriee - Cross

A.   Yes.  That's when I missed my shot, I think, I believe.

Q.   And when you say you missed your shot, you missed your shot
of what?

A.   Sublocade.

Q.   And in May of 2023, isn't it true that you were switched
from buprenorphine to Sublocade?

A.   Sublocade -- Sublocade is the shot, yes.

Q.   OK.  And why were you switched at that time?

A.   That's how they do it.  That's how DOCCS do it.  They put
you on, they put you on, they put you on Suboxone strips -- or
not strips, the pills and then they switch you over to the
shot, to the Sublocade.

Q.   And you had been recommended for the MAT program in October
of 2022, correct?

A.   Correct.  I believe so.

Q.   But then in February of 2023, isn't it also true that you
refused a MAT treatment?

A.   Yes.  One time for the way they was treating me -- like an
animal -- yes.  I'm just saying if you're going to say what I
said, please -- because I wrote that on there also.  When I
signed that refusal, I said that I felt like I was being
treated like an animal.  The officers were being disrespectful
and, and, and treated us like we were garbage.  So yes, all of
that was on that refusal, so --

Q.   Sir, I --

N95Wall6                        Myriee - Cross

1   A.  All that's said too.

2   Q.  I appreciate your position.  I just would like it if I

3   asked you questions that you answer just the question that I'm

4   asking.  But I appreciate the information.

5   A.  Because I understand what you're saying, your Honor -- I

6   mean, ma'am, but you're not asking the correction, the question

7   the way that it's -- you're halfway asking it.

8   Q.  Are you currently taking Cymbalta?

9   A.  Yes.

10  Q.  And were you prescribed Cymbalta in June of 2022?

11  A.  June?  Yes.

12  Q.  And --

13  A.  I was actually -- I was actually given Cymbalta way before

14  June of '22.

15  Q.  When were you first prescribed Cymbalta?

16  A.  In my county jail.  Nassau County, in my -- Nassau County,

17  before I came to state prison.  So that was, like, the

18  beginning of '22, somewhere around there.

19  Q.  OK.  And I apologize if you've already answered this

20  question, but when you were at the Nassau County jail in 2022,

21  you were taking Cymbalta and what other medications?

22  A.  Tramadol -- I mean trazodone.  Trazodone, Percocet,

23  gabapentin, aspirin.  That's about it, I believe.

24  Q.  OK.  You were taking trazodone, Percocet, gabapentin,

25  aspirin and Cymbalta all at the same time while incarcerated at

1  Nassau County jail?

2  A.  Yes, ma'am.

3  Q.  OK.  And are you aware that Percocet is an opioid?

4  A.  Yes, I am.

5  Q.  And did you have any concerns that you were prescribed

6  Percocet in light of your history of heroin use?

7  A.  No.  I wasn't prescribed it because of that.  I was

8  prescribed it because of what I got, my pain that I go through.

9  Q.  Certainly, but were you at all concerned being prescribed

10  an opiate when you have a history of opiate abuse?

11  A.  No.  I just wanted that pain to end.  I didn't care about

12  none of that.  I just wanted my pain to go away.

13  Q.  You weren't concerned about potentially relapsing?

14  A.  No, I wasn't concerned about relapsing.  I'm incarcerated,

15  where I started actually using heroin.  So if I can -- you

16  know, like, the Department of Corrections is where I started

17  using heroin, where I ruined my life at.  So it's, like, I

18  definitely wasn't concerned.

19  Q.  OK.  And when you were in Nassau County jail, you were

20  prescribed Cymbalta.  Was that to treat your pain?

21  A.  Well, what happened is this.  I -- they said that Cymbalta

22  works for diabetic neuropathy also.  So they tried me -- to add

23  that in there.  My psych doctor added that in there.  My mental

24  health doctor.

