1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PETER ALLEN, *et al.*,

4                    Plaintiffs,

5          v.                              19 Civ. 8173 (LAP)

6   CARL KOENIGSMANN, *et al.*,

7                    Defendants.
                                           Trial
8   ------------------------------x
                                           New York, N.Y.
9                                          September 6, 2023
                                           9:00 a.m.
10
    Before:
11
                         HON. LORETTA A. PRESKA,
12
                                           District Judge
13

14                            APPEARANCES

15  AMY J. AGNEW
    JOSHUA L. MORRISON
16  VERONICA JOSIAH-ARYEH
         Attorneys for Plaintiffs
17
    WHITEMAN OSTERMAN & HANNA LLP
18       Attorneys for Defendant Moores
    BY:  WILLIAM S. NOLAN
19       ORIANA L. KILEY
         GABRIELLA R. LEVINE
20       JENNIFER M. THOMAS

21

22  Also Present:  Baron Jones, Law Student Clerk

23

24

25

N96Ball1                        Carinci- Direct

1              (Trial resumed)

2              THE COURT:  Good morning, who do we have?

3              MS. AGNEW:  Good morning, your Honor.  Plaintiff class

4    would like to call Dr. Adam Carinci.

5    ADAM JOHN CARINCI,

6         called as a witness by the Plaintiffs,

7         having been duly sworn, testified as follows:

8              THE DEPUTY CLERK:  Please state and spell your name

9    for the record.

10             THE WITNESS:  My name is Adam John Carinci,

11   C-A-R-I-N-C-I.

12             THE COURT:  Ms. Agnew.

13   DIRECT EXAMINATION

14   BY MS. AGNEW:

15   Q.  Good morning, Dr. Carinci.

16   A.  Good morning.

17   Q.  Why are you here today?

18   A.  I'm here to testify in this trial with regards to 70

19   essential inmates that are claiming mistreatment with regards

20   to medications with potential abuse potential.

21   Q.  Could you go through your educational background for the

22   Court.  You don't have to give us all your grades.  We just

23   want to know where you went to school.  Let's start with

24   undergraduate education, please.

25   A.  So undergraduate is at Pace University.  I did a

N96Ball1                          Carinci- Direct

1   biochemistry degree.  I then moved into medical school at Johns

2   Hopkins University School of medicine.  This was followed by

3   residency in anesthesiology, critical care and pain management

4   also at Johns Hopkins hospital.

5           My final year of training was at Massachusetts General

6   Hospital and Harvard Medical School with a fellowship in pain

7   management.

8   Q.  Okay.  And during the course of your education or at any

9   time thereafter did you hold any teaching positions?

10  A.  Yes.  So when I finished my fellowship, I stayed on faculty

11  at Harvard Medical School at Mass General hospital.  I was an

12  assistant professor there.  I had responsibilities for teaching

13  medical students as well as interns, residents and pain

14  management fellows for approximately seven years while I was on

15  staff there.

16          I then in my current role at University of Rochester

17  Medical Center I have similar responsibilities.  I'm an

18  associate professor of anesthesiology and pain management.  I

19  also teach medical students, residents and fellows.

20  Q.  When you were teaching at Harvard Medical School, sir, did

21  you give any lectures?

22          Did you publish?

23  A.  Yes, I gave many lectures on a monthly basis, so these were

24  ongoing lectures with regards to various aspects of pain

25  management.  I also did publish book chapters as well as

several articles in pain management journals throughout that

time.

Q.  Can you tell me, sir, just for those in the room who may

not know, I think you mentioned training in anesthesiology and

in pain medicine, are those two separate disciplines?

A.  Yes.  So anesthesia is my primary board certification, and

that is a general grounding in aspects of pain management.

        But in terms of specialization, in terms of being able

to practice the area, the specialty of pain management, one

would have to pursue a fellowship, which is an additional year

of training that is very specific and focused on the area of

pain management.

Q.  And I want to be clear because I don't always understand

the distinction.  When I think of an anesthesiologist, I think

of the doctor who's in the operating room.

        Is that what you do, sir, in your daily practice, you

go into operating rooms and put people under?

A.  No.  In the early parts of my career, that was something I

did.  Now I'm engaged entirely in the practice of pain

management, which is essentially outpatient, pain management,

dealing with medication, prescriptions, interventional

procedures, essentially just dealing with the area of pain

management, and not at all dealing with operating room

anesthesia as you're referring to.

Q.  And so as at this point in your life, for how many years

N96Ball1                        Carinci- Direct

1   have you been treating patients in pain management?

2   A.  I finished my fellowship in 2009, so since then

3   continuously.

4   Q.  In what states do you hold medical licenses currently?

5   A.  Now just New York.

6   Q.  Where did you previously hold medical licenses?

7   A.  Massachusetts, Louisiana and New York.  I've since let

8   Massachusetts and Louisiana -- I just didn't renew them.  I let

9   them lapse.

10  Q.  Have you ever had any blemishes on your medical licenses?

11  A.  No.

12  Q.  To your knowledge has anyone ever complained to any medical

13  review boards or professional associations about your practice?

14  A.  No.

15  Q.  Can you tell me, Dr. Carinci, over your career

16  approximately how many patients have you seen and treated --

17  and I'm not asking for a concise number -- in the area of pain

18  management?

19  A.  Well-over 10,000 patients.

20          MS. AGNEW:  Your Honor, the plaintiff class moves to

21  qualify Dr. Adam Carinci as an expert in pain management.

22          MR. NOLAN:  No objection, your Honor.

23          THE COURT:  He is so qualified.

24  Q.  Dr. Carinci, for this case, can you tell me what's your

25  understanding of why we hired you?

A.   I was hired for two primary reasons.  The first was to

review MWAP policy and how it was instituted in regards to the

named plaintiffs in this case, and to ascertain whether that

was consistent with the standard of care.

          The second area was to review the reassessment process

to determine whether that was done appropriately and consistent

with best practice.

Q.   And when you talk about looking at the MWAP policy, I think

you just said the named plaintiffs, but was your study isolated

to the 18 named plaintiffs?

A.   No.

Q.   First of all, let's just start, did you publish a report of

your findings in this case?

A.   Yes.

Q.   And so what I'd like to do is talk about the things that

you examined before you wrote your report in order to come to

the conclusions that you did.

A.   Okay.  Beginning with the medical records was the primary

evaluation.  So given the voluminous amount of records in this

case, I had asked that your firm provide summaries of the

patients, which I could then use as a 10,000-foot view or

springboard to really delve into the substance of each

patient's record.

          And from there, I reviewed MWAP forms, the medical

records, and really the entirety of their chart to come to my

conclusions.

Q.   When you say you reviewed the entirety of their chart,

isn't it true we created, meaning my office, subsets of the

medical records for you at your direction?

A.   Yes.  So, again, when I was asking to engage in this, I

understood there was a timeframe that was of the essence given

that there was some number of patients that were being harmed

potentially and that time was of the essence in putting this

together.

        And so to make my time and my ability to actually

process through the records, I had asked that -- again, there

were certain particular areas that I wanted to look closer at

again with that 10,000-foot view.  And if you could provide

that to me and then also references to the underlying medical

records so that would be fruitful to me in being able to

effectively process it.

        And I'll just open my report if you don't mind to

again review those particular areas.

Q.   We just want you to refresh your recollection, but not read

your report, sir, okay.

A.   Yes. Just as a matter of reference, page nine, there were

nine things --

Q.   Let's stop, Dr. Carinci.

        MS. AGNEW:  Mr. Manly, to your right is a set for the

judge.

1          THE COURT:  Thank you so much.

2     Q.  Please continue, Dr. Carinci.

3     A.  Just to be more specific about what I had asked you, again,

4     there were nine particular things that I wanted you to focus

5     on, and I'm happy to read those if you'd like me to, but really

6     they're on page nine, patient file review, subsection A, nature

7     of the files reviewed.

8          So there were these multiple areas that I really

9     wanted to delve into in order to answer the questions I was

10    asked to be answered.

11    Q.  To assess kind of the history of pain management, why were

12    those particular records necessary for you to look at?

13    A.  I understood early-on that the critical aspect of this were

14    with regard to medication with potential abuse, and whether

15    these patients were inappropriately discontinued on their

16    medication and was their medical rationale for doing so.

17         In order to really be able to answer that question, I

18    had to dig through information about, for instance, any issues

19    with drug abuse, any history of what was their primary

20    diagnosis while they were there, what type of diagnostic

21    testing had been established for instance, what type of

22    medications were they on and was there any indication that

23    those medications were successful in improving pain and

24    improving function.

25         Were there any specialist consultations and

1    recommendations thereof.  Importantly, I wanted to know about

2    the MWAP request forms and were those available for the

3    particular patients, and so on and so forth, really just

4    delving into a broad view of the patient's history, and then

5    with the ability to dig deep to formulate my own conclusions

6    about that.

7    Q.  Can you explain to the Court your understanding of what an

8    MWAP request form is in the context of this case?

9    A.  So the patients were being treated –- I'll refer to it like

10   the first level provider or the primary provider within the

11   system that would determine whether they were a candidate for

12   one of these medications.

13        So medications with abuse potential is or was a list

14   of medications that were deemed to have potential abuse

15   liability, and it ranged from things like gabapentin up to

16   things like opioid, such as percocet and hydrocodone, and

17   various sort of things within.

18        And the MWAP request form was completed by this first

19   level provider if they were examining the patient and they

20   thought the patient was a candidate for one of these

21   medications.  They would complete one of these forms.

22        And it was my understanding that that form would then

23   circle up to what was called the regional medical director who

24   would essentially be able to give a thumbs up or thumbs down, a

25   yes or no, with regards to that medication.

1   Q.  When you were working on your report, did you review all of

2   the MWAP request forms?

3   A.  No.  There was at minimum it seemed over 10,000 of these

4   MWAP request forms.  So again, in order to make my time

5   fruitful and to be able to efficiently process through the

6   volume of information, I again asked your office to put that

7   information into a much more easily read format in a summary

8   essentially of those forms.

9          So that I could again get a general sense for what was

10  the outcome of those requests, again in a general sense, and

11  then be able to take a very deep dive when needed and wanted on

12  particular patients.

13  Q.  Can you tell me when you were looking at medical records

14  and the summaries we created, did you rely on my office's

15  summaries?

16  A.  No, not at all.

17  Q.  How did you use the summaries?

18         And I apologize.  You explained a little bit, but I

19  want the record to be extremely clear as to how those summaries

20  were used by you?

21  A.  Again, I think if we just take a step back, I been trying

22  to answer the questions that we've talked about.  There was at

23  least 225,000 pages of medical records here that we're dealing

24  with.

25         So I asked you to put together a brief summary of each

1    of these patients with references to the underlying medical

2    records.  And I didn't ask for any interpretation.  I just ask

3    for raw factual data with regards to pertinent dates,

4    medication names and general history of the patient.

5            From there, I would read that summary to just garner a

6    really high level what I would call a 10,000-foot view of

7    patient X.  From there, I would then delve into the underlying

8    medical records to synthesize that information and formulate my

9    own opinion.  So your summaries were again simply factual

10   information that I checked against the medical records, but did

11   not rely on in formulating my opinions.

12   Q.  When you looked at these summaries and in certain instances

13   contrasted them with the medical records, were the summaries

14   perfect?

15   A.  No.

16   Q.  And did you at any time believe that the summaries were

17   being created by medical professionals?

18   A.  No.

19   Q.  So other than the medical records in the MWAP request

20   forms, what other sources of evidence did you use before you

21   drafted your report?

22   A.  Well, for 17 of these individuals, I personally examined

23   them.  So on several dates I went out to the facilities where

24   some were located and interviewed them, performed an

25   examination of them, spoke with them, had access to their

1   medical records, both before and during.

2              And so that was also a significant portion of my

3   understanding that garnered additional information from that.

4   Q.  Dr. Carinci, why didn't you go and physically examine each

5   one of the patients that you speak about in your report?

6   A.  I think first off I didn't specifically request to see any

7   one particular individual or all of them.  I was available to

8   review whoever was available to be seen on those dates.

9              And I think you worked with the defense in determining

10  who was available to be seen, what was the time which we could

11  accomplish this.

12             And I think also importantly, this was during the sort

13  of early days of Covid and there was a lot of restrictions at

14  these facilities about who could enter and for what purpose.

15  And so I think the logistical barriers were quite enormous even

16  to accomplish this evaluation of 17 of them, let alone all of

17  them.

18  Q.  And I just want to walk through generally what your

19  encounter was like and how you conducted it with any one of the

20  17 who you did physically examine?

21  A.  I'm sorry. Could you ask me again what is it you're looking

22  for specifically.

23  Q.  I'd like you to explain to the Court in one of these

24  encounters where you went into a facility and examined a

25  patient, what steps did you take?  What did the encounter look

1    like?

2            I'm looking for, did you do it as you might have done

3    for any patient in your own office?

4    A.   Yes.  To the extent possible, I essentially simulated how I

5    would examine and determine the course of treatment for a

6    patient who would come to see me in my own clinic in the

7    community.

8            And so I brought a reflex hammer, ability to test

9    strength and sensation.  I performed a subjective interview

10   with the patient, kind of going in with knowledge of their

11   history already from their medical records.  And so getting a

12   subjective sense of their pain, how they're describing their

13   pain, their location, the severity, importantly functional

14   measures of what they're able to do, again from a subjective

15   standpoint.

16           From there I moved into objective evaluations, which

17   are what I would consider a musculoskeletal and neurological

18   exam, which would be no different than I would perform with

19   again a patient that was seeing me in the community. So I'd be

20   looking at muscle strength, sensation, reflexes, range of

21   motion, tenderness, any sort of dysfunction of muscle atrophy.

22   Those would be the various things I would look at.

23           From there I would then move into my assessment of the

24   patient, having an understanding of what medications they're

25   currently on, what medications they were on in the past; where

N96Ball1                        Carinci- Direct

1  is their function relative to memory in the past or current;

2  and then formulating a plan forward in terms of medications

3  that worked and where we could go in the future from an

4  assessment.

5  Q.  Did you speak with the patients when you met with them to

6  examine them?

7  A.  Yes.

8  Q.  What were you looking for when you spoke to those patients?

9  A.  I think in general I want to know their again subjective

10  and objective findings.

11       So from a subjective standpoint, I simply want to

12  know, hey, what is your pain score at rest, what is your pain

13  score with functional movements.  And so when we talk about a

14  pain score, we're really talking about a range of zero to ten

15  is a very simple one.  Zero is no pain.  Ten is the most severe

16  pain, and just getting a sense of where they sort of

17  self-assess on that scale.

18       Pain location.  I would want to know then the etiology

19  of the pain, so what type of data was available for me to

20  corroborate their systematology.  And so I'm not -- I think any

21  physician in my specialty doesn't just accept what the patient

22  says at face value.  We're looking to corroborate their

23  subjective complaints with objective findings.  And so that

24  really was always the goal to corroborate what they're telling

25  me subjectively that I'm having X, Y and Z problem, with the

1   objective data.  And so that's really the role that I'm playing

2   there.

3   Q.  Before we get into the heart of your report and your

4   conclusions, can you tell me were there any patients you

5   examined who you felt did not need to be included in the

6   report; and if so, why?

7   A.  Yes.  There were two patients that I thought did not

8   have -- they did not meet the criteria for medication with

9   abuse potential.  And that was Mr. Ernest Iverson and Mr. Jose

10  Torres were two of those.

11          And it really came down to I guess in the simplest

12  way, their subjective complaints were not corroborated by

13  objective data.

14  Q.  And so then why did you determine not to include them in

15  your report?

16          Were you trying to skew your data?  Were you trying to

17  skew your results?

18  A.  No, it wasn't a means of trying to skew data.  The point of

19  this exercise really was to determine who was a candidate for

20  medications with abuse potential, and was that policy as

21  applied to them done in a manner that was consistent with the

22  standard of care.

23          And so if someone was not a candidate in my opinion

24  for those medications with abuse potential, then they really --

25  it was really irrelevant whether the MWAP was applied to them

1  in a manner that was consistent with the standard of care

2  because we were really looking to see who was actually wronged

3  in this scenario.

4  Q.  And can you tell me, Dr. Carinci, before you started

5  drafting your report, did you rely on any assumptions?

6  A.  Yes, I did rely on several assumptions which I outlined in

7  page two of my report.  I'm happy to go through those with you

8  if you'd like, or I'll just leave it at that.  I did outline my

9  assumptions on page two.

10 Q.  Why don't you just run through and summarize them briefly

11 for the Court, and then let's talk about the importance of

12 these assumptions or why you felt it was necessary to include

13 them in the report, okay.

14         MR. NOLAN:  One quick objection.  It's not really an

15 objection, bug if he's going to be reviewing the report in this

16 detail rather than just refreshing recollection, should we

17 enter it into evidence.

18         MS. AGNEW:  I'm happy to enter into evidence, your

19 Honor.

20         THE COURT:  What do you want to call it?

21         MR. NOLAN:  Just to be clear, it's just the text of

22 the report, not the underlying --

23         MS. AGNEW:  Sure. Your Honor, in your bound copy it's

24 going to be the actual report itself is up to Exhibit 1, so

25 that will be pages 1 through 47.  We're going to call that

1   P137, and let me quickly lay the foundation.

2   Q.  Dr. Carinci, what I have not marked, but have just said

3   will be Plaintiff's P137 is in that bound copy in front of you

4   of pages 1 through 47.

5           Sir, do you know what that document is?

6   A.  Yes.

7   Q.  What do you know that document to be?

8   A.  This is my expert report.

9   Q.  And, sir, did you draft that document?

10  A.  Yes, I did.

11  Q.  And did you draft that document after you examined and

12  studied the evidence that you've explained to the Court here

13  today?

14  A.  Yes.

15  Q.  And, sir, is that your signature on the last page of the

16  report?

17  A.  Yes.

18  Q.  Did anyone else write this report?

19  A.  No.

20          MS. AGNEW:  Your Honor, I'd like to enter into

21  evidence Plaintiff's 137 which is the expert report of Dr. Adam

22  Carinci.

23          MR. NOLAN:  No objection.

24          THE COURT:  Received.

25          (Plaintiff's Exhibit 137 received in evidence)

BY MS. AGNEW:

Q.  If you could just run through the assumptions. We don't need to go into terrible detail, but we do want to understand.

A.  Certainly.  So the first assumption is this MWAP policy was really put forth on June 1, 2017.  That was the date on the policy itself.

It was also clear though as I was reviewing these records that a lot of this treatment had preceded that date, and a lot of the medication discontinuation had preceded that date by many years.  So I just wanted to indicate my assumption that this looks like this process had been sort of going on for some period of time.

My second assumption is that really in order to get one of these medications that there had to be a form, an MWAP request form that was filled out, and that it was circled up to the regional medical director for ultimate approval on that.  I outlined who those folks were in the records that I reviewed.

I also assumed that in some instances the chief medical officer were able to review those forms as well, just really who was the decision maker with regards to the ultimate decision about terminating medication or issuing medication.

I made an assumption with regards to reassessment, which was the process undertaken by DOCCS in the fall of 2020, where providers were filling out these chronic pain and MWAP reassessment forms, that they were really only instructed to

1   view one year of the patient's medical records at the time they

2   were doing it.

3           I assumed that patients in DOCCS's custody could not

4   arrange their own specialty visits.  I also assumed that those

5   FHS1 entries that I reviewed were not in the chart, and they

6   were maintained in a separate database.

7           I assumed that in most instances the RMDs did not have

8   access to the patients' charts, only that FHS1 system, and

9   really those were my main assumptions.

10  Q.  Why do you disclose assumptions in an expert report?

11  A.  Well, I think I want to set the stage for my background and

12  understanding as I put the report together, sort of where I was

13  coming from.

14          I think it's always important when you're evaluating

15  data to provide the assumptions as you're interpreting that

16  data so that we're all on the same page.

17  Q.  So I'd now like to turn to your opinions.  Let's do this.

18  Why don't we start with the standard of care just cause I think

19  it lays a nice landscape for then your opinions and conclusion.

20          Could you please explain to the Court your expert

21  opinion of the standard of care for the treatment of chronic

22  pain?

23  A.  I'm sorry.  I was just flipping through the report.  Can

24  you ask the question again.

25  Q.  I can.  Can you explain to the Court in your expert opinion

1   what is the standard of care for the treatment of chronic pain?

2   A.  Well, the standard of care is what would a reasonably

3   prudent physician do under the same or similar circumstances.

4   Q.  Can you expound on that?

5   A.  Well, certainly.  I think if we're talking about, I think

6   to be more specific with this case, we're talking about

7   individualized patient assessment is critical to the standard

8   of care, particularly with the practice of pain management.

9            No two patients are the same.  And importantly when

10  we're talking about medications, no two patients will respond

11  in the same way to a given medication, and they may have

12  different outcomes.  They may have different side effects.

13           And so I think the practice of pain management is one

14  where individual patient assessment is really paramount to

15  effective treatment.  And that I think is really the basis of

16  the standard of care here when we're taking about the practice

17  of pain management.

18           THE COURT:  Doctor, can I ask you to slide in a little

19  closer to that microphone, please.

20           THE WITNESS:  Yes.

21  Q.  And that term I think you just mentioned twice,

22  "individualized assessment," did you make that up?

23  A.  No.  I mean this is generally what we speak about in pain

24  management.  As early as my training I can remember speaking

25  about individual patient assessment being critical, even as far

1    back as medical school.

2    Q.  Can you tell me, sir, does -- I think you mentioned it, but

3    let's pretend we have two patients that suffer from the same

4    basic diagnoses, are you going to prescribe the same treatment

5    plan for those two patients?

6    A.  No.  And again it comes back to individual patient

7    parameters.  So as we all age, we all develop different medical

8    comorbidities or medical conditions.

9         On top of that, we may have different medications that

10   we're already taking that may be contraindications to certain

11   prescribed medications.  So two patients may have the same pain

12   problem; for instance, but have very different underlying let's

13   say substrate, which would be important in determining what

14   medication to pursue.

15        So they may have medical comorbidities that would

16   preclude certain medications.  They may also have medications

17   that they're taking which would have drug-drug interactions.

18   And then on top of that, there is an area of medicine called

19   pharmacogenetics where just genetic, we're all different

20   genetically.  We metabolize and respond to medications

21   differently, so you simply cannot treat every patient the same

22   just based on the type of pain condition they're presenting

23   with

24   Q.  And could a treatment that worked for a patient in any

25   given year, would that always work for that patient in every

N96Ball1                         Carinci- Direct

1  instance?

2  A.   No.   I think things -- it's dynamic.   It's a dynamic

3  process, and that's why follow-up visits, regular checkup

4  visits are important in my specialty.

5        In particular, people can develop tolerance to certain

6  medications where certain doses are no longer effective, and we

7  do need to titrate the medication or increase the dose to

8  respond to that tolerance.

9        In other instances, patients may over time develop

10  other medical conditions that would -- for instance, a very

11  common one is kidney failure or kidney disease that would

12  prevent the metabolism of the medication and potentially could

13  be harmful if you maintained them on the same dose or if you

14  continue that same medication.

15        And just to kind of bring it back in a more succinct

16  manner -- and I don't mean to be so long-winded.   My point is,

17  pain management is an area where it is critical to look at the

18  patients at individuals for the reasons I outlined; otherwise

19  you're going to end up with ineffective care, and at worst

20  potentially harmful care.

21  Q.   What about documentation of a patient's medical history,

22  where does that lie within the standard of care?

23  A.   Yes.   I mean certainly I would say right next in line after

24  individualized assessment and documentation is critical.   Not

25  only for your own knowledge about the patient, but if the

N96Ball1                           Carinci- Direct

1    patient should be seen by another provider or out-of-state

2    provider or be transferred to a facility or a hospital, if your

3    documentation is poor, the next person treating the patient is

4    going to be at a significant disadvantage for treating the

5    patient appropriately and potentially at risk for harmful

6    treatment simply because they didn't know the critical elements

7    of that patient's history.

8           And so documentation is really the essential

9    ingredient in the standard of care because without it, you're

10   operating in a vacuum and that is potentially harmful.

11   Q.  And did you find anything about the documentation of the

12   medical history of these patients that you believed deviated

13   from the standard of care?

14   A.  Well, yes.  I think there was a number of issues with

15   regards to the documentation.  I think importantly a lot of

16   their record is just handwritten notes, and I think we can all

17   understand the nature of handwritten notes that could

18   potentially lead to confusion, illegibility.  Someone, the next

19   person, may not understand what was written there.  Paper

20   charts can be lot, pages can be missing.  So I think that's one

21   issue, is the nature of a handwritten note is prone to error.

22          On top of that is, in this case, what I noted as a

23   sort of unfortunate theme is that some of these claimants would

24   rotate from one facility to the next for whatever reason.  They

25   would be transferred from facility A to facility B.

1          And when they got to facility B, either some or none
2     of the medical record would go with the patient.  And so the
3     next provider in line would, as I mentioned earlier, would be
4     starting from scratch again, where they don't know the history.
5     They don't know the diagnoses, importantly they don't know what
6     medications or doses that the patient was on; or that
7     importantly, again in this case, what had been tried and failed
8     before.

9          And so it really just created a nostrum f confusion,
10    and I think led to those issues that I outline in the report.

11         MR. NOLAN:  Your Honor, I just want to preserve an
12    objection for the record.  To the extent that Dr. Carinci is
13    testifying to anything outside the scope of his report, we
14    would move to strike that.  I believe some of what he just said
15    about the transfers was not in his report, but I'm not going to
16    make him go through it now.

17         MS. AGNEW:  We are discussing the documentation
18    section of his report, your Honor.  And sitting here right now,
19    I don't know if it talks about the transfers, but I could
20    certainly discuss that more in depth with Dr. Carinci because
21    appended to his report were 25,000 pages of medical records.

22         THE COURT:  I'm not sure what you're asking me to do
23    at this moment, Mr. Nolan.

24         MR. NOLAN:  I guess it would be reasonable to preclude
25    any testimony that goes outside the scope of his report.

N96Ball1                          Carinci- Direct

1           THE COURT:  I'm not sure that this does.

2           MR. NOLAN:  There's nothing in this report that I can

3      see that talks about transfers from one medical facility to

4      another, and he just talked about that.

5           THE COURT:  My recollection -- and I don't purport to

6      have memorized all of this, but my recollection is that some of

7      the individuals who are discussed in the report did speak about

8      transfers from one facility to another.

9           MR. NOLAN:  Right.  But this report is dated March 5,

10      2022, and the individuals who talked about transports weren't

11      talking about the time period before March 5, 2022, that we

12      know of.

13           THE COURT:  I'm not sure it has to be a transport that

14      was discussed in the report or was at the time.  I believe the

15      testimony the doctor just gave was generalized testimony

16      applicable to most situations.

17           MR. NOLAN:  Again, it's outside the scope of his

18      report.  If he's going to give --

19           THE COURT:  Are you moving to strike it or not?

20           MR. NOLAN:  Yes.

21           THE COURT:  Denied.

22           MR. NOLAN:  Thanks.

23      BY MS. AGNEW:

24      Q.  Dr. Carinci, so beyond the medical records when we talk

25      about the standard of care, what about the assessment of the

1  patient itself as recorded in medical records?

2  A.  Yes. Assessment goes back to documenting subjective and

3  objective findings.  And again when we're talking about an

4  evaluation of the patient, we're talking about an in-person

5  examination with a -- again to be specific with our are of

6  specialty here, a musculoskeletal and neurological examination.

7         On top of that when we're talking about the practice

8  of pain management and understanding, is a medication effective

9  for someone, we want to be able to document what they're pain

10  score is, what their function is, any side effects.  We want to

11  be able to talk about the location of the pain, exacerbating or

12  relieving factors.

13         And all of these things are -- they're sort of

14  interrelated.  There's the individual assessment, and then

15  there's the documentation piece.  And then there's an actual

16  medical record that consistent and moves forward in time with

17  the patient as not having to be recreated at each visit.  All

18  of these are interrelated in terms of the standard of care in

19  actually examining the patient.

20         If you were going to be examined by a physician, you

21  would want the same level of rigor that you're not having to

22  recreate the same story over and over again.

23  Q.  And what was your general impression reviewing the medical

24  records that you studied of the quality of the assessments as

25  reflected in the records?

N96Ball1                    Carinci- Direct

1    A.  Generally the assessments I would say were poor.

2    Q.  And why is that, sir?

3    A.  They were often very superficial.  They often did not

4    integrate the subjective and objective findings.  There was no

5    evidence that there often times was any sort of physical exam

6    performed to corroborate the subjective and objective

7    complaints.

8            And for those reasons, I would consider that to be a

9    poor assessment.

10   Q.  Let's talk about in the standard of care for the treatment

11   of patients with chronic pain management issues, the importance

12   or irrelevance of substance abuse history?

13   A.  Certainly that's an important factor.  The human condition,

14   people will unfortunately abuse anything really that they can

15   get their hands on sometimes.

16           And so knowing that there are certain medications that

17   have a predisposition to abuse is important.  Also consistent

18   with that is knowing the patient's history, did they have a

19   personal history of abuse of substances, whether illicit or

20   prescription; is there a family history.  Those are risk

21   factors.  Because ultimately, again, we don't want to create

22   another problem on top of trying to solve one problem, which is

23   pain, and then create another problem which is fueling and

24   addiction process.  So absolutely we would want to know that.

25   It is important.

1          On the other hand, a remote history of abuse is not an

2    absolute contraindication to prescribing medications with abuse

3    potential.  And people with a history of abuse are routinely

4    prescribed medications with abuse potential, and I do that in

5    my own practice.  I think importantly though, there's a level

6    of monitoring that may need to be more aggressive in those

7    instances.  Where, like in the outpatient world, for instance,

8    we may not want to give a month prescription at a time.

9          We may see them more closely, perhaps every week or

10   every two weeks while we're titrating the medication to ensure

11   that, again, the patient is staying compliant on the regimen;

12   that there's no issues.  That, again, we're not creating harm.

13         Just to be more succinct on this, yes, it's a very

14   important parameter when we are considering prescribing a

15   medication with abuse potential, but it is not an absolute

16   contraindication to doing so.

17   Q.  And you used the term "remote," and I just want to ask you,

18   is there some kind of bright line about how remote a substance

19   abuse history has to be, how close in time where it becomes

20   preclusive?

21   A.  Well, let me say this -- and I'm not someone who prescribes

22   like substances with abuse potential for someone who has an

23   active addiction process.

24         If I knew that the patient in front of me had an

25   active addiction to opioids, I think it would be very

1    problematic and really concerning to provide ongoing opioids to

2    that patient.  But an active addiction is very different than a

3    history of remote addiction.  And remote really can be anything

4    other than an ongoing active addiction.

5         So, yes, once you have a history of addiction, you're

6    always at risk for potentially doing it again; but with close

7    monitoring and supervision, many of these patients can

8    consistently stay on these medications in a safe manner.

9    Q.  I want to ask you are about -- you are a specialist,

10   correct, sir?

11   A.  Yes.

12   Q.  And you provide what we would call general medical care to

13   patients, like my family practitioner?

14   A.  No.

15   Q.  When you looked through these records, could you tell the

16   Court what you perceive to be the role of this specialist?

17   A.  Well, the specialist's job is to often times answer a very

18   specific question about a subset of the patient's medical

19   history.

20        So, for instance, I'll just be specific with my

21   specialty.  I receive referrals from both primary care doctors

22   like you're referring to, and from other specialists outside of

23   my area of specialty, so say an orthopedic surgeon.

24        And the request is generally very specific.  It may

25   come in for a specific body part, a specific pain condition, or

even a specific question with regards to a medication.  But a
referral is made with the understanding that if I'm sending out
a referral, I'm asking for help. I'm not sending someone to you
because I don't want to take care of the patient anymore.  I'm
sending them to the specialist because I need assistance.

I'm asking either a particular question, or I'm asking
for assistance in a particular condition.  And so the role of
the specialist is to provide a very focused answer to a request
or problem, as opposed to a general practitioner who may be
dealing with five or ten different issues on a more superficial
level.  The specialist is going to delve deep into the
specifics of a particular issue.

Q.  When you review the records of the patients that you talk
about in your study, did you find that their appointments with
specialists mimicked your own experience?

A.  I think it mimicked it in terms of providing -- what I do
is, I examine the patient, and I provide a succinct answer
about the condition.

So if the questions is, is X, Y and Z medication
appropriate, I would provide a specific answer for that.  If
the question is, Can you provide some guidance on the
management of this patient's diabetic peripheral neuropathy,
we'll provide an answer there.  So the role of the specialist
is to provide the answer.  And I did note that the specialist
consultations were fairly succinct and provided an answer.

Q.  And did you find that those specialty consultations were
generally followed by the practitioners back in the facilities?
A.  Generally followed, no.  I think in most instances there
was confusion.

        And I think it's important to understand who was
following them.  It seem like the front-line providers were
trying to follow them.  And the front-line provider would be
the person who filled out the MWAP request form.  I'm using a
generic term "front-line provide."  I don't know if they're
refer to as primary doctors or front-line doctors, but the
person who is filling out the MWAP request form would often try
to follow the recommendation.

        So, for instance, if the recommendation was restart
gabapentin, the front-line provider would fill out the MWAP
request form with the requested gabapentin following specialist
recommendation.

        When it got to the level of the regional medical
director, there was just a systematic issue there where that
regional medical director, first off, didn't have access to the
specialist recommendation.  I think broadly speaking they
didn't have access to the patient's chart even. They definitely
didn't have access to the patient.  And they were really making
these decisions in a vacuum unfortunately without the critical
necessary information to be able to determine, is it indicated
or not.

