N971ALL1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  PETER ALLEN, *et al.*,

4                  Plaintiffs,

5           v.                          19 Civ. 8173 (LAP)

6  CARL KOENIGSMANN, *et al.*,

7                  Defendants.
                                        Hearing
8  ------------------------------x
                                        New York, N.Y.
9                                       September 7, 2023
                                        9:00 a.m.
10
   Before:
11
                     HON. LORETTA A. PRESKA,
12
                                        District Judge
13

14                       APPEARANCES

15 AMY J. AGNEW
   JOSHUA L. MORRISON
16 VERONICA JOSIAH-ARYEH
       Attorneys for Plaintiffs
17
   WHITEMAN OSTERMAN & HANNA LLP
18     Attorneys for Defendant Moores
   BY:  WILLIAM S. NOLAN
19      ORIANA L. KILEY
        GABRIELLA R. LEVINE
20      JENNIFER M. THOMAS

21

22 Also Present:  Baron Jones, Law Student Clerk

23

24

25

1            (Trial resumed)

2            THE COURT:  And who are we going to start with this

3   morning, please?

4            MS. AGNEW:  Good morning, your Honor.  The plaintiff

5   class calls to the stand Mr. Kenneth Windley.

6            THE COURT:  Yes, ma'am.

7            MS. AGNEW:  Mr. Windley, can you hear me?

8            THE WITNESS:  Yes, ma'am.

9            MS. AGNEW:  And I know it's hard to see me because I'm

10  in the corner of your screen.  Do you see me waving?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  Okay.

13           MS. AGNEW:  Okay.  Very good.

14           THE COURT:  Would you give your attention, please, to

15  Ms. Phillips.

16           (Witness sworn)

17           THE COURT:  Thank you.  Ms. Agnew.

18   KENNETH WINDLEY,

19       called as a witness by the Plaintiff,

20       having been duly sworn, testified as follows:

21  DIRECT EXAMINATION

22  BY MS. AGNEW:

23  Q.  Good morning, Mr. Windley.  Just for the record, I know

24  that there is a printing machine next to you, so if it starts

25  to print, let us know, because I know then you won't be able to

1    hear, okay?

2    A.  All right, ma'am.

3    Q.  All right.  Can you tell us, Mr. Windley, how old are you?

4    A.  58, ma'am.

5    Q.  Okay.  Can you tell us, when did you come into DOCCS

6    custody?

7    A.  I came into custody April—April 1st—no, April, I think

8    it's the 7th or the 10th of '07, 2007.

9    Q.  Okay.  And Mr. Windley, what was your underlying criminal

10    conviction that you're serving right now?

11    A.  I was convicted of robbery in the second degree.

12    Q.  Okay.  Do you have any other felony convictions,

13    Mr. Windley?

14    A.  Yes, ma'am.

15    Q.  Can you please tell the Court what those are.

16    A.  I have robbery in the—robbery in the second, drug

17    possession in the third, possession of a firearm in the third,

18    and robbery in the second.

19    Q.  Okay.  When was your drug possession charge, Mr. Windley?

20    A.  2000.

21    Q.  Okay.  And Mr. Windley, when was the last time you

22    personally used illicit substances?

23    A.  Last time I used was alcohol, when I was on the street.

24    Q.  When was that, Mr. Windley?

25    A.  2006.

1  Q.  Okay.  And Mr. Windley, do you currently have a substance

2  abuse problem?

3  A.  No, ma'am.

4  Q.  Okay.  When you came into DOCCS in 2007, Mr. Windley, what,

5  if any, diagnoses or symptoms caused you chronic pain?

6  A.  Well, I start feeling pain in two thousand—no, in 2012.

7  Q.  Okay.  And what kind of pain did you start to suffer from

8  in 2012?

9  A.  Severe back pain, and I couldn't walk 'cause I can't

10  dorsiflex my feet.

11  Q.  Okay.  Explain to the Court what you mean when you say, "I

12  can't dorsiflex my feet."

13  A.  I couldn't walk.  I had trouble walking down the steps or

14  walking down the hallway because I couldn't—the term they use

15  is dorsiflex, where I can't lift my toes up.

16  Q.  Okay.  And do you also suffer from drop foot?

17  A.  Yes, that's what they call it, it's called a gant (ph).

18          THE COURT:  Is that G-A-N-T, sir?

19  A.  No, G-A, G-A-I-T, gait.

20  Q.  Oh, gait.

21          THE COURT:  Yes.  Thank you, sir.

22  Q.  Okay, Mr. Windley.  Do you know what the source of these

23  issues with your feet is?

24  A.  The source of it is I have severe case of spinal stenosis.

25  Q.  Okay.  And so around 2012 were you diagnosed with that

1   spinal stenosis?

2   A.  Yes, that's what the——that's what the specialist told me.

3   Q.  Okay.  Did you have any surgeries to help with your spinal

4   stenosis?

5   A.  Yes.  I had two surgeries, one in 2013 and the other in

6   2015.

7   Q.  Okay.  I want you to say those years again because they

8   both sounded like 2015 to me.

9   A.  No, the first one was April 2013.

10  Q.  Okay.

11  A.  And the second was July 2015.

12  Q.  Okay.  Did those surgeries fix your issues with chronic

13  pain?

14  A.  No, ma'am.  I'm still seeing——I'm still seeing medical and

15  I'm scheduled to see the neurosurgeon because he——he wants to

16  do another surgery.

17  Q.  Okay.  I want to go back to 2015, though, after your second

18  surgery, okay?  Around that time were you prescribed anything

19  that helped you with your chronic pain?

20  A.  Yes, I was prescribed Percocets and Neurontin.

21  Q.  Okay.  And just for the record, Mr. Windley, is Neurontin

22  also known as gabapentin?

23  A.  Yes, that's the name they use now, yes.

24  Q.  Okay.  That's fine.  So when you were prescribed those

25  medications in 2015, did they help your pain?

N971ALL1                    Windley - Direct

```
1    A.  Yes, they——they alleviated a lot of the pain from my
2    everyday course of going on after the surgery.
3    Q.  Okay.  And when they alleviated your pain, did that have
4    any effect on your activities of daily living?
5    A.  When I was able to not feel the pain, I was moving a little
6    better.
7    Q.  Okay.  So tell me this, Mr. Windley.  Which facility were
8    you at in 2015 when you were prescribed those effective
9    medications?
10   A.  Green Haven Correctional Facility.
11   Q.  Okay.  And do you remember who your provider was at Green
12   Haven?
13   A.  That was Dr. Pine.
14   Q.  Okay.  Did there ever come a time, Mr. Windley, when your
15   effective medications were discontinued?
16   A.  Yes.
17   Q.  When was that, sir?
18   A.  In mid-2015, I think.
19   Q.  Okay.
20   A.  Yeah, it was mid-2015.
21   Q.  And which facility were you at when that occurred?
22   A.  Green Haven.
23   Q.  Okay.  Did anyone tell you why your medications were being
24   discontinued, Mr. Windley?
25   A.  The doctor said there was somebody called pain management.
```

1          MS. LEVINE:  We object, your Honor, to hearsay, to

2     preserve for the record.

3          MS. AGNEW:  If I may just inquire a little further.

4          THE COURT:  Yes.

5     Q.  Mr. Windley, which doctor told you that?

6     A.  It was a nurse called Stephanie, and it was my medical

7     provider.

8     Q.  Okay.  And who was your medical provider then?

9     A.  At that time, I think my medical provider was Dr. Wolf, I

10    think it was.

11    Q.  And do you know if that was Dr. Janice Wolf?

12    A.  Yes, that was her name, Wolf.  I didn't really know,

13    remember her first name.

14    Q.  That's fair.

15         MS. LEVINE:  Your Honor, I would just renew my hearsay

16    objection for the record.

17         THE COURT:  Yes, ma'am.  Overruled for the same

18    reasons.

19    Q.  Okay.  Mr. Windley, when your medications were

20    discontinued, did you speak with your medical providers about

21    how that affected your daily pain?

22    A.  Several times I talked to the provider.

23    Q.  Okay.  And which provider did you speak to?

24    A.  Dr. --

25    Q.  I'm so sorry, Mr. Windley.  You froze for a second.  That's

N971ALL1                        Windley - Direct

1   not your fault.

2        I'm going to ask you again:  Which medical provider did you

3   tell about the effect of the discontinuations?

4   A.  I told several.  I told Dr. Wolf, I told Dr. Kenning,

5   Dr. Goldman.  It was different doctors I was speaking to in the

6   medical.

7   Q.  Okay.  And in the course of those discussions did they ever

8   prescribe to you an effective alternative to help with your

9   chronic pain?

10  A.  It was only ibuprofen 600.

11  Q.  Did the ibuprofen 600 help you?

12  A.  No.  I told them it didn't help, so they said that's all

13  they had.

14  Q.  Okay.  Can you remember who told you "that's all we have"?

15  A.  Dr. Wolf told me that, Dr. Kenning told me——

16            MS. LEVINE:  Your Honor——sorry.

17  A.  ——and also Dr. -- Dr. Bode.

18  Q.  Okay.

19            MS. LEVINE:  I just renew my hearsay objection.

20            THE COURT:  Yes, ma'am.  Same ruling.

21  Q.  Okay, Mr. Windley.  Can you tell us, was there a time when

22  you were transferred away from Green Haven?

23  A.  Yes, I went to Woodbourne Correctional Facility.

24  Q.  And do you recall approximately when you transferred to

25  Woodbourne?

1    A.   August the 5th, 2021.

2    Q.   Okay.  And do you recall who your provider was when you

3    were housed at Woodbourne?

4    A.   Dr. Switz.

5    Q.   Okay.  Is that Switz?  Let me spell that for the record,

6    okay?  S-W-I-T-Z; is that correct?

7    A.   Yes, ma'am.

8    Q.   Okay.  Did you share with Nurse Switz that you were

9    suffering from chronic pain?

10   A.   Yes, I told——I told Dr. Switz that she has my medical

11   record, she sees the condition I'm in, and I'm in pain, but she

12   continued——I had a medication called Cymbalta.

13   Q.   That's Cymbalta, Mr. Windley?

14   A.   Yes, Cymbalta.

15   Q.   Okay.  Did the Cymbalta help your chronic pain?

16   A.   A little bit, but it was——I still was feeling major pain.

17   Q.   Okay.  Did the Cymbalta help you with your activities of

18   daily living?

19   A.   A little bit, because I was medically unemployed.

20   Q.   What does it mean to be medically unemployed, Mr. Windley?

21   A.   They don't give you a program.

22   Q.   Okay.  So what do you do when you're medically unemployed

23   instead of going to programming?

24   A.   Sit around or just go out and get some air.

25   Q.   Okay.  Do you have any idea, sitting here today, why you

1  were made medically exempted from programming?

2  A.  A little bit.  It was hard to sit down for long periods.

3  Q.  Okay.  Is it hard for you to sit?

4  A.  For a long period of time.

5  Q.  Okay.  Is it hard for you to ambulate, Mr. Windley?

6  A.  It's hard to get around, yes.

7  Q.  Okay.  So did you ever share with Nurse Switz that the

8  Cymbalta was not significantly helping your pain?

9  A.  Yes, I told her that, though she offered me──she told me

10  that they don't give that medication there.

11          MS. LEVINE:  I just renew my objection to hearsay,

12  your Honor.

13          THE COURT:  Same ruling.  Thank you, counsel.

14  Q.  Okay.  Now tell me, Mr. Windley, was there a time when you

15  were transferred away from Woodbourne Correctional Facility?

16  A.  Yes, I was in the SHU at Sullivan, then Sullivan

17  transferred me to Adirondack.

18  Q.  Okay.  And what did you do to get into SHU at Sullivan, to

19  your knowledge?

20  A.  I was convicted for possession of drugs.

21  Q.  Okay.  Mr. Windley, what drugs were you convicted of

22  possessing?

23  A.  Oxycodone pills.

24  Q.  Did you indeed possess oxycodone pills?

25  A.  They was in my folder, so they said it was mine.

1    Q.  Okay.  Were they your oxycodone pills, Mr. Windley?

2        Mr. Windley, can you hear me?

3    A.  Yes, ma'am.

4    Q.  Okay.  I apologize, because you froze again.  So I'm going

5    to ask my question again.

6        The oxycodone pills, were those yours?

7    A.  No, ma'am, they were not mine.

8    Q.  How did they come to be in your folder, if you know?

9    A.  I explained to the on-site officer the name of the person

10   that put them in my folder.

11   Q.  Do you have any knowledge of why another person would put

12   oxycodone pills in your folder?

13            MS. LEVINE:  Objection.  Calls for speculation.

14            MS. AGNEW:  I'm asking him if he knows.

15            THE COURT:  Let's find out what the answer is and then

16   we'll find out the source.

17            Sir, are you able to answer counsel's question?

18            THE WITNESS:  Yes, ma'am.

19            THE COURT:  Would you do so, please.

20   A.  He's a drug member—I mean, he was a gang member.

21            MS. LEVINE:  I renew my objection.

22            MS. AGNEW:  Let me just inquire a little further.

23   Q.  How do you know that this gang member put the pills in your

24   folder, Mr. Windley?

25   A.  'Cause he told me.

1   Q.   Okay.  Did you see him do it?

2            MS. LEVINE:  Object to hearsay.

3            THE COURT:  Let me hear the answer.

4   A.   No, I—I didn't see him do it; he just told me he did it.

5            MS. AGNEW:  Okay.  I will allow the striking of that

6   line.

7            THE COURT:  Yes, ma'am.

8   Q.   Okay, Mr. Windley.  So you were in the SHU at Sullivan,

9   correct, and then you were transferred to Adirondack; is that

10  right?

11  A.   Yes.

12  Q.   At the time—

13  A.   Yes, ma'am.

14  Q.   —you got that disciplinary ticket, were you given a drug

15  test to see if there was oxycodone in your system?

16  A.   No, ma'am.

17  Q.   Okay.  So once you got to Adirondack, Mr. Windley, do you

18  know who your provider is?

19  A.   At that time, I didn't know.  I just was talking to the

20  nurse.

21  Q.   Okay.  Once you got to Adirondack, how long did it take you

22  to figure out who your provider was?

23  A.   I—

24  Q.   Go ahead, Mr. Windley.

25       Can you hear me?

N971ALL1                    Windley - Direct

1    A.  Yes.

2    Q.  Okay.  How long after you got to Adirondack was it until

3    you met your provider?

4    A.  Two and a half months.

5    Q.  Okay.  And can you tell us who that provider was when you

6    finally met with him or her.

7    A.  PA Wiggan.

8    Q.  For the record, that's W-I-G-G-A-N; is that correct,

9    Mr. Windley?

10   A.  Yes.

11   Q.  Okay.  When you met with Nurse Wiggan, did you tell her

12   about your chronic pain?

13   A.  Yes, I——I told the nurses since I arrived all the way till

14   I saw Mr. —— Ms. Wiggan.

15   Q.  Do you file any——I'm sorry.  Did you submit any sick call

16   slips in those two and a half months to see your provider?

17   A.  Yes.

18   Q.  And when you submitted those sick call slips, did you see

19   your provider immediately after you submitted them?

20   A.  No.  I only saw the nurse.

21   Q.  So can you tell me, approximately when did you come to

22   Adirondack?

23   A.  Sep——it was in September; maybe the second or third week.

24   Q.  Of which year, sir?

25   A.  2022, September.

N971ALL1                          Windley - Direct

1   Q.  Okay.  And then so is it correct you saw Ms. Wiggan for the

2   first time in about November of '22?

3   A.  Yes.

4   Q.  Okay.

5   A.  Yeah, November.

6   Q.  And when you met with Nurse Wiggan, did you share with her

7   whether or not you had ever been on any effective treatments?

8   A.  Yes.

9   Q.  And what did you tell her?

10  A.  I told her that I'm feeling a lot of pain every day and

11  that I need to see the specialist, and she only gave me

12  meloxicam.

13  Q.  Okay.  And did the meloxicam—I'm sorry.  Did the meloxicam

14  effectively treat your chronic pain?

15  A.  No.  I told her that it was not working, so she referred me

16  to—to get an x-ray, an MRI.

17  Q.  How long did it take you to get an MRI, Mr. Windley?

18  A.  Maybe about a month.

19  Q.  Okay.

20  A.  A month.

21  Q.  And after you got the MRI did Nurse Wiggan prescribe you

22  effective treatment?

23  A.  No, not yet, no.

24  Q.  Okay.  Did there come a time when Nurse Wiggan did

25  prescribe you treatment?

N971ALL1                       Windley - Direct

1   A.   Yeah.  She was prescribing me treatment when—when I wrote

2   the law firm, and they sent an email to her, then she

3   prescribed me something.

4   Q.   When you say "wrote the law firm," do you mean my law firm?

5   A.   Yeah, Agnew, yes, Ms. Agnew, yes.

6   Q.   Okay.  And so it's your testimony that Nurse Wiggan

7   prescribed you treatment after you contacted my office; is that

8   correct?

9            MS. LEVINE:  Objection.  Calls for speculation.

10  A.   Yes, ma'am.

11           THE COURT:  I don't think it's speculation.  It's a

12  timing issue.  Overruled.

13  Q.   Mr. Windley, before you contacted my office, had any of

14  your providers, since you were discontinued, offered you

15  effective treatment?

16  A.   Not yet.

17  Q.   Can you tell me, do you remember meeting with a law student

18  from my office?

19  A.   Yes.

20  Q.   Do you remember his name?

21  A.   I believe his name is Josh, I believe.

22  Q.   Okay.  That's all right.  Can you tell me this:  Were you

23  prescribed effective treatment, or treatment at all, before or

24  after you met with someone from my office?

25  A.   I believe I started treatment in March.

1    Q.  Okay.  And would that be March of 2023?

2    A.  Yes.

3    Q.  Okay.  And can you tell me, what were you prescribed by

4    Nurse Wiggan?

5    A.  I was prescribed 600 milligrams of Neurontin and

6    50 milligrams of Tramadol.

7    Q.  And is Tramadol also known as Ultram, to your knowledge?

8    A.  Yes.

9    Q.  Okay.  And Mr. Windley, has that prescription helped you

10   with your chronic pain?

11   A.  Somewhat, sometimes, but when the weather is bad,

12   it's——nothing at all will help me.

13   Q.  Okay.  Have you seen Ms. Wiggan for a follow-up since she

14   prescribed that treatment to you?

15   A.  I seen her a couple of times, and she gave me a back brace,

16   for the neurosurgeon.

17   Q.  Have you seen the neurosurgeon yet, Mr. Windley?

18   A.  Yes, I seen him twice, and I have to see him——

19   Q.  Do you know, are you going to go forward with any kind of

20   surgery?

21   A.  Yes, I have to see him again, because he——he needed the

22   EM——EMG report before he can come to his diagnosis on where the

23   surgery has to take place.

24   Q.  Can you tell me this, Mr. Windley.  From 2015, when your

25   medications were discontinued, until Ms. Wiggan sent you to

N971ALL1                    Windley - Cross

1   neurosurgery, had you seen a neurosurgeon or had an EMG done

2   while you were in DOCCS custody?

3   A.   I—I had numerous times had tests done.

4   Q.   And after you had those tests, did any of your providers

5   prescribe you effective treatment for your chronic pain?

6   A.   No.

7   Q.   Okay.  I'm done with my questioning, Mr. Windley, but

8   Ms. Levine is going to come ask you some questions, okay?

9   A.   Oh, yeah, yeah.

10  Q.   Okay.

11  A.   I'm 59.  My birthday just passed.

12  Q.   What was that, Mr. Windley?

13  A.   I'm 59.  My birthday just passed.

14  Q.   That's right.  I remember it was going to be your birthday

15  when we did your deposition, correct?

16  A.   Yes.

17  Q.   Okay.  Well, happy birthday, and we'll note that for the

18  record.

19  A.   All right.

20          THE COURT:  Ms. Levine.

21          MS. LEVINE:  Thank you, your Honor.

22  CROSS EXAMINATION

23  BY MS. LEVINE:

24  Q.   Good morning, Mr. Windley.

25  A.   Good morning.

N971ALL1                          Windley - Cross

1   Q.   Can you hear me okay?

2   A.   Yes, ma'am.

3   Q.   Okay.  My name is Gabriella Levine.  You might remember me

4   from when I deposed you back in August.  It's good to see you

5   again.

6        I'm going to ask you a couple questions today, okay?

7   A.   All right, ma'am.

8   Q.   All right.  You're currently at Adirondack, right?

9   A.   Yes, ma'am.

10  Q.   Okay.  And you got there around the end of September of

11  2022; is that right?

12  A.   Yes, ma'am.

13  Q.   Okay.  And as I understand it, you suffer from leg and back

14  pain; is that right?

15  A.   Yes, leg and back pain.

16  Q.   And you're currently on medication called gabapentin and

17  Tramadol to treat that pain, right?

18  A.   Yes, ma'am.

19  Q.   Can you remind us what the doses are again.

20  A.   600 of gabapentin twice a day; and 50 milligrams of

21  Tramadol in the day and a hundred milligrams at evening.

22  Q.   Okay.  And I believe you testified on direct that you've

23  been continuously prescribed those medications for seven

24  months, since March of 2023; is that fair?

25  A.   Yes, since March, yes.

```
 1   Q.   Okay.  And no one at Adirondack has discontinued your
 2   gabapentin and Tramadol since it's been prescribed to you in
 3   March of 2023, right?
 4   A.   No, ma'am.
 5   Q.   Okay.  No, no one's discontinued it, right?
 6   A.   No, ma'am.
 7   Q.   Okay.  And I believe you said that you see a provider at
 8   Adirondack by the last name of Wiggan?
 9   A.   Yes.  PA Wiggan, yes.
10   Q.   Okay.  And is that Nurse Practitioner Dahlia Wiggan?
11   A.   Yes, Ms. Wiggan, female, yes.
12   Q.   Have you seen any other providers at Adirondack?
13   A.   No, just nurses besides Ms. Wiggan.
14   Q.   Okay.  I want to take you through a bit your treatment
15   history since you've been at Adirondack, okay?
16   A.   All right.
17   Q.   All right.  So we established that you arrived at the end
18   of September 2022, right?
19   A.   Yes.
20   Q.   Okay.  And I believe that you told your attorney on direct
21   that you weren't immediately seen by a provider, right?
22   A.   No, only nurses.
23   Q.   Okay.  You left out the reason, though, that you weren't
24   immediately seen by a provider, and that reason was because you
25   refused an initial examination with the provider when you got
```

1    to Adirondack, right?

2    A.  Yeah, I put in for sick call, but all I seen was nurses

3    because I was in the R unit.

4    Q.  My question is:  Isn't it true that you refused an initial

5    visit with a provider on September 26, 2022, when you got to

6    Adirondack?

7    A.  No.  I didn't refuse anything.

8    Q.  Is it your testimony that you didn't refuse a visit with

9    the provider on September 26, 2022?

10   A.  No, I didn't refuse any—any visits with any nurses.

11   Q.  Okay.  Mr. Windley, do you see the document in front of

12   you?

13   A.  Yeah.  It could be a little bigger.

14   Q.  For purposes of the record, I'm showing you Defendant's

15   Exhibit 23, and it's Bates labeled at the bottom

16   Windley-000898.

17       Do you recognize this document, Mr. Windley?

18   A.  It's got my name on it.

19   Q.  It's got your name at the top, right?

20   A.  Yes.

21   Q.  And then it's got a signature of the inmate, right?

22   A.  Yes.

23   Q.  And that's your signature, right?

24   A.  Yes.

25   Q.  And it's dated September 26, 2022?

1   A.  Mm-hmm.

2   Q.  And then it says here, "Describe the examination and/or

3   treatment and consequences as discussed with patient."  Do you

4   see that?

5   A.  Yes.

6   Q.  And it says, "Chronic hypertension.  New draft appointment

7   with medical provider"?

8   A.  Yes.

9   Q.  This is a refusal form you signed, right, Mr. Windley?

10   A.  Yes.  This document was not—this document was not filled

11   out when I signed it.

12   Q.  Mr. Windley, did you refuse an appointment with your

13   medical provider when you got to Adirondack?

14   A.  No, ma'am.

15   Q.  Did you sign this document?

16   A.  I signed that document, but those words on that document

17   was not in place on that paper when the officer gave it to me.

18         MS. LEVINE:  Okay.  Your Honor, I believe I took it

19   down, but I'd like to enter that page into evidence as D23.

20         MS. AGNEW:  No objection, your Honor.

21         THE COURT:  Received.

22         (Defendant's Exhibit 23 received in evidence)

23   Q.  Mr. Windley, as I understand it, when you got to

24   Adirondack, you put in a sick call request complaining about

25   your pain, right?

1    A.  Yes.

2    Q.  And you saw a nurse practitioner after you put in a sick

3    call about your pain, right?

4    A.  No, I saw Ms. Wiggan months after I came.

5    Q.  Isn't it true that you saw Nurse Practitioner Wiggan in

6    response to a sick call request that you put in in March of

7    2023?

8    A.  Yeah, in March, I seen her.

9    Q.  And you saw her in response to a sick call request that you

10   put in; isn't that right?

11   A.  Yes, I seen her.

12   Q.  In response to a sick call request you put in, right?

13   A.  Yeah, they scheduled me to see her, yes.

14   Q.  Okay.  Now the first time that you saw Nurse Practitioner

15   Wiggan, as I understand it, she gave you a medication called

16   meloxicam, right?

17   A.  Yes.

18   Q.  Okay.  And that was to treat your pain, correct?

19   A.  Yes.

20   Q.  Okay.  And she also sent you out for a back x-ray the first

21   time you saw her, right?

22   A.  Yes, she did.  Yeah, she referred me to a x-ray, yeah.

23   Q.  Okay.  And that also was in response to your complaints of

24   pain, right?

25   A.  Yes, ma'am.

1   Q.  Okay.  And she ordered you an MRI as well, right?

2   A.  Yes, after that I had an MRI done.

3   Q.  And that was also in response to your complaints of pain?

4   A.  (Inaudible)

5   Q.  Sorry, Mr. Windley.  I didn't hear your answer.

6   A.  I said yes, ma'am.

7   Q.  Okay.  And at that first appointment she also gave you a

8   back brace, right?

9   A.  Yes.

10  Q.  And that was for your pain too, right?

11  A.  Yes, ma'am.

12  Q.  And then she gave you leg braces too, right?

13  A.  Excuse me?

14  Q.  She also gave you leg braces, right?

15  A.  Yes.

16  Q.  And those help you walk better, right?

17  A.  Yes, they do.

18  Q.  And after that first appointment you saw Nurse Practitioner

19  Wiggan again in March of 2023, right?

20  A.  Yes.

21  Q.  Okay.  And at that appointment in March of 2023, Nurse

22  Practitioner Wiggan specifically asked you if the meloxicam

23  helped your pain, right?

24  A.  Yes.

25  Q.  And you told her it wasn't helping, right?

N971ALL1                         Windley - Cross

1    A.  Yes, ma'am.

2    Q.  Okay.  And after you told her that the meloxicam wasn't

3    working for you, she then prescribed you the Tramadol and

4    gabapentin, right?

5    A.  Yes.

6    Q.  Okay.  So she didn't ignore you when you told her about how

7    the meloxicam wasn't working, right?

8    A.  No, not at that time, no.

9    Q.  No.  In fact, she prescribed you a new medication when you

10   told her that it wasn't working, right?

11   A.  Yes.

12   Q.  Okay.  At this March 2023 appointment she also made a

13   referral for you to see a neurosurgeon, right?

