N981ALLF

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PETER ALLEN, *et al.*,

4                    Plaintiffs,

5            v.                              19 Civ. 8173 (LAP)

6   CARL KOENIGSMANN, *et al.*,

7                    Defendants.
                                             Hearing
8   ------------------------------x
                                             New York, N.Y.
9                                            September 8, 2023
                                             9:07 a.m.
10
    Before:
11
                         HON. LORETTA A. PRESKA,
12
                                             District Judge
13

14                            APPEARANCES

15  AMY J. AGNEW
    JOSHUA L. MORRISON
16  VERONICA JOSIAH-ARYEH
         Attorneys for Plaintiffs
17
    WHITEMAN OSTERMAN & HANNA LLP
18       Attorneys for Defendant Moores
    BY:  WILLIAM S. NOLAN
19       ORIANA L. KILEY
         GABRIELLA R. LEVINE
20       JENNIFER M. THOMAS

21

22  Also Present:  Baron Jones, Law Student Clerk

23

24

25

1            (Trial resumed)

2            THE COURT:  Good morning, counsel.  Won't you be

3   seated.

4            And are we ready to resume with Dr. Dinello?

5            MS. AGNEW:  We are, your Honor.

6            THE COURT:  Good morning, Dr. Dinello.  I'll just

7   remind you that you're still under oath, sir.

8            THE WITNESS:  Good morning.  Yes, ma'am.

9            THE COURT:  Ms. Agnew.

10    DAVID DINELLO MD, resumed.

11   DIRECT EXAMINATION

12   BY MS. AGNEW:

13   Q.  Good morning, Dr. Dinello.  We may——

14   A.  Good morning.

15   Q.  ——backtrack a tiny bit on things we covered the other day,

16   okay?  And forgive me.  That's just because I don't have a

17   transcript.

18            I want to go back to the development of the MWAP

19   policy, and I believe that was in approximately 2015 when you

20   started working on that, correct?

21   A.  I'm not sure, but that sounds about right.

22   Q.  Okay.  And isn't it true that during that time frame you

23   started having discussions with providers in your hub

24   persuading them to stop prescribing some of these MWAP

25   medications, correct?

N981ALLF                    Dinello - Direct

1  A.  No, I wouldn't characterize it as persuading them not to.

2  We just explained the risk/benefits, different things to use,

3  and concern out there and the safety of our patients.

4  Q.  Okay.  And when you were developing the MWAP policy,

5  Dr. Dinello, isn't it true you were trying to create a

6  uniformity of thought regarding these medications?

7  A.  No, I wouldn't say—I wouldn't call it uniformity of

8  thought, no.

9  Q.  Okay.  We've actually sat for a number of depositions, you

10  and I, correct?

11  A.  Yes.

12  Q.  Okay.  And in fact, in July of this year, July 13, I took

13  your deposition in Syracuse, New York, correct?

14  A.  Yes.

15  Q.  And present at that deposition was your counsel, Mr. Keane,

16  correct?

17  A.  Yes.

18  Q.  And I was there?

19  A.  Yes, ma'am.

20  Q.  Okay.  We had a court reporter, correct?

21  A.  Yes.

22  Q.  And you were under oath, correct?

23  A.  Yes, ma'am.

24  Q.  Okay.  And do you recall I asked you this question and you

25  gave this answer:

1          "Q.  And so who then tasked you with writing the MWAP

2      policy?"

3          I'm going to warn you it's a long answer, Dr. Dinello.

4          "I think we brought it up as a concern and we noticed,

5      other medical directors noticed it's a huge problem, and the

6      way DOCCS is set up, its patients can travel from one prison to

7      another and they can be in all 50 prisons by the time they are

8      done with their 25-year bid, and there was no consistency.

9      Every doctor at every prison would do their own thing.  So the

10     need was to create some type of cohesiveness, where we could

11     think along one line of thought, because one patient would be

12     prescribed one med in one prison, he gets sent to another, and

13     that doctor thought something totally different and changed

14     them all up, and then he went to another prison, that guy

15     changed it all up.  Unlike blood pressure meds, which are

16     uniformly pretty──there is a standard, there is some kind of

17     outlined use, when you go to these kind of medications, there's

18     no outline.  So they were changed constantly, so we had to

19     develop some type of uniformity of thought."

20         Was that your testimony?

21         MS. THOMAS:  Could we please just get a page for the

22     record.

23         MS. AGNEW:  Oh, I apologize.  51──

24         MS. THOMAS:  Thank you.

25         MS. AGNEW:  ──14, and it goes through 52:14.

1   Q.  Is that your testimony, Dr. Dinello?

2   A.  Yes, if that's what you read, yes.

3   Q.  Okay.  So at least one of the objectives was to create a

4   uniformity of thought, correct?

5   A.  Yes, that's probably better characterized as continuity of

6   care, but I guess that's probably one and the same.

7   Q.  And I think that you believe a continuity of care can be

8   created if the patient in fact isn't getting the drug in the

9   first place, correct?

10  A.  No.  Continuity of care means the medications are carried

11  from place to place with not all the switching.

12  Q.  Okay.  So on that same date, I want you to recall that you

13  were under oath, correct?

14  A.  Yes, ma'am.

15        MS. AGNEW:  Okay.  So counsel, page 60:12-15.

16  Q.  And on that date, I want you to──do you recall being asked

17  this question and giving this answer:

18        "Q.  So is there continuity of care when they are just

19  not on the medication?"

20        Mr. Keane objects.

21        And you say:  "Yes, there can be."

22        So isn't it true a continuity of care can be created

23  when the patient is not on the medication at all?

24  A.  Continuity of care is──they're on the same medications, not

25  on other medications, yeah; continuity is both with medications

1    and without medications, yes.

2    Q.  Okay.  And then tell us——you may have already described

3    this, but——why did MWAP have to be a policy instead of a

4    guideline?

5    A.  Well, as you know, there was a serious epidemic——and there

6    still is——of substance abuse and addiction, which kills

7    obviously thousands of people, hundreds of thousands of people,

8    roughly, and we have a very vulnerable patient population, and

9    one of the problems that we were having is that——that doctors

10   weren't controlling some of these medications, and they don't

11   really follow certain guidelines, and they——it's a dangerous

12   situation, and our patient populations are so sensitive to it,

13   we had to be sure that our patients were safely taking the

14   medications that weren't going to make underlying issues worse.

15   Q.  Okay.  So why not train the providers on these new laws, if

16   that's what it was?

17   A.  Well, they're all supposed to be taking classes now,

18   especially with the VA registration on addictive substances,

19   that's something that they're requiring all providers have to

20   do.  In most of the——I don't know how many percentages that had

21   an X license and so they were familiar with the addictive

22   nature of these medications on——and it's been well written and

23   documented in medical literature, the names of these

24   medications.

25   Q.  Wait a second, Dr. Dinello.  Isn't it true that at least in

1    2018 you were the only doctor in DOCCS with an X license?

2    A.   Oh, I'm not—I don't think that's true.  I'm pretty sure I

3    knew of a few more that had their X license.

4    Q.   What was the X license to prescribe?  Why do you need an X

5    license?

6    A.   In order to get an X license, you have to take a class on

7    addiction and some training on substance abuse and addiction,

8    and it's pretty overall—it's broad, but then along with that,

9    you were only allowed to write this medication called

10   buprenorphine if you had the training in addiction under your X

11   license.

12   Q.   Okay.  But in 2018, within DOCCS, there were no

13   prescriptions for Suboxone.  I'm going to call it Suboxone

14   because I can't say the other word.

15   A.   I'm not too sure, and I believe there was—at like the

16   Bedford Hills, for pregnant women, I'm pretty sure there was

17   women on buprenorphine or methadone at that time, but I'm not a

18   hundred percent sure that nobody was on it during that time.

19   Q.   Okay.  But there was no MAT program in 2018, correct?

20   A.   No formal MAT program; at least in the male jails, prisons,

21   yes.

22   Q.   Okay.  So let's go back to these providers who—is it your

23   testimony you didn't trust them to properly prescribe these

24   medications and that's why it had to be a policy?

25   A.   No, not at all.  Just wanted the documentation of the

reasons why they need these medications.  I trust all my

providers.  Just wanted to make sure that we justified the use

of dangerous medications.

Q.  So how did you trust them but not believe that they had

justification to write these prescriptions?

A.  I just wanted to see it in writing.  I believe they're all

writing for the medications with the right meanings and the

right reasons; just wanted to see it and have a conversation,

open up dialogue about these medications.

Q.  Okay.  So when you saw the MWAP request forms for which the

providers, who you trusted, gave the medical justification, you

approved them all, right?

