UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PETER ALLEN, et al.,

                    Plaintiffs,

-against-

CARL KOENIGSMANN, et al.,

                    Defendants.

No. 19-CV-8173 (LAP)

OPINION & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

     Before the Court is Plaintiffs' application to convert the preliminary injunction into a permanent injunction.[1] Dr. Moores opposed the application.[2] For the reasons below, Plaintiffs' application is GRANTED.

I.   **Procedural History**

     A. **The Preliminary Injunction**

     On March 31, 2023, the Court filed an opinion granting Plaintiffs' motion for a preliminary injunction and reserving ruling on the terms of the injunction pending receipt of the parties' proposals. (Dkt. no. 552, the preliminary injunction opinion ("Pre. Inj. Op.").) On June 12, 2023, following its

---

[1] (See dkt. nos. 574, 583, and 803, Plaintiff Class's Post-Trial Brief ("Pl. Br.").)

[2] (See dkt. nos. 576, 583, and 802, Defendant Dr. Carol Moores' Post-Trial Brief ("Moores Br.").)

receipt of the parties' proposed terms,[3] the Court ordered the terms of the preliminary injunction. (See dkt. no. 602.)

**B. The Permanent Injunction Trial**

On May 3, 2023, Plaintiffs requested "a pre-motion conference regarding an intended application requesting that the Court convert its anticipated preliminary injunction to a permanent injunction or the scheduling of a trial on the merits of Plaintiffs' request for a permanent injunction." (See dkt. no. 574 at 1.) The next day, Dr. Moores responded to Plaintiffs' letter, arguing that the Court should not entertain Plaintiffs'

---

[3] Pursuant to the cautions embodied in Dean v. Coughlin, 804 F.2d 207, 213 (2d Cir. 1986), and out of respect for Dr. Moores' experience in correctional healthcare, the Court allowed Dr. Moores the opportunity to draft proposed terms for the preliminary injunction. (See dkt. nos. 575 and 575-1.) The Court found Dr. Moores' first draft of the proposed terms to be "bordering on bad faith" because her terms only applied to the seven class members whose care was discussed at the preliminary injunction hearing. (Dkt. no. 583 at 3:2-6.) The Court ordered Dr. Moores to try drafting terms again after conferring with Plaintiffs' Counsel. (Id. at 11:8-22, 13:16-25.)

On May 16, 2023, Plaintiffs filed Dr. Moores' second draft of the terms of the preliminary injunction along with a letter explaining their objections to the draft terms and requesting the opportunity to draft terms themselves. (Dkt. no. 579 and 579-1.) The Court granted Plaintiffs' request. (Dkt. no. 580.) On May 25, 2023, Plaintiffs filed their proposed terms for the preliminary injunction. (Dkt. no. 586 and 586-1.)

On May 31, 2023, the Court held a conference with the parties where it reviewed Plaintiffs' proposed terms for the preliminary injunction. On June 2, 2023, Plaintiffs submitted updated terms reflecting the agreements and orders discussed during the conference. (See dkt. no. 591 and 591-1.)

anticipated motion to convert because: 1) Dr. Moores needed time to demonstrate compliance with the terms of the not-then-entered preliminary injunction; and 2) the Court needed to hold a trial on the merits before converting the preliminary injunction to a permanent injunction. (See dkt. no. 576.)

On May 9, 2023, the Court held a conference with the parties in which Plaintiffs again raised their motion to convert. (See dkt. no. 583 at 11:23-24.) The Court ruled that it would proceed with a trial on the merits for the permanent injunction. (See id. at 12:15-13:11, 14:1-23.) In general, the Prison Litigation Reform Act provides that "[p]reliminary injunctive relief shall automatically expire on the date that is 90 days after its entry . . . ." 18 U.S.C. § 3626(a)(2). On June 20, 2023, the Court ruled that the preliminary injunction record would be incorporated into the permanent injunction trial record and noted that it was not bound by any findings of fact or conclusions of law made in the preliminary injunction opinion. (See dkt. no. 616.)

What follows is a review of the evidence relevant to the motion to convert presented in the parties' briefs, the trial record, and other associated submissions. The Court presumes the parties' familiarity with the more general facts of the case.

## II.   <u>Relevant Facts from the Trial on the Merits</u>

### A. <u>DOCCS Medical Practices under the MWAP Policy</u>

Plaintiffs called fifteen witnesses at the permanent injunction trial. Three of them, Drs. Carinci, Mueller, and Dinello, primarily testified as to DOCCS' medical practices under the MWAP policy before it was rescinded in February 2021. The Court found the testimony of Drs. Mueller and Dinello to be largely irrelevant to the issue of the permanent injunction because Dr. Dinello left DOCCS' employ in March 2021, (dkt. no. 796 ("Sept. 8 Tr.") at 716:7-16), and Dr. Mueller does not currently treat or prescribe medications to any DOCCS patients or review any prescriptions written by other providers. (Dkt. no. 792 ("Sept. 6 Tr.") at 445:16-446:22). The remaining twelve witnesses were plaintiff class members who testified as to their current treatment under Policy 1.24A.[4]

---

[4] The Court will not discuss in detail the testimony of Mark Daniels. Mr. Daniels testified that he was prescribed Lyrica in April 2023 and that though it helped his pain a little, he requested that he be taken off Lyrica completely due to the side effects he experienced. (Dkt. no. 790 ("Sept. 5 Tr.") at 102:18-103:9.) Mr. Daniels ultimately agreed to remain on Lyrica until he could discuss the medication with a pain management specialist. (<u>Id.</u> at 103:10-17.) However, his Lyrica prescription was discontinued several times upon transfer. (<u>Id.</u> at 103:18-114:10.) While this testimony shows evidence of DOCCS medical providers' discontinuing pain medications upon transfer without first meeting with or examining the patient, Mr. Daniels's testimony regarding the inefficacy of Lyrica in treating his pain and the intolerable side effects he experienced while taking Lyrica limits the value of this (footnote continued)

i. **Dr. Adam Carinci**

a. **Background**

Dr. Adam Carinci is an associate professor of anesthesiology and pain management at the University of Rochester Medical Center. (Sept. 6 Tr. at 233:8-19.) His specialty is pain management. To be able to practice this specialty, he completed a one-year fellowship at Massachusetts General Hospital and Harvard Medical School. (Id. at 233:5-7, 234:8-12.) Dr. Carinci's current pain management practice is an outpatient practice in which he prescribes medication and interventional procedures to help treat his patients' pain. (Id. at 234:13-24.) Dr. Carinci has treated patients as a pain management specialist continuously since 2009 and has treated "[w]ell-over 10,000 patients" in that time. (Id. at 234:25-235:19.) Plaintiffs moved without objection to certify Dr. Carinci as an expert in pain management, which the Court approved. (Id. at 235:20-23.)[5]

---

(continued) evidence as it relates to the deliberate indifference claims that underpin the permanent injunction application.

[5] Dr. Moores attempted to impugn Dr. Carinci's credibility by referencing his testimony in other cases on behalf of what Dr. Moores characterizes as "pill mill[s]." (See, e.g., Moores Br. at 9, n.1.) Dr. Moores' attempt is unpersuasive. The Court finds Dr. Carinci to be a credible expert in pain management.

Dr. Moores also notes that, like the DOCCS medical providers whose care he critiques in his report, (footnote continued)

b. **The Practice of Pain Management**

Dr. Carinci testified that "individualized patient assessment is critical to the standard of care" in a pain management practice because "no two patients will respond in the same way to a given medication." (Sept. 6 Tr. at 249:25-250:12.) Indeed, Dr. Carinci testified that in the practice of pain management, "individual patient assessment is really paramount to effective treatment." (Id. at 250:13-17.)

Dr. Carinci testified that in the pain management specialty, many of the medications he and other medical providers prescribe to their patients are used in a way that is "off label or not FDA approved." (Id. at 300:21-301:4; 301:13-16.) Dr. Carinci explained that a medication is only approved for a particular condition after a clinical trial has been done to address a specific question; for example, whether Neurontin[6] is more effective in treating diabetic peripheral neuropathy than a placebo. If the results showed that Neurontin was more effective, the FDA would then approve the use of Neurontin for

_____

(continued) Dr. Carinci made findings regarding many patients who he did not personally examine and without discussing the patients with their medical providers. (Id. at 9-10.) The Court accepts these facts and has considered them in determining the weight to assign to Dr. Carinci's report.

[6] Neurontin (generic name gabapentin) is an anti-seizure drug that is also prescribed to treat nerve pain. (Sept. 6 Tr. at 351:4-17; 301:5-23.) Any references in the record to gabapentin will be changed to Neurontin for the purposes of this opinion.

diabetic peripheral neuropathy. (Id. at 301:5-13.) Dr. Carinci thus testified that a Regional Medical Director's ("RMD") discontinuing a medication as not appropriate because it was being used off-label or in a way that was not FDA-approved was "not consistent with the practice of medicine" because in the pain management practice "many of these medications are used off label or not FDA approved." (Id. at 300:24–301:4; 301:16-23.)

Dr. Carinci explained that different medications can "fail" for different patients. Dr. Carinci testified that drug failure can take one of three forms: 1) the drug did not provide efficacy in treating the patient's pain; 2) the drug caused intolerable side effects; or 3) there were other contraindicators with the drug, such as drug to drug interactions or underlying medical problems. (Id. at 269:22-270:15.)

Dr. Carinci testified that a patient's history of substance abuse was an important factor in determining the patient's pain management care. (Id. at 257:10-15.) However, Dr. Carinci also testified that a "remote history of abuse is not an absolute contraindication to prescribing medications with abuse potential." (Id. at 258:1-3.) Dr. Carinci elaborated that "people with a history of abuse are routinely prescribed medications with abuse potential" and that he does this in his

own practice. (Id. at 258:3-5.) Dr. Carinci testified that he felt that an "active addiction is very different than a history of remote addiction" and "remote really can be anything other than an ongoing active addiction." (Id. at 258:21-259:8.) Dr. Carinci also testified that the abuse potential of a medication would not be a medical basis for discontinuing a medication that was otherwise effective. (Id. at 273:17-21.)

The Court found Dr. Carinci to be a credible witness.

### c. **The MWAP Policy**

As part of his review of DOCCS' MWAP policy, Dr. Carinci studied the medical records of seventy patients and ten thousand MWAP request forms and conducted physical examinations of seventeen patients in DOCCS facilities. (See Exhibit P-137, Expert Report of Dr. Adam Carinci, "Carinci Report.") Dr. Carinci testified that "in many, many instances," the MWAP policy caused DOCCS providers to discontinue Neurontin for non-medical reasons and "without regard to the individual patient parameters." (Sept. 6 Tr. at 272:7-273:16.) Dr. Carinci testified that based on the medical records he reviewed, the assessments conducted by DOCCS providers were poor. (Id. at 256:23-257:1.) Dr. Carinci testified that the assessments reflected in the medical records were "often very superficial," lacking any evidence that the DOCCS provider performed "any sort

of physical exam" to corroborate a patient's subjective complaints of pain. (Id. at 257:2-9.)

Dr. Carinci felt that the MWAP policy "overstepped" the "potential abuse liability of certain medications" covered by the policy, like Neurontin and Lyrica,[7] which have "exceedingly low" abuse liability. (Id. at 262:14-25.) Dr. Carinci noted that concerns about abuse of Neurontin, for example, would be especially low in a prison environment because Neurontin could be administered in a liquid form one unit dose at a time. Dr. Carinci compared this to the standard in the wider community where a patient could receive a jar of 180 to 360 tablets of Neurontin in one prescription. (Id. at 263:18-264:3.) Dr. Carinci testified that in his fifteen years of practice, he had never: 1) been concerned that one of his patients was abusing or selling Neurontin; 2) had any patients ask for more Neurontin than he provided; 3) had any patients ask him for an very early refill of their Neurontin prescription; 4) had a family member report that a patient was over-taking Neurontin; or 5) had any patients fail a urine screen for Neurontin. (Id. at 265:6-16.) Dr. Carinci has had a similar experience with Lyrica. (Id. at 266:16-17.) By contrast, he has had these issues

_____

[7] Lyrica (generic name pregabalin) is a newer, more potent version of gabapentin. (Sept. 6 Tr. at 274:13-19.) Any references in the record to pregabalin will be changed to Lyrica for the purposes of this opinion.

with other medications he prescribes in his practice, such as opioids. (Id. at 265:17-266:15.)

Dr. Carinci's criticism of the MWAP policy is focused on the fact that the RMDs had the power to veto primary care physician ("PCP") prescriptions for their patients when the RMDs did not evaluate the patients or have access to the patients' medical records. (Id. at 267:6-17.) The MWAP request forms that the RMDs reviewed to inform their decisions did not include data on specialist recommendations, medications that had been tried and failed, or the efficacy of different medications. (Id. at 267:23-268:4.) Dr. Carinci found that due to the MWAP policy, DOCCS patients' medications were discontinued without an individualized assessment. (Id. at 267:1-2; 272:7-13.) Dr. Carinci testified that if a medical provider does not have a reason to discontinue an effective medication, that medical provider is causing his or her patient harm. (See id. at 282:24-283:1.) Dr. Carinci never saw any evidence that an RMD followed up about a patient's treatment after discontinuing or denying that patient an MWAP medication. (See id. at 269:4-7.)