25  Q.  OK.

```
 1  A.  OMH.  That wasn't prescribed -- that wasn't prescribed from
 2  my provider.  That was OMH.  Cymbalta and trazadone is
 3  prescribed by OMH.  It has nothing to do with my regular
 4  provider.
 5          THE COURT:  Sir, when you say OMH, you mean office of
 6  mental health.  Is that right, sir?
 7          THE WITNESS:  Yes, ma'am.
 8          THE COURT:  Thank you.
 9  BY MS. THOMAS:
10  Q.  Just to clarify, you had just testified that you were told
11  that Cymbalta worked to help with neuropathic pain, is that
12  correct?
13  A.  Yes.  That's what I was told, yes, but that's not why I was
14  prescribed in the county jail.
15  Q.  When you went from Nassau County jail to Ulster, did you
16  continue taking Cymbalta?
17  A.  Yes.
18  Q.  And then when you went from Ulster to Woodbourne, did you
19  continue taking Cymbalta?
20  A.  No, because Dr. Ruiz took me off.  They took me -- they
21  discontinued all of that.
22  Q.  So --
23  A.  So when I came --
24  Q.  I apologize.
25  A.  So when I came, OMH doctor, when I seen my OMH doctor, I
```

N95Wall6

1    expressed to him that -- he saw me walking.  He said:  Wow,

2    man.  You look like you in a lot of pain.

3        I said:  I am.  I said they don't prescribe me no

4    medication to help me.  They took my gabapentin away.  I said:

5    Is it possible you prescribe me Cymbalta so that I could get

6    some kind of relief?

7        And my OMH doctor provided me with Cymbalta to help me out,

8    yes, and that's not even his job.

9    Q.  OK.  I just want to clarify.  You entered Woodbourne

10   towards the end of May 2022, correct?

11   A.  Yes.

12   Q.  And then in June 2022, you were put back on Cymbalta,

13   correct?

14   A.  Yes.

15   Q.  OK.  And do you have any pain relief from taking the

16   Cymbalta?

17   A.  Slightly.  It's better than nothing.

18           MS. THOMAS:  OK.  Thank you.  I have no further

19   questions.

20           THE COURT:  Thank you.

21           Redirect, counsel.

22           MR. MORRISON:  Your Honor, I have no further questions

23   for Mr. Myriee.

24           THE COURT:  Thank you.

25           MR. MORRISON:  Thank you, Mr. Myriee.

N95Wall6

1          THE COURT:  Thank you.  Please thank the officers,

2     sir.

3          THE WITNESS:  Yes.  Thank you very much, ma'am, for

4     your time and your patience.  I'm sorry if I got a little

5     worked up, but thank you very much for your time.

6          THE COURT:  Yes, sir.  Thank you.

7          (Witness excused)

8          THE COURT:  Anyone else on deck?

9          MS. AGNEW:  No, your Honor.  We're at 4:45.  I think

10    we're going to fold.

11         THE COURT:  OK.

12         MS. AGNEW:  There's just one issue I'd like to address

13    with the Court.

14         THE COURT:  Certainly.

15         MS. AGNEW:  So, as the Court is aware, and obviously

16    our colleagues are as well, we ran all over the state to

17    accommodate their depositions.  I think we did a great job.  We

18    did have to cancel one because Mr. Morrison had a personal

19    issue that day, and it was of Robert Oleman, who is at Green

20    Haven.

21         Defendants have suggested they're going to object if

22    we call him because they did not have the opportunity to depose

23    him.  We certainly never said no.  They never asked us to

24    reschedule.  I'm not suggesting they did something wrong with

25    that.  But they didn't.  If the Court is not going to allow

N95Wall6

1   Mr. Oleman to testify due to their objection, I just want to

2   let him know because he's one of my UPD guys in a wheelchair.

3   I don't want him to sit there all day waiting to see if maybe,

4   maybe not.  So if we could resolve that issue, I would

5   appreciate it.

6          THE COURT:  OK.  Do you want to give me a little

7   background?

8          MS. AGNEW:  Sure.  Robert Oleman, as I mentioned, he

9   is one of the patients on the UPD.  He was examined by our

10   expert, who will testify tomorrow about him and 68 other guys.

11   He's certainly been known to defendants for a very long time.

12   They did -- I don't remember the day they scheduled it, but

13   Mr. Morrison had something he absolutely had to do.  It was not

14   something we take lightly or do lightly.  We were then -- and

15   they graciously consented.  So there was no animosity about the

16   issue.  They never asked to reschedule that deposition.  We

17   would have accommodated them certainly had we been able to, and

18   I just note for the record that when the Second Circuit entered

19   the administrative stay, they, in fact, wanted to cancel the

20   rest of the depositions.  And I said look, I think this is an

21   administrative stay, and if you do cancel them, we're going to

22   have to consider the waiver because this took us a whole lot of

23   time and effort.