1          So to answer your question, no, they weren't being

2      followed by the regional medical directors in general.

3      Q.  Let's now turn, sir, to the conclusions in your report,

4      start on page 42 of the expert report.  And I'd like to walk

5      through those.  Let's talk about the MWAP policy itself.  Did

6      you review that?

7      A.  Yes.

8      Q.  Did you find that the MWAP policy itself followed the

9      standard of care?

10     A.  I don't have an issue from a standard of care perspective

11     with the MWAP policy.  I don't agree with it in its entirety.

12     We can delve into that, but, no, I don't think the policy

13     itself was below the standard of care.

14     Q.  Why don't you tell me what your disagreements were with the

15     policy as written or your concerns?

16     A.  I think the policy overstepped the potential or the

17     potential abuse liability of certain medications that were

18     within the policy, and it sort of lumped all of them in a large

19     bucket where there's varying degrees of abuse liability.

20          For instance, there's many medications in there

21     including some of these culprits that came up again and again

22     in this particular litigation with regards to gabapentin and

23     Lyrica where the abuse liability of the medications is

24     exceedingly low, and really based on a lot of different

25     factors.

N96Ball1                          Carinci- Direct

1          And I think that's where I think this policy sort of

2     went astray where it oversold the abuse liability of some of

3     the medications that were within the policy and essentially

4     prevented people from getting them.

5     Q.  Let me ask you, cause they're going to, are you an expert

6     in correctional healthcare?

7     A.  No.

8     Q.  Have you ever heard of the certification in correctional

9     healthcare?

10    A.  I have not heard that.

11    Q.  Do you believe sitting here today that there is a specialty

12    where someone could be board certificated in correctional

13    healthcare?

14    A.  I have not heard of it.

15    Q.  When you talk about these culprits, and I think you

16    mentioned gabapentin and Lyrica, could you talk to me about

17    some of the things you found that would -- strike that.

18         Did you see any evidence of how those two drugs in

19    these kind of -- this family of drugs were administered in the

20    prison environment that made you feel better about their

21    administration?

22    A.  I think, yes.  My understanding, particularly let's say

23    gabapentin for instance, is in liquid form and is administered

24    as a unit dose when the patient presents for the medication.

25    That is in vast contradistinction to say the community where

1    when I provide gabapentin to a patient, they go to the pharmacy

2    and they receive -- it's many times it's a jar of 180 or 360

3    tablets of gabapentin all at once.

4           And so I think one scenario is very different from

5    another.  If someone is given a jar of gabapentin and you're

6    concerned about the abuse liability or you have concerns about

7    the patient, that's a very challenging situation to present a

8    patient with 360 tablets of a medication, versus they present

9    to a window.  They're monitored.  They take a liquid dose.

10   There's really no opportunity to abuse that medication.  They

11   can't take it with anybody other concurrent agents for like a

12   sort of sedative or synergistic effect.  So I think, yes.  Does

13   that answer your question?

14   Q.  It starts to.  Would your conclusion be that the

15   administration of these medications is much more controlled in

16   a prison environment than it is, per se, one of your patients?

17   A.  Yes, absolutely.  That's what I neglected to say.  Yes.

18   The aspect of the prison environment where the patient presents

19   for a unit dose of liquid gabapentin is a much more reassuring

20   process than a patient in the outpatient world going back to

21   their apartment or home with 360 tablets of gabapentin.

22   Q.  Would you as the treating physician know if your patient

23   then went and abused that large bottle of gabapentin?

24   A.  I mean, you may or may not know that, right.

25          If the patient comes back requesting -- that

1    prescription was supposed to last them a month, and they come

2    back in a week and say they need more or they're requesting

3    higher doses or they're presenting in a very sedated format or

4    urine screen comes back showing a very high dose of gabapentin

5    in their system, those are concerns.

6            I will say -- and I've testified to this before -- is

7    that in my 15 years of practice, I have not had a patient that

8    I've been concerned about was abusing gabapentin.  I've not had

9    anyone ask me for more gabapentin that I provided.  I've not

10   had a scenario where somebody ask me to very early on refill a

11   dose that should have lasted them a month.

12           I have not had anyone with a failed urine screen for

13   gabapentin or concerns for selling it or a family member

14   reporting that they're overtaking it.  So, again, this is just

15   my 15 years of practice with gabapentin which has been around

16   for a very long time not having concerns about it.

17   Q.  And have you had concerns about other medications within

18   your practice being abused by your patients?

19   A.  Yes, certainly.

20   Q.  Can you just explain a little bit of that to the Court?

21   A.  Well, I think opioids are the main issue in my specialty.

22   And it's been -- it's a scenario of like a pendulum where in

23   the '90s, maybe the early 2000s opioids were more liberally

24   prescribed.

25           Now we're on a different scenario where opioids are

1    much more tightly controlled by primary doctors and specialists

2    and the like.  And opioids have a very well-known very well

3    defined liability, abuse liability, a liking ring forcing

4    addiction sort of process.

5            And I think this sort of draws back to my earlier

6    statements with regard to the MWAP policy sort of lumping all

7    of these types of agents together is problematic.  So, yes,

8    opioids are definitely abused.  People do ask for early

9    refills.  People do take more than prescribed.  In my 15 years

10   of practice, I've had instances of people abusing them, taking

11   more than prescribed.  All of those various infractions.

12   Having to discontinue patients from taking opioids, sending

13   people to rehabilitation because of opioid abuse.  I mean these

14   are all real phenomenon.  In contrast, I have not had any of

15   that with gabapentin.

16   Q.  What about Lyrica?

17   A.  I have not had that with Lyrica.

18   Q.  Let's now move from the facial policy itself.  What were

19   your conclusions about how MWAP was implemented at least

20   throughout the records of the 70 patients that you reviewed?

21   A.  I think the big issue here is that how the MWAP was

22   implemented was done in a very broad stroke manner that was

23   non-individualized. So it was applied to patients in a manner

24   that did not take into account their individual picture

25   parameters.

1           So just bluntly, people were discontinued on their

2    medications without an individualized assessment.  And so the

3    policy itself was implemented in a manner inconsistent with the

4    standard of care that we talked about earlier because there was

5    no individual patient specifics.

6           And really it's very clear when you look at how those

7    medications would be approved in this process because it was

8    the regional medical directors who essentially had the power so

9    to speak to give the thumbs up or thumbs down on these

10   medications, to say yes or no, and they simply didn't have the

11   ability to make an individualized assessment.

12          They didn't evaluate the patients.  They had very

13   basic information about the patient.  They had no access to the

14   patient's chart.  And so for those reasons, it's not

15   conceivable that these were individualized assessments.  These

16   were very non-individualized.  It was implemented in a

17   non-individualize manner.

18   Q.  Dr. Carinci, didn't the MWAP form that you reviewed as part

19   of your process and the compilation put together by my office,

20   wasn't there enough information on that MWAP form to make a

21   study considered decision based on the standard of care?

22   A.  No.

23   Q.  Why do you say that?

24   A.  Because those forms lacked the information needed to make

25   the determination in an individualized manner.

N96Ball1                         Carinci- Direct

1          For instance, with regards to specialist

2     recommendations, with regards to medications that had been

3     tried and failed, with regard to the efficacy.  On hindsight,

4     those forms, those request forms, did not encompass that data.

5     Q.  Let's talk about, within that you come to a conclusion

6     about the oversight of the regional medical directors and the

7     administrators over this MWAP implementation. Can you speak to

8     that?

9     A.  Yes.  It was a very haphazard confusing and chaotic

10    implementation and oversight.  I think, for instance, on one

11    hand those first-line providers were provided literature,

12    articles and other forms of sort of "educational material" with

13    regards to these medications with abuse liability, such as

14    gabapentin and Lyrica; and what indications they would be

15    useful for and how to dose them and how to monitor them.

16    They'd be provided that information about how to utilize them.

17          But on the other hand, the actual use of these

18    medications was to the point where they were refused so often

19    that these front-line providers basically stopped asking for

20    them.  So they would repeatedly ask for them.  They would be

21    repeatedly denied, and it sort of left those front-line

22    providers sort of cycling back to the same three medications

23    that had been tried and failed over and over again.  And that

24    would have been Ibuprofen, Elavil or amitriptyline and

25    Cymbalta.

1    So the oversight of this process was really just very

2    poor, not only was implementation, but also the ongoing

3    oversight of the process was chaotic and problematic.

4    Q.  Did you see any evidence in the medical records you

5    reviewed that RMDs would then follow-up about the patient's

6    effective treatment after an MWAP was discontinued or denied?

7    A.  No, I didn't see that.

8    Q.  And you just talked about I think cycling through

9    alternative medications, can you expand on that for the Court?

10   A.  Yes.  So in lieu of a utilizing an MWAP medication, it was

11   understood that there were basically these three medications

12   that could be utilized without any degree of MWAP request form.

13       So you didn't have to request someone's authorization.

14   You didn't have to request the regional medical director's

15   input If you wanted to use Ibuprofen, amitriptyline or

16   cymbalta.  So you would see again and again these attempts to

17   utilize those medications, those three medications as I

18   mentioned, when they had been tried and failed before.  Even

19   when there was contraindications to utilizing those

20   medications.  And so, yeah, it was just very problematic in

21   that sense.

22   Q.  What does it mean for a drug to fail?

23   A.  Well, a drug failure could take a number of different

24   meanings.  One with regards to pain management would mean they

25   didn't provide efficacy.  There was no analgesic or pain

1    relieving response with it.  They were titrated up.  It didn't

2    help.  It was a failure.  It didn't help the problem.

3           Another form of failure is intolerable side effects.

4    They were titrated up to a therapeutic dose, but it wasn't able

5    to be taken due to intolerance of side effects.  That could be

6    nausea, could be dizziness, could take on a number of different

7    areas.  That would mean failure.

8           I think also I would look at failure in a broader

9    sense also saying that if, you know, it's a contraindication to

10   utilize that medication, that's sort of also like a dead-end.

11   It's a failure.  Going down that route would be a failure.  for

12   instance if there's a drug-drug interaction with using that

13   medication or the patient has an underlying medical problem

14   that would preclude you from utilizing it then that would be a

15   failure to me.  It takes one of those three forms.

16   Q.  And you have a section in your conclusions at page 43 where

17   you talk about lack of knowledge about medications hurt

18   patients.

19          Where do you see evidence of that lack of knowledge,

20   and who in your conclusions lack the knowledge?

21   A.  Well, the lack of knowledge sort of stem from seeing

22   patients that were reporting ongoing constipation, for

23   instance, horrible constipation that required multiple

24   medications to alleviate; or horrible urinary retention that

25   required catheterization to alleviate the urine.

1            And you would look back and realize that those

2     patients in some instances were actually being prescribed

3     Elavil which is a tricyclic antidepressant medication that was

4     one that was often posited as being, don't use an MWAP.  Use

5     this.  Unfortunately that medication is prone to having those

6     particular side effects.  It's very prone to it.

7            And when you also have a patient who may be prone to

8     those potential issues due to underlying medical condition,

9     starting them on Elavil for instance would only worsen or

10    precipitate or exacerbate those underlying problems.  So there

11    were instances where the patient would continually have to

12    self-catheterize to get the urine out, but they were also

13    repeatedly going up on the dose of Elavil.

14           So it was clear to me that that provider just didn't

15    understand that Elavil was a tricyclic antidepressant that was

16    going to cause this.  I think that goes back to the oversight

17    in education part of this where they were repeatedly told to

18    use that and then you create an issue.  So that was one of the

19    main issues that I saw there.

20           Similarly, things like cymbalta being prescribed to

21    people that were already on -- so cymbalta is a -- it is an

22    antidepressant medication.  And in many instances patients were

23    being put on cymbalta when they were already on an

24    antidepressant for anxiety or depression.  And they were being

25    told, let's put you on cymbalta for pain, when that would

1    really be an inappropriate thing to do because you could create

2    this drug-drug interaction with two antidepressants that are

3    going to precipitate either depression, could precipitate

4    mania.  And again just not being monitored or really

5    understanding the potential downstream effects of those

6    medications.

7    Q.  So let's talk about one of your culprits as you call it

8    gabapentin and what conclusion you came about regarding the

9    impact of gabapentin by the implementation of the MWAP policy?

10   A.  So in many, many instances as I've outlined in my report

11   here through the 70 patients, the gabapentin was discontinued

12   without for non-medical records and without regard to the

13   individual patient parameters.

14        So you see many instances where patients were stable

15   on gabapentin for many years leading up to the institution of

16   MWAP.  They were taking the medication.  They were functional.

17   They had good analgesia.  And really sort of without any

18   medical indication, the medications were titrated off,

19   discontinued, tapered down, substituted with amitriptyline or

20   some other medication like cymbalta without any medical

21   rationale and for non-medical reasons, and irrespective of

22   their individual patient parameters for use.

23        It's like we talked about, everyone responds

24   differently to these medications.  And if you're lucky enough

25   to find a medication that does work for someone, it's really a

1    critical decision to discontinue that medication.  You've got

2    to have a good reason because people could try for years to

3    find an effective medication.  And so really, the decision to

4    taper off an effective medication is not to be taken lightly.

5    There's got to be an impetus to do so, a medical impetus

6    really, whether that's the patient developed a medical

7    condition that the medication is no longer safe for them.

8            They're on another medication like a chemotherapy

9    agent or something that's going to interact with the drug, and

10   so they need to be tapered off, and those are just particular

11   instances.

12           But my point is that in this case gabapentin was a

13   very common culprit here that was tapered off for non-medical

14   reasons, for no medical rationale was provided for why, and

15   really irrespective of the individual parameters of efficacy

16   and functional improvement on the agent.

17   Q.  In your expert opinion would just the potential abuse

18   potential of a drug.  Sorry.  I just did that twice.

19           Would the abuse potential of a drug be a medical basis

20   absent other factors for discontinuing it?

21   A.  No.

22   Q.  Talk to me a little bit about that, like what is the

23   spectrum?

24           You touched on it, why would you just stop effective

25   treatment for a medical basis?

N96Ball1                    Carinci- Direct

1    A.  Well, for a medical bases, a perfect example is, someone is

2    on gabapentin.  They're doing well with it.  A medical reason

3    to discontinue would be they developed kidney failure.  And

4    because gabapentin is metabolized through the kidneys.  If your

5    kidneys are not working, you're going to accumulate massive

6    amounts of gabapentin and you're going to essentially be highly

7    sedated and potentially worse off.

8            So in those instances, we need to move to a medication

9    that is not metabolized through the kidney.  We may need to

10   pursue some other route, but it wouldn't be gabapentin.  So

11   that would be a medical reason to discontinue it, even though

12   it was effective.

13   Q.  What about Lyrica?

14   A.  Same thing. Lyrica and gabapentin, they operate at the same

15   receptor.  Lyrica is a newer formulation of gabapentin

16   that's -- just to be simplistic with it, it's just a more

17   potent version of gabapentin.  You can titrate people to a

18   higher dose quicker with less side effects, but the same

19   provisos with gabapentin would be applicable to Lyrica.

20   Q.  And in your experience as an expert in pain management are

21   there patients for whom gabapentin or Lyrica alternatively work

22   better for that particular patient?

23   A.  Yes.

24   Q.  And so how would you as the medical provider come to that

25   conclusion?

N96Ball1                        Carinci- Direct

1  A.  Well, generally speaking we would start someone on

2  gabapentin first because it's generic.  It's been around

3  longer.  Most people's health insurance would want them to try

4  gabapentin before Lyrica. And it just makes sense because

5  gabapentin is generally well-tolerated by many.  So we'll start

6  there.

7         We'll titrate people to an efficacious dose.

8  Hopefully we can get them there.  If we reach either the

9  maximum dose without any benefit, or we get to a dose that is

10  not providing benefit or is having intolerant side effects,

11  then we would consider Lyrica.  It's hard to know, maybe 30

12  percent of people will have efficacy with Lyrica versus

13  gabapentin.

14  Q.  One of the other conclusions you touch on in your report

15  regards baclofen and muscle relaxants.  Can you explain that

16  particular conclusion to the Court?

17  A.  Yes.  So baclofen is a medication that's used for

18  myofascial muscle spasms, muscle related pain.  It's an

19  antispasmodic agent, but is not without harm.

20         Baclofen was also reverted to as the muscle relaxant

21  of choice.  Again, even when it had been tried and failed, even

22  when there were reasons, medical reasons not to use it, when

23  there are many other muscle relaxants that are equally or in

24  some cases more efficacious with more side effects.

25         So the general sense in reviewing these records is

there was just this overprescription of baclofen when it wasn't

necessary to do so, and when there was even reasons not to do

it.

Q.  And what would the alternatives to baclofen be in your

practice?

A.  There is many other muscle relaxants to use.  Some of them

are old.  Some of them are new.  Flexeril is one. Zanaflex,

Robaxin is another.  Those are the main ones that we can

consider using.

        And, in fact, I think most providers would reserve

baclofen later down the line after one of those other failed

because baclofen is so heavily sedating.  And also once you're

on baclofen, you can't discontinue it abruptly.  It has to be

tapered down.  And that was again going back to the oversight

monitoring education part of this, you often saw the medication

just being tapered abruptly, not really understanding that it

is a medication where people could actually have a withdrawal

from it.

Q.  In your experience though do these alternatives Flexeril,

Robaxin, forgive me for forgetting the other one, do those have

abuse potential?

A.  No.

Q.  None whatsoever?

A.  Not to my knowledge, no.

Q.  Have you ever had a patient in 15 years abusing Flexeril?

N96Ball1                    Carinci- Direct

1    A.  No.

2    Q.  So now I want to talk to you about what you call in your

3    expert report the reassessment process.

4           First, to your knowledge, can you tell us how that

5    came to be?

6    A.  Well, the reassessment process really was something that

7    came to be as a means to mitigate the effects from the

8    implementation, the poor implementation of the MWAP where many

9    patients were discontinued off their medications in this sort

10   of broad-sweeping non-individualized, non-medical manner.

11          The reassessment process was meant to sort of solve

12   the ills of that process.  In other words, could we actually

13   sit down, reassess the patient, determine if there was a

14   medication they were functional with; and was there a reason to

15   discontinue it.  And if not, can we consider reinstituting it,

16   or is there some other measure we can take here.  So basically

17   to see if we can mend the wounds from the poor implementation

18   of MWAP.

19   Q.  And did you have any role in that reassessment process?

20   A.  Yes.  Early on we met with some of the DOCCS I think

21   medical team in sort of putting together what we would consider

22   a reasonable reassessment process; how would we think about

23   reassessing; what are the components; and how should we do it.

24          And I was involved -- I think it was a zoom call if

25   I'm not mistaken -- with several participants with DOCCS.

N96Ball1                         Carinci- Direct

1   Q.  Can you tell me -- and those are not in your report, did
2   you design any documents to kind of guide that reassessment
3   process?
4   A.  Yes, we had a -- it was a reassessment form I think we
5   called it.
6   Q.  Would it refresh your recollection if we call those
7   treatment algorithms?
8   A.  Yes.
9   Q.  To your knowledge when you reviewed the records, were those
10  treatment algorithms used by the providers when they did these
11  reassessments?
12  A.  Sometimes.
13  Q.  So now I want to talk about your review of those
14  reassessments and what you found.

15          First, why don't you just explain to the Court what we
16  had hoped?  What you had hoped and us as well would happen in a
17  reassessment?
18  A.  So the reassessment was really designed to answer a very
19  specific question, and this really was, Was the patient on a
20  medication that was helpful; and was there a reason that that
21  medication was discontinued.

22          In other words, we wanted to refresh on the idea of,
23  like, where this patient is in time, relative to where they
24  previously were prior to the institution of the MWAP.

25          So, for instance, we would ask question -- that form

1    that you're talking about was really designed to guide the

2    practitioner in answering that question in a way that was

3    reproducible and was understandable for someone else who read

4    it.

5            And if at the end it was clear that the medication was

6    discontinued for a medical reason that was particular to their

7    individual circumstance, well then so be it, great.  Let's move

8    on to the next person.

9            If on the other hand at the end of that analysis we

10   determine that there really wasn't a medical reason that this

11   medication was discontinued, there was really no individual

12   patient parameters that guided the discontinuation of that

13   medication, well then perhaps we can consider reinstituting it.

14   So that was really the point of the reassessment process was to

15   answer that question.

16   Q.  To your knowledge was there only one sweep of

17   reassessments?

18   A.  No, there was some of two waves of reassessment, July of

19   2020 and then it was sort of November fall of 2020.

20   Q.  And to your knowledge were the reassessment forms in that

21   process used for both of those sweeps of reassessments?

22   A.  No, it was used in the second.

23   Q.  So talk to me about the first to your knowledge and what

24   you saw in the records?

25   A.  Well, I would say the first wave of reassessments was just

1   fraught with problem right from the start.  It doesn't seem

2   like the front-line providers who were performing those

3   reassessment really understood what the point of the

4   reassessment was.

5            Often times in the documentation there would be

6   various notations of data that were collected that were off

7   base relative to the question we're trying to answer here.  So

8   there may be multiple documentation about lung studies and

9   pulmonary function test and lung medications, and no mention at

10  all of the gabapentin or the specialist recommendations or even

11  the pain of the patient.  So it was clear that when you read

12  that reassessment it was clear when the person who did it just

13  didn't understand what they were being asked to do.

14           They just thought they're going in there to assess the

15  patient in a broad sense, like as a medical provider.  I'm

16  going to address your multiple medical problems, opposed to

17  reassessment to the MWAP medication.  And so that first wave of

18  reassessments was really just problematic for those reasons.

19  It was off-base.  It didn't answer the question.  Many times it

20  didn't mention pain medication.  There was often not an exam

21  performed.  So those were the issue.

22  Q.  What about that second wave where we had the form, what

23  were your findings when you reviewed those documents?

24  A.  The second wave I think was an improvement over the first,

25  but mostly because we provided a form that was to be filled

N96Ball1                        Carinci- Direct

out, so that at least guided folks.  But again I think the

education on what that form was designed to do and what

question we were trying to answer was again just off-base.

        It was not a context sensitive evaluation.  In other

words, the context being the MWAP policy and the institution of

the policy and the medications and pain management treatment

thereof, that was the context of why the form was being done.

But the forms were completed in a manner that was context

insensitive.  Like they didn't recognize that, hey, in this

particular instance with this particular patient, it's all

about gabapentin.

        The patient was on gabapentin.  They were very

functional on it for such and such reasons.  Here's the

objective data with regards to their subjective complaints, so

here's some X-ray findings.  Here are some MRIs findings.

Here's a list of medications that they failed before and why

they failed them.  Here's an examination of the patient.  They

have weakness in the leg.  They can't bend over, whatever it

is, musculoskeletal neurologic.

        There's really no contraindication to restarting

gabapentin. The patient was functional on it, no side effects,

doesn't have an abuse history, never abused gabapentin or

anything else.  Let's consider reinstituting gabapentin.  I

know I'm sort of just glazing over the points, but that's what

we were sort of looking for a context sensitive evaluation that

1    answers the question.

2              Even with the use of that form it was just again a

3    somewhat chaotic analysis where elements of the histories were

4    missing.  Elements of the medications that were really critical

5    to this whole process were missing, so it was hard to know

6    where the disconnect was, but there was clearly a disconnect.

7    Q.  And why as a part of that process is the history of failed

8    medications important?

9    A.  Well, for the reasons we outlined earlier.  These

10   medications are not immediately effective.  Many times the

11   agents we're talking about take many, several months really to

12   get up to efficacious level.

13             So when you got someone who has diabetic peripheral

14   neuropathy and burning pain in their legs and they've been

15   stable on gabapentin, the medication's discontinued.  There's

16   no reason why, but they're started on amitriptyline, but we've

17   already documented that amitriptyline is a failure.  As the

18   provider, you're not going to recognize for probably another

19   two or three months if the patient is actually willing to go

20   down this road again.  So you're essentially just wasting time.

21   You're wasting the patient's time.  You're wasting your time

22   going down a road that's already proven to be problematic when

23   you've already got an answer that is effective.

24             If you don't have a reason to discontinue that

25   medication as we discussed earlier, you're basically causing

1    harm.

2    Q.  What about the physical evaluations of patients on those

3    reassessments?

4    A.  For the points we touched on earlier, the physical

5    evaluation is critical because the job as the clinician is to

6    corroborate the subjective complaints with the objective

7    findings.  And those objective findings come from the studies,

8    whether that's an MRI, an X-ray, an EMG what have you, and the

9    physical exam.

10           Because we're not just taking the patient's subjective

11   statements as a hundred percent fact without any corroborative

12   data, we're trying to integrate that, all of those data points

13   to come to a conclusion about the overall plan, assessment and

14   plan.  And so without a physical exam, a documented physical

15   exam, you're basically only having a small portion of the

16   history of the subjective complaints available to you.

17   Q.  Did you see good evidence within those reassessments of

18   physical evaluation?

19   A.  Not routinely, no.

20   Q.  Tell me something, the objective of those reevaluations,

21   was it just to put every patient back on an MWAP?

22   A.  No.

23   Q.  What was the objective?

24   A.  As I said earlier, the objective was the context what we're

25   talking about.  It was to answer the question.  Was the patient

1    on an MWAP medication that was effective, and was it

2    discontinued for a non-medical reason and for

3    non-individualized parameters.

4          If the answer was yes to that and there was an MWAP

5    medication that we could identify that was effective, can we

6    consider reinstituting it; or is there a reason we can't.  So

7    it wasn't that everybody needs gabapentin, that was not the

8    point of the reassessment period.

9          The reassessment period was the context of the MWAP

10   implementation, and we really wanted to answer the question as

11   I outlined earlier, were they on a medication that was

12   effective for them, and why was it discontinued.  Is there a

13   medical reason or not and go from there, a path forward really.

14         THE COURT:  Could I just ask a question, were the

15   reassessment done after the MWAP policy was withdrawn and at or

16   about the time when policy 1.24A was promulgated?

17         MS. AGNEW:  No, ma'am. So the second swath of

18   reassessments took place around November of 2020.  That's

19   bourne out by the documents. DOCCS rescinded MWAP February 3,

20   2021.  Somebody can correct me -- 8th.  February 8th of 2021.

21         THE COURT:  Thank you.

22   BY MS. AGNEW:

23   Q.  Tell me this, when we're talking about the objective of

24   these reassessments, was the objective perfect analgesia?  I'm

25   saying that wrong.  You just gave me a look --

A.  No.  No.

Q.  Was the objective to completely cure the patient's chronic

pain?  Is that the objective?

A.  No, and it never is in the process of pain management. It's

impossible to get perfect.  You can't get the pain score to

zero.

     And importantly here, there maybe instances where an

MWAP medication was not medically necessary or reasonable.  It

wasn't about, again, everybody that step forward is a candidate

for MWAP and should be on it; but with a proper analysis and a

proper reassessment, we'd be able to answer that question in a

reproducible rigorous manner that was individualized.

Q.  So tell me, sir, we created these data subsets which are

appended to your report --

     MS. AGNEW:  And, your Honor, Mr. Manly has three small

binders to his right.  You might want to pass those up, and we

do apologize for the presentation.  Your Honor, this report was

so big and huge, we've done our best.

Q.  So I do want to talk about those exhibits, Dr. Carinci,

first I want to turn your attention to Exhibit 70.  And again,

I know you touched on it briefly, but talk about how you looked

at the data from these 10,000 MWAP request forms?

     MR. NOLAN:  Real quick, is it P128?

     MS. AGNEW:  Yes.  So 70 has been premarked, your

Honor, P128.

```
 1              THE COURT:  Yes, ma'am.
 2              MS. AGNEW:  I'm going to approach the witness and make
 3    sure he has it.
 4    Q.  Dr. Carinci, Exhibit 70, was that one of the sources of
 5    evidence you used?
 6    A.  Yes.
 7    Q.  And to your knowledge, where did that data come from?
 8    A.  This data came from the MWAP forms themselves.
 9    Q.  Did you review the MWAP forms themselves in their entirety?
10    A.  Well, there was like 10,000 of these forms, so I wasn't
11    able to personally review each and every one of those forms,
12    but I had asked -- understanding that time was of an essence
13    here, if your office could put together a more condensed
14    version of those, pulling out the salient data and putting it
15    in a manner that I could read through it and understand the
16    themes, why they were denied, what was approved, what wasn't
17    and why.
18    Q.  Is it your understanding when we pulled together this data
19    that it was pulled directly from the MWAP request forms
20    themselves?
21    A.  Yes.
22    Q.  Did you have an opportunity to spot check, but did you have
23    an opportunity to peruse through the MWAP request forms
24    themselves and kind of do a spot check against what we produced
25    to you?
```

N96Ball1                    Carinci- Direct

1    A.  Yes.

2    Q.  Were they perfect?

3    A.  No.

4    Q.  Given that they weren't perfect, how did you use them

5    recognizing there might be some imperfection?

6    A.  I looked for themes, understanding that, look, again, we're

7    talking about 10,000 of these forms, I wanted to get a sense

8    for broadly speaking how many were approved, how many were

9    denied, how long were they approved for, kind of just getting a

10   10,000-foot view.

11              Just like when I talked about with the patient

12   records, a starting point for digesting the material.  It's

13   just impractical to delve into each and every of those 10,000

14   MWAP review forms and start taking my own notes on them.  And

15   so the synthesis of this information as put together here in

16   Exhibit 70 was a means to digest that information in a more

17   efficient manner.

18              MS. AGNEW:  Your Honor, I would like to move into

19   evidence Exhibit 70.  It's Dr. Carinci's report.  We premarked

20   it P128. We would like to do that as a 1006 exhibit, and we did

21   bring all of the underlying records which are in binders behind

22   if my colleagues wanted to review them or test the data.

23              MR. NOLAN:  Your Honor, we object to the introduction

24   of this exhibit into evidence because it doesn't meet the

25   requirements of FRE1006.

N96Ball1                        Carinci- Direct

1              In this Circuit in order for a summary chart or

2       summary of evidence, particularly one created by counsel, the

3       offering party has to establish a foundation connecting the

4       numbers in the chart with the underlying evidence for the data

5       on the chart.  And the Court must ascertain that the summary

6       charts fairly represent and summarize the evidence upon which

7       they are based.

8              There has to be foundation testimony connecting it to

9       the understanding evidence summarize.  We haven't heard a

10      foundation evidence who prepared these testify today.

11              THE COURT:  Counsel.

12              MS. AGNEW:  Your Honor, it's not our position that we

13      have to provide the actual person, but that he needs to

14      authenticate them, that they're admissible. And I would point

15      to the Court's order of March 1st of 2021 where we talked about

16      the admissibility of the underlying MWAP request forms.  Cause

17      if the Court recalls, they were all produced to us in Excel

18      spreadsheets.  You couldn't get to the data.

19              We then went ahead and converted them, and we had to

20      move for an order allowing their admission because state

21      defendants were concerned that we had played with data, which

22      of course we had not.

23              My understanding of 1006 is that Dr. Carinci having

24      spot-checked the data, which of course nobody could go through

25      10,000 forms and confirming its reliability and the fact that

1    it reflects what is on a spot check of the forms is a witness

2    who can lay the foundation, and then through which we can bring

3    in the summary.

4              THE COURT:  May I see the prior order you preferred

5    to, please?

6              MS. AGNEW:  Yes.

7              THE COURT:  And is this document, Plaintiff's Exhibit

8    70, or Plaintiff's 128, is that the MWAP forms in the PDF

9    format that is referred to in the March 1, 2021, order?

10             MS. AGNEW:  It is, your Honor those exact forms are

11   laid out here in about 25 binders.

12             THE COURT:  Mr. Nolan.

13             MR. NOLAN:  We have no objection to the MWAP forms

14   being in evidence, your Honor. It's the chart itself.  We just

15   don't have any foundation.  We don't even know who specifically

16   created it.

17             THE COURT:  Can I hand you back the order that was

18   just handed to me, please.

19             MS. AGNEW:  I can give him a copy.

20             THE COURT:  Please do.  Isn't this already ruled on?

21             MS. AGNEW:  To be fair to Mr. Nolan, this does predate

22   his entrance into the case.

23             MR. NOLAN:  I'm not seeing where it says that these

24   are admissible at trial.

25             THE COURT:  Maybe read it.  It talks about the

N96Ball1                    Carinci- Direct

1   declaration from Mali Curran, C-U-R-R-A-N, at docket number

2   207, setting out the steps she took to convert the forms, that

3   is the forms received from defendants, into a readable PDF

4   format.

5          MR. NOLAN:  I still don't know how that makes it

6   admissible at trial.  Somebody submits a declaration, for

7   example, on a motion, it's still hearsay at trial.

8          THE COURT:  Right.

9          MR. NOLAN:  So we have no foundation testimony from

10  Ms. Curran here.  We have no ability to cross-examine

11  Ms. Curran, or if that's who created it.

12         THE COURT:  It seems to me that the declaration that

13  is reflected in the March 1, 2021, order does that; and at the

14  time, apparently the parties were fighting about whether or not

15  to admit this document.

16         MS. AGNEW:  No, no, your Honor.  I want the record to

17  be very clear.  The fight among the parties was about the

18  admissibility of the MWAP request forms themselves.  If counsel

19  wants us to admit all of those into the record, we're happy to

20  do it instead of this summary.

21         He suggested that's okay with him.  We can do that.

22  Our expert of course could not go through all of those.  We did

23  have -- and there's a declaration on the record from Sterling

24  Avellino. He is the one who extracted the data and created the

25  summaries that Dr. Carinci relied upon.