14   A.  Yes.

15   Q.  Okay.  And you've since seen a neurosurgeon?

16   A.  Yes, I seen him twice.

17   Q.  Two times; is that right?

18   A.  Yes.

19   Q.  Okay.  And she sent you to the neurosurgeon in response to

20   your complaints of pain, right?

21   A.  Yes, ma'am.

22   Q.  Okay.  Did you have an EMG test done?

23   A.  Yes.

24   Q.  Okay.  To your knowledge what was the EMG for?

25   A.  It was to see the nerves in my back.

1    Q.  Okay.  And you had that done, right?

2    A.  Yes, ma'am.

3    Q.  When was that?

4    A.  Like two weeks ago.

5    Q.  Two weeks ago.  Okay.  When Nurse Practitioner Wiggan first

6    prescribed you gabapentin, you were initially on a dose of

7    300 milligrams, right?

8    A.  No.

9    Q.  You don't recall being on a dose of 300 milligrams

10   initially?

11   A.  No.  She had——300.

12   Q.  In the beginning, right, and then she increased you to

13   600 milligrams, right?

14   A.  Yes.

15   Q.  Okay.  And she did that after you told her that you were

16   still in a bit of pain, right?

17   A.  Yes.

18   Q.  Okay.  Now you also received ibuprofen at Adirondack too,

19   right?

20   A.  Yes, when I first came, I was receiving the ibuprofen.

21   Q.  Okay.  And that was to treat your pain, too, right?

22       I think you might have froze, Mr. Windley.  Did you hear my

23   question?

24   A.  Yes.  I said the nurse was giving me ibuprofen.

25   Q.  Okay.  And that was for your pain too, right?

1    A.  Yes.

2    Q.  Okay.  So I just want to go over this with you to make sure

3    we haven't missed anything.

4        In the 11 months or so since you've been at Adirondack,

5    you've been given ibuprofen, right?

6    A.  Yeah, for——

7    Q.  Meloxicam, right?

8    A.  No, ibuprofen they was giving me at first.

9    Q.  And then meloxicam, a back brace, leg braces, a back x-ray,

10   an MRI, gabapentin, Tramadol, increased dosages of gabapentin,

11   a neuro consult, and an EMG test.  Is there anything else that

12   they've done for you since you've been at Adirondack?

13   A.  No.  I'm waiting to see the neurosurgeon.

14   Q.  Okay.  And what specifically are you waiting to have done?

15   A.  He said he wants to have——fuse the disc on the S1 to take

16   the pain off the nerve.

17            MS. LEVINE:  Can I have a moment just to confer with

18   counsel, your Honor.

19            THE COURT:  Yes, ma'am.

20            MS. LEVINE:  I have no further questions, your Honor.

21            THE COURT:  Thank you.

22            Redirect, please.

23   REDIRECT EXAMINATION

24   BY MS. AGNEW:

25   Q.  Mr. Windley, it's Ms. Agnew again.  I'm going to

1    ask——Kathryn Haas is putting up that refusal that Ms. Levine

2    was just talking to you about, okay?

3    A.   Yes.

4    Q.   Can you see that?

5    A.   Yes.

6    Q.   Okay.  Can you tell me, did you write anything on that

7    refusal form, sir?

8    A.   No, I only have my name on it.

9    Q.   Okay.  And when——who brought you that refusal form, if you

10   remember?

11   A.   One of the officers just told me just to put my name down

12   because they didn't want to walk me anywhere to the infirmary

13   because they know I walk real slow.

14          MS. LEVINE:  I'm going to object to hearsay, your

15   Honor.

16          THE COURT:  Ma'am.

17   Q.   Do you remember what the officer's name was, Mr. Windley?

18   A.   No, ma'am.  I don't know his name; just one of the SAG

19   officers.

20          MS. LEVINE:  I would renew my objection, your Honor,

21   and on the additional ground that I think we've been proceeding

22   with the assumption that providers are agents or employees of

23   the official capacity defendant, Dr. Moores in this case, but

24   now we're talking about security staff, so I think it's

25   different at this point.

N971ALL1                    Windley – Redirect

1              MS. AGNEW:  Your Honor, security staff are——it's their

2       job to get these prisoners back and forth from medical care.  I

3       can establish that here.  And in fact, many times if the

4       officer decides the patient is not going, he doesn't go.  So if

5       I could inquire further, I'm sure I can do that.

6              THE COURT:  All right.  Go ahead.

7              And counsel, renew whenever you're ready.

8       BY MS. AGNEW:

9       Q.  Mr. Windley, do you recall this date in signing this

10      refusal?

11      A.  I don't really remember the date, but I know that's my name

12      on that 'cause that's my signature.  But that paper was——

13      Q.  Okay.  So do you remember the circumstances under which you

14      signed this piece of paper?

15      A.  Well, I remember the date because he told me I walked too

16      slow.

17      Q.  Okay.  Can you tell me where you were housed on that date.

18      A.  I was in the R unit, I believe, in 5 cell.

19      Q.  Okay.  And where is that in relation to the medical unit,

20      sir?

21      A.  On the other side of the jail.

22      Q.  And when you talk about the jail, how many buildings are

23      there at Adirondack that comprise the jail?

24      A.  It's several buildings.  I don't know how many exactly.

25      Several buildings, though.

N971ALL1                        Windley - Redirect

1    Q.   Okay.  Do you get to walk from one building to another all

2    by yourself without an officer?

3    A.   Not in the R unit.

4    Q.   Okay.  Can you tell us what that R unit is.  Forgive me for

5    not knowing.

6    A.   It's—it's the SHU, but they call it the rehabilitation

7    unit.

8    Q.   Oh, and is that because when you first came there, you were

9    still finalizing your SHU time?

10   A.   Yes.

11   Q.   Okay.  And so it's your testimony you needed an officer to

12   take you to a medical appointment?

13   A.   Yes, you need two officers and a sergeant.

14   Q.   Okay.  And I know you don't remember that it was

15   September 26th, but do you remember an officer coming to you

16   with this refusal form?

17   A.   Yeah, one officer came—came to me with the form.

18   Q.   Okay.  And I believe you testified, sir, that you suffer

19   from drop foot, correct?

20   A.   Yes.

21   Q.   And how does that affect your ambulation?

22   A.   If I'm not careful, I could trip and fall.

23   Q.   Say that again, please.

24   A.   If I'm not careful, I can trip and fall.

25   Q.   Okay.  And do you walk fast or slow, Mr. Windley?

1   A.  Slow and cautious.

2   Q.  Okay.  And so I want you to say again what the officer said

3   to you when he brought you this form.

4   A.  He said: *You walk too slow.  You don't have to walk.  Just*

5   *sign here.*

6   Q.  Okay.  And was the rest of the form filled out when he

7   asked you to sign it?

8   A.  No.  The form was blank.

9   Q.  Okay.  Now tell me something.  At the bottom of the form,

10   do you see a nurse's signature?

11   A.  On the bottom?  No nurse was there.  No nurse was there.

12   Q.  Okay.  I'm asking you if you see the signature that says RN

13   after it.

14   A.  On the bottom?

15   Q.  Yes.

16   A.  Yeah, that's a signature, but I don't know who that is.

17   Q.  Okay.

18        MS. LEVINE:  Just for purposes of the record, I just

19   wanted to renew my objection.

20        THE COURT:  Okay.  When counsel is finished with this

21   line, then I'll decide it, okay?

22   Q.  Mr. Windley, when you signed this form, was there a nurse

23   there with the officer?

24   A.  No.  No nurse was present.  It was just him and me talking

25   at my cell.

1          MS. AGNEW:  Okay.  Your Honor, the evidence is already

2     in the record.  I would like to keep Mr. Windley's testimony,

3     but I leave it to the Court.

4          THE COURT:  So let me ask you this:  Is the testimony

5     that the officer said, *You walk too slowly,* is that offered for

6     the truth or is that offered for its having been said?

7          MS. AGNEW:  It's offered for its having been said.  I

8     think that's his testimony.  But what I'm trying to establish

9     here is that Mr. Windley was not offered the opportunity to go

10    to medical on that day.  He was presented with a refusal and

11    told to sign it.  So it's about that exchange and why my client

12    didn't attend.

13         THE COURT:  Ms. Levine.

14         MS. LEVINE:  I think it is in fact being offered for

15    the truth, your Honor.  I don't know how it would be offered

16    for the effect on Mr. Windley, if any.  I think it is being

17    offered for the truth.

18         THE COURT:  I'm not sure it is relevant that the

19    officer thought he walked slowly.  It's very hard to separate

20    it now that we have the testimony that he in fact walked

21    slowly.  I think the point, I guess, that counsel is making is

22    that the officer said something to him to get him to sign the

23    form.  Isn't that the point?

24         MS. LEVINE:  And I think that——I'm not sure if that

25    was fleshed out clearly in the witness's testimony.  I think

N971ALL1                    Windley - Redirect

1   that was fleshed out in Ms. Agnew's explanation for what the

2   witness said.  I don't think he said it that clearly.  So I'll

3   renew my objection, your Honor.

4            THE COURT:  Ms. Agnew.

5            MS. AGNEW:  The document is in the record, your Honor.

6   We can strike the testimony.

7            THE COURT:  All right.  Done.

8            MS. AGNEW:  Okay.  Thank you.

9   BY MS. AGNEW:

10  Q.  Mr. Windley——

11           THE COURT:  I'm sorry.  Before we do that, striking

12  the testimony with respect to what the officer said, right?

13           MS. AGNEW:  But not with respect to his slow

14  ambulation, your Honor.

15           THE COURT:  The remaining testimony about the document

16  having been blank when Mr. Windley signed it remains in, right?

17  Nothing wrong with that testimony?

18           MS. LEVINE:  I don't have a basis to——I don't have an

19  objection to that, no, your Honor.

20           THE COURT:  Yes, ma'am.  Thank you.

21           MS. AGNEW:  Thank you very much, your Honor.

22  BY MS. AGNEW:

23  Q.  Mr. Windley, can you tell me, when you were in that R unit

24  at Adirondack, in those first few months, did you have the AFOs

25  to help you walk?

N971ALL1                          Burch - Direct

1   A.   No.

2   Q.   Can you tell the Court what the AFOs are, just so we have a

3   clear record.

4   A.   They're leg braces that inserts into your shoe or your boot

5   and they come up and tie on your legs.

6   Q.   Okay.  And can you tell me—Ms. Levine asked you about

7   Nurse Wiggan giving you a back brace, correct?

8   A.   Yes.

9   Q.   Did the back brace fit, Mr. Windley?

10  A.   Somewhat, it fit.

11          MS. AGNEW:  Okay.  I have no further questions, your

12  Honor.

13          THE COURT:  Thank you.

14          Recross, counsel?

15          MS. LEVINE:  No, your Honor.

16          THE COURT:  Thank you.

17          Thank you, Mr. Windley.  Good morning.

18          MS. AGNEW:  Thank you, Mr. Windley.  You'll hear from

19  us soon, okay?

20          THE WITNESS:  Thank you, ma'am.

21          MS. AGNEW:  Let us know if you have that surgery,

22  okay?

23          THE WITNESS:  Yes, ma'am.

24          (Witness excused)

25          MS. AGNEW:  Your Honor, the plaintiff class calls

1  Mr. Samson Burch to the stand.

2            THE COURT:  Thank you.

3            Please give your attention to Ms. Phillips.

4            (Witness sworn)

5            THE COURT:  Ms. Agnew.

6   SAMSON BURCH,

7        called as a witness by the Plaintiff,

8        having been duly sworn, testified as follows:

9   DIRECT EXAMINATION

10  BY MS. AGNEW:

11  Q.  Good morning, Mr. Burch.  This is Ms. Agnew.  Can you see

12  me in the corner?

13  A.  Left-hand corner or right-hand corner?

14  Q.  I don't know because it might be reversed.  I have a red

15  dress on and I'm standing behind the lectern.

16            THE COURT:  Left-hand corner.  Red dress.

17  A.  You're moving your left arm.

18  Q.  I am, sir.  Okay.  Very good.  I just want to make sure you

19  know where I am.

20        Can you tell us, Mr. Burch, how old are you?

21  A.  I was born 1959.  I believe that would make me maybe 64, in

22  that area.

23  Q.  That sounds good to me, Mr. Burch.

24        Can you tell us, when did you enter DOCCS custody?

25  A.  I was arrested June 16, '80, and I became a member of DOCCS

1    custody I think August——August 12, '81.

2    Q.  1981, correct?

3    A.  Yes.

4    Q.  Okay.  And can you tell us, sir, what was your criminal

5    conviction?

6    A.  Second degree murder, 15 years to life.

7    Q.  Okay.  And can you tell me, sir, since you've been in DOCCS

8    custody, have you gotten any additional sentences?

9    A.  Yes, (inaudible).

10   Q.  Mr. Burch, can you move your chair closer to the computer?

11   I know it's difficult.

12       There you go.  And I'm going to ask you just to kind of

13   lean in a little bit and speak clearly, okay?

14   A.  Okay.

15   Q.  All right.  So I asked you if you ever received an

16   additional sentence since you've been in custody.

17   A.  (Inaudible)

18   Q.  I need you to say that one more time, please.

19   A.  At this facility, in 2017, I received an additional

20   sentence.

21   Q.  Okay.  And what was that for?

22   A.  Weapon possession.

23   Q.  Okay.  So you had a weapon, correct?

24   A.  Yes.

25   Q.  Okay.  So Mr. Burch, can you tell me, do you suffer from

N971ALL1                          Burch - Direct

1   any symptoms or diagnoses which cause you chronic pain?

2   A.  Yes, I do.

3   Q.  Tell the Court what you suffer from, sir.

4   A.  I suffer from sciatic nerve damage and degenerated disc

5   problem.

6   Q.  Okay.  Can you explain to us, how does that make you feel?

7   How does it affect you?

8   A.  Well, at one time it——it really didn't affect me, some

9   years ago, but now, after some years, it changed my walk, it

10  changes my walk, and the mornings when I get out of bed, I have

11  to fight to get up and stand for about ten minutes before I can

12  move, the pain is so intense.

13  Q.  Okay.  I want you to try to speak very clearly, Mr. Burch.

14  And I apologize.  It's a little garbled, okay?  It's not your

15  fault.

16  A.  Okay.

17  Q.  Just do your best to enunciate, all right?  Can you say

18  that again for us.

19  A.  At one time the pain issues wasn't so intense as they are

20  now.  But as the years progress, it's to the point that I walk

21  like with a limp, a permanent limp, and when I go to get out of

22  bed in the mornings, I have to fight to get out, toss and turn,

23  and it takes about ten minutes to even move a step.

24  Q.  Okay.  How does that affect your ability to attend

25  programming and do things at Adirondack?

1   A.  Well, I noticed yesterday——(unintelligible)——I have a

2   tendency to be less painful.

3   Q.  Say that again, sir.  And I want you to speak a little bit

4   more slowly, okay?

5   A.  Yes.  Throughout the course of the day, as the time moves

6   on and the blood starts to circulate and I'm more physically

7   active, the pain has a tendency to be less chronic than it does

8   the first four, five hours after waking up in the morning.

9   Q.  Okay.  And are you able to do everything you want to do

10  despite your pain?

11  A.  I can do some things, but the things I want to do, I can no

12  longer do.

13  Q.  Like what?  Please give us some examples.

14  A.  Like lifting certain amounts of weight, not necessarily for

15  recreation, or maybe just a box that may weigh 10 pounds, it

16  causes some type of pain, you know?

17  Q.  Sure.

18  A.  On my back.  And working out and doing squats, I definitely

19  can't do that anymore.

20  Q.  Does it affect your sleep at all, Mr. Burch?

21  A.  Oh, of course, yeah.  Sometimes it's——a lot of occasions,

22  it's hard to get to sleep.

23  Q.  And what do you mean when you say on "a lot of occasions"?

24  A.  Most nights, I usually go to bed usually between 10:30 and

25  11:00 at night, but the pain, the pain is so intense, I keep

1   tossing and turning, trying to find a spot where there's no

2   pain, and that's hard to do sometimes.

3   Q.   Okay.  I'm going to ask you, before this year, before 2023,

4   were you ever prescribed medications that effectively treated

5   your pain?

6   A.   Yes, I was.  That was some years ago.

7   Q.   Okay.  Why don't you describe that for the Court,

8   Mr. Burch.  And speak slowly.

9   A.   Well, I remember years ago, I was receiving a medication of

10  Neurontin, 6:00 in the morning; 400 milligrams of the same

11  medication 2:00 in the afternoon; and 1200 milligrams of the

12  same medication 8:45 at night, at this facility.  In addition,

13  along with that, I was also receiving a medication called

14  Ultram three times a day.  And from there——

15  Q.   Say the last part again.  With those medications——well,

16  strike that.

17       With those medications, how did that affect your chronic

18  pain, if at all?

19  A.   It affected it to the point where I couldn't tell I had

20  pain.

21  Q.   Okay.  And did that affect the things you did every day?

22  A.   No, it didn't.

23  Q.   Okay.  So do you recall a time, if ever, when those

24  medications were discontinued?

25  A.   Yes, I do.

1    Q.   And when was that?

2    A.   The medications from me, I believe I was at Greene——

3    Q.   Say the name of the facility again?

4    A.   Greene Correctional Facility.

5    Q.   Greene.  And do you know approximately when that was?

6    A.   The years have to be between 20——2018 and 2020, when I came

7    here.

8    Q.   Okay.  Do you recall who your provider was at Greene?

9    A.   Dr. Keiser, Dr. Keiser.

10        MS. AGNEW:  Okay.  For the record, that's K-E-I-S-E-R.

11   Q.   Did you discuss the discontinuations with Dr. Keiser?

12   A.   Yeah, he——he was very upset, but he say he's forced to do

13   it from someone higher than him, so when he say——

14        MS. LEVINE:  Your Honor——sorry about that.

15   Q.   Keep going.

16   A.   Yeah, he was upset behind that, but he said he had no

17   control because it was coming from Albany, higher than him.

18   What he would do, instead of take me off like that, leave me in

19   the dark, he would do something call wean me off, or——wean me

20   off.  Yeah.

21        MS. LEVINE:  I'm just going to renew my objection,

22   your Honor.

23        THE COURT:  Yes, ma'am.  Same ruling.

24   Q.   Okay.  And so did Dr. Keiser in fact wean you off?

25   A.   Yes, he did.

N971ALL1                          Burch - Direct

1    Q.  Okay.  So when you say he was upset, what do you mean?

2    A.  When I got it from him, he didn't really want to do it,

3    'cause he knew that what he was prescribing was helpful.

4    Q.  Okay.  Tell me this, Mr. Burch.  Did Dr. Keiser prescribe

5    you an effective alternative that helped your pain?

6    A.  Not really.  He prescribed something called Elavil, which I

7    believe is a psych medication, and all Elavil did was make my

8    lips (inaudible) and my tongue feel like sandpaper and keep me

9    in a lot of pain.

10   Q.  So did the Elavil help your pain at all?

11   A.  Not at all.

12   Q.  Okay.  And did you discuss that with Dr. Keiser?

13   A.  On a few occasions.

14   Q.  Okay.  Did Dr. Keiser try anything else to treat your

15   chronic pain?

16   A.  Well, he did.  He notified someone to see if he could

17   prescribe something else, but he said all he could prescribe me

18   was Elavil, and left the dosage up to a higher number.

19   Q.  So did he increase the dose?

20   A.  Yes, he did.

21   Q.  Did that help you?

22   A.  Slightly; very slightly.

23   Q.  Okay.  Did you continue taking Elavil, Mr. Windley?  Oh,

24   I'm so sorry.  Mr. Burch.

25   A.  Yes, I did.

N971ALL1                          Burch - Direct

1    Q.   Okay.  And you testified that around 2020 you came to

2    Adirondack; is that right?

3    A.   I believe it was about 2020 or 2021.

4    Q.   Okay.

5    A.   I think.  At this time I've been here 27 months.

6    Q.   Okay.  So when you came to Adirondack, do you know who your

7    provider was?

8         Mr. Burch, it's not your fault, but you froze.  So I'm

9    going to ask the question again.

10        When you came to Adirondack, do you know who your provider

11   was?

12   A.   I didn't find out who my provider was this time until I had

13   a callout to speak to someone named Wiggan.

14   Q.   Okay.

15   A.   A Dr. Wiggan.

16   Q.   Okay.  And did you speak with Nurse Wiggan about your

17   chronic——I'm going to ask that again, Mr. Burch.

18        Did you speak with Nurse Wiggan about your chronic pain?

19   A.   Yes, I did.

20   Q.   Okay.  And did Nurse Wiggan, when you first spoke with her,

21   did she prescribe you effective treatment?

22   A.   Something called meloxicam that was useless, and I think I

23   was on meloxicam——

24   Q.   Did the meloxicam help you?

25   A.   No, it didn't.

1    Q.   And did you communicate that to Nurse Wiggan?

2    A.   Yes, I did, and after I spoke to the law office of Amy J.

3    Agnew and she found out that I was——

4    Q.   Okay.  Mr. Burch, you know that you're speaking with Amy J.

5    Agnew right now, right?

6    A.   Oh, okay.  I only see the red dress.

7    Q.   I know.  That's okay.  But it's me.

8         All right.  So your testimony is that after you spoke with

9    me, Nurse Wiggan prescribed you something; is that correct?

10   A.   Yes.

11   Q.   Okay.  What did she prescribe you, Mr. Burch?

12   A.   600 milligrams of Neurontin at 6 in the morning, and

13   600 milligrams of Neurontin, 8:45 in the evening.

14   Q.   Okay.  And do you recall when did she prescribe that to

15   you?

16   A.   Exact date, I don't recall, or month.

17   Q.   Okay.  Was it this year, Mr. Burch?

18   A.   Yes, it was.

19   Q.   Okay.  And it was after you spoke with me, correct?

20   A.   Mm-hmm.

21   Q.   And was it after you met with one of our law students?

22   A.   It was after that.  Yup.

23   Q.   Okay.  And has the gabapentin that Nurse Wiggan prescribed,

24   has that helped your chronic pain?

25   A.   Somewhat, but not like the original gabapentin.

N971ALL1                          Burch - Cross

1    Q.  Okay.  But originally you had it at a higher dose, correct?

2    A.  Much higher dosage.

3    Q.  Okay.  Have you talked to Nurse Wiggan about the dosage?

4    A.  No, I haven't.

5    Q.  Okay.  Have you seen Nurse Wiggan since she prescribed the

6    Neurontin?

7    A.  Yeah (inaudible).

8    Q.  Okay.  Have you put in a sick call to see her to discuss

9    the dosage?

10        Don't pick your nose on the camera, honey.

11   A.  Because I just got the slip——this is Thursday, right?  I

12   got the slip on Tuesday, to let her know this isn't working.

13   Q.  Okay.  Mr. Burch, do you do any illicit substances?

14   A.  No, I don't.

15   Q.  Okay.  All right.  Mr. Burch, I have no further questions,

16   but Ms. Levine is going to ask you some questions, okay?

17   A.  Okay.

18   Q.  I'm going to remind you again, I want you to speak slowly

19   and try to be clear, okay?

20   A.  All right.

21            THE COURT:  Ms. Levine.

22   CROSS EXAMINATION

23   BY MS. LEVINE:

24   Q.  Good morning, Mr. Burch.  Can you hear me okay?

25   A.  Good morning.  I hear you loud and clear.

N971ALL1                          Burch – Cross

1    Q.   You can hear me loud and clear?

2    A.   Yes.

3    Q.   Okay.  My name is Gabriella Levine.  If you remember, I

4    deposed you back in August, and I'm going to be asking you some

5    questions, okay?

6    A.   All right.

7    Q.   Okay.  So I think you told us that you're currently on

8    600 milligrams of Neurontin in the morning and 600 milligrams

9    in the evening, right?

10   A.   Yes.

11   Q.   For a total of 1200 milligrams, right?

12   A.   Repeat that?

13   Q.   For a total of 1200 milligrams?

14       Sorry, Mr. Burch.  I'm not sure if you heard my last

15   question.

16   A.   For a total of 1200 milligrams.

17   Q.   Right?  That's what you're on right now?

18   A.   Yes, I am.

19   Q.   Okay.  Are you also still on Elavil?

20   A.   That was discontinued.

21   Q.   When was that discontinued?

22   A.   By Nurse Wiggan.

23   Q.   Okay.  And when was that?

24   A.   Well, I let her know that the Elavil was not working, and

25   the very same day (inaudible)——

N971ALL1                          Burch - Cross

1    Q.   Okay.

2    A.   Yeah.

3         You hear me?

4    Q.   You said the very same day what?

5    A.   I let her know the Elavil wasn't working, I let her know

6    that in the morning by 9:00, and that night when I went to

7    medication, it was discontinued and replaced with Neurontin.

8    Q.   Okay.  So on the same day that you told Nurse Practitioner

9    Wiggan that the Elavil wasn't working for you, you immediately

10   got a prescription for Neurontin?

11   A.   Yes.

12   Q.   Okay.  And you were on Elavil when you got to Adirondack,

13   right?

14   A.   Yes.

15   Q.   And you were first prescribed it at——was it Cayuga?

16   A.   Greene Correctional Facility.

17   Q.   Okay.  Was that by Dr. Keiser?

18   A.   Yes, it was.

19   Q.   Okay.  And that was continued when you transferred into

20   Adirondack?

21   A.   When I came here, I was still receiving——I still had Elavil

22   when I came here.

23   Q.   Okay.  When you were prescribed the Neurontin that you're

24   on right now, that was in response to a sick call request you

25   put in, right?

N971ALL1

```
 1   A.   Yes.
 2   Q.   Okay.  And the Neurontin that you're on right now, it's
 3   working better than the Elavil, right?
 4   A.   It works better than Elavil, yes.
 5   Q.   Okay.  In the time since you've been at Adirondack, you've
 6   also been given a back brace, right?
 7   A.   Yes.
 8   Q.   Okay.  And that's to treat your pain too, right?
 9   A.   I believe it is.
10   Q.   Okay.  And you said that you were also on meloxicam when
11   you got to Adirondack, right?
12   A.   That was what I was put on.
13   Q.   I'm sorry.  Can you say that again.  I couldn't hear you.
14   A.   I received meloxicam when I came here, this trip.
15   Q.   Okay.  And you claim that the meloxicam wasn't working for
16   you when you were at Adirondack on this trip, right?
17   A.   Correct.
18   Q.   And you asked to be taken off of it, right?
19   A.   Yes.
20           MS. LEVINE:  Okay.  I have nothing further, your
21   Honor.
22           THE COURT:  Thank you.
23           Redirect, counsel?
24           MS. AGNEW:  I'm just going to say good-bye, your
25   Honor.  I don't have any questions.
```

N971ALL1                    Confessore - Direct

 1            All right.  Mr. Burch, we have no further questions.

 2    Thank you so much, okay?

 3            THE WITNESS:  All right.  Everybody have a good day.

 4            MS. AGNEW:  You too, sir.

 5            THE COURT:  Thank you.

 6            THE WITNESS:  Okay.

 7            (Witness excused)

 8            THE COURT:  Mr. Jones.

 9            MR. JONES:  Good morning, your Honor.  Thank you.

10    Baron Jones for the plaintiff class.  We would like to call

11    Marc Confessore from Bare Hill Correctional Facility.

12            THE COURT:  Yes, sir.

13            Ms. Phillips.

14            MR. JONES:  Marc, can you hear us?

15            THE WITNESS:  Yes.

16            (Witness sworn)

17            THE COURT:  Mr. Jones.

18            MR. JONES:  Thank you, your Honor.

19     MARC CONFESSORE,

20        called as a witness by the Plaintiff,

21        having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MR. JONES:

24    Q.  Good morning, Mr. Confessore.  How are you doing today?

25    A.  I'm all right.  Yourself?

1   Q.  Good.  Please identify yourself one more time for the

2   Court, sir.

3   A.  Marc Confessore.

4   Q.  Where are you from, Mr. Confessore?

5   A.  Staten Island.

6   Q.  Are you currently incarcerated in the New York State

7   Department of Corrections?

8   A.  Yes.

9   Q.  Do you suffer from chronic pain or neuropathy?

10  A.  Yes.

11  Q.  Where do you currently reside; which facility?

12  A.  Bare Hill.

13  Q.  How long have you been in the custody of New York State

14  Department of Corrections?

15  A.  Since 2017.

16  Q.  How many facilities have you been housed in throughout your

17  bid in the New York State Department of Corrections custody?