A.  Not if there's insufficient justification, no.

Q.  Okay.  So isn't it true you believe you reviewed between

2800 and 4,000 of these MWAP request forms?

A.  It was a lot, but if you say that number, that sounds about

right to me.

Q.  Okay.  That was your testimony previously, right, 2800 to

4,000?

A.  I think, yeah, roughly, 'cause I had to download them all

for a file.  I think there was—I don't know if it was 2800,

but it was close to that amount.

Q.  Okay.  And isn't it true that over and over and over again,

you denied these MWAP requests and you cited "insufficient

medical justification"?

1   A.  I don't know how—what percentage that was, but I'll take

2   your word for it.

3   Q.  Okay.  Is that your phrase, "insufficient medical

4   justification"?

5   A.  That sounds like something I would use.

6   Q.  Okay.  And isn't it true in fact you used that phrase to

7   start the denial of thousands of these MWAP request forms?

8   A.  I don't know if it was thousands, but that could be the way

9   I worded it, started it out.

10  Q.  Okay.

11  A.  I'm not sure.

12  Q.  And do you think you denied more of these MWAP requests

13  than you approved?

14  A.  I'm not sure.

15  Q.  Okay.  But you denied many, many, many, correct?

16  A.  Yeah, I don't know what "many" means, but yes, I denied—I

17  denied and approved hundreds of them, yes.

18  Q.  Okay.  So tell the Court, what does "insufficient medical

19  justification" mean in the context of you reviewing an MWAP

20  request form?

21  A.  Well, when a patient or a provider would want a medication,

22  we just needed the medical rationale behind the medication.

23  It's like if somebody had diabetes, just give us the numbers.

24  What's their daily glucoses or A1C?  And is there any organ

25  damage?  So with these medications, specifically we wanted to

1    know, was there any muscle atrophy, was there any weakness, was

2    there sign of any indication, what do the two-point

3    discrimination tests show, monofilament tests, laboratories

4    sent, (unintelligible), any sign of atrophy, documented nerve

5    studies, so some justification, medical justification that

6    would warrant the use of a dangerous medication.

7    Q.  So if there's no medical justification, from your

8    perspective, on the MWAP form, it got denied, correct?

9    A.  It wasn't my perspective.  On literature, when you give

10   these medications, there are certain indications of use, and if

11   there was no indication for use, based on the Physicians' Desk

12   Reference, the PDR, there wasn't sufficient medical

13   justification to warrant the use of these medications.

14   Q.  Okay.

15          THE COURT:  Excuse me.  Doctor, I'm just going to ask

16   you to go a little bit more slowly, please.

17          THE WITNESS:  Okay.  Sorry.

18   Q.  So the PDR is the Physicians' Desk Reference; is that

19   correct?

20   A.  Yes, ma'am.

21   Q.  Okay.  So it's your testimony that if the symptomology

22   wasn't covered within the PDR, you were not going to approve

23   the medication?

24   A.  No, not always.  Each case was taken case by case,

25   sometimes based on other literature.  We'd use not just the

1   Physicians' Desk Reference, but other criteria.

2   Q.  Does the Physicians' Desk Reference mimic FDA approvals?

3   A.  I'm not sure how much that correlates with FDA approvals.

4   I'm pretty sure it's done hand in hand.  I'm not sure.

5   Q.  Okay.  So why choose the PDR as your roadmap for whether or

6   not you're going to approve or disapprove MWAP prescriptions?

7   A.  I was trained to follow the PDR as close as possible in

8   residency.  It's something I've always leaned towards.

9   Q.  And so if something deviates from the PDR, that means it's

10  medically inappropriate?

11  A.  No.  You just have to be careful why we're giving the

12  medication, that the risks outweigh the benefits, and we tend

13  to not——if we don't PDR to back us up, then we tend not to——we

14  shouldn't use that medication if the Physicians' Desk Reference

15  doesn't give us clear guidance, and the risks——also if the

16  risks outweigh the benefits.

17  Q.  Okay.  How did you, for each one of these patients for whom

18  an MWAP request form was submitted, determine whether or not

19  the risks outweighed the benefits for that individual patient?

20  A.  Based on the information given, provided by the provider,

21  also information I can find in the FHS1 and looking at the lab

22  work, was which is radiology testing, nerve testing, CAT scans,

23  and there's a bunch of information you can glean from the chart

24  and from the electronic record.

25  Q.  Well, wait.  In most instances you did not have access to

1   the physical chart, correct?

2   A.   Probably in most instances not direct access, no.

3   Q.   Okay.  You had access to the FHS1, correct?

4   A.   Yes.

5   Q.   Okay.  So the FHS1 is really a scheduling program, but

6   there are instances in which a provider, if given the time and

7   opportunity, can put in the results of certain specialty visits

8   and diagnostics, correct?

9   A.   Yes.

10   Q.   But isn't it true in the majority of instances, the

11   providers do not spend the time putting that information into

12   FHS1?

13   A.   I would say it's probably a good estimate, yes.

14   Q.   Okay.  So majority of the time, the information you need is

15   not on FHS1, but FHS1 is really the biggest source of your

16   information for making one of these determinations, correct?

17   A.   No, ma'am.

18   Q.   Okay.  What's the other source?  What's the biggest source?

19   A.   I was able to get on, directly on to Syracuse University's

20   EMR, and I would look up the CAT scans and MRIs and consult

21   reports on their electronic record through Syracuse University.

22   I was also on Cayuga Med Center's; I got information from

23   Auburn's; I got—I was also on Rochester, Strong Memorial's MR

24   services, and I was able to look directly at the consult

25   requests and CAT scans, MRIs, whatever tests were done.

1   Q.   Okay.  But you covered also the Watertown——and forgive me;

2   what's the other hub way up there?

3   A.   Clinton.

4   Q.   ——and Clinton, right?  And the Watertown and Clinton hubs

5   are up by the Canadian border, correct?

6   A.   The Clinton hub is, yes.

7   Q.   Okay.  And where are those patients getting sent when they

8   need diagnostics or workups?

9   A.   I——you know, I forget the name.  I met with that hospital

10  chain up there, and forgive me if I'm forgetting the name.  I

11  tried to gain access to the MR and it didn't work, but I

12  couldn't get a relationship with the medical records——with

13  people there, and I didn't get things faxed to me if I needed

14  it.

15  Q.   Really.  So Clayburn (ph) would just send you——

16  A.   That's it.

17  Q.   Yeah, yeah.  They'd just send you a medical record without

18  a HIPAA?

19  A.   No.  I'm pretty sure that a HIPAA was on file.  They would

20  fax the results of the MRI or a consult request or nerve

21  studies, and a lot of times it went directly to the nerve study

22  vendor, which is somebody we use in DOCCS, and I got a lot of

23  information from them, and I can't remember who we used

24  primarily for the nerve studies.  But they would fax me the

25  results, I'd put it in——send it to the facility, put it in

1   their records.

2   Q.   So that sounds like a lot of work, Dr. Dinello.

3   A.   Yes, ma'am, it was.

4   Q.   Okay.  And it sounds to me like your testimony is that you

5   had a signed HIPAA form on file signed by DOCCS patients that

6   you were able to then produce to someplace like Claxton?

7   A.   Claxton-Hepburn, I think that's the name of the——well, it

8   was a bigger one.  There was another hospital.  But that was

9   one of the hospitals, yes.

10  Q.   Okay.  But answer my question.  You had the signed HIPAA

11  forms on file?  Where were those?

12  A.   I didn't have them personally, no.

13  Q.   Okay.  But you just told me you would contact these

14  hospitals and get them to give you access or send you the

15  information, correct?

16  A.   Yes.

17  Q.   And we all know you needed a HIPAA form for that, right?

18  A.   Yes.  I assume they had them on file.  They never asked.

19  Q.   Really.  Okay.  Let's move on a little bit.

20        When you look at these MWAP request forms, isn't it

21  true your belief is if there was a lack of documentation, that

22  meant there were no symptoms to justify the medication?

23  A.   No, that doesn't go hand in hand with that comment, no.

24  Symptoms and medications, yeah, it doesn't——we don't treat

25  every symptom with a medication, no.

1    Q.  Okay.  So I'm going to turn your attention back to that

2    deposition I took in July of 2023.  I'm going to ask you, I

3    asked you this question and do you recall giving this answer?

4            This is 144, lines 20-25.

5            "Q.  Okay, wait.  Does the lack of documentation mean

6    a patient doesn't have the symptoms?"

7            "A.  The lack of documentation means there is not

8    symptoms to justify gabapentin."