Dr. Carinci concluded that the MWAP policy prevented DOCCS patients from getting Neurontin and Lyrica, among other medications. (Id. at 263:1-4.) Dr. Carinci testified that PCPs would "repeatedly" ask for MWAP drugs, and they would be

"repeatedly denied." (Id. at 268:17-23.) Dr. Carinci testified that these medications were "refused so often that [the PCPs] basically stopped asking for them." (Id. at 268:17-20.) Dr. Carinci testified that PCPs were left "sort of cycling back to the same three medications that had been tried and failed over and over again": ibuprofen, Elavil,[8] and Cymbalta.[9] (Id. at 268:20-25.) Dr. Carinci testified that DOCCS PCPs understood they could prescribe these three drugs without having to receive authorization from their RMDs. (Id. at 269:8-16.) Dr. Carinci testified that this led DOCCS PCPs to try to treat patients with these medications even when they had been "tried and failed before" or even when there were "contraindications" to using these medications. (Id. at 269:16-20.)

As an example of how this cycle of drug failure occurred during the MWAP policy, Dr. Carinci testified that he saw instances of patients suffering from constipation or lack of

---

[8] Elavil (generic name amitriptyline) is a "tricyclic antidepressant medication" that is also a "first-line medication for chronic pain" and a "valid treatment" for some patients with neuropathic or chronic pain. (Sept. 6 Tr. at 271:3; 369:3-20.) Any references in the record to amitriptyline will be changed to Elavil for the purposes of this opinion.

[9] Cymbalta (generic name duloxetine) is an antidepressant used to treat anxiety or depression that is also a "valid treatment" for some patients with neuropathic or chronic pain. (Sept. 6 Tr. at 271:20-24; 369:15-22.) Any references in the record to duloxetine will be changed to Cymbalta for the purposes of this opinion.

urinary retention who were continued on an Elavil prescription, even though these conditions are common side effects from taking Elavil. (Id. at 270:19-271:19.) Dr. Carinci also saw instances where patients were put on Cymbalta for pain despite already being on another antidepressant for anxiety or depression. In such instances, putting the patient on Cymbalta could lead to drug-to-drug interactions that could precipitate depression or mania. (Id. at 271:20-272:6.)

   B. **DOCCS Patients Whose Medications Were Discontinued Under the MWAP Policy and Re-Prescribed in 2023 After They Contacted Plaintiffs' Counsel**

      i. **Kenneth Windley**

   Kenneth Windley came into DOCCS custody in April 2007. (See Dkt. no. 794 ("Sept. 7 Tr.") at 475:5-8.) He does not currently have a substance abuse problem. (Id. at 476:1-3.) Mr. Windley suffers from a severe case of spinal stenosis. (Id. at 476:22-24.) His condition causes him severe back pain and led to a condition called "drop foot" which interferes with his ability to walk. (Id. at 476:4-21.) Mr. Windley went through two surgeries in 2013 and 2015 to address his spinal stenosis, though they did not ameliorate his chronic pain. (Id. at 477:3-16.) In 2015, while he was housed at Green Haven Correctional Facility ("Green Haven"), Mr. Windley was prescribed Percocet and Neurontin, which he testified helped with his chronic pain. (Id. at 477:17-478:2; 478:7-10.) Mr. Windley testified that he

moved "a little better" when he was not in as much pain. (Id. at 478:3-6.) However, his medications were discontinued in mid-2015. (Id. at 478:14-22.) When Mr. Windley spoke to his medical providers, Drs. Wolf, Kenning, Goldman, and Bode, about the pain he was feeling due to the discontinuation of his medication, they prescribed him ibuprofen 600 and told him that it was "all they had." (Id. at 479:19-480:17.)

In August 2021, Mr. Windley was transferred to Woodbourne Correctional Facility ("Woodbourne"). (Id. at 480:21-481:1.) He told PA Switz, his provider at Woodbourne, that he was suffering from chronic pain, and she continued a prescription he had for Cymbalta, which he said helped "a little bit" to treat his pain. (Id. at 481:15-16.) However, he asserted he "still was feeling major pain." (Id. at 481:2-16.) Mr. Windley testified that he was medically unemployed (i.e., without prison programming) because it was hard for him to sit for long periods and hard for him to walk due to his conditions. (Id. at 481:17-482:6.) Mr. Windley testified credibly that he told PA Switz that Cymbalta was not significantly helping with his pain, and she replied that they did not "give that medication there," an apparent reference to his Neurontin prescription that was discontinued at Green Haven in 2015. (Id. at 482:7-10.)

After Woodbourne, Mr. Windley was transferred to the special housing unit ("SHU") at Sullivan Correctional Facility ("Sullivan") due to a conviction for drug possession. (Id. at 482:14-20.) Mr. Windley testified that the drugs were not his and that he was not given a drug test at the time to see if the drugs were in his system. (Id. at 482:18-483:7; 484:12-16.)

In September 2022, Mr. Windley was transferred to Adirondack Correctional Facility ("Adirondack"). (Id. at 484:8-11; 485:21-25.) He did not meet his medical provider, Nurse Practitioner ("NP") Dahlia Wiggan, until two and a half months after he arrived at Adirondack. (Id. at 485:2-10; 491:10-11.) During that time, he submitted sick call slips to meet with his provider but was only given access to the nursing staff. (Id. at 485:15-20.) Dr. Moores offered into evidence Defense Exhibit 23, a refusal form signed by Mr. Windley and dated September 26, 2022, that appeared to show Mr. Windley refusing a "[n]ew draft appointment" with his medical provider. (Id. at 491:23-493:8.) However, Mr. Windley denied refusing the appointment with his medical provider and testified that while he signed the form, the words on the form detailing the service he was refusing were "not in place on that paper" when it was given to him by the prison officer. (Id. at 492:4-493:17.) The Court credits his testimony.

When Mr. Windley met with NP Wiggan in November 2022, he
told NP Wiggan that he was feeling "a lot of pain every day,"
that he had been on effective treatments previously, and that he
needed to see a specialist. (Id. at 485:11-14; 486:1-12.)
Mr. Windley testified that she only gave him meloxicam. When
Mr. Windley told NP Wiggan that the meloxicam did not
effectively treat his pain, she referred him to get an x-ray
an1d an MRI, which took about a month. (Id. at 486:9-20; 494:20-
25.) Mr. Windley testified that at his first appointment, NP
Wiggan prescribed him a back brace and leg braces to treat his
pain and help him walk. (Id. at 495:7-17.)

Mr. Windley testified that following the MRI, NP Wiggan had
not prescribed him effective treatment for his pain. (Id. at
486:21-23.) However, Mr. Windley testified that he saw NP Wiggan
a second time in March 2023 where NP Wiggan asked him if the
meloxicam was helping his pain. (Id. at 495:18-24.) Mr. Windley
testified that after he told her the meloxicam was not helping
his pain, NP Wiggan prescribed him Neurontin and Ultram. (Id. at
495:18-496:11.) Mr. Windley noted that NP Wiggan prescribed him
the Neurontin and Ultram only after he contacted Plaintiffs'
Counsel. (Id. at 486:24-488:8.) NP Wiggan initially prescribed
Mr. Windley three hundred milligrams of Neurontin and fifty
milligrams of Ultram and increased the Neurontin dosage to six

15

hundred milligrams after Mr. Windley told her that he was still in pain. (Id. at 486:24-488:8; 497:5-17.)

Mr. Windley testified that at the second appointment in March 2023, NP Wiggan referred him to a neurosurgeon whom he had seen twice and who ordered Mr. Windley an EMG test that was completed. (Id. at 496:12-497:4.) The neurosurgeon wanted to fuse the disc on his S1 vertebrae to take the pain off his nerve. (Id. at 498:14-16.) Mr. Windley testified that his new prescription sometimes helped with his chronic pain. (Id. at 488:9-12.) No one at Adirondack has discontinued his medications since they were prescribed in March 2023 or since he contacted Plaintiffs' counsel. (Id. at 486:24-487:10; 490:22-491:6.)

The Court found Mr. Windley to be a credible witness.

### ii.  **Samson Burch**

Samson Burch entered DOCCS custody in 1981. (Sept. 7 Tr. at 506:24-507:3.) He suffers from sciatic nerve damage and a degenerated disc. (Id. at 507:25-508:5.) Mr. Burch testified that his pain is so intense that he must fight for ten minutes to get out of bed. (Id. 508:6-12.) He now walks with a permanent limp due to his pain. (Id. at 508:17-23.) Mr. Burch testified that his pain prevents him from lifting lightweight objects, prevents him from exercising, and interferes with his sleep. (Id. at 509:9-510:2.)

16

Mr. Burch testified that he used to receive Neurontin and Ultram three times a day and that they eliminated his pain. (Id. at 510:3-22.) Mr. Burch testified his medications were discontinued while he was at Greene Correctional Facility ("Greene") between 2018 and 2020. (Id. at 510:23-511:7.) Mr. Burch testified credibly that his provider, Dr. Keiser, was upset about the discontinuation and that the doctor said he was forced to discontinue Mr. Burch's medication by someone higher up in Albany. (Id. at 511:11-25.) Mr. Burch testified that Dr. Keiser did not want to discontinue his medication because Dr. Keiser knew it was helping Mr. Burch. (Id. at 512:1-3.) Mr. Burch testified that Dr. Keiser prescribed him Elavil instead, which did not help with Mr. Burch's pain. (Id. at 512:4-11.) Mr. Burch testified that Dr. Keiser tried to see if he could prescribe Mr. Burch a different medication, but he told Mr. Burch that he could only prescribe Elavil. (Id. at 512:14-22.) Dr. Keiser then increased Mr. Burch's Elavil dosage, which Mr. Burch testified helped him "very slightly." (Id.) Mr. Burch testified that he continued taking Elavil. (Id. at 512:23-25.)

In 2020 or 2021, Mr. Burch was transferred to Adirondack, where he is currently housed. (Id. at 513:1-5.) Mr. Burch's Elavil prescription was continued after his transfer to Adirondack. (Id. at 517:12-22.) Mr. Burch testified that he spoke to his provider, NP Wiggan, about his chronic pain. (Id.

17

at 513:16-19.) Mr. Burch testified that NP Wiggan first prescribed him meloxicam, which he said was "useless." (Id. at 513:18-25.) Mr. Burch testified he then contacted Plaintiffs' Counsel, and following that contact, he met with NP Wiggan again to tell her that his Elavil prescription was not working. (Id. at 514:8-22; 516:19-517:11.) Mr. Burch testified that the same day, NP Wiggan discontinued his Elavil prescription and prescribed him six hundred milligrams of Neurontin twice a day. (Id.) Mr. Burch testified that he received his new prescription for Neurontin in 2023 and that it had helped his chronic pain "somewhat." (Id. at 514:11-25.) Mr. Burch testified that he had previously been on a much higher dosage of Neurontin and had recently filed a sick call slip to discuss his treatment with NP Wiggan. (Id. at 515:1-12.) Mr. Burch testified that his Neurontin prescription works better to treat his pain than the Elavil he had previously taken. (Id. at 518:2-4.) Mr. Burch testified that since he arrived at Adirondack, he had also been prescribed a back brace to help with his pain. (Id. at 518:5-9.)

The Court found Mr. Burch to be a credible witness.

### C. DOCCS Patients Whose Medications Were Discontinued Under the MWAP Policy and Re-Prescribed After the Preliminary Injunction Order Was Issued

#### i. Tina Vivenzio

Tina Vivenzio came into DOCCS custody in 2014. (Sept. 5 Tr. at 9:21-23.) She suffers from degenerative back disease, neuropathy, and restless legs. (Id. at 10:4-7.) When she came into DOCCS custody, Ms. Vivenzio was taking Indocin, Mobic, Belbuca, and Neurontin. (Id. at 10:9-13.) Ms. Vivenzio said that while she was on Neurontin, it helped her to "move around better," enabled her to walk around and do more activities, relieved some of the pain she suffered due to her neuropathy, and significantly improved her sleep. (Id. at 11:2-9.) Ms. Vivenzio has a history of opioid addiction, having taken Suboxone without a prescription as recently as 2017. (Id. at 25:23-26:6.)

When Ms. Vivenzio was transferred from Bedford Hills Correctional Center ("Bedford Hills") to Albion Correctional Center ("Albion") in December 2017, her Neurontin prescription was discontinued. (Id. at 11:10-12:10.) She does not remember who specifically discontinued her Neurontin prescription, but she found out that it was discontinued when she went to receive her medication at the medication window. (Id. at 12:11-18.) Ms. Vivenzio testified credibly that she spoke to her provider about why her Neurontin prescription was discontinued, and he told her

that it was "cut off by Albany because it was now a controlled substance." (13:13-18.)

Ms. Vivenzio testified that without her Neurontin prescription, her back pain was "terrible" and, along with her leg neuropathy, prevented her from sitting or standing for long stretches. (Id. at 12:22-13:1.) Ms. Vivenzio testified that after her Neurontin was discontinued, she was not given anything that was effective in treating her neuropathic symptoms. (Id. at 18:14-18.) Ms. Vivenzio testified that she tried Mobic and Elavil as alternatives to Neurontin and neither helped her. (Id. at 18:14-19:4.)