24          Our position is that we should be able to call

25   Mr. Oleman.  If there's any way we can accommodate him

N95Wall6

otherwise, we're happy to do it.  His medical records are his

medical records, and I know they have had the opportunity to

speak to his provider because they have done a very good job of

doing that.

THE COURT:  Who wants to be heard?

Mr. Nolan.

MR. NOLAN:  We object to them calling Mr. Oleman.  We

had scheduled, I think, 21 depositions in one week, and we were

already constrained in how much we could ask most of these

witnesses because we had very, very little time and we had to

split them up four ways.  We had almost no time to prepare.  We

were doing this the week before the deposition.  I understand

counsel indicated that we wanted to cancel.  That was certainly

not what we wanted to do, but we offered the idea of do we want

to do this or not, and counsel pointed out that it may not be a

very long stay.  And we said OK, let's move forward.

As for --

THE COURT:  Let's move forward, and then what did we

do --

MR. NOLAN:  With all the other depositions.

THE COURT:  Right.

MR. NOLAN:  As for Oleman's deposition, frankly, there

was no other time that we could've taken it.  They canceled it.

They didn't ask to adjourn it.  They just told us it was

canceled; it was over.

N95Wall6

1          We didn't get to consent to that.  We had no choice.

2     We were told we're not doing it.  So from our perspective, we

3     have a witness we never were allowed to depose.  We have an

4     order saying that he was to be deposed, and we didn't get that

5     chance.  And we think it's unfair for them to call him now, you

6     know, when we didn't have that chance.

7          MS. AGNEW:  I would only suggest, your Honor, they

8     didn't ask us to reschedule, and we absolutely couldn't have

9     done it that day.  Had I been able to, everyone in this room

10    knows I would have been in my car and I would've made it

11    happen.  I was actually attending other depositions in the

12    state.  But certainly had they asked to reschedule, we would've

13    made that happen.

14         MR. NOLAN:  Your Honor, there was no time to

15    reschedule.  We were in the middle of August.  We were all --

16    we all had 30, 40 other cases.  There was no time, so -- and

17    they canceled it.  They never offered an actual excuse other

18    than Mr. Morrison had an emergency.  We don't know what that

19    was.  We're not saying that that's not true.  It did happen

20    around the exact same time that they were able to put in papers

21    about the Marcy visit, not that I'm saying that Mr. Morrison

22    necessarily worked on those.

23         THE COURT:  Are you really saying that he wasn't

24    telling the truth about a personal issue?  Are you really going

25    to make him tell me what it is?

N95Wall6

| | |
|---|---|
| 1 | MR. NOLAN:  There was nothing offered.  There was |
| 2 | nothing offered, your Honor.  Nothing.  It was just it was a |
| 3 | personal issue. |
| 4 | THE COURT:  Ms. Reporter, come to the sidebar. |
| 5 | Mr. Morrison, sidebar. |
| 6 | Not you. |
| 7 | MR. NOLAN:  Are you going to have an *ex parte* |
| 8 | conversation? |
| 9 | THE COURT:  No, I'm not.  I'm going to ask him what |
| 10 | his personal issues were. |
| 11 | MR. NOLAN:  So I can't be a part of that, your Honor? |
| 12 | THE COURT:  You'll find out. |
| 13 | MR. NOLAN:  I object. |
| 14 | THE COURT:  So you're telling me that you think he's |
| 15 | not telling you the truth about his personal situation. |
| 16 | MR. NOLAN:  I didn't say that.  I said they never |
| 17 | offered an explanation, and they canceled it. |
| 18 | THE COURT:  May I ask you something.  When an opponent |
| 19 | says I have a personal issue that I can't appear, do you make |
| 20 | the opponent tell you the issue? |
| 21 | MR. NOLAN:  Your Honor, I'm just saying we never got |
| 22 | an explanation, and they canceled it.  And now I'm being |
| 23 | blamed.  They didn't adjourn it.  They didn't say when are you |
| 24 | available?  They just said it's over.  We're not doing it. |
| 25 | When you cancel a deposition, that means it's over. |

N95Wall6

1   They didn't say can we do it on a different date?  They didn't

2   offer a different time.  They didn't ask, let's go get an order

3   from the judge to re-produce him and have all DOCCS do this

4   again.  They never asked for any of that.