1          Dr. Carinci then spot-checked the summary data in

2    Exhibit 70 through 73 against the MWAP request forms to make

3    himself feel comfortable that it was an accurate reflection,

4    and he's laying the foundation that he then relied on that

5    data.  We could also call Mr. Avellino. He's at school, but I

6    can get him on a video tomorrow and we can do this again. I'm

7    happy to do that as well, or we can go ahead and admit all the

8    MWAP request forms.

9          THE COURT:  Would you hand up the Avellino

10   declaration.  I know we just had it recently, but I don't have

11   it in front of me at this minute.

12         MS. AGNEW:  Forgive me, your Honor, I did not print it

13   out.

14         THE COURT:  Tell me the docket number and we will pull

15   it up.

16         MS. AGNEW:  If we can go off the record for two

17   minutes.

18         THE COURT:  Do you want to take a break now?  We've

19   been going an hour and a half or so, is that a reasonable idea?

20         MS. AGNEW:  That's great, your Honor.  Thank you.

21         (Recess)

22         THE COURT:  Have you had a chance to chat?

23         MS. AGNEW:  We have not. I thought we were, so I'm

24   going to renew my motion to admit into evidence Exhibit 70 of

25   Dr. Carinci's report which we premarked P128.  It is a summary,

1   although I'll state, if they have no objection to all the MWAP

2   request forms themselves, we'll do that. I think the record on

3   appeal is going to be painful, but we'll do it.

4          THE COURT: Let me ask you this question, what is the

5   relationship between P128 or Exhibit 70, and the PDF format

6   referenced in Ms. Curran's declaration versus the document

7   referenced in Mr. Avellino's declaration?

8          MS. AGNEW: Sure. So the binders back here, which

9   your Honor can't see. It's about 15 binders. Those contain

10  the documents Ms. Curran created. Mr. Avellino then pulled the

11  data from those documents to create the summaries that

12  Dr. Carinci relied upon; because if I sent him that many

13  documents, he would quit.

14         THE COURT: Mr. Nolan.

15         MR. NOLAN: Your Honor, with respect to Mr. Avellino

16  who we understand I think was the author of Exhibit P128, he

17  was subpoenaed to testify for a deposition. Your Honor, you

18  quashed that subpoena, without a motion. The parties never got

19  an opportunity.

20         THE COURT: I'm sorry. There were letters back and

21  forth.

22         MR. NOLAN: There were letters back and forth, but

23  there was no formal motion.

24         THE COURT: Let me say for the record, I took the

25  letters as a motion and a opposition.

1          MR. NOLAN:  Fair enough, but it was ordered and it was

2    quashed.  The parties never had the opportunity to depose

3    Mr. Avellino, so we would object to him even testifying.

4          THE COURT:  My recollection of that exchange was that,

5    the question was what was the defect in the 1006 summary that

6    was to be the subject of the deposition.  And there having been

7    none stated, there seemed to be no reason to order the

8    deposition.  And that was, by my recollection, the finding that

9    was made.

10          If there is something else that counsel wants to

11   examine about to cast doubt on the accuracy of the Rule 1006

12   summary, then by all means, let's hear it.

13          MR. NOLAN:  Respectfully, your Honor, I think sort of

14   the purpose of the exercise of deposing Mr. Avellino was to do

15   just that, to understand exactly the process he went through to

16   test his declaration, which would be standard in any discovery.

17   It was quashed.  And now we're being told his declaration is

18   the foundation for his testimony.  That declaration is hearsay.

19   It's inadmissible.  It cannot serve as the foundation.  That's

20   other objection.

21          MS. AGNEW:  Your Honor, a couple of points.  The first

22   is that it was state defendants who served the subpoena on

23   Mr. Avellino.  It was not defendant Moores counsel, nor did

24   they, as far as I know, join in any motion or submit any letter

25   at all.

1          You are correct that it was about whether or not there

2     was a defect in the 1006.  I think you gave Mr. Ramage every

3     opportunity on the record to enunciate those defects.  He

4     couldn't come up with any, but you did reserve his right to

5     renew his subpoena should they come up with anyone.  They

6     didn't.

7          But again, your Honor, we are happy to admit the MWAP

8     request forms.  My only concern is about the record on appeal

9     and how voluminous that will be, but I will tell you the

10    plaintiff class would love to have those in the record. I think

11    the utility would be better to have the summaries, but what

12    your Honor decides we're going to be happy with.

13         MR. NOLAN:  Separate issue of the MWAP request forms,

14    your Honor, I don't think we've gotten there yet in terms of

15    the testimony, was in fact brought to the Court's attention at

16    docket number 684 when Ms. Agnew filed a submission about

17    Dr. Hammer's deposition where Dr. Hammer pointed out the issue

18    that the MWAP forms were not accurate.

19         MS. AGNEW:  No, that's not what he said.  Your Honor,

20    just so the record is extremely clear, we created separate

21    binders by RMD.

22         So at Dr. Hammer's deposition, we put two binders down

23    in front of him that we believed to be Dr. Hammer's MWAP

24    request forms.  What we found out is just because the face of

25    the form said Dr. Hammer, that doesn't mean he was the

reviewer.  And in fact we were able then to identify

Dr. Hammer's request forms based on his initials, which he

would add to the end of his reviewer comments.

        So the issue that arose in Dr. Hammer's deposition is

we could not with precision identify the actual RMD reviewer of

any given form.  Dr. Carinci is not making a conclusion based

on who the specific RMD reviewer is.  He's making his

conclusion based on the contents of the forms themselves and

whether or not they were approved or disapproved.

        THE COURT:  So with respect to the Dr. Hammer dispute,

would you refresh my recollection about whether the outcome of

that was?

        MS. AGNEW:  So what we did, your Honor, was we

reopened discovery so that state defendants could reproduce the

MWAP request forms to us based on the RMD's computer they came

from.  So each RMD, as I understand it, when they process an

MWAP request form would save it on their personal desktop.

        What happened is when the state defendants originally

produced those MWAP request forms, they threw them altogether.

They took the 10,000 forms from four different computers, threw

them altogether and produced them to us.  I think all counsel

relied on the fact that the face of the form would say

Dr. Mueller, Dr. Hammer, Dr. Dinello.

        What we didn't appreciate is just because the provider

put my RMD is Dr. Hammer, that didn't mean Dr. Hammer reviewed

N96Ball1                     Carinci- Direct

1    it because he might have been on vacation.  In which case, one

2    of the other RMDs would step in and do the review and write the

3    comments, so it was really a production issue.  I'm not blaming

4    state defendants, but at the time no one appreciated what was

5    going on with the forms.

6             We then would, as we pulled the data, say this is a

7    Dr. Mueller form based on the face of the form.  When we sat

8    down with Dr. Hammer he said, gosh, some of these aren't me.  I

9    wouldn't have written that.

10            THE COURT:  I got it.  So Mr. Nolan, I'm not certain

11   what it is you're telling me about the Dr. Hammer situation

12   that bears on this issue.

13            MR. NOLAN:  I guess I would in summary say we don't

14   necessarily believe there's any foundation for those.  But if

15   they're moving to enter them now, that's not clear to me, but

16   if they are, I think the easiest way to deal with this if

17   they're concern about the MWAP forms in the record, for them to

18   produce Mr. Avellino to testify as to foundation on the Exhibit

19   128.

20            THE COURT:  Why don't we do this then, we'll admit the

21   underlying forms and permit Dr. Carinci to testify as to the

22   documents subject to connection with Mr. Avellino.

23            MS. AGNEW:  Your Honor, if we're admitting MWAP

24   request forms, I don't need Mr. Avellino, right, because we're

25   not entering the summaries.

```
 1              THE COURT:  To your point, we don't want to overburden
 2    our friends across the street on the 17th floor.  Let's do it
 3    subject to Mr. Avellino's testimony, which hopefully can be
 4    videoed in at a convenient time, but this will allow the
 5    testimony to go forward this morning.
 6              MS. AGNEW:  Very good.
 7              THE COURT:  And if it turns out that the 1006 summary
 8    comes in, then you people don't have to burden the Court of
 9    Appeals with the MWAP forms.
10              MS. AGNEW:  Your Honor, would I like to do is come
11    back with some exhibit numbers with those.
12              THE COURT:  Certainly.  You let us know how you want
13    to mark them.
14              MS. AGNEW:  I will, and I'll come on the record a
15    little later today because we have a little work to do then.
16    Shall I proceed, your Honor?
17              THE COURT:  Yes, ma'am.
18    BY MS. AGNEW:
19    Q.  Dr. Carinci, I want to now talk about the actual MWAP
20    request form data that you examined and your conclusions based
21    on that data.
22    A.  Okay.
23    Q.  I want to direct your attention to your third subject
24    heading on page 40 where you talk about the MWAP request forms
25    themselves and your conclusions based on the data you saw
```

within the forms and/or the summaries that you examined.

A.  Sure.  So of those 10,000 request forms, as I talk about in my report here, 6385 were approved.  This is just sort of the raw information.

2,866 of those approved were for medication administration of 14 days or less; 3,519 approvals were for prescriptions of 15 days or more.  When you sort of track that through the patients what became clear in fact was that these were not approvals for medications that were continued for months on end.

In fact, what it became clear was of those 14 days or less, many of those MWAP approvals were for patients who had an acute issue such as surgery or an injury, some sort of trauma, and they were medications that were meant to only last approximately two weeks.  And so they were for acute pain issues.

On top of that, those other approvals that were beyond 15 days, many of those were also for post-surgical pain for instance; but more importantly many of those approvals were for actually tapering the medications over multiple months.  And so whereas on the face of it, it may look like, okay, 3,519 MWAP approvals for more than 15 days, if you actually started tracking that through the patients that were provided these approvals, it really was for tapering the medications down month after month.

1            And so ultimately that face value of that data does

2    not indicate that all of those folks were maintained on an

3    MWAP.  In fact, it means that the vast majority of them were

4    tapered over time when you actually tracked it through the

5    patients.  So that was the value of that analysis of looking at

6    that data in a very 10,000-foot view, and then drilling down

7    the specifics of each of those patients to sort of track what

8    actually occurred with those MWAP request forms.

9    Q.  And what about your conclusions regarding one of your

10   culprits as you put it, Neurontin and that's interchangeably

11   gabapentin just for the record?

12   A.  It was a similar type of process.  So as I outlined on page

13   41 there, 268 were female.  Of the 1440 total Neurontin patient

14   requests, 833 were only made once, with 50 of those for female;

15   545 of those one time request were denied.  The other 288

16   approved, but not again requested.

17           So I think it's the similar theme where we're seeing

18   these approvals and they will show up as an MWAP approval, but

19   that is not a testament to the fact that the MWAP process and

20   implementation was in fact providing these medications for an

21   ongoing basis.  In fact, what it shows when you actually drill

22   into the data is that these medications were being approved for

23   tapering purposes.

24   Q.  And then you have some conclusions based on your review of

25   that data about a phrase used repeatedly, insufficient medical

1  justification.  Can you explain that to the Court?

2  A.  Right.  And so again in that summary sheet that we spent

3  sometime talking about, and then when I spot checked many of

4  these actual MWAP request forms, you would see this particular

5  phrase show up quite frequently.  No medical documentation or

6  insufficient medical justification to refuse these medications,

7  when in fact the actual RMDs really didn't have access -- as we

8  talked about, really had no access to the patient, no access to

9  the patient's chart, no access to their history.

10        And really it was just unclear how that determination

11  was being made.  It really wasn't substantiated by anything

12  specific to the individual patient.  And so that was concerning

13  as I saw that.  Importantly too, and I think I go on to talk

14  about it here.  That was the next paragraph, the off label you

15  saw. I'll hold on that statement, but suffice it to stay with

16  the point we're making here is that the RMDs couldn't have made

17  individualized medical decisions without access to the

18  patients' medical chart or history.

19        So to say insufficient medical justification really is

20  not substantiated in the records available for review.

21  Q.  And what about the off-label use that you just mentioned?

22  A.  So another comment that came up fairly frequently was this

23  statement of not FDA approved or off-label use.

24        In medical practice, particularly in my specialty, you

25  know, many of these medications are used off label or not FDA

approved, so I think it's an interesting statement.  It doesn't

really make sense in the context of clinical practice because

many of these medications are used in off-label manner and not

in an FDA approved fashion.

Just to take a step back so that my point of view is

clear, for instance, a medication may be FDA approved for a

particular condition only when there's been a specific clinical

trial that addresses a specific question.  In other words, is

gabapentin more effective than placebo for diabetic peripheral

neuropathy.

If the results of a clinical trial do indicate that is

the case, then gabapentin will be FDA approved for diabetic

peripheral neuropathy.  On the same token, however, in the

practice of pain medicine and the practice of medicine in

general, medications are often used off-label through just the

practice of medicine.  And so, for instance, gabapentin where

it is not FDA approved for lumbosacral radiculopathy or

cervical spondylosis or any number of other conditions, it's

quite frequently used, and in many of the guidelines listed as

a first-line medication for those very conditions.

And so to state that the medication is not appropriate

because it's off-label or not FDA approved for that condition,

again is not consistent with the practice of medicine.

Q.  As we expand on that, we mentioned earlier the repeated

prescription of a medication like cymbalta.  Is cymbalta FDA

1    approved for the treatment of neuropathic pain?

2    A.  It's hard to know now because there's always updated

3    studies.  My understanding is that it is not for neuropathic

4    pain, it may be for like musculoskeletal pain.  But

5    nevertheless, the particular FDA indication for the medication

6    is not a reason to prescribe or not prescribe for a particular

7    condition.

8              In other words, these medications, just to be clear,

9    in the practice of medicine are utilized off-label for many,

10   many indications, and not just in the realm of pain medicine.

11   In the practice of medicine in general, medications are used

12   off-label for treatment of various conditions.

13   Q.  And now let's talk about your conclusion based on the data

14   pulled from the MWAP request forms.  You say RMDs were not

15   following the standard of care.  Can you expand on that?

16   A.  Yes. As we talked about early on, one of the big issues --

17   let's back up for a moment and say what was the standard of

18   care with regards to the MWAP implementation.  And that was

19   individualized patient assessment.

20             And it's very clear that the decision maker in this

21   process was the RMD.  And for the RMDs to make these decisions,

22   they had no ability to ascertain the individual patient

23   parameters to be consistent with the standard of care.  In

24   other words to be more specific, they did not have access to

25   the patient.  They were not examining the patient.  They did

N96Ball1                         Carinci- Direct

1   not have access to the patient's medical record, and they had

2   minimal, if at all, patient specific data to make these

3   decisions.  And so really all they had was the MWAP request

4   form that did not contain this relevant information.

5           And so for that reason, they're not following the

6   standard of care as we outlined earlier.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

N95Wall6                     Carinci - Direct

1    BY MS. AGNEW:

2    Q.  I just have a few more questions, and the first is, you

3    know, we talked a lot about the abuse potential of opioids

4    during the course of your testimony.  Did you find that there

5    were patients within your 70-patient sample for whom opioid

6    treatment would be appropriate?

7    A.  Yes, there were some patients.

8    Q.  OK.  Do you recall -- and you're welcome to refresh your

9    recollection -- the condition of those two patients and why in

10   that particular, those two particular instances it was

11   appropriate?

12   A.  Yes.  I'll be honest.  The names escape me now, and I would

13   have to take time to review them, but I remember their history

14   was significant for sickle cell anemia.  Sickle cell, you know,

15   just to sort of set the stage with regard to the problem, is a

16   condition that can be provoked due to pain.  And so in these

17   particular instances -- I think in both cases -- the patients

18   were maintained on opioid therapy that managed to lessen the

19   frequency of these flares as well as control their baseline

20   pain.  Unfortunately, as the medical records would indicate,

21   they were tapered off their opioid therapy, you know, really

22   despite multiple requests from the hematologists or the

23   specialists taking care of them to maintain them on opioid

24   therapy in order to prevent the exacerbation and the sickle

25   cell flares.  And so in these two instances, you saw repeated,

1    you know, hospitalizations, repeated readmissions to the

2    hospitals for sickle cell crises due to poor pain control as a

3    result of their opioid therapy being tapered down.

4           And again, as a pain management provider, I understand

5    the implications of, you know, flagrant opioid prescribing, but

6    there are obviously patients that benefit from opioids in a

7    controlled fashion particularly when we document efficacy.  And

8    to have a scenario where a specialist is repeatedly

9    recommending, you know, reinstituting an opioid regimen that

10   was found to be efficacious and, on top of that, seeing

11   repeated, you know, hospitalizations for sickle cell crises as

12   a result of insufficient pain, I think, was really a testament

13   to the misuse of the MWAP policy.

14          THE COURT:  Insufficient pain or insufficient pain

15   treatment?

16          The record says, in the middle of your answer, "seeing

17   repeated hospitalizations for sickle cell crises as a result of

18   insufficient pain, I think, was really a testament to the

19   misuse of the MWAP policy."

20          Did you mean insufficient pain?

21          THE WITNESS:  Insufficient pain management or poorly

22   controlled pain, to be clear.

23          THE COURT:  Thank you.

24   BY MS. AGNEW:

25   Q.  Dr. Carinci, finally, as we all know, one of the

1   justifications for the MWAP policy is the abuse potential and

2   abuse history of these patients.  When you reviewed their

3   medical records, did you take that into consideration?

4   A.  Yes, I did.

5   Q.  OK.  And where would you have seen that?

6   A.  Well, that would have been in various areas.  Certainly

7   within the context of the medical records.  There were also

8   sort of urine drug screens or urine drug tickets or -- yeah, I

9   think they called them behavior tickets where these sorts of

10  things would be documented.  But yes, those were apparent in

11  the records as well as the patients' history.  It may indicate

12  prior history of drug abuse or substance abuse.  And so, yes,

13  that was clearly something that was on my radar.

14  Q.  OK.  And I just want to make the record very clear.  Did

15  you actually see the disciplinary tickets themselves or

16  references?

17  A.  I don't recall seeing the tickets.  I think these were just

18  references.

19  Q.  OK.  And Dr. Carinci, did my office -- was my office able

20  to provide you with the criminal histories of these patients?

21  A.  Not that I recall.

22  Q.  OK.  Tell me something, Dr. Carinci.  In conclusion, based

23  on your direct testimony, did you make any mistakes in your

24  report?

25  A.  Yes.

Q.  OK.  Can you give me an example of a mistake you might have
made?

A.  Well, I think, you know, just taking a step back for a
moment, this is probably the biggest report I've personally
ever written.  You know, again, I did this myself.  I did not
have any assistants helping me with this.  I also understood
that there was an essence -- you know, time was of an essence,
given that there were people suffering here.  And so there may
be some oversights in some of my summaries that I put together.

     One particular one, I think, was fleshed out during my
deposition, where I had indicated that the provider had never
mentioned that the patient had myelopathy, which was true in
one of the reassessment forms but was clearly documented in the
second reassessment form.  And so, you know, clearly I over --
it was an oversight by saying that it was never mentioned when
it was only mentioned in one of the two.  That was one
particular issue that showed up in my deposition.

     You know, there may have been other, you know, sort of
small either grammatical or, you know, documented a wrong dose,
or something like that.  There could be many of them in a
report this size and given the voluminous records that I
reviewed.

     I think the point is, however, that none of those errors
were systematic errors that would affect the overall conclusion
in this case.  You know, whether that particular patient had

1  myelopathy or not is not going to alter the overall opinion in

2  this matter.  You know, clearly we all strive for 100 percent

3  accuracy, but you know, again, when you're putting a report

4  like, of this size together, there's going to be some errors.

5  Again, I stand by the report.  There's no systematic errors

6  that would affect the overall conclusion, however.

7          MS. AGNEW:  Dr. Carinci, I've concluded my direct, and

8  I'm going to turn it over to my colleagues.

9          THE COURT:  Thank you.

10         Cross-examination, counsel.

11         MR. NOLAN:  Thanks, your Honor.

12         THE COURT:  Yes, sir.

13 CROSS-EXAMINATION

14 BY MR. NOLAN:

15 Q.  Good morning, Dr. Carinci.

16 A.  Good morning.

17 Q.  My name is Will Nolan.  I'm one of the attorneys for Dr.

18 Moores, the chief medical officer at DOCCS.  I've got some

19 questions for you today.  OK?

20 A.  All right.

21 Q.  OK.  First, we are going to go through some of your

22 qualifications and just make sure I understand -- and I think

23 counsel already alluded to this, that we'd be asking -- you

24 never worked in a prison before?

25 A.  No.

N95Wall6                        Carinci - Cross

1   Q.  OK.  You never worked in any correctional facility or

2   setting?

3   A.  No.

4   Q.  OK.  Your experience with the correctional setting then is

5   based on your services in this case and one other.  Do I have

6   that right?

7   A.  When -- could you clarify what you mean by my services

8   particularly?

9   Q.  The work that you've done with prisoners in an incarcerated

10  setting.

11  A.  Well, I think, I mean I would separate out, like, the sort

12  of serving as an expert witness from serving as a physician.

13  As I've indicated, I have taken care of, you know, incarcerated

14  patients.  But as an expert witness, yes, this would have been

15  the second case.

16  Q.  OK.  And the first case, was that *Medina v. Buther*?

17  A.  Yes.

18  Q.  OK.  And that was in this court?

19  A.  Yes.

20  Q.  And other than this case and the *Medina* **case, do you have**

21  **any experience actually speaking or treating with prisoners who**

22  **are actually -- while they're in the correctional setting as**

23  **opposed to outside in your own office?**

24  A.  Well, again, I guess I'm just trying to clarify, you know

25  when a prisoner is sent to my office for medical care, I would

1    consider that treating the patient.

2    Q.  And when they're sent to your office for medical care, are

3    they being sent to your office in your capacity as a pain

4    management specialist?

5    A.  Yes.

6    Q.  OK.  And when you're treating patients as a pain management

7    specialist, do you typically follow patients for a long period

8    of time, or do you see them only a few times as a consultant?

9    A.  Generally, it's longitudinally over time, for long periods

10   of time, the majority.

11   Q.  OK.  You mentioned the *Medina* **case before.  I just wanted**

12   **to clarify.  The attorney representing the plaintiff in that**

13   **case was Ms. Agnew, is that correct?**

14   A.  Yes.

15   *Q.*  **You were paid for your services in the** *Medina* **case***?*

16   A.  Yes.

17   Q.  OK.  How much were you paid?

18   A.  I don't recall.

19   Q.  OK.  Do you know what the terms of your compensation were?

20   A.  Yes.

21   Q.  And what were they?

22   A.  You mean, like, an hourly rate?

23   Q.  Sure.

24   A.  $800 an hour.

25   Q.  OK.  Do you have an idea of how many hours you spent on

N95Wall6                        Carinci - Cross

1    that case?

2    A.  I don't.  I'm sorry.

3         THE COURT:  I'm going to ask you to slide in a little

4    closer to the microphone again, please, sir.

5         THE WITNESS:  Oh, sure.

6    BY MR. NOLAN:

7    Q.  How about this case; are you being compensated for your

8    time?

9    A.  Yes.

10   Q.  OK.  And do you know how much you've been paid to date on

11   this case?

12   A.  In the order of about 50,000, I think, over approximately

13   three years.

14   Q.  And what are the terms of your compensation; by hourly

15   rate?

16   A.  Some is hourly.  You know, record review, phone

17   conversations, Zoom meetings, those sorts of things are hourly.

18   There's other things, like deposition -- well, deposition

19   testimony was hourly as well.  But court appearance or when I

20   went out to examine some of these claimants, those are more

21   flat-rate fees.

22   Q.  When you're charging an hourly rate for this case, what was

23   the rate?

24   A.  800.

25   Q.  OK.  And the flat fees?

N95Wall6                         Carinci - Cross

1    A.  Well, for today, testifying is 12,000.

2    Q.  And to be clear, with respect to your areas of expertise,

3    are you an expert in treating addiction?

4    A.  No.

5    Q.  OK.  Have you served on any corporate boards, scientific

6    advisory boards of any type?

7    A.  Yes.

8    Q.  And can you identify those for us?

9    A.  They would have been listed in my CV.  It's not something

10   I've done in probably the last five or six years, but in the

11   past I was asked, primarily when I was at, you know, Harvard

12   and MGH, to participate in a medical advisory board, which was

13   essentially just a meeting of physicians from around the

14   country to review data with regards to new medications and to

15   offer your opinions about what you felt were -- did this

16   medication have an applicability for patients?

17   Q.  OK.  And was one of the boards that you sat on Mallinckrodt

18   Pharmaceuticals?

19   A.  Yes.

20   Q.  You sat on that board from 2013 to 2014?

21   A.  No.  This was just a one-time meeting.

22   Q.  OK.

23            THE COURT:  I think the question was:  "And was one of

24   the boards that you sat on Mallinckrodt Pharmaceuticals,"

25   right?

1          MR. NOLAN:  Yes.

2          THE WITNESS:  And my answer was yes.

3     BY MR. NOLAN:

4     Q.  And did you sit on that board in 2013 and 2014?

5     A.  No.  I think the way you're interpreting that from the CV

6     is that was the academic year.  But it's -- it was just a

7     one-time meeting.  This is not like I was on a board that met

8     consistently.  These scientific advisory boards are essentially

9     one-time meetings, where there might be a specific date where

10    we all met at a conference table; might have been a hundred

11    doctors that were there.

12    Q.  Did you get paid for that?

13    A.  Yes.

14    Q.  Do you recall how much you got paid for your work with

15    Mallinckrodt?

16    A.  No, I don't.

17    Q.  Mallinckrodt is a pharma company, correct?

18    A.  Yes.

19    Q.  And it's one of the biggest manufacturers of opioids in the

20    U.S., right?

21    A.  I don't know about that.

22    Q.  Does it sell or market opioids?

23    A.  I don't know.

24    Q.  You don't know?

25    A.  I don't know.

N95Wall6                           Carinci - Cross

1   Q.   OK.  Do you know whether it sells fentanyl?

2   A.   I don't know.

3   Q.   How about Collegium Pharmaceuticals; did you sit on that

4   board?

5   A.   Yes.

6   Q.   And that's also a pharma company, correct?

7   A.   I don't know if they're still in existence, to be frank,

8   but they were at least at one point.

9   Q.   Did they sell and market opioids?

10   A.   I don't know.

11   Q.   Were you paid for your work for Collegium?

12   A.   Yes.

13   Q.   Do you know if they sold Xtampza?

14   A.   Yes, they did.

15   Q.   How about Cubist Pharmaceuticals; did you serve on the

16   scientific advisory board for Cubist Pharmaceuticals?

17   A.   Yes.

18   Q.   OK.  And was that in 2012 and 2013?

19   A.   Again, it's a one-time meeting.  It was probably in that

20   academic year, 2012 to 2013.

21   Q.   And were you paid for that work?

22   A.   I don't recall.

23   Q.   And do you know what they made, what pharmaceuticals?

24   A.   I think it's a nonopioid agent, although I -- you know,

25   it's quite a while ago.  I don't recall specifically.

N95Wall6                         Carinci - Cross

1   Q.   How about Covidien Pharmaceuticals; did you serve on a

2   scientific advisory board for Covidien?

3   A.   I think that was the same with Mallinckrodt.  I can't

4   recall specifically.  This is probably going back a decade or

5   so at this point.

6   Q.   OK.  Were you paid for that work?

7   A.   I don't recall.

8   Q.   Did you serve on any board for Abbott Labs?

9   A.   No.

10  Q.   Did you do any work for Abbott Labs at any time?

11  A.   I taught spinal cord stimulater implant classes.  I think I

12  did one of those in, I want to say 2020, '21, possibly.

13  Q.   Were you paid for that work?

14  A.   Yes.

15  Q.   And does Abbott Labs, to your knowledge, partner with

16  pharma companies to sell drugs?

17  A.   No.

18  Q.   You've served as an expert in litigation plenty of times,

19  right?

20  A.   What do you mean by plenty?

21  Q.   Well, how many cases have you testified in?

22  A.   12 case -- you mean in the court testified?

23  Q.   Let me start with in court.

24  A.   I think this is my 14th or 15th court appearance.

25  Q.   OK.  And how many times have you been retained to be an

1    expert?

2    A.  Since 2009, over a hundred times.

3    Q.  OK.  And you provided an expert opinion in a case called

4    State of Ohio v. Frank Lazzarini, correct?

5    A.  Yes.

6    Q.  And Mr. Lazzarini was a doctor in Ohio, is that correct?

7    A.  Yes.

8    Q.  And you testified on his behalf or as his expert?

9    A.  Yes.

10   Q.  And he was accused of running a pill mill, is that correct?

11   A.  Yes, he was.

12   Q.  What's a pill mill, for the record?

13   A.  A pill mill would be a practice that provides opioids

14   fairly indiscriminately, I think, if you're talking

15   particularly about opioids, indiscriminate without really

16   caring to treat the patient, just to provide the opioids.

17   Q.  For that case you reviewed the medical records of

18   Mr. Lazzarini's pain prescriptions, right?

19   A.  Could you ask the question again?

20   Q.  You reviewed the medical records related to Mr. Lazzarini's

21   pain prescriptions?

22   A.  Yes, I did.

23   Q.  And you actually opined that all of the pain prescriptions

24   he wrote were medically sound, right?

25   A.  That's not true.

N95Wall6                        Carinci - Cross

```
 1    Q.  Mr. Lazzarini -- he was convicted in engaging in a pattern
 2    of corrupt activity, telecommunications fraud, Medicaid fraud,
 3    tampering with a record, grand theft, involuntary manslaughter,
 4    aggravated drug trafficking, drug trafficking and illegal
 5    processing of drug documents.  Is that your understanding?
 6              MS. AGNEW:  Objection.  I'm objecting to the relevancy
 7    of the criminal conviction of a client of Dr. Carinci's.
 8              THE COURT:  Mr. Nolan.
 9              MR. NOLAN:  Well, I think it's relevant in that it
10    goes to bias and it goes to credibility.
11              MS. AGNEW:  I don't know why Dr. Carinci's client's
12    conviction for criminal charges goes to bias or credibility.
13    There might be other ways to elicit testimony that meets that
14    mark, but I don't think this is it.
15              MR. NOLAN:  Why don't I take a step back.  I withdraw
16    the question for now, but I have more questions about that
17    case.
18              THE COURT:  All right.
19              Off the record.
20              (Discussion off the record)
21              THE COURT:  Mr. Nolan.
22    BY MR. NOLAN:
23    Q.  In the Lazzarini case, Dr. Carinci, you opined that
24    Dr. Lazzarini exercised good medical judgment, correct?
25    A.  In some of the cases -- in some of his patients, yes.
```

N95Wall6                    Carinci - Cross

1  Q.  And in fact, one of those patients was prescribed Percocet,

2  fentanyl, alprazolam and hydrocodone all in one day, is that

3  correct?

4  A.  I don't know.  Which particular patient?  I mean you're

5  asking me something that's very generalized.

6  Q.  Do you know whether Mr. Lazzarini is still a doctor?

7  A.  I don't know.

8  Q.  You also provided an expert opinion in Rhodes v. Fred W.

9  Albrecht Grocery Co., correct?

10  A.  That does not sound familiar to me.

11  Q.  That was an Ohio case?

12  A.  Doesn't sound familiar.

13  Q.  Do you recall Dr. Higley in that case?

14  A.  I don't.

15  Q.  You don't recall being retained by Dr. Higley?

16  A.  No.

17  Q.  Why was this on your CV?

18  A.  That would not have been on my CV.

19  Q.  OK.  I want to talk about some of the assumptions in the

20  report that we talked about earlier, which is in the record as

21  P137.  Do you have that before you?

22  A.  I do.

23  Q.  OK.  Now, the assumptions that you made, and just looking

24  at the first assumption on the second page, that relates to the

25  MWAP policy, right?

N95Wall6                         Carinci - Cross

```
 1   A.  Yes.
 2   Q.  And the second assumption also relates to the MWAP policy,
 3   right?
 4   A.  Yes.
 5   Q.  And the third assumption relates to the MWAP policy?
 6   A.  Well, I think -- yes, it does.  I mean all of this relates
 7   to the MWAP policy.
 8   Q.  All of them relate to the MWAP policy.  OK.
 9       And are you aware that the MWAP policy was rescinded on
10   February 8, 2021?
11   A.  Yes.
12   Q.  Are you aware that it was replaced with a new policy?
13   A.  I'm not.
14   Q.  OK.  So you don't know what any new policy would be called?
15   A.  Correct.  I do not know.
16   Q.  And you were not retained to provide any opinion about any
17   medical care given to any inmates or prisoners or patients of
18   any type in this case under any new policy; is that fair?
19            MR. NOLAN:  Objection, your Honor.
20            THE COURT:  Basis.
21            MS. AGNEW:  So, the medical records that Dr. Carinci
22   examined in some instances do go longer and go past the point
23   of the new policy.  Dr. Carinci wouldn't know whether or not
24   that was in effect.  But I want the record to be extremely
25   clear of that fact.
```

N95Wall6                       Carinci - Cross

 1              THE COURT:  You don't object to that, do you, counsel?

 2              MR. NOLAN:  Well, I object to Ms. Agnew testifying for

 3       him, yes.

 4              THE COURT:  Do you dispute the facts with respect to

 5       the time period over which the medical records Dr. Carinci

 6       looked at extend?

 7              MR. NOLAN:  I dispute that as evidence in any way to

 8       support what she's saying so far based on Dr. Carinci's

 9       testimony.