18  A.  About four, maybe five.

19  Q.  Okay.  What are your current medical conditions, if

20  anything?

21  A.  I don't know the exact terms, but my back's messed up,

22  pain, and my finger, my head, my foot, and——

23  Q.  Can you describe your issues with your back and your head

24  and your foot.

25  A.  Yeah.  My back, I have real bad pains in my lower back, and

1   my right shoulder; and my finger shakes because it was broken,

2   so it nonstop shakes; and my foot was also broken, so that's

3   messed up.

4   Q.  Are your shakes like tremors or how would you describe

5   those?

6   A.  Yeah, they're tremors.

7   Q.  Okay.  And in regard to the pain you just described, what,

8   if anything——how has this pain affected your daily life?

9   A.  It's terrible.

10  Q.  What do you mean by terrible?  Can you describe a little

11  bit for the Court what you're able to do, what you're able not

12  to do.

13  A.  Oh, basically mostly I can't get out of bed most of the day

14  'cause of my back, and when I'm trying to do things with my

15  hands, my fingers keep shaking, so——

16  Q.  Okay.  And how long have you been suffering from these

17  conditions that you just described?

18  A.  Couple years now.

19  Q.  Okay.  Where did you reside when this pain started?

20  A.  Rikers Island.

21  Q.  What caused this pain that you described?

22  A.  Well, I had my foot and my finger broken on Rikers Island.

23  Q.  How did that happen?

24  A.  Someone else broke it.

25  Q.  Okay.  Have you ever received any effective medication to

N971ALL1                         Confessore - Direct

1   treat your described pain?

2   A.   Yeah.  And they took me off after a while.

3   Q.   Okay.  What were those medications?

4   A.   Neurontin.

5   Q.   Okay.  When did you first start receiving that prescribed

6   medication of Neurontin?

7   A.   2018.

8   Q.   Do you remember who prescribed such medication?

9   A.   No, I—I don't remember.

10   Q.   Okay.  Where were you when you were prescribed the

11   medication of Neurontin?

12   A.   In Rikers Island.

13   Q.   Was that medication refilled while you were on Rikers

14   Island?

15   A.   Yes.

16   Q.   Okay.  And you said that medication was discontinued,

17   correct?

18   A.   Yes.

19   Q.   When?

20   A.   While I was in Sing Sing, after Rikers Island.

21   Q.   Do you remember who discontinued the medication?

22   A.   No.  I—you know, I don't know who.

23   Q.   Does Dr. Parker ring a bell?

24   A.   I know it was a—a guy, so maybe.

25   Q.   Okay.  Can you describe what that doctor may have looked

1   like, his ethnicity, whether he was tall or short?

2   A.  He was kind of tall, a little heavy weight, I think he was

3   white.

4   Q.  How did you learn that your medication was discontinued?

5   A.  He told me.  He told me they——he just told me I can't get

6   it anymore.  I asked why, and he just told me he couldn't get

7   it.

8           MS. LEVINE:  Your Honor, I'm just going to preserve a

9   hearsay objection and note that the identity of the declarant

10  has not been——no declarant has really been identified at this

11  point.

12          THE COURT:  Yes, ma'am.  Same ruling.

13  Q.  How did you feel after your medication was discontinued,

14  Mr. Confessore?

15  A.  Even worse than before I was on it.

16  Q.  And prior to the medication being discontinued did any

17  medical provider discuss with you why you would be taken off?

18  A.  No.

19  Q.  Okay.  I want to circle back to your facilities that you've

20  been in, Mr. Confessore.

21      So you started your bid in Rikers, correct?

22  A.  Yes.

23  Q.  Okay.  What year was that?

24  A.  2017.

25  Q.  Okay.  After Rikers in 2017 where did you go?

N971ALL1                        Confessore – Direct

1   A.  Sing Sing.

2   Q.  Did you go to any reception center of any sort?

3      I'm sorry, Mr. Confessore.  I'm just going to repeat my

4   question.

5      Did you go to any reception center of some sort before Sing

6   Sing?

7   A.  Yes, Downstate.

8   Q.  Okay.  And at Rikers you were receiving Neurontin, correct?

9   A.  Yes.

10  Q.  And what year did you go to Downstate reception center?

11  A.  2019.

12  Q.  Okay.  Were you receiving Neurontin at Downstate reception

13  center?

14  A.  Yes.

15  Q.  Okay.  Do you remember the provider or nurse that gave you

16  the prescribed Neurontin?

17  A.  No.

18  Q.  Okay.  Can you describe them for me.

19  A.  I couldn't.  I don't remember, to be honest.

20  Q.  No problem.

21      What year did you get to Sing Sing; what year and month, if

22  you remember?

23  A.  I don't——I don't remember what month, but it was 2019.

24  Q.  Okay.  And that's where you saw the tall, heavyweight,

25  white provider, correct?

N971ALL1                     Confessore – Direct

1   A.  Yes.

2   Q.  And that provider discontinued the Neurontin, correct, at

3   Sing Sing?

4   A.  Yes.

5   Q.  Okay.  What, if any, alternative medications did this tall,

6   heavyweight, white provider give you?

7   A.  Nothing.

8   Q.  Okay.  After Sing Sing where did you go; which facility?

9           MR. JONES:  Froze up again.

10          THE COURT:  Go ahead, counsel.  Ask it again.

11  Q.  Mr. Confessore, after Sing Sing——

12  A.  Yes.

13  Q.  ——after Sing Sing Correctional Facility, which facility did

14  you go to?

15  A.  Upstate.

16  Q.  Which year were you in Upstate Correctional Facility?

17  A.  Also in 2019.

18  Q.  Okay.  And did you see a provider at Upstate Correctional?

19  A.  Yes.

20  Q.  Do you remember their name?

21  A.  No.

22  Q.  Does a Vijay Mandalaywala ring a bell?

23  A.  It may be.  I can't——I really can't remember.

24  Q.  Can you remember what that provider may have looked like at

25  Upstate Correctional?

N971ALL1                         Confessore - Direct

1   A.  I don't remember actually ever seeing a doctor.  I was only

2   seeing nurses.

3   Q.  Okay.  And did you receive any Neurontin at Upstate

4   Correctional?

5   A.  No.

6   Q.  Okay.  Did you receive any alternative medications to the

7   Neurontin at Upstate Correctional?

8   A.  Just maybe ibuprofen, and that wasn't doing anything.

9   Q.  Okay.  After Upstate Correctional, which facility did you

10  go to?

11  A.  Clinton.

12  Q.  All right.  Do you remember your provider at Clinton?

13  A.  No.

14  Q.  Okay.  Did you get any Neurontin at Clinton Correctional?

15  A.  No.

16  Q.  Any pain medication at all at Clinton Correctional?

17  A.  Maybe still ibuprofen.  That was about it.

18  Q.  While you were at Upstate Correctional or Clinton

19  Correctional did you ever see a provider and express to them

20  your pain and your Neurontin?

21  A.  All the time.

22  Q.  About how many times would you say that you've put in sick

23  calls or grievances or wrote letters to doctors regarding your

24  pain and your Neurontin?

25  A.  A lot.

N971ALL1                    Confessore - Direct

1    Q.  Can you put a number on it?

2    A.  I was in both facilities for a while, so—most of the time.

3    Q.  Okay.  And after Clinton where did you go; which facility?

4    A.  Here, Bare Hill.

5    Q.  Who is your provider at Bare Hill?

6    A.  Dr. Connolly.

7    Q.  Okay.  When you got to Bare Hill, did you receive any

8    Neurontin?

9    A.  No.

10   Q.  Okay.  In your custody at DOCCS how many times have you

11   seen a provider, to the best of your knowledge?

12   A.  Every—well, how many times overall?

13   Q.  Overall.

14   A.  I don't—a real lot.  I can't put a number on it.

15   Q.  Okay.  Can you explain how the Neurontin affected your

16   pain?  Did it make it any better?

17   A.  Oh, yeah, a lot better.  It works, a hundred percent.

18   Q.  And you informed your medical providers that the Neurontin

19   was effective, correct?

20   A.  Yes.

21   Q.  Did you ever get your Neurontin back?

22   A.  Yeah, very, very recently.

23   Q.  Okay.  Do you have any understanding of why you got your

24   medication back?

25   A.  Pretty sure it was because of this.

N971ALL1                    Confessore - Direct

1          MS. LEVINE:  Objection.  Calls for speculation.

2          THE COURT:  Let's hear the answer and then you can

3     move.

4          Sir, are you able to answer the question?  You started

5     by saying "it was because of this."  Was that your answer, sir?

6          THE WITNESS:  Yes.

7     BY MR. JONES:

8     Q.  Can you elaborate?  What is this exactly?

9     A.  Yes.  It was the day before this last videoconference, so

10    (inaudible) gave it to me at the last minute.

11         MS. LEVINE:  I would renew my objection, your Honor.

12         THE COURT:  What is the basis?

13         MS. LEVINE:  He said he's assuming, so I object on the

14    basis of speculation.

15         THE COURT:  Counsel?

16         MR. JONES:  One minute, your Honor, please?

17         THE COURT:  Yes, sir.

18         MR. JONES:  Your Honor, I could follow up.

19         THE COURT:  Yes, sir.

20    BY MR. JONES:

21    Q.  Mr. Confessore, what do you mean by the radio conference?

22    A.  This videoconference we're having, the last one we had, I

23    got response the day before.

24    Q.  That radio conference—

25         THE COURT:  I think it's videoconference, counsel, I'm

1    pretty sure.

2              MR. JONES:  Yes, I'm sorry.

3    Q.  It was a videoconference, right, with a webcam,

4    Mr. Confessore?

5        Mr. Confessore, can you hear me?

6    A.  Yes.  Yes, yes, videoconference.

7    Q.  Okay.  When, if ever, have you met me?

8    A.  Not long ago.

9    Q.  When was the first time that you met me?

10   A.  Couple months ago, maybe.

11   Q.  Okay.  When was the second time that you met me?

12   A.  For the——for the last visit.

13   Q.  And that was the deposition, correct, by defense counsel?

14   A.  Yeah, the last one.  This is what I was talking about, the

15   deposition, yeah.

16   Q.  Okay.  When, in relation to the deposition when I was

17   present with you, did you get your Neurontin back?

18   A.  The day before.

19   Q.  Okay.

20             THE COURT:  Ms. Levine, anything further?

21             MS. LEVINE:  I would just renew my objection based on

22   speculation at this time.  I think that he's assuming based on

23   timing of the deposition that that's why he received his

24   medication.

25             THE COURT:  Counsel, with respect to the portion of

N971ALL1                     Confessore - Cross

1   the testimony where he said "I assume it was because of this"—

2              MR. JONES:  I was just trying to—we'll strike—I'll

3   strike that question, your Honor.

4              THE COURT:  Okay.  Thank you.

5              Go ahead.

6   BY MR. JONES:

7   Q.  Mr. Confessore, since the video deposition by defense

8   counsel when I was present, you got your medication back the

9   day before; is that what you're testifying?

10  A.  Yes.

11  Q.  Okay.  Has it been effective since, the Neurontin?

12  A.  Yes, absolutely.  Yes.

13             MR. JONES:  Okay.  That's all for me, your Honor.

14             THE COURT:  Thank you.

15             Cross-examination, counsel.

16             MR. JONES:  Thank you.

17             MS. LEVINE:  May I proceed, your Honor.

18             THE COURT:  Yes.

19  CROSS EXAMINATION

20  BY MS. LEVINE:

21  Q.  Good morning, Mr. Confessore.

22  A.  Good morning.

23  Q.  Can you hear me okay?

24  A.  Yes.

25  Q.  Okay.  My name is Gabriella Levine.  If you might remember,

1    I deposed you back in August.

2        I'm going to ask you some questions today, okay?

3    A.    Okay.

4    Q.    Okay.  You're currently at Bare Hill Correctional Facility,

5    right?

6    A.    Yes.

7    Q.    And you've been there since March 2021; is that right?

8    A.    Yes.

9    Q.    Okay.  And you're in DOCCS custody right now on a robbery

10   conviction, right?

11   A.    Yes.

12   Q.    And you've got priors for attempted robbery and criminal

13   possession of stolen property, right?

14   A.    Yes.

15   Q.    Okay.  And I believe you testified that you suffer from

16   back pain and hand tremors; is that accurate?

17   A.    Yes.

18   Q.    Okay.  And since you've been at Bare Hill you've put in

19   sick call requests, right?

20   A.    Yes.

21   Q.    And you complained about having back pain in a sick call

22   request in July 2023, right?

23   A.    Yes.

24   Q.    Okay.  And then you were seen by your provider Dr. Connolly

25   in the first week of August 2023, right?

1   A.  Yes.

2   Q.  Okay.  And at that appointment in the first week of August,

3   Dr. Connolly asked you about your back pain, right?

4   A.  Pretty sure.

5   Q.  Okay.  And he asked you about your tremors too, right?

6   A.  Yes.

7   Q.  Okay.  And in response you told him that you were in pain,

8   right?

9          THE COURT:  Go ahead and ask it again, counsel.

10  Q.  Sorry, Mr. Confessore.  You froze.  Did you hear my last

11  question?

12  A.  Say it again?

13  Q.  I asked:  In response, you told him that you were still in

14  pain, right?

15  A.  Yes, I've been telling him the same thing for the past two

16  and a half years.

17  Q.  Okay.  And at that appointment Dr. Connolly prescribed you

18  Neurontin, right?

19  A.  Yes.

20  Q.  Okay.  And that was to treat both your hand tremors and

21  your back pain, right?

22  A.  Yes.

23  Q.  Okay.  And you're still on that medication today?

24  A.  Yes.

25  Q.  Okay.  And you've been on it continuously?

N971ALL1                          Confessore - Cross

1    A.  Yes.

2    Q.  Okay.  And that's the medication you thought you needed to

3    treat your pain, correct?

4    A.  Yes.

5    Q.  Okay.  I want to talk to you about what happened at Bare

6    Hill before you got Neurontin, okay?

7    A.  Okay.

8    Q.  When you got to Bare Hill, you were given ibuprofen, right?

9    A.  Yes.

10   Q.  And that was for your back pain, right?

11   A.  Yes.

12   Q.  But that made your stomach upset; is that right?

13   A.  Yes.

14   Q.  Okay.

15   A.  Yeah.

16   Q.  And you complained about that, right?

17   A.  Yeah.

18   Q.  Okay.  And then your provider you see at Bare Hill,

19   Dr. Connolly, then switched you to meloxicam to try to treat

20   your back pain, right?

21   A.  Yes.

22   Q.  Okay.  And you've seen Dr. Connolly about your hand tremors

23   too, right?

24   A.  Yes.

25   Q.  Okay.  And he recommended that you go to see a hand

N971ALL1                       Confessore – Cross

1   specialist for that, right?

2   A.  Yes.

3   Q.  And he referred you to one?

4   A.  Yes.

5   Q.  Did you see the hand specialist?

6   A.  Yes.

7   Q.  Okay.  And after you saw the hand specialist Dr. Connolly

8   prescribed you a medication called primidone, right?

9   A.  Yes.

10  Q.  That was to treat your tremors, right?

11  A.  Yes.

12  Q.  Okay.  And you complained that the primidone made you

13  tired, right?

14  A.  Yes.

15  Q.  And because of that you refused to continue taking it,

16  right?

17  A.  Yes.

18  Q.  Okay.  And your provider at Bare Hill, Dr. Connolly, he

19  also sent you for two MRIs; is that right?

20  A.  Yes.

21  Q.  And that was in response to your complaints of tremors and

22  pain?

23  A.  No.  I was complaining about a Sublocade shot that I'm on,

24  and he's been just asking me to do other random things.  I

25  don't know why.

N971ALL1                          Confessore - Cross

1   Q.  Okay.  Did you have the MRIs done?

2   A.  Yes.

3   Q.  Okay.  When was that?

4   A.  Couple months ago, maybe.  I don't really remember.

5   Q.  Okay.  So I just want to make sure I'm not missing anything

6   from the time you've been at Bare Hill, Mr. Confessore.  You've

7   been prescribed Neurontin, ibuprofen, meloxicam, primidone,

8   sent to a hand specialist, and you've had two MRIs done.  Is

9   there anything else?

10  A.  Is there anything else that I've been prescribed?

11  Q.  At Bare Hill.

12  A.  Yeah, a Sublocade that I've been complaining about since

13  I've been on.

14  Q.  You're in the MAT program at Bare Hill, right?

15  A.  Yes.

16  Q.  Okay.  Did you have to apply to be in that?

17  A.  Yes.

18  Q.  And you've been in it since December 2022, right?

19  A.  Yes.

20  Q.  And you're in it because you have a history of substance

21  abuse, right, Mr. Confessore?

22  A.  Yes.

23  Q.  You've abused pills in the past?

24  A.  Yes.

25  Q.  Namely Percocet and Xanax; is that accurate?

1   A.  Yes.

2   Q.  Also—

3   A.  Yes.

4   Q.  —Klonopin?

5   A.  Yes.

6   Q.  Okay.  Before you got to DOCCS you were treated for opioid

7   addiction at Staten Island University, right?

8   A.  Yes.

9   Q.  Okay.  And as I understand it, you're on an injection right

10  now to treat your drug addiction, right?

11  A.  Yes.

12          MS. LEVINE:  Okay.  I have nothing further.

13          THE COURT:  Thank you.

14          Redirect, counsel?

15          MR. JONES:  One moment, your Honor.

16          THE COURT:  Yes, sir.

17  REDIRECT EXAMINATION

18  BY MR. JONES:

19  Q.  Mr. Confessore, I just have one question for you for the

20  record.

21  A.  Okay.

22  Q.  How old are you?

23  A.  32.

24          MR. JONES:  All right.  Thank you, Mr. Confessore.

25  We'll be in touch, all right?

1            THE WITNESS:  Okay.

2            THE COURT:  Thank you.

3            MS. LEVINE:  Nothing further, your Honor.

4            THE COURT:  Yes, ma'am.  Thank you.

5            (Witness excused)

6            THE COURT:  Do you want to take a break, counsel?

7            COUNSEL:  Please.

8            THE COURT:  Thank you.  And you'll let us know off the

9     record who's next?

10            Good morning, sir.  Thank you.

11            THE WITNESS:  Thank you.

12            (Discussion off the record)

13            (Recess)

14

15

16

17

18

19

20

21

22

23

24

25

N97Wall2

1          THE COURT:  We're ready.

2          MS. AGNEW:  Your Honor, the parties have entered into

3    a stipulation regarding certain exhibits and testimony specific

4    to this proceeding.

5          The parties agree that the MWAP request forms

6    themselves that constitute exhibit 70 of the expert report of

7    Dr. Carinci are going to come in in their MWAP request form.

8    Those will be marked P140.

9          The same is true of the Dr. Carinci expert report

10   exhibit 71.  The MWAP request forms themselves will be entered

11   into the record at P141.

12         For Dr. Carinci expert exhibit 72, the underlying MWAP

13   request forms will come in as P142.

14         And for the Dr. Carinci expert report exhibit 73, the

15   underlying MWAP request forms will come in as P143.

16         Defendants are agreeing that Mr. Sterling Avellino

17   will not be called to testify.

18         Plaintiffs are agreeing to take the remaining

19   testimony of Dr. David Dinello virtually so that he does not

20   have to come down to New York City.

21         And in lieu of the MWAP request forms, the plaintiff

22   class is agreeing not to enter the 1006 summaries that

23   constitute exhibits 70 through 73 of Dr. Carinci's reports but

24   rather the MWAP request forms as described before.

25         MR. NOLAN:  The only caveat that I have to that, your

N97Wall2

1   Honor, is that -- the only condition to that is that

2   Dr. Dinello be available to testify virtually Friday anytime.

3          MS. AGNEW:  Yeah.  Whatever time they can get him

4   produced, we'll take his testimony.

5          THE COURT:  OK.  Sounds like a plan.  Accepted.

6          Received.

7          (Plaintiff's Exhibits 70-73 and 140-143 received in

8   evidence)

9          MS. AGNEW:  Thank you very much.

10         Your Honor, we're also moving into evidence as trial

11  exhibit 72, which was premarked P72, but at Bates Nos. Mueller

12  MWAP 28 through 29.  That was discussed yesterday.

13         THE COURT:  Right.

14         MS. THOMAS:  Yes, your Honor.

15         I'd just like to add that we agreed to enter that into

16  evidence just with the stipulation that the metadata

17  demonstrates that the author of the document was Dr. Susan

18  Mueller, but it was last modified by Dr. Paula Bozer.

19         THE COURT:  Yes.

20         (Luncheon recess)

21

22

23

24

25

N97Wall2                        Tirado - Direct

1                           AFTERNOON SESSION

2                              12:30 p.m.

3               THE COURT:  Thank you, counsel.  Won't you be seated.

4               Mr. Morrison.

5               MR. MORRISON:  Just before we begin, some

6       housecleaning in regards to the Mueller exhibit that we entered

7       into evidence.  I think we identified it as 72.  It's actually

8       76, exhibit 76.

9               THE COURT:  OK.  Thank you.

10              MR. MORRISON:  At this time, plaintiffs call

11      Mr. Miguel Tirado to the stand from Marcy Correctional

12      Facility.

13              THE COURT:  Thank you.

14       MIGUEL TIRADO,

15           Plaintiff, called as a witness on his own behalf,

16           having been duly sworn, testified as follows:

17              THE COURT:  Mr. Morrison.

18              MR. MORRISON:  Thank you, Judge.

19      DIRECT EXAMINATION

20      BY MR. MORRISON:

21      Q.  Good afternoon, Mr. Tirado.  How are you doing?

22      A.  All right.

23      Q.  Let me start by asking you, how old are you?

24      A.  46.

25      Q.  OK.  And are you currently in custody with the New York

N97Wall2                          Tirado - Direct

1    State Department of Corrections and Community Supervision?

2    A.  Yes, sir.

3    Q.  And how long have you been incarcerated in DOCCS on this

4    bid?

5    A.  Close to two years.

6    Q.  OK.  Do you remember when you entered into DOCCS?

7    A.  I believe it was April -- April of '22.

8    Q.  April of 2022?  OK.

9    A.  Yeah, around there.

10   Q.  OK.  Do you suffer from any -- well, strike that.

11       Can you tell the Court about any medical conditions that

12   you currently have?

13   A.  I'm diabetic.

14   Q.  And when did you get diagnosed with diabetes?

15   A.  When I was, like, 35 years old.

16   Q.  OK.  And can you tell the Court how it came about you being

17   diagnosed with diabetes?

18   A.  I mean I didn't even know I was diabetic until I started

19   getting (inaudible), and I went to the hospital and my sugar

20   was really high, and they told me I got diabetes.

21   Q.  As a result of your diabetes, has it caused any type of

22   pain or neuropathies that you're aware of?

23   A.  Yes.  My, my feet.  My feet, I feel pins and needles and

24   stuff like that.  Started noticing it, and I told the doctor

25   about it, and they gave me -- they prescribed me gabapentin.

N97Wall2                      Tirado - Direct

1    (inaudible)

2    Q.  When did you first start feeling these pins and needles in

3    your feet?

4    A.  I would say, like, like probably, eight years ago, ten

5    years ago.

6    Q.  And when you were feeling these pins and needles in your

7    feet, were you incarcerated at the time?

8    A.  No.

9    Q.  And you said you went to your doctor?

10   A.  Yeah.  I went to the doctor, and I explained to him what I

11   was feeling in my feet.  And he told me I had neuropathy?

12   Q.  OK.

13   A.  And (inaudible) --

14   Q.  Did he perform any tests on you?

15   A.  Yes.  They, they, he -- I don't know.  He put these, like,

16   suction things on my body, or whatever, my chest and all that.

17   And I don't know what he did, but he told me I had neuropathy.

18   Q.  OK.  And do you remember the name of this doctor?

19   A.  No.

20   Q.  Do you remember where you saw the doctor?  Was it a clinic,

21   hospital?

22   A.  It was in Florida, so I don't remember now.

23   Q.  And you said you were prescribed gabapentin, is that

24   correct?

25   A.  Yes, sir.

N97Wall2                        Tirado - Direct

1   Q.  How long have you been prescribed gabapentin?

2   A.  For, like, a -- a good while.  Like, seven or eight years.

3   Q.  OK.  And after you were prescribed gabapentin, was it

4   effective in treating the pins and needles you were feeling in

5   your feet?

6   A.  Yes, it helps a lot.

7   Q.  OK.  And when you were first prescribed gabapentin, would

8   you get that prescription refilled?

9   A.  It would -- yes.

10   Q.  And would you follow up with your doctor regarding your

11   symptoms and your diabetes?

12   A.  Yes.

13   Q.  And would your doctor continually refill your gabapentin?

14   A.  Yes.  All the time.

15   Q.  At some point you were arrested for a crime out here in New

16   York.  Is that accurate?

17   A.  Yes.

18   Q.  And can you tell the Court what crime it was that you were

19   arrested for and then convicted?

20   A.  For possession of a firearm.

21   Q.  And what -- when were you originally arrested?

22   A.  I'd say around '21, like, close to, like close to the

23   summer of '21.

24   Q.  And when you were arrested, were you still being -- did you

25   still have an active prescription from your doctor for

N97Wall2                          Tirado - Direct

1   gabapentin?

2   A.  Yes.  And Rikers, while I was at Rikers, I was getting it

3   also.

4   Q.  OK.  That was my next question.

5       What county jail were you incarcerated in; was it Rikers?

6   A.  Rikers Island, yeah.  I explained to them my situation, and

7   they gave it to me no problem.

8   Q.  And how long were you Rikers as a pretrial detainee?

9   A.  I would say probably close to a year or -- maybe a year.

10  Q.  And throughout that year, was your gabapentin continually

11  prescribed to you by the providers on Rikers Island?

12  A.  Yes.

13  Q.  Was the gabapentin effective in treating the diabetic

14  neuropathy in your feet?

15  A.  Yes.  Yes, it was.

16  Q.  OK.  At some point you were transferred out of Rikers

17  Island, which is the New York City Department of Corrections,

18  to the New York State Department of Corrections, correct?

19  A.  Yes.

20  Q.  And I think you testified it was around, sometime around

21  April of 2022?

22  A.  Yes.

23  Q.  What was the first facility you entered after you were

24  transferred out of the New York City Department of Corrections

25  custody?

N97Wall2                         Tirado - Direct

1    A.  I think it was Green -- Green Haven, I think it was.

2    Q.  OK.  And how long were you at Green Haven?

3    A.  For a day.

4    Q.  And when you were at Green Haven, do you recall whether you

5    were prescribed gabapentin?