9            MS. THOMAS:  I believe it's on page 143.

10           MS. AGNEW:  I have 144.  I'm looking right at it.

11           MS. THOMAS:  So are we.

12           MS. AGNEW:  Sorry.  It may be on 143 or 144.

13   Q.  Go ahead.  Explain this to me.  How does the lack of

14   documentation mean there are no symptoms to justify gabapentin?

15   A.  Symptoms have to—they don't have to be, but symptoms are

16   usually correlated with some objective finding.  So symptoms

17   are subjective findings.  Signs are objective findings, along

18   with tests are objective findings.  So you don't just treat

19   primarily based on subjective data alone; you need objective

20   data also, so subjective data alone won't justify anything,

21   really.  You have to have some objective data as well.

22   Q.  I need you to answer the question I asked, Dr. Dinello.

23   How does a lack of documentation mean there are no symptoms to

24   justify gabapentin?

25   A.  It means that the symptoms don't have objective criteria to

1   back them up.

2   Q.  And how did you know, in all of these instances where you

3   disapproved these prescriptions, the patient didn't have the

4   symptoms to justify the prescription?

5   A.  Well, I'm sure they had the symptoms.  You can't really

6   refute symptoms.  But there's no objective data that came along

7   with the subjective data in order to make a decision with the

8   data with that.

9   Q.  Okay.  So there could have been symptoms but you didn't see

10  the data, right?

11  A.  There was no objective data with the subjective symptoms,

12  no.

13  Q.  Okay.  So is it possible the patient actually met the

14  criteria but the provider was not reporting it to you?

15  A.  That's a possibility.

16  Q.  Okay.  So under this scenario, a patient is going to lose

17  or be denied a prescription based on how a provider filled out

18  a form, right?

19  A.  No.  I wouldn't say that.

20  Q.  Okay.  So why are you disapproving the medication if there

21  are symptoms but you're not seeing the objective criteria?

22  A.  Well, if I went to look for the objective criteria as well

23  and couldn't find any, just we needed documentation.  We're

24  just looking for reasons why we would allow a risky medication

25  to be given to a patient.

N981ALLF                         Dinello - Direct

1    Q.   Okay.  Isn't it true in many of these instances you also

2    would approve the medication but recommended a tapering

3    schedule, correct?

4    A.   On certain medications, yes.

5    Q.   Okay.  Which medications were those?

6    A.   Obviously any opiates, benzodiazepines, because it

7    just——with many of those, it could mean not stopping them cold

8    turkey, which just means right away without tapering down.

9    Other medications like opiates, gabapentin, you can——you don't

10   have to taper, but I find it's better for the patients to taper

11   them until they're not as uncomfortable coming off of addictive

12   medications.

13   Q.   So we've got gabapentin, benzos, opioids, correct?

14   A.   Yeah.  There's a whole list of other ones that are on the

15   controlled substance list.

16   Q.   Okay.  And in those instances where you wrote "Approved"

17   or, you know, you typed in "Approved" on the MWAP request form

18   but you put in a tapering schedule, it wasn't your intention

19   that the patient be kept on those medications long term,

20   correct?

21   A.   Not necessarily.  If they have proper justification,

22   objective data, they could be continued or restarted, sure.

23   Q.   Wait.  Forgive me.  Why would you taper it if they had

24   objective criteria or data?

25   A.   They didn't at the time, but they can always find it or do

1   a test or come back with more information that says this

2   patient does have objective data or——so we can then continue it

3   or restart it.  That's not a problem.

4   Q.  Okay.  But wasn't it true that after a period of this MWAP

5   policy and process, the use of gabapentin was almost

6   nonexistent?

7   A.  I——I heard of this.  Definitely we didn't use it as much.

8   I don't know the exact numbers, how much it was cut down,

9   because it was never my intent to single out one medication.

10  Q.  In fact, sir, you said the use of gabapentin was almost

11  nonexistent, correct?

12  A.  That's what I heard.  I didn't look at any objective data

13  on that, but that's what was told to me, yes.

14  Q.  All right.  Let's talk about objective data.  When you

15  developed the MWAP policy——and I think we talked a little bit

16  about this the other day——you didn't look at any data in terms

17  of hard numbers, correct?

18  A.  No.  Hard, no.  I looked at a lot of data from other jails

19  that had policies similar, I looked at a lot of articles on

20  gabapentin use and misuse, on opiate prescription.  I don't

21  know what data you're referring to.

22  Q.  Okay.  I'm referring to DOCCS data on the diversion or

23  abuse of Neurontin; numbers, this is how many times it happened

24  in this facility in the month of May, for example.  Did you

25  ever see that data?

N981ALLF                      Dinello - Direct

1    A.  I never saw any hard data on that, just heard about it.

2    Q.  Okay.  Did you ever ask for that data?

3    A.  I did not ask for that data; not to my knowledge.

4    Q.  Okay.  So before you developed this policy there was no

5    time when you said, somebody put together this data for us so

6    that we know we're appropriately responding to a true problem

7    that is documented.

8    A.  Oh, it's well documented.  The misuse and diversion of

9    gabapentin is probably documented in a thousand records.  I've

10   seen hundreds of them.  I've seen medications—I've seen people

11   cheek their medications personally, on video and personally.

12   It—there is hundreds of eyewitnesses, hundreds of

13   documentation, HR, security logs.  I've seen those personally,

14   hundreds, hundreds, if not thousands.

15   Q.  Okay.  I want to know if anyone ever put that data

16   together.

17   A.  Not to my knowledge.

18   Q.  And you've never heard of a patient being accused of

19   cheeking who in truth did not cheek?

20   A.  So you're saying a patient was accused of cheeking but

21   didn't cheek?

22   Q.  Yeah.  You never heard of a patient that accused—got a

23   disciplinary ticket, and then comes to find out they get

24   acquitted of that ticket because there was no real proof they

25   did it.

1   A.  I'm sure that's happened, yes.

2   Q.  And in fact, didn't it happen to Anthony Medina in the

3   litigation you and I first were involved in?

4   A.  I'm not familiar.  If you say so.  I'm not really familiar

5   with that.

6   Q.  Okay.  But can you not agree it's possible there are

7   instances in which patients have been accused of diversion,

8   abuse, cheeking, where it didn't actually happen?

9   A.  Sure, I'm sure that's happened, yes.

10  Q.  And wouldn't real data have been helpful to kind of

11  ascertain whether or not there was a real problem, where the

12  problem was, which facilities where this was happening?

13  A.  No.  There was enough people that readily admitted it and

14  got caught with the medications in their mouth or other places

15  and admitted to it afterwards.  I've talked to hundreds of

16  those patients.

17  Q.  Okay.  Isn't medication supposed to be in my mouth?

18  A.  It's supposed to be in your mouth and swallowed at the

19  window when the nurse is watching, or checking the medication

20  to make sure it was ingested properly and not put in their

21  hand.  A lot of times it was caught in people's hands, cotton

22  balls.  They get pretty creative.  It was rolled in the palates

23  of the back of their tongues, spit out in their hands, so a lot

24  of people got caught doing that as well.

25  Q.  Explain something to me.  Over the last couple days in this

1   courtroom, we've heard from some patients who actually have

2   never had a ticket for diversion.  Why would a patient who had

3   never had a ticket for diversion or abuse then be subject to

4   the MWAP policy and losing their effective medication?

5   A.   Well, the overwhelming majority of people that are in

6   corrections are in for drug-related crimes, and even a higher

7   number have a personal history of substance abuse and

8   addiction, so they're very vulnerable to any addictive

9   medications.  We have a very highly sensitive patient

10  population to these addictive medications, number one.  Number

11  two, there's high value in the population, many patients have

12  expressed a concern, taking these medications and getting

13  pushed up on, asked to cheek it or they're going to get

14  murdered——

15  Q.   Okay.  Just slow down, Mr. Dinello.  I'm so sorry.  I know

16  you have this memorized, but slow down, please.

17  A.   Okay.  That's pretty much it.

18  Q.   I'm going to ask the question again, and this time from a

19  medical standpoint.  What's the medical rationale for stopping

20  effective medication for a patient who does not abuse it, does

21  not cheek it, does not divert it?

22  A.   Medical rationale can be many things.  It could be getting

23  pushed up on, they're getting pressure from outside people to

24  give it to them.

25          Second thing is, when they get close to release, a lot

1   of these patients express concern being able to get these

2   medications when they get released and then they get cut off

3   cold turkey and worry about the symptoms when they get

4   released.  A lot of patients express concern about that.