Ms. Vivenzio testified that in the last year, she started seeing a new medical provider at Albion, NP Bode. (Id. at 19:17-25.) Ms. Vivenzio said that around July 2023, NP Bode restored Ms. Vivenzio's Neurontin prescription and sent her out to see a neurologist. (Id. at 19:7-19; 20:21-21:6.)[10] Ms. Vivenzio testified that the Neurontin she now receives significantly

---

[10] Dr. Moores' Counsel asserted during cross examination that Ms. Vivenzio's medical records showed that her Neurontin prescription was restarted by NP Bode in October 2022 rather than July 2023. (Sept. 5 Tr. at 24:14-25:1.) However, Dr. Moores did not offer Ms. Vivenzio's relevant medical records as evidence. Thus, the Court adopts Ms. Vivenzio's testimony as the date she was re-prescribed Neurontin.

improves her mobility, allowing her to do more, stand more, and work more. (Id. at 21:7-11.)

Ms. Vivenzio testified that in August 2023, she participated in an annual pain assessment with NP Bode. During the pain assessment, Ms. Vivenzio testified that she was currently taking baclofen,[11] Neurontin, and Indocin for her pain. (Id. at 26:17-27:4.) When she saw the neurologist in July 2023, the neurologist recommended that Ms. Vivenzio take baclofen for her back spasms, which NP Bode then prescribed. (Id. at 29:5-18.) The neurologist also recommended that Ms. Vivenzio's Neurontin dosage be increased, which NP Bode prescribed. (Id. at 30:7-10.)

---

[11] Baclofen is a muscle relaxant and an antispasmodic agent that treats muscle-related pain. (Sept. 6 Tr. at 275:17-24.) Dr. Carinci testified that while the MWAP policy was in place, baclofen was "reverted to as the muscle relaxant of choice." (Id. at 275:20-21.) Dr. Carinci testified that there was an "overprescription" of baclofen even when it had been tried and failed, even when there were medical reasons not to use it, and even when there were other muscle relaxants that were equally or more efficacious. (Id. at 275:20-276:3.) Dr. Carinci testified that he thought "most providers would reserve baclofen later down the line" until after an alternative muscle relaxant had failed because "baclofen is so heavily sedating." (Id. at 276:10-12.) Dr. Carinci also noted that once a patient is on baclofen, the medication cannot be abruptly discontinued. It must be tapered down to avoid withdrawal. (Id. at 276:12-18.)

Ms. Vivenzio also indicated in her pain assessment that she had previously used a TENS unit,[12] that she currently uses a knee brace, two wrist braces, heat sources, and ice, all to treat her pain. (Id. at 27:12-29:1.) Ms. Vivenzio asked NP Bode for a lidocaine patch and diclofenac gel to treat her pain, which NP Bode prescribed for her. (Id. at 29:19-30:6.)

The Court found Ms. Vivenzio to be a credible witness.

### ii.  Marc Confessore

Marc Confessore entered DOCCS custody in 2017. (Sept. 7 Tr. at 520:13-15.) Mr. Confessore suffers from "real bad pains" in his lower back and right shoulder, and had suffered both a broken foot and a broken finger, the latter of which resulted in tremors in his finger. (Id. at 520:23-521:6.) Mr. Confessore testified credibly that his pain was "terrible" and kept him from getting out of bed most of the day. (Id. at 521:7-15.) Mr. Confessore testified that Neurontin was effective in treating his pain. (Id. at 521:25-522:4.) He first received Neurontin at Rikers Island ("Rikers") in 2018. (Id. at 522:5-15.) Once he

---

[12] A transcutaneous electrical nerve simulation ("TENS") unit is a small electronic device that serves to alleviate a patient's pain by placing electrodes on his or her skin to activate his or her nerves. See Dac Teoli, M.D. and Jason An, M.D., Transcutaneous Nerve Simulation, NATIONAL LIBRARY OF MEDICINE (last updated Jan. 22, 2023), https://www.ncbi.nlm.nih.gov/books/NBK537188/; see also Sept. 5 Tr. at 180:1-13.

entered DOCCS custody, Mr. Confessore stopped in Downstate
Correctional Facility ("Downstate") before he was transferred to
Sing Sing Correctional Facility ("Sing Sing") in 2019, where his
Neurontin prescription was discontinued. (Id. at 522:16-20;
524:5-23.) Mr. Confessore testified credibly that the medical
provider who discontinued his Neurontin told Mr. Confessore that
the medical provider could not get Neurontin anymore. (Id. at
523:4-7.) Mr. Confessore testified that he was not prescribed
any alternative medications. (Id. at 525:5-7.)

After Sing Sing, Mr. Confessore was transferred to Upstate
Correctional Facility ("Upstate") and then Clinton Correctional
Facility ("Clinton"). (Id. at 525:13-526:11.) Mr. Confessore
testified that in both facilities he was only given ibuprofen
for his pain despite frequently putting in sick call requests
and grievances and expressing his pain to his providers. (Id. at
525:13-527:2.)

After Clinton, Mr. Confessore was transferred to Bare Hill
Correctional Facility ("Bare Hill"), where he is currently
housed. (Id. at 527:3-4.) His medical provider at Bare Hill is
Dr. Connolly, who did not originally prescribe him Neurontin
despite his explaining to Dr. Connolly that Neurontin was
effective in treating his pain. (Id. at 527:5-20.)
Mr. Confessore testified that Dr. Connolly first prescribed him

23

ibuprofen. After Mr. Confessore complained of an upset stomach, Dr. Connolly prescribed Mr. Confessore meloxicam. (Id. at 533:5-21.) Mr. Confessore testified that he had seen Dr. Connolly about his hand tremors and that Dr. Connolly referred him to a hand specialist. (Id. at 533:22-534:4.) Mr. Confessore testified that he saw the specialist and Dr. Connolly prescribed him primidone to treat his tremors, but Mr. Confessore complained that the primidone made him tired, and he refused to continue taking it. (Id. at 534:7-17.)

Mr. Confessore testified that he complained about having back pain in a sick call request in July 2023 and that he was seen by Dr. Connolly in the first week of August 2023. (Id. at 531:21-532:1.) Mr. Confessore testified that during that appointment, Dr. Connolly asked about his back pain and his tremors. (Id. at 532:2-6.) Mr. Confessore testified credibly that at this meeting, he told Dr. Connolly that he was still in pain, just as he had been telling Dr. Connolly "for the past two and a half years." (Id. at 532:7-16.) Mr. Confessore testified that Dr. Connolly re-prescribed him Neurontin at that appointment, the day before Mr. Confessore's deposition in this case was set to take place. (Id. at 527:21-530:10; 532:17-19.)

Mr. Confessore testified that the Neurontin prescription makes his pain "a lot better" and has "absolutely" been

effective in treating his pain. (Id. at 527:15-17; 530:7-12.)
Mr. Confessore testified that he has been on Neurontin
continuously since it was re-prescribed. (Id. at 532:23-533:1.)
Mr. Confessore testified that due to his history of abusing
Percocet, Xanax, and Klonopin, he is in the MAT program, a
treatment program that DOCCS offers for patients who suffer from
opioid-abuse disorder. (Id. at 535:14-536:5; Sept. 5 Tr. at
79:6-10.)

 The Court found Mr. Confessore to be a credible witness.

**D. DOCCS Patients Whose Medications Were Discontinued
   Without Medical Justification After DOCCS Promulgated
   Policy 1.24A**

  **i. James Pine, Sr.**

 James Pine, Sr. entered DOCCS custody in February 2008.
(Sept. 5 Tr. at 39:2-4.) His worst medical condition is the
neuropathy he sustained in his right leg following a hip
replacement. (Id. at 39:13-16.) When left untreated, Mr. Pine
slept eight to twelve minutes at a time because his left leg
spasmed and his right leg cramped, leaving him with constant
burning, shooting pains down the leg. (Id. at 39:22-40:4.)
Mr. Pine testified that he was sometimes bedridden the entire
day due to the pain he experienced traversing the stairs of the
prison. (Id. at 40:6-16.) Mr. Pine has dealt with this pain
since 2009, when he slipped at Great Meadow Correctional

25

Facility ("Great Meadow") and fractured his pelvis. (Id. at
40:18-25.) At Green Haven, where Mr. Pine was housed from 2011
to 2022, Mr. Pine was formally diagnosed with nerve damage by
his medical provider, Dr. Silver. (Id. at 41:2-13; 55:11-14.)
Mr. Pine has a history of substance abuse. (Id. at 53:14-54:2.)

While he was at Green Haven, Dr. Silver prescribed Mr. Pine
Neurontin and MS Contin. (Id. at 41:24-42:6.) Mr. Pine testified
that his Neurontin was discontinued in 2017. (Id. at 42:14-20.)
When Mr. Pine was told at the medication window that his
Neurontin was discontinued, he filed for sick call to talk to
Dr. Silver about his prescription and he testified credibly that
Dr. Silver told Mr. Pine that his hands were tied because Dr.
Hammer told him that the Neurontin prescription was
discontinued. (Id. at 42:21-43:1; 43:25-45:8.)

Mr. Pine testified that after his Neurontin prescription
was discontinued, he was "left to suffer from that point on."
(Id. at 45:10-12.) He described the intensity of his nerve pain
as "horrible," characterizing it as a "burning" sensation, and
recounting that his "leg would be numb and cramp all night
long." (Id. at 45:10-19.) Mr. Pine recalled that when he was
receiving his Neurontin prescription, he was able to get out of
bed in the morning, walk, and exercise regularly. (Id. at 46:1-
6.) Mr. Pine testified credibly that he "constantly ask[ed]

26

[Dr. Silver] what was going on with the Neurontin" and all Dr. Silver said was that it was a discontinued medication. (Id. at 46:7-47:8.)

Dr. Silver ultimately reinstated Mr. Pine's Neurontin prescription after the MWAP policy was rescinded in February 2021. (Id. at 57:4-22.) Then, in 2022, Mr. Pine was transferred from Green Haven to Great Meadows, and his Neurontin prescription was again discontinued. (Id. at 57:23-58:18.) Mr. Pine testified that during his initial consultation at Great Meadows, he told his medical provider, Dr. Silverberg, that he was prescribed Neurontin and asked Dr. Silverberg to review his records so he would see that Mr. Pine had been prescribed Neurontin in the past. (Id. at 49:16-24.) Mr. Pine testified that he told Dr. Silverberg that his "leg pain was horrible because of the neuropathy." (Id. at 59:16-24.) Mr. Pine testified credibly that Dr. Silverberg ignored him, said that Mr. Pine was "not [t]here for that," and when he pressed the issue, Dr. Silverberg "threw [Mr. Pine] out of his office; he didn't want to hear it." (Id. at 49:19-50:1.) Mr. Pine testified that for the five months he was at Great Meadows, he was never prescribed Neurontin. (Id. at 59:25-60:6.)

In December 2022, Mr. Pine was transferred to Clinton, where he is currently housed. (Id. at 47:10-16; 50:2-12.) After

he arrived, when he went down to sick call once a month to receive medication for his blood pressure, Mr. Pine said as an aside that he wanted to see his medical provider regarding his Neurontin prescription. (Id. at 47:13-48:1.) Mr. Pine testified that his current medical provider, Nurse Devlin-Varin, re-prescribed him Neurontin in January 2023. (Id. at 48:3-9.) Nurse Devlin-Varin re-prescribed Mr. Pine Neurontin the first time Mr. Pine requested it and has fulfilled two separate requests from Mr. Pine in April and July 2023 to increase his dosage of Neurontin. (Id. at 54:3-16.) Mr. Pine testified that the Neurontin he receives now "absolutely" helps him. (Id. at 51:2-8.)

The Court found Mr. Pine to be a credible witness.

### ii. **Miguel Tirado**

Miguel Tirado entered DOCCS custody in or around April 2022. (Id. at 541:6-9.) Mr. Tirado testified he is diabetic and experiences pins and needles in his feet. (Id. at 541:11-25.) Mr. Tirado testified that he started feeling pins and needles in his feet while he was free, and his outside doctor prescribed him Neurontin. (Id. at 542:2-25.) Mr. Tirado testified he was prescribed Neurontin for seven or eight years and it was effective in treating the pins and needles he felt in his feet. (Id. at 543:1-6.) Mr. Tirado testified that at the time of his

arrest, before he entered DOCCS custody, he was still on
Neurontin and his Neurontin prescription was continued while he
was held at Rikers. (Id. at 543:24-544:15.) Mr. Tirado testified
that he did his DOCCS intake at Green Haven where the person
doing his intake told him that "they don't give [Neurontin] here
in the state." (Id. at 544:23-546:10.)

After his intake at Green Haven, Mr. Tirado spent a month
at Elmira Correctional Facility ("Elmira") where he was not
prescribed Neurontin. (Id. at 546:22-547:13.) Mr. Tirado
testified credibly that because his Neurontin prescription was
discontinued, he began to feel pins and needles in his feet
again and a numbness from his shins down. (Id. at 547:14-548:5.)
Mr. Tirado testified credibly that he told his medical providers
at Elmira about his pain but that they did not prescribe him any
medication to address the pins and needles in his feet. (Id. at
548:6-11.) Mr. Tirado testified he did not see any specialists
while he was at Elmira. (Id. at 548:12-15.)