5              THE COURT:  Stop talking and come on up here.

6              (Continued on next page)

N95Wall6

1            (At sidebar)

2            THE COURT:  Why were you unable to appear on that

3    date?

4            MR. MORRISON:  My wife had to be in the hospital.

5            MR. NOLAN:  Could have just told us.

6            THE COURT:  Do you have any questions?

7            MR. NOLAN:  No, not if his wife's in the hospital.

8            THE COURT:  All right.

9            MR. NOLAN:  I still don't think that --

10           THE COURT:  We are now going on the record in the open

11   courtroom.

12           MR. MORRISON:  Thank you.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

N95Wall6

1          (In open court)

2          THE COURT:  Let me ask you this.  Ms. Agnew said that

3     everyone is familiar with this individual.  How do I know that?

4          MS. AGNEW:  By individual, ma'am, do you mean

5     Mr. Oleman?

6          THE COURT:  Yes.

7          MS. AGNEW:  Yes.  My point is that he's been part of

8     this case since inception.  Both experts studied his records.

9     Everyone's had his medical records the whole time.  We did just

10    get an update from defendant Moores' counsel, and we appreciate

11    that, because it's been a while.  My point is that this isn't

12    one of these guys we plucked out here right before this

13    proceeding that they didn't know about before, and that is why

14    we allowed the depositions to go forward despite the late date.

15    My only point is Mr. Oleman's been here forever.

16          THE COURT:  Anything else, Mr. Nolan?

17          MR. NOLAN:  Nothing further, your Honor.

18          THE COURT:  All right.  I'll allow the individual to

19    appear.

20          Mr. Nolan, if you want an opportunity to consult, let

21    me know.

22          MR. NOLAN:  Thank you.

23          THE COURT:  What else, friends?

24          MS. AGNEW:  That's all from plaintiffs.  And I would

25    just thank the Court, first of all, for all your patience

N95Wall6

1    today, for helping.  Tomorrow everyone will be live, so we'll

2    get a break from the video, and we will try to do our best to

3    orchestrate Thursday, which will be video prisoners again.

4              Do we want to do a time count as to where we are?  We

5    have been keeping time.

6              THE COURT:  Would you read it out, Ms. Phillips,

7    please.

8              THE DEPUTY CLERK:  Plaintiffs have 11 hours, 46

9    minutes and 15 seconds.  And defendants have 12 hours, 48

10   minutes and 48 seconds.

11             MS. AGNEW:  OK.  Thank you very much.

12             THE COURT:  Anything else?

13             Thank you, folks.

14             (Adjourned to September 6, 2023, at 9:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                    INDEX OF EXAMINATION

2   Examination of:                              Page

3   TINA VIVENZIO

4   Direct By Ms. Agnew  . . . . . . . . . . . . 9

5   Cross By Ms. Thomas  . . . . . . . . . . . .23

6   Redirect By Ms. Agnew  . . . . . . . . . . .34

7   JAMES PINE

8   Direct By Mr. Jones  . . . . . . . . . . . .36

9   Cross By Ms. Kiley . . . . . . . . . . . . .51

10  Redirect By Mr. Morrison . . . . . . . . . .55

11   ERIC LINDEMANN

12  Direct By Mr. Morrison . . . . . . . . . . .62

13  Cross By Mr. Nolan . . . . . . . . . . . . .80

14  Redirect By Mr. Morrison . . . . . . . . . .98

15  Recross By Mr. Nolan . . . . . . . . . . . 100

16  MARK DANIELS

17  Direct By Mr. Morrison . . . . . . . . . . 101

18  Cross By Ms. Thomas  . . . . . . . . . . . 114

19  Redirect By Mr. Morrison . . . . . . . . . 124

20   RICHARD VASQUEZ

21  Direct By Ms. Agnew  . . . . . . . . . . . 128

22  Cross By Ms. Levine  . . . . . . . . . . . 144

23  Redirect By Ms. Agnew  . . . . . . . . . . 167

24  RAFAEL MONTANEZ

25  Direct By Ms. Agnew  . . . . . . . . . . . 168
</pre>

Cross By Ms. Levine   . . . . . . . . . . . . 177

Redirect By Ms. Agnew   . . . . . . . . . . . 185

RAMAL MYRIEE

Direct By Mr. Morrison . . . . . . . . . . . 188

Cross By Ms. Thomas   . . . . . . . . . . . . 209