10              MS. AGNEW:  Your Honor, I'll withdraw my objection.

11       Let's move on.

12              THE COURT:  Yes, ma'am.

13       BY MR. NOLAN:

14       Q.  But just to be clear, have you heard of a policy called

15       1.24A?

16       A.  No.

17       Q.  And just to be clear, you aren't here rendering an opinion

18       about anything to do with 1.24A, correct?

19       A.  Correct.

20       Q.  All of your opinions relate to the MWAP policy, which has

21       now been rescinded, correct?

22       A.  Yes.

23       Q.  Your report is dated May 5, 2022, correct?

24       A.  March 5, 2022.

25       Q.  Sorry.  Yes.  March 5, 2022.

1          And so it's fair to say that you concluded your review of

2     records before March 5, 2022, correct?

3     A.  Well, I think, you know, the date of my report is the date

4     of my conclusions.

5     Q.  OK.  And do you know what the last date of the last dated

6     record you looked at in terms of all the medical records?

7     A.  Not offhand, no.

8     Q.  Was it dated 2021 sometime?

9     A.  I don't recall without looking at the specifics.

10    Q.  But you certainly didn't review any medical records that

11    dated after March 5, 2022; fair to say?

12    A.  Correct.

13    Q.  OK.  And so you didn't render or come up with any opinion

14    that any group or class of patients -- well, actually, let me

15    take a step back.

16         One of the aims of your report was to determine whether the

17    MWAP policy injured patients through a deviation from the

18    standard of care.  Is that fair?

19    A.  Yes.

20    Q.  And you were looking back at what the individuals -- when

21    you use the term "injured," which is right there on the first

22    page, that's past tense, right?

23    A.  To an extent, past.  But you know, keep in mind that I did

24    examine, you know, 17 of these individuals.  So that would have

25    been current as well.

N95Wall6                          Carinci - Cross

1   Q.  And when you say current, that was in 2020 or 2021 that you

2   examined them?

3   A.  Yes, the date of the examinations.

4   Q.  OK.  Not in 2022?

5   A.  No.

6   Q.  Not in 2023?

7   A.  No.

8   Q.  OK.  And so your report also doesn't contain any opinion

9   that any group or class of patients were going to suffer any

10  future harm, does it?

11  A.  Future as in from, like -- can you be more specific?  What

12  do you mean?

13  Q.  Well, you have the report in front of you.  At any point in

14  time, did you opine in your report, is there anything there

15  that you see that suggests that anybody was in danger of

16  imminent harm of any type?

17  A.  Well, I think, yes.  I mean I would disagree with what

18  you're saying.  Yes, there were.  We talked about those two

19  sickle cell patients were repeatedly admitted.  I would say

20  that those in particular were harmed.

21  Q.  And what happened to those after the date of your report;

22  do you know?

23  A.  I don't know.

24  Q.  And you can't render an opinion as to whether they suffered

25  any harm after the date of your report; fair?

N95Wall6                         Carinci - Cross

1  A.  Correct.  I mean I do know that many of these individuals,

2  as I outlined in my report, once they were released into the

3  community, were restarted on many of their efficacious

4  medications.

5  Q.  So some of these individuals are no longer with DOCCS,

6  correct?

7  A.  Correct.

8  Q.  In fact, many of them are no longer with DOCCS?

9  A.  I don't know.

10  Q.  Do you know if any of them are still with DOCCS?

11  A.  I don't know.

12  Q.  When you refer to an injury through a deviation from the

13  standard of care, you're referring to the standard of care for

14  the treatment of pain conditions, is that correct?

15  A.  Yes.

16  Q.  OK.  And can we agree that when we refer to standard of

17  care, we're talking about a benchmark or to measure whether a

18  medical provider is meeting his or her obligations to a

19  patient?

20  A.  I'm not sure I would define it that way, but I think I'm

21  following you in general, yes.

22  Q.  All right.  But isn't it also true that when it comes to

23  the treatment of pain conditions, there is no recognized

24  standard of care?

25  A.  No, that's not true.

N95Wall6                          Carinci - Cross

1    Q.   We talked about your work in the *Medina* **case earlier,**

2    **correct**?

3    A.   I don't think we really talked much about my work.  You --

4    Q.   We recognized that you were an expert in that case,

5    correct?

6    A.   Yes, sir.

7    Q.   OK.  You gave testimony in that case, correct?

8    A.   Yes.

9    Q.   And you appeared in this court and gave testimony, correct?

10   A.   Yes.

11   Q.   And that was on September 18, 2018 --

12   A.   I don't recall.

13   Q.   -- is that fair?

14        But you do recall testifying?

15   A.   I do.

16   Q.   And you swore to tell the truth?

17   A.   Yes.

18        MR. NOLAN:  I'm going to read from page 275, lines 4

19   through 8 of the transcript of that testimony, which, for the

20   record, is located at Dkt. No. 392 from the *Medina* **case.**

21   Q.   You testified --

22        THE COURT:  Can I just ask you what we're doing; are

23   we putting it in front of the witness?  Or what are we doing

24   here, sir.

25        MR. NOLAN:  I'm impeaching the witness with his prior

1    inconsistent statement.

2               THE COURT:  OK.  Are we going to put it in front of

3    him?

4               MS. AGNEW:  Your Honor, I actually don't have a copy.

5               MR. NOLAN:  There's nothing that requires me to put it

6    in front of him, your Honor.  If you want me to put it in front

7    of him, I can, but I'm not required to.

8               THE COURT:  All right.  Well, I think you ought let

9    counsel look at it over your shoulder.

10              MR. NOLAN:  Yeah, I think counsel's familiar with her

11   client's testimony.

12              MS. AGNEW:  He's not my client, and I don't have it

13   memorized.

14              Can I take it?

15              MR. NOLAN:  No.  You can read it.

16   Q.  You testified, did you not, that there's really no

17   standards of care for treatment?

18              THE COURT:  Counsel, question, answer.

19              MR. NOLAN:  Well, the question was:  "Sir, are you

20   able to answer the question?"

21              You posed that to him, and he testified --

22              THE COURT:  Counsel.

23              MS. AGNEW:  I believe that --

24              THE COURT:  Counsel.

25              MR. NOLAN:  Your Honor, under the rules --

N95Wall6                           Carinci - Cross

1          THE COURT:  Two things.  No. 1, talk into the

2     microphone or we can't have it taken down.

3          Two, you have to ask the question and give the answer

4     that you want to read.

5          MR. NOLAN:  I will ask the question and give the

6     answer, and I'll let Ms. Agnew look over my shoulder.

7          MS. AGNEW:  Wait.

8          MR. NOLAN:  OK.

9     "Q.  Is there any standard of care for keratoconus-related

10    pain?"

11         Answer --

12         MS. AGNEW:  You have to read it all.

13         MR. NOLAN:  Keratoconus-related pain.

14         "Ms. Agnew:  Objection.  The witness is not an

15    ophthalmologist, nor has he been qualified as one.

16         "Mr. Schulze:  He is a pain specialist.

17         "The Court:  Sir, are you able to answer that

18    question?

19         "The Witness:  Well, there's really no standards of

20    care for treatment of really any pain conditions.  That's

21    really a decision between the patient and the physician.  There

22    are certainly guidelines, but I would hesitate to call any of

23    these standards of care."

24    Q.  That was your testimony, correct?

25    A.  Yes.

1   Q.  Yet your report contains several pages in this case on

2   standards of care related to pain conditions.  Is that fair?

3   A.  Well, I think you're misallocating my opinion with regards

4   to conditions versus pain management.  You know, you first

5   asked me are there standards of care in pain management.  I

6   think that's a different question of is there standards of pain

7   management relative to particular pain conditions.  I mean, you

8   know of course there are standards of care in pain management.

9   There may or may not be standards of care in particular pain

10  conditions.  But I think both of my answers are consistent.

11  Q.  OK.

12  A.  I don't think that there's any evidence that they're not

13  consistent.

14  Q.  OK.  I'll now read from page'77 of your transcript in that

15  case.

16  "Q.  Well, is it fair to say then there's not one standard of

17  care that should be followed in regard to keratoconus-related

18  pain, correct?

19  "A.  Right, and as I said before, I would hesitate to use the

20  term 'standard of care' with regards to pain treatment.  There

21  really are no specific standards of care relative to the

22  treatment of pain.  It's more of a guideline-based,

23  physician's-based discussion."

24      Again, that was your testimony in the *Medina* case, correct?

25  A.  Correct.  And again, it is consistent with my current

N95Wall6                          Carinci - Cross

1   position as well.

2   Q.  It's consistent with your current position that there is a

3   standard of care; is that what you're saying?

4   A.  What you're asking me about is a specific standard for a

5   specific condition.

6   Q.  You said any pain condition.

7   A.  Right.

8   Q.  Thank you.

9   A.  Any condition.  But what I'm talking about is there are

10  standards of care in pain management.  There are certainly

11  standards of care in pain management.  There may or may not be

12  standards of care for particular pain conditions.

13  Q.  Right, but in either case, the ultimate decision, right, is

14  the medical provider?  Correct?

15  A.  The ultimate decision for what.

16  Q.  Whether to prescribe a particular pain medication.

17  Correct?

18  A.  That's not -- are we talking about the standard of care, or

19  are you talking about general --

20  Q.  That's my next question.

21          THE COURT:  Would you be kind enough to let the

22  witness finish --

23          MR. NOLAN:  Sure.

24          THE COURT:  -- so that the reporter can get it down

25  before you start again.

N95Wall6                          Carinci - Cross

1          MR. NOLAN:  Sure.

2     Q.  The ultimate decision as to whether or not to prescribe a

3     particular pain medication lies with the medical provider,

4     correct?

5     A.  Yes.

6     Q.  All right.  And in this case, as I understand your

7     testimony, you're not suggesting that the frontline medical

8     providers as opposed to the RMDs have failed to meet any

9     standard of care, are you?

10    A.  No.

11    Q.  And you, as I understand it, found fault with the RMDs

12    themselves, not with -- just to say it another way, you found

13    fault with the RMDs?

14    A.  Yes, in general.

15    Q.  OK.  And you found fault with them because they were the

16    ones that ultimately could provide or not provide the

17    medications, correct?

18    A.  Yes.

19    Q.  OK.  Is that still the case?

20    A.  Yes.

21    Q.  Do you know whether the RMDs are still deciding whether or

22    not to prescribe medications?

23    A.  I don't know.

24    Q.  OK.  And in this case, when you did your work, the RMDs

25    weren't the ones seeing the patients, right?

N95Wall6                          Carinci - Cross

1    A.  Correct.

2    Q.  And so the paramount issue for you really was that the RMDs

3    were still the ones making the decisions with regard to

4    treatment with MWAP medications, right?

5    A.  Yes, that was part of it.

6    Q.  They didn't always have the medical records before them; is

7    that fair?

8    A.  Yeah, I don't think they ever the medical records.

9    Q.  But you were not making that conclusion with respect to the

10   frontline medical providers, right?

11   A.  Correct.

12   Q.  You don't know whether they had the medical records in

13   front of them at the time they were making decisions as to

14   whether or not to prescribe any medication?

15   A.  I don't know.

16   Q.  OK.  And so when you're talking about the violation of the

17   standard of care in this case, it was the RMD process which

18   ultimately led to that opinion that you have?

19   A.  Well, the standard of care, yes, comes back to the

20   implementation of the MWAP, which is really in the hands of the

21   RMDs.

22   Q.  OK.  We established that your report's dated March 5, 2022.

23   And just to be clear, you didn't review any medical records of

24   any patients on that -- that postdate that report, right?

25   A.  I don't think so, no.

N95Wall6                         Carinci - Cross

1   Q.  OK.  And you weren't asked to opine on any patient's

2   treatment after February 8, 2021, were you?

3   A.  I don't think so.

4   Q.  OK.  And so you can't testify today as to the care and

5   treatment of any patients in DOCCS custody postdating your

6   report?

7   A.  Correct.

8   Q.  And you can't testify that, as of today, any particular

9   patient is getting the care they need or not?

10  A.  I don't know.

11  Q.  OK.  And you reviewed medical information for, you said, 70

12  DOCCS patients?

13  A.  Yes.

14  Q.  And -- but you saw only 18 of them; is that fair?

15  A.  Could you ask the question again?  I got distracted.

16  Q.  You actually examined 18 of them?

17  A.  Yes.

18  Q.  OK.  What about the others; you didn't examine them?

19  A.  No.

20  Q.  OK.  How did you select the 18?

21  A.  I didn't select them.

22  Q.  Who selected them?

23  A.  I think Attorney Agnew in concert with the defense team.

24  Q.  How about the other -- I'm bad at math -- other 52; you

25  just reviewed their medical records?

N95Wall6                         Carinci - Cross

1    A.  Yes.  I did not examine those others.

2    Q.  OK.  And how were those others selected?

3    A.  Those were -- those were -- I don't know exactly how they

4    were selected.

5    Q.  Well, how did you determine that you were going to look at

6    those particular records?

7    A.  That was the list of patients that was provided as a sample

8    of the population.

9    Q.  OK.  As I understand it, you found the number of documents

10   to be unmanageable.  Is that fair?

11   A.  Well, I don't know if it was -- I wouldn't say it was

12   unmanageable.  I think I managed to get through the

13   documentation.  I think unmanageable would have basically not

14   resulted in a report.  I think -- I would say these were

15   voluminous records.

16   Q.  OK.  And if you'd just look at page 9 of your report, under

17   patient file review, section II, there's a subsection A.  Do

18   you see where it says, "Due to the unmanageable number of

19   documents"?

20   A.  No.

21   Q.  Do you see that word?

22   A.  Could you just point me -- how far down are you?

23   Q.  Third line down of the paragraph in the middle.

24   A.  OK.

25   Q.  And you used the word "unmanageable" number of documents,

1   correct?

2   A.   OK.

3   Q.   So you did find the number of documents to be unmanageable,

4   right?

5   A.   Right.  I see the point you're making.  I think, you know,

6   the way I'm interpreting your question to me, however, was,

7   like, unmanageable meaning like you couldn't actually get

8   through them in an efficient manner.

9   Q.   OK.  And to do it in an efficient matter, you had the legal

10  team create subsets of documents for you?

11  A.   Yes.  So, I, as I outlined here, asked that a summary be

12  created.  I asked for particular information, nine bullet

13  points, as I mention here, information, that I wanted a

14  10,000-foot view of each patient with references to the

15  underlying medical records so that I could get a sense for the

16  patient, get a sense for the issues, again, not looking for any

17  emotive statements, not looking for any interpretation, just

18  raw data that I could use to more fully delve into each of the

19  individual patients.

20  Q.   So for the subsets of documents that were created for you,

21  you refer to them as the important documents in your report,

22  correct?

23  A.   Yes.

24  Q.   And so naturally, certain medical records were left out of

25  your review then, correct?

N95Wall6                      Carinci - Cross

1   A.  No, that's not true.

2   Q.  Well, what were the unimportant documents, or were there

3   none?

4   A.  Well, there's a level of importance in terms of putting

5   together a 10,000-foot view summary that I would consider

6   important, and those are the ones that are outlined there.

7   Q.  OK.

8   A.  There was -- pardon me.

9        There was the ability to then delve into the additional

10  remainder of the records, which may have been of lesser

11  importance in some instances or perhaps even more important.

12  But in general, to get the 10,000-foot view, these were the

13  important things I wanted to see.

14  Q.  OK.  And so let's take a look at these.  The list that you

15  have on page 9 of your report, there's eight different

16  categories of documents that it says that you had the legal

17  team curate, I guess.  Is that fair?

18  A.  Yeah.  I have nine, nine bullet points here.

19  Q.  Sorry.  Nine.  Fair enough.

20       And so it says, "The legal team was directed to include any

21  available documents related to" -- let's take the first one --

22  "drug abuse or allegations of the same."

23       Who did -- who directed the legal team to do that?

24  A.  I did.

25  Q.  OK.  And who from the legal team did you direct to do that?

N95Wall6                        Carinci - Cross

1    A.  Well, I communicated to Attorney Agnew.

2    Q.  OK.  So am I correct in understanding that Attorney Agnew

3    was directed to include, among other things, documents related

4    to drug abuse or alleged drug abuse?

5    A.  Yes.

6    Q.  OK.  So you left it up to the legal team to determine what

7    records related to drug abuse or alleged drug abuse, correct?

8    A.  What do you mean I left it up to the legal team?

9    Q.  Well, you directed them to include them, correct?

10   A.  Correct.

11   Q.  Which means you didn't have them, correct?

12   A.  What do you mean by "have them"?

13   Q.  Well, you had to get them from somewhere; fair?

14   A.  No.  I had them.

15   Q.  OK.  So why were you directing the legal team to prepare

16   these for you if you had them?

17   A.  Well, as I mentioned to you, I'm asking to put together a

18   summary of the basic 10,000-foot view of each patient so I can

19   have an understanding of what the issue was.

20   Q.  OK.  But I'm not --

21   A.  I'm just looking for the facts in the case here that then I

22   could use to delve into the specifics, the medical records, to

23   really reach a conclusion about what the issues were.

24   Q.  OK.  And maybe there's some confusion, but as I understand

25   it, there were summaries that were created by the legal team

N95Wall6                          Carinci - Cross

1   that were narratives.  Is that fair?

2   A.  Yes.

3   Q.  And you didn't rely on those, you said; you just used them

4   as a 10,000-foot view, right?

5   A.  Correct.

6   Q.  But then there were the documents that you directed them to

7   include to base their summaries on.  Is that fair?

8   A.  The summaries -- so, I think you're perhaps looking at it

9   incorrectly or maybe I'm misunderstanding your interpretation

10  of it.  The summaries were to be composed, in part, with these

11  nine pieces of data that I'm asking for.  I wanted the

12  summaries to be based upon that.

13  Q.  Right.  So the nine pieces of data that you were asking

14  for, like -- for example, the first one was documents related

15  to drug abuse or allegations of same.  OK?  That's something

16  that you asked the legal team to get to you, correct?

17  A.  No.  I had it.

18  Q.  You had it.  So -- but why does it say, "The legal team

19  created subsets of important documents pulled from each

20  patient's voluminous records"?  OK.  So is what you're saying

21  you had all of the records, but you had the legal team go

22  through them for you to pull out what was important?

23  A.  No.  I think you're misinterpreting what I'm saying, or --

24  Q.  Please explain.

25  A.  I had the records.  All of the records were forwarded to

me.  For instance, if I wanted to get a better understanding or
an initial understanding of patient A, I would read the summary
to get a sense, OK, here's just from, just facts about patient
A based on these nine items that I asked for.  From there I can
then delve into the individual records to delve into more
specifics to formulate my opinion.  But I had all of the
records.

Q.  OK.  So the subsets that were created, those came from the
records that you had?

A.  Yes.

Q.  OK.  Once you had the subsets, did you go back and review
all the other records, or did you just rely on the subsets?

A.  **No.  The subsets were referenced -- the medical records,**
**underlying medical records are referenced to the subsets, so I**
**had access to all of it.**

Q.  Right.  I'm not asking whether you would access to it.  I'm
asking, when you reviewed it, were you relying on the subsets
for your opinion --

A.  No.

Q.  You were relying on the subsets created by counsel,
correct?

A.  No.  That's not correct at all.  I relied on the underlying
medical records to formulate my opinion.

Q.  OK.  So then you didn't need them to create subsets; fair?

A.  No, that's not correct.  It was helpful to me to get a

N95Wall6                         Carinci - Cross

1   10,000-foot view of each patient.

2   Q.  OK.  And to get the 10,000 view of each patient, legal team

3   created a summary and attached medical records to support that,

4   right?

5   A.  There were references to the underlying medical records.  I

6   don't -- I wouldn't use the term "attached"; I am not sure what

7   you mean specifically by that.  There was a summary, based on

8   the information I requested, that gave me a broad overview of

9   the patient, what was the salient issue that we were dealing

10  with here?  From there I could delve into the underlying

11  medical records to formulate my opinion.

12  Q.  OK.  So let's talk about just the subsets without regard to

13  your reliance one way or the other.

14      It was the legal team who was directed to create those

15  subsets, right?

16  A.  I asked them to put together summaries based on those nine

17  data points.

18  Q.  OK.  But your report uses the term "subsets."

19  A.  OK.

20  Q.  OK.  So you asked them to create subsets, right?

21  A.  I asked them to create summaries from those subsets, yes.

22  Q.  But it says here that you asked them -- they were directed

23  to include certain documents in subsets?

24  A.  I mean, look, I feel like I answered your question ten

25  times, which -- what more would you like me to say?

N95Wall6                         Carinci - Cross

1   Q.  I guess the question is did the legal team curate any

2   documents for you?

3   A.  What do you mean by curate?  I mean --

4   Q.  You used the word in your report, "curate" --

5          THE COURT:  One at a time, friends.  Let the witness

6   finish before the question starts.

7   A.  I think to just put it very simply, there's voluminous

8   records.  There's 70 patients with many years of data, and for

9   me to get an understanding of patient A, I identified nine

10  pieces of information that I wanted put together into a factual

11  summary from which I could then read, as a 10,000-foot view, to

12  get a general sense for things and then delve into the

13  underlying medical records to formulate my own opinion.

14  Q.  Fair enough, but the last two sentences of the middle

15  paragraph on page 9 says:  "The legal team also wrote a

16  synopsis of these curated medical records."  What did you mean

17  by curated?

18  A.  It's exactly what I'm telling you.  They put together the

19  summaries based on those nine pieces of information, those

20  curated pieces of information that were pulled out.

21  Q.  All right.  Let's go through it slower.

22      "The legal team also wrote a synopsis."  is the synopsis a

23  summary?

24  A.  Yes.

25  Q.  OK.  And those were based on curated medical records; fair?

1    A.  Yes.

2    Q.  OK.  Who created the curated medical records?

3    A.  They did based on my request for those nine pieces of

4    information.

5    Q.  OK.  So the legal team determined what fell within those

6    nine pieces of information, right?

7    A.  As a first pass, they did.  But again, I was able to then

8    go into the primary records and spot-check those, review them,

9    delve into the substance of them.

10   Q.  How --

11   A.  I didn't rely upon their summaries to formulate my opinion,

12   if that's what you're getting to.

13   Q.  Right, but you relied on the summary to figure out what the

14   issues were, correct?

15   A.  No.  I --

16   Q.  You didn't rely on the summaries at all?

17   A.  I did rely on the summaries to get a 10,000-foot view of

18   each patient.  But I wouldn't say that all of the issues were

19   embodied in those summaries, because it was just factual data.

20   Q.  OK.  Once you saw something in the summary, you then went

21   to the curated medical records to figure out whether it

22   supported what was in the summary?

23   A.  No.  The summaries -- I reviewed all of the medical records

24   for each patient.  The summaries were in addition to that as a

25   first pass to just review and get a 10,000-foot view of what

1    was going on.

2    Q.  OK.  So why didn't you just have them summarize all the

3    medical records?

4    A.  I don't think that was practical.

5    Q.  OK.  But somebody had to determine what was relevant,

6    right?

7    A.  I determined what was relevant.

8    Q.  OK.  And so you directed them to include specific things

9    about drug abuse or allegations of same, right?

10   A.  As an example, yes.

11   Q.  Yeah.  And the legal time determined what related to drug

12   abuse or allegations of same and gave it to you, right?

13   A.  No.  I had it all.  I think you're misunderstanding.

14   Q.  So there was no purpose to what they were doing?

15   A.  No, that's not true.

16   Q.  What was the purpose?

17   A.  To provide a 10,000-foot overview of the patient's history.

18   Whether they had all of the drug tickets in there or one of

19   them, I went back to the main medical records to review them.

20   The summaries just got me going so I had an initial sense of

21   each of the patients.  That's really it.

22   Q.  So, for example, if you went to a patient's summary, you

23   didn't see anything related to drug addiction, right, did you

24   then look at the curated medical records to see if there was

25   anything related to drug addiction?

N95Wall6                          Carinci - Cross

1   A.  I went through all of the records for each patient.  The

2   summaries were just the first pass.

3   Q.  Let's go back.  Just answer my question.  I'm asking you if

4   when you reviewed the summaries created by the legal team and

5   let's say, for example, you say nothing related to drug abuse

6   or allegations of same -- OK?  Are you with me?

7   A.  Yes.

8   Q.  OK.  If you didn't see anything, did you then look at the

9   curated medical records that the legal team put together for

10  you to determine whether or not those records -- whether they

11  missed anything?

12  A.  Yes.  I went back to the main medical records.

13  Q.  I'm asking about the curated medical records.

14  A.  I think --

15          MS. AGNEW:  I'm going to now object.  I think we're

16  getting to a little bit of badgering at this point.

17          MR. NOLAN:  I'm just really trying to understand the

18  process here.

19          MS. AGNEW:  I think he's explained it many times.

20          THE COURT:  If you want to keep using your time to do

21  this, go right ahead.

22          MR. NOLAN:  Thank you.

23          THE COURT:  But we are getting close to badgering.

24          MR. NOLAN:  I'm not trying to badger the witness.

25  Q.  What I'm trying to understand is if you saw nothing related

```
 1    to drug abuse in either the summary or the "curated" records --
 2    that's your term -- did you then go and look at all of the
 3    records to see if there was anything in there related to drug
 4    abuse or allegations of same just to make sure you weren't
 5    missing anything?
 6    A.  And the answer is yes.
 7    Q.  OK.  So you reviewed every page of every medical record?
 8    A.  Yes.
 9    Q.  OK.  How do you know that those were complete?
10    A.  I don't know.  That was what was provided to me.
11    Q.  It was provided to you by counsel?
12    A.  All of the medical records for each patient that they were
13    in, I had, that they had I had.
14    Q.  OK.  So everything you got you got from counsel, and you
15    relied on them to make sure that it was relevant to what you
16    were doing?
17    A.  Yes.
18    Q.  OK.  You have 75 exhibits to your report; fair?
19    A.  Yes.
20    Q.  OK.  And 70 of those exhibits corresponded to the medical
21    records you reviewed for those 70 patients, right?
22    A.  OK.
23    Q.  Is that fair -- is that correct?
24    A.  I mean I'd have to go back and, you know, do the math on
25    it.  But I'll take what you're saying.  OK.
```

N95Wall6                        Carinci - Cross

1   Q.  OK.  And those exhibits, did that comprise all of the

2   medical records that you reviewed in connection with your

3   report?

4   A.  I don't know.

5           MS. AGNEW:  Your Honor, may I?  Forgive me.  I see you

6   looking at your version of the report.  It does not include the

7   medical records.

8           THE COURT:  Good thing.

9           MS. AGNEW:  Exactly.

10  BY MR. NOLAN:

11  Q.  All right.  I'm now going to change topics.

12      As for patient examinations that you did, you said you did

13  how many -- 17?

14  A.  Yes.

15  Q.  OK.  And again, you -- you didn't select those; those were

16  selected for you?

17  A.  That's correct.

18  Q.  OK.  I want to focus on the three plaintiffs in this case.

19  Do you know who they are?

20  A.  No.

21  Q.  The named plaintiffs?  Do you know who Mark Daniels is?

22  A.  I know the name, yes.

23  Q.  Rashid Rahman?

24  A.  Yes.

25  Q.  And Felipe Rivera-Cruz?

1    A.  Yes.

2    Q.  OK.  And you issued a medical opinion or an opinion about

3    the care given to each of those four individuals, right?

4    A.  I believe so, yes.

5    Q.  You didn't physically examine Mark Daniels, did you?

6    A.  I don't recall, but let me just take a quick look.

7        No.

8    Q.  And you didn't speak to Mr. Daniels before issuing an

9    opinion about his care, did you?

10   A.  I did not.

11   Q.  And you didn't speak to his medical providers before

12   issuing an opinion about his care, did you?

13   A.  No.

14   Q.  And you didn't physically examine Rashid Rahman, did you?

15   A.  No.

16   Q.  OK.  And you didn't actually speak with Mr. Rahman before

17   issuing an opinion about his care, did you?

18   A.  No.

19   Q.  And you didn't speak with any of his medical providers, did

20   you?

21   A.  No.

22   Q.  OK.  And you didn't physically examine Felipe Rivera-Cruz,

23   did you?

24   A.  No.

25   Q.  And you didn't actually speak with him before issuing an

N95Wall6                          Carinci - Cross

1    opinion about his care, did you?

2    A.  No.

3    Q.  And you didn't speak with any of his medical providers?

4    A.  No.

5    Q.  With respect to the 17 patients that you did examine, how

6    many of their medical providers did you speak to?

7    A.  I don't think I spoke to any of them.

8    Q.  Did you speak to any of the RMDs?

9    A.  Not that I can recall specifically.

10   Q.  Did you review any testimony given by any RMDs or medical

11   providers in support of your opinion in this case?

12   A.  Well, let me just go back just for a quick minute just to

13   be clear.  When I arrived at the facilities, I did speak with

14   some physicians.  I can't recall who they were.  They did, you

15   know, bring me to the rooms.  They did get me settled, so I

16   don't know specifically who I spoke to.  My understanding is

17   that they were physicians that I spoke to.

18   Q.  All right.  But fair to say you didn't speak with anybody

19   about the reasons behind any decisions made with respect to the

20   pain management decisions that any medical providers made?

21   A.  No.

22   Q.  And so you can't say one way or the other what their

23   reasoning was, as reflected -- you're just looking at the

24   records; nothing further?

25   A.  I didn't have a conversation with the particular providers,

N95Wall6                          Carinci - Cross

1    no.

2    Q.  So you were really just looking at the records?

3    A.  Well, are we talking about the patients I examined in those

4    instances --

5    Q.  Yeah.  You were -- yeah, so let me just ask you.

6    A.  -- the providers?

7           THE COURT:  Counsel.  Counsel, you've got to let the

8    witness finish.

9           THE WITNESS:  Agreed.

10          THE COURT:  "Well, are we talking about the patients I

11   examined in those instances?"

12          THE WITNESS:  What was your question, sir?

13          MR. NOLAN:  Yeah, I will withdraw the question.

14   Q.  With respect to the patients you did examine, you relied on

15   their records and an examination of them, correct?

16   A.  Yes.

17   Q.  OK.  And you -- did you look at anything other than the

18   records, and did -- strike that.

19       Did you base your decisions or your opinions on anything

20   other than your examination of those individuals and your

21   examination of their records?

22   A.  Well, I would consider the MWAP forms as sort of separate

23   from the medical records.  So yes, I looked at those as well.

24   Q.  Anything else?

25   A.  Not that I can recall.

1    Q.  And you testified earlier that the medical records were --

2    I think you used the word "disarray."

3    A.  I don't know if I used that word.

4    Q.  OK.  Were they in disarray?

5    A.  In some instances; in many instances, yes.

6    Q.  And were they difficult to understand?

7    A.  Yes.

8    Q.  And were they illegible in many cases?

9    A.  Yes.

10   Q.  OK.  How about the MWAP forms?

11   A.  Some were illegible, yes.

12   Q.  Were any of them handwritten?

13   A.  I don't recall.

14   Q.  Were they difficult to understand?

15   A.  Some of them, yes.

16           MS. AGNEW:  Your Honor, could we get a check on time?

17   I do need a break.  I'm happy to wait if it's going to be 15

18   minutes.

19           THE COURT:  Off the record.

20           (Discussion off the record)

21           THE COURT:  All right.

22           Do you want to take a break now?

23           MR. NOLAN:  Sure.

24           THE COURT:  All right.

25           MS. AGNEW:  Thank you.

1          MR. NOLAN:  Your Honor, can I get an instruction that

2     they're not to talk about the testimony?

3          THE COURT:  Of course.

4          (Recess)

5          THE COURT:  Mr. Nolan.

6     BY MR. NOLAN:

7     Q.  OK.  I apologize for going back to this topic, but you

8     testified that you reviewed all of the medical records for

9     every patient that's referenced in your report.  Correct?

10    A.  Yes.

11    Q.  And how many hours would you estimate that took?

12    A.  60 hours probably at this point.

13    Q.  60 hours, a lot of work?

14    A.  Right.  Was that a question?

15    Q.  Was that a lot of work, 60 hours, for you?

16    A.  Yes, it's a lot.

17    Q.  You recall, again, you were deposed in this case --

18    A.  Yes.

19    Q.  -- correct?

20         And your attorney was there when you were deposed -- or not

21    your attorney, but Ms. Agnew was there when you were deposed?

22    A.  Yes.

23    Q.  And again, you gave an oath at that time, correct?

24    A.  Yes.

25    Q.  And you swore to tell the truth, right?

N95Wall6                         Carinci - Cross

1    A.  Yes.

2    Q.  I'm going to read from page 98 of your deposition

3    transcript, lines 16 to page 99, line 6:

4              MS. AGNEW:  Your Honor, he was deposed twice.  Can I

5    just ask --

6              MR. NOLAN:  The first one.  You can look at mine, if

7    you want.

8    "Q.  So 15 to 20 hours reviewing medical records?

9    "A.  Yes.

10   "Q.  Is that reviewing medical records for each of the 70

11   patients that you were provided?

12   "A.  Yes.

13   "Q.  Is that 15 to 20 hours per patient or a total for all the

14   material records?

15   "A.  No.  That's cumulative, but that doesn't include the time,

16   you know, spent at the facilities examining those individual

17   patients, which was essentially a full day at each of those

18   facilities."

19   Q.  Does that refresh your recollection whether -- as to how

20   long you spent reviewing medical records for this case?

21   A.  Yes.  And I know I went on to further clarify that, and I

22   believe we talked about 40 hours further down in the

23   deposition.

24   Q.  And that was for other work that you did other than

25   reviewing medical records?