6    A.  Well, they sat us down and asked us what kind of

7    medications we take and stuff like that, and I explained to

8    them I'm diabetic and metformin and gabapentin.

9    Q.  One second.  If you can repeat that answer, it was coming

10   in kind of garbled on our end.

11   A.  OK.

12   Q.  Try to speak slower and clearly, because we're over video.

13   A.  OK.  They sat us down one by one and asked us, you know,

14   kind of medications we take and stuff like that.  And I

15   explained to them I'm diabetic; that I take insulin.

16            THE COURT:  Sir, very slowly, please.

17            THE WITNESS:  All right.

18            THE COURT:  Thank you.

19   A.  I told him I take metformin, I take insulin and I take

20   gabapentin.  And he told me that, that, you know, they don't

21   give gabapentin here in the state.

22   Q.  And when you say he, do you recall who this person was?

23   Was it a doctor?  Was it a nurse?

24            MS. KILEY:  Objection, your Honor.

25            MR. MORRISON:  One second.  Mr. Tirado, one second.

1          MS. KILEY:  Objection, your Honor.  Hearsay.

2          THE COURT:  Let's at least get the answer.  We'll get

3     the answer and you can object.

4          Sir, would you answer the question.  Was it a doctor

5     or a nurse who said that to you?

6     A.  I don't know if it was a doctor or a nurse.  I know he did

7     the intake.

8     Q.  Did he provide any physical examination of you during this

9     encounter at Green Haven?

10    A.  No.

11         MS. KILEY:  I'll renew the objection, your Honor.

12         THE COURT:  All right.  Same ruling.  Thank you.

13    BY MR. MORRISON:

14    Q.  And just to be clear, you were or were not provided

15    gabapentin after the encounter with the medical staff at Green

16    Haven?

17    A.  No, I wasn't.

18    Q.  Were you provided insulin?

19    A.  Yes.

20    Q.  OK.  And you said you were there for only one day, right?

21    A.  Yes.

22    Q.  Where did you go after that?

23    A.  To -- I don't know the name of it.  Elmira?  Elmira.

24    Q.  OK.  And when you got to Elmira, did you -- tell me what

25    happened when you got to Elmira in regards to your Neurontin

1  prescription.

2  A.  So, when we get to Elmira, there we had a physical and all

3  that stuff, see dental and all that stuff.  And I also

4  explained it to them, and they told me that when I get to my

5  jail that I'm supposed to come to that they (inaudible).  And

6  when I got here, I explained it to them, and they also told me

7  that I can't get that here.

8  Q.  OK.  We'll get there.  Let's stick with Elmira.

9      How long were you at Elmira?

10 A.  Probably a month.

11 Q.  And during that month at Elmira, were you prescribed

12 gabapentin?

13 A.  No.

14 Q.  Can you describe to the -- were you having any adverse

15 effects in regards to pain from not having the gabapentin

16 prescription?

17 A.  Yes, I was starting to go through the pains.

18 Q.  And can you describe, just as best you can, the pain that

19 started to increase?

20 A.  I would say it feels like pins and needles; that numbness,

21 like I could scratch, I could scratch and scratch and scratch

22 my whole skin off and not even notice that I'm scratching until

23 the blood comes out.

24 Q.  When you say numbness, where were you experiencing the

25 numbness?

N97Wall2                         Tirado - Direct

1   A.  Kind of like from my -- from a little bit under my knee,

2   like, down.

3   Q.  Is that a sensation that you were feeling while you were

4   taking gabapentin?

5   A.  No, I wasn't feeling that when I was taking gabapentin.

6   Q.  OK.  Did you inform any of your medical providers at Elmira

7   about the increased pins and needles and numbness in your feet?

8   A.  Yes.

9   Q.  And did you get provided any medication in regards to the

10  pins and needles in your feet at Elmira?

11  A.  No.  No, not at all.

12  Q.  Were you sent out to any specialists, pain specialists in

13  regards to your complaints of increased pins and needles in

14  your feet?

15  A.  No, not at all.

16  Q.  And were you being prescribed insulin and taking insulin

17  injections while at Elmira?

18  A.  Yes, they were giving me my insulin.

19  Q.  OK.  So, after a month in Elmira, where did you go next, if

20  anywhere?

21  A.  After a month, I'm here, in Marcy.

22  Q.  And when did you -- to the best of your recollection, when

23  did you arrive at Marcy?

24  A.  I would say (inaudible)

25  Q.  If you can repeat, what month and year, if you remember,

N97Wall2                          Tirado - Direct

1    did you arrive at Marcy?  Remember, slow and loud.

2    A.  Oh.  I would say April.  I don't remember the date, exact

3    date, but around April of 2022.

4    Q.  Can you describe what occurred in regards to medical and

5    your prescription meds when you arrived at Marcy in April of

6    2022?

7    A.  So, I'm getting my insulin, like I do normally, and I

8    explained, tried to explain to the nurse about the gabapentin

9    and the metformin and she told me to drop a sick call.  So I

10   did that.  I dropped a sick call.  And then the nurse that I

11   actually saw -- the doctor that I saw, I explained to her about

12   the neuropathy.  And they told me they don't give that here

13   because that's a narcotic.  That's what she said to me

14   (inaudible).

15   Q.  Do you know the name of the nurse that you spoke with at

16   Marcy?

17   A.  No.

18           MS. KILEY:  Your Honor, I'm just going to preserve my

19   objection.

20           THE COURT:  Yes, ma'am.

21   BY MR. MORRISON:

22   Q.  Was it your understanding that that was your provider?

23   A.  Say it again?

24   Q.  Was it your understanding that who you smoke to and who

25   informed you that they don't provide that medication here was

N97Wall2                          Tirado - Direct

1    your medical provider at Marcy?

2    A.  It was a nurse (inaudible).  Theresa.

3    Q.  Pardon me?

4    A.  I think her name was Theresa Riley.

5    Q.  Theresa Riley.

6        Where did you -- where were you when you were told this

7    information by Theresa Riley?

8    A.  I was getting my insulin, and I asked her about it.

9    Q.  And where do you get your insulin from?

10   A.  From the meds, what they call meds, at the window.

11   Q.  The medical window?

12   A.  Yeah.

13   Q.  Any point in time after this conversation with Theresa

14   Riley at the medical window, did you -- or do you understand

15   that you had an encounter with your medical provider at Marcy?

16   A.  Yes.  I also told the doctor, and the doctor told me the

17   same thing, that they don't give that here at Marcy.

18   Q.  OK.  Do you recall the name of that doctor?

19   A.  No.  That I don't recall.

20   Q.  Was it a male or female?

21        MS. KILEY:  Your Honor, I'm just going to preserve my

22   objection again.

23        THE COURT:  Yes, ma'am.

24   A.  It was a female.

25   Q.  It was a female?

N97Wall2                        Tirado - Direct

1    A.  Yes.

2    Q.  Did you explain to your doctors and the nurse about the

3    increased pain and pins and needles and numbness you were

4    feeling in your legs?

5    A.  Yes.

6    Q.  Did they provide you any medication to treat the pins and

7    needles and pain?

8    A.  No.  They just telling me that, that I can't get that here

9    and just, like, brushed me off about it.

10             MS. KILEY:  Same objection, your Honor.

11             THE COURT:  Yes, ma'am.  Same ruling.

12   BY MR. MORRISON:

13   Q.  How often would you see your medical provider at Marcy?

14   A.  Every couple of months, every three months, every two

15   months.  It depends.

16   Q.  Would you write sick calls about increased pain you were

17   experiencing?

18   A.  After I got just, what you call it, discouraged so I just

19   stopped asking for it, because I know they would tell me no.

20   So I just stopped bothering them about it.

21   Q.  OK.  At some point did you get represcribed Neurontin?

22   A.  Yes.

23   Q.  And was there some point where the law office of Amy -- you

24   came into contact with the Law Offices of Amy Jane Agnew?

25   A.  Yes.

N97Wall2                          Tirado - Direct

1   Q.  And how -- when was -- when did you first come into contact
2   with the Law Offices of Amy Jane Agnew?
3   A.  I would say, like, five months ago, maybe six months ago.
4   Q.  OK.  And when did you get represcribed Neurontin?
5   A.  Last month, on the 15th.  Before that I went to see the
6   doctor and I explained to him again that I'm going through
7   pain, neuropathy pains and stuff like that, and he actually
8   told me that he could give me the pill.  And I just started
9   getting it on the 15th of last month.
10  Q.  Did anything change from the time you were at Marcy to
11  August 15, 2023, in regards to your medical condition?
12  A.  I don't understand the question.
13  Q.  Yeah, it was a terrible question.  That's why.  And I won't
14  reask it.
15      After you were prescribed the Neurontin medication -- or,
16  strike that.
17      Are you aware that a deposition was scheduled for you in
18  regards to this matter?
19  A.  Am I aware --
20  Q.  Yeah.
21  A.  -- of a deposition?
22  Q.  Yeah.  Are you aware that a deposition was scheduled for
23  you in this matter?
24          MS. KILEY:  Objection.  Relevance.
25  A.  Yes --

1           THE COURT:  Overruled.

2    A.  -- someone come (inaudible).

3    BY MR. MORRISON:

4    Q.  Answer yes?

5    A.  Yes.

6    Q.  Did that deposition go forward?

7    A.  No.

8    Q.  Did you get prescribed Neurontin before or after that

9    deposition?

10   A.  I think it was before.  Actually, I spoke to the doctor,

11   and then he was nice and he gave it to me.  I don't understand

12   why, but then I wrote to Amy and I told her they giving it to

13   me, and I guess the deposition was done.

14   Q.  OK.  Since you've been returned to your Neurontin

15   prescription, has your pain -- has it affected your pain at

16   all?

17   A.  I mean it's helping me, but I think I need a higher dose.

18   Q.  OK.

19   A.  I still feel -- I still wake up at night from the pain.

20   Q.  Have you had any follow-ups with your provider since you've

21   been prescribed Neurontin?

22   A.  No, not yet, but I'm, I'm planning on letting him know that

23   I need a little bit higher dose.

24   Q.  Is the dosage that you were put on just recently, on August

25   15, the same amount dosage that you were receiving before it

N97Wall2                          Tirado - Cross

1    was discontinued?

2    A.   No.   They started me at 300.   I was taking, like, 1,200 a

3    day.

4              MR. MORRISON:   OK.   One moment, your Honor?

5              THE COURT:   Yes, sir.

6    BY MR. MORRISON:

7    Q.   Mr. Tirado, do you have any history of drug use or drug

8    addiction?

9    A.   No.

10             MR. MORRISON:   Nothing further.

11             Thank you, Mr. Tirado.

12             THE COURT:   Thank you.

13             Cross-examination, please, counsel.

14   CROSS-EXAMINATION

15   BY MS. KILEY:

16   Q.   Good afternoon, Mr. Tirado.   My name is Oriana Kiley.   I

17   represent the chief medical officer at DOCCS.   I'm in your

18   upper left-hand corner raising my hand.

19       Just some follow-up questions to Mr. Morrison's

20   examination.   I want to take a step back.

21       Prior to your current bid at DOCCS from your arrest in

22   2021, were you previously incarcerated with the Department of

23   Corrections?

24   A.   Yes.

25   Q.   OK.   When was that?

N97Wall2                        Tirado - Cross

1    A.  (inaudible).

2    Q.  OK.  But weren't you arrested in 1998 in New York?

3    A.  Yeah.

4    Q.  OK.  And didn't you serve a sentence for attempted criminal

5    sale of a controlled substance in 1998?

6    A.  Yeah.

7    Q.  OK.  And how long did you serve your sentence?

8    A.  Maybe two years or so.

9    Q.  OK.  And what was that substance, sir?

10   A.  What was that that I got arrested for?

11   Q.  Yes.

12   A.  Heroin.

13   Q.  Do you have a history of substance abuse with heroin, sir?

14   A.  No.  I was selling it.

15   Q.  OK.  When were you released on that bid?

16   A.  I'm not sure.  (inaudible).

17   Q.  OK.  And to confirm, between the years 2015 and 2021, you

18   were not in DOCCS custody.  Is that right?

19   A.  No.

20   Q.  OK.

21       Mr. Tirado, when you entered DOCCS custody, didn't you --

22   you went through an OMH screening, isn't that right?

23   A.  A what?  Excuse me, ma'am?

24   Q.  An office of mental health screening.

25   A.  Yes.

N97Wall2                          Tirado - Cross

```
 1  Q.  And during that screening, you were asked a series of
 2  questions?
 3  A.  Yeah.
 4  Q.  OK.  And among those questions were if you're seeing a
 5  mental health provider?
 6  A.  OK.  Yeah.
 7  Q.  And you answered yes?
 8  A.  Uh-huh.
 9          MS. AGNEW:  Your Honor, objection.  I just don't want
10  counsel to elicit testimony regarding the
11  psychotherapist-patient privilege, which Mr. Tirado has
12  preserved.
13          THE COURT:  Noted.
14          Yes, ma'am.
15  BY MS. KILEY:
16  Q.  During that screening, were you asked if you ever used
17  alcohol or drugs?
18  A.  Yes.
19  Q.  And you answered yes, isn't that right?
20  A.  I mean, yes, I've used, but I'm not -- I'm not an addict.
21  Q.  Sir, the question you were asked during your mental health
22  screening was whether or not you abused alcohol or drugs, and
23  you answered yes, correct?
24  A.  OK.  Yes.
25  Q.  And what was it?  Was it alcohol or drugs.
```

N97Wall2                    Tirado - Cross

1    A.  Well, I explained to her that I, like I drink on occasions

2    and I use drugs sometimes.  I'm not an addict.

3    Q.  What kind of drug, sir?

4    A.  Cocaine.

5    Q.  And when was the last time you used cocaine?

6    A.  Long time ago.

7    Q.  OK.  And during that OMH screening, you were also asked if

8    you ever tried to commit suicide.  Do you recall that?

9    A.  Yeah.

10   Q.  And you responded that you had attempted suicide in October

11   of 2021, isn't that right?

12   A.  Uh-huh.

13   Q.  I want to talk a little bit about your condition with type

14   2 diabetes.  You testified that you learned that you were

15   diabetic when you were 35.  Is that right?

16   A.  Yes.

17   Q.  So that's approximately, if my math is correct --

18   A.  (inaudible).

19   Q.  If my math serves me correct, you've been at -- you've been

20   living with type 2 diabetes for at least 11 years, as far as

21   you know, is that right?

22   A.  Yes.

23   Q.  OK.  And in order to keep your diabetes under control, you

24   have to take insulin, isn't that right?

25   A.  Yes.

N97Wall2                        Tirado - Cross

1   Q.  And we can agree that taking insulin is important to

2   keeping your blood sugar under control?

3   A.  Yes.

4   Q.  And isn't it true that keeping a diet low in sugar is also

5   important to controlling your diabetes?  Correct?

6   A.  Say it again?

7   Q.  We can agree that eating a diet low in sugar is important

8   to control your diabetes?

9   A.  Yes.

10  Q.  OK.  And isn't it true, sir, that since you've been in

11  DOCCS, you have consistently refused to take your insulin?

12  A.  Not consistently.  I refused for, like, a month, when I

13  first got here.

14  Q.  OK.  And when was that?

15  A.  When I first got here, around '22 (inaudible).  Around

16  April or May, around there, I refused for, like, a whole month

17  to take my insulin, yes.

18  Q.  OK.  So in April of '22 -- did I understand that correctly;

19  you just said April of '22?

20  A.  Yes.

21  Q.  OK.  So you noted on a refusal form that you don't want to

22  take it anymore, isn't that right?

23  A.  Yeah.  I also put because of Theresa Riley.

24  Q.  OK.  Why did you put because of Theresa Riley?

25  A.  Because she was kind of terrorizing me and kind of like

N97Wall2                          Tirado - Cross

1   getting at the officers to, I guess, beat me up or whatever,

2   (inaudible) and she didn't act like a nurse.  She was acting

3   like a CO.  And I didn't want the deal with that.

4   Q.  But, sir, you understand that taking insulin is important

5   to keeping your blood sugar under control with type 2 diabetes?

6   A.  I understand that, but I also understand that a nurse is

7   supposed to act like a nurse, not like a CO.  So I didn't want

8   to be around her.  I just refused.

9   Q.  OK.  And then, again, on May 15 of 2022 --

10  A.  (inaudible)

11  Q.  -- you refused your insulin again?

12  A.  (inaudible) person like that --

13      Say it again?

14      THE COURT:  Slowly, please, Ms. Kiley.

15      MS. KILEY:  Sure.

16  Q.  On May 15 of 2022, you refused your insulin again,

17  because -- but this time it was because you didn't want to walk

18  to the building anymore, isn't that right?

19  A.  Yes, because of Theresa Riley.

20  Q.  OK.  But every -- but you were explained in detail about

21  the consequences of not taking your insulin for your diabetes,

22  isn't that right?

23  A.  Yeah.  I know I have to take insulin.  I know.

24  Q.  You are aware of all of the risks that are associated with

25  not taking your medications, right, sir?

N97Wall2                    Tirado - Cross

1   A.  Yes.

2   Q.  You are aware that you could eventually go blind, right?

3   A.  Yes.

4   Q.  And that it could result in kidney failure?

5   A.  Yes.  I'm aware of all of that.

6   Q.  And you could result in a stroke?

7   A.  Yes.

8   Q.  And by not taking your insulin, it could result in a heart

9   attack?

10  A.  Yes, I'm aware.

11  Q.  And by not taking your insulin, it could result in

12  peripheral vascular disease?

13  A.  Yes.

14  Q.  And it could also increase your chances of infection, so

15  all those risks have been explained to you, sir, is that

16  correct?

17  A.  Well, nothing was explained to me.  I knew this.

18  Q.  OK.

19  A.  They didn't explain none of that to me.

20  Q.  OK.  But despite that, again, in May, twice you refused

21  your insulin, isn't that right?

22  A.  Yes.

23  Q.  OK.  And then again in June, June 27 of 2022, you again

24  refused to take your insulin, isn't that right, sir?

25  A.  Yeah.  If you notice, there's a pattern.  In the morning,

N97Wall2                    Tirado - Cross

1   because Theresa Riley was working, I refused.  But if you look

2   at the afternoon, at the afternoon I never refused with the

3   afternoon.  So I know what you're getting at.

4   Q.  And then, July 17 of 2022, again you refused to take your

5   insulin, isn't that right?

6   A.  Yes.

7   Q.  OK.  And the consequences were discussed with you again

8   about what happens when you don't take your insulin, isn't that

9   right?

10  A.  Nobody explained to me what happens.  I know this.

11  Q.  OK.  And then again in September --

12  A.  (inaudible).

13  Q.  September 28, 2022, you again refused to take your insulin.

14  Isn't that right?

15  A.  I don't know the dates, but I guess so.

16  Q.  OK.  And again, you indicated that you didn't want to deal

17  with Theresa Riley?

18  A.  Yes.

19  Q.  OK.  And -- strike that.

20      And it was noted that you had been late for your insulin

21  over eight times, isn't that right?

22  A.  OK.

23  Q.  OK.  Again, in October, on October 4 of '22, again you

24  refused your insulin, sir?

25  A.  OK.  (inaudible) Theresa Riley, yes.

N97Wall2                          Tirado - Cross

1   Q.  OK.  And then again, on October 18 of '22, you refused your

2   insulin --

3   A.  Yes.

4   Q.  -- saying that you were not interested, isn't that right?

5   A.  Because of Theresa Riley, yes.

6   Q.  OK.  And then, finally, sir, on January 22 of 2023, you

7   didn't even want to take your labs, isn't that right?

8   A.  My what?

9   Q.  Your labs.

10  A.  Yeah.  I started -- (inaudible) I didn't want to deal with

11  those people no more.

12  Q.  OK.

13  A.  They (inaudible).

14  Q.  And you understand, sir, that taking your labs is also very

15  important to keeping your diabetes under control, isn't that

16  right?

17  A.  Yeah, I understand all of that.

18  Q.  OK.  And you understand that even taking your finger stick

19  is equally important to keeping your blood sugar under control?

20  A.  I understand all of that.

21  Q.  OK.  So every time you've refused your insulin, it's also

22  been for the finger stick as well, isn't that right?

23  A.  I don't remember refusing finger stick.  I take the finger

24  stick.

25  Q.  OK.  Mr. Tirado, are you aware of any other inmates at

N97Wall2                        Tirado - Cross

1   Marcy that are prescribed gabapentin?

2   A.  No.  I don't know -- I don't know what they take.

3   Q.  I want to go back to the list of risks associated with

4   diabetes that we just mentioned, sir.

5       You have, in fact, been experiencing some complications

6   that comes with not being compliant with your diabetes

7   medication, isn't that right?

8   A.  Ma'am?

9           MS. KILEY:  Could you read back the question?  I'm

10  sorry.

11          THE COURT:  "You have, in fact, been experiencing some

12  complications that come with not being compliant with your

13  diabetes medication, isn't that right?"

14          THE WITNESS:  OK.

15  A.  Just so you know, like, when my insulin, in the morning, I

16  didn't take it with Ms. Riley, but I took my insulin in the

17  afternoon.  So it's not like I didn't take insulin.

18  Q.  Isn't it true that in January of 2023, when you were at

19  Marcy, you were referred to an ophthalmologist for a retina

20  service?

21  A.  Yes.

22  Q.  OK.  And it was in January of 2023 that you were diagnosed

23  with diabetic retinopathy, which is essentially a vessel damage

24  to your eyes?

25  A.  Yes.

N97Wall2                          Tirado - Cross

1    Q.  OK.  And as a result of that, you had to get eye -- excuse

2    me, eye injections, isn't that right?

3    A.  The next time I went to get the injections, they told me

4    that I was good; that I didn't need that.

5    Q.  OK.  But you were, in fact, diagnosed with diabetic

6    retinopathy?

7    A.  Yeah.

8    Q.  And you (inaudible) the consequences associated with being

9    noncompliant with your diabetes medication?

10   A.  Yes.

11   Q.  And you understand that the diagnosis of diabetic

12   retinopathy is a result of not being compliant with your

13   diabetes medication?

14   A.  Yes.

15   Q.  Sir, since being prescribed Neurontin, isn't it true that

16   you refused to take it at least twice?

17   A.  The pill?

18   Q.  Neurontin, yeah.

19       I'm sorry.  I think you froze for a minute.  We didn't get

20   the answer.

21   A.  I say I didn't refuse to take it.  I just told -- I told

22   the nurse I didn't want to come in the morning; they were

23   trying to make me come over there in the morning.

24   Q.  OK.  So were you, in fact, supposed to take Neurontin and

25   then chose not to?

N97Wall2                          Tirado - Cross

1   A.  Well, I take it in the afternoon every day, but I don't

2   come in the morning to take it, because I'm waiting to see the

3   doctor again to let him know that I don't want to come in the

4   morning.

5   Q.  OK.  Let's back up.

6       What is your current dose of Neurontin?

7   A.  300 milligrams.

8   Q.  OK.  And are you supposed to take that twice a day?

9   A.  One in the morning and then one at night.

10  Q.  OK.  And so at least twice you've refused your morning dose

11  of Neurontin?

12  A.  Yes.

13  Q.  OK.  And why is that, sir?

14  A.  Because the officers in the morning, they not nice, so I

15  don't -- I don't, I just don't want to deal with these officers

16  in the morning.  That's the problem.  That's why I refuse it in

17  the morning, and also, the officers don't treat you nice

18  (inaudible) I just don't want to be around it.  I'm a calm

19  person.  I don't need the trouble.  I'd rather not take it --

20  I'd rather take it in the afternoon.

21          MS. KILEY:  OK.  Just one moment?

22          THE COURT:  Yes, ma'am.

23  BY MS. KILEY:

24  Q.  Sir, you've testified repeatedly about issues that you

25  appear to have with Theresa Riley.  You're aware that Theresa

1  Riley is a nurse?

2  A.  She -- yeah.  She's not here no more.  I don't know what

3  happened.  She's not here no more.  But the officers that work

4  here in the morning that -- I don't, I don't -- we just don't

5  get along.

6  Q.  When did she leave, as far as you know?

7  A.  Huh?

8  Q.  When you say she left, you mean she left your facility or

9  she left DOCCS, as far as you know?

10  A.  I don't know.  She's not here no more.  (inaudible) no

11  more.

12  Q.  OK.  So as far as you know, when was your last interaction

13  with Nurse Riley?

14  A.  Probably, like, three months ago, or something like that.

15  Q.  OK.

16  A.  (inaudible)

17  Q.  And Ms. Riley is not a nurse practitioner, isn't that

18  right?

19  A.  She's a nurse.  She was a nurse.

20  Q.  I'm sorry.  Sir, Theresa Riley is a nurse; she is not a

21  nurse practitioner, sir, isn't that right?

22  A.  She's a nurse.  I don't know if she's a nurse practitioner

23  or what kind of nurse she is.  I know she's a nurse.

24  Q.  OK.  But you're aware she's not a doctor, correct?

25  A.  I know she's not a doctor.  She -- she works here as a

N97Wall2                          Tirado - Cross

1  nurse.

2  Q.  But is it your testimony that a nurse refused to give you

3  Neurontin?

4           MS. AGNEW:  Objection.  That wasn't the testimony.

5  A.  I didn't say that the nurse refused.

6           THE COURT:  All right.  I think the witness answered.

7           If you're going to object, you have to scream into the

8  microphone so the witness hears you.

9           MS. AGNEW:  OK.

10          THE COURT:  Sir, if you hear "objection," just hold

11 your answer for a minute until I decide if you have to answer.

12          THE WITNESS:  OK.

13          THE COURT:  Go ahead, Ms. Kiley.

14          Question.

15 BY MS. KILEY:

16 Q.  Mr. Tirado, isn't it true that since at least January of

17 2023, you have also been prescribed Celebrex?

18 A.  Celebrex?

19 Q.  Yeah.

20 A.  I don't remember.  I know I was taking some mental illness

21 pill or something like that, and I stopped taking that.  I

22 don't know if that's what you're talking about.

23 Q.  Have you taken Celebrex?

24 A.  I'm not aware of the name of the pills I was taking.  I

25 don't know.

N97Wall2                      Tirado – Cross

1    Q.  You've also been prescribed Tylenol for pain since January,

2    isn't that right?

3    A.  Yeah, (inaudible) something like that, yeah.

4    Q.  I'm sorry.  Could you repeat that answer?

5    A.  I said for, like, a toothache I was given Tylenol.

6    Q.  OK.  And you were also prescribed HCTZ, and that's for your

7    blood pressure?

8    A.  I believe so.

9    Q.  And you were prescribed Lantus, which is your insulin?

10   A.  Yes.

11   Q.  And albuterol for your asthma, isn't that right?

12   A.  Come again?

13   Q.  Albuterol for your asthma?

14   A.  No, I never got that.

15   Q.  So, Mr. Tirado, just to confirm, again, going back to your

16   exchanges with Nurse Riley, Nurse Riley did not refuse to

17   prescribe you Neurontin, isn't that right?

18   A.  She told me that I can't get that because it's, it's a

19   narcotic.  That's what she said when I first got here.

20   Q.  OK.  And again, Nurse Riley is not a doctor?

21   A.  No.

22   Q.  OK.  And you've never asked for any alternative to

23   Neurontin, have you?

24   A.  No.  I didn't know there was an alternative.

25             MS. KILEY:  OK.  I have nothing further.  Thank you.

1              THE COURT:  Yes, ma'am.

2              Redirect, counsel.

3              MR. MORRISON:  One moment, your Honor.

4     REDIRECT EXAMINATION

5     BY MR. MORRISON:

6     Q.  Mr. Tirado, it's me, Mr. Morrison, again.  Just some

7     follow-ups.  I want to talk quickly about Nurse Riley, because

8     we have some testimony about her actions in this case already.