5   Q.  Okay.  Where was the data on that?

6   A.  Hard data?  I don't have any hard data, but I talked to

7   hundreds of patients that that was their concern.  Indeed, it

8   did happen.  In my 17 years at the drug addicts clinic, I

9   talked to many people who come from incarcerated setting and

10  had their medications stopped by the family doctor that were

11  addictive or habit forming.

12  Q.  Okay.  And you know we had an expert testify in this case

13  who said of 70 patients, everyone who got released was

14  re-prescribed his gabapentin on the outside.  Why would that

15  happen?

16  A.  That might be his experience, yes.  That might be his

17  experience.  Sounds like a high number, but that could be his

18  experience.

19  Q.  So you were going to discontinue their medications because

20  it is possible that four years later, they might be released

21  and their outside provider might not re-prescribe it?

22  A.  That's just one of the concerns.

23  Q.  Okay.  I want to know the medical rationale for that exact

24  scenario.  So let's pretend——

25  A.  There are——

N981ALLF                    Dinello - Direct

1   Q.  Listen to me.  It's 2018.  My release date is 2024.  And I

2   come to you and I say, Dr. Dinello, gosh, my outside provider

3   might not re-prescribe gabapentin.  What's the medical

4   justification for stopping it?

5   A.  Based on just that one scenario or other——just because the

6   doctor might not prescribe it?

7   Q.  Just that one scenario.  Just answer the question, please.

8   A.  That one scenario.  People who stop these addictive

9   medications, it could take months and years to get their brain

10  right and to stop craving these medications, and it's not just

11  as simple as you stop the medication and the effect on your

12  psychology is done in a day or a week or a month.  Some people

13  go through these for years before they really can get their

14  mind, chemistry right in their brain and they stop craving

15  these medications.  Takes awhile.

16  Q.  I'm trying to hear the medical justification, Dr. Dinello.

17  Help me out.  It's about getting their brain right?

18  A.  I think I explained it.  The craving for some of these

19  medications can last a lot longer than when they actually stop

20  the physical medication.  Can last years.

21  Q.  Okay.  All right.  Let's go back to these MWAP request

22  forms.

23           So I'm going to direct everyone's

24  attention——Dr. Dinello, we're going to share this on the screen

25  with you, okay?

1    A.  Okay.

2    Q.  All right.  So we're going to look at P75.  And you don't

3    know this, Dr. Dinello, but there's a big binder in front of me

4    with what we hope are all your MWAP request forms.  My friends

5    may object, but we're just going to talk about some documents.

6            So Ms. Haas is going to put up the first one, which is

7    marked Dinello MWAP 1.  And it will say—Dr. Dinello, these

8    look a little bit different than when you dealt with them on

9    your computer at the prison, right?

10   A.  They're similar.

11   Q.  Okay.  We had to make some adjustments because I understand

12   they were in Excel spreadsheets when you dealt with them,

13   correct?

14   A.  Yes, and this is probably pdf, correct.

15   Q.  Yeah.  We had to—we had to do a little magic.

16           All right.  But you recognize this document, correct?

17   A.  Yes.

18   Q.  Okay.  And can we agree that the prescriber for this

19   document is Ms. Devlin-Varin, who was a provider up at Clinton

20   Correctional Facility, correct?

21   A.  Yes, ma'am.

22   Q.  And for a long time you were the RMD of the Clinton hub,

23   correct?

24   A.  Yes.

25   Q.  Okay.  So this particular MWAP request form is for

1    Percocet, right?  And can we agree that that's a controlled

2    substance?

3    A.  Yes.

4    Q.  Okay.  And I don't want to read every single detail, but

5    let's go to the second page.

6          You approved this one and you approved it for acute

7    discomfort for 72 hours, correct?

8    A.  Yes, ma'am.

9    Q.  Okay.  And you and I can both agree, that's a reasonable

10   prescription for a controlled substance for an acute episode of

11   pain, correct?

12   A.  Yes, the medical literature suggests no more than five to

13   seven days.

14         MS. LEVINE:  Your Honor, I just want clarification.

15   I'm not sure at this time if P75 is in evidence.

16         MS. AGNEW:  It's not in evidence yet.

17         MS. LEVINE:  Then I would object to reading from

18   documents that are not in evidence.

19         MS. AGNEW:  All right.  Your Honor, I'd like to move

20   Dinello MWAP 1-2 into evidence.

21         MS. LEVINE:  I don't think that there is a foundation

22   for this.  I think it's—

23   BY MS. AGNEW:

24   Q.  Dr. Dinello, do you have any reason to believe, looking at

25   this document, that you did not indeed review it and approve

1   it?

2   A.  No.  It seems like they're pretty good.  I suggest that I

3   looked at this and wrote it, yes.

4           MS. LEVINE:  I would just object on hearsay.

5           MS. AGNEW:  Your Honor, I offer it into evidence.

6   P75, Dinello MWAP 1-2.

7           THE COURT:  It's in Volume 1.

8           MS. LEVINE:  Again, I——I apologize if I phrased my

9   objection wrong initially, but the objection would be to

10  hearsay here, and I don't think that we have a hearsay

11  exception established for this document.

12          THE COURT:  Counsel has laid the foundation for the

13  document by having the witness identify it.  Is that not

14  sufficient for receiving it into evidence?

15          MS. LEVINE:  I——I don't believe so, your Honor.  I

16  know that he has said that he recognizes the document and that

17  it might be what it purports to be as authentic, but I still

18  believe that it's hearsay.

19          THE COURT:  Ms. Agnew.

20  BY MS. AGNEW:

21  Q.  Dr. Dinello, in your role as an RMD, were these MWAP

22  request forms created in the normal course of business?

23  A.  Yes.

24  Q.  Okay.  And these MWAP request forms would be sent to you by

25  providers in your hubs, correct?

N981ALLF                     Dinello - Direct

A.  Yes.

Q.  And how were they sent to you, sir?

A.  They're sent via email, sometimes faxed if people couldn't use their email, but mostly they were sent by email attachment.

Q.  And how would you either approve or deny the MWAP request and then convey that to another person?  How would you do that?

A.  I would email back to the patient—or the provider.

Q.  Okay.  And isn't it true under the MWAP policy these MWAP request forms should have been then put into the patient's chart?

A.  I think that was written in the policy, yes.

          MS. AGNEW:  Okay.  Your Honor, I'd move it into evidence as both a business record and a medical record as an exception to the hearsay rule, and I will add that the witness has identified it and said he has no reason to believe it's not his.

          THE COURT:  Ms. Levine.

          MS. LEVINE:  I would renew my prior objections, your Honor, on both hearsay and foundation.  I think that it was suggested to him that it was his, and I don't think that he unequivocally stated that he recognized what was in this document, and I do think that there is a hearsay issue.  I don't think the business record foundation has been laid.  He is not testifying to be a records custodian.  And on top of that, there would be double-hearsay here, even if there was a

1   business record foundation laid.

2            THE COURT:  I will receive it as a business record.

3            MS. AGNEW:  Thank you.

4            (Plaintiff's Exhibit 75, Dinello MWAP 1-2 received in

5   evidence)

6            MS. AGNEW:  I'd just like to note for the record that

7   defense counsel has allowed the admission of thousands of these

8   documents earlier in the proceeding, just for the record.

9   BY MS. AGNEW:

10  Q.  All right.  So Dr. Dinello, I want to talk very briefly

11  about these approvals for the treatment of acute or

12  exacerbations of chronic pain.  You did these pretty

13  systematically, correct?

14  A.  I don't believe it's systematically.  I did a lot of them,

15  if that's what you mean.

16  Q.  What's the difference in your mind between treating an

17  acute or an exacerbation of pain and treating chronic pain?

18  A.  Well, the medical—medical literature supports the use of

19  these addictive medications for five to seven days because the

20  addiction potential is a lot lower for seven days.  After seven

21  days, these medications become very addictive and habit

22  forming.  So the risk goes up exponentially after those seven

23  days.

24  Q.  Okay.  I now want to turn your attention to the same

25  exhibit, which is P75, at Dinello MWAP 5.

1          And Dr. Dinello, do you recognize this as an MWAP

2     request form which was created in the normal course of

3     business?

4     A.  Yes.

5     Q.  And then I want you to just——

6          MS. AGNEW:  Let's look at the second page, Ms. Haas.

7     Q.  I think you testified earlier that you started or you

8     believe you started many of these with the phrase "insufficient

9     medical justification," correct, Dr. Dinello?

10    A.  If you say so.  I don't know if I did most of them like

11    that.  I'm not sure, but sounds correct.

12    Q.  Can we agree the facility associated with this particular

13    form is Five Points?