In or around April 2022, Mr. Tirado was then transferred
from Elmira to Marcy Correctional Facility ("Marcy") where he
currently resides. (Id. at 548:19-549:3.) Mr. Tirado testified
that once he was at Marcy, he tried to explain to Nurse Theresa
Riley what had happened to his discontinued medications, and
Nurse Riley told him to file for sick call. (Id. 549:4-550:5.)

Mr. Tirado testified credibly that the doctor he saw for sick call told him that they did not give Neurontin there because it was a narcotic. (Id. at 549:10-14; 550:13-19.) Mr. Tirado testified credibly that he was told the same thing by Nurse Riley when he asked her about his discontinued medication at the medication window while he was getting his insulin. (Id. at 549:24-550:19.) Mr. Tirado testified credibly that he told both the doctor and Nurse Riley about the pain, pins and needles, and numbness he was feeling in his legs and that they both "brushed [him] off" and told him that he could not get Neurontin there. (Id. at 551:2-9.)

Mr. Tirado testified that he refused to take his insulin for a month when he first arrived at Marcy because Nurse Riley was "terrorizing" him, trying to get him in trouble by telling the prison officers to give him a disciplinary ticket. (Id. at 558:10-559:3; 571:2-13.) Mr. Tirado testified that because the officers did not want to do the paperwork necessary to give him a ticket, they would tell him to do menial tasks like picking up cigarette butts from the floor. (Id. at 571:2-13.) Mr. Tirado testified that he understood the risks of not taking his insulin, including blindness, kidney failure, stroke, heart attack, peripheral vascular disease, and infection, but that none of these risks was explained to him. (Id. at 559:20-560:19.) Mr. Tirado testified that he only refused to take his

insulin in the mornings because that was when Nurse Riley was working. (Id. at 560:25-562:5.) Mr. Tirado testified that he also refused to take his labs but said he did not refuse to take the finger stick test. (Id. at 562:6-24.) In January 2023, Mr. Tirado was diagnosed with diabetic retinopathy, i.e., vessel damage to his eyes, because he did not take his insulin. (Id. at 563:22-564:14.)

Mr. Tirado testified that he first contacted Plaintiffs' Counsel in early 2023 and was re-prescribed Neurontin on August 15th, 2023. (Id. at 552:1-9.) Mr. Tirado testified he was re-prescribed Neurontin before his deposition in this case was scheduled. (Id. at 552:17-553:13.) Mr. Tirado testified that the Neurontin he now receives is helping him but that he believes he needs a higher dose because he "still wake[s] up at night from the pain." (Id. at 553:14-23.) Mr. Tirado previously received twelve hundred milligrams of Neurontin per day and is now prescribed three hundred milligrams. (Id. at 553:24-554:3.) Mr. Tirado testified that twice he refused to take his Neurontin in the mornings because he was being mistreated by the officers on duty in the mornings. (Id. at 564:15-565:20.) Mr. Tirado testified he has no history of drug addiction, though he used cocaine a "long time ago." (Id. at 554:7-9; 556:21-557:6.)

The Court found Mr. Tirado to be a credible witness.

31

E. **DOCCS Patients Whose Medications Were Discontinued and Remain Without Effective Medication**

i. **Eric Lindemann**

Eric Lindemann entered DOCCS custody in or around June of 2021. (Sept. 5 Tr. at 63:6-12; 66:18-21.) Mr. Lindemann suffers from nerve pain in his lower back that shoots down his right leg and "[c]onstant cramping and pain in the lower back" due to several herniated discs. (Id. at 63:13-20.) Mr. Lindemann has suffered from these conditions for over fifteen years following two car accidents that damaged his lower back. (Id. at 63:21-64:5.) After these car accidents, Mr. Lindemann's outside medical providers initially treated his pain with opioids. (Id. at 64:9-16.) Mr. Lindemann later developed opioid-abuse disorder,[13] and starting in 2018 or 2019, Mr. Lindemann's doctors were simultaneously prescribing him Suboxone[14] to treat his opioid-abuse disorder and Neurontin to treat his pain with no

_____

[13] Dr. Moores attempted to impeach Mr. Lindemann's testimony by reading a section of his deposition in which Mr. Lindemann testified that his opioid-abuse disorder started while he was incarcerated, not before he was incarcerated. (Sept. 5 Tr. at 84:18-22.) On cross, Mr. Lindemann explained that his deposition testimony referred to the fact that he was diagnosed with opioid-abuse disorder when he was incarcerated, and he had not known what the disorder was called before then. (Id. at 85:4-6.) The Court found Mr. Lindemann's explanation persuasive and thus adopts his hearing testimony.

[14] Suboxone is an "is an opioid class of medications that is generally prescribed for people that have an opioid-abuse disorder" in which buprenorphine is the main ingredient. It is used to treat addiction and pain. (Sept. 6 Tr. at 364:7-365:16.)

ill effects. (Id. at 64:17-65:19; 79:6-80:14.) Mr. Lindemann
testified that the Neurontin alleviated his pain by stopping the
"radiating pain that started in [his] lower back and went down
[his] right leg." (Id. at 65:20-22.) Mr. Lindemann further
testified that his Neurontin prescription helped him to sleep
and sit more comfortably. (Id. at 65:24-66:1.)

Before coming into DOCCS custody, Mr. Lindemann was
incarcerated for around nine months in two Suffolk County jails:
Yaphank Correctional Facility and Riverhead Correctional
Facility. (Id. at 66:18-67:5.) Mr. Lindemann testified that
while he was held in those county jails, the medical providers
there continued his Neurontin prescription that he had received
while he was free. (Id. at 67:6-14.) When Mr. Lindemann left the
Suffolk County facilities, he came into DOCCS custody at
Downstate. (Id. 67:15-19.) There, Mr. Lindemann's medical
providers again continued his Neurontin prescription and
increased it when he complained of increased pain due to
sleeping on a steel bed at the prison. (Id. at 67:20-68:11.)
After a few months, Mr. Lindemann was transferred from Downstate
to Marcy. (Id. at 68:12-16.) Mr. Lindemann testified that at
Marcy, his medical provider, Dr. Zaki, also continued and
increased his Neurontin prescription so that Mr. Lindemann could
go to the medical window less frequently and attend more
programming. (Id. at 68:17-70:11.)

In December 2021, Mr. Lindemann was transferred to Fishkill Correctional Facility ("Fishkill"). (Id. at 70:12-15.) Mr. Lindemann testified credibly that during his intake on December 12, 2021, he was told by Nurse Davis that he should not "expect to be on medication too long." (Id. at 70:16-20; 74:7-9.) Mr. Lindemann testified that Nurse Davis told him that NP Sullivan did not prescribe Neurontin. (Id. at 74:12-15.)

Mr. Lindemann testified that after he went to the medication window and they did not have any prescriptions for him, he filed for sick call to speak to his provider, NP Sullivan. (Id. at 75:10-15.) Mr. Lindemann testified credibly that NP Sullivan told him she does not prescribe Neurontin and she would not prescribe him Neurontin. (Id. at 75:14-19.) Mr. Lindemann testified that he later learned that NP Sullivan does prescribe Neurontin to other patients. (Id. at 95:18-97:1.) Mr. Lindemann testified credibly that he made NP Sullivan aware of the nerve damage he had and the pain he was experiencing, as well as his treatment by Dr. Zaki. (Id. at 75:20-76:1.) Mr. Lindemann testified that he is not currently being prescribed Neurontin. (Id. at 76:8-9.)

Mr. Lindemann testified that since being taken off the Neurontin, he has developed a limp in his right leg, and he now suffers from shooting pains down his right leg. (Id. at 76:2-6.)

Mr. Lindemann testified that without his Neurontin prescription, getting out of bed, moving around, walking, climbing stairs, and exercising are all difficult. (Id. at 76:10-16.) Mr. Lindemann testified credibly that he has talked to NP Sullivan about his difficulties "numerous times," that he had been "going down there on a weekly basis to complain and request to be put back on [Neurontin]," but "was constantly denied." (Id. at 76:17-23.)[15]

Mr. Lindemann testified that he is currently in the MAT program to treat his opioid-abuse disorder. (Id. at 79:4-10.) Mr. Lindemann testified that the MAT program is not meant to treat his chronic pain or neuropathies. (Id. at 79:11-14.) Mr. Lindemann testified that he currently receives Suboxone through the MAT program. (Id. at 79:18-80:5.) Mr. Lindemann testified that he also receives Zyprexa and Trazodone to treat depression. (Id. at 86:16-23; 90:1-19.) Mr. Lindemann testified that he received meloxicam to treat his pain, which was discontinued, and Buspirone, which he said was for "something

---

[15] Dr. Moores' Counsel made several assertions of fact on cross regarding NP Sullivan's reasons for discontinuing Mr. Lindemann's Neurontin prescription and Mr. Lindemann's attitude towards trying alternatives to Neurontin, all of which Mr. Lindemann denied. (Sept. 5 Tr. at 88:10-89:8.) Because Dr. Moores failed to offer any evidence to corroborate these assertions of fact, including either testimony by NP Sullivan or medical records regarding Mr. Lindemann's treatment, the Court will disregard her Counsel's assertions of fact.

completely different." (Id. at 93:2-19.)  Mr. Lindemann also

testified that he tried taking Cymbalta for six weeks but that

he experienced "very bad side effects" including anxiety and

depression. (Id. at 89:9-90:7.) Mr. Lindemann testified that he

has also received topical analgesic balms, access to a TENS unit

that did not work, and acetaminophen. (Id. at 93:20-94:17.)

Mr. Lindemann testified that NP Sullivan told him she was not

going to prescribe him Lyrica. (Id. at 97:2-8.) Mr. Lindemann

testified that NP Sullivan said before receiving Lyrica, he

needed to do physical therapy, but that he had not yet received

access to physical therapy. (Id. at 97:9-11.) Mr. Lindemann

testified that any refusal forms in his medical records

regarding physical therapy were for his shoulder, not his lower

back or nerve damage. (Id. at 97:12-25.)

In general, Mr. Lindemann described the pain treatments he

has received from NP Sullivan as "trial and error, when she

discontinued something that was working." (Id. at 95:9-12.)

Mr. Lindemann testified that NP Sullivan has never physically

examined him, conducted a chronic pain assessment for him, or

sent him out to a pain management specialist. (Id. at 98:23-

99:15.) Mr. Lindemann testified that he still wants to receive

Neurontin to alleviate the nerve damage and pain he experiences.

(Id. at 87:6-11.)

The Court found Mr. Lindemann to be a credible witness.

### ii.  **Richard Vasquez**

During a prior bid with DOCCS in 2017, Richard Vasquez was housed in Franklin Correctional Facility ("Franklin") where he underwent a replacement surgery in his left hip. (Sept. 5 Tr. at 129:18-25.) At the time of the hip replacement, he was prescribed Neurontin, which he said effectively treated his pain. (Id. at 130:1-7.) Mr. Vasquez testified that he received Neurontin continuously during that bid until his release in late 2017 or early 2018 and his Neurontin prescription was continued by his outside doctor after his release. (Id. at 130:8-131:3.)

Mr. Vasquez began his current bid in DOCCS custody in January 2020. (Id. at 128:12-16.) Prior to that, he was held at the Albany County jail, where his medical providers continued his Neurontin prescription. (Id. at 128:17-21; 131:17-22.) At the time of his DOCCS intake, he suffered from chronic pain in his lower lumbar area, both hips, and his left foot. (Id. at 128:22-129:2.) Mr. Vasquez did his DOCCS intake at Downstate, where his medical providers continued his Neurontin prescription for the short time he was there. (Id. at 131:23-132:10.) He was quickly transferred to Marcy, where his Neurontin prescription was discontinued. (Id. at 132:11-19.)

Mr. Vasquez testified that he met with his medical provider at Marcy, Dr. Burke, several months after he arrived at Marcy. (Id. at 133:10-16.) Mr. Vasquez testified that he had written complaining about his back, hip, and leg, so they called him in to see Dr. Burke. (Id. at 133:10-134:9.) Mr. Vasquez testified credibly that he found out his Neurontin prescription was discontinued when he met with Dr. Burke, who told him that they did not give out Neurontin at Marcy. (Id. at 132:20-133:5; 134:4-8.) Mr. Vasquez testified that instead, Dr. Burke put him on Tylenol, which Mr. Vasquez asserted he could not use because it was having bad side effects on his stomach and Tylenol was not supposed to be for long-term use. (Id. at 134:8-16.) Mr. Vasquez testified that Dr. Burke also prescribed him a muscle relaxer to treat his pain, but that the muscle relaxer did not work because his pain was related to his nerves. (Id. at 134:17-23.) In 2020, while Mr. Vasquez was at Marcy, he was sent out to see a pain specialist. (Id. at 150:8-12.) The specialist recommended he be put on baclofen and Cymbalta to treat his pain. (Id. at 150:13-154:8.)