N95Wall6                         Carinci - Cross

1    A.  No.  I think that was all-encompassing.  In addition, you

2    know, we didn't account for the time spent at the facilities.

3    Q.  OK.  Fair.

4        I want to talk a little bit about gabapentin.  That's also

5    known as Neurontin, correct?

6    A.  Yes.

7    Q.  Neurontin's just a brand name?

8    A.  Yes.

9    Q.  OK.  And we talked a little bit about FDA approval earlier.

10   Do you recall that?

11   A.  Yes.

12   Q.  And what, if anything, is gabapentin FDA-approved for?

13   A.  Well, there's probably multiple seizure diagnoses that it's

14   approved for.  I don't know about those.  I don't provide it

15   for, you know, seizures, an antiepileptic medication, so

16   there's probably some FDA approvals for seizure-type

17   indications that I'm not familiar with.

18   Q.  OK.  And in terms of your practice, in terms of pain

19   management, what is it FDA-approved for, if anything?

20   A.  It may be diabetic peripheral neuropathy, but again, I'm

21   not --

22             THE COURT:  Slow down for the court reporter, please.

23             Diabetic peripheral neuropathy.

24             THE WITNESS:  Yes.

25   BY MR. NOLAN:

N95Wall6                          Carinci - Cross

1   Q.  OK.  Do you know whether it's FDA-approved for diabetic

2   peripheral neuropathy or not?

3   A.  Not with 100 percent certainty.

4   Q.  OK.  Do you know whether it was at the time you issued your

5   report?

6   A.  I don't recall.

7   Q.  OK.  Gabapentin, fair to say it's potentially addictive,

8   right?

9   A.  Theoretically, there's a very minimal risk, yes.

10  Q.  And you said it works by essentially binding to the calcium

11  channels in your spinal cord; is that fair?

12  A.  Yes.

13  Q.  Same way as Lyrica works?

14  A.  Yes.

15  Q.  And you said there's potential for it to be addictive, but

16  there's also potential for it to be abused, right --

17  gabapentin?

18  A.  Yeah.  I mean really anything could be abused.

19  Q.  And to be clear, gabapentin and Lyrica are both known as

20  gabapentinoids; is that fair?

21  A.  Yes.

22  Q.  And can you just explain what does -- is that a class of

23  drugs -- gabapentinoids?

24  A.  Yes.

25  Q.  And with respect to the potential for abusing them, is

N95Wall6                         Carinci - Cross

1   that -- can that be exacerbated if a person has a history of

2   addiction?

3   A.  Well, the risk -- you know, the risk of addiction increases

4   if someone has a risk -- a history of addiction.

5   Q.  OK.  What if they are also using, a person's also using

6   opioid therapies?

7   A.  Correct.  It would increase the risk.

8   Q.  OK.  And so is there a risk with, when a patient uses

9   gabapentin also with alcohol?

10  A.  Yes.

11  Q.  And what's that risk?

12  A.  I don't know if anyone knows the specific, quantifiable

13  number, but the risk increases.

14  Q.  OK.  And how about using them in combination with CNS

15  depressants?

16  A.  And what's the question with regard to that?

17  Q.  CNS depressants, central nervous system drugs.

18  A.  Yes.  What's your question, though?

19  Q.  Is there any risk posed by using gabapentinoids with those?

20  A.  Yes, there are risks.

21  Q.  Does gabapentin or gabapentinoids generally, do they

22  have -- are they commonly indicated with respect to other

23  medications?  Are there any that you can name that you think it

24  shouldn't be mixed with?

25          THE COURT:  Counsel, one question at a time.

N95Wall6                              Carinci - Cross

 1                  MR. NOLAN:  Yeah.

 2                  THE COURT:  Which one do you want?

 3     BY MR. NOLAN:

 4     Q.  Are there any medicines that, other pain medications or

 5     pain medications at all that you're aware of that shouldn't mix

 6     with gabapentinoids?

 7     A.  Yes.

 8     Q.  OK.  What are those?

 9     A.  Well, I think just in a basic form, it's not generally a

10     good practice to have someone on both gabapentin and Lyrica,

11     for instance.  In addition, other central nervous system

12     antiepileptic agents would also be generally not best practice.

13     Q.  You cite in your report, if you look at the bottom, there's

14     a number of footnotes to various articles, authorities,

15     publications.  Is that fair?

16     A.  Yes.

17     Q.  OK.  You consider those part of your report?

18     A.  The references?  Yes.  I mean they're referenced out to

19     those reports, yeah.

20     Q.  Are those reliable sources?

21     A.  Generally, yes.

22     Q.  And did you rely on them in preparing your report?

23     A.  Only so much as it was to make a particular point or to

24     reference a particular, whatever I was referencing.

25     Q.  And the sources that you relied on, the publications were

N95Wall6                        Carinci - Cross

1   reliable sources?

2   A.  Yes.

3   Q.  I want to bring your attention, very briefly, to -- I

4   believe it's footnote 4.

5   A.  What page are you on?

6   Q.  It's on page 6.

7   A.  OK.

8   Q.  Talks about a -- there's a reference to a Goodman CW, Brett

9   AS.  Do you know who that refers to?  Is that an author?

10  A.  Are you asking me if I know the author?

11  Q.  Do you know who it is that authored that publication?

12  A.  Well, it's referenced there, but I don't know who that

13  person is.

14  Q.  OK.  But the publication that you relied on is a clinical

15  overview of off-label use of gabapentinoid drugs.  Is that

16  fair?

17  A.  Yes.

18  Q.  OK.  And you said -- and that would be a reliable article;

19  is that fair?

20  A.  For the point I'm making, yes.

21         MR. NOLAN:  OK.  I'm going to read from that article,

22  under F.R.E. 803(18), your Honor.

23         THE COURT:  I have it memorized.

24         MS. AGNEW:  Your Honor, I'd also ask for a copy,

25  please.

N95Wall6                          Carinci - Cross

 1            MR. NOLAN:  Sure.

 2            MS. AGNEW:  Thank you.  He should get a copy.

 3            MR. NOLAN:  Who should get a copy?  Are you talking

 4   about the witness?  Well, he doesn't need it.

 5            MS. AGNEW:  Do you have another copy?

 6            MR. NOLAN:  Do you want to enter it into evidence?

 7            MS. AGNEW:  No.  I'm asking you if you have another

 8   copy.

 9            MR. NOLAN:  I do.  I have two more copies.

10            MS. AGNEW:  Then why can't he see it?

11            MR. NOLAN:  Well, I guess he can.

12            THE COURT:  Are you people talking off the record, or

13   what?

14            MS. AGNEW:  Sorry.

15            MR. NOLAN:  Sorry.

16            THE COURT:  If you're going to talk off the record,

17   use your off-the-record voices.

18   BY MR. NOLAN:

19   Q.  I'm going to show you, Dr. Carinci, an exhibit that's

20   marked as D28.  I hand marked it.

21   A.  Thank you.

22   Q.  And have you taken a look at exhibit D28?

23   A.  I mean I haven't read through it, but yes, I -- this is

24   familiar to me.

25   Q.  And that is, in fact, the article that is referenced in

N95Wall6                          Carinci - Cross

1    footnote 4 of your report; fair?

2    A.  Yes.

3    Q.  OK.  And I'm just going to read through portions of it with

4    you.  If you can look at the second page, on the right-hand

5    side, about halfway down, there is a paragraph that starts with

6    "several findings are noteworthy."  Do you see that?

7    A.  Yes.

8    Q.  OK.  It says:  "First, for gabapentin treatment of painful

9    diabetic neuropathy (a common condition for which gabapentin is

10   prescribed off-label), the evidence is mixed at best.  Among

11   five trials, two (including the largest and longest-duration

12   trial) showed no benefit, and two showed improvement of only

13   about one point on zero to ten scales compared with placebo."

14   Do you see that?

15   A.  I do.

16   Q.  OK.  If you go to the next sentence, it says, "A recent

17   Cochrane review estimated that roughly six patients with

18   painful diabetic neuropathy would require treatment with

19   gabapentin to provide 'substantial benefit' for one patient."

20   Do you see that?

21   A.  Yes.

22   Q.  OK.  And then it says:  "Second, there were few studies of

23   gabapentinoids for nondiabetic neuropathies; studies were

24   either negative or yielded statistically significant mean

25   differences less than one point on zero to ten scales compared

1  with placebo."  Do you see that?

2  A.  Yes.

3  Q.  OK.  The next paragraph down, it says, "Third, the evidence

4  does not support gabapentinoid therapy for low back pain or

5  radiculopathy."  Do you see that?

6  A.  Yes.

7  Q.  And then it says, "In the largest study (a

8  placebo-controlled trial of pregabalin for sciatica), the drug

9  was ineffective."  Do you see that?

10  A.  Yes.

11         THE COURT:  Slow down.

12  BY MR. NOLAN:

13  Q.  OK.  And then if you look at the next page, there's a

14  statement at the top.  It says, "table 1, randomized clinical

15  trials of gabapentin versus placebo for off-label treatment of

16  pain."  Do you see that?

17  A.  Yes.

18  Q.  And then the first, under clinical condition, it lists a

19  test, it lists diabetic neuropathy, a trial for that.  Do you

20  see it?

21  A.  I do.

22  Q.  And it says 421 participants.  Do you see that?

23  A.  Yes.

24  Q.  And for 12-week duration, there was no benefit in the

25  difference in pain compared with the placebo.  Do you see that?

N95Wall6                      Carinci - Cross

1    A.  Yes.

2    Q.  Now, if you look at the bottom of the article, the bottom

3    right, the first -- the paragraph at the bottom right, it says,

4    "Fifth, both gabapentin and pregabalin are FDA-approved for

5    treatment of postherpetic neuralgia."  Do you know what

6    postherpetic neuralgia is?

7    A.  Yes.

8    Q.  What is it?

9    A.  Postherpetic neuralgia is essentially a neuropathic pain

10   condition that results after an acute herpes zoster infection.

11   Q.  OK.  And doesn't have anything to do with diabetic

12   neuropathy?

13   A.  What was your question?

14   Q.  It's not related to diabetic neuropathy, is it?

15   A.  It's not related to it, no.

16   Q.  Right.  And does that refresh your recollection as to what

17   the gabapentinoids are approved for by the FDA?

18   A.  Does this article refresh my --

19   Q.  No.  That statement right there.

20   A.  Yes.

21   Q.  And then would you go to the next page, sir; there's a

22   paragraph on the bottom left.  It starts with "sixth."  Do you

23   see that?

24   A.  I do.

25   Q.  It says:  "Tables 1 and 2 summarize that a small number of

1   placebo-controlled gabapentinoid trials have been performed for

2   various other pain syndromes.  With few exceptions, the drugs

3   were either ineffective or associated with small analgesic

4   effects that were statistically significant but of questionable

5   clinical importance."  Do you see that?

6   A.  Yes.

7   Q.  If you go to the next page, under -- there's a column that

8   says the language of review articles and guidelines involving

9   gabapentinoids.  About halfway through the first paragraph,

10  there's a sentence starting with "Neuropathic pain."  See that?

11  A.  Yes.

12  Q.  It says, "Neuropathic pain is defined by the International

13  Association for the Study of Pain as '[p]ain caused by a lesion

14  or disease of the somatosensory nervous system.'"

15      Is that an accurate description of neuropathic pain?

16  A.  It's reasonably, yes.

17  Q.  Then it says, "Many clinicians likely conceptualize

18  neuropathic pain in a similarly nonspecific way that includes

19  conditions ranging from localized anatomical pathology (e.g.,

20  nerve root compression from disc herniation) to systemic

21  disorders with neuropathic effects (e.g., diabetes)."  Do you

22  see that?

23  A.  I do.

24  Q.  OK.  And then to the right, there's a column, says adverse

25  effects and misuse.  Do you see that?

N95Wall6                         Carinci - Cross

1    A.  Yes.

2    Q.  It also says that "Meta-analyses consistently show a

3    substantial incidence of dizziness, somnolence and gait

4    disturbance in patients who take gabapentinoids, with

5    dose-dependent effects."  Would you agree with that?

6    A.  Yes.  Depends, but yes.

7    Q.  And then it says, next paragraph down, first sentence:

8    "Evidence of misuse of gabapentinoids is accumulating and

9    likely related to the opioid epidemic.  A recent review article

10   reported an overall population prevalence of gabapentinoid

11   'misuse and abuse' as high as 1 percent, with substantially

12   higher prevalence noted among patients with opioid-use

13   disorders."  See that?

14   A.  I do.

15   Q.  "The higher prevalence among patients with opioid-use

16   disorders may relate to the reported augmentation of euphoria."

17   Do you agree with that?

18   A.  Yes, in some instances.

19   Q.  And then the next sentence, it says, "This trend is

20   troubling, particularly because concomitant use of opioids and

21   gabapentinoids is associated with increased odds of

22   opioid-related death."  Do you agree with that?

23   A.  No, not particularly.

24   Q.  OK.  But this is an article you cited and put in your

25   report?

N95Wall6                          Carinci - Cross

1   A.  Let me clarify my point of view.  I think it depends is

2   what I'll say there.

3   Q.  OK.

4   A.  Depends.

5   Q.  Then the next paragraph says, "Reports from law enforcement

6   agencies corroborate growing diversion activity and street

7   value for gabapentinoids."  Do you agree with that?

8   A.  I don't dispute it.

9   Q.  You don't?

10  A.  Have not seen it in clinical practice personally.

11  Q.  OK.  And the next page, under conclusions, it says:  "The

12  evidence to support off-label gabapentinoid use for most

13  painful clinical conditions is limited.  For some conditions,

14  no well-performed controlled trials exist.  For others, one or

15  several placebo-controlled studies have been published, but

16  results have generally shown the drugs to be either ineffective

17  or only modestly and inconsistently effective."  Do you see

18  that?

19  A.  Yes.

20  Q.  OK.  And just to be clear, this is an article you used in

21  support of your own report; fair?

22  A.  Yes, it is.

23  Q.  Thank you.

24      I want to ask a little bit about tramadol.  That's

25  mentioned in your report a few times, but I think you used the

N95Wall6                         Carinci - Cross

1   word Ultram?

2   A.  Yes.

3   Q.  Is that the commercial name?

4   A.  Yes.

5   Q.  Is that a drug that's meant to be taken routinely?

6   A.  It depends.

7   Q.  You typically would not prescribe it in a manner that's

8   used on a day-to-day basis, would you?

9   A.  No, that's not true.

10  Q.  You would typically -- don't you consider it an abortive

11  medication?

12  A.  In some instances, yes.  But in others, no.

13  Q.  OK.  I'll come back to that.

14      On page 11 of your report, you refer to a patient named

15  James Allen.  See that?

16  A.  Yes.

17  Q.  You refer to a drug called Tegretol?

18  A.  Yes.

19  Q.  Is that an anticonvulsant drug?

20  A.  Yes.

21  Q.  Is that sort of like an antiseizure drug?

22  A.  Yes.

23  Q.  OK.  And does it also go by the name carbamazepine?

24  A.  Yes.

25  Q.  And is that ever used to treat pain?

N95Wall6                          Carinci - Cross

1   A.  It is.

2   Q.  Is it ever used to treat nerve pain?

3   A.  It is.  It's like a third-line agent.

4   Q.  OK.  At page 12 of your report, there's a reference to a

5   Frank Andolina?

6   A.  Yes.

7   Q.  It refers to -- there's a reference to Suboxone.  What is

8   Suboxone?

9   A.  Suboxone is an opioid class of medications that is

10  generally prescribed for people that have an opioid-abuse

11  disorder.

12  Q.  And is it -- what is it made of?

13  A.  Buprenorphine is the main ingredient.

14  Q.  Is buprenorphine an opioid?

15  A.  It is.

16  Q.  And is it for -- it's used to treat addiction; is that

17  fair?

18  A.  It is used to treat addiction.  It is also used to treat

19  pain.

20          THE COURT:  Doctor, would you spell what the drug is

21  made from; what is it its main ingredient?

22          THE WITNESS:  Buprenorphine, B-U-P-E-N.

23          MS. AGNEW:  I think it's on our list, your Honor.

24          THE WITNESS:  This is a lot of pressure.

25          THE COURT:  Anyway, somebody give it to the court

1    reporter eventually.

2    BY MR. NOLAN:

3    Q.  All right.  You said it's used to treat -- are you saying

4    Suboxone is used to treat pain?

5    A.  Yes.

6    Q.  Is that frequent?

7    A.  It's increasingly used in that instance.

8    Q.  Does it work well for pain?

9    A.  Yes.

10   Q.  Do you prescribe it for pain?

11   A.  I have in the past.

12   Q.  Any of your patients responded well when you do?

13   A.  Some have and some have not.

14   Q.  Is it -- in addition to treating pain, does Suboxone

15   also -- is it used to treat active addiction?

16   A.  It can.

17   Q.  OK.  And chronic pain and addiction have many shared

18   patterns, correct?

19   A.  They do.

20   Q.  Those are neuropsychological patterns?

21   A.  Yes.

22   Q.  And the presence of active addiction complicates the care

23   of chronic pain patients, right?

24   A.  It does.

25   Q.  And treating patients with active addictions with

N95Wall6                        Carinci - Cross

1    medications that have abuse potential is not something that is

2    advised, is it?

3    A.   Generally not.

4              THE COURT:  Wait for just a minute.

5              OK.

6    BY MR. NOLAN:

7    Q.   OK.  And in your practice, you have had patients who demand

8    specific medications, right?

9    A.   Sometimes, yes.

10   Q.   Are there times when you refuse to give it to them?

11   A.   Yes.

12   Q.   Even when they're telling you it helps for their pain?

13   A.   Yes.

14   Q.   Why is that?

15   A.   Well, I think it depends.  It depends on what particular

16   medication they're asking for.  It depends on their medical

17   history.  It depends on their medical contraindications.  I

18   think there's a lot that goes into that assessment.

19   Q.   So just because a patient tells you it worked for their

20   pain doesn't necessarily mean that it's right for them, right?

21   A.   Correct.

22   Q.   That could be true with any drug, right?

23   A.   Possibly.

24   Q.   Any pain medication?

25   A.   Possibly, yes.

N95Wall6                    Carinci - Cross

```
1   Q.  Have you ever given in and prescribed a drug that you

2   thought was inappropriate?

3   A.  No.

4   Q.  You wouldn't expect other providers to prescribe

5   medications that they thought were inappropriate for a patient,

6   would you?

7   A.  No.  I would just ask that they document their rationale.

8   Q.  OK.  And in cases where you refused to provide the drug of

9   choice to the patient, do you offer them alternatives?

10  A.  Yes.

11  Q.  OK.  What are some of those alternatives?

12  A.  Well, I mean it depends.  It depends what they're asking

13  for and it depends what their medical condition is, and it's --

14  I don't think you can answer the question without knowing more

15  about the particular patient and request.

16  Q.  Do you ever offer nonmedication alternatives?

17  A.  Yes.

18  Q.  OK.  What types?

19  A.  Well, physical therapy, chiropractic therapy, TENS units,

20  you know, injections or procedures.

21  Q.  All of those are things that can be used to treat pain?

22  A.  Yes.

23  Q.  And if the patient doesn't want those alternatives, then

24  there's really nothing more that you can do for them, right?

25  A.  I think it depends.  Depends how willing they are to try
```

1   something that they've, they may not initially be open to.

2   Depends on the patient.  Depends on the situation.

3   Q.  When a patient comes to you and wants a specific drug and

4   you -- maybe you have your doubts, is there anything that you

5   require them to do before you'll consider putting them on that

6   drug?

7   A.  Well, again, you know, we're just talking in such an

8   abstract way, but I think depending upon the particular

9   medication at issue, I would want to know for sure what their

10  medical records, their prior history -- you know, if they're

11  attesting that a particular drug is very helpful to them, I

12  would like to see corroborative data in their medical record.

13  Depending on the particular medication, we may necessitate a

14  urine toxicology screen, a phone call with their prior treating

15  doctor.  I mean there's -- you know, it can get complicated.

16  Q.  Have you had occasions in your practice where you found

17  that a patient was abusing drugs?

18  A.  Yes.

19  Q.  OK.  And when you've found that they were abusing drugs, do

20  you typically wean them off or take them off the drug

21  immediately?  Sorry.

22      Do you typically take them off the drug?

23  A.  It really depends upon the drug we're talking about and

24  what particular infraction we're speaking of.

25  Q.  Any case you've ever just stopped cold turkey prescribing

1   it?

2   A.  Yes.

3   Q.  You mentioned Elavil on your direct examination.  Is that

4   also known as amitriptyline?

5   A.  Yes.

6   Q.  That's considered by some to be a first-line medication for

7   chronic pain, right?

8   A.  Yes.

9   Q.  And it can lessen pain severity?

10  A.  Yes.

11  Q.  And it can improve pain control, correct?

12  A.  In some instances, yes.

13  Q.  And it can result in improved function, correct?

14  A.  In some instances, yes.

15  Q.  All right.  So we can agree it's a valid treatment for some

16  patients with neuropathic pain, right?

17  A.  Yes.

18  Q.  And it's a valid treatment for some patients with chronic

19  pain, right?

20  A.  Yes.

21  Q.  Is the same true with respect to Cymbalta?

22  A.  Yes.

23  Q.  Are you familiar with Sublocade?

24  A.  No.

25  Q.  OK.  Is there an injection form of Suboxone that you're

1    aware of?

2    A.   There may be.

3    Q.   OK.  You just don't prescribe it?

4    A.   That's not something I would prescribe, no.

5    Q.   OK.  You've never heard of Sublocade?

6    A.   No.

7            MR. NOLAN:  No further questions.

8            THE COURT:  Thank you.

9            Redirect examination, counsel.

10   REDIRECT EXAMINATION

11   BY MS. AGNEW:

12   Q.   All right.  Dr. Carinci, I'm going to direct your attention

13   back to the exhibit that was premarked D27 by defense counsel.

14           MS. AGNEW:  Was this entered into the record, counsel?

15           MR. NOLAN:  No.

16           I'll move it into evidence, your Honor.

17           MS. AGNEW:  We're happy to have it in evidence, your

18   Honor.

19           THE COURT:  Received.

20           (Defendants' Exhibit 28 received in evidence)

21   BY MS. AGNEW:

22   Q.   Dr. Carinci, I want to look again at the last page of --

23   well, first of all -- strike that.

24       Can you look at your report, Dr. Carinci, where you cited

25   this particular article, and I believe it was on page 6.  And

1   what I'd ask you to do is just review that paragraph again,

2   especially the middle section, to refresh your recollection on

3   why you cited this particular article.  Take your time.

4   A.  Well, I cited this article in reference to the fact that

5   gabapentin and Lyrica are widely prescribed for off-label pain

6   syndromes, and they're frequently first-line alternatives for

7   chronic pain, particularly when opioids are being weaned,

8   withheld, withdrawn.  And you know, whereas there may not be a

9   hundred -- you know there's always conflicting studies.  Some

10  show efficacy.  Some show no efficacy.  Really depends on how

11  the trials were designed.  There's oftentimes not great

12  clinical efficacy.

13      At the same time, we know with other patients that they may

14  have no other alternatives, and we know that gabapentin is a

15  relatively safe medication.  It's generally well tolerated and

16  does have effect on multiple different pain medications --

17  multiple different pain syndromes.  So I was citing it in

18  reference to the fact that it is being used off-label for many

19  pain conditions despite the fact that there may be limited

20  evidence.

21  Q.  OK.  And can you tell us the title of D --

22          MS. AGNEW:  Is it 27 or 28?  I am so sorry.

23          MR. NOLAN:  Sorry.  It's 28.

24          MS. AGNEW:  OK.

25          MR. NOLAN:  Did I say D27?  If I did, it's D28 for the

N95Wall6                    Carinci - Redirect

1   record.

2            MS. AGNEW:  OK.  I apologize.

3   Q.  D28, the title of D28 is the clinical overview of off-label

4   use of gabapentinoid drugs.  Can you tell us, Dr. Carinci, what

5   is a clinical overview, in your experience?

6   A.  A clinical overview is essentially a culmination of

7   articles, you know, looking at efficacy of a particular

8   outcome.  And in this case, it's the off-labelled use of

9   gabapentinoid drugs.  And so the overview is meant to provide

10  clinicians with essentially a summary of the thinking to date.

11  Q.  And when you say thinking to date, are you indicating that

12  this is a clinical summary of the trial data available to date?

13  A.  Yes.

14  Q.  OK.  And in the section that Mr. Nolan read into the

15  record, isn't it true it says, "for some conditions no

16  well-performed controlled trials exist"?

17  A.  Correct.

18  Q.  OK.  And then that same section of the article, which is

19  the conclusion section, if you look at the last paragraph,

20  probably the third sentence down, it says, "Judicious

21  therapeutic trials of gabapentinoids are justified in patients

22  with selected off-label pain syndromes when at least modest

23  evidence of efficacy exists."  Correct?

24  A.  Yes.

25  Q.  When you reviewed, sir, the records and you went and

N95Wall6                        Carinci - Redirect

1   examined those patients in order to publish your report, did

2   you find evidence of efficacy existing in these patients with

3   their prior treatment with gabapentinoids?

4   A.  Yes.

5   Q.  OK.  And so would your opinion in this case actually

6   comport very much with the conclusion of this article?

7   A.  Yes.

8   Q.  Can you tell me -- Mr. Nolan talked to you about Suboxone

9   and in particular because one of these patients was on

10  Suboxone.  Correct?

11  A.  Yes.

12  Q.  And do you prescribe Suboxone to treat neuropathy in your

13  patients?

14  A.  I have.

15  Q.  OK.  And is it always a successful treatment for

16  neuropathy?

17  A.  No.

18  Q.  If you had to, on any given patient, determine whether you

19  would prescribe Suboxone for the treatment of neuropathy or a

20  gabapentinoid, in your clinical experience, which would be your

21  first-line treatment?

22  A.  Gabapentin.

23  Q.  And why is that, sir?

24  A.  Safety, tolerability, efficacy are better with gabapentin

25  in general.

1    Q.  And is it possible if there is a patient who is already

2    being treated with Suboxone for opioid addiction therapy that

3    they might also need additional pharmaceutical treatment for

4    severe diabetic neuropathy?

5    A.  Yes.

6    Q.  And why would that be?

7    A.  Well, patients can have more than one pain issue.  Patients

8    can have overlapping problems, such as addiction and pain, like

9    we talked about.  And as we talked about early on, this

10   morning, patients can respond differently to different

11   medications, whereas some patients may respond to Suboxone for

12   pain management, others may not.  Some of them, patients may

13   have -- Suboxone may actually be a good deterrent for opioid

14   abuse.  Others it may not.  And so patients are individuals,

15   and I'll just hearken back to that fact, that everyone responds

16   differently to medications and when we find a medication that

17   is efficacious, we're very careful in tapering it off.

18   Q.  OK.  And you also discussed with Mr. Nolan

19   nonpharmaceutical treatments, correct?

20   A.  Yes.

21   Q.  OK.  What is the goal when you prescribe a patient a

22   nonpharmaceutical treatment?

23   A.  Well, the goal is really multimodal therapy.  Pardon me.

24        The goal is multimodal therapy, whereas a single agent or

25   intervention may provide some relief, generally speaking, with

N95Wall6                    Carinci - Redirect

1  chronic pain, multimodal therapy tends to be synergistic in the

2  sense that we can provide overall better analgesia with

3  multiple routes of treatment.

4  Q.  OK.  And with those nonpharmaceutical treatments, would

5  your goals be the same as if you were indeed tendering

6  pharmaceutical treatment?

7  A.  Would you ask the question again, please?  I'm sorry.

8  Q.  I will.  That was confusing, and I apologize.

9      So, you reviewed the records of patients who, in fact,

10  engaged in nonpharmaceutical treatments, correct?

11  A.  Yes.

12  Q.  In every one of those situations, did you find that the

13  nonpharmaceutical treatments constituted effective pain

14  management?

15  A.  Well, in some instances they were effective.  In others,

16  no.

17  Q.  OK.  And so for any given patient, could you rely solely on

18  nonpharmaceutical treatments?

19  A.  No.

20              MS. AGNEW:  I have no further questions, your Honor.

21              THE COURT:  Thank you.

22              Recross, counsel.

23              MR. NOLAN:  Nothing, your Honor.

24              THE COURT:  Wonderful.  You may step down, sir.

25              (Witness excused)

1          THE COURT:  Is this a good time to break, friends?

2          MS. AGNEW:  I think it is, your Honor.

3          (Luncheon recess)

1                        AFTERNOON SESSION

2                            2:04 p.m.

3             (In open court)

4             THE COURT:  Good afternoon, folks.  Won't you be

5    seated.

6             Mr. Morrison.

7             MR. MORRISON:  The plaintiff class will call Susan

8    Mueller to the stand.

9     SUSAN MUELLER MD,

10        called as a witness by the Plaintiff,

11        having been duly sworn, testified as follows:

12   DIRECT EXAMINATION

13   BY MR. MORRISON:

14   Q.  Good afternoon, Dr. Mueller.  How are you doing?

15   A.  Good afternoon.

16   Q.  Just to start, can you please let us know where you are

17   currently employed.

18             THE WITNESS:  I have hearing problems, cochlear

19   implants.

20             THE COURT:  Yes, ma'am.

21             THE WITNESS:  And——

22             THE COURT:  Do you want them to speak up?

23             THE WITNESS:  I have this little device that if he

24   wears it, it will stream right into my devices.  I'm having

25   trouble hearing you.

 1                (Discussion off the record)

 2     BY MR. MORRISON:

 3     Q.  Dr. Mueller, can you start by you identifying where you

 4     currently work.

 5     A.  My office is at the Fishkill Correctional Facility in

 6     Beacon, New York.

 7     Q.  What position do you hold there?

 8     A.  Clinical physician III, regional medical director.

 9     Q.  Okay.  And you're a regional medical director of what?

10     A.  The Sullivan, Great Meadow, Oneida, and Watertown hubs.

11     Q.  Okay.  Can you explain what a hub is.

12     A.  It's a grouping of correctional facilities—geographic

13     grouping.

14     Q.  Okay.  So for each of those hubs—how many did you just

15     mention; was it five?

16     A.  Four.

17     Q.  Four.  For each of those hubs combined, how many

18     correctional facilities do you oversee, for lack of a better

19     word?

20     A.  Good question.

21     Q.  You don't know?

22     A.  Honestly, I don't.

23     Q.  Okay.  How about an estimate?

24     A.  Maybe about 15.

25     Q.  And currently what are the duties and responsibilities of a

1    regional medical director for a hub?

2    A.   We attend quality improvement meetings that are held

3    quarterly in the facilities; we're a participant in mortality

4    quality improvement meetings that occur when there's an

5    unexpected death in a facility; we—when specialty referrals

6    are made by the primary care physicians, if the outside

7    reviewing agency denies the consult, then it's forwarded to the

8    RMD for a review, for a final decision, one way or another; we

9    serve as a resource to the facilities; any needs or questions,

10   be it clinical or operational, they email or call us; sometimes

11   we help train new employees.  I'm kind of drawing a blank after

12   that.

13   Q.   That's okay.  That's enough.

14       I think you've also testified before that you are a

15   clinical supervisor of the physicians working in the facilities

16   under your hubs; is that accurate?

17   A.   Yes.  In other words—yes, clinical.  We're not their

18   actual supervisor, but we are supervisory for clinical matters,

19   yes.

20   Q.   Okay.  And it's also accurate that back starting in June of

21   2017 through February 8th of 2022, you also, as part of your

22   responsibility, reviewed and were responsible for either

23   approving or disapproving requests by providers to prescribe

24   patients MWAP—M-W-A-P—prescriptions, is that it?

25            MS. THOMAS:  Objection, leading.

N961ALL3                           Mueller - Direct

1    A.  Yes.

2              THE COURT:  It's cross.

3              MS. THOMAS:  No.  This is his witness.

4              THE COURT:  But isn't this an adverse witness?

5              MS. THOMAS:  He hasn't established that she's a

6    hostile witness.

7              THE COURT:  And it is introductory.

8              THE WITNESS:  I don't──was I supposed to hear that?

9              THE COURT:  Yes.  It doesn't matter.

10             THE WITNESS:  Can you repeat?  I don't know what was

11   said.  When I have it tuned in to you, I'm not hearing other

12   things.

13             THE COURT:  That was some legal talk.

14   BY MR. MORRISON:

15   Q.  That was legal talk.  You didn't need to hear that.

16   A.  Oh, okay.

17   Q.  When did you first become a regional medical director?  And

18   I'm going to use the acronym RMD, if that's okay.  Do you

19   understand what I mean?

20   A.  Yes.

21   Q.  Okay.

22   A.  I'm──I think it was──it was either two thousand──the end of

23   2012 or 2013.

24   Q.  And prior to that what were you doing; where were you

25   working?

1    A.  I was the facility health service director at Wallkill

2    Correctional.

3    Q.  And as facility health service director at Wallkill

4    Correctional Facility, did you provide direct patient care?

5    A.  Yes, I was the only provider there.  There were no others.

6    Q.  Okay.  And when you became an RMD, would you consider that

7    a promotion when you became an RMD?

8    A.  It was a promotion, but we made less money.

9    Q.  Doesn't sound like a promotion to me.

10   A.  And worse benefits.  Yeah.

11   Q.  When you became an RMD, did you continue to provide direct

12   patient care to patients in custody of the New York State

13   Department of Corrections?

14   A.  No.

15   Q.  So is it fair to say that you haven't provided any direct

16   patient care to any incarcerated individual since your

17   promotion?