9     A.  OK.

10    Q.  Can you describe what was concerning -- or, why did you

11    want to avoid Nurse Riley?

12    A.  Because I mean she's a nurse.  Right?  So you go see a

13    nurse, she's nice, right?  She's not that kind of nurse.

14    She's, like, pretty mean.  So I want to go (inaudible) I just

15    figured -- I didn't want to be around her.  I just didn't like

16    her vibe, and I wanted to avoid her as much as I can.

17    Q.  Can you be a little more specific about what -- you said

18    she's mean.  What do you mean, and why do you feel like being

19    around her would get you in trouble?

20    A.  OK.  Let's say, let's say, she -- the lady that was talking

21    to me, she said that I was late a couple of times.  Right?  So

22    the reason I was late, because the officer they call, he didn't

23    call meds.  So I didn't know he called meds.  So by the time

24    they called (inaudible) to tell them why I didn't get over

25    here -- I guess she didn't hear his radio.  So then I go over

1   there, she tried to make it seem like it's my fault, that I was

2   late or like (inaudible) open the door, to come down there

3   myself and show, like, try to get the officers to, like, I

4   guess, beat me up or make me do -- you know, make me pick up

5   (inaudible) and do things like that.  And I didn't want to deal

6   with that.

7   Q.  They said they would make you do things when you were late,

8   like pick up what?

9   A.  Like pick up cigarette butts from a floor, (inaudible) in a

10  bag.  They make me do stupid stuff like that in the morning,

11  and I just didn't want to deal with that.

12  Q.  Can you describe to the Court how the med line works at

13  Marcy Correctional Facility?

14  A.  So they call -- they call (inaudible) minutes --

15  Q.  Hold on a minute, Mr. Tirado.  I'm sorry.  You froze.  So,

16  the question was, and you can start again, to describe how the

17  med line works at Marcy Correctional Facility.

18  A.  So there's side one and side two.  So they might call side

19  one, and then when they call side one, there might be 30 or 40

20  people that go for meds.  We all have to make a line.

21  Q.  Is the line inside or outside?

22  A.  It's outside.

23       So, it doesn't matter if it's snowing, if it's zero below,

24  doesn't matter if it's raining, you got to stand on that line.

25  And then you go in there and get your meds and then go back to

N97Wall2                      Tirado - Redirect

1     the dorm.

2     Q.   And is that where you would be forced to pick up cigarette

3     butts if you were late?

4     A.   No, no.  I was explaining -- I was talking about Theresa

5     Riley --

6     Q.   OK.

7     A.   -- when she -- she thought I was late, she'll, like, try to

8     get the officers to, like, get me in trouble or do something to

9     me, like, tell me, to tell them to give me a ticket, write me

10    up, or something like that.  And then the officers, they don't

11    want to do paperwork so they would tell me to go pick up the

12    cigarette butts and fill up the bag with cigarette butts, stuff

13    like that.  (inaudible)

14    Q.   OK.  And you also testified that -- well, first,

15    Mr. Tirado, are any correctional officers in the room with you

16    right now?

17    A.   No.

18    Q.   OK.  You mentioned that currently you are -- you don't want

19    to go to the window in the morning because of the correctional

20    officers?

21    A.   (inaudible).

22    Q.   Can you explain your concerns?

23    A.   Well, I just don't want to deal with that nonsense and the

24    games they play.

25    Q.   Can you describe what you're talking about?

N97Wall2                         Tirado - Recross

1    A.  They -- they're just not nice people (inaudible) say.

2              MR. MORRISON:  OK.  Nothing further.  Thank you very

3    much.

4              THE COURT:  Recross, counsel.

5              MS. KILEY:  Yes.

6    RECROSS EXAMINATION

7    BY MS. KILEY:

8    Q.  Mr. Tirado, very briefly.  Going back to -- just to clarify

9    some of your testimony from earlier.  In terms of the times

10   that you've refused the Neurontin in the morning, and I just

11   want to clarify your testimony.  I believe I heard you say I

12   didn't take it in the morning a bunch of times.  Did I

13   understand you correctly?

14   A.  No, I didn't say that.

15   Q.  OK.

16        Mr. Tirado, could you please list everything that you've

17   been prescribed since you've been at Marcy?

18   A.  That I could remember, I got my insulin, I got my metformin

19   and now I'm getting the gabapentin.

20   Q.  OK.  And -- I'm sorry.  When were you prescribed the

21   gabapentin?

22   A.  On the 15th of last month.  I asked the doctor for it, and

23   I actually got it.

24   Q.  OK.  And I know it's only since August of last month, but

25   since being prescribed the Neurontin, has it been taken away

N97Wall2                          Tirado - Recross

1  from you or discontinued since you've been prescribed it?

2  A.  No.  I still get it.

3             MS. KILEY:  OK.  Thank you.

4             THE COURT:  Redirect.

5             MR. MORRISON:  No, Judge.  Thank you.

6             THE COURT:  Thank you.

7             Thank you, Mr. Tirado.

8             THE WITNESS:  Thank you.

9             MS. AGNEW:  Your Honor, I'd like to make an oral

10  motion.

11            THE COURT:  Hold on.  Hold on.

12            MR. MORRISON:  You're done, Mr. Tirado.  Thank you

13  very much.

14            THE WITNESS:  I can go?

15            THE COURT:  You're excused, sir.  Thank you.

16            (Witness excused)

17            MS. AGNEW:  Your Honor, we have Anthony Jackson, who

18  would be our last prisoner to testify.  He's at SingSing.  The

19  video technology is not working.  However, the voice technology

20  is.  I would like to move the Court for permission to take his

21  testimony verbally.  I recognize that the Court won't be able

22  to see Mr. Jackson, but it is important testimony to us.

23            That's my motion.

24            THE COURT:  Any objection, friends?

25            MS. KILEY:  No objection.

N97Wall2

1              THE COURT:  Very well.  Let's do it.

2              Please state the name again.

3              MS. AGNEW:  Anthony Jackson.

4              THE COURT:  Thank you.

5              Ms. Agnew.

6              MS. AGNEW:  Your Honor, the plaintiff class is going

7    to call to the stand Anthony Jackson.

8              Mr. Jackson, we cannot see you because the video

9    technology is not working, but can you hear us?

10             VOICE:  Sorry.  This is the clerk.  Give me one

11   second.  I'm going to put him on.

12             MS. AGNEW:  Very good.  Thank you, ma'am.

13             Mr. Jackson, are you there?

14             Did they drop off?

15             I apologize, your Honor.

16             THE COURT:  It's OK.

17             MS. AGNEW:  Your Honor, I don't want to impose upon

18   the tolerance of the Court, so we are going to hold off on

19   Mr. Jackson, see if we can get him back on.

20             Why don't we go ahead with Dr. Moores, your Honor.

21   And I do apologize.

22             THE COURT:  OK.  They'll let us know when they have

23   the witness, the other witness, correct?

24             MS. AGNEW:  Yeah, we'll see what we can do, but let's

25   let them --

N97Wall2

1                 MS. KILEY:  Your Honor, can I just take five minutes?

2                 THE COURT:  Yes, ma'am.

3                 All right.  Let's take five, friends.

4                 (Recess)

5                 THE COURT:  Dr. Moores, it seems to be your turn.

6                 Ms. Kiley, do you call Dr. Moores?

7                 MS. KILEY:  Yes.

8                 (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Ms. Kiley.

2              MS. KILEY:  Thank you.

3    CAROL MOORES MD,

4         called as a witness by the Defendant,

5         having been duly sworn, testified as follows:

6    DIRECT EXAMINATION

7    BY MS. KILEY:

8    Q.  Good afternoon, Dr. Moores.

9         Dr. Moores, your qualifications and professional background

10   are already in the record, so I don't want to spend time going

11   over that.  However, just to confirm, you are in fact still the

12   chief medical officer at DOCCS?

13   A.  I am.

14   Q.  Okay.  And have any of your duties changed since the last

15   time we were here in February of 2023?

16   A.  For the most part, they're the same.  I've added a few

17   additional responsibilities.  One is that the governor assigned

18   me to an interagency task force for the state for dealing with

19   the——putting a plan together for dealing with the overdose

20   epidemic, primarily opioid.  Additionally, I've been put on

21   standards committee for the American Correctional Association.

22   Q.  Okay.  And is there anything else?

23   A.  Not——nothing of significance.

24   Q.  Okay.  Dr. Moores, can you give us an overview on staffing

25   as far as medical providers and staff at facilitywide——excuse

1   me—statewide and—however it's easiest to break that down.

2   A.  For the providers, which includes the physicians, the

3   physicians assistants, and nurse practitioners, we're running

4   at around 135.  About half of that is physicians.  That's

5   probably about 20 percent under what we probably should be; at

6   least what our basic items are listed as.

7        For nursing, we're running about a third below as far as

8   shortages.  There's quite a nursing shortage in the country.

9   Q.  Okay.  When you say nursing shortages, you mean nurse

10  practitioners or registered nurses or both?

11  A.  Just registered nurses.

12  Q.  Okay.  Is there a lot of turnover?

13  A.  There is.

14  Q.  Why do you think that is?

15  A.  It can—it can vary with the situations.  Some people are a

16  bit challenged by this environment.  It is stressful.  And

17  some—some people get other job offers.  We do have quite a few

18  folks who go between different state agencies.

19  Q.  And if you're able to answer this, how many new staff, how

20  many new medical providers have started with DOCCS this

21  calendar year so far?

22  A.  I'm not really sure.  I probably sign off on, at least for

23  providers, a couple a month.

24  Q.  A few per month?

25  A.  Yeah.

1   Q.   Okay.  So a few new providers per month——strike that.

2        Are there still facilities that are operating with one

3   provider?

4   A.   There are.

5   Q.   Okay.  About how many facilities have only one provider?

6   A.   I'm really not sure right now.

7   Q.   Okay.  I want to take a look at what was formerly the

8   medications with abuse potential policy.

9             MS. KILEY:  Your Honor, may I approach the witness?

10            THE COURT:  Of course.

11  Q.   Dr. Moores, I'm going to hand you what was entered during

12  our February hearing with the note that it's D1B, because it

13  has the attached list of medications with abuse potential.

14            MS. KILEY:  I have a copy for the Court.

15            THE COURT:  Yes, ma'am.  Thank you.

16            (Discussion off the record)

17  Q.   Dr. Moores, looking at the list of medications that were

18  formerly deemed medications with abuse potential, we can agree

19  that there are eight muscle relaxants on this list?

20  A.   Yes.

21  Q.   Okay.  And in terms of the other medications, there are

22  seven under other medications?

23  A.   Yes.

24  Q.   Including gabapentin?

25  A.   Yes.

1    Q.  Okay.  And going—sorry to do this backwards, but the first

2    one, medications with abuse potential, number one being all

3    medications on the DEA controlled substances list, Dr. Moores,

4    to your knowledge, how many medications are on the DEA

5    controlled substances list?

6    A.  I have no idea.  It includes—it includes drugs that we

7    can't prescribe, so I don't pay attention to certain portions.

8    Q.  Sure.  Let me ask another way.  How many—are there drugs

9    that are currently prescribed at DOCCS that are on the DEA

10   controlled substances list?

11   A.  Yes.

12   Q.  Could you name a few for the record.

13   A.  So, for example, MS Contin, Percocet, Lyrica.  So most

14   commonly they—there are medications we use very frequently

15   with postoperative pain and with cancer patients, and with

16   sickle cell anemia patients.

17   Q.  And would Tramadol and Ultram also be on that list?

18   A.  Yeah.

19   Q.  Okay.  Looking at this list and some of the additional

20   controlled substances that you just testified to, does DOCCS

21   currently have any policies specific to these drugs that are on

22   this list?

23   A.  The only thing we have is that within pharmacy, there are

24   some rules to make sure that we keep within regulations as far

25   as how the medications are handled, such as how—how much can

N971ALL3                          Jackson - Direct

1    be prescribed all at once before you have to do a refill,

2    whether or not you have to—whether or not you can put a refill

3    on, so that's all within the pharmacy documents.

4    Q.  Okay.  Are there any policies that are specific to the

5    providers—

6                THE COURT:  Excuse me.  I'm sorry, counsel.

7                MS. KILEY:  Yes.

8                THE COURT:  There's a phone number wanting to get into

9    the video call.  It's probably Mr. Jackson.  Do you want to go

10   ahead and do him?

11               MS. AGNEW:  I would love to.  I'm not trying to be

12   discourteous to my adversaries, but it's our last witness.

13               THE COURT:  Let's just get it over with.

14               MS. KILEY:  Okay.

15               THE COURT:  I know Dr. Moores is terribly upset to be

16   able to go back to her seat.  But let's see if we can get this

17   in and get going.  Thank you, ma'am.

18               (Witness excused)

19               (Discussion off the record)

20               MS. AGNEW:  Your Honor, the plaintiff class calls

21   Mr. Anthony Jackson.

22               THE COURT:  Yes, ma'am.

23               (Witness sworn)

24               THE COURT:  Ms. Agnew.

25               MS. AGNEW:  All right.  Thank you, Mr. Jackson.

1    ANTHONY JACKSON,

2         called as a witness by the Plaintiff,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MS. AGNEW:

6    Q.  Can you tell us, Mr. Jackson, when did you come into DOCCS

7    custody on this bid?

8    A.  When did I come——I believe in 1991.

9    Q.  Okay.  And can you tell——

10   A.  Yeah, and they gave me 93 number.

11   Q.  Okay.  You have a 93 number, but you came in in '91?

12   A.  Yes.

13   Q.  Okay.  Thank you for clarifying that for us.

14        Can you tell me, Mr. Jackson, so that means you've been in

15   prison quite awhile, correct?

16   A.  Yeah.

17   Q.  Okay.  What's your underlying criminal conviction?

18   A.  Murder in the second degree.

19   Q.  Okay.  Mr. Jackson, can you tell the Court, do you have a

20   history of substance abuse?

21   A.  Not really.  Not in prison, no.  I stopped a long time ago.

22   Q.  Okay.  When was the last time you used illicit drugs that

23   were not prescribed to you, Mr. Jackson?

24   A.  I believe it was 1995——yeah.  Wait a minute.  No.  2005.

25   Q.  2005.  And how old are you now, Mr. Jackson?

1   A.  64.

2   Q.  Okay.  Do you have any chronic conditions that cause you

3   pain, Mr. Jackson?

4   A.  Yes, I do.

5   Q.  Can you please explain to the Court what those are.

6   A.  Okay.  I have——well, I have a back problem.  I have——of the

7   33 vertebraes, about 13 of them are messed up; I have

8   degenerative disc in C4, C5, and 6; and I have mild anterior

9   wedge deformity in T11, T12, and L1.  And those came from a

10  x-ray from Sullivan, Sullivan Correctional Facility.  But then

11  when they changed nurse practitioners and I kept——I kept

12  complaining about pain, they took another x-ray and compared it

13  to the other two x-rays and they said that it——it got worse.

14  They said that there was a narrowing of disc spaces between 3

15  and 6 and 7, and atrophy at C3, 7——to 7, with mild anterior

16  osteophytes at T12 to S1.

17  Q.  Okay.  Mr. Jackson, are you reading from your records, sir?

18  A.  Yeah.

19  Q.  Okay.

20  A.  I had——I have——I had got——

21  Q.  Okay.

22  A.  I have got——I had got——

23  Q.  Okay.  Wait.  Mr. Jackson, please stop.  Listen to me.  I

24  want you to put away your medical records, okay?

25  A.  Okay.

N971ALL3                          Jackson - Direct

1   Q.  Do not look at them anymore and do not read from them,

2   although we appreciate your diligence.

3   A.  Okay.

4   Q.  Okay?

5   A.  'Cause I had—I had got the medical records from Sullivan.

6   I paid for them.

7   Q.  Okay.  No.  And I appreciate that.  Good job.  But let's do

8   this.  I want you to put those medical records under your chair

9   where you cannot get to them.

10  A.  Okay.  They're not there.

11  Q.  Okay.  Don't look at them again, all right?

12  A.  All right.

13  Q.  Promise me?

14  A.  I promise.

15  Q.  Okay.

16  A.  They're gone.  They're put away.

17  Q.  Okay.  I just want you to tell me, like if you were talking

18  to your friends, what's wrong with you?

19  A.  Okay.  I have chronic back problems.  I'm always in pain.

20  I can't walk that far.  If I walk to a certain distance, I have

21  to stop.  I can't stand up too long.  If I stand up too long,

22  my back start hurting, my -- and I—my body starts shaking.

23      There was a time—it didn't happen here, happened at

24  another jail—I'm walking in the hallway and my—and I guess

25  you would call them a muscle spasm or something, and I just

1    dropped to the floor.  That's the bottom half of my——bottom

2    half of my problem, my back problem.  The top half of my

3    problem, it's——I was told that I had gotten a spinal tap when I

4    was a child, when I was a baby.  I was born with spinal

5    meningitis.  I had two of them.  And I don't know if the

6    technology is——the technology was worse than it is today, but

7    the discs in my back are messed up and——

8    Q.  I want you, Mr. Jackson——

9    A.  It's like bone grinding on bone.

10   Q.  Okay.  Please just listen to my questions and answer them

11   pretty succinctly, okay?

12   A.  Okay.

13   Q.  All right.  Because we've got things to do here today.

14   A.  Okay.

15   Q.  So the top part of your back hurts, right, and the bottom

16   part; is that correct?

17   A.  Yeah.

18   Q.  Okay.  How does that pain affect your daily life?

19   A.  Oh.  I'm——almost bedridden.  I do nothing.  I just lay in

20   bed most of the day.  Any time I have to go to like assigned

21   programs, my program is a clerk spot, so I go to one area to

22   the other area, and I sit down and I'm behind a typewriter——I

23   mean, a computer.  Other than that, I can't go to the yard, I

24   can't——can't do any activities like that.  I go to the mess

25   hall.  The mess hall is right there on my floor so there's no

1    really going up and down.  Other than that, that's my life.  I

2    go to the phone, to kiosk, and I can't do what other people do.

3    Q.  All right, Mr. Jackson.  So tell me this:  When did your

4    chronic pain start to get really bad?

5    A.  Oh, really bad.

6    Q.  Just give me a year.

7    A.  I would say——a year?  Like 2012.

8    Q.  Okay.  At any time after 2012 were you treated with

9    effective medications?

10   A.  Yes, I was.

11   Q.  Okay.  What were those medications?

12   A.  They was giving me 800 milligrams of Neurontin, plus

13   20 milligrams of Elavil.

14   Q.  Okay.  Do you remember who prescribed that for you and

15   where you were at the time?

16   A.  Yeah.  I was at Sullivan Correctional Facility and

17   Dr. Sidorowicz prescribed Elavil after he gave me a——a x-ray on

18   my back, and then the nurse——I was passed off to Dr. Maria

19   Diaz.  She was the nurse practitioner at the time.  She——she

20   said——because I kept complaining of pain, she said it might not

21   only be like a physical area——like I had blunt trauma force

22   thing——I must have had some nerve damage or something as well.

23   So she gave me Neurontin, 800 milligrams.

24   Q.  Okay.  So how did the Neurontin improve your pain, if at

25   all?

1   A.  Oh, I was able to go to the yard, I——we had a big yard in
2   Sullivan, and I was able to go to the big yard, and when I felt
3   really good, I tried to do some——what do you call them, cherry
4   pickers?  Stretch my back and stuff like that.  I was able to
5   exercise a little bit; not much, but a little bit.  And I was
6   able to go up and down the hills and stuff like that.  I was
7   able to do almost everything as a normal inmate.
8   Q.  Okay.  Mr. Jackson, did you ever divert or abuse your
9   Neurontin?
10  A.  No.
11  Q.  Okay.  Did you——
12  A.  Not at all.
13  Q.  Okay.  Did you ever pick up a drug ticket after you were
14  prescribed Neurontin?
15  A.  A drug ticket?  Oh, no, no.  You mean a misbehavior report?
16  Q.  Yes, sir.
17  A.  No.  No.
18  Q.  Okay.  So tell me this:  Did there come a time when your
19  Neurontin was discontinued?
20  A.  Yeah.  That——that was crazy.  I go——I go to report to
21  the——to the med window like we always do at a certain time, and
22  then I——I believe——I believe it was a nurse that came out and
23  like pulled me and somebody else to the side and said, Look, I
24  want to let you know now that the Neurontin is going to be
25  discontinued.  I said——and I said, *Why?*  I said, *That works for*

1    *me.*  And then he said, *Well, nobody's getting Neurontin no*

2    *more.*

3    Q.  Okay.  Okay.  I want to stop you, Mr. Jackson, because some

4    friends of mine have to object.  But first, I want you to tell

5    me:  What facility were you in when that happened?

6    A.  Sullivan Correctional Facility.

7    Q.  Okay.  And do you remember approximately the date, like the

8    year or the month?

9    A.  Oh, da-da, da-da, da-da, somewhere—

10   Q.  Don't look at your records.

11   A.  I'm not.  It's not—I swear it's not out.  It's not.

12   Q.  Okay.

13   A.  And it doesn't have that on there anyway.  Let me see.

14       Let me see.

15       20—12.  Around—around two—February of—around the

16   second—second half of the month of February in two

17   thousand—two thousand—da-da, da-da, da—I want to say '15, or

18   '16.

19   Q.  Okay.  All right.  And that's approximate, right?

20   A.  Yes.

21   Q.  That's not a perfect date, right?

22   A.  No.

23   Q.  Okay.

24   A.  No.

25   Q.  Okay.  So you were at Sullivan.  Can you remember who the

1    nurse was that made those statements to you?

2    A.   Darby?

3    Q.   Darby?

4    A.   Yes, Nurse Darby.

5              MS. KILEY:  I'm going to object to hearsay.

6              THE COURT:  Same ruling.

7              THE WITNESS:  D-A-R-B-Y.

8    Q.   All right.  Thank you very much, Mr. Jackson.

9         And can you tell me, when your Neurontin was discontinued,

10   did that have an effect on your pain?

11   A.   Oh, woo.  What they did——yes, it did.  When I was getting

12   the 800 milligrams of that and the Elavil, I was good.  And

13   then after Nurse Darby told me that they said we would be taken

14   off of it, they——they like started reducing my——the drugs, the

15   medication, and I started complaining then, and they started

16   going back to the same thing, back in my cell, limited——I was

17   limited in where I was going, what I could do, stuff like that.

18   I was in pain.

19   Q.   Okay.  Did anyone try to prescribe you an effective

20   alternative to the Neurontin?

21   A.   Oh, da-da, da-da, da.  Let me see.  Yes.  At first, I

22   believe I was given ibuprofen, aspirin, by——by Sidorowicz, and

23   I believe Flexeril by Nurse Practitioner Maria Diaz.

24   Q.   Okay.  Did those work for you?

25   A.   No.

1    Q.  Okay.  And so did you try anything else or was anything
2    else prescribed to you as an alternative?
3    A.  Yeah.  The Flexeril, and it was crazy, 'cause it was on and
4    off.  They would give me——they gave me back, when I complained
5    a lot, the amitriptyline, which is the Elavil, and I kept
6    complaining, it's not working.  It's like, all right, I need
7    something——I want the Neurontin back.  And they said that I
8    could forget about that.  So that's all they was giving me, the
9    Flexeril.  I told them that wasn't working, then they gave me
10   the amitriptyline, and naproxen every once in a while, I
11   believe.  Other than that, I didn't get anything else except
12   when I got back here, I complained so much, they gave me
13   something that's similar to Elavil called bu——bu something
14   tane.  Cymbalta.
15   Q.  It's Cymbalta; is that what you said?
16   A.  Yes.  Yes.
17   Q.  Okay.
18   A.  Yes.
19   Q.  Okay.  Well, let's talk about that.
20       When did you come to Sing Sing, approximately, Mr. Jackson?
21   A.  Approximately 2020.
22   Q.  Okay.  And who is your provider at Sing Sing; do you know?
23   A.  Fedrous, or Fedora?  I know that Nurse Practitioner
24   Kacchapilli, she's the one that's taking care of me, but on
25   some——there's a stamp and it says Fedrous or Fedora?

1    Q.   Does it say Ferdous?

2    A.   Yes, that's it.

3    Q.   Okay.  That's F-E-R-D-O-U-S.  But Dr. Ferdous isn't your

4    provider, right?

5    A.   Yes.

6    Q.   Okay.  Who do you see as your provider?

7    A.   Well, they keep sending me to Dee——what's the

8    name——Kacchapilly.  I only seen that Fedrous one time.

9    Q.   Okay.  For the record, Kacchapilly——okay, Mr. Jackson.

10   Please hold on.  K-A-C-H-A——start over.  I apologize.

11   K-A-C-C-H-A-P-I-L-L-Y.  Does that sound right, Mr. Jackson?

12   A.   Yeah.

13   Q.   Okay.  Good.

14        All right.  So since you've been at Sing Sing, has Nurse

15   Kacchapilly prescribed anything to you that effectively treats

16   your chronic pain?

17   A.   Absolutely not.  Not.  Nothing, until the last——until I

18   think two weeks ago.

19   Q.   Two weeks ago?

20   A.   They gave me Cymbalta, Cymbalta, and——let's see.  Cymbalta,

21   and I complained about my neck injuries and the cinch in my

22   back within the last month and a half, and she gave me some

23   naproxen, one time, a one-time thing, and that was it.  Until

24   two weeks ago.  And I've been here like, what, three years?

25   Q.   Okay.  Well, tell me something.  Has the Cymbalta helped?

1    A.  No.

2    Q.  Okay.  Have you let Nurse Kacchapilly know that the

3    Cymbalta isn't helping?

4    A.  Yeah.  Yes, I did.  And she just looked at me and she

5    said—well, when I say, *Could I keep the Neurontin back,* she

6    said, *No, we're gonna go with this,* and that was it.  She just

7    kept me on the—Cymbalta.

8    Q.  Okay.  Has the Cymbalta helped at all?

9    A.  Not really.  It's—it's—it's like the same—same thing

10   as—what's that—amitriptyline.  Elavil.

11   Q.  What do you mean when you say it's the same?

12   A.  It makes you—it's like the bottom half of my body

13   like—like from the—like I'm hurt in two different areas, the

14   middle of my back to the neck and then from the bottom of my

15   back down to the—to I guess the tailbone.  And the Cymbalta,

16   it helps a little bit—helps dampen the pain, just a little, on

17   my lower half.  But that's it.

18   Q.  Okay.

19   A.  It doesn't take—

20   Q.  All right.

21   A.  It doesn't take the pain away.

22   Q.  Okay.  Well, tell me something.  Mr. Jackson, do you use

23   anything to help you walk?

24   A.  Yes, I have a cane.

25   Q.  Okay.  How long have you had your cane?

1   A.  I had it at Sullivan too.  Hmm?

2   Q.  How long have you had your cane?

3   A.  Well, I can't—Sullivan Correctional Facility first gave it

4   to me.  I don't remember the date, but then when I got here, I

5   told her I wanted my cane back so she—they're not giving me

6   the Neurontin.  So I guess I have a cane—I don't know—maybe a

7   year and a half.

8   Q.  Okay.  But does the cane help you get around?

9   A.  Yes.  It helps me.  Really.  A lot.

10  Q.  Okay.

11  A.  Without it—without it, I—I go to my left all the time and

12  I'll fall.

13          MS. AGNEW:  Okay.  All right.  Mr. Jackson, I'm going

14  to be done with my questions to start.  Someone else is going

15  to ask you some questions, okay?  Do not pick up those papers.