14    A.  Yes, that's what it says, yes.

15    Q.  And Five Points was in one of your hubs, correct?

16    A.  Yes, I did a lot of work at Five Points directly, yes.

17    Q.  And is that——didn't you have an office at Five Points?

18    A.  I wouldn't say it was my office.  It was the facility

19    health service director's, and they didn't have one for a

20    period of time and I would use that, yes.

21    Q.  Okay.  And you treated patients directly at Five Points,

22    correct?

23    A.  Yes.

24    Q.  And you know who Kristin Salotti is, correct?

25    A.  Yes, ma'am.

1    Q.  Okay.  And can we agree that Kristin Salotti is the

2    provider who submitted this MWAP request form?

3    A.  Yes, it appears that Kristin sent this form, yes.

4    Q.  Okay.  So I want to just look at the first page of the

5    form.

6            MS. AGNEW:  First of all, your Honor, I'd like to move

7    into evidence P75 at Dinello MWAP 5-6.

8            MS. LEVINE:  Your Honor, I would just renew my prior

9    objections for the record.

10           THE COURT:  Yes, ma'am.

11           MS. LEVINE:  Thank you.

12           THE COURT:  Received.

13           (Plaintiff's Exhibit 75, Dinello MWAP 5-6 received in

14   evidence)

15   BY MS. AGNEW:

16   Q.  Okay.  Dr. Dinello, so this is an MWAP request form for

17   Kevin Crichlow, correct?

18   A.  Yes, ma'am.

19   Q.  Okay.  I just want you to look at this form.  And I can

20   have Ms. Haas show you the first page again because I want to

21   understand why you did not approve this particular MWAP

22   request.

23   A.  I think on the second page it says, once again, that there

24   was no objective data, there was no nerve study, there was no

25   sign of atrophy, decreased reflexes, monofilament testing,

N981ALLF                     Dinello - Direct

vibratory sense, positional testing, and no sign of ulceration.

There's no objective data here.

Q.  Okay.  Well, let's just look at this.  In fact, there was

some objective data.  It was in an EMG dated——

        MS. AGNEW:  Oh, second page, please, Ms. Haas.

Q.  ——an EMG that was done in August of '09, right?  You cite

that EMG.

A.  Yes.  The final results of that, I don't think it was in

the record.

Q.  So you knew an EMG had taken place.  And just for the Court

and the record, what's an EMG?

A.  Electromyogram, nerve conduction study.  That's what the

EMG/NCS stand for.

Q.  Okay.  So you know there's an EMG, but you don't know what

the results of it are, right?

A.  No, I did not.

Q.  Okay.  And where in here do you say, *Ms. Salotti, just send

over those EMG results?*

A.  I didn't ask them have them sent over.  She can review them

herself.  She's pretty smart.

Q.  Okay.  But in fact, you didn't care what the EMG results

were because you say here, "if the results of the EMG . . .

show severe disease, suggest blinking if appropriate along with

pain management evaluation and possible orthopedics if

necessary," correct?

1   A.  Yes.

2   Q.  So even if the EMG showed what you characterize as severe

3   disease, you weren't going to approve Neurontin, would you?

4   A.  Not for long-term use, no.

5   Q.  Okay.  So it did not matter what the objective findings of

6   that EMG were in the context of this patient, correct?

7   A.  No, that's not true at all.  It mattered greatly.

8   Q.  How so, sir?  Because you're saying if the results are

9   severe, you don't say, *Come back to me and I'll prescribe the*

10  *Neurontin*, right?

11  A.  No.  I wanted it to be fixed.  If there was a problem,

12  let's not mask it with a medication, let's fix it with maybe an

13  orthopedic evaluation, maybe an injection somewhere

14  (inaudible/unintelligible), rhizotomy, something—let's fix it.

15  Let's not just max it with an addictive medication.  Let's

16  actually fix the problem.

17  Q.  Well, you were also advocating for pharmaceuticals here.

18  You say for severe disease, safer, nonhabit-forming medications

19  can be obtained, correct?

20  A.  Absolutely, yes.

21  Q.  All right.  So it's not that you were saying he shouldn't

22  have medication, he should go get surgery, you were just saying

23  he's not going to get this medication.  Right?

24  A.  This medication, the risk/benefit ratio is too high.

25  Q.  Okay.  Why?

1    A.  Because it's an extremely habit-forming, addictive, and—

2    Q.  Where in this form do you see that Kevin Crichlow has

3    evidence of a recent overdose, drug abuse, or diversion?

4    A.  It doesn't matter, really.  In the end, it doesn't matter

5    what the medication does.  It's just what it does.

6    Q.  Okay.  Tell me why it doesn't matter if a particular

7    patient has a history of abuse or diversion?

8    A.  Obviously it matters.  It doesn't matter for the use of

9    gabapentin.  Gabapentin is an addictive medication.  It's

10   extremely problematic in the community and also in corrections.

11   It's a misused medication, which is documented in hundreds of

12   different articles which attacks providers throughout the

13   years.  It's a controlled substance in four states and the

14   country of England.  And it's an ethics and—overused, very

15   potentially dangerous medication.

16   Q.  It wasn't about the patient, Dr. Dinello, it's about the

17   drug?

18   A.  No, it's about the patient.  I don't want to subject him to

19   addictive medications.

20   Q.  Okay.  But what if this patient was effectively treated

21   with this medication for a very long time, which I can tell you

22   he was?

23           MS. THOMAS:  Objection.  Assuming facts into evidence.

24           MS. AGNEW:  I'll strike that, your Honor.

25           THE COURT:  Okay.  Counsel, just yell out objection

1   when you say it so that the witness can hear it.

2          MS. THOMAS:  Thank you, your Honor.

3          THE COURT:  Ask the question again, please, ma'am.

4   BY MS. AGNEW:

5   Q.  Okay.  Isn't it true, Dr. Dinello, it wasn't about this

6   particular patient, it was about the medication?

7   A.  No.  It was based on this particular patient along with the

8   medication.

9   Q.  Isn't it true in this instance Ms. Salotti was renewing the

10  medication, the patient was already on it?

11  A.  Yes, it looks like it was started two—5/24/2017.

12         MS. AGNEW:  Okay.  Go to the second page, Ms. Haas.

13  Q.  So you're discontinuing this medication, correct?

14  A.  Yes.

15  Q.  And it doesn't matter what the objective criteria from the

16  EMG read, correct?

17  A.  No, that always matters.

18  Q.  We've already gone over this.  You said if the results are

19  severe, we're going to try a safer, nonhabit-forming

20  medication, right?

21  A.  Yes.

22  Q.  No matter what, this patient is not getting Neurontin,

23  right?

24  A.  No.  I mean, it depends what it showed.  If the nerve study

25  showed something severe and there was documented atrophy,

N981ALLF                      Dinello - Direct

1    weakness, loss of function, then gabapentin might be just

2    restarted.  No problem.

3    Q.  But doesn't the last sentence that you wrote there in your

4    comments say, "For severe disease, safer, nonhabit-forming

5    medications can be obtained," yes or no?

6    A.  Yes, and that's—yes, that is a—that is an option, yes.

7    Q.  Okay.  Ms. Haas, could you please?

8            MS. AGNEW:   go to Dinello MWAP 63.

9    Q.  I think we talked earlier about treatment with controlled

10   substances for acute exacerbations of pain, correct?

11   A.  Yes.

12   Q.  And could we agree that would be in the postsurgical

13   context sometimes?

14   A.  Yes, sometimes, yes.

15   Q.  Okay.  So why would it be appropriate to treat a patient

16   postsurgical pain for a couple of days?

17   A.  With an opiate?  It's always—you got to—it's always

18   better to treat their postsurgical pain, but with an opiate,

19   you mean?

20   Q.  With any of these MWAPs.  Let's just say with any of these

21   MWAPs.

22   A.  It's an indication of use for acute pain to use a small

23   amount of opiates in a short time, and the risk of addiction is

24   much lower in those situations, yes.

25   Q.  Okay.  So if we look at this MWAP request form, it's from

1   Dr. Medved, and Dr. Medved worked at Franklin, correct?

2   A.  I believe Irena, did, yes.

3   Q.  And Franklin was in your hub, correct?

4   A.  Well, one of them, one of those I was pseudo covering, yes.

5   That was in the Watertown hub, I think.  Or Franklin hub.  I

6   mean, sorry.  Fulton hub.

7   Q.  It was in your hub, right?

8   A.  Yeah, one of the ones I was covering, yes.

9   Q.  Okay.  And this is an MWAP request form just like the last

10  two we looked at, correct?

11  A.  Yes, but as you said, that was Excel spreadsheet.  This is

12  pdf, but it looks similar.