Mr. Vasquez was eventually transferred from Marcy to the Walsh Regional Medical Unit ("Walsh RMU") at Mohawk Correctional Facility ("Mohawk") for a total hip replacement on his right hip. (Id. at 136:14-137:6.) While at the Walsh RMU, Mr. Vasquez was prescribed Neurontin for a week, which he testified was

effective in treating his pain. (Id. at 137:7-12.) Mr. Vasquez testified that the hip replacement did not resolve his chronic pain. (Id. at 137:20-23.) Mr. Vasquez testified that his physical therapist recommended he do physical therapy to help his pain and that he refused to do the physical therapy due to the pain in his lower back. (Id. at 154:21-156:6.)

Next, in February or March of 2022, Mr. Vasquez was transferred to Midstate Correctional Facility ("Midstate") where he spoke to NP Amy Ferguson about his pain. (Id. at 138:13-20; 165:4-12.) Mr. Vasquez testified credibly that NP Ferguson was aware of his chronic pain problems and that she said she could not give him Neurontin because they were not allowed to give it out. (Id. at 139:8-24.) Mr. Vasquez testified that NP Ferguson requested that he get a self-carry medication rather than Neurontin, which had to be administered at the medication window, because Mr. Vasquez had "just c[o]me out of surgery" and having a self-carry medication would keep him from having to traverse the stairs and hills of the prison. (Id. at 166:1-11.)

In addition to the pain stemming from the conditions already discussed, in January 2023, a mentally ill prisoner poured several gallons of scalding water on Mr. Vasquez while he was sleeping. (Id. at 141:21-142:3; 167:7-13.) Mr. Vasquez testified that he spent two days at a Syracuse hospital where he

was diagnosed with second degree burns. (Id. at 142:12-13; 143:9-15.) Mr. Vasquez testified that because of these burns, he now has nerve pain all around his upper body, describing the pain as "needles just sticking [him] everywhere." (Id. at 142:20-22.) Mr. Vasquez testified that when he returned to Midstate after his hospital visit, he was prescribed Neurontin and Percocet for three or four days before they were discontinued. (Id. at 143:16-144:7.)

Mr. Vasquez testified that in May 2023, NP Schrader prescribed him baclofen, but that baclofen did not work for him because it is used to treat muscle spasms and he does not have spasms. (Id. at 140:4-10; 145:21-146:2.) Mr. Vasquez testified credibly that he told NP Schrader that he has used baclofen in the past and that it does not work, but she gave it to him anyway and he has been taking it to no effect. (Id. at 140:9-14; 146:13-21.) While Mr. Vasquez testified at his deposition that NP Schrader was "fishing, [he] believe[d], for a medication that might help," he responded at the hearing: "She didn't have to fish. I told her I know exactly what works. Why fish?" (Id. at 147:10-148:25.)

Mr. Vasquez testified that he hadn't seen NP Schrader since she prescribed the baclofen in May 2023 and that though she said at that visit that she would send him out for an MRI, he only

received the MRI one week before the trial in the beginning of September. (Id. at 140:15-21.) Mr. Vasquez testified that since he received the MRI, he has not received a response from his provider at Midstate. (Id. at 141:4-9.) Mr. Vasquez testified that in addition to the baclofen he currently receives, he also receives ibuprofen and Tylenol. (Id. at 156:11-23.) Mr. Vasquez testified he also tried Tegretol[16] for a few weeks until he started having adverse side effects and then requested that the prescription be discontinued. (Id. at 156:24-160:6.)

The Court observed Mr. Vasquez shift in his chair repeatedly while testifying. Mr. Vasquez testified that he shifted because when he sat for that long, his body felt numb, he would experience radiating pain down his leg and up his spine, and he might lose control of his bladder or his bowels. (Id. at 137:24-138:8.) Mr. Vasquez testified that he was in pain even as he testified. (Id. at 167:18-19.)

The Court found Mr. Vasquez to be a credible witness.

### iii.   __Rafael Montanez__

Rafael Montanez came into DOCCS custody on his current bid in 2011. (Id. at 168:19-21.) At that time, he had an impinged

---

[16] Tegretol (generic name carbamazepine) is an anticonvulsant that is used to treat pain and nerve pain. (Sept. 6 Tr. at 363:17-364:3.) Any references in the record to carbamazepine will be changed to Tegretol for the purposes of this opinion.

nerve in his lower back, a mild case of stenosis, and degeneration in his L1 and L2 discs, all of which caused him pain. (Id. at 169:7-18.) Mr. Montanez testified that his pinched nerve felt like something was "pressing on [his] back." (Id. at 169:19-23.) Mr. Montanez testified that there are times that he could not get out of bed because it hurt too much and he was in so much pain that he could not even walk straight. (Id. at 173:14-18.) Mr. Montanez testified credibly that because of his pain, he does not go anywhere in the prison and gave up on exercising. (Id. at 186:3-11.) Mr. Montanez testified that because of his pain, he could not play sports like he could before and that he is unable to do certain jobs. (Id. at 169:24-170:2.)

Mr. Montanez testified that his pain was effectively treated while he was at Rikers before coming into DOCCS custody. (Id. at 170:3-11.) Mr. Montanez testified that at Rikers, he received Ultram[17] and Neurontin. (Id. at 170:12-16.) When Mr. Montanez first entered DOCCS custody, he was housed in three different facilities: Downstate, Sing Sing, and Five Points Correctional Facility ("Five Points"). (Id. at 170:20-171:18.)

---

[17] Ultram (generic name tramadol) is a medication frequently used to treat severe pain. (See Sept. 6 Tr. at 362:24-363:2; Sept. 7 Tr. at 579:13-18.) Any references in the record to tramadol will be changed to Ultram for the purposes of this opinion.

Mr. Montanez testified that at Downstate and Sing Sing, his prescriptions for Ultram and Neurontin were continued. (Id.)

Mr. Montanez testified that while he was at Five Points in 2013, his prescriptions were discontinued, and his medical providers started to wean him off his medications. (Id. at 171:19-172:4; 177:24-178:4.) Mr. Montanez testified credibly that since 2017, he had complained to medical staff in DOCCS facilities about his chronic pain more than fifty times. (Id. at 174:23-175:5.) Mr. Montanez testified credibly that he is not currently receiving effective treatment for his chronic pain. (Id. at 176:15-17.)

Mr. Montanez testified that he was part of the MAT program and he received buprenorphine to treat his addiction issues. (Id. at 176:18-177:9.) Mr. Montanez has a history of heroin abuse. (Id. 182:15-21.) There was an incident in 2021 in which Mr. Montanez lost consciousness and was revived with Narcan. (Id. at 182:22-183:4.) Mr. Montanez testified that he did not overdose on drugs during his current bid with DOCCS. He testified that the cause of his losing consciousness was dehydration. (Id. at 183:5-21.) Mr. Montanez testified that the buprenorphine he receives through the MAT program does not address his chronic pain or his impinged nerve. (Id. at 176:23-177:7.) Mr. Montanez testified that he has received Tylenol,

naproxen, omeprazole, ibuprofen, a TENS unit, a back brace, and had been told to do back exercises to relieve his back pain. (Id. 178:5-182:7.) Mr. Montanez testified credibly that he still suffers from chronic pain. (Id. at 185:23-186:2.)

With the exception of his testimony about the 2021 Narcan incident, the Court found Mr. Montanez to be a credible witness.

### iv.   **Ramal Myriee**

Ramal Myriee suffers from diabetic neuropathy and degenerative disc disease. (Sept. 5 Tr. at 188:8-11.) He was first diagnosed with diabetes in 2008 while he was incarcerated at Rikers. (Id. at 188:12-22.) While at Rikers, Mr. Myriee began receiving 800 milligrams of Neurontin three times a day to treat his nerve pain. (Id. at 190:3-8.) Mr. Myriee testified credibly that his nerve pain is "severe" and makes it hard for him to walk, adding that his legs and feet are constantly swollen. (Id. at 190:13-18.) Mr. Myriee also testified that his pain makes it "unbearable" for him to sleep. (Id. at 195:10-13.) Mr. Myriee testified that his "feet and legs are falling apart rapidly." (Id. at 205:5-6.)

Mr. Myriee testified credibly that his Neurontin prescription alleviated a lot of his pain and allowed him to do things like walk and play with his kids. (Id. at 190:21-191:3.) Mr. Myriee testified that he received Neurontin continuously

through his prior bid with DOCCS from 2010 to 2013 despite
transferring facilities multiple times. (Id. at 191:11-193:6.)
After his release, Mr. Myriee's outside doctor prescribed him
aspirin, Percocet, Flexeril, and insulin in addition to
continuing his Neurontin prescription. (Id. at 193:7-194:11.)

Mr. Myriee's current DOCCS bid started in May 2022. (Id. at
199:22-200:2.) Before entering DOCCS custody, Mr. Myriee was
held at the Nassau County jail where he was prescribed
Neurontin, Percocet, aspirin, trazodone, and Cymbalta. (Id. at
197:20-198:4; 216:19-23.) Mr. Myriee testified that his medical
providers in Nassau County tried him on Lyrica rather than
Neurontin for a few weeks because the pain he was experiencing
was so unbearable that he asked to have his feet amputated. (Id.
at 198:8-23.) Mr. Myriee testified that he was switched back to
Neurontin because he had an adverse reaction to Lyrica that
featured nausea, vomiting, sweating, and chills. (Id. at 198:24-
199:12.) His providers at Nassau County ended up increasing his
dosage of Neurontin, which helped his pain. (Id. at 199:14-18.)

Mr. Myriee did his DOCCS reception at Ulster Correctional
Facility ("Ulster") before he was transferred to Woodbourne,
where he is currently housed. (Id. at 199:22-201:1.) He spent a
week at Ulster where he received Neurontin, Ultram, Cymbalta,
aspirin, and insulin. (Id. at 200:3-8.) Mr. Myriee testified

45

that he did not discuss his medications with any medical
provider at Ulster and that they kept him on his medication
because it was what he had been prescribed at Nassau County.
(Id. at 200:9-17.)

Mr. Myriee testified that his medication was discontinued
upon his transfer to Woodbourne. (Id. at 201:11-13.) He
testified credibly that he learned it was discontinued when he
went to the medication window and the staff there told him that
the doctor took him off his medication because they do not give
Neurontin out in Woodbourne. (Id. at 201:17-23.) Mr. Myriee
testified he had not spoken with any of his medical providers
before they decided to take him off Neurontin. (Id. at 202:8-
15.) Mr. Myriee testified that a few weeks after his Neurontin
prescription was discontinued, he met with PA Switz after
writing sick calls every day "complaining about the pain [he]
was going through." (Id. at 202:25-203:19.) Mr. Myriee testified
he explained to PA Switz that he had diabetic neuropathy and
that he had been using Neurontin for over twelve years. (Id. at
204:3-8.) Mr. Myriee testified credibly that he expressed to PA
Switz that he was in severe pain, that he could barely walk, and
that he needed his medication back, and she responded that they
did not give out Neurontin in Woodbourne and that the medical
staff knew what was best for him. (Id. at 203:20-24.) Mr. Myriee
testified that this meeting with PA Switz lasted no more than

five minutes and did not include a physical examination or any discussion of Neurontin alternatives. (Id. at 204:9-16.)

Mr. Myriee testified credibly that he has also met with Dr. Ruiz, explained his pain to her, and tried to show her how bad his legs were, and she responded that she knew what was good for him and that he did not need Neurontin. (Id. at 205:12-206:1.) Mr. Myriee testified that Dr. Ruiz had never physically examined him during their meetings. (Id. at 206:5-7.) Mr. Myriee testified his feet were turning black and his toenails were falling off and that Dr. Ruiz and PA Switz had not provided any treatment regarding these conditions other than a visit to a vascular specialist, who told Mr. Myriee that his veins were not the source of his symptoms. (Id. at 206:8-207:3.) Mr. Myriee testified he had not been sent to a pain management specialist. (Id. at 204:17-22.)

Mr. Myriee testified that he was in the MAT program due to his history with heroin addiction. (Id. at 207:4-9.) Mr. Myriee testified that he was first prescribed Suboxone in 2018 or 2019 while he was free. (Id. at 207:21-208:5.) During that time, his outside medical providers continued his Neurontin prescription and discontinued his Percocet prescription. (Id. at 208:6-23.) Mr. Myriee testified that in April or May 2023 he switched from taking buprenorphine to receiving Sublocade shots. (Id. at

214:22-215:12.) Mr. Myriee testified that he missed one of his
Sublocade shots and that he refused a MAT treatment because the
prison officers were treating him like an animal. (Id. at
214:22-215:23.)

Mr. Myriee testified that his provider prescribed daily
finger stick tests to test his blood sugar and that he might
have missed a handful of tests because of how much pain he was
in but that his test numbers were "always excellent." (Id. at
210:22-211:11.) Mr. Myriee testified that there were several
times he did not show for his insulin treatment because he was
in too much pain to sit and wait for the treatment. (Id. at
211:15-21.)