18   A.  That's correct.

19   Q.  Other than Wallkill Correctional Facility, were you working

20   as a physician in any other correctional facility during your

21   time at DOCCS?

22   A.  Yes.

23   Q.  What other correctional facility?

24   A.  Shawangunk and Sullivan.

25   Q.  Sullivan was the first correctional facility you began

N961ALL3                        Mueller – Direct

 1   working at?

 2   A.   Yes.

 3   Q.   What year was that?

 4            MS. THOMAS:   I believe it was 1993.

 5   Q.   And during your time——and then you went to Shawangunk.

 6   A.   Yes.

 7   Q.   And were you the facility health service director at

 8   Shawangunk?

 9   A.   Yes.

10   Q.   And is it accurate that you were also the only medical

11   provider at Shawangunk when you were there?

12   A.   Yes.

13   Q.   During your time providing direct patient care at Sullivan,

14   Shawangunk, and Wallkill, did you prescribe medication to your

15   patients?

16   A.   Yes.

17   Q.   And in prescribing medications, did you ever have to submit

18   any form to any regional medical director or any supervisor

19   above you to be allowed to prescribe that medication to a

20   patient?

21   A.   Yes.

22   Q.   And under what circumstances did you have to submit

23   paperwork to get approval?

24   A.   For any nonformulary medication.

25   Q.   And can you explain what a nonformulary medication was, or

N961ALL3                          Mueller - Direct

1    is.

2    A.   Pharmacies, be it hospitals or insurance companies,

3    whatnot, have certain medications that they keep on formulary.

4    They are the medications they would prefer you prescribe

5    because that's what they have.  You can't have every medication

6    in a certain class on formulary, so to speak.

7    Q.   Okay.  In regards to pain medication back when you were

8    working as a direct care provider, do you recall what classes

9    or types of medications were considered nonformulary?

10   A.   I don't think that there is—there's always something in a

11   class that's formulary, so I'm not quite understanding the

12   question.

13   Q.   That's fair.  It was a bad question.

14       Was Neurontin, back when you were a direct care provider, a

15   formulary or nonformulary drug?

16   A.   I believe it was formulary.

17   Q.   Was it your practice—or strike that.

18       While you were providing direct patient care did you ever

19   prescribe any patient Neurontin?

20   A.   I don't remember.

21   Q.   Okay.  Do you have any—strike that.

22       Can you describe briefly your medical education and

23   background.

24   A.   You mean where I went to medical school?

25   Q.   Yeah.

N961ALL3                         Mueller - Direct

1    A.  I went to New York Medical College.  I was a physical

2    therapist for several years, then due to exposures and whatnot,

3    I decided I wanted to go to medical school.  And then I

4    completed a residency in general surgery.

5    Q.  What year was that?

6    A.  1990.

7    Q.  And after your residency did you practice?

8    A.  Yes.

9    Q.  Where?

10   A.  In Georgia, and in Liberty, New York, and in Newburgh, New

11   York.

12   Q.  And what type of medicine did you practice?

13   A.  General surgery.

14   Q.  Do you have any board certifications?

15   A.  I was board certified in general surgery, but when you're

16   due for recert, part of the process has to be your operative

17   log, and since I no longer operate, my certification has

18   expired.

19   Q.  Okay.  So when did your certification expire?

20   A.  I don't know.

21   Q.  Was it before the time that you became an RMD?

22   A.  Yes.  I——I believe so.

23   Q.  Did you ever get any specialty training or certifications

24   in pain management?

25   A.  No.

1   Q.  And it's true, as you sit here today, you don't consider

2   yourself an expert in anything, right?

3   A.  I don't really know what that question means.

4   Q.  Well, do you remember taking a deposition in July 28, 2023?

5   A.  Yes.

6   Q.  With a court reporter there?

7   A.  Yes.

8   Q.  And you were sworn to tell the truth?

9   A.  Yes.

10  Q.  Do you remember being asked these questions and providing

11  this answer:

12          MS. KILEY:  Could you give us the page and line

13  number, please.

14          MR. MORRISON:  It's page 54, line 24.

15  Q.  "Q.  Would you consider yourself an expert in anything?"

16  Mr. Ramage, your attorney, objected.  Your answer:  "No."

17      Do you remember being asked that question and you provided

18  that answer?

19  A.  You've just refreshed my memory.  Thank you.

20  Q.  Okay.  So would you agree that as you sit here today, you

21  don't consider yourself an expert in anything?

22  A.  I guess officially speaking, yes.

23  Q.  Okay.  I want to direct your attention right to it, back to

24  2015, okay?  And you were an RMD in 2015, right?

25  A.  Yes.

N961ALL3                        Mueller - Direct

1   Q.  And do you remember being asked to participate in something

2   called the narcotics review committee?

3   A.  Are you referring to the Green Haven?

4   Q.  I am.

5   A.  Oh, yes.

6   Q.  Okay.

7   A.  I didn't know it by that name.

8   Q.  What name did you know it by?

9   A.  I guess I don't really remember any particular name, but

10  yes.

11  Q.  Okay.  How did you come to learn that you—strike that.

12      How were you asked to participate in the narcotics review

13  committee?

14  A.  I believe the CMO asked me.

15  Q.  And who was the CMO at the time?

16  A.  Dr. Koenigsmann.

17  Q.  And can you describe what the narcotics review committee

18  was.

19  A.  There were three—three RMDs; and the facility health

20  service director—this is at Green Haven—I think a pain

21  medication nurse; Dr. Weinstein, a physiatrist.  I'm not sure

22  who else might have been on the committee.  It's quite awhile

23  ago.  And per the direction of the then-commissioner, they

24  wanted us to review the patients who were on narcotics and

25  Neurontin because at the time the facility was crippled with

1    medication lines that were running all day and in several

2    locations throughout the facility programs couldn't run, etc.,

3    etc., is how it was explained to me, so every patient who was

4    on any of these identified substances, medications, was

5    presented to the committee by their primary care provider;

6    their case was presented.

7    Q.  Okay.  So it's your understanding that this committee was

8    formed because Green Haven was being crippled with long

9    medication lines that was affecting programmings and things

10   like that.

11   A.  That's what I was told.

12   Q.  Okay.  Who told you that?

13   A.  I don't know if it was Dr. Koenigsmann, the superintendent

14   at the time?  I don't recall exactly who told me, but those

15   would be my guesses.

16   Q.  When you became part of this committee, were you provided

17   any data in regards to the amount of medications or narcotics

18   that were being prescribed at Green Haven?

19   A.  No, but I wasn't the, shall we say, the head of the

20   committee.  The RMD who was might have been.

21   Q.  And who was that?

22   A.  That was Dr. Bailey-Wallace.  Green Haven was actually one

23   of her facilities.

24   Q.  Was it your understanding during the committee that the

25   purpose was to review all the patients that are on narcotics

1   and try to see which ones you can get off?

2   A.  Well, if that was a possibility.

3   Q.  Okay.  And isn't it also true that in addition to narcotic

4   medications, you were also tasked with reviewing every

5   prescription of Neurontin that was in Green Haven?

6   A.  Yes.

7   Q.  And how often as part of this committee would you go about

8   these presentations at Green Haven?

9   A.  Weekly.

10  Q.  For how long?

11  A.  Months.

12  Q.  And can you describe to the Court these presentations and

13  how they went about.  Did that make sense?

14  A.  I don't know.

15  Q.  Okay.  So can you describe the presentations that were

16  presented to the committee at Green Haven.

17  A.  The provider whose patient was being presented——we sat in a

18  room with a big table——would come in, would have the patient's

19  chart, and would present the patient to the committee, and then

20  a discussion would ensue.

21  Q.  During these presentations were you and other committee

22  members allowed to ask questions to the provider about the

23  patient?

24  A.  Yes.

25  Q.  During these committee meetings with the presentation, was

1   the patient itself, himself, ever brought in and asked any

2   questions?

3   A.  No.

4   Q.  Any reason why that didn't happen?

5   A.  The provider met with the patient prior to and after each

6   of these meetings.  As to why they weren't brought in, I don't

7   have the answer to that.

8   Q.  And as a result——do you know roughly how many patients and

9   how many reviews occurred?

10  A.  No.  Dr. Bailey-Wallace would probably——would have had that

11  information because she was tasked with each week

12  sending——making and sending a report to the commissioner.

13  Q.  Okay.  Each day or once a week when you went to Green Haven

14  and did these presentations, roughly how many presentations

15  were done?

16  A.  I don't know.

17  Q.  Prior to starting were you provided any data——strike that.

18  I've already asked that.

19     As a result of the narcotics review committee, would you

20  agree that numerous patients at Green Haven were discontinued

21  from medications that they were previously on?

22  A.  I honestly don't know.  I wasn't tracking it.

23  Q.  Okay.  If you can take a look, there should be a document

24  that's marked Exhibit 138.

25  A.  That's not in this book, is it?

1   Q.  No.  It's right to your——

2              THE COURT:  It's on the side bar right next to you on

3   your left, ma'am.  Yes, ma'am.

4   A.  Sorry.

5   Q.  No problem.

6      Dr. Mueller, if you can take a moment and just flip through

7   this document quickly.  And let me know if you recognize it.

8   A.  No, I never saw this.

9   Q.  Okay.  Well, do you remember seeing it at your deposition?

10  A.  Oh, at the deposition?  Yes.

11  Q.  Okay.

12  A.  Sorry.

13  Q.  And do you remember discussing it and this being a printout

14  or a chart of meeting dates and inmates that were reviewed?

15  A.  I recognize it as such.

16  Q.  Okay.  And it looks like we have——don't worry.  I'm not

17  going to go through each meeting.

18     But on the first page up at the top, it says 4/15/2015.

19  The next page, 4/21/2015 date.

20  A.  Yes.

21  Q.  And this reflects those patients that were reviewed on each

22  meeting date for those dates; would you agree?

23  A.  It would appear as such.

24  Q.  Okay.  And without going——well, going through the chart,

25  the sixth column has medications, and it lists the medications

N961ALL3                         Mueller – Direct

1   that are associated with each inmate, correct?

2   A.  Yes.

3   Q.  And then on the column to the right of that, it says Final

4   D/C Date, right?

5   A.  Yes.

6   Q.  What does D/C mean to you?

7   A.  Discontinue.

8   Q.  Okay.  And in this first page, there are 16

9   inmates—correct?—listed.

10  A.  Oh, the first page.  I'm on the second.  Sorry.

11      Yes.

12  Q.  And of these 16 inmates, all but one have a final

13  discontinue date for the medications associated with them; is

14  that accurate?

15  A.  Which is the one?

16  Q.  Looks like No. 4, Baez?

17  A.  Okay.  Yes.

18  Q.  And this would reflect that each 15 of the 16 patients that

19  were discussed on April 15, 2015, resulted in a final

20  discontinuation date for their medication.  Would you agree

21  with that?

22  A.  Yes.

23  Q.  Okay.  And if you flip to the next page.

24      For April 21, 2015, there's 15 patients listed, two of them

25  discussed during the meeting; is that accurate?

N961ALL3                       Mueller - Direct

1    A.  Yes.

2    Q.  And of those 15 patients, if you look to the final

3    discontinue date column, it looks like there are only two that

4    do not have a final discontinuation date listed; is that

5    accurate?

6    A.  I'm still looking.

7    Q.  Sure.  And I'll direct your attention to Boone, No. 2, and

8    Ruiz, No. 12.

9    A.  Well, I'm seeing on No. 3, it says, "Keep Neurontin," "Keep

10   Neurontin, MS Contin" on No. 3.

11   Q.  There in the comment section?

12   A.  No. 1, it says, "Keep Neurontin"; No. 3, "Keep Neurontin

13   and MS Contin," yes.

14   Q.  Okay.  Fair.  No. 6, to be fair, says "Keep Neurontin" as

15   well, right?

16   A.  No. 6.  I haven't gotten any further.

17   Q.  Okay.

18   A.  Okay.

19   Q.  So but it's true—strike that.

20        Looking at just these first two meeting dates, does it look

21   to you that the majority of the individuals that were discussed

22   in the presentations did result in the discontinuation of their

23   medications?

24   A.  Yes.

25   Q.  And instead of going over each page, if you want to turn to

1   the last page of this exhibit, which is marked 138, it has a

2   chart breakdown, first column having meeting dates, the second

3   column discontinued date, or discontinued, the next column

4   weaning.  What does weaning mean?

5   A.  Tapering a dose, lowering.

6   Q.  Okay.  Does it mean tapering and lowering till taking them

7   off?

8   A.  Usually it does.

9   Q.  Okay.  And then it says keep, which, do you know what keep

10  means?

11  A.  Continue the medication.

12  Q.  Okay.  And the total at the bottom has 196 discontinued, 4

13  weaning, 11 keep, correct?

14  A.  Yes.

15  Q.  Now looking at this document, and this breakdown, would you

16  agree that the majority of the individuals that were reviewed

17  from April 15, 2015, to June 9, 2015, were discontinued from

18  their medication?

19  A.  Yes.  And it should be noted that word gets out in

20  facilities pretty quickly when something's going on, and a lot

21  of——we were told that quite a few of the incarcerated

22  individuals who were on these medications were coming to their

23  providers proactively and saying "Take me off of it," because

24  in reality, they weren't taking the medication themselves, they

25  were being hit up——upon by other incarcerated individuals for

1    the drug.

2    Q.  Do you have any documentation to support what you just

3    stated?

4    A.  No.

5    Q.  Where did you learn this information from?

6    A.  From the primary care providers there at Green Haven.

7    Q.  Okay.  You never——none of these patients that you allege

8    stated to the provider that they wanted to be taken off this

9    medication told this to you.

10   A.  No.  I didn't speak to any of the patients, so this was not

11   direct——a patient did not speak to me, no.  It was their

12   provider relaying the information.

13   Q.  And according to you, you learned this information during

14   the provider's presentation?

15   A.  Yes.

16   Q.  Okay.  Which provider told you that?

17   A.  Oh, I think it was——it might have been all of them.  There

18   were——a lot of the incarcerated individuals who had been on

19   these medications had been on them for a long time, and the

20   providers weren't even seeing them.  It was just automatic

21   renewals without seeing the patient.

22   Q.  So if the provider wasn't ever seeing the patients, how did

23   the patient inform the provider that they wanted to get off

24   their medication?

25   A.  Because when the word got out that this——all of the cases

1  were being reviewed and whatnot, they came proactively and

2  said, "Take me off of it."

3  Q.  Well, isn't it also accurate that patients at Green Haven

4  or any facility aren't forced to take medication?

5  A.  They weren't taking it themselves.  It was being—they were

6  obtaining it for the other incarcerated individual who was

7  pressuring them to get the medication to divert it to him.

8  Q.  Which patient did this occur to?

9  A.  Oh, I don't know.  I'm sorry.

10  Q.  Okay.  So would you agree that as a result of the narcotics

11  review committee, the lines at Green Haven in regards to

12  medication decreased?

13  A.  I don't know.

14  Q.  Did you ever come to learn any positive or negative

15  response from the commissioner's office in regards to the

16  narcotic review committee's work?

17  A.  No, because I wasn't the RMD in charge, so any

18  communication was between that RMD and the commissioner.

19  Q.  Were you, as part of the narcotics review committee, ever

20  part of reviewing or creating a final report for the

21  commissioner?

22  A.  No.

23  Q.  And do you consider the narcotics review committee to be a

24  successful endeavor?

25  A.  According to their superintendent and even some of the

1   providers who were involved, they felt that it was.

2   Q.  And do you feel like the narcotics review committee was a

3   successful endeavor?

4   A.  Well, if the people that were working there felt it was, by

5   virtue of that, I guess I would say it was.

6   Q.  Did you have any communication or have you ever spoken to

7   any of the patients who were subject to the narcotics review

8   committee's presentations who lost their medication, of whether

9   they believed it was successful?

10  A.  No.

11  Q.  After——let me ask you this:  So after the presentation how

12  did the determination from the narcotics review committee of

13  whether to discontinue or continue medication occur?

14  A.  Could you repeat that.

15  Q.  Sure.  Following the presentation of the provider, he comes

16  in, he has his, or her——has the chart of the patient, questions

17  are asked back and forth regarding the patient's medications.

18  How did it come——how did the committee make their determination

19  of whether the patient should continue on the medication or be

20  discontinued?

21  A.  It was a group discussion.

22  Q.  Pardon?

23  A.  It was a group discussion and determination.

24  Q.  Was the provider involved in the group discussion or was

25  it——

N961ALL3                         Mueller - Direct

1    A.  Yes.

2    Q.  Okay.  And how long did those group discussions occur?

3    A.  How long did it——

4    Q.  Yeah.

5    A.  I can't tell you that.

6    Q.  Were they short, ten minutes, five minutes, 30 seconds?

7    A.  It all depended on the case.

8    Q.  Okay.  And what type of issues were discussed?

9    A.  What treatments had been, you know——what kind of testing

10   might have been done for that particular incarcerated

11   individual; what treatments had the incarcerated individual

12   undergone——physical therapy, perhaps pain management

13   injections, orthopedic or neurology, neurosurgery,

14   consultations, different——what other medications had been

15   trialed.

16   Q.  How about the effectiveness that the medication has on the

17   patient?

18   A.  You just went——okay.  You went dead.

19   Q.  Sorry.  Is it working?

20   A.  Yes.

21   Q.  Okay.  Was the effectiveness of the medication on the

22   patient discussed during the determination?

23   A.  Yes.

24   Q.  And if the medication was effective in treating the pain of

25   the patient, did you keep the patient on the medication?

1    A.  I don't——I can't——I can't really answer that because each

2    case was different.

3    Q.  Okay.  Well, under what circumstances where the discussion

4    resulted that the patient was being effectively treated by the

5    medication would result in that medication being discontinued?

6    A.  Hypothetically an example could be where some diagnostics

7    needed to be performed to see if there would be a more

8    effective treatment for the patient, or in some of these cases

9    the provider themself might have said, I don't think that he

10   needs this.  This wasn't a one-sided determination or decision.

11   The provider was part of the decision-making process.

12   Q.  Okay.  Well, was there ultimately a vote?  What happens if

13   one person on the committee thought that he should keep the

14   medication, another person thought he shouldn't keep the

15   medication?

16   A.  I guess you need a tiebreaker.  I'm not trying to be——

17   Q.  A typewriter?

18            THE COURT:  Tiebreaker.

19   A.  Tiebreaker.  But I'm not trying to be smart, you know, or

20   disrespectful.

21   Q.  Okay.  No, no, no.  That actually helps me.

22        So there was a vote after the discussion.

23   A.  I don't recall formal votes, just discussions, and then

24   everybody would seem to come——in my recollection, seem to come

25   to the same consensus.

1    Q.   Okay.  And all of these discussions were done outside of

2    the presence of the patient himself, right?

3    A.   Yes.

4    Q.   And you mentioned something in regards to if the proper

5    testing wasn't done for a patient that the medication would be

6    discontinued until that testing was completed; is that

7    accurate?

8    A.   I think that's why some of them might have had, you know,

9    "Keep Neurontin" or whatnot, while things were pending.

10   Q.   Okay.  Because you would agree that discontinuing a

11   medication because proper testing wasn't done or in the file

12   would not be appropriate if that medication was effective for

13   the patient.

14   A.   Yes.

15   Q.   To your knowledge was the narcotics review committee ever

16   instituted in any other correctional facility?

17   A.   Not to my knowledge.

18   Q.   In any of your correctional facilities did you ever do an

19   independent review of the amount of prescription narcotic drugs

20   or Neurontin being prescribed?

21   A.   No.

22   Q.   Did you ever have a concern about the amount of Neurontin

23   or prescription drugs being prescribed?

24   A.   The——in some facilities, SURNs——which are senior

25   utilization review nurses——had done audits, and thought that

N961ALL3                    Mueller - Direct

1    there was an excess number――not excess――too high a number of

2    patients receiving Neurontin, but that wasn't RMD directed and

3    it wasn't at all facilities.

4    Q.  As the clinical supervisor, an RMD, of the facilities and

5    the providers, you never were concerned about the amount of

6    narcotics or Neurontin medications being prescribed; is that

7    accurate?

8    A.  Not in my role as an RMD, no.

9    Q.  You didn't think that――

10             THE COURT:  No, you were not concerned?

11             Repeat my question.

12   Q.  "No, you were not concerned?"

13   A.  If it was brought to my attention.  Sometimes there were――I

14   can think of――I can think of one facility offhand where a SURN

15   had completed a Neurontin audit and there was concern, and they

16   made a QI project out of it.

17   Q.  Okay.  Before that SURN or indication to you that there

18   was, they believed, a high amount of Neurontin being prescribed

19   in that facility, did you have any concern?

20   A.  No, because I would have no way of being aware of how much

21   Neurontin was being prescribed in a facility.

22   Q.  You never received any complaints from any provider or

23   anyone regarding that before that SURN report.

24   A.  Not that I recall.

25   Q.  Okay.  And you didn't take any action to try to reduce the

N961ALL3                     Mueller - Direct

1   amount of prescriptions or the prescription habits of any

2   provider before the SURN reports——would that be accurate?——in

3   any of your facilities?

4   A.  Correct.

5   Q.  At some point in time——I want to move on to the MWAP

6   policy, okay?

7       At some point in time you came to learn that a new policy

8   was being formed, formulated in regards to how certain

9   medications would be prescribed; is that accurate?

10  A.  Yes.

11  Q.  And that was called the MWAP policy, right?

12  A.  Yes.

13  Q.  Who, to your understanding, was charged with drafting that

14  policy?

15  A.  Dr. Dinello.

16  Q.  Do you understand why Dr. Dinello was charged with drafting

17  that policy?

18  A.  I assumed it was because he was the head of the pharmacy

19  and therapeutics committee and also because he worked on the

20  outside in addiction medicine.

21  Q.  Do you remember the first time you learned that this policy

22  was starting to formulate within DOCCS?

23  A.  Do you mean like a date?

24  Q.  Roughly.  Like 2016——how long after the narcotics review

25  committee ended?

1    A.  I don't know.

2    Q.  Do you remember being involved in discussions about the

3    formulation of that policy?

4    A.  Not the specific formulation, but we had discussions at RMD

5    meetings about perhaps having a policy created.

6    Q.  Were you advocating for that policy?

7    A.  Yes.

8    Q.  Okay.  And why were you advocating for that policy?

9    A.  Because at the time, this was a time when the opioid

10   epidemic was big-time national news, laws were changing with

11   how prescription, you know, prescriptions can be written, and

12   the SURN audits that were done were discovering what they

13   thought to be overprescription of Neurontin, so yes, so I

14   thought that maybe we needed to do something.

15   Q.  Okay.  You said laws were changing.  Was it your

16   determination that the prescriptions of medication within DOCCS

17   by your providers were breaking laws?

18   A.  Well, the DEA changed the law that you could only prescribe

19   an opioid for three days for acute pain, so up until that

20   point, yes, it was—they were being prescribed for longer than

21   three days.

22   Q.  Other than the three days of this new law that you allege

23   occurred, any other laws that were being broken by your

24   providers at DOCCS?

25   A.  No, not that I'm aware.

Q.  Was the issue in the SURN reports, to your understanding, about acute pain prescriptions or long-term prescription of narcotics and Neurontin medications?

A.  They were long-term prescriptions.

Q.  Did you see data in regards to your hubs about the amount of Neurontin medication or opioid medications being prescribed to patients?

A.  I—I remember that when I was talking about the one facility where they brought up about the Neurontin, they had a report, so it had numbers.

Q.  And when you saw those—what facility was that?

A.  That was Greene.

Q.  And what were the numbers that—were you disturbed by the numbers you saw?

A.  I thought they seemed to be a little excessive.

Q.  Okay.  Were those numbers attached to any patients?

A.  I don't recall.

Q.  After you saw those numbers and you thought they were a little extreme, did you do any investigation in regards to why that many, those—that many prescriptions were being prescribed at Greene Correctional Facility?

A.  The facility made a QI project out of it, and the facility, not with any of my involvement, met, I don't know how often. For argument's—I don't know how often, but I think they met weekly and discussed all the patients.

N961ALL3                              Mueller - Direct

1    Q.   Okay.

2    A.   That was a facility committee, though, and I was not

3    involved with it.

4    Q.   Okay.  It was a QI project?  What's a QI project, just to

5    be clear?

6    A.   Quality improvement.

7    Q.   And you had no involvement in the quality improvement?

8    A.   Not in their QI, their Neurontin project, no.

9    Q.   Okay.  Tell me about the Neurontin project.

10   A.   Not——their QI project, to evaluate their patients on

11   Neurontin.

12   Q.   Okay.  And how were they evaluating the——

13   A.   I didn't participate in the committee, so I——I don't know.

14   Q.   You had no concerns about what was going on?  I mean, you

15   just saw the SURN report that you said had a disturbing amount

16   of Neurontin prescriptions coming out of Greene.  You weren't

17   interested at all, you didn't think it was a bit important for

18   you as the RMD to follow up?

19   A.   Well, there was follow-up because they presented the

20   findings of their committee meetings at the next QI meeting.

21   Q.   Okay.  But you weren't interested to be involved in that

22   and find out how they were evaluating these patients at Greene,

23   in prescriptions.

24   A.   I was——it sounded to me, from what I was told by the

25   facility, that they had a, again, several members of their

1    group, and they were presenting each case, probably similar to

2    Green Haven, but I wasn't there so I can't say.

3    Q.  You don't have any idea who was involved in this committee

4    or group that was reviewing the prescriptions out at Greene?

5    A.  I do know that the facility health service director, the

6    nurse administrator, the deputy superintendent of

7    administration, and I don't know about the superintendent or

8    any other nurses.  Those are who I do know.

9    Q.  Why would the deputy superintendent of administration be

10   involved in reviewing the medications of patients?

11   A.  Because that person supervises medical units.

12   Q.  Okay.  Was that person a doctor?

13   A.  No.

14   Q.  Same thing with the superintendent.  Why would a

15   superintendent be involved in reviewing the prescription

16   medications of patients in the facility?

17   A.  I don't know if the superintendent was involved.

18   Q.  Okay.  And as a result of that committee, would you agree

19   that Greene decreased the amount of Neurontin prescriptions

20   being prescribed to patients?

21   A.  My recollection is they did.

22   Q.  And this all occurred before the MWAP policy came into

23   effect; would you agree?

24   A.  Yes.  Yes.

25   Q.  Do you know whether any of the patients involved in this

N961ALL3                        Mueller - Direct

1   review were allowed to participate in the discussion and the

2   review of their prescriptions?

3   A.  I don't know.

4   Q.  As the RMD, you also do peer reviews of each physician that

5   works in your hub.

6   A.  Yes.

7   Q.  And you have been doing that since you became an RMD.

8   A.  Yes.

9   Q.  And I believe you testified before that that is—you take

10  that role seriously, right, that job?

11  A.  Doing peer reviews?

12  Q.  Yes.

13  A.  I take it seriously, but it has no impact.

14  Q.  Right.  Well, I know you go to the facility, you spend the

15  day there, reviewing charts of a provider, right?

16  A.  Yes.

17  Q.  And then you go back to your office and you write the peer

18  review.

19  A.  Yes.

20  Q.  At any point in time did you ever write a peer review for

21  any doctor or nurse practitioner or provider criticizing them

22  for the amount of prescription medications they provide to

23  their patients?

24  A.  No, and that's not part of the peer review.

25  Q.  What's the peer review about?

1   A.  It's checkmarks, when you are reading a chart, and

2   theoretically it's supposed to be about chronic care

3   appointments——for example, asthma——and there are certain things

4   that you have to check and see, did they do.  So it has nothing

5   to do with prescription of narcotics, Neurontin, or anything

6   else.

7   Q.  Isn't it true, that's the first half of the peer review

8   document and then there's another half where you can write a

9   narrative?

10  A.  You can write a narrative, and the narrative I write is in

11  relation to the responses to those indicators.

12  Q.  So in a narrative section of a peer review, it's true

13  you've never criticized a provider working in one of your hubs

14  for overprescribing medication.

15  A.  I just don't address that.

16  Q.  Okay.  So you could address that if that was an issue,

17  though; you could put that in the peer review.

18  A.  Never thought to.

19  Q.  Have you ever raised, made a complaint or an allegation to

20  any provider during your time as an RMD that, you're

21  overprescribing certain medications?

22  A.  Did I ever make a complaint?

23  Q.  Correct.

24  A.  I don't think complaint would be the word, but when it got

25  brought up, let's say, by an audit, I would speak to them about

N961ALL3                    Mueller – Direct

1   it.

2   Q.  Okay.  Which audit and which provider are you speaking

3   about?

4   A.  Neurontin audit.  I don't think there were any other audits

5   that I——well, there weren't any that I was aware of.

6   Q.  That was at Greene Correctional Facility.

7   A.  Yes.

8   Q.  And after that you brought it up with——what provider was at

9   issue?

10  A.  What?  Which provider was it?

11  Q.  Yeah.

12  A.  Dr. Smith.  I don't know——I don't remember who else was

13  there then.

14  Q.  What's Dr. Smith's first name?

15  A.  Doreen.

16  Q.  Doreen?  And what were the numbers in regards to Doreen

17  Smith's prescriptions of Neurontin that concerned you?

18  A.  I don't know.

19  Q.  How did you raise that issue to Dr. Smith after you

20  determined that she was overprescribing or prescribing

21  Neurontin in an excessive amount?

22  A.  It was discussed at the QI meeting.

23  Q.  Was Dr. Smith there?

24  A.  Yes.  It's the——it's the facility health director's

25  meeting.

N961ALL3                              Mueller – Direct

1    Q.  Oh, she was the facility health service director at Greene.

2    A.  Yes.

3    Q.  And what did she——how did she respond to you informing her

4    that you are troubled by the amount of Neurontin prescriptions

5    she was providing to her patients?

6    A.  Well, it wasn't me.  It was the SURN giving the report.

7    Q.  Okay.  What did the SURN tell Dr. Smith?

8    A.  I guess I really——this is a long time ago for me to

9    remember specifics for you, so I can just surmise how it

10   usually works at a QI meeting.

11   Q.  Okay.  Is it fair to say that after whatever the SURN

12   report said and was presented to Dr. Smith, that she would have

13   come away with the impression that she needs to reduce those

14   prescriptions?

15          MS. THOMAS:  I would just object to the extent it

16   calls for someone else's impression, not Dr. Mueller's

17   impression.

18          THE COURT:  Okay.  Would you ask the witness if she's

19   able to answer the question.

20          MR. MORRISON:  Sure.

21   BY MR. MORRISON:

22   Q.  Did you understand that question and are you able to answer

23   it?

24   A.  Can you repeat it.

25   Q.  Sure.  Actually, let me rephrase it.

N961ALL3                         Mueller - Direct

1       You were at that quarterly—that QI meeting where the SURNs

2   informed Dr. Smith that they were concerned about the amount of

3   Neurontin prescriptions; is that accurate?

4   A.  I would assume I was, 'cause I go to most of them.

5   Q.  Okay.  And after you saw and heard the SURN informing

6   Dr. Smith about this issue, were you under the impression that

7   Dr. Smith should be reducing the amount of Neurontin

8   prescriptions she was providing to patients?

9   A.  What I—what I thought was, and what the—the members of

10  the meeting decided was, that it warranted a QI project to take

11  a look at—to take a look at the patients and the numbers.

12  Q.  Okay.  And was Dr. Smith involved in that QI, that

13  Neurontin project from the QI meeting?

14  A.  Yes.

15  Q.  And as a result, did she reduce the prescriptions of

16  Neurontin she was providing to patients?

17  A.  I believe she did.

18  Q.  Okay.  And did you follow up after that in any way in

19  regards to the effects that had on the patients that Neurontin

20  prescriptions were discontinued?

21  A.  No.  That would have been Dr. Smith's doing.

22  Q.  Okay.  Was there any follow-up audit by SURNs in regards to

23  the effects of the Neurontin project?

24  A.  I don't know.

25  Q.  Were you interested ever to find out the effects that the

N961ALL3                         Mueller - Direct

1    Neurontin project had on the patients at Greene Correctional

2    Facility that were prescribed Neurontin at one point?

3    A.   Yes.

4    Q.   And what did you do about those concerns?

5    A.   Well, I—I can't say specifically.  I would just be

6    conjecturing that I speak with Dr. Smith, and she was never shy

7    about voicing complaints about things she didn't agree with.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. MORRISON:

2    Q.  OK.  And she didn't agree with the Neurontin project's

3    results, correct; that's fair to say?

4    A.  I had the impression that she was satisfied with the

5    results.

6    Q.  OK.  So, after this Neurontin project at Greene, can you

7    describe how the MWAP policies -- strike that.  Terrible.

8         Can you describe your role in the creation or drafting or

9    review of the MWAP policy before it was put into effect?

10   A.  It was drafted by Dr. Dinello, and in my deposition, I

11   believe he said that there were, you know, emails exchanged

12   when he sent it around, does anybody have anything to say?

13   And -- because I didn't have any real recollection of any.

14   Q.  What was your understanding of what the MWAP policy was

15   going to do in concerns with prescribing narcotic and Neurontin

16   medication to patients?

17   A.  The hope was that more time would be taken carefully

18   evaluating patients and what treatment -- you know, what

19   diagnostics may not, may or may not have been done that needed

20   to be done, what other therapeutic options had been trialed or

21   not, and to kind of have people take a closer look at their

22   patients.

23   Q.  It also involved the RMD taking control of whether

24   Neurontin or MWAP medications could actually be prescribed by

25   the provider to the patient?