16  Do you understand?

17          THE WITNESS:  No, I won't.  They're gone.  They're

18  gone.

19          MS. AGNEW:  Okay.  All right.

20          THE WITNESS:  Yeah.

21          THE COURT:  Ms. Kiley.

22          THE WITNESS:  Who?

23          THE COURT:  Ms. Kiley is going to examine you now.

24  She's going to ask you a few questions, sir.

25          THE WITNESS:  Okay.

N971ALL3                         Jackson - Cross

1    CROSS EXAMINATION

2    BY MS. KILEY:

3    Q.  Good afternoon, Mr. Jackson.  How are you?

4    A.  I'm doing a little better.

5    Q.  Okay.  My name is Oriana Kiley.  We met about a month ago

6    when I took your deposition, via videoconference.  Do you

7    remember that, sir?

8    A.  Yes.

9    Q.  Okay.  So I'm going to—so it's me again.  I'm going to ask

10   you some follow-up questions, okay?

11   A.  Mm-hmm.

12   Q.  Okay.  So I just want to make sure I have an understanding

13   of the various medications that you've tried over the years

14   leading up to today.

15       So to confirm, in 2015 you were initially prescribed the

16   Elavil for arm pain; isn't that right?

17   A.  You said 2015?  Yeah.

18   Q.  Okay.

19   A.  Yeah.  Elavil?

20   Q.  Yes.

21   A.  Yeah.

22   Q.  Okay.  And it was after that you started the Elavil that

23   you were then prescribed the Neurontin; is that right?

24   A.  Yes.

25   Q.  Okay.  And then at a certain point your pain continued to

N971ALL3                           Jackson - Cross

1   increase even though you were on the Neurontin; isn't that
2   right?
3   A.   Yeah, 'cause they——they gave me a low dose of Neurontin and
4   they kept me——they took me off of Elavil.
5   Q.   Okay.
6   A.   So when they——so when they gave me a bigger dose of
7   Neurontin, they also included the Elavil, and then I was fine.
8   Q.   Okay.  And then in February of 2016, you told your provider
9   that the medications you were taking were not working; isn't
10  that right?
11  A.   2016?  No.  You're talking about the Neurontin?
12  Q.   Yes.
13  A.   No.
14  Q.   Okay.  It's your testimony that you've never told——
15  A.   The only thing——the only——the only time I say something is
16  not working is I——if it's not working, then I go to the person,
17  my provider, or the nurse practitioner, whoever they send me
18  to, and they'll increase——they increase it.  But when they
19  increased it to 800 milligrams, I was fine.
20  Q.   Okay.  So it's your testimony that at no point you've told
21  a provider that your Neurontin is not working.
22  A.   See, that's like a trick question, because they started me
23  out——they started me out with——I don't know——200 milligrams of
24  Neurontin, and that wasn't working.  And then when they
25  increased it——no, they started me on 300, and when they

1   increased it to 800, I was good.  So I don't remember if I told

2   them that the Neurontin wasn't working and they increased it to

3   800, or not.  But when they did, I was fine.

4   Q.  Okay.  Very good.  But there came a time when you were

5   taking the Elavil that your pain was controlled; isn't that

6   right, sir?

7   A.  Some.  Not——not——I didn't expect to not feel any pain at

8   all, but it——let's put it this way.  On the pain thing from 1

9   to 10, right, and they put me on Elavil, if I'm at 10 and they

10  put me on Elavil, then it might have knocked it down to a 7.

11  Q.  Okay.  And then if you had——once you——in 2016 your back

12  pain became very bad, and as a result of that, you were then

13  given Flexeril to try; isn't that right?

14  A.  After——no.  After——you see, what happened was, they had me

15  on 800 milligrams of Neurontin, from 300 to 800, and then they

16  also gave me the amitriptyline, right?  That's the Elavil.

17  10 milligrams of Elavil.  At the same time.  So I was good.

18  But then after they stopped the Neurontin, and the Elavil, they

19  gave——put me on Flexeril, and that did nothing.

20  Q.  Sir, didn't they stop your Neurontin because you told them

21  it wasn't working?

22  A.  No, ma'am.  No.

23  Q.  So once the——strike that.

24      You testified that the Flexeril wasn't working and so then

25  you went back on the Elavil; isn't that right?

1  A.  Did they give me that——I don't know if they gave me the

2  Elavil or they put me back on some aspirin business or naproxen

3  or something.

4  Q.  Okay.

5  A.  I don't remember.

6  Q.  And then in 2017 you also started meloxicam; isn't that

7  right?

8  A.  Meloxicam, yes.

9  Q.  And you were also given Tylenol; isn't that right?

10 A.  Yeah, but the Tylenol didn't do nothing.  The meloxicam, I

11 liked; I had liked it, the meloxicam.  I think it had——I had

12 trouble like going to the——urinating, and the only thing it

13 did, the meloxicam did was relax the muscles down there and I

14 was able to go to the bathroom.

15 Q.  Okay.  When you——and to confirm, when you got to Sing Sing

16 in 2020, you were still on the Elavil, and then you told

17 providers that wasn't working, so then they switched you to the

18 duloxetine, which is the Cymbalta; is that right?

19 A.  Yes.

20 Q.  Okay.  And a referral was placed for you to see an

21 orthopedic; isn't that right?

22 A.  I'm sorry.  Repeat the question.

23 Q.  And a referral was placed for you to see an orthopedic;

24 isn't that right?

25 A.  Orthopedic?

N971ALL3                           Jackson - Cross

1    Q.   Yes.

2    A.   That's a—I thought it was—excuse me for not being

3    knowledgeable, but I'm thinking foot doctor when you say

4    orthopedic.

5    Q.   No.  Okay.  Were you seeing—did you see any pain

6    specialists?

7    A.   Oh, yes.

8    Q.   Okay.

9    A.   Yes.

10   Q.   And when did you see the pain specialist?

11   A.   I think in '21.

12   Q.   And—

13   A.   Or '22.

14   Q.   And in '21 you got a cortisone shot; isn't that right?

15   A.   I got a what?

16   Q.   A cortisone shot?

17   A.   Yes, yes.

18   Q.   And where was that cortisone shot?

19   A.   I got it on my lower back.

20   Q.   Okay.  And that was to treat the pain?

21   A.   In the hospital—yes.  That was supposed to treat my—they

22   said that, 'cause I had shooting pain down from my lower back

23   down my leg to my little toe, they call it sciatica.  So they

24   gave me a shot in my back.

25   Q.   And you reported that your pain was well controlled after

N971ALL3                        Jackson - Cross

1   that cortisone shot; isn't that right?

2   A.  I said it was okay, and then I asked for another one

3   because it seemed like it wasn't holding.  So they gave me a

4   second one.

5   Q.  And did you in fact get a second cortisone shot?

6   A.  Yes.

7   Q.  Okay.  And you were even offered to do physical therapy;

8   isn't that right?

9   A.  Yes.

10  Q.  Okay.  And you said you didn't need it.

11  A.  No.  No.  I've been going to the physical therapy all my

12  life.  Matter of fact, when I first got arrested for this

13  crime, I was going to physical therapy.  And I told—I told it

14  only works for—the physical therapy only works for like two

15  weeks and then it—I'm going back to—back to the pain.  I've

16  been going back and forth to physical therapy all my life.  It

17  doesn't—it doesn't actually work, but I would never refuse.

18  Q.  Sir, but the question is:  You were offered physical

19  therapy in 2021; isn't that right?

20  A.  2021?  I'm—I'm not sure.  I'm sorry.

21  Q.  Put it this way:  After your cortisone shots you were also

22  advised that you should undergo physical therapy; isn't that

23  right?

24  A.  No.  I—I don't remember they offered physical therapy

25  after the cortisone shots.

1   Q.  Okay.

2   A.  But I do know that when they was wearing off, I asked——I

3   asked for more pain meds, 'cause the pain——the shots wasn't

4   holding me; I know that.

5   Q.  Okay.  But during this time you were on the Cymbalta,

6   right?

7   A.  I asked to be placed back on the Cymbalta because the

8   cortisone shots was not working.

9   Q.  Okay.

10  A.  It wasn't working the way it's supposed to, the way I was

11  told it would.  Yeah.

12  Q.  Okay.  Can you explain to us, when——for how long were your

13  Cymbalta prescriptions?  Like how long would a refill like last

14  you?

15  A.  The subscription?

16  Q.  Prescription.

17  A.  Well——

18  Q.  Strike that.

19  A.  If you——

20          THE COURT:  Counsel is going to ask you a new

21  question, sir.

22          THE WITNESS:  Who are you?

23          THE COURT:  I'm the judge.

24          THE WITNESS:  Okay.  Okay.  I'm sorry.  I didn't know.

25  Yeah, I didn't know.

1            THE COURT:  That's all right.  We're not on video.

2       It's a lot easier on video because then you can see the black

3       robe.

4            THE WITNESS:  Yeah.  The black who?  Oh, black cape.

5       Okay.

6            THE COURT:  Ms. Kiley.

7            MS. KILEY:  Thank you, your Honor.

8            THE WITNESS:  These phones is not that good either.

9            THE COURT:  We are familiar with that problem, sir.

10      BY MS. KILEY:

11      Q.  Mr. Jackson, you were on——to confirm, how long have you

12      been on the Cymbalta?

13      A.  Da-da, da-da, da, 20——this is '23.  Maybe——maybe one and a

14      half or——one——between one and one and a half years, I guess.

15      Q.  Okay.  So how do you get your Cymbalta?  How are you able

16      to take it?

17      A.  Oh, I have to go travel, walk, to the hospital where they

18      dispense it out of a little window.  Like the little windows is

19      like, if you go to a grocery——bodega grocery store, they have

20      a——and in the middle of the night, they have the cutoff in the

21      window that——that they administer the drugs.

22      Q.  Thank you, sir.  I understand you go to a window to get

23      your medications.

24           So my question to you is:  In this last year and a half to

25      two years, you've been taking Cymbalta.  How often do you in

N971ALL3                           Jackson - Cross

1    fact take the Cymbalta?

2    A.   Oh, once a day.

3    Q.   Okay.  And you take that once a day because it provides you

4    with at least some pain relief; isn't that right?

5    A.   Yeah.  I get to get——I get to go to sleep, but I wake up in

6    the middle of the night sometimes, 2, 3:00 in the morning, but

7    at least I get some sleep.

8    Q.   Because if it wasn't working, you would not go and get it

9    every day; isn't that right?

10   A.   Well, something is better than nothing, but that's almost

11   like nothing at all.

12   Q.   Okay.

13   A.   Like I said, I——I——I'm not——I wasn't looking to be——I don't

14   see the Department of Corrections having me pain free, you

15   know, because I've been in prison for a while.  So I don't see

16   them doing that.  So I expect to be in some kind of pain.

17   Q.   Okay.

18   A.   So I——I take what they prescribe.

19   Q.   Mr. Jackson, I just want to switch gears for a moment.

20        Isn't it true that you told providers at DOCCS that you

21   formerly used heroin for 26 years?

22   A.   I'm sorry?  Repeat that?

23   Q.   Isn't it true that you told doctor——you told DOCCS

24   providers that you have in fact used heroin for 26 years?

25   A.   Oh, in the street?  Yeah.

N971ALL3                         Jackson – Cross

1   Q.  Okay.

2   A.  But I stopped.

3   Q.  Right.  And the last time you used it, it was in 2007.

4   A.  I thought it was 2005.

5   Q.  Okay.

6   A.  See, my father——my father had died and the——I guess you

7   could call it the snitch or whatever.  In any case, my father

8   died, and my father——well, I was raised by my father 'cause

9   when I was like 2, I was 2, my sister was 1 or so, and my

10  mother called my father at the job and said she's leaving.  So

11  she took off, and my father was left to raise us.  But when my

12  father had passed, I was——I was all sorts of messed up,

13  mentally, emotionally.  He was my only provider, my only

14  parent.  So——

15  Q.  Mr. Jackson, thank you.

16  A.  The Department of Corrections had this——

17  Q.  Thank you.

18  A.  Huh?

19  Q.  I'm sorry.  Keep going.

20          THE COURT:  Had you finished your answer, sir?

21          THE WITNESS:  No.  Didn't she want to know why I used

22  it, in 2005, or 7, whatever month?

23          THE COURT:  I think we probably have the picture, sir.

24  I'm going to ask counsel to ask you a new question, all right?

25          THE WITNESS:  Okay.  Okay.

1              THE COURT:  Okay.

2     BY MS. KILEY:

3     Q.  Mr. Jackson, isn't it true that in March of 2023 you asked

4     providers to be evaluated for the MAT program?

5     A.  No.

6     Q.  You were never——it's your testimony you were never

7     evaluated to be part of the medication assisted treatment

8     program?

9     A.  Oh, yes, I was evaluated.  I was called down to see

10    Kacchapilly, and then she told me that I had asked to go to the

11    MAT program, and I asked what was the MAT program.  It's

12    the——it's the——some program, they give you some drugs to

13    counter-react heroin, or from what I was told.  So I would have

14    never asked for that because I'm no longer on——on heroin.  I've

15    been clean.  I've been clean all these years.  And I've been

16    drug tested up the wazoo.  They gave me urine tests and all

17    that.  I've been clean ever since that one——that one time, that

18    one incident, when my father had died, then they turned around

19    and buried him.  They told me, wait.  I didn't take the death

20    too easy for the people that I love.  So they hurry up and

21    buried him.  They told me afterwards that he was dead and they

22    buried him.  I was messed up.  That was the only time since I

23    was at Department of Corrections that I had used.

24    Q.  Mr. Jackson, my question is——what I'm trying to ask is

25    about the evaluation that you underwent in March to be part of

N971ALL3                        Jackson - Cross

1    the MAT program.  Do you remember—do you remember that?

2    A.  Yes.

3    Q.  Okay.

4    A.  I remember—I remember Kacchapilly interviewing and writing

5    down stuff.  She—when I said I didn't want to, I didn't want

6    to go to the program, it wasn't necessary, she said, well,

7    you're here now, why don't you just fill it out.

8    Q.  Okay.  And she asked you a series of questions, right?

9    A.  Yes.

10   Q.  Okay.  And in one of your answers you told her, "I want to

11   enroll in the program so that I feel good."  Do you remember

12   saying that?

13   A.  No.  Absolutely not.  If I turned around—that doesn't make

14   sense to me, because, I mean—well, it does make sense.  If I

15   was on drugs—if I was on heroin, and as bad as my back is

16   messing with me, I would want to take something to take that

17   away, but I'm not on it.  I'm not—I don't get high no more.

18   I've—went to school and everything else.  I—I went all the

19   way to getting a master's degree in the New York Theological

20   Seminary.  So I—I'm on the straight and narrow.

21   Q.  To confirm, you're obviously aware of what the MAT program

22   is for, correct?

23   A.  Absolutely, because at night, those people come—those guys

24   come down with us, they go to see—go to one window, we go to

25   the other window.

N971ALL3                          Jackson - Cross

1    Q.   Okay.  Mr. Jackson, do you recall on July 31st when I took

2    your deposition via videoconference?

3    A.   Okay.

4    Q.   Do you remember that?

5    A.   Yeah.

6    Q.   Okay.  And I had asked you about—well, put it this way:

7    On page 24 of Mr. Jackson's deposition transcript—

8              MS. KILEY:  I'm sorry, counsel.  I don't have another

9    copy.  But you're welcome to come here and take a look.

10   Q.   On page 24, I asked you the following, starting on line 9:

11        "Q.  Okay.  And I'm sorry.  I just want to go back to my

12   previous question.  Have—are you—have you ever been evaluated

13   for the medication assisted treatment program?"

14        "A.  Could you clarify the question.  I mean, tell me what

15   you're talking about."

16        "Q.  Well, do you have any understanding of what the MAT

17   program is?"

18        "A.  No."

19        Do you recall giving that—

20   A.   Yes.

21   Q.   —giving that testimony?

22   A.   Yes, yes.

23   Q.   And you recall that at your deposition you took an—you

24   swore to tell the truth?

25   A.   Yes.

N971ALL3                         Jackson - Redirect

1    Q.  Okay.  And you also swore to tell the truth today, sir;
2    isn't that right?
3    A.  Yes.
4    Q.  Okay.  So do you or don't you have an understanding of what
5    the MAT program is?
6    A.  I do know what the MAT program is.
7    Q.  Okay.  Is there a reason that——
8    A.  When you asked——when you had asked if I knew what the MAT
9    program, I thought you was talking about the——because you
10   turned around and asked me what——do you know what MWAP is,
11   and——and I told you.  But I knew——I thought it was the same
12   thing.
13       The question you was asking me, I didn't know MAT.  You
14   said medical——medication assistance treatment?
15   Q.  Yes, sir.
16           MS. KILEY:  Mr. Jackson, thank you very, very much for
17   your time.  I have no further questions.
18           THE COURT:  Thank you.
19           Ms. Agnew.
20   REDIRECT EXAMINATION
21   BY MS. AGNEW:
22   Q.  Mr. Jackson, did you get into the MAT program?
23   A.  Did I get into the MAT program?
24   Q.  Yeah.
25   A.  No.

N971ALL3                          Moores - Direct

1    Q.  Okay.  When you got your—

2    A.  I know that—

3    Q.  No.  Listen to me.

4    A.  Okay.

5    Q.  When you got your second cortisone shot, did it work?

6    A.  Mm-hmm.

7    Q.  Yes?

8    A.  Yeah, for a little while.  Yes, for a little while.

9    Q.  Okay.  Did they offer you a third cortisone shot?

10   A.  No.

11          MS. AGNEW:  Okay.  Thank you very much, Mr. Jackson.

12          THE COURT:  Anything else, counsel?

13          MS. KILEY:  No, thank you.

14          THE COURT:  Thank you, Mr. Jackson.  You are excused.

15          THE WITNESS:  Thank you.

16          MS. AGNEW:  Take care.  You'll hear from me soon,

17   okay?

18          THE WITNESS:  Okay.

19          (Witness excused)

20          THE COURT:  Off the record.

21          (Discussion off the record)

22          (Recess)

23          (In open court)

24          THE COURT:  Ms. Kiley.

25          MS. KILEY:  Yes.  Thank you, your Honor.

1    CAROL MOORES MD, resumed.

2    DIRECT EXAMINATION CONTINUED

3    BY MS. KILEY:

4    Q.   Okay.  Switching gears.

5         Just to get us reoriented again, since we just took a

6    break, Dr. Moores, we were taking a look at the former

7    medications with abuse potential and specifically the list

8    that's attached to the former MWAP policy that has now been

9    rescinded.  And if I remember correctly, my last question was:

10   Are there any policies on any of these drugs?  I believe the

11   answer was only specific as to pharmacy; is that right?

12   A.   Correct.

13   Q.   Okay.  So the follow-up question before we took a break

14   was:  Are there any current policies as to DOCCS providers with

15   respect to the medications that are on this list?

16   A.   Yes.  Also within the pharmacy policies has to do with

17   formulary.  Our formulary is a list of medications that we keep

18   so that we know which ones we're regularly going to order,

19   which we're going to put into stock in various places.  The

20   point of the formulary is there are so many thousands and

21   thousands of drugs, there's no way that any medical

22   organization could keep all of them, and so it's a way to

23   choose a limited number so that when you know you're going to,

24   say, start with a diuretic for blood pressure, we only have a

25   certain number of them, and that we'd prefer you do those

1   because we already have an easy process to purchase into the

2   system.  If it's not on formulary, they can still request it;

3   they just put it through the nonformulary request process.

4   Q.  Okay.  Is Flexeril currently on formulary or nonformulary?

5   A.  Flexeril I believe is on formulary.  I think there is about

6   maybe three of these that are within the list of what's listed

7   as muscle relaxants here that are on formulary.

8   Q.  What are the others?

9   A.  Oh, I don't remember.  I have actually——what I hear most

10  often are the ones that are nonformulary because I'm part of

11  the re——review for the nonformulary system, and so it's——it's

12  one of the more frequent nonformulary requests we have, usually

13  specific——specifically based on a recommendation by a

14  neurologist for our patients with neuromuscular diseases.

15  Q.  So looking at this list, to your knowledge which of these

16  drugs are currently on the nonformulary?

17  A.  I——I know that on a regular basis Zanaflex gets requested,

18  so that's one of them.  And that's probably the one that is

19  brought up most often, so that's one I can say for sure is

20  nonformulary right now.

21  Q.  Okay.  And what about the medication listed under No. 3?

22  A.  I don't know if we have all of them on formulary right now

23  because some of them are coming through on nonformulary.  But

24  most of them are.

25  Q.  Okay.  And is gabapentin on formulary?

1    A.  It is.

2    Q.  Okay.  So we can agree that the medication with abuse

3    potential policy involved an——an approval process before

4    providers could prescribe these medications on this list.

5    A.  That's correct.

6    Q.  Okay.  And since it's been rescinded, have there been any

7    policy implemented as to any one of these specific medications

8    on this list?

9    A.  No, not——not anything I've seen.

10   Q.  Okay.  And since MWAP has been rescinded has there been any

11   limitation——and I just want to get more specific——has there

12   been any limitation on a provider's ability to prescribe

13   Tramadol or Ultram?

14   A.  No.

15   Q.  Okay.  To your knowledge are there any facilities that are

16   not prescribing Tramadol or Ultram?

17   A.  Not that I know of.

18   Q.  Okay.  How about pregabalin or Lyrica?

19   A.  That's prescribed regularly.

20   Q.  Okay.  And since MWAP has been rescinded have there been

21   any limitation on a provider's ability to prescribe Lyrica,

22   also known as pregabalin?

23   A.  No.

24   Q.  Okay.  Same question.  Since MWAP has been rescinded, has

25   there been any limitation on a provider's ability to prescribe

N971ALL3                          Moores - Direct

1   Cymbalta or duloxetine?

2   A.  No.

3   Q.  Okay.  To your knowledge are there any facilities not

4   prescribing Cymbalta?

5   A.  No.  That's a pretty frequent medication.

6   Q.  Okay.  And then of course gabapentin.  Since MWAP has been

7   rescinded, are there any limitations on a provider's ability to

8   prescribe gabapentin?

9   A.  No.

10  Q.  Okay.  And to your knowledge are any of the DOCCS

11  facilities not prescribing gabapentin?

12  A.  No.  As far as I know, they're——they're all having patients

13  with gabapentin.

14  Q.  Okay.  Would you have any reason to believe that any DOCCS

15  facility is creating a policy of their own within that facility

16  regarding any of these medications we've just talked about?

17  A.  No, I've not seen any evidence that there's any facility

18  that's——that's not using these medications.

19  Q.  Okay.  In your capacity as the chief medical officer and

20  based on your knowledge of DOCCS and its medical

21  administration, could you estimate for the Court approximately

22  how many patients are currently prescribed gabapentin?

23  A.  I wouldn't know for sure.  I know that there's got to be at

24  least a few hundred, because it's——it's pretty common.

25  Q.  I want to talk a little bit about the regional medical

1   directors.  Can you state for the Court, who currently holds
2   the titles of regional medical director?
3   A.   There are two regional medical directors right now who that
4   is their title, and that's John Hammer, Dr. John Hammer, and
5   Dr. Susan Mueller.  Dr. Afsar Khan does fill some of the
6   regional medical director roles for three of the hubs.
7   Q.   Okay.  And what are their duties today?
8   A.   Dr. Mueller and Dr. Hammer do reviews for specialty
9   referrals that have been given a preliminary denial by our
10  utilization review vendor.  Used to be called Kepro and now
11  it's Acentra.  And they also go to certain QI meetings, the
12  quarterly QI meetings.  And if there's an unexpected death,
13  they'll go to that or dial in by phone.  They're also available
14  to be as a consultant if somebody wants to get their input on
15  something.  And they are responsible for doing the peer reviews
16  for physicians every two years.
17  Q.   Okay.  And are those duties different from their duties
18  under the MWAP policy?
19  A.   When they were——when the MWAP policy was in place, they did
20  all the reviews for the MWAP requests and gave the approval or
21  denial.
22  Q.   Okay.  And I know we got into a lot of that testimony at
23  the February hearing, so I won't go too far into it, but just
24  to confirm, are the RMDs——currently, do they have any oversight
25  on a provider's ability to prescribe medications?

1    A.  No.

2    Q.  Okay.  And with the RMDs removed from this process, are

3    providers able to exercise their judgment in administering care

4    as they see fit?

5    A.  Yes.

6    Q.  Okay.  You mentioned the nonformulary requests that are

7    reviewed.  The nonformulary requests and specialty care

8    referral denials, do those continue to be audited?

9    A.  They are, although almost all the nonformulary requests,

10   the great majority of them are done by myself and by Dr. Khan.

11   Almost all of them are approved.  It's pretty rare that we

12   don't approve.  The others that are not us are the FHSDs at

13   some facilities, and they actually have the situation where

14   they have their providers that work for them discuss the

15   medication, and they agree to do the medication before they

16   even put the referral in, or the request in.  And so that is

17   done as an in-person consult with their FHSD.  Dr. Khan and I

18   just review the others coming in, and they're—honestly,

19   they're very straightforward, appropriate requests.  It's very

20   rare that we have to say no to anything.  If we do, it's

21   usually something like a supplement, like they're asking for

22   some unusual supplement that is not a prescription medication,

23   and so we'll check into it to see why they're asking for that

24   and whether it makes sense.  And then every once in a while for

25   something that's extremely expensive—we're talking 50 to a

1  hundred thousand dollars or more per year——we'll just do a
2  quick review.  Still, most of the time, with those, they get
3  approved because they are the first-line therapy for an
4  oncology situation.
5  Q.  Thank you.
6      Just going back to that in-person consult that you just
7  mentioned a moment ago, can you elaborate a little bit more on
8  that.  Like what would be the circumstances in which an
9  in-person consult would take place with an FHSD?
10 A.  So for example, again, Bedford Hills, Dr. McGurty does his
11 own reviews, and if I by mistake review one of them and process
12 it through, his pharmacist will contact me and say, *Oh, he was*
13 *about to do that, you didn't need to do that.*  He has his
14 physicians and providers talk to him first about medications
15 that are nonformulary, so that he can understand why they're
16 asking for it and if it's optimal for their patient.  And so I
17 see them go through.  And so I still see what they are and what
18 he's approving.
19      THE COURT:  Would you remind me of Dr. McGurty's
20 position, please.
21      THE WITNESS:  Dr. McGurty is the facility health
22 services director at Bedford Hills Correctional Facility.
23      THE COURT:  Thank you.
24 Q.  Thank you.
25      Turning to the peer reviews you just mentioned a moment

1    ago, can you just describe briefly that process and how it

2    works.

3    A.   There are forms that we have established within our health

4    services policies, and the——the RMD, or whoever is doing the

5    review——because sometimes it will be myself or a facility

6    health services director that actually ends up doing it——they

7    have to pull ten charts, it's supposed to be by random, and

8    it's——the instructions with it are that they want to make sure

9    that there's an emphasis on chronic care medicine rather than

10   to just look at acute care situations.  There are some very

11   specific things they're supposed to look at and mark off.  And

12   then they can also put in any comments that they have about it.

13   Q.   What is the purpose of the peer review?

14   A.   It's required with licensure requirements that we do this;

15   but also for the American Correctional Association

16   accreditation process, and they check that we're doing those

17   also when they come to accredit our facilities.

18   Q.   And to the extent that any issue comes up during this peer

19   review process——strike that.