13  Q.  Fair.

14          MS. AGNEW:  Your Honor, I'd like to move into evidence

15  P75 at Dinello MWAP 63-64.

16          MS. LEVINE:  Just renew the prior objections, your

17  Honor, for the record.

18          THE COURT:  Yes, ma'am.  Overruled.  Received.

19          (Plaintiff's Exhibit 75, Dinello MWAP 63-64 received

20  in evidence)

21  BY MS. AGNEW:

22  Q.  Okay.  Dr. Dinello, we're going to move to the second page.

23  Well, wait.  Stop.

24          MS. AGNEW:  I apologize, Ms. Haas.

25  Q.  So here, Dr. Medved is asking for Percocet for postsurgical

1    pain for a patient who just had a total knee replacement on

2    November 27th; is that correct?

3    A.  Yes.

4    Q.  And she describes this as acute pain, correct?

5    A.  Yes.

6    Q.  And Dr. Medved, to your knowledge, at the facility with

7    this patient who's most likely in the infirmary——in fact, it

8    says that, correct?

9    A.  Yes.

10   Q.  And the infirmary has a nursing staff all the time, right?

11   A.  Yes.

12   Q.  Okay.  Now let's look at the second page.  Why didn't you

13   approve this for treatment of acute postsurgical pain in

14   Dr. Medved's patient?

15   A.  Because she was asking for an extension above the five to

16   seven days and not——she said for ten days, and that's——runs the

17   risk of having somebody being dependent on an opiate, and

18   that's well documented in the literature.  So after that five-

19   to seven-day window the risk of dependence goes up, and the

20   last thing we want is this poor patient to have an opiate

21   dependence.

22   Q.  Okay.  So I don't see where you told her she could give it

23   for five or seven days.

24   A.  Well, what usually happens with——they don't need my

25   approval for five to seven days.  Or five days was the cutoff.

1   Every provider can give whatever they want for five days, no

2   problem.  They would need——they don't need my approval.  All

3   this is for acute pain is just to let me know it was ordered.

4   They don't need approval for five days.  Any provider could

5   give whatever they wanted for five days, without question.  We

6   just wanted documentation it was given, since it's so habit

7   forming and addictive and there's a big problem with misuse.

8   Q.  So you're telling me you didn't get MWAP request forms for

9   three to five days for postsurgical treatment that you said

10   approved or not approved for?

11   A.  Yes, but the form——if you read the form, it was——or the

12   policy, five days is——they didn't need approval.  They just

13   needed documentation.  Now sometimes it went beyond the five to

14   seven days, and that would have to be approved.  But no, they

15   can give whatever they want for five days without questions.

16   Q.  Okay.

17   A.  Just need documentation.

18   Q.  I know.  That documentation, right?  If it's in the form,

19   then they get it; if it's not in the form, they don't get it,

20   right?

21   A.  That's not necessarily true, no.

22   Q.  Okay.  Let's go back to the first page of this.

23   Dr. Medved, in her medical judgment, is asking you for ten days

24   for this patient, right, and she's saying, I've given two

25   pills, one per day, over the course of two days, right?

N981ALLF                    Dinello - Direct

1    A.  No.  I think this says two pills four times a day.  It's

2    QIV, not two a day.  That's Latin for four times a day.

3    Q.  But in her medical judgment she thinks this particular

4    patient needs ten days of gabapentin for pain management, and

5    you're denying it, correct?

6    A.  The ten days, yes.

7    Q.  Did you ever make mistakes with these MWAP request

8    approvals or denials, in your mind?

9    A.  I'm sure; I'm sure I have, yes.

10   Q.  And in fact, isn't it true that you think you made a

11   mistake when you denied gabapentin to one of our class members

12   Aaron Dockery, who suffers from multiple sclerosis?

13   A.  No.  I wouldn't say I erred, no.  Not that I remember.

14           MS. AGNEW:  P121, counsel.

15           MR. NOLAN:  Your Honor, I just wanted to request—I

16   asked Ms. Agnew to clarify a point on the record, which is that

17   Mr. Dockery has been released from DOCCS and is no longer a

18   class member.  I just want that to be—we can stip stipulate to

19   that, correct?

20           MS. AGNEW:  Mr. Nolan is correct.  Mr. Dockery was

21   released a couple of weeks ago.  We're still going to talk

22   about him, though, your Honor.

23           THE COURT:  Okay.  Does 121 relate to him?  The one I

24   have says Lawrence Elliott.

25           MS. THOMAS:  If I may, I don't believe it's in the

N981ALLF                    Dinello - Direct

1    binder.  I think it's a separate——

2                MS. AGNEW:  Oh, yes, your Honor.  I apologize.  It's a

3    separate exhibit.  It's paper.

4                THE COURT:  Thank you.

5                MS. AGNEW:  Sorry.

6    BY MS. AGNEW:

7    Q.  All right.  Dr. Dinello, you recall your deposition in July

8    of 2023, correct?

9    A.  Yes.

10   Q.  Okay.  And I'm going to direct you to what on the screen

11   says DD, and I apologize.  That's actually the exhibit number

12   that was used at your deposition.  In fact, it's premarked P121

13   for today's exercise.  Do you recognize this as being an email

14   that you wrote?

15   A.  It appears to be so, yes.

16   Q.  Okay.  And can we agree the date of this email is

17   September 15th of 2017?

18   A.  Yes.

19   Q.  And this is an email in fact where you're conveying a

20   disapproval to Dr. John Miller, correct?

21   A.  John Miller.  Yes, it appears so.

22   Q.  Can we agree Dr. John Miller was a physician working at

23   Coxsackie Correctional Facility?  Do you remember?

24   A.  I'm not sure, but it sounds familiar.

25   Q.  Okay.  Was Coxsackie in your hub?

1    A.  No.

2    Q.  Okay.

3    A.  It was not.

4    Q.  Under what circumstances would you review an MWAP request

5    form from a provider in a hub that was not yours?

6    A.  When the other RMDs are on vacation, we cover for each

7    other, or they're away for surgical procedures or—for a period

8    of time.

9    Q.  We were at your deposition——

10           MS. AGNEW:  Your Honor, forgive me.  I'd like to move

11   into evidence P121, and I will state for the record it's an

12   email and then the next two pages are an MWAP request form

13   which was the attachment to the email, Bates Nos. OAG MWAP 597,

14   but then the MWAP request form itself bears Bates Nos. OAG MWAP

15   600-1 through 2.  That's just by virtue of how these things got

16   produced and handled.

17           MS. THOMAS:  I would renew our objection with respect

18   to the MWAP form, but otherwise no objections to this exhibit.

19           THE COURT:  Thank you.  Received, all three pages.

20           (Plaintiff's Exhibit 121, OAG WAP 597/OAG MWAP 600-1

21   through 2 received in evidence)

22           MS. AGNEW:  Thank you.

23   BY MS. AGNEW:

24   Q.  All right.  Dr. Dinello, I want you now to look at the MWAP

25   request form.  Ms. Haas is going to show you page 1.  And I do

1    apologize.  The type by the radiological testing is very small.

2    Was that something that happened when you received one of these

3    Excel spreadsheets?

4    A.  I'm sorry.  What was it that happened?

5    Q.  Okay.  If you look at the radiological testing on this

6    particular form, it's about halfway down the sheet, you'll see

7    that—

8    A.  Oh, yes, yes.

9    Q.  The print is very, very small, correct?

10   A.  Yes, ma'am.

11   Q.  And that is often how it would show up on your computer in

12   the Excel form, correct?

13   A.  I'm not sure if that was a typical appearance or not.

14   Q.  Isn't it true you could take your cursor and go in there

15   and then it would blow up so that you could read the

16   information?

17   A.  Oh, yes.

18   Q.  Okay.  And I apologize.  This was an early, early version

19   for us, so that particular type is not readable, and I do

20   apologize.  But can we agree that this is an MWAP request form

21   from Aaron Dockery?

22   A.  Yes, it appears to be.

23   Q.  And that Dr. Miller at Coxsackie is requesting Neurontin

24   based on consultations from both neurology and physical

25   therapy, correct?

1    A.  He's seen those, yes.  I don't know if they recommended

2    that medication or not, but he definitely was being seen by

3    both neurology and physical therapy, it looks like.

4    Q.  Okay.  And the treatment options attempted reads——and I'm

5    just going to read it for the record:  Inmate on Copaxone,

6    Elavil, Tegretol, which is causing significant diarrhea and

7    dizziness and not helping with painful neuropathy of feet.