Mr. Myriee testified that he was currently taking Cymbalta,
which he started taking at the Nassau County jail in 2022. (Id.
at 216:8-18.) Mr. Myriee testified that his prescription for
Cymbalta came about because, after Dr. Ruiz discontinued his
Cymbalta prescription, his mental health provider noted that
Mr. Myriee looked like he was in a lot of pain and prescribed
Mr. Myriee the Cymbalta. (Id. at 217:19-219:8.) Mr. Myriee
testified that he entered Woodbourne towards the end of May
2022, and he was put back on Cymbalta in June 2022. (Id. at
219:9-14.) Mr. Myriee testified that Cymbalta "[s]lightly"
relieved his pain and said that it was "better than nothing."

(Id. at 219:15-17.) Mr. Myriee noted that he also received Percocet at Nassau County jail and he testified that he was not concerned about taking Percocet for his pain, despite its being an opioid, because he "just wanted [his] pain to go away." (Id. at 216:24-217:18.)

The Court found Mr. Myriee to be a credible witness.

### v.   **Anthony Jackson**

Anthony Jackson came into DOCCS custody in 1991. (Sept. 7 Tr. at 581:6-12.) Mr. Jackson testified that the last time he used illicit drugs was 2005 and that he had previously used heroin for twenty-six years. (Id. at 581:19-24; 601:19-25.) Mr. Jackson testified that his current provider, NP Kacchapilly, suggested that he fill out the evaluation for the MAT program despite his never having requested that he be evaluated for the MAT program. (Id. at 603:3-604:7.) Mr. Jackson testified that he did not say in the evaluation that he wanted to enroll in the MAT program so he could "feel good" because he did not get high anymore and was "on the straight and narrow." (Id. at 604:8-20.) Mr. Jackson was not admitted into the MAT program. (Id. at 606:22-25.)

Mr. Jackson testified credibly that he has chronic back problems, that he is always in pain, and that he cannot walk long distances or stand for significant lengths of time. (Id. at

49

583:17-22.) Mr. Jackson testified that he is "almost bedridden" and that he cannot "do what other people do" when it comes to physical activity. (Id. at 584:18-585:2.) Mr. Jackson testified that his chronic pain had worsened significantly by 2012 and that at Sullivan, NP Diaz prescribed him eight hundred milligrams of Neurontin and twenty milligrams of Elavil, which he testified effectively treated his pain. (Id. at 585:3-13.) Mr. Jackson testified credibly that the Neurontin prescription allowed him to do "almost everything as a normal inmate." (Id. at 585:14-586:7.) Mr. Jackson testified he never diverted his Neurontin or had a misbehavior report filed against him due to illicit drug use. (Id. at 586:8-17.)

Mr. Jackson testified that in February 2015 or 2016, his Neurontin prescription was discontinued. (Id. at 586:18-587:24.) Mr. Jackson testified credibly that he found out the prescription was discontinued when he reported to the medication window and he was pulled aside by the nurse on duty, Nurse Darby, who told him that that his Neurontin prescription would be discontinued, and "nobody[]" would get Neurontin anymore. (Id. at 586:18-588:4.) Mr. Jackson testified credibly that when his Neurontin was discontinued, he was back in pain again, limited in where he could go and what he could do. (Id. at 588:9-18.) Mr. Jackson testified that Dr. Sidorowicz prescribed him ibuprofen and aspirin and NP Diaz prescribed him Flexeril as

alternatives to Neurontin but that these medications did not work for him. (Id. at 588:19-25.) Mr. Jackson testified that when he complained a lot, his providers re-prescribed him Elavil, but that it did not work without the Neurontin, so they gave him naproxen "every once in a while." (Id. at 589:1-11.)

Mr. Jackson testified that he was transferred to Sing Sing around 2020. (Id. at 589:19-21.) Mr. Jackson testified that his provider at Sing Sing is NP Kacchapilly. (Id. at 589:22-590:13.) Mr. Jackson testified credibly that NP Kacchapilly had not prescribed him anything that effectively treated his pain. (Id. at 590:14-591:21.) Mr. Jackson testified that NP Kacchapilly had prescribed him Cymbalta around a year and a half ago and had given him a one-time dose of naproxen in the prior month and a half but that the Cymbalta prescription had not helped to treat his pain. (Id. at 590:19-591:1; 600:11-14.) Mr. Jackson testified credibly that he told NP Kacchapilly that the Cymbalta was not helping his pain but she did not change his treatment. (Id. at 591:2-7.) Mr. Jackson said of the Cymbalta "something is better than nothing, but that's almost like nothing at all." (Id. at 600:24-601:11.)

Mr. Jackson testified that he saw a pain specialist in 2021 or 2022, received a cortisone shot in 2021, and requested a second cortisone shot, which he received. (Id. at 597:5-598:6.)

Mr. Jackson testified that he was never offered a third cortisone shot. (Id. at 607:9-10.) Mr. Jackson testified that he was given a cane within the last year and a half. (Id. at 591:22-592:7.) Mr. Jackson testified that without his cane, he would be unable to walk straight and would fall. (Id. at 592:8-12.)

The Court found Mr. Jackson to be a credible witness.

## F. **Dr. Moores' Testimony**

### i. **DOCCS' Current Policies and Procedures**

The only witness Dr. Moores called at trial was Dr. Moores herself. Dr. Moores testified that DOCCS is twenty percent under the level of medical providers and thirty-three percent under the level of nurses it should have based on DOCCS' base-level guidelines. (Sept. 7 Tr. at 576:24-577:8.) Dr. Moores testified there was also a lot of turnover in DOCCS' medical positions. (Id. at 577:12-18.) Dr. Moores testified that she signs off on hiring a few new medical providers each month. (Id. at 577:19-25.) Dr. Moores testified that there were facilities that were operating with only one medical provider. (Id. at 578:2-6.)

Regarding the medications formerly covered by the MWAP policy, Dr. Moores testified that there are two types of policies that currently apply to these medications. The first set of policies relates to making sure that DOCCS complies with

regulations for how these medications are handled. (Id. at 579:19-580:3.) The second is the nonformulary request process, which only applies if the medication is not listed on DOCCS' formulary and, thus, not readily available to the provider. (Id. at 608:13-609:3.) Dr. Moores testified that if a medication is not on DOCCS' formulary, providers can still request it, but they have to go through the request process. (Id.) Dr. Moores testified that nonformulary request and specialty care referral denials continue to be audited, but Dr. Moores and her deputy, Dr Khan, reviewed most of those requests and "[a]lmost all" all of them were approved. (Id. at 613:6-11.) Dr. Moores testified that the requests that were not reviewed by her or Dr. Khan were typically reviewed by the Facility Health Services Director ("FHSD") in charge of the facility where the request originated and Dr. Moores still sees those requests and the results of the FHSD's review. (Id. at 614:6-18.)

Dr. Moores testified that since the MWAP policy was rescinded, there has not been any policy implemented imposing a limitation on a DOCCS medical provider's ability to prescribe Ultram, Lyrica, Cymbalta, or Neurontin. (Id. at 610:6-611:13.) Dr. Moores testified that as far as she was aware, medical providers in all of DOCCS' prisons were prescribing each of those medications. (Id.) Dr. Moores testified that she has not seen any evidence of a DOCCS facility creating its own policy

regarding the former MWAP medications, though Dr. Moores had not contacted all the each FSHDs and asked them if they had any facility-specific procedures. (Id. at 611:14-18; 638:24-639:15; 640:8-18.) Dr. Moores testified that the RMDs currently do not have any oversight over a PCP's ability to prescribe medications and that PCPs were exercising their judgment in how they cared for their patients. (Id. at 612:22-613:5.)

Dr. Moores described a peer review process in which the administrator doing the review, whether that administrator was an RMD, an FHSD, or Dr. Moores, pulled ten charts at random from a provider's set to review and comment on. (Id. at 614:25-615:12.) The peer review system was implemented in response to licensure requirements and the American Correctional Associate accreditation process. (Id. at 615:13-17.) Dr. Moores testified that if the peer review process identified an issue with a provider's standard of care, that would be brought to her attention, and it would culminate in either an educational approach with additional monitoring of the provider's work or a disciplinary action, depending on whether the provider was open to the education and monitoring. (Id. at 616:2-25.) Dr. Moores testified that in addition to the peer review process, issues regarding a provider's standard of care might also be brought to her attention through patient letters, contact with a member of the facility's executive team or another member of the

provider's medical staff, SURN audits,[18] or Dr. Moores' reviewing records herself for other reasons. (Id. at 617:13-23.)

Dr. Moores testified that she went to Woodbourne to conduct an investigation in May 2023. (Id. 619:18-23.) Dr. Moores discussed an incident with Dr. Ruiz where she found that Dr. Ruiz was not following the policies, was discontinuing medications as soon as a patient was transferred into the facility and was forcing the PAs to do the same thing. (Id. at 618:20-619:7.) Dr. Moores testified that she counseled Dr. Ruiz, educated the superintendent of Woodbourne, removed Dr. Ruiz's title of FHSD, and warned Dr. Ruiz that she had to be compliant with DOCCS' policy or face termination. (Id. at 619:7-13.) Dr. Moores testified that she learned of Dr. Ruiz's actions in part from Plaintiffs' Counsel. (Id. at 640:19-643:2.)

Dr. Moores explained that the procedure regarding patient transfers between facilities called for the patient's medical record and any medications dispensed directly to the patient to follow the patient to his or her new facility. (Id. at 619:24-620:5.) Dr. Moores said DOCCS also encouraged the nursing staff at the sending and receiving facilities to discuss if there was

---

[18] A senior utilization review nurse ("SURN") is a nurse at a DOCCS facility who may review the amount of a particular prescriptions issued at a facility. (See Sept. 6 Tr. 399:22-400:3; 409:3-6; 410:1-8.)

something special about a patient, especially if the new facility would need to order medication ahead of time. (Id. at 620:5-9.) Dr. Moores called the transfer process "cumbersome" and said DOCCS was "still trying to fix that and figure it out." (Id. at 620:17-23.) Dr. Moores testified that she did not have any policy in place that guaranteed that DOCCS facilities other than Woodbourne were continuing patients' medications upon transfer. (Id. at 658:15-21.) However, she testified that the new central office pharmacist would be collecting information on medication transfers because she felt that some facilities did it well and other facilities did not, and DOCCS needed to address those issues "in a very objective manner." (Id. at 658:21-659:2.)

Dr. Moores also discussed a violation by Dr. Kim at Green Haven in which Dr. Kim violated DOCCS' policy by refusing to refill a pain medication without meeting the patient and having a documented reason to discontinue the medication. (Id. at 621:15-622:9.) Dr. Moores felt that Dr. Kim needed to be disciplined for his violation of DOCCS' policy and the superintendent agreed. (Id. at 622:14-16.) Dr. Moores testified that the information about the incident with Dr. Kim came from Plaintiffs' Counsel. (Id. at 643:16-18.) Other than these incidents, Dr. Moores testified that she had seen more general issues with DOCCS' communication, but she said she has not seen

56

"any intent to stop the medication on purpose." (Id. at 622:18-623:1.)

Dr. Moores testified that the risk associated with patients' diverting their medication would be that: 1) a patient might stockpile it to get a high or attempt suicide; 2) a patient might sell it on his or her housing block; or 3) a patient might be threatened by another prisoner to give the prisoner the medication. (Id. at 623:16-624:1.) Dr. Moores said she did not have data on how often any specific drug is diverted, but she testified that "diversion is a regular problem with almost all the facilities" and that Neurontin, opioids, and muscle relaxants tend to be "preferred drugs." (Id. at 624:2-12.)

### ii.  Challenges with the Preliminary Injunction

Dr. Moores described several challenges with the preliminary injunction order entered by the Court in March 2023. Regarding the preliminary injunction provision that DOCCS identify all the patients who might need the chronic pain code 338 added to their medical problem lists, Dr. Moores testified that she had eight central office staff members working on it and had gotten about one third of the way through reviewing the medical problem lists of all thirty-two thousand DOCCS patients. (Id. at 624:17-625:25.) Dr. Moores testified that before the

57

review, eight hundred or nine hundred patients had been coded
338, and after the review was one third completed, the number of
patients coded 338 had increased to twenty-five hundred
patients. (Id. at 626:18-627:15.) Dr. Moores testified that they
had slowed the process of trying to identify patients that
needed to be coded with 338 because Dr. Moores received feedback
from patients and providers that the 338 code they were applying
in DOCCS central office did not make sense for the patient. (Id.
at 627:16-25.) Dr. Moores testified that she had not
"completely" figured out the patient identification process.
(Id. at 627:25-628:6.)

Dr. Moores testified that she had also slowed the patient
identification process because DOCCS had to focus on complying
with the piece of the preliminary injunction that ordered DOCCS
to schedule pain assessments for its chronic pain patients. (Id.
at 628:16-21.) Dr. Moores took steps coordinating with DOCCS'
ITS department to make sure that her office could audit that the
assessments were scheduled and occurring. (Id. at 628:22-
629:25.) She also created two new forms for providers to fill
out: one for the annual assessment and another for the quarterly
assessment. (Id. at 630:1-16.) Then, Dr. Moores sent out two
memos. The first went to DOCCS' superintendents to make sure all
the health care staff received a hard copy of the Court's
preliminary injunction order. (Id. at 631:14-17.) The second

58

memo included instructions, the new forms, and a summary form
for the providers. (Id. at 631:17-25.)