N96Wall4                          Mueller - Direct

1    A.  Yes.

2    Q.  Did you have any concerns about that part of the policy

3    while it was being drafted?

4    A.  I think while it was being drafted, I -- I was hoping that

5    this was going to be, was hoping it was going to be a

6    successful -- and when I say successful, I don't mean in

7    discontinuing medications: I mean in seeing that a patient was

8    getting the appropriate care.

9    Q.  OK.

10   A.  Too often -- too often prescriptions are written either

11   without a patient being seen or just to get them out of the

12   office without examining the patient and exploring, like I say,

13   what really maybe needs to be done for this specific patient.

14   And that can include diagnostics and other modalities, such as

15   physical therapy, pain management.

16   Q.  OK.  So at around -- in 2016 and 2017, did you believe

17   there was a rampant problem within DOCCS and its medical

18   providers of not physically assessing their patients before

19   prescribing or making prescription determinations?

20   A.  I was having -- had a feeling that that was the case.

21   Q.  And what was that feeling based on?

22   A.  You get to know -- you get to know your providers, and you

23   get -- you kind of know who is really taking the time with the

24   patient.  And it's more difficult and time-consuming, but you

25   can take -- you know, you know that there are those that were,

1   but there also were those that weren't.

2   Q.  And did you counsel those providers that you thought

3   weren't taking care or seeing or assessing their patients about

4   that?

5   A.  Yes.

6   Q.  And how -- how many providers did you counsel?

7   A.  Oh, let's see.  One, two -- it's hard for me to recall now.

8   I'm just trying to -- I would be guessing if I said ten.  I

9   probably need more time to --

10  Q.  OK.  Roughly ten, maybe more, maybe less?

11  A.  Maybe more.

12  Q.  Maybe more.

13      And how many providers -- and at that time -- strike that.

14      Just to be clear, at that time, how many hubs were you the

15  RMD over?  I know it's not as many as today.

16  A.  Two.

17  Q.  Which ones were that, were they?

18  A.  Sullivan and Great Meadow.

19  Q.  And how many providers were you supervising or in those two

20  hubs at that time, roughly?

21  A.  20.

22  Q.  So about half?

23  A.  But --

24  Q.  Sorry.

25  A.  But that's a really rough estimate.

N96Wall4                          Mueller - Direct

1  Q.  OK.  So you believe it was about half of the providers at

2  the time not providing and not conducting individual

3  assessments of their patients before prescribing medication; is

4  that accurate?

5  A.  I know that I said that, but I would have to spend more

6  time trying to think back as to who everybody was at the time.

7  Q.  So when -- and at this time the MWAP policy is being

8  formulated, discussions are going back with Dr. Dinello and

9  yourself and other RMDs about formulating this policy, right?

10  A.  Yes.

11  Q.  And did you ever stop and say, you know, there's -- half of

12  my providers are doing a fine job, why are we going to subject

13  and take away their ability to prescribe medication without my

14  approval?  Did you ever bring that up?

15  A.  No, but I think that they were going to do the job

16  regardless, and they would most likely be prescribing things

17  and providing information on the form supportive of their

18  request.

19  Q.  And which providers, just name -- if you can name three

20  providers at the time that you felt were prescribing

21  medications correctly, with assessments of their patients and

22  no issues?

23  A.  Oh, geez.  Dr. Genovese.  Dr. Makrim.  Dr. Lavvio.

24  Q.  Where was Dr. Genovese working; which facility?

25  A.  She was at Wallkill.

N96Wall4                        Mueller - Direct

1   Q.  And Dr. Makrim?

2   A.  Woodbourne.

3   Q.  And the last one was -- I'm sorry.  I wrote it down.  I

4   can't read my writing.

5   A.  Lavvio.

6   Q.  Lavvio.  Where was --

7   A.  Ulster.

8   Q.  Now, we've identified three that you had no concerns about.

9   Can you name me three that you were concerned about?

10  A.  Dr. Lee.

11  Q.  And where was Dr. Lee?

12  A.  Shawangunk.

13      Dr. Andola.

14  Q.  Where was Dr. Andola?

15  A.  Eastern.

16      And -- I'm trying to think back to the facilities.  Sorry.

17      I don't remember who was at Sullivan then.  Doctor -- he

18  was at Coxsackie.  There were two of them there.  He's been

19  gone for quite a while.

20  Q.  OK.  That's OK.  So Dr. Lee and Andola were two that you

21  remember that you were concerned and had an issue with them

22  overprescribing Neurontin and medications?

23  A.  Dr. Miller at Coxsackie.

24  Q.  To your knowledge, does Dr. Lee still work at -- for the

25  Department of Corrections?

1    A.  I believe he does not.

2    Q.  Dr. Andola?

3    A.  She left and just came back.

4    Q.  Were you part of her hiring process when she returned?

5    A.  No.

6    Q.  How about Dr. Miller?

7    A.  What?

8    Q.  Is he still working at DOCCS -- he?

9    A.  No.

10   Q.  Is Dr. Miller a he or she?

11   A.  He.

12   Q.  So, upon learning, having these concerns, first, how --

13   what raised your concerns about these three providers

14   specifically?  Did you get data, or was it based on something

15   else?

16   A.  I don't get data.

17   Q.  So is it fair to say while this, you were participating in

18   it remotely, you weren't drafting it, you weren't doing what

19   Dr. Dinello was doing, all of your recommendations and

20   suggestions regarding the MWAP policy were all done based on no

21   data?  Is that fair?

22   A.  I think the only recommendation that I made was to make

23   sure he included about the three-day limit on a narcotic

24   prescription for acute pain, because that had just come down

25   from the DEA.

1    Q.  OK.  But that wasn't agreed upon, right?  Because wasn't it

2    a five-day emergency supply agreed upon?

3    A.  Yes, but that didn't necessarily mean acute pain.

4    Q.  OK.  At any point in time, were you aware of whether a pain

5    specialist doctor or someone with some sort of specialty in

6    pain management was part of the process of creating the MWAP

7    policy, which came to be known as policy 1.24?

8    A.  I don't know if Dr. Dinello consulted with any pain

9    management people.

10   Q.  OK.  Did you consult with any pain management people at any

11   point in time about the policy?

12   A.  No, I don't think so.

13   Q.  How about when you were reviewing -- after the policy was

14   implemented and you were reviewing medication requests, did you

15   ever consult with any pain management specialists of whether

16   you should approve or deny a prescription being presented to

17   you?

18   A.  I know there were times that I consulted with orthopedic

19   surgeons and neurologists, but I don't specifically recall if I

20   ever consulted with a pain management person.

21   Q.  You would call -- strike that.

22       You would consult with orthopedic specialists or

23   neurologists when you're determining to approve or deny an MWAP

24   request?

25   A.  Yeah -- yes.

N96Wall4                          Mueller - Direct

1    Q.  How would you do that?

2    A.  It's by phone.

3    Q.  OK.  Which neurologist would you call on the phone?

4    A.  Dr. Nancy Mueller.

5    Q.  And Dr. Nancy Mueller is your sister, right?

6    A.  Yes.

7    Q.  How often would you call your sister, Dr. Mueller,

8    regarding an MWAP request that was being presented to you?

9    A.  I don't know.

10   Q.  More than once?

11   A.  Yes.

12   Q.  OK.  More than ten times?

13   A.  Probably.

14   Q.  OK.  And when you had consulted with your sister,

15   Dr. Mueller, about this, do you remember what was the ultimate

16   conclusions?  Would they be normally approved?

17   A.  I don't recall.

18   Q.  Under what circumstances would you want to consult with

19   your sister, Dr. Mueller, in regards to an MWAP request?

20   A.  I don't -- I don't remember what was going, what the

21   requests were at the time, what was going through my mind.

22   Might have been looking for some expertise that I don't have in

23   the field or with medications.

24   Q.  Because it's fair to say that you have never been and never

25   held yourself out as an expert in what pain medication is good

1   for certain chronic pain conditions or neuropathies of

2   patients?

3   A.  Well, I think I have a pretty fair knowledge of what

4   medications are indicated for neuropathies.

5   Q.  OK.  So -- oh.  What -- you said it was, a neurologist

6   would be your -- Dr. Nancy Mueller, who you would consult on

7   times; and what was the other specialty?  An orthopedic.  What

8   orthopedic would you --

9   A.  Orthopedic surgeon.

10  Q.  Who?

11  A.  Dr. Francis Pflum.

12  Q.  And who is Dr. Francis Pflum?

13  A.  An orthopedic surgeon with specialty in spine.

14  Q.  Does he have any position in DOCCS, or --

15  A.  No.

16  Q.  How do you know him?

17  A.  From my work on the outside.

18  Q.  A friend, colleague?

19  A.  Colleague.

20  Q.  And you would discuss MWAP requests and whether you should

21  approve it or deny it?

22  A.  I wouldn't be asking should I approve or deny this.  I

23  would be asking, you know, for additional information about

24  what the, per the diagnosis was and if he had other management

25  suggestions.

N96Wall4                          Mueller - Direct

1    Q.  Did your doctor -- your sister, Dr. Mueller, or Dr. Pflum

2    say, you know, maybe it would be a good idea you should go see

3    and talk to the patient?

4    A.  I don't recall.

5    Q.  Do you think it's a good idea whether to -- to determine

6    whether to prescribe or not prescribe the medication for a

7    patient to actually sit and speak with them?

8    A.  In an ideal world, yes.  But even with nonformulary

9    medications, we never got to speak with or meet with the

10   patient.

11   Q.  Do you think it's a good idea to physically examine the

12   patient before whether -- before you decide whether to approve

13   or not approve a prescription medication for that patient?

14   A.  I relied upon the physical examination conducted by the

15   primary care physician.

16   Q.  A physical examination that you didn't conduct?

17   A.  That the primary care physician conducted.

18   Q.  OK.  Do you think it's appropriate to prescribe medication

19   to -- or, strike that.

20       Do you think it's appropriate to determine whether a

21   prescription should be provided to a patient when you never

22   conducted a physical examination on the patient?

23           MS. THOMAS:  Objection.  This calls for expert

24   testimony.

25           THE COURT:  Counsel.

1              MR. MORRISON:  It's her opinion, her belief.

2              THE COURT:  Ask the witness is if she's able to answer

3      the question, please.

4              MR. MORRISON:  Sure.

5      Q.  Are you able to answer that question?

6      A.  The problem is the requesting primary care physician is

7      tasked with performing a physical examination, and more

8      times -- more often than not, they did not provide that.  And

9      that was where the problem lay.

10     Q.  OK.  So it's fair to say that you were, on many occasions,

11     disapproving a primary care provider's request for Neurontin or

12     an MWAP medication because the form didn't include the physical

13     examination?

14     A.  The physical examination and other information too that may

15     have been pertinent to that request.

16     Q.  OK.

17     A.  And I would reach out to the requesting provider, either by

18     email or phone, saying, you know, I need this information.  And

19     if they didn't furnish it, unfortunately, there was no pend

20     option on the form.  So it would end up having to be a denial,

21     where if the information had been furnished, it very well could

22     have been an approval.

23     Q.  OK.  So you would get a form that, to your determination,

24     isn't complete to allow you to approve the medication, and you

25     would pick up the phone and call the provider and tell him or

N96Wall4                     Mueller - Direct

1    her what is incomplete in that form?

2    A.  Yes.  Either phone or email.

3    Q.  OK.  And when you're on the phone with the provider, can't

4    the provider then just tell you what's -- what the information

5    you needed?

6    A.  I have to get the chart or I have to see the patient.  No,

7    they didn't necessarily -- they did not provide me with the

8    information.

9    Q.  Did they ever -- at no point in time you call and say I

10   need the results of the physical exam and they'd say let me

11   pull the chart and tell you what they are and then you can

12   approve the medication?

13   A.  If they provided it to me, yes.

14   Q.  OK.  And how often did that happen?

15   A.  In my estimation -- well, I don't know.

16   Q.  OK.  So it's fair to say that if the form wasn't completed

17   to the way that you wanted it to be completed, you would have

18   to disapprove the medication?

19   A.  Yes.

20   Q.  And that was your practice. is that accurate, in reviewing

21   MWAP requests from providers?

22   A.  If you don't have the pertinent information, you can't

23   make --

24   Q.  And you understand by disapproving the medication means

25   that that provider cannot get that medication from the pharmacy

1   for the patient?

2   A.   When I disapproved a medication, I wrote comments, and it

3   would be suggestions in absence of all of the information,

4   suggestions of alternative treatments, modalities and whatnot

5   that could be trialed.

6   Q.   OK.

7   A.   So it wasn't that the patient was being left without

8   treatment.

9   Q.   The patient was being left without the treatment that the

10  provider was requesting; you would agree with that?

11  A.   Without that medication, unless they resubmitted with the

12  information that was necessary.

13  Q.   Right.  Well, I'm not talking about any resubmissions.  I'm

14  talking about the form that comes in that, according to you,

15  isn't filled out properly so you have to not approve the

16  medication.  Right?  You were aware that by saying not

17  approved, that that provider couldn't provide that medication

18  and prescribe that medication from the pharmacy to the patient?

19  A.   Yes.

20  Q.   And oftentimes, with these requests that you deemed were

21  not properly completed were for renewals of prescriptions;

22  would you agree with that?

23  A.   I don't -- I don't really understand the question.

24  Q.   All right.  Well, let's -- you have a -- there's a big

25  binder in front of you, which has been marked for the purposes

N96Wall4                      Mueller - Direct

1   as Plaintiffs' Exhibit -- sorry -- 76, I believe.

2          MS. AGNEW:  It's 76.

3          MR. MORRISON:  Yeah, 76.

4   Q.  Do you have that in front of you?

5      If you can turn to --

6          THE COURT:  Counsel, would you ask the witness if the

7   witness needs a break.

8          MR. MORRISON:  Sure.

9          Do you need a moment?  Do you need a break?

10         THE COURT:  Tell us when you do.

11         MR. MORRISON:  Yeah.

12         THE COURT:  No, no.  You're supposed to say that.

13         MR. MORRISON:  Oh, tell us when you --

14         If you need a break anytime, let me know; we'll take a

15  break.  OK?

16  Q.  OK.  If you can turn to the, in the upper part of this

17  document, in these documents there's -- it says Mueller MWAP

18  and a number.  If you can turn to No. 18.

19  A.  I have a 17 and a 19.  Oh --

20  Q.  OK.

21  A.  Sorry.  Got it.

22  Q.  A lot of pages here.

23     If you can look at 18 and 19 and let me know if you

24  recognize what this document is.

25  A.  I'm surprised that my name is on it.  It's Green Haven.

1    Q.  Well, what is this document?

2    A.  Oh.  It's an MWAP.  I'm sorry.

3    Q.  OK.

4    A.  Sorry.

5    Q.  No problem.

6        And this was a document that was formed as a result of

7    policy 1.24, right?

8    A.  Yes.

9    Q.  OK.  And just briefly, the -- let's -- the second -- it

10   says housing location SHU.  What does that mean?

11   A.  Special housing unit.

12   Q.  OK.  And this request is from -- is for a patient by the

13   name of Hardley Silus, right?

14   A.  Yes.  Yes.

15   Q.  OK.  And it says a rationale for GP.  What does that mean,

16   rationale for GP?

17   A.  General population.

18   Q.  OK.  And it says neuropathy.  What does that -- when you

19   were reading these documents, what does that mean to you?

20   A.  I think it usually was meant that if this was, for

21   instance, an opioid, whether they should be in a specialized

22   unit, like an infirmary, or whatnot.

23   Q.  OK.  But do you know why it says neuropathy there?  How did

24   you interpret that?

25               MS. THOMAS:  Objection.  Just to the extent that it

1   assumes that she did interpret that.

2   A.  I don't know how to interpret it.  It's not the kind of --

3   I wouldn't have filled it out that way.

4   Q.  OK.  Well, let me -- I guess that's a fair point.  Did you

5   review this document and make a determination whether to

6   approve or deny the request coming in for gabapentin?

7   A.  I don't know.  That's why I say, because it's Green Haven,

8   so I'm not sure.

9   Q.  OK.  OK.  Let's -- just so the record's clear, let's look

10  at -- if you can flip to Mueller MWAP page 20, just one page

11  over, we'll try another one.  Take a look at this document and

12  let me know if this is a MWAP request form that you made a

13  determination of whether to approve or deny.

14  A.  Probably not.  It's Taconic.

15  Q.  It's to what?

16  A.  It's probably not.  It's Taconic.

17  Q.  OK.

18      OK.  Let's -- let me find one that there's no question.

19  Let's go to Mueller MWAP page 28.

20  A.  OK.

21  Q.  This is for a medication with abuse potential request form

22  for a Mr. Aaron Dockery from Shawangunk Correctional Facility,

23  right?

24  A.  Yes.

25  Q.  The date of this request was August 8, 2018, right?

1   A.  It says August 19 -- oh, that's his date of birth.

2        Yes.

3   Q.  Now, reviewing these -- it's two pages, 28 to 29 -- is this

4   a MWAP request form that you reviewed?

5   A.  I would assume so.  It's one of my facilities.

6   Q.  OK.  And your name is on the bottom as the name of the RMD,

7   right?

8   A.  Yes.

9   Q.  And do you recall -- do you know who Mr. Aaron Dockery is?

10  A.  I recognize the name.

11  Q.  OK.  Do you recognize ever being in the same room with him

12  and treating him or having any direct, providing any direct

13  care for Mr. Dockery?

14  A.  No.

15  Q.  And the prescriber from this form requesting an MWAP

16  medication of Neurontin was Dr. Lee, right?

17  A.  Yes.

18  Q.  And Dr. Lee was one of the providers that you mentioned

19  earlier that you had some concerns about?

20  A.  Yes.

21  Q.  When you reviewed MWAP forms submitted by Dr. Lee, were you

22  more -- did you provide more scrutiny on those forms than

23  other, to other providers that you didn't have any concerns

24  about?

25            MS. THOMAS:  I would just object to the extent that

 1   the witness could not recall if she did, in fact, review this

 2   form and write in this document, and the question assumes that

 3   she did.

 4            THE COURT:  I think it actually is a question more

 5   generally.  It begins, "When you reviewed MWAP forms submitted

 6   by Dr. Lee."

 7            MS. THOMAS:  Understood.

 8            THE COURT:  Overruled.

 9            MS. THOMAS:  Thank you.

10            THE COURT:  Yes, ma'am.

11   BY MR. MORRISON:

12   Q.  When you reviewed forms submitted by Dr. Lee, did you

13   provide more scrutiny to his requests than other providers?

14   A.  No.

15   Q.  You held every provider to the same standard of review of

16   their MWAP requests?

17   A.  Yes.

18   Q.  By the way, who taught you or how did you learn to review

19   these MWAP request forms?

20   A.  I don't know what you mean by that question.

21   Q.  Well, when policy 1.24 came into effect, you were provided

22   this new responsibility of your job, to review these forms,

23   right?

24   A.  Yes.

25   Q.  Were you provided any training at all in how to review

1    these forms?

2    A.  Not that I recall.

3    Q.  Just told you're going to start getting forms to approve or

4    disapprove medication for patients; do what you want?

5    A.  I don't know what -- do what you want?

6    Q.  Well, there's no standard, there's no requirements that you

7    had to follow into whether making a determination to approve or

8    disapprove?

9    A.  I think as physicians we know what needs to be done.

10   Q.  What do you mean by that?

11   A.  In other words, you review the form and then you review

12   everything you can on the computer and get as much information

13   as you can about each case, each request.

14   Q.  OK.  As a physician also you'd want to look at the medical

15   records, right?

16   A.  Well, the records that we could see that were on the

17   computer, yes.

18   Q.  OK.  And you would agree that the -- you're talking about

19   the FHS1 system, right?

20   A.  Yes.

21   Q.  And you would agree that the FHS1 system is not the medical

22   records and complete medical chart of the patient?

23   A.  Yes.

24   Q.  You would agree that the FHS1 system is a scheduling tool,

25   for the most part?

1    A.  No.

2    Q.  What would you -- what would you categorize the FHS1 system

3    to be then?

4    A.  It shows you all of the specialty consults, consultations

5    that the patient has had, what testing the patient has had,

6    what appointments at the facility the patient has had.

7    Q.  It doesn't show the results of those testing unless they

8    were entered in, right?

9    A.  Not if they weren't entered in.

10   Q.  And oftentimes, one of the issues that you would have is

11   that providers don't follow up after the consultation comes

12   back with what the specialist recommended and the results;

13   fair?

14   A.  Correct.

15   Q.  OK.

16   A.  And that's why they need to write that on the request.

17   Q.  OK.  Now, let's go back to the MWAP request of Mr. Dockery.

18   Do you have any reason to believe that you did not review and

19   make a determination on this MWAP request form?

20   A.  Can I read it?

21   Q.  Of course.

22   A.  No.

23   Q.  No?  No what?  I'm sorry.

24       Just to be clear, no reason to disbelieve that you didn't

25   review this and make a --

1           THE COURT:  You had no reason to believe you didn't

2    review this.

3           MR. MORRISON:  Correct.

4           OK.  Now I'm really confused.

5           MS. AGNEW:  I think there's a double negative.

6           THE COURT:  Thank you.

7    A.  I believe I reviewed this.

8    Q.  Thank you.  Thank you.

9        Then it was your determination not to approve, right?

10   A.  Correct.

11   Q.  OK.  Let's go over this, try to do it quickly.  The first

12   page, completely this first page, do you input any of the

13   information on this first page?  And I'm speaking specifically

14   about page 28.

15   A.  I'm sorry.  What was the question?

16   Q.  Sorry.  The information on page 28, is that inputted into

17   this document by you?

18   A.  No.

19   Q.  OK.  And it's fair to say the only input that you put in on

20   this document would be on page 29 in the reviewer comments and

21   the approval?

22   A.  Yes.

23           MS. THOMAS:  I would just object to the extent the

24   witness has not confirmed whether or not she has put those

25   comments in.  So to the extent the question assumes that, I

1    would object.

2                    THE COURT:  All right.  I think I'll take it for what

3    it's worth.

4                    Go ahead.

5    BY MR. MORRISON:

6    Q.  So in the first page, when you -- before you make a

7    decision, you read this whole form, right?

8    A.  Yes.

9    Q.  And do you see anything in this form that's missing in

10   regards to Dr. Lee's request to prescribe Neurontin to

11   Mr. Dockery?

12   A.  He didn't fill out -- oh, actually, wait a second.

13   Physical exams and kind of updated information, he pretty much

14   parroted what had come to him from elsewhere.  But other than

15   that, it's mostly filled out.

16   Q.  When you say parroted what came to him from elsewhere, are

17   you referring to the section where it says requests for

18   consultation with specialty provider, and he marks yes; and

19   then it says if yes, specify specialty, he writes neurology,

20   continue Tecfidera and Neurontin for hand and feet neuropathy?

21   Is that what he parroted?

22   A.  No.  I was thinking more under treatment options.

23   Q.  OK.  Oh.  So when you -- you think he parroted when he

24   says:  Offender was transferred to C-O-X, Cox, which I assume

25   means Coxsackie, infirmary RMU; was consulted to Dr.

1   Koenigsmann for Neurontin and approved; MRI confirmed presence

2   of multiple subcortical white matter lesions; Neurontin

3   discontinued on July 2018; now offender can't sleep times

4   several days due to pain in hands and foot neuropathy; used

5   walker for ambulatory, used to walk without a walker; tried

6   with Elavil, Tegretol, Cymbalta.  Not effective.

7        You think he was parroting that information or he was

8   providing the information he became aware of as his provider?

9   A.  It's hard for me to tell right now.

10  Q.  OK.  Did you believe the information in that treatment

11  option, TEP /step therapy section?

12  A.  I guess some of it.

13  Q.  What part didn't you -- did you believe that his Neurontin

14  was discontinued on July 2018 and now he can't sleep for

15  several days due to his pain in hands and foot neuropathy?

16  A.  Nursing staff was coming forth with different -- with

17  conflicting information.

18  Q.  Did you believe that Mr. Dockery was deteriorating after

19  his Neurontin was discontinued on July of 2018?

20  A.  Medical staff other than Dr. Lee didn't think so.

21  Q.  OK.  So who did -- so according to you, you're getting

22  information about Mr. Lee -- Dr. Lee's request for Neurontin,

23  and you're speaking to nursing staff about his patient.  Is

24  that accurate?

25  A.  From my comments, it would appear that I had received

1   information from nursing staff.

2   Q.  So if you're reaching out to nursing staff because, for

3   some reason, you don't trust or you don't believe what Dr. Lee

4   has wrote, why don't you just reach out to the patient himself

5   and talk to him?

6   A.  It was probably the nursing staff that reached out to me.

7   Q.  Probably, or are you just guessing?

8   A.  I -- I don't remember, but the way things -- I don't -- I

9   wouldn't ordinarily reach out to the nursing staff like that.

10  Q.  But you don't remember the nursing staff actually reaching

11  out to you about this request?

12  A.  From what my comments were.

13  Q.  Tell me where in your comments you believe you talked to

14  medical staff.

15  A.  "According to medical staff, does not appear to be in pain

16  but rather malingering and drug seeking; strongly muscled;

17  started bringing walker to medical unit after Neurontin stopped

18  last month."

19  Q.  And this is a man with multiple sclerosis, right?

20  A.  But Neurontin doesn't treat multiple sclerosis.

21  Q.  You're an expert in multiple sclerosis?

22  A.  I'm not a neurologist, but Neurontin is not used to treat

23  multiple sclerosis.  The Tecfidera is.

24  Q.  Does Neurontin treat neuropathy in your feet?

25  A.  It's been used for that, but it's an off-label use

1    currently.

2    Q.  And it's been effective for some people, like Mr. Dockery.

3    Would you agree?

4    A.  I don't know.

5    Q.  And it's fair to say that you did not approve Mr. Dockery

6    being represcribed Neurontin following this MWAP request?

7    A.  Yeah.  I said I needed supportive diagnostics and suggested

8    alternative, safer treatment modalities.

9    Q.  OK.  Well, the fact that Dr. Lee put in he saw a

10   neurologist who recommended Neurontin for his hand and feet

11   neuropathy wasn't enough for you; is that fair?

12   A.  I don't know that Neurontin was specifically recommended by

13   neurology.

14   Q.  It says it right here on the form, Doctor.  Page 28.

15   A.  You mean where it says continue Tecfidera?

16   Q.  And Neurontin.

17   A.  And Neurontin.  OK.

18   Q.  For hand/feet neuropathy.

19   A.  OK.

20   Q.  It says that, right?

21   A.  It says that on the form.

22   Q.  OK.  After you disapproved this request by Dr. Lee to treat

23   Mr. Dockery with Neurontin, did you follow up, you know, maybe

24   a week later to how Mr. Dockery was responding to any of these

25   alternative medications that you wanted him -- or strike that.

1      I don't even think you recommended alternative -- strike

2    that.

3      After you denied or not approved this MWAP form, did you

4    follow up on the condition of Mr. Dockery?

5    A.  I don't know.

6    Q.  Is that something you normally did after you failed to

7    approve or did not approve an MWAP request form, to follow up

8    with the patient?

9    A.  Some of them I would -- some of the providers I would speak

10   with or email or I could look on FH1s to see if they had

11   ordered any testing.

12   Q.  Did you do that with Dr. Lee?  Did you call Dr. Lee and

13   say:  Hey, I disapproved -- I didn't approve the Neurontin last

14   week; how's Mr. Dockery doing?

15   A.  I don't recall.

16            MS. AGNEW:  Your Honor, can we take five minutes?

17            THE COURT:  Is it all right with you?

18            MR. MORRISON:  It's fine with me.

19            THE COURT:  All right.  Would you inform the witness,

20   please.

21            MR. MORRISON:  We're going to take a five-minute

22   break.  Is that OK?  Do you want a little longer?

23            (Recess)

24            THE COURT:  Mr. Morrison.

25            MR. MORRISON:  Before I begin, Judge, I do want to

N96Wall4                        Mueller - Direct

1    move into evidence exhibit 138 and exhibit 72, which just the

2    pages Bates stamped Mueller MWAP 28 and 29 that we were just

3    discussing.

4             MS. THOMAS:  Could I please start with exhibit 138?

5             I would object on foundation, as the witness had

6    testified that she hadn't recognized the document, didn't

7    remember seeing the document before, other than when it was

8    submitted to her at her deposition and had no other information

9    other than being walked through the contents of the document

10   rather than independent recollection of the document itself.

11            I'd also object on the grounds of relevance, as it

12   applies to a time period at least two years before the MWAP

13   period was enacted.

14            Those are my objections to 138.

15            MR. MORRISON:  Your Honor, she agreed that these were

16   records reflecting the meetings of the narcotics review

17   committee.  She testified about the documents, and our case is

18   stating that the policy of discontinuing medications began back

19   in 2015 as a direct result of this narcotics review committee.

20            (Continued on next page)

21

22

23

24

25

N961ALL5

MS. THOMAS:  In Dr. Mueller's testimony, she was walked through what the different columns stated, and she was asked questions such as:  Does this show a discontinuance date? If I looked at this document and it says Final D/C Date, I too could say that.  I don't believe that shows an independent——any independent information from the witness.  And she also testified that she did not have knowledge of this document otherwise.

THE COURT:  My recollection is she said she didn't recognize the document, but I thought that as they went through it, she did acknowledge that these were the results of the meetings on the stated dates.

MS. THOMAS:  Respectfully, I believe that her testimony was that that's what it would appear to be from the document.  I don't believe that reviewing the document and saying, yes, the document reflects what the question states, after the leading questions that stated that, is evidence of her own understanding of the contents, or validation that the contents are what they say they are.

MR. MORRISON:  I believe that the question was:  Do you agree that these documents reflect the patients that were reviewed on the first page, 4/15/2015?  And she agreed.

THE COURT:  Okay.  The question, though, is the document.  I think the substance of the testimony was that, for example, on April 15 of 2015, 15 of the 16 people who were

N961ALL5

1    considered had final discontinuation dates, but I really don't

2    think that the witness really laid a foundation for the

3    document.  So I will affirm the objection.

4         MS. THOMAS:  Thank you, your Honor.

5         And if I may be heard as to, I believe Exhibit 72,

6    which would be pages Mueller MWAP 28 and 29.  I would object to

7    the entrance of this exhibit.  There's an issue with this

8    document that had been previously raised.  All of the parties

9    are aware of this.  If you look at the metadata for the

10   document in question, it actually shows that the last editor of

11   the document was Dr. Bozer, not Dr. Mueller, and as Dr. Mueller

12   originally testified, she did not recall this particular

13   document, so I would object on the grounds that the metadata

14   for the document itself reflects a different author than

15   Dr. Mueller, and she did not have a sufficient recollection to

16   show that she did in fact write this document.

17        MR. MORRISON:  I think the opposite was the testimony,

18   that she did, not that she didn't review this document and not

19   approve it.

20        MS. THOMAS:  Respectfully, Dr. Mueller was asked a

21   series of leading questions, which I'm not objecting to those

22   questions per se, but she was asked questions after information

23   was read to her.  So she was led to believe that this was her

24   writing but originally testified—and if we go back to what she

25   originally testified, she did not recall writing this document

1    or having seen it before.

2              MR. MORRISON:  Personally, I don't recall any

3    confusion about whether she approved this document or not.  In

4    fact, I think I went through two where she didn't recall until

5    I landed on this one.

6              THE COURT:  We'll review the transcript overnight, and

7    just remind me in the morning, please.

8              MS. THOMAS:  Yes, your Honor.

9              I just also would like to identify that the two other

10   pages that were raised were MWAP 18 and MWAP 20.  Those also

11   have the same metadata issues that we discussed earlier today

12   and relate to that.  I just wanted to put that on the record.

13             THE COURT:  I don't think counsel was offering them.

14             MS. THOMAS:  I understand.  I just wanted to make it

15   clear that there was testimony as to those documents, so I just

16   wanted to raise that as that was discussed this morning as

17   well.

18             THE COURT:  Okay.

19             MS. THOMAS:  Thank you, your Honor.

20             MR. MORRISON:  May I proceed?

21             THE COURT:  Yes, sir.

22   BY MR. MORRISON:

23   Q.  Dr. Mueller, do you have any idea how many MWAP medication

24   request forms you did not approve?

25   A.  No.

1  Q.  Did you ever do any research or investigate how many MWAP

2  request forms you didn't approve?

3  A.  No.

4  Q.  Were you ever informed by anyone—or strike that.

5      Did anyone ever review your MWAP request forms, to your

6  knowledge?

7  A.  Not to my knowledge.

8  Q.  Okay.  Was there any person overseeing to make sure that

9  your approvals or disapprovals were appropriate?

10  A.  I don't know.

11  Q.  Okay.  It's true that between—some facilities, by the end

12  of the MWAP policy, which would be February of 2022, got their

13  prescription Neurontin levels down to 0 in their facility;

14  would you agree with that?

15  A.  I wouldn't know.

16  Q.  Okay.  You're not aware that Wallkill, Wallkill

17  Correctional Facility, actually got their Neurontin

18  prescriptions in that facility to 0?

19  A.  Not aware.

20  Q.  Now briefly, I want to talk about the end of the MWAP

21  policy.  You're aware that occurred in early February of 2022?

22  A.  Yes.

23  Q.  And were you involved in the creation of the new policy at

24  all?

25  A.  No.

1   Q.  Do you know why you weren't involved in the creation of the

2   new policy?

3   A.  No.

4   Q.  What is your understanding of why the MWAP policy was

5   terminated?

6   A.  I believe it came out as a result of this suit.

7   Q.  Okay.  And when the new policy, 1.24A, started, did you

8   conduct any training or provide any information to any of the

9   medical providers in your hub?