20        If there was an issue——strike that.

21        If a regional medical director during this peer review

22   process identified something in a provider's chart that might

23   indicate an issue with their standard of care, is that

24   something that would be addressed through this peer review

25   process?

1   A.  Yes.

2   Q.  Okay.  And would that be brought to your attention?

3   A.  Yes.

4   Q.  Okay.  Have any standard of care issues been brought to

5   your attention by way of the peer review process?

6   A.  Yes.

7   Q.  Okay.  And when was that?

8   A.  The last one was probably about six months ago.

9   Q.  Okay.

10  A.  And with that, I—I asked another physician to go take a

11  look at their charts, and to identify if there's issues.

12  Specifically Dr. Khan went, took a look at that, and did an

13  educational piece with them.  And it was something that the

14  provider was open to and worked on that piece where it had to

15  do with diabetes care so they could improve upon it, and was

16  followed through, and it's still checked on periodically by

17  Dr. Khan.

18      But to give another example, sometime before that there was

19  another provider who was not open to being educated on a piece

20  that we thought was an issue, and I—because we do not yet have

21  policies that have been approved by our union and such for us

22  to do this in a different manner, it has to go through as a

23  labor relations disciplinary action, and as I was starting to

24  do that with them and they realized that this was significant,

25  they resigned their position.

1   Q.  Okay.  So those are two separate incidents you just

2   described?

3   A.  Right.

4   Q.  And were those—when were those two separate incidents?

5   A.  The—the one with the diabetes was probably around March or

6   April.

7   Q.  Of 2023?

8   A.  Yeah.

9   Q.  Okay.

10  A.  And the other one, maybe it was around November.

11  Q.  November of '22?

12  A.  Yes.

13  Q.  Okay.  Would the peer review process be the only way in

14  which a standard of care issue would be brought to your

15  attention?

16  A.  No.  I regularly get all kinds of sources.  Some examples:

17  Patients actually will send letters to me directly; and then

18  there are situations where a superintendent or another member

19  of the executive team at a facility will contact me with a

20  concern; sometimes a nurse will do so; sometimes it will come

21  up because the SURNs do an audit and they bring that to my

22  attention; and then I regularly review records for—for various

23  things, such as medical parole potential.

24              THE COURT:  I'm sorry.  Medical?

25              THE WITNESS:  Medical parole.  So we're trying to be

1    very aggressive in finding candidates that——that meet the

2    criteria for medical parole.

3           THE COURT:  What does that mean, please?

4           THE WITNESS:  There is a——a New York regulation that

5    says that if somebody——there are some criteria as far as what

6    their——their conviction was and what their time is, but if they

7    meet those criteria and they have either a terminal illness or

8    they are so debilitated that the likelihood is that the safety

9    risk is quite low, then I can submit them to the commissioner

10   of Department of Corrections.  If he agrees, then they ask for

11   input from the judge and both attorneys for——that went through

12   it.  And then it goes to the parole board.  They have the final

13   say.

14          THE COURT:  Thank you.

15   BY MS. KILEY:

16   Q.  Have there been any issues brought to your attention about

17   providers specifically regarding the administration of chronic

18   pain medication?

19   A.  Yes.

20   Q.  Okay.  And which providers have been brought to your

21   attention?

22   A.  Because there was actually a few——few different complaints

23   or notifications about Woodbourne that——and when I would call

24   the facility to ask what actually was occurring, I was not

25   comfortable with what they were saying, so I went to Woodbourne

1   and spoke with the superintendent and spoke to a number of the

2   employees and reviewed some medical records, and I did find

3   that Dr. Ruiz was not following the policies and she was

4   stopping medications, quite a list of medications, as soon as

5   somebody was transferred into that facility.  And not only

6   that, she was forcing the PAs to do the same thing when they

7   didn't agree to do so.  So I counseled her; I went——I educated

8   the superintendent, the DSA; I educated the NA, who also had

9   been very uncomfortable with it; I took the official supervisor

10  of the PA and changed it to somebody else; and I removed the

11  title of FHSD from Dr. Ruiz, and let her know if she doesn't

12  start being compliant with this policy, that we're not going to

13  be able to keep her working anymore.  She then was off on

14  vacation for quite a bit through the summer, and it will be a

15  little bit of time before we——I was going to give her a few

16  weeks and then audit her situation again.

17  Q.  So let's just back up just a little bit.

18      When did you go to Woodbourne to conduct your investigation

19  that you've just described?

20  A.  I think it was around May.  It was in the——it was like late

21  spring, I think.

22  Q.  May of '23?

23  A.  Yes.

24  Q.  And the issues that you saw with what she was doing at

25  transfer, Dr. Moores, can you tell us, what is the procedure

1  when a patient transfers from one facility to another as far as

2  their medications?

3  A.   The——if everybody follows the directives, then the——the

4  medical record and any medications that are dispensed directly

5  to the patient will follow and be there, and that we also

6  encourage the nursing staff, especially the NAs, to have a

7  direct phone call or email to say if there's something special

8  about a patient that they need to know about, especially if

9  they have to order something ahead of time.  We have had some

10  challenges with——with having the right setup for certain kind

11  of transfers of controlled substances, and security has been

12  working with us to come up with a new solution, and we're just

13  waiting for the appropriate locks to come in.  There was a

14  supply chain issue.  But they——we should be able to

15  move——especially the MAT medication.  We should be able to move

16  that easily between facilities at that point.

17       It is a——it's a very cumbersome process.  And

18  another——another challenge is that although some of these are

19  routine and you can know about them a week ahead of time, some

20  of them are sudden transfers, and sometimes they'll even be in

21  the middle of the night, and we end up not following all of

22  those pieces, and we're still trying to fix that and figure it

23  out.  I had a SURN do——do some audit on that, but it was

24  limited, so I didn't really get a full feel.  They were just

25  asking people for their list of when things didn't go well.

1    But we really need the whole picture.  So now the new

2    pharmacist that I've hired in to central office is going to be

3    auditing that piece.  Because my gut feeling is that it's—the

4    problems are not the same across the entire state, and we've

5    got to locate which problems are where, and we've got to get

6    the full details.  We can't come up with a solution that's

7    going to work for everybody unless we have the full details.

8    Q.  Sure.  Just one moment.

9        Thank you, Dr. Moores.

10       And to confirm, you said it was your intention to continue

11   to audit Dr. Ruiz once she returns from being out?

12   A.  Yes.  She's been back long enough now that I can go audit

13   as soon as I return from these outings.

14   Q.  Okay.  Very good.

15       Have there been any other providers besides Dr. Ruiz who

16   you've had to counsel or something else with regard to how

17   they're administering chronic pain medication?

18   A.  The—the only other one recently that wasn't a simple fix

19   was an incident that occurred at Green Haven, and involving one

20   of the physicians there, Dr. Kim.  There was a patient that

21   had—hadn't been there that long, but when they transferred in,

22   they did appropriately give, prescribe the medication, and then

23   when—that medication, which was a 30-day medication, had to be

24   renewed every 30 days, and the—Dr. Kim was approached by the

25   nurse to go ahead and prescribe it and give the refill, he did

1    not do it.  And so when I found out about that, I also found

2    that there were other issues that were within Green Haven as

3    far as their communication goes.  And they were willing and

4    already starting to fix that, but I didn't see them fixing the

5    issue with Dr. Kim, and I spoke to the superintendent and the

6    deputy superintendent for health, and I said, This is a clear

7    violation.  You can't stop——and it's a pain medication.  You

8    can't stop a pain medication without meeting with the patient

9    and having a reason.  And it has to be documented.  None of

10   that had occurred.  I said, this is a true violation, and

11   considering how far we're going, especially with the court

12   order, especially after he had been——he had been educated

13   specifically, and he had been given a copy of the court order,

14   I said, this needs to be a disciplinary action.  And the

15   superintendent agreed that he would go forward with a

16   disciplinary action.

17   Q.   Thank you.

18        Other than these two providers that you've just described,

19   have there been any other issues with——that have been brought

20   to your attention that you've addressed regarding specific

21   providers and their administration of chronic pain medication?

22   A.   As I've heard about any issues that come up, when I've

23   checked into it, I've never——I have seen that we——we do have to

24   work on our procedures as far as communication goes, but

25   I've——but I've fortunately not seen any intent to stop the

1   medication on purpose.

2   Q.  Okay.  Thank you.

3       I want to switch gears for a moment.  We heard some

4   testimony yesterday from Dr. Carinci about——there's testimony

5   about gabapentin and sometimes it can be dispensed in liquid

6   form.  How is gabapentin distributed at DOCCS?

7   A.  We have both liquid and pill forms, and it's up to the

8   provider to decide, and they write it with their prescription.

9   Q.  Okay.  And to your knowledge why might a provider choose

10  one over the other?

11  A.  If they're concerned that that patient may have a tendency

12  to divert medication or not take it appropriately, or if

13  they've been having a lot of diversion issues within that

14  facility and they just want to decrease the chance that

15  diversion can occur.

16  Q.  Okay.  And why might that——what is the risk associated with

17  diversion?

18  A.  There are various reasons for diversion.  Sometimes we have

19  patients that will stockpile medication and then take it all at

20  once, either to try to get a high or to attempt a suicide.

21  Then we have patients who have an intention to sell it on the

22  housing block.  And then we, unfortunately, have patients who

23  really wanted to take the medication but they're being——I could

24  say bullied by somebody else on the unit who has threatened

25  them if they don't divert and give them the medication, that

1   they will suffer bodily harm or something.

2   Q.  To your knowledge are there any issues of diversion at

3   DOCCS with Lyrica?

4   A.  I don't know specifically with Lyrica.

5   Q.  Okay.  How about Cymbalta?

6   A.  I mean, I don't know for specific medications, right now,

7   because I don't have data on that.  I know that diversion is a

8   regular problem with almost all the facilities, that—that the

9   gabapentin, the opioids, sometimes muscle relaxants—not as

10  much—tend to be preferred drugs.

11  Q.  And how about with the Suboxone?

12  A.  Yes.

13  Q.  Okay.  Dr. Moores, I want to now turn our attention to the

14  preliminary injunction order which was entered by the Court on

15  June 12th of '23.  And I have just two specific areas of

16  questioning on the order.

17      One of the terms of the order asks or requires that DOCCS

18  identify patients who need to be coded with 338 on their

19  medical problems list.  So my question to you, Dr. Moores, is:

20  How have you executed this portion of the order in identifying

21  which patients need to be coded with 338?

22  A.  That was challenging to try to figure out.  It's a very

23  short period of time.  There is—if we were to review, it's

24  over 32,000 patients, and the fact that there isn't a clear

25  definition for what the chronic pain syndrome would be for this

1    specific situation, and so the options might be to talk to all
2    the patients and ask them to review all the records, which we
3    really didn't have time to do in that short period of time.
4    One thing that we could do is to——because from central office
5    we could have access to the problem list, which is within the
6    electronic portion of the record, which is FHS1 on the
7    mainframe.  And so I got a group of about eight people together
8    in central office and we printed out the names and DINS of——the
9    departmentwide identification numbers for all 32,000-plus
10   incarcerated individuals and we started just reviewing all of
11   the problem lists, and added 338 when it seemed there might be
12   something listed there that could potentially be a chronic or
13   recurrent pain, if they didn't already have 338 on there.
14   Q.  Okay.  When you say "we went through each of the names on
15   the list," let's back up for a second.  So the——if I understand
16   it, there's a——you printed out every name of every incarcerated
17   individual?
18   A.  Yes.
19   Q.  Okay.  And to do this, did you have to go into each
20   individual's medical problems list?
21   A.  Yes.
22   Q.  Okay.  And have you completed that?
23   A.  No.
24   Q.  Okay.  How far have you gotten?
25   A.  Maybe a third of the way.

1   Q.  Okay.  And that's with the assistance of eight staff
2   members?
3   A.  Yes, it was about eight people within central office.
4   Q.  Okay.  Do these staff members have other duties?
5   A.  Yes.
6   Q.  Okay.  What are those duties?
7   A.  It included physicians, physician assistant, registered
8   nurses, pharmacist, myself.
9   Q.  Okay.  And just to be—make sure I'm understanding this, so
10  that they would open the medical problems list, and to the
11  extent that there's a condition that your staff believes could
12  lead to chronic pain, they have then coded that person 338?
13  A.  Correct.
14  Q.  Okay.  And this was done to comply with the order.
15  A.  Yes.
16  Q.  Okay.  Before beginning this—before executing this part of
17  the order, or I should say—strike that.
18       Prior to the order being entered, approximately how many
19  patients were coded 338?
20  A.  I think it was around 800 or 900.
21  Q.  Okay.  And now having gone through what you believe is
22  approximately one third of the entire incarcerated population
23  at DOCCS, how far have you gotten thus far, in identifying who
24  might need to be coded 338?
25  A.  Say that question again?

N971ALL3                         Moores - Direct

1    Q.  How far have you gotten in identifying who needs to be

2    coded 338?

3    A.  We've only gotten through about a third of the stack of

4    paper.

5    Q.  So—sorry.  But the question is:  What is the number now,

6    approximately?

7    A.  Oh, the total number.

8    Q.  Yes.

9    A.  Not having reviewed for the report for a bit, I think that

10   we're maybe around 2500 or so, but that was—it was before we

11   hit the one third mark.

12   Q.  That's about 2500?

13   A.  Right.

14   Q.  Patients?

15   A.  Right.

16   Q.  Okay.  And is the staff continuing to do this on an ongoing

17   basis?

18   A.  I've slowed down right now.  We're concentrated more on

19   getting the assessments in, assessments, making sure they're

20   getting scheduled and in, and also because I was getting so

21   many questions about what does this mean out in the field and

22   that patients are asking why they're getting a 338 because they

23   didn't think it made sense, and then the provider saying, I'm

24   not sure, this doesn't make sense for this patient, and—and

25   they have been adding it in the field anyway.  So I slowed down

1    with it, concerned that in the past sometimes our facilities

2    were really good at putting things onto problem lists.  So the

3    fact that somebody has migraine listed, we were putting 338 on,

4    but maybe they hardly ever get migraines.  And that maybe we're

5    creating something that was going to be challenging.  So I

6    haven't figured this out completely.

7    Q.  Okay.  And could you—if you're able to estimate, how much

8    time has your staff spent thus far in this project alone, which

9    is identifying the 338 candidates?

10   A.  Well, it takes—I could do maybe four patient reviews per

11   hour.  I probably was at least twice as fast as most of them.

12   And that they've gotten through a third of 32,000 patients.  So

13   whatever that calculates out to.

14   Q.  Okay.

15   A.  I was paying some people overtime to do it also.

16   Q.  Okay.  You mentioned a moment ago wanting to slow down so

17   that you can get the pain assessments going?

18   A.  Right.

19   Q.  Are you referring to the pain assessments that are detailed

20   in the June 12th order?

21   A.  Yes.

22   Q.  Okay.  Can you describe to me the process that you've

23   undertaken to comply with that piece of the order, which is the

24   pain assessments.

25   A.  First—first issue, of course, is that we've got to figure

1   out how we can audit that this is occurring, and easily pull

2   those encounter reports in so that they can be produced.  And

3   so that was——since I had already been working on forms for pain

4   assessment because I was trying to put together a chronic pain

5   toolkit for providers to refer to if they found it was useful

6   to use the forms, that I put together some of those forms that

7   we were already working on and so that there would be something

8   that was much easier for us to identify within a chart as

9   compared to another encounter note which could be, you know,

10  mixed in with their hypertension follow-up and everything else

11  and just make it very difficult for us to be able to identify

12  where this is, and also for them to produce——we also——we asked

13  ITS to create some codes so that it was easier for them to know

14  that an appointment was made specifically for this.  They of

15  course could use an appointment for anything, but that way we

16  at least have this in; we could then start pulling up, based on

17  the 338 codes, pulling up the list of the patients that need to

18  have these.  We can then see if they're at least getting the

19  appointment referral in and whether it's getting scheduled.

20  And we can follow that and see if it's happening in a

21  reasonable period of time.

22      We also had ITS make us a shared mailbox so that we——so

23  that when they get it done, they're told that they need to scan

24  a copy of that to our mailbox so that way we can produce it to

25  you and to plaintiff's counsel.

Q.  And to confirm, you created a new form for this
specifically.
A.  I created two new forms——one for the annual assessment that
has more detail in it, and one for the——just the quarterly
assessment, just to make sure there are some things written in
there and that they don't forget, just to kind of jog their
memory.  This is not a form that——that limits what they can
write.  They can also write anything in addition within the
medical record.  But I made those forms just so I'd have
something to refer to.  There are some of our providers who are
just great at writing notes, and that note would suffice.  But
for some of our providers, I think they've got to get an idea
this is what we're looking for, we want a little bit more
information.  And that also makes it easy for any of our folks
who are trying to audit, trying to identify, trying to find
these forms.

     So we also revised one of the forms.  So there's a form
that is filled out when somebody transfers into a facility.
Whether——well, basically usually interfacility transfers.  And
there's a number of medical issues that get put on there, and
medical history and medication lists are put on there, so that
they're at least looking to see, does this person have a
chronic pain issue that warrants a 338 on the medical problem
list.  So those forms went out with the instructions to do the
assessments as per 1.24A, and to send those scanned encounter

1  forms so that we can produce them.

2  Q.  Okay.  Thank you.

3     Did you wait until you've completed creating the forms

4  before the pain assessments for purposes of the order began?

5  A.  Well, so you're asking when did I create the forms or when

6  did I release them so that they were available?

7  Q.  Both.  We'll start with the first one.  When did you create

8  the forms?

9  A.  I had been working on them and I hadn't finished.

10  Q.  When were they completed?

11  A.  They were completed basically almost as soon as the order

12  came out, 'cause all I had to do was add a couple things on to

13  it, and review them with your office, so they were pretty much

14  ready to go.  So we put them out with——I put out two memos when

15  the order came out.  The first on the list, make sure, to all

16  superintendents, to make sure that all of the health care staff

17  did receive a hard copy of the order; and the second memo was

18  after ITS had gotten us all of those new type of service codes,

19  appointment codes, problem list codes that we wanted to be able

20  to track, in addition to the shared mailbox.  Once that was

21  done, then I sent out the second memo, which included those

22  instructions, the new forms, and——and also a summary form,

23  because with all of our new codes and such, as far as the

24  appointment times, that it gave them kind of an easy way to

25  follow.

1    Q.  And when did the pain assessments begin, for purposes of
2    the preliminary injunction order?
3    A.  Well, for the order itself, I mean, some of them could have
4    been shortly before that just because it depends on when their
5    338 code got put in.  However, once we had that in place, we
6    did start seeing some of them coming through the mailbox.  So
7    we've got some coming into the mailbox, but what we need to do
8    now is to make sure that we're going to go through our 338
9    report and make sure that folks are at least scheduled, at
10   least they have a referral in there, and that we look back to
11   see who has actually had primary care encounters recently,
12   basically since about the time that the order came out, so that
13   if somebody did do an annual assessment because they were
14   already following 1.24A before, that it was before the form was
15   available, that if that is an appropriate encounter, that would
16   produce that.
17   Q.  What, if any, response have you received from the providers
18   in the field regarding these pain assessments?
19   A.  The——I've only had a few responses.  The——something I
20   have——I've had somewhat frequently from——more so from the
21   nursing staff, because they're the ones who are bringing the
22   patients in or seeing that patients are refusing, some of these
23   patients that we probably put through 338 on, and it wasn't
24   applicable to them because they said, *I don't see why you're*
25   *having me come in for this, I don't have a pain problem,* and

1    then when——I haven't looked at all of the assessments that have

2    come in, and there's been mixed information on them as far as

3    whether it looks like this was a new——there was new information

4    coming out to the provider.  And so it was helping.  Then to

5    get a better history and to think more about that chronic pain

6    situation, what to do.  That's several that have said no change

7    in the plan because they were already seeing the patient.  I've

8    had providers tell me that the patients ask, *Why are you doing*

9    *this?  I see you all the time anyway.  We're talking about the*

10   *same thing we always talk about.*  So in some ways that's nice

11   to hear that the patient feels they've already had

12   communication with their provider.

13       And so it's been a mix, but we haven't had a lot of them

14   yet, so it's still early.

15   Q.  Okay.  Based on what you know thus far, how has the pain

16   assessment process affected the delivery of health care at

17   DOCCS?

18   A.  Do you mean specifically the order?

19   Q.  The process of the annual pain assessments as required by

20   the order, that specifically the provider is using the form

21   that you created.

22   A.  The form and the requirement that we required them to have

23   an appointment that's specific to this, it——there has been a

24   lot of——there has been a lot of concern just because it's an

25   additional appointment, and if the patient's already been seen

1    regularly and they've been discussing any complaint that they

2    had, that there's a concern that we're adding workload that

3    isn't necessary and it's not going to produce any positive

4    effect.

5    Q.   Okay.  Do you agree with that, Dr. Moores?

6    A.   I do, and the reason I do is because if——for competent

7    providers and with patients who are cooperative with their

8    providers, meaning they give a complaint and then they work

9    with their provider and communicate with their provider, when

10   all of that occurs, this isn't necessary.

11       If I have a provider who maybe isn't as competent in this,

12   this is not a great skill set that they have, even if we have

13   them have this appointment and fill out the form, I'm not

14   convinced that it changes anything with their evaluation and

15   treatment for their chronic pain.

16            THE COURT:  May I just interrupt for one minute.

17            By that last answer, were you saying that the

18   competent providers don't need this and the incompetent

19   providers aren't helped by it?

20            THE WITNESS:  Correct.

21            THE COURT:  Okay.

22   BY MS. KILEY:

23   Q.   Why do you believe they're not helped by it?

24   A.   Because what will happen is they fill in the——they fill in

25   the form, and they might get a little bit better history with

N971ALL3                        Moores - Direct

1   it, but if they don't quite know that maybe they should

2   consider more of an evaluation with testing or specialty

3   referral or consider a different treatment, having the specific

4   appointment and having a specific form doesn't get them there.

5   Q.  And just turning back to your testimony from earlier, that

6   having only gone through one third of the entire patient

7   population at DOCCS and now the number is already at——I believe

8   you said it was approximately 2500, how is this going to——over

9   time, what do you foresee as far as the workload on the

10  providers, particularly in the facilities where there's only

11  one provider?

12  A.  This is a——this is a big workload.  It's a big workload,

13  and it's a big workload for——for the entire health care staff,

14  and they've got to fit in that and also worry if they're

15  putting that in and the patient's already been taken care of,

16  or if the appointment isn't going to give them something that

17  they——something new that they need, then you took up an

18  appointment spot, and it could be that you're delaying care

19  with diabetes or hypertension, or delaying care with somebody

20  who did put in a request to be seen for something else.  And

21  that's my concern, because we're always trying to deal with the

22  fact that our staffing isn't what we would like.

23  Q.  Dr. Moores, do you have any other concerns about compliance

24  with the PI order that we haven't already talked about?

25  A.  I can't think of anything right now.

N971ALL3                         Moores – Direct

1              MS. KILEY:  Okay.  Thank you very much.  I have no

2     further questions.

3              THE COURT:  Is this a good time to take a break?

4              MS. KILEY:  I think so.

5              MS. AGNEW:  Your Honor, could we take——we have to pull

6     some exhibits together——10 minutes, 15?

7              THE COURT:  Yes, ma'am.

8              MS. AGNEW:  Thank you.

9              (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURT:  Ms. Agnew.

2    BY MS. AGNEW:

3    Q.  Good afternoon, Dr. Moores.

4    A.  Good afternoon.

5    Q.  It's weird to say that when I (inaudible) every day.

6         So, I want to start to address some of the issues you

7    raised with your counsel's inquiry.

8         First of all, I think you spoke about the staffing levels

9    within DOCCS facilities.  Correct?

10   A.  Yes.

11   Q.  And you mentioned that there are some facilities that only

12   have one provider, correct?

13   A.  Correct.

14   Q.  And isn't it true, though, there are some facilities within

15   DOCCS that have historically only had one provider?

16   A.  I don't actually know the history.

17   Q.  OK.  Do you have any reason to believe that's not true?

18   A.  I don't know.

19   Q.  And I think you went over the MWAP list with your counsel,

20   correct -- and I'm referring to the list attached to the policy

21   itself?

22   A.  Yes.

23   Q.  OK.  And I think you testified that there were no

24   prescribing restrictions on, for instance, the drugs that are

25   part of the formulary.  Correct?

1   A.  They can always be prescribed.  Sometimes there's

2   restrictions for how much you can give at a time before you

3   have to refill.

4   Q.  OK.  And isn't it true there are restrictions on how

5   much -- how long you can prescribe -- those muscle relaxers,

6   for instance, that you mentioned?

7   A.  There are some -- there's some policy work that talks about

8   that, but they can put in nonformulary for us to change.

9   Q.  OK.  But there are still policies in effect?

10  A.  There are --

11  Q.  -- that create --

12      Let me finish.

13  A.  -- policies.

14  Q.  -- that create restrictions on some of those medications

15  that are formulary, correct?

16  A.  There are still policies that have some of those

17  restrictions listed.

18  Q.  OK.  And have you, since you've been in office as the chief

19  medical officer, have you revised the formulary?

20  A.  As chief medical officer, I know I've had a couple of

21  revisions.  I don't recall what they were.  My new pharmacist

22  in the central office is going to get us into an electronic

23  version so it will be easier to refer to.

24  Q.  OK.  And I think your counsel discussed with you whether or

25  not there are facility health services directors with their own

N97Wall4                           Moores - Cross

1    policies.  Correct?

2    A.  Yes.

3    Q.  OK.  And you said I haven't seen any evidence of that?

4    A.  Correct.

5    Q.  OK.  Did you contact each facility and ask them, in fact,

6    if they had any facility-specific policies?

7    A.  Can you clarify what you're asking?

8    Q.  Did you pick up the phone or write an email to each

9    facilities health service director -- and I imagine there'd be

10   approximately 44 -- and ask them, do you have any

11   facility-specific policies, whether written or unwritten, that

12   you currently enforce --

13   A.  No.  I --

14   Q.  -- regarding medical?

15   A.  No, I did not do that.

16   Q.  OK.  I think you described for the record Dr. McGurty at

17   Bedford Hills, in fact, having an informal policy, where his

18   providers discuss the prescriptions with him beforehand to make

19   sure they're appropriate.  Correct?

20   A.  That's part of the nonformulary approval process that he

21   does.

22   Q.  OK.  But that's that he does, correct?

23   A.  Correct.

24   Q.  So that is a policy specific to Bedford Hills.  I'm not

25   criticizing that, by the way.  But what I want to know is,

1    isn't it true that is a facility policy specific to Bedford

2    Hills implemented by Dr. McGurty?  Correct?

3    A.  It depends on your definition of policy.

4    Q.  Well, doesn't he demand it's done that way?

5    A.  That's what he requests of his providers in order for him

6    to be the one to approve the nonformulary, when he's the one

7    who is doing the approvals for Bedford Hills.

8    Q.  OK.  I appreciate that, but -- so, can we revisit this

9    question of whether there are facility health services

10   directors who have their own policies about prescribing

11   practices?  Because it sounds to me like Mr. McGurty does --

12   Dr. McGurty.

13   A.  I apologize.  Policy, in our agency, is a specific approved

14   document.  So I tend not to think of it as a procedure.

15       If you're talking about procedure, if they're having a

16   procedure that they set up at their facility, I didn't ask if

17   any of them have specific procedures that they set up at their

18   facility.