8    Ibuprofen tried, Ditropan for bladder, left facial numbness.

9    10/16.  Decreased sensation left side of body, weak gait,

10   diagnosed with MS.  11/16.  Medication was an MWAP approval

11   with no refills.  Request for renewal."  Correct?

12   A.  I think that's what it says, yes.

13   Q.  And then on page 2——Ms. Haas——you respond, "Insufficient

14   medical justification.  Would wean at 300 milligrams twice a

15   day times 14 days, then 300 milligrams once a day for 14 days.

16   A safer, nonhabit-forming nerve-modulating agent is recommended

17   that has also found to be effective in MS."  Correct?

18   A.  Yes.

19   Q.  But you actually feel like you should have approved this

20   one, don't you?

21   A.  Well, I——I would have been okay if it was approved.  MS is

22   one of those——actually, in this case, Baclofen probably would

23   have been the better medication, although that is for more

24   bladder spasms and generally spasms, but with MS, I tend to

25   approve the gabapentin with less objective data and criteria,

1   even though there is no hard data that the provider gives us.

2   MS is a little trickier to deal with.

3   Q.  But when you saw this form in July of 2023—I'm going to

4   refer to page 268 at lines 23 to 269 at line 9.  I asked you

5   this question and you gave this answer:

6          Oh, I apologize.  Mr. Manley asked you this question.

7          "Q.  Where on this form did you expect the treating

8   physician would write or list their justification for their

9   request for the particular medication?"

10         "A.  Where it says indicate any diagnostic testing

11  performed and then treatment options attempted, step therapy.

12  So they wrote it.  They wrote all the good stuff.  It actually

13  looks pretty good.  I don't really know why I denied that.  I

14  can't see what that radiology thing says."

15         So when you saw this in July of 2023, you didn't

16  really know why you denied it, right?

17  A.  No, I don't know.  When I saw it then?  I have no idea why

18  I—when I saw it six years ago, what I was thinking.  But what

19  does the radiology thing say; do you know?

20  Q.  You took a man with MS off Neurontin and you don't really

21  know why you did it; isn't that true?

22  A.  No, that's not true at all.

23  Q.  Why did you take him off Neurontin?

24  A.  Gabapentin really isn't indicated for treating MS.  It's

25  designed, according to the PDR, for severe profuse neuropathy.

1   But MS doesn't usually have neuropathy associated with it by

2   itself.  Or trigeminal neuralgia pain or the adjunct

3   procedures.  There was no indication.  I can't see what that

4   radiology study showed, but once again, gabapentin usually is

5   not written, indicated for MS, but it has been given.

6   Q.  It has been given, right?  Doctors prescribe Neurontin as

7   an adjunct to treat MS patients, correct?

8   A.  I don't know why they prescribe it.

9   Q.  Okay.  Let's go back to page 1.  Sorry, page 2.  This MWAP

10  request form clearly says that Mr. Dockery suffers from

11  neuropathy, correct?

12  A.  I don't think the word "neuropathy" is used, is it?

13  Q.  Neuropathy of feet.  It says "painful neuropathy of feet."

14  A.  Oh, there it is.  Okay.  I didn't see it.  There we go.

15  Q.  Okay.  How many of these forms do you think you might have

16  messed up on, Dr. Dinello?

17  A.  Not many.

18  Q.  Because——

19  A.  I don't think this is messed up.  There was no nerve study

20  done that he gave me.  Unless that's the test up there.  I

21  can't see it.

22  Q.  Okay.  Do you think based on this form that you wouldn't

23  ask for nerve study results?  Is that in your denial?  Did you

24  say, Hey, Mr. Miller, can you just shoot over those nerve study

25  results?

1    A.  I didn't ask for those specifically, no.

2    Q.  And it's your testimony you don't think you messed up on

3    many of these?

4    A.  I don't think I messed up on a lot of them.  I don't think

5    I messed up on this one either.

6    Q.  Well, you testified under oath in July that you don't know

7    why you denied it, right?

8    A.  I didn't have any information at the time.  I couldn't read

9    the radiology testing.

10   Q.  Okay.

11   A.  I still can't read it.

12   Q.  Tell me this:  When you say "I didn't mess up," what was

13   your objective?  How were you──how were you quantifying success

14   of the MWAP policy?

15   A.  Success of the MWAP policy is to create a dialogue with

16   providers on the medications we're using so we don't have

17   another episode like the OxyContin debacle years ago.  It was

18   really to give communication for doctors to really think about

19   the addictive properties of the medications they're writing for

20   and to seek alternative definitive treatment modalities that

21   can actually fix the problem, not just mask it.

22   Q.  Okay.  So I think you testified earlier──or I impeached you

23   on it──that the MWAP policy had the result of basically getting

24   rid of gabapentin from these facilities, correct?

25   A.  No, that──that wasn't the intent.

N981ALLF                    Dinello - Direct

1  Q.  Okay.  But there were some people who were happy about the

2  MWAP policy, right?

3  A.  I think everybody, to be done, yes, with the substance

4  abuse epidemic that our patients were so sensitive, to, yes.

5  Almost every provider.

6  Q.  That wasn't the question.  That wasn't the question.  Isn't

7  it true that the guards were really happy about the effects of

8  the MWAP policy?

9        MS. THOMAS:  Objection.  Calls for speculation.

10        THE COURT:  If he knows.

11  Q.  Do you know, were the guards happy?

12  A.  I have no idea.  I'm sure some were, some weren't.  I have

13  no idea.  Doesn't matter to me what the guards think.

14        MS. AGNEW:  Just give me a second here.

15  Q.  All right.  And you recall that deposition in July of 2023?

16  A.  Yes.

17        MS. AGNEW:  And counsel, I'm going to be looking at

18  64.  I'm going to start at line 2 on 64.

19  Q.  I asked you this question, you gave——it's a series of

20  questions and answers.

21        "Was one of the objectives to reduce the length of the

22  med line?"

23        "No.  It was to give——no, it was not one of the

24  objectives."

25        "So what are you talking——"

N981ALLF                      Dinello - Direct

1           THE COURT:  Counsel, counsel, question, answer.

2           MS. AGNEW:  I apologize.  I'm sorry.

3   Q.  "Q.  Was one of the objectives to reduce the length of the

4   med line?"

5           "A.  No.  It was to give——no, it was not one of the

6   objectives."

7           "Q.  So what are you talking about, foot traffic?"

8           "A.  As a benefit of the MWAP policy, the

9   patients——because we weren't giving a lot of controlled,

10  addictive substances, unless they absolutely needed them, there

11  was less patients having to go to the nurse window to get their

12  one-on-one medication."

13          "Q.  But that's the line, right?"

14          "A.  That's the line, yeah."

15          "Q.  Okay.  So it was about the line."

16          "A.  That's not why the policy was written, though."

17          "Q.  Okay.  But you just said it was about increased

18  foot traffic, right?"

19          Mr. Keane objects.

20          "Q.  It was overwhelmingly successful because it

21  decreased foot traffic, right?"

22          "A.  That is what the COs and the nurses thought."

23          So you heard from the COs and the nurses that it was

24  an overwhelming success because it decreased foot traffic in

25  the med lines, correct?

1            THE COURT:  Hold for just a minute.

2            Counsel?

3            MS. THOMAS:  Thank you, your Honor.  I would just

4      object to the beginning portion of this prior to the question

5      and answer directly related to the COs as improper impeachment.

6      The only question that relates to the COs is what relates to

7      what Dr. Dinello had testified to.  I believe the question was

8      with respect to what he knew about the guards.  The questions

9      prior to the deposition question that asked about the COs are

10     irrelevant and improper impeachment.

11           THE COURT:  What are you asking me to do?

12           MS. THOMAS:  I'd like to strike the portion of the

13     deposition that was read prior to—if you would just bear with

14     me—prior to the question that specifically mentions the COs.

15           THE COURT:  Counsel?

16           MS. AGNEW:  Your Honor, I think that's the context of

17     the line of questioning.  I've done my best to set this up so

18     that the record is clear as to the context, what he was

19     answering.

20           THE COURT:  Anything else, counsel?

21           MS. THOMAS:  I would just add that I believe that

22     there was no context necessary other than the actual question

23     and answer that referred to the COs as it directly relates to

24     what Ms. Agnew was attempting to impeach Dr. Dinello on.