Dr. Moores testified that there was not a place on the
annual assessment form where a provider would know or note that
a patient lost effective medication during the MWAP period. (Id.
at 648:17-24.) Dr. Moores testified that she had been in the
process of gathering and reviewing the medical records for
patients still in DOCCS custody who lost medications during the
MWAP period when the preliminary injunction order came out and
she had to stop that process to focus on the work required by
the order. (Id. at 648:25-649:16.) Dr. Moores testified that the
annual assessment form was not intended to be used solely for
patients who formerly had medication discontinued under MWAP and
that the form had a place for the provider to record treatments
or medications that the patient had previously tried. (Id. at
661:15-24.)

Dr. Moores testified that she had only received a few
responses to the new assessments. (Id. 632:17-19.) Dr. Moores
testified that: 1) some patients had told nursing staff that
they did not have a pain problem and should not be subject to
the assessment; 2) several providers have written that there was
no change to their plan because they were "already seeing the
patient"; 3) some patients told their providers that they were

already talking about their pain issues and did not understand why the assessment was necessary. (Id. at 632:19-633:12.) Dr. Moores testified that there was concern among DOCCS providers that the additional appointment may have added to their workload without producing a positive effect. (Id. at 633:19-634:4.) Dr. Moores agreed with that sentiment because she felt that competent DOCCS medical providers did not need the additional assessment to adequately treat their patients and incompetent providers are not helped by the assessments. (Id. at 634:5-20.) Dr. Moores testified that the workload concern was pertinent given DOCCS' shortage of healthcare staff, which could mean that these additional assessments were delaying care for other patient needs. (Id. at 635:5-22.)

Dr. Moores testified that, in some cases, it was possible to move patients with chronic pain conditions who need a heightened level of care to competent providers who can meet their needs. (Id. at 655:17-656:18.) Dr. Moores also testified she was trying to "beef up" DOCCS' "ring of competent physicians" who could teach other providers who were deficient in pain management because frequently, what providers with a deficiency really needed was "a mentor and a model." (Id. at 657:3-22.)

60

Dr. Moores testified that DOCCS trained its providers on
the requirements of Policy 1.24A. (Id. at 657:23-658:10.)
Dr. Moores testified that they did a training at every facility
and that they did "train-the-trainer" instructions so that each
facility had individuals who could train those who were not
present for the original training. (Id.) Dr. Moores testified
that the nurse education unit is keeping track of which DOCCS
providers have received the Policy 1.24A training. (Id. at
658:11-14.)

The Court found the testimony of Dr. Moores related above,
as far as it goes, to be credible.

## III.  **Legal Standard**

### A. **Standing**

"At all stages of litigation, 'the party invoking federal
jurisdiction bears the burden of establishing the elements of
Article III standing.'" Calcano v. Swarovski N. Am. Ltd., 36
F.4th 68, 74 (2d Cir. 2022) (quoting Carter v. HealthPort
Techs., LLC, 822 F.3d 47, 56 (2d Cir. 2016)). "'[T]o establish
standing, a plaintiff must show (i) that he suffered an injury
in fact that is concrete, particularized, and actual or
imminent; (ii) that the injury was likely caused by the
defendant; and (iii) that the injury would likely be redressed

by judicial relief.'" Id. (quoting TransUnion LLC v. Ramirez, 141 S. Ct. 2190, 2203, (2021)).

"A plaintiff pursuing injunctive relief may not rely solely on past injury, but also must establish that "'she is likely to be harmed again in the future in a similar way.'" Id. (quoting Nicosia v. Amazon.com, Inc., 834 F.3d 220, 239 (2d Cir. 2016)). "[T]hreatened injury must be certainly impending to constitute injury in fact, and . . . allegations of possible future injury are not sufficient." Am. C.L. Union v. Clapper, 785 F.3d 787, 800 (2d Cir. 2015) (cleaned up). "[A] plaintiff seeking injunctive relief must demonstrate both a likelihood of future harm and the existence of an official policy or its equivalent." Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105–06 (1983)).

### B. Permanent Injunction

[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

SEC v. Citigroup Glob. Mkts., Inc., 752 F.3d 285, 296 (2d Cir. 2014) (quoting eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). "The party requesting permanent injunctive relief

must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits." Ognibene v. Parkes, 671 F.3d 174, 182 (2d Cir. 2011) (citing Cartier v. Symbolix, Inc., 454 F.Supp.2d 175, 186 (S.D.N.Y. 2006)).

### C. **Eighth Amendment Deliberate Indifference**

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). A plaintiff who alleges deliberate indifference to his medical needs must satisfy both an "objective and a subjective component." Griffin v. Amatucci, 611 F. App'x 732, 734 (2d Cir. 2015). The objective test requires the plaintiff to show that the "alleged deprivation of medical care '[is] sufficiently serious,'" while under the subjective test the plaintiff must demonstrate that the "defendant acted with the requisite mental state . . . akin to criminal recklessness" in so depriving the plaintiff of medical care. Id. (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)).

The objective test asks "(1) 'whether the prisoner was actually deprived of adequate medical care,' meaning that the officials responsible for his treatment 'fail[ed] to take reasonable measures in response to a medical condition'; and

(2) 'whether the inadequacy in medical care is sufficiently serious.'" Green v. Shaw, 827 F. App'x 95, 96 (2d Cir. 2020) (quoting Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006)).

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Smith v. Carpenter, 316 F.3d 178, 185-86 (2d Cir. 2003). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quotation marks omitted). In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry "focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." Smith, 316 F.3d at 185 (emphasis omitted).

Salahuddin, 467 F.3d at 280.

The subjective test requires that the charged official act with a "sufficiently culpable state of mind" called deliberate indifference. Id. "Deliberate indifference is a mental state equivalent to subjective recklessness" such that the charged official must act "while actually aware of a substantial risk that serious inmate harm will result." Id. (citing Farmer v. Brennan, 511 U.S. 825, 836-37, 839-40 (1994)). "[E]vidence that the risk was obvious or otherwise must have been known to a

defendant is sufficient to permit a jury to conclude that the defendant was actually aware of it." Brock v. Wright, 315 F.3d 158, 164 (2d Cir. 2003) (citing Farmer, 511 U.S. at 842).

If the charged official "'knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent,'" then the official did not act with deliberate indifference. Salahuddin, 467 F.3d at 281 (citing Farmer, 511 U.S. at 844). If a charged official "sincerely and honestly believed . . . that applying [a prison policy mandating the denial of treatment] was, in plaintiff's case, medically justifiable," then a jury could infer the absence of a sufficiently culpable state of mind. Id. (quoting Johnson v. Wright, 412 F.3d 398, 404 (2d Cir.2005)). "[A] physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." Chance, 143 F.3d at 703 (internal quotations and citations omitted).

## IV.  Discussion

### A. Standing

The Court will first address Dr. Moores' argument that Plaintiffs lack standing to seek a permanent injunction. (Moores Br. at 16.) The Court will address this argument quickly as it has already dealt with challenges to Plaintiffs' standing in the

preliminary injunction opinion issued in March 2023. (See Pre. Inj. Op. at 45-49.) Through the evidence adduced at trial, Plaintiffs have identified several DOCCS patients whose effective pain medications were discontinued without medical justification and who remain without effective treatment today. See Section (II)(D), supra. This discontinuation of effective pain medication meets the standard of a "concrete, particularized, and actual" injury. Calcano, 36 F.4th at 74. These injuries were caused by DOCCS medical providers, and they are redressable by judicial relief. Thus, Plaintiffs have standing to seek a permanent injunction. See Section (III)(A), supra.

### B. Success on the Merits of the Deliberate Indifference Claim

The Court next turns to the first element of the permanent injunction analysis: irreparable harm and actual success on the merits. As laid out above, a constitutional violation meets the standard of irreparable harm. See Ognibene, 671 F.3d at 182. Thus, the only question under this element is whether Plaintiffs succeed on the merits of their deliberate indifference claim. To address this question, the Court returns to the evidence adduced at trial.

i.   __DOCCS' Treatment of Ramal Myriee__

Ramal Myriee suffers from diabetic neuropathy and degenerative disc disease. (Sept. 5 Tr. at 188:8-11.) Mr. Myriee testified that even when he was on a lower dose of Neurontin, his pain was at one point so severe that he asked to have his feet amputated. (Id. at 198:8-199:18.) Mr. Myriee testified that his pain makes it hard for him to walk, "unbearable" to sleep, and his condition leaves his legs and feet constantly swollen. (Id. at 190:13-18; 195:10-13.) Together, these facts meet the objective seriousness prong of deliberate indifference. A condition that causes pain so severe that the patient requests to have the affected limb amputated is a condition that is "worthy of comment" to a reasonable doctor or patient and exceeds the standard of causing "chronic and substantial pain." Salahuddin, 467 F.3d at 280. Further, Mr. Myriee's condition "significantly affects" his daily activities by inhibiting his ability to walk and sleep. Id.

DOCCS' treatment of Mr. Myriee also meets the standard for a provider acting with a sufficiently culpable state of mind. Mr. Myriee testified credibly that his Neurontin prescription was discontinued upon his arrival at Woodbourne, without his meeting with a medical provider, (Sept. 5 Tr. at 201:11-13; 202:8-15), in violation of DOCCS' Policy 1.24A. Mr. Myriee testified credibly that after the discontinuation, he filed sick

call requests every day complaining about his pain. (Id. at
202:25-203:19.) Mr. Myriee testified that he met with two
medical providers, PA Switz and Dr. Ruiz, explained to them the
pain he was experiencing, and told them that Neurontin had
effectively treated his pain in the past. (Id. at 203:20-24;
204:3-8; 205:12-206:1.) Mr. Myriee testified that he attempted
to prove to Dr. Ruiz how serious his illness was by showing her
his feet, which he testified were turning black and losing their
toenails. (Id. at 205:12-206:1; 206:8-207:3.) Mr. Myriee
testified credibly that both PA Switz and Dr. Ruiz brushed off
his concerns without bothering to examine him. (Id. at 203:20-
24; 205:12-206:1; 206:5-7.) Without treatment, Mr. Myriee was
left in such bad shape that his mental health provider was moved
to re-prescribe him Cymbalta, another of Mr. Myriee's
prescriptions that had been discontinued upon his arrival at
Woodbourne. (Id. at 217:19-219:8.)

Mr. Myriee's deteriorating condition, headlined by the
disturbing degeneration of his feet, was obvious to his mental
health provider and should have been obvious or otherwise known
to PA Switz and Dr. Ruiz. This evidence is sufficient to permit
the Court to conclude that PA Switz and Dr. Ruiz were actually
aware of the substantial risk of serious harm that would result
to Mr. Myriee from their failure to treat him. Salahuddin, 467
F.3d at 280; Brock, 315 F.3d at 164.

The strength of this evidence is compounded by the fact
that Dr. Moores testified she was personally aware of the
deficiencies in Dr. Ruiz's treatment. (Sept. 7 Tr. at 618:20-
619:7.) While Dr. Moores appears to be taking sufficient steps
to train and discipline Dr. Ruiz, (id. at 619:7-13), Dr. Moores
did not provide any evidence that DOCCS had remedied whatever
harm Dr. Ruiz might have caused to her patients. The fact that
Mr. Myriee remains insufficiently treated is itself evidence
that Dr. Ruiz's patients are still suffering.

In response, Dr. Moores notes that Mr. Myriee receives
buprenorphine through the MAT program and Cymbalta through his
mental health provider, both of which are used to treat pain in
some instances. (Moores Br. at 7-8.) Dr. Moores rather brazenly
asserts that Mr. Myriee is not being denied any pain treatment.
(Id. at 23.) However, where Dr. Moores concedes that a DOCCS
provider discontinued a patient's effective treatment in
violation of Policy 1.24A, and the provider discontinued the
treatment without an individual assessment or a medical
justification, it is not sufficient that the patient receives
prescriptions through other means that happen to be used as pain
treatments in some cases. Mr. Myriee testified that the
buprenorphine he receives through the MAT program is to treat
his heroin addiction. (Sept. 5 Tr. at 207:4-9.) Mr. Myriee
testified he received the Cymbalta through his mental health

provider, who was moved to prescribe it because of Mr. Myriee's
deteriorating condition. (Id. at 217:19-219:8.) Mr. Myriee
further testified that the Cymbalta only "[s]lightly" relieved
his pain. (Id. at 219:15-17.) Neither of these prescriptions
reflects an attempt by Dr. Ruiz or PA Switz to treat
Mr. Myriee's chronic pain. In addition, Dr. Moores did not offer
any testimony by Dr. Ruiz or any of Mr. Myriee's medical records
to show that Mr. Myriee's chronic pain is adequately treated.

### ii.   DOCCS' Treatment of Richard Vasquez

DOCCS' treatment of Richard Vasquez also meets the
deliberate indifference standard. Mr. Vasquez suffers from
chronic pain in his lower lumbar area, both hips, and his left
foot. (Sept. 5 Tr. at 128:22-129:2.) Mr. Vasquez testified that
when he sat for long periods, his body went numb, he would
experience radiating pain down his leg and up his spine, and he
could lose control of his bladder or his bowels. (Id. at 137:24-
138:8.) Mr. Vasquez testified that he was in pain even as he
testified. (Id. at 167:18-19.) In addition, in January 2023,
Mr. Vasquez was soaked with gallons of scalding water, leading
to second degree burns across his upper body that have caused
him nerve pain throughout the affected area, which he described
as "needles just sticking [him] everywhere." (Id. at 142:20-22.)
Each of these conditions meets the objective seriousness prong
of deliberate indifference, being worthy of comment to a

reasonable doctor or patient, significantly affecting
Mr. Vasquez's daily activities, and causing chronic and
substantial pain. Salahuddin, 467 F.3d at 280.