10  A.  What kind of training?

11  Q.  Regarding the new policy, 1.24A, and how to prescribe

12  medications with abuse potential.

13  A.  I can only conduct that kind of training at the direction

14  of the CMO.

15  Q.  Okay.  And were you ever directed by the CMO at any time to

16  train your providers and make sure that they are aware and

17  abiding by policy 1.24A provisions?

18  A.  Could you repeat that.

19  Q.  Sure.  Did the CMO, at any time after policy 1.24A came

20  into effect, direct you, as the RMD, to make sure that the

21  providers in your hub are aware of policy 1.24A and following

22  the provisions?

23  A.  I don't believe so.

24  Q.  Okay.  Do you do anything as a clinical supervisor today to

25  ensure compliance of the providers with policy 1.24A?

N961ALL5                    Mueller - Direct

1    A.  As the RMD?

2    Q.  Yes.

3    A.  No.

4    Q.  It's not part of your job, correct?

5    A.  Correct.

6    Q.  Are you aware of whose job that is at all?

7    A.  I know that the SURNs are conducting audits continuously in

8    all of the facilities to assure that they are in compliance

9    with 1.24A.

10            MR. MORRISON:  One second, your Honor.

11   Q.  To go back one more second regarding the MWAP request forms

12   that you disapproved because they weren't completed correctly

13   by providers——do you remember that testimony we were talking

14   about?

15   A.  Yes.

16   Q.  After you were presented with one of these forms and they

17   weren't completed correctly, did you go back and call the

18   providers and train them and tell them what is missing and what

19   you need in regards to each request form?

20   A.  Yes.

21   Q.  And following that, did that fix the problem?

22   A.  With some, yes; with others, no.

23   Q.  Okay.  And then you would continue——strike that.

24            MR. MORRISON:  Nothing further.  Thank you, Doctor.

25            THE COURT:  Cross-examination, please, counsel.

```
 1              MS. THOMAS:  Thank you, your Honor.

 2              THE COURT:  Ms. Thomas.

 3              MS. THOMAS:  Thank you, your Honor.

 4    CROSS EXAMINATION

 5    BY MS. THOMAS:

 6    Q.  Dr. Mueller, can you hear me okay?

 7    A.  Yes.  Thank you.

 8    Q.  Great.  Thank you very much.

 9         My name is Jennifer Thomas, and I represent Dr. Carol

10    Moores in her official capacity as the Chief Medical Officer

11    for the Department of Corrections, and I have a few questions

12    for you today.

13         You're currently an RMD with the Department of Corrections,

14    right?

15    A.  Yes.

16    Q.  Do you currently treat any patients?

17    A.  No.

18    Q.  Do you currently perform any physical exams of patients?

19    A.  Not unless a provider in a facility asks me to go with them

20    to see a patient, but not as a routine.

21    Q.  Are any individual patients assigned to you currently?

22    A.  No.

23    Q.  And in what year did you last treat patients at DOCCS?

24    A.  As a regular, ongoing——

25    Q.  Yes.
```

N961ALL5                    Mueller - Cross

A.  Well, that would have been when I became an RMD.

Q.  And is that approximately 2012-2013?

A.  Yes.  Probably more 2013, I think.

Q.  Okay.  Thank you.

And do you currently prescribe any medications to any patients at DOCCS?

A.  No.

Q.  And in what year did you last prescribe medications to patients at DOCCS?

A.  I don't know.

Q.  Would that have been around the same time as you transferred to be an RMD?

A.  Yes, but sometimes a circumstance comes up where we're asked to because the provider is not available or whatnot, so if there was something anecdotal, I don't recall when that would have been.

Q.  Okay.  But in your regular day-to-day duties it doesn't include prescribing medications currently?

A.  That's correct.

Q.  Okay.  Do you currently review any prescriptions written by other providers?

A.  No.

Q.  Do you currently review any nonformulary requests?

A.  No.

Q.  To the best of your understanding is the MWAP policy still

N961ALL5                          Mueller - Cross

1   in effect at the hub that you are in charge of?

2   A.  Is the MWAP still in effect?

3   Q.  Yes.

4   A.  No.

5   Q.  And is the MWAP policy still in effect at DOCCS?

6   A.  No.

7   Q.  Do you currently review any MWAP requests?

8   A.  No.

9   Q.  Earlier you had testified about certain events at Green

10  Haven, right?

11  A.  You mean that review committee?

12  Q.  Yes.

13  A.  Yes.

14  Q.  In what year did those meetings occur, to the best of your

15  recollection?

16  A.  I think it was 2015.

17  Q.  And you testified earlier about events at Greene

18  Correctional Facility, right?

19  A.  Yes.

20  Q.  And what year did those events occur?

21  A.  I don't know.

22  Q.  Was that approximately around 2015 or 2016?

23  A.  I really would be guessing.

24  Q.  Okay.  And just to confirm, what year was MWAP implemented?

25  A.  2017.

N961ALL5

1    Q.   And in what year was MWAP repealed?

2    A.   2020.

3    Q.   Was it February 8, 2021?

4    A.   I don't know the exact date, and I do know it was in

5    February.

6             MS. THOMAS:   Okay.   Thank you.   I have no further

7    questions.

8             THE COURT:   Redirect, counsel?

9             MR. MORRISON:   Nothing based on that.   Thank you.

10   Thank you, Dr. Mueller.

11            THE COURT:   You may step down, ma'am.

12            Counsel?

13            MS. THOMAS:   You may step down.

14            (Witness excused)

15            MS. AGNEW:   Your Honor, if we could please just——and

16   I'm not casting aspersions on Ms. Thomas, who is an excellent

17   lawyer and doing an excellent job, but my team just pulled up

18   the original Excel file that was produced to us by DOCCS for

19   the exhibit at Mueller MWAP 28-29, and the metadata actually

20   shows it was authored by Susan Mueller.   We're happy to show

21   that to counsel, meet and confer, and come back to you in the

22   morning, before you go through the mayhem of reviewing the

23   transcript.   It's up to you.

24            MS. THOMAS:   If I may, just for the record, I'm

25   looking at the exact same document, and she's correct that it

1  does say the author is Susan Mueller, but it says it was last

2  modified by Paula Bozer.  So that's what the clarification is.

3  We're both looking at the same document.  We're having a little

4  dispute as to what those terms mean, but I just wanted to

5  clarify.

6          THE COURT:  All right.  Why don't you folks look at it

7  tonight and let me know.

8          MS. THOMAS:  Certainly.

9          MS. AGNEW:  Okay.  Very good.  Thank you, your Honor.

10         THE COURT:  Is there anything else you want to do on

11  the record?

12         MS. AGNEW:  Not from the plaintiff class, your Honor.

13  Thank you.

14         MS. THOMAS:  Nothing on this issue.  Thank you.

15         THE COURT:  Okay.  Off the record.

16         (Discussion off the record)

17         MS. AGNEW:  Okay.  Plaintiffs call Dr. Dinello.

18         THE COURT:  Ms. Agnew.

19         MS. AGNEW:  Just one moment, your Honor.

20   DAVID DINELLO MD,

21       called as a witness by the Plaintiff,

22       having been duly sworn, testified as follows:

23  DIRECT EXAMINATION

24  BY MS. AGNEW:

25  Q.  Good afternoon, Dr. Dinello.

1    A.  Good afternoon.

2    Q.  We do apologize to you for the delay.  We've been trying to

3    move things along.

4    A.  That's okay.  Doctors can't complain about making people

5    wait.

6    Q.  Okay.  Here we go.

7         Dr. Dinello, do you know who I am?

8    A.  Yes, ma'am.

9    Q.  Who am I?

10   A.  Ms. Amy Agnew.

11   Q.  And what do I do?

12   A.  You are a lawyer.

13   Q.  Okay.  I want you to just look at what I've premarked as

14   P139 in that pile.  And it may be out of order, and for that I

15   apologize.

16   A.  Okay.  P139.

17        Yes.

18   Q.  And you know, given our history, that I review your emails,

19   correct?

20   A.  Yes, ma'am.

21   Q.  And what is our history?

22   A.  We go way back for years with different cases.

23   Q.  Okay.  Can you look at P139, sir, and tell me, do you

24   recognize that document?

25   A.  It looks like an email, yes.

1   Q.  Okay.  And are you an author of that email?

2   A.  I am on this email, yes.

3   Q.  Okay.  And isn't it true this is an email exchange between

4   you and Dr. Christopher Wright at Five Points Correctional

5   Facility?

6   A.  Yes.

7   Q.  And the exchange is roughly dated July 21st of 2020?

8   A.  Yes, ma'am.

9   Q.  Okay.  And in this email do you tell Dr. Wright,

10  "Unfortunately, there are some very unhealthy and liberal

11  lawyers that see DOCCS as easy pickings and continually present

12  lawsuits.  The MWAP policy and the way DOCCS approaches

13  chronic, nonpalliative care is currently in their crosshairs.

14  We will keep everyone abreast of changes as they occur."  Did

15  you write that, sir?

16  A.  Yes, ma'am.

17           MS. AGNEW:  Your Honor, permission to treat the

18  witness as hostile.

19           THE COURT:  Any objection?

20           MS. THOMAS:  I would object because he hasn't shown

21  that he's hostile.  Other than reading the contents of an

22  email, he himself has not testified to anything that would

23  demonstrate that he's a hostile witness at this point, and it's

24  plaintiff's own witness.

25           THE COURT:  Ms. Agnew.

1          MS. AGNEW:  Your Honor, David Dinello is most

2     certainly a hostile witness.  I can keep going if we like, but

3     I don't think it's necessary.

4          THE COURT:  Ms. Thomas, go ahead.

5          MS. THOMAS:  I'm not sure what the response to my

6     argument is, other than your characterization that he's a

7     hostile witness, but I'd be happy to hear what the argument for

8     why he's a hostile witness is.

9     BY MS. AGNEW:

10    Q.  All right.  Dr. Dinello, in your email were you referring

11    to me when you said "unhealthy and liberal lawyers that see

12    DOCCS as easy pickings"?

13    A.  No.

14    Q.  You weren't?

15    A.  Not you only.

16    Q.  Okay.  But I was among the lawyers you were referring to,

17    correct?

18    A.  Probably, yes.

19    Q.  Okay.  And isn't it true you've told me previously that in

20    fact you were referring to me in this email?

21    A.  I believe one email.  I don't know if it was this one, but

22    yes.

23    Q.  Okay.  And so, Dr. Dinello, can we agree that in July of

24    2021 there were some reassessments going on for patients who

25    were involved in this litigation?

1   A.  In July of 2021?

2   Q.  I'm sorry.  July of 2020.

3   A.  Maybe.  If you say so.

4   Q.  Why don't you review the email.

5   A.  Let's see.

6       I don't know if it was a reevaluation.  He saw the patient.

7   He talked about his chronic pain.  I don't know if it was

8   characterized as a reevaluation or not.

9   Q.  Can you tell me, isn't it true, reading this email, that

10  Dr. Wright was reaching out to you about the re-prescription of

11  Neurontin to a Mr. Harold Ortiz?

12          MS. THOMAS:  Objection to the extent that this

13  document is not admitted as an exhibit at this point.

14          THE COURT:  Okay.  Off the record.

15          (Discussion off the record)

16          THE COURT:  Are you moving the exhibit?

17          MS. AGNEW:  Yes, your Honor.  I'm going to move to

18  admit Plaintiff's P139 into evidence.

19          MS. THOMAS:  We do not object to the exhibit.

20          THE COURT:  Received.

21          (Plaintiff's Exhibit 139 received in evidence)

22          MS. AGNEW:  Very good.

23  BY MS. AGNEW:

24  Q.  Dr. Dinello, looking at this email, isn't it true

25  Dr. Wright was looking——he was writing you about the

1   prescription of Neurontin to Mr. Harold Ortiz?

2   A.  I see his name at the top.  He was referring about that

3   patient.  He was talking about the medical care of that

4   patient, yes.

5   Q.  Okay.  And specifically isn't he asking you about the

6   prescription of Neurontin for that patient?

7   A.  Let's see.  He mentions Naprosyn, Tegretol, gab——gabapentin

8   is mentioned, Neurontin is mentioned, yes.

9   Q.  Okay.  And do you have any reason to believe that this

10  email wasn't in response to a reassessment that was part of

11  this litigation?

12  A.  I have no idea why this was generated by Dr. Wright.

13  Q.  Okay.  Dr. Dinello, have you previously served as a

14  regional medical director for New York State DOCCS?

15  A.  Yes, ma'am.

16  Q.  Okay.  Give us the years that you served as a regional

17  medical director.

18  A.  2014 to 2021.

19  Q.  Okay.  And isn't it true you started working in DOCCS

20  around 2009?

21  A.  No.  It was 2006 or 7, as a moonlighting physician.

22  Q.  Then you became part time in 2009, correct?

23  A.  Yes, ma'am.

24  Q.  Okay.  And then you became a full-time physician in 2011,

25  correct?

1   A.  Around then, I think, yes.

2   Q.  Okay.  And you became a full-time physician after you had

3   medical licensing issues; is that correct?

4   A.  No.  I don't really know, in all honesty.

5   Q.  Is it true that you voluntarily gave up your license to

6   practice emergency medicine as part of a consent agreement?

7   A.  No.  It was voluntary limitation.  You don't give it up;

8   you just limit—limit yourself, not to work with the ER.

9   Q.  What does a voluntary limitation mean?

10  A.  I promised them I'm not going to look to work in the

11  emergency room—

12  Q.  Okay.

13  A.  — as an attending physician.

14  Q.  In fact, can you walk into an emergency room and serve as

15  an emergency room physician?

16  A.  Yes.

17  Q.  Right now.

18  A.  In Maryland and West Virginia, yes.

19  Q.  Okay.  In the state of New York, can you serve?

20  A.  No, ma'am.

21  Q.  Can you do so in the state of Pennsylvania?

22  A.  No, ma'am.

23  Q.  Why not?

24  A.  Because the restriction carries there too.

25  Q.  Okay.  And then as also a product of that proceeding and

N961ALL5                      Dinello - Direct

1   your agreement, you also were supervised by another doctor for

2   three years, right?

3   A.  Yes.

4   Q.  And during that time you worked for DOCCS, correct?

5   A.  Yes.

6   Q.  Okay.  And who supervised you during that three years?

7   A.  The regional medical director, Marshall Trabout, for my

8   corrections work; and for my addictions work, it was Hannah

9   McAdams (ph).

10  Q.  Okay.  And so was there some kind of reporting or something

11  that happened as part of that oversight?

12  A.  Yes, quarterly reporting was sent to the OPMC, which is the

13  Office of Professional Medical Conduct.

14          THE COURT:  Sir, may I ask you to slide in a little

15  closer to that microphone, please.

16          THE WITNESS:  Sure.  Sure thing.

17  Q.  Okay.  So as I understand it, you served as a treating

18  physician in DOCCS, then full-time from 2011 until you

19  resigned; is that correct?

20  A.  Yes.

21  Q.  And just so the Court knows, when did you resign?

22  A.  In April 1, 2021.

23  Q.  And just to put this in the time line, the MWAP policy was

24  rescinded on February 8th of 2021; is that correct?

25  A.  If you say so.  I'm not sure of the exact date.

1  Q.  Okay.  And can you tell me, in your role as a treating

2  physician, were you working with patients on the facility

3  level?

4  A.  Yes.

5  Q.  Were you prescribing medications?

6  A.  Yes.

7  Q.  Okay.  And then when you became an RMD, did you continue to

8  prescribe to patients and facilities?

9  A.  Yes.

10  Q.  In what circumstances?

11  A.  When they didn't have a physician, which was many of them;

12  where I saw patients, Five Points, Auburn; I even saw patients

13  when I went up to north country and Altona Correctional

14  Facility; I even saw patients at Watertown and—all over the

15  state, barely.

16  Q.  Okay.  When you saw patients at these different

17  facilities—I'm sorry.  Is it your testimony there was no

18  doctor at the facility?

19  A.  There might have been a midlevel provider or I was there

20  and there was no doctor and there was somebody needed to be

21  seen and so they asked me to see them.

22  Q.  Okay.  And then when you served as an RMD, can you just

23  tell us, in the beginning, which hubs did you cover?

24  A.  The Elmira and Oneida hubs.

25  Q.  Okay.  Was there another point in time in which you were

1    not assigned but rather you volunteered to be oversight of

2    other hubs?

3    A.  Yes.

4    Q.  Which were those hubs?

5    A.  The Watertown and Clinton hubs.

6    Q.  So isn't it true during the pendency of the MWAP

7    period——and I'm just going to call that June 1st of 2017 until

8    it was rescinded——that you were generally the RMD for four

9    DOCCS hubs?

10   A.  More or less, yes.

11   Q.  Okay.  And so that means you had the oversight of

12   approximately 20 prisons, correct?

13   A.  Yes.

14   Q.  And was that a substantially larger number than any other

15   RMD had?

16   A.  I believe so, yes.

17   Q.  So the impact of any policies or practices you put into

18   place in those facilities would have a greater DOCCS-wide

19   impact; would you agree with that?

20   A.  Yes.

21   Q.  Okay.  So let's talk about the MWAP policy itself for a

22   moment.

23          MS. AGNEW:  And I'm just going to caution you, we're

24   not going to finish today, but we're going to get started and

25   then we're going to find a way to get you back, okay?

N961ALL5                    Dinello - Direct

1    Q.  Let's talk about the MWAP policy itself.  Is it true you

2    worked on the policy development for two years before it was

3    promulgated?

4    A.  I don't know exact time frame, but it was a while

5    beforehand.

6    Q.  Okay.  And was that as part of your role as the policy and

7    review committee chairperson or did you bring that as an extra

8    project to that committee?

9    A.  I did serve on the policy and review committee.  I don't

10   know exactly what those dates were, so I'm not too sure.

11   Q.  Okay.  And is it true around the same time frame you were

12   also chairman of the pharmaceuticals and therapeutics

13   committee?

14   A.  Yes.

15   Q.  Do I have the name right?

16   A.  Yes.

17   Q.  Okay.  So you were the chair of the department that decided

18   which drugs went on the formulary; is that correct?

19   A.  Yes.

20   Q.  And during some of that same time you were also the chair

21   of this policy review committee; is that correct?

22   A.  No, I don't think I was the chair.  I was just one of the

23   team members.

24   Q.  Okay.  And so how did it come to be that you assumed

25   control of the MWAP policy development?

N961ALL5                    Dinello - Direct

1    A.  I don't know how.  It just happened.  Maybe because I'm the

2    one that decided to—to take control of it and be the forefront

3    to write it.

4    Q.  Okay.  When you say, "I'm the one who decided to take

5    control of it," was that because it was your idea?

6    A.  No.  We talked about it, the regional medical directors and

7    a number of other people, the chief medical officer, and we

8    decided that we'd—something should be addressed.

9    Q.  Okay.  Isn't it true, though, you brought it to

10   Dr. Koenigsmann first and he actually decided it wasn't a good

11   idea at that time and then you reapproached him later and then

12   he said okay?

13   A.  I don't believe that's the case, no.  I didn't take it to

14   him first, I don't think.  He—no, he never turned it down,

15   then it got revisited.  No, not to my knowledge.

16   Q.  Okay.  Can you explain to the Court why it was determined

17   to make the MWAP, let's say, criteria or scheme a policy rather

18   than a clinical guideline?

19   A.  A policy has more teeth and it has to be followed, where

20   guidelines are just guidelines and you can follow them or not

21   follow them.

22   Q.  Okay.  And what made you believe that if it was a

23   guideline, providers within DOCCS would not follow it?

24   A.  Because it was happening in the real world with the

25   narcotics and other addictive medications.  Guidelines are

1   everywhere, but yet they're still being written like candy.

2   Q.  Okay.  Tell me what's "the real world"?

3   A.  The world outside of DOCCS; the medical world outside of

4   DOCCS, within the United States.

5   Q.  Okay.  And you considered DOCCS to be different than the

6   real world because it's a paramilitary organization; is that

7   correct?

8   A.  No, ma'am.  I think it's just a slice of the American

9   population, with a higher concentration of people that have

10  serious drug addiction problems.

11  Q.  Okay.  But don't you think that DOCCS is operated in a

12  paramilitary fashion and that's why one rung answers to the

13  next rung answers to the next rung?

14  A.  Not necessarily, no.  I don't think I believe that.

15  Q.  You don't think you've ever used that term, "paramilitary"?

16  A.  I know I've heard that term, and it makes sense the way

17  DOCCS works.  That's how I'd describe DOCCS, as paramilitary,

18  yes.

19  Q.  So you've described DOCCS as paramilitary, correct?

20  A.  I'm sure I have, yes.

21  Q.  Okay.  And so tell me your own prescribing practices.  You

22  started limiting your prescriptions of medications with abuse

23  potential yourself beginning in about 2015, correct?

24  A.  No, I don't——I think I always have been pretty conservative

25  with medicines that are addictive and habit forming, almost my

1  entire career.  I was trained that way at Penn State.

2  Q.  Okay.  So there was no time when you started paying

3  particular attention to the types of medications you were

4  prescribing within DOCCS facilities?

5  A.  I'm sure there was a time I paid more attention to that,

6  especially as the national epidemic was brought to our

7  attention.

8  Q.  Okay.  Were you prescribing MWAP medications pretty

9  regularly within the facilities?

10  A.  I don't believe so.  I'm not too sure.

11  Q.  Okay.  Can you tell me, did there come a time in your kind

12  of regime as the RMD of some of these hubs when you started

13  encouraging your providers to "think of alternatives to

14  prescribing MWAP medications"?

15  A.  Did I have that conversation, with providers?

16  Q.  Yes.

17  A.  Oh, yes.

18  Q.  And you had it quite widely, correct?

19  A.  Oh, yes.

20  Q.  Okay.  And so how would you encourage these providers to

21  change their own prescribing practices?

22  A.  It was—just gave them alternatives to treat pain and

23  actually get to the bottom of the real pain and fix it and not

24  mask it with medications.  I always encourage patients, let's

25  find the nonpalliative chronic pain and let's fix it, not just

N961ALL5                        Dinello - Direct

1   keep masking it and medicating it.  Let's get to the bottom of

2   it and see if we can take it away totally, which isn't really

3   possible totally.

4   Q.  So let's just start to think about this.  When you put

5   together the MWAP policy, how did the provisions of that policy

6   encourage providers to start finding alternatives?

7   A.  I don't know, besides it——I don't know how it encouraged

8   them.

9   Q.  Okay.  So if I understand, you were encouraging providers

10  before MWAP to change their prescribing practices, correct?

11  A.  Yes.

12  Q.  Were those encouragements successful?

13  A.  I'm not sure if they were or not.

14  Q.  Okay.  So you would talk to a given provider but you would

15  have no idea of what the effect of your conversations or your

16  persuasion would have on him or her?

17  A.  I'm not too sure if it had an effect or not.  I believe so.

18  I'm not really sure.  I didn't really follow up with them.

19  Q.  Okay.  So you had no interest, is it your testimony, in

20  their prescribing practices pre-MWAP?

21  A.  I always have——as a medical——the regional medical director,

22  you have to be concerned about all the practices of your

23  providers.  That's kind of what you do when you review charts

24  and you have to do performance evaluations and things like

25  that.

N961ALL5                          Dinello – Direct

```
1    Q.  Okay.  So how would you know any given provider needed
2    persuasion to choose different prescribing practices if you
3    weren't aware——
4    A.  They would come to me and ask for guidance.
5    Q.  Okay.  So they were coming to you and saying, *Dr. Dinello,*
6    *I don't know what to do*?
7    A.  No.
8    Q.  *Can you tell me what to do*?
9    A.  No.
10   Q.  Okay.  So tell me how they would come to you and ask,
11   generally.
12   A.  They would generally ask other suggestions to treat certain
13   painful conditions, what other means we had at DOCCS at our
14   disposal.
15   Q.  Okay.  And did each of these providers have access to a
16   copy of the formulary?
17   A.  I'm sure they did, yes.
18   Q.  Okay.  So why wouldn't they know other alternatives
19   available within DOCCS?
20   A.  Because the formulary just contains medications.  The
21   medication is just a small part of how you treat pain.  There
22   are a dozen other things we use to treat pain.
23   Q.  Okay.  So I just want to clarify your testimony.  They were
24   coming to you to look for things other than pharmaceuticals?
25   A.  Other than med——sometimes medications, but other modalities
```

1    that were safer alternative.

2    Q.  Okay.  And what were those other modalities that they

3    wouldn't know of within DOCCS?

4    A.  They might not know, realize TENS units might be

5    beneficial; they might not realize other medications, like

6    Cymbalta, can be useful for chronic neuropathic pain; Topamax

7    can be used; also, they weren't too sure, some of them, of

8    different orthotics we could use in DOCCS, what would be

9    useful; referrals to specialists who we had available in

10   certain hubs, if we had access to certain specialists.  There

11   was a variety of things.

12   Q.  Okay.  So it's your testimony that providers wouldn't know

13   about the utility or availability of TENS machines?

14   A.  They wouldn't know if they're allowed in DOCCS.  Based on

15   the wiring and some of the newer doctors and providers, which

16   are a lot of them over the years, weren't too sure what was

17   allowed or what wasn't allowed.

18   Q.  Were there facilities within your hubs that didn't have

19   TENS units?

20   A.  There are some that did not use it, yes.

21   Q.  Okay.  And so you would encourage them to look at these

22   alternatives—two of which I note are medications—correct?

23   A.  If you say two, yeah.  I'm not too sure.

24   Q.  I think you just said Tegretol and Cymbalta.

25   A.  No.  Topamax, I think.  Tegretol can be used too.

1    Q.  Okay.  All right.  We got three now.  Good.

2        So how—and forgive me for circling back.  I'm just

3    wondering, if you're in charge of your facilities and you're

4    paying attention to these providers, how do you not know if

5    these persuasive conversations you're having were having an

6    impact on prescribing practices?

7    A.  I never looked into it.

8    Q.  Okay.  So did you have any data on prescriptions or

9    prescribing practices?

10   A.  Gabapentin was probably the—the one that comes to mind the

11   most, and obviously we were always aware of the controlled

12   substances—Tylenol with codeine, OxyContin, anything that's on

13   the federal drug list.  We were pretty aware of what's being

14   used and what's not being used.

15   Q.  Okay.  And so how did you become aware of data on Neurontin

16   prescriptions?

17   A.  Oh, it's well documented throughout the country, in various

18   states and prison systems, and it's well documented.  And not

19   only that, personal testimony from probably hundreds, if not

20   thousands of recovering patients who are also inmates that I've

21   gotten to know in my 17 years of being an addiction specialist.

22   So—

23   Q.  Okay.  I'm not talking about the real world; I'm talking

24   about in DOCCS.

25   A.  In DOCCS.  These patients were in DOCCS and told me how

1   they would use it.  In fact, DOCCS, gabapentin used to be what

2   we call a self-carry medication.  It was so widely abused and

3   diverted that security said, enough is enough, we have to make

4   this a nurse med, and then we eventually had to crush it

5   because hundreds of people were caught cheeking it and selling

6   it on the block.  That's well documented.  I've seen it dozens

7   of times myself.

8   Q.  Okay.  What are you—I'm asking about data.  I'm asking

9   about hard data that you reviewed created by DOCCS about

10  numbers of Neurontin prescriptions within DOCCS, not anecdotal

11  evidence.  Hard data.

12  A.  I personally saw it.  That's as hard as it gets.  Many

13  times.  Many times.  I personally saw people cheeking the

14  medication.

15  Q.  Dr. Dinello, please listen to the question and try to

16  answer it.  Don't elicit anything else you need to add, okay?

17      When did you see hard data on Neurontin?  Whether it was

18  diversion numbers, abuse numbers, prescription numbers, data

19  derived from DOCCS.

20  A.  Besides witnessing it on camera personally, no numbers,

21  hard numbers, no.

22  Q.  Okay.  When you say on camera, how many videos did you

23  review that you believe constitute data, systemwide data, on

24  Neurontin?

25  A.  I'm not sure off the top of my head.  I'd say—I'm not

1    really sure.  I've seen so much video over the years.  I don't

2    really know how much.

3    Q.   Okay.  So who created some data somewhere based on those

4    videos?

5    A.   I don't know if it was ever taken down and——and put in a

6    form.

7    Q.   Okay.  And how would you come to review those videos?

8    A.   Usually someone from security would alert us to a problem

9    that they're seeing, that they're having, and the people

10   they're catching.

11   Q.   Okay.  So you're part of the disciplinary process for

12   security?

13   A.   No.

14   Q.   Okay.  So forgive me.  It's not clear to me why a doctor

15   would be brought in to review a video as part of a disciplinary

16   proceeding.

17   A.   It wasn't——I don't know if it was used for disciplinary

18   reasons.  I don't know what that video was used for.

19   Q.   Okay.  But you think at some point you may have reviewed

20   some video, but you don't know how many and you don't know

21   when, correct?

22   A.   I don't know when, no.

23   Q.   Okay.  So we've got some maybe video, and we've got some

24   anecdotal things, correct?

25   A.   If you say so.  Anecdotal, yeah.

N961ALL5                       Dinello - Direct

1   Q.  Okay.  But at no time were you ever presented with any real

2   data, correct?

3   A.  Just the stuff that I saw personally.

4   Q.  Okay.  So let's talk about——there was a time, right, when

5   Dr. Trabout sent you down to Elmira Correctional Facility to

6   try to deal with what he considered to be an overprescription

7   of opioids, correct?

8   A.  Yes.

9   Q.  Okay.  And that was around 2011, correct?

10  A.  If——yeah, if you say so.

11  Q.  Okay.  So you spent some time actually at Elmira, right,

12  meeting with patients; is that correct?

13  A.  Yes, ma'am.

14  Q.  And you believed it was your marching orders to try to move

15  those patients off of opioids and on to alternative treatment

16  modalities; is that correct?

17  A.  I wouldn't say marching them off opioids.  That's——trying

18  to find safer treatment modalities for these patients that

19  weren't habit forming, yes.

20  Q.  But Dr. Trabout was worried about the number of opioid

21  prescriptions at Elmira, correct?

22  A.  I would assume so.  That's why he sent me down, yes.

23  Q.  And as part of that process, did you talk to the actual

24  prescribing providers about their overprescriptions?

25  A.  Yes, I——yes, I did.  I believe so.  I don't know if it was

N961ALL5                          Dinello - Direct

1   my time as the doctor or just within the regional medical

2   director, but I may have had discussions with providers.

3   Q.  I'm talking about Elmira, 2011.

4   A.  I believe so, yes.

5   Q.  Okay.  And then later, in approximately 2015, you served on

6   the narcotics review committee at Green Haven, correct?

7   A.  If—yeah, if it was 2015.  I was there, but I don't know

8   exactly what time, what year.

9   Q.  Okay.  You were there.  And can you tell the Court what you

10  believed the marching orders were for the narcotics review

11  committee.  What did you do?

12  A.  It was really no marching orders.  It was just a review of

13  patients' medications to make sure that they were on safe

14  medications and there was no safer alternative that wasn't

15  habit forming or addictive.

16  Q.  Okay.  And you believed that this was a by-product of the

17  termination of the *Milburn* consent decree, correct?

18  A.  That's what I was told, yes.

19  Q.  Okay.  And how did you understand that the termination of

20  *Milburn* had something to do with discontinuing patients from

21  medications at Green Haven?

22  A.  Just because it came coincidentally.  *Milburn* ended, and

23  they—I think there was a concern they—there was like 500 Perc

24  tins, Percocet tins missing, and I think that prompted a big

25  audit, and I got asked to take a look at the patients and——

N961ALL5                    Dinello - Direct

1   Q.  Wasn't it 9900 Percocets that went missing?

2   A.  It could be.  It was a lot.  I don't know exactly the

3   number.

4   Q.  And wasn't it found it was actually a nurse who had

5   diverted those Percocets, correct?

6   A.  I really have no idea who was—I did hear a nurse, though;

7   you're right.  But I didn't—at the time I didn't really know

8   who took them.

9   Q.  Okay.  So—

10            THE COURT:  When you get to a convenient point to end,

11   let me know.

12            MS. AGNEW:  I think it's convenient.

13            THE COURT:  All right.  Would you people confer with

14   Dr. Dinello and let me know when we're going to resume him,

15   please.

16            MS. AGNEW:  We can, your Honor.  Thank you.

17            THE COURT:  Good afternoon, friends.  I'll see you in

18   the morning.

19            (Discussion off the record)

20            (Adjourned to September 7, 2023, at 9:00 a.m.)

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   ADAM JOHN CARINCI

 4   Direct By Ms. Agnew  . . . . . . . . . . . . 233

 5   Cross By Mr. Nolan . . . . . . . . . . . . . 309

 6   Redirect By Ms. Agnew  . . . . . . . . . . . 371

 7    SUSAN MUELLER MD

 8   Direct By Mr. Morrison . . . . . . . . . . . 378

 9   Cross By Ms. Thomas  . . . . . . . . . . . . 446

10    DAVID DINELLO MD

11   Direct By Ms. Agnew  . . . . . . . . . . . . 450

12                        PLAINTIFF EXHIBITS

13   Exhibit No.                              Received

14    137   . . . . . . . . . . . . . . . . . . 248

15    139   . . . . . . . . . . . . . . . . . . 454

16                        DEFENDANT EXHIBITS

17   Exhibit No.                              Received

18    28   . . . . . . . . . . . . . . . . . . 371

19

20

21

22

23

24

25
```