19   Q.  OK.  You described -- and we're going to call it a

20   procedure.  It doesn't matter.  I think we call it custom or

21   policy or procedure, whatever we want, but you described a

22   procedure at Woodbourne, right, that Dr. Ruiz had in which she

23   said I'm going to cut off prescriptions and I'm, in fact, going

24   to direct my two mid-levels to do the same thing?  Correct?

25   A.  Correct.

N97Wall4                              Moores - Cross

1    Q.  OK.  And that wasn't written, correct?

2    A.  As far as I know, it was not written anywhere.

3    Q.  OK.  And isn't it true you learned about what was going on

4    at Woodbourne from my office?  Correct?

5    A.  You were one source.  You weren't the only source.

6    Q.  OK.  But there were multiple instances when I wrote emails

7    to your counsel, which they then forwarded to you, correct?

8              MR. NOLAN:  Objection.

9              MS. KILEY:  Objection.

10             MR. NOLAN:  Attorney-client privilege.

11             THE COURT:  I'm sorry.  It doesn't ask for any

12   content, counsel.  Were there emails that were forwarded,

13   right?

14   BY MS. AGNEW:

15   Q.  I definitely don't want to know anything your counsel said

16   about the emails, and I don't want to know how you responded to

17   your counsel.  What I want to know is did they forward emails I

18   wrote about Woodbourne?

19             MR. NOLAN:  Renew the objection.  I'd ask for a

20   ruling.

21             THE COURT:  Counsel, first of all, we can't hear you

22   because you don't have your microphone.

23             MR. NOLAN:  Renew the objection.  I would just ask for

24   a ruling.

25             THE COURT:  Tell me why it is privileged.

1           MR. NOLAN:  Because the content of the communication

2     necessarily includes communication from her office, so we are,

3     in effect, communicating if that's the case.

4           THE COURT:  First of all --

5           MR. NOLAN:  -- subject matter.

6           THE COURT:  Overruled.

7           MR. NOLAN:  Reviewing the subject matter.

8           THE COURT:  Overruled.

9           MR. NOLAN:  (Inaudible) communication.

10    BY MS. AGNEW:

11    Q.  Dr. Moores, do you need the question again?

12    A.  No.  I think I understand the question.

13         I do know -- however it got to me, I don't always keep

14    track of what comes through that office, or whatever.  But I

15    know that there's times where I have had information from your

16    office that -- about issues with medications that occurred at

17    Woodbourne.

18    Q.  OK.  And that there were repeated instances, in fact?

19    A.  I -- I can't remember specifically all the ones that came

20    from your office.

21    Q.  OK.  Do you recall an email specific to Mark Daniels on

22    April 27 of 2023, in which I stated "I've given Dr. Moores

23    ample opportunity to address the issues with Dr. Ruiz"?

24    A.  I don't recall that specifically.

25    Q.  OK.  But you did testify that then you started to look into

1    Dr. Ruiz in May of 2023, right?

2    A.  I did look into -- yes.

3    Q.  OK.  So let's go back to these facility-specific policies,

4    and I think we agree that Dr. Ruiz had her facility-specific

5    procedure, policy, whatever you want to call it.  Have you

6    reached out to each facility to ensure that they don't have

7    their own policies and procedures which violate 1.24A?

8    A.  No.

9    Q.  OK.  And I think you also talked about an issue with

10   Dr. Kim.  Correct?

11   A.  That's correct.

12   Q.  OK.  And isn't it true the instance that you're describing

13   in which Dr. Kim discontinued medications was about our class

14   member Wayne Stewart?

15   A.  Yes, it was.

16   Q.  And the information about Mr. Stewart's discontinuation

17   came from my office as well, correct?

18   A.  That's correct.

19   Q.  OK.  Now, do you recall sitting in this courtroom in

20   February of 2023, when we did the preliminary injunction

21   hearing?

22   A.  Yes.

23   Q.  And do you recall testimony from a number of my clients?

24   A.  I -- I recall that your clients did testify.

25   Q.  OK.  After you heard my clients testify, did you take any

1   actions to ensure that my clients got the treatment that they

2   needed?

3   A.   I don't recall specifically for those clients.  After that,

4   I did start pulling the prior MWAP denials to start going

5   through all of those to see if, out of that whole list, what's

6   going on with them, of those that are still incarcerated.

7   Q.   OK.  Well, let's go back to my clients who testified.

8        There was a gentleman, Felipe Rivera-Cruz, who had very

9   severe foot issues.  Did you take any actions to see that

10  Mr. Felipe Rivera-Cruz was transferred to a regional medical

11  unit shortly after the hearing?

12  A.   I don't recall if it was -- I don't recall doing that.  I

13  do recall on more than one occasion having my central office

14  staff go check on him to see what was going on, because it

15  didn't make sense.  That was the information I was getting.

16  Q.   And what do you mean it didn't make sense?

17  A.   The information I was getting from your office, that it,

18  it -- I couldn't really figure out what was going on based on

19  that.  And so I sent a provider in to -- to take a look.

20  That's all I can remember --

21  Q.   OK.

22  A.   -- off the top of my head.

23  Q.   Was that Patricia Pulver?

24  A.   That's one of them.

25  Q.   You sent her over to Shawangunk, correct?

N97Wall4                        Moores - Cross

1  A.  I did.

2  Q.  OK.  And then she examined a number of my clients at

3  Shawangunk, correct?

4  A.  She actually went there to see multiple patients.

5       THE COURT:  Would you spell Patricia Pulver's name,

6  please.

7       THE WITNESS:  Pulver is spelled P-U-L-V-E-R.

8       THE COURT:  Thank you.

9  BY MS. AGNEW:

10  Q.  And isn't it true a number of my clients at Shawangunk

11  finally received treatment after Ms. Pulver went and examined

12  them herself?

13  A.  She saw patients in addition to that.

14  Q.  OK.  But she saw my patients too, correct?

15  A.  Some of them, I believe, were your clients.

16  Q.  OK.  I think you testified earlier about circulating a hard

17  copy of the order.  Correct?

18  A.  Correct.

19  Q.  And you said you sent it to the superintendents of the

20  facilities, correct?

21  A.  The memo was sent to them.

22  Q.  OK.  The memo was sent to them; who was the order sent to?

23  A.  The memo was sent with the order accompanying, with the

24  instruction that they are to give a hard copy to the healthcare

25  staff.

```
1    Q.  OK.  And how did you confirm that indeed each member of the
2    healthcare staff received a copy of the order?
3    A.  They had -- they required the superintendent to have them
4    sign for them and then send us the signed documents, and I have
5    a central office staff who was -- who is compiling them.
6    Q.  OK.  But these were circulated ten days after the order was
7    entered, correct?
8    A.  It was done -- yes, it was done very shortly after that.
9    But we still had a few coming just because some people were out
10   for extended absences.
11   Q.  OK.  That's fair.  But how long does it take to compile
12   back these receipts, so to speak?  They should have come back
13   in June, correct?
14   A.  They did come back rapidly.
15   Q.  OK.
16   A.  Uh-huh.
17   Q.  And so, has somebody rectified that list and ensured that
18   every member of the medical staff has received a copy of the
19   order?
20   A.  I have -- I have staff who's been looking at it, and I -- I
21   don't know for sure that absolutely everybody is on there.
22   Q.  OK.  You also talked about circulating instructions with
23   the new forms, correct?
24   A.  Yes.
25   Q.  OK.  So next to you is a pile of documents.
```

N97Wall4                      Moores - Cross

1    A.  Uh-huh.

2    Q.  And I'm hopeful that in there is one marked P120.

3            MS. KILEY:  Do you have a copy?

4            MS. AGNEW:  I think I just put your --

5            MS. KILEY:  Thank you.

6    A.  Yes, I have P120.

7    Q.  OK.  I don't want to talk about the contents of the

8    document, the handwritten parts, because I know you didn't

9    write that, but what I want to ask you is if you know what this

10   document is.

11   A.  This is the version of the document that we initially put

12   out for doing the annual individualized chronic pain

13   assessment.

14   Q.  OK.  And when you say it's the initial version, has a

15   subsequent version been circulated?

16   A.  No, but we want to be open to revising it as people tell us

17   what works and what doesn't.

18   Q.  OK.  So, where was this document circulated to?

19   A.  It was sent out with a memo to executive staff and to the

20   FHSDs.

21   Q.  OK.

22   A.  And I think to the NAs too.  I'm not sure.

23   Q.  OK.  And is it true that in at least two facilities they

24   started using the documents, correct?

25   A.  I don't know how many facilities, but we've been getting

1    some of them back.

2    Q.  OK.  Can you tell me where on this document -- is there

3    somewhere for the provider to acknowledge whether or not the

4    patient lost medication during the MWAP period?

5    A.  No, there isn't anything on this for that, anything on this

6    form that -- that asks about that.

7    Q.  OK.  So, this specific form, you identified what this form

8    is, correct?

9    A.  I -- I identify it as something that's titled annual

10   individualized chronic pain assessment form.

11   Q.  OK.  And you took part in drafting this document itself,

12   correct?

13   A.  Yes.

14   Q.  OK.  I'm just curious.  So, can we agree this document

15   pertains to a patient named Michael Torres?

16   A.  The name Michael Torres is at the top.

17   Q.  OK.  So, I just don't understand where on this document

18   would his provider have noted that, in fact, he lost Neurontin

19   during the MWAP period.

20   A.  There isn't anywhere on this form that we would indicate

21   that they should ask that question.

22   Q.  OK.  So would the provider know that this particular

23   patient lost effective medication during the MWAP period?

24   A.  No.

25   Q.  OK.  So how have you gone about identifying the actual

1   patients who lost their medications during the MWAP period and

2   seeing to it that they specifically gain a reassessment?

3   A.  I was in the process of going through the list of those

4   that are still in our custody when the order came out and I had

5   to stop in order to do all of the work that had to go with the

6   order.  I was starting to do that.  I was pulling them.  I was

7   looking up on our sips.  Some of them were -- had gotten the

8   medication.  Some of them I couldn't tell from looking at sips

9   and FHS1, and it's going to require getting their medical

10  records or having somebody go out and check or to talk to the

11  patient.  And then some you could tell by the MWAP denial that

12  it was something that wasn't relevant normal; it was something

13  just a short -- for example, a short-term medication, post-op

14  or a short-term sinus medication, things that weren't really

15  involved with chronic pain, or it was for a treatment that

16  didn't have to do with the chronic pain syndrome.

17  Q.  OK.  And we discussed, I think, the last time you testified

18  the Project Bob database, correct?

19  A.  I had been told about it last time.

20  Q.  OK.  And I think the last time you testified I told you

21  your counsel has a copy.  Correct?

22  A.  I don't know that for sure.

23  Q.  Did you ever ask your counsel for a list of the patients

24  who lost their medications during the MWAP period?

25            MS. KILEY:  Objection.  Attorney-client privilege.

1           MS. AGNEW:  I'm just asking if she asked for it.  I'm

2     not asking about any legal advice or the solicitation of legal

3     advice.

4           MS. KILEY:  I renew my objection.

5           THE COURT:  Overruled.

6           You may answer, ma'am.  Do you need the question

7     again?

8           THE WITNESS:  No.  Thank you.

9     A.   The -- I did not ask my attorneys' office for it.  I asked

10    the central office folks, because I knew that in the past they

11    were involved with producing these lists.  And so I asked, are

12    they still -- is it still available partly because I wanted

13    them to take the list I was -- I'm not interested in the

14    approvals.  I'm interested in the -- I was interested in the

15    denials.  I'm less interested in basically any of them for

16    those that are still incarcerated.  So I did have somebody run

17    that against our -- our research unit was able to tell which

18    are still incarcerated, because if they're not with us anymore

19    there isn't anything that I can do, and -- so that was what I

20    was starting to do, was to look at those that still had, those

21    that had forms that are still incarcerated, and I'm starting to

22    go through that.

23         Some of them were very easy, like I said; I could tell

24    which medication they wanted; it was reasonable to think it was

25    chronic pain and that sips showed that currently they're

N97Wall4                         Moores - Cross

1   getting that medication and that they're getting medical care.

2   But all I have available to me in the central office is to look

3   at pharmacy sips history and to look at FHS1 that can tell me

4   the medical problem list, and that doesn't tell me how they're

5   getting care.

6              THE COURT:  Just A little more slowly.

7   A.   The specialty referral list is in there also, so I can see

8   whether or not they're going to a specialist and if they put in

9   a post-note about what's going on there.

10       Not all of our facilities are using sips right now, because

11  when the central automated pharmacy had to shut down due to a

12  contract issue, we had to take some of our pharmacy source and

13  send it, and use contracted vendors in the -- in the community.

14  And so then there's not an electronic version of those ordered

15  medications.

16       If they have a pharmacist available that's assigned, they

17  will enter in that information, but we're -- we don't have

18  everything there.  So the next step, as I was reviewing these,

19  was for those that looked like they have a chronic pain and

20  it's not clear that they're on the medication now or something

21  that's within that class, then it was going to require doing

22  some investigation.  And that I had been working on, put it

23  aside as I was trying to make sure I had all the paperwork done

24  for the order.  But I'm very interested in continuing that.

25  Q.   OK.  But just to clarify, when you say you were looking at

N97Wall4                      Moores - Cross

1   the MWAP request forms, you were looking at denied forms,

2   correct?

3   A.  I was looking -- although those are the ones that I paid

4   the most attention to initially, but I was looking at

5   anybody --

6              THE COURT:  Slowly, slowly.

7   A.  -- anybody who's still incarcerated and all their forms.

8   And so I did have both the approvals and the denials.  And in

9   your -- I did see approvals that were clearly to taper.  So

10  approvals also give information.  But I had all of them pulled

11  for those that are crossed with, currently on our incarcerated

12  list.

13  Q.  Would you be willing to accept a list from my office?

14  Because we have one, and you don't have to do all this work.

15             MS. KILEY:  Objection.

16  A.  I would have to consult with my attorney.

17             MS. KILEY:  I would just object.  This calls for

18  speculation.

19             THE COURT:  It doesn't call for speculation at all.

20             MR. NOLAN:  Your Honor, what she's willing to do or

21  not to do is not evidence and is not a fact by which she should

22  be -- that should be relevant to this.

23             MS. KILEY:  Counsel's essentially making a document

24  demand by way of testimony.

25             MS. AGNEW:  I'm not making a document demand.

1            THE COURT:  No, she's not.

2            MS. AGNEW:  I'm offering to produce something.

3            THE COURT:  Counsel said would you be willing to

4    accept a document from me.

5            MS. KILEY:  Forgive me.  I just meant an exchange of

6    some sort of document --

7            THE COURT:  I didn't hear anything about exchange.

8            MS. KILEY:  Counsel's looking to elicit further

9    discovery through trial.

10           MS. AGNEW:  I am not asking for discovery.

11           THE COURT:  What discovery was she looking to elicit?

12           MS. KILEY:  She wants to -- it appears that she's

13   looking to offer Dr. Moores a list of patients that she thinks

14   need to be evaluated as far as what MWAPs they may still have

15   or not have.

16           THE COURT:  OK.  And so what discovery was that that

17   counsel was seeking to elicit through trial?

18           MR. NOLAN:  Your Honor, can we get a ruling?

19           THE COURT:  Denied.

20           MR. NOLAN:  Thank you.

21           MS. AGNEW:  Thank you.

22   Q.  My only question to you, Dr. Moores, would you be willing

23   to accept a list from my office of patients who lost MWAP

24   medications, and there's a request form, who are still in

25   custody?

1    A.   I -- I -- I'd be fine with it coming.

2    Q.   That's all you have to say.  We appreciate that.

3         OK.  And I think you testified that you haven't reviewed

4    all of these.  Correct?

5    A.   That's correct.

6    Q.   OK.  But you have reviewed some of them, correct?

7    A.   Yes.

8    Q.   OK.  And so what's the plan for getting these reassessments

9    done?  And I fully appreciate it can't be done in 30 days, but

10   what is the plan, moving forward?

11   A.   I -- my central office staff is going to just clarify that

12   the appointment referrals are getting put into FHS1 systems so

13   that we can see that that -- that it's being planned and that

14   it gets scheduled and that we keep track of the facilities to

15   make sure -- considering how many they might have, that they're

16   doing a reasonable number per month, so that they're getting

17   done in the six-month time frame.

18   Q.   OK.  And I think you were referring to this form when you

19   said competent providers don't need it and it won't help

20   incompetent providers.  I'm paraphrasing, so forgive me.  But

21   is this the form you were alluding to?

22   A.   Yes.

23   Q.   OK.  How do you know who the competent providers are and

24   who the incompetent ones are?

25   A.   I -- although I wouldn't use incompetent across the board,

N97Wall4                    Moores - Cross

1    many times we have providers where they're, their abilities,

2    their skill sets are limited in certain areas of medicine.  And

3    so there's -- until we review things that they've been doing,

4    there's -- there's no way for me to tell until that.  So I find

5    out because there's many, many different scenarios.  You know,

6    pain evaluation and treatment is just one portion of medicine.

7    There are so many ways that I find out about concerns or some

8    less-than-stellar approaches, and so those are how we end up

9    finding out.

10        I'll be reviewing the record for other reasons, such as for

11   medical parole, realize there's something I have a concern

12   about, and then I'll -- I'll contact a, either a physician

13   that's in that area or I'll send Dr. Khan to go take a look,

14   see whether that is really what's going on or I'll do it myself

15   and see if we have a situation where there needs to be

16   education or -- or something else.

17   Q.  Is there a reason, if you can determine the competent

18   versus the incompetent, we can't move patients with chronic

19   pain conditions that need a heightened level of care or a

20   competent provider to those competent providers?

21   A.  That sometimes -- for chronic pain, that -- I mean I do

22   this with other issues.  I do.  I do this with other issues.

23   So for chronic pain, sometimes that is an appropriate thing to

24   do.  When we've got a facility that we see for a complex

25   medical situation, because many times for chronic pain, chronic

1   pain is just one of their symptoms.  Many times they have a

2   very complex medical situation.  If they've got a chronic pain

3   syndrome that isn't easily addressed by the common provider,

4   they are complex, and that if we have a facility that their

5   current statuses of provider mix maybe isn't that strong,

6   sometimes the best answer is to move them.

7       So periodically I do end up arranging for movements with --

8   with patients.

9               THE COURT:  Try to slow down a little bit, please.

10              THE WITNESS:  OK.

11  A.  Sometimes they -- unfortunately, sometimes the patient's

12  not so happy about that, because the environment they were in

13  from a social standpoint and a program standpoint was working

14  for them.  But it's much easier for me to move them to a

15  facility that can give the right kind of health care they might

16  need for their complex situation as compared to moving, trying

17  to set up new providers.  That's much harder to get into the

18  system.

19  Q.  OK.  But there might be a solution.  It might be a tough

20  one, but there might be a solution, correct?

21  A.  Specifically?  A solution for --

22  Q.  For the fact that the incompetent providers this may not

23  help.

24              THE COURT:  This, as in --

25              MS. AGNEW:  I'm sorry.

1           THE COURT:  -- P120.

2           MS. AGNEW:  P120, yes.

3   A.  Do you mean something to do with the providers that

4   aren't -- aren't as competent at complex pain patients?

5   Q.  Yes, ma'am.

6   A.  Yes.  As I -- and again, the skills for chronic pain are

7   just one of them.  I -- I'm trying to beef up our, our ring of

8   competent physicians.  Many times the best way for a physician

9   with a, sort of a deficit in some area or another level

10  provider who's just got a deficit in some area, although you

11  can give them reading material, you can give them didactic

12  presentations, many times that won't really change and update

13  their abilities in that they really need a mentor and a model.

14  And I'm trying to beef up our physician ring that is at that

15  level so that we have them in the various hubs, and then when

16  we identify that somebody has a weak area, that I can send that

17  person over to spend some time with them, give them feedback,

18  give them encouragement and that we can identify is this person

19  teachable or are they not teachable?  Because if they're not,

20  we need to move them out.  If they're teachable, we need to

21  teach them and we need to audit for a period of time

22  afterwards.

23  Q.  And one thing I didn't hear you mention when your counsel

24  was asking you questions is about the training that you

25  undertook with all of these providers DOCCS-wide pursuant to

1   the preliminary injunction.  Can you tell us what training

2   ensued?

3   A.  We did do a training.  It was -- the first ones were in

4   person.  And our nurse education unit did a PowerPoint that

5   went through piece by piece of 1.24A, and they did a training

6   at every single facility.

7      They also did train-the-trainer instructions so that every

8   facility has individuals who now could train those who weren't

9   there during those shifts that the presentation occurred and

10  those who came on later, new hires, or had been on vacation.

11  Q.  OK.  And how do you -- how are you keeping track of who's

12  been trained?

13  A.  They do a report-of-training form, and that is going into a

14  database that's being kept by the nurse education unit.

15  Q.  So, one last thing.  You know, we talked about the issues

16  with patients losing their medications upon transfer to

17  Woodbourne.  Have you done anything to ensure that those

18  medication discontinuations at transfer aren't happening at

19  other facilities?

20  A.  I don't have anything that guarantees that it doesn't

21  happen.  However, my new central office pharmacist is starting

22  a project so that he can try to really collect a lot of

23  information on that.  Because my gut feeling is that some

24  facilities are really great at this and other facilities aren't

25  and that we've really got to identify, are there certain places

1    that are not doing well?  And that it needs to be addressed in

2    a very objective manner.

3        I'm certainly hoping that we actually move to a more

4    sophisticated system once the electronic health record gets in.

5    We have several things on the horizon that I think will start

6    to take care of this, but it's going to take us a while to get

7    there.  The electronic health record is right at the very end

8    point of the contract.  They finished -- finally got an

9    agreement with the money.  They're just writing up the contract

10   now, and then the vendor can implement.  I would say probably

11   the end of this calendar year, beginning of next calendar year,

12   they'll be able to pilot in the female facilities, give it a

13   few months to make sure if we have any glitches.  And then by

14   next year question should at least have the electronic health

15   records so finally we can read what we're trying to look at

16   and -- and produce it from -- and look at it from various

17   places.

18       And then after that we're going -- oh, meanwhile, we're

19   also going to -- I'm getting the final proposal together to get

20   permission from the commissioner to start putting the

21   pharmacies back into the facilities.  They had pulled them out

22   when they went to the automated pharmacy in central New York,

23   and that -- we realized that part of the problems with the

24   facility transfers was that some of the medications are stock

25   medications, which means even if everybody is doing the

N97Wall4                    Moores - Cross

1   transfer as the directive says, there's no medications that go

2   with them because they haven't been dispensed in their name.

3   And so if they're moving to another facility that doesn't have

4   that in stock because they don't keep that pharmacy stuff or

5   they don't have a pharmacy, then they have to order that

6   medication.

7       If they did not get the heads-up from the other facility,

8   either because they didn't keep everything organized or it was

9   a sudden transfer, then we have situations where even if

10  everybody realizes it, we can have a delay in getting the

11  medication.  So we're going to -- I'm going to propose that we

12  bring pharmacy back in also because we have a lot of young

13  clinical pharmacists that have come in to work for us, and they

14  can be a big help in reviewing medication lists, helping

15  patients with figuring out what their side effects might be

16  from, and to help providers with figuring out whether they're

17  on a medication combination that's a problem.

18      But then we'll get to electronic prescribing, and

19  everything will go into one place, so we'll know what

20  medications everybody's been ordered.

21          MS. AGNEW:  OK.  Dr. Moores, I have nothing further.

22  I do want to say you've done more for my clients than anyone

23  else within DOCCS.  So despite this, know that we appreciate

24  you.

25          THE WITNESS:  Thank you.

1          MS. AGNEW:  Truly, truly.

2          THE COURT:  Thank you.

3          Redirect, counsel, please.

4          MS. KILEY:  We would like to move P120 into evidence.

5          MS. AGNEW:  No objection.

6          THE COURT:  Received.

7          (Plaintiffs' Exhibit 120 received in evidence)

8   REDIRECT EXAMINATION

9   BY MS. KILEY:

10  Q.  Dr. Moores, very briefly, just going back to the form that

11  Ms. Agnew talked about, now in evidence as P120, this form is

12  intended for all of the patients who are being coded with 338,

13  is that right?

14  A.  Correct.

15  Q.  OK.  And so, therefore, it was not intended to be used

16  solely for the patients who formerly had medications

17  discontinued under MWAP, is that right?

18  A.  That's correct.

19  Q.  OK.  And on the second page of the form, in the middle,

20  where it specifically says what treatments or medications have

21  you been given for pain and then there's a little box where the

22  provider can list those medications, would you expect that any

23  medications that have been tried before would be listed there?

24  A.  Yes.

25  Q.  OK.  And you would expect that that would potentially

N97Wall4                           Moores - Redirect

1   include medications that were prescribed under MWAP?

2   A.  Correct.

3   Q.  OK.  Because the order, the PI, the preliminary injunction

4   order specifically requires that an individual assessment note

5   what past medications have been used to treat pain?

6   A.  Yes.

7            MS. KILEY:  OK.  I have nothing further.  Thank you

8   very much.

9            THE COURT:  Recross.

10            MS. AGNEW:  Nothing further.

11            THE COURT:  Dr. Moores, you may step down.

12            (Witness excused)

13            THE COURT:  Where are we now, friends?

14            MS. KILEY:  Your Honor, I think this -- as far as our

15   case, this would be all we have for today.  We are going to

16   make arrangements to have some rebuttal witnesses on tomorrow

17   after Dr. Dinello's testimony.

18            THE COURT:  OK.  Anything else on the record, friends?

19            Off the record.

20            (Discussion off the record).

21            THE COURT:  Thank you, friends.

22            (Adjourned to September 8, 2023, at 9 o'clock a.m.)

23

24

25

```
 1                    INDEX OF EXAMINATION

 2    Examination of:                         Page

 3     KENNETH WINDLEY

 4    Direct By Ms. Agnew  . . . . . . . . . . . 474

 5    Cross By Ms. Levine  . . . . . . . . . . . 489

 6    Redirect By Ms. Agnew  . . . . . . . . . . 498

 7     SAMSON BURCH

 8    Direct By Ms. Agnew  . . . . . . . . . . . 506

 9    Cross By Ms. Levine  . . . . . . . . . . . 515

10     MARC CONFESSORE

11    Direct By Mr. Jones  . . . . . . . . . . . 519

12    Cross By Ms. Levine  . . . . . . . . . . . 530

13    Redirect By Mr. Jones  . . . . . . . . . . 536

14     MIGUEL TIRADO

15    Direct By Mr. Morrison . . . . . . . . . . 540

16    Cross By Ms. Kiley . . . . . . . . . . . . 554

17    Redirect By Mr. Morrison . . . . . . . . . 569

18    Recross By Ms. Kiley . . . . . . . . . . . 572

19     CAROL MOORES MD

20    Direct By Ms. Kiley  . . . . . . . . . . . 576

21     ANTHONY JACKSON

22    Direct By Ms. Agnew  . . . . . . . . . . . 581

23    Cross By Ms. Kiley . . . . . . . . . . . . 593

24    Redirect By Ms. Agnew  . . . . . . . . . . 606

25     CAROL MOORES MD
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1    Direct By Ms. Kiley  . . . . . . . . . . . . 608

2    Redirect By Ms. Kiley  . . . . . . . . . . . 661

3                      PLAINTIFF EXHIBITS

4    Exhibit No.                              Received

5     70-73 and 140-143  . . . . . . . . . . . . 539

6     120   . . . . . . . . . . . . . . . . . . 661

7                      DEFENDANT EXHIBITS

8    Exhibit No.                              Received

9     23    . . . . . . . . . . . . . . . . . . 493

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```