25           THE COURT:  Okay.  It seems it did set the context.

N981ALLF                          Dinello - Direct

```
1   But in any event, if anything, it's irrelevant, so I don't
2   care.
3              MS. THOMAS:  Thank you, your Honor.
4              THE COURT:  Counsel.
5   BY MS. AGNEW:
6   Q.  Okay.  And I think MWAP also had an impact on drug testing,
7   correct, in these facilities?
8   A.  I'm not sure.
9   Q.  Were there any other collateral benefits of the MWAP
10  policy?
11  A.  I'm sure there are a number of them.
12  Q.  Okay.  And what about the patient, Dr. Dinello, who felt
13  that they lost their effective medical treatment?  Isn't it
14  true you didn't care unless they died or lost a limb?
15  A.  No, that's not true.
16             MS. AGNEW:  Okay.  I'm going to ask Ms. Haas to
17  actually play a video of Dr. Dinello's deposition as a form of
18  impeachment, if that's allowable to your Honor.
19             THE COURT:  Go ahead.
20             (Pause)
21             MS. AGNEW:  Your Honor, I'm going to go to the record.
22  I apologize.
23             Turn that off.
24             Counsel, it's page 225 at 14-18.
25  BY MS. AGNEW:
```

N981ALLF                    Dinello - Cross

Q.  Going back to that July 2023 deposition, Dr. Dinello, you
were under oath, correct?

A.  Yes, ma'am.

Q.  Okay.  And do you recall this question and giving this
answer:

        "Q.  What about the hundreds of patients who were
involved in this lawsuit who say, jeez, in fact, I lost
effective medication?"

        "A.  Did they die?"

        "Mr. Keane:  Objection."

        "Q.  Did they die?"

        "A.  Did they die?"

        "Q.  I'm ending right there."

        "A.  Did they lose body parts?"

        MS. AGNEW:  I have no further questions, your Honor.

        THE COURT:  Thank you.

        Do you want a break, ladies and gentlemen?

        MS. THOMAS:  No, thank you.  Unless the Court would
like to break.

        THE COURT:  Whatever you want.

        MS. THOMAS:  Thank you.

CROSS EXAMINATION

BY MS. THOMAS:

Q.  Good morning, Dr. Dinello.  My name is Jennifer Thomas, and
I represent Dr. Carol Moores in her official capacity as the

N981ALLF                    Dinello - Cross

1    chief medical officer for the Department of Corrections, and I
2    just have a few questions for you today.
3              First, I'd like to ask you──
4    A.  Good morning.
5    Q.  ──you no longer work at DOCCS, right?
6    A.  That is correct.
7    Q.  Okay.  And when was the last time that you worked at DOCCS?
8    A.  Probably March 31, 2021.
9    Q.  Okay.  And you no longer──
10   A.  Or thereabouts.
11   Q.  I apologize.  What did you say?
12   A.  Or thereabouts, yeah, the end of March.
13   Q.  Okay.  Thank you.
14             And you don't currently have any authority over any
15   patients in the Department of Corrections care, correct?
16   A.  Correct.
17   Q.  Okay.  And just a few moments ago you were read back a
18   portion of your deposition testimony from July, correct?
19   A.  Yes.
20   Q.  Could you clarify.  What did you mean when you said, "But
21   did they die?"
22   A.  Oh, yes.  When you're dealing with addictive substances,
23   you're trying to get people off of them, the danger is that
24   they'll find other medications to use and can combine them and
25   die.  So we see this in my drug clinic.  And when we're taking

N981ALLF                    Dinello - Redirect

1    people off of addictive medications, we don't have as much

2    control of them.  It's very safe, it's a much safer place of

3    doing it in a controlled environment like corrections, so

4    therefore, to my knowledge, when people were struggling off

5    these medications, nobody died, nobody injected something and

6    got an infection or lost an arm or leg and——so it's a real safe

7    place to do it.  My comment was to do with the safety in doing

8    this in a controlled setting, like a corrections department,

9    than doing it in the street or a clinic, when you have less

10   control and you have more access to a variety of illicit

11   medications.  So yes, that's——that was the context.

12   Q.  Okay.  And just to clarify, when you say "doing this," are

13   you referring to taking the individual off of a medication?

14   A.  No.  Dealing with addictive substances.  When you are

15   dealing with addictive substances, it is much safer and easier

16   to do it in a controlled setting like a group home, supportive

17   living, long-term residential, or a correctional setting, be it

18   a jail or state prison.  It's much safer for the patients to do

19   it in those settings.

20              MS. THOMAS:  I have nothing further.  Thank you.

21              THE COURT:  Thank you.

22              Redirect, counsel.

23   REDIRECT EXAMINATION

24   BY MS. AGNEW:

25   Q.  Dr. Dinello, you testified I think in the first day that

N981ALLF

1   you've reviewed security video, correct?

2   A.  Yes.

3   Q.  Do you think once you—let's just talk about an active

4   addict.

5          MS. THOMAS:  I would just object if this goes beyond

6   the scope of cross-examination.

7          THE COURT:  Counsel?

8          MS. AGNEW:  I'm getting to his point about them not

9   dying, your Honor.

10          THE COURT:  All right.

11          MS. AGNEW:  Sorry I'm a little slow.

12   BY MS. AGNEW:

13   Q.  These patients with active addiction, if you're trying to

14   get them off of MWAP medications, can they get drugs with abuse

15   potential in the yards of their facilities?

16          MS. THOMAS:  I would just renew my objection.

17   A.  Yes, they can.

18          MS. AGNEW:  I'm done.

19          THE COURT:  All right.  Thank you, counsel.

20          MS. THOMAS:  Thank you, your Honor.

21          THE COURT:  Any further cross?

22          MS. THOMAS:  No, thank you.

23          THE COURT:  Thank you.

24          Thank you, Dr. Dinello.  Good morning.

25          THE WITNESS:  Have a great weekend.

N981ALLF

```
 1            THE COURT:  You too, sir.

 2            THE WITNESS:  Bye.

 3            (Witness excused)

 4            THE COURT:  What are we doing next, friends?

 5            MS. AGNEW:  We're done.  Before they continue, I'd

 6   like to clean up my mess.

 7            THE COURT:  Okay.  So plaintiffs rest.

 8            MS. AGNEW:  Yes, plaintiffs rest, your Honor.

 9            THE COURT:  Defendants.

10            MR. NOLAN:  Given that plaintiffs have rested and what

11   we've seen today, we've decided that we're done as well and we

12   rest.

13            THE COURT:  All right then.  Thank you, friends.

14   Anything else on the record?

15            MS. AGNEW:  I have a little thing.  Because Mr. Keane

16   is here, it deals with the MDL, so I don't know if you want it

17   on this record, but it's just a little clerical thing.

18            THE COURT:  Fine.  Come on up, Mr. Keane.

19            MS. AGNEW:  I've been contacted by the Southern

20   District clerk's office, so in the cases in the Northern and

21   the Western Districts, what they asked us to do was file the

22   MDL papers on the dockets for each case.  That is a little bit

23   more onerous of a task in the Southern District because there

24   are so many cases.  I think it takes us about 45 minutes for

25   each case.  But I wanted to ask the Court if you want us to do
```

N981ALLF

1     that, and we're happy to do it.  We will.  If there's another

2     solution I can work out with the clerk's office, would you be

3     comfortable with that?  And the reason I'm involving Mr. Keane

4     is because the Office of the Attorney General might have a

5     position.

6             THE COURT:  All right.  Anything you can work out with

7     the clerk is fine with me.

8             MS. AGNEW:  Okay.

9             THE COURT:  You can take yourselves down there now.

10     Anything else, friends?

11             MS. AGNEW:  No, no.  I do think we should talk about

12     scheduling of the post-trial briefs, if that's what your Honor

13     wants.

14             THE COURT:  Yes, please.

15             MR. KEANE:  Is your Honor done with me?

16             THE COURT:  Of course.  But not for long.

17             All right.  Do you need to be on the record for that,

18     friends?

19             MS. AGNEW:  We don't, your Honor.

20             THE COURT:  All right.  Thank you, Ms. Reporter.

21                               o0o

22

23

24

25

```
 1                      INDEX OF EXAMINATION
 2   Examination of:                            Page
 3    DAVID DINELLO MD
 4   Direct By Ms. Agnew  . . . . . . . . . . . 666
 5   Cross By Ms. Thomas  . . . . . . . . . . . 715
 6   Redirect By Ms. Agnew  . . . . . . . . . . 717
 7                      PLAINTIFF EXHIBITS
 8   Exhibit No.                             Received
 9    75, Dinello MWAP 1-2    . . . . . . . . . 692
10    75, Dinello MWAP 5-6    . . . . . . . . . 694
11    75, Dinello MWAP 63-64    . . . . . . . . 700
12    121, OAG WAP 597/OAG MWAP 600-1 through 2  . 705
13
14
15
16
17
18
19
20
21
22
23
24
25
```