DOCCS' treatment of Mr. Vasquez meets the standard for a
provider acting with a sufficiently culpable state of mind.
First, after he returned from the hospital where his burns were
initially treated, Mr. Vasquez was given Neurontin and Percocet
for three or four days before the medications were discontinued.
(Sept. 5 Tr. at 143:16-144:7.) That Mr. Vasquez was a
complaining patient recovering from second degree burns and
suffering from documented nerve pain across his body is
sufficient to allow the Court to conclude that Mr. Vasquez's
providers were actually aware of the serious risk of harm that
would result from their failure to treat Mr. Vasquez.
Salahuddin, 467 F.3d at 280; Brock, 315 F.3d at 164 (citation
omitted).

Second, Mr. Vasquez's provider, NP Schrader, prescribed him
baclofen in May 2023 even though Mr. Vasquez told her that he
had tried baclofen in the past and that it did not work to
alleviate his pain. (Id. at 140:9-14; 146:1-21.) Dr. Moores
argues that Mr. Vasquez "does not have a constitutional right to
his drug of choice." (Moores Br. at 20.) While that may be
accurate, Dr. Moores' argument is a strawman. Mr. Vasquez is not

demanding that he be treated with Neurontin, he is demanding effective treatment.

Mr. Vasquez's pain was effectively treated with Neurontin for more than three years before it was discontinued in 2020 by his DOCCS provider at Marcy without any medical justification. (See Section (II)(E)(ii), supra.) Due to DOCCS' decision to discontinue his effective treatment, Mr. Vasquez has suffered three years of unmitigated pain and diminished quality of life. When medical providers discontinue effective medications without justification and they start patients on medications that have already been documented as failures, they are "causing harm" to their patients. (Sept. 6 Tr. at 282:7-283:1.) Though medical providers can point to treatments they undertook to defend against an accusation of deliberate indifference, medical providers cannot benefit from that defense when they subjectively knew that the treatment they provided had already been tried and failed and thus was likely to be ineffective. See Hathaway v. Coughlin, 37 F.3d 63, 68 (2d Cir. 1994) ("A jury could infer deliberate indifference from the fact that [the defendant doctor] knew the extent of [the patient's] pain, knew that the course of treatment was largely ineffective, and

declined to do anything more to attempt to improve [the patient's] situation.").[19]

Dr. Moores relies on Acosta v. Thomas, 837 F. App'x 32 (2d Cir. 2020), which she characterizes as a "standalone MWAP case," (Moores Br. at 18), for the proposition that the "mere 'fact that a prisoner might prefer a different treatment' does not give rise to an Eighth Amendment violation." (Id. at 17 (quoting Acosta, 837 F. App'x at 35).) In Acosta, the Court of Appeals held that Acosta's provider, Dr. Vladlamudi, was not deliberately indifferent in deciding to taper Acosta's Neurontin prescription and substitute first Motrin, then Tylenol, for his pain. Acosta, 837 F. App'x at 34-35. However, the facts in Acosta differ dramatically from the facts in this case.

In Acosta, the defense presented evidence regarding Dr. Vladlamudi's medical judgment that justified discontinuing Acosta's Neurontin prescription. Id. at 34 (discussing Dr. Vladlamudi's concerns regarding Neurontin's addictive

---

[19] Dr. Moores suggests that a medical provider must have an improper motive for choosing an "easier and less efficacious treatment plan than otherwise available" for there to be a finding of deliberate indifference. (Moores Br. at 18 (quoting O'Connor v. McArdle, 217 F. App'x 81, 83 (2d Cir. 2007), and citing Williams v. Vincent, 508 F.2d 541, 544 (2d Cir. 1974); Chance, 143 F.3d at 702). However, if the provider "knew that the prescribed course of treatment would be ineffective," that may be sufficient for a finding of deliberate indifference. Tolliver v. Sidorowicz, 714 F. App'x 73, 74 (2d Cir. 2018) (citing Chance, 143 F.3d at 703).

properties and side effects and its long-term use for a well-controlled condition). Such facts are largely absent from the record before the Court in this case. In addition, Dr. Vladlamudi tapered Acosta's Neurontin prescription only after he conducted a "comprehensive review of Mr. Acosta's medical history" and monitored Acosta's medical need for Neurontin over a thirty-day period, id., a process that exhibits a level of forethought, caution, and care that is totally unlike the abrupt, mechanical way in which the patients in this case had their prescriptions discontinued. Finally, in Acosta, there was evidence that Acosta told medical staff that the Tylenol he received helped with his pain and that Acosta did not make clear to his providers that his pain was not effectively controlled by Tylenol. Id. at 35. That is in stark contrast to the patients in this case, who testified that they complained repeatedly about the debilitating nature of their pain and the inefficacy of their treatment.[20]

---

[20] Dr. Moores also cites Lacen v. Aygemong, 2022 WL 14177191 (2d Cir. Oct. 25, 2022) and Reyes v. Gardener, 93 F. App'x 283 (2d Cir. 2004). (See Moores Br. at 17–18.) Each case is not on point for a similar reason: the DOCCS medical providers in those cases took steps to care for their patients that were significantly more responsive and effective than those taken here. In Lacen, when the patient complained of back pain, his providers prescribed him medications, sent him for x-rays, referred him to physical therapy and a neurologist, and gave him extra blankets, a cane, and special shoes. Lacen, 2022 WL 14177191, at *1. His only complaint was (footnote continued)

### iii.   <u>DOCCS' Policy or Custom Violates Federal Law</u>

Dr. Moores asserts that Plaintiffs failed to prove that the mistreatment they complain of was caused by a DOCCS policy or custom. (Moores Br. at 19.) This argument fails. In a declaration filed before this Court, Dr. Moores wrote that the "MWAP Policy placed all decision-making authority into the hands of the [RMDs] regarding the prescription of pain management medication and as a result, many patients were denied the pain treatment they needed." (Dkt. no. 489 at ¶ 13.) Plaintiffs have identified several patients whose effective medications were discontinued when the MWAP Policy was in place who remain insufficiently treated. (<u>See</u> Sections (II)(E)(ii) and (II)(E)(v), <u>supra</u>.) The testimony of these patients demonstrates that that DOCCS' MWAP policy is responsible for ongoing violations of federal law because its impacts remain in place despite its being officially rescinded by DOCCS. In addition, Plaintiffs identified several patients who entered DOCCS'

---

(continued) that he was not given a second mattress on which to sleep. <u>Id.</u> Similarly, in <u>Reyes</u>, Reyes's providers designed a detailed treatment plan that involved scaling Reyes's medications as necessary to treat his sickle cell affliction. <u>Reyes</u>, 93 F. App'x at 284-85. In each sickle cell crisis that Reyes invoked in his complaint, he ultimately received the medication that he wanted. <u>Id.</u> The Court of Appeals held that it was not a case where "defendants refused to treat Reyes's condition, failed to provide prescribed treatment, or placed unreasonable conditions on the receipt of treatment." <u>Id.</u> at 285.

custody after the MWAP Policy was replaced by Policy 1.24A yet had their effective medication discontinued and were told that their medication was not given at their facility. (See Sections (II)(D)(ii), (II)(E)(i), (II)(E)(iv), supra.)[21] This testimony demonstrates that not all facilities or providers have updated their customs and practices following the repeal of the MWAP Policy.[22]

As it did at the preliminary injunction stage, the Court acknowledges that one or two examples of inmates' being denied adequate pain medications might not be sufficient to demonstrate the systemic issues that would support success on the merits of the Plaintiff Class's claim that DOCCS' medical system is deliberately indifferent to its patients' chronic pain needs.

---

[21] Dr. Moores asserts that this testimony is contradicted by her testimony that medical providers in all of DOCCS' prisons were prescribing Ultram, Lyrica, Cymbalta, or Neurontin, as far as she is aware. (Sept. 7 Tr. at 610:6-611:13.) While Dr. Moores' testimony may be true, Dr. Moores did not testify that all of DOCCS' medical providers were prescribing these medications. Thus, the Plaintiffs' testimony may accurately describe the practice at the time they were told these statements or the practice of the providers by whom they were treated, and the Court so finds.

[22] It also does not inspire confidence that several of the patients had their treatments reinstated the day before their depositions were scheduled to go forward in this case, (see Sections (II)(C)(ii), (II)(D)(ii), supra), or following intercessions by Plaintiffs' Counsel on their clients' behalf, (see Sections (II)(B)(i) and (II)(B)(ii), supra).

That is not this case.[23] Here, the totality of the evidence
detailed above demonstrates a pervasive failure across multiple
DOCCS facilities of multiple DOCCS medical providers to provide
reasonable pain medications to inmates suffering from
debilitating pain while actually aware that the lack of
medication would result in such pain – that is, with the
requisite objective pain and subjective state of mind. Thus, the
Court concludes that Plaintiffs have succeeded on the merits of
their Eighth Amendment claim.[24] Because the Court has found
ongoing violations of the Plaintiffs' Eighth Amendment rights,
and that Plaintiffs continue to suffer due to inadequate
treatment, the Court also holds that the remedies available at
law, such as monetary damages, are inadequate to compensate for
this injury.

---

[23] Indeed, the Court could go on to analyze the two-and-a-half-
year delay in treatment to which Mr. Confessore was subjected.
(Sept. 7 Tr. at 532:7-16.) The Court could discuss Mr. Pine's
testimony that his effective medication was discontinued upon
transfer in violation of Policy 1.24A. (Sept. 5 Tr. at 57:23-
58:18.) The Court could examine the "trial and error" approach
Mr. Lindemann received in his care after his provider
"discontinued something that was working." (Id. at 95:9-12.) Any
of these examples could be additional instances of deliberate
indifference. However, because that point has been made, the
Court declines to spill further ink on the issue.

[24] For the reasons above, the Court rejects Dr. Moores' arguments
that Plaintiffs have failed to establish: 1) a "cognizable
danger of recurrent violation;" 2) a "threat of actual, non-
remote and imminent harm that is likely to recur" related to the
MWAP Policy; or 3) anything but a "speculative harm." (Moores
Br. at 25-26.)

C. **The Balance of Hardships and the Public Interest**

Dr. Moores testified at trial regarding several challenges she faced in implementing two pieces of the preliminary injunction order. (Sept. 7 Tr. at 624:17-635:22.) Dr. Moores also raises the principles of "caution, restraint, and deference to state authorities in issuing injunctive relief regarding prison conditions" embodied in the Court of Appeals' precedent Dean v. Coughlin. (Moores Br. at 30 (citing Dean, 804 F.2d at 215). However, as it did at the preliminary injunction stage, the Court finds that remedying the constitutional violations in DOCCS' pain management practices outweighs the administrative challenges DOCCS will face in implementing a permanent injunction and the federalism principles that caution against federal courts' intervening in the administration of state prisons. Therefore, the Court finds that the balance of equities tips in Plaintiffs' favor and that a permanent injunction would be in the public interest. Plaintiffs' motion for a preliminary injunction is GRANTED.

V. **Conclusion**

For the reasons above, Plaintiffs' application to convert the preliminary injunction into a permanent injunction is GRANTED. The Court remains sensitive to the cautions embodied in Dean and Dr. Moores' concerns regarding the implementation of a permanent injunction. As such, the Court will reserve ruling on

the provisions of the permanent injunction until it has heard
from the parties.

When, out of deference to Dr. Moores' expertise as a prison
administrator, the Court gave Dr. Moores the opportunity to
draft the provisions of the preliminary injunction, Dr. Moores
drafted a set of provisions that the Court felt bordered on bad
faith because they applied only to the class members who had
testified at the preliminary injunction hearing. (See dkt. no.
575-1.) To avoid any misunderstandings, the Court provides the
parties with the following instructions regarding their
proposals for the provisions of the permanent injunction.

A good faith proposal shall be applicable to the Plaintiff
Class as a whole. A good faith proposal shall outline how DOCCS
will identify any patients remaining in its care whose effective
pain medications were discontinued under the MWAP Policy and how
DOCCS will assess whether those patients require additional or
alternative treatment to adequately address their chronic pain.
A good faith proposal shall identify the remaining steps DOCCS
must take to ensure that Policy 1.24A is effectively implemented
across all its facilities and adhered to by all its medical
providers.

Keeping these instructions in mind, counsel shall confer
and file a proposal for the provisions of the permanent

injunction. If counsel cannot agree on a single proposal,
Dr. Moores' Counsel and Plaintiffs' Counsel shall file separate
proposals while highlighting for the Court any areas of
disagreement. Whether filing jointly or separately, counsel
shall file their proposal(s) within two weeks of the date of
this opinion.


**SO ORDERED.**

Dated:     October 31, 2023
           New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge